| | |
|---|---|
| 76b-c. Subsequently, on or about February 4, 2000, the Conspirators arranged for MDM Bank to enter into a sham Credit Agreement with GOK for $15 million to be loaned to GOK and repaid within several days. . . . On February 4, 2000, MDM Bank loaned the $15 million to GOK, which Svyatogor guaranteed under a guaranty agreement (the "Guarantee Agreement"). | 376. Subsequently, on or about February 4, 2000, the Conspirators arranged for MDM Bank to enter into a Credit Agreement with GOK for $15 million to be loaned to GOK and repaid within several days. On February 4, 2000, MDM Bank loaned the $15 millon to GOK, which Svyatogor . . . guaranteed under a guaranty agreement (the "Guarantee Agreement.") |
| 76d. Under the terms of Guarantee Agreement, GOK was to pledge its promissory notes for approximately $25 million as "security" for Svyatogor's issuance of Guarantee. | 378. Under the terms of Guarantee Agreement, GOK was to pledge its promissory notes for approximately $25 million as "security" for Svyatogor's issuance of Guarantee. |
| 76e. Subsequent to GOK's delivery of its promissory notes to Svyatogor, on February 10, 2000, GOK wired the $15 million it had obtained from MDM Bank to Svyatogor, through an American Bank, as GOK's contribution to the "Joint Venture." | 379. Subsequently to GOK's delivery to Svyatogor of its promissory notes, on February 10, 2000, GOK transferred to Svyatogor's account with MDM Bank about $10 million as its contribution to the "Joint Venture." Upon information and belief, the remaining $5 million was also transferred to Svyatogor's account with MDM Bank. |
| 76f. On February 10, 2001, GOK "defaulted" on its obligation to repay the $15 million "loan" from MDM Bank. | 380. On February 10, 2001, GOK "defaulted" on its obligation to repay MDM Bank for the $15 million loan. |
| 76g. The following day, Svyatogor, as guarantor under the Guarantee Assessment, wired $15 million to MDM Bank, through an American Bank. | 381. The following day, Svyatogor paid $10 million to MDM Bank from its account with MDM Bank pursuant to the Guarantee. Upon information and belief, Svyatogor paid the remaining $5 million to MDM Bank from its account with MDM Bank. |
| 76h. Pursuant to the terms of the Guarantee Agreement, after the "default," Svyatogor became the holder of the GOK promissory notes for $25 million . . . . | 382. Pursuant to the terms of the Guarantee Agreement, after the "default," Svyatogor became the holder of the promissory notes for $25 million. |
| 76i. Just 10 days later, on or about February 21, Svyatogor transferred the promissory notes to Lebaut. | 383. Just 10 days thereafter, on or about February 21, Svyatogor transferred the promissory notes to Leybout. |

| | |
|---|---|
| 77. Thus, as a result of this "transaction," the Conspirators arranged for $15 million to circulate through GOK's and Svyatogor's accounts, and, in return, obtained $25 million of GOK notes for literally nothing. | 384. Thus, as a result of this "transaction," the Conspirators arranged for $15 million to circulate . . . through GOK's and Svyatogor's accounts, and, in return, obtained $25 million of GOK notes. |
| 78. Through the use of this and various other sham transactions during the period of five days from February 18 to February 23, Lebaut accumulated a total of 53 GOK promissory notes with a face value of approximately $39 million. | 385. . . . [T]hrough the use of various sham contracts during the period of five days from February 18 to February 23, Leybout accumulated a total of 53 GOK promissory notes with a face value of approximately $39 million. |
| **GOK's Sham Bankruptcy** | **The Sham Bankruptcy of GOK** |
| 79. Following the "last chance" meeting with Malevsky, the Conspirators arranged for a false bankruptcy to take place in order to cement their control over GOK, causing a local natural gas company to file an involuntary bankruptcy petition against GOK on March 24, 2000. | 387. Following the "last chance" meeting with Malevsky, the Conspirators arranged for a false bankruptcy to take place in order to cement their control over GOK, causing a local natural gas company to file an involuntary bankruptcy petition against GOK on March 24, 2000. |
| 80. Prior to initiation of bankruptcy proceedings, GOK's debt to "Krasnouralskmezhraygaz" ("Krazgaz"), its gas supplier, amounted to $810,000 caused by the Conspirators' deliberate nonpayment of natural gas bills for January, February, and March 2000, -- the time period after they took over GOK. At the instigation of the Conspirators, on February 4, 2000, Krazgaz demanded that GOK pay the debt even though an agreement had been reached to pay the debt over time. | 388. The gas company's receivables were not overdue under the terms of a prior settlement agreement with GOK, and thus under Russian Law, they could not be used as a basis for the bankruptcy petition. |
| 81. Despite the fact that GOK had on its bank account funds nineteen times greater than the amount of its debt to Krasgaz, on February 8, 2000, Kozytsin refused to payoff the debt due to "lack of monetary funds at GOK." | |
| 82. On February 21, 2000, Kozitsin again | |

| | |
|---|---|
| rejected a collusive demand to pay the debt despite the availability of the funds exceeding $2 million; thereafter, in collusion with Kozitsin, Krasgaz filed a petition placing GOK in involuntary bankruptcy. | |
| 83. On or about March 30, 2000, the Sverdlovsk Arbitrazh Court accepted the bankruptcy petition and appointed Oleg Kozyrev ("Kozyrev"), an agent of the Conspirators, as provisional manger [sic] of GOK. | 389. . . . [O]n or about March 30, 2000, the Sverdlovsk Arbitrazh Court . . . accepted the bankruptcy petition and appointed Oleg Kozyrev as provisional manger [sic]. |
| 84. On or about August 11, 2000, Kozyrev held the first meeting of creditors where Lebaut's fraudulent claim amounted to 94% of creditor votes. As a result of the first creditors meeting, Kozyrev was nominated as external manager of GOK. Under Russian Law, an external manager has management authority over a company. Thus, the appointment allowed the Conspirators to avoid the risk that a court could invalidate the decision to remove Khaidarov and return him to the position of the general director of GOK as well as give them time for the subsequent conversion of GOK shares from the Plaintiff companies. | 391-93. On or about August 11, 2000, Kozyrev held the first meeting of creditors where Leybout's fraudulent claim amounted to 94% of creditor votes. As a result of the first creditors meeting, Kozyrev was nominated as external manager of GOK. Under Russian Law, an external manager has management authority over a company. Thus, the appointment allowed the Conspirators to avoid the risk that a court could invalidate the decision to remove Khaidarov and return him to the position of the general director of GOK. |

| | |
|---|---|
| 85-86. Shortly thereafter, on August 22, 2000, the court held a hearing to approve the decision of the first meeting of the creditors to appoint Kozyrev as external manager.<br>The Sverdlovsk Oblast government, controlled by Roussel, filed a petition in support of the approval of the appointment of Kozyrev in order to send a signal to the court, which approved the appointment of Kozyrev. | 394. Shortly thereafter, on . . . August 22, 2000, the [court] held a hearing to approve the decision of the first meeting of the creditors.<br><br>The Sverdlovsk Oblast government controlled by Roussel filed a petition in support of the approval of the appointment of Kozyrev in order to send a signal to the Court, causing the SAC to approve the appointment of Kozyrev. |
| 87. As shareholders, Plaintiffs had no standing under the Russian bankruptcy law to challenge these actions. | |
| **The Fraudulent Transfers of Plaintiffs' Shares in GOK** | |
| 88. After Kozyrev was appointed as external manager in August 2000, the Conspirators arranged for Plaintiffs to be removed from the registry of GOK shareholders and for their shares to be transferred secretly to Delaware shell companies New Start and Venitom and other companies controlled by the Conspirators.<br>This tactic is a relatively common method in Russia by which organized crime groups seize control of economic enterprises. | 395-96. After Kozyev was appointed as external manager in August 2000, the Conspirators arranged for . . . Plaintiffs to be removed from the registry of shareholders of GOK and for shares . . . to be secretly transferred to Venitom, Unidale, and Investland.<br><br>This tactic is a relatively common method in Russia by which organized crime groups seize control of economic enterprises. |
| **The Davis Shares** | **The Fradulent Transfer of the Davis Shares** |
| 89. On or about September, 2000, the Conspirators had Kozyrev change the registrar of shares of GOK to VRK Company, a registration company controlled by the Conspirators through UGMC, which was a shareholder of VRK. | 397. On or about September 30, 2000, the Conspirators had Kozyrev change the registrar of shares to VRK Company, a "friendly" company organized by Ural-Electromed, the company which was used to create the false debt described above, and where Kozytsin was one of the key employees. |

|  |  |
|---|---|
| 90. On or about October 18, 2000, the VRK Company registered a transfer of 35,106,022 shares of GOK from Davis to New Start, which constituted 18.39% of issued and outstanding GOK shares and all of the shares owned by Davis. | 399. On or about October 18, 2000, the VRK Company registered a transfer of about 35 million shares of GOK from Davis to New Start Group Corporation ("New Start"), a company organized under the laws of the state of Delaware. |
| 91. In order to cloak the transfer with the appearance of legitimacy, the Conspirators arranged for Mr. Ashenbrenner, a prior agent of Davis, to submit to VRK an invalid, not notarized and unauthorized power of attorney which purportedly authorized him to transfer shares from Davis to New Start. The only power of attorney that has ever been issued to Ashenbrenner had been revoked on or about September 28, 2000 -- three weeks before the fraudulent transfer. VRK, according to its own Charter, improperly accepted the transfer order signed by Ashenbrenner even though the order was not executed with Davis' corporate seal and the power of attorney issued from the name of the company and submitted by Ahsenbrenner was not an original document. | 400. In order to cloak the transfer with the appearance of legitimacy, the Conspirators arranged for Mr. Ashenbrenner, a prior agent of Davis, to submit to VRK a power of attorney authorizing him to transfer shares from Davis to New Start. This power of attorney, however, had been revoked on or about September 28, 2000 -- thee weeks before the fraudulent transfer. |
| 92. Furthermore, in order to give the transfer of the Davis shares appearance of legality, the Conspirators, on or about October 20, 2000, arranged for New Start to make a wire transfer in the amount of $2 million to the order of Davis' account with MDM Bank through an American bank. The same day, the Conspirators arranged for MDM Bank to wire the above $2 million from Davis' MDM Bank account. This transfer was based on a forged payment order executed by Ashenbrener. The order was not executed with Davis' corporate seal.<br>At no time did Davis authorize Ashenbrener to execute any payment orders on its behalf. | 401-02. Furthermore, in order to give the transfer of the Davis shares appearance of legality, the Conspirators, on or about October 20, 2000, arranged for New Start to make a wire transfer in the amount of $2 million to Davis' account with MDM Bank [through an American bank.]. Three days later, the Conspirators arranged for MDM Bank to wire the above $2 million from Davis's MDM Bank account . . . This transfer was based on a forged payment order executed by Ashenbrener. . .<br><br>At no time did Davis authorize Ashenbrener to execute any payment orders on its behalf. |
| 93. Moreover, Davis would never agree to |  |

| | |
|---|---|
| sell its 35 million shares constituting 18.39% of all issued and outstanding GOK shares for $2 million. | |
| 94. The Davis shares, in whole or in part, were registered in the names of New Start and Venitom. There has never been litigation related to the Davis Shares. | 403. The Davis Shares, in whole or in part, are currently registered in the name of Investland, Unidale, and/or Venitom, having been transferred to them by New Start. |
| **Omni's Shares** | **The Fraudulent Transfer of Omni's Shares** |
| 95. Prior to 2000, Omni purchased its shares in GOK from various entities that had acquired the shares as a result of a judicial sale that occurred in September 1998. As the result, Omni accumulated 34,031,114 shares, which constituted 17.83% of issued and outstanding GOK shares. | 404. Prior to 2000, Omni purchased its shares in GOK from various entities who had acquired the shares as a result of a judicial sale that occurred in September 1998. |
| 96. In the spring of 2000, . . . NPRO Urals . . . filed a lawsuit in the obscure Chelyabinsk Arbitrazh Court to set aside the judicial sale. On August 1, 2000, the court ruled in favor of NPRO Urals and ordered that the shares be re-registered in the name of NPRO Urals. By decision dated October 16, 2000, the appellate division of the court likewise ordered that the shares be re-registered in the name of NPRO Urals, which occurred on or about November 15, 2000. This order was affirmed by the Federal Court for the Ural District on January 4, 2001. | 405-08. In spring 2000, NPRO Urals filed a lawsuit in the Chelyabinsk Arbitrazh Court (ChAC) to set aside the judicial sale. On August 1, 2000, [the court] ruled in favor of NPRO Urals and ordered that the shares be re-registered in the name of NPRO Urals. By decision dated October 16, 2000, the appellate division of [the court] ordered that the shares be re-registered, which occurred on or about November 15, 2000. [This] order was affirmed in January 2001. |
| 97. As a result, Omni was divested of 10,583,063 shares, which constituted 5.54% of the issued and outstanding GOK shares. | |

| | |
|---|---|
| 98. Contrary to Russian law, Omni . . . was never notified of or participated in these proceedings and did not learn of the transfer of its shares until two months after it took place. Court ordered transfer of property of persons who are not named as parties and not provided notice or an opportunity to be heard in violation of Russian law is emblematic of corruption in Russia. | 409. Contrary to Russian law, Omni was never notified of or participated in these proceedings and did not learn of the transfer until two months after it took place. |
| 99. After Omni had learned of the transfer of its shares, its representative appeared at the January 4, 2001 hearing and petitioned to make Omni a party to the proceedings. This request was denied; thus, Omni has never been party to the proceedings even though its shares were transferred. | |
| 100. Several defendants in the NPRO Urals lawsuit, who had sold the shares to Omni, filed applications for protest at the Supreme Arbitrazh Court of the Russian Federation, seeking to reverse these decisions. Two of the applications were denied on February 12, 2001, and May 21, 2001, by Judge Arifulin, and another application was denied on July 4, 2001, by Judge Yukov. | |
| 101. In *Films By Jove v. Berov,* 2003 U.S. Dist. LEXIS 6233 (E.D.N.Y. Apr. 16, 2003), Judge Trager of the Eastern District of New York found that a decision in which Judge Arifulin was involved was obtained through corruption. | |
| 102. Omni's shares were registered in whole or in part in the name of Venitom and other companies controlled by the Conspirators, even though it was not named and did not participate in the proceeding. | 410. Omni's shares are currently registered in whole or in part in the name of Investland, Unidale, and/or Venitome. |

| **Foston's Shares** | **The Fraudulent Transfer of Foston's Shares** |
|---|---|
| 104. As of September 2000, Foston owned 37,799,600 shares, which constituted 19.8% of issued and outstanding GOK shares. | |
| 105. In 2000, three companies owned and controlled by the Conspirators sued Foston in Moscow, seeking to invalidate the sale of shares to Foston. Foston was never notified of the proceedings and, instead, a forged power of attorney was submitted to the court purportedly on behalf of Foston; presumably, an impostor appeared on behalf of Foston. | 411-12. In 2000, three Russian plaintiffs sued Foston for a declaration that Foston was required to transfer its shares in . . . Moscow. Foston was never notified of the proceedings and, instead, a forged power of attorney was submitted to the Court purportedly on behalf of Foston. |
| 106. On September 29, 2000, absent any opposition, the court ordered the transfer of 37,715,081 of the Foston's GOK shares which consisted of 19.75% of the Gok shares to the Conspirators' companies. Subsequently, on October 18, 2000 the transfer has been registered on the books of the registrar company VRK controlled by UGMC. | 413. On September 29, 2000, absent any opposition, the Court ordered the transfer of 1.2 million GOK shares owned by Foston to these [the Conspirators'] companies, which are owned and controlled, directly or indirectly, by the Conspirators. |
| 107. Only in October 2000, Foston accidentally learned of the transfer of its shares. When Foston attempted to investigate what had occurred, the court files were stolen. | 414-15. Foston was never notified of the . . . proceedings, and Foston learned that its shares in GOK were transferred on October 31, 2000. . . . Shortly thereafter, the original file in the . . . court was stolen. |
| 108. Although a final decision of the Russian court compelling the return of these shares was entered in October 30, 2003, the Conspirators in the person of new owners of the stolen shares did not honor the decision. The shares had been transferred by the Russian companies controlled by the Conspirators to other companies, including Venitom. On information and belief, Venitom "paid" for these shares with monies wired through an American bank. | 416. As a result of the original decision, the shares are no longer in Foston's name and instead are owned in whole or in part by Investland, Unidale and/or Venitome. |

| **Holdex's Shares** | **The Fraudulent Transfer of Holdex's Shares** |
|---|---|
| 109. As of September 25, 2000, Holdex owned 30,947,386 shares, which constituted 16.21 % of issued and outstanding GOK shares. | |
| 110. In late 2000, GOK filed a suit in the Kalmykia Arbitrazh Court against Polyprom, the company that sold its GOK shares to Holdex, to declare that the sale of shares to Polyprom . . . was invalid. By order dated November 22, 2000, the Court ruled in favor of GOK . . . and ordered that the shares be re-registered to another Russian company, which occurred on or about December 22, 2000. As the result, Holdex was divested of 2,307,984 shares, which constitutes 1.2% of the issued and outstanding shares. | 417-18, 420. In 2000, a suit was filed by GOK in the Kalmykia Arbitrazh Court . . . against Polyprom, . . . the company that sold its GOK shares to Holdex to declare that the sale of shares to Polyprom was invalid. By order dated November 22, 2000, the Court ruled in favor of GOK and ordered that the shares be re-registered based on the submission of a forged contract allegedly entered between GOK and Polyprom on January 18, 1999. * * * On or about December 22, 2000, the GOK shares owned by Holdex were re-registered as a result of the illegal proceedings to another Russian company. |
| 111-12. Contrary to Russian law, neither Polyprom nor Holdex were notified of, and did not participate in, the proceedings; . . . Polyprom and Holdex did not learn about the decision until about two months after it was rendered. | 419. . . . [C]ontrary to Russian law, neither Polyprom nor Holdex were notified of, did not participate in, the proceedings. Thus, they [Polyprom and Holdex] did not learn about this decision until about two months after it was rendered. |
| 113. Subsequently, hearings have taken place in the Russian courts for which Holdex never received notice; thus Holdex never participated in these proceedings. | 422. Subsequently, KaAC held another hearing on this matter, however, like the previous proceedings in the KaAC, neither Holdex nor Polyprom were notified of the hearing. |
| 114. Ultimately, the shares purchased by Holdex were transferred in whole or in part to Venitom and other companies controlled by Conspirators. On information and belief, Venitom "paid" for these shares with monies wired through an American bank. | 423. Ultimately, these shares were transferred in whole or in part to . . . Venitome as a result of the above fraudulent litigation proceedings conducted at the direction of the Conspirators. |

| **The Bankruptcy "Settlement Agreement"** | **The Sham Bankruptcy Agreement** |
|---|---|
| 115. After the fraudulent transfer of shares was completed and the Conspirators no longer needed the bankruptcy proceedings, they decided to terminate the bankruptcy by having GOK enter into a settlement agreement with creditors. | 424. After the fraudulent transfer of shares was completed and the Conspirators no longer needed the bankruptcy proceedings, they decided to terminate the bankruptcy by having GOK enter into a sham settlement Agreement with creditors. |
| 116. To that end, on or about March 3, 2001, Kozyrev held a Second Meeting of Creditors. At the meeting, based on Lebaut's huge claim, the creditors approved a sham settlement agreement that, provided that the payments to creditors would be effected without interest pursuant to the following schedule: 5% in 2006, 7% in 2007, 9% in 2008, 9% in 2009 10% in 2010, and 15% each year thereafter until paid. | 425 & 428. To that end, on or about March 3, 2001, Kozyrev held a Second Meeting of Creditors. . . . Based on Leybout's huge claim, a sham settlement agreement was approved which provided that the payments to creditors would be effected without interest pursuant to the following schedule: 5% in 2006, 7% in 2007, 9% in 2008 9% in 2009, 10% in 2010, and 15% each year thereafter until paid. |
| 117. The GOK sham settlement agreement was intended to make the debt owed legitimate creditors worthless while transferring control of GOK to the "new" shareholders. Shareholders had no standing to challenge this agreement under Russian bankruptcy law. | 429. The GOK sham settlement agreement was intended to make the debt owed . . . legitimate creditors worthless while transferring control of GOK . . . to the "new" shareholders. |
| **The False Criminal Charges Against Khaidarov** | **The False Criminal Charges Against Khaidarov** |
| 118. In retaliation for the filing of the Russian litigation to set aside the fraudulent transfer of the shares, the Conspirators arranged for false criminal charges to be brought against Khaidarov. | 435. In retaliation for the filing of the Russian litigation to set aside the fraudulent transfer of the shares, the Conspirators arranged for false criminal charges to be brought against Khaidarov. |
| 119-20. In July 2000, false criminal charges were filed as a result of a well-publicized incident in which the police planted drugs on Khaidarov while he was at the Starlight Diner in Moscow. The police asked Khaidarov for his passport and | 436. In July 2000, false criminal charges were filed as a result of a well-publicized incident in which the police planted drugs on Khaidarov while he was . . . at the Starlight Diner in Moscow. The police asked Khaidarov for his passport and |

| | |
|---|---|
| then "found" a packet of heroin inside. False charges of rape were also brought against Khaidarov. As a result of these false charges and threats on his life, Khaidarov was forced to flee Russia in November 2000, and now lives in Israel under police protection, where he is cooperating with the Israeli, as well as American, authorities in their investigation of Chernoi and his associates. | then "found" a packet of heroin inside. False charges of rape were also brought against Khaidarov. As a result of these false charges and threats on his life, Khaidarov was forced to flee Russia in November 2000 and now resides in another country under protection. |
| **The Illegal Detention of Traum** | |
| 121. Joseph Traum ("Traum") was a managing director of Davis and was also authorized to represent the interests of several other GOK shareholders, including Holdex and Omni. | |
| 122. Subsequent to the illegal takeover of GOK in January 2000, Traum had numerous conversations with Makmudov and Chernoi, during which Makmudov demanded that Traum sell them all of Davis' Gok shares or he would lose his "freedom." | |
| 123. In March 2001, after Makmudov and Aschenbrenner had arranged the theft of all of the GOK shares from Davis, Makmudov threatened Traum with huge problems if he continued to challenge the theft of the shares. | |
| 124. One month later, in April 2001, Traum was in his office in Moscow when Russian police (i.e. special forces) came to his office and directed people to lay on the floor. The police announced that they had information that Traum was a drug dealer, and that there were drugs hidden in the office. The police then put a big package on Traum's desk which they said contained a kilo of heroin. Within a few minutes, Makmudov called Traum and said, "Are you convinced? Now | |

| | |
|---|---|
| you can face 18 years in jail, or you can go to the airport and leave Russia." | |
| 125. A secretary from the office called Khaidarov in Israel to inform him what was occurring. Khaidarov then called the Israeli police to request immediate assistance. Shortly thereafter, the Russian police received a telephone call while in Traum's office and then said he would be free to go. Apparently, Israeli officials interceded on behalf of Traum. | |
| 126. Later, Makmudov called Traum and said that Traum had left him no choice and now he would have to eliminate him. Traum reported this to the Israeli police, who recommended that Traum immediately leave Russia, which he did. He is also cooperating with the authorities in their investigation of Chernoi and his associates. | |
| **The Final Step to Consolidate the Conspirators' Control Over GOK** | |
| 127. In 2003, the Conspirators arranged for GOK to issue new shares in an amount equal to all previously issued shares to companies which they controlled. | |
| 128. As of May 31, 2001, Holdex owned 14.99%, Omni owned 12.28%, and Foston owned 0.044% totaling to about 27% of all of then issued and outstanding GOK shares. | |
| 129. The purpose of this was to dilute the Plaintiffs' remaining shares, since at the relevant time Plaintiffs still owned a blocking amount of GOK shares because under Russian law certain corporate decisions require the approval of 75% plus 1 of the voting shares. | |
| 130. Upon information and belief, the Conspirators used profits obtained from | |

| | |
|---|---|
| their control of GOK to purchase the newly issued shares. Upon information and belief, payment was made through fraudulently obtained funds which were wired to GOK or MDM Bank, directly or indirectly, in dollar denominated amounts through banks in the United States. | |
| 131. Ultimately, the GOK shares illegally taken from Plaintiffs were "sold" to UGMC which then "sold" the shares to EVRAZ in 2004. | |
| 132. Specifically, according to media reports in 2004, the Conspirators via UGMC, which they control, "sold" their controlling interest in GOK, which was illegally taken from Plaintiffs for $500 million, to EVRAZ. | |
| 133. In an attempt to further consolidate their control of GOK, the Conspirators, through intermediaries, approached Holdex and Omni with an offer to purchase their GOK shares. Ultimately, a block of about 52 million shares constituting about 13.64% of issued and outstanding GOK shares was sold for about $27.7 million. | |
| 134. After conclusion of the transaction, Holdex and Omni learned that the shares ultimately end up in the hands of the Conspirators. Apparently, the Conspirators are seeking access to Western financing or equity investment and, thus, are seeking to eliminate minority shareholders through legal means. | |