**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

--------------------------------------------------------------x

DAVIS INTERNATIONAL, LLC, HOLDEX,　　　：
LLC, FOSTON MANAGEMENT, LTD, and　　　：
OMNI TRUSTHOUSE, LTD,　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　Plaintiffs,　　　　：
　　　　　　　v.　　　　　　　　　　　　：　　　Case No. 04-1482-GMS
　　　　　　　　　　　　　　　　　　　　：
NEW START GROUP CORP., VENITOM　　　　：
CORP., PAN-AMERICAN CORP., MDM　　　　：
BANK, URAL-GORNO METALLURGICAL　　　 ：
COMPANY, EVRAZ HOLDING, MIKHAIL　　　 ：
CHERNOI, OLEG DERIPASKA, ARNOLD　　　 ：
KISLIN, MIKHAIL NEKRICH, and　　　　　：
ISKANDER MAKMUDOV,　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　Defendants.　　　 ：

--------------------------------------------------------------x

**DECLARATION OF PAUL B. STEPHAN III**

I, Paul B. Stephan III, declare:

1.      My name is Paul B. Stephan III. I hold the Lewis F. Powell, Jr. Chair and the Hunton & Williams Research Chair at the University of Virginia School of Law. I became a full professor at Virginia in 1985 and have held the Powell Chair since 2003 and the Hunton & Williams Chair since 2004. From 1991 to 2003 I held the Percy Brown, Jr., Chair in Law at Virginia. I received a B.A. in History from Yale University in 1973. I also received an M.A. in Russian Studies from Yale in 1974. After graduating from the University of Virginia School of Law in 1977, I worked first as a law clerk for Judge Levin H. Campbell of the United States Court of Appeals for the First Circuit, and then for Justice Lewis F. Powell, Jr. of the Supreme Court of the United States. A copy of my Resume is attached at A-465 of the Appendix.[1]

2.      I joined the Virginia faculty in 1979 and have taught Soviet and post-Soviet law continuously since then. I have worked for numerous government agencies, law firms, international organizations, nongovernmental organizations, and private businesses as an adviser on matters relating to Soviet and Russian law. In particular, from 1993 to 1998 I was employed by the U.S. Department of Treasury as a consultant on issues relating to tax reform in former socialist countries, with the lion's share of my work in Russia. I have taught or lectured in many legal and research institutions in Russia, as well as Azerbaijan, Georgia, Kazakhstan and Ukraine, and have published a number of books and articles–in both Russia and the United States–dealing with Soviet and Russian law.

---

[1]   The exhibits and other documents referred to herein are contained in the Appendix to the Defendants' motions to dismiss and cited as A-__ .

3.     I have worked with the Russian court system generally, and in particular with the courts responsible for commercial disputes (the so-called arbitrazh courts) for more than a decade. In 1990 the U.S. Agency for International Development, through the National Judicial College, contracted with me to organize and lead a U.S.-based program for the education of Soviet judges, including members of the Russian Supreme Court. In 1990 I also worked with Soviet judges, including members of the Supreme Court of the U.S.S.R. and judges in the arbitrazh system, in my capacity as organizer of an American Bar Association conference on Soviet Law. In 1992, acting on behalf of the American Bar Association's Central and East European Law Initiative, I met with the leadership of the various branches of the Russian court system and led a seminar on judicial training at the Russian Ministry of Justice's judicial training institute. Between 1994 and 1997, acting on behalf of the U.S. Treasury, I worked with the Presidium of the Supreme Arbitrazh Court of the Russian Federation to design and implement a training program for judges in the arbitrazh court system responsible for deciding tax disputes. As part of this program I led classes for arbitrazh court judges in both Moscow and the United States and organized and participated in training seminars for these judges and other Russian officials in both Paris and Vienna. I have maintained professional and scholarly contacts with a number of participants in the arbitrazh court system as well as other members of the Russian judiciary.

4.     I have worked on numerous occasions as an expert on questions of Russian law in the context of a litigated dispute. A list of U.S. lawsuits in which I have offered an opinion on questions of Russian law is attached at A-476.

5.     In Base Metal Trading S.A. v. Russian Aluminum, 00 CIV. 9627 (S.D.N.Y.), the case brought by plaintiffs in the Southern District of New York, I was retained by lead counsel for the defendants to offer an opinion about matters relating to the adequacy of the courts of the

Russian Federation as an alternative forum for the subject matter of that litigation and the validity of Russian legal proceedings that already had occurred in relation to that dispute. The Base Metal Trading amended complaint was substantially similar, if not identical, to the complaint filed by plaintiffs in this case. In Base Metal Trading, I submitted a total of four declarations that are included in the Appendix at A-479, A-514, A-705, A-933. Because of the similarity between the two cases, my declaration here will necessarily restate many of the points made in my Base Metal Trading declarations. As part of preparing those declarations, I reviewed the numerous Russian judicial decisions that pertained to that dispute. Those decisions are again submitted in connection with this declaration and can be found in Volumes 7 through 11 of the Appendix. In Base Metal Trading, based on my review of those decisions as well as of other material submitted in that case, other relevant authorities and my personal knowledge of and experience with Russian law, I stated that that there was no reason to conclude that the Russian courts would not provide an adequate forum, and that the Russian judicial decisions that already have been reached reflected acceptable and fair procedures and applied Russian rules of law that meet general standards for reasonable commercial practice. In granting the motion to dismiss in Base Metal Trading, the court referred to my declarations as support for its decision.[2]

6.      Defendants here (essentially all of whom were defendants in the Base Metal Trading litigation) again have requested my opinion about matters relating to the adequacy of the courts of the Russian Federation as an alternative forum for the subject matter of the litigation brought by Davis International et al., as alleged shareholders or Kachanar GOK "Vanadium" (GOK)[3]

---

[2] Base Metal Trading v. Russian Aluminum 253 F. Supp. 2nd 681, 700-07 (S.D.N.Y. 2003).
[3]  The Russian acronym "GOK" is a generic term meaning "mineral processing company." There are many GOKs in Russia, but, to my knowledge, only one trades under the name "Vanadium." But because the amended complaint uses this acronym as designating the "Vanadium" company, and because there appear to be no other GOKs

and as alleged victims of a purported conspiracy to obtain control of the Russian vanadium industry. The defendants also have requested my opinion about the validity of the legal proceedings that have occurred in Russia with respect to these claims.

7.    In preparing this declaration, I again reviewed the Russian judicial opinions that were at issue in the <u>Base Metal Trading</u> litigation, as well as new Russian judicial decisions and other Russian legal materials that have been adopted since my declarations in that case. None of these new materials has given me grounds to question the conclusions I reached in my <u>Base Metal Tradings</u> declarations; if anything, they strengthen my conclusions in this case.  Based on this review as well as my personal knowledge of and experience with Russian law, I again do not believe that there is any reason to conclude that the Russian courts would not provide an adequate forum. The dispute over the ownership of shares in GOK and injuries alleged to have been suffered as a result of the bankruptcy of GOK have been the subject of litigation in both the arbitrazh court system and in the Russian courts of general jurisdiction. Further judicial review of all of these claims remains available in Russia. In addition, the Russian courts would entertain a claim for damages based on the assertion that the defendants in this suit injured the business interests of plaintiffs through fraudulent or otherwise criminal misconduct. Moreover, those Russian court decisions that already have been reached reflect acceptable and fair procedures and apply Russian rules of law that meet general standards for reasonable commercial practice.

<u>The Russian "Arbitrazh Courts"</u>

8.    The system of "state arbitrazh" arose in the Soviet Union originally as a means of resolving disputes between state-owned enterprises with respect to their contractual relations. It may have been envisioned as an informal means of working out differences between firm

---

involved in this litigation, I will use "GOK'" to refer to "Vanadium."

managers (hence the name "arbitrazh," which is Russian for "arbitration"), but by the Khrushchev period (1953-1964) the system had acquired all the characteristics of a formal, law-oriented court. When the Soviet regime relaxed its controls on private entrepreneurial activity in the late 1980s, the system of state arbitrazh became the logical venue for addressing business law disputes. In July 1991, the Russian Federation enacted a "Law on Arbitrazh Courts" that codified this role, and in March 1992 an "Arbitrazh Procedure Code." The Russian parliament substantially revised both these laws in April 1995 and adopted a new Arbitrazh Procedural Code in July 2002 (APC). The Constitutional Law on Arbitrazh Courts in the Russian Federation, enacted in 1995, established a three-tier system of courts with jurisdiction over commercial disputes, including bankruptcy. Amendments to that law in 2003 added a fourth tier to that system. The name "arbitrazh" continues to exist for historical reasons, but the institution is in every sense of the word a court system. Most English translations refer to the institution as the Commercial Court, a name that accurately captures that body's function.

9.      The arbitrazh court system, as noted in the previous paragraph, comprises four levels of courts. The lowest level arbitrazh courts both consider the "first instance" of cases (the analog to a trial in our system) and can hear appeals of decisions of members of that court. These courts also have the right to reopen proceedings in the light of newly discovered circumstances. The second tier consists of courts of appeal created by the 2003 amendment, an innovation still in the process of implementation. The amendment contemplates that twenty such courts, possessing the authority to review both the legality and the reasonableness of decisions of the first-tier courts, will be established by the end of 2005. The Federal Circuit Arbitrazh Courts exercise appellate review (what in Russian terminology is called cassational review) over decisions of the lower courts, including those that already have been appealed within the lower

courts. Ten such courts were created by the 1995 Constitutional Law. The Supreme Arbitrazh Court (sometimes called the Higher Arbitrazh Court), based in Moscow, has original jurisdiction over a limited number of disputes involving the Russian Federation, exercises supervisory review over the other arbitrazh courts, and has the authority to reopen closed cases in light of newly discovered circumstances. Supervisory jurisdiction is roughly analogous to the certiorari jurisdiction of the Supreme Court of the United States, inasmuch as it is appellate in nature and discretionary rather than of right.

10.    One of the functions that the arbitrazh courts perform is winding up the affairs of insolvent private firms through bankruptcy proceedings. Unlike the U.S. system, there are no separate bankruptcy judges; rather, the arbitrazh courts handle bankruptcies as part of their overall responsibilities. These courts also resolve disputes among businesses, including joint stock companies and individuals acting in an entrepreneurial capacity. Their jurisdiction extends to disputes over the fulfillment of contracts, other violations of the rights of enterprises and entrepreneurs, and controversies involving foreign organizations and persons engaged in economic activity.

11.    The Arbitrazh Procedure Code of the Russian Federation makes clear that the court system is to operate under principles of legality and independence. Article 4 protects a citizen's right of access to the courts; Article 5 guarantees the independence of judges; Article 6 prescribes the principle of equality before the law; Article 7 and 8 ensure equal rights to all parties, and Article 9 guarantees the adversarial nature of proceedings. Article 12 protects the rights of persons who lack knowledge of Russian, and Article 11 requires open proceedings except in limited circumstances. Article 41 describes the procedural rights of participants in arbitrazh court proceedings, including the right to present evidence, to ask questions, and to

object to the evidence and questions presented by other parties. Article 56 established the right of an arbitrazh court to summon witnesses to give evidence, and Article 66(4) gives participants the right to petition the court to obtain a summons of witnesses and other evidence. Article 59 guarantees the right of participants to have legal representatives act on their behalf in court.

12.    The fact that not every procedural right available under the Federal Rules of Civil Procedure is identically protected by the Arbitrazh Procedure Code does not render the arbitrazh courts an invalid alternative forum. In particular, while discovery rights are different under Russian law than those that exist in the United States, they are not inadequate. The procedural rules of the arbitrazh court provide for full discovery of evidence relevant to the matter before it. The mechanism for discovery, which is described in Chapter 7 of the Arbitrazh Procedure Code, closely resembles that available in most Western European courts, such as those of Germany or France. The arbitrazh court has clear authority under Articles 66(4), 72 and 73 of the Arbitrazh Procedure Code to procure and preserve all evidence for which a party makes a showing of relevance.

13.    No one who has studied the operation of the arbitrazh court system could honestly claim that it operates perfectly all of the time or that all of the strictures of the Arbitrazh Procedure Code always are honored. Russia has been involved in a difficult transition process involving the replacement of state control over the economy with a system of law-based commercial relations. From the beginning of the transition, however, the country's leadership, with significant U.S. support, has invested in strengthening and protecting the integrity of the judicial system generally, and the arbitrazh courts in particular. My work with participants in the system and study of its operations leads me to conclude that the leadership of the system is committed to making the legal guarantees contained in the Code a reality for all participants. It is realistic

for persons who litigate in these courts to expect a fair and disinterested resolution of business disputes based on the law and evidence.

14.     In practice, the Russian arbitrazh courts have demonstrated an ability to decide bankruptcy cases fairly to creditors. The crisis in the banking industry following the August 1998 collapse of the ruble has presented the greatest challenges to the system. Rossiyskiy Credit Bank, Uneximbank, SBS-Agro, and Mezhkombank all have carried out restructurings with partial or full court supervision, and in each case alleged efforts by bank insiders during the period of bankruptcy supervision to strip assets to the detriment of bank creditors were defeated. Other industries similarly have witnessed successful resolutions of bankruptcies under the supervision of the arbitrazh courts. The Russian press has cited Topkinsky Cement in the Kemerovo region and the Amurstal steel enterprise in the Far East as examples of bankrupt firms that have managed to reorganize their operations and retain economic viability. In recognition of the fundamental fairness of Russian bankruptcy procedures, at least one U.S. bankruptcy court has supported the reorganization of Rossiyskiy Credit Bank under way in Russia by enjoining U.S. lawsuits that contravene the protective order of the Russian bankruptcy authorities. *In re Rossiyskiy Kredit Bank,* No. 00-13504 (S.D.N.Y.) (Beatty, J.)

15.     In addition, the arbitrazh courts can handle this dispute expeditiously. Article 134 of the Arbitrazh Procedure Code imposes a sixty-day limit on the preparation of a case for a hearing by the trial court, a period that commences with the filing of the claim. Article 152 then gives the trial court one month from the commencement of the hearing to decide the case. The appeals process is similarly regulated. Some exceptions to this strict time limitation exist, but in general the arbitrazh courts handle the cases before them expeditiously and in much less time than U.S. courts normally take to decide civil disputes.

16.     Besides bankruptcy cases, Russian arbitrazh courts consider disputes between commercial actors, whether legal persons or individuals who have registered as entrepreneurs. In particular, arbitrazh courts have the authority and capacity to determine disputed claims of stock ownership, if the parties to the dispute are commercial actors. An aggrieved shareholder may vindicate its rights through at least two different processes. It may sue directly the person who has contested its ownership of shares of stock. Alternatively, an aggrieved shareholder may sue the registrar of a company's shares to force the registrar to recognize its claim of ownership. In deciding such disputes, the arbitrazh court would apply the Russian Civil Code and other relevant legislation, including the 1996 Federal Law on the Securities Market and the 1995 Federal Law on Joint Stock Companies. Foreign persons have full rights of access to arbitrazh courts with respect to these cases.

17.     Russian arbitrazh courts also have jurisdiction over corporate governance disputes where the aggrieved party is a legal person or a registered entrepreneur. The 1995 Federal Law on Joint Stock Companies provides for judicial oversight of decisions undertaken by the officials, governing bodies, and shareholders of stock companies, both to ensure compliance with statutory law and with the enterprise's own charter and related constitutive instruments. Russian law ensures foreign investors full rights of access to the arbitrazh courts with respect to these issues.

### The Courts of General Jurisdiction of the Russian Federation

18.     The Soviet Union established a system of courts of general jurisdiction along the lines of those existing in Europe. During the Soviet period, these courts had jurisdiction over all judicially cognizable disputes, civil and criminal, except for those involving disputes between state enterprises. Because the system was organized within each of the fifteen Soviet republics,

the Russian Federation had a functioning court system comprising three levels: local courts, regional courts, and the Supreme Court of the Russian Federation. With the dissolution of the Soviet Union and the reorganization of the arbitrazh courts, the Russian Federation courts continued to operate. Under the Code of Civil Procedure (CPC), the current version of which was enacted in 2002 and went into effect on February 1, 2003, courts of general jurisdiction may hear cases involving tort, contract, and other private disputes. In particular, if a dispute involves an individual acting in his or her own capacity, rather than as the agent of an organization, who is not a registered individual entrepreneur, then a court of general jurisdiction, and not an arbitrazh court, will hear the case. The arbitrazh courts and courts of general jurisdiction coordinate their activity so as to avoid duplicative proceedings while ensuring that every lawful claim receives a hearing.

19.    As does the arbitrazh court system, the courts of general jurisdiction operate under principles of legality and independence. The courts have the power to compel production of evidence, including non-party testimony. In all significant respects, the procedural rights of persons who participate in civil proceedings in these courts are the same as those who appear before the arbitrazh courts. Stringent time limits apply to civil cases within these courts, as specified in Article 154 of the Civil Procedure Code. As the arbitrazh courts and also with substantial U.S. support, the courts of general jurisdiction have benefited from significant investments in training and strengthened protection of their integrity. It likewise is realistic for persons who litigate in these courts to expect a fair and disinterested resolution of business disputes based on the law and evidence. Under Russian law, these courts are open to foreigners on a nondiscriminatory basis.

<u>Jurisdiction and Venue Over Defendants</u>

20.    The Russian courts are entitled to hear disputes against all persons at the place where at least one of those persons is located. In situations where a person has multiple locations or there are several defendants with different locations, the plaintiff may choose among those locations. Suits against Russian citizens and organizations that have foreign locations may be brought at the place of the plaintiff's location or wherever the respondent has property. Foreign firms with a representative office or subsidiary in Russia are subject to a court's jurisdiction at the location of the office or subsidiary. Suits against foreign persons who do not have a representative office or a subsidiary in Russia may be brought before the courts if the claim involves a contract that is to be carried out in Russia, is based on a tort or unjust enrichment that occurs in Russia, or the foreign person has consented to jurisdiction.

21.    The Complaint in this case involves allegations that various legal persons (legal entities) and individuals acted together to harm plaintiffs. Were this dispute to be brought in Russia, this case might be heard either by the arbitrazh courts or by the courts of general jurisdiction, depending on how the plaintiffs chose to pursue their claims. Were the plaintiffs, all of whom would be considered legal persons under Russian law, to sue only those defendants who are legal persons, or if the individual defendants had acted in the capacity of registered entrepreneurs, the arbitrazh courts would have jurisdiction over the dispute. In this instance, the plaintiffs could select from among any venue in Russia in which any defendant was located. Were the plaintiffs to include as defendants individuals who had not acted as registered entrepreneurs, the courts of general jurisdiction, and not the arbitrazh courts, would hear the case. The plaintiffs similarly could choose the venue from among those regions in Russia where any of the defendants was located. In either event, it would be possible for a single court to exercise jurisdiction over the entire case. In addition, both the Civil Procedure Code and the

Arbitrazh Procedure Code allow the parties to agree or consent to any venue they wish, subject to certain constraints that do not seem relevant to this dispute. CPC Article 32, APC Article 37.

<u>The Claims Alleged by Plaintiffs</u>

22.    Russian law would recognize claims of the sort raised by the plaintiffs in this case. A few background remarks about Russian law are in order. Although Soviet Russia abolished most private commercial relations shortly after the 1917 revolution, it soon became clear to the Soviet leaders that a limited reintroduction of private commerce would be necessary, and that such commerce would need a legal foundation. Accordingly, Soviet Russia in 1922 adopted a Civil Code that relied both conceptually and literally on the German Civil Code. During the Soviet period, as the scope of private commerce waxed and waned in response to changes in administrative law, this basic legal structure remained in effect and provided the jurisprudential principles for liabilities due to violation of ownership rights. Since the fall of Communism, the Russian Parliament enacted a new Civil Code that resembles the basic private law that exists in most modern capitalist countries. The First Part of the new Civil Code went into effect on January 1, 1995, the Second Part on March 1, 1996, and the Third Part on March 1, 2002.

23.    Russian law thus has had a long connection with the private law of property and contract, even if during the Soviet period its state-run economy did not operate along these lines. The Soviet system also maintained a strong academic expertise in civil law, which was reflected in the training of the judges who came to the arbitrazh courts. For example, Venyamin Yakovlev, the first chairman of the Supreme Arbitrazh Court, the highest body within the commercial court structure, was a distinguished professor of civil law with a particular expertise in the law of property.

24.    The Russian Civil Code now in effect provides full remedies for conversion of property, including for indirect involvement or participation in conversion, and for injuries due to fraud. Russian law also has the capacity to impose liability on persons who abuse the corporate form. The Russian courts have broad remedial powers to make the victims of such injuries whole, and in particular have the authority to award damages for lost profits and other types of injuries. Although Russian law does not provide an exact counterpart to civil liability under the Racketeering Influenced and Corrupt Organizations Act, and in particular would not make treble damages available, in all salient respects it offers equivalent causes of action and remedies to those sought by plaintiffs.

25.    I should note that the normal way of challenging fraudulently procured judicial decisions, or decisions in which there is a claim of lack of notice (which is at the heart of Plaintiffs' claim), would be through appellate review. Plaintiffs allege that several decisions of a first instance arbitrazh court conducting bankruptcy proceedings resulted in a fraudulent injury. Much as a U.S. District Court would review the decision of a U.S. bankruptcy judge, with further review in a Court of Appeal and, ultimately, the Supreme Court, the appellate instance of the arbitrazh court has the capacity to consider allegations of wrongful conduct by the first instance arbitrazh court, and a court of appeal, the Federal Circuit Court and the Supreme Arbitrazh Court also are available to hear such claims. Similarly, a regional court of general jurisdiction (and in the various Republics of the Russian Federation, the Republic Supreme Court), has the capacity to entertain an appeal from a decision of a court of general jurisdiction acting as a first instance court, and the Russian Supreme Court has further authority to review such cases.

26.    If a person injured by a fraudulently procured arbitrazh court decision fails to pursue its right to appellate review of a wrongful decision, the Arbitrazh Procedure Code offers two further means for overturning the improper decisions of a first instance arbitrazh court. First, a party to an erroneous court judgment can petition the Supreme Arbitrazh Court to exercise supervisory jurisdiction over the case. APC Article 292. As a general matter, parties have three months to seek supervisory review of a judgment, once it has entered into force. The Supreme Arbitrazh Court can decide whether to hear the supervisory filing and then may investigate the case to determine whether grounds for reversing a judgment exist. Article 304 of the Arbitrazh Procedure Code sets out the criteria for revising by way of supervision a judgment that already has gone into effect, and in particular authorizes the Court to revise a prior judgment that violates uniformity in the interpretation and application of legal norms. These criteria are reminiscent of those used by the Supreme Court of the United States in considering applications for a writ of certiorari, and the Supreme Arbitrazh Court grants this review with about the same frequency as does the Supreme Court of the United States. Were the Supreme Arbitrazh Court presented with credible evidence of fraudulent procurement of an arbitrazh court judgment, however, there is no reason to believe it would not exercise its jurisdiction by way of supervision.

27.    In addition, the Arbitrazh Procedure Code authorizes persons subject to a court judgment to bring newly discovered circumstances to the attention of the court that issued the judgment. APC Articles 309-17. A person aggrieved by a judgment has three months from the uncovering of circumstances justifying overturning or modifying of an existing judgment to apply for revision. APC Article 312(1). The aggrieved person must first present this application to the court that issued the offending judgment, but then may seek appellate review of the issuing

court's failure to correct its decision. APC Articles 312(1), 317(5). Article 311 requires revision of a prior judgment in seven different circumstances affecting the reliability or integrity of the prior proceeding. Only two of these seven grounds involve a determination of the criminality of the persons that procured the judgment. APC Article 311(2), (3).

28.    The Civil Procedure Code has virtually identical provisions for review of judgments of courts of general jurisdiction that have gone into effect. It provides for appellate review of erroneous or improper judgments, for supervisory review of judgments that have gone into effect, and for the reopening of judgments based on newly discovered circumstances. Anyone subject to a judgment in force from such a court has three months from the discovery of new evidence to attack that judgment. CPC Article 394.

29.    In addition to these avenues for directly attacking a wrongful judgment under Russian law, an aggrieved party may bring a civil suit for damages caused by fraud or any other violation of a legal duty. Article 1064 of the Civil Code creates a general obligation to compensate for harm caused by violation of a legal duty. Article 1102 creates a general obligation to return property unjustly obtained and Article 1107 mandates compensation for injury caused by unlawful taking of property. Furthermore, Article 1103(4) requires compensation for unjust enrichment resulting from the bad faith conduct of someone who has been enriched thereby. Actions brought under these Articles are not predicated on prior proof of criminal misconduct, although proof of violation of a criminal law may establish the breach of a duty or wrongful basis for the retention of property.

30.    In cases where a person alleges injury resulting from a criminal act, Russian law supplies a procedure that allows the victim to seek private compensation in tandem with the state's prosecution of the crime. Plaintiffs' claims, if substantiated, might establish a violation

of Article 294(1) of the Criminal Code of the Russian Federation (RCC), which forbids interference with the activity of a court for the purpose of obstructing justice, or RCC Article 305(1), which criminalizes the knowing issuance of an unjust judicial act. Proof of violation of one or the other of these Articles in turn would establish an element of a claim for damages under Articles 1064 or 1102 of the Civil Code. In the course of prosecution under either of the Criminal Code provisions, the victim may invoke Article 44 of the Criminal Procedure Code. This provision allows the victim to take advantage of the prosecution's evidence, to otherwise participate in the criminal trial, and to recover monetary compensation pursuant to its civil claim as part of the criminal proceeding. However, Article 31(3) of the CPC indicates clearly that this procedure is optional rather than mandatory, and that a person injured by criminal misconduct does not have to join his claim to the criminal prosecution to obtain compensation.

31.    Various provisions in the Civil Code and other Russian legislation contemplate holding the participants in a firm liable for the firm's debts. Article 56(3) of the Civil Code, for example, hold responsible persons liable for the debts of a firm in cases where those persons caused the firm's bankruptcy. Article 3(3) of the Law on Joint Stock Companies reinforces this point. Article 6 of the Law on Joint Stock Companies further provides for a parent company's liability in cases where a subsidiary carries out the instructions of the parent. More generally, Article 1080 of the Civil Code provides for joint and several liability for persons who cause harm, a concept that would extend to persons that use a corporate shell as part of a broader scheme to defraud.

32.    In light of these aspects of Russian civil law, I am confident that the plaintiffs, if they could prove that the defendants acted in an unlawful manner to injure their business interests, could obtain a satisfactory and sufficient remedy from the Russian courts.