2

Westlaw.

Not Reported in F.Supp.
1990 WL 168273 (E.D.Pa.)
**(Cite as: 1990 WL 168273 (E.D.Pa.))**

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Daniel H. CALLAHAN, et al.
v.
COMMONWEALTH LAND TITLE INSURANCE COMPANY, et al.
Daniel H. CALLAHAN, et al.
v.
CONGRESS ABSTRACT CORPORATION, et al.
**Civ. A. Nos. 88-7656, 88-8319.**

Oct. 29, 1990.

James J. Freeman, Yeadon, Pa., for plaintiffs.

Patrick T. Ryan, Drinker Biddle & Reath, Philadelphia, Pa., for Montgomery Service Corporation.

Edward J. Hayes, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for Academy Abstract Corp.

Edward J. Hayes, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for Congress Abstract Corp., Meridian Title Ins. Co., American Title Ins. Co., Beneficial Abstract Co., Inc., the Title Insurance Co. of Pa. and Assurance Abstract Co.

John C. Christie, Jr., Bell, Boyd & Lloyd, Washington, D.C. and Edward J. Hayes, Philadelphia, Pa., for Chicago Title Insurance Company.

Thomas F. Sacchetta, Tollen & Proctor, Media, Pa., for Industrial Valley Abstract Company.

*MEMORANDUM AND ORDER*

HUTTON, District Judge.

*1 Presently before the Court are the parties' [FN1] Joint Petition to Make Final the Preliminary Approval of Settlement (the "Joint Petition"); Petition of Plaintiffs to Make Final the Preliminary Approval of the Settlement between Defendants Conestoga Title Insurance Co. and Abstracting Co. of Delaware County (the "Conestoga and Abstract Petition"); and the Petition for Attorney's Fees and Costs submitted by plaintiffs' counsel. For the following reasons, the Joint Petition, the Conestoga and Abstracting Petition (sometimes collectively referred to hereafter as the "Parties' Settlement Petitions") and the Petitions for Attorney's Fees and Costs are GRANTED.

I. *Facts and Procedural History*

Plaintiffs brought this class action litigation challenging the conduct of several companies and agencies that underwrite or sell title insurance. These entities are alleged to have employed title clerks whom over a period of time charged notary fees in connection with real estate closings that exceeded limits imposed under Pennsylvania law. This action includes two related lawsuits filed with this Court during 1988: *Callahan, et al. v. Commonwealth Land and Title Insurance Company, et al.,* Civ. No. 88-7656 (E. D.Pa.1988) (*Callahan I*) and *Callahan, et al. v. Congress Abstract Corporation et al.,* Civ. No. 88-8319 (E.D.Pa.1988) (*Callahan II*). These actions were consolidated by Order of this Court dated October 2, 1990. Jurisdiction over the subject matter of the controversy is based upon 28 U.S.C. § 1331.

*Callahan I* was commenced October 4, 1988 by Daniel H. Callahan, Holly Mae Dickerson and Dorothy Judge on their own behalf and on behalf of a class of plaintiffs consisting of individuals who bought and sold real property in the Commonwealth of Pennsylvania and who paid for the services of the defendants in the conduct of real estate settlements. *Callahan II* was commenced October 28, 1988 naming twelve additional defendants and containing allegations similar to those set forth in *Callahan I.*
In early December 1988, several defendants moved to dismiss both actions pursuant to Fed.R.Civ.P.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1990 WL 168273 (E.D.Pa.)
**(Cite as: 1990 WL 168273 (E.D.Pa.))**

Page 2

12(b)(6), 12(b)(1), 9(b) and for summary judgment under Rule 54. Amended complaints were filed with the Court on December 19, 1988. Thereafter, by Order dated December 28, 1988, the defendants' motions were denied as moot.

The defendants in both suits consist of companies and agencies that underwrite or sell title insurance and who employed title clerks to preside at closings and to notarize certain documents relevant to settlement transactions. The gravamen of the complaint is that the defendants knowingly allowed the notary public/title clerks to charge the plaintiffs and class members notary fees for services that were not performed and for notary services that were not needed in violation of Pennsylvania law. [FN2] The complaint further alleges that the overcharging was the product of a conspiracy between the defendants, their agents and title clerks.

*2 The amended complaints in both actions allege violations of federal law and pendant state law claims. The federal causes of action comprise the Sherman Antitrust Act, 15 U.S.C. § 1, Clayton Antitrust Act, as amended, 15 U.S.C. §§ 13(a) and (c), 15 and 26, the Civil Rights Act of 1866, 42 U.S.C. §§ 1983 and 1988, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Pub.L. 91-452, Title IX, 84 Stat. 941, as amended, 18 U.S.C. §§ 1962(a), (b), (c) and (d) and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2607(c) and (d)(2). The state law claims consist of common law negligent supervision and entrustment, conspiracy and Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa.Stat.Ann. tit. 73, § 201 *et seq.* (Purdon Supp.1990). Equitable relief is also sought.

This Court, by Order dated February 22, 1990, approved the Parties' Settlement Petitions [FN3] and authorized dissemination of a notice of the preliminary settlement agreements in four newspapers of general circulation within the Commonwealth of Pennsylvania on or about March 5, 1990 and March 12, 1990. The Court also fixed a date for entertaining written objections and scheduled a hearing to assess the reasonableness, fairness and adequacy of the proposed settlements and to ascertain whether the proposals should be approved and final judgement entered thereon. Due to errors in the initial publication of the notice in the Pittsburgh Press and Scranton Times, this Court, by Order dated March 29, 1990, rescheduled the deadline for postmarking written objections to May 14, 1990 and the hearing date to June 18, 1990. Pursuant to this Court's Orders, plaintiffs' counsel arranged newspaper publication of the notice informing all the class members of the purpose for and date of the hearing. Specifically, the notice advised of the pendency of the class action and proposed settlements and stated that any member of the putative class could appear and be heard at the hearing if they wished to object. Proof of mailing of the notice was included with the Joint Petition and the Conestoga and Abstract Petition which were filed with the Court on June 15, 1990 and October 15, 1990, respectively.

The hearing was held as scheduled on June 18, 1990. Counsel for the plaintiffs and the settling defendants were present. [FN4] The hearing inquired into all issues relevant to class certification, the merits of the case and the specifics of the settlement proposals. The Court, having considered the arguments of the parties at the hearing and their written submissions in support of class certification and final approval of the settlement agreements, certifies the class and determines upon an independent review of the proposals that they are fair, adequate and reasonable.

II. *The Settlement*
A. *The Joint Petition*

The terms of the proposed settlement accompanying the Joint Petition are set forth in detail in the settlement agreement attached thereto as Exhibit "A". In summary, the settlement is between the settling defendants and the plaintiff class which consists of all individuals and entities who paid notary fees in connection with the settlement of real property involving one or more of the settling defendants within the Commonwealth of Pennsylvania from October 1984 through October 1988. The settlement requires the settling defendants to charge notary fees in a lawful manner in accordance with the Notary Public Act of 1953. [FN5] Additionally, the defendants are obligated to pay the plaintiffs' counsel fees in an amount not in excess of $150,000 and to underwrite the cost of providing notice to the putative class.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1990 WL 168273 (E.D.Pa.)
(Cite as: 1990 WL 168273 (E.D.Pa.))

Page 3

B. *The Conestoga and Abstract Petition*

*3 Similarly, the terms of this proposed settlement are set forth in detail in the settlement agreement attached as Exhibit "A" to the Conestoga and Abstracting Petition. This proposal does not seek injunctive relief nor payment of counsel fees and expenses associated with notifying the putative class members concerning the settlement. In full settlement of the action, Conestoga Title Insurance Co. and Abstracting Company of Delaware County have agreed to pay $2,500 into a fund that is to be used to underwrite the administration of the settlement and, if awarded by the Court, to pay attorney's fees and taxable costs.

III. *Discussion*
A. *Class Certification*

Before discussing the requirements of Rule 23, this Court is persuaded that the plaintiffs have proffered sufficient evidence to support the existence of a certifiable class. *See* 7A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure*, § 1760 at 115-167 (2d ed. 1986 & Supp.1990) and cases cited therein ("Although not mentioned in the rule, an essential prerequisite of an action under Rule 23 is that there must be a 'class.' "); *see also Zacharjasz v. The Lomas and Nettleton Co.,* No. 87-4303, slip op. at 4-5, 1988 WL 54066 (E.D.Pa. May 23, 1988) (limiting scope of proposed class before proceeding with Rule 23 analysis). This class consists as individuals or entities who beginning in October 1984 employed the services of one or more of the settling defendant title insurance companies and agencies to effect real property settlements in the Commonwealth of Pennsylvania and who were assessed a notary fee in violation of Pa.Stat.Ann. tit. 57, § 167 (Purdon Supp.1990). Far from being vague or amorphous, this class is well defined and plainly ascertainable.

1. *Rule 23(a)*

Courts may approve class actions only after a "rigorous analysis" ensuring compliance with Fed.R.Civ.P. 23. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161 (1982). The parties seek certification under Fed.R.Civ.P. 23(b)(1) and (b)(2). [FN6] Certification of a class under Rule 23(b)(1) and/or (b)(2) first requires that the proposed class meet the prerequisites of Rule 23(a). Fed.R.Civ.P. 23(b). Rule 23(a) authorizes certification of a class provided: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157-60 (1982); *Grasty v. Amalgamated Clothing & Textile Worker's Union,* 828 F.2d 123, 127 (3d Cir.1987), *cert. denied,* 484 U.S. 1042 (1988).

a. *Numerosity*

No magic number exists satisfying the numerosity requirement, nor must the plaintiff allege the exact number or identity of class members. *Moskowitz v. Lopp,* 128 F.R.D. 624, 628 (E.D.Pa.1989) (citing *Dirks v. Clayton Brokerage Co. of St. Louis, Inc.,* 105 F.R.D. 125, 131 (D.Minn.1985)); *see also Zeffiro v. Pennsylvania Bank & Trust Co.,* 96 F.R.D. 567, 569 (E.D.Pa.1983). It is proper for the court "to accept common sense assumptions in order to support a finding of numerosity." *Wolgin v. Magic Marker Corp.,* 82 F.R.D. 168, 171 (E.D.Pa.1979); *see also Piel v. Speiser,* 97 F.R.D. 657, 659 (E.D.Pa.1983). This Court concludes and the parties agree that the numerosity requirement is easily satisfied in this case. The class, as proposed, is estimated to include more than 100,000 people spread throughout the Commonwealth of Pennsylvania. [FN7] It would clearly be impracticable to attempt joinder of all the members of the proposed class. Under these circumstances, certification would serve the goal of economy for the parties and the court which is the hallmark of class actions under Rule 23. *See In re Three Mile Island Litig.,* 95 F.R.D. 164, 165 (M.D.Pa.1982).

*4 b. *Commonality*

"Commonality is not defeated by slight differences in class members' positions or because "all of the allegations of the class do not fit together like pieces in a jigsaw puzzle." *Green v. Wolf Corp.,* 406 F.2d 291, 300 (2d Cir.1968), *cert. denied,* 395 U.S. 977 (1969). "Rule 23 does not require that the representative plaintiff has suffered the same

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1990 WL 168273 (E.D.Pa.)  
**(Cite as: 1990 WL 168273 (E.D.Pa.))**

Page 4

injuries that have been sustained by the class members, only that the harm complained of be *common* to the class, and that the named plaintiff demonstrate a personal interest or 'threat of injury ... [that] is 'real and immediate,' not 'conjectural' or 'hypothetical.' " *Hassine v. Jeffes,* 846 F.2d 169, 177 (3d Cir.1988) (citing *O'Shea v. Littleton,* 414 U.S. 488, 494 (1974). In evaluating commonality, the Court must refrain from considering the merits of the substantive claims. *Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 177- 78 (1974). The court is limited to verifying the existence of common questions of law or fact.

This case presents issues of law and fact common to all of the proposed class members. The primary legal issues in this case pertain to the plaintiffs' civil rights, antitrust, RICO, RESPA and state claims particularly whether the defendants violated Pennsylvania's notary fee schedule. See Amended Complaints in *Callahan I* and *Callahan II,* ¶ 83. These legal issues are common to the entire proposed class as a whole. *See Califano v. Yamasaki,* 442 U.S. 682, 701 (1979). The primary factual issues in this case would appear to be the extent of loss in the settlement transactions that resulted from the overcharging of notary fees. Furthermore, it should be noted that the commonality requirement of Rule 23(a)(2) is not as stringent as that of 23(b)(3) which requires that the common issues predominate in the litigation. *See Wilensky v. Olympic Airways, S.A.,* 73 F.R.D. 473, 477 (E.D.Pa.1977); *see generally* 7 A. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* § 1763 (2d ed. 1986).

c. *Typicality*

The typicality requirement is a safeguard against interclass conflicts, insuring that the named plaintiff's interests are more or less coextensive with those of the class. *Sley v. Jamaica Water & Utilities, Inc.,* 77 F.R.D. 391, 394 (E.D.Pa.1977). Typicality depends upon whether the named plaintiff's individual circumstances are markedly different or whether the legal theory upon which the claims are based differs from that upon which the claims of the other class members will be based. *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.), *cert. denied sub. nom., Weinstein v. Eisenberg,* 474 U.S. 946 (1985); *Weiss v. York Hospital,* 745 F.2d 786, 809 n. 36 (3d Cir.1984), *cert. denied,* 470 U.S. 1060 (1985). Thus, the typicality requirement is met if the plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based upon the same legal theory. *In re Bexar County Health Facility Dev. Corp. Sec. Litig.,* 125 F.R.D. 625, 629 (E.D.Pa.1989) (citing *Zeffiro v. First Pennsylvania Bank,* 96 F.R.D. at 567). "The heart of this requirement is that plaintiff and each class member of the represented group have an interest in prevailing on similar legal claims. Assuming such an interest, particular factual differences, differences in the amount of damages claimed, or even the availability of certain defenses against a class representative may not render his or her claims atypical." *Zeffiro v. First Pennsylvania Bank,* 96 F.R.D. at 569-70. Moreover, the Third Circuit has observed that "typical" does not mean "identical." *See Eisenberg v. Gagnon,* 766 F.2d at 786.

*5 The claims of the class representatives in *Callahan I* and *Callahan II,* are typical of those of the proposed class since they all involve challenges to defendants' alleged conduct in overcharging notary fees in connection with real property settlements. Further, the defenses raised by the defendants against the plaintiffs' claims are also the same as those that are raised against all of the proposed class members.

d. *Adequacy of Representation*

This prerequisite to class certification is based on two factors: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1091 (1975). This prerequisite is of particular importance because a final judgment is binding on all those the court determines are members of the class. 1 H. Newberg *Class Actions* § 3.21 at 19 (2d ed. 1985 & Supp.1990). Plaintiffs' counsel are experienced, have approached this suit with vigor and in the opinion of the court are capable of adequately conducting this litigation. (*See* Affidavit of James J. Freeman and William C. Reil in Support of Petition for Attorney's Fees and Costs dated June 5, 1990.) Further, the defendants have not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1990 WL 168273 (E.D.Pa.)  
**(Cite as: 1990 WL 168273 (E.D.Pa.))**

Page 5

challenged the quality and experience of the plaintiffs' attorneys. The Court as well as the defendants are also unable to detect any basis to conclude that the interests of the named plaintiffs are antagonistic or in conflict with interests of the proposed class.

*2. Rule 23(b)(1)*

Having satisfied the requirements of Rule 23(a), the court must determine whether the class may be certified under Rule 23(b)(1) and/or (b)(2). Rule 23(b)(1) requires that:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

The settling parties under the Joint Petition rely on subsection (A) of Rule 23(b)(1) and argue that any injunctive relief obtained by plaintiffs in individual actions could subject notaries and, therefore, the settling defendants by whom they are employed to inconsistent rulings as to their fee charging obligations. (Transcript of Hearing June 18, 1990, hereafter cited as "Tr." at 21.) The Court agrees that there is a real risk that in the absence of a class certification, courts in separate actions could impose inconsistent obligations on the defendants in trying to fashion injunctive relief to remedy the unlawful charging of notary fees. This is precisely the situation Rule 23(b)(1)(A) is intended to prevent. *See* 1 H. Newberg, *Class Actions* § 1.09 at 15. The Court is also mindful of the ever-present risk in multiple adjudications that one court may find certain activity to violate the law and another may find no violation. *See Bogosian v. Gulf Oil Corp.*, 62 F.R.D. 124, 132 (E.D.Pa.1973), *vacated on other grounds*, 561 F.2d 434 (3d Cir.1977), *cert. denied*, 434 F.2d 1086 (1978) ("[ Rule 23(b)(1)(A) ] requires not only 'inconsistent and varying adjudication,' but such adjudications must establish 'incompatible standards of conduct.' ") The court believes that this analysis applies with equal force to the settlement proposed pursuant to the Conestoga and Abstracting Petition. Thus, this Court finds that certification of the proposed class under Rule 23(b)(1)(A) is appropriate for purposes of the proposed settlements in this action.

*6 *3. Rule 23(b)(2)*

The settling parties to the Joint Petition also seek certification of the proposed class under Rule 23(b)(2) which provides for a class action where the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

In this case, the proposed plaintiff class is challenging the defendants' conduct in charging notary fees in excess of amounts authorized by state law. The injunctive relief sought pursuant to the Joint Petition relates directly to the notary fee charging activities of the defendants and thus provides a remedy for the class as a whole. This case is properly certifiable under Rule 23(b)(2) since the proposed class seeks to define the defendants' relationship to buyers and sellers of real estate in the Commonwealth of Pennsylvania and to preclude the settling defendants from unlawfully assessing notary fees. *See Weiss v. York Hospital*, 745 F.2d at 811.

Further, because the relief sought in the proposed settlement is primarily injunctive, certification is appropriate under Rule 23(b)(2). *See Frazier v. Southeastern Pennsylvania Transp. Auth.*, Nos. 84-2950, 84-3004, slip op. 1989 WL 73791 (E.D.Pa.1989); *Lloyd v. City of Philadelphia*, 121 F.R.D. 246, 251 (E.D.Pa.1988). In *Callahan I and II*, the plaintiffs originally sought monetary as well as injunctive relief. In the proposed settlement accompanying the Joint Petition, however, the plaintiffs have abandoned their claim for money damages and now seek approval of the proposed settlement and its injunctive relief provisions. Certification of the proposed class under Rule

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1990 WL 168273 (E.D.Pa.)  
**(Cite as: 1990 WL 168273 (E.D.Pa.))**

Page 6

23(b)(2) is not precluded by the fact that the settlement provides for counsel fees and reimbursement of the costs of issuing the required notice to the putative class since the primary relief provided is injunctive and the challenged conduct of the defendants is such that injunctive relief would be appropriate. *See Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d at 251 (class action maintainable under Rule 23(b)(2) even though monetary relief is sought as well as injunctive relief). Therefore, this Court finds that for purposes of the settlement proposed pursuant to the Joint Petition, the proposed class can be properly certified under Rule 23(b)(2).

B. *Standards for Approval of Settlement*

Rule 23(e) of the Federal Rules of Civil Procedure mandates court approval of a class action settlement:

A class action shall not be dismissed without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class ...

Fed.R.Civ.P. Rule 23(e) requires the court to review the proposed settlement to make sure that the rights of the participating as well absent class members are not prejudiced or otherwise put in jeopardy by the settlement. *See In re Asbestos School Litig.,* No. 83-0268, slip op. at 21 1990 WL 18761 (E.D.Pa. Feb. 20, 1990); *In re Washington Pub. Power Supply Sys. Sec. Litig.,* 720 F.Supp. 1379, 1378 (D.Ariz.1989). "Compromises of disputed claims are favored by the courts." *Sherin v. Gould,* 679 F.Supp. 473, 475 (E.D.Pa.1987) (quoting *William v. First Nat'l Bank,* 216 U.S. 582, 595 (1910)). Accordingly, while protecting rights of the class members is essential, it has been recognized that apprehension in settling should be tempered by the long standing policy favoring settlements. *See In re Asbestos Litig.,* No. 83-0268, slip op. at 22. *See also Sherin v. Gould,* 679 F.Supp. at 474; *Harris v. Pernsley,* 654 F.Supp. 1042, 1049 (E.D.Pa.1987), *appeal dismissed,* 820 F.2d 592, *cert. denied sub nom., Castille v. Harris,* 484 U.S. 947 (1987); *Daniel B. v. O'Bannon,* 633 F.Supp. 919, 922 (E.D.Pa.1986).

*7 The approval or disapproval of a proposed class action settlement is discretionary with the court. *Georgevich v. Strauss,* 772 F.2d 1078, 1085 (3d Cir.1985), *cert. denied,* 475 U.S. 1028 (1986); *Walsh v. Great Atlantic Pac. Tea Co.,* 726 F.2d 956, 965 (3d Cir.1983). The Court's central concern is whether the settlement is "fair, adequate and reasonable" to the members of the class. *Walsh v. Great Atlantic & Pac. Tea Co., Inc.,* 726 F.2d at 956. The settlement must be both reasonable compared to the likely rewards of litigation and the result of good faith negotiations. *Harris v. Pernsley,* 654 F.Supp. at 1042. (Citations omitted).

In *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975), the Court of Appeals for this Circuit identified the following factors to be considered in determining whether a proposed settlement agreement is fair, adequate and reasonable:

1. The complexity, expense and likely duration of the litigation;

2. The reaction of the class to the settlement;

3. The stage of the proceedings and the amount of discovery completed;

4. The risks of establishing liability;

5. The risks of establishing damages;

6. The risk of maintaining the class action through the trial;

7. The ability of the defendants to withstand a greater judgment;

8. The range of reasonableness of the settlement in light of the best possible recovery; and

9. The range of reasonableness of the settlement fund to a possible recovery in light of all the possible attendant risks of litigation.

521 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974)).

The Court's role in evaluating a proposed settlement is limited. Although the Court may either approve or disapprove the settlement, it may not rewrite it. *Harris v. Pernsley,* 654 F.Supp. at 1049; Manual for Complex Litigation § 30.41 at 237 (2d ed. 1985).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### 1. *Complexity, Expense and Duration of Litigation*

This litigation presents issues which may be costly to resolve and could result in protracted proceedings. Resolution of this controversy would require an evaluation of each overcharge transaction. At the hearing, counsel for both parties indicated that such an inquiry could potentially result in 100,000 to 150,000 mini-trials given the large number of potential class members, defendants and transactions involved. (Tr. at 5, 9-10.) Indeed, counsel for the settling defendant's indicated that burden and costs associated with discovery in this action was a substantial factor in the settlement decision. (Tr. at 24.) [FN8]

### 2. *Class Reaction*

Pursuant to the Orders of February 22 and March 29, 1990, notice of the proposed settlement was disseminated in four newspapers of general circulation in the Commonwealth of Pennsylvania. The notice advised the class that written objections were required to be postmarked by May 14, 1990 and that members could appear at the hearing on June 18, 1990 to object. No objections were filed with the Court and no member of the putative class appeared at the hearing to contest the settlement. Counsel for the parties indicated that while a few request were made for copies of the settlement proposal, no one came forward to object. (Tr. at 14, 44.) The lack of any objection from the class to the settlement is entitled to dispositive weight. *See Fisher Bros. v. Phelps Dodge Indus., Inc.,* 604 F.Supp. 446, 451 (E.D.Pa.1985) (citing *In re Art Materials Antitrust Litig.,* 100 F.R.D. 367, 382 (N.D.Ohio 1983)).

*8 3. *The Stage of the Proceedings*

Although formal discovery was stayed by Order of this Court dated March 6, 1990, [FN9] the plaintiffs did initiate and obtain materials from some of the settling defendants. (*See* Tr. at 17.) Examination of the amended complaints are a strong indication that the plaintiffs had conducted a thorough investigation of the alleged notary overcharges and gathered a sizable quantity of data pertaining thereto even prior to commencing the actions. Moreover, correspondence and other written submissions directed to the Court and the presentations of counsel during the settlement hearing conveys the impression that counsel for the parties exchanged information more than sufficient to adequately negotiate and effectuate fair proposals.

### 4. and 5. *Risk of Establishing Liability and Damages*

This factor requires an examination of the probability of plaintiffs' proving liability and an inquiry into the risks in proving damages. In doing so, however, it is not the function of the Court to resolve the litigation on the merits. To the contrary, "[o]ne of the purposes of a settlement is to avoid the necessity of having the court and jury resolve disputed issues of fact and law ..." *In re Real Estate Title and Settlement Servs. Antitrust Litig.,* 1986-1 Trade Cas. (CCH) ¶ 67,149 at 62, 931 (E.D.Pa.1986), *aff'd without op.,* 815 F.2d 695 (3d Cir.1987) (citing *Florida Trailer & Equip. Co. v. Deal,* 284 F.2d 567, 571 (5th Cir.1960) and *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 456 (2d Cir.1974) ("It cannot be overemphasized that neither the trial court in approving the settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute.")

The plaintiffs have advanced a number of claims which admittedly are predicated upon a somewhat novel application of the law. Indeed, at various stages of this litigation several defendants filed motions to dismiss or for summary judgment. Although the underlying allegations appear to have merit, the viability of some of the claims is suspect. The difficulty of the plaintiffs' case is vividly illustrated by examination of the civil rights, antitrust, RICO and RESPA claims. [FN10]

### a. *Claim Under 42 U.S.C. § 1983*

The thrust of plaintiffs' section 1983 claim appears to be that the title clerks, as notary publics, are officers of the state of Pennsylvania, and by overcharging notary fees acted under color of state law. Liability is asserted solely on account of defendants' as employers of the title clerks/notary publics. Consistent with the views expressed by the defendants [FN11], the court notes its skepticism as to the viability of these claims.

Not Reported in F.Supp.  
1990 WL 168273 (E.D.Pa.)  
**(Cite as: 1990 WL 168273 (E.D.Pa.))**

Page 8

To state a claim under section 1983, a plaintiff must allege: "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cohen v. City of Philadelphia,* 736 F.2d 81, 83 (3d Cir.1984) (citing *Parratt v. Taylor,* 451 U.S. 527 (1981), *cert. denied,* 469 U.S. 1019 (1984)). Defendants claim that plaintiff has failed to allege either prong of a 1983 claim.

*\*9* (1) *Under Color of State Law*

It is axiomatic that no action under section 1983 or the constitution may be brought against a private actor for constitutional violations. *See, e.g., Civil Rights Cases,* 109 U.S. 3 (1883); *Cohen v. City of Philadelphia,* 736 F.2d at 83. This under-color-of-state-law, or state-action requirement [FN12] protects "individual freedom by limiting the reach of federal law and federal judicial power" while it avoids "imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936 (1982).

In *Lugar,* the Supreme Court articulated a two-part test to determine whether the requisite state action was present:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.

*Lugar v. Edmonson Oil Co.,* 457 U.S. at 937. The issue presented in this case is whether the defendants may fairly be deemed state actors merely by virtue of their alleged agency relationship with the title clerk/notary publics. Three tests have been developed to determine whether an entity is a state actor: (1) the symbiotic-relationship analysis; (2) the close-nexus test; and (3) the public-function approach. *Community Medical Center v. Emergency Medical Servs.,* 712 F.2d 878, 880 (3d Cir.1983).

The symbiotic-relationship analysis was defined in *Burton v. Wilmington Parking Auth.,* 365 U.S. 715 (1961), as where:

The State has so far insinuated itself into a position of interdependence with [the acting party] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.

*Id.* at 725.

Under the close-nexus test, the Court in *Blum v. Yaretsky,* 457 U.S. 991 (1982), held that the complainant must show that " 'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.' " *Id.* at 1004 (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351 (1974)).

The public function analysis has traditionally been applied in three situations. First, it has been used when the government, after carrying out a particular function, attempts to void its constitutional obligations by transferring that function to a private entity. *Evans v. Newton,* 382 U.S. 296 (1966). Second, the public function approach has been utilized with respect to those powers almost invariably used by the government. *Terry v. Adams,* 345 U.S. 461 (1953). Finally, the public function analysis has been applied in the First Amendment context to ascertain whether private property was functionally the same as a town, *Marsh v. Alabama,* 326 U.S. 501 (1946), or a business district. *Hudgens v. N.L.R.B.,* 424 U.S. 74 (1976).

*\*10* The defendants do not fall within any of the three test articulated above defining state actors and action. The defendants merely appear to be private actors employing title clerks who may be notaries. Additionally, the novel agency theory upon which the defendants liability is largely predicated is without precedent and would unduly broaden the scope of the statute. [FN13] Finally, even assuming that the defendants could somehow be deemed state actors, the Court notes that the proposition implicit in the plaintiffs' theory is that a person can act under color of state law and violate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

same simultaneously.

*(2) Underlying Constitutional Violation*

The plaintiffs may also have difficulty with the second prong of the section 1983 analysis. The amended complaints allege that the defendants and their title clerks violated the 5th and 14th Amendments of the Constitution "in that they have taken the property of the plaintiffs without due process of law and failed to afford protection of the law to the plaintiffs ... (Amended Complaints, Fourth Count ¶ 170.) Whatever rights the plaintiffs may have been deprived of by virtue of the defendants' alleged conduct, the court is not persuaded that they are rights, privileges or immunities secured by the Constitution.

b. *Claims Under § 1985*

In general terms, section 1985(3) [FN14] renders unlawful any conspiracy to deprive persons of equal protection of the law or of equal privileges and immunities under the law. 42 U.S.C. § 1985(3) (1981). Under this statute, the plaintiff must show some racial or other class-based discriminatory animus that bellies the conspirators' conduct. *See United Bhd. of Carpenter & Joiners v. Scott,* 463 U.S. 825 (1983); *Griffin v. Breckenridge,* 403 U.S. 88 (1971). Moreover, liability for violating § 1985(3) may not be predicated on the doctrine of *respondeat superior. Gant v. Aliquippa Borough,* 612 F.Supp. 1139, 1142 (W.D.Pa.1985). On the strength of the record before it, this Court does not believe that the plaintiffs will be able to satisfy these preconditions for liability under § 1985(3).

c. *Sherman and Clayton Act Claims*

The Court is also uncertain as to whether the plaintiffs could prove a violation of the Sherman and Clayton Acts. Examination of these statutes combined with the facts adduced during the settlement hearing indicate that proving conduct violative of these antitrust laws will be an uphill battle.

(1) *Clayton Act, as amended, 15 U.S.C. §§ 13(a) and 13(c)*

The defendants contend that the plaintiffs' claim under the Clayton Act, 15 U.S.C. § 13(c) [FN15] is defective in that the statute speaks only to tangible goods not services such as those performed by a notary. (*See* Memorandum of Law in Support Motion for Final Approval of Settlement at 11. [FN16]) Section 13(c) [FN17] is restricted to transactions for the sale and purchase of goods, wares or merchandise. While the issue of whether the notary services provided by the title clerks can fairly be construed as commodities or goods, wares or merchandise appears to be one of first impression in this Circuit, a review of case law interpreting section 13(c) in other contexts supports the conclusion that such services, as distinguished from tangible property, may not fall within the scope of the statute. *See, e.g., Union City Barge Line, Inc. v. Union Carbide Corp.,* 823 F.2d 129, 140 (5th Cir.1987) (fuel gauging services); *May Dep't Store v. Graphic Process Co.,* 637 F.2d 1211, 1214 (9th Cir.1980) (production of veloxes to reproduce art work; *Freeman v. Chicago Title & Trust Co.,* 505 F.2d 527, 529-30 (7th Cir.1974) (selling of title insurance); *Fleetway, Inc. v. Public Serv. Interstate Transp. Co.,* 72 F.2d 761, 763 (3d Cir.1934), *cert. denied,* 293 U.S. 626 (1935) (case decided prior to Robinson-Patman Act holding that Clayton Act does not apply to interstate transport of bus passengers); *Fiore v. Kelley Run Sanitation, Inc.,* 609 F.Supp. 909, 916 (W.D.Pa.1985) (issuing permits to operate landfills); *Stutzman Feed Serv., Inc. v. Todd & Sargent, Inc.,* 336 F.Supp. 417, 419 (S.D.Iowa 1972) (payment of commission for obtaining contract for construction of feed mill.) [FN18]

*11 The claim under 15 U.S.C. § 13(a) suffers a similar defect. Section 13(a) deals exclusively with "commodities." [FN19] Courts have held that the term "commodities" used in the statute connotes tangible goods not services. *See Consolidated Gas Co. of Florida, Inc. v. City Gas Co. of Florida, Inc.,* 655 F.Supp. 1493, 1546 (S.D.Fla.1987); *Advanced Office Sys., Inc. v. Accounting Sys. Co. Inc.,* 442 F.Supp. 418, 421 and n. 5 (D.S.C. Greenville Div.1977); *Kennedy Theater Ticket Serv. v. Ticketron, Inc.,* 342 F.Supp. 922, 926 (E.D.Pa.1972) ; *Record Club of America, Inc. v. Columbia Broadcasting Sys.,* 310 F.Supp. 1241, 1243 (E.D.Pa.1970); *Gaylord Shops, Inc. v. Pittsburgh Miracle Mile Town & Country Shopping Center, Inc.,* 219 F.Supp. 400, 403 (W.D.Pa.1963).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1990 WL 168273 (E.D.Pa.)
**(Cite as: 1990 WL 168273 (E.D.Pa.))**

Page 10

*(2) Sherman Act, 15 U.S.C. § 1*

Section 1 of the Sherman act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations ..." 15 U.S.C. § 1 (1984). The plaintiffs allege that the defendants conspired horizontally to fix and control the price of notary fees. This conspiracy is alleged to involve the defendant title companies and their title clerks, real estate brokers and the conveyancing departments of real estate firms. Plaintiffs' also assert that the defendants represent approximately 90% of the market share for title insurance in the eastern United States and by virtue of that concentration have monopoly or have attempted or conspired to monopolize that market. Plaintiffs contend that this conduct has lessened competition and substantially impacted interstate commerce.

Section 1 prohibits only unreasonable restraints on trade. *National Collegiate Athletic Assn. v. Board of Regents of the University of Oklahoma,* 468 U.S. 85, 98 (1984). The framework for analyzing activity under section 1 was recently summarized in *Business Elecs. v. Sharp,* 485 U.S. 717 (1988) as follows:

Ordinarily whether particular concerted action violated section 1 of the Sherman Act is determined through a case-by-case application of the so-called rule of reason--that is "the fact finder weighs all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition" ... Certain categories of agreements, however, have been held per se illegal, dispensing with the need for a case-by-case evaluation. We have said that per se rules are appropriate only for "conduct that is manifestly anticompetitive," ... that is " 'conduct that would always or almost always tend to restrict competition and decrease output' " ...

485 U.S. at 723 (citations omitted). Horizontal price-fixing arrangements are considered per se violations of the antitrust laws because of their pernicious effect on the economy. *See Copperweld v. Independence Tube Co.,* 467 U.S. 752, 768 (1984); *see also White Motor Co. v. United States,* 372 U.S. 253 (1963); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150 (1939). In *United States v. Socony-Vacuum Oil Co.,* the Supreme Court stated:

*12 Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate commerce is illegal per se ... Proof that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that result is proof of the completion of a price-fixing conspiracy under § 1 of the Act."

310 U.S. at 223-224. The court went on to state that "[w]hatever justification particular price fixing agreements may be thought to have, the law does not permit inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." 310 U.S. at 226 n. 59. The proscription applies whether its an agreement to set minimum or maximum prices. *Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 346-48 (1982).

Although complete discovery may support a section 1 claim, the facts revealed during the settlement hearing are not conclusive. First, section 1 reaches only concerted activity, it does not reach conduct that is "wholly unilateral." *Copperweld v. Independence Tube,* 467 U.S. at 768 (citing *Albrecht v. Herald Co.,* 390 U.S. 145, 149 (1968)); *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 760 (1984). The facts before the court are not sufficient to the exclude the possibility that the defendants were acting anything but independently. *See Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 457 U.S. 574, 588 (1986). There is nothing to suggest that there was a conscious commitment to engage in conduct violative of the antitrust laws, *Edward Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911 (1981), or that a tacit or mutual understanding existed, *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 540-41 (1954); *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 446-47 (3d Cir.1977), *cert. denied,* 434 U.S. 1086 (1978), sufficient to establish the required contract, combination or conspiracy for section 1 purposes. These transactions appear to a series of isolated events.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.