1986 WL 15374                                                                                                               Page 4
1986 WL 15374 (D.Del.), RICO Bus.Disp.Guide 6369, RICO Bus.Disp.Guide 6370
**(Cite as: 1986 WL 15374 (D.Del.))**

711 F.2d 1217 (5th Cir.1983) (applying Texas law); *see generally,* 6 A.L.R. 4th 195 *et seq.* Nevertheless, in a small number of cases where liability was upheld the plaintiff did enter voluntarily into a contract with the third party, although on terms allegedly more unfavorable than plaintiff would have obtained but for the interference of the defendant. *See Frank Coulson, Inc.-Buick v. General Motors Corp.,* 488 F.2d 202 (5th Cir.1974) (applying Florida law); *Leibovitz v. Central Nat'l Bank,* 75 Ohio App. 25, 60 N.E.2d 727 (1944).

Plaintiff voluntarily entered into a contract with Robertshaw, albeit on terms allegedly more unfavorable than he would have obtained but for the allegedly wrongful interference of defendant Reynolds. Construing, as I must, the allegations in the complaint in the light most favorable to plaintiff, plaintiff's claim appears to fit within the outer perimeters of the tort. Plaintiff has made out a *prima facie* case under the elements articulated by the Virginia Supreme Court in *Allen Realty Co. v. Holbert, supra,* and case law from other jurisdictions would support a finding of liability under certain sets of facts. As it does not "appear[ ] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson,* 355 U.S. at 45-46, I must deny defendant Reynolds' motion to dismiss Count Four.

b. *Defenses to the Prima Facie Case*

Defendant Reynolds also claims that even if plaintiff has properly alleged against him a cause of action for tortious interference with prospective contractual relations, Reynolds cannot be held responsible because his conduct is privileged. Under the economic-interest privilege enunciated in *Zoby v. American Fidelity Co.,* 242 F.2d 76 (4th Cir.1957), defendant Reynolds alleges that the impetus for his conduct stems from a proper business interest and not from malice. Dkt. 72, at 35 (citing *Zoby, supra,* at 80). Furthermore, Reynolds argues his conduct is privileged because as a Robertshaw director he was acting in the best interests of Robertshaw and its shareholders. Dkt. 72, at 34-35 (citing *Steranko v. Inforex, Inc.,* 5 Mass.App. 253, 362 N.E.2d (1977), and *Greyhound Corp. v. Commercial Cas. Ins. Co.,* 259 A.D. 317, 19 N.Y.S.2d 239 (1st Dep't 1940)).

Assuming *arguendo* one or more of these defenses is viable under Virginia law, the question whether Reynolds is entitled to claim a privilege cannot be resolved in a context of a motion to dismiss. A finding on defendant's assertion of privilege would require the Court to resolve a disputed factual issue. Reynolds maintains he qualifies for the privilege because he did not act out of malice, but in his own and Robertshaw's best interest. Plaintiff claims otherwise.

*5 The Court denies defendant Reynolds' motion to dismiss plaintiff's claim against Reynolds for tortious interference with prospective contractual relations.

C. *The Claims for Wrongful Discharge (Counts Six and Seven)*

Defendants claim that plaintiff's cause of action against them for wrongful discharge must fail because plaintiff's claim does not fall within the narrow confines of the tort as it exists in Virginia. I agree.

In *Bowman v. State Bank,* 229 Va. 534, 331 S.E.2d 797 (1985), the Virginia Supreme Court reaffirmed Virginia's adherence to the common-law rule that allows either party to terminate a contract of employment at will for any reason or for no reason at all by giving notice of intention to terminate. *Id.* at 798, 800. The Virginia Supreme Court observed, however, that the Virginia legislature has made various exceptions to the employment-at-will doctrine for employees who are physically handicapped, who file safety or health complaints, or who exercise rights under the Workers' Compensation Act. *Id.* at 800. Moreover, the court noted that at least 20 state courts have recognized an exception to the doctrine in favor of at-will employees who claim to have been discharged in violation of public policy. *Id.* at 801.

Plaintiffs in *Bowman* were discharged not for unsatisfactory job performance, but for "the proper exercise of their protected rights as shareholders," *id.* at 800, conferred pursuant to Virginia Code § 13.1-32. *See id.* at 801. While refusing to abrogate the general rule against recognizing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1986 WL 15374                                                                                   Page 5
1986 WL 15374 (D.Del.), RICO Bus.Disp.Guide 6369, RICO Bus.Disp.Guide 6370
**(Cite as: 1986 WL 15374 (D.Del.))**

wrongful discharge, the Virginia Supreme Court held that the facts of the case before it stated an action in tort for wrongful discharge because plaintiffs claimed they had been discharged for exercising a statutory right. *Id.* at 800. This narrow exception to the employment-at-will doctrine for the exercise of a protected right is inapplicable in this case, however.

A shareholder exercising his statutory right to vote on corporate matters is exercising a personal and proprietary right; he is acting only on his own behalf and thus may exercise "unfettered discretion" in voting. *See id.* at 801. A corporate director carrying out his duties has no similar personal or proprietary "right" to carry out those duties; rather, a director has a fiduciary obligation to act on behalf of the shareholders of the corporation. A director's discretion in fulfilling his duty is bounded by that fiduciary obligation.

Since plaintiff is unable to allege that his termination violated a protected right, as required by the Virginia Supreme Court, his claim of wrongful discharge must be dismissed. [FN3]

IV. *Conclusion*

The Court grants defendants Reynolds' and Reynolds Metals' motion to dismiss as to them Counts One, Two, Three, Six, and Seven of plaintiff's Second Amended Complaint and denies defendant Reynolds' motion to dismiss Count Four. The Court denies defendants' motion for a rule 11 hearing.

> FN1. Thomas has been a member of the Board of Directors of Reynolds Metals and President and Chief Executive Officer of Robertshaw since 1972. Second Amended Complaint ¶ 4.

> FN2. Plaintiff in Counts Five and Eight alleges a breach-of-contract action against Robertshaw. *Id.* ¶¶ 71-73, 86-90. Defendants Reynolds and Reynolds Metals were not charged in these two counts.

> FN3. Because the Court has granted defendants' motion to dismiss all but Count Four of the complaint, defendants' motion in the alternative for a rule 11 hearing cannot, by its own terms, be considered.

The Court declines to grant a rule 11 hearing as to plaintiff's claim of intentional interference with prospective contractual relations because the Court has found plaintiff's allegations sufficient as a matter of law. Defendants may renew their motion at a later stage of the proceedings.

Defendant Reynolds also seeks a rule 11 hearing with respect to plaintiff's breach of contract claims in his Amended Complaint.

In the Amended Complaint, filed on July 12, 1984, plaintiff charged Reynolds with breaching plaintiff's severance agreement. Amended Complaint, Dkt. 31, Counts Five & Eight, ¶¶ 51-53 & 66-70. Plaintiff's counsel acknowledged at oral argument before this Court in July, 1984 that Reynolds was not a party to plaintiff's severance agreement with Robertshaw, TRO Tr. 37, and in plaintiff's Second Amended Complaint the breach-of-contract claim against Reynolds was dropped. The Court does not believe the purposes of justice or of judicial economy would be served by holding a hearing.

1986 WL 15374 (D.Del.), RICO Bus.Disp.Guide 6369, RICO Bus.Disp.Guide 6370

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5

Westlaw.

104 Fed.Appx. 811                                                                                                           Page 1
104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,720
**(Cite as: 104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)))**

H

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Leon R. DONGELEWICZ; Margaret J. Dongelewicz, Husband and Wife; Francis X. Burns; Laura Burns; Lois A. Burns; George M. De Persia; Sharon M. De Persia, Husband and Wife; John B. Knox; Betsy C. Knox, Husband and Wife; *
Estate of John T. Miele; Frank J. Rachubinski; Helen A. Rachubinski, Husband and Wife; Senta M. Sheridan; Ger D.J. Smit; Waclaw Szczesniak; Danuta Szczesniak, Husband and Wife, For Themselves and on Behalf of all Others Similarly Situated, Appellants,
v.
*PNC BANK NATIONAL ASSOCIATION, Successor by Merger to First Eastern Bank,**
Bankshares Realty Company, Successor to First Eastern Corp.; Frank M. Cedrone; C.B.G. Limited, A Pennsylvania Limited Partnership; Oneida Water Company, A Company Organized Under the Laws of Pennsylvania; Valley Utilities Company, Inc., a Pennsylvania Corporation; Mla Management Assoc., a Pennsylvania Corporation; Ralph Conte; Arlene Reiness; the Property Owners Association of the Valley of Lakes, An Unincorporated Association

*(Amended Per Clerk's Order dated January 17, 2003).
**(Amended Per Court Order dated April 23, 2003).
No. 03-1045.

Argued on Jan. 26, 2004.
Decided July 23, 2004.

**Background:** Real estate development lot owners on a brought a class action against the owners and managers of the development, as well as a bank which was the development's primary source of finance, alleging years of fraud and broken promises. The United States District Court for the Middle District of Pennsylvania, James F. McClure, J., decertified the class action, granted summary judgment to the bank, and denied the lot owners' motion for leave to supplement the complaint. Lot owners appealed.

**Holdings:** The Court of Appeals, Fuentes, Circuit Judge, held that:
(1) Racketeer Influenced and Corrupt Organizations Act (RICO) claims by lot owners were barred by limitations;
(2) decertification of the class was not an abuse of discretion;
(3) bank did not have sufficient involvement to support a finding that it "conducted" the affairs of any "enterprise," for RICO purposes;
(4) lot owners' mortgage payments did not constitute the proceeds of racketeering activities for RICO purposes;
(5) bank did not violate the RICO section providing for conspiracy liability;
(6) lot owners' common law fraud claim was barred by limitations; and
(7) developers' actions could not be attributed to bank on agency theory.
Affirmed.

West Headnotes

**[1] Limitation of Actions** ⚞95(3)
241k95(3) Most Cited Cases
Racketeer Influenced and Corrupt Organizations

104 Fed.Appx. 811    Page 2
104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,720
**(Cite as: 104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)))**

Act (RICO) claims by owners of lots in a real estate development whose developer was in bankruptcy, alleging that mortgage payments received by a bank from the lot owners were fraudulently concealed from the bankruptcy court, concerned conduct which came to the attention of the lot owners over six years before they moved for leave to assert the claims, and thus, the claims were barred by the four-year statute of limitations for RICO claims. 18 U.S.C.A. §§ 1961-1968.

**[2] Limitation of Actions** 🔑126.5
241k126.5 Most Cited Cases
Abrogation of the "injury plus pattern" rule and its replacement with the "injury discovery" rule, under which a Racketeer Influenced and Corrupt Organizations Act (RICO) claim accrues when the plaintiff knew or should have known of his injury, did not render decertification of a class an abuse of discretion in an action brought by lot owners alleging years of fraud and broken promises by owners and managers of their development, and a bank which was the development's primary source of finance; there was no reason to believe that the district court's conclusion regarding the need for individualized
inquiry was no longer true under the new rule. 18 U.S.C.A. §§ 1961-1968.

**[3] Racketeer Influenced and Corrupt Organizations** 🔑50
319Hk50 Most Cited Cases
or
Bank that merely supplied financing for a development that failed, and then took steps to preserve its collateral, did not have sufficient involvement to support a finding that it "conducted" the affairs of any "enterprise," for purposes of a Racketeer Influenced and Corrupt Organizations Act (RICO) claim asserted by lot owners. 18 U.S.C.A. § 1962(c).

**[4] Racketeer Influenced and Corrupt Organizations** 🔑16
319Hk16 Most Cited Cases
Although bank may have reinvested income received from lot owners' mortgage payments into the real estate development, which it financed, the lot owners had contractual obligations to pay their mortgages, and such payments did not constitute the proceeds of racketeering activities, thus defeating the lot owner's claim under the Racketeer Influenced and Corrupt Organizations Act (RICO) section prohibiting the investment of income derived from a pattern of racketeering activity. 18 U.S.C.A. § 2; 18 U.S.C.A. § 1962(a).

**[5] Conspiracy** 🔑2
91k2 Most Cited Cases
Bank's facilitating the conduct of a real estate developer's business by providing financing, which it had a contractual obligation to do, did not violate the Racketeer Influenced and Corrupt Organizations Act (RICO) section providing for conspiracy liability. 18 U.S.C.A. § 1962(d).

**[6] Limitation of Actions** 🔑100(12)
241k100(12) Most Cited Cases
Real estate development lot owners' common law fraud claim under Pennsylvania law, asserting that a bank failed to disclose the developer's precarious financial condition to the owners prior to the developer's bankruptcy, accrued for limitations purposes no later than the date on which the developer filed for bankruptcy, despite claim that after the developer filed for bankruptcy, the bank engaged in bankruptcy fraud.

**[7] Banks and Banking** 🔑118
52k118 Most Cited Cases
Real estate development lot owners seeking to assert a common law fraud claim under Pennsylvania law against a bank which was the development's primary source of finance failed to prove an agency relationship between the bank and the developer or a management firm, as required for the actions of those entities to be attributed to and binding on the bank.
*813 On Appeal from the United States District Court for the Middle District of Pennsylvania. District Court Judge: The Honorable James F. McClure. (D.C. Civil No. 95-cv-00457).

Roger S. Antao (argued), Enna Chuang, Antao & Chuang, Fort Lee, NJ, for Appellants.

Steven A. Arbittier (argued), Darryl J. May, Thomas B. Roberts, Michael N. Gordan, Ballard, Spahr, Andrews & Ingersoll, LLP, Philadelphia, PA, for Appellees PNC Bank, N.A. and Bankshares Realty Company.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

104 Fed.Appx. 811
104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,720
(Cite as: 104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)))

Page 3

Before NYGAARD, FUENTES, and STAPLETON, Circuit Judges.

OPINION OF THE COURT

FUENTES, Circuit Judge.

**1 This appeal involves a real estate development known as Valley of the Lakes ("VOL") located near the Poconos in Hazleton, Pennsylvania and developed by CBG Limited ("CBG"), a Pennsylvania Limited Partnership. On June 17, 1994, Leon R. Dongelewicz and ten other sets of VOL lot owners ("Dongelewicz") commenced a class action against the owners and managers of VOL as well as First Eastern Bank, N.A., the development's primary source of financing, alleging years of fraud and broken promises. [FN1] As of the date of this appeal, First Eastern is the only remaining defendant. [FN2] Dongelewicz appeals a September 30, 1999 decision of the District Court which decertified the class action, granted summary judgment to First Eastern, and denied appellants' motion for leave to supplement the complaint. We agree with the District Court and affirm.

> FN1. We will refer to First Eastern Bank, N.A. and its parent, First Eastern Corporation, collectively, as "First Eastern." First Eastern was acquired by PNC Bank, N.A. and by an Order dated January 17, 2003, PNC was substituted for First Eastern. However, because the events at issue here occurred primarily before 2003, we will refer to the relevant party as First Eastern.

> FN2. CBG, Frank Cedrone (a general partner of CBG), Oneida Water Company and Valley Utilities Company, Inc. (two CBG-related corporations that provided water and utilities to VOL) defaulted, and MLA Management Associates, Inc. ("MLA"), Ralph Conte, Arlene Rainess, and the Property Owners Association of VOL settled with Dongelewicz.

I. Background

The facts, as exhaustively recounted in Dongelewicz's 157-page complaint, are well known to the parties. We only discuss those that are relevant to our discussion of the issues on appeal. In September of 1986, CBG acquired VOL, a 4000 acre tract of land partially subdivided for residential and recreational development. From the registration of the lots in 1987 until about 1989, the VOL development did well, selling lots to individual purchasers *814 and beginning to construct amenities. Potential lot purchasers were told that the development would eventually include roads, a central sewer system, an 18-hole golf course and "Lake Algonquin." Dongelewicz claims that CBG never intended to complete the promised amenities.

As CBG's primary source of financing, First Eastern Bank made its initial loans to CBG in 1988: a $5 million revolving development loan and a $2 million receivable line of credit. These amounts were increased and by the end of 1989, the Development Loan was at $11,500,000 and the Receivable Line at $10,000,000. The Development Loan was secured by a first mortgage on the property owned by CBG. The primary collateral for the Receivable Line were CBG's accounts receivable on notes secured by purchase money mortgages, ("Lot Paper") which lot owners in VOL provided to CBG when buying lots. CBG financed up to 90% of the lot price, and First Eastern advanced 90% of the financed amount to CBG. When mortgage payments were made to C & E Credit, the funds would be wired to First Eastern as payment on the receivable line.

Although First Eastern advanced the entire Development Loan to CBG, their inspectors found that the improvements described in the Property Reports filed by CBG with HUD were not completed by the dates specified in those reports. In November 1990, CBG failed to meet obligations under the terms of its loans from First Eastern because mortgagors were no longer making enough payments on CBG's purchase money mortgages for the receivables to constitute adequate payment on the receivable loan. CBG attempted to sell or re-finance the development with no success.

**2 Dongelewicz contends that during this period between November 1990 and CBG's declaration of bankruptcy in 1992, First Eastern undertook a scheme to conceal the insolvency of CBG. VOL

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

104 Fed.Appx. 811
104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,720
**(Cite as: 104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)))**

Page 4

was having cash-flow difficulties and First Eastern made cash infusions and loans to CBG to keep the development alive and thereby preserve their collateral. Dongelewicz characterizes these actions as a scheme designed to allow CBG to appear solvent to purchasers, property owners, mortgagors, participant banks, bank regulators and HUD, and to continue to perpetrate its land fraud.

On March 30, 1992, CBG filed for Chapter 11 bankruptcy in the Middle District of Pennsylvania, claiming it was necessary in order to complete the development. CBG became debtor-in-possession, and entered into an agreement with MLA Management Associates to monitor their actions. Dongelewicz contends that, after CGB's declaration of bankruptcy, First Eastern concealed the income stream on the receivables from the Bankruptcy court, in effect siphoning millions of dollars of the bankruptcy estate's receivables. Dongelewicz also alleges that, during this period, First Eastern mailed out mortgage coupon booklets to the mortgagors, naming themselves and not CBG as payee, and hired MLA Management Associates to act as their representative at VOL to closely monitor the collection and expenditure of funds, and to develop a budget for CBG. In response, First Eastern argues that the actions it took, including the cash advances and loans, were done to preserve its collateral and therefore provided for by an order of the bankruptcy court dated October 22, 1992.

In February 1995, CBG was removed as debtor-in-possession and a trustee was appointed. In 1996, a joint venture of Double Diamond Inc. and the Valley of the Lakes Civic Association ("VOLCA") acquired VOL. First Eastern had by this time been acquired by PNC, and PNC *815 released its interests in VOL for less than $1,200,000, resulting in a loss of over $20 million.

On June 17, 1994, Dongelewicz commenced this action in the U.S. District Court for the District of New Jersey against CBG, Frank M. Cedrone, Oneida Water, Valley Utilities, First Eastern, MLA, Ralph Conte, and Arlene Rainess. On First Eastern's motion to dismiss, the District Court dismissed all counts except two, one filed pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO) 18 USC §§ 1961-1968, and the other filed under the common law of New Jersey for fraud and deceit. The case was thereafter transferred to the Middle District of Pennsylvania by a March 15, 1995 order. A class and subclasses were certified on June 19, 1996. About two years later, Dongelewicz filed a motion to supplement the Complaint asserting new RICO claims against First Eastern based on the allegation that during CBG's bankruptcy, the bank received mortgage payments due to CBG and fraudulently concealed receipt of those payments from the bankruptcy court.

On September 30, 1999 the District Court decertified the class action, granted summary judgment to First Eastern, and denied appellants' motion for leave to supplement the complaint. The District Court originally certified issues for an interlocutory appeal on February 8, 2000, however this court denied permission to appeal at that time. This court's jurisdiction is pursuant to a Fed.R.Civ.P. 54(b) certification issued by the District Court and 28 U.S.C. § 1291.

## II. DISCUSSION

### A. Leave to Amend and Supplement

**\*\*3** [1] We first address Dongelewicz's motion to amend the complaint to include allegations that the mortgage payments received by First Eastern from lot owners were fraudulently concealed from the bankruptcy court. (App 2341) The District Court denied Dongelewicz's motion to amend holding that the supplemental RICO claims were barred by the statute of limitations and therefore "amendment would be futile." (App 171) We review this decision for abuse of discretion.

The four-year statute of limitations for RICO claims begins to run when a plaintiff knew or should have known that he has been injured. *Mathews v. Kidder, Peabody Co.,* 260 F.3d 239, 247 (3d Cir.2001). In the proposed supplement, Dongelewicz alleges that First Eastern violated RICO, injuring the bankruptcy estate and the lot owners by receiving payments on the mortgage notes after CBG had filed for bankruptcy. These allegations do not arise from the same conduct alleged in the Complaint, so the supplement cannot relate back under Fed.R.Civ.P. 15(c)(2) to the date of filing. However, as the District Court found, all of the allegations made in the proposed supplement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

104 Fed.Appx. 811
104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,720
**(Cite as: 104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)))**

Page 5

concern conduct which came to the attention of the lot owners over six years before they moved for leave to supplement in 1998. The supplemental claims were therefore untimely. The lot owners knew that CBG was in bankruptcy as of its filing on March 30, 1992. By April 1992, the lot owners' mortgage checks were made payable to and endorsed for deposit by First Eastern (App 5558-61), and the bankruptcy stay, which they now allege First Eastern was violating by cashing their checks, was issued on March 30, 1992. Because we agree that the supplemental claims were untimely, we affirm the District Court's denial of leave to amend.

B. Decertification

[2] We review a class decertification for abuse of discretion. See *816*Holmes v. Pension Plan of Bethlehem Steel Corp.* 213 F.3d 124, 136 (3d Cir.2000). Abuse of discretion is found "where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.* (internal quotation omitted)

The District Court decertified the class, holding that the application of the "injury plus pattern discovery rule," in evaluating the statute of limitations defense, would require individualized inquiries into differing factual circumstances and therefore decertification is appropriate. Under the injury plus pattern rule, the limitations period begins when the plaintiff knew or should have known that the defendant engaged in a pattern of racketeering activity and that the plaintiff was injured by the pattern of racketeering activity." *See, e.g., Perlberger v. Perlberger,* 1999 WL 79503, *3 (E.D.Pa. Feb. 12, 1999). Dongelewicz correctly notes that the injury plus pattern discovery rule is no longer the law in this circuit. Shortly after the District Court's decertification order, in *Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000), the Supreme Court abrogated the injury plus pattern rule and replaced it with the "injury discovery" rule of *Forbes v. Eagleson,* 228 F.3d 471, 484 (3d Cir.2000), *cert denied,* 533 U.S. 929, 121 S.Ct. 2551, 150 L.Ed.2d 718 (2001). Under the injury discovery rule, a RICO claim accrues when the plaintiff knew or should have known of his injury.

**\*\*4** Dongelewicz argues that the injury discovery rule presents none of the complexities that led the District Court to decertify the class under the injury plus pattern rule. However, this argument defies common sense because, as the court explained in *Forbes,* the new rule "alter[s] the judicial landscape unfavorably to the plaintiffs from the shape in which it existed when this case was before the district court" and requires us to "consider the case under an accrual rule more adverse to plaintiffs than that the district court applied." 228 F.3d at 474. In fact, as First Eastern points out, the new rule may mean that all class members' claims are barred by the statute of limitations. Dongelewicz argues that even if the new rule is "stricter" than the old, it does not require the same individualized inquiry that compelled the District Court to decertify, but there is no reason to believe that the District Court's conclusion regarding the need for individualized inquiry is no longer true under the new rule. Under the injury discovery rule, the court must still determine when each lot purchaser, by the exercise of diligence, should have discovered she was injured. With respect to the fraud claims, the District Court held that March 30, 1992 was the latest date any reasonable person would have discovered her injury. However, setting the precise date for each plaintiff, given the differing circumstances of their purchase and ownership of the lots, still requires an "extremely fact-specific" individualized inquiry. *Mathews v. Kidder,* 260 F.3d 239, 250 (3d Cir.2001). The District Court's application of the injury discovery rule to the fraud claim is not an apt analogy here because, as this court explained in *Mathews,* "the focus of accrual in a RICO action is different from that for a fraud claim where the focus is on the acts of the defendants" which are common to all plaintiffs--"a RICO claim accrues when the plaintiffs should have discovered their injuries." *Id.* at 251. The District Court was well within its discretion decertifying the class in light of the statute of limitations defense, and that decertification remains valid under the new injury discovery rule.

C. Summary Judgment

1. RICO Claim

[3] To establish a RICO violation under § 1962, plaintiffs must prove (1) the *817 conduct (2) of an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

104 Fed.Appx. 811    Page 6
104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,720
**(Cite as: 104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)))**

enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3292, 87 L.Ed.2d 346 (1985). To recover under civil RICO, an injury to plaintiff's business or property must have been proximately caused by the § 1962 violation. The "conducted the affairs of an enterprise" elements of § 1962(c) are satisfied by showing that a defendant "participate[d] in the operation of management of the enterprise itself." *Reves v. Ernst & Young,* 507 U.S. 170, 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

In granting summary judgment to First Eastern, the District Court relied primarily on *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644 (3d Cir.1998). *Rolo* involved a residential land development scheme in which lot purchasers alleged that the developer, GDC, committed RICO predicate acts by making promises concerning future development they never intended to keep. The lot purchasers also sued secondary defendants, who were not alleged to have participated in the fraudulent sales, but were alleged to have enabled GDC to perpetuate its fraud by continuing to finance the development despite knowledge of the fraud, and by their concealment of it. Plaintiffs also alleged that the financiers, by doing the same sorts of things alleged against First Eastern here, had exercised control over the enterprise. The district court dismissed the complaint, finding that the activity did not constitute operation and management of the enterprise as required by *Reves.* We affirmed, holding that the allegations against the financiers made out an aiding and abetting claim, which was no longer viable after the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

**\*\*5** Dongelewicz is correct to point out that *Rolo* does not control here because although those facts are appealingly similar to those we face here, in that case, we did not discuss the District Court's ruling concerning the "operation and management" test. However, in his denial of motions for reconsideration, Judge McClure clarified his invocation of *Rolo.* He explained that he did not hold that *Rolo* controlled on the *Reves* issue, but rather noted that "First Eastern's role was analogous to that played by the 'secondary defendants' in *Rolo"* and held that "since First Eastern did not participate directly in the affairs of the enterprise and cannot be held civilly liable (under *Rolo* ) as an aider and abettor, it cannot be liable."

In *Univ. of Md. v. Peat,* 996 F.2d 1534 (3d Cir.1993), policyholders claimed that Peat's provision of accounting and other financial services to an insurer satisfied the *Reves* standard. We explained, however, that "[s]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result." *Id.* at 1539. We have also stated, albeit in the fraud context, that "we are unwilling to hold that merely because a lender requires security and approval of aspects of construction, the lender thereby takes 'control' of the project. To do so would wreak havoc on the lending industry, for any lender who reasonably wished to protect itself would be forced to run the risk of being sued for the unknown fraudulent acts of its borrowers." *Bhatla v. U.S. Capital Corp.,* 990 F.2d 780, 787 (3d Cir.1993). While it is certainly true that a major creditor of a corporation can have "substantial persuasive power" and some legal authority over management, alone, such power is "not equivalent to having the power to conduct or participate directly or indirectly in the conduct in the affairs of those corporations." \*818*Strong & Fisher Ltd. v. Maxima Leather, Inc.,* 1993 WL 277205, \*1 (S.D.N.Y., July 22, 1993).

We agree with that analysis. First Eastern was merely a lender--it supplied financing for a development that failed, and then took steps to preserve its collateral. Such involvement does not support a finding that it "conducted" the affairs of any "enterprise" under *Reves* (be it CBG, VOL, or an association in fact of the various defendants). We therefore affirm the District Court's grant of Summary Judgment as to the § 1962(c) claims.

Although § 1962(c) was the focus of Dongelewicz' original claim, in this appeal his emphasis shifts. Based on the District Court's characterization of First Eastern's actions as "aiding and abetting", Dongelewicz argues that the bank's conduct violates § 1962(a) and § 1962(d).

[4] Section 1962(a) prohibits the investment of income derived from a pattern of racketeering activity, by a "principal" in any racketeering activity

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

104 Fed.Appx. 811
104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,720
**(Cite as: 104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)))**

Page 7

that affects interstate or foreign commerce. Dongelewicz correctly notes that "principal" is defined in 18 U.S.C. § 2 as anyone who "aids, abets, counsels, commands, induces or procures" a RICO violation. However, contrary to Dongelewicz' assertions, the District Court did not err "as a matter of law," simply by granting summary judgment as to § 1962(a) while simultaneously noting that the evidence, at best, might be sufficient to establish aiding and abetting. Although First Eastern may have reinvested the income received from the Mortgages into VOL, the lot owners had contractual obligations to pay their mortgages, and such payments do not constitute the proceeds of racketeering activities.

**\*\*6** [5] Section 1962(d) of RICO makes it "unlawful to conspire to violate [§§ 1962(a), (b) or (c)]." In *Smith v. Berg,* 247 F.3d 532 (3d Cir.2001), we adopted the Supreme Court's analysis in *Salinas,* which held that § 1962(c) liability is not a prerequisite to § 1962(d) liability. Rather, conspiracy liability under § 1962(d) does not require satisfaction of the *Reves* test, but is governed by the "general principles of criminal conspiracy law" which requires only that the defendant "share[s] a common purpose" with his co-conspirators and "knowingly agrees to facilitate a scheme, which includes the operation or management of a RICO enterprise." *Smith* 247 F.3d at 538. As First Eastern argued in its motion for summary judgment, the fact that First Eastern provided financing to CBG in no way gives rise to an inference (i) that First Eastern agreed to commit predicate acts; or (ii) that First Eastern knew that the predicate acts were part of racketeering activity, two necessary elements of a RICO conspiracy.

Dongelewicz additionally argues that the District Court erred as a matter of law because it erroneously imposed the "conducting the affairs of the enterprise" element of § 1962(c) onto § 1962(d). We agree with the District Court, however, that, at best, Dongelewicz "could prove nothing more than that First Eastern facilitated the conduct of CBG's business by providing financing, which it had a contractual obligation to do." This conduct does not violate § 1962(d). Accordingly, we agree with the District Court that "there is no evidence to support a claim that First Eastern directly participated in fraud or extortion ... nor does it support a claim of conspiracy." We therefore affirm the District Court's decision on this issue.

**2. Common Law Fraud Claim**

[6] The statute of limitations for fraud in Pennsylvania is two years. A claim accrues when injury is suffered and the statute **\*819** begins to run when the injured person knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct. *Ingenito v. AC & S, Inc.,* 430 Pa.Super. 129, 633 A.2d 1172, 1174 (1993). Dongelewicz's primary fraud theory is that First Eastern failed to disclose the precarious financial condition of CBG to plaintiffs prior to CBG's bankruptcy. Even assuming *arguendo* that this claim could support a cause of action for fraud, we agree with the District Court that Dongelewicz and his fellow lot owners were injured when they purchased lots in VOL and their claims therefore accrued by 1990. Therefore, CBG's filing of bankruptcy on March 30, 1992 was the *latest* point at which the statute of limitations was triggered for all plaintiffs because it gave any reasonable person cause to know of the financial status of CBG and of the fact that First Eastern had not disclosed that financial status to Dongelewicz.

Dongelewicz relies on *EBS v. Barclays,* 304 F.3d 302, 306 (3d Cir.2002), but that case is not dispositive here. In *EBS,* we held that the filing of bankruptcy does not alert a reasonable plaintiff to the cause of the insolvency and does not trigger the running of the statute of limitations as to that fraudulent cause. Here, it is not the cause but the fact of the insolvency that is in issue--a fact that was allegedly concealed from the plaintiffs by the actions of First Eastern, but was made plain upon filing of bankruptcy.

**\*\*7** Seeking to escape the statute of limitations problem, Dongelewicz suggests that, after CBG filed for bankruptcy, First Eastern engaged in a "massive bankruptcy fraud." To the extent that plaintiffs suggest that the statute of limitations with respect to their pre-bankruptcy failure to disclose claim should be tolled because an alleged fraud upon the bankruptcy court lulled them into not pursuing their claim, that argument fails. As the District Court noted, this alleged fraud would "not alter the notice of financial troubles" plaintiffs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

104 Fed.Appx. 811                                                                                                             Page 8
104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,720
**(Cite as: 104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)))**

received when CBG filed for bankruptcy and would not operate to conceal First Eastern's alleged failure to disclose CBG's financial condition to the lot owners before the bankruptcy. See *Beauty Time, Inc. v. VU Skin Systems, Inc.,* 118 F.3d 140, 146 (3d Cir.1997) (explaining the doctrine of fraudulent concealment). [FN3]

> FN3. We do not examine whether any alleged "fraud upon the bankruptcy court" amounted to a new, actionable fraud claim. As we noted above in addressing the 1998 proposed supplement to plaintiffs' RICO claims, plaintiffs' complaint as filed does not allege such events or allegations with respect to First Eastern having engaged in a "fraud upon the bankruptcy court."

[7] Dongelewicz has also suggested that, during CBG's bankruptcy, CBG and MLA made various misrepresentations to the lot-owners. Dongelewicz alleges that First Eastern had knowledge of these misrepresentations, but, as the District Court properly concluded, "plaintiffs' attempts to place liability for the actions of MLA [and CBG] on First Eastern based on agency simply are not supported by the record; 'approval' of an action is not agency." (App.203.) Plaintiffs "had the burden of proving an agency relationship before [MLA's or CBG's] actions could be attributed to and binding on" First Eastern. *Bolus v. United Penn Bank,* 363 Pa.Super. 247, 525 A.2d 1215, 1221 (1987). Simply put, Dongelewicz has not met that burden. No evidence of an agency relationship has been offered. [FN4]

> FN4. Dongelewicz also briefly argues in his opening brief that mortgage coupon books mailed by C & E Credit to mortgagors amounted to fraud because they requested that payment be made to First Eastern Bank as opposed to CBG, thereby "misrepresenting" First Eastern as the entity mortgage payments were owed to. Additionally, Dongelewicz takes issue with one tax statement mailed to one mortgagor--detailing the amount of interest that mortgagor paid in 1993--because the statement indicated that it was from First Eastern Bank and not CBG. These theories of fraud, however, were not advanced in

Dongelewicz's complaint. Of course, "a contention in a brief" "clearly ... may not" be used to "substitute for an allegation in a complaint," *Williams v. New Castle County,* 970 F.2d 1260, 1266 n. 4 (3d Cir.1992), especially in the context of a fraud claim, which must be pled with particularity under Fed.R.Civ.P. 9(b).

*820 Accordingly, we agree with the District Court that First Eastern is entitled to summary judgment on Dongelewicz' claim of common law fraud and we therefore affirm.

### III. CONCLUSION

For the reasons discussed above, we find that the District Court was within its discretion to deny Dongelewicz leave to file a supplement to the complaint and to decertify the class action. Furthermore, we find that the District Court properly granted summary judgment on Dongelewicz' RICO claims and correctly dismissed the fraud claim as untimely. We therefore affirm the judgment of the District Court in its entirety.

104 Fed.Appx. 811, 2004 WL 1661863 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,720

**Briefs and Other Related Documents (Back to top)**

. 03-1045 (Docket)
                                    (Jan. 07, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.