Not Reported in F.Supp.  
1992 WL 696398 (C.D.Cal.)  
**(Cite as: 1992 WL 696398 (C.D.Cal.))**

Page 16

*Banker's Trust, Barnett,* and *L'Europeene de Banque* on the on the grounds that, unlike the case before the Court, (1) full recovery was certain in the bankruptcy proceedings; (2) the trustees were appointed pursuant to an orderly scheme, *e.g.*, the U.S. Bankruptcy laws; and (3) rulings that plaintiffs stated no RICO injury did not end those plaintiffs' suits. These contentions are either factually incorrect or unpersuasive.

FN39. When a court encounters activity that is predominately foreign, it must question whether "Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries. *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985 (2d Cir.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975).

FN40. A motion to dismiss for lack of subject matter jurisdiction is generally treated as a Rule 12(b)(1) "speaking motion" and summary judgment treatment under Rule 56 of the Federal Rules of Civil Procedure is not required. *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.,* 813 F.2d 1553, 1558 (9th Cir.1987); *see McCarthy v. United States,* 850 F.2d 558 (9th Cir.), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1988) (a court is not restricted to the face of the pleadings when considering a Rule 12(b)(1) motion but may review any evidence that might resolve factual disputes concerning the existence of jurisdiction).

If the Court were to resolve the question of jurisdiction on either of the first two parts of the *Timberlane I* test, however, the issues might be sufficiently intertwined with the merits of the case such that the Court should afford the motion Rule 56 treatment. *Timberlane Lumber Co. v. Bank of Am. N.T. & S.A.,* 749 F.2d 1378, 1381 (9th Cir.1984). On the other hand, refusal to exercise jurisdiction under the third part of the *Timberlane I* test need not directly implicate the merits of the case and Rule 12(b)(1) dismissal would be proper when the case is dismissed on that basis. *Id.*

FN41. Plaintiffs' conclusion, however, that *Timberlane* is therefore inapplicable to this case does not follow. Many key provisions of RICO were patterned after the antitrust laws and are construed by analyzing antitrust jurisprudence. Thus, the *Timberlane I* test applies to plaintiffs' RICO claims.

FN42. The Court has considered expert opinions on the enforceability of a RICO judgment in the six countries where BCCI chiefly operated--the United Kingdom, Hong Kong, Luxembourg, the Grand Cayman Islands, Bahrain, and the United Arab Emirates--as well as thirty-eight additional countries.

FN43. Even assuming that United States deposits will be returned to the depositors without any interest for the time the funds were unavailable, that interest constitutes a small percentage of the 1/2 of one percent of the total BCCI deposits made in the United States. More importantly, that lost interest is only a minuscule portion of the deposits lost outside the United States.

FN44. Consequently, the motion to dismiss brought by Paul C. Warnke, John F. Kovin, David I. Granger, Harold D. Murry, Jr., John G. Calendar, J. Griffin Lesher, Bryan Jay Yolles, Robert P. Reznick, Philip H. Hecht, and James C. Duff is not before the Court.

FN1. These include: (a) the motion of defendants Bank of America NT & SA and BankAmerica Corporation (collectively "BofA") to dismiss; (b) the motion of defendant Price Waterhouse U.K. ("PW/UK") to dismiss; (c) the motion of defendant Price Waterhouse U.S. ("PW/US") to dismiss; (d) the motion of defendant Price Waterhouse World Firm Ltd. to dismiss and to strike; (e) the motion of defendants Clark Clifford,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1992 WL 696398 (C.D.Cal.)  
**(Cite as: 1992 WL 696398 (C.D.Cal.))**

Page 17

Robert Altman, and the law firm of Clifford & Warnke (collectively the "Clifford Defendants") to dismiss; (f) the motion of defendants InterRedec, Inc., InterRedec Southern Co., Inc., Wesley Co., Inc., River Oaks, Inc., River Oaks Investments, Inc., Sterling Bluff, Inc., Concorde Finance & Investments, and GRP Investments N.V. (collectively the "InterRedec Defendants") to dismiss; (g) the motion of defendants First American Corporation, First American Bankshares, Inc., Jack W. Beddow, Paul G. Adams, III, and A. Vincent Scoffone (collectively the "First American Defendants") to dismiss; (h) the motion of defendant Ernst & Young U.S. ("E & Y") to dismiss; (i) the motion of defendant Fulvio Dobrich to dismiss; (j) the motion of defendant Abu Dhabi Investment Authority ("ADIA") to dismiss; and (k) the motion of defendant Hill & Knowlton, Inc. ("H & K") to dismiss. Additionally, putative defendants Paul C. Warnke, John F. Kovin, David I. Granger, Harold D. Murry, Jr., John G. Calendar, J. Griffin Lesher, Bryan Jay Yolles, Robert P. Reznick, Philip H. Hecht, and James C. Duff, all partners in Clifford & Warnke, have filed a motion to dismiss. However, plaintiffs added these individuals to the Complaint without first seeking leave of the Court to amend. Thus, neither these individuals, nor the motion they have filed, are presently before the Court.

1992 WL 696398 (C.D.Cal.)

**Motions, Pleadings and Filings (Back to top)**

. 2:91CV04483 (Docket)
(Aug. 21, 1991)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Westlaw.

Not Reported in F.Supp.2d
2003 WL 22179008 (S.D.N.Y.)
**(Cite as: 2003 WL 22179008 (S.D.N.Y.))**

Page 1

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Ezequiel Edmond NASSER et al., Plaintiffs,
v.
ANDERSEN WORLDWIDE SOCIETE
COOPERATIVE a/k/a Andersen Worldwide,
Defendant.
**No. 02 Civ. 6832(DC).**

Sept. 23, 2003.

Brazilian investors brought action against Swiss cooperative, under Racketeering Influenced and Corrupt Organizations Act (RICO), alleging investors were coerced and defrauded into selling shares for a price far below their value. Defendants moved to dismiss. The District Court, Chin, J., held that U.S. courts lacked subject matter jurisdiction.

Motion granted.

West Headnotes

**[1] Racketeer Influenced and Corrupt Organizations** ⛯55
319Hk55 Most Cited Cases
Evidence that member entities of defendant, a Swiss cooperative, had offices in the United States, could not be imputed to establish that cooperative had a presence in the U.S. sufficient to confer subject matter jurisdiction, in Brazilian investors' action, under Racketeering Influenced and Corrupt Organizations Act (RICO). Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. § 1961 et seq.; Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[2] Racketeer Influenced and Corrupt Organizations** ⛯55
319Hk55 Most Cited Cases
Any presence in United States of offices, of defendant Swiss cooperative, was insufficient to establish that cooperative's U.S. presence was sufficient to confer subject matter jurisdiction, in Brazilian investors' action, under Racketeering Influenced and Corrupt Organizations Act (RICO), absent any U.S. conduct or effects. Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. § 1961 et seq.; Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[3] Racketeer Influenced and Corrupt Organizations** ⛯55
319Hk55 Most Cited Cases
Racketeering Influenced and Corrupt Organizations Act (RICO) did not confer subject matter jurisdiction extraterritorially, in Brazilian investors' action alleging fraud by Swiss cooperative; complaint did not allege specific conduct in the U.S. material to completion of the fraud, allegations as to the effects of the alleged fraud in the U.S. were vague and conclusory, and use of U.S. judicial resources was inappropriate given the exclusively foreign nature of the transactions at issue. Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. § 1961 et seq.; Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

Srour Fischer & Mandell, LLP, By Barry R. Fischer, Esq., Audrey I. Dursht, Esq., Mitchell G. Mandell, Esq., New York, NY, for Plaintiffs.

Sidley Austin Brown & Wood LLP, By James J. Sabella, Esq., Steven E. Klein, Esq., New York, NY, for Defendant.

CHIN, D.J.

*1 In this case, plaintiffs sue defendant for damages under the Racketeering Influenced and Corrupt Organizations Act ("RICO"). None of the relevant contacts, however, were in the United States. Rather, all the key events occurred in Brazil, Spain, or Switzerland. Hence, defendants move to dismiss, *inter alia,* for lack of subject matter jurisdiction, arguing that RICO does not apply to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22179008 (S.D.N.Y.)
**(Cite as: 2003 WL 22179008 (S.D.N.Y.))**

Page 2

wholly foreign transactions. For the reasons that follow, the motion is granted.

## STATEMENT OF THE CASE
### A. *The Facts*

As alleged in the complaint, the facts are as follows:

Plaintiffs were controlling shareholders in Banco Excel Economico S.A. ("Excel"), a Brazilian bank subject to regulation by Banco Central of Brazil (the "Central Bank"). (Compl.¶¶ 3-7, 31). Plaintiffs are Brazilian, comprised of individuals who are citizens and residents of Brazil and one Brazilian corporation. (*Id.* ¶¶ 3-7). Banco Bilboa Viscaya Argentaria S/A ("BBVA"), not named as a defendant in this case but with whom defendant is alleged to have conspired, is a Spanish bank. (*Id.* ¶ 26).

The complaint is confusing as to the identity of the defendant. The caption identifies the defendant as "Andersen Worldwide Societe Cooperative a/k/a Andersen Worldwide." The introduction, however, refers to wrongful conduct by "Arthur Andersen, at the time, the world's preeminent accounting and auditing firm." Paragraph 9 of the complaint alleges that "[d]efendant Andersen Worldwide was, at the time of the events alleged herein, a Swiss cooperative entity with a principal place of business and worldwide executive offices in the United States in both New York and Chicago." Paragraph 11 defines the term "Andersen" as meaning "Andersen Worldwide." Paragraph 13 alleges that "Anderson [sic] is comprised of Arthur Andersen & Co. Societe Cooperative ("AWSC"), a Swiss cooperative created as an administrative coordinating entity that operates as an umbrella organization for the partners of AWSC, Andersen member firms ("Member Firms"), the individual partners of Andersen and Andersen's offices around the world." (Parentheses in original). In this memorandum decision, the Court's references to "AWSC" are to defendant "Andersen Worldwide Societe Cooperative," and not "Arthur Andersen & Co. Societe Cooperative" or any other entity. [FN1]

> FN1. As AWSC's evidentiary materials make clear, AWSC was created in 1977 and originally was named Arthur Andersen & Co. Societe Cooperative ("Andersen SC"). (*See* Ekdahl Aff. ¶ 5 (attached to Sabella Reply Aff. as Ex. A.); *see also* Sabella Reply Aff. ¶¶ 4, 5). Andersen SC was created to coordinate the professional practices of the separate national practice entities that were affiliates of Arthur Andersen & Co. Each national practice was to be kept separate and autonomous, and Andersen SC did not earn net income, nor did it engage in professional practice. (Ekdahl Aff. ¶¶ 5, 6).

In the first quarter of 1998, BBVA decided to purchase plaintiffs' controlling shares of Excel. (*Id.* ¶ 26). On April 29, 1998, BBVA entered into a Letter of Intent ("LOI") with Excel to purchase plaintiffs' shares of Excel. (*Id.* ¶ 29). The purchase price was to be determined based on the value of Excel, after due diligence and valuation by defendant, BBVA's auditors. (*Id.* ¶ 30).

In the end, plaintiffs sold their shares for R$1, [FN2] far below their value. [FN3] (*Id.* ¶ 54). Plaintiffs contend that they were coerced and defrauded into selling their shares for such a low price. According to plaintiffs, AWSC agreed, at BBVA's request, to create a fraudulent financial report to "drastically devalue Excel so that Plaintiffs could be coerced by threat of Central Bank intervention to sell their Shares for nothing." (*Id.* ¶ 58).

> FN2. "R" represents the Brazilian currency--the "real." Plaintiffs allege that on June 28, 1998 US$1.00 equaled R$1.15. (Compl. ¶ 27 n. 1).

> FN3. Excel's net asset value on June 30, 1998, as determined by its auditors, was R$686,885,000. (*Id.* ¶ 62).

*2 Plaintiffs allege that defendant's conduct was part of a pattern of racketeering activity, including eleven other "conspiracies" that were "directed, controlled, supervised, monitored, or acquiesced in by Andersen senior partners in New York and/or Chicago ." (*Id.* ¶¶ 76, 79). In addition, the profits "derived by [defendant], either directly or indirectly" from its conduct were "shared in and distributed to Andersen partners worldwide,

including in the United States." (*Id.* ¶ 76). In these "criminal conspiracies throughout the world," defendant's partners acted to increase their fees and enrich themselves. (*Id.* ¶¶ 79, 80). Plaintiffs allege that defendant's "pattern of racketeering activity" has had a "profound and negative effect and impact upon financial markets throughout the world and especially in the United States." (*Id.* ¶ 82). United States equity markets, plaintiffs allege, have experienced "dramatic declines ... as a result of the loss of investor confidence in the credibility of reports of corporate earnings based upon" defendant's accounting and audit services. (*Id.*).

These are the only contacts alleged in the United States. All the key players are foreign and all the critical facts--the meetings, the execution of the LOI, the valuation and due diligence, and the sale of the shares--took place outside the United States.

**B.** *Procedural History*

Plaintiffs filed their complaint on August 27, 2002. Defendant moves to dismiss, arguing lack of subject matter jurisdiction, lack of personal jurisdiction, forum non conveniens, and failure to state a claim against defendant and under RICO. As I conclude that defendant's motion to dismiss should be granted based on lack of subject matter jurisdiction, I do not address the remaining grounds.

## DISCUSSION
**A.** *Applicable Law*

**1.** *Subject Matter Jurisdiction*

In considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), federal courts "need not accept as true contested jurisdictional allegations." *Jarvis v. Cardillo,* No. 98 Civ. 5793(RWS), 1999 U.S. Dist. LEXIS 4310, at *7 (S.D.N.Y. Apr. 5, 1999). Rather, a court may resolve disputed jurisdictional facts by referring to evidence outside the pleadings, including affidavits. *See Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000); *Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 932 (2d Cir.1998). As the party "seeking to invoke the subject matter jurisdiction of the district court," the plaintiff bears the burden of demonstrating that there is subject matter jurisdiction in the case.

*Scelsa v. City Univ. of New York,* 76 F.3d 37, 40 (2d Cir.1996).

**2.** *RICO*

The Second Circuit has noted that "[t]he RICO statute is silent as to any extraterritorial application." *North South Fin. Corp. v. Al-Turki,* 100 F.3d 1046, 1051 (2d Cir.1996). Although "a corporate defendant that is a foreign entity is not for that reason alone shielded from the reach of RICO," the Second Circuit has acknowledged ambiguity as to the "character and amount of activity in the United States that will justify RICO subject matter jurisdiction over a foreign entity." *Id.* at 1052 (citing *Alfadda v. Fenn,* 935 F.2d 475, 479 (2d Cir.1991)). The Second Circuit has noted that "guidance [regarding the extraterritorial application of RICO] is furnished by precedents concerning subject matter jurisdiction for international securities transactions and antitrust matters." *North South Fin.,* 100 F.3d at 1052.

*3 The Second Circuit, however, has not specified the test for extraterritorial applications of RICO. In dicta in *North South Fin.,* the court expressed ambivalence about the relevance to RICO of securities--or antitrust-based standards, in light of differing congressional intent behind the various statutes involved. *Id.* at 1052. "The ultimate inquiry is ... whether 'Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to [foreign transactions] rather than leave the problem to foreign countries.' " *Id.* at 1052 (quoting *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985 (2d Cir.1975)).

Although the Second Circuit has not specified a precise standard, in RICO extraterritoriality cases courts in this circuit have generally applied two alternative tests derived from transnational and antitrust cases--the "conduct" and "effects" tests. *See North South Fin.,* 100 F.3d at 1051-52 (affirming district court's dismissal of RICO action for lack of subject matter jurisdiction for absence of U.S. conduct material to fraud); *Wiwa v. Royal Dutch Petroleum Co.,* No. 96 Civ. 8386(KMW), 2002 WL 319887, at *21 (S.D.N.Y. Feb.28, 2002); *Giro v. Banco Espanol De Credito, S.A.,* No. 98 CIV.6195(WHP), 1999 WL 440462, at *2

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2003 WL 22179008 (S.D.N.Y.)  
**(Cite as: 2003 WL 22179008 (S.D.N.Y.))**

Page 4

(S.D.N.Y. June 28, 1999), *aff'd*, 208 F.3d 203 (2d Cir.2000); *Madanes v. Madanes*, 981 F.Supp. 241, 250 (S.D.N.Y.1997).

Under the conduct test, subject matter jurisdiction exists "only where conduct material to the completion of the fraud occurred in the United States." *Giro,* 1999 WL 440462, at *3 (citing *Alfadda,* 935 F.2d at 479); *see also Madanes,* 981 F.Supp. at 251; *but see C.A. Westel de Venezuela v. Am. Tel. & Tel. Co.,* No. 90 Civ. 6665(PKL), 1993 WL 497971, at *4 (S.D.N.Y.1993) (rejecting conduct and effects tests in RICO context but asserting jurisdiction because predicate acts occurred in U.S.). The conduct in the United States must have "directly caused" the loss for subject matter jurisdiction to exist. *North South Fin.,* 100 F.3d at 1050 (citing *Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1046 (2d Cir.1983) (quoting *Bersch,* 519 F.2d at 993)). "Mere preparatory activities, and conduct far removed from the consummation of the fraud, will not suffice to establish jurisdiction." *North South Fin.,* 100 F.3d at 1051 (quoting *Psimenos,* 722 F.2d at 1046)). As for the effects test, two versions exist—one in the securities and the other in the antitrust context. *North South Fin.,* 100 F.3d at 1051-52. Under the effects test borrowed from securities cases, jurisdiction exists over a predominantly foreign transaction when it has "substantial effects within the United States." *North South Fin.,* 100 F.3d at 1051; *see also Giro,* 1999 WL 440462, at *3; *Madanes,* 981 F.Supp. at 250 (quoting *Consol. Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 261-62 (2d Cir.1989)). "Remote and indirect effects" do not qualify as substantial. *North South Fin.,* 100 F.3d at 1052. The "effect" must be a "direct and foreseeable result" of the conduct alleged. *Consol. Gold Fields,* 871 F.2d at 261-62. In antitrust cases, liability may attach when the extraterritorial conduct is "intended to and actually does have an effect on United States imports or exports which the state reprehends." *North South Fin.,* 100 F.3d at 1052. Under both versions of the effects test, "the reasoning behind the test is 'to protect ... domestic markets from corrupt foreign influences.' " *Wiwa,* 2002 WL 319887, at *21 (quoting *Madanes,* 981 F.Supp. at 250)).

**B.** *Application*

*4 AWSC contends that RICO does not confer subject matter jurisdiction, as alleged by plaintiffs, because it is a foreign entity that has allegedly engaged in conduct violating RICO on foreign soil against foreign victims. (Def.Mem.6). AWSC argues that plaintiffs have failed to allege sufficient U.S conduct or effects to justify extraterritorial application of RICO against a foreign party. (*Id.* 6-9).

Plaintiffs maintain, however, that this case does not involve the extraterritorial application of RICO, arguing that, in fact, AWSC is a not a foreign entity but a worldwide organization based in the U.S. (Pl.Mem.8-10). Plaintiffs argue, alternatively, that even if AWSC were treated as a foreign entity, they have made sufficient allegations of U.S. conduct and effects to confer subject matter jurisdiction. (*Id.* 10-12).

For the reasons stated below, I conclude that plaintiffs have failed to establish subject matter jurisdiction.

**1.** *Is Defendant a Foreign Entity?*

As a preliminary matter, I consider whether AWSC is a foreign or domestic entity. Plaintiffs concede that AWSC is a Swiss cooperative. (Compl.¶ 9). Nonetheless, plaintiffs maintain that this case does not involve the extraterritorial application of RICO because defendant is a worldwide, unified entity that includes Andersen-Brazil and has U.S. offices. (Pl. Mem. 8; Compl. ¶ 9; Fischer Decl. ¶¶ 52-56; PX 25; PX 26). [FN4] Plaintiffs allege that AWSC or "Andersen Worldwide," as they also refer to defendant, is comprised of AWSC and "Andersen member firms, the individual partners of Andersen and Andersen's offices around the world." (Compl. ¶ 13). These offices around the world include those of U.S. member firms. (*Id.* ¶ 15). In addition, plaintiffs allege that AWSC and its U.S. member firms are "closely intertwined." (*Id.* ¶ 18).

> FN4. "PX" refers to plaintiffs' exhibits to the Declaration of Barry R. Fischer accompanying Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss.

Plaintiffs rely on a 1995 Chicago Tribune article discussing a recent shift in office space for "Arthur

Not Reported in F.Supp.2d
2003 WL 22179008 (S.D.N.Y.)
**(Cite as: 2003 WL 22179008 (S.D.N.Y.))**

Page 5

Andersen & Co." and "Andersen Worldwide" within the Chicago area. (Pl. Mem. 9; Fischer Decl. ¶¶ 8, 52-57; PX 25). Plaintiffs additionally refer to a 1998 Client Service Directory of "Andersen Worldwide" (PX 26) to establish that AWSC professionals, partners, and officers worked out of AWSC offices in Chicago and New York. (Pl. Mem. 8; Fisher Decl. ¶¶ 8, 52- 57).

[1] Plaintiffs' evidence fails to establish that AWSC itself has a U.S. presence. The 1995 article and the 1998 Client Services Directory refer not to the AWSC, but to "Andersen Worldwide" or "Arthur Andersen & Co." (PX 25, 26). Any assertion that "Arthur Andersen & Co." has U.S. offices is irrelevant to determining whether AWSC has a U.S. presence. Furthermore, references to the offices of "Andersen Worldwide" does not establish AWSC's presence in the U.S., for the complaint alleges that "Andersen Worldwide" refers to entities beyond AWSC. (Compl.¶ 13).

Moreover, to the extent plaintiffs rely on assertions that other "Andersen" entities, i.e., Andersen member firms, may be linked to AWSC to establish AWSC's domestic presence for subject matter jurisdiction purposes, these assertions are refuted by the evidentiary materials presented. AWSC was created to coordinate administratively the separate and autonomous national practice entities affiliated with Arthur Andersen & Co. (Ekdahl Aff. ¶ 5, 6; Sabella Reply Aff. ¶¶ 4, 5). AWSC does not engage in professional practice, nor does it earn net income. (Ekdahl Aff. ¶¶ 5). Accordingly, any alleged U.S. presence of Andersen member firms may not be imputed to AWSC to establish AWSC's domestic connection. Hence, I conclude that AWSC is a foreign entity.

*5 [2] Even assuming arguendo that AWSC has U.S. offices, such contacts would not confer subject matter jurisdiction automatically. *See IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1016 (2d Cir.1975); *Bersch,* 519 F.2d at 985; *Fidenas AG v. Honeywell, Inc.,* 501 F.Supp. 1029, 1041 (S.D.N.Y.1980). In the transnational securities context, from which courts have sought guidance for the extraterritorial application of RICO, a defendant's U.S. citizenship or U.S. presence alone has been deemed insufficient to confer subject matter jurisdiction without additional connections, such as U.S. conduct or effects. *IIT,* 519 F.2d at 1016 (deeming control over other defendants by U.S. citizen defendant insufficient to establish subject matter jurisdiction: "It is simply unimaginable that Congress would have wished the anti-fraud provisions of the securities laws to apply if, for example, [a U.S. citizen defendant] while in London had done all the acts here charged and had defrauded only European investors."); *Bersch,* 519 F.2d at 985, 986-90 (examining U.S. conduct and effects, even where defendants included U.S. citizens); *Fidenas,* 501 F.Supp. at 1041 (holding lack of subject matter jurisdiction in absence of U.S. conduct or effects by U.S.-based defendants). Accordingly, even accepting plaintiffs' allegations of AWSC's U.S. presence as true, such connections would be insufficient to confer subject matter jurisdiction without U.S. conduct or effects.

**2. *Does RICO Apply Here?***

[3] In light of the predominantly foreign nature of this action, this Court must determine whether RICO confers subject matter jurisdiction extraterritorially. I hold that it does not, for plaintiffs fail to satisfy the conduct test or either version of the effects test.

Plaintiffs do not allege any facts of U.S. conduct "material to the completion of the fraud." *Giro,* 1999 WL 440462, at *3. The complaint contains allegations about defendant's U.S. conduct in only one paragraph. (Compl.¶ 76). Plaintiffs allege that defendant engaged in a "pattern of racketeering activity ... which, upon information and belief, was either directed, controlled, supervised, monitored, or acquiesced in by Andersen senior partners in New York and/or Chicago." (*Id.* ¶ 76). Plaintiffs' conclusory allegation, however, is strikingly devoid of any specific, supporting facts. Plaintiffs do not identify what conduct material to the fraud occurred in the United States. In fact, all the material conduct is alleged to have occurred outside the United States.

Furthermore, plaintiffs fail sufficiently to allege effects in the United States resulting from defendant's conduct. Plaintiffs allege that U.S. effects arose in two ways: (1) profits derived "either directly or indirectly" from defendant's acquisition of Excel were shared with defendant's partners, including those in the United States, "upon

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2003 WL 22179008 (S.D.N.Y.)  
**(Cite as: 2003 WL 22179008 (S.D.N.Y.))**

Page 6

information and belief"; or (2) defendant's conduct has had "a profound and negative effect and impact upon the financial markets throughout the world and especially in the United States," manifested in the "recent dramatic declines in United States equity markets as a result of the loss of investor confidence in the credibility of reports of corporate earnings based on [defendant's] accounting and audit services." (*Id.* ¶¶ 76, 82).

**\*6** Plaintiffs fail both variations of the effects test. Plaintiffs' allegations of profit-sharing and market effect are insufficient to meet the securities-based requirement for "substantial effects." *North South Fin.,* 100 F.3d at 1051. First, plaintiffs again offer only a vague, conclusory statement regarding profit-sharing without any specific, factual allegations. Moreover, as pled by plaintiffs, the profits allegedly shared in the United States are far from direct effects of defendant's conduct, allegedly derived "either directly or indirectly." (Compl.¶ 76). *See North South Fin.,* 100 F.3d at 1051. Second, the allegedly "generalized effects" on the U.S. market are insufficient to meet the requirement for "substantial effects." *Bersch,* 519 F.2d at 987-88 (holding that allegations of market decline both in U.S. and abroad, resulting from "deterioration of investor confidence" due to securities fraud, were insufficient to confer subject matter jurisdiction over suit by foreign plaintiff).

Moreover, plaintiffs' allegations fall far short of the antitrust-based effects test, which requires that the defendant's conduct be intended to and actually have an effect in the United States. *North South Fin.,* 100 F.3d at 1052; *Wiwa,* 2002 WL 319887, at \*21. Plaintiffs fail to allege anywhere in the complaint that AWSC intended, through its alleged conduct, to create in the U.S. the partner profits or market effects alleged. *See Wiwa,* 2002 WL 319887, at \*22 (holding that plaintiffs met effects test based, *inter alia,* on allegations that defendants "had the 'intention to gain significant competitive advantage' in the United States through their racketeering activities"). Nor have plaintiffs alleged or shown any actual material effects in the United States.

In addition to plaintiffs' failure to satisfy either the conduct or effects tests, this Court lacks subject matter jurisdiction because this matter is not one to which U.S. resources should be devoted, given the exclusively foreign nature of the transactions in question. *North South Fin.,* 100 F.3d at 1052. *North South Fin.* involved criminal RICO allegations based on facts strikingly similar to those in this case. There, the foreign plaintiffs were holding companies and their stockholders who eventually sold their ownership stake in a French bank to two French investment banking groups. *Id.* at 1048- 49. The defendants allegedly forced the sale of the bank at a fraudulently undervalued price. *Id.* The plaintiffs alleged that the defendants "artificially depressed the sale price of [the French bank] by corrupting the bank's general manager in Paris, who then understated the bank's liquidity for financial and regulatory purposes and misused information drawn from company sources (including a New York office)." *Id.* at 1048. Arthur Andersen & Co., not named as a defendant, prepared an audit report for the defendants that "falsely understated" the French bank's net worth. *Id.* at 1049. The defendants then used the audit report to create "regulatory pressure in France that was calculated to force the sale of [the bank] and to drive down the purchase price." *Id.* The plaintiffs further alleged that the defendants manipulated post-sale transactions, some in New York, so that contingent payments of the purchase price on high risk loans were not apportioned to the plaintiffs and were instead fraudulently reduced or eliminated. *Id.* at 1048- 49.

**\*7** While affirming the district court's holding that it did not have subject matter jurisdiction due to a dearth of U.S. conduct material to the fraud's completion, the Second Circuit noted that subject matter jurisdiction was also lacking in light of the policy concerns implicated in cases involving the extraterritorial application of RICO. *Id.* at 1052. Specifically, the court highlighted the inquiry into "whether 'Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to [foreign transactions] rather than leave the problem to foreign countries.' " *Id.* at 1052. The court concluded, "we have no doubt that the district court was without jurisdiction over a controversy involving foreign victims who sold a foreign entity to foreign defrauders in a foreign transaction lacking significant and material contact with the United States." *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 7
2003 WL 22179008 (S.D.N.Y.)
**(Cite as: 2003 WL 22179008 (S.D.N.Y.))**

This reasoning applies with equal--if not more--force here. As in *North South Fin.*, the parties and key non-parties in this case are all foreign. Furthermore, while the transaction in *North South Fin.* was connected in part to the United States, plaintiffs in the case at bar have failed to allege with any sufficiency any wrongful domestic conduct. Accordingly, the policy considerations raised in *North South Fin.* further support the conclusion that this Court lacks subject matter jurisdiction over the instant matter.

Because I have concluded that this Court does not have subject matter jurisdiction over this case, I do not address defendant's remaining proposed grounds for dismissal. *Rhulen Agency v. Alabama Ins. Guar. Ass'n,* 896 F.2d 674, 678 (2d Cir.1990).

### CONCLUSION

For the reasons set forth above, defendant's motion is granted and the complaint is dismissed for lack of subject matter jurisdiction. The Clerk of the Court shall enter judgment accordingly and this case shall be closed.

SO ORDERED.

2003 WL 22179008 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

. 1:02CV06832  (Docket)
(Aug. 27, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**9**