Westlaw.

Not Reported in F.Supp.
1991 WL 172950 (N.D.Ill.)
**(Cite as: 1991 WL 172950 (N.D.Ill.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
Frank E. PETERS, Plaintiff,
v.
WELSH DEVELOPMENT AGENCY and
Development Capital Group Limited, Defendants.
**No. 86 C 2646.**

Aug. 29, 1991.

MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

*1 Defendant Welsh Development Agency
("WDA") files a five count counterclaim in
response to plaintiff Frank E. Peters' ("Peters")
security fraud action against WDA. In its
counterclaim, WDA alleges that Peters himself
committed securities fraud in violation of Section
19(b) of the Securities Exchange Act of 1934, 15
U.S.C. § 78j(b), and Rule 10b(5), 17 C.F.R. §
240.10b-5. WDA also alleges that Peters'
fraudulent activities violated the provisions of the
Racketeer Influenced and Corrupt Organizations
Act ("RICO"), 18 U.S.C. §§ 1961-68. Peters
moves to dismiss the securities fraud counterclaim
for lack of subject matter jurisdiction under
Fed.R.Civ.P. 12(b)(1). Peters also moves to
dismiss both the securities fraud and RICO
counterclaims under Fed.R.Civ.P. 12(b)(6) as
failing to state claims upon which relief can be
granted.

BACKGROUND
On this motion to dismiss, the court must accept
the well-pleaded factual allegations stated in the
counterclaim as true and view those allegations in
the light most favorable to complainant. *Gillman v.*

*Burlington Northern R.R. Co.,* 878 F.2d 1020, 1022
(7th Cir.1989). The court must construe pleadings
liberally; vagueness or lack of detail are
insufficient grounds to dismiss. Fed.R.Civ.P. 8;
*Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th
Cir.1985). However, the court need not ignore
facts set forth in the complaint that undermine the
plaintiff's claim, nor is this court required to accept
the plaintiff's legal conclusions. *American Nurses'
Ass'n v. Illinois,* 783 F.2d 716, 724 (7th Cir.1986);
*Capalbo v. PaineWebber, Inc.,* 694 F.Supp. 1315,
1318 (N.D.Ill.1988).

Peters is an Illinois citizen temporarily residing in
Colorado. WDA counterclaim ¶ 5. [FN1] WDA
is a Wales-based corporation organized under the
laws of the United Kingdom. *Id.* at ¶ 2. One of
WDA's principal purposes is to further the
economic development of Wales by providing
financing for persons carrying on or intending to
carry on industrial undertakings in Wales. *Id.*

In the spring and summer of 1983, Peters
conceived of a plan to set up a software
manufacturing operation in Wales. *Id.* at ¶ 5.
WDA alleges that Peters contacted WDA and
presented his plan in the hopes of attracting an
investment from WDA. *Id.* at ¶ 7. WDA
expressed an interest in Peters' plan. *Id.* at ¶ 8.
Subject to certain conditions precedent, WDA
pledged and ultimately invested one million pounds
in the proposed project. *Id.*

Peters and WDA, either individually or
collectively, undertook a series of acts leading up to
the signing of their formal investment agreement on
December 23, 1983. In June 1983, Peters acquired
a British company and subsequently changed its
name to Parrot Corporation Limited ("Parrot") prior
to its entry into the software manufacturing
industry. *Id.* at ¶ 6. Neil Taylor, an employee of
WDA, immediately began to work with Peters to
find additional investors for the project. *Id.* at ¶ 9.

*2 WDA alleges that Taylor surreptitiously ceased
serving the interests of WDA and entered into a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1991 WL 172950 (N.D.Ill.)
(Cite as: 1991 WL 172950 (N.D.Ill.))

Page 2

conspiracy with Peters in pursuit of their own private agenda outside the scope of the WDA-Peters relationship. *Id.* Part of the Peters-Taylor conspiracy involved attracting additional investors to contribute capital to the Parrot project. *Id.* at ¶ 10. Toward this end, they procured the services of the Development Capital Group Limited ("DCG"), *id.,* a London-based investment banker and licensed securities dealer and underwriter organized under the laws of the United Kingdom.

During the fall of 1983, DCG found three British entities, in addition to WDA, interested in investing in Parrot: Legal and General Assurance Society Limited, Commercial Union Assurance Company PLC and CIN Industrial Investments Limited (collectively referred to as the "other investors"). *Id.* at ¶ 11. DCG obtained a commitment from the European Coal and Steel Community ("ECSC") to provide a two million pound working capital loan to Parrot. *Id.* As a condition precedent to granting the loan, ECSC required that Parrot obtain a guarantor acceptable to ECSC's agent, National Westminster Bank PLC, a British banking concern. *Id.* at ¶ 12. Peters, however, advised WDA, DCG, and the other investors that the ECSC loan could be obtained merely by pledging a security interest in the assets of Parrot as collateral. *Id.* at ¶ 13. WDA, DCG, and the other investors relied on this advice in making their final decision to invest in Parrot. *Id.*

Following these events, but prior to the investing parties entering into a formal agreement with Peters, Peters entered into negotiations with the London branch of the Northern Trust Company ("Northern Trust"), an American bank, regarding the possibility of Northern Trust acting as guarantor for the ECSC loan. *Id.* at ¶ 14. Northern Trust informed Peters that it would act as guarantor only if Parrot would deposit all of the ECSC loan proceeds into an account with Northern Trust for a period of eight years. *Id.*

On December 23, 1983, WDA, DCG, and the other investors met to close the agreement by which they formally committed themselves to invest in Parrot. *Id.* at ¶ 15. Peters, who was in attendance as the promoter of the project and who would become Parrot's managing director under the terms of the

agreement, knew that the investors were entering the agreement on the basis of his prior advice that the ECSC loan could be obtained merely by pledging a security interest in Parrot assets. *Id.* He did not, according to WDA, inform these parties of the material change in the collateral pledged to Northern Trust to guarantee the ECSC loan. *Id.* When asked at the meeting about the terms of the guarantee, Peters stated only that Northern Trust would receive a one percent fee for serving as guarantor. *Id.*

In reliance upon Peters' prior advice and present misrepresentations and omissions regarding the collateral for the ECSC loan guarantee, the investing parties, including WDA, signed the investment agreement. *Id.* at ¶¶ 16, 27, 30. WDA contends that none of the investors would have entered into the investment agreement or proceeded with the transaction had they known of the actual terms of the guarantee arrangement with Northern Trust. *Id.* at ¶¶ 16, 27, 28. The Parrot investment would not have been attractive, claims WDA, because Northern Trust's collateral requirement left Parrot without access to the ECSC loan proceeds that were necessary to fund Parrot's early operations. *Id.*

*3 Parrot received the ECSC loan in two installments: the first in September 1984, and the second in March 1985. *Id.* at ¶ 17. As a condition precedent to issuing its guarantee of each installment, Northern Trust required Peters, as managing director of Parrot, to produce an authorization from the Parrot board of directors ("board") approving the deposit of the proceeds of the loan with Northern Trust as collateral. *Id.* at ¶ 18. To satisfy Northern Trust's authorization requirement and further his fraudulent scheme, Peters forged minutes of board meetings dated August 16, 1984 and February 28, 1985, in which he falsely stated that the board authorized the deposit of the loan installments with Northern Trust. *Id.* at ¶¶ 19 and 29. The board did not meet on either of those days. *Id.* at ¶ 20. The board also never authorized the deposit of the loan proceeds with Northern Trust, nor could it have done so, because it had no knowledge of the actual terms of the guarantee arrangement. *Id.*

The board did not learn of the terms of the

Not Reported in F.Supp.
1991 WL 172950 (N.D.Ill.)
(Cite as: 1991 WL 172950 (N.D.Ill.))

Page 3

Northern Trust loan guarantee until August 1985, when it made an inquiry into Parrot's mounting financial problems. *Id.* at ¶ 21. The board's inquiry revealed that Parrot's financial woes were caused, in part, by a shortage of working capital, due to the fact that the proceeds of the ECSC working capital loan had been deposited with Northern Trust and were thus unavailable for corporate use. *Id.* Upon learning of Peters' misrepresentations, omissions and malfeasance regarding the terms of the guarantee, the board immediately removed Peters from his position as managing director. *Id.* at ¶ 22. WDA asserts that Peters' activities constituted a violation of federal securities laws and that the acts of fraud supporting its securities fraud claim also constitute a RICO violation. *Id.* at ¶¶ 31, 45-50.

As a result of its working capital shortfall due to Peters' activities, Parrot required an immediate infusion of capital and pledges of 1,750,000 pounds from WDA and the other investors to stave off bankruptcy. *Id.* at ¶ 23. Even with the infusion of additional capital, Parrot was financially crippled and has never attained its expected value. *Id.* at ¶ 24. Thus, WDA suffered the following injuries as a result of Peters' fraud: first, WDA was forced to incur an unexpected cost in providing Parrot with additional capital to stay afloat; and second, Parrot's resulting poor financial performance meant that WDA never realized the rate of return on its investment anticipated at the time of its initial investment on December 23, 1983. *Id.*

## DISCUSSION

The purpose of a motion to dismiss is merely to test the sufficiency of the complaint, not to decide its merits. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990), quoting *Traid Assocs., Inc. v. Chicago Hous. Authority,* 892 F.2d 583, 586 (7th Cir.1989). Generally, the federal system of notice pleading does not favor dismissal for failure to state a claim. *Gray v. Dane County,* 854 F.2d 179, 182 (7th Cir.1988). However, dismissal is proper if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to the relief requested. *Illinois Health Care Ass'n v. Illinois Dep't of Public Health,* 879 F.2d 286, 288 (7th Cir.1989), citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In addition, if the complaint fails to allege a necessary element

required to obtain relief, dismissal is in order. *R.J.R. Services, Inc. v. Aetna Casualty and Sur. Co.,* 895 F.2d 279, 281 (7th Cir.1989).

I.     Securities     Fraud     Claim     Subject-Matter Jurisdiction

*4 Peters moves to dismiss WDA's securities fraud counterclaim for lack of subject matter jurisdiction. More particularly, Peters contends that WDA has failed to allege sufficient actionable fraudulent conduct or effects arising from that conduct within the United States to support the application of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.,* to the transnational securities transaction at issue.

The Securities Exchange Act is silent as to its extra-territorial application. *E.g., Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.1991); *cf.,* 15 U.S.C. § 78aa (jurisdictional provision simply vests district court with exclusive original jurisdiction for violations of the Act). The silence of federal securities law as to its extraterritorial application has prompted courts to draw upon general principles of foreign relations law [FN2] to determine whether federal securities law should apply to a particular transnational fraud claim. The resulting analysis has come to be known as the "conduct and effects tests." *See, e.g., Continental Grain (Australia) Pty Ltd. v. Pacific Oilseeds, Inc.,* 592 F.2d 409 (8th Cir.1979); *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974 (2d Cir.), *cert. denied,* 423 U.S. 1018 (1975); *cf. Tamari v. Bache & Co. (Lebanon) S.A.L.,* 730 F.2d 1103 (7th Cir.), *cert. denied,* 469 U.S. 871 (1984) (securities law conduct and effects analysis adopted and applied to determine extraterritorial application of Commodities Exchange Act in transnational fraud case).

A. Conduct Test

The conduct test focuses on a defendant's alleged conduct within the United States as it relates to the overall scheme to defraud. *Tamari,* 730 F.2d at 1108; *see also Continental Grain,* 592 F.2d at 420; *Grunenthal GmbH v. Hotz,* 712 F.2d 421, 424-25 (9th Cir.1983). A federal court does not have subject matter jurisdiction if the defendant's conduct or failure to act within the United States was merely

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1991 WL 172950 (N.D.Ill.)
(Cite as: 1991 WL 172950 (N.D.Ill.))

Page 4

preparatory to the fraud, particularly where the bulk of the activity occurred in a foreign country. *Alfadda,* 935 F.2d at 478 (citations omitted); *Continental Grain,* 592 F.2d at 420; *accord Tamari v. Bache & Co. (Lebanon) S.A.L.,* 547 F.Supp. 309, 314 (N.D.Ill.1982). Thus "[l]awsuits by aliens alleging securities fraud should be entertained in American courts 'only where conduct *material* to the completion of the fraud occurred in the United States'" *Id.* at 478, quoting *Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1046 (2d Cir.1983) (emphasis added). Alternatively stated, the particular acts or culpable failure to act within the United States must *directly* cause the losses complained of by the foreign investors. *Id.* (citation omitted).

Even according WDA's factual allegations the generous construction due them on this motion to dismiss, *Gillman v. Burlington Northern R.R. Co.,* 878 F.2d 1020, 1022 (7th Cir.1989), WDA has failed to allege sufficient actionable conduct to support subject matter jurisdiction under federal securities law. Simply stated, WDA has not alleged that any of the material conduct constituting the alleged fraudulent scheme occurred within the United States.

*5 As an initial matter, it is worth noting the foreign nationality of nearly all of the parties implicated in the scheme in some capacity. As alleged, the scheme was undeniably perpetrated by an American, Peters. However, all remaining players are of foreign origin, including alleged co-conspirator Taylor. WDA names only foreign corporations among the purportedly defrauded investors. The scheme revolved around the formation and development of a foreign corporation, Parrot. The working capital loan necessary to secure the commitment of the investors came from another foreign entity, ECSC. WDA does allege that Peters negotiated and secured the guarantee for the ECSC loan from Northern Trust, an American banking concern. However, by its own admission, WDA states that Peters negotiated with the *London* branch of Northern Trust.

More significant than the foreign nationality of nearly all the players and all the victims is the fact that WDA's counterclaim does not allege that any conduct, let alone conduct material to the development of the purported fraudulent scheme, occurred within the United States. Foremost among the activities occurring on foreign soil is the crucial December 23, 1983 meeting at which Peters allegedly withheld material information regarding the terms of the Northern Trust guarantee of the ECSC loan. As noted above, Peters' only alleged interaction with a remotely American entity was his involvement with the London branch of Northern Trust. But regardless of the degree to which the American headquarters of Northern Trust was involved in the guarantee arrangement, the alleged fraud did not arise from the guarantee itself. Instead, the alleged fraud, by WDA's own characterization of its case, arose from "the nondisclosure of the true terms of [the] guarantee for [the] loan." WDA Memorandum in Opposition to Motion to Dismiss, p. 2 ("WDA memo."). Thus, the Parrot-Northern Trust relationship is not "material" to the fraud scheme in the sense of having "directly" caused the injury to WDA and the other investors. *Alfadda,* 935 F.2d at 478; *cf., Tamari,* 730 F.2d at 1108.

WDA asserts that the present case compares favorably with *Securities & Exch. Comm'n v. Kasser,* 548 F.2d 109, 114 (3d Cir.), *cert. denied,* 431 U.S. 938 (1977). In *Kasser,* a foreign corporation was the victim of a complex, long-term securities fraud scheme operated from within the United States by Americans. Crucial to the fraud scheme in *Kasser* was the fraudulent inducement of the plaintiff foreign corporation to enter into investment contracts. In this respect only does Peters' scheme bear any resemblance to the scheme at issue in *Kasser.* In addition to being vastly larger in scope, complexity and duration, the *Kasser* scheme entailed significant conduct occurring within the United States, including negotiations, execution of one of the investment contracts, and the incorporation of defendant companies in the United States to launder money. 548 F.2d at 111.
In contrast, none of material events in the development of the Peters' scheme occurred within the United States. Consequently, WDA's claim is not analogous with *Kasser.*

*6 WDA now attempts to bolster the American dimensions of its claim with additional allegations of purportedly fraud-related activity within the United States. Because these factual assertions

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 5
1991 WL 172950 (N.D.Ill.)
**(Cite as: 1991 WL 172950 (N.D.Ill.))**

were neither stated nor implied in WDA's counterclaim, they are beyond the proper scope of this motion to dismiss. In any event, these allegations are unlikely to support the weight of WDA's jurisdictional burden when measured in the context of a scheme to defraud in which all material conduct appears to have occurred abroad.

B. Effects Test

Failure to allege sufficient activity within the United States to satisfy the conduct test will not alone defeat a claim of transnational securities fraud. A federal court also has subject-matter jurisdiction where the claim satisfies the "effects" test. The effects test is satisfied where illegal activity abroad causes a "substantial effect" within the United States. *Alfadda*, 935 F.2d at 478, citing *Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 261-62 (2d Cir.), *cert. dismissed,* 492 U.S. 939 (1989).

Foremost among the effects of a defendant's conduct satisfying this test would be the creation of a "foreseeable and substantial harm to interests within the United States." *Tamari,* 730 F.2d at 1108 (citations omitted). Peters correctly asserts that WDA has failed to allege any resulting harm to the interests of an American entity or, more generally, to the interest of any foreign entity within the United States. A further cataloguing of possible results that might satisfy the effects test would serve no purpose here, as WDA does not assert subject-matter jurisdiction on this basis. Accordingly, WDA's claim of securities fraud is dismissed for failure to allege actionable fraudulent conduct, or substantial effects arising from that conduct, within the United States sufficient to create subject-matter jurisdiction under federal securities law.

II. RICO Claim

Peters also moves for dismissal of WDA's RICO claims under 18 U.S.C. §§ 1962(a), (b), (c) and (d). To state a claim under the RICO statute, a plaintiff must allege that the defendant engaged in or conspired to engage in a "pattern of racketeering activity." 18 U.S.C. § 1962 (1988); *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479 (1985). "Racketeering activity" is defined to include "any

offense involving ... fraud in the sale of securities ... punishable under any law of the United States." 18 U.S.C. § 1961(1).

WDA alleges as racketeering activity the same conduct that serves as the basis for its securities fraud claim. *See* WDA counterclaim ¶ 46. Peters logically contends that because the alleged activities are not sufficient to create subject-matter jurisdiction under federal securities law, they are not punishable under any law of the United States. Therefore, the allegedly fraudulent activity may not serve as the basis for a racketeering claim under the RICO statute. Peters thus concludes that WDA, having failed to allege racketeering activity as defined in the RICO statute, necessarily fails to state a claim upon which relief can be granted.

*7 WDA responds with the contention that the statutory phrase "punishable under any law of the United States" extends to acts occurring outside of the United States "which, if they had occurred within the United States, would be punishable under United States law." WDA memo. p. 9. This interpretation of established law is without merit. WDA's interpretation would give RICO a nearly boundless extraterritorial scope and turn RICO into a vehicle for adventurous civil and criminal litigators with an itch to see the world. As defined in the statute, racketeering activity consists of acts for which the defendant could actually be convicted. *Sedima,* 473 U.S. at 489. "[A] racketeering activity ... must be an act in itself *subject to* criminal sanction." [FN3] *Id.* at 489, quoting S.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969). Peters' activities, as alleged in WDA's counterclaim, are not subject to criminal sanction within the United States. Consequently, they are not racketeering activities within the meaning of the RICO statute and are unavailable as a basis upon which to state a RICO claim. Peters' motion to dismiss WDA's RICO counterclaim is therefore granted.

*CONCLUSION*

Peters' motion to dismiss Count I of WDA's counterclaim is granted due to lack of subject-matter jurisdiction. Count V of WDA's counterclaim is dismissed for failure to state a claim upon which relief can be granted.

        FN1. All citations regarding factual

Not Reported in F.Supp.
1991 WL 172950 (N.D.Ill.)
(Cite as: 1991 WL 172950 (N.D.Ill.))

allegations are to WDA's counterclaim unless otherwise indicated.

FN2. *See generally, Restatement (Third) of the Foreign Relations Law of the United States* § 416 (1987).

FN3. This is not to say that RICO has no extraterritorial application. The provisions of the statute are cast in language inviting some degree of extraterritorial application. *See* 18 U.S.C. §§ 1962(a), (b) and (c) (proscribing certain activities "which affect [ ] interstate or foreign commerce."). Moreover, applying the same general principles of international law referred to in the previous discussion of the jurisdictional scope of federal securities law, at least one circuit has applied RICO to cases involving foreign enterprises as either defendants or plaintiffs. *See Alfadda v. Fenn,* 935 F.2d 475, 479 (2d Cir.1991); *United States v. Parness,* 503 F.2d 430 (2d Cir.1974), *cert. denied,* 419 U.S. 1105 (1975). But even when extended to transnational racketeering activities, application of the RICO statute remains limited by the requirement that the particular underlying predicate acts alleged to constitute racketeering activity must themselves be subject to criminal sanction under the laws of the United States.

1991 WL 172950 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

. 1:86CV02646  (Docket)
(Apr. 17, 1986)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**12**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 90-2913-CIV-UNGARO-BENAGES

REPUBLIC OF PANAMA,

      Plaintiff,

vs.

BCCI HOLDINGS (LUXEMBOURG) S.A.;
BANK OF CREDIT AND COMMERCE
INTERNATIONAL, S.A.; BANK OF CREDIT
AND COMMERCE INTERNATIONAL (OVERSEAS)
LIMITED; AMJAD AWAN,

      Defendants.

_____/



### ORDER GRANTING BCCI'S MOTION TO DISMISS

THIS CAUSE is before the Court upon Defendant BCCI's Motion to Dismiss Panama's

Fourth Amended Complaint [hereinafter BCCI's Motion to Dismiss] filed on June 2, 1994. Plaintiff

filed a Memorandum in Opposition to BCCI Defendants' Motion to Dismiss Panama's Fourth

Amended Complaint [hereinafter Response to Motion to Dismiss] on August 17, 1994 and the BCCI

Defendants' filed a Reply Memorandum in Support of Their Motion to Dismiss the Fourth Amended

Complaint [hereinafter Reply to Motion to Dismiss] on August 26, 1994. This matter is ripe for

disposition.

241

# I. BACKGROUND

*A. Procedural History*

The procedural history of this matter is important to an overall understanding of the present Motion. The BCCI Defendants [1] initially filed a Motion to Dismiss the Second Amended Complaint on Jurisdictional Grounds and to Quash Service of Process [hereinafter BCCI's Original Motion to Dismiss] on September 30, 1991. (D.E. #73). The Court denied the BCCI's Original Motion to Dismiss as it related to subject-matter and personal jurisdiction and deferred ruling on the issue of forum non conveniens. (D.E. #121). Then the BCCI Defendants filed a Supplemental Memorandum on Motion to Dismiss on February 19, 1993 [hereinafter BCCI's Supplemental Motion to Dismiss], which focused solely on the issue of forum non conveniens. BCCI's Supplemental Motion to Dismiss was denied without prejudice on July 13, 1993. (D.E. # 200). On September 30, 1993 the First American Defendants [2] filed a Motion to Dismiss the Fourth Amended Complaint. (D.E. # 210). The First American Defendants Motion to Dismiss was granted on May 6, 1994. (D.E. # 226). Then the BCCI Defendants' filed the present Motion to Dismiss on June 2, 1994, requesting dismissal in accordance with the doctrines of international comity and forum non conveniens. [3]

---

[1] The BCCI Defendants consist of BCCI Holdings (Luxembourg) S.A., BCCI S.A., BCCI (Overseas) Limited.

[2] The First American Defendants included First American Bank, N.A. and First American Bank of New York.

[3] The BCCI Defendants incorporated by reference their Original and Supplemental Motions to Dismiss into the present Motion. The Original Motion addressed the traditional factors of forum non conveniens - the location of witnesses and documents, the application of foreign law, and public interest considerations - and the Supplemental Motion addressed the

*B. Facts*

      BCCI was a worldwide banking organization with operations in approximately 69 countries. Plea Agreement at 2-3, Exhibit A-3, BCCI's Supplemental Motion to Dismiss [hereinafter Plea Agreement]. On July 5, 1991, BCCI was closed by banking regulatory authorities in the United Kingdom, the United States, the Cayman Islands, Luxembourg and elsewhere. Id. In the Cayman Islands and Luxembourg where the BCCI Defendants are incorporated and in England where BCCI had its major base of operations, courts of local jurisdiction appointed provisional liquidators to assume control over the operations of BCCI. *See* Court of Appeals Judgment, Exhibit A, Plaintiff's Response to BCCI's Supplemental Memorandum on Motion to Dismiss Due to Forum Non Conveniens, filed on March 12, 1993 [hereinafter Response to Supplemental Motion to Dismiss]. In January 1992, after it became apparent that BCCI could not be rescued from insolvency, the courts in Luxembourg, England and the Cayman Islands ordered the formal liquidation of BCCI. Liquidators in each country were charged with the responsibility for supervising the collection of remaining assets and the orderly distribution of those assets to BCCI's legitimate depositors and creditors. Affidavit of Ian A.N. Wight at para. 5, Exhibit A, BCCI's Supplemental Motion to Dismiss [hereinafter Wight Aff.]. In accordance with the law of the jurisdictions, the liquidators implemented a "pooling agreement" as the means of collecting and distributing assets.[4] Court of Appeals Judgment, Exhibit A, Response to Supplemental Motion to Dismiss [hereinafter Court of Appeals

---

threshold issue of the availability of an alternative forum.

    [4] A "pooling agreement" essentially combines all the assets of a debtor or group of debtors and then equally distributes them to all unsecured creditors. *See* Court of Appeals Judgment.

3

Judgment]. The "pooling agreement" received Final Court approval in England and the Cayman Islands and District Court approval in Luxembourg, where an appeal is pending. Affidavit of Stephen J. Akers at 2, Exhibit C, BCCI's Supplemental Motion to Dismiss [hereinafter Akers Aff.].

In addition to establishing a "pooling agreement," each jurisdiction has established an essentially identical procedure for filing a claim. *See* Akers Aff at 4-7; Wight Aff. at 6-12; Declaration of Georges Baden, Exhibit B, BCCI's Supplemental Motion to Dismiss [hereinafter Baden Decl.]. First, a creditor or a depositor of BCCI must submit a proof of debt form or other acceptable evidence of debt for all present and future claims, including claims for damages, to the Official Liquidators. Id. Proof of debt forms are currently available and have been sent to the creditors and depositors along with an explanatory letter, a summary of proposed agreements, and if applicable, the latest available bank statement. Proof of debt forms were also published in approximately 136 newspapers worldwide. Id. Claims may be submitted to the Official Liquidator in the Cayman Islands in the liquidation of BCCI Overseas at any time up to the deadline which has not yet been established by the Court. Wight Aff. para. 20. In the liquidation of BCCI S.A., depositors and creditors may submit their claims to either the English liquidators or the liquidators appointed in Luxembourg. Akers Aff. para. 8. The claims will then be considered by the Official Liquidators who may accept or reject any claim in whole or in part, in accordance with the law of the jurisdiction. Akers Aff. para. 13. If a claim is rejected, the creditor may appeal to a court of appropriate jurisdiction. Akers Aff. para. 14.

In addition to the above described proceedings, a liquidation proceeding against BCCI Overseas currently exists in Panama. The assets of some branches of the BCCI banking

4