13

Westlaw.

Not Reported in F.Supp.2d
2004 WL 1488384 (S.D.N.Y.)
**(Cite as: 2004 WL 1488384 (S.D.N.Y.))**

Page 1

C
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
ROQUETTE AMERICA, INC. and Roquette Freres, Plaintiffs,
v.
ALYMUM N.V., Amylum France SAS, A.E. Staley Manufacturing Company, Inc., Tate & Lyle PLC., Laurent Gerber, and Carole Piwnica, Defendants.
No. 03 Civ. 0434(DC).

July 1, 2004.

Fox Horan & Camerini LLP, By: Oleg Rivkin, Eric Lindquist, New York, New York, for Plaintiffs.

Winston & Strawn LLP, By: Robert M. Buschmann, Sheri N. Lewis, New York, New York, for Defendants Tate & Lyle PLC, and AE Staley Manufacturing Company, Inc.

Kelley Drye & Warren LLP, By: Jonathan K. Cooperman, Alison L. MacGregor, Damon W. Suden, New York, New York, for Defendants Amylum France SAS, Amylum N.V., Laurent Gerber, and Carole Piwnica.

*MEMORANDUM DECISION*

CHIN, J.

*1 In this unfair competition case, plaintiffs Roquette Freres ("Roquette") and Roquette America, Inc. ("RAI") assert claims under § 44(h) of the Lanham Act, 15 U.S.C. § 1126(h), and the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1964. Plaintiffs also bring state law claims alleging breach of contract, breach of fiduciary duty, conversion of confidential information, misappropriation of trade secrets, intentional interference with contract, and procurement of breach of fiduciary duty. Before the Court are defendants' motions to dismiss. For the reasons set forth below, this Court lacks jurisdiction over plaintiffs' federal claims. The federal claims are therefore dismissed with prejudice and the state law claims are dismissed without prejudice.

*STATEMENT OF THE CASE*
I. *The Facts*

A. *The Parties*

Roquette is a French corporation that manufactures starch-derived food ingredients and other starch-based products, including sorbitol and maltitol. (Compl.¶ 2). [FN1] Roquette is the parent company and sole owner of RAI, an American subsidiary incorporated in Delaware with its principal place of business in Keokuk, Iowa. (Compl.¶ 1).

> FN1. References to "Compl." are to the First Amended Complaint filed on July 30, 2003.

Defendant Tate & Lyle PLC ("Tate & Lyle") is a United Kingdom limited company, with its principal place of business in London, England. (Compl.¶ 3). Tate & Lyle is the parent company of defendants Amylum N.V. ("Amylum"), a Belgian company, and A.E. Staley Manufacturing Company, Inc. ("Staley"), a Delaware corporation with its principal place of business in Illinois. (Compl.¶¶ 3-5).

Amylum is the parent of a group of companies (the "Amylum Group"). (*Id.* ¶ 4). One of Amylum's subsidiaries is defendant Amylum France SAS ("Amylum France"), a French company. (*Id.*).

Individual defendant Carole Piwnica is a Belgian citizen domiciled in France. (*Id.* ¶ 7). During the relevant time period, she was the Chairman of the Board of the Amylum Group and a member of the Staley and Tate & Lyle Boards. (*Id.* ¶ 7).

Individual defendant Laurent Gerber is a French citizen living in Belgium. (*Id.* ¶ 6). Gerber worked for Roquette from 1976 to 1982 as an engineer in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Roquette's manufacturing facilities in France. (*Id.* ¶ 32). From 1982 to 1988, and again from 1993 to 1997, Gerber worked for RAI in Illinois and Iowa. (*Id.* ¶¶ 32, 34). In 1997, Gerber returned to France where he continued to work for Roquette until his resignation in 1998. (*Id.* ¶ 42).

B. *Gerber's Non-Compete and Non-Disclosure Agreement*

In March 1994, during his assignment with RAI in Iowa, Gerber signed a standard RAI non-competition/non-disclosure agreement. (*Id.* ¶¶ 38-39). The language of the agreement is as follows:

> 1. No employee of [RAI] shall, during his employment or at any time after his termination, disclose to any third party any proprietary information relating to the business of ... [Roquette] or any of [its] affiliates obtained by the employee while in its ... employ without ... [written consent] ... and upon leaving the employ of [RAI] no employee shall take with him, without like consent, any drawing, blueprint or other reproduction, or any special data, formulae, know-how, or any tables, calculations, letters or other documents, or copies of any thereof, or any proprietary information pertaining to ... [Roquette] or any of [its] affiliates or any of the activities thereof.
>
> * * *
>
> *2 3. No employees of [RAI] shall, during his employment and for two years thereafter, without ... written consent ..., engage in any other employment or business, directly or indirectly, alone or as a member of a partnership or as an officer or employee of or consultant to a corporation, firm or business, engaged in the manufacture or sale of sorbitol ... or any other products developed by ... [Roquette or any of its affiliates].

(*Id.* ¶ 39).

C. *Amylum's "Master Plan" and the Decision to Recruit Gerber*

In 1994-95, Amylum conceived a "Master Plan," encompassing the Amylum Group, with the ultimate goal of entering the sorbitol market on a global basis. (*Id.* ¶ 46). In furtherance of the plan, Amylum formed a joint venture in 1996 with SPI Polyols, Inc. ("SPI"), a Delaware company chosen for its technology, know-how, and customer base. (*Id.* ¶ 50). The Amylum/SPI joint venture then began construction of a $400,000,000 powder sorbitol plant in Nesle, France (the "Nesle Plant"). (*Id.* ¶¶ 47, 50).

In March 1998, Amylum provided sorbitol samples to Warner-Lambert, one of the largest world-wide purchasers of powder sorbitol. (*Id.* ¶ 52). Warner-Lambert rejected these samples because the sorbitol produced by Amylum was not in conformity with the requirements of the European market. (*Id.*). Amylum determined that the technology supplied by SPI for the Nesle Plant was only capable of producing a type of powder sorbitol acceptable in the North American market. (*Id.*). Amylum then decided that the objectives of its joint venture with SPI could be achieved only through technology capable of varying the characteristics of powder sorbitol so that it would be suitable for both the European and North American markets. (*Id.* ¶ 53). Allegedly, Amylum knew that only the Roquette group possessed such technology. (*Id.*).

In March 1998, at an Amylum Group Policy Board meeting, Larry Pillard, the CEO of Tate & Lyle, Roderick Burden, Amylum Group's Managing Director, and Piwnica decided to recruit Gerber to work as Amylum's "Vice President-Technical." (*Id.* ¶¶ 54-55). Pillard, Burden, and Piwnica knew and intended that by recruiting Gerber they would be obtaining plaintiffs' highly confidential and proprietary information. (*Id.* ¶ 55).

Amylum retained a corporate recruiting firm whose representatives contacted Gerber and met with him on April 4, 1998. (*Id.* ¶¶ 56-57). Subsequently, representatives of Amylum met with Gerber on eight separate occasions. (*Id.* ¶ 58). On July 30, 1998, Gerber accepted a position as the Vice-President Technical of the Amylum Group. (*Id.* ¶ 71). A few days later Gerber resigned from Roquette. (*See id.* ¶ 62). [FN2]

> FN2. Although the First Amended Complaint does not specifically allege where these meetings in the spring and early summer of 1998 took place, they must have occurred in Europe.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1488384 (S.D.N.Y.)
(Cite as: 2004 WL 1488384 (S.D.N.Y.))

Page 3

D. *Gerber Seeks and Obtains Confidential Information From Roquette*

1. *The MBH-Sorbitol Plan*

On June 29 or 30, 1998, RAI's director of polyols and sweeteners, Richard O'Hara, was in France visiting Roquette. (*Id.* ¶ 60). While O'Hara was in France, Gerber asked him for a copy of a document entitled the Mass Balance of Hydrogenation (the "MBH-sorbitol plan"). (*Id.* ¶ 60). The MBH-sorbitol plan is a highly confidential document that provides a complete description of RAI's proprietary processes for production of its various grades and qualities of liquid sorbitol. (*Id.*). When O'Hara returned to RAI's Keokuk plant, he directed the author of the MBH-sorbitol plan, John McAndrew, to download a copy for delivery to Gerber. (*Id.* ¶ 62). On August 5 or 6, 1998, O'Hara returned to France with McAndrew. (*Id.*). Although Gerber had tendered his resignation a few days earlier, he met with O'Hara and McAndrew and received a copy of the MBH-sorbitol plan, apparently in France. (*Id.*). At the time, neither O'Hara nor McAndrew was aware of Gerber's resignation. (*Id.*).

2. *Information Regarding Raw Materials*

*3 On July 27, 1998, three days before accepting the job as Vice President-Technical, Gerber telephoned Phillippe Rousseaux, Roquette's purchasing director of raw materials. [FN3] (*Id.* ¶ 67). From his office in France, Gerber questioned Rousseaux in detail regarding the net cost and sources of wheat and corn as projected to 2003. (*See id.* ¶ 67). After about 15 or 20 minutes, Rousseaux told Gerber that he did not have time to talk because he was preparing to leave on vacation. (*Id.* ¶ 68). Rousseaux advised Gerber that he could get the information he wanted from some documents. (*Id.*). Gerber, however, did not officially have access to these documents and asked Rousseaux for copies. (*Id.*). Rousseaux refused because his secretary had left for the day and he did not have time to make copies for Gerber. (*Id.*).

> FN3. The First Amended Complaint does not indicate where Rousseaux was located when he received Gerber's call.

3. *The MBH-Maltitol Plan*

Gerber also attended an internal Roquette working group meeting on August 5 or 6, 1998. (*Id.* ¶ 63). The meeting focused on a project to construct a maltitol plant using highly confidential and proprietary technology developed jointly by RAI and Roquette. (*Id.*). During the meeting, Gerber asked detailed questions regarding the size of the equipment installed in the new plant, the status of the construction, and the new technology involved. (*Id.*). Gerber also obtained a highly confidential document that effectively provided instructions for the production of maltitol using RAI's and Roquette's proprietary technology (the "MBH-maltitol plan").

E. *Gerber Joins Amylum*

Gerber's July 30, 1998 employment agreement with Amylum provided that Gerber would assume the duties of "Group Vice President-Technical" as of November 4, 1998. (*Id.* ¶ 71). [FN4] The agreement also obligated Amylum to indemnify Gerber "for any legal claims and costs" brought against him by Roquette or its affiliates. (*Id.* ¶ 72).

> FN4. The First Amended Complaint does not specifically allege the location of Gerber's job with Amylum, but because Amylum is a Belgian company with offices in France, Gerber must have worked in Europe.

Amylum was concerned that Gerber's non-compete/non-disclosure agreement could lead to litigation. To conceal the nature of Gerber's work for Amylum, the July 30, 1998 employment agreement was cancelled. (*Id.* ¶ 74). In its place, Amylum and Gerber executed an agreement making Gerber the Technical Director of Orsan, an entity that produces monosodium gluconate ("MSG"). (*Id.* ¶ 75). Gerber had no experience producing MSG during his twenty-three year career with Roquette. (*Id.*). A second agreement made Gerber the Group Vice President-Technical of the Amylum Group starting September 2, 1999--the same day his non-competition/non disclosure agreement expired. (*Id.* ¶ 74). As part of an additional effort to conceal Gerber's involvement in Amylum's sorbitol production, Amylum allegedly assigned the internal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

code "FKP" to refer to Gerber in all internal documents until September 2, 1999. (*Id.* ¶ 76).

F. *Gerber's Role at Amylum*

From the very beginning of his employment by Amylum, Gerber was actively involved in Amylum's sorbitol production. (*Id.* ¶ 79). As a result, Amylum adopted technology substantially identical to Roquette's and RAI's unique process for manufacturing powder sorbitol. (*Id.* ¶ 84). Once Amylum began using the new process, it was able to qualify its sorbitol for sale to Warner-Lambert for use in its gum products in all of its global locations. (*Id.* at 85).

G. *Amylum's Efforts to Enter the United States Sorbitol Market*

*4 In June 1999 Amylum began negotiations with Ashland Inc. ("Ashland"), one of the largest distributors in North America, to distribute sorbitol produced by Amylum France. (*Id.* ¶ 88). At the time, RAI was also in negotiations with Ashland. (*Id.*). On February 18, 2000, Ashland informed RAI that Amylum was offering its sorbitol at a lower price. (*Id.*). As a result, RAI was forced to lower its price to compete. (*Id.* ¶ 91). Although Amylum eventually withdrew from its negotiations with Ashland, RAI remained obligated to sell its sorbitol at the lower price.

H. *Roquette I*

On March 25, 1999, plaintiffs sued Gerber, Amylum, and Piwnica in Iowa state court alleging common law claims ("Roquette I"). (Compl.¶ 92). During discovery, Amylum, Piwnica, and Gerber allegedly submitted a number of false and improperly redacted documents in an effort to perpetuate and conceal their scheme to misappropriate Roquette's and RAI's technology. (*Id.* ¶ 94). Specifically, each of these defendants submitted false interrogatory responses indicating that Gerber's work for the Amylum Group was limited to Orsan. (*Id.*). Despite these false responses, the Iowa trial court found that Gerber functioned as the Group Vice President-Technical and was responsible for all of Amylum's operations. (*Id.*).

Roquette I was subsequently dismissed by the Iowa Court of Appeals for lack of personal jurisdiction. (*Id.* ¶ 100).

I. *Roquette II*

In August 2000, Tate & Lyle acquired control over Amylum's board of directors and began operating Amylum as a unit or division of Tate & Lyle. (*Id.* ¶ 102). As the parent company of Staley, Tate & Lyle's acquisition of control over Amylum enabled it to transfer information from Amylum to Staley. (*Id.* ¶ 116). On November 17, 2000, while the Roquette I appeal was pending, Roquette and RAI commenced a second lawsuit in Iowa state court ("Roquette II") seeking to enjoin the transfer of Roquette's and RAI's trade secrets from Amylum to Staley. (D'Amore Decl., Exh. 2). After eight months of discovery, and three and one half days of live testimony, the Iowa court denied the motion for injunctive relief on December 27, 2001. (*Id.*, Exh. 3). Plaintiffs did not appeal the decision and on January 2, 2003, Roquette II was dismissed for want of prosecution. (*Id.*, Exh. 5).

II. *Procedural History*

Plaintiffs filed this action on January 17, 2003. After defendants moved to dismiss the original complaint, plaintiffs filed the First Amended Complaint on July 30, 2003 asserting claims under Section 44(h) of the Lanham Act, RICO and RICO conspiracy claims, breach of the non-competition covenant, breach of the non-disclosure covenant, breach of fiduciary duty, conversion of confidential information, misappropriation of trade secrets, intentional interference with contract, and procurement of breach of fiduciary duty. Defendants' motions to dismiss the original complaint were denied as moot on August 11, 2003.

*5 Defendants filed new motions to dismiss the First Amended Complaint for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), for lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2), and for failure to state a claim under Fed.R.Civ.P. 12(b)(6). [FN5] These motions are now before the Court. For the reasons set forth below, plaintiffs' claims are dismissed.

FN5. Tate & Lyle, Amylum, Amylum

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2004 WL 1488384 (S.D.N.Y.)  
**(Cite as: 2004 WL 1488384 (S.D.N.Y.))**

Page 5

France, Staley, Gerber, and Piwnica each submitted separate motion papers in support of the motion to dismiss.

## DISCUSSION
### A. *Subject Matter Jurisdiction*

In considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), federal courts "need not accept as true contested jurisdictional allegations." *Jarvis v. Cardillo,* No. 98 Civ. 5793(RWS), 1999 U.S. Dist. LEXIS 4310, at *7 (S.D.N.Y. Apr. 5, 1999). As the party "seeking to invoke the subject matter jurisdiction of the district court," the plaintiff bears the burden of demonstrating that there is subject matter jurisdiction in the case. *Scelsa v. City Univ. of New York,* 76 F .3d 37, 40 (2d Cir.1996).

### B. *The Lanham Act Claim*

#### 1. *Applicable Law*

Plaintiffs' first claim for relief is brought pursuant to Section 44(h) of the Lanham Act, 15 U.S.C. § 1126(h). Section 44(h) entitles foreign nationals of countries that are party to certain international conventions with the United States the right to "effective protection against unfair competition." To guarantee this protection, Section 44(h) makes available "the remedies provided in this chapter ... so far as they may be appropriate in repressing acts of unfair competition." 15 U.S.C. § 1126(h) (2002).

While Section 44(h) plainly extends protection against unfair competition to foreign nationals, it does not apply extraterritorially to unfair competition occurring in foreign countries. The benefits of the Lanham Act "are limited to application within the United States. It is true that they are not expressly so limited, but it seems inconceivable that Congress meant ... to extend to all foreign nationals a remedy in the United States against unfair competition occurring in their own countries." *Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633 (2d. Cir.1956); *see also Am. White Cross Labs., Inc. v. H.M. Cote, Inc.,* 556 F.Supp. 753, 758 (S.D.N.Y.1983)("I regard *Vanity Fair Mills* as controlling authority for the proposition that insofar as [plaintiff] alleges ... unfair competition occurring [outside the United States], the complaint does not state a claim arising under the laws of the United States.").

#### 2. *Application*

Each of the parties here is either a European corporation, a subsidiary of a European corporation, or a European citizen. (*See* Compl. ¶ 1). The decision to recruit Gerber allegedly was made at a meeting of the Amylum Group Policy Board. (*Id.* ¶ 55). Amylum is a European corporation and plaintiffs do not claim that this meeting took place in the United States. Moreover, the allegations of unfair competition focus predominately on the actions of Gerber, a French citizen who worked in France for a French company throughout the relevant time period. (*Id.* ¶¶ 42-45). Gerber's acts of misappropriation occurred in Europe. His alleged efforts to obtain information from Rousseaux and his misappropriation of information regarding Roquette's planned maltitol production plant took place entirely in Europe. (*Id.* ¶ 63, 67, 68). Even crediting plaintiff's allegations that Gerber used O'Hara as an "instrumentality" to obtain the MBH-sorbitol plan from RAI in the United States, the fact remains that Gerber and O'Hara were both in France when Gerber allegedly requested and then later received the plan. (*Id.* ¶¶ 60-62).

*6 Staley, the only American defendant, is not alleged to have been involved in the recruitment of Gerber. In fact, Staley's only interaction with Gerber occurred when its CEO, John Doxsie, along with the CEO of Tate & Lyle and the managing director of the Amylum Group, attended a "meeting/interview" with Gerber on September 27, 1998--almost two months after Gerber's resignation from Roquette. (*See id.* ¶¶ 54, 55, 58, 62). Even assuming this meeting is somehow relevant to plaintiffs' claims, the meeting is not alleged to have taken place in the United States.

Plaintiffs' allegation that Staley has received or may receive plaintiffs' proprietary information (*id.* ¶ 115-20) does not change the overwhelmingly European nature of plaintiffs' complaint. [FN6] Staley is wholly owned and controlled by European-based Tate & Lyle, and it allegedly received the information not from Gerber but from Tate & Lyle, its parent company. Moreover, Tate & Lyle did not even acquire control over Amylum

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2004 WL 1488384 (S.D.N.Y.)  
(Cite as: 2004 WL 1488384 (S.D.N.Y.))

Page 6

until well after the alleged misappropriation.

> FN6. Notably, the Iowa court in Roquette II expressed its view that plaintiffs' allegations against Staley are baseless: "Despite voluminous discovery from the March 1999 filing of [Roquette I] until the July 3, 2001 hearing [in Roquette II], the plaintiffs have found no clear evidence that any of their proprietary information has found its way directly or indirectly to Staley." (D'Amore Decl., Ex. 3 at ¶ 44).

Finally, there is no allegation that any of the defendants ever engaged in unfair competition in the United States by selling any product manufactured using plaintiffs' trade secrets. (*See id.* ¶ 88). Although Amylum allegedly tried to sell sorbitol to a distributor in the United States, it withdrew from negotiations a few months later. [FN7] (*Id.* ¶ 90).

> FN7. Plaintiffs allege that Amylum only withdrew from negotiations because of litigation commenced by RAI and Roquette. (*Id.* ¶ 90). Even if true, the fact remains that Amylum is not alleged to have sold any sorbitol in the United States in competition with plaintiffs.

The gravamen of this complaint is a dispute between European rivals, Roquette and Amylum, that arose in Europe. Despite some arguable minor connections to the United States, the crucial acts of unfair competition all took place in Europe. Because the Lanham Act does not apply extraterritorially, plaintiffs' Lanham Act claim must be dismissed for lack of subject matter jurisdiction.

C. *The RICO Claims*

1. *Applicable Law*

The Second Circuit has noted that "[t]he RICO statute is silent as to any extraterritorial application." *North South Fin. Corp. v.. Al-Turki,* 100 F.3d 1046, 1051 (2d Cir.1996). Although "a corporate defendant that is a foreign entity is not for that reason alone shielded from the reach of RICO," the Second Circuit has acknowledged ambiguity as to the "character and amount of activity in the United States that will justify RICO subject matter jurisdiction over a foreign entity." *Id.* at 1052 (citing *Alfadda v. Fenn,* 935 F.2d 475, 479 (2d Cir.1991)). The Second Circuit has noted that "guidance [regarding the extraterritorial application of RICO] is furnished by precedents concerning subject matter jurisdiction for international securities transactions and antitrust matters." *North South Fin.,* 100 F.3d at 1052. The Second Circuit, however, has not specified the test for extraterritorial applications of RICO. "The ultimate inquiry is ... whether 'Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to [foreign transactions] rather than leave the problem to foreign countries." ' *Id.* (quoting *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985 (2d Cir.1975)).

*7 Although the Second Circuit has not specified a precise standard, courts in this circuit have generally applied two alternative tests derived from transnational and antitrust cases in RICO extraterritoriality cases: the "conduct test" and the "effects test." *See North South Fin.,* 100 F.3d at 1051-52 (affirming district court's dismissal of RICO action for lack of subject matter jurisdiction for absence of U.S. conduct material to fraud); *Wiwa v. Royal Dutch Petroleum Co.,* No. 96 Civ. 8386(KMW), 2002 WL 319887, at *21 (S.D.N.Y. Feb. 28, 2002); *Giro v. Banco Espanol De Credito, S.A.,* No. 98 CIV. 6195(WHP), 1999 WL 440462, at *2 (S.D.N.Y. June 28, 1999); *Madanes v. Madanes,* 981 F.Supp. 241, 250 (S.D.N.Y.1997). "Because it is not clear which test should be used in the context of RICO, jurisdiction will exist where either test is satisfied." *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Corp.,* 98 F.Supp.2d 480, 486-87 (S.D.N.Y.2000).

Under the conduct test, subject matter jurisdiction exists "only where conduct material to the completion of the fraud occurred in the United States." *Giro,* 1999 WL 440462, at *3 (citing *Alfadda,* 935 F.2d at 479); *see also Madanes,* 981 F.Supp. at 251; *but see C.A. Westel de Venezuela v. Am. Tel. & Tel. Co.,* No. 90 Civ. 6665(PKL), 1993 WL 497971, at *4 (S.D.N.Y.1993) (rejecting conduct and effects tests in RICO context but asserting jurisdiction because predicate acts occurred in U.S.). The conduct in the United States must have "directly caused" the loss for subject

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1488384 (S.D.N.Y.)
(Cite as: 2004 WL 1488384 (S.D.N.Y.))

Page 7

matter jurisdiction to exist. *North South Fin.*, 100 F.3d at 1050 (citing *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1046 (2d Cir.1983) (quoting *Bersch*, 519 F.2d at 993)). "Mere preparatory activities, and conduct far removed from the consummation of the fraud, will not suffice to establish jurisdiction." *North South Fin.*, 100 F.3d at 1051 (quoting *Psimenos*, 722 F.2d at 1046)).

There are two versions of the effects test. *Id.* at 1051-52. One version is derived from securities cases and the other is derived from antitrust law. *Id.* Under the effects test borrowed from securities cases, jurisdiction exists over a predominantly foreign transaction when it has "substantial effects within the United States." *North South Fin.*, 100 F.3d at 1051; *see also Giro*, 1999 WL 440462, at *3; *Madanes*, 981 F.Supp. at 250 (quoting *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261-62 (2d Cir.1989)). "Remote and indirect effects" do not qualify as substantial. *North South Fin.*, 100 F.3d at 1052. The "effect" must be a "direct and foreseeable result" of the conduct alleged. *Consol. Gold Fields*, 871 F.2d at 261-62. In antitrust cases, liability may attach when the extraterritorial conduct is "intended to and actually does have an effect on United States imports or exports which the state reprehends." *North South Fin.*, 100 F.3d at 1052. Under both versions of the effects test, "the reasoning behind the test is 'to protect ... domestic markets from corrupt foreign influences.' " *Wiwa*, 2002 WL 319887, at *21 (quoting *Madanes*, 981 F.Supp. at 250).

2. *Application*

i. *The Conduct Test*

*8 The allegations underlying the RICO claim do not satisfy the conduct test for extraterritorial application of RICO. As discussed above in reference to plaintiff's Lanham Act claims, the crucial events comprising plaintiffs' allegations took place in Europe. Indeed, plaintiffs do not even argue that the RICO claims asserted in this action satisfy the conduct test for extraterritorial application of RICO. (*See* Plts.' Opp. Br. at 26-30). [FN8] Accordingly, the RICO claims must satisfy the effects test to withstand dismissal.

FN8. Plaintiffs do argue that their allegations satisfy the Second Circuit's test for personal jurisdiction in a section of their opposition brief entitled "Amended Complaint Satisfies The 'Conduct' Test." (Plts.' Opp. Br. at 6-7). This test, however, differs from the conduct test used to determine RICO's extraterritorial application. Because plaintiffs' claims fail to adequately allege this Court's subject matter jurisdiction, I do not address the merits of their arguments for personal jurisdiction.

ii. *The Effects Test*

a. *The Securities Effects Test*

The alleged effects of the RICO claim in the United States were not substantial or direct. The direct results of the RICO allegations were Gerber's immediate involvement in Amylum's sorbitol production in France, his alleged disclosure of plaintiffs' confidential and proprietary information to Amylum, and the creation of the Orsan and "FKP" schemes to conceal Gerber's role at Amylum. (Compl.¶¶ 74-84). These "effects" occurred in Europe.

Although Amylum allegedly entered into negotiations to sell sorbitol in the United States, there is no allegation that Amylum ever actually sold sorbitol here. In fact, the only alleged effect of Amylum's negotiations with Ashland is that RAI, on a single occasion, was allegedly forced to "lower its sorbitol price to meet Amylum's offer." (Compl.¶ 91). This falls short of the "substantial effects" set forth in cases applying the securities-based effects test and is, at worst, a remote and indirect effect that is not sufficient. *See e.g., Johnson Elec. North Am., Inc. v. Mabuchi Motor Am. Corp.*, 98 F.Supp.2d 480, 486-87 (S.D.N.Y.2000) (holding that a loss of sales in the United States constitutes a substantial effect sufficient to justify extraterritorial application of RICO).

Plaintiffs also claim that the alleged transfer of their proprietary information from Amylum to Staley, an American corporation and competitor of RAI, had a substantial effect in the United States. (Plts.' Opp. Br. at 29). Although plaintiffs allege that the result of this transfer is "severe damage to

RAI's market position and possible elimination of RAI as a polyols manufacturer" (Compl.¶ 113), the allegations of the First Amended Complaint do not support this claim. Because plaintiffs do not allege a single instance of Staley, or any other defendant, ever selling anything in the United States manufactured using plaintiffs' trade secrets, the alleged damage to RAI's market position is purely speculative.

Furthermore, Amylum's corporate relationship to Staley is so attenuated that the transfer of plaintiffs' proprietary information from Amylum to Staley cannot be considered a direct effect. As the parent company of both Amylum and Staley, Tate & Lyle served as an intermediary of any information that passed between its subsidiaries. (*See* Compl. ¶¶ 3-5). Because of defendants' corporate structure, plaintiffs' proprietary information would have to pass from Gerber to Amylum France, to Amylum N.V., and then to Tate & Lyle before it could be transferred to Staley. Moreover, Tate & Lyle did not even acquire Amylum until after the alleged misappropriation. Accordingly, Staley's receipt of the proprietary information is too far removed from the fraud allegations underlying the RICO claims to be considered a direct effect. (*See id.* ¶ 115).

b. *The Antitrust Effects Test*

*9 Plaintiffs' RICO allegations do not satisfy the antitrust effects test. First, the complaint does not allege that the defendants' extraterritorial conduct was intended to cause an effect in the United States. The scheme to recruit Gerber and misappropriate plaintiffs' trade secrets was allegedly conceived to further Amylum's "Master Plan" to enter the global sorbitol market. (*Id.* ¶ 46). At the time of the decision to recruit Gerber, Amylum was already capable of producing a type of powder sorbitol acceptable in the North American Market. (*Id.* ¶ 52). Amylum's inability to develop a powder sorbitol for sale in Europe prompted its decision to seek plaintiffs' trade secrets from Gerber. (*See id.* ¶¶ 52-55). Therefore, Amylum's scheme to obtain plaintiffs' trade secrets was intended to cause its greatest effect in Europe by enabling Amylum to sell sorbitol there.

Second, plaintiffs fail to adequately allege that defendants' extraterritorial conduct had an effect on United States imports or exports. Not only is there no allegation that defendants ever sold any product in the United States using plaintiffs' misappropriated trade secrets, plaintiffs also fail to allege that defendants' extraterritorial conduct interfered in any way with exports from the United States.

For these reasons, plaintiffs' allegations fail to satisfy either the antitrust-based or the securities-based effects test for extraterritorial application of RICO. Based on the facts alleged, a European tribunal is the proper forum for resolution of plaintiffs' claims. Accordingly, plaintiffs' RICO claims are dismissed for lack of subject matter jurisdiction.

C. *State Law Claims*

When, as here, the federal claims in a case are dismissed, leaving only state law claims, it is within the discretion of the district court to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *Purgess v. Sharrock*, 33 F.3d 134, 138-39 (2d Cir.1994). "When all bases for federal jurisdiction have been eliminated ... the federal court should ordinarily dismiss the state claims." *Bhd. of Locomotive Eng'rs Div. 269 v. Long Island R.R. Co.*, 85 F.3d 35, 39 (2d Cir.1996) (quoting *Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir.1988)). Here, I decline to exercise supplemental jurisdiction over plaintiffs' state law claims. Accordingly, the claims for breach of contract, breach of fiduciary duty, conversion of confidential information, misappropriation of trade secrets, intentional interference with contract, and procurement of breach of fiduciary duty are dismissed without prejudice.

CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are granted. The First Amended Complaint is dismissed, with prejudice as to the federal claims and without prejudice as to the state law claims (or any claims under foreign law brought in the appropriate court).

The Clerk of Court shall enter judgment accordingly.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1488384 (S.D.N.Y.)
**(Cite as: 2004 WL 1488384 (S.D.N.Y.))**

Page 9

***10** SO ORDERED.

2004 WL 1488384 (S.D.N.Y.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.