Not Reported in F.Supp.2d  
2003 WL 230741 (S.D.N.Y.)  
**(Cite as: 2003 WL 230741 (S.D.N.Y.))**

Page 27

*S.A.,* 997 F.2d 974, 982 (2d Cir.1993) (affirming FNC dismissal based in part upon the "considerable expense" that would be entailed to compel the appearance of necessary witnesses from Venezuela if case were tried here); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 1001 (2d Cir.) (affirming FNC dismissal where "the [district] court also properly recognized that ... [t]he cost of bringing [foreign] witnesses to the United States for trial, assuming they are willing, would be prohibitive"), *cert. denied,* 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993); *Potomac Capital Inv. Corp. v. KLM,* 1998 WL 92416 at *9 (cost of airline transporting witnesses from Netherlands to New York weighs in favor of FNC dismissal). [FN42]

> FN42. *Accord, e.g., Beekmans v. J.P. Morgan & Co.,* 945 F.Supp. 90, 93 (S.D.N.Y.1996) (FNC dismissal where none of the witnesses reside in New York and "virtually all of the witnesses and other sources of proof are located in the Netherlands or the United Kingdom"); *Guimond v. Wyndham Hotels & Resorts,* 95 Civ. 0428, 1996 WL 281959 at *4 (S.D.N.Y. May 29, 1996) (costs of obtaining attendance of witnesses weighs in favor of trial in Jamaica where witnesses to accident were in Jamaica and none of plaintiff's witnesses reside in the United States); *Nippon Fire & Marine Ins. Co. v. M.V. Egasco Star,* 899 F.Supp. 164, 169 (S.D.N.Y.1995) ("when the greater number and more relevant witnesses are located in a foreign forum, common sense suggests that the litigation proceed in that forum"), *aff'd,* 104 F.3d 351 (2d Cir.1996); *Gazis v. John S. Latsis (USA) Inc.,* 729 F.Supp. 979, 989 (S.D.N.Y.1990) (FNC dismissal based in part upon defendant's proffer that "it will cost approximately $30,000 to transport and lodge all of the [foreign] witnesses" if case was tried in New York.); *Postol v. El-Al Israel Airlines, Ltd.,* 690 F.Supp. 1361, 1364 (S.D.N.Y.1988) (FNC dismissal where "[t]he potential witnesses ... will also be mainly from Israel and Geneva," and the "expense of bringing over and accommodating willing witnesses would involve a disruption of at least three days work in addition to transportation and lodging costs, and may therefore be prohibitive."); *Ocean Shelf Trading Inc. v. Flota Mercante Grancolombiana S.A.,* 638 F.Supp. 249, 252 (S.D.N.Y.1986) (cost of bringing willing and unwilling witnesses to New York "points toward trial in Colombia" because "[a]lthough witnesses would have to travel were this action tried in either Colombia or in New York, since considerably more of the witnesses are Colombian or Pakistani nationals and residents than are New York residents, the cost of transporting them would be less were [the] litigation adjudicated in Colombia."); *Doufexis v. Nagos S.S., Inc.,* 583 F.Supp. 1132, 1134 (S.D.N.Y.1983).

b. *The Russian Residence of Any Damages Witnesses Also Favors Trial In Russia*

**\*22** Eastwind asserts that "all sources of proof on plaintiff's claim of pecuniary loss on account of her husband's past and to be expected future contribution to her support are located" in Kaliningrad, adding that plaintiff does not identify any witness in New York who possesses relevant information regarding Stanislav's "health, state of mind or the sums he spent for personal consumption or instead contributed to his wife's support." (Dkt. No. 18: Eastwind Reply Br. at 5.)

Plaintiff herself would likely provide much of the relevant damages testimony. Eastwind claims that trial in New York would be inconvenient to plaintiff, both because of plaintiff's travel expenses and the danger to plaintiff's frail health of traveling to New York. (Dkt. No. 13: Eastwind Br. at 4-5, 10.) The Court rejects this argument, as decisions have widely held that on a forum non conveniens motion, "defendants cannot rely on any inconvenience to plaintiff and witnesses whose expenses plaintiff will bear." *Manela v. Garantia Banking Ltd.,* 940 F.Supp. 584, 592 n. 12 (S.D.N.Y.1996); *accord, e.g., Jose Armando Bermudez & Co. v. Bermudez Int'l,* 99 Civ. 9346, 2000 WL 1225792 at *6 n. 6 (S.D.N.Y. Aug.29, 2000) ("Defendants rely in part on allegations of inconvenience to plaintiff, which should be disregarded."); *Royal Indus. Ltd. v. Kraft Foods,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 230741 (S.D.N.Y.)
**(Cite as: 2003 WL 230741 (S.D.N.Y.))**

Page 28

*Inc.,* 926 F.Supp. 407, 417 (S.D.N.Y.1996) (Denying FNC motion to dismiss in favor of *Russian* forum: "nothing prevents a plaintiff from burdening itself with an inconvenient forum. The forum non conveniens doctrine is simply designed to relieve 'oppressiveness and vexation to a defendant,' not a plaintiff.... To apply the doctrine differently, and disturb a plaintiff's choice of forum based on that party's self-imposed inconvenience would be paternalistic, to say the least."). [FN43]

> FN43. *See also, e.g., In re Rezulin Prods. Liab. Litig.,* 214 F.Supp.2d 396, 400 (S.D.N.Y.2002) ("[T]he contention that litigation otherwise more appropriately located in plaintiff's home province should be retained here for the defendants' convenience does not lie easily in plaintiff's mouth. Surely it would be more convenient for plaintiff to litigate in Quebec than here ..."); *Close v. Holiday Inns of America, Inc.,* No. CIV-86-189, 1987 WL 8951 at *2 (W.D.N.Y. Apr. 3, 1987) ("The plaintiff has evidently calculated that it is worthwhile for her to bring the Ohio witnesses to New York. Because the evidentiary burden and the expense of bringing their proof to New York will be hers to bear, that calculation is hers to make unless the defendants are unduly prejudiced thereby. A defendant cannot rely on any inconvenience to the plaintiff or her witnesses to support its motion for change of venue based on forum non conveniens.").

In its original motion papers, Eastwind failed to identify any Russian damages witnesses other than plaintiff. (*See generally* Dkt. No. 13: Eastwind Br.) In its supplemental papers, however, Eastwind has averred that "A. Kozlov," formerly a representative of Yellowstone's crewing agent, would testify about Stanislav's retirement pension under Russian law, as well as the average working life of a Russian seaman. (Dkt. No. 31: Arralde 12/2/02 Aff. ¶ 9 & Ex. A: Kozlov 11/27/02 Aff. ¶ 3.) Even if Eastwind were able to compel Kozlov's attendance in New York, the cost--in time, money and disruption--of transporting Kozlov to New York would favor trial in Russia. (*See* cases cited at pages 49-50 & n. 42 above.)

The location of damages witnesses slightly favors trial in Russia.

c. *The Location of Defendants' Offices In New York Is Not a Significant Factor*

Plaintiff asserts that defendants' shipping operations are based in New York. (*See* page 8 above.) Even if plaintiff is correct, it is well settled that evidence and witnesses relevant to a particular controversy are not necessarily located at a defendant's headquarters. *See, e.g., Transunion Corp. v. PepsiCo, Inc.,* 811 F.2d 127, 129 (2d Cir.1987) (dismissing action despite fact that defendant was a New York corporation, certain of the alleged misrepresentations were made in New York, and certain witnesses and documents were in New York); *Potomac Capital Inv. Corp. v. KLM,* 97 Civ. 8141, 1998 WL 92416 at *10 (S.D.N.Y. Mar.4, 1998) (Peck, M.J.) ("The fact that [defendant] ... has its American headquarters here is of no consequence [to FNC decision], since the tort and the resulting damage both occurred elsewhere."); *Beekmans v. J.P. Morgan & Co.,* 945 F.Supp. 90, 94 & n. 2 (S.D.N.Y.1996) ( "[T]he relevant private factors strongly lean toward dismissal in favor of a Dutch forum. The mere fact that [defendant] is headquartered in New York is simply not significant enough to justify the litigation of this action in the United States."); *Nippon Fire & Marine Ins. Co. v. M.V. Egasco Star,* 899 F.Supp. 164, 169 (S.D.N.Y.1995) (New York has no interest in "the claim of a foreign-owned subsidiary against an Egyptian shipper for subsequent damage to goods shipped from Louisiana to Egypt," even though plaintiff has a New York office which handles all of its U.S. claims), *aff'd,* 104 F.3d 351 (2d Cir.1996); *Doe v. Hyland Therapeutics Div.,* 807 F.Supp. 1117, 1124-25 (S.D.N.Y.1992) ("[R]emarkably, plaintiffs have failed to point to the existence of any evidence within [the Southern District of New York] that is materially related to plaintiffs' causes of action. While defendants 'do business in New York,' it is evident that the places where they collect, test, heat treat, and process the blood products in question, as well as where they are incorporated, and maintain their principal places of business, are located elsewhere."); *Ocean Shelf Trading Inc. v. Flota Mercante Grancolombiana,* 638 F.Supp. 249, 253 (S.D.N.Y.1986) ("Although both parties maintain

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2003 WL 230741 (S.D.N.Y.)  
**(Cite as: 2003 WL 230741 (S.D.N.Y.))**

Page 29

offices in New York, there is minimal local interest in this controversy.... All of the acts complained of occurred in Colombia, ... and all parties are foreign.... This points toward dismissal because courts should encourage trial of controversies in the localities in which they arise.").

*23 Nevertheless, plaintiff is also correct that in addition to the Yellowstone's crew, certain employees in defendants' management suite may possess relevant information. Plaintiff, however, has not identified who might have what information. Indeed, since it appears that defendant Mayflower, located in Piraeus, Greece, managed or "operated" the Yellowstone, its management would be most likely to possess relevant information about any ship defects. (*See, e.g.,* Dkt. No. 15: Lekkos 7/1/02 Aff. ¶¶ 1, 7 & Exs. D-E; Dkt. No. 31: Arralde 12/2/02 Aff. Ex. B: Lekkos 11/29/02 Aff. ¶¶ 1,6.) [FN44] Importantly, plaintiff does not explain what particular evidence might be obtained from defendants' New York employees. *See Saab v. Citibank, N.A.,* 00 Civ. 6784, 2001 WL 1382577 at *3 (S.D.N.Y. Nov.7, 2001) ("Plaintiffs argue that the Southern District is more convenient and appropriate because [defendant] is the true focus of this litigation and the key witnesses and documents will be found at [defendant's New York corporate headquarters].... However, Plaintiffs merely assert the existence of these documents and witnesses without any apparent factual backing.... [T]he location of witnesses and documents in this case actually favors dismissal ...."), *aff'd,* No. 01- 9417, 2002 WL 31317708 (2d Cir. Oct.16, 2002). Further, Eastwind's counsel has asserted in an affidavit that "it is believed no witness who is available in New York has any knowledge concerning causation or damages." (Dkt. No. 31: Arralde 12/2/02 Aff. ¶ 13).

> FN44. Mayflower's control over the Yellowstone's day-to-day operations is shown by the following: (1) immediately after Stanislav's accident, the master of the Yellowstone sent a telex report of the accident to "Capt P. Lekkos" at Mayflower in Greece, with only a "cc" to Eastwind in New York (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 10); (2) Lekkos describes himself as the "ships' operator for Mayflower Ship Management Corporation, responsible for the M/V Yellowstone, when under management by above company" (Dkt. No. 15: Lekkos 7/1/02 Aff. ¶ 1); (3) a report on "Eastwind Transport Ltd." dated November 20, 2001 and submitted by plaintiff states "The Russian vessels are managed out of Piraeus [Greece] by Mayflower Ship Management." (Edelman 7/15/02 Aff. Ex. 6 at 1, 3); (4) excerpts from the website of Eastwind's parent company, submitted by plaintiff, state: "Technical ship management of the Eastwind fleet is provided by [*inter alia* ], Mayflower Ship Management of Piraeus. In particular, the Russian joint-venture vessels are managed by Mayflower, which provides training programs for Russian and FSU seafarers. Eastwind has also opened its own crew recruitment and training company in Kaliningrad." (Edelman 7/15/02 Aff. Ex. 7); (5) the Service Agreement under which Stanislav was employed states that the Yellowstone is "managed by Mayflower" (Lekkos 7/1/02 Aff. Ex. A: Service Agm't at 1); and (6) ship inspectors employed by Mayflower all reside in or near Piraeus (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. B: Lekkos 11/29/02 Aff. ¶ 6).

Accordingly, because the Court may not base its decision on speculation that New York-based witnesses *may* possess relevant information, the alleged existence of any New York-based witnesses will be deemed at best a neutral factor. [FN45] *See, e.g., Scottish Air Int'l, Inc. v. British Caledonian Group P.L.C.,* 81 F.3d 1224, 1233 (2d Cir.1996) ("Plaintiff's contention that the district court ignored several potential U.S. witnesses is, on this record, more wishful than real."); *Ioannides v. Marika Mar. Corp.,* 928 F.Supp. 374, 379 (S.D.N.Y.1996) (FNC dismissal despite claim by plaintiff, represented by attorney Edelman, that ship actually owned by local owner: "There is no suggestion anywhere in plaintiff's voluminous papers that there is anyone with knowledge of any of these matters in the United States.... Insofar as the case turns on the condition of the ship at the time it was in Piraeus and what transpired there, the bulk of the evidence--including everyone with personal knowledge--is in Greece. While [alleged local

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2003 WL 230741 (S.D.N.Y.)  
**(Cite as: 2003 WL 230741 (S.D.N.Y.))**

Page 30

owner and executives], as plaintiffs suggest, may have received reports from Piraeus ..., the bulk of the relevant evidence regarding the ship ... is in Greece.").

> FN45. Moreover, since any such witnesses would be Eastwind's employees and thus within Eastwind's control, this Court may condition a dismissal on defendants' agreement to make such witnesses available as required by a Russian court. *See Saab v. Citibank, N.A.,* No. 01-9417, 50 Fed. Appx. 467, 469, 2002 WL 31317708 at *2 (2d Cir. Oct.16, 2002) (affirming FNC dismissal based on condition that "defendant has agreed to make all witnesses and documents available to plaintiffs as required by an English court"); *In re Rezulin Prod. Liab. Litig.,* 214 F.Supp.2d 396, 400 (S.D.N.Y.2002) ("First, as defendants have sought this dismissal in favor of litigation in Canada, it will be conditioned on, *inter alia,* their undertaking to produce in Quebec at their own expense any witnesses within their control whose presence is necessary for litigation there."); *Bastas v. Atlantic Mar. Enter. Corp.,* No. Civ. A. 86-6962, 1988 WL 48547 at *2 (E.D.Pa. May 13, 1988) ("Defendants have agreed to make persons within their control available in Greece, which eases any burden on plaintiff.").

d. *The Location of Witnesses in Greece or China Is a Neutral Factor*

As noted in the previous section, witnesses in Mayflower's Greek offices almost certainly possess relevant information. (*See* pages 53-54 & n. 44 above.) However, this is a neutral factor, as it is not clear, despite plaintiff's protestations, that this Court would be any more effective than a Russian court in obtaining discovery from Greek witnesses. Nevertheless, to alleviate any difficulty in obtaining such discovery, this Court will condition any dismissal order on defendants' agreement to make any relevant Greek witnesses they control, such as Captain Lekkos, available in the Russian forum. (*See* cases discussed at page 55 n. 45 above).

*24 The parties have also mentioned the possibility of calling Chinese witnesses, including the Chinese pilot (Dkt. No. 13: Eastwind Br. at 9; Dkt. No. 17: Edelman 7/15/02 Aff. at 15), and Eastwind asserts that the Yellowstone was inspected by "superintendents" or inspectors at various ports throughout the world (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. B: Lekkos 11/29/02 Aff. ¶ 6). However, neither side seems to have taken any steps to determine the identity of such witnesses, much less their availability; indeed, the likelihood that such witnesses will ever be found seems slim. (*Id.*) And again, it is unclear that this forum's procedure would be more effective than the Russian forum's in obtaining such testimony. [FN46]

> FN46. For the same reasons, although neither party has raised the issue, the current location of the Yellowstone in China (Arralde 12/2/02 Aff. Ex. C: Murray Aff. ¶ 2) is a neutral factor. Further, to the extent the parties intend to rely on expert witnesses, the location of such witnesses "is entitled to little weight." *Potomac Capital Inv. Corp. v. KLM,* 97 Civ. 8141, 1998 WL 92416 at *8 (S.D.N.Y. Mar.4, 1998) (Peck, M.J.); *accord, e.g., Balaban v. Pettigrew Auction Co.,* 96 Civ. 3177, 1997 WL 470373 at *3 n. 1 (E.D.N.Y. June 27, 1997) ("it has repeatedly been held that '[t]he convenience of expert witnesses is of 'little or no significance' on a motion to transfer' "); *Brown v. Dow Corning Corp.,* 93 Civ. 5510, 1996 WL 257614 at *2 (S.D.N.Y. May 15, 1996) ("since an expert witness is paid for his or her time, 'the convenience of expert witnesses is of little or no significance on a motion to transfer' "); *Total Licensed Care, Inc. v. Aetna Life & Cas., Inc.,* 92 Civ. 5817, 1993 WL 410456 at *3 (S.D.N.Y. Oct.13, 1993); *Studiengesellschaft Kohle MBH v. Shell Oil Co.,* 93 Civ. 1868, 1993 WL 403340 at *3 (S.D.N.Y. Oct.8, 1993); *Bernal v. Du Pont de Nemours E.I. & Corp.,* 93 Civ. 1639, 1993 WL 378790 at *2 (S.D.N.Y. Sept.24, 1993); *Cento Group, S.p.A., v. OroAmerica, Inc.,* 822 F.Supp. 1058, 1062 (S.D.N.Y.1993); *Babbidge v. Apex Oil Co.,* 676 F.Supp. 517, 520 (S.D.N.Y.1987).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 230741 (S.D.N.Y.)
**(Cite as: 2003 WL 230741 (S.D.N.Y.))**

Page 31

*2. The Location of Documents is a Neutral Factor*

The ease of access to documentary proof is essentially a neutral factor. "The parties have not submitted any evidence regarding the difficulty involved in bringing the relevant documents to either forum." *Tsangaris v. Elite, Inc.,* 92 Civ. 7855, 1993 WL 267425 at *8 (S.D.N.Y. July 9, 1993). This does not appear to be a document-intensive case. Most of the relevant documents regarding the accident or the condition of the ship appear to be located on board the ship or at Mayflower's offices in Greece. To the extent any documents are located in New York, such documents would, in any event, be in defendants' hands, and could easily be produced in Russia. *See Hughes v. John E. Graham & Sons,* No. CIV. A. 93-303, 1993 WL 133814 at *4 (E.D.La. Apr.21, 1993) (Denying § 1404 transfer motion relating to action by seaman for injury aboard ship: "[T]his is not one of those cases where the location of books and records is of paramount importance. A personal injury action such as this does not fall into the category of cases where such numerous documents are expected to be produced that their production in another district could prove to be overly burdensome. The liability question in this case should not be much different than the typical negligent injury case, where liability is proven through the testimony of witnesses."); *see also Beekmans v. J.P. Morgan & Co.,* 945 F.Supp. 90, 94 (S.D.N.Y.1996) ("[Plaintiff's] assertion that the Memorandum may have passed through the hands of some individuals in [defendant's] New York office does not, on balance, outweigh the overwhelming inconvenience of continuing litigation in New York as compared to the Netherlands.").

*3. Translation Costs Slightly Favor Russia*

Translation costs can be an important, though not necessarily dispositive, factor in the forum non conveniens analysis. [FN47] The relative translation burdens in this case slightly favor Russia.

> FN47. *See, e.g., Blanco v. Banco Indus. de Venezuela, S.A.,* 997 F.2d 974, 982 (2d Cir.1993) ("[T]he documentary evidence is in the Spanish language, as would be trial or deposition testimony, requiring translation to English that would result in significant cost to the parties and delay to the court. This factor militates strongly in favor of Venezuela as a more appropriate forum for this litigation."); *Schertenleib v. Traum,* 589 F.2d 1156, 1165 (2d Cir.1978) ("Moreover, even if the documents and witnesses could be brought here, there is a serious problem of translation. The only record of [defendant's] allegedly defamatory testimony are French minutes dictated by the Swiss judge from the simultaneous French translation of [defendant's] testimony in English. More to the point, most of the pertinent documents relevant to the underlying dispute are in French. The expense of translation, which is potentially substantial, would be totally avoided if trial is in Geneva."); *Flores v. Southern Peru Copper Corp.,* 00 Civ. 9812, 2002 WL 1587224 at *26 (S.D.N.Y. July 16, 2002) ("The principal fact witnesses, including plaintiffs and the defendant's operating personnel, are in Peru; many of the witnesses, again including plaintiffs, speak only Spanish.... If this case were presented to a jury in this Court, the translation requirements alone, of testimony and documents, would double the length of the trial."); *Jose Armando Bermudez & Co. v. Bermudez Int'l,* 99 Civ. 9346, 2000 WL 1225792 at *5 (S.D.N.Y. Aug.29, 2000) ("While maintaining the action in this Court may require the translation of certain Spanish documents, the need for such translation 'is not a hardship of sufficient magnitude to justify dismissal.' "); *Tsangaris v. Elite, Inc.,* 92 Civ. 7855, 1993 WL 267425 at *8 (S.D.N.Y. July 9, 1993) ("Defendants, however, have noted that all documents relevant to this case are written in Greek and that translation of these documents would cause 'delays, expenses and difficulties in communication' if this action were to proceed in a New York forum.... Because of the time and expense involved in translation, presentation of documentary evidence would be easier in Greek courts than in this Court."); *Zweig v. National Mortg. Bank of Greece,* 91 Civ. 5482,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 230741 (S.D.N.Y.)
(Cite as: 2003 WL 230741 (S.D.N.Y.))

Page 32

1993 WL 227663 at *8 (S.D.N.Y. June 21, 1993) ("Finally, the large amount of translation of documents and testimony that would be required if this litigation remained in New York far outweighs the amount that would be required if the action continues in Greece."); *Petcor v. MEGA BREEZE,* No. 91-CV-1387, 1992 WL 245587 at *4 (N.D.N.Y. Sept.16, 1992) ("Nonetheless, the cost of translation is but one of the many factors considered by this court in arriving at its final conclusion. In fact, the savings realized on translation costs by trying the action in this court could be offset by the expense of bringing the witnesses and documents to New York for depositions and trial."); *Karvelis v. Constellation Lines SA,* 608 F.Supp. 966, 972 (S.D.N.Y.1985) ("Defendants argue that time and money will have to be expended to translate testimony and documents from the Greek. This may be true, but it is not a hardship of sufficient magnitude to justify dismissal."), *aff'd,* 806 F.2d 49 (2d Cir.1986), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987).

Because Helga's affidavit submitted on this motion was translated from Russian into English (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 3), the Court assumes that her testimony would have to be translated. By contrast, "A. Kozlov," the crewing agent's representative, submitted an affidavit in English on this motion, and thus would not seem to require an interpreter. (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. A: Kozlov Aff.) It is unclear whether the remaining Russian-speaking witnesses would require translation. Although both the Master's initial telex report on the accident and Mr. Nuke's "statement" to investigators are in English (Dkt. No. 15: Lekkos 7/1/02 Aff. Exs. D & E), Kozlov asserts that the Master and First Mate "speak English within the scope of their profession, but not well enough to give testimony in English without the aid of an interpreter," and that Mr. Nuke and the other seamen "speaks only limited English" (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. A: Kozlov Aff. ¶ 1). *See Petcor v. MEGA BREEZE,* 1992 WL 245587 at *4 ("[E]ven if all witnesses were willing to testify in New York, the defendant argues that language translation from Greek to English would be needed for not only the key witnesses, but also for many documents. The court, however, is hesitant to credit this position with the weight that the defendant argues it should be given. Indeed, the majority of the documents supplied to the court, with the exception of the vessel's log, are written in English. From this it can fairly be concluded that the drafters of such documents as well as those individuals who participated in the negotiations and performance thereof, ... are conversant in English and that translation would not be needed for these witnesses.").

*25 On the other side of the ledger, if the case were litigated in Russia, defendants' documents (including the Service Agreement, statements to investigators, etc.) and the testimony of defendants' New York and Greek employees would presumably have to be translated into Russian. (*See* Dkt. No. 17: Edelman 7/15/02 Aff. at 10.) Although defendants--and specifically Mayflower--apparently do business in Kaliningrad on a regular basis, Eastwind has offered no evidence that defendants' back-office managers speak Russian fluently enough to testify in a Kaliningrad court without a translator. Indeed, Captain Lekkos averred that he speaks English and Greek but failed to mention Russian. (Dkt. No. 31. Arralde 12/2/02 Aff. Ex. B: Lekkos 11/29/02 Aff. ¶ 1.)

Because there are so few documents, and most of the witnesses are Russian, the overall cost of translations slightly favors the Russian forum. *See In re Bridgestone/Firestone, Inc.,* 190 F.Supp.2d 1125, 1142 (S.D.Ind.2002) ("[T]he best course is to weigh the amount of evidence that must be translated if the trial remains in the U.S. forum against the amount of evidence to be translated if the trial is held in a foreign forum.").

4. *Russian Judgments are Enforceable in the U.S.*

Plaintiff's Russian legal expert asserts that it is "practically impossible" to enforce Russian judgments outside Eastern Europe and the former Soviet Union. (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 1: Kargopolov 6/6/02 Aff. ¶ 7.) Judge Kaplan recently rejected the identical argument:

[O]ne of plaintiffs' experts expresses concern that plaintiffs, were they to prevail in Russia, would

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 230741 (S.D.N.Y.)
(Cite as: 2003 WL 230741 (S.D.N.Y.))

Page 33

be forced to "relitigate substantial portions of their case before a U.S. court would honor a Russian judgment against a U.S. bank in this matter." But plaintiffs' expert is a Russian lawyer with no discernable qualifications in U.S. law. The Uniform Foreign Country Money-Judgments Recognition Act, which has been adopted in New York, insofar as it is relevant here, would permit a court to refuse enforcement to a Russian money judgment only if it concluded that the Russian legal system "does not provide impartial tribunals or procedures compatible with the requirements of due process of law...." In view of [defendant's] staunch assertion here that the Russian legal system provides an adequate alternative forum, it quite likely would be estopped to mount such a challenge to a Russian money judgment in this case. Moreover, at least one U.S. court has recognized and enforced a Russian custody decree. [*Bliss v. Bliss*, 733 A.2d 954 (D.C.App.1999).]
*Pavlov v. Bank of New York Co.*, 135 F.Supp.2d 426, 435 (S.D.N.Y.2001) (fns.omitted), *vacated on other grounds*, No. 01-7434, 25 Fed. Appx. 70, 2002 WL 63516 (2d Cir. Jan. 14, 2002); *see also, e.g., AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 139 F.3d 980, 982-83 (2d Cir.1998) (confirming Russian arbitration awards despite claims arbitral panel was corrupt tribunal); *In re Union Carbide Corp. Gas Plant Disaster*, 809 F.2d 195, 203-04 (2d Cir.) (Indian judgment would be enforceable in New York based on adoption of Uniform Foreign Money-Judgments Recognition Act), *cert. denied*, 484 U.S. 871, 108 S.Ct. 199 (1987).

**\*26** Thus, this factor favors transfer to Russia, or at least is a neutral factor.

5. *The Allegedly Burdensome Procedure in Russian Courts Does Not Favor the New York Forum*

Plaintiff's Russian law expert asserts that even were a Russian court to entertain this action, it would be "slow, burdensome and costly," lasting "in practice" one year (and up to four years). (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 1: Kargopolov 6/6/02 Aff. ¶ 6.) The procedure for serving summonses upon foreign defendants is burdensome and time-consuming. (*Id.*) All documents would have to be translated into Russian and the translation certified by a notary public. (*Id.*) Further, Russian courts do not have subpoena power over witnesses (including defendants) or documents outside the jurisdiction. (*Id.* ¶¶ 6, 9.)

Plaintiff's argument is meritless. While Russian courts may or may not be "slow, burdensome and costly," this Court has no way of comparing the two systems in terms of efficiency or speed; we have, however, already deemed the Russian courts to be an adequate alternate forum (*see* Point IV above). As for the Russian court's subpoena power, the only relevant witnesses not located in the Russian jurisdiction appear to be employees of defendants. Dismissal here would be conditioned on defendants submitting to the jurisdiction of the Russian court and making their employees available for trial or deposition.

6. *On Balance, the Private Interest Factors Strongly Favor Dismissal*

On balance, and giving great weight to the Russian location of the key witnesses, the evidentiary center of gravity strongly favors trial in Russia. *See, e.g., Capital Currency Exch., N.V. v. National Westminster Bank PLC*, 155 F.3d 603, 611 (2d Cir.1998) (FNC granted where, *inter alia*, "most of the witnesses ... FNC dismissal where "Scotland offers superior access to documentary, physical and testimonial evidence, and consequently, a trial in Scotland is likely to be more efficient and less expensive than a comparable proceeding in New York"). [FN48]

> FN48. *Accord, e.g., Becker v. Club Las Velas*, 94 Civ. 2412, 1995 WL 267025 at \*3 (S.D.N.Y. May 8, 1995) (FNC dismissal where all of defendant's witnesses are located in Mexico and plaintiff's only non-party witnesses are located in the United States outside the court's 100 mile radius subpoena power), *aff'd*, 101 F.3d 684 (2d Cir.1996); *Penny v. United Fruit Co.*, 869 F.Supp. 122, 130 (E.D.N.Y.1994) (FNC dismissal where "[v]irtually every significant source of proof ... will be found in England" and no relevant witnesses are located in New York); *Lindner Fund, Inc. v. Polly Peck*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 230741 (S.D.N.Y.)
**(Cite as: 2003 WL 230741 (S.D.N.Y.))**

Page 34

*Int'l PLC,* 811 F.Supp. 133, 136 (S.D.N.Y.1992) (FNC dismissal where "most of the key witnesses in [the] action ... are all located in England" and "[n]one of [plaintiff's] documents or witnesses are located in New York"); *Doe v. Hyland Therapeutics Div.,* 807 F.Supp. 1117, 1125 (S.D.N.Y.1992) (FNC dismissal where, although defendants do business in New York, the activities giving rise to plaintiffs' claims, and hence most evidence, occurred outside New York); *Sussman v. Bank of Israel,* 801 F.Supp. 1068, 1079 (S.D.N.Y.1992) (FNC dismissal where "[p]laintiffs have not shown that any witnesses with probative evidence to give reside in New York"), *aff'd,* 990 F.2d 71 (2d Cir.1993); *Ocean Shelf Trading Inc. v. Flota Mercante Grancolombiana S.A.,* 638 F.Supp. 249, 252 (S.D.N.Y.1986) (FNC dismissal where "[a]ll evidence relating to liability [in the form of witnesses] is located outside New York, and nearly all of it is located outside of the United States").

B. *Gilbert's Public Interest Factors Also Favor Russia*

**\*27** "The Supreme Court has outlined four public interest factors to be weighed in the forum non conveniens inquiry: (1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the 'local interest in having localized controversies decided at home;' and (4) avoiding difficult problems in conflict of laws and the application of foreign law." *DiRienzo v. Philip Servs. Corp.,* 294 F.3d 21, 31 (2d Cir.2002) (quoting *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)); *accord, e.g., Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241 n. 6, 102 S.Ct. 252, 258 n. 6, 70 L.Ed.2d 419 (1981); *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine,* 311 F.3d 488, 500 (2d Cir.2002); *Aguinda v. Texaco, Inc.,* 303 F.3d 470, 480 (2d Cir.2002); *Iragorri v. United Tech. Corp.,* 274 F.3d 65, 74 (2d Cir.2001) (*en banc*).

1. *The Choice of Law Factor Is Neutral*

The Supreme Court has counseled that:
The doctrine of forum non conveniens ... is designed in part to help courts avoid conducting complex exercises in comparative law. As we stated in *Gilbert,* the public interest factors point towards dismissal where the court would be required to 'untangle problems in conflict of laws, and in law foreign to itself.' " 330 U.S., at 509, 67 S.Ct., at 843.
*Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 251, 102 S.Ct. 252, 263, 70 L.Ed.2d 419 (1981). Although " 'the need to apply foreign law is not in itself a reason to apply the doctrine of forum non conveniens,' " and courts "must guard against an excessive reluctance to undertake the task of deciding foreign law," the need to apply foreign law is "relevant" to the forum non conveniens analysis. *Manu Int'l, S.A. v. Avon Prods., Inc.,* 641 F.2d 62, 67-68 (2d Cir.1981) (citation omitted). [FN49]

FN49. *Accord, e.g., Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 260 n. 29, 102 S.Ct. 252, 268 n. 29, 70 L.Ed.2d 419 (1981) ("[T]he need to apply foreign law .... alone is not sufficient to warrant dismissal...."); *Alnwick v. European Micro Holdings, Inc.,* No. 01-7548, 29 Fed. Appx. 781, 784, 2002 WL 407940 at *2 (2d Cir. Mar.15, 2002) ("the District Court should keep in mind that '[t]he need to apply foreign law is not in itself a reason to apply the doctrine of forum non conveniens.' ") (quoting *Manu Int'l, S.A. v. Avon Prods., Inc.,* 641 F.2d at 67); *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.,* 145 F.3d 481, 492 (2d Cir.1998) ("While reluctance to apply foreign law is a valid factor favoring dismissal under *Gilbert,* standing alone it does not justify dismissal."); *CCS Int'l, Ltd. v. ECI Telesystems, Ltd.,* 97 Civ. 4646, 1998 WL 512951 at *12 (S.D.N.Y.1998) ("While the prospect of applying foreign law is not dispositive in favor of dismissal, ... it is relevant.") (citation omitted).

Contrary to plaintiff's contention (*see* Dkt. No. 16: Pl's Br. at 12-15), "a district court may dismiss a case on forum non conveniens grounds without first making a choice of law determination." *Gazis v. John S. Latsis (USA) Inc.,* 729 F.Supp. 979, 985

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2003 WL 230741 (S.D.N.Y.)  
**(Cite as: 2003 WL 230741 (S.D.N.Y.))**

Page 35

(S.D.N.Y.1990) (citing *Cruz v. Maritime Co. of Philippines,* 702 F.2d 47, 48 (2d Cir.1983) (per curiam) ("[M]aritime choice of law principles are not involved in a forum non conveniens analysis and that the district court's discussion on the subject was therefore unnecessary.")). Although foreign choice of law is one factor favoring dismissal, "it is well established that a court considering a forum non conveniens motion should not engage in a complex conflict of laws inquiry." *PT United Can Co. v. Crown Cork & Seal Co.,* 96 Civ. 3669, 1997 WL 31194 at *10 (S.D.N.Y. Jan.28, 1997), *aff'd,* 138 F.3d 65 (2d Cir.1998). "While the Court need not definitively resolve the choice of law issue at this point, the likelihood that foreign law will apply weighs against retention of the action." *Ioannides v. Marika Mar. Corp.,* 928 F.Supp. 374, 379 (S.D.N.Y.1996); *accord, e.g., Abert Trading, Inc. v. Kipling Belgium N.V/S.A.,* 00 Civ. 0478, 2002 WL 272408 at *6 (S.D.N.Y. Feb.26, 2002) ("While the prospect of applying foreign law is not dispositive in favor of dismissal, ... it is relevant.") (citation omitted); *Potomac Capital Inv. Corp. v. KLM,* 97 Civ. 8141, 1998 WL 92416 at *14 (S.D.N.Y. Mar.4, 1998) (Peck, M.J.) ("[A]t this stage of the proceedings, the Court need not definitively determine what law applies, *i.e.,* whether maritime law applies."); *Karlitz v. Regent Int'l Hotels, Ltd.,* 95 Civ. 10136, 1997 WL 88291 at *4 (S.D.N.Y. Feb.28, 1997); *Flynn v. General Motors, Inc.,* 141 F.R.D. 5, 10 (E.D.N.Y.1992) (McLaughlin, C.J.) ("it is not immediately clear which forum's law will apply; nor is it necessary to determine this issue at this time."); *Bybee v. Oper der Standt Bonn,* 899 F.Supp. 1217, 1223 (S.D.N.Y.1995) ("The need to apply foreign law is a factor that weighs in favor of dismissal."); *Damigos v. Flanders Compania Naviera, S.A. Panama,* 716 F.Supp. 104, 108 (S.D.N.Y.1989) ("The necessity of conducting conflict of laws analyses, and the likely need to apply Greek law points toward dismissal.").

*28 In *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), the Supreme Court set forth the factors that are now used in determining choice of law questions in admiralty and maritime cases. *See Romero v. International Terminal Operating Co.,* 358 U.S. 354, 382, 79 S.Ct. 468, 485, 3 L.Ed.2d 368 (1959) (providing that *Lauritzen* test applies to Jones Act as well as general maritime cases). According to *Lauritzen,* the following factors are to be balanced to determine which forum's law will apply to any given claim: (1) place of the wrongful act; (2) law of the flag; (3) allegiance or domicile of the injured seaman; (4) allegiance of the defendant shipowner; (5) place contract of employment was made; (6) inaccessibility of foreign forum; and (7) the law of the forum. *Lauritzen v. Larsen,* 345 U.S. at 583-90, 73 S.Ct. at 928-32. Later, in *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), the Supreme Court added to the list of factors consideration of the shipowner's base of operations. *See id.* at 309, 90 S.Ct. at 1734 (providing that "the list of seven factors in *Lauritzen* was not intended as exhaustive.... [T]he shipowner's base of operations is another factor of importance in determining whether the Jones Act is applicable; and there well may be others."). Ultimately, before applying the Jones Act, the Second Circuit requires evidence that the defendants had "substantial contact" with the United States. *See Sango v. Plovba,* 966 F.Supp. 229, 231 (S.D.N.Y.1997) ("Use of the Jones Act and the unseaworthiness doctrine is limited to 'suits in which the defendant has some substantial contact with the United States.' ") (quoting *Koupetoris v. Konkar Intrepid Corp.,* 535 F.2d 1392, 1396 (2d Cir.1976)).

In this case, only two factors arguably favor application of the Jones Act: (1) the alleged ultimate American ownership of the vessel; and (2) defendants' alleged American "base of operations." ( *See* page 5 above.) Of these two factors, plaintiff has a far better claim as to the first (American ownership) than the second (American base of operations). [FN50] If the fleet's "base of operations" is strictly defined as the location from which day-to-day operations are managed, then the base of operations for defendants' Russian fleet appears to be with Mayflower in Greece (see pages 53-54 & n. 44 above). *See Fogleman v. ARAMCO (Arabian American Oil Co.),* 920 F.2d 278, 284 (5th Cir.1991) (for Jones Act purposes, look to day-to-day operations). If, however, base of operations is defined more broadly, then it might be located in New York. *See Gazis v. John S. Latsis (USA) Inc.,* 729 F.Supp. 979, 984 (S.D.N.Y.1990) ("Various factors determine the base of operations including the location of the shipowner's home office, the location where management and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 230741 (S.D.N.Y.)
**(Cite as: 2003 WL 230741 (S.D.N.Y.))**

Page 36

day-to-day operating decisions are made, the country where the ship most frequently calls or generates the most income, and the location of the ship's home port."). [FN51]

> FN50. Ultimate American ownership seems a strong possibility, as Charm, the nominally Liberian owner of the ship, is probably a shell corporation, and, indeed, Eastwind's parent lists the Yellowstone as an asset on its website. *See Carbotrade S.p.A. v. Bureau Veritas,* 99 F.3d 86, 92 (2d Cir.1996) ("[T]he domicile and base of operations of the shipowner--favors the application of Greek law. Although the nominal shipowner, Caribene, was a Gibraltar corporation, there is little doubt that Caribene was simply a shell corporation. The actual owners of the Star of Alexandria, as distinguished from its paper owner, were Greek. Both of Caribene's directors are Greek residents, and Palm Navigation, the company that operated the Star of Alexandria, is located in Greece. Therefore, the fifth *Lauritzen* factor weighs in favor of applying Greek law.") (fns.omitted), *cert. denied,* 520 U.S. 1274, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997); *Sigalas v. Lido Mar., Inc.,* 776 F.2d 1512, 1518 (11th Cir.1985) (maritime choice of law analysis: disregarding fact that ship was nominally owned by Liberian corporation, as "over 80% of the stock in the relevant corporations is held by Greeks, who exercise complete control over the day-to-day management of the [vessel]").

> FN51. Plaintiff's counsel's proof here often resembles the wild accusations (by this same counsel) rejected by other courts in this district. *See Krimizis v. Panoceanic Navigation Corp.,* 83 Civ. 5667, 1985 WL 3834 at *3 (S.D.N.Y. Nov.14, 1985) (rejecting "bald assertion" in Edelman affidavit that American citizen related to defendants "is the 'present head of the shipping conglomerate,' " and the conclusory statement that certain parties were "alter-ego[s]"; plaintiff "fails to establish the existence of evidence of control or beneficial ownership by American citizens or residents of Panoceanic, even upon invoking the claim that Orion is the 'alter-ego' of the Goulandris fleet.").

**\*29** The "Second Circuit has suggested," without actually holding, "that American ownership alone may be sufficient to establish jurisdiction." *See Gazis v. John S. Latsis (USA) Inc.,* 729 F.Supp. 979, 985 & n. 2 (S.D.N.Y.1990) (citing *Antypas v. Cia. Maritima San Basilio, S.A.,* 541 F.2d 307, 310 (2d Cir.1976) ("It appears that at least some of the stockholders of the shipowner ... are American citizens. This contact, in and of itself, has been held sufficient to support jurisdiction under the Jones Act."), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); *Moncada v. Lemuria Shipping Corp.,* 491 F.2d 470, 473 (2d Cir.) ("In *Bartholomew* we suggested that American ownership alone suffices to establish Jones Act jurisdiction.... However, we need not rely upon this ground alone, for there are here additional contacts which, when added to American ownership, make the sum of the contacts substantial."), *cert. denied,* 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1974) ; *Bartholomew v. Universe Tankships, Inc.,* 263 F.2d 437, 443 n. 4 (2d Cir.), *cert. denied,* 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959)). Here, plaintiff has made colorable arguments for both American ownership and American base of operations. On the present record, therefore, the Court concludes that the Jones Act may apply to this case. *Cf. Gazis v. John S. Latsis (USA) Inc.,* 729 F.Supp. at 989-91 (even though FNC "private interest factors point strongly toward dismissal," denying dismissal to determine "the extent of the defendants' shipping business in the United States and whether the [vessel] has an American base of operations"); *Ioannides v. Marika Mar. Corp.,* 928 F.Supp. 374, 378-80 (S.D.N.Y.1996) (granting FNC motion because private and public factors strongly favored dismissal; even assuming American base of operations, "there is at least a substantial possibility that foreign law will govern," where "case [was] brought on behalf of Greek seamen who shipped aboard a Liberian vessel crewed by a Greek company which, wherever its ownership lay, was engaged exclusively in carrying cargos to and from non-U.S. ports," parties had Greek forum and choice of law clauses, and some

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 230741 (S.D.N.Y.)
**(Cite as: 2003 WL 230741 (S.D.N.Y.))**

Page 37

claimants had already settled in Greece); *Tsangaris v. Elite, Inc.,* 92 Civ. 7855, 1993 WL 267425 at *8-9 (S.D.N.Y. July 9, 1993) (granting FNC motion as private and public factors heavily favored Greek forum; Greek forum selection clause and choice of law clause in contract required Greek law, so Jones Act would not apply; *Hellenic Lines* was distinguishable because "plaintiffs have failed to show that the defendant corporations mainly operate out of New York or that any United States domiciliary owns the defendant corporations.").

Accordingly, because it is unclear whether the law to be applied in this case is foreign or U.S. maritime law, the choice of law factor is essentially neutral.

*2. Russia Has a Strong Interest in This Action, While New York's Interest Is Attenuated*

**\*30** Russia, and particularly Kaliningrad, has a strong interest in this dispute: (1) Stanislav was a resident of Kaliningrad; (2) Stanislav was hired in Kaliningrad; (3) the ship apparently made home port in Kaliningrad; (4) the ship had an all-Russian crew; and (5) plaintiff Helga--Stanislav's widow and beneficiary--resides in Kaliningrad. *See, e.g., Murray v. British Broad. Corp.,* 81 F.3d 287, 293 (2d Cir.1996) (FNC dismissal: "The crux of the matter, therefore, involves a dispute between British citizens over events that took place exclusively in the United Kingdom.... The United States thus has virtually no interest in resolving the truly disputed issues."); *Valarezo v. Ecuadorian Line, Inc.,* 00 Civ. 6387, 2001 WL 740773 at *5 (S.D.N.Y. June 29, 2001) ("There is nothing local about [plaintiff's] claim and this jurisdiction has no interest in it. Ecuador has a far greater interest in adjudicating disputes between its own seamen and a foreign-flagged vessel over an incident that occurred on international waters. Dismissal in favor of an Ecuadorian forum is also favored by the burden this case will impose on this court 'relative to the forum's minimal interest in the controversy.' "); *Tsangaris v. Elite, Inc.,* 92 Civ. 7855, 1993 WL 267425 at *9 (S.D.N.Y. July 9, 1993) ("Plaintiffs have not shown how this Court and the United States have any interest in this action between a Greek seaman and his Greek employer arising out of an incident occurring on the high seas.... Greek courts, unlike this Court, have much interest in resolving this dispute which partially involves interpreting a contract executed in Greece between Greek citizens and under Greek law and which determines whether a Greek citizen will be compensated for his injuries."); *Damigos v. Flanders Compania Naviera, S.A. Panama,* 716 F.Supp. 104, 109 (S.D.N.Y.1989) (Leval, D.J.) ("Greece has a strong interest in the well-being of Greek seamen and Greek vessels, generally, and in this action in particular.... Conversely, the United States has no interest in adjudicating disputes involving Greek seamen employed on Greek flag vessels in foreign waters, and has no interest in this action."); *Doufexis v. Nagos S.S., Inc.,* 583 F.Supp. 1132, 1134 (S.D.N.Y.1983) ("The decedent was Greek and was employed on a Greek flag ship at the time of his death. His widow and children are Greek. It is obvious that Greece has a more substantial interest in the resolution of this dispute.").

By contrast, the action's only connection to this forum is that the ship is allegedly owned by New York residents and defendants allegedly base their shipping operations here, although the Yellowstone appears to have been managed on a day-to-day basis from Greece. The fact that defendants may have their headquarters or base of operations here would ordinarily carry little weight, as the tort and the resulting damage both occurred elsewhere. *See* cases cited in Point V.B.1., above; *see also, e.g., Alfadda v. Fenn,* 159 F.3d 41, 46 (2d Cir.1998) ("This case involves a dispute between a Netherlands Antilles corporation and Saudi Arabian shareholders over the conduct of a French bank. Thus, France has a far greater interest in this litigation than the United States."); *Villar v. Crowley Mar. Corp.,* 782 F.2d 1478, 1483 (9th Cir.1986) (Jones Act suit by family members of a Philippine sailor who drowned in Saudi Arabian waters while working on a Philippines-flagged ship owned by Americans was dismissed for forum non conveniens. "[T]he Philippines has a powerful interest in deciding the controversy because of its strong contacts with both the decedent and the [plaintiffs], and [the] American jurors and court personnel have little interest in this controversy."); *Saab v. Citibank, N.A.,* 00 Civ. 6784, 2001 WL 1382577 at *5 (S.D.N.Y. Nov.7, 2001) (FNC dismissal: "Although [defendant's] headquarters are in New York, the other major players in this controversy are Lebanese businessmen and a Saudi

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.