**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------x
```
DAVIS INTERNATIONAL, LLC, HOLDEX,    :
LLC, FOSTON MANAGEMENT, LTD, and    :
OMNI TRUSTHOUSE, LTD,    :
    :
             Plaintiffs,    :
    v.    :    Case No. 04-1482-GMS
    :
NEW START GROUP CORP., VENITOM    :
CORP., PAN-AMERICAN CORP., MDM    :
BANK, URAL-GORNO METALURAGICAL    :
COMPANY, EVRAZ HOLDING, MIKHAIL    :
CHERNOI, OLEG DERIPASKA, ARNOLD    :
KISLIN, MIKHAIL NEKRICH, and    :
ISKANDER MAKMUDOV,    :
    :
             Defendants.    :
```
------------------------------------------------------------x
```

# APPENDIX TO DEFENDANTS'
# OPENING BRIEFS IN SUPPORT OF
# DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

## Volume 1 of 13

Attorneys for Defendant Arnold Kislin:

Charles M. Oberly, III (DSBA No. 743)    Lisa C. Cohen
Karen V. Sullivan (DSBA No. 3872)    Schindler Cohen & Hochman LLP
Oberly, Jennings & Rhodunda, P.A.    100 Wall Street
800 Delaware Avenue, Suite 901    15th Floor
PO Box 2054    New York, NY 10005
Wilmington, DE 19899    (212) 277-6300
(302) 576-2000

    Lawrence S. Goldman
    Elizabeth Johnson
    The Law Offices of Lawrence S. Goldman
    500 Fifth Ave., 29th Floor
    New York NY 10110-2900
    (212) 997-7499

Attorneys for Defendants New Start Group
Corp. and Venitom Group:

Charles M. Oberly, III (DSBA No. 743)
Karen V. Sullivan (DSBA No. 3872)
Oberly, Jennings & Rhodunda, P.A.
800 Delaware Avenue, Suite 901
PO Box 2054
Wilmington, DE 19899
(302) 576-2000

Richard J. Schaeffer
Peter J. Venaglia
Laura D. Sullivan
Dornbush, Schaeffer, Strongin &
Weinstein, LLP
747 Third Avenue, 11th Floor
New York, NY 10017
(212) 759-3300

Attorneys for Defendant Oleg Deripaska:

Collins J. Seitz, Jr.(DSBA No. 2237)
Kevin F. Brady (DSBA No. 2248)
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141

Rodney F. Page
Michael G. Biggers
Bryan Cave LLP
700 13th Street, N.W.
Washington, D.C. 20005-3960
(202) 508-6002

Attorneys for Defendant Evraz Holding:

William M. Lafferty (DSBA No. 2755)
Morris, Nichols, Arsht & Tunnell
Chase Manhattan Centre, 18th Floor
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 575-7341

David H. Herrington
Vitali Rosenfeld
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York New York 10006
(212) 225-2266

Attorneys for Defendant MDM Bank:

Stephen E. Jenkins (DSBA No. 2152)
Richard I.G. Jones, Jr. (DSBA No. 3301)
Ashby & Geddes
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

Joel B. Kleinman
Steven J. Roman
David H. Greenberg
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street NW
Washington, DC 20037-1526
(202) 785-9700

Attorneys for Defendant Ural-Gorno
Metallurgical Company:

Charles M. Oberly, III (DSBA No. 743)     William H. Devaney
Karen V. Sullivan (DSBA No. 3872)         Heard & O'Toole LLP
Oberly, Jennings & Rhodunda, P.A.         405 Lexington Ave, Floor 62
800 Delaware Avenue, Suite 901            New York, NY 10174
PO Box 2054                               (212) 307-5500
Wilmington, DE 19899
(302) 576-2000

Attorneys for Defendant Iskander
Makmudov:

Charles M. Oberly, III (DSBA No. 743)     William H. Devaney
Karen V. Sullivan (DSBA No. 3872)         Heard & O'Toole LLP
Oberly, Jennings & Rhodunda, P.A.         405 Lexington Ave, Floor 62
800 Delaware Avenue, Suite 901            New York, NY 10174
PO Box 2054                               (212) 307-5500
Wilmington, DE 19899
(302) 576-2000

Attorneys for Defendant Mikhail Chernoi:

Charles M. Oberly, III (DSBA No. 743)     Brian Maas
Karen V. Sullivan (DSBA No. 3872)         Cameron Myler
Oberly, Jennings & Rhodunda, P.A.         Frankfurt Kurnit Klein & Selz PC
800 Delaware Avenue, Suite 901            488 Madison Avenue, 9th Floor
PO Box 2054                               New York, NY 10022
Wilmington, DE 19899                      (212) 980-0120
(302) 576-2000

Attorneys for Defendant Mikhail Nekrich:

Charles M. Oberly, III (DSBA No. 743)     Paul R. Grand
Karen V. Sullivan (DSBA No. 3872)         Edward M. Spiro
Oberly, Jennings & Rhodunda, P.A.         Morvillo, Abramowitz, Grand, Iason &
800 Delaware Avenue, Suite 901            Silberberg, P.C.
PO Box 2054                               565 Fifth Avenue
Wilmington, DE 19899                      New York, NY 10017
(302) 576-2000                            (212) 880-9510

# Table of Contents

| **DOCUMENT** | **PAGE** |
|---|---|
| **VOLUME 1 OF 13:** | |
| Complaint | A-1 |
| *Base Metal Trading v. Russian Alum.*, 253 F. Supp. 2d 681 (S.D.N.Y. 2003) ("*Base Metal Trading*") | A-31 |
| Transcript of Oral Argument before Hon. John G. Koeltl, dated February 10, 2003, in *Base Metal Trading* | A-64 |
| **VOLUME 2 OF 13:** | |
| First Amended Complaint, dated August 3, 2001, filed in *Base Metal Trading* | A-176 |
| **VOLUME 3 OF 13:** | |
| Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss the Amended Complaint, dated September 15, 2002, filed in *Base Metal Trading* | A-295 |
| **VOLUME 4 OF 13:** | |
| Resume of Paul B. Stephan | A-465 |
| List of Paul B. Stephan's "Participation in U.S. Lawsuits" | A-476 |
| Declaration of Paul B. Stephan, dated January 28, 2002, filed in *Base Metal Trading* | A-479 |
| Reply Declaration of Paul B. Stephan, dated October 17, 2002, filed in *Base Metal Trading* | A-514 |
| Complaint filed in *Norex Petroleum Ltd. v. Access Indus.* (LTS) (S.D.N.Y.) | A-535 |
| *Norex Petroleum Ltd. v. Access Indus.*, 304 F. Supp. 2d 570 (S.D.N.Y. 2004) | A-607 |
| Judge Koeltl's written request for submissions prior to oral argument, dated January 29, 2003 | A-622 |
| Defendants' response to Judge Koeltl's Jan. 29th request ("Defendants' Oral Argument Submissions") | A-624 |
| Chronology of GOK-related Russian court decisions | A-625 |
| Map – location of courts | A-651 |
| Chart of Russian Court Decisions | A-652 |

| **VOLUME 5 OF 13:** | |
|---|---|
| Plaintiffs' response to Judge Koeltl's Jan. 29th request ("Plaintiffs' Oral Argument Submissions") | A-653 |
| GOK Bankruptcy Litigation Chart | A-654 |
| Shareholder Litigation Chart | A-660 |
| Chart – Kozitsin and Kozyrev "Wrongful Conduct" | A-668 |
| Chart – "Direct Evidence of Corruption" | A-677 |
| Sergei Zankovsky: Theory and Practice of Bankruptcy | A-684 |
| Defendants' post-oral argument submissions in *Base Metal Trading*, dated February 20, 2003 | A-687 |
| Letter from Winston & Strawn, dated February 20, 2003 | A-688 |
| Letter from Hogan & Hartson, dated February 20, 2003 | A-690 |
| Letter from Dornbush Mensch Mandelstam & Schaeffer, dated February 20, 2003 | A-695 |
| Defendants' Summary of Contracts | A-698 |
| Supplemental Declaration of Paul B. Stephan, dated Feb. 19, 2003 | A-705 |
| Third Declaration of Igor Petrukhin, dated Feb. 20, 2003 | A-713 |
| Plaintiffs' post-oral argument submissions in *Base Metal Trading*, dated February 20, 2003 | A-744 |
| Letter from Strook Stroock & Lavan, dated February 20, 2003 (with exhibits) | A-745 |
| Second Declaration and Exhibits of Joseph Traum, dated February 19, 2003 | A-782 |
| Expert Report of Sergei B. Zaitsev, dated February 19, 2003 (without exhibits) | A-828 |
| **VOLUME 6 OF 13:** | |
| Defendants' post-oral argument submissions in *Base Metal Trading*, dated February 25, 2003 | A-885 |
| Letter from Winston & Strawn, dated February 25, 2003 (with exhibits) | A-886 |
| Supplemental Declaration of Paul B. Stephan, dated February 25, 2003 | A-933 |
| Plaintiffs' post-oral argument submissions in *Base Metal Trading*, dated February 25, 2003 | A-941 |

| | |
|---|---|
| Letter from Strook Stroock & Lavan, dated February 25, 2003 (with exhibits) | A-942 |
| Letter from Herrick Feinstein, dated February 25, 2003 | A-986 |
| Second Declaration of Victor Golubev, dated February 25, 2003 (without exhibits) | A-989 |
| Second Declaration of Sergei B. Zaitsev, dated February 25, 2003 (without exhibits) | A-1027 |
| **VOLUME 7 OF 13:** | |
| March 30, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1075 |
| August 22, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1080 |
| April 19, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1092 |
| Application to the Arbitrazh Court for the Sverdlovsk Oblast dated March 24, 2000 filed by Krasnouralskmezhraygaz ("Kras Gas") | A-1112 |
| January 24, 1997 contract between GOK and Kras Gas | A-1130 |
| Letter dated February 4, 2000 from Kras Gas to GOK | A-1146 |
| Letter dated February 15, 2000 from Kras Gas to GOK | A-1157 |
| Letter dated February 8, 2000 from GOK to Kras Gas | A-1170 |
| Letter dated February 21, 2000 from GOK to Kras Gas | A-1175 |
| Federal Service's recommendation to appoint Kozyrev as Interim Trustee | A-1180 |
| Instruction of the Government of the Russian Federation from July 10, 1999 (No. 1100-R) | A-1187 |
| Audit Report and list of GOK's creditors as of March 24, 2000 | A-1191 |
| Minutes of the first GOK creditors' meeting held on August 11, 2000 | A-1245 |
| August 2, 2000 decision of the Izmailovo Inter-Municipal Court of Moscow | A-1266 |
| November 30, 2000 decision of the Moscow City Court | A-1269 |
| **VOLUME 8 OF 13:** | |
| Nexis' appellate complaint | A-1276 |
| January 15, 2001 determination of the Appellate Instance of the Arbitrazh Court for the Sverdlovsk Oblast | A-1306 |
| Nexis' cassation complaint | A-1311 |
| June 7, 2001 decision of the Federal Arbitrazh Court for the Urals Circuit | A-1318 |

| | |
|---|---|
| Minutes of the March 11, 2001 creditors' meeting | A-1323 |
| June 27, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1357 |
| August 21, 2001 decision of the Federal Arbitrazh Court for the Urals Circuit | A-1365 |
| August 18, 2000 opinion of the Federal Service | A-1367 |
| August 29, 2000 Nexis petition regarding loan agreement | A-1382 |
| July 26, 1999 supply contract between Nexis and GOK | A-1392 |
| August 29, 2000 Application filed by Nexis regarding supply contract | A-1424 |
| October 4, 2000 letter to Nexis from Trustee Kozyrev | A-1442 |
| March 23, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1445 |
| August 29, 2000 Statement of Claim submitted by Polyprom | A-1452 |
| **VOLUME 9 OF 13:** | |
| Supply agreements between GOK and Polyprom | A-1479 |
| October 4, 2000 letter to Polyprom from Trustee Kozyrev | A-1579 |
| October 31, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1583 |
| February 16, 2001 letter from Trustee Kozyrev to the Arbitrazh Court for the Sverdlovsk Oblast | A-1588 |
| February 19, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1591 |
| April 19, 2001 Resolution of the Appellate Instance of the Arbitrazh Court for the Sverdlovsk Oblast | A-1598 |
| July 12, 2001 determination of the Federal Arbitrazh Court of the Urals District | A-1607 |
| April 18, 2001 decision of the Arbitrazh Court for Sverdlovsk Oblast | A-1613 |
| January 22, 2000 letter from several members of GOK Board of Directors requesting meeting of GOK Board | A-1620 |
| January 24, 2000 letter from several members of GOK Board of Directors requesting meeting of GOK Board | A-1623 |
| February 2, 2000 "Decision Not To Institute Legal Proceedings" of the Senior Assistant Prosecutor for the City of Kachkanar | A-1628 |
| February 1, 2000 ruling of the Kachkanar City Court for the Sverdlovsk Oblast | A-1635 |
| February 15, 2000 decision of the Arbitrazh Court for the Sverdlovsk | A-1649 |

| | |
|---|---|
| Oblast | |
| March 8, 2001 decision by the Moscow City Court | A-1657 |
| September 19, 2000 decision of the Meshchansky Inter-Municipal Regional Court of Moscow | A-1667 |
| **VOLUME 10 OF 13:** | |
| March 26, 2001 decision of the Moscow City Court | A-1676 |
| November 21, 2000 decision of the Tverskoy Inter-Municipal Regional Court of Moscow | A-1683 |
| February 22, 2001 decision of the Appellate Instance of the Federal Arbitrazh Court of Moscow | A-1691 |
| November 16, 2000 decision of the Arbitrazh Court of Moscow | A-1698 |
| April 26, 2001 decision of the Federal Arbitrazh Court of the Moscow Circuit | A-1706 |
| December 13, 2000 decision of the Perovsky Inter-Municipal Regional Court of Moscow | A-1712 |
| Davis Complaint filed in Moscow before the Gagarinsky Inter-Municipal Court of Moscow | A-1728 |
| April 10, 2000 decision of the Perovsky Inter-Municipal Regional Court of Moscow | A-1737 |
| September 25, 2000 decision of the Perovsky Inter-Municipal Regional Court of Moscow | A-1747 |
| October 26, 2000 decision of the Moscow City Court | A-1752 |
| September 17, 2001 decision of the Gagarinsky Inter-Municipal Court of Moscow | A-1758 |
| May 30, 2000 decision of the Tverskoy Inter-Municipal Regional Court | A-1761 |
| February 7, 2000 decision of the Tverskoy Inter-Municipal Court of Moscow | A-1765 |
| December 22, 2000 decision of the Gagarinsky Inter-Municipal Court of Moscow | A-1768 |
| February 14, 2000 decsion of the Cheryomoushkinsky Inter-Municipal Court of Moscow | A-1774 |
| March 2, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1779 |
| September 4, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1784 |
| August 14, 2000, decision of the Kachkanar City Court of the Sverdlovsk Oblast | A-1790 |

| | |
|---|---|
| February 15, 2000 decision of the Kachkanar City Court | A-1797 |
| February 29, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1801 |
| March 6, 2001 decision of the Moscow City Court | A-1806 |
| April 5, 2000 decision of the Meshchansky Inter-Municipal Regional Court of Moscow | A-1814 |
| June 22, 2001 decision of the Tverskoy Inter-Municipal Regional Court of Moscow | A-1827 |
| Two Notices of registrar change published in the *Oblastnaya gazeta* on, respectively, March 17, 2000 and October 21, 2000 | A-1832 |
| March 20, 2001 decision by the Arbitrazh Court of Moscow | A-1839 |
| June 26, 2001 decision of Appellate Instance of the Arbitrazh Court of Moscow | A-1846 |
| **VOLUME 11 OF 13:** | |
| September 5, 2001 decision of the Federal Arbitrazh court of the Moscow Circuit | A-1852 |
| December 20, 2000 decision of the Petrogradsky Regional Court of St. Petersburg | A-1859 |
| January 12, 2001 decision of the Petrogradsky Regional Court of St. Petersburg | A-1864 |
| March 13, 2001 decision of Izmailovsky Regional Court of Moscow | A-1871 |
| March 13, 2001 decision of Izmailovsky Regional Court of Moscow | A-1874 |
| August 27, 2001 decision of the Chertanovo Federal Court | A-1877 |
| Agreement between GOK and Polyprom dated January 18, 1999 | A-1880 |
| November 22, 2000 decision of the Arbitrazh Court of the Republic of Kalmykia | A-1884 |
| April 17, 2001 decision of the Arbitrazh Court for the North Caucasus Region | A-1895 |
| July 5, 2001 decision of the Arbitrazh Court for the Republic of Kalmykia | A-1904 |
| November 9, 2001 decision of the Appellate Instance of the Arbitrazh Court for the Republic of Kalmykia | A-1910 |
| September 10, 2001 decision of the Arbitrazh Court for the Republic of Kalmykia | A-1919 |
| August 1, 2000 decision of the Arbitrazh Court for the Chelyabinsk Region | A-1924 |

| | |
|---|---|
| October 16, 2000 decision of the Appellate Instance for the Arbitrazh Court for the Chelyabinsk Region | A-1942 |
| January 4, 2001 decision of the Arbitrazh Court for Urals Circuit | A-1952 |
| September 29, 2000 decision of the Solntsevsky Inter-Municipal Regional Court of Moscow | A-1960 |
| March 30, 2001 decision of the Moscow City Court | A-1970 |
| November 30, 2001 decision of the Solntsevsky Inter-Municipal Regional Court of Moscow | A-1980 |
| Agreement between New Start Group, Corp. and Davis dated October 6, 2000 | A-1995 |
| Eugene Aschenbrenner's Power of Attorney to act on behalf of Davis (valid December 3, 1999 through December 3, 2000) | A-2002 |
| Nexis Loan Agreement dated July 13, 1999 | A-2010 |
| March 23, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2020 |
| July 13, 2000 decision of the Meshchansky Inter-Municipal Regional Court of Moscow | A-2027 |
| Republic of Panama v. BCCI Holdings (Luxemborg) S.A., 90-2913-CV-UUB, slip.op. (S.D. Fla. July 17, 1995) | A-2033 |
| **VOLUME 12 OF 13** | |
| October 29, 2001 decision of the Federal Arbitrazh Court for the Urals Circuit | A-2053 |
| November 24, 2001 Opinion of the Department of the Interior of the Sverdlovsk Region | A-2060 |
| January 21, 2002 decision of the Federal Arbitrazh Court for the North Caucasus Circuit | A-2084 |
| March 12, 2002 decision of the Arbitrazh Court for the Republic of Kalmykia | A-2094 |
| April 23, 2002 decision of the Federal Arbitrazh Court for the North Caucasus Circuit | A-2105 |
| April 30, 2002 decision of the Kachkanar Town Court for the Sverdlovsk Oblast | A-2108 |
| September 24, 2002 decision of the Kachkanar Town Court for the Sverdlovsk Oblast | A-2121 |
| November 19, 2002 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2126 |

| | |
|---|---|
| January 22, 2003 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2133 |
| February 4, 2003 decision of the Appellate Instance for the Arbitrazh Court for the Republic of Kalmykia | A-2143 |
| May 20, 2003 decision of the Federal Arbitrazh Court for the North Caucasus Region | A-2150 |
| May 27, 2003 decision of the Appellate Instance of the Arbitrazh Court for the Sverdlovsk Oblast | A-2159 |
| August 27, 2003 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2165 |
| October 30, 2003 decision of the Moscow Municipal Court | A-2170 |
| January 14, 2004 decision of the Federal Arbitrazh Court for the Urals Circuit | A-2176 |
| April 20, 2004 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2187 |
| **VOLUME 13 OF 13** | |
| April 27, 2004 decision of the Arbitrazh Court for the Republic of Kalmykia | A-2197 |
| July 2, 2004 decision of the Moscow City Court | A-2205 |
| July 29, 2004 decision of the Federal Arbitrazh Court for the Urals Circuit | A-2212 |
| December 7, 2004 decision of the Moscow City Court | A-2221 |
| September 18, 2001 decision of the Sverdlovsk Arbitrazh Court | A-2224 |
| December 20, 2001 decision of the Urals Circuit | A-2238 |
| May 22, 2002 decision of the Moscow City Court | A-2246 |
| August 22, 2002 decision of the Moscow City Court | A-2256 |
| September 10, 2002 decision of the Kalmykia Court | A-2269 |
| May 22, 2003 decision of the Sverdlovsk Arbitrazh Court | A-2277 |
| August 13, 2003 decision of the Solntsevsky Court | A-2283 |
| March 3, 2004 decision of the Sverdlovsk Arbitrazh Court | A-2289 |
| March 31, 2004 report issued by Russian Ministry of Internal Affairs | A-2294 |
| Declaration of Tatiana Yastrebova, dated September 16, 2002, filed in *Base Metal Trading* (without exhibits) | A-2314 |
| July 2, 2002 decision of the North Caucasus Circuit | A-2344 |

EFiled: Nov 4 2004 2:43PM EST
Filing ID 4545661

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

DAVIS INTERNATIONAL, LLC, HOLDEX, LLC,:
FOSTON MANAGEMENT, LTD, and                  :
OMNI TRUSTHOUSE, LTD,                         :
                                             :
                    Plaintiffs,              :
                                             :
          v.                                 :    C.A. No. ___801-N___
                                             :
NEW START GROUP CORP., VENITOM CORP.,:
PAN-AMERICAN CORP., MDM BANK,                 :
URAL-GORNO METALURAGICAL COMPANY,:
EVRAZ HOLDING,                               :
MIKHAIL CHERNOI, OLEG DERIPASKA,             :
ARNOLD KISLIN, MIKHAIL NEKRICH, and          :
ISKANDER MAKMUDOV,                           :
                                             :
                    Defendants.              :

## COMPLAINT

Plaintiffs Davis International, LLC, ("Davis"), Holdex, LLC ("Holdex"), Foston

Management, LTD ("Foston"), and Omni Trusthouse, LTD ("Omni," and collectively,

"Plaintiffs"), by and through their undersigned counsel, as and for their Complaint against

Defendants, hereby allege as follows:

### Nature of the Action

1.     The instant case concerns a racketeering scheme beginning in the 1990s among

members of an international organized crime group, headed by Mikhail Chernoi, Oleg

Deripaska, Iskander Makmudov, and American Mikhail Nekrich, utilizing Delaware entities as

their alter egos, managed by American Arnold Kislin (the "Illegal Scheme").

2.    Defendants Chernoi, Deripaska, Makmudov, Nekrich and Kislin (the "Conspirators"), as a unified criminal group, committed numerous criminal acts, including bribery, extortion, and mail and wire fraud, as part of the Illegal Scheme.

3.    In the early 1990's, the Conspirators effected a scheme by which they took advantage of weaknesses in the Russian central banking system. By providing forged authorizations from regional banks to the central banking system, they were able to wire funds to shell companies in other regions, convert the funds to cash, and then ultimately wire the funds to the U.S. in order to launder and legalize them.

4.    From 1993 onward, these funds were laundered through Delaware entities and used to purchase tens of millions of dollars of real estate in the U.S.; the real estate was then sold and the laundered and "legalized" funds further reinvested in other businesses. These funds, "legalized" in the U.S. in the above manner, served as seed money for their illegal ventures.

5.    In mid 1999, the Conspirators threatened physical harm to Plaintiffs' representatives unless they ceded control over Kachkanarsky GOK ("GOK"), Russia's largest vanadium ore mining concern, of which Plaintiffs were the majority shareholders.

6.    In early 2000, the Conspirators took over GOK through physical force, bribery, and extortion.

7.    Once in physical control of GOK, the Conspirators replaced the plant's general director with their own designee, who had the plant enter into sham contracts with their affiliates, which contracts were then deliberately defaulted, creating massive sham debts.

8.    The plant was then placed in a bankruptcy by which they could assert control, because the debts they were "owed" allowed them to elect their agent as the bankruptcy manager.

562501v1

2

9.    In late 2000, the Conspirators arranged for Plaintiffs' shares in GOK to be transferred to the Delaware corporate defendants, utilizing, *inter alia,* fraud or corrupted court proceedings in which Plaintiffs were not even named as parties; the Delaware companies ultimately transferred these shares to UGMC and then to EVRAZ, which is controlled by Chernoi, Deripaska, Makmudov, and Nekrich.

10.    Delaware was the forum of choice for Defendants for effecting this and other illegal schemes; over the course of time, Defendants used over 100 Delaware entities to effect their schemes of fraud, bribery, and money laundering; seventeen of these entities are named herein.

11.    Also, in 2000, in order to sustain the seizure of GOK, false criminal charges were brought against Jalol Khaidarov, who had served as the general director of GOK, including an incident widely-reported in the electronic and print media of the police planting narcotics on him at the Starlight Diner in Moscow, which forced him to flee to Israel.

12.    In 2001, at Makmudov's direction, Russian police purported to find narcotics in the Moscow headquarters office of Israeli citizen Joseph Traum, a principal and managing director of Plaintiff Davis; when freed, he fled home. The "discovery" of "narcotics" at Traum's office and his "deportation" from Russia was covered on TV and radio.

13.    In 2003, the Conspirators arranged for GOK to issue new shares to companies which they control so that even if Plaintiffs recovered their shares in GOK they would be in the minority, unless the new shares are either transferred to Plaintiffs or set aside.

14.    As a result of the Illegal Scheme, Plaintiffs have suffered in excess of $500 million in damages through the loss of their shares and control over GOK.

565501v1

3

15.    In August 2001, Plaintiffs joined a suit in the Southern District of New York brought by other plaintiffs involving additional defendants and additional claims, which was dismissed for *forum non conveniens* in March 2003 and affirmed in a non-published opinion in March 2004.

### Parties and Related Non-Parties

### Plaintiffs

16.    **Plaintiff Davis International, LLC** ("Davis") is a company organized under the laws of the State of West Virginia.

17.    **Plaintiff Holdex, LLC** ("Holdex") is a company organized under the laws of the State of Texas.

18.    **Plaintiff Foston Management, LTD** ("Foston") is a company organized under the laws of Cyprus.

19.    **Plaintiff Omni Trusthouse, LTD** ("Omni") is a company organized under the laws of England.

20.    Davis, Holdex, Foston, and Omni collectively owned more than 72% of the shares of GOK prior to the fraudulent transfer of their shares described herein.

### Kachkanarsky GOK

21.    Non-party **Kachkanarsky GOK** ("GOK") is a company organized under the laws of the Russian Federation that maintains Russia's largest vanadium ore plant in Kachkanarsky GOK, which is located in the town of Kachkanar in the Sverdlovsk Oblast in the Ural Mountains.

22.    Vanadium ore produced by GOK is used to manufacture various metal products as well as pure vanadium, which are sold to customers in the United States.

562901v1

4

### Defendants

23.     **Defendant New Start Group Corp.** ("New Start") is a company organized under the laws of the State of Delaware.

24.     **Defendant Venitom Corp.** ("Venitom") is a company organized under the laws of the State of Delaware.

25.     **Defendant Pan-American Corp.** ("Pan-American") is a company organized under the laws of the State of Delaware, which was dissolved in 1998.

26.     **Defendant Mikhail Chernoi** ("Chernoi") is a Russian and/or Israeli citizen who resides in Israel. He is the head of the Conspirators' criminal group.

27.     **Defendant Oleg Deripaska** ("Deripaska") is a Russian citizen who resides in Moscow.

28.     **Defendant Arnold Kislin** ("Kislin") is an American citizen and resident of the State of New York.

29.     **Defendant Iskander Makmudov** ("Makmudov") is a Russian citizen who resides in Moscow.

30.     **Defendant Mikhail Nekrich ("Nekrich")** is a United States citizen who resides in Switzerland or Russia and joined the conspiracy in 1997.

31.     **Defendant Moscovsky Delovoy Mir Bank ("MDM Bank")** is organized under the laws of the Russian Federation; its name means Moscow Business Bank.   MDM Bank was owned, directly or indirectly, by Chernoi, Deripaska, Makmudov, and Nekrich and operated and managed by them.

32.     **Defendant Ural-Gorno Metallurgical Company ("UGMC")** is organized under the laws of the Russian Federation; during the relevant time, Makmudov operated and managed

503501-1

5

UGMC. At present, Makhmudov is the Chairman of the Board of Directors of UGMC. The beneficial owners of UGMC are Chernoi, Deripaska, Makmudov, and Nekrich.

33. **Defendant Evraz Holdings ("EVRAZ")** is organized under the laws of the Russian Federation. Evraz was owned, directly or indirectly, by Chernoi, Deripaska, Makmudov, and Nekrich and operated and managed by them, or under their direction and control.

34. Defendants New Start, Venitom, and Pan-American are owned and controlled, directly or indirectly, and the corporate alter egos of Chernoi, Deripaska, Makmudov, and Nekrich, and managed and operated by Kislin.

35. These Delaware Defendants and other Delaware entities were created by the Conspirators and used for the purpose of furthering criminal conduct.

36. The Conspirators regularly utilized Delaware entities in their various illegal schemes involving fraud, bribery, and money laundering. The Conspirators organized or bought over 100 Delaware entities for these purposes, including **(1) MIC Building Co. L.P.; (2) MC MIC Building Corp.; (3) MIC Leasing Co., L.P.; (4) MC MIC Leasing Corp.; (5) Around the Clock Corp.; (6) CMC MIC Holding Company, LLC; (7) MC Holdings Company, LLC; (8) CMC Factory Holding Company, LLC; (9) CMC Center Holding Company, LLC; (10) CMC Falchi Holding Company, LLC; (11) Falchi Building Co., L.P.; (12) 33-00 Center Building LLC; (13) The Factory, L.P.; and (14) MC Factory Corp.** (collectively the "Delaware Real Estate Entities").

37. The Delaware Real Estate Entities were used by Chernoi, Deripaska, Kislin, Makmudov, and Nekrich in part, to own real estate in the United States as a means of laundering their illegally obtained funds.

6

### The Russian-American "Izmailovo Mafia"

38.    Non-party **Anton Malevsky** ("Malevsky"), now deceased, was a Russian citizen who was a member of and controlled the Russian-American Izmailovo Mafia during the relevant time period and acted on behalf of Defendants.

39.    The Izmailovo Mafia is one of the most powerful Russian-American organized crime groups and is named for the Izmailovo region of Moscow.

40.    As set forth in numerous media articles and government reports, the Izmailovo Mafia has infiltrated the United States; its American leader, Vyacheslav Ivankov, was recently released from federal prison where he served seven years for extortion; he was immediately extradited to Russia to be tried for murder charges.

41.    Chernoi, Deripaska, Makmudov, and Nekrich operate an organized crime group which is part of the Izmailevo Mafia.

42.    Chernoi has been indicted in Israel for the equivalent of money laundering; on information and belief, he is currently the subject of criminal proceedings in Switzerland.

43.    Deripaska has been barred from entering Switzerland and, on information and belief, he is currently the subject of criminal proceedings in Switzerland.

44.    According to numerous media articles, the Ismailovo Mafia, through Nekrich, has financed Chechen terrorists, including those with ties to the international terrorist network of al-Qaeda.

### The Central Bank Fraud

45.    In the early 1990's, a number of Russian organized crime groups, including the Chernoi, Deripaska, and Makmudov association, engaged in a simple, but effective, check kiting-like fraud, on the Russian central bank.

562901.1

7

46.    In order to effect the fraud, they set up dummy companies and opened accounts in their names with a local branch of the Russian central bank, usually in Chechnya. Then, they would issue a payment advice to the order of another dummy company controlled by them and arrange for it to be accepted by the branch. The branch would transfer the advice to the payee company's account in another branch which would be credited with immediate availability of funds upon receipt of the advice. Because the Conspirators used Chechen branches to effect the fraud, the advices were known as "Chechen Advices."

.47.    The payee would then cash the funds, which would ultimately be wired through bank accounts in the United States. The funds were used to purchase tens of millions of dollars of real estate in the U.S. in the name of entities registered in the state of Delaware.

48.    Fourteen of these Delaware entities are named above as the Delaware Real Estate Entities; ultimately, this real estate was sold and the proceeds were used as "seed money" for the Conspirators other criminal ventures, including the takeover of GOK.

### The Initial Extortion

49.    Prior to December 1998, Jalol Khaidarov ("Khaidarov") had worked for Chernoi, Deripaska, and Makmudov as a financial advisor. In December 1998, Khaidarov established an independent career and began to serve as the general director of GOK in April 1999.

50.    In April 1999, Khaidarov met with Chernoi and Makmudov in Chernoi's apartment in the center of Paris regarding GOK. Chernoi told Khaidarov that "there were a lot of clever people like Felix Lvov, Oleg Kantor, Vadim Yafasov, but sometimes they die. Don't be too clever. You have a chance to continue working with us. To that end, you should persuade the shareholders of GOK to transfer their shares to us. Some people refuse my offers. But for the rest of their lives, they wear bulletproof jackets. So what's the sense? Think it over." This

562901-1

8

was a direct threat on the life of Khaidarov if he did not cooperate with Chernoi because all of the above persons had been murdered in Russia.

51.    By May or June 1999, the controlling shareholders of GOK agreed preliminarily to sell 20% of their shares to a company controlled by the Conspirators in response to the extortion.  The GOK controlling shareholders hoped that this would satisfy the Conspirators. The Conspirators made a down payment of $5 million for these shares, which was wired through a bank in the United States to an account held on behalf of the GOK shareholders.

52.    Several months later, Makmudov told Khaidarov that the Conspirators needed a controlling share of GOK, and Chernoi demanded that Khaidarov arrange for 51% of the shares of GOK to be transferred to the Conspirators.

53.    In response, the GOK controlling shareholders decided that it was impossible to cooperate or satisfy Chernoi and Makmudov, short of simply giving up their interests for far less than their worth.  As a result, the GOK shareholders returned the $5 million through a bank in the U.S. and the purported transfer of shares did not take place.

### The Malevsky Extortion

54.    Immediately thereafter, in November 1999, Makmudov asked Khaidarov to meet with him at the Luxor Restaurant at the Metropole Hotel in Moscow.  Shortly after the meeting began, Makmudov called Malevsky, who then joined the meeting, accompanied by five armed thugs; Deripaska, Kislin, and Nekrich were also present.  Malevsky is well known as a leader in the Russian mafia and his mere presence was a direct threat by Deripaska, Kislin, and Nekrich.

55.    Makmudov demanded that Khaidarov arrange for the GOK controlling shareholders to transfer 51% of Gok's shares to Chernoi without payment.

56.    Khaidarov said he thought Makmudov was crazy, but that he would transmit the message.

57.    Malevsky then told Khaidarov, "What do you think you're saying?    This is the last time that you will leave here alive."

### The Bribery of Governor Roussel

58.    As of 1999, Eduard Roussel ("Roussel") was the Governor of the Sverdlovsk Oblast, where GOK was located.

59.    In that year, meetings were arranged between representatives of the Conspirators, including Makmudov, to pay Roussel for his "protection" and "help."

60.    Payments were then wired by Pan-American through banks in the United States to MDM Bank for conversion into cash for payment at the direction of Roussel.

61.    These payments included the illegal payment of $850,000 in cash for Roussel's election campaign -- a payment that was widely reported in the Russian press.

62.    In return for these payments, Roussel agreed to support the Conspirators' efforts to do "business" in Sverdlovsk Oblast.

### The Physical Takeover of GOK

63.    On or about January 28, 2000, the Conspirators took over GOK by sending armed persons to take physical control of the plant.    The takeover of GOK was widely covered by leading Russian TV and media.

64.    By threat of physical harm, the Conspirators caused four of the seven member board of directors of GOK in the absence of a quorum, which according to the bylaws was five to vote to remove Khaidarov as general director and to replace him with Andrey Kozitsin ("Kozitsin"), an agent of the Conspirators.

562903v1

10

65.     Although the lower court order approving this resolution of the board of directors was invalidated by a directive from a member of the Supreme Court of Russia, which remanded the case for reconsideration, the lower court failed to conduct a hearing to reconsider its order for over two years and, as of the filing of this Complaint, has yet to decide the matter.

66.     The three remaining board members initially refused to succumb to the threats and filed criminal complaints with the Prosecutors of the Kachkanar and Sverdlovsk areas, requesting initiation of the criminal proceedings in connection with the illegal takeover.

67.     Malevsky's people threatened the three resisting directors that their families would be killed. Two of the remaining directors then agreed to support the Conspirators and, in return, received bribes in the form of expensive automobiles and apartments in Moscow.

68.     On information and belief, these apartments and automobiles were purchased with cash from MDM Bank which had been wired through banks in the United States from Pan-American or another company associated with the Conspirators.

### Makmudov's Next Threat

69.     After the physical takeover of GOK, one of Makmudov's men met with Khaidarov.

70.     The man said that the Conspirators knew that Khaidarov and the GOK shareholders could fight them with complaints to the authorities and lawsuits in Russia. The man also said that the Conspirators also knew that Khaidarov had relatives in Tashkent and that his wife and son were then in England, and threatened harm to them if Khaidarov resisted the takeover.

562901v1

11

**A - 11**

### The Initial Efforts to Fight the Illegal Takeover

71.    On or about March 4, 2000, shareholders of GOK conducted a meeting to invalidate the decision of the board which removed Khaidarov as the general director.

72.    The meeting of shareholders took place on a side of the road near Kachkanar.

73.    The shareholders adopted a resolution invalidating the decision of the board meeting, elected a new board of directors, and expressed confidence in Khaidarov as general director of GOK.

### Malevsky's Final Threat

74.    After the shareholders' meeting, Malevsky met with Khaidarov at the Balchug-Kempinsky Hotel in Moscow in late February or early March 2000. There, he said to Khaidarov: "What are you doing?  It's going to end badly for you. Nobody will help. Not the FSB [Federal Security Service].  Not the MVD [Ministry of Interior Affairs]."  Malevsky was sending the message that the Conspirators controlled government agencies and that Khaidarov and the GOK shareholders had a "last chance" to give up.

### The Creation of the False Debt of GOK

75.    Recognizing that the shareholders of GOK had an opportunity to reacquire control, the Conspirators arranged for GOK to incur massive false debts prior to placing it in a sham bankruptcy.

76.    The Conspirators and MDM Bank arranged for Andrey Kozitsin, who was acting as general manager of GOK, to enter into a number of sham transactions. The end result of the sham transactions was that a shell company, Lebaut, during the period of several days in the middle of February, became a holder of demand promissory notes issued by GOK with the face value of about $39 million through the following scheme:

562501v1

12

(a)    On or about January 28, 2000 -- the very day of the physical takeover of GOK -- Kozitsin had GOK enter into a sham Joint Venture Agreement (the "JV Agreement") with a Russian company named Svyatogor, which was controlled by the Conspirators and which is currently a subsidiary of UGMK.

(b)    Subsequently, on or about February 4, 2000, the Conspirators arranged for MDM Bank to enter into a sham Credit Agreement with GOK for $15 million to be loaned to GOK and repaid within several days.

(c)    On February 4, 2000, MDM Bank loaned the $15 million to GOK, which Svyatogor guaranteed under a guaranty agreement (the "Guarantee Agreement").

(d)    Under the terms of Guarantee Agreement, GOK was to pledge its promissory notes for approximately $25 million as "security" for Svyatogor's issuance of Guarantee.

(e)    Subsequent to GOK's delivery of its promissory notes to Svyatogor, on February 10, 2000, GOK wired the $15 million it had obtained from MDM Bank to Svyatogor, through an American Bank, as GOK's contribution to the "Joint Venture."

(f)    On February 10, 2001, GOK "defaulted" on its obligation to repay the $15 million "loan" from MDM Bank.

(g)    The following day, Svyatogor, as guarantor under the Guarantee Assessment, wired $15 million to MDM Bank, through an American Bank.

(h)    Pursuant to the terms of the Guarantee Agreement, after the "default," Svyatogor became the holder of the GOK promissory notes for $25 million -- using the same monies lent by MDM Bank to GOK to repay MDM Bank!

(i)    Just 10 days later, on or about February 21, Svyatogor transferred the promissory notes to Lebaut.

77.    Thus, as a result of this "transaction," the Conspirators arranged for $15 million to circulate through GOK's and Svyatogor's accounts, and, in return, obtained $25 million of GOK notes for literally nothing.

78.    Through the use of this and various other sham transactions during the period of five days from February 18 to February 23, Lebaut accumulated a total of 53 GOK promissory notes with a face value of approximately $39 million.

### GOK's Sham Bankruptcy

79.    Following the "last chance" meeting with Malevsky, the Conspirators arranged for a false bankruptcy to take place in order to cement their control over GOK, causing a local natural gas company to file an involuntary bankruptcy petition against GOK on March 24, 2000.

80.    Prior   to    initiation    of    bankruptcy   proceedings,   GOK's   debt   to "Krasnouralskmezhraygaz" ("Krazgaz"), its gas supplier, amounted to $810,000 caused by the Conspirators' deliberate nonpayment of natural gas bills for January, February, and March 2000, -- the time period after they took over GOK.  At the instigation of the Conspirators, on February 4, 2000, Krazgaz demanded that GOK pay the debt even though an agreement had been reached to pay the debt over time.

81.    Despite the fact that GOK had on its bank account funds nineteen times greater than the amount of its debt to Krasgaz, on February 8, 2000, Kozytsin refused to pay off the debt due to "lack of monetary funds at GOK."

82.    On February 21, 2000, Kozitsin again rejected a collusive demand to pay the debt despite the availability of the funds exceeding $2 million; thereafter, in collusion with Kozitsin, Krasgaz filed a petition placing GOK in involuntary bankruptcy.

83.    On or about March 30, 2000, the Sverdlovsk Arbitrazh Court accepted the bankruptcy petition and appointed Oleg Kozyrev ("Kozyrev"), an agent of the Conspirators, as provisional manger of GOK.

84.    On or about August 11, 2000, Kozyrev held the first meeting of creditors where Lebaut's fraudulent claim amounted to 94% of creditor votes.  As a result of the first creditors meeting, Kozyrev was nominated as external manager of GOK.  Under Russian Law, an external manager has management authority over a company.  Thus, the appointment allowed the Conspirators to avoid the risk that a court could invalidate the decision to remove Khaidarov and return him to the position of the general director of GOK as well as give them time for the subsequent conversion of GOK shares from the Plaintiff companies.

85.    Shortly thereafter, on August 22, 2000, the court held a hearing to approve the decision of the first meeting of the creditors to appoint Kozyrev as external manager.

86.    The Sverdlovsk Oblast government, controlled by Roussel, filed a petition in support of the approval of the appointment of Kozyrev in order to send a signal to the court, which approved the appointment of Kozyrev.

87.    As shareholders, Plaintiffs had no standing under the Russian bankruptcy law to challenge these actions.

### The Fraudulent Transfers of Plaintiffs' Shares in GOK

88.    After Kozyrev was appointed as external manager in August 2000, the Conspirators arranged for Plaintiffs to be removed from the registry of GOK shareholders and for their shares to be transferred secretly to Delaware shell companies New Start and Venitom and other companies controlled by the Conspirators. This tactic is a relatively common method in Russia by which organized crime groups seize control of economic enterprises.

### The Davis Shares

89.    On or about September 30, 2000, the Conspirators had Kozyrev change the registrar of shares of GOK to VRK Company, a registration company controlled by the Conspirators through UGMC, which was a shareholder of VRK.

90.    On or about October 18, 2000, the VRK Company registered a transfer of 35,106,022 shares of GOK from Davis to New Start, which constituted 18.39% of issued and outstanding GOK shares and all of the shares owned by Davis.

91.    In order to cloak the transfer with the appearance of legitimacy, the Conspirators arranged for Mr. Ashenbrenner, a prior agent of Davis, to submit to VRK an invalid, not notarized and unauthorized power of attorney which purportedly authorized him to transfer shares from Davis to New Start.  The only power of attorney that has ever been issued to Ashenbrenner had been revoked on or about September 28, 2000 -- three weeks before the fraudulent transfer.  VRK, according to its own Charter, improperly accepted the transfer order signed by Ashenbrenner even though the order was not executed with Davis' corporate seal and the power of attorney issued from the name of the company and submitted by Ahsenbrenner was not an original document.

92.    Furthermore, in order to give the transfer of the Davis shares appearance of legality, the Conspirators, on or about October 20, 2000, arranged for New Start to make a wire transfer in the amount of $2 million to the order of Davis' account with MDM Bank through an American bank.  The same day, the Conspirators arranged for MDM Bank to wire the above $2 million from Davis' MDM Bank account.  This transfer was based on a forged payment order executed by Ashenbrener.  The order was not executed with Davis' corporate seal.  At no time did Davis authorize Ashenbrener to execute any payment orders on its behalf.

362500v1

16

93.    Moreover, Davis would never agree to sell its 35 million shares constituting 18.39% of all issued and outstanding GOK shares for $2 million.

94.    The Davis shares, in whole or in part, were registered in the names of New Start and Venitom. There has never been litigation related to the Davis Shares.

### Omni's Shares

95.    Prior to 2000, Omni purchased its shares in GOK from various entities that had acquired the shares as a result of a judicial sale that occurred in September 1998. As the result, Omni accumulated 34,031,114 shares, which constituted 17.83 % of issued and outstanding GOK shares.

96.    In the spring of 2000, unbeknownst to Omni, NPRO Urals, a company controlled by the Conspirators, filed a lawsuit in the obscure Chelyabinsk Arbitrazh Court to set aside the judicial sale. On August 1, 2000, the court ruled in favor of NPRO Urals and ordered that the shares be re-registered in the name of NPRO Urals. By decision dated October 16, 2000, the appellate division of the court likewise ordered that the shares be re-registered in the name of NPRO Urals, which occurred on or about November 15, 2000. This order was affirmed by the Federal Court for the Ural District on January 4, 2001.

97.    As a result, Omni was divested of 10,583,063 shares, which constituted 5.54 % of the issued and outstanding GOK shares.

98.    Contrary to Russian law, Omni, the owner of shares, was never notified of or participated in these proceedings and did not learn of the transfer of its shares until two months after it took place.  Court ordered transfer of property of persons who are not named as parties and not provided notice or an opportunity to be heard in violation of Russian law is emblematic of corruption in Russia.

562901-1

17

99.    After Omni had learned of the transfer of its shares, its representative appeared at the January 4, 2001 hearing and petitioned to make Omni a party to the proceedings. This request was denied; thus, Omni has never been party to the proceedings even though its shares were transferred.

100.    Several defendants in the NPRO Urals lawsuit, who had sold the shares to Omni, filed applications for protest at the Supreme Arbitrazh Court of the Russian Federation, seeking to reverse these decisions. Two of the applications were denied on February 12, 2001, and May 21, 2001, by Judge Arifulin, and another application was denied on July 4, 2001, by Judge Yukov.

101.    In *Films By Jove v. Berov*, 2003 U.S. Dist. LEXIS 6233 (E.D.N.Y. Apr. 16, 2003), Judge Trager of the Eastern District of New York found that a decision in which Judge Arifulin was involved was obtained through corruption.

102.    Omni's shares were registered in whole or in part in the name of Venitom and other companies controlled by the Conspirators, even though it was not named and did not participate in the proceeding.

103.    On information and belief, Venitom "paid" for these shares with monies wired through an American bank.

## Foston's Shares

104.    As of September 2000, Foston owned 37,799,600 shares, which constituted 19.8% of issued and outstanding GOK shares.

105.    In 2000, three companies owned and controlled by the Conspirators sued Foston in Moscow, seeking to invalidate the sale of shares to Foston. Foston was never notified of the

proceedings and, instead, a forged power of attorney was submitted to the court purportedly on behalf of Foston; presumably, an impostor appeared on behalf of Foston.

106.    On September 29, 2000, absent any opposition, the court ordered the transfer of 37,715,081 of the Foston's GOK shares which consisted of 19.75% of the Gok shares to the Conspirators' companies. Subsequently, on October 18, 2000 the transfer has been registered on the books of the registrar company VRK controlled by UGMC.

107.    Only in October 2000, Foston accidentally learned of the transfer of its shares. When Foston attempted to investigate what had occurred, the court files were stolen.

108.    Although a final decision of the Russian court compelling the return of these shares was entered in October 30, 2003, the Conspirators in the person of new owners of the stolen shares did not honor the decision.  The shares had been transferred by the Russian companies controlled by the Conspirators to other companies, including Venitom.   On information and belief, Venitom "paid" for these shares with monies wired through an American bank.

### Holdex's Shares

109.    As of September 25, 2000, Holdex owned 30,947,386 shares, which constituted 16.21% of issued and outstanding GOK shares.

110.    In late 2000, GOK filed a suit in the Kalmykia Arbitrazh Court against Polyprom, the company that sold its GOK shares to Holdex, to declare that the sale of shares to Polyprom, which it later sold to Holdex, was invalid. By order dated November 22, 2000, the Court ruled in favor of GOK which the Conspirators then controlled and ordered that the shares be re-registered to another Russian company, which occurred on or about December 22, 2000.  As the result,

Holdex was divested of 2,307,984 shares, which constitutes 1.2 % of the issued and outstanding shares.

111.    Contrary to Russian law, neither Polyprom nor Holdex were notified of, and did not participate in, the proceedings; in fact, Holdex was not even originally named as a defendant in the suit, but was only added as a defendant later upon the demand of Holdex itself after the fact of transfer of its shares.  Again, court ordered transfers of property belonging to persons who were not named as parties and not provided notice or an opportunity to be heard, in violation of Russian law, which is emblematic of corruption in Russia.

112.    Polyprom and Holdex did not learn about the decision until about two months after it was rendered.

113.    Subsequently, hearings have taken place in the Russian courts for which Holdex never received notice; thus Holdex never participated in these proceedings.

114.    Ultimately, the shares purchased by Holdex were transferred in whole or in part to Venitom and other companies controlled by Conspirators.  On information and belief, Venitom "paid" for these shares with monies wired through an American bank

## The Bankruptcy "Settlement Agreement"

115.    After the fraudulent transfer of shares was completed and the Conspirators no longer needed the bankruptcy proceedings, they decided to terminate the bankruptcy by having GOK enter into a settlement agreement with creditors.

116.    To that end, on or about March 3, 2001, Kozyrev held a Second Meeting of Creditors.  At the meeting, based on Lebaut's huge claim, the creditors approved a sham settlement agreement that, provided that the payments to creditors would be effected without

%290143

interest pursuant to the following schedule: 5% in 2006, 7% in 2007, 9% in 2008, 9% in 2009, 10% in 2010, and 15% each year thereafter until paid.

117. The GOK sham settlement agreement was intended to make the debt owed to legitimate creditors worthless while transferring control of GOK to the "new" shareholders. Shareholders had no standing to challenge this agreement under Russian bankruptcy law.

### The False Criminal Charges Against Khaidarov

118. In retaliation for the filing of the Russian litigation to set aside the fraudulent transfer of the shares, the Conspirators arranged for false criminal charges to be brought against Khaidarov.

119. In July 2000, false criminal charges were filed as a result of a well-publicized incident in which the police planted drugs on Khaidarov while he was at the Starlight Diner in Moscow. The police asked Khaidarov for his passport and then "found" a packet of heroin inside. False charges of rape were also brought against Khaidarov.

120. As a result of these false charges and threats on his life, Khaidarov was forced to flee Russia in November 2000, and now lives in Israel under police protection, where he is cooperating with the Israeli, as well as American, authorities in their investigation of Chernoi and his associates.

### The Illegal Detention of Traum

121. Joseph Traum ("Traum") was a managing director of Davis and was also authorized to represent the interests of several other GOK shareholders, including Holdex and Omni.

382901v1

21

122.    Subsequent to the illegal takeover of GOK in January 2000, Traum had numerous conversations with Makmudov and Chernoi, during which Makmudov demanded that Traum sell them all of Davis' Gok shares or he would lose his "freedom."

123.    In March 2001, after Makmudov and Aschenbrenner had arranged the theft of all of the GOK shares from Davis, Makmudov threatened Traum with huge problems if he continued to challenge the theft of the shares.

124.    One month later, in April 2001, Traum was in his office in Moscow when Russian police (i.e. special forces) came to his office and directed people to lay on the floor. The police announced that they had information that Traum was a drug dealer, and that there were drugs hidden in the office. The police then put a big package on Traum's desk which they said contained a kilo of heroin. Within a few minutes, Makmudov called Traum and said, "Are you convinced? Now you can face 18 years in jail, or you can go to the airport and leave Russia."

125.    A secretary from the office called Khaidarov in Israel to inform him what was occurring. Khaidarov then called the Israeli police to request immediate assistance. Shortly thereafter, the Russian police received a telephone call while in Traum's office and then said he would be free to go. Apparently, Israeli officials interceded on behalf of Traum.

126.    Later, Makmudov called Traum and said that Traum had left him no choice and now he would have to eliminate him. Traum reported this to the Israeli police, who recommended that Traum immediately leave Russia, which he did. He is also cooperating with the authorities in their investigation of Chernoi and his associates.

### The Final Step to Consolidate
### the Conspirators' Control Over GOK

127.    In 2003, the Conspirators arranged for GOK to issue new shares in an amount equal to all previously issued shares to companies which they controlled.

362901v3

22

128.    As of May 31, 2001, Holdex owned 14.99%, Omni owned 12.28%, and Foston owned 0.044% totaling to about 27% of all of then issued and outstanding GOK shares.

129.    The purpose of this was to dilute the Plaintiffs' remaining shares, since at the relevant time Plaintiffs still owned a blocking amount of GOK shares because under Russian law certain corporate decisions require the approval of 75% plus 1 of the voting shares.

130.    Upon information and belief, the Conspirators used profits obtained from their control of GOK to purchase the newly issued shares. Upon information and belief, payment was made through fraudulently obtained funds which were wired to GOK or MDM Bank, directly or indirectly, in dollar denominated amounts through banks in the United States.

131.    Ultimately, the GOK shares illegally taken from Plaintiffs were "sold" to UGMC which then "sold" the shares to EVRAZ in 2004.

132.    Specifically, according to media reports in 2004, the Conspirators via UGMC, which they control, "sold" their controlling interest in GOK, which was illegally taken from Plaintiffs for $500 million, to EVRAZ.

133.    In an attempt to further consolidate their control of GOK, the Conspirators, through intermediaries, approached Holdex and Omni with an offer to purchase their GOK shares. Ultimately, a block of about 52 million shares constituting about 13.64 % of issued and outstanding GOK shares was sold for about $27.7 million.

134.    After conclusion of the transaction, Holdex and Omni learned that the shares ultimately end up in the hands of the Conspirators. Apparently, the Conspirators are seeking access to Western financing or equity investment and, thus, are seeking to eliminate minority shareholders through legal means.

### The Predicate Acts of Racketeering

135.    Defendants committed numerous predicate acts forming a pattern of racketeering, including extortion, bribery, money laundering, illegal transactions in monetary instruments, violations of the Travel Act, and mail and wire fraud, described above.

136.    The pattern of racketeering began no later than the early 1990's and continues through the current date.

### The Enterprises

137.    New Start, Venitom, Pan-American, GOK, MDM, UGMC, and EVRAZ, as well as the Delaware Real Estate Entities, each constitute an enterprise pursuant to 18 U.S.C. § 1961(4), which engaged in and effected interstate and foreign commerce in the United States.

### COUNT I
### Conversion
### (Against New Start, Venitom, UGMC, EVRAZ,

### Chernoi, Deripaska, Kislin, Makmudov and Nekrich)

138.    The allegations in the above paragraphs are incorporated herein as if set out in full.

139.    Pursuant to the Illegal Scheme, New Start, Venitom, UGMC, EVRAZ, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich exercised undue dominion and control over the property of the Plaintiffs by misappropriating Plaintiffs' shares and control of GOK, which were ultimately transferred to UGMC and EVRAZ.

140.    As a direct and proximate result of the unlawful acts of these Defendants, the Plaintiffs have suffered damages in an amount in excess of $500 million, including loss of the value of their controlling interest in GOK and loss of dividends which would have been paid to them.

562901-1

24

**COUNT II**
**Equitable Relief**
**(Against New Start, Venitom, UGMC, EVRAZ,**
**Chernoi,Deripaska, Kislin, Makmudov, and Nekrich)**

141.    The allegations of the above paragraphs are incorporated herein as if set out in full.

142.    The Conspirators used New Start and Venitom, two Delaware shell companies, in order to carry out their conversion of Plaintiffs' GOK shares.  The Conspirators formed these and other Delaware corporations for fraudulent and illegal purposes, including money laundering and schemes like, and including, the conversion of Plaintiffs' GOK shares, which were ultimately transferred to UGMC and then to EVRAZ.

143.    On information and belief, New Start and Venitom do not conduct any real or legitimate business activities, but exist solely as the Conspirators' *alter egos* to serve their unlawful purposes.  The Conspirators even attempt to hide their relationship with New Start and Venitom, as though they are clandestine "off-shore" corporations in which anonymity is the norm, by failing to identify any officers or directors of those companies in their annual franchise tax reports filed with the Delaware Secretary of State.

144.    Accordingly, it is probable that New Start and Venitom are not capitalized and that any judgment rendered against them -- particularly a judgment for millions or hundreds of millions of dollars --would be uncollectible.

145.    Delaware has a significant state·interest in preventing the use of corporations formed under its aegis for perpetrating illegal international schemes.  To the extent that New Start and Venitom are unable to satisfy any judgment rendered against them in this action, Plaintiffs may be left without an adequate remedy at law, and this Court should exercise its

565501v1

equitable powers to pierce those companies' corporate veils and hold the Conspirators personally liable for any judgment against those companies.

146.    To the extent that it is still possible, the Court should also exercise its equitable power of injunction to require Defendants to disgorge and return Plaintiffs' GOK shares to them.

**COUNT III**
**Violation of RICO 18 U.S.C. § 1962(a)**
**(Against New Start, Venitom, Pan-American, Chernoi,**
**Deripaska, Makmudov, and Nekrich)**

147.    The allegations of the above paragraphs are incorporated herein as if set out in full.

148.    Defendants received income from a pattern of racketeering, as described above.

149.    The pattern included predicate acts of bribery, extortion, money laundering, illegal transactions in monetary instruments, violations of the Travel Act, and mail and wire fraud.

150.    A part of such income or its proceeds were used, directly or indirectly, to acquire an interest in GOK and to operate GOK through the Illegal Takeover and conversion of Plaintiffs' shares, in violation of 18 U.S.C. § 1962(a).

151.    As a direct and proximate result of Defendants' use and investment of racketeering income in the Illegal Takeover of GOK and loss of their shares, Plaintiffs have suffered damages in an amount in excess of $500 million.

**COUNT IV**
**Violation of RICO 18 U.S.C. § 1962(b)**
**(Against MDM Bank, New Start, Venitom,**
**Pan-American, UGMC, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich)**

152.    The allegations of the above paragraphs are incorporated herein as if alleged in full.

382901.1

26

**A - 26**

153.    Pursuant to the Illegal Scheme, MDM Bank, New Start, Venitom, Pan-American, UGMC, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich engaged in a pattern of racketeering activity specifically directed at acquiring and maintaining control of GOK, in violation of 18 U.S.C. § 1962(b).

154.    This pattern of racketeering activity resulted in their gaining control of GOK.

155.    The pattern included predicate acts of bribery, extortion, money laundering, illegal transactions in monetary instruments, violations of the Travel Act, and mail and wire fraud.

156.    As a direct and proximate result of the takeover of GOK, Plaintiffs have suffered damages in an amount in excess of $500 million.

**COUNT V**
**Violation of RICO 18 U.S.C. § 1962(c)**
**(Against New Start, Venitom, Pan-American, UGMC, EVRAZ**
**Chernoi, Deripaska, Kislin, Makmudov, Nekrich)**

157.    The allegations of the above paragraphs are incorporated herein as if set out in full.

158.    Pursuant to the Illegal Scheme, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich operated and managed the New Start, Venitom, Pan-American, and, with the exception of Nekrich, the Delaware Real Estate Entities enterprises through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

159.    Pursuant to the Illegal Scheme, New Start, Venitom, UGMC, EVRAZ, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich operated and managed the GOK enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

160.    Pursuant to the Illegal Scheme, Chernoi, Deripaska, Makmudov, and Nekrich operated and managed the MDM Bank, UGMC, and EVRAZ enterprises through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

161.    The pattern included predicate acts of bribery, extortion, money laundering, illegal transactions in monetary instruments, violations of the Travel Act, and mail and wire fraud.

162.    The pattern of racketeering activity included the commission of two or more predicate acts of racketeering from 1993 through the current date, in violation of 18 U.S.C. § 1962(c).

163.    As a direct and proximate result of Defendants' misconduct, Plaintiffs have suffered damages in an amount in excess of $500 million.

**COUNT VI**
**Violation of 18 U.S.C. § 1962(d)**
**(Against New Start, Venitom, Pan-American, MDM Bank, UGMC, EVRAZ,**
**Chernoi, Deripaska, Kislin, Makmudov, and Nekrich)**

164.    The allegations of the above paragraphs are incorporated herein as if set out in full.

**Conspiracy to Violate § 1962(a)**

165.    Pursuant to the Illegal Scheme, MDM Bank, New Start, Venitom, Pan-American, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich conspired among themselves, and with others, including Malevsky, to use the monies received from a pattern of racketeering, as detailed above, to directly or indirectly, to acquire an interest in GOK and to operate GOK through the Illegal Takeover and conversion of Plaintiffs' shares in GOK, in violation of 18 U.S.C. § 1962(a).

562901v1

### Conspiracy to Violate § 1962(b)

166.    Pursuant to the Illegal Scheme, MDM Bank, New Start, Venitom, Pan-American, Chernoi, UGMC, Deripaska, Kislin, Makmudov, and Nekrich conspired among themselves, and with others, including Malevsky, who acted as Defendants' agent, to violate 18 U.S.C. § 1962(b) by taking over GOK through a pattern of racketeering activity.

### Conspiracy to Violate § 1962(c)

167.    Pursuant to the Illegal Scheme, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich conspired among themselves, and with others, to violate 18 U.S.C. § 1962(c) by operating and managing New Start, Venitom, Pan-American, and, with the exception of Nekrich, the Delaware Real Estate Entities through a pattern of racketeering activity.

168.    Pursuant to the Illegal Scheme, MDM Bank, New Start, Venitom, Pan-American, UGMC, EVRAZ, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich conspired among themselves, and with others, including Malevsky, who acted as Defendants' agent, to violate 18 U.S.C. § 1962(c) by operating and managing GOK through a pattern of racketeering activity.

169.    Pursuant to the Illegal Scheme, Chernoi, Deripaska, Makmudov, and Nekrich among themselves, and with others, to violate 18 U.S.C. § 1962(c) by operating and managing MDM Bank, UGMC, and EVRAZ through a pattern of racketeering activity.

170.    Defendants knowingly agreed among themselves to commit and did commit at least two Predicate Acts in furtherance thereof of each of the conspiracies within a ten year period.

171.    As a direct and proximate result of the above conspiracies, Plaintiffs have suffered damages in an amount in excess of $500 million.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

563901v1

      a.      Awarding compensatory damages in excess of $500 million;

      b.      Awarding treble damages under RICO in excess of $1.5 billion;

      c.      Holding the Conspirators personally liable for any judgment against New

Start and Venitom, by piercing those companies' corporate veils;

      d.      Awarding appropriate injunctive relief requiring the return of Plaintiffs'

GOK shares and Defendants to transfer any subsequently issued Gok shares to Plaintiffs;

      e.      Awarding costs and attorney fees under RICO; and

      f.      Granting such other relief as is just and proper.

OF COUNSEL:                                  THE BAYARD FIRM

MARKS & SOKOLOV, LLC
Bruce S. Marks
1835 Market Street - 28th Floor
Philadelphia, PA 19103                       Kurt M. Heyman (# 3054)
(215) 569-8901                               Patricia L. Enerio (# 3728)
                                             222 Delaware Avenue, Suite 900
                                             P.O. Box 25130
                                             Wilmington, Delaware 19899
                                             (302) 655-5000
                                             Attorneys for Plaintiffs

Dated: November 4, 2004

56290113

30

BASE METAL TRADING SA v. RUSSIAN ALUMINUM    **681**
Cite as 253 F.Supp.2d 681 (S.D.N.Y. 2003)

the individual defendants for summary judgment on the basis of a lack of personal jurisdiction is also denied. Finally, the motion for summary judgment by Polar with respect to the claims alleged by the third-party plaintiffs is also denied.

The parties should submit joint pre-trial orders by April 15, 2003.

SO ORDERED.



**BASE METAL TRADING SA, Base Metal Trading Ltd., Alucoal Holdings Ltd., Mikom, Davis International, LLC, Holdex, LLC, Foston Management, Ltd., Omni Trusthouse, Ltd., Nexis Products, LLC, and Polyprom, Ltd., Plaintiffs,**

v.

**RUSSIAN ALUMINUM, Rual Trade Ltd., Sibirsky Aluminum Products USA Corp. a/k/a Sibirsky Aluminum (US), Sibirsky Aluminum (Russia), Bauxal Management, SA, Metcare Management, SA, Unimetal Limited, SA, Oleg Deripaska, Mikhail Chernoi, Blonde Management, Inc., Blonde Investments, Corp., Pan–American Corp., Arnold Kislin, Iskander Makhmudov, Moskovskiy Delovoi Mir Bank, Novokuznetsk Aluminum Zavod, New Start Group Corp., Venitom Corp., Unidale LLC, and Investland, LLC. Defendants.**

No. 00 CIV.9627 JGK.

United States District Court,
S.D. New York.

March 27, 2003.

Metal trading companies brought action against Russian consortia, stemming from allegedly illegal takeovers of Russian aluminum and vanadium producers. On defendants' motion to dismiss for forum non conveniens, the District Court, Koeltl, J., held that: (1) trading companies' choice of forum warranted low degree of deference; (2) adequate alternative forum existed for action; and (3) public and private interest factors warranted finding of forum non conveniens.

Motion granted.

**1. Federal Courts ⚖45**

Doctrine of "forum non conveniens" contemplates dismissal of lawsuits brought by plaintiffs in their favored forum in favor of adjudication in foreign court.

See publication Words and Phrases for other judicial constructions and definitions.

**2. Federal Courts ⚖45**

Resolution of motion to dismiss based on forum non conveniens requires three-step analysis: (1) determination of degree of deference to be afforded to plaintiff's choice of forum; (2) analysis of whether adequate alternative forum exists; and (3) consideration of private and public interest factors.

**3. Federal Courts ⚖44**

While any plaintiff's selection of forum is entitled to deference, that deference increases as plaintiff's ties to forum increase; accordingly, foreign plaintiff's choice of forum is entitled to less deference.

**4. Federal Courts ⚖45**

Choice of New York district court by metal trading companies bringing action against Russian consortia, stemming from allegedly illegal takeovers of Russian aluminum and vanadium producers, warranted low degree of deference, as required for finding of forum non conveniens, since seven of ten companies were not United States corporate citizens, remaining three

companies did not maintain offices in New York, action arose out of business transacted in Russia, and only one out of many contracts relevant to case contained New York forum selection clause.

**5. Federal Courts ⬅45**

Where American plaintiff chooses to invest in foreign country and then complains of fraudulent acts occurring primarily in that country, plaintiff's ability to rely upon citizenship as talisman against forum non conveniens dismissal is diminished.

**6. Federal Courts ⬅45**

Requirement under forum non conveniens doctrine that adequate alternative forum be available for claim ordinarily will be satisfied when defendant is amenable to process in other jurisdiction; in rare circumstances, however, where remedy offered by other forum is clearly unsatisfactory, other forum may not be adequate alternative.

**7. Federal Courts ⬅45**

In determining whether foreign law provides adequate relief, as element of determining whether forum non conveniens doctrine applies, court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under Federal Rules of Evidence; such determination shall be treated as ruling on question of law. Fed.Rules Civ.Proc.Rule 44.1, 28 U.S.C.A.

**8. Federal Courts ⬅45**

Adequate alternative forum existed for action brought by metal trading companies against Russian consortia, stemming from allegedly illegal takeovers of Russian aluminum and vanadium producers, as required for finding of forum non conveniens; civil and criminal actions for fraud, conversion and intentional interference with contract were available in Russian courts, companies failed to demonstrate alleged corruptness of Russian courts, and hearing of action in Russian

courts was consistent with principles of international comity.

**9. Federal Courts ⬅45**

Private interest factors to be considered by court when determining whether to grant motion to dismiss on forum non conveniens grounds include: (1) relative ease of access to sources of proof; (2) convenience of willing witnesses; (3) availability of compulsory process for attaining attendance of unwilling witnesses; and (4) other practical problems that make trial easy, expeditious, and inexpensive.

**10. Federal Courts ⬅45**

In action brought by metal trading companies against Russian consortia, stemming from allegedly illegal takeovers of Russian aluminum and vanadium producers, private and public interest factors warranted proceedings in forum other than one in which complaint was filed, as required for finding of forum non conveniens; vast majority of potential non-party witnesses resided in Russia, bulk of significant documentary evidence was located in Russia and was in Russian language, and Russian interest in adjudicating case outweighed that of United States.

**11. Federal Courts ⬅45**

Public interest factors to be considered by court when determining whether to grant motion to dismiss on forum non conveniens grounds include: (1) court congestion, (2) avoiding difficult problems in conflict of laws and application of foreign law, (3) unfairness of imposing jury duty on community with no relation to case, and (4) interest of communities in having local disputes decided at home.

———————

Robert Abrams, Stroock & Stroock & Lavan, L.L.P., New York City, Bruce S.

Marks, Marks & Sokolov, L.L.P., Philadelphia, PA, Raymond N. Hannigan, Herrick, Feinstein, LLP, New York City, for plaintiffs.

Michael D. Burrows, Robert M. Buschmann, Winston & Strawn, New York City, for Sibirsky Aluminum Group, Sibirsky Aluminum Products USA Corp., Bauxal Management, S.A., Metcare Management, S.A., Unimetal Limited, S.A., and Mr. Oleg Deripaska.

Ira M. Feinberg, John A. Redmon, Hogan & Hartson L.L.P., New York City, for Novokuznetsk Aluminum Zavod.

Paul R. Grand, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, for Russian Aluminum, RUAL Trade Ltd.

Richard Schaeffer, Peter Venaglia, Dornbush, Mensch, Mandelstam & Schaeffer, LLP, New York City, for New Start Group Corp., Venitom Corp., Unidale LLC, Investland, LLC.

Victor Roger Rubin, International Law Counsel, PC, New York City, for Mikhail Chernoi, Chernoi Companies.

Raymond L. Vandenberg, Vandenberg & Feliu, LLP, New York City, for Moskovskiy Delovoi Mir Bank.

Brian S. Cousin, Greenberg Traurig, LLP, New York City, for Panamerican Trade Corp.

Elizabeth M. Johnson, Law Offices of Lawrence S. Goldman, Lisa C. Cohen, Schindler Cohen & Hochman LLP, New York City, for Arnold Kislin and Blonde Managemnet, Inc.

Robert E. Hauberg, Jr., Baker, Donelson, Bearman & Cauldwell, Washington, DC, for Iskander Makhmudov.

## OPINION AND ORDER

KOELTL, District Judge.

This is a case about two Russian companies, Novokuznetsk Aluminum Zavod ("NKAZ") and Kochkanarsky GOK ("GOK"), Russia's largest producers of aluminum and vanadium, respectively. The plaintiffs' claims arise from the defendants' alleged illegal takeovers of these companies by means including bribery of local Russian political officials, judicial corruption in Russia, and armed force. The plaintiffs argue that the defendants drove NKAZ and GOK into bankruptcy and then gained control of the companies through sham bankruptcy proceedings overseen by allegedly corrupt local Russian judges. The plaintiffs seek over $3 billion for alleged damages. The defendants have now moved to dismiss the current Complaint on many bases, including *forum non conveniens*.

The plaintiffs, Base Metal Trading, SA ("BMT SA"), Base Metal Trading, Ltd. ("BMT Ltd."), Alucoal Holdings, Ltd. ("Alucoal") (collectively the "BMT Plaintiffs"), MIKOM (collectively, with the BMT Plaintiffs the "NKAZ Plaintiffs" or the "Aluminum Plaintiffs"); Davis International, LLC ("Davis"), Holdex, LLC ("Holdex"), Foston Management, Ltd. ("Foston"), Omni Trusthouse, Ltd. ("Omni") (collectively the "Davis Plaintiffs"); Nexis Products, LLC ("Nexis") and Polyprom (collectively the "GOK Plaintiffs") bring this action for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, intentional interference with contract, and conversion. The defendants are Sibirsky Aluminum Group ("Sibirsky Russia"), Sibirsky Aluminum Products USA Corp. ("Sibirsky USA"), Bauxal Management, S.A. ("Bauxal"), Metcare Management, S.A. ("Metcare"), Unimetal Limited, S.A. ("Unimetal"), Mr. Oleg Deripaska ("Deripaska") ("collectively the "Sibirsky Defendants"), Russian Aluminum, RUAL Trade, Ltd. ("RUAL"), Mikhail Chernoi ("Chernoi"), Blonde Management, Inc. ("Blonde Management"), Blonde Investments, Corpora-

tion ("Blonde Investments"), Pan–American Corporation ("Pan–American"), Arnold Kislin ("Kislin"), Iskander Makhmudov ("Makhmudov"), Moskovskiy Delovoi Mir Bank ("MDM Bank"), NKAZ, New Start Group Corporation ("New Start"), Venitom Corporation ("Venitom"), Unidale LLC ("Unidale") and Investland, LLC ("Investland") (New Start, Venitom, Unidale and Investland hereinafter the "GOK Defendants").

The Sibirsky Defendants now move to dismiss on the basis of *forum non conveniens* and all defendants join this motion. MDM Bank has also filed a motion to dismiss for *forum non conveniens*. The Sibirsky Defendants move pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss for lack of subject matter jurisdiction and failure to state a claim, as well as failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). All defendants join in this motion. Two motions to dismiss on the ground of comity have also been filed, one by NKAZ and the other by the GOK Defendants. All defendants join in these motions.

### I.

On December 19, 2000, the BMT Plaintiffs—BMT SA, BMT Ltd. and Alucoal—filed suit in this Court alleging that defendant Deripaska, the head of Sibirsky Aluminum, and his partner, defendant Chernoi, conspired with others to monopolize the Russian aluminum industry beginning in the 1990's. (Original Compl. ¶ 1.) The Complaint alleged that Sibirsky, comprising Sibirsky Aluminum and its affiliates, including Russian Aluminum, took over NKAZ through rigged bankruptcy pro-

ceedings in the Kemerovo Region of Russia. (Original Compl. ¶ 5.) The Kemerovo Region is located in Western Siberia north of the border between Kazakhstan and Mongolia. Once in control of NKAZ, Sibirsky terminated contracts between NKAZ and the BMT Plaintiffs and forced the BMT Plaintiffs to enter into less favorable contracts with Sibirsky affiliates. (Original Compl. ¶ 6.) None of the BMT Plaintiffs are United States citizens or residents. (Am.Compl.¶¶ 23, 25, 27.)

In May, 2001, all of the defendants filed motions to dismiss on a series of grounds, including *forum non conveniens* and lack of subject matter jurisdiction. In response, the BMT Plaintiffs amended the Complaint on August 3, 2001 to add seven new plaintiffs, including three United States corporations.[1] The Amended Complaint added twelve new defendants and a new scheme to take over GOK, in addition to NKAZ. The Amended Complaint alleges a:

> massive racketeering scheme beginning in the 1990's among, *inter alia*, the members of an international Russian-American organized crime group, headed by Mikhail Chernoi, and including business moguls Oleg Deripaska, the head of Sibirsky Aluminum, and Iskander Makhmudov, the then de facto head of MDM Bank, and the Izmailovo Russian-American mafia group to take over and monopolize the Russian aluminum and other metals industries (the "Illegal scheme").

(Am.Compl.¶ 1.) The plaintiffs claim Chernoi, Deripaska, and Makhmudov ("the Conspirators"), as well as their allies and

---

1. The motions currently before the Court seek to dismiss the claims alleged in the First Amended Complaint filed August 3, 2001. However, by Stipulation and Order dated March 27, 2002, the parties agreed that the plaintiffs could file a Second Amended Complaint solely to amend paragraphs 11, 294, 297 and 300 of the First Amended Complaint. As such, the Court will consider the motions as directed to the pending Second Amended Complaint but will cite to the First Amended Complaint unless otherwise specified.

the companies they control, directly or indirectly committed numerous criminal acts including physical violence, mail and wire fraud, and money laundering in the United States in furtherance of the illegal scheme. (Am.Compl.¶¶ 2–4.)

The Amended Complaint comprises two primary parts. First, the BMT Plaintiffs and one new party, MIKOM, reallege that the Conspirators took over NKAZ in 2000 by using rigged bankruptcy proceedings.[2] (Am.Compl.¶¶ 5–6.) Second, the remainder of the new plaintiffs bring new claims for the alleged illegal takeover of GOK through physical force, bribery, and extortion.[3] (Am.Compl.¶ 5.)

Changes to one section of the Original Complaint exemplify the way in which the plaintiffs try to meld the new claims into the old to form one coherent scheme. The Original Complaint included a section entitled "The Aluminum Wars" that traced the history of an alleged series of "wars" to control the Russian aluminum industry precipitated by its privatization in the 1990s. (Original Complaint ¶¶ 68–71.) The BMT Plaintiffs alleged that during this period and continuing to the present, Deripaska and Chernoi conspired together to take over the Russian aluminum industry, including NKAZ. (Original Compl. ¶ 71.) These allegations have been newly styled in the Amended Complaint as the history of "The Metal Wars." The sole changes to the Original Complaint are add-

ed references to the vanadium industry and other metal industries that are tacked on to the text of the Original Complaint. (Am.Compl.¶¶ 122–24.)    Additionally, Chernoi and Deripaska are now alleged to have been joined by defendant Makhmudov in conspiring to control the Russian metals industry, including NKAZ and GOK. (Am.Compl.¶ 124.)

(A)

The Amended Complaint first tells the story of the defendants' alleged illegal takeover of the Russian aluminum industry, particularly with respect to NKAZ. The first steps in this scheme allegedly included takeovers of three other Russian aluminum companies: Krasnoyarsk Aluminum Zavod ("KRAZ"), Sayansk Aluminum Zavod ("SAZ"), and Bratsk Aluminum Zavod ("BRAZ"). (Am.Compl.¶¶ 123, 125–47.) The Conspirators allegedly effected the takeovers through various illegal means, including redirecting the shipment of finished aluminum from the factories, the murder of numerous rivals in association with the Izmailovo Mafia, the filing of false criminal charges against an official of KRAZ, rigged Russian court proceedings and economic extortion. (Am. Compl.¶¶ 130, 136, 138, 140, 142, 145.)

Beginning in late 1994 or early 1995, plaintiff MIKOM, under its president Mikhail Zhivilo ("Zhivilo"), entered into a con-

2. The Amended Complaint alleges that "Deripaska, Chernoi, Makhmudov, Malevsky, MDM Bank, Pan–American, Blonde Management, Blonde Investments, Kislin, Karam, Transmetal, Trans–Commodities, Russian Aluminum, RUAL, SibAl, Sibirsky U.S., Bauxal, Metcare, Unimetal, NKAZ, KRAZ, BRAZ and SAZ constitute an 'association-in-fact' formed for the common purpose of taking over the aluminum and other metals industries in Russia and diverting, appropriating, and distributing profits from the Illegal Scheme, continuing from the mid-1990's through today (the "Aluminum Enterprise")." (Am.Compl.¶ 518.)

3. The Amended Complaint alleges that "Deripaska, Chernoi, Makhmudov, Malevsky, MDM Bank, Pan–American, Blonde Management, Blonde Investments, GOK, Kislin, Karam, Transmetal, Trans–Commodities, New Start, Venitom, Unidale and Investland constitute an 'association-in-fact' formed for the common purpose of taking over the vanadium and other metals industries in Russia and diverting, appropriating, and distributing profits from the Illegal Scheme, continuing from the mid-1990's through today (the "Vanadium Enterprise")." (Am.Compl.¶ 519.)

tract to manage NKAZ. (Am.Compl.¶¶ 12, 30, 148.) MIKOM then solicited Western trading partners such as BMT Ltd. to extend loans to NKAZ and to trade with the company. (Am.Compl.¶ 149.) At that time, NKAZ purchased approximately 70% of its alumina, a raw material necessary to produce aluminum, from the Pavlodarsky Aluminum Zavod ("PAZ"). (Am. Compl.¶ 150.) At about the same time, the plaintiffs allege, Chernoi and his allies gained control of PAZ and threatened to stop shipments of alumina to NKAZ unless NKAZ gave them 50% of its aluminum sales profits and 50% of the shares in NKAZ. (Am.Compl.¶ 151.) Chernoi later manipulated NKAZ into buying all of its alumina from PAZ at a premium. (Am. Compl.¶ 152.)

In August 1995, Zhivilo informed Chernoi that NKAZ and BMT Ltd. would no longer trade with PAZ. (Am.Compl.¶ 161.) The plaintiffs allege that shortly thereafter, Deripaska and Chernoi made direct and indirect threats on Zhivilo's life that were followed by an unsuccessful attempt to assassinate him. One of the threats was allegedly made to Yuri Zhivilo, Mikhail Zhivilo's brother, in Chicago, Illinois in 1995. (Am.Comp.¶¶ 165–66.) Other threats were allegedly made directly to Mikhail Zhivilo in Tel Aviv, Israel and in Paris, France. (Am.Comp.¶¶ 165–70, 189.) In response to the threats, BMT Ltd., NKAZ, and Alucoal allegedly paid millions of dollars in protection money to the Conspirators between April, 1996 and October,

1999. (Am.Compl.¶¶ 172–74.) The payments were allegedly made through several New York banks and the funds were eventually laundered through various entities including defendants Pan–American and Blonde Management. (Am. Compl.¶¶ 173–176.)

In or about 1997, Russian President Boris Yeltsin appointed Aman Tuleyev ("Tuleyev") as Kemerovo Regional Governor. (Am.Compl.¶ 186.) The next year Tuleyev allegedly began demanding that Zhivilo pay bribes from NKAZ, MIKOM, BMT Ltd. and BMT SA. (Am.Compl.¶ 187.) Tuleyev threatened that failure to pay would result in the transfer of NKAZ to the Conspirators. (Am.Compl.¶ 188.)

In 1999, the Conspirators and Tuleyev allegedly joined together to take over NKAZ illegally with the assistance of the local energy provider, Kuzbass. (Am. Compl.¶¶ 177, 193–94.) The essence of the takeover scheme was for Kuzbass to "assert false tariff claims [against NKAZ], file suit upon them, and obtain a sham judgment against NKAZ, with the active assistance of Tuleyev, using the corrupt Russian regional court system."[4] (Am. Compl.¶ 199.) This would allow the Conspirators to force NKAZ into an involuntary bankruptcy after which the Conspirators could place their own agents in control of the company. (Am.Compl.¶ 202.) The Conspirators would then cancel NKAZ's trading contracts with the BMT Plaintiffs as well as the management contract with

---

4. The regional court at issue was the Kemerovo Arbitrazh Court. Russian arbitrazh courts comprise a three-tier system of courts with jurisdiction over commercial disputes, including bankruptcies. (Declaration of Paul B. Stephan III dated Jan. 28, 2002 ("Stephan 2002 Decl.") ¶¶ 6–8.) The first level of the arbitrazh courts presides over the "first instance" of cases and can also hear appeals of those decisions. (Stephan 2002 Decl. ¶ 7.) Ten Federal Circuit Arbitrazh Courts exercise appellate review, or "cassation" review, over

both first instance and appellate decisions of the lower court. (Stephan 2002 Decl. ¶ 7.) Finally, the Supreme (or Higher) Arbitrazh Court in Moscow has original jurisdiction over certain cases involving the Russian Federation, exercises supervisory review over the arbitrazh courts (roughly the equivalent of the certiorari jurisdiction of the United States Supreme Court), and has the authority to reopen closed cases in view of newly discovered evidence. (Stephan 2002 Decl. ¶ 7.)

MIKOM and replace those companies with affiliates of the Conspirators. (Am. Compl.¶ 201.) The Conspirators would profit from the scheme by supplying raw materials to NKAZ and then trading in the finished aluminum, while Kuzbass would receive higher energy payments for its participation in the takeover. (Am. Compl.¶ 200.) For his role in the take-over, Tuleyev allegedly received $3 million between 1999 and 2000 paid at least in part with funds wired by Pan-American, Blonde Management, and Blonde Investments through American banks at Kislin's instruction. (Am.Compl.¶¶ 196–98, 455, 459.)

The plaintiffs allege that the illegal scheme unfolded as follows. Beginning in late 1994, NKAZ contracted with Kuzbass to supply energy at agreed upon rates. (Am.Compl.¶¶ 204–06.) In an action filed on November 12, 1997 in the Kemerovo Arbitrazh Court, Kuzbass repudiated its agreements with NKAZ in response to which NKAZ filed a counter suit. (Am. Compl.¶¶ 208–15.) As a result of the dispute, the Kemerovo Arbitrazh court ultimately awarded Kuzbass a judgment of approximately $26.3 million on October 21, 1999. (Am.Compl.¶ 216.) The plaintiffs contend that Tuleyev influenced the arbitrazh court to obtain this result. (Am. Compl.¶ 216.) NKAZ unsuccessfully appealed the award to the appellate branch of the Kemerovo Arbitrazh Court which was "also apparently under the influence of Tuleyev" and which entered a final judgment upholding the award on December 24, 1999. (Am.Compl.¶¶ 217–18.) NKAZ then appealed the award to the West Siberian Circuit Federal Arbitrazh Court in Tyumen. (Am.Compl.¶ 219.) The court stayed the execution of the award on or about January 19, 2000 pend-

ing consideration of the appeal. (Am. Compl.¶ 220.)

Despite the stay, Kuzbass prevailed on an *ex parte* petition to the Kemerovo Arbitrazh Court for an order declaring NKAZ bankrupt, appointing Sergey A. Chernyshev ("Chernyshev") as Provisional Manager, and imposing allegedly unnecessary conservatory measures on the company. (Am.Compl.¶ 222–24, 227–230.) The plaintiffs claim that the bankruptcy order constituted a clear violation of Russian law which requires an executable judgment of a creditor in order to place a business into involuntary bankruptcy. (Am. Compl.¶¶ 221, 225.) Moreover, the plaintiffs claim that NKAZ was never bankrupt. (Am.Compl.¶ 226.)

The plaintiffs contend that Chernyshev proceeded to issue a series of unreasonable information requests on MIKOM and used MIKOM's failure to satisfy the requests promptly as a basis for his petition to remove the company as NKAZ's manager.[5] (Am.Compl.¶¶ 231–236.) Kuzbass also petitioned the arbitrazh court to remove MIKOM using information supplied by Chernyshev from his investigation. The gist of the information was that MIKOM was hiding money that should have been used to pay current debts. (Am.Compl.¶¶ 237–38.) In an allegedly unusual step, the local Kemerovo procurator filed a separate petition for bankruptcy against NKAZ at the behest of Tuleyev. (Am.Compl.¶¶ 239–41.) The plaintiffs claim that the procurator did so "to signal to the Kemerovo court that the local political authorities supported Chernyshev's position and Kuzbass' petition." (Am.Compl.¶ 239.) At an alleged sham hearing on February 16 and 17, 2000 the arbitrazh court summarily granted the motions for MIKOM's removal and Cher-

5.  As provisional manager in the early stages of a bankruptcy, Chernyshev's role was to gather information about the bankrupt com-

pany on behalf of the arbitrazh court. (Am. Compl.¶ 230.)

nyshev's appointment. (Am.Compl.¶¶ 245, 252–57.) The plaintiffs claim that the BMT Plaintiffs, NKAZ, and MIKOM were denied important procedural rights at the hearing, including the full opportunity to present evidence and to properly cross-examine witnesses, as well as timely access to an interpreter. (Am.Compl.¶¶ 252–56, 258–59.)

Once installed as Acting Manager, Chernyshev instructed NKAZ's attorneys to cease to pursue the actions preceding the award and to withdraw prosecution of NKAZ's claims against Kuzbass. (Am. Compl.¶¶ 261–64.) Chernyshev proceeded to recognize a series of allegedly fictitious claims against NKAZ by companies controlled by the Conspirators totaling approximately $70 million. (Am. Compl.¶¶ 265–67.) Recognition of the false creditors provided the Conspirators with voting power at subsequent creditor meetings where control of the agenda was proportional to the sums due to each creditor. (Am.Compl.¶ 268.) At the same time, Chernyshev allegedly refused to recognize valid claims asserted by BMT Ltd. and Alucoal worth approximately $60 million. (Am.Compl.¶ 269.) These maneuvers altered the balance of power at future creditor meetings because prior to the allegedly illegal takeover the BMT Plaintiffs allegedly held the majority of NKAZ's debt. (Am.Compl.¶ 270.)

At the first creditors' meeting, the new creditors voted to place NKAZ under external management and to appoint Chernyshev to the position of External Manager. (Am.Compl.¶ 272.) The Kemerovo Arbitrazh Court confirmed the appointment on March 20, 2000, enabling Chernyshev to cancel NKAZ's contracts with the BMT Plaintiffs for the supply of raw materials and subsequent purchase of finished aluminum. (Am.Compl.¶¶ 272–76.) Chernyshev then entered into substitute purchase and supply contracts with companies controlled by the Conspirators. (Am. Compl.¶¶ 276–290.)

While not referred to in the Amended Complaint, BMT SA, supported by MIKOM, sought review of the Arbitrazh Court's March 20, 2000 decision in the West Siberian Circuit Federal Arbitrazh Court. The Circuit Court rejected all of the grounds for appeal finding, among other things, that NKAZ was insolvent. (Declaration of Paul B. Stephan III ("Stephan") dated Jan. 28, 2002 ("Stephan 2002 Decl.") ¶ 29; Decree of the Federal Arbitration Court of the West Siberian District dated July 3, 2000 ("West Siberian District July 3, 2000 Decree") attached as Ex. 112 to Second Declaration of Sergei Chernyshev dated Jan. 27, 2002 ("Chernyshev Decl.").)

The Conspirators allegedly reached a subsequent agreement with an unnamed powerful Russian oligarch to form Russian Aluminum, thus establishing a monopoly over the Russian aluminum industry. (Am.Compl.¶ 305.) This partnership freed the Conspirators from their need to partner with Kuzbass, and Chernyshev subsequently attempted to remove Kuzbass from NKAZ's list of outstanding creditors. (Am.Compl.¶¶ 306–10.) Tying up further loose ends, Tuleyev accused Zhivilo of conspiring to have him murdered. (Am. Compl.¶ 302.) As a result, allegedly false charges were filed against Zhivilo before he sought asylum in France in February 2001. (Am.Compl.¶¶ 302–04.)

In or about August 2000, the Conspirators secured total control of NKAZ by allegedly forcing its shareholders to sell their stock at distressed prices to four unspecified companies controlled by the Conspirators. (Am.Compl.¶¶ 312–13.) At a final creditors' meeting on March 6, 2001, through the votes of the allegedly false creditors recognized by Chernyshev, the Conspirators won approval of a bank-

ruptcy settlement. (Am.Compl.¶ 315.) The settlement was allegedly highly prejudicial to NKAZ's legitimate creditors, including the BMT Plaintiffs. (Am. Compl.¶ 316.) The Kemerovo Arbitrazh Court approved the allegedly sham settlement on April 3, 2001. (Am.Compl.¶ 317.) Again, while not referred to in the Amended Complaint, BMT SA and others appealed the April 3, 2001 decision of the Kemerovo Arbitrazh Court to the West Siberian Circuit Federal Arbitrazh Court. On September 6, 2001, a panel of three judges, different from those who heard the previous appeal, approved the settlement agreement terminating the bankruptcy. (Stephan 2002 Decl. ¶ 30; Resolution of the Federal Arbitrazh Court of the Western–Siberian Circuit dated Sept. 6, 2001 ("West Siberian Circuit Sept. 6, 2001 Resolution") attached as Ex. 133 to Chernyshev Decl.)

The Conspirators allegedly remain in control of NKAZ today and use the sales and purchasing power of the company to benefit their affiliates, including defendants Metcare, RUAL, Bauxal and Unimetal. (Am.Compl.¶ 321.) The plaintiffs claim that the Conspirators also siphon profits from the company while failing to pay the legitimate debts owed to the NKAZ Plaintiffs. (Am.Compl.¶ 322.)

**(B)**

The Amended Complaint contains a new series of claims not present in the Original Complaint and in which the BMT Plaintiffs play no part. The claims involve a conspiracy to take over GOK, "Russia's largest vanadium ore mining factory." (Compl.¶ 5.) GOK is located in the Sverdlosk Oblast which is situated on the east side of the Ural Mountains north of central Kazakhstan. Six new plaintiffs bring these allegations: Davis, Holdex, Foston and Omni (collectively the "Davis Plaintiffs"), as well as Nexis and Polyprom (collectively the "GOK Plaintiffs"). These allegations can be divided into two parts.

First, the Davis Plaintiffs allege the fraudulent transfer of their shares in GOK which collectively totaled over 70% of the company. (Am.Compl.¶¶ 32–36.) Second, the GOK Plaintiffs allegedly maintained contracts and loan agreements with GOK that GOK then breached. (Am. Compl. ¶¶ 37–39.)

The plaintiffs' narrative of the events involving GOK similarly begins with claims of extortion and threats of violence. In December 1998, Jalol Khaidarov ("Khaidarov") became general director of GOK after having worked as a financial advisor for Chernoi and Makhmudov. (Am. Compl.¶ 341.) In April 1999, Khaidarov allegedly met twice with his former employers in Paris to discuss GOK. (Am. Compl.¶ 342.) At the second meeting, Chernoi allegedly instructed Khaidarov to convince GOK's shareholders to transfer their shares to Chernoi and Makhmudov and reminded Khaidarov that, "Some people refuse my offers. But for the rest of their lives, they wear bullet proof jackets." (Am.Compl.¶ 343.)

In response to ongoing threats, GOK's controlling shareholders agreed preliminarily to sell 20% of their shares to a company controlled by the Conspirators. (Am.Compl.¶ 344.) Makhmudov and Chernoi made a $5 million down payment on the shares with money allegedly wired through an unnamed United States bank. (Am.Compl.¶ 345.) However, Makhmudov and Chernoi were soon unsatisfied and demanded that Khaidarov arrange for the transfer of additional shares. (Am. Compl.¶ 346.) Believing that the two men would never be satisfied, the shareholders returned the $5 million and cancelled the transfer. (Am.Compl.¶ 347.)

Similar to the allegations concerning the NKAZ takeover, the plaintiffs allege that the Conspirators bribed the local Governor to aid in their scheme. (Am.

Compl.¶¶ 352–55.)    Eduard    Roussel ("Roussel"), Governor of the Sverdlovsk Oblast as of 1999, was allegedly paid for "protection" and "help" in support of the Conspirators' efforts to do business in the region. (Am.Compl.¶¶ 352–53, 355.)  Makhmudov and Chernoi allegedly paid Roussel "more than $850,000 in bribes ... so that Roussel would allow them to use the police to take over GOK and would exercise his influence over the corrupt Sverdlovsk    judiciary."    (Am.Compl.¶ 458.) These "payments were made by Pan-American    and    Blonde    Management through banks in the United States to MDM Bank for conversions into cash for payment at the direction of Roussel." (Am.Compl.¶ 354.)

On or about January 28, 2000, with the support of regional authorities, Makhmudov and Chernoi allegedly sent a group of armed thugs to take over GOK physically. (Am.Compl.¶ 356.)  The Conspirators then used bribes and threats of physical force to convince four members of GOK's Board of Directors to vote to remove Khaidarov as general director and to replace him with Andrey Kozitsin ("Kozitsin"), an alleged agent    of    the    Conspirators.    (Am. Compl.¶ 357.)  This vote allegedly violated GOK's charter which required five votes in order to remove the general director. (Am.Compl.¶ 357.)  The Complaint alleges that the three remaining board members asked prosecutors in the Kachkanar and Sverdlovsk areas to initiate criminal proceedings in connection with the GOK takeover. (Am.Compl.¶ 358.)  However, the Kachkanar City Court upheld the Board's vote in a decision dated February 1, 2000. (Ruling of the Kachkanar City Court dated Feb. 1, 2000 attached as Ex. 41 to Declarations of Oleg S. Kozyrev ("Kozyrev") (no date) and Samir Kapoura ("Kapoura") (no date) ("Kozyrev/Kapoura Decls.").)

To thwart any further efforts by GOK shareholders to reacquire control of the

company, the Conspirators and MDM Bank allegedly arranged for GOK to incur massive false debts in February 2000. (Am.Compl.¶¶ 371–86.)  By the end of this brief period, a series of sham transactions left a small company named Leybout in possession of approximately $39 million in demand promissory notes issued by GOK. (Am.Compl.¶¶ 373–86.)  The Conspirators then    caused    Krasnouralskmezhraigaz ("Kras Gas"), a local natural gas company in the Sverdlovsk Region, to file an involuntary bankruptcy petition against GOK on March 24, 2000. (Am.Compl.¶ 387.) Although the plaintiffs claim that the petition should not have been granted under Russian law because Kras Gas' receivables were not overdue, the Sverdlovsk Arbitrazh Court did just that and appointed Oleg Kozyrev ("Kozyrev") Provisional Manager of GOK on March 30, 2000. (Am.Compl.¶¶ 388–89.)  After he was appointed Provisional Manager, Kozyrev refused to recognize what the plaintiffs contend was a $7 million valid claim by Nexis arising from a "certain" loan agreement with GOK. (Am.Compl.¶ 390.)

At the time of the GOK creditors' initial meeting, Leybout's allegedly fraudulent claims left that company with 94% of the creditor votes. (Am.Compl.¶ 391.)  At the meeting the creditors nominated Kozyrev as External Manager. (Am.Compl.¶ 392.) On March 30, 2000, the Sverdlovsk Arbitrazh Court approved Kozyrev's appointment, having been signaled allegedly to do so by Roussel's Sverdlovsk Oblast government. (Am.Compl.¶ 392–94.)

What came next, according to the Davis Plaintiffs, was a series of fraudulent transfers of their shares in GOK, often through defendant New Start, and ultimately to defendants Venitom, Unidale, and Investland. (Am.Compl.¶¶ 397–423.)  The plaintiffs claim that these four companies are owned and controlled by the Conspirators.

(Am.Compl.¶ 431.) Defendant Kislin allegedly arranged for the incorporation of the companies, a process paid for with funds from Blonde Management or Pan–American. (Am.Compl.¶¶ 433–34.)

The first step in the fraudulent transfers was allegedly to install VRK Company, a company "friendly" to the Conspirators, as GOK's registrar of shares. (Am. Compl.¶ 397.) VRK Company then improperly "registered a transfer of about 35 million shares of GOK from Davis to New Start ..." while disguising the transfer as a legitimate sale. (Am.Compl.¶¶ 399–402.) The Amended Complaint alleges that the "Davis [s]hares, in whole or in part, are currently registered in the name of Investland, Unidale, and/or Venitom, having been transferred to them by New Start." (Am. Comp.¶ 403.)

Omni's shares in GOK, allegedly purchased from "various entities who had acquired the shares as a result of a judicial sale that occurred in September 1998," were transferred as the result of a lawsuit filed in the Chelyabinsk Arbitrazh Court in the spring of 2000 to set aside the judicial sale. (Am.Compl.¶¶ 404–06.) The Chelyabinsk Oblast, in which the Chelyabinsk Arbitrazh Court is located, is situated south of the Sverdlosk Oblast and just north of Kazakhstan. In October 2000, the Appellate Instance for the Arbitrazh Court for the Chelyabinsk Region affirmed the lower court's decision setting aside the judgment and ordered that the stock be re-registered to Omni's detriment. (Am. Compl.¶ 407.) The plaintiffs contend that "[c]ontrary to Russian law, Omni was never notified of or participated in these proceedings and did not learn of the transfer until two months after it took place." (Am.Compl.¶ 409.) While the Complaint does not mention the fact, the October 2000 decision of the Appellate Instance for the Arbitrazh Court for the Chelyabinsk Region was affirmed by the Arbitrazh

Court for the Urals Circuit on December 4, 2001. (Ruling by the Urals Circuit Federal Arbitrazh Court dated Dec. 4, 2001 attached as Ex. 85 to Kozyrev/Kapoura Decls.) Omni's shares in GOK are alleged to be registered currently, in whole or in part, in the name of Investland, Unidale, and/or Venitom. (Am.Compl.¶ 410.)

In 2000, three Russian plaintiffs sued Foston in the Solntsevo Intermunicipal Court in Moscow for a declaration requiring Foston to transfer its shares in GOK. (Am.Compl.¶ 411.) Foston allegedly received no notice of the suit and instead a forged power of attorney was submitted to the court on the company's behalf. (Am. Compl.¶ 412.) On September 29, 2000 the Intermunicipal Court ordered the unopposed transfer of 1.2 million GOK shares to three companies. (Am.Compl.¶ 413.) The Amended Complaint never identifies these companies except to say that they are owned and controlled, directly or indirectly, by the Conspirators. (Am. Compl.¶ 413.) Foston allegedly did not know of the proceedings or of the transfer until October 31, 2000 and subsequently won a reversal of the decision in the Moscow City Court. (Am.Compl.¶¶ 414–15.) However, the plaintiffs claim that Foston no longer has control of its shares as a result of the Intermunicipal Court's original decision, and they are instead in the possession of Investland, Unidale, and/or Venitom. (Am.Compl.¶ 416.)

Finally, the Amended Complaint alleges that in 2000, at the direction of the Conspirators, GOK filed suit in the Kalmykia Arbitrazh Court against Polyprom seeking a declaration that GOK's original sale of shares to Polyprom was invalid. (Am. Compl.¶¶ 417, 423.) Kalmykia is located in the southwestern part of Russia bordering the Caspian Sea. Polyprom had sold the shares obtained from GOK to Holdex. (Am.Compl.¶ 417.) The arbitrazh court

ruled in favor of GOK on November 22, 2000 and ordered that the GOK shares then owned by Holdex be re-registered to an unnamed Russian company. (Am. Compl.¶ 418.) The plaintiffs contend that the arbitrazh court's decision was based on a forged contract purported to have been signed by GOK and Polyprom in January 1999. (Am. Compl. ¶ 418.) The plaintiffs claim that, in violation of Russian law, neither Holdex nor Polyprom was notified of the proceedings and that neither learned of the re-registration until months after the November 2000 order. (Am.Compl.¶ 419.)   On April 17, 2001 the Federal Arbitrazh Court for the Caucasus Circuit, which is located in Krasnodar, reversed the decision of the Kalmykia Arbitrazh Court and remanded the case for further fact finding. (Resolution of the North Caucasus Circuit Federal Arbitrazh Court attached as Ex. 79 to Kozyrev/Kapoura Decls.) The plaintiffs claim that Holdex and Polyprom did not receive notice of the subsequent hearing before the Kalmykia Arbitrazh Court. (Am. Compl.¶¶ 421–22.) Holdex's shares in GOK are alleged to have been transferred to Investland, Unidale, and/or Venitom. (Am.Compl.¶ 423.)

Once the transfer of shares was complete, the plaintiffs claim, the Conspirators had no use for further bankruptcy proceedings. (Am.Compl.¶ 424.) GOK thus entered into a sham settlement agreement with its creditors. (Am.Compl.¶ 424.)

The settlement was allegedly structured so as to make the debt owed to legitimate creditors worthless while transferring control of GOK to the new shareholders—New Start, Venitom, Unidale and/or Investland. (Compl.¶¶ 428–30.)

While not discussed in the Amended Complaint, the settlement of the GOK bankruptcy was approved by the Arbitrazh Court for the Sverdlosk Oblast on April 19, 2001, despite the objection of Nexis, and that decision was affirmed on June 27, 2001 by the Appellate Instance of the Arbitrazh Court for the Sverdlovsk Oblast. (Determination of the Sverdlovsk Oblast Arbitrazh Court dated Apr. 19, 2001 attached as Ex. 3 to Kozyrev/Kapoura Decls.; Determination of the Sverdlovsk Oblast Arbitrazh Court dated June 27, 2001 attached as Ex. 21 to Kozyrev/Kapoura Decls.) That decision was affirmed in turn by the Federal Arbitrazh Court of the Urals Circuit on August 21, 2001. (Determination of the Federal Arbitrazh Court for the Urals Circuit dated Aug. 21, 2001 ("Urals Circuit Aug. 21 2001 Determination") attached as Ex. 22 to Kozyrev/Kapoura Decls.)

## II.

[1, 2]  The defendants move to dismiss the Amended Complaint pursuant to the doctrine of *forum non conveniens.*[6] "[T]he doctrine of *forum non conveniens* contemplates the dismissal of lawsuits

---

6.  In view of the defendants' motion to dismiss for lack of subject matter jurisdiction, the plaintiffs initially argued that the Court must decide the existence of jurisdiction before reaching the *forum non conveniens* argument. The argument for lack of jurisdiction was based primarily on the assertion that the RICO statute did not cover the primarily foreign alleged activities asserted in the Amended Complaint. However, the Second Circuit Court of Appeals has recently made clear that it is not necessary to consider such a jurisdictional issue before considering a *forum non* *conveniens* basis for dismissal. The Court of Appeals held that a court must consider the jurisdictional issue first only where the potential lack of jurisdiction is a constitutional question and where, as here, "jurisdiction revolves around statutory [RICO] requirements, ... no constitutional issue is presented." *Monegasque De Reassurances S.A.M. v. Nak Naftogaz Of Ukraine,* 311 F.3d 488, 497–98 (2d Cir.2002). At argument, in light of *Monegasque,* the plaintiffs withdrew their argument that the RICO issues must be considered before the *forum non conveniens* issues.

brought by plaintiffs in their favored forum in favor of adjudication in a foreign court." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 101 (2d Cir.2000). Pursuant to the recent decisions of the Court of Appeals for the Second Circuit, resolution of a motion to dismiss based on *forum non conveniens* requires a three step analysis: first, determination of the degree of deference to be afforded to the plaintiffs' choice of forum; second, analysis of whether an adequate alternative forum exists; and third, consideration of the private and public factors enumerated by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). *See Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73–74 (2d Cir.2001) (en banc). Each step is discussed below.

(A)

As an initial matter, the Court must determine the degree of deference that should be afforded to the plaintiffs' choice of forum in this case. *See Iragorri*, 274 F.3d at 70–73; *accord Monegasque De Reassurances S.A.M. v. Nak Naftogaz Of Ukraine*, 311 F.3d 488, 498 (2d Cir.2002); *DiRienzo v. Philip Services Corp.*, 294 F.3d 21, 28 (2d Cir.2002); *Varnelo v. Eastwind Transport, Ltd.*, No. 02 Civ.2084, 2003 WL 230741, at *6 & n. 13 (S.D.N.Y. Feb.3, 2003). In *Gulf Oil*, the Supreme Court instructed that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil*, 330 U.S. at 508, 67 S.Ct. 839. The Second Circuit Court of Appeals has interpreted the Supreme Court's instruction to mean that "a court reviewing a motion to dismiss for *forum non conveniens* should begin with the assumption that the plaintiff's choice of forum will stand unless the defendant meets the burden of demonstrating" the factors discussed below. *Iragorri*, 274 F.3d at 71.

[3] "While any plaintiff's selection of a forum is entitled to deference, that defer-

ence increases as the plaintiff's ties to the forum increase." *Wiwa*, 226 F.3d at 101 (collecting cases). Accordingly, "[w]here a foreign plaintiff is concerned ... its choice of forum is entitled to less deference." *Varnelo*, 2003 WL 230741, at *7 (quoting *Murray v. British Broad. Corp.*, 81 F.3d 287, 290 (2d Cir.1996)). This is not due to any prejudice against foreign plaintiffs, but because courts defer to a plaintiff's choice of the home forum "because [the home forum] is presumed to be convenient. In contrast, when a foreign plaintiff chooses a U.S. forum, it is 'much less reasonable' to presume that the choice was made for convenience." *Iragorri*, 274 F.3d at 71 (internal citation omitted) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)); *see also Wiwa*, 226 F.3d at 102; *Varnelo*, 2003 WL 230741, at *7–8.

In *Iragorri*, the Court of Appeals clarified the degree of deference that courts should afford to a United States resident's choice of forum when that plaintiff files suit in a district other than the one in which the plaintiff resides. *Iragorri*, 274 F.3d at 71. The Court of Appeals sought guidance from two types of the Supreme Court's prior *forum non conveniens* cases, those involving a plaintiff who sued in a home forum, and those cases in which a foreign plaintiff brought suit in the United States. *Id.* at 71–72. Based on those precedents, the Court of Appeals concluded that:

The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice. Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the

lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*.... On the other hand, the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons ... the less deference the plaintiff's choice commands....

*Id.* at 71–72.

[4] Little deference should be given to the plaintiffs' choice of forum in this case. As this litigation was originally brought, not one plaintiff was a citizen or resident of the United States. BMT SA is a Swiss company, BMT Ltd. is organized under

the laws of Guernsey, Channel Islands, and Alucoal is organized under the laws of Cyprus.[7] (Am.Compl.¶¶ 23, 25, 27.) After the defendants moved to dismiss the case for lack of subject matter jurisdiction, the BMT Plaintiffs added a Russian plaintiff to the NKAZ claims, MIKOM. (Am. Compl.¶ 29.) The plaintiffs also brought in six other new plaintiffs to assert separate claims arising from the GOK bankruptcy.[8] The new plaintiffs included Foston, another company organized under the laws of Cyprus; another Russian company, Polyprom; Omni, an English company; and three corporations organized under the

---

7. The citizenship of the initial defendants to the action as it was originally brought is as follows: Russian Aluminum is a Russian "Joint Open Stock Company." (Declaration of Paul R. Grand dated Jan. 29, 2002 ("Grand Decl.") ¶ 2 attached as Ex. A to Declaration of Michael D. Burrows dated Jan. 30, 2002 ("Burrows Decl."); Declaration of Stalbek Mishakov dated Jan. 29, 2002 ("Mishakov Decl.") ¶ 3.) Sibirsky USA is a Delaware Corporation with offices in Harrison NY. (Mishakov Decl. ¶ 5.) Sibirsky Russia is a "conglomerate company engaged in numerous businesses in Russia." (Mishakov Decl. ¶ 3.) Bauxal and Metcare are corporations incorporated in the British Virgin Islands. (Mishakov Decl. ¶ 6.) Unimetal is a Panama corporation. (Mishakov Decl. ¶ 6.) Oleg Deripaska is a Russian citizen and resident. (Mishakov Decl. ¶ 10.) Mikhail Chernoi is a resident of Israel, citizenship unknown. (Declaration of Victor Roger Rubin dated Jan. 29, 2002 ("Rubin Decl.") ¶ 2 attached as Ex. B to Burrows Decl.) NKAZ is a Russian company with its principal place of business in the Kemerovo Region of Russia. (Declaration of John A. Redmon dated Jan. 28, 2002 ("Redmon Decl.") ¶ 2 attached as Ex. G to Burrows Decl.) The Original Complaint also named "Chernoi Companies 1 to 10" as defendants. These were "companies organized under the laws of the United States whose identities are unknown through which Chernoi transfers proceeds from the illegal Scheme through banks in the United States." (Original Compl. ¶ 32.)

8. The citizenship of the defendants added in the Amended Complaint is as follows: RUAL

is a trading company organized under the laws of the British Virgin Islands, with offices in the British Virgin Islands, Cyprus, and China. (Grand Decl. ¶ 2.) Blonde Investments is a company organized under the laws of the Cayman Islands with offices in Switzerland. (Rubin Decl. ¶ 3.) Pan-American was a Delaware corporation and was dissolved in or about 1998. (Declaration of Brian S. Cousin dated Jan. 25, 2002 ("Cousin Decl.") ¶ 2 attached as Ex. C to Burrows Decl.) Arnold Kislin is a United States citizen residing in New York. (Declaration of Elizabeth M. Johnson dated Jan. 29, 2002 ("Johnson Decl.") ¶ 2 attached as Ex. D to Burrows Decl.) Blonde Management is a New York company owned by Kislin that is now inactive. (Johnson Decl. ¶ 3.) Iskander Makhmudov is a Russian citizen residing in Russia. (Affidavit of Robert E. Hauberg, Jr. sworn Jan. 25, 2002 ("Hauberg Aff.") ¶ 2 attached as Ex. E to Burrows Decl.) MDM Bank is a bank organized under the laws of the Russian Federation with offices in Russia. (Declaration of Christopher D. Armeniades dated Jan. 24, 2002 ("Armeniades Decl.") ¶ 2 attached as Ex. F. to Burrows Decl.) The declaration submitted by counsel for New Start, Venitom, Unidale, and Investland in support of the motion to dismiss on *forum non conveniens* grounds does not identify the citizenship of these plaintiffs. (Declaration of Richard Schaeffer dated Jan. 25, 2002 ("Schaeffer Decl.") attached as Ex. H to Burrows Decl.) The unspecified "Chernoi Companies 1–10" were dropped from the Amended Complaint.

laws of Virginia, Texas, and Utah, respectively, namely Davis, Holdex and Nexis. (Am.Compl.¶¶ 32–35, 37–38.)[9]

With regard to plaintiffs Davis', Holdex', and Nexis' connections with the United States, the Amended Complaint states only that the companies are organized under the laws of West Virginia, Texas, and Utah, respectively (Am.Compl.¶¶ 32–33, 37.) The record contains no evidence that any of the companies maintain offices in New York. This is a fact that *Iragorri* instructs is not dispositive but that the Court may consider in assessing the relative convenience of bringing this case in this district.

The defendants allege that Davis, Holdex, and Nexis are mere shell companies whose choice of forum should be afforded little deference. In view of the scant information in the record about the American plaintiffs' ties to the United States, the Court asked plaintiffs' counsel to submit affidavits as to the identity of the three companies' officers, directors, and shareholders, including their citizenship, the location of the companies' offices, and the precise nature of their operations in the United States. (Tr. 65–66.) Plaintiffs' counsel agreed to supplement the record and subsequently filed a second declaration by Joseph Traum ("Traum"), the managing director of Davis and beneficial owner of Nexis. (Declaration of Joseph Traum dated Sept. 14, 2002 ("First Traum Decl.") ¶ 1; Second Declaration of Joseph Traum dated Feb. 19, 2003 ("Second Traum Decl.") ¶ 33.) The submission is telling for how little information it provides about the American plaintiffs.

Traum informs the Court that Davis was organized under the laws of West Virginia in December 1998 by two offshore corporate service companies that served as "nominee members" solely for organizational services. (Second Traum Decl. ¶¶ 4–5.) Traum asserts that the use of nominee registration to form the company "is common in doing business in Russia in order to maintain the confidentiality of the identity of the beneficial owners for reasons of personal safety." (Second Traum Decl. ¶ 6.) Davis now has two "members", a term Traum does not define, one being Traum himself. (Second Traum Decl. ¶ 12.) While Traum tells the Court that "[n]one of the members or officers of Davis are Russian citizens," he identifies only one "member" and one officer by name besides himself, Sara Ofen ("Ofen") and Isaac Savion ("Savion"). (Second Traum Decl. ¶¶ 12, 14, 16.) Traum identifies himself as "an international businessman and native citizen of Israel." (Second Traum Decl. ¶ 2.) He advises that he has lived two years in the United States but it is not clear when that was. (Second Traum Decl. ¶ 3.) Ofen and Savion are allegedly United States citizens but neither's place of residence is revealed. (Second Traum Decl. ¶¶ 12, 14.) Nor have either of them submitted an affidavit to the Court with further information about themselves or their roles at Davis. The only other information that Traum provides about Davis's operations, besides its registered address

9. The plaintiffs contend that even though some of the plaintiffs are clearly foreign nationals residing outside the United States, international treaty obligations require the Court to afford the plaintiffs equal access to the American courts. *See Blanco v. Banco Industrial de Venezuela, S.A.*, 997 F.2d 974, 981 (2d Cir.1993); *see also Varnelo*, 2003 WL 230741, at *12 (collecting cases). However, the concept that such treaties may provide foreign plaintiffs with equal access to United States courts is "easily harmonized with the line of cases granting less deference to plaintiffs residing overseas. Foreign plaintiffs deserve less deference, not because they lack United States citizenship, but simply because their overseas residence vitiates any presumption that they would find the U.S. forum convenient." *Varnelo*, 2003 WL 230741, at *12 (internal citation omitted).

in Charleston, West Virginia, is that "Davis was organized for the purpose of serving as a holding company to own various investments, including the shares in [GOK] that are at issue in this case." (Second Traum Decl. ¶¶ 7–8.)

The second American plaintiff, Holdex, was also organized by two nominee members under the laws of Texas in September 1999 for the "purpose of serving as a holding company to own various investments, including shares of Kachkanarsky GOK." (Second Traum Decl. ¶¶ 21, 24.) The beneficial owners of Holdex are both citizens of Israel. (Second Traum Decl. ¶ 27). Traum provides no other information linking Holdex to the United States besides a registered address in Austin, Texas. (Second Traum Decl. ¶ 23.)

Finally, Nexis is a company organized under the laws of Utah in October 1996 for the purposes of "serving as an operating company for various investments, including more than U.S. $13 million for trade financing with Kachkanarsky GOK and more than U.S. $ 4.5 million in investments in trade with a fertilizer plant in Kazakhstan." (Second Traum Decl. ¶¶ 30, 34.) Traum is the beneficial owner of Nexis, and the only other individual identified in association with the company is Isaac Savion, who serves as an officer in the company but whose exact title is not specified. (Second Traum Decl. ¶¶ 33, 40.) Traum claims that Nexis planned to open an electronics refurbishing center in San Diego, California. (Second Traum Decl. ¶¶ 35–36.) Not only has this not happened, but the e-commerce business that Nexis intended to establish in Canada to "compliment" the San Diego work has yet to come to fruition. (Second Traum Decl. ¶¶ 35–36.) No other ties to the United States are disclosed except for a registered address in Midale, Utah. (Second Traum Decl. ¶ 32.)

Traum's Second Declaration is the plaintiffs' sole submission provided to answer the Court's questions about the American plaintiffs' ties to the United States. It provides no bona fide reason for the plaintiffs to have sued in this Court. The declaration does not tell the Court why it would be more convenient for the parties to litigate this case here rather than in Russia. Nor does the declaration effectively counter the defendants' allegation that Davis, Holdex, and Nexis are nothing more than shell corporations whose choice of forum deserves little deference.

[5] To the extent that the plaintiffs rely simply on the status of three of the ten plaintiffs as United States corporate citizens as the basis for bringing suit in New York, this strategy is without merit. These three plaintiffs appear to be nothing more than holding companies for shares of GOK and possibly other stocks. "[W]here an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a talisman against forum non conveniens dismissal is diminished." *Sussman v. Bank of Israel*, 801 F.Supp. 1068, 1073 (S.D.N.Y.1992), *aff'd*, 990 F.2d 71 (2d Cir.1993) (per curiam). *Cf. Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147 (2d Cir.2000) ("This is not a case where the plaintiff is a corporation doing business abroad and can expect to litigate in foreign courts.").

The record before the Court points to nothing but forum shopping by the plaintiffs. All of the NKAZ Plaintiffs are foreign citizens whose complaints arise out of activities in connection with business that was transacted in Russia. All of the GOK plaintiffs are also complaining about activities that arise from the conduct of business in Russia. The contracts that are at issue in this case demonstrate that the plaintiffs

should not have expected that any of their disputes would be litigated in the United States. This makes sense in view of the fact that the contracts were for services to be performed in Russia. For example, the management contract (and subsequent amendments) between NKAZ and MI-KOM contains a forum selection clause for the Moscow Arbitrazh Court. (NKAZ–MIKOM Contract dated June 21, 1996 ¶ 3.2 attached as Ex. 1 to Chernyshev Decl.)

The parties' own submissions reveal that at most one of the relevant contracts to the case contains a New York forum selection clause. (Defendants' Submission of The GOK and NKAZ Contracts ("Defendants' Contract Summary"); Chart of Contracts with U.S. and Other Non–Russian Plaintiffs ("Plaintiffs' Contract Summary") at-

tached as Ex. A to letter from James L. Bernard to the Court dated Feb. 20, 2003.)

The plaintiffs identify only one relevant contract, a \$13 million loan agreement between GOK and Nexis, which, as amended, contains a forum selection clause for the New York State Courts.[10] (Amended Contract between Nexis and GOK dated Nov. 25, 1999 ¶ 2 attached as Ex. 4 to Second Traum Decl.) Such a contract, if valid, constitutes a minuscule percentage of the damages in excess of \$3 billion at issue in this case.[11] When compared with the myriad contracts providing for litigation and arbitration in fora outside the United States, there is no justification for litigating this case in New York based on this one contract alone. These other contracts include not only the MIKOM management contract, but all the various contracts that

10. The Second Traum Declaration mentions several contracts listed in the Plaintiffs' Contract Summary that appear to contain forum selection clauses for the New York courts but which are wholly irrelevant to this case. None of those contracts are referred to in the lengthy Amended Complaint and they are not at issue in this case. For example, Traum states that Davis purchased shares from two companies, Amber Star, LLC and Lenex, pursuant to three contracts signed in 1998 and 1999. (Second Traum Decl. ¶¶ 10–11; Amber Star–Davis Contract dated Sept. 28, 1999 ("Amber Star Contract") attached as Ex. 1 to Second Traum Decl.; Lenex–Davis Contracts dated Mar. 15, 1999 and Sept. 28, 1999 ("Lenex Contracts") attached as Ex. 2 to Second Traum Decl.) Traum notes that the contracts provide for the resolution of disputes in the New York State courts under New York and United States law. (Second Traum Decl. ¶¶ 10–11; Amber Star Contract ¶ 8.1; Lenex Contracts ¶¶ 8.1, 8.1.) This information is irrelevant to this case because these contracts are between Davis and two third parties and the issue of how Davis acquired the shares is not at issue in this case.

Similarly, Traum informs the Court that Holdex purchased shares from Polyprom by contract dated January 20, 2000 which, by an amendment dated January 26, 2000, provided for disputes to be resolved in the courts of the

State of New York. (Second Traum Decl. ¶ 26; Amendment to Contract # KGOK–001/A of Jan. 20, 2000 dated Jan. 26, 2000 ¶ 1 attached as Ex. 3 to Second Traum Decl.) However, this contract is between two co-plaintiffs and is not at issue in this case.

11. The Amended Nexis–GOK Contract modified an original loan agreement between the parties which included a choice of forum clause for the Moscow Arbitrazh Courts and a Russian choice of law clause. (Contract between GOK and Nexis dated July 13, 1999 ¶¶ 5.4–5.5 attached as Ex. 4 to Second Traum Decl.) The defendants question the validity of the amendment in view of the fact that the document was never mentioned in the plaintiffs' submissions until after oral argument. Moreover, the defendants also allege that the amended contract was purportedly signed after Nexis had been involuntarily dissolved. (Application for Reinstatement of Nexis Products LLC filed Feb. 25, 2000 attached as Ex. 5 to letter from Michael D. Burrows to the Court dated Feb. 25, 2003.) For the reasons explained above, the validity of the amended contract is irrelevant because the Court will not defer to the forum selection clause of one contract that constitutes a de minimis portion of this case in view of the many other relevant contracts in which the parties agree to litigate in other fora.

the plaintiffs allege were unlawfully abrogated in the NKAZ and GOK bankruptcies with the exception of the $13 million loan. The forum selection clauses provided for a Russian forum or arbitration in Russia, Stockholm, or London. (*See* Defendants' Contract Summary; Plaintiffs' Contract Summary.)

The fact that in no other relevant contract do the parties to this litigation agree to litigate in the United States supports the Court's view that it should afford little deference to the plaintiffs' current choice of forum. This type of forum shopping is the antithesis of the bona fide connection to the plaintiffs' chosen forum that would cause the Court to defer to the plaintiffs' desires. There is no indication that the parties anticipated litigating in the United States or that the choice of this forum is based on true motives of convenience. Instead, having pursued various remedies in the Russian court system with unsatisfactory results,[12] the plaintiffs now seek to take their cause to the United States. Such a tactical maneuver is not protected by the deference generally owed to the plaintiffs' choice of forum. *See Iragorri*, 274 F.3d at 72.

### (B)

[6]    The next step in the Court's *forum non conveniens* inquiry is to determine the availability of an adequate alternative forum. Ordinarily, this requirement "will be satisfied when the defendant is 'amenable to process' in the other jurisdiction. In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum

may not be an adequate alternative...." *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 476–77 (2d Cir.2002) (quoting *Piper*, 454 U.S. at 255 n. 22, 102 S.Ct. 252). For purposes of the motion to dismiss for *forum non conveniens*, all twenty defendants have explicitly consented to jurisdiction in the Russian courts. (Declaration of Michael D. Burrows dated Jan. 30, 2002 ("Burrows Decl.") ¶ 5; Declaration of Paul R. Grand dated Jan. 29, 2002 ("Grand Decl.") ¶ 3–4 attached as Ex. A to Burrows Decl.; Declaration of Victor Roger Rubin dated Jan. 29, 2002 ("Rubin Decl.") ¶ 4 attached as Ex. B to Burrows Decl.; Declaration of Brian S. Cousin dated Jan. 25, 2002 ("Cousin Decl.") ¶ 3 attached as Ex. C to Burrows Decl.; Declaration of Elizabeth M. Johnson dated Jan. 29, 2002 ("Johnson Decl.") ¶ 4 attached as Ex. D to Burrows Decl.; Affidavit of Robert E. Hauberg, Jr. sworn Jan. 25, 2002 ("Hauberg Aff.") ¶ 3 attached as Ex. E to Burrows Decl.; Declaration of Christopher D. Armeniades dated Jan. 24, 2002 ("Armeniades Decl.") ¶ 4 attached as Ex. F to Burrows Decl.; Declaration of John A. Redman dated Jan. 28, 2002 ("Redman Decl.") ¶ 2 attached as Ex. G to Burrows Decl.; Declaration of Richard Schaeffer dated Jan. 25, 2002 ("Schaeffer Decl.") ¶ 2 attached as Ex. H to Burrows Decl.) Russia is thus an "available" alternative forum. The next question is whether Russia provides the plaintiffs with adequate judicial remedies.

The plaintiffs argue that Russia is not an adequate alternative forum because of the alleged corruption of the Russian courts, and the arbitrazh courts that dealt with the NKAZ and GOK bankruptcies in

---

12.    Plaintiffs BMT SA, Alucoal, and BMT Ltd. have initiated arbitrations against NKAZ in Zurich, Stockholm, and Cyprus, respectively, alleging breach of contracts that are also at issue in this case. (Chernyshev Decl. ¶¶ 156, 160, 164.) The Zurich arbitration was dismissed on December 9, 2002 for lack of arbitral jurisdiction. (Final Award on Juris-

diction in *Base Metal Trading SA v. OJSC Novokuznetsk Aluminium Plant* dated Dec. 9, 2002 at 143.) The fact that these plaintiffs have pursued simultaneous arbitrations on closely related issues underscores that they are forum shopping in filing suit before this Court.

particular. The Court has carefully considered the submissions of the parties to determine whether the defendants have borne their burden of showing that Russia is an available and adequate alternative forum. *See Monegasque,* 311 F.3d at 499 (finding Ukraine an adequate alternative forum and noting the reluctance to find foreign courts "corrupt" or "biased"); *Aguinda,* 303 F.3d at 478 (affirming adequacy of Ecuadorian courts despite allegations of corruption).[13]

[7] The Court must determine whether Russian law provides adequate, not identical, relief. *PT United Can Co. Ltd. v.*

*Crown Cork & Seal Co., Inc.,* 138 F.3d 65, 74 (2d Cir.1998). In answering this question, the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." Fed.R.Civ.P. 44.1; *see also Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina"),* 313 F.3d 70, 80 (2d Cir.2002) (court's determination of foreign law treated as question of law); *Euromepa, S.A. v. Esmerian,* 154 F.3d 24, 28 n. 2 (2d Cir.

---

13. The plaintiffs make two preliminary arguments with respect to the standard to be applied to this motion that should be considered at the outset.

First, the plaintiffs contend that the Court should apply a summary judgment standard to the defendants' motion. The Court would thus deny the motion if it found that the plaintiffs have raised genuine issues of material fact regarding their allegations of corruption and fraud. At the outset, the Court notes that the defendants are correct that the Court's consideration of documents outside of the pleadings does not automatically convert the motion to dismiss into a motion for summary judgment. *See, e.g., Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 645 (2d Cir.1956) ("in the determination of a motion to dismiss for forum non conveniens, the court may consider affidavits submitted by the moving and opposing parties"); *see also Varnelo,* 2003 WL 230741 (relying on affidavits and exhibits outside the pleadings in deciding a motion to dismiss on *forum non conveniens* grounds); *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.,* No. 96 Civ. 3669, 1997 WL 31194 (S.D.N.Y. Jan.28, 1997) (same), *aff'd,* 138 F.3d 65 (2d Cir.1998). The plaintiffs argue that the motion to dismiss before the Court is somehow different from most such motions because of the allegations of corruption in the alternative forum. However, judges in this district have considered similar allegations on *forum non conveniens* motions without transforming them into motions for summary judgment. *See, e.g., Abdullahi v. Pfizer,* No. 01 Civ. 8118, 2002 WL 31082956 (S.D.N.Y. Sept.17, 2002); *Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine,*

158 F.Supp.2d 377 (S.D.N.Y.2001), *aff'd,* 311 F.3d 488 (2d Cir.2002). There is no reason to depart from the standards applied in past cases and to apply a summary judgment standard because of the submission of affidavits.

Second, the plaintiffs argue that the Court should judge this case in accordance with the standard enunciated by Judge Newman of the Second Circuit Court of Appeals writing for the Eleventh Circuit Court of Appeals in *Leon v. Millon Air, Inc.,* 251 F.3d 1305 (11th Cir. 2001). *See also Eastman Kodak Co. v. Kavlin,* 978 F.Supp. 1078, 1087 (S.D.Fla.1997) ("defendants bear the burden of proving that the alternative forum is available, and that defendants [sic] will not be unjustly prejudiced if they have to litigate" in the alternative forum). In *Leon,* the Court of Appeals found that "defendants have the ultimate burden of persuasion, but only where the plaintiff has substantiated his allegation of serious corruption or delay." *Leon,* 251 F.3d at 1312. *Leon* noted the difference among the various Courts of Appeals on the issue of the degree of presumption that a foreign forum enjoys as to its adequacy and the nature of the plaintiff's burden of production to raise a sufficient question as to the adequacy of the foreign forum. *Leon* also noted the deference afforded by the Court of Appeals for the Second Circuit to the adequacy of a foreign forum. *Leon,* 251 F.3d at 1312. *Leon* does not change the result here. In this case, as explained below, the defendants have satisfied their ultimate burden of showing that Russia is an adequate alternative forum.