1998) (questions of foreign law are questions of law, not of fact).

The parties have provided the Court with extensive submissions from purported experts in Russian law. The plaintiffs have moved to strike the declarations of two of the defendants' experts, Paul B. Stephan III and Sergei Zankovsky. To the extent that these submissions are helpful to the Court in understanding the Russian legal system, the Court may use the declarations to answer questions of law. The Court will not use the declarations to make determinations of fact because this is not proper under Rule 44.1. The Court must decide what weight, if any, to give to these declarations and to all of the evidence the Court uses in determining Russian law, but the Court will make such a determination rather than to merely strike informative testimony. *See Norwest Financial, Inc. v. Fernandez*, 86 F.Supp.2d 212, 228, n. 16 (S.D.N.Y.2000) (declining to strike expert testimony on Argentine labor law in view of the Second Circuit Court of Appeals urging district courts "to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations") (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir.1998)), *aff'd*, 225 F.3d 646 (2d Cir.2000) (table). The plaintiffs' motions to strike the expert declarations are denied.

[8] The plaintiffs bring claims for violations of RICO, intentional interference with contract, and conversion. The defendants and their experts contend that there are provisions of the Russian Civil Code that supply causes of action analogous to those alleged in this proceeding. (Stephan 2002 Decl. ¶¶ 23–24 [14]; Declaration of Igor Leonidovich Petrukhin ("Petrukhin") dated Jan. 26, 2002 ("Petrukhin Decl.") ¶¶ 23–31.) [15] Although there is no exact equivalent of the RICO statute in Russia, the defendants' legal experts argue convincingly that the plaintiffs can bring a cause of action for fraud that would provide an adequate alternative remedy. (Petrukhin Decl. ¶ 29; Stephan Decl. ¶ 23.) [16] *See PT United*, 138 F.3d at 74 ("the nonexistence of a RICO statute [in the alternative forum] does not, by itself, preclude the use of [another forum]") (collecting cases). Russian law also provides causes of action equivalent to conversion and intentional interference with contract. (Stephan 2002 Decl. ¶ 23.)

More particularly, the plaintiffs may bring civil and criminal actions for fraud in the Russian courts. (Declaration of Paul B. Stephan III dated February 19, 2003 ("Stephan 2003 Decl.") ¶ 9; Third Declaration of Igor Leonidovich Petrukhin (dated in Russian) ("Petrukhin Third Decl.") ¶ 4; Petrukhin Decl. ¶ 29.) In his January 26,

14. Stephan holds the Percy Brown, Jr. Chair and the E. James Kelly, Jr.-Class of 1965 Research Chair at the University of Virginia School of Law where he has taught Soviet and post-Soviet law continuously since joining the faculty in 1979. (Stephan 2002 Decl. ¶¶ 1–2.) Stephan has worked with the Russian court system, in particular with the arbitrazh courts, for over ten years. (Stephan 2002 Decl. ¶ 3.)

15. Petrukhin is a citizen and permanent resident of Russia who is currently Head of the Judicial System Department of the Institute of State and Law of the Russian Academy of Sciences, Professor of the Academic Law School (Moscow), and a member of the Mos-

cow bar. (Petrukhin Decl. ¶ 1.) Petrukhin's research focuses on court system organization and procedure, with a specialization in the judicial system, justice and human rights. (Petrukhin Decl. ¶ 8.) The plaintiffs have not moved to strike the expert declaration of Professor Petrukhin.

16. Petrukhin and Stephan concede that Russia does not provide treble damages for fraud as does RICO. (Petrukhin Decl. ¶ 32; Stephan 2002 Decl. ¶ 23.) This fact does not preclude the Court from dismissing the RICO claims on the basis of *forum non conveniens*. *See Transunion Corp. v. PepsiCo, Inc.*, 811 F.2d 127, 129 (2d Cir.1987).

2002 Declaration, Professor Petrukhin outlined two options that provide the plaintiffs with equivalent recourse for their RICO claims. (Petrukhin Decl. ¶ 29.) The plaintiffs may either:

> (1) bring a civil law claim against the Defendants for compensation of damages caused by fraudulent actions or repayment of the amount of the unjust enrichment particularly for compensation for damages caused by the bad faith of the person unjustly enriched pursuant to Chapter 59 and Chapter 60 of the [Civil Code of Russia], and/or (2) request that the relevant authorities initiate a criminal investigation of the Defendants on fraud charges and, if any of the Defendants is held criminally liable, then file a civil lawsuit within a criminal proceeding. . . .

(Petrukhin Decl. ¶ 29.)

Under the first alternative, the plaintiffs could bring a civil suit for damages caused by fraud. (Stephan 2003 Decl. ¶ 9.) Russia's Civil Code creates a general obligation to provide compensation for harm caused by the violation of a legal duty, to return unjustly obtained property, and to compensate for injuries caused by an unlawful taking, potentially in excess of the actual loss. (Stephan 2003 Decl. ¶ 9; Petrukhin Decl. ¶¶ 31–34.) Under the Civil Code, a party may seek compensation for damages caused by the fraudulent actions of another without any prior proof of criminal misconduct. (Stephan 2003 Decl. ¶ 9.)

The second alternative listed by Professor Petrukhin involves filing a petition with the General Prosecutor's Office of the Russian Federation. (Petrukhin Third Decl. ¶ 13.) The mere receipt of the petition would require the General Prosecutor's Office to make a pre-investigation examination of the allegations. (Petrukhin Third Decl. ¶ 14.) Should investigators decline to pursue criminal proceedings yet discover the commission of unlawful actions (even if not criminally punishable), the plaintiffs could use these findings to begin a civil proceeding in the arbitrazh or general jurisdiction courts in the manner discussed above. (Petrukhin Third Decl. ¶¶ 15, 27–28.) In the alternative, if prosecutors did bring criminal charges in association with the alleged illegal scheme, the plaintiffs could initiate a civil suit within the criminal proceedings to recover damages directly caused by the criminal acts perpetrated by the defendants. (Petrukhin Third Decl. ¶ 20.) Moreover, if the preliminary investigation supports the plaintiffs' contention that arbitrazh judges were bribed by the Conspirators in connection with the NKAZ and GOK bankruptcy proceedings, the judges would face criminal liability. (Petrukhin Third Decl. ¶ 23.)

The plaintiffs attempt to argue that there is no available cause of action for fraud in Russian and rely on the Declaration of Sergey B. Zaitsev ("Zaitsev"), a judge who retired in 1997 after two years service on the Federal Arbitrazh Court for the District of Moscow, having previously served in courts in Novosibirsk for approximately eighteen years. (Declaration of Sergey .B. Zaitsev (dated in Russian) ("Zaitsev Decl.").) Zaitsev's argument is that Chapters 59 and 60 of the Civil Code do not provide explicitly for a cause of action for fraud. (Zaitsev Decl. ¶¶ 67–72.) However, those chapters do provide the general grounds for liability for damages and for unjust enrichment. Zaitsev cites no persuasive authority to limit those broad sections for liability and the opinions of Professor Stephan and Professor Petrukhin are plainly more persuasive. Similarly, there is no effective response to the existence of claims for conversion and interference with contract.

The plaintiffs launch three additional challenges to the adequacy of the Russian courts. First, they argue that the previ-

ously issued decisions of the Russian courts will prevent any availability for relief in this case because those actions must be overturned to obtain relief. Second, the plaintiffs argue that the original NKAZ and GOK bankruptcy proceedings were corrupt. Finally, the plaintiffs argue that the Russian courts are generally corrupt so that the Russian courts cannot be an adequate alternative forum.

The plaintiffs' argue that the prior decisions of the Russian courts would be an obstacle to their relief in the Russian judicial system. On its face, this is a curious argument because this Court would also owe deference to decisions of foreign courts unless it could be demonstrated that the decisions were not entitled to deference because, for example, they were rendered in such a way as to deny fundamental standards of procedural fairness, which the plaintiffs have not shown in this case. *See, e.g., Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 249–50 (2d Cir.1999) (affording comity to Brazilian bankruptcy proceeding where proceeding contained indicia of procedural fairness). There are, however, ample means in the Russian judicial system to overturn decisions that were obtained as a result of corruption and this argument therefore is not a basis for finding that there are no adequate remedies in the Russian courts.

In Russia the plaintiffs may pursue either appellate review of the allegedly fraudulent judicial decisions or may seek relief through wholly new claims. The appellate instance of the arbitrazh court has jurisdiction over allegations of wrongful conduct by the first instance arbitrazh court, as does the Federal Circuit Court and the Supreme Arbitrazh Court ("SAC"). (Stephan 2003 Decl. ¶ 4.) [17]

As an alternative to pursuing appellate review of an arbitrazh court ruling, a party injured by a fraudulently procured decision may seek relief under the newly enacted Arbitrazh Procedure Code of the Russian Federation ("APC") which went into effect on September 1, 2002. (Stephan 2003 Decl. ¶ 5; 2002 Arbitrazh Procedure Code of the Russian Federation (effective Sept. 1, 2002) ("APC") attached as App. B to Stephan 2003 Decl.) Under Article 292 of the APC, a party to an erroneous court judgment can petition the Supreme Arbitrazh Court to exercise supervisory jurisdiction over the case. (Stephan Decl. ¶ 6; APC Art. 292.) Although APC Article 292(3) allows litigants three months to make such a petition, the APC's implementing legislation granted any party to a judgment of an arbitrazh court currently in effect until March 31, 2003 to do so.[18] (Stephan 2002 Decl. ¶ 6.)

---

17. The arbitrazh courts resolve economic disputes, including claims for damages and breach of obligations, in which the parties are legal entities or individuals with the status of "individual entrepreneurs", private business people who conduct entrepreneurial activities and who are registered as individual entrepreneurs under Russian law. (Petrukhin Decl. ¶ 15.) If an individual without such status is a party to an economic dispute, the dispute is resolved in a court of general jurisdiction. (Petrukhin Decl. ¶ 15.)
    The Civil Procedure Code of the Russian Federation ("CPC"), effective February 1, 2003, provides similar avenues of appellate review to those of the Arbitrazh Procedure

Code, including appellate review of erroneous or improper judgments, supervisory review of judgments that have gone into effect, and the reopening of judgments based on newly discovered circumstances. (Stephan 2003 Decl. ¶¶ 5–8; CPC attached as App. D to Stephan 2003 Decl.) Additionally, parties seeking supervisory review of a judgment of a court of general jurisdiction have an extension from the usual one year limitations period until February 1, 2004 to do so. (Stephan 2003 Decl. ¶ 8; CPC Article 376(2).)

18. Professor Petrukhin argues convincingly that the plaintiffs would not face statute of limitations problems with regard to their sub-

The APC also authorizes persons subject to a court judgment to bring newly discovered circumstances to the attention of the court that issued the judgment. (APC Arts. 309–17.) The discovery of "circumstances, essential for the case, which have not been and could not have been known to the applicant" is grounds for the revision of a judicial act. (APC Art. 311–1.) Of the seven instances provided by Article 311 that can serve as bases for such a revision, only two require a determination of the criminality of the persons that procured the contested judgment. (APC Arts. 311(2), (3).) In all cases, the aggrieved party must pursue relief within three months of the discovery of the circumstances comprising the

ground for review, but the party may seek appellate review if the court fails to correct its decision. (APC Arts. 312(1), 317(5).)

Russian law allows the parties to consent to jurisdiction in Moscow. (Stephan 2003 Decl. ¶ 15.) Doing so would remove the case from the allegedly corrupt Kemerovo and Kachkanar courts where the GOK and NKAZ bankruptcies were primarily adjudicated. By letter to the Court dated February 20, 2003, the defendants agreed to consent to venue in Moscow if the Court deemed it appropriate. (Letter from Michael D. Burrows to the Court dated Feb. 20, 2003.)

The Court has carefully considered the various arguments raised by Mr. Zaitsev, the plaintiffs' expert, and finds them con-

---

stantive allegations if forced to proceed in Russia because such limitations were tolled as of the filing of the Original and Amended Complaints in this action (for the NKAZ and GOK claims, respectively). (Petrukhin 2002 Decl. ¶ 34.) Moreover, the defendants have agreed not to raise any defense based on the statute of limitations or other time limit for bringing suit in any Russian Court that expired after the date the current lawsuit was filed until 90 days after any dismissal of this case becomes final. (Letter from Michael Burrows to the Court dated Mar. 21, 2003 ("Burrows Mar. 21, 2203 Letter").) The defendants have also agreed to join or cooperate in any motion necessary to extend such statute of limitations or other time period. (Id.)

The plaintiffs argue that the March 31, 2003 deadline is not a statute of limitations but rather a jurisdictional time limit that cannot be waived by a party or extended by the SAC. (Third Declaration of Sergey B. Zaitsev dated Mar. 20, 2003 ("Third Zaitsev Decl.") ¶¶ 9, 11 attached as Ex. A to letter from James Bernard to the Court dated Mar. 21, 2003 ("Bernard Mar. 21, 2003 Letter").) The plaintiffs contend that procedural time limits may not be restored or extended by arbitrazh courts unless the right to do so is expressly provided by law which, the plaintiffs argue, is not the case for the March 31, 2003 deadline under the APC. (Third Zaitsev Decl. ¶ 10; Fourth Declaration of Sergey B. Zaitsev dated Mar. 24, 2003 ("Fourth Zaitsev Decl.") ¶¶ 6, 12–14,

20 attached as Ex. A to letter from James Bernard to the Court dated Mar. 24, 2003.)

The defendants concede that a Russian court might conclude that the March 31, 2003 deadline cannot be extended, even with the consent of the parties. (Burrows Mar. 21, 2003 Letter.) Neither party is aware of any case in which a party has applied to the SAC for an extension of the deadline. (Burrows Mar. 21, 2003 Letter; Fourth Zaitsev Decl. ¶ 19.) The defendants are correct, however, that the plaintiffs have been on notice of the availability of this additional avenue of redress since the enactment of the APC in July 2002. (Burrows Mar. 21, 2003 Letter; Stephan 2003 Decl. ¶ 5.)

The March 31, 2003 deadline is not a barrier to dismissal. Petitioning the SAC is only one means of redress for the plaintiffs in the Russian courts. Moreover, the plaintiffs assumed the risk that an expiration of their time to petition the SAC could occur but have chosen not to pursue that avenue of review.

The defendants' agreement not to raise any statute of limitations or other time limit that expired after this case was filed until 90 days after the dismissal becomes final is reasonable. In view of the relatively small number of plaintiffs in the case and the claims at issue, the 90 day period to bring these claims in Russia is reasonable. Cf. Aguinda, 303 F.3d at 478–79 (providing for a one year tolling period given the number of plaintiffs involved).

tradicted by the more persuasive opinions of Professor Petrukhin and Professor Stephan. If Mr. Zaitsev were to be credited, despite the numerous avenues for obtaining judicial review, they are all ineffective. Mr. Zaitsev reaches that conclusion only by unreasonable interpretation of the review procedures. For example, he argues that APC 311(2) and (3) can only be used to open a corruptly obtained judgment after there has been a criminal conviction and then argues that the general provision of APC 311(1) cannot be used because it is too general and only applies to the "merits of the case, and not to corruption...." (Zaitsev Decl. ¶ 27.) It would be an unreasonable reading of the provisions for review, and would contradict the more credible opinion of the defendants' experts, to find that the review provisions would be interpreted in such a constricted way that allegations of corruption allegedly unknown at the time, and which prevented a correct decision on the merits, could not be raised in a timely fashion when the evidence became known.

The second specific challenge to the adequacy of the Russian courts rests on the plaintiffs' arguments that the bankruptcy proceedings were themselves corrupt and this demonstrates, according to the plaintiffs, that they could not obtain fair results in the Russian courts. This argument fails on several levels. First, the defendants have shown that there are various ways of challenging the past decisions. Moreover, there are claims that are independent of the past decisions. Furthermore, on the current record, the Court could not conclude that there has been a sufficient showing of corruption in the underlying proceedings. This is particularly so in view of the appellate decisions in the Russian courts that have affirmed various decisions about which the plaintiffs complain but for which there is no persuasive showing of any corruption.

In support of their contention that Governor Tuleyev used his influence to obtain results favorable to the Conspirators in the NKAZ bankruptcy, the plaintiffs offer the declaration of Valery Grishkovets ("Grishkovets") who worked as the director of the Regional Agency of the Federal Insolvency (Bankruptcy) Department ("FID") in the Kemerovo region from April 1994 through August 1998. (Declaration of Valery Borisovich Grishkovets (dated in Russian) ("Grishkovets Decl.") ¶ 3.) During his tenure, Grishkovets claims to have been "aware of a widespread practice of secret, informal contacts by the local governor's representatives with the judges of the Kemerovo Arbitrazh Court who heard bankruptcy cases. The purpose of those contacts was to convince the judges to issue the decisions that would conform to the demands of the governor." (Grishkovets Decl. ¶ 9.)

Grishkovets attests to meeting with judges of the Kemerovo Arbitrazh Court on numerous occasions on Tuleyev's instructions in order to influence the outcome of certain bankruptcy proceedings by convincing judges to appoint bankruptcy managers controlled by the Governor. (Grishkovets Decl. ¶¶ 10–53.) Grishkovets claims that he had inappropriate ex parte contacts with one judge in particular, Judge Segodina, who, as chair of the bankruptcy panel of the Kemerovo Arbitrazh Court, controlled the assignment of bankruptcy judges to various cases. (Grishkovets Decl. ¶ 10.)

Although Grishkovets does not claim to have played any role in the NKAZ bankruptcy, the plaintiffs ask the Court to infer from Grishkovets' allegedly extensive, improper contacts with Judge Segodina that the NKAZ bankruptcy was also corrupted by Tuleyev's influence over the judge. Judge Segodina participated in various contested aspects of the NKAZ bankrupt-

cy. (Declaration of Igor Rehkhovsky dated Sept. 16, 2002 ("Rehkhovsky Decl.") ¶¶ 144–48.)

The plaintiffs also cite the testimony of Sergey Kuznetsov ("Kuznetsov") who represented the Kemerovo government in bankruptcy matters from June, 1997 to February, 1998 and who allegedly tailored his reports and recommendations to suit Tuleyev's needs. (Declaration of Sergey Kuznetsov (dated in Russian) ("Kuznetsov Decl.") ¶¶ 3, 8.) The declaration indicates that Tuleyev was dissatisfied with the Kemerovo Arbitrazh Court. (Kuznetsov Decl. ¶ 20.) It also indicates that Kuznetsov faced criminal charges in Kemerovo which were subsequently dismissed. (Kuznetsov Decl. ¶ 56.)

The plaintiffs argue that Grishkovets' and Kuznetsov's declarations establish a pattern and practice of corruption in the Russian courts by the same individuals who allegedly corrupted the NKAZ proceedings. The declarations provide no testimony about the NKAZ proceedings themselves, or any direct knowledge by the declarants of the alleged corruption of those proceedings. Moreover, the declarations are the testimony of persons who claim to have corrupted the Kemerovo arbitrazh courts in the past but who now ask this Court to accept their word as true.

Even if the Grishkovets and Kuznetsov declarations did support the plaintiffs' allegations in this case, which they do not, the plaintiffs' papers fail to present any specific allegations that the subsequent appellate decisions upholding many of the Kemerovo Arbitrazh Court's decisions were corrupt. For example, the plaintiffs make no serious allegations of corruption as to the deci-

sion by the West Siberian Circuit Federal Arbitrazh Court upholding the Kemerovo Arbitrazh Court's Order appointing Chernyshev External Manager of NKAZ. (West Siberian District July 3, 2000 Decree.) Nor do the plaintiffs allege corruption as to the September 6, 2001 decision by that same court upholding the NKAZ bankruptcy settlement. (West Siberian Circuit Sept. 6, 2001 Resolution.) (See, e.g., Plaintiffs' Oral Argument Exhibit Binder, tab entitled "NKAZ Bankruptcy Litigation.") The plaintiffs alleged that the three judge appellate court "rubber stamped" the lower court ruling, but affirmances, even summary affirmances, are not evidence of corruption. (See Rehkhovsky Decl. ¶ 167.) These were central decisions to the NKAZ bankruptcy. The lack of allegations of corruption at the appellate level undercuts the plaintiffs' contention that they cannot receive a fair trial of their claims anywhere in Russia.

The plaintiffs' allegations about the corruption of the GOK bankruptcy are similarly insufficient to counter the defendants' showing that Russia is an adequate alternative forum. The plaintiffs rely on the opinion of their expert, Marina Telyukina ("Telyukina"), who evaluated the GOK bankruptcy for signs of corruption or other illegality. (Declaration of Marina Telyukina (dated in Russian) ("Telyukina Decl.") ¶ 1.)[19] Telyukina concluded that the GOK bankruptcy settlement as approved by the GOK creditors must have been a sham because the parties agreed to terms that "in [her] opinion, no rational creditor would accept." (Telyukina Decl. ¶ 103.) Telyukina alleges that the Sverdlovsk Arbitrazh Court should have refused to af-

19. Telyukina is a Russian citizen who earned her postgraduate degree in law in 1997. (Telyukina Decl. ¶¶ 4–5.) She is currently Senior Scientific Researcher at the Institute of State and Law of the Russian Academy of Sciences and Assistant Professor of the M.M. Speran-

sky law faculty at the Academy of National Economy of the Government of the Russian Federation. (Telyukina Decl. ¶ 6.) She has authored over 80 publications on issues concerning Russian bankruptcy law. (Telyukina Decl. ¶ 8.)

firm the settlement because Leybout's claims as GOK's primary creditor were "obviously false." (Telyukina Decl. ¶ 105.)

But Telyukina offers no further insight why the court affirmed the settlement or how the arbitrazh court may have been corrupted—in fact she makes no direct allegation of corruption at all. Moreover, Telyukina acknowledges that appeals of that decision were twice dismissed by two separate appellate courts on technical grounds. (Telyukina Decl. ¶¶ 108–09.) She claims, however, that the "courts' reliance on formalistic arguments, and their inaction and disregard, lead me to the conclusion that the courts failed to ensure due process with fair regard for the rights of the creditors seeking justice in the courts." (Telyukina Decl. ¶ 110.) Such conclusory contentions are not the type of specific allegations of corruption, at the trial or appellate level, that would justify a conclusion that the Russian judiciary is so rife with corruption as to be an inadequate alternative forum.

The plaintiffs also cite the work of a Russian prosecutor who investigated the GOK bankruptcy. (Order to Close Criminal Case dated Nov. 24, 2001 ("Prosecutor's GOK Report") attached as Ex. 36 to Declaration of James L. Bernard dated Sept. 20, 2002 ("Bernard Decl.").) The plaintiffs fail to note, however, the prosecutor's ultimate conclusion that "indicators of an intentional bankruptcy are not present" in the case of GOK and that the corresponding criminal case was closed. (Prosecutor's GOK Report.)

Finally, the plaintiffs launch a breathtaking challenge to all of the Russian courts arguing that the Russian judiciary is so corrupt that the plaintiffs cannot obtain a fair decision anywhere in Russia. The plaintiffs present generalized descriptions of corruption that are insufficient to disqualify all of the possible Russian venues. Typical is the charge by Mr. Zaitsev, who served as a judge in the Russian judiciary for twenty years but who is now a consultant: "[T]he plaintiffs cannot expect a fair and impartial resolution of their claims in Russia, irrespective of whether they pursue their claims in Moscow, Kemerovo, Sverdlovsk or another region, and at all levels of the courts...." (Zaitsev Decl. ¶ 96.) The conclusory allegations are insufficient.

"The 'alternative forum is too corrupt to be adequate' argument does not enjoy a particularly impressive track record." *Eastman Kodak Co. v. Kavlin*, 978 F.Supp. 1078, 1084 (S.D.Fla.1997) (collecting cases); *see also Monegasque De Reassurances*, 311 F.3d at 493; *Blanco v. Banco Industrial de Venezuela, S.A.*, 997 F.2d 974, 981–82 (2d Cir.1993); *Abdullahi*, 2002 WL 31082956, at *8–9 (collecting cases). Other judges of this court have found Russia to be an adequate alternative forum. *See Varnelo*, 2003 WL 230741, at *13–18 (finding Russia an adequate alternative forum and rejecting plaintiff's contention that Russian courts would not exercise jurisdiction over non-Russian defendants as "inconceivable" on the facts of the case); *Pavlov v. Bank of New York Company, Inc.*, 135 F.Supp.2d 426 (S.D.N.Y.2001).[20]

20. The Court of Appeals vacated and remanded *Pavlov* by summary order dated January 14, 2002 on the ground that the district court improperly dismissed the plaintiffs' RICO claim for failure to adequately plead a RICO enterprise. On remand, the district court dismissed the case for the reasons stated in the defendants' memorandum of law regarding the plaintiffs' lack of standing and, in the alternative, for lack of prosecution. *See Pavlov v. Bank of New York Co., Inc.*, No. 99 Civ. 10347, 2002 WL 31324097, at *1 (S.D.N.Y. Oct.16, 2002). The Court of Appeals' summary order has no precedential effect and did not discuss the *forum non conveniens* issue.

In *Pavlov,* Judge Kaplan rejected the plaintiffs' argument that "the Russian legal system is corrupt and riddled with political influence, characteristics that allegedly would be at their worst given the political sensitivity of the subject matter of [the] case" which involved claims for the "looting and laundering of assets of several Russian banks." *Id.* at 428, 433. The court found that "it would be inappropriate for it to pass judgment on [the Russian judicial] system, particularly on the basis of the sort of broad brush, hearsay accounts upon which plaintiffs' attack rests." *Id.* at 434. Similarly, in *Parex Bank v. Russian Savings Bank,* 116 F.Supp.2d 415 (S.D.N.Y.2000), Judge Sweet noted that "[a] foreign forum is not inadequate despite employing different procedures or due to general allegations of judicial corruption." *Id.* at 423 (internal citation omitted). The court subsequently denied the plaintiff's claims that Russian courts provide insufficient procedural safeguards to ensure a fair trial and would be biased against the plaintiff, a Latvian entity, due to the strained political climate between Russia and Latvia. *Id.* at 424–25.[21] In so doing, Judge Sweet found it "notable that [the plaintiff] did not find Russia to be an inadequate forum due to lack of procedural fairness or discrimination when it filed its initial complaint [in the case] in the Moscow Arbitration Court." *Parex,* 116 F.Supp.2d at 425.[22]

The plaintiffs in this case have similarly pursued relief in the Russian courts until the results were not to their liking. Moreover, the plaintiffs voluntarily entered into numerous contracts in Russia relevant to this case that contain Russian forum selection clauses. The plaintiffs must have anticipated the possibility of litigation in Russia. *See Monegasque De Reassurances,* 311 F.3d at 499. "There is a substantial temerity to the claim that the forum where a party has chosen to transact business ... is inadequate." *Eastman Kodak,* 978 F.Supp. at 1084–85.

BMT Ltd. recently acknowledged the availability of a fair and adequate forum in Russia and sought dismissal for *forum non conveniens* of an action against it in Guernsey in favor of adjudication in Russia. (*See* Judgment in the Royal Court of Guernsey Ordinary Division in the case of *Ruslan Borisovich Shamurin v. Base Metal Trading Ltd., Yurii Yurievich Zhivilo and Mikhail Zhivilo* dated July 23, 2001 ("Guernsey Judgment") attached as Ex. I to Burrows Decl.) The court denied the motion in view of the inconsistency with the position BMT Ltd. takes in this case. (Guernsey Judgment at 6–7.) The plaintiffs attempt to explain the apparent inconsistency by characterizing the Guernsey action as a "dispute [concerning] the ownership of an apartment in Russia" in which there was no evidence that the plaintiff had the ability to corrupt the Russian judiciary. (Pls.' Mem. Opp. at 88 n. 43.) But that case involved allegations that Mikhail Zhivilo used threats of violence and death against the plaintiff that caused the plaintiff to resign his directorship of BMT Ltd. and to transfer his shares in the company to Zhivilo and his brother Yuri Zhivilo.

---

21. The court in *Parex* ultimately found that "this is one of the rare cases in which the alternative forum provides 'no remedy at all'" because Russian law did not recognize the type of contracts at issue in the case as legally enforceable. *Id.* at 426 (quoting *Piper,* 454 U.S. at 254, 102 S.Ct. 252).

22. For the reasons explained by Judge Sweet, this Court also rejects the argument raised by the plaintiffs here that because Russia uses different procedures, relying on the continental civil model, rather than American procedures, Russian procedures are inadequate to assure fair resolution of disputes. *See Parex,* 116 F.Supp.2d at 424–25. (*See also* Stephan 2003 Decl. ¶ 16.)

(Guernsey Judgment 1.) BMT Ltd.'s claims in the Guernsey action, and the plaintiffs' subsequent attempts to justify those actions to this Court, undercut the credibility of their assertion that they cannot obtain adequate relief in Russia.

Nor are the public testimonials about problems facing the Russian judicial system cited by the plaintiffs sufficient.[23] These conclusory statements do not demonstrate that the plaintiffs cannot obtain relief within the Russian courts. While one plaintiffs' expert, Professor Ethan Burger ("Burger"), points to President Putin's 2001 Annual Message to the Federal Assembly as evidence of the corruption of the Russian judiciary, (Declaration of Ethan S. Burger dated Sept. 16, 2002 ("Burger Decl.") ¶ 25), the address acknowledges the need for reform but is not a wholesale indictment of the fairness of the Russian judiciary. (See Burger Decl. ¶ 25; Annual Message of President Vladimir Putin to the Federal Assembly (Part 1) dated Apr. 3, 2001 ("Putin Address 1") at 4 attached as Ex. 15 to Burger Decl.) Indeed, the avowed commitment to judicial reform by

the highest levels of the Russian government, as well as the nature and scope of the allegations in this case, indicate that the case would not be subject to abuse and would receive sufficient public and political scrutiny to assure that the case would be tried fairly in Russia. See Aguinda, 303 F.3d at 478.

Should the plaintiffs prevail on the motion to dismiss and the case proceed to trial in this Court, the Court would be forced to consider approximately 120 Russian legal decisions related to the NKAZ and GOK bankruptcies and the GOK change of control. (Defendants' Chronology of GOK–Related Russian Court Decisions and Chronology of NKAZ ("Defendants' Decision Chart").) These decisions involved almost 150 Russian judges. (Defendants' Map of Russian Courts with Accompanying List of Judges.) This Court is not a court of appeals for the Russian legal system and will not act as such. To do so would amount to an act of judicial overreaching of the precise sort rejected by the Court of Appeals for the Second Circuit. The Court of Appeals has "repeatedly em-

**23.** This includes the plaintiffs' citations to United States Department of State reports that provide only minimal information about the Russian judiciary. Of the two reports cited, one dedicates only two paragraphs to the topic of the Russian judicial system, and the other is devoted to evaluating human rights in Russia, a subject not at issue in this case. (Declaration of Ethan S. Burger dated Sept. 15, 2002 ("Burger Decl.") ¶¶ 43–48; U.S. Department of State Background Note: Russia dated May 2000 at 5 attached as Ex. 46 to Burger Decl.; U.S. Department of State Country Reports on Human Rights Practices dated Feb. 23, 2001 attached as Ex. 47 to Burger Decl.) Such reports do not suffice to show the Russian forum inadequate. See Abdullahi, 2002 WL 31082956, at *9 (collecting cases).

Professor Burger also relies on popular and scholarly articles and reports from the United States and abroad, including Russia, in reaching his sweeping conclusion that the plaintiffs

could not receive a fair resolution of their claims in the Russian courts. (Burger Decl. ¶¶ 8, 13, 21–23, 34–38, 70–71, 73.) However, many of the sources are cited for broad propositions such as the results of one survey that found that "[m]any people do not want to seek redress in the [Russian] courts because the unofficial expenditures are too onerous," (Burger Decl. ¶ 31), or a description in the Washington Post of the remarks given by President Putin to the Federal Assembly discussed in the text as part of an effort "designed to overhaul Russia's famously corrupt courts." (Burger Decl. ¶ 25.) Professor Burger's criticism goes beyond the Russian courts. He concludes as part of his expert opinion that, "In Russia, individuals who comply with the law are widely viewed as naïve and stupid." (Burger Decl. ¶ 59.) These broad and conclusory allegations, founded on multiple levels of hearsay, are insufficient to condemn the entire Russian judiciary as an inadequate alternative forum in which to try this case.

BASE METAL TRADING SA v. RUSSIAN ALUMINUM    **709**
Cite as 253 F.Supp.2d 681 (S.D.N.Y. 2003)

phasized that it is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." *See Blanco,* 997 F.2d at 982 (internal quotation marks omitted).

Considerations of comity also play an important role in the Court's *forum non conveniens* analysis. *See Blanco,* 997 F.2d at 982, 983; *Sussman,* 801 F.Supp. at 1078. In this light, the defendants have identified four Russian court decisions that are integral to this case but which, they claim, are not subject to allegations of corruption. These are 1) the July 3, 2000 decision by the West Siberian Circuit Federal Arbitrazh Court rejecting an appeal by BMT SA and MIKOM of the Kemerovo Arbitrazh Court's March 20, 2000 Order appointing Chernyshev External Manager of NKAZ, (West Siberian District July 3, 2000 Decree); 2) the September 6, 2001 decision of the West Siberian Circuit Federal Arbitrazh Court upholding the Kemerovo Arbitrazh Court's approval of the NKAZ bankruptcy settlement on appeal by BMT SA, (West Siberian Circuit Sept. 6, 2001 Resolution); 3) the August 21, 2001 decision of the Federal Arbitrazh Court for the Urals Circuit affirming the lower court's dismissal of Nexis' appeal of the GOK bankruptcy settlement, (Urals Circuit Aug. 21 2001 Determination); and 4) the September 5, 2001 decision of the Federal Arbitrazh Court for the Moscow Circuit upholding two lower court decisions

rejecting claims by Davis, Holdex, Omni and Foston against GOK's change in registrar. (Decree of the Moscow Circuit Federal Arbitrazh Court dated Sept. 5, 2001 attached as Ex. 71 to Kozyrev/Kapoura Decls.) The Court has reviewed the record and finds the defendants' contention to be true: The plaintiffs have made little, if any, attempt to articulate substantive allegations of corruption against these decisions which are clearly at the core of the plaintiffs' case. (*See, e.g.,* Plaintiffs' Oral Argument Exhibit Binder, tabs entitled "NKAZ Bankruptcy Litigation", "GOK Bankruptcy Litigation", and "GOK Shareholder Litigation" and associated citations.) In view of this fact, it would be a particular affront to notions of international comity for the Court effectively to ignore or overrule the findings of the Russian courts in these decisions.[24]

The plaintiffs would have this Court believe that there is no court in Russia that could provide a fair, uncorrupted forum for this dispute. (Zaitsev Decl. ¶ 96.) To agree with this assertion would be to accept a mass indictment of the Russian judicial system that is not supported by the record. For the reasons explained above, Russia is an adequate alternative forum for this dispute.

### (C)

**[9]** Having considered the plaintiffs' choice of forum and having found Russia

---

24. The plaintiffs concede the availability of an application for protest to the Supreme Arbitrazh Court for at least the first three of these decisions. (NKAZ Bankruptcy Litigation at 20, 29; GOK Bankruptcy Litigation at 4.) Moreover, the defendants contend that the Russian Constitutional Court's decision in March 2001 overruling previous limits on creditors' rights to appeal decisions of the arbitrazh courts provides a basis on which the plaintiffs could seek leave to appeal, within reasonable time, virtually all of the decisions taken by the Kemerovo Arbitrazh Court and

the Sverdlovsk Arbitrazh Court in connection with the NKAZ and GOK bankruptcies. (Decision of the Constitutional Court of the Russian Federation dated Mar. 12, 2001 attached as Ex. 7 to Second Declaration of Victory Vasilyevich Golubev dated Feb. 25, 2003; Second Declaration of Sergei Zankovsky (dated in Russian) ¶¶ 46, 121; Defendants' Decision Chart, GOK Chart n. 8.) Having failed to take advantage of the avenues of appeal open to them, the defendants argue, the plaintiffs now seek to appeal the Russian court decisions to this Court.

an adequate alternative forum, the Court now weighs the remaining private and public interest factors set forth by the Supreme Court in *Gilbert*, 330 U.S. at 508–09, 67 S.Ct. 839. The private factors to be considered in this case are 1) the relative ease of access to sources of proof; 2) the convenience of willing witnesses; 3) the availability of compulsory process for attaining the attendance of unwilling witnesses; and 4) the other practical problems that make trial easy, expeditious, and inexpensive. *See Gilbert*, 330 U.S. at 508, 67 S.Ct. 839; *accord Aguinda*, 303 F.3d at 479. "In applying these factors, the court should focus on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues." *Monegasque*, 311 F.3d at 500 (internal quotation marks omitted).

[10] The list of potential non-party witnesses who appear in the Amended Complaint alone demonstrates why this litigation should proceed in Russia. On the NKAZ side of the case, the plaintiffs claim the involvement of numerous persons in Russia from whom the defendants would want to obtain evidence. The extensive list includes Kemerovo Governor Tuleyev; Russian "oligarchs" involved in the metallurgical industry with connections to Russian organized crime; unspecified witnesses to the SAZ, KRAZ, and BRAZ takeovers; members of the Kemerovo Regional Energy Commission and the Russian Federal Energy Commission; Sergey Chernysev, who served as Provisional and External manager of NKAZ; the local procurator who filed the "unusual" petition with the Kemerovo Arbitrazh Court to remove MIKOM from NKAZ's management; employees of Kuzbass, which joined with Conspirators to take over NKAZ; NKAZ's shareholders who were allegedly forced to sell their shares at distressed prices; as well as each of the unnamed judges who

participated in each of the court actions that the defendants claim were corrupted. (*See, e.g.,* Am. Compl. ¶¶ 112–13, 125–47, 186, 208, 210, 239–40, 243, 306, 312).

The GOK allegations present a similarly extensive list of non-party witnesses in Russia from whom evidence would be critical. This list includes Sverdlovsk Oblast Governor Roussel; former GOK general director Khaidarov who was allegedly ordered to convince GOK's shareholders to transfer their shares to the Conspirators; the unnamed GOK shareholders; the "armed thugs" who took over GOK and their supporters in the regional authorities; employees of Leybout, which allegedly held a false $39 million promissary note from GOK; Oleg Kozyrev, who became Provisional and External Manager of GOK after its bankruptcy; employees of VRK Company; and the judges who presided over the allegedly corrupt bankruptcy proceedings as well as the cases allegedly illegally transferring the Davis Plaintiffs' shares. (*See, e.g.,* Am. Compl. ¶¶ 343–44, 352, 356, 360, 373, 389, 397.)

In view of the plaintiffs' allegations, which themselves appear to place most of these parties in Russia, the defendants argue persuasively that almost all of their likely witnesses are located in Russia or elsewhere, and that few, if any, are in the United States. (Grand Decl. ¶¶ 3–4; Rubin Decl. ¶¶ 2–3; Hauberg Aff. ¶ 2; Armeniades Decl. ¶ 3; Redmon Decl. ¶ 2; Declaration of Stalbek Mishakov dated Jan. 29, 2002 ("Mishakov Decl.") ¶¶ 4, 9.) And as third-parties to this action, the Court cannot compel such witnesses appear. *See Pavlov*, 135 F.Supp.2d at 436 ("This Court has no ability whatever to compel the production of documents or witnesses from Russia, which appears to be the locus of all or substantially all of the evidence concerning the core issues in the case....") Moreover, even if the Court

could do so, the striking number of Russian parties and witnesses involved in the case demonstrates the extreme inconvenience of bringing this case to trial in the United States.

The plaintiffs contend that such a list overlooks the fact that the plaintiffs allege predicate acts for their RICO claims that occurred in United States. These acts primarily include the laundering and transfer of funds through American banks. However, the relevant allegations that may involve witnesses located in the United States pale in comparison to those involving persons and companies located in Russia. Furthermore, it is unlikely that testimony from bank officials would be necessary in any forum simply to document that funds were transferred through the use of banks in the United States. Moreover, the plaintiffs' citation to the allegedly integral role in the illegal scheme played by United States defendants Kislin, Blonde Management, Pan–American and Sibirsky U.S. does little to persuade the Court that the action should remain here. This is because on the face of the Amended Complaint these parties were not the main actors to the events that led to the litigation and, moreover, each of the defendants has consented to jurisdiction in the Russian courts.

The plaintiffs urge the Court that in considering the convenience of the witnesses, the Court must account for the fact that certain of the plaintiffs' witnesses are "unable" to go to Russia. For example, the plaintiffs allege that Mikhail Zhivilo could not return to Russia for fear of prosecution on the allegedly false charges filed against him for the attempted murder of Governor Tuleyev. This Court cannot, however, determine whether the serious criminal charges pending against the witness in a sovereign foreign forum are justified. As such, Zhivilo's refusal to return to Russia to defend against the charges

provides no ground for keeping the action here.

Similarly, Joseph Traum claims that he is unwilling to return to Russia for fear of prosecution on false drug charges and threats to his life. (First Traum Decl. ¶¶ 28–31; Second Traum Decl. ¶ 18.) Traum also alleges that Isaac Savion, the beneficial owners of Holdex, and unnamed members and officers of Davis are also unwilling to travel to Russia because of the threats against Traum. (Second Traum Decl. ¶¶ 20, 29, 41.) The Court cannot determine whether Traum faces legitimate prosecution in Russia. In any event, Traum is not a witness to the main allegations in the Amended Complaint. Moreover, Traum's fear of returning to Russia does not rise to the level of gravity at which courts within this Circuit have spared *parties*, not merely witnesses, from returning to a threatening forum. *See, e.g., Guidi*, 224 F.3d at 146 ("the special circumstances presented by this case—specifically, the emotional burden on Plaintiffs of returning to the country where they or their loved ones were shot in an act of religious terrorism—provide additional weight for favoring Plaintiffs' choice of their home forum for this litigation"); *Rasoulzadeh v. Associated Press*, 574 F.Supp. 854, 861 (S.D.N.Y.1983) ("I consider that if the plaintiffs returned to Iran to prosecute this claim, they would probably be shot."), *aff'd* 767 F.2d 908 (2d Cir.1985) (table). This is especially true for the other named and unnamed individuals for whom Traum claims to speak who allege no threats to their own lives or safety, but who instead refuse to go to Russia based on threats against Traum. It is clear that the convenience of the witnesses strongly favors litigation in Russia.

The bulk of the important documentary evidence in this case is also located in Russia. (Grand Decl. ¶ 3; Hauberg Aff.

¶ 2;  Armeniades Decl ¶ 3;  Redmon Decl. ¶ 2;  Mishakov Decl. ¶¶ 4, 9.) Such documents would likely require translation in order to be useful to an American court (as would, presumably, many of the witnesses who might testify). The need for extensive document translation supports a finding that this forum is inconvenient. *See PT United*, 1997 WL 31194, at *8.

The plaintiffs are correct that technological advances have lessened the burden of transporting documentary evidence, leading courts to afford this consideration less weight in the *forum non conveniens analysis. See DiRienzo*, 294 F.3d at 30. However, the substantial degree to which it appears that Russia and the Russian language outweigh the United States and English in the location and format of many of documents demonstrates the high burden of putting such evidence to use in this Court. Access to sources of proof thus tips heavily in favor of Russia.

[11] Similarly, an assessment of the public interest factors also counsels in favor of dismissal for *forum non conveniens*. The public factors to be evaluated are 1) court congestion; 2) avoiding difficult problems in conflict of laws and the application of foreign law; 3) the unfairness of imposing jury duty on a community with no relation to the case; and 4) the interest of communities in having local disputes decided at home. *See Gilbert*, 330 U.S. at 509, 67 S.Ct. 839; *Aguinda*, 303 F.3d at 480.

First, considerations of court congestion favor neither forum. *See Varnelo*, 2003 WL 230741 at *31. While this is a busy Court, the Court of Appeals has reminded us that the filling of judicial vacancies makes court congestion in this district "of little or no present significance." *Guidi*, 224 F.3d at 147 n. 5. The case could also be litigated expeditiously in Russia. (Stephan 2002 Decl. ¶ 13.) All of the principle events in this case transpired in Russia

and the action's connection to the Southern District of New York is far too attenuated to justify asking the citizens of this district to resolve the parties' dispute. *See Varnelo*, 2003 WL 230741, at *32.

Second, there would likely be extensive application of Russian law in this case. The Amended Complaint contains myriad alleged violations of Russian law. These range from the claim that "[t]he procurator's petition [to remove NKAZ's management] was invalid on its face and should have been returned by the Kemerovo court because it was not prepared in accordance with Russian bankruptcy law," to the allegation that, in the event that triggered the GOK bankruptcy, "[t]he gas company's receivables were not overdue under the terms of a prior settlement agreement with GOK, and thus under Russian Law, they could not be used as a basis for the bankruptcy petition." (Am.Compl.¶¶ 240, 388.) Furthermore, this action challenges over 100 Russian court decisions, the validity of which will have to be determined under Russian law. Indeed, the plaintiffs ask the Court to conclude that some decisions must have been corrupt because they were so wrong under Russian law. Moreover, the parties have both submitted lists of the relevant contracts at issue in the case. (Defendants' Contract Summary; Plaintiffs' Contract Summary.) Virtually every contract calls for interpretation under laws other than those of the United States, primarily Russian law. (Defendants' Contract Summary.) Thus, although the need to apply foreign law is not alone sufficient to warrant dismissal, *Piper*, 454 U.S. at 260 n. 29, 102 S.Ct. 252, this factor weighs heavily in favor of dismissing this case in favor of a Russian forum.

The third and fourth factors weigh strongly in favor of dismissal. Russia's interest in adjudicating this action is far greater than any interest the United

States has in adjudicating this dispute. It would be unfair to require a New York jury to sit on this case. The plaintiffs' claims involve the bankruptcies of two major Russian companies. These bankruptcies were allegedly part of a larger scheme to take over the Russian aluminum and vanadium industries. The plaintiffs contend that the illegal scheme involved high level Russian politicians, as well as numerous members of the Russian judiciary. The controversy presents issues that are of clear import to Russian citizens that should be resolved by the Russian courts. By contrast, the case has virtually no connection with the United States or this district. As such, the local interest in resolution of the dispute is virtually none.

Based on an evaluation of all the private and public *Gilbert* factors, Russia is clearly the more convenient forum. Therefore, this action is dismissed.

### CONCLUSION

Any remaining arguments of the parties are either moot or without merit. The defendants' motions to dismiss for *forum non conveniens* are granted. This dismissal is based on the defendants' consent to jurisdiction in the Russian courts, consent to venue in Moscow, and waiver of any statute of limitations or other time limit that expired after this lawsuit was brought until 90 days after judgment in this case becomes final—all of which the defendants have agreed to do. It is not necessary for the Court to reach the other grounds asserted in the motion filed by the Sibirsky Defendants on behalf of all defendants. The motions to dismiss on the basis of comity are similarly denied without prejudice as moot. The plaintiffs' motions to strike the expert reports of Paul B. Stephan III and Sergei Zankovsky are

also denied. The Clerk is directed to enter Judgment and to close this case.

**SO ORDERED.**



Donna **PARRISH**, Plaintiff,

v.

Louis **SOLLECITO**, Individually, James Gallagher, Individually, Mount Kisco Import Cars, Ltd. d/b/a Mount Kisco Honda, and Westchester Import Cars, Ltd, d/b/a/ Acura of Bedford Hills, Defendants.

No. 01 CIV.5420.

United States District Court, S.D. New York.

March 27, 2003.

Former employee sued her former employers and supervisor, alleging sexual discrimination and retaliation in violation of Title VII and corresponding state law provisions. Following denial of a defense motion for summary judgment, the defense moved for reconsideration. The District Court, Marrero, J., held that the court had not overlooked the issues raised by defendants.

Motion denied.

**1. Federal Civil Procedure ⚖928**

Reconsideration of a court's previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

```
1        UNITED STATES DISTRICT COURT
2       SOUTHERN DISTRICT OF NEW YORK

3   ──────────────────────────────x
4   BASE METAL TRADING, et al.,
5
6            Plaintiffs
7                              DOCKET NO.: CV-00-9627 (JGK)
8            -vs-              New York, New York
9                             February 10, 2003
10  RUSSIAN ALUMINUM, et al,

11
12           Defendants
13  ──────────────────────────────x

14       TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE

15      BEFORE THE HONORABLE JOHN G. KOELTL
16           UNITED STATES DISTRICT JUDGE


17  A P P E A R A N C E S:

18  For the Plaintiffs

19  For Base Metal:          BRUCE S. MARKS, ESQ.
20                           Marks & Sokolov LLP
21                           1835 Market Street
22                           Philadelphia, PA  19103

23                           JAMES BERNARD, ESQ.
24                           ROBERT ABRAMS, ESQ.
25                           BRIAN M. COGAN, ESQ.
26                           ALAN M. KLINGER, ESQ.
27                           JACOB E. MIOTA, ESQ.
28                           Stroock & Stroock & Lavan LLP
29                           180 Maiden Lane
30                           New York, NY  10038


31  Audio Operator:          No Audio Operator

32      Proceedings Recorded by Electronic Sound Recording
33       Transcript Produced by Transcription Service
34
35              KRISTIN M RUSIN
36       328 Flatbush Avenue, Suite 251
37         Brooklyn, New York 11238
38             (718) 789-0620
```

```
1   ADDITIONAL APPEARANCES

2   For the Plaintiffs

3   For the Davis Plaintiffs:      DAVID MEISELS, ESQ.
4                                  Herrick Feinstein
5                                  2 Park Avenue
6                                  New York, NY  10016


7   For the Defendants

8   For Sibirsky:                  MICHAEL DONALD BURROWS, ESQ.
9                                  CATHERINE SCHUMACHER, ESQ.
10                                 Winston & Strawn
11                                 200 Park Avenue
12                                 New York, NY  10166

13                                 ROBERT M. BUSCHMANN, ESQ.
14                                 Winston & Strawn
15                                 35 West Wacker Drive
16                                 Chicago, IL  60601

17                                 KATHERINE SCHUMACHER, ESQ.
18                                 Winston & Strawn
19                                 Xxx Street
20                                 City, State, Zip

21  For NKAZ:                      IRA M. FEINBERG, ESQ.
22                                 Hogan & Hartson LLP
23                                 100 Park Avenue
24                                 New York, NY  10007

25  For New Start:                 PETER J. VENAGLIA, ESQ.
26                                 WILLIAM E. BERNARDUCI, ESQ.
27                                 Dornbush Mensch Mandelstam
28                                   & Schaeffer LLP
29                                 747 Third Avenue
30                                 New York, NY  10017
```

1        THE CLERK:  Base Metal versus Russian Aluminum.  All

2   parties please say who they are for the record.

3        MR. MARKS:  I'm Bruce Marks, Marks & Sokolov.  I

4   represent Base Metal S.A., Base Metal Trading L T D, Alucoal,

5   and Mikom.

6        MR. BERNARD:  Good morning, Your Honor.  James

7   Bernard, from Stroock & Stroock & Lavan, on behalf of the same

8   plaintiffs.

9        MR. COGAN:  Brian Cogan, from Stroock, for those same

10  plaintiffs.

11        MR. KLINGER:  Alan Klinger, from Stroock, Your Honor,

12  for the same ——

13        MR. ABRAMS:  Robert Abrams, from Stroock, for the

14  same plaintiffs.

15        MR. MEISELS:  David Meisels, from Paris Weinstein,

16  for the Davis plaintiffs.

17        MR. MIOTA:  Jake Miota from Stroock for the aluminum

18  plaintiffs.

19        MR. BURROWS:  I'm Michael Burrows, Your Honor, from

20  Winston & Strawn, for Sibirsky Aluminum, Sibirsky USA, Bauxal,

21  Metcare, Unimetal, and Oleg Deripaska.

22        MR. BUSCHMANN:  Robert Buschmann, with Winston &

23  Strawn, for the same defendants, Your Honor.

24        MS. SCHUMACHER:  Catherine Schumacher, with Winston &

25  Strawn, for the same defendants.

1          MR. FEINBERG:  Ira Feinberg, Hogan & Hartson, for the

2   defendant NKAZ.

3          MR. VENAGLIA:  Peter Venaglia, Dornbush Mensch

4   Mandelstam & Schaeffer, for defendants New Start Group, Venitom

5   Corp, Unidale LLC, and Investland LLC.

6          MR. BERNARDUCI:  William Bernarduci, from Dornbush,

7   for the same defendants.

8          THE COURT:  All right.  Is the tape on?

9          THE CLERK:  Yes.

10          THE COURT:  Okay.  We're keeping a record of the

11   argument on — on tape, which can then be transcribed, so you

12   all should say who you are when you — when you speak.

13          I appreciate the submissions that both parties made

14   with respect to the court decisions and references to the

15   record, and appeals, and the maps.  I've now received them from

16   both sides.  The one thing that I didn't receive was if it's

17   possible, I indicated that it would be helpful to me to have it

18   on disk which is hyperlinked, so that I can go back and check

19   the cites, and I'm — if you can give me disks, that would be

20   useful.  Okay.

21          I'm sure that I have previously indicated the fact

22   that I know various attorneys here and people in your firms,

23   and none of that would affect anything that I do.

24          With that, I have read the papers and I'm prepared to

25   listen to argument.  I haven't given you any time limits on the

1   argument.  However, I really think that the arguments need not

2   go beyond the morning, and with that, I am prepared to listen

3   to argument.

4       *(DEFECTIVE RECORDING:  Counsel are not sufficiently close*

5   *to an operational recording microphone and are very difficult*

6   *to hear.  Some speech could not be transcribed.)*

7           MR. BURROWS:  Thank you, Your Honor.  I'm Michael

8   Burrows, from Winston & Strawn, and I intend to address the

9   forum non conveniens motion of the defendants.  After I'm done,

10  I will ask other counsel to address the two separate

11  [indiscernible] motions that have been made.

12          I will be speaking for all the defendants

13  [indiscernible] other two, Your Honor.  Mr. Bernard and I

14  agreed to divide this time equally, and we estimated that Your

15  Honor would give us about two hours, so that's what we expect

16  to do.

17          Before I begin, Your Honor, we have three charts that

18  I would ask Your Honor's permission to put up —

19          THE COURT:  Sure.

20          MR. BURROWS:  — during the argument.  We have also

21  handouts for all counsel, so just bear with me a minute.

22          THE COURT:  Sure.

23      (Pause in proceeding)

24          MR. BURROWS:  [indiscernible] hand these up to the

25  Court, Your Honor?

1    THE COURT: Yes. And if you have an extra set for my

2    clerk, that would be ——

3    MR. BURROWS: Yeah, I do.

4    THE COURT: Great. In fact, if you had two sets, so

5    that no one feels left out, ——

6    (Pause in proceeding)

7    MR. BURROWS: The map behind me, Your Honor, is the

8    same map that was served on the Court Friday and on counsel.

9    The chart in the middle is simply a listing of the same court

10   decisions that were included in our chart, and the —— the one

11   closest to the Court is a depiction of the business of Russian

12   Aluminum, which I will explain during my presentation.

13   Your Honor, when I first got involved in this case, I

14   was struck by the sensation [indiscernible] as I think

15   everybody was, particularly the press, the allegations of

16   bribery and extortion, even murder, the use of the words 'the

17   conspirators', and of course the romanticized depiction of the

18   Russian mafia.

19   But after a considerable amount of time —— and it

20   took quite a bit of time, Your Honor, to get the picture ——

21   this case reminded me of one of the first cases I had in this

22   court, in front of Judge Brieant, as a young associate. The

23   judge had a different view of the case than I did, and he ruled

24   against me harshly, not totally ending the case procedurally,

25   but for all practical purposes finishing me off.

1    I whined and complained.  I said he had unfairly put

2 my client in an impossible position.  I said it was a horrible

3 miscarriage of justice.  And Judge Brieant said that — he said

4 no.  He said the only thing I have done Mr. Burrows, is place

5 your client in a category of disgruntled litigants whose names

6 are legion in this building.  And I, having no smart-aleck

7 reply to that, packed up my documents and went home.

8    And that, Your Honor, is exactly what the plaintiffs

9 here should do.  They are nothing more than disgruntled

10 litigants dressed up to look like real plaintiffs.  They should

11 pack up and go back to where they came from.  And where they

12 came from, Your Honor, is a significant issue here.  They came

13 from Switzerland [indiscernible] Cyprus, England, and Russia.

14 That's where these plaintiffs are from, Your Honor.

15    Now, the standing — the very first sentence of their

16 brief, which says this lawsuit is about the claims of three

17 U.S. companies against seven U.S. companies — in a similar

18 case that Your Honor's aware of in front of Judge Swain, they

19 say they're suing nine American companies, and in their

20 answering brief they say there are eight U.S. defendants.

21    But in all cases, they claim that there are three

22 U.S. companies as plaintiffs.  And what they forgot to do, Your

23 Honor, is read Iragorri carefully.  The Second Circuit said

24 that the plaintiffs' connection to the forum had to be bona

25 fide, not U.S. shell companies with the real owners in Russia,

1  France, or Israel. I'll come back to Iragorri later, Your

2  Honor, and to the identity of the plaintiffs.

3  These plaintiffs are disgruntled litigants, just like

4  [indiscernible] before Judge Brieant, but Your Honor, I only

5  lost one case. These plaintiffs have lost a hundred and

6  nineteen. Actually, they won some. I shouldn't say a hundred

7  and nineteen.

8  They won about twenty five, and I gather they would

9  tell us that the twenty five decisions on this chart that they

10  were successful in — those proceedings, I guess, were not

11  corrupt. I can't imagine what term Judge Brieant would use for

12  litigants that were disgruntled that many times.

13  And now, Your Honor, they want you to give them a

14  second bite at the apple. The arbitrator in Switzerland has

15  already denied them a third bite, but they want you to give

16  them a second bite.

17  The question is how this all happened, and if I can

18  just take a minute to review some history and some background

19  of how this case started, Your Honor, it goes back to 1991, the

20  collapse of the Soviet Union. In that year, Boris Yeltsin

21  became the first democratically elected president. Latvia and

22  the Ukraine declared independence. Leningrad was renamed St.

23  Petersburg, and on December 25th Gorbachev resigned as head of

24  the Communist Party and the USSR ceased to exist.

25  I don't think any of us can imagine the social and

1  political and economic turmoil that began in 1991.  In 1992,
2  the ruble plummeted.  Prices skyrocketed.  And privatization
3  began.  In '93 there was a virtual civil war.  Anti-Yeltsin
4  factions tried to seize power.  When it was over, a hundred and
5  fifty people were dead and thousands were injured.

6          In that year, at the same time, President Clinton was
7  in his first year as president.  The World Trade Center was
8  bombed.  Eighty people died in Waco, Texas.  Michael Jordan
9  retired from basketball.  And Your Honor was probably up all
10  night preparing for oral argument.

11          Russia was desperately trying to become what it would
12  eventually be.  In '94, troops invaded Chechnya.  In '95,
13  Yeltsin had two heart attacks.  In '96, Yeltsin was reelected.
14  In '97, a new criminal code was enacted to replace the 1960
15  code.  There was a crisis in '98.  And in '99 Vladimir Putin
16  was elected — became the prime minister.  The Bank of New York
17  money laundering scheme was revealed, and in the year 2000
18  Putin was elected president, and the original complaint in this
19  case was filed in this court.

20          Now, during these eight or nine years, in the midst
21  of all this change, the media became enamored with the stories
22  of the Russian mafia.  We should remember that for seventy
23  years before that in the former Soviet Union, business, any
24  kind of business, any kind of free enterprise, was regarded as
25  western concept, against the interests of the socialist state.

1    Anyone doing business had to be doing illegal

2  business and was referred to as mafia, a word that the press

3  borrowed from the American films.  And so mafia quickly became

4  a term, a pejorative term, applied to anyone who was making

5  money, owned a western automobile, or was able to travel

6  internationally.

7    And the Americans loved it.  Americans have always

8  been fascinated with crime and criminals, but Russian criminals

9  were even more exciting.  We've been socialized not to trust

10  the people who swore that they would bury us.  We find it

11  exciting to read tales of mafia immigrants from the former

12  Soviet Union hiding out in Brighton Beach.

13    The mafia theme plays well in New York, and back in

14  Russia politically motivated Russians labeled their enemies as

15  mafia-connected, both the corrupt former officials and those

16  who are participating in the beginnings of free enterprise are

17  labeled mafia members.

18    And so the Russian mafia provides journalists and

19  their readers with a model of crime à la Marlon Brando, a world

20  of consiglieres and soldiers.  It is appealingly seductive,

21  Your Honor, but it is quite inaccurate.

22    THE COURT:  Well, there have been — there have been

23  some decisions in our courts which have found that there have

24  been Russians involved in what could be described as criminal

25  conduct.

1       MR. BURROWS: There certainly have, Your Honor. The

2 question is whether that criminal conduct involves enough

3 people and rises to an organized level to be as romanticized as

4 it has been in the press. I suggest that it does not.

5       When this case began, Your Honor, Robert Abrams, who

6 signed all three complaints here, said in a press release that

7 was distributed in London, New York, and Dusseldorf, that this

8 case represents a great challenge for the American court system

9 to send a message of confidence that America and worldwide

10 investors will have their rights served.

11       Your Honor, there are no American investors here. At

12 the time of this press release, there were only three

13 plaintiffs — Base Metal Trading Limited, Base Metal S.A., and

14 Alucoal. We know now, without any doubt, that those are the

15 companies of Michael and Yuri Chivilo, the Russian brothers who

16 previously owned NKAZ, ran it into the ground, and then sold

17 it. In Zurich, Dr. Blessing found Michael Chivilo to be the

18 mysterious Mr. X referred to in those proceedings.

19       When the complaint was filed, there were no American

20 investors to protect. And the worldwide investors — you, this

21 Court, is supposed to send a message to worldwide investors to

22 protect their investments in Russia? I don't think so. I

23 guess the challenge for you was to review these hundred and

24 nineteen court decisions and see if each one of them was

25 correct.

1    And then, Your Honor, the defendants made their

2  initial motions in May of 2002, and this time Mr. Abrams told

3  the press that criminal elements have besieged Russian industry

4  with illegal payoffs, threats, and acts of violence.  The

5  United States must not allow Russian organized crime to spill

6  into the U.S. banking and commercial systems, and the courts,

7  presumably Your Honor, have the power to prevent it.

8    Well, is that what's happening here?  Is this case

9  about Russian organized crime spilling into the U.S. banking

10  and commercial system?  Or is it, in fact, just about some

11  disgruntled litigants trying to get a second bite at the apple

12  based on flimsy allegations, sensational headlines, and

13  information and belief?  Your Honor, they allege a murder on

14  information and belief in the complaint.

15    What this case really concerns is a battle for the

16  control of two Russian companies, Novokuznetsk Aluminum plant,

17  and a company called Kochkanarsky GOK, which is a

18  [indiscernible] mining and refining company.

19    Plaintiffs would have Your Honor believe that these

20  battles for corporate control are fought in dark alleys by

21  mafia hit men with knives and Kalashnikovs, but it is apparent

22  from this chart, Your Honor, that it was fought in courtrooms

23  by lawyers, just as battles for company control are fought in

24  the United States.

25    The only real defendant here, Your Honor, is Russian

1  Aluminum.  Russian Aluminum is a company that was actually

2  being formed at the time this case was filed.  It is now the

3  second largest aluminum company in the world.  The first chart

4  depicts some of its operations.

5      It is a company with — it is a company which now

6  owns Novokuznetsk, and that took place during the time that

7  this case was pending.  Kochkanarsky GOK, which I will come

8  back to, is not really a bona fide defendant here, Your Honor.

9  As you will recall, it was pasted onto the original case to

10 create — in an attempt to create subject matter jurisdiction.

11     NKAZ was described — has been described variously as

12 .[indiscernible] it was described in Switzerland as a joint

13 stock company organized and existing under the laws of Russia.

14 It is a large aluminum smelting plant with its principal place

15 of business in Novokuznetsk, in the Kemerovo region of Russia.

16 It was privatized in 1994, and among the shareholders were

17 Mikom, various other companies, as well as the Russian

18 government, and a number of individual shareholders.

19     Mikom was a company controlled by Mr. Michael

20 Chivilo, who was the chairman of the board of directors of NKAZ

21 and the general director of Mikom.  It acted as the management

22 organization of NKAZ, and it has about five thousand employees.

23     Russian Aluminum, which is now its parent, has annual

24 revenues in excess of four billion, and it employs seventy

25 thousand people.  Its headquarters are in Moscow, and its

1    chairman is Oleg Deripaska, one of the defendants here.

2         Kochkanarsky GOK is a smaller company than Russian

3    Aluminum.  It has about nine thousand employees, sales of about

4    three hundred million dollars, and as I said it was added to

5    bolster the subject matter jurisdiction.

6         So what is this case doing here, Your Honor?  The

7    Gilbert factors point undeniably to Russia.

8         THE COURT:  Before you get to the Gilbert factors,

9    the plaintiffs read their forum non conveniens argument towards

10   the middle or latter part of their brief, because they argue

11   initially that I can't reach the forum non conveniens argument

12   until I have decided that I have jurisdiction.  Do you agree

13   with that?

14         MR. BURROWS:  No.

15         THE COURT:  Why?

16         MR. BURROWS:  I believe that the — the forum non

17   conveniens argument can be reached without deciding that, Your

18   Honor, and I think you did that in P.T. United.  That's our —

19   that's our position.

20         THE COURT:  It can be reached —

21         MR. BURROWS:  I think the forum non conveniens

22   argument can dispose of this entire matter without reference to

23   comity, or without reference to the RICO claims.  I would say,

24   unlike some — unlike other forum non cases, where there is a

25   dispute which someone wants you to hear or another court to

1  hear, this is a little different, and that's why

2  [indiscernible] because all these decisions have already taken

3  place.  I think that's a significant difference.

4          THE COURT:  All right.

5          MR. BURROWS:  Thank you, Your Honor.  The — the

6  private factors, the public — Your Honor knows them very well.

7  You described them in P.T. United five years ago, but the

8  interest of the litigants in having the case tried in a

9  particular forum, access to sources of proof, convenience of

10  the willing witnesses and availability of process to compel the

11  unwilling witnesses, and then other practical or logistical

12  problems — all of these factors weigh in favor of Russia.

13          THE COURT:  Do you think that the — the spade of

14  Second Circuit decisions after P.T. United have changed the

15  analysis for forum non conveniens at least at the preliminary

16  level, before I turn to the Gilbert factors?

17          MR. BURROWS:  Choice of forum, Your Honor?

18          THE COURT:  No, in — don't I have to make the

19  initial inquiry as to why the — why the plaintiff is seeking

20  to bring this case in a United States court, and the answer to

21  that question —

22          MR. BURROWS:  Yes.

23          THE COURT:  Right.

24          MR. BURROWS:  Yes, Your Honor.  I'm — I'm going to

25  deal with them in reverse order, because I think that is, in

1   fact, the issue here.  I can go right to that issue, —

2            THE COURT:  No, do it —

3            MR. BURROWS:  — because you're familiar with the

4   factors.

5            THE COURT:  No, do it in whatever order you feel

6   comfortable with.

7            MR. BURROWS:  Thank you, Your Honor.  With regard to

8   the interest of litigants in a particular forum, I think a very

9   important issue is that the defendants here have all consented

10  to jurisdiction and to produce witnesses and documents.  That

11  has been a condition of your orders and of other courts.

12           In any event, almost all the witnesses and documents

13  are in Russia, and most of them are in the Russian language.

14  Compulsory process is available in Russia, as Professor

15  Petrukhin, Your Honor, stated in his declaration which is

16  unchallenged, his declaration dated June 26, 2002.  In their

17  attacks on defendants' experts, Professor Petrukhin escaped

18  that attack.

19           Other practical problems include more than fifty

20  witnesses in Russia, most of whom speak Russian and need

21  translations.  Documents have to be translated.  And finally,

22  Your Honor, plaintiffs have not specified what particular

23  evidence would be obtained in New York.  They haven't told us

24  that.

25           The public interest factors — court congestion,

1  interest of competing forums, and interest in having foreign

2  law decided by a foreign tribunal, again point to Russia, we

3  contend.  Professor Stephan shows clearly that Russian cases

4  move faster than U.S. cases.  That is unchallenged.

5          New York has no interest in this case, Your Honor.

6  We argue that allegations of wires through New York are

7  insufficient to demonstrate a significant New York interest in

8  this dispute.  Your Honor is probably familiar with

9  Lan Associates, at pages forty and forty one of our brief, a

10 decision by Judge Keenan, in which he says that if such a

11 minimal contact with New York were deemed significant, this

12 court, located in one of the world's largest and busiest

13 financial centers, would be burdened with countless

14 international financial disputes having no real substantive

15 link to New York.

16         Russia, on the other hand, has a strong interest in

17 ensuring that the ruling of its courts are respected, enforced,

18 and given the proper preclusive effect.  The Russian courts are

19 in a much better position than a court in New York to ensure

20 that the interests of its legal system are protected.  That

21 language is from Your Honor's decision in P.T. United.

22         Finally, it's plain that Russian law would have to be

23 involved in the resolution of the claims here.  We have listed

24 for Your Honor more than a hundred and fifty laws of the

25 Russian Federation which are cited in plaintiff's declarations.

The list of these laws are Exhibits E and F to my reply
declaration dated October 21, 2002.

On this point, Your Honor, I just want to give you an
example of three issues that the plaintiffs would have you
decide in this case.  One of their declarants, Mr. Zanadraw
[phonetic], attaches to his declaration an order of the
regional government of the town of Kochkanarsky.  It relates to
the March 4th, 2000 shareholders meeting, and it claims that
that order is unconstitutional.  Evidently, the plaintiffs
would ask you to resolve the issue of Russian
constitutionality.

They would also ask Your Honor to decide whether
ninety two document demands made by an external manager, a
trustee in bankruptcy, appointed by a Russian court, in a
Russian proceeding, were procedurally defective or were they
proper.

Finally, they would ask Your Honor to determine
whether a board of directors meeting involving Kochkanarsky GOK
was illegal because it violated the charter of GOK which
required five board members to vote to remove the general
director.  These are things they would ask you to decide, but I
suggest that as Professor Stephan does that a Russian court is
uniquely qualified to answer those questions.

The third Gilbert factor, Your Honor, is choice — I
mean, the third one I'm going to discuss is choice of forum,

1  and as the Second Circuit said in Iragorri, the greater the

2  plaintiff's bona fide connection to the United States and to

3  the forum of choice, and the more it appears that

4  considerations of convenience favor conducting the lawsuit in

5  the United States, the more difficult it will be for the

6  defendant to gain dismissal on the grounds of forum non

7  conveniens.

8         On the other hand, the more it appears that the

9  plaintiff's choice of a U.S. forum was motivated by forum

10 shopping reasons such as attempts to win tactical advantage,

11 then less weight will be accorded.

12        This choice of forum here, Your Honor, is very

13 important.  In the original complaint, the plaintiffs had no

14 chance, no chance with those three plaintiffs, so they added.

15 Instead of responding to the motion, they added a bunch of new

16 plaintiffs, three of whom — three of whom claim to be U.S.

17 companies.  .

18        But the clear import of Iragorri is that it has to be

19 a bona fide connection.  You can't satisfy Iragorri by just

20 creating some U.S. companies.  Shell companies do not pass the

21 test, and I think Your Honor addressed this issue in the Red

22 Rock case.

23        The three U.S. plaintiffs have no business here, no

24 offices, no employees, nothing but their states of

25 incorporation: West Virginia, Texas, and Utah.

1          THE COURT:  We don't know that, do we?

2          MR. BURROWS:  The states of incorporation?

3          THE COURT:  No, no.  We know the three of them —

4  states of incorporation, and we know for at least two of them

5  that the managing director is abroad, but we don't know

6  anything else about them, do we?

7          MR. BURROWS:  I suggest, Your Honor, that we have, in

8  our motion papers, challenged the defendant to come forward

9  with some evidence that they have connections here.  I suggest

10  to you that they have not.  They cannot identify one solid bona

11  fide connection that any plaintiff has to New York or the U.S.

12          Of the sixteen declarants they submit, Your Honor,

13  not a single one is from the United States.  Not a single one.

14  The declarants for the three alleged U.S. companies — two of

15  those declarants are Israelis and one is a Russian.  One

16  Israeli says he is the owner of Holdex, one of the plaintiffs.

17          The declarant for Nexis Products is Nexis's lawyer in

18  Russia, and the declarant for Davis International, Joseph

19  Traum, an Iraeli, says to us that one beneficial owner is a

20  U.S. citizen.  He doesn't tell us whether it's a corporation or

21  a partnership.  He doesn't tell us — or a person.  He says

22  he's a managing director of Davis.

23          I suggest, Your Honor, that that is hardly what the

24  Second Circuit intended by bona fide connections with the —

1   with New York.  I suggest that this Gilbert factor favors the
2   defendants as well.
3           THE COURT:  There are also some individual plaintiffs
4   who are U.S., aren't there?
5           MR. BURROWS:  I don't think so, Your Honor.  I think
6   there are no — I don't believe there are any individual
7   defendants — plaintiffs, Your Honor.  There are some
8   individual defendants.
9           THE COURT:  I'm sorry, you're right.
10          MR. BURROWS:  And now we get to the key issue.  If
11  I'm right, Your Honor, and all these Gilbert factors so
12  obviously favor Russia, then what are we doing here?  We're
13  doing here because of the final or initial — I think you're
14  probably right, the initial inquiry, which is the adequate
15  alternate forum.
16          First of all, the defendants have consented to
17  jurisdiction and so that is not an issue.  It is our position
18  that the cause of action for fraud that exists in Russia is
19  enough in a RICO case.  Your Honor so held in P.T. United.
20          I would just — by way of digression, I would say
21  that Your Honor is aware we have made a RICO motion as well,
22  and it's our position that the alleged conduct, and surely any
23  effects of that conduct, are in Russia.  In fact, the
24  plaintiffs' brief states in its introduction that this harm was
25  caused, in part, through the corruption of court proceedings in

1  Russia.

2       But the plaintiffs say that the Russian courts are

3  notoriously corrupt, and therefore they're not adequate, and

4  Your Honor can't consider the matter.  Plaintiffs point to

5  various sources to convince the Court, but none of the sources

6  are convincing.

7       In their answering brief, plaintiffs state that a

8  Russian prosecutor found objective signs of an intentional

9  bankruptcy at Kochkanarsky GOK.  In fact, however, that

10  prosecutor's report found enough evidence to warrant an

11  investigation, but after the investigation the report concluded

12  that the indicators of an intentional bankruptcy are not

13  present.

14       The prosecutor's order concluded that there was no

15  evidence of an intentional bankruptcy, and the case was closed.

16  We discuss this very important document, Your Honor, which was

17  put in by the plaintiffs in our reply brief at page fourteen.

18       THE COURT:  Where do — do the papers indicate where

19  — if the plaintiffs sought to bring a fraud action as the

20  equivalent of their RICO claim in the Russian courts, where

21  they would bring such a claim?

22       MR. BURROWS:  I believe that — I would have to — I

23  would have to check, Your Honor.  I think Professor Stephan

24  says that there are several possibilities open to them, and I

25  could direct Your Honor's attention to that in a minute, if I

1  could.

2          THE COURT:  Okay, because you can correct me if I'm

3  wrong, but on the issue of an adequate alternative forum, all

4  of the issues that the parties argue out with — at length,

5  including the Russian prosecutor's report and much of the

6  expert declarations, appear to go to the issue of whether the

7  bankruptcy proceedings were tainted by corruption, and not to

8  the issue of whether, if the plaintiffs sought to bring a fraud

9  complaint now in the Russian courts, whatever courts they

10 sought to bring such a claim in would be inadequate because

11 they are so tainted by corruption that they're not an adequate

12 alternative forum.

13          Such a claim would not be brought in the bankruptcy

14 proceedings but in a wholly separate court, and presumably even

15 in another jurisdiction.

16          MR. BURROWS:  Well, Your Honor, I think — I think it

17 — our position is that there are appellate avenues and

18 administrative avenues available to the plaintiffs that they

19 have not yet taken advantage of.  There are some cases that are

20 still open on the GOK side.

21          And in those proceedings, Your Honor, there certainly

22 — I think Professor Stephan makes it clear they are free to

23 raise these issues of corruption, bias, improper — I mean,

24 they can raise all this, and they have, Your Honor.  They have

25 raised it in a hundred and nineteen decisions, four of which

1  I'm going to discuss, which are appellate decisions.

2          I think Your Honor understands there are four levels.

3  There's the trial level and what we call the appellate term

4  [indiscernible] same place.  The second level would be the

5  equivalent of our Second Circuit, and then the Supreme

6  Arbitrage Court.

7          The decisions I'm going to discuss are the circuit

8  court decisions, where the allegations of corruption are weak,

9  and where the plaintiffs certainly had opportunity to raise

10 these concerns.  At some point, Your Honor, in the — in any

11 legal system, they just run out of appeals.  And they just have

12 to be categorized as unhappy litigants.

13         I would like to direct your attention, in addition to

14 the order I just discussed, which you're obviously familiar

15 with, there was another order on the GOK side.

16         THE COURT:  No, but before we get to that, —

17         MR. BURROWS:  Yes.

18         THE COURT:  — you know, I realize that — I realize

19 that argument, but we deal — and I realize that there are

20 appeals going on on the G O K side, and I also understand the

21 argument that with respect to some of the issues that they

22 raise that they are free to bring a separate action because, as

23 I understand it, if a claim is dismissed in bankruptcy they can

24 bring a separate proceeding.  I understand all of that.  And

25 that, I understand you argue, goes into the analysis of whether

1    there is an adequate alternative forum.

2            The case is complex because there are a lot of

3    decisions and a lot of issues.  Over these issues is the

4    plaintiffs' claim of RICO here, which you say could be brought

5    in Russia as a fraud claim.  But if they brought it as a fraud

6    claim in Russia, that would not be an appeal from — I assume;

7    you can correct me if I'm wrong — an appeal from a dismissal

8    of claim in bankruptcy.  That would be a separate case that

9    argues that they have been defrauded.

10            And some Russian court would then have to answer the

11    question of what is the binding effect of these past decisions

12    of the — what they allege are allegedly corrupt bankruptcy

13    courts.  But that court, whichever that court is, is — and

14    again, you can correct me if I'm wrong, but that is the court

15    that's out there as to which a large part of the analysis of is

16    there an adequate alternative forum in Russia.

17            That's the court that we have to ask the question has

18    there been a showing of such systemic corruption that they

19    can't — the plaintiffs cannot get a fair proceeding in Russia.

20    And the answer to that question doesn't depend on whether the

21    bankruptcy proceeding was or was not in any way tainted.

22            MR. BURROWS:  I understand your question, Your Honor.

23    I think I have two responses.  First of all, our position

24    [indiscernible] cases get toward the top of the pyramid the

25    court — whether it's the circuit court, or the Supreme

1 Arbitrage Court — is the competent place and the appropriate

2 place to raise those concerns.

3    Maybe there are two separate courts that should hear

4 this, one on the GOK side, and one on the NKAZ side.  But Your

5 Honor's point is have we addressed the fact that what we're

6 talking about is a separate proceeding, perhaps, or two

7 separate proceedings, perhaps two separate proceedings, in some

8 forum in Russia, challenging the entire structure of all these

9 — these hundred and nineteen decisions, which is what they're

10 asking you to do, and you're saying could they do it in Russia.

11    If that is not addressed in our opinions, Your Honor,

12 which I believe it is not, and Your Honor would like us to

13 address it, I would request the opportunity to do that, and I

14 would put that question to Professor Stephan.  But I have your

15 point.

16    THE COURT:  Okay.  Because what — what good does it

17 do to say that the alternative to a RICO claim in the United

18 States is a fraud claim in Russia if there's no forum that can

19 hear a fraud claim?

20    One would think — and I — and maybe it's answered

21 in the papers, and you can direct me to it, but one would think

22 that the possibilities are that a fraud claim can be raised

23 somewhere in the course of the arbitration proceedings —

24 bankruptcy proceedings, or that it can be raised in a separate

25 — in a separate proceeding.

1    MR. BURROWS:  Again, Your Honor, we believe that the

2  correct forum for that — that fraud claim is the bankruptcy

3  proceedings as they work their way up the appellate level.  If

4  that happened here, Your Honor, if there was a bankruptcy here,

5  and it was hopelessly tainted, and people were corrupted and

6  bribed, it would end up — it would end up here with Your

7  Honor, and then it would end up at the Second Circuit.

8    And if it was a bankruptcy that was then — that then

9  came to Your Honor, we would make those allegations right here.

10  We would say Judge, here's what happened below, this is what

11  happened to this witness, this is what happened to this

12  witness, and this judge was influenced, and he got a call from

13  the governor.  We would make those allegations, and you would

14  hear it.

15    You wouldn't send us to — where would you send us?

16  You wouldn't send us to state court.  You wouldn't send us

17  anywhere else.  You would hear that right here, because that's

18  the jurisdiction, and I suggest to you that the —

19    THE COURT:  It's not — it's not — it's not

20  inconceivable that parties could bring a claim in another — in

21  another federal forum and argue that their rights have been

22  denied, find a basis for jurisdiction under another statute,

23  and then the defendants would come in and argue that for the

24  convenience of the parties and witnesses it ought to be

25  transferred back to the — to the jurisdiction which — about

1  which allegations are being made.

2       MR. BURROWS:  Your Honor, if there was a bankruptcy

3  in California, and someone took an appeal from it, started a

4  separate action in front of Your Honor, you would very quickly

5  send them to the District Court in California.  You wouldn't

6  hear that case.

7       THE COURT:  Okay.

8       MR. BURROWS:  Thank you, Your Honor.  I wanted to

9  direct Your Honor to two other agency decisions, one — the

10 first involving GOK, which is an August 18th, 2001 opinion of

11 the Federal Service of Russia on Financial Rehabilitation and

12 Bankruptcy.  It found no evidence of intentional bankruptcy.

13 It looked at the GOK bankruptcy and found it to be legitimate.

14 That is discussed in our reply brief at page sixteen.

15      On the NKAZ side the Federal Service on Financial

16 Rehabilitation and Bankruptcy — the same federal service

17 overseeing bankruptcies — on September 12th, 2001, and by

18 order of October 8th, 2001, found no violations in the actions

19 of the arbitrage manager, Mr. Chernyshev.

20      And that — those minutes and that order are Exhibits

21 139 and one forty to Mr. Chernishev's declaration.  Both

22 bankruptcies, Your Honor, were reviewed and approved, not just

23 by the courts, but by the watchdog agency.

24      Your Honor will recall also on the issue of forum

25 selection the action in Guernsey involving counsel's then-law

1  partner in that case, BMT Limited, one of the plaintiffs here,

2  a Guernsey company, Your Honor, a Guernsey company sued in its

3  own jurisdiction, argued that the lawsuit should be dismissed

4  on forum non conveniens grounds and instead be brought in

5  Russia.  BMT Limited argued that Russia would provide an

6  appropriate judicial environment and that the court there would

7  be better able to deal with the case.

8         The court in Guernsey, the judge having been made

9  aware of this case before Your Honor, said how then can the

10  same client claim that this plaintiff can obtain justice in

11  Russia if its statements in the American case are true.

12         Plaintiffs' evidence, Your Honor, of corruption is

13  general, vague, and sensationalized.  It seeks to take

14  advantage of media reports regarding the Russian mafia.

15  However, when put to its proof — when put to their proof, Your

16  Honor, the plaintiffs have no credible allegations of

17  corruption regarding what I suggest to Your Honor are the four

18  most important decisions by the Russian courts.

19         On the NKAZ side, Your Honor, there is a decision of

20  the West Siberian Circuit — Federal Circuit on July 3rd, 2000.

21  And there's another — there's another NKAZ decision, Your

22  Honor, of the same circuit, the West Siberian circuit, on

23  September 6th, 2001.

24         I suggest, Your Honor, that those decisions, which

25  are — which are items thirty two and forty one of defendants'

1  chart — I suggest that those decisions provide significant

2  evidence that the lower court, the arbitrage court, was correct

3  in finding that NKAZ was insolvent and properly ordered

4  external management.  That's what the July 3rd decision says,

5  item thirty two in our chart, Your Honor.  It upheld the lower

6  court decision, and it basically approved the bankruptcy

7  proceedings.

8          Now, the allegations of corruption from the

9  plaintiffs are as follows.  One of their experts, Viktor

10  Golubev, said that he found the court's reasoning — this is

11  the circuit court, Your Honor — found the court's reasoning

12  strange, to say the least.  And he said that in violation of

13  Article 31, the court failed to consider the company's location

14  as of the moment of the filing of the bankruptcy case and

15  instead considered the location at later points during the

16  consideration of the bankruptcy.  That's an allegation of

17  corruption.

18          Another of plaintiffs' declarants, Mr. Rekhovsky,

19  said that the [indiscernible] appeals court — that's the one

20  we were talking about, the West Siberian circuit — ruled

21  against creditors on July 3rd, 2000, relying mainly on the

22  collusive, unopposed February 28th holding of the

23  [indiscernible] court, and that's an allegation of corruption.

24          Decision number — number forty one on the chart,

25  Your Honor, the same circuit, affirmed the lower court holding

1  of April 3rd, 2001, and said that the NKAZ settlement

2  agreement, the settlement agreement with the creditors, was, in

3  fact, valid.  I think that that decision, Your Honor, is

4  dispositive on the NKAZ side.  We could not find a specific

5  allegation of corruption with regard to that decision.

6          THE COURT:  But doesn't that really go to the comity

7  argument, rather than the forum non —

8          MR. BURROWS:  I think it does, Your Honor.

9          THE COURT:  — rather than the forum non conveniens?

10         MR. BURROWS:  I think it does.  I think these

11 arguments in this case, because of the number of decisions that

12 are here, I think that a lot of the issues overlap.  I think

13 it's inevitable.

14         With regard to the GOK bankruptcy, Your Honor, I

15 would direct your attention to decision fifty nine in our

16 chart, in which the court rejected a challenge to two decisions

17 — I think it's fifty nine.  Again, this is a circuit court,

18 Your Honor, the Ural Circuit [indiscernible] is this decision

19 here, August 21, 2001.

20         The court rejected a challenge to a lower court

21 decision that approved the GOK settlement.  That's number fifty

22 on our chart, Your Honor, and it rejected a challenge to the

23 appellate instance of that case, the same case, which upheld

24 that approval.  That's number fifty six.

25         In the declaration of Foston and Nexis, Russian

1 attorney, Ms. Ashkeymia, Foston and Nexis being two of the

2 plaintiffs — her declaration said in the appeal heard by the

3 Federal Arbitrage Court for the Ural District on August 21,

4 2001 — the decision we're talking about — the court also did

5 not address the merits of the case, and dismissed the appeal on

6 the grounds that the court received no proof of authority to

7 sign appeals of judicial acts by the representatives.  That's

8 an allegation of corruption.

9          Another declarant said that the court's reliance on

10 formalistic arguments and their inaction and disregard lead me

11 to the conclusion that the court's failure to ensure — failed

12 to ensure due process with fair regard for the rights of the

13 creditors.  That's another allegation of corruption.

14          Finally, Your Honor, again, with regard to the —

15 this is with regard to the GOK shareholder action, change of

16 control action — it's number sixty one on the chart — it's

17 the — it — this — it's another circuit court, Your Honor,

18 the Moscow Circuit, September 5th.

19          In that case, Your Honor, September — [Pause]  In

20 that case, Your Honor, the appellate court, the circuit court,

21 upheld two prior decisions concerning the registrar and share

22 transfer, which is really the crux of the GOK shareholder

23 litigation.  And again, Your Honor, we cannot — we have not

24 identified any specific allegations of corruption.

25          I would add that there are cases still pending in the

1  Omni and Foston actions, still pending, and I would just remind

2  the Court that these are in addition to the three supervisory

3  decisions that I just mentioned.

4          Finally, Your Honor, plaintiffs resort to the country

5  reports issued by the State Department regarding the Russian

6  Federation.  They point to these reports, Your Honor, to

7  somehow prove that in all these cases, a hundred and nineteen

8  cases, involving — on this map, you have a hundred and forty

9  six judges — that there was corruption.

10         We responded by submitting country reports for

11  various other countries — Indonesia, Italy, Argentina, Peru.

12  We cited cases in our reply brief for the proposition that

13  generalized and one-sided depictions of the Russian judicial

14  system are conclusory and have been found to be unpersuasive,

15  Your Honor, in similar cases.

16         We cited Abduahlli, decided by Judge Pauley last

17  September.  He found the country report on Nigeria to be

18  conclusive and unpersuasive.

19         I have another chart that I want to show Your Honor

20  [indiscernible].  [Pause]  The chart I just handed to Your

21  Honor and distributed to counsel are quotes from a brief in a

22  case recently decided by the Second Circuit, decided November

23  15th, 2002, and they deal with the — these quotes deal with

24  the issue of country reports.

25         This case involved the Ukraine, called Monde Re

1  Vernek Nektogas of the Ukraine, Second Circuit, 311 Fed 3d 488.

2  These quotes are from the briefs in that case, Your Honor.

3  Plaintiff was resisting a motion to dismiss for forum non

4  conveniens.  Defendant said the documents — all the

5  documentary evidence is located in the Ukraine or Russia,

6  making its access exceedingly difficult.

7        And then the plaintiffs, of course, use the country

8  reports to say the Russian — to say the Ukraine was not

9  appropriate, and you can see the last quote: the country

10 reports simply do not provide the degree of specificity that is

11 needed for a U.S. court to properly assess whether there —

12 whether an alternative forum is adequate.

13        And this brief, Your Honor, was submitted and signed

14 — and I have copies for the Court and counsel — was submitted

15 and signed by Stroock Stroock & Lavan, counsel for the

16 plaintiffs here, who are resisting the forum non conveniens

17 motion, and who have suggested that Your Honor consider the

18 country report for Russia in support of their contention that

19 the Russian court system is notoriously corrupt.

20        Your Honor, — [Pause]  Your Honor, Russia is our

21 ally, and relations with that country have never been stronger.

22 No one has ever held that Russia is an inadequate forum. Judge

23 Kaplan addressed the issue in Pavlov, as you're well aware, and

24 —

25        THE COURT:  How do you — I'm sorry, I didn't mean to

1  interrupt you in that sentence.  I was going to ask a question

2  about Pavlov.

3          MR. BURROWS:  Fine, Your Honor.  Go ahead.

4          THE COURT:  What do you — what am I to make of

5  Pavlov?  I realize that the disposition of the Second Circuit

6  is a summary disposition and is not binding.  Judge Kaplan

7  dismisses on forum non conveniens and plainly finds the Russian

8  courts to be an adequate alternative forum.  That gets vacated

9  for whatever reason.  It comes back, and of course the final

10  decision is he asks the parties to brief an issue.  It's not

11  briefed, so he dismisses the case.

12          Now, what Judge Kaplan has said is not binding on me,

13  but —

14          MR. BURROWS:  No.

15          THE COURT:  — but his reasoning I can certainly turn

16  to as — for whatever persuasive merit it has.  The Second

17  Circuit decision isn't binding.  It's a summary disposition, so

18  where does that —

19          MR. BURROWS:  Your Honor, you're left with the

20  discretion to treat that decision any way you want.  It's our

21  position that the Second Circuit certainly didn't overrule

22  Pavlov, and when it went back to Judge Kaplan, he did the — he

23  dealt with it.

24          He solved the problem.  And he was not focusing on

25  the jurisprudence of Russia as an adequate alternate forum.  I

1  suggest that he solved the problem and went on to his next

2  matter.  I don't think it was overruled by the Second Circuit.

3  Your Honor has correspondence, which I know you've read, back

4  and forth from the parties.

5           There is another case, Your Honor, that was decided

6  last week by Magistrate Judge Peck, who in a thirty nine page

7  decision found Russia to be an adequate alternate forum.  He

8  went through a detailed analysis of the Gilbert factors, and

9  then he granted the defendant's motion to dismiss on forum non

10 conveniens grounds.  I have copies here for the Court and for

11 counsel.

12          One — the decision is very thorough.  One part of it

13 is — I just have to read to Your Honor.  Being sympathetic to

14 your task of sorting through the parties' opposing statements

15 of the law, and I can just see Judge Peck being frustrated —

16 he said, this, Your Honor.  He said both parties' submissions

17 regarding Russian law are virtually incoherent.

18      (Laughter)

19      MR. BURROWS:  He said the Court — the Court cannot

20 determine foreign law based on garbled snippets of translated

21 statutes or summaries of Russian court decisions.  So —

22 [Laughs] — I say that in sympathy.  And I'm handing copies to

23 counsel and to the Court.

24          Your Honor, I suppose there are political

25 considerations here, but we are not diplomats.  We deal in

1  evidence.  We deal in proof.  And the plaintiffs have not given

2  us any.  I think that Professor Stephan put it best, Your

3  Honor.  He said no one who has studied the operation of the

4  arbitrage court system could honestly claim that it operates

5  perfectly all of the time, or that all of the strictures of the

6  arbitrage procedure code always are honored.  From the

7  beginning of the transition, however, the country's leadership,

8  with significant U.S. support, has invested in strengthening

9  and protecting the integrity of the judicial system generally

10  and the arbitrage courts in particular.

11       He concludes, Your Honor, that it is realistic for

12  persons who litigate in these courts to expect a fair and

13  disinterested resolution of business disputes based on the law

14  and the evidence.

15       This chart, Your Honor, tells the story.  The list of

16  cases tells the story.  The plaintiffs here are disgruntled

17  litigants, in Judge Brieant's term, nothing more.  Thank you,

18  Your Honor.  That's all I have.  Mr. Feinberg will address

19  comity for the NKAZ defendants, and Mr. Venaglia for the

20  [indiscernible].

21       THE COURT:  All right.  Thank you.

22     (Pause in proceeding)

23       MR. FEINBERG:  Good morning, Your Honor.  Ira

24  Feinberg, Hogan & Hartson, for defendant NKAZ.  As Mr. Burrows

25  said, I'm here to address the comity argument on the aluminum

1  side of the case, and in that connection I'm speaking on behalf

2  of all defendants involved in that side of the case.

3         Before I get to the comity argument, Your Honor,

4  there are two questions that you asked that I'd like to address

5  — two questions you asked Mr. Burrows that I'd like to

6  address.  One was the question whether the Court could properly

7  reach out to decide the forum non conveniens argument without

8  first addressing the question of subject matter jurisdiction.

9         Now, I haven't specifically researched that question,

10  but I did want to bring to your attention, Your Honor, the

11  Supreme Court's decision in Ruragas A.G. [phonetic] versus

12  Marathon Oil Company.  That's 526 U.S. 574, 1999, where the

13  Supreme Court held that it was proper for a court to pass the

14  subject matter jurisdiction issue and decide an issue of

15  personal jurisdiction and dispose of the case in that way.

16         And the court's reasoning, essentially, is that where

17  there is an available alternative that [indiscernible] can

18  dispose of the case on preliminary procedural grounds it is

19  proper for a court to go to that issue rather than to deal with

20  the difficult question of subject matter jurisdiction.  So it's

21  not squarely on point, but I think it is very instructive.

22         The second question, Your Honor, had to do with

23  whether the plaintiffs here can bring a fraud case in — in

24  Russia.  And in addition to the appeals that we're going to

25  talk about, and we've talked about in our papers, our papers

1  clearly set out that the plaintiffs here could bring a fraud

2  action based on allegations of the sort that they are making

3  here.

4          That's addressed in Professor Stephan's declaration,

5  paragraph twenty or paragraph twenty three, and in Professor

6  Petrukhin's declaration at paragraph twenty nine, and as

7  Professor Stephan says the action could be brought at the

8  plaintiffs' election in either the courts of general

9  jurisdiction of Russia or in the arbitrage courts, and I also

10 would — can suggest that they could be brought in Moscow,

11 since the cases can be brought where any of the defendants can

12 be located, and the defendants here are principally centered in

13 Moscow.

14         So to the extent that the plaintiffs have any concern

15 about the fairness of the Kemerovo courts, there's simply no

16 reason to believe they couldn't find a fair alternative forum

17 in Moscow.

18         THE COURT:  That was really what I was obviously

19 getting at with Mr. Burrows.  Do you think it's clear from the

20 — from the affidavits already submitted that the courts of

21 general jurisdiction in Moscow would be an available

22 alternative forum for these claims?

23         MR. FEINBERG:  I do think it's clear, Your Honor.

24 It's clearly set out in those declarations that I have

25 provided.  If the Court would prefer some additional briefing

1  of the issue, we're happy to submit something further.

2        THE COURT:  No, if the parties think that that's

3  clear in the affidavits already submitted, I'll take that

4  without any — I'll review again those paragraph and — I'll

5  review those paragraphs and make a determination about that.

6        MR. FEINBERG:  Let me turn then, Your Honor, to the

7  comity argument.

8        THE COURT:  You're welcome if you decide to submit

9  anything further.  One of the issues — and if you did, both

10  sides would have to give me — there may be no dispute on that.

11  I'll wait and see what the plaintiffs have to say.

12        MR. FEINBERG:  Your Honor, rather than speak for all

13  counsel, I think — I'm sure counsel would like to confer and

14  decide whether we feel that the papers adequately address the

15  point or whether some further submission would be required, so

16  I think we would get back to you after the argument about that,

17  if that's okay.

18        THE COURT:  Sure.

19        MR. FEINBERG:  Let me turn to the comity argument,

20  then, Your Honor, and I'd like to make clear that we are making

21  comity arguments — three distinct strands of comity argument,

22  and comity is a very amorphous concept that has a lot of

23  different strands to it, and we're relying on three of them

24  here.

25        One is what Judge Newman in the Diorino [phonetic]

1  case talked about as the preclusive effect of litigation

2  [indiscernible] collateral estoppel or res judicata issues.

3  The second has to do with the pendency or availability of

4  litigation in the foreign forum, which was the — the first of

5  the strands of the comity argument that Judge Newman identified

6  also in Diorino.

7          The third is an argument based on kind of fundamental

8  jurisprudential principles that what the plaintiffs are asking

9  this Court to decide in this case, and the issues that they're

10  trying to present to this Court are simply beyond the

11  competence of this Court or any American court.

12          Let me address those issues in turn.  First, as to

13  the preclusive effect, obviously there have been extensive

14  bankruptcy proceedings in Russia in the Kemerovo courts, and up

15  on appeal to the West Siberian Circuit Court.   Yes.

16          THE COURT:  But if I were to — even if I were to

17  accept your argument on comity, first, it would not dispose of

18  all of the issues in this case.  It would indicate that certain

19  issues in the case are — may be foreclosed, so the case would

20  be here, and you can correct me if I'm wrong.

21          Second, how on a motion to dismiss rather than a

22  motion for summary judgment can I take into account all of the

23  materials with respect to the claim that individual decisions

24  which underlay the argument of comity are tainted?   I

25  understand the argument that on a motion to dismiss for forum

1  non conveniens, courts traditionally take into account — have

2  to take into account a large amount of material.

3      Judge Marrero did it in the Monde Re arbitration, and

4  it's done all the time, has to be done in order to consider

5  whether therse an adequate alternative forum.  That doesn't

6  mean that on a comity motion I could decide on a motion —

7  comity motion to dismiss I could consider all of those

8  materials.  Isn't that right?

9      MR. FEINBERG:  Let me address those issues, Your

10  Honor, in order.  First of all, as to whether the comity issue

11  disposes of all of the case, as opposed to selective issues,

12  you are correct that the res judicata collateral estoppel

13  strand of comity only applies to certain claims and certain

14  parties.

15      We argued that the claims of Base Metal Trading S.A.

16  and Mikom are completely foreclosed, and that certain claims of

17  others are foreclosed.

18      But as to the other two strands of the comity

19  argument that we are making, Your Honor, it is our position

20  that they would permit the Court to dispose of the entire case.

21      THE COURT:  Why, if that were true, is comity any

22  different from forum non conveniens?

23      MR. FEINBERG:  Because comity relates — comity

24  addresses the court's — the propriety of a court — American

25  court deciding certain issues of — that belong in a — well,

1  not belong in a foreign forum, but that are inappropriate for

2  an American forum, is probably the best way for me to put it,

3  and don't depend, for example, on the Court finding there to be

4  an alternative remedy in Russia.

5          In other words, let me turn to the third argument I'm

6  making.  The plaintiffs in this case, Your Honor, are asking

7  the Court to examine the conduct of Russian [indiscernible]

8  Russian judges, Russian energy regulators, the governor of a

9  Russian province, the mayor too — excuse me, I'm focusing on

10 the NKAZ side of the case — the conduct of the mayor of

11 Novokuznetsk.  How is this Court supposed to decide these

12 issues?

13         There's no — the Court can't really order discovery

14 of these people.  And it would be totally inappropriate to do

15 so.  One of the main strands of comity has to do with propriety

16 of an American court trying to reach out and decide issues that

17 implicate foreign relations, and what greater impact on foreign

18 relations could there be than this Court trying to judge the

19 fairness of the entire Russian government?

20         And not only the entire Russian court system, but

21 also the fairness of these energy regulators, and the governor

22 of the province, and all the rest.  These are issues the Court

23 should not, as a matter of jurisprudential — you know, prudent

24 exercise of the Court's discretion, should not entertain.

25 There should be some sort of abstention doctrine here that

1  applies.

2        I mean, if this case arose even in the United States,
3  the Supreme Court has made it very clear that examining the
4  conduct of prosecutors is an inquiry that a federal court
5  should get into with great, great reluctance, and should not
6  order discovery into the reasoning of a prosecutor.

7        Here, the plaintiffs are asking the Court to make
8  determinations about the conduct of prosecutors in Kemerovo and
9  whether they were acting in good faith, or subject to influence
10  of Governor Tuleyev, or something else.

11        Similarly, there's a concept of exhaustion of state
12  remedies, which runs through much of American law, much of
13  federal court jurisprudence.  How inappropriate is it, Your
14  Honor, for the plaintiffs here to fail to exhaust every remedy
15  available to them in Russia, including courts that are far away
16  from Kemerovo, that they have no serious claim of — of
17  corruption about [indiscernible] for example, the West Siberian
18  Circuit Court is about a thousand miles from Kemerovo.

19        It is not subject to the — whatever political
20  pressure Governor Tuleyev allegedly exercises in Kemerovo.  And
21  the plaintiffs, as we sit here today, Your Honor, could bring
22  every single claim in this complaint to the Supreme Arbitrage
23  Court in Moscow.

24        There was a recent amendment — and this is in our —
25  this is in our chart that we brought this to the Court's

1    attention.   There as a recent amendment to the arbitrage

2    procedure code in Russia which, for the first time, established

3    a time limit on bringing claims to the Supreme Arbitrage Court,

4    but grandfathered every old claim and said you have ninety days

5    from the first — from the effective date of his law, on

6    January 1st, 2003, to bring any old claim to the Supreme

7    Arbitrage Court.

8            There's no reason to believe that that Court, the

9    highest of the commercial courts of Russia, which is located in

10   Moscow, would not be prepared to deal with these arguments

11   about corruption in the lower courts.

12           Your Honor, you also asked a question about how could

13   the Court resolve this issue without addressing — on a motion

14   to dismiss without addressing all of these factual matters, and

15   you're right, you have to address some of these factual

16   matters, and to that extent have to go beyond the four corners

17   of the complaint, but that is a proper thing for the Court to

18   do, for a variety of reasons.

19           I mean, just as you said that in the forum non

20   situation the Court has to — to do that in order to properly

21   address the issue, so too in the comity issue, the Court really

22   has to consider these factors, and it's proper for the Court to

23   do so.

24           The Second Circuit, in the Allstate Life Insurance

25   Company versus Gerlintner Group [phonetic] case, decided a

—

1  comity motion and dismissed, even though it considered factors

2  outside of the four corners of the complaint.

3         THE COURT:  Was that on a motion to dismiss?

4         MR. FEINBERG:  Yes, it was, Your Honor.  This Court,

5  in the U.S. Fidelity & Guaranty case — versus Bras Petro

6  [phonetic] case, also noted that the Court can look beyond the

7  pleadings on a motion to dismiss under Rule 12(b)(1) involving

8  a sovereign entity, and the same reasoning, I would suggest,

9  applies to the comity argument that we're making here.

10        It's also important to bear in mind that comity is

11  ultimately a discretionary doctrine.

12        THE COURT:  Do you —

13        MR. FEINBERG:  Sorry.

14        THE COURT:  Is the comity argument really a 12(b)(1)

15  argument?

16        MR. FEINBERG:  It's analogous to it, but I don't

17  think it's strictly a 12(b)(1) argument.  I was starting to

18  say, Your Honor, that comity is — is a set of discretionary

19  principles that's supposed to guide the Court, and there's

20  nothing improper about the Court considering factors outside

21  the complaint in making that discretionary ruling.

22        And the only review of that would be an abuse of

23  discretion as to whether the Court improperly went — decided

24  something without giving the other side an opportunity to

25  address the issue.  In other words, the Court can reach out,