1 consider a lot of factors that we have presented here, without

2 doing anything improper, and decide the case on a motion to

3 dismiss.

4    Getting back to my argument, if I might, the first

5 strand, as I was saying, is the — is the [indiscernible]

6 strand —

7    THE COURT: Could I just raise a question in terms of

8 time? Everyone assured me at the outset that they would divide

9 up the time and be done by — in the morning.

10    MR. FEINBERG: Yes, Your Honor. I was planning on

11 bring brief, but I'll try to be briefer. I've actually made

12 most of the points I want to make, Your Honor, so let me

13 quickly go through the three strands of our argument, and then

14 I'll — if the Court has any further questions, I'll be happy

15 to try to answer them, and otherwise I will sit down.

16    As to the res judicata, collateral estoppel effect

17 issue, certain of these plaintiffs litigated fully in the

18 bankruptcy court, as — particularly Base Metal Trading S.A.

19 and Miko [sic]. They participated — Base Metal Trading S.A.

20 participated at every stage of the process. It was Base Metal

21 Trading S.A. that took the appeals to the West Siberian Circuit

22 Court.

23    Their claims have been rejected in the Russian

24 courts. Again, the plaintiffs' allegations of corruption,

25 which are largely centered on Governor Tuleyev and the

1 influence he allegedly has, has nothing to do with the West

2 Siberian Circuit Court, and no reason to believe that those

3 decisions were corrupted, and therefore the Court should, as a

4 matter of comity, hold that they cannot re-litigate these

5 issues in this court.

6         As to the availability of remedies in Russia,

7 plaintiffs failed at every turn to pursue remedies that they —

8 that they had and that were available to them, and, as I said,

9 to some extent are still available to them.  The plaintiffs did

10 not bring, for example, a separate proceeding in the bankruptcy

11 court to challenge the repudiation of their contracts by the

12 [indiscernible] that they could have done.

13         They could have appealed after the constitutional

14 court ruling of March 2001.  They could have appealed a lot of

15 the interlocutory rulings of the bankruptcy court that had

16 prior — previous to that not been appealable, but they failed

17 to do that.

18         And as I said, they even now have the right to

19 petition the Supreme Arbitrage Court to [indiscernible] and it

20 failed to pursue that remedy.

21         In addition, there are also the pending arbitrations

22 [indiscernible] the Court has already mentioned is clearly

23 aware of.  And I should add only that although the Zurich

24 arbitration has now been dismissed because of the invalidity of

25 this consolidated arbitration agreement, and the Stockholm

1  court — excuse me, Stockholm arbitrators also found that

2  agreement to be valid.

3         Number one, the Stockholm arbitration —

4         THE COURT:  Invalid.  The agreement was invalid.

5         MR. FEINBERG:  Invalid.  The Stockholm arbitration

6  continues as to the plaintiffs' claims under the four contracts

7  which actually had a Stockholm venue for arbitration in it.

8  Every one of Base Metal Trading's contracts has a arbitration

9  clause in it, and the plaintiffs have a remedy in the

10 arbitration forums that are provided in those contracts, which

11 was not at all affected by the decision of the arbitrator in

12 Zurich.

13         In fact, every one of the plaintiffs' contracts has

14 an arbitration clause and an available remedy in that forum if

15 the plaintiffs only wanted to pursue it.

16         And finally, my argument as to the inappropriateness

17 of the Court deciding this — I guess I've made my argument,

18 Your Honor, that —

19         THE COURT:  When you say every one of the plaintiffs'

20 contracts, you're talking about on the aluminum side.

21         MR. FEINBERG:  I am, Your Honor.  I'm sorry.  I'm

22 addressing only the aluminum side.  Unless the Court has some

23 further questions, I'll rest on that.

24         THE COURT:  Thank you.

25         MR. VENAGLIA:  Good morning, Your Honor.  Peter

1  Venaglia from the law firm of Dornbush Mensch Mandelstam &

2  Shaeffer for the GOK defendants.  That would be New Start,

3  Unidale, Investland, and Venitom.

4          Your Honor, the check is in the mail, and I'll be

5  brief.  Let me just — in terms of the volume of GOK decisions,

6  as Your Honor sees, the first column on the chart that Mr.

7  Burrows has referred to are the NKAZ decisions.  The remaining

8  three columns involve a litany of decisions on the GOK side.

9          And the GOK comity motion is predicated upon the

10  existence of all of these decisions as well as the pendency of

11  other proceedings in Russia.  And there's really three

12  components to the plaintiff's GOK claim.  The first, and the

13  heart of the plaintiff's GOK claim, is that GOK was somehow

14  illegally seized through a sham Russian bankruptcy proceeding.

15          Well, Your Honor, that argument — that precise

16  argument — has already been rejected by multiple levels of

17  Russian courts, by the Federal Service of the Russian

18  Federation on Insolvency and Bankruptcy, and by the Department

19  of the Interior for the Sverdlosk region.

20          And it's not surprising that these various courts and

21  agencies have made that conclusion, because the plaintiffs' own

22  papers indicate that GOK was, in fact, on the verge of

23  bankruptcy at the end of 1998.  It is therefore not so

24  surprising that a year later GOK filed for bankruptcy.

25          The GOK bankruptcy proceedings themselves have been

1 the subject of numerous proceedings and numerous challenges.

2 And some of those proceedings are very instructive, and by way

3 of illustration only, take the case of Polyprom.

4        Polyprom claims that their claim was inappropriately

5 rejected in the context of the bankruptcy proceeding.  Well, in

6 the plaintiffs' own papers they indicated that they themselves

7 chose not to file that claim because they had assumed that the

8 GOK bankruptcy was going to be dismissed.  The fault lies in

9 themselves, not in the [indiscernible] but in themselves.

10        When the case then went up to the Sverdlosk arbitrage

11 courts, the plaintiffs themselves, Polyprom, chose not to

12 provide the court with the documents that the court requested.

13 The claim was therefore, not surprisingly, rejected by the

14 court.

15        Every phase of the GOK bankruptcy proceeding fits

16 into that same pattern of having been litigated and re-

17 litigated in Russia, and certainly the litany of cases from

18 Finanz, to Cunard, to Victrix, all make it clear that comity is

19 appropriate under those circumstances.

20        The second component of the GOK comity claim is that

21 the plaintiffs claim that the takeover was produced as a result

22 of an illegal board of directors meeting, and an attempt to

23 stop a GOK shareholders meeting — has already been litigated

24 in the Russian courts.

25        The charts that have been submitted to the Court this

1   morning by the plaintiffs make no reference to dozens of

2   decisions in which the Russian courts have already addressed

3   the propriety of the claims made by the plaintiffs in their

4   complaint that the GOK board of directors meeting held on

5   January 28th was invalid — that's of 2000 — and that somehow

6   the shareholders were prevented from conducting an appropriate

7   meeting on March 4th, 2000.

8           Again, both of those issues were ruled upon over and

9   over again by the Russian courts, and in a number of those

10  decisions, the courts specifically rejected claims that had

11  been brought by various of the plaintiffs and their agents on

12  the grounds that they brought the cases in the wrong courts.

13          Well, that's exactly what they've done here again, so

14  again, that's the second component, is these issues relating to

15  the corporate governance, the propriety of board of directors'

16  meetings, and propriety of shareholders' meetings — again,

17  issues that are properly left for the Russian courts to

18  resolve.

19          The third component of the plaintiffs — of the GOK

20  comity claim relates to the pendency of various shareholder

21  litigations in Russia.  And again, if you go back to the second

22  amended complaint filed by the plaintiffs, they say that the

23  shareholder lawsuits were preceded by an illegal change in

24  Gok's registrar.

25          Among other things, the plaintiffs claim that they

1  never received notice of that.  Well, we've already

2  demonstrated that they did receive notice.  And we demonstrated

3  that because we read the Russian court decisions that had been

4  issued in proceedings brought by Davis, and Foston, and Holdex,

5  and Omni.  Three levels of Russian courts have already rejected

6  the claims brought by these same plaintiffs that the registrar

7  change was somehow inappropriate.

8        In the meantime, litigation has been commenced in

9  Russia with respect to Omni, Foston, and Holdex.  Those

10  litigations remain pending.  Plaintiffs' charts submitted this

11  morning indicate that as recently as last week there was a

12  development in one of those cases.

13        And it is the GOK defendants' position that this

14  Court should not only recognize the existence and the decisions

15  that have been reached in all of the cases on the chart here,

16  but also should defer to the pendency of those proceedings in

17  which the plaintiffs have actively litigated their rights in

18  Russia.

19        Your Honor, there — the chart that was attached to

20  the GOK defendants' reply brief cited the more than one hundred

21  laws that are implicated by the — by the plaintiffs' claim

22  against GOK.  Over — I'm sorry, nearly one hundred judges —

23  ninety eight, to be exact — in Russia have ruled upon these

24  claims.

25        In view of all of those decisions, in view of all of

1   those laws, in view of all of the pendency of the proceedings

2   that are pending, we submit that the GOK defendants' motion for

3   comity should be granted.

4           THE COURT:  All right.  Thank you.  I'll take five

5   minutes, and then we'll sit until one thirty.  Okay.

6       (The Court takes a brief recess)

7       (The Court resumes in session)

8           THE CLERK:  All rise.

9           THE COURT:  All right.  Good afternoon, all.  Please

10  be seated.  All right, Mr. Bernard.

11          MR. BERNARD:  Good afternoon, Your Honor.  James

12  Bernard, from Stroock & Stroock & Lavan, on behalf of the

13  aluminum plaintiffs.

14          Your Honor, I'm going to be handling the legal

15  arguments on — the U.S. legal arguments, that is — in

16  connection with the forum non and comity points that were

17  raised by counsel.  Mr. Marks is going to handle certain

18  Russian legal issues that were addressed in their arguments, as

19  well as certain issues relating to the underlying facts of the

20  various proceedings.

21          Your Honor, Mr. Burrows started his presentation by

22  characterizing this complaint as sensationalism and by

23  referring to allegations of murder and corruption as romantic.

24  I submit, Your Honor, that on this record there is nothing

25  sensational and nothing romantic about what happened.

1          What is incredible about this record is the evidence

2    that the plaintiffs in this case have submitted by individuals

3    who are willing to come forward and testify as to specific

4    threats of violence, threats of murder, bribes that were paid,

5    corruption of court proceedings, and to do so under oath.  What

6    is incredible is the lack of any factual submission in reply

7    rebutting or refuting those allegations.

8          Time and time again, the declarants that we submitted

9    declarations from in this case have testified to threats of

10   corruption, threats of extortion, threats of murder, by the

11   individual defendants in this case, defendant Chernoi,

12   defendant Makhmudov, and defendant Deripaska.  These

13   allegations are set forth in our declarations from Mr.

14   Khaidarov, from Mr. Traum, from Mr. Chivilo.

15         And in response, and in reply, although they could

16   have submitted a declaration saying we never said those things,

17   we never corrupted these proceedings, there is not a single

18   factual affidavit in reply in this record denying our core

19   allegations of corruption.

20         Your Honor, we have also alleged in our complaint

21   that bribes to — to bribe the judges in the specific — excuse

22   me, the governors in the specific regions where these

23   proceedings took place emanated from the United States by

24   defendants Pan-American, defendants Blonde Management, both of

25   whom are managed by defendant Kislin.

1     All of those companies and Mr. Kislin are U.S.

2 citizens and entities.  Mr. Kislin resides in New York.  Blonde

3 Management is a New York corporation.  There is not a single

4 declaration from any of those defendants denying those

5 allegations.

6     It would have been a simple matter, I submit, Your

7 Honor, to submit a declaration that says we never wired those

8 products, we never made those threats, we never participated in

9 those actions.  But that is not in this record.

10     THE COURT:  But —

11     MR. BERNARD:  Now, —

12     THE COURT:  — if they had done that, then you would

13 have said that there are issues of fact that can't be resolved

14 on the motions that are before me.

15     MR. BERNARD:  Your Honor, that's what we would have

16 said, except that the point here is that in connection with the

17 forum non analysis, and in connection with determining the

18 adequacy of the alternative forum, what Your Honor is left with

19 is a determination under Leon and the balancing inquiry that

20 needs to be made of have we made a specific showing, a serious

21 showing, as Judge Newman articulated it in Leon, of corruption.

22     We submit we have done that.  And then the burden

23 shifts back to them to refute those allegations.  That burden

24 shifting here, Your Honor, we submit, as I'll address in more

25 detail when I get to the — that particular section of the

1 ┃ forum non analysis — has not been met by them.

2 ┃         THE COURT:  Judge — when you say Judge Newman, that

3 ┃ was his concurring opinion for another Court of Appeals.

4 ┃         MR. BERNARD:  It was his — it was his opinion that

5 ┃ he authored, Your Honor, yes, in the Eleventh Circuit in Leon.

6 ┃ This was a decision in the Eleventh Circuit, Your Honor,

7 ┃ adopting the Eastman Kodak court's reasoning, which I would

8 ┃ point out, by the way, the case that defendants cite, Abduahlli

9 ┃ by Judge Pauley recently — Judge Pauley adopted the Leon

10 ┃ analysis as well.

11 ┃         And even more recently than that, in the Second

12 ┃ Circuit's affirmance of Judge Mukasey's decision in Aguinda,

13 ┃ the Second Circuit references Leon in a footnote.  I would not

14 ┃ go so far as to say that the Second Circuit, by doing that,

15 ┃ adopted Leon, but it is an indication nonetheless that the

16 ┃ court is aware and that the court has — had seen the decision.

17 ┃         But Your Honor, let me turn exactly to that point in

18 ┃ connection with what standard we think ought to be applied on

19 ┃ the forum non conveniens motion, because we argue in our

20 ┃ briefs, and Your Honor asked questions, about the appropriate

21 ┃ standard.

22 ┃         And as we set forth there, we believe —

23 ┃         THE COURT:  Before we get to the —

24 ┃         MR. BERNARD:  Yeah.

25 ┃         THE COURT:  — to the standard, let me — do you

1 still believe that I have to reach the question of jurisdiction

2 first before the issue of forum non conveniens?

3          MR. BERNARD:  No, I don't, Your Honor, and let me

4 tell you why.  There is a recent Second Circuit decision that

5 defendants' counsel referred to at 311 F. 3d 488.

6          THE COURT:  Very good.

7          MR. BERNARD:  Your Honor is ahead of me.  Yes.  And

8 the Second Circuit analyzing Steelco there did ultimately reach

9 a different conclusion.  I might disagree with that, but I

10 think for purposes of this proceeding it is what it is.

11          Moving on, Your Honor, we believe that the

12 appropriate standard on the forum non motion should be a

13 summary judgment standard, and the reason is Your Honor

14 indicated that it is typical for courts on a forum non

15 conveniens motion, when addressing the adequacy of the

16 alternative forum, to consider material outside the pleadings

17 and to weigh the different evidence.

18          Here, Your Honor, there's a critical difference

19 between that typical case and this case.  In those cases, what

20 the court is generally doing is trying to determine is there

21 access to proof in the foreign country, is there available

22 remedies in the foreign country.

23          But here, Your Honor, much like the Second Circuit

24 has held in connection with personal jurisdiction analysis and

25 what they refer to as the intertwined doctrine, where the

A - 121

1  merits of the case are tied up with the question of adequacy,
2  we submit that the only proper — the only proper burden to —
3  or the only proper standard to apply is summary judgment.

4        THE COURT:  Why is that — why is that right?  First,
5  there are appellate remedies in the bankruptcy court system in
6  Russia going all the way up to the Supreme Bankruptcy Court —
7  Supreme Arbitrage Ct.  And second, there are other courts that
8  would be available to hear a claim of fraud.

9        As to those courts, there is no specific showing of
10 corruption, and I would not have to reach the issues of is
11 there an issue of fact as to whether the two initial bankruptcy
12 courts' decisions were tainted by corruption.

13       MR. BERNARD:  Let me answer both — both points, Your
14 Honor.  With respect to the — the availability of appeals and
15 what exists in Russia, Mr. Marks is going to address those
16 points, so I'd like to focus instead on the second.

17       And I submit, Your Honor, that the answer is this: on
18 this record, without the benefit of any discovery, what we have
19 been able to demonstrate to the Court about instances of
20 specific corruption, about instances of the defendants'
21 abilities to corrupt proceedings, extends beyond simply the two
22 courts in which we have already — or the multiple courts in
23 which we have already litigated, Your Honor.

24       I think that without the benefit of any discovery
25 from these defendants in connection with their — in connection

1  with their ability to influence proceedings in other arenas, in

2  other forums, it would be improper to simply hold at this stage

3  of the case that because we have only shown corruption in one

4  or two forums that we — that we cannot show corruption or the

5  ability to corrupt in other forums.

6       THE COURT:  Well, that would — if that were true, as

7  the — the magistrate judge in the prior decision in this case

8  pointed out, it would always be possible to point to some

9  specific instances in any court system where there has been a

10  — an appalling situation — any court system in any court in

11  the world — in any country in the world.

12       And to say that because we have shown, allegedly

13  shown, in two bankruptcy courts reasonably far away from Moscow

14  that, in fact, no fair trial could be held anywhere in the

15  country in Russia would appear to be a leap.

16       MR. BERNARD:  Your Honor, I submit that on this

17  record it's not a leap, and let me answer specifically the

18  point about the United States and your example.  Let me try to

19  explain it.

20       Your Honor, there is a qualitative and a quantitative

21  difference between the type of corruption that we've been able

22  to establish on this record and the isolated instances of

23  corruption that may take place in a forum like the United

24  States, and that has to count for something.

25       It's not just simply a matter of a corrupt judge in

1  Brooklyn taking a bribe on one or two occasions.  It's a matter
2  of a system-wide problem that we have demonstrated, which is
3  what I would characterize as a susceptibility to corruption, a
4  general corruption problem, and the specific ability of these
5  defendants to manipulate proceedings in Russia based on that
6  general problem.

7         I submit that it's not a leap to say that from the
8  evidence in this record these defendants are not capable of
9  doing much more than we've been able to establish, Your Honor,
10  without any discovery whatsoever.

11        We have gathered this evidence.  These people have
12  come forward.  Without giving us any opportunity to examine the
13  defendants' books and records, their wire records, to
14  determine, for example, whether bribes were paid to other
15  individuals than the government — as we've established a good
16  faith basis for in this record.

17        We have declarations from individuals, Your Honor,
18  who say that the defendants told them specifically that they
19  were going to corrupt proceedings against us.  We have a
20  declaration from one individual, Your Honor, were defendant
21  Makhmudov says we control the legal system.

22        It's not, Your Honor — and I understand Your Honor's
23  concern, and maybe Your Honor's —

24        THE COURT:  Well, it's not only my concern.  The
25  tenor of what the Court of Appeals said most recently in the —

A - 124

1  in the — in the Monde arbitration was much the same, and —

2        MR. BERNARD:  Your Honor, if I can, because I can

3  distinguish the case in an important way, I think going back to

4  this point about general and specific corruption, it's a very

5  important point.

6        What almost all of the forum non conveniens cases

7  dealing with allegations of corruption [indiscernible] are just

8  simply allegations of what I would refer to as general

9  corruption.  Your Honor, we're here in the United States.

10  There are these reports and other things out there that say

11  that a foreign forum is — is — has problems of corruption,

12  and we shouldn't be allowed to go there.

13        But this case is different, and the only case that I

14  know of that's similar to this one factually is Eastman Kodak,

15  because what makes this case different is that we claim, Your

16  Honor — and we've been able to establish, again, without the

17  benefit of any discovery, that these defendants have already

18  corrupted proceedings involving these claims against these

19  plaintiffs to the forum that they seek dismissal to.

20        That's a different — that's a different character to

21  the nature of the claim than the kind that you see in these

22  other cases.

23        THE COURT:  But why would it follow that a court

24  system can be systemically indicted because of allegations,

25  whatever their strength are, with respect to the bankruptcy

1  courts in two districts?  And you can correct me if I'm wrong,

2  but there are no specific affidavits or evidence to suggest

3  that the courts in Moscow have been affected, or at least the

4  — the affidavits before me — again, you can correct me if I'm

5  wrong and point me to the affidavits — or the Supreme

6  Bankruptcy Court.

7         MR. BERNARD:  Your Honor, there is information in the

8  record — there are affidavits in the record that Mr. Marks

9  will address with respect to allegations of corruption and

10 evidence of corruption beyond those two proceedings, or beyond

11 those two forums, and I'll let him do that.

12        And I'll also, Your Honor, note that with respect to

13 the ability of an appeal to the Supreme Arbitrage Court, that's

14 another matter that we will address shortly.

15        But I want to return, I think, to the more

16 fundamental premise, and that is that I think it is hard for a

17 U.S. court sitting here, where we have, fortunately, a system

18 where these kinds of things are so far-fetched as to seem

19 unbelievable — the notion that an appellate court could

20 possibly be corrupt, that appellate judges could possibly be

21 corrupted.

22        But Your Honor, on the evidence that we've submitted

23 already, I just return to the point that I think at this stage,

24 without any discovery, we're entitled to a benefit that at

25 least, Your Honor, the kind of discovery that we sought earlier

1  on in the case that we have not been able to obtain that we be

2  able to obtain.

3          And then this — and then the discussion about

4  whether or not the defendants are able to do what I submit they

5  are able to do can occur on a full record.  And that's

6  precisely the point I was making, Your Honor, with respect to

7  the summary judgment standard, is that analyzing the adequacy

8  of the alternative forum at this stage, without the benefit of

9  any of that discovery, would be unfair to us, unfair to the

10  plaintiffs, without applying that standard.

11          Your Honor, I think that we've addressed this point.

12  If I may, —

13          THE COURT:  Okay, could I just — and maybe Mr. Marks

14  will address this specifically.  Can you — no, when he gets

15  up, but the same point that I addressed with defendants, which

16  is if this case were brought as a fraud case in Russia, where

17  would it — what courts — he — okay.

18          MR. BERNARD:  Mr. Marks will be addressing —

19          THE COURT:  All right.

20          MR. BERNARD:  Unfortunately, Your Honor, my knowledge

21  of Russian law does not extend as far.

22          THE COURT:  Okay.

23          MR. BERNARD:  Let me turn to the — to the argument

24  about deference, Your Honor, that should be afforded to

25  plaintiffs.  Your Honor asked a number of questions about that.

1    Iragorri establishes the point that there is an
2    assumption that the plaintiff's choice of forum will stand and
3    should rarely be disturbed, and that the degree of that
4    deference increases where U.S. plaintiffs are involved.

5    Mr. Burrows contends that that should not be the case
6    here, because some of the U.S. plaintiffs, in his view, are
7    what he refers to as shell companies. Let me answer those —
8    those points.

9    These plaintiffs are legitimate businesses in the
10   United States who were established long before this lawsuit was
11   brought, or before this lawsuit was brought, and they undertake
12   all the duties and the obligations of any other corporation in
13   the United States. They pay taxes. They subject themselves to
14   the jurisdiction of the court. They do all of the things that
15   companies in the United States do.

16   THE COURT:  Is all of —

17   MR. BERNARD:  There is no —

18   THE COURT:  Is all of that in the record in their
19   affidavits?

20   MR. BERNARD:  It is not in their affidavits, no.
21   They're not — is not, Your Honor.

22   THE COURT:  Would you be prepared to submit
23   affidavits from Davis, Holdex, and Nexis as to who their
24   officers, directors, shareholders, and operations in the United
25   States are, where they're — where they have offices, what

1  their business —

2        MR. BERNARD:  Yes.

3        THE COURT:  — is in the United States?

4        MR. BERNARD:  Yes, Your Honor.  We would supplement

5  the record for that.

6        THE COURT:  All right.

7        MR. BERNARD:  Even in the absence of that, Your

8  Honor, for present purposes, based on this record, Mr.

9  Burrows's point seems to be that because these individuals —

10  because these companies are owned by Israelis or other citizens

11  overseas that for purposes of the forum non conveniens analysis

12  —

13        THE COURT:  Oh, by the way, when I — when I ask for

14  officers — whether you would be prepared — officers,

15  directors, shareholders — I also intended by that to encompass

16  what — what citizenship these people have.

17        MR. BERNARD:  Yes.  I don't — Mr. Marks?

18        MR. MARKS:  Yes, Your Honor.  I don't see a problem

19  with that.

20        MR. BERNARD:  The reason that I asked, Your Honor, is

21  just — just to let you [indiscernible] we don't — I

22  technically do not represent those plaintiffs, so that's why

23  [indiscernible].

24        Your Honor, even if you look to the citizenship of

25  some of these individuals, the way that Mr. Burrows is

1 suggesting — he's pointed, for example, to Israel; he's

2 pointed, for example, to Russia with respect to Mr. Chivilo in

3 connection with the aluminum plaintiffs — there is a doctrine

4 that the Second Circuit enunciated in the Blanco opinion which

5 says — and I'll quote:

6        "We have ruled, however, that when a treaty with a

7        foreign nation accords its nationals access to our

8        courts equivalent to that provided American citizens,

9        identical forum non conveniens standards must be

10        applied to such nationals by American courts."

11 In other words, where there is a treaty of cooperation, of

12 friendship, that in those instances, even though the foreign

13 nationals are foreigners, they ought to be accorded the same

14 deference that a U.S. plaintiff is accorded.

15        And Your Honor, we've gathered treaties with respect

16 to this type of relationship between the United States and

17 other countries for both Russia, Israel, of course the United

18 Kingdom, and also Switzerland. And I'll hand those up and pass

19 that out to counsel.

20        THE COURT:  Okay.

21        MR. BERNARD:  With respect to Mr. Chivilo, Your

22 Honor, and the argument in connection with the aluminum

23 plaintiffs, there's another point that I wanted to add. As we

24 demonstrated in our declarations, in both Mr. Chivilo's first

25 and second declaration — and I should add that Mr. Chivilo

1  right now resides in France after having fled Russia on false

2  criminal charges — this is in the record.

3          THE COURT:  Well, it's —

4          MR. BERNARD:  The —

5          THE COURT:  You say it's in the record.  Mr. Chivilo

6  says that they were false.  There is a — there's a prosecutor

7  who's brought a charge against him in Russia, and that's

8  pending.

9          MR. BERNARD:  That's correct.

10         THE COURT:  I couldn't possibly make a determination

11  on this record that the charge is a false charge, could I?

12         MR. BERNARD:  There are two points, Your Honor.  One

13  is — no, there are two points.  One is — is that Mr. Chivilo

14  sets forth in his declaration that these charges were brought

15  against him by the defendants, and he sets forth in some detail

16  the nature of how that was done.

17         What there is an absence of in the record is anything

18  from the defendants denying those claims.

19         THE COURT:  But there — but there is a — there's a

20  prosecutorial decision subjecting him to the possibility of

21  criminal penalties in Russia which he has chosen not to go to

22  Russia to defend.

23         MR. BERNARD:  That's correct.  Actually, Your Honor,

24  the French courts refused to extradite him.  And the point here

25  regardless of the reason is, as Your Honor pointed out, that

1  Mr. Chivilo cannot return, will not return, to Russia because

2  of the threats, because of the things that are in the record,

3  that are not contradicted.

4         So at the end of the day, if the aluminum plaintiffs

5  are deemed to be Russian plaintiffs, Russia is not a place that

6  Mr. Chivilo or that any one of the other declarants who we've

7  submitted declarations from, who talk about the threats, who

8  describe in great detail the false claims that were charged —

9  that were filed against them — none of those people can return

10 to Russia.

11        And that — that is simply the — the point that I

12 wanted to make in connection with the aluminum plaintiffs, and

13 their alleged relationship with Mr. Chivilo.

14        THE COURT:  Isn't —

15        MR. BERNARD:  Now, —

16        THE COURT:  Isn't that — isn't that somewhat similar

17 to Red Rock, that the — that the defendants rely on?

18        MR. BERNARD:  Your Honor, I looked at Red Rock, and

19 in Red Rock I think what Your Honor held was that in those

20 instances the corporations had become inactive, and had

21 forfeited their corporate status.  There is no similar claim

22 here.

23        THE COURT:  No, but I was thinking of the aspect of

24 Red Rock where the individual was, if I'm right, in jail.

25        MR. BERNARD:  Um hmm.

1        THE COURT:  I mean, so he makes the argument that it

2   would be unfair to him to have the case proceed in another

3   jurisdiction because he couldn't go there.  He was in jail

4   here.  Similarly, —

5        MR. BERNARD:  The difference is, Your Honor — is

6   that he was already incarcerated, whereas here there is a theat

7   of incarceration on false charges.  And I think that's the

8   difference that really makes the case different.

9        THE COURT:  All right.

10       MR. BERNARD:  Moving on, Your Honor, in the forum non

11  analysis, I think we've talked about the point already, so I

12  won't address it in any greater detail, about how Eastman Kodak

13  did adopt a standard, a burden shifting analysis, that Judge

14  Newman in Leon found persuasive, and that other courts have

15  since looked to, as I mentioned, including Judge Pauley.

16       And I think that that ultimately is the standard that

17  should govern this case, and just to repeat it, it is where —

18  where the plaintiff produces significant evidence documenting

19  the partiality, and these conditions are so serious as to call

20  the adequacy of the foreign forum into doubt, then the

21  defendant has the burden to persuade the district court that

22  the facts are otherwise.

23       And I'd like to just spend a minute or two on the

24  defendants' burden and on what's in the record in regards to

25  that, because in addition to the — the various fact affidavits

1  that we've submitted, there are expert declarations in this

2  record, and we have moved to strike two of those expert

3  declarations, and I want to address that briefly.

4         Mr. Marks will address it in greater detail, Your

5  Honor, but with respect to Mr. Zankovsky it is hard to imagine

6  a more incredible set of circumstances than appearing at a

7  deposition to ask questions of an expert witness who's been

8  retained by the defendants, who you discover has written an

9  article that for purposes of these proceedings, as I've said in

10 my sealed declaration, we'll assume to be the — the — the

11 entity GOK, setting forth that the bankruptcy proceedings that

12 effected a change of control with respect to that company were

13 corrupted.

14        This is not our expert.  This is their expert who

15 submitted that — who submitted a — who wrote an article

16 published after he was retained in this case.  Now, when we

17 tried to question Mr. Zankovsky about that at his deposition,

18 as Your Honor knows from our — from our brief, time and time

19 again we were blocked by claims of confidentiality.

20        We were not permitted to inquire into the basis for

21 his opinion.  We were not permitted to inquire into the reasons

22 that he formed a belief as to certain proceedings because —

23 that were corrupted because he said they were confidential.  We

24 weren't even able to find out the identity of the proceedings

25 where he had found in the past there were instances of

1   corruption because of this claim of confidentiality.

2             THE COURT:  But he opined only on NKAZ, didn't he?

3             MR. BERNARD:  He did, Your Honor, but the —

4             THE COURT:  And he was — he was retained at a — he

5   was retained initially at the time when GOK wasn't even in the

6   case.

7             MR. BERNARD:  That's correct, Your Honor.  But Your

8   Honor, there's two important points with respect to his

9   opinion.  One is it goes not just to the NKAZ issue, because

10  ultimately what he's opining on, as Your Honor is asking

11  questions about, is the — the relevance between specific

12  corruption and general corruption.  And we were actually taking

13  his deposition in connection with this general corruption

14  issue.

15            Instances of specific corruption are directly

16  relevant to general corruption because that's how — that's how

17  — that's how systems become corrupt, Your Honor.  They become

18  corrupt based on specific things that happen in specific

19  proceedings.  And we weren't able to inquire with respect to

20  any of those matters because of this confidentiality, this

21  claim of confidentiality.

22            Now, there's another important point that — that

23  links the two, Your Honor.  We asked Mr. Zankovsky at his

24  deposition assume for a moment that the individuals who are

25  behind the proceeding in connection with GOK are also the

1  individuals behind the proceeding in connection with NKAZ,
2  would that change your opinion.  And he refused to answer that
3  question on the grounds of confidentiality.
4        I think, Your Honor, that that highlights the link
5  between the two, that it can't be so — so easily separate to
6  simply say that Mr. Zankovsky was the expert with respect to
7  NKAZ and therefore his opinions in an article concerning GOK
8  are not relevant to this proceeding.
9        Also, in connection with their burden, Your Honor,
10  Professor Stephan — I'm not going to go into at length the
11  various points that have been raised in the briefs on that,
12  except I'll just point this out, Your Honor.  I think, as one
13  of the courts in this district said once, that a prestigious
14  resume is not enough.  And a sterling resume is not a
15  sufficient basis to be qualified as an expert.
16        What we demonstrated in our moving brief were
17  specific areas in connection with corruption that Professor
18  Stephan had not investigated, had not discussed with people,
19  had not researched.
20        Even more specifically, when we asked him with
21  respect to bankruptcy matters what his background was, this is
22  what he said: I don't desire to put myself in the position of
23  someone who could, without assistance, take a client through
24  the bankruptcy procedure.  We asked him whether he had written
25  any articles or any treatises in connection with bankruptcy

1  matters, and he hadn't.

2       Now, I think, Your Honor, that in terms of the

3  balance that Leon requires the Court to engage in, even if Your

4  Honor doesn't strike the declaration, that that lack of

5  background is a factor to consider in determining whether or

6  not the defendants have met their burden, once we've met ours.

7       And then finally, Mr. Burrows mentioned Mr.

8  Petrukhin.  We actually did address Professor Petrukhin or Mr.

9  Petrukhin's expert affidavit.  Mr. Berger addresses it in his

10 declaration at paragraph one hundred.  And the reason why the

11 analysis is brief is because what Professor Petrukhin has to

12 say is brief.

13      He has two paragraphs at the end of his declaration,

14 paragraphs forty two and forty three, where he recites various

15 provisions of Russian law, black letter provisions of Russian

16 law, and based on this he says the forum must be adequate.

17      The Second Circuit in Bridgeway, addressing the

18 declarations that were submitted in a Liberian case, had a

19 similar declaration and said this about it:

20           The first declaration concerns the design of the

21           Liberian judicial system but says nothing about its

22           practice during the period in question.

23 And the Second Circuit refused to give that declaration any

24 weight.  I submit the Court should do the same with respect to

25 Professor Petrukhin's declaration.

1          Now, I would also point out, Your Honor, that in our

2 papers we have submitted a document from the fifty percent

3 owner of Russian Aluminum, Sibneft, and that document says a

4 lot about what the defendants have said in the past concerning

5 corruption.  It's an offering —

6          THE COURT:  Oh, before we leave the —

7          MR. BERNARD:  Yes.

8          THE COURT:  — the — the experts and all, —

9          MR. BERNARD:  Yes.

10          THE COURT:  — do you — is it a — is it a fair

11 statement that you do not contest — you don't dispute — that

12 — that there is a — a claim under Russian law that could be

13 brought by the plaintiffs, first, that would be an adequate

14 alternative claim, —

15          MR. BERNARD:  Um hmm.

16          THE COURT:  — and second, that the procedures in the

17 Russian court system are there to prosecute such a claim, such

18 that the procedures would satisfy the requirements of the forum

19 non conveniens cases for an adequate alternative forum, but you

20 contend that because of corruption, those procedures, otherwise

21 adequate, would not be followed.

22          There is no — to put it another way, it is not

23 because of the absence of a claim that could be brought, or

24 because the absence of procedures that are so deficient that

25 the Russian courts are not an adequate alternative forum.

1    The problem you have with the Russian courts is the

2 allegations of corruption.

3    MR. BERNARD:  Your Honor, the ability to bring a

4 claim in Russia is disputed, and the type of claim that can be

5 brought — and again, I'm going to defer to Mr. Marks, who will

6 address those points.

7    THE COURT:  Okay.

8    MR. BERNARD:  Your Honor, I was — I was drawing

9 attention to the — the Sibneft offering that is in our papers,

10 because there are two statements in there that I think bear on

11 this issue of corruption — and again, in terms of the balance

12 that the Leon court adopted.

13    Sibneft, as I mentioned, is the fifty percent owner

14 of defendant Russian Aluminum, and in the securities offering

15 in the United States had this to say in connection with their

16 risk disclosure statements:

17 .    Russia has a judiciary which is vulnerable to

18         economic and political influence.  In Russia there is

19         no guarantee that a foreign investor will obtain

20         effective redress in a Russian court.

21 Your Honor, this goes back to the point earlier that I made in

22 connection with discovery.

23    We submitted a request to take additional narrow

24 discovery just in connection with this offering.  The Court

25 denied that request.  I understand that.  The point is, Your

1  Honor, that information about how they came to this conclusion,

2  information about specifically what data they reviewed, what

3  analysis was performed, and those kinds of factors that go into

4  making this kind of a statement in a legal document in the

5  United States is relevant to the very question of to what

6  degree are defendants able to influence proceedings.

7          And in connection with the balancing inquiry, I think

8  it's a factor that the Court should consider when we talk about

9  the claims of corruption, when we have set forth evidence in

10  our papers in terms of corruption, because it's not just things

11  that we're saying.  It's things that the defendants have said.

12          Now, —

13.          THE COURT:  Could I —

14          MR. BERNARD:  Yeah.  Yes, Your Honor.

15          THE COURT:  There are a couple of contracts, at

16  least, that — and I raise this because it's relevant to the

17  disclosure in — in an American securities offering.  There are

18  a couple of contracts which it struck me are particularly

19  relevant in the papers.  One is any contract between Mikom and

20  NKAZ.  And another is any contract between Nexis and GOK,

21  because both of those are, at least as I understand it, alleged

22  to have been wrongly abrogated.

23          MR. BERNARD:  Um hmm.

24          THE COURT:  And there may be more.  But are those

25  contracts in the papers themselves somewhere?

1    MR. BERNARD:  Your Honor, as I stand here now, I
2  don't believe they are.  It —

3    THE COURT:  I didn't think so, because one of the
4  issues that's raised by the defendants is that the very
5  contracts at issue may contain forum selection clauses,
6  arbitration clauses, and it may well be useful to put them in
7  the record one way or another, and it raises the issue —
8  plainly, a securities disclosure in the United States is meant
9  to provide potential investors with a fair representation of
10  all of the risks of — of such an investment.

11    At the time that these investments were made, it was
12  another time in Russia.  And you can correct me if I'm wrong.
13  Would it not be a fair consideration to say that people — that
14  non-United States citizens investing in Russia at the time
15  would reasonably expect to get what relief was available in
16  Russia?

17    The disclosure that you read from the securities
18  filing says that there could be problems in connection with
19  that relief.  But wouldn't that be a factor to be taken into
20  account when the investments here were made, who was making
21  them, and whether there were forum selection clauses in the
22  contracts?

23    MR. BERNARD:  Yes, Your Honor.  I think it is
24  relevant.  As I stand here now, I don't recall the date of the
25  Sibneft offering, and I think that obviously that would — that

1  would be critical.

2        THE COURT:  It's very recent, I believe, I thought,

3  because it came up in the course of the briefing of these

4  motions.

5        MR. BERNARD:  It — it is, Your Honor.  I'll say —

6  I'll say one thing, and then I know that — that Mr. Marks also

7  has something that he wants to say in connection with that.

8  And that is that the time period certainly is relevant; in

9  other words, when was this disclosure made, when did the

10  actions take place here.

11        But this record already, Your Honor, has evidence of

12  corruption going back to the time that the claims that we —

13  that we've brought before you are — that are set forth in the

14  record.  In other words, that it's not an isolated instance of

15  corruption or a description of corruption after the fact.

16        It ties in — it links in — to all of the evidence

17  that's not only with respect to these specific defendants, Your

18  Honor, but also with respect to the general evidence of

19  corruption that Professor Berger outlines in his declaration

20  from speeches that the president of Russia has given, et

21  cetera.

22        So I think it's more than just an isolated act.  It's

23  part of a continuing —

24        THE COURT:  Could I — on a slightly different point,

25  would you agree that in order to find eventually for the

1  plaintiffs in this case, whether it be by the Court or by a

2  jury, the Court would have to find, or the jury would have to

3  find, that the two bankruptcy proceedings in Russia were

4  corrupt?

5          MR. BERNARD:  Yes, Your Honor.  I think that — that

6  in connection with a RICO claim, part of the element is an

7  enterprise.  Part of the predicate acts are mail and wire fraud

8  in furtherance of a scheme to defraud.  And therefore, as part

9  of that proof, we would need to show a fraud.

10         THE COURT:  All right.  And the — the two central

11  frauds in this case are the — alleged to be the NKAZ

12  bankruptcy and the GOK bankruptcy, right?

13         MR. BERNARD:  Correct.

14         THE COURT:  And would the Court also have to find

15  that the governors of the respective Russian states were

16  involved in those allegedly corrupt bankruptcies?

17         MR. BERNARD:  Not by necessity, no, Your Honor.  That

18  would be one way of proving it.  For example, another way of

19  proving it could be — and again, this goes to the point

20  earlier in connection with our request for discovery — that

21  the external manager of the plant NKAZ, Mr. Chernyshev, who

22  submitted a declaration in this case, acted fraudulently.  And

23  that could take place in the absence of a finding of a bribe or

24  some other corruption at that level.

25         And in fact, Your Honor, the evidence in this record,

1  as Mr. Marks will go through, in connection with Mr.

2  Chernyshev's affiliations with the defendants — we have

3  evidence in the record, Your Honor, that Mr. Chernyshev's team

4  that worked with him in connection with this bankruptcy

5  referred to themselves as The Takeover Team.  We have evidence

6  in the record, Your Honor, that some of the individuals —

7          THE COURT:  When I read that in the papers, I —

8  words have different meanings in different contexts.  There are

9  some — there are some law firms in the city who would consider

10  that to be a badge of honor.

11      (Laughter)

12          MR. BERNARD:  Your Honor, I think that in the context

13  of this evidence —.

14      (Laughter)

15          MR. BERNARD:  — that's already in this record, that

16  — that term could have no meaning other than the term that

17  this was an unlawful takeover.  And certainly, Your Honor, if

18  it had that meaning, the defendants who submitted a declaration

19  from Mr. Chernyshev in their moving papers could have obtained

20  a declaration from Mr. Chernyshev in their reply papers to

21  address that point, and they didn't.

22          THE COURT:  The reason that I — that I — I raise

23  the issue, just so that you're aware — when your papers argue

24  about the number of connections with the United States, the

25  alleged — and the three prior bankruptcies in Russia, the

1 alleged connections and the history are whatever they are, but
2 at bottom, in order to prevail, the central allegations that
3 the plaintiffs must prove are two Russian bankruptcies that
4 were allegedly corrupted, which in terms of the interests of
5 Russia and the United States place a — a great weight in — in
6 Russia.

7          MR. BERNARD:  Your Honor, let me address that,
8 because it's — it's relevant to the — to the balancing of the
9 private and public interest factors.  And I think — as I said,
10 I do not dispute that ultimately that is — that is the locus
11 of the fraud, of that portion of the fraud.

12          The important point, Your Honor, though, is — is
13 that in order for that scheme to have been carried out, the
14 actions that took place in the United States were a necessary
15 part of it.  For example, when the defendants stole the shares
16 that belonged to the U.S. — that were held by the U.S.
17 plaintiffs, they could have transferred those shares anywhere
18 in the world.

19          They set up four companies in the United States to
20 receive those shares.  Those shares could have been taken and
21 delivered to virtually any other country in the world, but they
22 reached out and decided to do that here in the United States.

23          And by the same token, when the bribes that were paid
24 that we have alleged in our complaint to the regional
25 governors, to Mr. Tuleyev and [indiscernible] — when those

1  bribes were paid, they were paid in part from entities here in

2  New York — Blonde Management.  Mr. Kislin manages — defendant

3  Kislin manages Blonde Management — and Pan-American, as we've

4  alleged in our complaint.

5         So when Your Honor speaks about the relative — the

6  relative balancing of these factors, on the other side of the

7  equation is a series of predicate acts committed in this

8  country by U.S. defendants that were necessary to carry that

9  scheme out.

10        And ultimately, I guess, Your Honor, the question

11 that has to be applied —

12        THE COURT:  But of course, there is no question that

13 all of those U.S. defendants have consented to jurisdiction in

14 Russia, which is not a — which is not a slight concession.

15        MR. BERNARD:  I don't know, Your Honor, whether or

16 not it's slight, because part of the answer to that, I think,

17 will ultimately depend — when we are able to determine their

18 affiliations, as we've alleged [indiscernible] defendants, as

19 we've set forth in our pleading, and as I think the evidence —

20 the evidence that we've been able to submit to date already

21 supports, these are not separate and distinct entities existing

22 in the United States as — as corporations independent of the

23 defendants.

24        They're the instrumentality through which the

25 defendants did what they did here.  And because of that, Your

1  Honor, I — the reason that I say I don't know if it's slight

2  is, in fact, if they are, as we allege, the alter egos of the

3  defendants, and they are simply operating at the defendants'

4  behest, then going to Russia to litigate these cases is — is

5  — is — is not a — is not a tremendous burden and would —

6  THE COURT:  So these are — these are simply shells

7  in the United States which does not — not suggest that their

8  presence gives the United States such an interest here.

9  Admittedly, the United States has an interest in

10  assuring that it is not the locus of a fraud, that its

11  instrumentalities are not used for a fraud, but simply adding

12  up the number of shells in the United States doesn't give a

13  significant shift to the United States any more than to any one

14  of a number of other jurisdictions where companies have been

15  set up.

16  MR. BERNARD:  Your Honor, they are alter egos, but

17  they are not necessarily shells.  We know already, without

18  having taken any discovery, that Mr. Kislin manages these

19  entities and operations here in New York.

20  I think it would be unfair at this stage of the

21  proceedings, without the benefit of any discovery, to suggest

22  that there is nothing more to it there than that, when what

23  we've already been able to allege suggests that the contrary is

24  true, suggests that, in fact, they are actively managed

25  companies.  They are not just simply shells.

1          We know, as we allege in the complaint, that the

2    entities that were set up to receive the stolen shares were set

3    up by defendant Kislin.  And again, Your Honor, if we were able

4    to bring to — to get the kind of discovery in connection with

5    those actions, there might be more to it there than just that.

6          Your Honor, I've been up here for a while, and Mr.

7    Marks has quite a bit that, you know, he wants to cover, so I'd

8    like to turn quickly to comity and just address one point,

9    because Your Honor asked about it in connection with the

10   summary judgment standard.

11         I think the key here, Your Honor, is that what we

12   allege is that these judgments were procured by fraud.  How can

13   you make a determination in the absence of some factual

14   standard, some factual application, to the evidence that's —

15   an application to the evidence that's here, that — that that

16   took place without applying a summary judgment standard?

17         At the end of the day, the question of whether or not

18   a judgment was procured by fraud is inherently a question of

19   fact.  In this — on this record, it is even more troubling

20   because it is a question of fact where we haven't been able to

21   have any discovery with respect to the procurement of those

22   judgments by fraud.

23         And I would add, I guess, Your Honor, that in the

24   restatement [indiscernible] foreign relations [indiscernible]

25   the Second Circuit cites in Dioniro [phonetic], there is a

1  comment that I think speaks to this.  It says evidence that the

2  judiciary was dominated by an opposing litigant would support a

3  conclusion that a legal system, not just a court, but a legal

4  system, was one whose judgments are not entitled to

5  recognition.

6          Also, a particular case may disclose such defects as

7  to make the particular judgment not entitled to recognition.

8  That's comment B to section four eighty three of the

9  restatement [indiscernible] foreign relations that's cited in

10  Dioniro.

11          I think that that comment, which elaborates on the

12  provision dealing with procuring by fraud, makes clear that

13  this kind of question could not occur except after an inquiry

14  into the facts surrounding the judgments, the facts surrounding

15  the circumstances of how they were procured.  And I submit,

16  Your Honor — and with that, I'll — unless you have any

17  further questions, Your Honor —

18          THE COURT:  One last one.  I went back and forth with

19  Mr. Burrows over Pavlov.  Is there any — is there any case

20  which has found that the Russian — that Russia was not an

21  available alternative forum?

22          MR. BERNARD:  Your Honor, I'm not aware of one.  I

23  would point out, though, that other than Eastman Kodak, I don't

24  think there is a single case where a party prior to any

25  discovery — and by the way, in Eastman Kodak there was

1  discovery on this issue — I don't think there's any case where

2  a plaintiff has made a showing of corruption like this, of

3  specific corruption.

4       The cases — for instance, Judge Peck's recent

5  opinion that counsel referred to does not involve a claim of

6  corruption, and to the extent that Pavlov involved a claim of

7  corruption, we have annexed to my declaration, Your Honor, the

8  expert affidavit that was submitted in that case.  To call it

9  meager is generous.

10      The evidence that was submitted in that case was

11 strictly evidence of the kind of general corruption that courts

12 have found insufficient.  But what this case has which is

13 different than any other case but Eastman Kodak, is the

14 evidence of specific corruption.

15      THE COURT:  All right.

16      MR. BERNARD:  With that, I'll yield to Mr. Marks.

17      THE COURT:  Thank you.  Mr. Marks?

18      MR. MARKS:  Good afternoon, Your Honor.  Your Honor,

19 I would begin by addressing some of the questions that you

20 raised with Mr. Burrows.  The first issue that Your Honor

21 raised was whether there's a — an opportunity for the

22 plaintiffs to bring a cause of action in Russia for fraud, and

23 in our — in our view, the answer is simply no.

24      The Russian civil code provides no section — and

25 it's a civil law country.  The Russian civil code provides for

1   no cause of action for fraud.  And neither Professor Stephan or

2   Mr. Petrukhin, in my reading of their declaration, cite to any

3   provision of the Russian civil code which would so do that.

4        It's not a common law country.  It's a civil law

5   country.  And in order to recover in Russia in a civil action,

6   you would need a provision of the civil code to permit such a

7   cause of action.

8        THE COURT:  It would be — their experts do say that

9   you could bring a claim of fraud.

10       MR. MARKS:  They say it without any support, Your

11  Honor, to any citation in the Russian civil code that the claim

12  for fraud could be made.

13       It is true that if you have a prosecutor who is

14  willing to bring a criminal action in Russia that you can have

15  a tagalong civil claim for fraud at the same time.  That is a

16  world of difference between a litigant having the right to go

17  into a judicial system and bring a claim themselves.

18       THE COURT:  Do any of your affidavits say that there

19  is no provision in the Russian civil code for fraud?

20       MR. MARKS:  I do not know, Your Honor.  But we could

21  supplement the record if this is an issue of importance to the

22  Court.

23       THE COURT:  All right.  Plainly, the existence of —

24  under P.T. United, the existence of some claim under — under

25  the — under the legal system of the — of the forum is a

1  relevant consideration.  It's difficult, is it not, to conceive

2  of a — of a civil system where there is no claim at all that

3  — on the civil side that one party defrauded another?

4      I mean, I realize that in civil code countries you

5  follow the civil code.  On the other hand, the civil code in

6  many civil code countries has been broadly construed to allow

7  the kinds of causes of action — and P.T. United was Indonesia.

8      MR. MARKS:  Your Honor, if — if — I don't mean to

9  interrupt the Court.

10     THE COURT:  No, you weren't interrupting.  It's all

11 right.

12     MR. MARKS:  And the answer to that, Your Honor,

13 putting aside it is what it is, of course — the answer is it's

14 not difficult to concede that, because what you have to take

15 into account is the way, according to Professor Zankovsky,

16 cases are tried in Russia.

17     Fraud claims are often the result of things that you

18 prove through oral testimony, as opposed to contracts, you

19 know, where you've got the contract and you know what the duty

20 is.  This is what the defendants' expert said about how you try

21 cases in Russia, and I'm quoting his declaration, section

22 seventy seven, quote:

23         "The cross examination of witnesses aimed at

24         determining whether evidence presented is truthful

25         simply does not exist in Russian law.  Indeed,

Russian arbitrage courts have no authority to summon witnesses either on their own initiative or at the request of the parties."

So if Your Honor asked me does it make sense, if there's no claim for fraud in Russia, I would say first, Your Honor, it [indiscernible] it would appear to make sense, given the way that the procedures in Russia work in terms of how cases are tried, and when Your Honor asked Mr. Bernard whether we conceded — or that the procedures in Russia were fair to try a fraud claim, I would cite Your Honor to the Berger declaration.

He's our expert, Professor Ethan Berger, who's actually been to courts in Russia, unlike Professor Stephan, who testified he's only been to Russia once in the last six years, solely at the request of the defendants to meet them, and in his entire life he had never been in a Russian court.

But our position is you could — it would be inconceivable to try a fraud claim, let alone this fraud claim, if you can't cross examine witnesses, and you can't compel them to testify.  There's another instrumental —

THE COURT:  But doesn't —

MR. MARKS:  I'm sorry, Your Honor.

THE COURT:  Maybe — this goes back to the dialogue that I had with Mr. — with Mr. Burrows earlier.  The quote that you read was what is the available procedure in a Russian

1  arbitrage court.

2         MR. MARKS: Yes, Your Honor.

3         THE COURT: The procedures — the regular procedures

4  in an American bankruptcy court are — are different, though

5  there are procedures for adversary proceedings in a bankruptcy

6  court, but the normal way in which a bankruptcy proceeding is

7  done is different from a regular civil court action, and my

8  question would be whether the description of procedures in the

9  Russian bankruptcy court applies, for example, to a Russian

10  court of general civil jurisdiction.

11         MR. MARKS: I'd be happy to answer that, Your Honor.

12  The answer is, first, I think — and it's — it's in the Berger

13  declaration, I believe — there's two types of courts in

14  Russia. There's courts of general jurisdiction, which

15  generally deal with claim between individuals. And then

16  there's the arbitrage courts that deal with claims regarding

17  commercial entities.

18         There is no distinction in the arbitrage court

19  between bankruptcies or other matters. It's not like our court

20  system where there's — the bankruptcy court for the Southern

21  District of New York and then there's obviously Your Honor's

22  court. It is one court that justices — the judges are — are

23  [indiscernible] and the judges — and it's treated as a regular

24  commercial matter simply governed by the bankruptcy law, as a

25  — as a — as opposed to a different law of Russia.

1    The second thing, Your Honor, is that the arbitrage

2  procedural code to which we would refer, and which Mr.

3  Zankovsky has so [indiscernible] is describing — that code

4  would apply in the arbitrage courts whether the matter was a

5  bankruptcy matter or whether it was a claim for fraud, which

6  unfortunately doesn't exist in Russia.

7    So what he is — is describing is the standard that

8  would apply in any type of commercial case [indiscernible]

9  bankruptcy or not.  I would submit to Your Honor that that same

10  standard, because the — the code for the courts of general

11  jurisdiction is essentially a mirror of the arbitrage

12  procedural code — that that same problem would exist if you

13  were in a court of general jurisdiction as well.

14    What I would do, to go back to the exchange between

15  Your Honor and Mr. Burrows, is that I would concur with Mr.

16  Burrows in [indiscernible] I think that he said three times,

17  although I'll only agree once, is that if this case were

18  brought in Russia, it would have to go back to the — to the

19  arbitrage court that handled the bankruptcy, whether it was the

20  bankruptcy of GOK or whether it was the bankruptcy of NKAZ,

21  because what you would be essentially doing under the Russian

22  code — and we have this footnote [indiscernible] it's — it's

23  — it's in the supplemental materials that we provided to the

24  Court.

25    It's footnote four in the NKAZ litigation binder

1   [indiscernible] what do you [indiscernible] required to do in

2   Russia, Your Honor, in order to bring this — bring a claim of

3   — of corruption is you would have to first collaterally attack

4   the judgments that had been entered.

5           In order to collaterally attack the judgments in the

6   NKAZ bankruptcy and the GOK bankruptcy, Your Honor, you have to

7   bring the claim not only in the same court which rendered the

8   judgment, but in order to collaterally attack those for

9   fraudulent testimony, bribing of — of — of the judges, newly

10  discovered — newly discovered evidence, what you have to do is

11  you have to show that the original decision was obtained

12  wrongfully by showing that there has been a criminal conviction

13  of somebody who was involved in that wrongdoing.

14          So how could we possibly, even if we wanted, bring

15  such — bring such a claim?  Because to do so would be to go

16  back to the very courts which we were corrupt — say were

17  corrupted in the first place, and even to open a door we would

18  need the prosecutor to have indicted and convicted these very

19  same people.

20          And in the case, Your Honor, of —— of NKAZ, we have

21  two witnesses, Mr. Brayshevyetz [phonetic] and — and I believe

22  Mr. Kuzniaksov [phonetic] who have come forward.  These were

23  people who were in the system in Kemerovo for a number of

24  years.  These were intimates of Governor Tuleyev.  And these

25  people have given declarations, uncontested, under oath, naming

1   four of the judges in the Kemerovo court who actually

2   [indiscernible] actually participated in the NKAZ bankruptcy.

3   So we're [indiscernible] so we're not saying, you know, we

4   think that these people were corrupted because the bribes were

5   paid to Tuleyev.

6         We're saying that we know in other bankruptcy

7   proceedings, based on two eyewitness accounts, that these

8   judges met with people ex parte, took the instructions of

9   Governor Tuleyev, went back to the bench, and rendered

10   decisions accordingly.

11         And neither of those forums could conceivably be

12   adequate to bring a fraud claim which we say doesn't exist

13   under a procedure which doesn't provide for the compulsion of

14   witnesses or cross examination, and ab initio can only be

15   brought after there's prior criminal convictions.

16         THE COURT:  All right.

17         MR. MARKS:  Just one second, Your Honor.  I wanted to

18   go to a second point [indiscernible] is well prepared and well

19   rehearsed [indiscernible] I wanted to first respond to issues

20   that the Court raised.

21         The second issue that Your Honor raised was the issue

22   of corruption in places outside of where we say corruption has

23   — has — has occurred and have been able to demonstrate

24   through specific evidence.  In the GOK bankruptcy, all of the

25   courts related to the GOK bankruptcy are located in Sverdlosk.

1    There is a trial level court which is the arbitrage court.

2    There's the first instance of appeal, which is simply an appeal

3    before judges of the same — of the — of the same group of

4    judges.

5        And then the appeals court for that, the Urals Appeal

6    Court, is also located in Sverdlosk, which is the capital of

7    the region of Governor Rusao, who we have submitted the

8    allegations that he received bribes from the defendants.

9        The NKAZ bankruptcy — the first trial level, of

10   course, takes place in Kemerova.  The second — the first

11   appeal level, of course, also takes place in Kemerova.  And

12   then the appeals go to the appeal court in Tumen.  I will tell

13   Your Honor the approach that we — that we took, and I will

14   also tell Your Honor, if it makes a difference, what we can do

15   to supplement the record.

16       We have taken the position on a motion to dismiss,

17   where the allegations of our complaint are to be accepted as

18   true, that we have shown that they have corrupted the courts in

19   Kemerova [indiscernible] they have corrupted the courts in

20   Kemerova, and supported that with extremely specific evidence.

21       We have shown that they have corrupted the courts in

22   Sverdlosk and supported that with our declarations in evidence.

23   And based on that, without any discovery, of course, we have

24   the allegations that the decisions in the court in Tumen would

25   have been corrupted as well.

1    We say that because we have the affidavit of Ethan
2  Berger who has — who — and if — you know, there's the — the
3  Jane Austen model, Pride and Prejudice, where it begins it's a
4  truth universally acknowledged that a — that a person — that
5  a wealthy person is in want of a spouse.  And if you look at
6  the wealth of information in the Berger affidavit, it's
7  universal that there's general corruption in the Russian
8  courts.

9    You have the U.S. State Department — you have
10  President Putin — you have — you have Russian judges — you
11  have — you have — you have Russian experts — you have
12  Transparency International — every — every entity that has
13  looked at this, people not associated with us, independent
14  people, have concluded that the courts are subject to general
15  jurisdiction — general corruption.

16    The only person who was — who was — who has
17  confounded this in the record is Stephan.  He doesn't agree
18  with it.  But he hasn't been there.

19    THE COURT:  If that — if that were —

20    MR. MARKS:  Yeah.

21    THE COURT:  If that were right, —

22    MR. MARKS:  Yes.

23    THE COURT:  — if those general allegations of
24  universally acknowledged corruption in the Russian court system
25  were adequate, there could never be a case that a forum non

1    conveniens motion would not be granted to keep a case here

2    rather than in Russia, and your partner or former partner's

3    motion in Guernsey would have been wrong.

4            MR. MARKS: The — the — the issue is not quite that

5    simple. And the reason that I say that — not that I was

6    always agreeing with my former partners [indiscernible] he

7    didn't give an affidavit that the system — the — there was no

8    issue of — of — of corruption. He was simply setting forth

9    what the Russian law was that had to deal with an issue of

10   exclusive jurisdiction.

11           However, Your Honor, the distinction — and it's an

12   enormously important distinction — is that the system is

13   corruptable when you have people with powerful interests. If

14   there are people with powerful interests — and if I could

15   borrow Mr. Burrows's chart for Russian Aluminum — I put it up

16   here because I — to some extent proves my point.

17           When you have people who are that powerful and have

18   those type of resources, they can corrupt these people. If

19   it's a case — and it's — it's the case where the magistrate

20   judge just recently issued the opinion returning it to Russia

21   — that was a case of a woman whose husband died and fell off a

22   ship. It was a small ship company that's on the other side of

23   it.

24           One would — there's no reason to believe, whatever

25   the imperfections of the Russian court system are, that that

1  woman would attempt to influence the courts in Kaliningrad, or

2  that the specific defendants in the case, which included an

3  American company, would have attempted to influence —

4  influence the courts in Kaliningrad either.

5          This case is, of course, substantially different

6  because we have powerful interests who are not only capable of

7  influencing the courts.  We have affidavit after affidavit

8  after affidavit that they have done so.

9          What I would submit to Your Honor in terms of Tumen

10  where the appeals court is — I believe on this record, and

11  given the inferences to which we're entitled, particularly —

12  there's been no discovery — that your Court can — that the

13  Court can well infer that that court is susceptible to the same

14  type of corruption which we have demonstrated.

15          However, Your Honor, Your Honor doesn't necessarily

16  have to make those inferences in a vacuum, because the court in

17  Tumen is famous in the United States.  There is a dispute

18  between B.P. Amoco and the Tumen Oil Company that had to do

19  with the bankruptcies, corrupted, of two Russian oil companies,

20  Nisnivaratos Nefsky Gas [phonetic] and Shornogrady Gas

21  [phonetic] by which the — if you don't want to hear it, I'll

22  —

23          THE COURT:  No, no.  No, it's all right.  It's all

24  right.  I was just — I was thinking about the court reporter

25  who transcribes this tape.

A - 161

1    (Laughter)

2        THE COURT:  Go ahead.

3        MR. MARKS:  Well, I hope they get it right.

4        THE COURT:  It's all right.  There's no way — there

5    is no way — there is no way around that.  You're not going to

6    spell all of the names, and the reporter will have to do the

7    best they can.  It may actually be useful to — for the parties

8    to give a glossary for the court reporter.  Thank you.

9        MR. MARKS:  The — what — what — in a nutshell,

10   Your Honor, there were corrupted bankruptcies in Tumen.  The

11   Tumen Oil Company, based in Tumen, put these companies into

12   bankruptcy.  It's the same type of sham, unfortunately, that we

13   say occurred in this case.

14       The difference in that case, Your Honor, was that —

15   is that the Tumen Oil Company that was behind it wanted to

16   obtain export import bank guarantees in purchasing materials

17   from the United States.  And B.P. Amoco involved the United

18   States Government.  They also involved the U.K. government.

19   And the point that I'm making, Your Honor, is that Secretary

20   Albright herself instructed the export import bank not to make

21   the guarantees until the Tumen Oil Company resolved the issue

22   of its corruption of the bankruptcy proceedings, and that was

23   ultimately settled.

24       What I'm saying to Your Honor — if —

25       THE COURT:  That's —

1        MR. MARKS:  Yeah.

2        THE COURT:  That's not in the record, is it?

3        MR. MARKS:  It is not in the record, Your Honor.

4  That — which was — to go back where I was, if Your Honor

5  wanted us to supplement the record on whether courts in Tumen

6  can be corrupted, we could easily do that.

7        THE COURT:  Oh, the — the record in the case is, at

8  this point, five boxes.  And I think that the — that the

9  record is — that the parties have had ample opportunity to put

10  in what they wish to put in the record.

11        There is — I have identified about three issues in

12  the record that I saw that needed to be amplified: the

13  plaintiffs who are U.S. companies' directors, shareholders,

14  officers, business in the United States, the contracts of Mikom

15  and Nexis, and if there is another contract that the parties

16  believe is centrally involved in the case, such a contract, and

17  I would need a — some translation, not of the whole contract

18  if it's in Russian, but of any choice of law or forum or

19  arbitration clause.

20        And finally, both sides' submission on — unless

21  either side believes that it's fully indicated in your

22  affidavits already, and I'm perfectly happy to accept that and

23  to look at the specific provisions that I've been cited to —

24  the issue of is there a claim under Russian law the equivalent

25  of RICO, fraud, or whatever, what court or courts could that be

1   brought in, and the — if the parties wish to go into it, the

2   procedures available in those — in those courts.

3          Again, the parties may think that it's — and both

4   sides have cited to me their expert affidavits so far, and I —

5   I'm — you know, if the parties wish to rely upon that, that's

6   fine.  But I wanted to give the parties that opportunity.  Go

7   ahead, Mr. Marks.  I didn't want to interrupt you.

8          MR. MARKS:  Fine, Your Honor.  I would move over

9   generally to some specific issues that I want to discuss on

10  comity.  One more thing I would suggest to Your Honor in terms

11  of Moscow — we don't believe, and we agree with Mr. Burrows,

12  that if there were claims for fraud, which we don't think

13  exist, that they would have to be brought in the Sverdlosk

14  region for GOK and Kemerovo for NKAZ.

15         This is, of course, totally different than the GOK

16  shareholders who have brought claims, because there's never

17  been any resolution against them in Russia in a case in which

18  they were either named or served.  In each of their instances

19  — there is four of them — Davis — there's no litigation

20  whatsoall [sic] — whatsoall against Davis.

21         There's no proceedings that have made any findings

22  against Davis in Russia.  Under — under typical proceedings of

23  comity, if there's parallel actions, you allow them to go

24  forth.

25         Omni lost its shares when it wasn't even named as a

1  party.  Same thing happened to Holdex.  You had Russian courts

2  entering orders taking the shares away from these companies

3  without them being parties to the action.  And those shares now

4  have ended up with the U.S. companies.

5        There's never — Omni has not participated at all in

6  that litigation, hasn't been served, because it wasn't named.

7  Holdex, when it learned about it, has tried to get that

8  reversed, but there's no — there's no findings against it.

9        In terms of Foston, Your Honor, I raise that as the

10  fourth issue, because that happened in Moscow.  And I can also

11  supplement, Your Honor, if — if — if — if — if — if

12  there's a belief in Your Honor that things might be different

13  in Moscow, we have State Department statements that had to do

14  with litigations regarding Lukoil, and MTV.  That was the

15  company that was — I can see Your Honor not wanting us to

16  supplement the record, so I will move on to —

17        THE COURT:  I have five — I have five boxes.  If I

18  have specific questions — and the —

19        MR. MARKS:  Sure.

20        THE COURT:  — parties were given every opportunity

21  to put in everything, and they put in a great deal on both

22  sides.  On Foston, weren't the shares returned to Foston?

23        MR. MARKS:  No, Your Honor.  They haven't been.  Wish

24  — wish that they were, but they — but they haven't.  What

25  happened in Foston, Your Honor, is that they were sued in

1  Moscow [indiscernible] imposter showed up on there behalf,

2  judgment was entered against them [indiscernible] Moscow court.

3  The court didn't indicate in its — in its — in its decision

4  — which is highly unusual, according to our expert, Got

5  Masheekmanah [phonetic] — another problem for the court

6  reporter — that — that — who was there for them.

7         The learned about it.  They went — they went to the

8  appeals court.  The appellate court let them do an appeal.

9  Then fraudulent letters are sent to the appellate court

10  purportedly on behalf of Masheekmanah and Foston.  Foston's

11  saying they're no longer interested in the appeal, and nothing

12  happens.  They learn about these fraudulent letters.  They have

13  to go back in and say that the letters are fraudulent.

14         The court finally says well, you know, if you — if

15  you weren't notified, fine, we will reverse, send it back to

16  the trial court, and then the trial court says — this is the

17  justice that Foston got — no, I'm sorry, I didn't have

18  jurisdiction in the first place, so I'm dismissing this case to

19  Sverdlosk, but I'm not making my order to return your shares.

20         So a court entered an order in Moscow without the

21  party participating, in a matter in which it had no

22  jurisdiction, but it allowed the effect of the order to

23  continue.

24         Foston then was forced to go back to Sverdlosk.

25  Recently there's been an order that the — that the shares are

1  supposed to be returned, but we have been unable to get —

2  Foston's been unable to get [indiscernible] for any of the —

3  of the court officials to enforce the order, which, of course,

4  is subject to yet another appeal.

5            THE COURT:  But —

6            MR. MARKS:  But — but — yeah.

7            THE COURT:  — the most recent court decision in

8  Russia in connection with the Foston shares was return the

9  Foston shares.

10            MR. MARKS:  That was the most recent decision.

11            THE COURT:  And —

12            MR. MARKS:  But —

13            THE COURT:  — that's subject to appeal.  I can — I

14  can understand that.  But how — how could you argue that that

15  was the subject of corruption when your client prevailed and

16  the decision is now on appeal?

17            MR. MARKS:  Well, I — that particular decision with

18  that particular judge, Your Honor, may not have been

19  influenced.  Our problem is that the overwhelming number of

20  decisions in which we have been involved have been influenced.

21            And I'll say to Your Honor, because what Your Honor

22  was doing was asking us to bring Your Honor up to date with

23  what happened, is that there's another reason why that decision

24  may have gone the way that it did without significance to the

25  defendants, because at the end of last year there was a

1  shareholders meeting of GOK.

2        The meeting was obviously controlled by the people

3  who took the shares from the GOK plaintiffs.  And the meeting

4  ruled that they were going to issue a substantial number of

5  additional GOK shares, which presumably are going to the — to

6  people associated with the defendants.

7        So at this point, there may be no significance on

8  behalf of the defendants to oppose that because whether —

9  whether Foston recovers those shares or not, it has no

10 significance to them controlling the company.  And I'll say to

11 you that exact same thing happened, Your Honor, in NKAZ.

12       As you may recall, we alleged that they used the

13 courts' influence to get the judgment on behalf of Kuzbass

14 against NKAZ, so they could put it into the false bankruptcy.

15 And that was done as a result of an agreement between Kuzbass

16 and the defendants.  They had a falling out.

17       So what happened?  The defendants went in — went to

18 the Tumen appeal court.  The appeals court reversed the

19 judgment on behalf of Kuzbass, and nonetheless when we went to

20 try to undo the bankruptcy, even though the very judgment that

21 was the basis for the bankruptcy in NKAZ had been reversed, the

22 court — the court wouldn't do it.

23       Ultimately, what happened in that case — which is

24 not dissimilar to these new issuances of shares — Chernyshev

25 [indiscernible] he recognized false claim after false claim.

1  Some of them — I mean, they're so bad [indiscernible]

2  questions of proof that they're humorous.  He's there for four

3  days.  He orders a furnace from Sibirsky.  They don't need a

4  furnace.  They've got furnaces.

5        He doesn't — he issues promissory notes to — to —

6  to support this alleged purchase.  The furnace is never

7  delivered.  He doesn't pay for the furnace.  And now they've

8  got these promissory notes for like twenty million dollars so

9  that they can increase their claims.

10        So in NKAZ, at the end of the day, Chernyshev

11  recognized so many false claims.  For Sibirsky, there's the —

12  there's the Flamstead transaction which is — again, it's

13  almost unbelievable.  He's supposed to sell aluminum to — to

14  Flamstead.  That's — what's what he says in one of his

15  declarations, on behalf of NKAZ.

16        So what does the seller do?  The seller gives

17  promissory notes to the buyer.  He doesn't deliver the

18  aluminum, and now the buyer has thirty million dollars of

19  claims against the estate.

20        So the point that I'm making, Your Honor, if we look

21  to see what happened in NKAZ with the flip-flopping of the

22  Kuzbass claim, at the end of the day they let Koosback have

23  their judgment, but it didn't mean anything because the

24  settlement agreement provided that there was no payment

25  [indiscernible] it was payment in rubles, without interest, no

1  earlier than twenty years.

2         What would have the difference been if — for — for

3  the Kuzbass judgment whether it would have been thirty million

4  dollars or thirty billion dollars?  There's nothing that's

5  going to happen.  So in terms of us maybe winning something

6  somewhere [indiscernible] it's — it's — it's so — and it

7  doesn't make a difference here because the control is not

8  effectively in the defendants.

9         Your Honor, I only have one other point to make, and

10 I want to add to what Mr. Bernard said.  There's no issue, Your

11 Honor — well, on the GOK shareholders, Your Honor, we don't

12 have to show Mr. Tuleyev was involved.  We don't have to show

13 Mr. Rusao was involved.  They took our — our — our — our

14 shares through court proceedings where we weren't parties or

15 weren't notified.

16        When we brought claims here in the United States

17 against the people who got them, there's no — we don't have to

18 show that the [indiscernible] that's really the — the

19 [indiscernible] on [indiscernible] in terms of the — the

20 bankruptcies, Your Honor, in terms of the bankruptcies, that's

21 a question of proof.

22        And we would suggest to Your Honor at this stage in

23 the proceedings Your Honor shouldn't dismiss for forum non

24 conveniens before any discovery, to see how we — how we might

25 prove things.

1    Chernyshev — we can take his deposition.  Maybe
2  he'll say he was instructed to do everything he — was done by
3  Sibirsky.  We'll find the wires that we're trying to get.
4  Maybe we'll find that there are wires that were paid to
5  Chernyshev's bank account at Liechtenstein or Switzerland.

6    We could do the same thing in GOK.  In GOK you had a
7  transaction the day after Kozorov became the general director
8  of GOK [indiscernible] borrows fifteen billion dollars from MBM
9  Bank.  He pays it to a — to — to — to a company called
10  Sviatagor [phonetic].  Sviatagor guarantees the loan, which is
11  for four days.  They don't pay the loan back.  Sviatagor gives
12  the money back to MBM Bank.  It's a round tripping transaction,
13  okay?  So they're [indiscernible] in fact, it doesn't even
14  leave the bank, okay?

15    And in return, GOK issued thirty million — it might
16  have been more — worth of loan notes to — to Sviatagor, which
17  — and it [indiscernible] offshore company from somewhere.  We
18  might be able to prove this case, Your Honor, simply by showing
19  that Chernyshev was corrupted, by showing the general director
20  was corrupted, by showing the bankruptcy administrator of — of
21  GOK was corrupted.

22    And these are — these are issues that courts can —
23  in the United States can try every day.  These are issues that
24  we can — if we prove that there's money in this guy's pocket,
25  if there's money in this guy's pocket, if we prove — if he

1 admits or he — you know, there's just no basis for him

2 entering [indiscernible] these — these type of transactions

3 [indiscernible] not hard for us to defeat a motion for summary

4 judgment. It's not hard for a jury to figure out.

5       These are questions of proof that in determining a —

6 a — a — a motion to dismiss we would submit that Your Honor

7 [indiscernible] not to [indiscernible] if this is a case that's

8 difficult to try in the United States, this isn't the time to

9 make that decision, particularly when there's so many

10 witnesses, and there's so much evidence that's in the United

11 States.

12       Mr. Kislin is in the United States. Blonde

13 Management is in the United States. Pan-American is in the

14 United States. These four shareholder defendants in the GOK

15 case are in the United States. All these wires went through

16 the United States. We need to get to the United States banks

17 to find out where they went.

18       Most of the defendants aren't even in Russia

19 [indiscernible] we have — we have Cyprus companies. We have

20 Panama companies. And this isn't a difficult place for this

21 four zillion dollar Russian Aluminum company to litigate. They

22 — they've got an office here in New York. Sibirsky Aluminum

23 had a — had an office — office in New York.

24       These — the — the — the — whether Russia has

25 causes of action for fraud here [indiscernible] Your Honor, we

1  do.  And these are issues that judges like you and juries here

2  in New York are capable of understanding and making decisions

3  on a day-to-day basis.  Your Honor, I appreciate your time.  If

4  you have anything more, I'm here.  But other than that, I would

5  simply thank the Court for considering our position.

6          THE COURT:  All right.  Thank you, Mr. Marks.  I will

7  take the motion under submission, and — or motions under

8  submission.

9          I appreciate the — the speed with which you got me

10  the charts and maps in preparation for the argument.  I found

11  them helpful.  And it seems to me that since I've invited some

12  specific responses which are not very lengthy, the parties can

13  get me, if they wish, any of those responses by this Friday,

14  the 14th, and any replies by the following week, the 21st.  And

15  also include, if you can, those disks.

16          And with that, I will take the motion under

17  submission.  Yes, Mr. Bernard.

18          MR. BERNARD:  Your Honor, I'm sorry.  I'm informed by

19  Mr. Marks that in connection with — with trying to get some of

20  the declarations that Your Honor asked we may need more time

21  than with respect to the letter submissions that Your Honor

22  requested.

23          Might we have an additional week or two to try and

24  get those declarations?  Or the — or the middle of next week,

25  or the end of next week, Your Honor?

1    THE COURT:  Sure.  I do want to — how about February

2  19th for submissions by the parties, and February 25 for any

3  replies?  All right.

4    MR. BERNARD:  Your Honor, also, Mr. Burrows and I

5  spoke about it before the argument — we'll work together on

6  putting together the I-brief information that you asked for in

7  connection with the charts on disk.  I don't think either of us

8  have had the opportunity to speak to the company yet, but we'll

9  endeavor to get that to you as soon as we can, hopefully by the

10  19th.

11    THE COURT:  Okay.  That's great.  Thank you very

12  much, all.

13    *    *    *    *    *

14    I, KRISTIN M. RUSIN, court approved transcriber, certify that the foregoing
15  is *as correct a transcript as possible, given the defective recording*, from the official
16  electronic sound recording of the proceedings in the above-entitled matter.
17    Transcript is certified original only if signed in green ink.

18