## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------x

DAVIS INTERNATIONAL, LLC, HOLDEX,  :
LLC, FOSTON MANAGEMENT, LTD, and   :
OMNI TRUSTHOUSE, LTD,              :
                                   :
              Plaintiffs,   :
                                   :
     v.                          :    Case No. 04-1482-GMS
                                   :
NEW START GROUP CORP., VENITOM     :
CORP., PAN-AMERICAN CORP., MDM     :
BANK, URAL-GORNO METALURAGICAL     :
COMPANY, EVRAZ HOLDING, MIKHAIL    :
CHERNOI, OLEG DERIPASKA, ARNOLD    :
KISLIN, MIKHAIL NEKRICH, and       :
ISKANDER MAKMUDOV,                 :
                                   :
              Defendants.   :

------------------------------------------------------------------x

# APPENDIX TO DEFENDANTS'
# OPENING BRIEFS IN SUPPORT OF
# DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

## Volume 2 of 13

Attorneys for Defendant Arnold Kislin:

Charles M. Oberly, III (DSBA No. 743)    Lisa C. Cohen
Karen V. Sullivan (DSBA No. 3872)    Schindler Cohen & Hochman LLP
Oberly, Jennings & Rhodunda, P.A.    100 Wall Street
800 Delaware Avenue, Suite 901    15th Floor
PO Box 2054    New York, NY 10005
Wilmington, DE 19899    (212) 277-6300
(302) 576-2000

    Lawrence S. Goldman
    Elizabeth Johnson
    The Law Offices of Lawrence S. Goldman
    500 Fifth Ave., 29th Floor
    New York NY 10110-2900
    (212) 997-7499

Attorneys for Defendants New Start Group
Corp. and Venitom Group:

Charles M. Oberly, III (DSBA No. 743)
Karen V. Sullivan (DSBA No. 3872)
Oberly, Jennings & Rhodunda, P.A.
800 Delaware Avenue, Suite 901
PO Box 2054
Wilmington, DE 19899
(302) 576-2000

Richard J. Schaeffer
Peter J. Venaglia
Laura D. Sullivan
Dornbush, Schaeffer, Strongin &
Weinstein, LLP
747 Third Avenue, 11th Floor
New York, NY 10017
(212) 759-3300

Attorneys for Defendant Oleg Deripaska:

Collins J. Seitz, Jr.(DSBA No. 2237)
Kevin F. Brady (DSBA No. 2248)
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141

Rodney F. Page
Michael G. Biggers
Bryan Cave LLP
700 13th Street, N.W.
Washington, D.C. 20005-3960
(202) 508-6002

Attorneys for Defendant Evraz Holding:

William M. Lafferty (DSBA No. 2755)
Morris, Nichols, Arsht & Tunnell
Chase Manhattan Centre, 18th Floor
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 575-7341

David H. Herrington
Vitali Rosenfeld
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York New York 10006
(212) 225-2266

Attorneys for Defendant MDM Bank:

Stephen E. Jenkins (DSBA No. 2152)
Richard I.G. Jones, Jr. (DSBA No. 3301)
Ashby & Geddes
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

Joel B. Kleinman
Steven J. Roman
David H. Greenberg
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street NW
Washington, DC 20037-1526
(202) 785-9700

.

Attorneys for Defendant Ural-Gorno
Metallurgical Company:

Charles M. Oberly, III (DSBA No. 743)          William H. Devaney
Karen V. Sullivan (DSBA No. 3872)              Heard & O'Toole LLP
Oberly, Jennings & Rhodunda, P.A.              405 Lexington Ave, Floor 62
800 Delaware Avenue, Suite 901                 New York, NY 10174
PO Box 2054                                    (212) 307-5500
Wilmington, DE 19899
(302) 576-2000

Attorneys for Defendant Iskander
Makmudov:

Charles M. Oberly, III (DSBA No. 743)          William H. Devaney
Karen V. Sullivan (DSBA No. 3872)              Heard & O'Toole LLP
Oberly, Jennings & Rhodunda, P.A.              405 Lexington Ave, Floor 62
800 Delaware Avenue, Suite 901                 New York, NY 10174
PO Box 2054                                    (212) 307-5500
Wilmington, DE 19899
(302) 576-2000

Attorneys for Defendant Mikhail Chernoi:

Charles M. Oberly, III (DSBA No. 743)          Brian Maas
Karen V. Sullivan (DSBA No. 3872)              Cameron Myler
Oberly, Jennings & Rhodunda, P.A.              Frankfurt Kurnit Klein & Selz PC
800 Delaware Avenue, Suite 901                 488 Madison Avenue, 9th Floor
PO Box 2054                                    New York, NY 10022
Wilmington, DE 19899                           (212) 980-0120
(302) 576-2000

Attorneys for Defendant Mikhail Nekrich:

Charles M. Oberly, III (DSBA No. 743)          Paul R. Grand
Karen V. Sullivan (DSBA No. 3872)              Edward M. Spiro
Oberly, Jennings & Rhodunda, P.A.              Morvillo, Abramowitz, Grand, Iason &
800 Delaware Avenue, Suite 901                 Silberberg, P.C.
PO Box 2054                                    565 Fifth Avenue
Wilmington, DE 19899                           New York, NY 10017
(302) 576-2000                                 (212) 880-9510

## Table of Contents

| DOCUMENT | PAGE |
|---|---|
| **VOLUME 1 OF 13:** | |
| Complaint | A-1 |
| *Base Metal Trading v. Russian Alum.*, 253 F. Supp. 2d 681 (S.D.N.Y. 2003) ("*Base Metal Trading*") | A-31 |
| Transcript of Oral Argument before Hon. John G. Koeltl, dated February 10, 2003, in *Base Metal Trading* | A-64 |
| **VOLUME 2 OF 13:** | |
| First Amended Complaint, dated August 3, 2001, filed in *Base Metal Trading* | A-176 |
| **VOLUME 3 OF 13:** | |
| Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss the Amended Complaint, dated September 15, 2002, filed in *Base Metal Trading* | A-295 |
| **VOLUME 4 OF 13:** | |
| Resume of Paul B. Stephan | A-465 |
| List of Paul B. Stephan's "Participation in U.S. Lawsuits" | A-476 |
| Declaration of Paul B. Stephan, dated January 28, 2002, filed in *Base Metal Trading* | A-479 |
| Reply Declaration of Paul B. Stephan, dated October 17, 2002, filed in *Base Metal Trading* | A-514 |
| Complaint filed in *Norex Petroleum Ltd. v. Access Indus.* (LTS) (S.D.N.Y.) | A-535 |
| *Norex Petroleum Ltd. v. Access Indus.*, 304 F. Supp. 2d 570 (S.D.N.Y. 2004) | A-607 |
| Judge Koeltl's written request for submissions prior to oral argument, dated January 29, 2003 | A-622 |
| Defendants' response to Judge Koeltl's Jan. 29th request ("Defendants' Oral Argument Submissions") | A-624 |
| Chronology of GOK-related Russian court decisions | A-625 |
| Map – location of courts | A-651 |
| Chart of Russian Court Decisions | A-652 |

| | |
|---|---|
| **VOLUME 5 OF 13:** | |
| Plaintiffs' response to Judge Koeltl's Jan. 29th request ("Plaintiffs' Oral Argument Submissions") | A-653 |
|    GOK Bankruptcy Litigation Chart | A-654 |
|    Shareholder Litigation Chart | A-660 |
|    Chart – Kozitsin and Kozyrev "Wrongful Conduct" | A-668 |
|    Chart – "Direct Evidence of Corruption" | A-677 |
|    Sergei Zankovsky: Theory and Practice of Bankruptcy | A-684 |
| Defendants' post-oral argument submissions in *Base Metal Trading*, dated February 20, 2003 | A-687 |
|    Letter from Winston & Strawn, dated February 20, 2003 | A-688 |
|    Letter from Hogan & Hartson, dated February 20, 2003 | A-690 |
|    Letter from Dornbush Mensch Mandelstam & Schaeffer, dated February 20, 2003 | A-695 |
|    Defendants' Summary of Contracts | A-698 |
|    Supplemental Declaration of Paul B. Stephan, dated Feb. 19, 2003 | A-705 |
|    Third Declaration of Igor Petrukhin, dated Feb. 20, 2003 | A-713 |
| Plaintiffs' post-oral argument submissions in *Base Metal Trading*, dated February 20, 2003 | A-744 |
|    Letter from Strook Stroock & Lavan, dated February 20, 2003 (with exhibits) | A-745 |
|    Second Declaration and Exhibits of Joseph Traum, dated February 19, 2003 | A-782 |
|    Expert Report of Sergei B. Zaitsev, dated February 19, 2003 (without exhibits) | A-828 |
| **VOLUME 6 OF 13:** | |
| Defendants' post-oral argument submissions in *Base Metal Trading*, dated February 25, 2003 | A-885 |
|    Letter from Winston & Strawn, dated February 25, 2003 (with exhibits) | A-886 |
|    Supplemental Declaration of Paul B. Stephan, dated February 25, 2003 | A-933 |
| Plaintiffs' post-oral argument submissions in *Base Metal Trading*, dated February 25, 2003 | A-941 |

| Letter from Strook Stroock & Lavan, dated February 25, 2003 (with exhibits) | A-942 |
| Letter from Herrick Feinstein, dated February 25, 2003 | A-986 |
| Second Declaration of Victor Golubev, dated February 25, 2003 (without exhibits) | A-989 |
| Second Declaration of Sergei B. Zaitsev, dated February 25, 2003 (without exhibits) | A-1027 |
| **VOLUME 7 OF 13:** | |
| March 30, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1075 |
| August 22, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1080 |
| April 19, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1092 |
| Application to the Arbitrazh Court for the Sverdlovsk Oblast dated March 24, 2000 filed by Krasnouralskmezhraygaz ("Kras Gas") | A-1112 |
| January 24, 1997 contract between GOK and Kras Gas | A-1130 |
| Letter dated February 4, 2000 from Kras Gas to GOK | A-1146 |
| Letter dated February 15, 2000 from Kras Gas to GOK | A-1157 |
| Letter dated February 8, 2000 from GOK to Kras Gas | A-1170 |
| Letter dated February 21, 2000 from GOK to Kras Gas | A-1175 |
| Federal Service's recommendation to appoint Kozyrev as Interim Trustee | A-1180 |
| Instruction of the Government of the Russian Federation from July 10, 1999 (No. 1100-R) | A-1187 |
| Audit Report and list of GOK's creditors as of March 24, 2000 | A-1191 |
| Minutes of the first GOK creditors' meeting held on August 11, 2000 | A-1245 |
| August 2, 2000 decision of the Izmailovo Inter-Municipal Court of Moscow | A-1266 |
| November 30, 2000 decision of the Moscow City Court | A-1269 |
| **VOLUME 8 OF 13:** | |
| Nexis' appellate complaint | A-1276 |
| January 15, 2001 determination of the Appellate Instance of the Arbitrazh Court for the Sverdlovsk Oblast | A-1306 |
| Nexis' cassation complaint | A-1311 |
| June 7, 2001 decision of the Federal Arbitrazh Court for the Urals Circuit | A-1318 |

| Minutes of the March 11, 2001 creditors' meeting | A-1323 |
|---|---|
| June 27, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1357 |
| August 21, 2001 decision of the Federal Arbitrazh Court for the Urals Circuit | A-1365 |
| August 18, 2000 opinion of the Federal Service | A-1367 |
| August 29, 2000 Nexis petition regarding loan agreement | A-1382 |
| July 26, 1999 supply contract between Nexis and GOK | A-1392 |
| August 29, 2000 Application filed by Nexis regarding supply contract | A-1424 |
| October 4, 2000 letter to Nexis from Trustee Kozyrev | A-1442 |
| March 23, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1445 |
| August 29, 2000 Statement of Claim submitted by Polyprom | A-1452 |
| **VOLUME 9 OF 13:** | |
| Supply agreements between GOK and Polyprom | A-1479 |
| October 4, 2000 letter to Polyprom from Trustee Kozyrev | A-1579 |
| October 31, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1583 |
| February 16, 2001 letter from Trustee Kozyrev to the Arbitrazh Court for the Sverdlovsk Oblast | A-1588 |
| February 19, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1591 |
| April 19, 2001 Resolution of the Appellate Instance of the Arbitrazh Court for the Sverdlovsk Oblast | A-1598 |
| July 12, 2001 determination of the Federal Arbitrazh Court of the Urals District | A-1607 |
| April 18, 2001 decision of the Arbitrazh Court for Sverdlovsk Oblast | A-1613 |
| January 22, 2000 letter from several members of GOK Board of Directors requesting meeting of GOK Board | A-1620 |
| January 24, 2000 letter from several members of GOK Board of Directors requesting meeting of GOK Board | A-1623 |
| February 2, 2000 "Decision Not To Institute Legal Proceedings" of the Senior Assistant Prosecutor for the City of Kachkanar | A-1628 |
| February 1, 2000 ruling of the Kachkanar City Court for the Sverdlovsk Oblast | A-1635 |
| February 15, 2000 decision of the Arbitrazh Court for the Sverdlovsk | A-1649 |

| | |
|---|---|
| Oblast | |
| March 8, 2001 decision by the Moscow City Court | A-1657 |
| September 19, 2000 decision of the Meshchansky Inter-Municipal Regional Court of Moscow | A-1667 |
| **VOLUME 10 OF 13:** | |
| March 26, 2001 decision of the Moscow City Court | A-1676 |
| November 21, 2000 decision of the Tverskoy Inter-Municipal Regional Court of Moscow | A-1683 |
| February 22, 2001 decision of the Appellate Instance of the Federal Arbitrazh Court of Moscow | A-1691 |
| November 16, 2000 decision of the Arbitrazh Court of Moscow | A-1698 |
| April 26, 2001 decision of the Federal Arbitrazh Court of the Moscow Circuit | A-1706 |
| December 13, 2000 decision of the Perovsky Inter-Municipal Regional Court of Moscow | A-1712 |
| Davis Complaint filed in Moscow before the Gagarinsky Inter-Municipal Court of Moscow | A-1728 |
| April 10, 2000 decision of the Perovsky Inter-Municipal Regional Court of Moscow | A-1737 |
| September 25, 2000 decision of the Perovsky Inter-Municipal Regional Court of Moscow | A-1747 |
| October 26, 2000 decision of the Moscow City Court | A-1752 |
| September 17, 2001 decision of the Gagarinsky Inter-Municipal Court of Moscow | A-1758 |
| May 30, 2000 decision of the Tverskoy Inter-Municipal Regional Court | A-1761 |
| February 7, 2000 decision of the Tverskoy Inter-Municipal Court of Moscow | A-1765 |
| December 22, 2000 decision of the Gagarinsky Inter-Municipal Court of Moscow | A-1768 |
| February 14, 2000 decsion of the Cheryomoushkinsky Inter-Municipal Court of Moscow | A-1774 |
| March 2, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1779 |
| September 4, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1784 |
| August 14, 2000, decision of the Kachkanar City Court of the Sverdlovsk Oblast | A-1790 |

| | |
|---|---|
| February 15, 2000 decision of the Kachkanar City Court | A-1797 |
| February 29, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1801 |
| March 6, 2001 decision of the Moscow City Court | A-1806 |
| April 5, 2000 decision of the Meshchansky Inter-Municipal Regional Court of Moscow | A-1814 |
| June 22, 2001 decision of the Tverskoy Inter-Municipal Regional Court of Moscow | A-1827 |
| Two Notices of registrar change published in the *Oblastnaya gazeta* on, respectively, March 17, 2000 and October 21, 2000 | A-1832 |
| March 20, 2001 decision by the Arbitrazh Court of Moscow | A-1839 |
| June 26, 2001 decision of Appellate Instance of the Arbitrazh Court of Moscow | A-1846 |
| **VOLUME 11 OF 13:** | |
| September 5, 2001 decision of the Federal Arbitrazh court of the Moscow Circuit | A-1852 |
| December 20, 2000 decision of the Petrogradsky Regional Court of St. Petersburg | A-1859 |
| January 12, 2001 decision of the Petrogradsky Regional Court of St. Petersburg | A-1864 |
| March 13, 2001 decision of Izmailovsky Regional Court of Moscow | A-1871 |
| March 13, 2001 decision of Izmailovsky Regional Court of Moscow | A-1874 |
| August 27, 2001 decision of the Chertanovo Federal Court | A-1877 |
| Agreement between GOK and Polyprom dated January 18, 1999 | A-1880 |
| November 22, 2000 decision of the Arbitrazh Court of the Republic of Kalmykia | A-1884 |
| April 17, 2001 decision of the Arbitrazh Court for the North Caucasus Region | A-1895 |
| July 5, 2001 decision of the Arbitrazh Court for the Republic of Kalmykia | A-1904 |
| November 9, 2001 decision of the Appellate Instance of the Arbitrazh Court for the Republic of Kalmykia | A-1910 |
| September 10, 2001 decision of the Arbitrazh Court for the Republic of Kalmykia | A-1919 |
| August 1, 2000 decision of the Arbitrazh Court for the Chelyabinsk Region | A-1924 |

| | |
|---|---|
| October 16, 2000 decision of the Appellate Instance for the Arbitrazh Court for the Chelyabinsk Region | A-1942 |
| January 4, 2001 decision of the Arbitrazh Court for Urals Circuit | A-1952 |
| September 29, 2000 decision of the Solntsevsky Inter-Municipal Regional Court of Moscow | A-1960 |
| March 30, 2001 decision of the Moscow City Court | A-1970 |
| November 30, 2001 decision of the Solntsevsky Inter-Municipal Regional Court of Moscow | A-1980 |
| Agreement between New Start Group, Corp. and Davis dated October 6, 2000 | A-1995 |
| Eugene Aschenbrenner's Power of Attorney to act on behalf of Davis (valid December 3, 1999 through December 3, 2000) | A-2002 |
| Nexis Loan Agreement dated July 13, 1999 | A-2010 |
| March 23, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2020 |
| July 13, 2000 decision of the Meshchansky Inter-Municipal Regional Court of Moscow | A-2027 |
| Republic of Panama v. BCCI Holdings (Luxemborg) S.A., 90-2913-CV-UUB, slip.op. (S.D. Fla. July 17, 1995) | A-2033 |
| **VOLUME 12 OF 13** | |
| October 29, 2001 decision of the Federal Arbitrazh Court for the Urals Circuit | A-2053 |
| November 24, 2001 Opinion of the Department of the Interior of the Sverdlovsk Region | A-2060 |
| January 21, 2002 decision of the Federal Arbitrazh Court for the North Caucasus Circuit | A-2084 |
| March 12, 2002 decision of the Arbitrazh Court for the Republic of Kalmykia | A-2094 |
| April 23, 2002 decision of the Federal Arbitrazh Court for the North Caucasus Circuit | A-2105 |
| April 30, 2002 decision of the Kachkanar Town Court for the Sverdlovsk Oblast | A-2108 |
| September 24, 2002 decision of the Kachkanar Town Court for the Sverdlovsk Oblast | A-2121 |
| November 19, 2002 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2126 |

| | |
|---|---|
| January 22, 2003 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2133 |
| February 4, 2003 decision of the Appellate Instance for the Arbitrazh Court for the Republic of Kalmykia | A-2143 |
| May 20, 2003 decision of the Federal Arbitrazh Court for the North Caucasus Region | A-2150 |
| May 27, 2003 decision of the Appellate Instance of the Arbitrazh Court for the Sverdlovsk Oblast | A-2159 |
| August 27, 2003 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2165 |
| October 30, 2003 decision of the Moscow Municipal Court | A-2170 |
| January 14, 2004 decision of the Federal Arbitrazh Court for the Urals Circuit | A-2176 |
| April 20, 2004 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2187 |
| **VOLUME 13 OF 13** | |
| April 27, 2004 decision of the Arbitrazh Court for the Republic of Kalmykia | A-2197 |
| July 2, 2004 decision of the Moscow City Court | A-2205 |
| July 29, 2004 decision of the Federal Arbitrazh Court for the Urals Circuit | A-2212 |
| December 7, 2004 decision of the Moscow City Court | A-2221 |
| September 18, 2001 decision of the Sverdlovsk Arbitrazh Court | A-2224 |
| December 20, 2001 decision of the Urals Circuit | A-2238 |
| May 22, 2002 decision of the Moscow City Court | A-2246 |
| August 22, 2002 decision of the Moscow City Court | A-2256 |
| September 10, 2002 decision of the Kalmykia Court | A-2269 |
| May 22, 2003 decision of the Sverdlovsk Arbitrazh Court | A-2277 |
| August 13, 2003 decision of the Solntsevsky Court | A-2283 |
| March 3, 2004 decision of the Sverdlovsk Arbitrazh Court | A-2289 |
| March 31, 2004 report issued by Russian Ministry of Internal Affairs | A-2294 |
| Declaration of Tatiana Yastrebova, dated September 16, 2002, filed in *Base Metal Trading* (without exhibits) | A-2314 |
| July 2, 2002 decision of the North Caucasus Circuit | A-2344 |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

BASE METAL TRADING SA;
BASE METAL TRADING LTD.;.
ALUCOAL HOLDINGS LTD.;
MIKOM;

DAVIS INTERNATIONAL, LLC;
HOLDEX, LLC;
FOSTON MANAGEMENT, LTD;
OMNI TRUSTHOUSE, LTD;
NEXIS PRODUCTS, LLC; and
POLYPROM, LTD.

                    Plaintiffs,

v.

RUSSIAN ALUMINUM;
RUAL TRADE LTD;

SIBIRSKY ALUMINUM PRODUCTS USA CORP.
  a/k/a SIBIRSKY ALUMINUM (US);
SIBIRSKY ALUMINUM (Russia);
BAUXAL MANAGEMENT, SA;
METCARE MANAGEMENT, SA;
UNIMETAL LIMITED, SA;
OLEG DERIPASKA;

MIKHAIL CHERNOI;
BLONDE MANAGEMENT, INC.;
BLONDE INVESTMENTS, CORP.;
PAN-AMERICAN CORP.;
ARNOLD KISLIN;

ISKANDER MAKHMUDOV;
MOSKOVSKIY DELOVOI MIR BANK;

NOVOKUZNETSK ALUMINUM ZAVOD;
NEW START GROUP CORP.;
VENITOM CORP.;
UNIDALE LLC; and
INVESTLAND, LLC

                    Defendants.

**FIRST AMENDED
COMPLAINT**

**Docket No: 00 Civ. 9627**



**PLAINTIFFS DEMAND
TRIAL BY JURY**

DOC # 34

## COMPLAINT

Plaintiffs Base Metal Trading, SA ("BMT SA"), Base Metal Trading, Ltd. ("BMT Ltd."), Alucoal Holdings, Ltd. ("Alucoal") (BMT SA, BMT Ltd and Alucoal, collectively, the "BMT Plaintiffs") and MIKOM, by and through their counsel Stroock & Stroock & Lavan LLP and Marks, LLC, and Plaintiffs Davis International, LLC, ("Davis") Holdex, LLC ("Holdex"), Foston Management, Ltd ("Foston"), Omni Trusthouse, Ltd ("Omni") (Davis, Holdex, Foston and Omni, collectively the "Davis Plaintiffs"); and Nexis Products, LLC ("Nexis"), and Polyprom ("Polyprom") (together, "GOK Plaintiffs"), by and through their counsel, Herrick, Feinstein LLP hereby complain, as follows:

### INTRODUCTION

1.    The instant case concerns a massive racketeering scheme beginning in the 1990's among, *inter alia*, the members of an international Russian-American organized crime group, headed by Mikhail Chernoi, and including business moguls Oleg Deripaska, the head of Sibirsky Aluminum, and Iskander Makhmudov, the then de facto head of MDM Bank, and the Izmailovo Russian-American mafia group, to take over and monopolize the Russian aluminum and other metals industries (the "Illegal Scheme"). Annexed hereto as Exhibit A is a chart that depicts the organizational structure of this illegal criminal scheme.

2.    In furtherance of the Illegal Scheme, Chernoi, Deripaska, and Makhmudov (the "Conspirators"), as well as their allies and the companies which they dominate and control, have, directly or indirectly, committed numerous criminal acts, including, but not limited to, murder, bribery, extortion, mail and wire fraud, and money laundering.

3.    These acts included threats of physical violence, mail and wire fraud, and money laundering in the United States in furtherance of the Illegal Scheme.

-2-

**A- 177**

4.    These acts included attempted murder and murder, including, but not limited to, the murder of American Felix Lvov and the demise of the American company for which Lvov worked.

5.    Most recently, in the year 2000, the Conspirators took over the Novokuznetz Aluminum Zavod ("NKAZ"), which maintains one of Russia's largest aluminum factories, through rigged bankruptcy proceedings in the Kemerovo Region of Russia (the "Illegal Takeover") and Kochkanarsky GOK ("GOK"), Russia's largest vanadium ore mining factory, through the pure physical force of armed thugs, bribery, extortion, and the fraudulent transfer of shares in GOK of the Davis Plaintiffs and the cancellation of contracts and debt of the GOK Plaintiffs (the "GOK Takeover"). To accomplish both takeovers, defendants used money laundered in, and wired from, United States banks.

6.    Once in control of NKAZ, the Conspirators terminated contracts between NKAZ, the BMT Plaintiffs and MIKOM, with the intended purpose to divert profits rightfully belonging to the BMT Plaintiffs and MIKOM, and compelled NKAZ to enter into less favorable contracts with their affiliates in order to seize the profits of NKAZ, to the detriment of the BMT Plaintiffs and MIKOM.

7.    Once in control of GOK, the Conspirators replaced the plant's general director with their own designee, and had the plant enter into fabricated contracts with affiliates of the Conspirators. These contracts were then deliberately defaulted in order to place the plant in a false bankruptcy by which they could assert control through rigged court proceedings.

8.    The Conspirators fraudulently removed the Davis Plaintiffs from the share registry and replaced them with companies affiliated with the Conspirators and terminated debt and contracts with the GOK Plaintiffs.

-3-

**A- 178**

9.    In order to effect and maintain the Illegal Takeover, the Conspirators, through Russian Aluminum, RUAL, Metcare, Unimetal, Pan-American, Blonde Management, and Blonde Investments, are selling aluminum produced by NKAZ and other plants under their control through their offices and agents in the United States and diverting and then laundering the proceeds from these sales through banks in the United States.

10.    Similarly, in order to maintain the GOK Takeover, the Conspirators, are selling products made with GOK vanadium to United States purchasers through a company known as Ferrotrade and other entities controlled by the Conspirators through their offices and agents in the United States.

11.    Following successful efforts in Louisiana and Maryland federal courts and New Jersey state courts by BMT Ltd. to arrest aluminum belonging to NKAZ pursuant to a $12 million-arbitration award, the Conspirator's ally, Kemerovo regional governor Aman Tuleyev ("Tuleyev"), falsely accused Russian businessman Mikhail Zhivilo ("Zhivilo") of conspiring to murder him and arranged a warrant for Zhivilo's arrest from the corrupt Russian authorities.

12.    Zhivilo served as president of MIKOM, which managed NKAZ prior to the Illegal Takeover, and recruited the BMT Plaintiffs to trade with NKAZ.

13.    The preposterous nature of Tuleyev's allegations is evidenced, in part, by the arrest of Zhivilo's friend and alleged conspirator, Alexander Tikhonov, a four time Olympic biathlon gold metal champion, as the purported "triggerman" because of his alleged possession of rifles.

14.    Zhivilo was forced to flee Russia to France, where he was taken into custody and ultimately exonerated by a French Court, which summarily refused Russia's request for extradition at the first hearing.

-4-

15.    The conduct toward Zhivilo is directly aimed at punishing Plaintiff BMT Ltd. for its resort to the United States courts in mid 2000.

16.    Similarly, false criminal charges also were brought against Jalol Khaidarov ("Khaidarov"), who formerly served as the general manager of GOK, including a widely-reported incident of the police planting narcotics on him while he dined at the Starlight Diner in Moscow, which forced him to flee to another country, where he is currently residing and under protection.

17.    Sham bankruptcies and false criminal charges have become a way of doing business in Russia by the Conspirators in order to extort concessions from business competitors in the Russian aluminum, vanadium, and other metals industries.

18.    In his book, Midnight Diaries, published October 2000, former Russian President Boris Yeltsin acknowledged that sham bankruptcies are regularly used in Russia to illegally takeover legitimate businesses.

19.    Recently, Russian President Vladimir Putin stated in his annual address that "We practically are standing before a dangerous boundary, when a judge or other law enforcer can at will choose a rule, which seems to him the most appropriate. As a result, along with the 'shadow economy' we already have a kind of 'a shadow justice' taking shape."

20.    As a result of the Illegal Scheme, the BMT Plaintiffs and MIKOM have suffered losses, including lost profits, in excess of $900 million, and the Davis Plaintiffs and GOK Plaintiffs have suffered losses, including losses in share value and lost profits, in excess of $100 million.

21.    As compensation for their losses, the BMT Plaintiffs and MIKOM seek compensatory and treble damages in excess of $2.7 billion for violation of the RICO Act, 18

-5-

A- 180

U.S.C. § 1961, et seq., tortious interference with and breach of contract, punitive damages, costs, and attorney fees.

22.     As compensation for their losses, the Davis and GOK Plaintiffs seek compensatory and treble damages in excess of $300 million for violation of the RICO Act, 18 U.S.C. § 1961, et seq., conversion, punitive damages, costs, and attorney fees.

## PARTIES AND OTHER IMPORTANT ENTITIES
### THE BMT PLAINTIFFS AND MIKOM

23.     **Plaintiff Base Metals Trading SA ("BMT SA")** is a company organized under the laws of Switzerland.

24.     BMT SA has suffered damages arising from NKAZ's breach of contracts Nos. 56-00, BSA-R-066/99, BSA 924-99, Framework Agreement, BSA-R-003/99, BSA-R 014/99, 640-99, 641-99, and N-RM-0002/99, which breaches were the result of the Illegal Scheme and caused damages in an amount in excess of $400 million.

25.     **Plaintiff Base Metal Trading Ltd. ("BMT Ltd.")** is a company organized under the laws of Guernsey, Channel Islands.

26.     BMT Ltd. has suffered damages arising from NKAZ's breach of contracts Nos. 41/98, 50/98, and 60/98, which breaches were the result of the Illegal Scheme and caused damages in an amount in excess of $30 million.

27.     **Plaintiff Alucoal Holdings Ltd. ("Alucoal")** is a company organized under the laws of Cyprus.

28.     Alucoal has suffered damages arising from NKAZ's breach of contracts Nos. Framework Agreement, 58-00, 57-00, 923-99, 275-99, AL10-99, 478-99, 607-99, 99/25, and AL-R-005/99, among others, which breaches were the result of the Illegal Scheme and caused damages in an amount in excess of $400 million.

-6-

29.    Plaintiff MIKOM ("MIKOM") is a company organized under the laws of the Russian Federation.

30.    MIKOM held a multi-year contract to manage NKAZ and was entitled to the greater of $240,000 per year or 5% of NKAZ's profits pursuant to the contract.

31.    MIKOM has suffered damages resulting from NKAZ's breach of this contract, which breaches were the result of the Illegal Scheme and caused damages in the millions.

### THE DAVIS AND GOK PLAINTIFFS

32.    Plaintiff DAVIS INTERNATIONAL, LLC ("Davis") is a company organized under the laws of the State of West Virginia which owned shares of GOK prior to the fraudulent transfer of shares described herein.

33.    Plaintiff HOLDEX, LLC ("Holdex") is a company organized under the laws of the state of Texas which owned shares of GOK prior to the fraudulent transfer of shares described herein.

34.    Plaintiff FOSTON MANAGEMENT, LTD ("Foston") is a company organized under the laws of Cyprus which owned shares of GOK prior to the fraudulent transfer of shares described herein.

35.    Plaintiff OMNI TRUSTHOUSE, LTD ("Omni") is a company organized under the laws of England which owned shares of GOK prior to the fraudulent transfer of shares described herein.

36.    Davis, Holdex, Foston, and Omni (collectively, the "Davis Plaintiffs") collectively owned more than 70% of the shares of GOK prior to the fraudulent transfer of shares described herein.

-7-

37.    **Plaintiff NEXIS PRODUCTS, LLC ("Nexis")** is a company organized under the laws of the State of Utah which is owed more than $15 million pursuant to various loan agreements with GOK.

38.    **Plaintiff POLYPROM ("Polyprom")** is a company organized under the laws of the Russian Federation which is owned by a subsidiary of Nexis that had contracts with GOK that the Conspirators terminated.

39.    Polyprom has suffered damages arising from GOK's breach of contracts Nos.15-99/PK, 16-99/PK, 01-99/P, 02-99, S-01-99/M, S-02/M-99, and KGOK 18/10-99 which breaches were the result of the Illegal Scheme and caused damages in an amount in excess of $100 million.

40.    Nexis and Polyprom are collectively referred to as the "GOK Plaintiffs."

## DEFENDANTS AND RELATED PERSONS

### SIBIRSKY

41.    **Defendant Oleg Deripaska** ("Deripaska") is a Russian citizen who, along with Chernoi and Makhmudov conceived, directed, and carried out the Illegal Scheme and controls, directly or indirectly, Russian Aluminum, RUAL, Sibirsky and GOK.

42.    **Defendant Sibirsky Aluminum Products USA Corp., a/k/a Sibirsky Aluminum (US) ("Sibirsky U.S.")** is a company organized under the laws of a state of the United States, and it maintains a place of business in New York.

43.    **Defendant Sibirsky Aluminum a/k/a Sibirsky Aluminum Group ("SibAl")** is a company organized under the laws of the Russian Federation, which conducts or maintains places of business in the United States through Sibirsky U.S. and other agents.

-8-

A- 183

44.    **Defendant Bauxal Management, SA** ("Bauxal") is a company organized under the laws of the British Virgin Islands and is used to sell alumina and other raw materials to NKAZ and then to divert and launder the proceeds through banks in the United States.

45.    **Defendant Metcare Management, SA** ("Metcare") is a company organized under the laws of Panama with the same registered address as Defendant Unimetal in Panama and is used to sell the metal produced by NKAZ and other factories in the United States and divert and launder the proceeds through banks in the United States.

46.    **Defendant Unimetal Limited, SA** ("Unimetal") is a company organized under the laws of Panama with a registered address in Panama and is used to sell the metal produced by NKAZ and other factories in the United States and divert and launder the proceeds through banks in the United States.

47.    **Fastact Development, Ltd.** ("Fastact") is a company organized under the laws of Cyprus with a registered address in Cyprus and is used to launder the proceeds of the sale of metal produced by NKAZ through banks in the United States.

48.    **Sayan Agro** ("Sayan Agro") is a company organized under the laws of Russia and owned by SibAl (or its affiliates) and which employed Sergei Chernyshev, prior to his appointment as the provisional, acting, and ultimately external manager of NKAZ in the Illegal Takeover.

49.    **Alpro, SA** ("Alpro") is a company organized under the laws of Switzerland which is owned by SibAl and which owns Aluminum of Siberia (UK).

50.    **Joseph Karam** ("Karam") is a citizen of Switzerland who serves as a director of Alpro.

A- 184

51.     **Aluminum of Siberia (UK)** ("A of S") is a company organized under the laws of England which is owned by Alpro.

52.     SibAl, Sibirsky U.S., Bauxal, Metcare, Unimetal, A of S, Alpro, Fastact, and Sayan Agro are collectively referred to as "Sibirsky" and are owned, dominated and controlled, directly or indirectly by, Chernoi, Makhmudov, Deripaska and their allies. The Sibirsky entities are among the instrumentalities through which Chernoi, Makhmudov, Deripaska and their allies carried out the Illegal Scheme, and, in disregard of corporate formalities, acted as alter egos of each other and their owners in engaging in the conduct described herein.

## MIKHAIL CHERNOI

53.     **Defendant Mikhail Chernoi ("Chernoi")** is a Russian and/or Israeli citizen who, along with Deripaska and Makhmudov, conceived, directed and carried out the Illegal Scheme and owns and controls, directly or indirectly, Russian Aluminum, RUAL, Sibirsky and GOK.

54.     **Defendant Pan-American Corp.** ("Pan-American") is a company, the exact name of which is unknown, organized under the laws of a state of the United States and is owned and controlled, directly or indirectly by, and is the corporate alter ego of, Chernoi, Makhmudov, and Deripaska.

55.     Pan-American is involved in trading metals obtained through the Illegal Scheme and laundering the profits of these trades through banks in the United States, ultimately wiring up to $35 million per year to MDM Bank for the benefit of the Conspirators in coordinating and directing the Illegal Scheme.

56.     **Defendant Blonde Management, Inc.** ("Blonde Management") is a corporation organized under the laws of New York and maintains an office in New York City, NY.

57.     Blonde Management is owned and controlled, directly or indirectly by, and is the corporate alter ego of, Chernoi and Makhmudov, and is managed and operated by American

-10-

A- 185

Arnold Kislin and used as a vehicle by which money obtained from the Illegal Scheme is laundered in the United States and then returned to Chernoi for use in illegal activity inside and outside of the United States.

58.     Blonde Management, through Kislin, arranged for corporate credits cards of United States banks (Citibank, Chase Manhattan) to be issued to Chernoi, Makhmudov, Deripaska, Malevsky and various employees of Sibirsky, for use in their travels to effect the Illegal Scheme.

59.     **Defendant Arnold Kislin** ("Kislin") is a resident of the state of New York and, with Chernoi, is involved in the operation and management of Blonde Management and its sister company Blonde Investment (Cayman).

60.     **Defendant Blonde Investment Corp.** ("Blonde Investment") is a company organized under the laws of the Cayman Islands and is a sister company of Blonde Management.

61.     Blonde Investment is owned and controlled, directly or indirectly by, and is the corporate alter ego of, Chernoi, Makhmudov, and Joseph Karam, who served as its directors during the relevant time period, and is operated and managed by Karam and Arnold Kislin.

62.     Blonde Investment is involved in trading metals obtained through the Illegal Scheme and laundering the proceeds of those trading through banks in the United States, ultimately wiring up to $35 million per year to MDM Bank for use by the Conspirators in coordinating and directing the Illegal Scheme.

63.     Kislin personally received cash in Moscow from MDM Bank which was wired by Blonde Management and/or Blonde Investment and also knew that monies wired through banks in the United States was converted to cash through MDM Bank and used for illegal purposes, including bribery.

-11-

A- 186

64.    **Transmetal Ltd.** ("Transmetal") is a company owned and controlled, directly or indirectly by, and is the corporate alter ego of, Chernoi, Makhmudov, and Deripaska.

65.    **Trans-Commodities** ("Trans-Commodities") is a company organized under the laws of the United States, and is owned and controlled, directly or indirectly by, and is the corporate alter ego of, Chernoi, Makhmudov, and Deripaska.

## MAKHMUDOV

66.    **Defendant Iskander Makhmudov** ("Makhmudov") is a Russian citizen who along with Chernoi and Deripaska conceived, directed and carried out the Illegal Scheme and owns and controls, directly or indirectly, Russian Aluminum, RUAL, Sibirsky, and GOK.

67.    **Defendant Moskovskiy Delovoi Mir or MDM Bank** ("MDM Bank") is a bank organized under the laws of the Russian Federation, which was operated and controlled by Makhmudov and Deripaska at all relevant times.

68.    MDM Bank maintains correspondent accounts at one or more banks in New York, New York and is used by the Conspirators to launder funds from the Illegal Scheme.

69.    Makhmudov, Deripaska and MDM Bank provide financing and financial structuring to the Conspirators in furtherance of the Illegal Scheme and are directly involved in the laundering of funds through banks in the United States which are ultimately converted to cash and used for, among other things, bribes in Russia as described herein.

## RUSSIAN ALUMINUM

70.    **Defendant Russian Aluminum** ("Russian Aluminum") is a company organized under the laws of the Russian Federation which maintains offices or agents in the United States.

71.    **Defendant RUAL Trade, Ltd.** ("RUAL"), formerly known as Runicom Trade, Ltd., is a company organized under the laws of Gibraltar which maintains offices or agents in the United States and is the trading arm of Russian Aluminum.

-12-

A- 187

72.    Russian Aluminum is a successor in interest to Sibirsky and was formed to serve as a conduit through which aluminum from four illegally seized aluminum plants in Russia is sold in the United States and other countries.

73.    RUAL is the company through which aluminum from the plants controlled by the Conspirators is sold in the United States and the proceeds laundered through United States banks.

74.    Russian Aluminum and RUAL are owned and controlled, directly or indirectly by, and are the corporate alter egos of, Chernoi, Makhmudov, Deripaska and their allies.

## THE "IZMAILOVO MAFIA"

75.    **Anton Malevsky** ("Malevsky") is a Russian citizen who is a member of and controls the Russian-American Izmailovo Mafia.

76.    **Vyacheslav Ivankov** ("Ivankov") is a member of the Russian-American Izmailovo Mafia who is also known as "Yaponchik" and is currently in federal prison in the United States.

77.    The Izmailovo Mafia is one of the most powerful Russian-American organized crime groups and is named for the Izmailovo region of Moscow.

78.    As set forth in numerous media articles and government reports, the Izmailovo Mafia has infiltrated the United States and uses New York as a center of operations.

## NKAZ

79.    **Defendant Novokuznetsk Aluminum Zavod ("NKAZ")** is an open, joint stock company organized under the laws of the Russian Federation, which maintains one of Russia's largest aluminum factories in Novokuznetsk, Kemerovo Region, Russia.

80.    Prior to the Illegal Takeover, NKAZ was managed by MIKOM whose President was Mikhail Zhivilo ("Zhivilo").

-13-

81.    Upon information and belief, in August-September, 2000, a group of shareholders who held a controlling interest in NKAZ sold such interests to a proxy for the Conspirators at a distressed price as a result of the Illegal Takeover.

### THE "CHUBAIS TEAM"

82.    **RAO United Energy System** ("UES") distributes electricity throughout the regions of the Russian Federation and sells its shares through American depository receipts ("ADR's") on the New York Stock Exchange.

83.    **Anatoly Chubais** ("Chubais") is a Russian citizen and serves as the chairman of UES and is an "oligarch" in the Russian business community.

84.    UES delegates the responsibility of delivering energy and collecting payment to a number of subsidiary regional energy companies including **OAO Kuzbassenergo** ("Kuzbass").

85.    Originally, as described herein, Kuzbass was an ally of the Conspirators in the Illegal Takeover of NKAZ; however, as a result of a subsequent alliance between the Conspirators and a Russian oligarch, the alliance dissolved and in 2001 Kuzbass filed fraud charges against Sergei Chernyshev, the agent of the Conspirators who managed NKAZ during the Illegal Takeover.

### THE GOK DEFENDANTS

86.    **Kochkanarsky GOK** ("GOK") is an open, joint stock company organized under the laws of the Russia Federation that maintains one of Russia's largest vanadium plants in Kochkanarsky GOK, which is located in the Sverdlovsk Oblast in the Ural Mountains.

87.    Prior to its illegal takeover, GOK was managed by a general manager, Jalol Khaidarov ("Khaidarov"), a Russian citizen, who had previously been a financial manager for Makhmudov and Chernoi.

-14-

**A- 189**

88.    As a result of their fraudulent transfer, the shares in GOK owned by the Davis Plaintiffs were transferred to United States entities owned and controlled by Chernoi and Makhmudov.

89.    **Defendant New Start Group Corp.** ("New Start") is a company organized under the laws of a state of the United States which received shares in GOK that were fraudulently re-registered from the Davis Plaintiffs. New Start, in turn, then transferred those shares to Venitom, Unidale, or Investland.

90.    **Defendant Venitom Corp.** ("Venitom") is a company organized under the laws of the state of Delaware and which received shares in GOK that were fraudulently re-registered from the Davis Plaintiffs.

91.    **Defendant Unidale LLC** ("Unidale") is a company organized under the laws of the state of Texas which received shares in GOK that were fraudulently re-registered from the Davis Plaintiffs.

92.    **Defendant InvestLand LLC** ("Investland") is a company organized under the laws of a state of the United States which received shares in GOK that were fraudulently re-registered from the Davis Plaintiffs.

93.    New Start, Venitom, Unidale, and Investland are all owned and controlled, directly or indirectly, and are the corporate alter egos, of the Conspirators.

## NON-PARTY UNITED STATES VICTIMS OF THE CONSPIRATORS

94.    As a result of the Illegal Scheme, non-party United States interests have been harmed by the defendants' conduct, which has a substantial negative impact in the United States, including, but not limited to, those entities named below.

-15-

A- 190

95.   **Transworld (Aluminum), Inc. (US)** ("Transworld") is a member of a group of related corporations organized under the laws of various countries, which maintains a place of business in the United States.

96.   Pursuant to a joint-venture between Transworld and Sibirsky, Transworld was to receive aluminum to sell in the United States from the Sayansk Aluminum Zavod.

97.   As described herein, as a result of defendants' fraudulent diversion of this business to companies controlled by the Conspirators, Transworld suffered damages.

98.   **ALCOA** ("Alcoa") is the world's largest aluminum producer.

99.   As described herein, ALCOA's efforts to purchase a controlling interest in the Bratsk Aluminum Zavod were defeated by defendants' Illegal Scheme.

100.   In addition, at the time of the Illegal Takeover, MIKOM and Alcoa had signed a confidentiality agreement expressing their negotiations with regard to Alcoa taking a significant interest in the affairs of NKAZ.

101.   **Reynolds Aluminum Co.** ("Reynolds") was a large aluminum company that was independent at the relevant time and is now part of Alcoa.

102.   As described herein, Reynolds' efforts to purchase a controlling interest in the Bratsk Aluminum Zavod were defeated by defendants' Illegal Scheme.

103.   **Aldeco (US)** is a member of a group of related corporations organized under the laws of various countries, which maintains a place of business in the United States.

104.   As described herein, Aldeco had contracts to purchase aluminum from the Krasnoyarsk Aluminum Zavod that were breached as a result of defendants' Illegal Scheme.

105.   **AIOC Corp.** is a company organized under the laws of a state of the New York which did business in Russia through its agent, American Felix Lvov.

-16-

A- 191

106.    Upon information and belief, Lvov was murdered at the direction of the Conspirators in furtherance of the Illegal Scheme.

107.    As a result of the murder of Lvov, AIOC Corp. failed.

## JURISDICTION AND VENUE

108.    Jurisdiction lies in this Court pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because this case arises under the laws of the United States, based on claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

109.    Jurisdiction also lies in this Court over all non-federal law claims pursuant to 18 U.S.C. § 1367 based on the doctrine of supplemental jurisdiction.

110.    Venue is proper in this District under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because events and transactions have taken place in this District.

## BACKGROUND

## THE NOTORIOUSLY CORRUPT
## RUSSIAN LEGAL AND ECONOMIC SYSTEM

111.    Unlike countries with long developed free-market systems, the economic system that emerged in Russia following the dissolution of the Soviet Union was largely unchecked by government laws or agency regulations.

112.    As a result of privatization of the metallurgical and other industries, there emerged a group of wealthy individuals commonly known in Russia as "oligarchs."

113.    These oligarchs often have direct connections with Russian organized criminal enterprises and exert their influence over the Russian legal and bureaucratic mechanisms.

-17-

A- 192

114.    In the absence of effective government regulation and law enforcement, these oligarchs use their wealth to influence local, regional and national officials, including judges, to issue decisions favorable to businesses operated or controlled by the oligarchs.

115.    According to the Harvard University's Belfer Center for Science and International Affairs acting in cooperation with the Strengthening Democratic Institutions Project (SDI), "Russia's oligarchic groups exert considerable control over the country's economic policies, politics in general and the Media - - politics can be said to have been somewhat privatized during the nation's economic privatization."

116.    On September 21, 1999, Arnaud De Brochgrave, Director of the Global Organized Crime Project, Center for Strategic and International Studies, gave sworn testimony before the United States House of Representatives Committee on Banking and Financial Aid Services on the status of economic crime within the Russian Federation.

117.    De Brochgrave testified that according to research conducted by the Russian Organized Crime Taskforce, as published in the Russian Organized Crime report, Russia's court system is ineffective, does not consistently enforce established contract and commercial rights, has limited enforcement powers, and has become a de facto adjudicator for companies operated by economic criminals.

118.    The report further points out that corruption pervades every level of Russia's bureaucracy and has infiltrated the Russian banking system and financial markets.

119.    The report cautioned "the lack of a formal legal infrastructure which is applied uniformly and publicly to all citizens, foreigners and companies operating in Russia, allows criminal groups to escape due process of the law and legitimate business and citizens to be victimized."

-18-

A- 193

120.    According to testimony before the Congress of the United States of America, the Russian government's anti-corruption program has been unsuccessful due to a lack of resources and the fact that salaries of government officials are so near the poverty level, that it is virtually impossible to eliminate corruption at the local levels, such as in Kemerovo.

### THE METAL WARS

121.    In the early 1990's, the Soviet Union dissolved and was succeeded by a variety of political entities, including the Russian Federation ("Russia").

122.    Beginning in the 1990's, as part of its economic reform, Russia began to privatize many of its major industries, including aluminum, vanadium, and other metals.

123.    From the 1990's through the current date, numerous "wars" were fought for control over the major aluminum factories in Russia (known as a "zavod" in Russian), including the Krasnoyarsk Aluminum Zavod ("KRAZ"), the Sayansk Aluminum Zavod ("SAZ"), and the Bratsk Aluminum Zavod ("BRAZ") as well as other metal plants.

124.    During this time period, Chernoi, Makhmudov, and Deripaska developed a plan and conspired together to take over the metals industry, beginning with SAZ, KRAZ, and BRAZ and ending with NKAZ in regard to aluminum and including GOK in regard to vanadium.

### THE SAZ TAKEOVER

125.    In the 1990's, the Conspirators were able to take control of SAZ which became the first Zavod owned by SibAl, and served as its base in effecting consolidation of the Russian aluminum industry.

126.    Originally, control over SAZ was shared between Transworld and the Conspirators.

-19-

A- 194

127.    Transworld and the Conspirators established various trading companies as part of a joint venture in which the aluminum and profits of SAZ were divided through a complicated tolling system.

128.    The tolling system consisted, in part, of joint venture related companies, many of which were incorporated in the British Virgin Islands ("BVI"), providing raw materials to SAZ and receiving finished aluminum products in return.

129.    Those products were then sold through Transworld in the United States.

130.    In or about late 1997, early 1998, the takeover of SAZ was effected, in part, through an illegal scheme by which the Conspirators, through Deripaska, Karam and Alpro, set up companies in the Bahamas with the same name as the BVI joint venture companies and shipped the finished aluminum products to their companies, instead of the joint venture BVI companies.

131.    Upon information and belief, funds from this scheme were wired through American banks to Trans-Commodities and Blonde Management and laundered through investments in real estate in New York.

132.    As a result of this fraud by the Conspirators, Transworld suffered substantial damages.

133.    Deripaska, Karam, SibAl, and Alpro are currently under criminal investigation in Switzerland for this conduct.

134.    SAZ was subsequently made part of SibAl.

### THE KRASNOYARSK TAKEOVER

135.    At some point in time, KRAZ was controlled by three shareholder groups, the Conspirators (represented by Chernoi), Transworld, and KRAZ management, with whom Lvov had a relationship.

-20-

A- 195

136.    With respect to KRAZ, Chernoi contracted for the murders of numerous rivals (known by their nicknames) through his association with the Izmailovo Mafia, including Chistyak on August 10, 1993; Siniy on September 22, 1993; Tolmach in 1994; Lyapa on May 12, 1994; and Tsmik on August 4, 1994.

137.    This allegation is based on (a) Russian government records and media articles reflecting the murder of the above individuals, (b) widespread media reports that the above individuals were opposed to Chernoi, (c) the extreme unlikelihood that so many individuals associated with KRAZ would be murdered for reasons unrelated to the battle for control of KRAZ, and (d) Chernoi's direct involvement with Malevsky in extorting money from NKAZ and its trading partners, as described herein.

138.    In addition, Chernoi, through the Izmailovo Mafia, arranged for the murder of American Felix Lvov in 1995. This allegation is based on the fact that (a) Lvov competed for control of KRAZ and PAZ against Chernoi, and (b) prior to his death, Lvov stated that Chernoi had threatened to murder him.

139.    As a result of the murder of Lvov, AIOC Corp., the American company with which Lvov was associated, collapsed and filed for bankruptcy.

140.    Following this conduct, the Conspirators took over complete control of KRAZ by the combined approach of a Russian oligarch paying Transworld a distressed price for its interest in KRAZ and the filing of false criminal charges against Anatoly Bikov, a representative of KRAZ management. Based on these charges, Bikov was arrested and extradited to Kransnoyarsk, where he was freed by the local court. He was then re-arrested on new charges of killing people who, in fact, are still alive. Bikov currently remains in jail in Russia where he has been unable to obtain a hearing to challenge the charges pending against him for over a year.

141.    Upon taking control of KRAZ, the Conspirators arranged for the termination of contracts by which Aldeco purchased aluminum from KRAZ through rigged court proceedings in Krasnoyarsk Oblast in order for their own affiliates to receive such metal.

142.    Based on their control over KRAZ, the Conspirators arranged for the plant's aluminum to be sold to their associated companies and then distributed the proceeds to themselves through wires sent through banks in the United States.

### THE BRAZ TAKEOVER

143.    In 1998, BRAZ was controlled by three shareholder groups, Transworld, BRAZ Management, and Lev Chernoi, the estranged brother of Chernoi.

144.    As set forth above, Reynolds and Alcoa separately sought to purchase a controlling interest in BRAZ in 1998.

145.    Upon information and belief, in response to the offers of Reynolds and Alcoa, the Conspirators effected an illegal scheme to takeover BRAZ, which included the filing of false energy claims by the local energy provider against BRAZ and economic extortion through the termination of deliveries of alumina (a necessary component of aluminum) to BRAZ.

146.    As a result of this illegal conduct, Reynolds and Alcoa were denied the opportunity to purchase BRAZ, and Transworld, BRAZ management, and Lev Chernoi were forced to sell their interests in BRAZ for far less than the Reynolds or ALCOA offers to the Russian oligarch associated with the Conspirators.

147.    Upon information and belief, the Russian oligarch paid for the shares of BRAZ owned by Transworld and Lev Chernoi through funds wired through United States banks.

-22-

## THE TAKEOVER OF NKAZ

### 1994-1995

148.    In late 1994 early 1995, MIKOM obtained management control of NKAZ through the support of the majority of its shareholders.

149.    In connection with its management contract, MIKOM solicited Western trading partners who had previously traded with NKAZ, such as BMT Ltd., to extend credit and to trade with NKAZ.

150.    At the time MIKOM began managing the plant, NKAZ purchased approximately 70% of its alumina, a raw material necessary for the production of aluminum, from the Pavlodarsky Aluminum Zavod ("PAZ").

151.    In late 1994, Chernoi and his allies obtained control over PAZ. After gaining control of PAZ, Chernoi threatened that PAZ would immediately stop shipments of alumina to NKAZ unless NKAZ gave Chernoi and his allies 50% of all the profits from the sale of aluminum and 50% of all the shares of NKAZ.

152.    Later, in or about 1995, Chernoi insisted that NKAZ enter a "co-operation" agreement to purchase all of its alumina from PAZ, at premium prices. With no alternative source of raw materials, NKAZ and the BMT Ltd. were forced to purchase the alumina from PAZ.

153.    The alumina was paid for in kind, with aluminum manufactured at NKAZ, to Chernoi companies.

154.    The extortion of NKAZ resulted in millions of dollars of under-priced aluminum being delivered to companies controlled by Chernoi.

155.    With very rare exception, the world's aluminum markets all trade in U.S. dollars.

-23-

A- 198

156. Chernoi, by his own admission, created various sister companies, all with names prefaced by "Trans".

157. Chernoi's share of the funds derived from the extortion of NKAZ was transferred through bank accounts maintained by Trans-Commodities, a company that has New York offices.

158. In addition, by Chernoi's own admission, these "Trans" companies were used to receive the money he derived from his activities in the Russian aluminum business.

159. Upon information and belief, Chernoi prefaced the names of his various companies with "Trans" in order to create the false impression that he was associated with Transworld.

1995-1997

160. By the end of 1995, NKAZ and the BMT Plaintiffs had found alternative sources for alumina.

161. In August 1995, Zhivilo informed Chernoi that NKAZ and the BMT Ltd. would no longer trade with PAZ.

162. Shortly thereafter, as set forth more fully above, in September 1995, American Felix Lvov was murdered. Upon information and belief, at the time of his murder Lvov was enroute to an aluminum trade conference in Chicago, Illinois.

163. After Lvov's murder, Yuri Zhivilo, Mikhail Zhivilo's brother, and a NKAZ representative met Deripaska at the aluminum trade conference in Chicago, Illinois.

164. Upon information and belief, Deripaska's travel to the conference in Chicago, Illinois, was paid for with corporate credit cards issued by American banks and guaranteed by Blonde Management.

-24-

165.    At the meeting in Chicago, Deripaska threatened Yuri Zhivilo that if Mikhail Zhivilo did not cooperate with the Conspirators "they", meaning the Conspirators, would do the same thing to the Zhivilos that they did to Lvov. In the fall of 1995, Zhivilo was summoned to meet Chernoi in Tel Aviv, Israel, where Chernoi demanded the protection payments continue.

166.    Chernoi was joined at the meeting by Malevsky, the notorious Russian mobster.

167.    Upon information and belief, Malevsky's travels were paid for with corporate credit cards issued by American banks and guaranteed by Blonde Management.

168.    During the meeting, Chernoi threatened Zhivilo that if he did not continue to cooperate as before, it would be necessary for Malevsky and his partner, Yaponchik, to "become involved in the business".

169.    Chernoi's declaration that Malevsky and Yaponchik would become involved in the business was a direct threat on Zhivilo's life. In March 1996, an actual attempt was made on Zhivilo's life.

170.    After the attempt on Zhivilo's life, Chernoi told Zhivilo that if "it" did not happen the first time, then "it" would happen the second time.

171.    As a result of the threats by Chernoi against Zhivilo and fearing for the safety of himself and his brother, Zhivilo arranged for BMT Ltd. and Alucoal to pay millions of dollars of "protection money" to companies controlled by the Conspirators, on a quarterly basis, including dollar funds they wired to companies called "Transmetal".

172.    Between on or about April 1996, and October 12, 1999, NKAZ and BMT Ltd. and Alucoal made sixteen dollar payments, of approximately $1.5 million each, to companies controlled by the Conspirators through U.S. banks to ensure Zhivilo's safety.

-25-

A- 200

173.    Neither NKAZ nor BMT Ltd. and Alucoal received anything of value for these payments.

174.    The extortion payments were made on behalf of Zhivilo by BMT Ltd. and Alucoal and included, among other payments, the following:

> (a) a payment dated April 7, 1999, for $1,500,229.02, to Transmetal with Chase Manhattan Bank in New York acting as the correspondent bank for the transaction;
>
> (b) a payment dated October 12, 1999, for $1,500,225.67, to Transmetal with Chase Manhattan Bank in New York acting as the correspondent bank for the transaction; and
>
> (c) a payment dated December 20, 1996, for approximately $1,500,000.00, to Transmetal, Ltd., through the Bank of New York, account number 803-309-3455, and an intermediary bank, Bank of New York, London, UK, account number 846-961-8400.

175.    Chernoi initially laundered these funds through Transmetal and Trans-Commodities and later through Pan-American and/or Blonde Management.

176.    The funds laundered were transferred through banks in the United States, including the Bank of New York (the Bank of New York also served as a bank for Transmetal Ltd.).

### 1997-1998

177.    In 1997, Zhivilo and BMT Ltd. learned of a scheme by which the Conspirators, in conjunction with the local energy provider, Kuzbass, planned to take over NKAZ by raising its energy tariffs, creating debt, and then forcing NKAZ into bankruptcy.

178.    The Conspirators were able to influence Kuzbass initially because of their association with organized crime and, later, because their company supplied Kuzbass with 80% of its coal.

-26-

179.    Upon learning of the plan, NKAZ requested help from the local Kemerovo government. In response to the request, Kemerovo regional deputy governor Dimitry Chirakadze ("Chirakadze") investigated the claims and determined that Kuzbass was indeed overcharging its customers by applying tariffs other than those promulgated by the Russian Federal Energy Commission.

180.    Chirakadze thereupon directed Kuzbass to reduce its tariffs to industrial customers, including NKAZ, so that they would be in line with the federal regulations. Kuzbass ignored this instruction.

181.    In the course of his investigation, Chirakadze also learned that Kuzbass was threatening to raise its customers' tariffs unless the customers paid bribes to those individuals in control of Kuzbass.

182.    Chirakadze then arranged a meeting, in Moscow, with Mr. Brunov, the general director of UES, Kuzbass' parent company, to report his findings of illegal conduct.

183.    However, on July 3, 1997, immediately before the meeting was to occur, Chirakadze was attacked on the street by two knife-wielding men.  He was stabbed five times in the neck, back, and stomach and was incapacitated for approximately six months.

184.    The Conspirators arranged the attack on Chirakadze through the Izmailovo Mafia to prevent him from reporting to UES and thereby interfering in their use of Kuzbass to extort money from honest businesses.

185.    This allegation is founded upon the timing of the attack, that the attackers made no demand for money or valuables from Chirakadze, and that Chirakadze had no known persons with an interest in assassinating him, other than the Conspirators.

186.    During this time, Russian President Boris Yeltsin replaced the Kemerovo Regional governor, who had appointed Chirakadze, with Aman Tuleyev ("Tuleyev").

### 1998-1999

187.    In 1998, Tuleyev demanded that Zhivilo arrange for NKAZ, MIKOM, and the BMT Ltd and BMT SA to pay him bribes through sponsorships or the payment of commissions. Zhivilo informed Tuleyev that NKAZ, MIKOM, BMT Ltd and BMT S.A would not pay such bribes.

188.    In response, Tuleyev threatened Zhivilo that failure to pay the bribes would result in the control of NKAZ being transferred to the Conspirators.

189.    In 1998, Zhivilo met Chernoi, by chance, at a World Cup football game in France. There, Chernoi took Zhivilo aside and threatened him that he, Chernoi, would speak with his friend "Anton" if Zhivilo did not cooperate with Deripaska. This threat was a direct reference by Chernoi to Malevsky and a direct threat on Zhivilo's life.

190.    In 1999, Zhivilo met with Anatoly Chubais, one of the architects of Russian privatization and the infamous "loans for shares" scheme by which great portions of Russian industry were turned over to oligarchs in exchange for their support for Boris Yeltsin's re-election campaign.

191.    At the meeting, Chubais demanded of Zhivilo that he cooperate with the Conspirators in their efforts to consolidate the aluminum industry. Zhivilo told Chubais that he, Zhivilo, could not cooperate or work with individuals who threatened his life and were associated with figures like Malevsky and Chernoi. Zhivilo also expressed his opinion of how dangerous Chernoi and Deripaska were, and said that Chubais too should not trust them.

192.    In response, Chubais told Zhivilo that he, Chubais, was the person responsible for Tuleyev's appointment as the governor of Kemerovo. Chubais further stated that if Zhivilo did

-28-

not follow instructions, he would arrange with Tuleyev to transfer control of NKAZ to the Conspirators by whatever means necessary.

## THE SUCCESSFUL CONSPIRACY

193.    In 1999, at a meeting in Moscow, the Conspirators enlisted the assistance of Tuleyev.

194.    At that time, Tuleyev agreed to allow the Conspirators to operate in Kemerovo and to assist them in effecting the Illegal Takeover.

195.    Tuleyev agreed that, at a minimum, he would assist the Conspirators by filing false claims through the local Kemerovo procurator, a government official, and by making false criminal charges.

196.    In partial payment to Tuleyev for his assistance in Kemerovo, Pan-American wired three payments, totaling $1.0 million dollars, in or about June and July, 1999, through an American bank to another company controlled by the Conspirators, which then transferred the money at the direction of Tuleyev.

197.    In further payment to Tuleyev for his assistance in Kemerovo, Blonde Investments wired a payment from its account at UEB, in Switzerland, for $500,000.00, in or about June and July 1999, through an American bank to the account of another company controlled by the Conspirators, which then transferred the money at the direction of Tuleyev.

198.    Upon information and belief, the instructions initiating these wire transfers originated from Kislin in the United States offices of Pan-American and/or Blonde Management. The above allegations are also based on the fact that (a) Tuleyev threatened Zhivilo that NKAZ would be taken over if the bribes were not paid, (b) Chernoi and Deripaska threatened Zhivilo that they would take over NKAZ, (c) Chubais threatened Zhivilo that Tuleyev would arrange for the takeover of NKAZ, and (d) information learned from a person formerly associated with the

-29-

Conspirators that the bribe was paid to Tuleyev through an intermediary associated with Chernoi and Makhmudov.

199.    As part of their Illegal Scheme to take over NKAZ, the Conspirators and Kuzbass agreed that Kuzbass would assert false tariff claims, file suit upon them, and obtain a sham judgment against NKAZ, with the active assistance of Tuleyev, using the corrupt Russian regional court system.

200.    The common goal of the Conspirators was the seizure of NKAZ in order for the Conspirators to obtain the benefit of supplying raw materials to NKAZ and of trading the aluminum produced by NKAZ. In addition, UES was to receive higher energy payments for its subsidiary, Kuzbass.

201.    The common goal of the Conspirators was to cancel the trading contracts with the BMT Plaintiffs, and the management contract with MIKOM and to replace those companies with ones affiliated with the Conspirators.

202.    The Conspirators agreed that once they obtained a fraudulent judgment, they would assert control over NKAZ by using that judgment to force an involuntary bankruptcy. The Conspirators also agreed that they would use the bankruptcy to place their handpicked agents in control of NKAZ.

## THE FALSE ENERGY CLAIMS

203.    NKAZ is located in the Kemerovo Region, where the local monopolistic electricity supplier is Kuzbass.

204.    As one of the largest consumers of electricity in the Kemerovo Region, NKAZ entered into contracts with Kuzbass that provided for a fixed tariff for electricity supplied by Kuzbass.

205.    The first such agreement was executed on or about November 1994.

-30-

206.    Later agreements were executed on or about April 18, 1996, (the "1996 Agreement"), and May 29, 1997, (the "1997 Agreement"), amended September 17, 1998 and October 31, 1998. The latter contracts provided for a flexible tariff schedule depending on the average price of aluminum as measured on the London Metals Exchange.

207.    By tying the price of electricity (which is a major component if the cost manufacturing aluminum) to the price of aluminum, MIKOM insulated NKAZ from sudden fluctuations in world aluminum prices and attempted to bring long-term stability to NKAZ and its employees.

208.    Despite the existence of the contracts, Kuzbass attempted to repudiate the agreement and it filed an action (the "First Kuzbass Action") on November 12, 1997, claiming that NKAZ should pay significantly higher tariffs, as were promulgated by the Kemerovo Regional Energy Commission ("KREC"), a local agency under the direction of Tuleyev.

209.    The amounts claimed in the First Kuzbass Action were grossly inflated, violated the terms of the contracts between the parties, and the tariffs upon which the claim was based deviated sharply from The Russian Federal Energy Commission's regulations and industry norms.

210.    In response, NKAZ commenced a lawsuit against the KREC alleging it had fixed illegally high tariffs (the "Kemerovo Tariff Action"). In the Kemerovo Tariff Action, NKAZ presented expert testimony, in the form of two reports, confirming that the KREC formulas deviated from The Russian Federal Energy Commission's regulations.

211.    The Russian Federal Energy Commission reviewed the expert reports and verified their accuracy.

212.    On the basis that the outcome of the First Kuzbass Action depended on the Kemerovo Tariff Action, the Kemerovo court adjourned the First Kuzbass Action.

213.    Although the First Kuzbass Action was adjourned pending decision in the Tariff Action, the local Kemerovo procurator instituted a new electricity claim in the name of Kuzbass, on behalf of the Conspirators, against NKAZ in the Kemerovo court (the "Second Kuzbass Action").

214.    This Second Kuzbass Action, filed September 10, 1999, alleged a debt for electricity by NKAZ of over $27 million, based on the discredited KREC tariffs, even though NKAZ had already paid in full the amounts properly due.

215.    The Second Kuzbass Action was fraudulent and without basis.  Furthermore, the Second Kuzbass Action also should have been adjourned pending the outcome of the Kemerovo Tariff Action.

216.    Nevertheless, through the influence exerted by Tuleyev on behalf of the Conspirators in Kemerovo, the Kemerovo court awarded Kuzbass a judgment for approximately $26.3 million dollars, on October 21, 1999.

## THE IMPROPER LOCAL APPELLATE DECISION

217.    NKAZ unsuccessfully appealed the corrupt October 21, 1999, Second Kuzbass Action judgment to the local appellate court.

218.    However, the local appellate court, also apparently under the influence of Tuleyev, affirmed the corrupt judgment and thus final judgment was entered on December 24, 1999 (the "Christmas Eve Award").

## THE SHAM BANKRUPTCY

219.    NKAZ then appealed the Christmas Eve Award to the Federal Arbitrazh Court for the Western District of Siberia, located in the city of Tumen (the "Tumen Appeals Court").

-32-

A- 207