220.    On or about January 19, 2000, pending consideration of the appeal, the Tumen Appeals Court thereupon issued a stay of the execution of the Christmas Eve Award (the "Tumen Stay Order").

221.    The Tumen Stay Order was significant for NKAZ because Russian law provides that only creditors with judgments that have are enforceable may be used as the basis for a successful involuntary bankruptcy petition.

222.    Despite the Tumen Stay Order, Kuzbass petitioned, *ex parte*, the Kemerovo court on January 19, 2000, for an order declaring NKAZ bankrupt, to appoint as provisional manager Sergey A. Chernyshev ("Chernyshev") and to impose security measures.

223.    The Kemerovo court accepted the petition and granted the relief requested despite the Tumen Stay Order and other procedural defects in the petition, which should have precluded its acceptance.

224.    At the same time it accepted the bankruptcy petition, the Kemerovo court also imposed so-called conservatory measures, and appointed Chernyshev as the Provisional Manager of NKAZ.

225.    The Kemerovo court's ruling plainly violated Russian law, which requires an executable judgment in order to place a business into involuntary bankruptcy.

226.    In any event, at no time relevant hereto was NKAZ bankrupt.

227.    The conservatory measures were imposed without any consideration by the court of their necessity.

228.    The conservatory measures consisted of, *inter alia,* freezing the bank accounts of NKAZ, thereby preventing it from paying its bills and prohibiting NKAZ from selling the aluminum it was manufacturing.

-33-

229.    As a result of the conservatory measures, NKAZ was effectively prevented from conducting outside business and receiving income from that business to pay its obligations.

230.    The Provisional Manager's role in the early stages of a Russian bankruptcy is to collect information about the business, and supply it to the court.

231.    Beginning on or about Friday, January 21, 2000, Chernyshev sent to NKAZ numerous multipart letter demands for detailed explanations and information, requiring it to produce such explanations and information within deadlines that were impossible to meet.

232.    Typical of the demands sent was Chernyshev's demand "#11", dated and delivered, January 21, 2000, that required NKAZ to provide ten detailed reports or documents by mid-day the next day, a Saturday.

233.    The information demanded in letter #11 included the following: the Main Accounting Book for October and November, 1999; an explanation of the status of seventeen accounts for each of October to December 1999 and January 2000; tax payment certificates; VAT calculations for December 1999; the creditor's register; the January financial plan and a status report as of January 20, 2000; the projected February financial plan report; a reconciliation of debts to budgets; and a reconciliation of certain outgoing funds in transit.

234.    Between January 21, 2000 and January 26, 2000, Chernyshev sent approximately thirty-four additional such demands with over one hundred complex subparts, usually with deadlines for compliance of the same or the next day.

235.    The deadlines imposed in each demand were impossible to comply with for various reasons, including, *inter alia*, that: (1) demands were received minutes before they were due; (2) demands were received after they were due; (3) information sought was physically not in Kemerovo; (4) explanations could not be compiled in the unrealistic time frame given; and (5)

because as set forth above, some demands were delivered on a Friday, in the middle of the Siberian winter, for reply by noon the next day, a Saturday.

236.    In furtherance of the Conspirator's plan to take over NKAZ, on January 26, 2000, Chernyshev filed a petition to remove the management of NKAZ, alleging that the failure of NKAZ's management to meet his impossible deadlines was proof of non-cooperation in the bankruptcy, thus justifying the remedy sought.

237.    On January 26, 2000, Kuzbass also filed a petition to remove NKAZ management.

238.    In its petition, Kuzbass relied upon information supplied by Chernyshev that, *inter alia*, MIKOM was hiding money that should have been used to pay the current debts of NKAZ.

239.    In addition, the same day Chernyshev and Kuzbass filed their petitions, the local Kemerovo procurator filed a separate petition in bankruptcy against NKAZ. It is unusual for the local procurator to file such a petition in a private bankruptcy and, upon information and belief, the reason for the filing was to signal the Kemerovo court that the local political authorities supported Chernyshev's position and Kuzbass' petition.

240.    The procurator's petition alleged the same debt as Kuzbass, an additional open claim by Kuzbass (the First Kuzbass Action claim) and non-specific violations of Russian Federation laws and without any specific details that NKAZ had been deliberately rendered insolvent. The procurator's petition was invalid on its face and should have been returned by the Kemerovo court because it was not prepared in accordance with Russian bankruptcy law.

-35-

A- 210

241.   The procurator's petition was, upon information and belief. filed at the direction of Tuleyev, who was fulfilling his agreement to support the Illegal Takeover and to use criminal charges as necessary.

### THE CORRUPT BANKRUPTCY HEARING

242.   As set forth above, on January 19, 2000, the Kemerovo court, in violation of the Tumen Stay Order, placed NKAZ into involuntary bankruptcy.

243.   Having started the bankruptcy, the next necessary step of transferring control of NKAZ to the Conspirators was to remove its then manager, MIKOM.  Removing MIKOM and installing Chernyshev as External Manager would allow the Conspirators to begin shifting the business of NKAZ to companies controlled by the Conspirators.

244.   Under Russian law, these goals were obtainable because an External Manager has authority that supersedes the directors and shareholders of the insolvent company.

245.   The removal of NKAZ management and the appointment of Chernyshev were accomplished at a sham Kemerovo court hearing, on February 16 and 17, 2000.

246.   The court convened, ostensibly, to hear motions by Chernyshev and Kuzbass seeking removal of MIKOM and appointment of Chernyshev to the post of Acting Manager. The Acting Manager would have the power to bind NKAZ to contracts and to run the company on a day-to-day basis.

247.   The allegations of Chernyshev and Kuzbass, as described above, were entirely specious.

248.   Chernyshev's allegations of non-cooperation by MIKOM were an obvious excuse designed to permit the Conspirators to further their take over of NKAZ, because they knew in advance that the Kemerovo court would rule in their favor.

249. That the result of the February 16-17, 2000, Kemerovo court hearing was pre-ordained is evidenced, in part, by the fact that well before the hearing, Sibirsky-affiliated companies Azial and Unimetal prepared contracts for sale of NKAZ metal, dated January 21, 2000, despite the fact that neither had previous affiliations with NKAZ and had no reason to believe that NKAZ product was available.

250. Furthermore, Azial also prepared a contract to sell NKAZ alumina, on January 21, 2000, with no legitimate expectation that the sale would occur.

251. The Conspirators even applied to Western banks for financing of future NKAZ aluminum trading before the Kemerovo court shifted control of NKAZ to them.

252. At the February 16-17, 2001 hearing, the Kemerovo court initially refused the requests of BMT, SA, and Alucoal representatives for an interpreter so that they could participate in the hearing, in violation of the Russian Procedural Code.

253. Further, the Kemerovo court refused the requests of NKAZ and the BMT Plaintiffs for time to inspect documents submitted by Chernyshev -- again, in violation of the Russian Procedural Code.

254. At the hearing, the Kemerovo court did not afford NKAZ, MIKOM, or the BMT Plaintiffs the opportunity to fully present their evidence or to properly cross-examine witnesses. For example, during the hearing, the Kemerovo court repeatedly refused to recognize counsel for BMT SA or Alucoal despite their repeated requests to be heard. Thus, during the hearing, the Kemerovo court repeatedly interfered in the questioning of Chernyshev by rephrasing questions to lead him to the "right" answer.

255. At noon, the second day of the proceeding, while Chernyshev was still testifying, the Kemerovo court abruptly adjourned, then briefly reconvened at 3:00 p.m., but immediately

A- 212

re-adjourned. As it adjourned for the second time, the Kemerovo court directed NKAZ and the BMT Plaintiffs to file all documents they intended to present by 6:00 p.m. that day.

256.    However, after only two hours, at 5:00 p.m., the court re-convened, demanding to know if the party's submissions were ready. When told the party's submissions were not yet ready, but would be by 6:00 p.m., the Kemerovo court shortened its deadline to 5:30 p.m., but actually reconvened at 5:20 p.m.

257.    At 5:20 p.m., the Kemerovo court reconvened only long enough to deny a motion to re-extend the document deadline until its original time, to wit, 6:00 p.m., and to summarily grant the motions to remove MIKOM and appoint Chernyshev as Acting Manager.

258.    The Kemerovo court's ruling was in violation of many aspects of Russian law and Western notions of fundamental fairness and due process, including but not limited to, the Russian Procedural Code, which permits all parties to a case to introduce evidence, to cross-examine adverse parties, and to appoint interpreters for foreign parties, such as BMT SA and Alucoal.

259.    The numerous improper and erroneous decisions of the Court including, but not limited to, allowing the stayed Second Kuzbass Action judgment debt to serve as the basis of the bankruptcy, the acceptance of the local procurator's petition, and the transfer of control from MIKOM to Chernyshev without a fair hearing, resulted from corruption of the Court and the influence exerted by the Conspirators and their allies.

260.    With the appointment of Chernyshev as Acting Manager, the Conspirators completed an important step in the seizure of NKAZ, controlling the day-to-day operations of the plant.

## CHERNYSHEV'S INITIAL PAYBACK TO KUZBASS

261.    As mentioned above, the First Kuzbass Action and Second Kuzbass Action were filed against NKAZ and were being contested by NKAZ.

262.    After the Sham Hearing on February 16-17, 2000, Chernyshev, who was then in control of NKAZ, instructed NKAZ's attorneys to neither appear nor to further contest those actions. As a result, on March 10, 2000, the Kemerovo Court gave a judgment to Kuzbass in the "First Kuzbass Action."

263.    Chernyshev also instructed NKAZ's attorneys not to appeal the Second Kuzbass Action, although it would have been in NKAZ's interest to do so. Finally, in regards to the Kuzbass claims, Chernyshev further instructed NKAZ's attorneys to withdraw prosecution of its claim in the Kemerovo Tariff Action.

264.    Chernyshev's conduct at that time with regard to the Kuzbass claims was plainly designed to reward UES and Kuzbass for their cooperation in permitting the Conspirators to use the false tariff claims to seize control of NKAZ.

## SIBIRSKY'S FALSE BANKRUPTCY CLAIMS

265.    Following the sham hearing on February 16-17, 2000, and before the First Creditors Meeting on March 10, 2000, Chernyshev, in his role as Acting Manager, recognized fictitious and fabricated new creditors' claims totaling approximately $70 million.

266.    The new creditors included:

OOO Azial - 664,832,611 rubles

OOO Resources of Eurasia - 82,800,000 rubles

ZAO Aktaniya - 16,370,581 rubles

Flamstead Investments Ltd. - 738,863,993 rubles

A- 214

ZAO Klarus-Service - 3,298,755 rubles

Medal, LLP - 66,243 rubles

OAO Rostar Holdings SA – 414,023 rubles

SA Holding, LLC – 30 rubles

OOO Energopromservice –(1st claim) 101,833,215 rubles

OOO Energopromservice – (2nd claim) 12,409,751 rubles

267.    All of these companies were owned and/or controlled directly or indirectly by the Conspirators.

268.    The purpose of recognizing the additional false creditors was to provide voting power to the Conspirators' affiliates and co-conspirators because, under Russian bankruptcy law, votes at the Creditors' Meeting, and hence control of the meeting agenda, are proportional to the sums due each creditor.

269.    In contrast, Chernyshev refused to recognize many claims asserted by BMT Ltd., and Alucoal, that totaled about $60 million, despite the fact that such claims were timely presented with the proper documentation.

270.    The BMT Plaintiffs' claims amounted to the majority of NKAZ's overall indebtedness before the Illegal Takeover and some had been previously acknowledged by NKAZ.

271.    Throughout the bankruptcy proceeding, Chernyshev, the new false creditors and the Conspirators concealed the interrelationship between the Conspirators, the false creditors and Chernyshev.  As a result of the fraud perpetrated at the direction of the Conspirators, the First Creditors' Meeting agenda was controlled by the Conspirators.

-40-

A- 215

272.    At the First Creditors' Meeting, the captive creditors voted to place the company under external management and to appoint Chernyshev, their agent and already Acting Manager and Provisional Manager, as the External Manager. The Kemerovo court confirmed the appointment of Chernyshev as External Manager at a hearing on March 20, 2000.

273.    With his appointment to the position of External Manager, the Conspirators then had the means to cancel NKAZ's contracts with BMT, SA, and Alucoal, by virtue of Chernyshev claiming the right to do so under Russian bankruptcy law.

### CHERNYSHEV'S CANCELLATION OF THE CONTRACTS BETWEEN BMT PLAINTIFFS AND NKAZ AND REPLACEMENT WITH CONTRACTS WITH SIBIRSKY AFFILIATES

274.    Before the Illegal Takeover, BMT, SA, and Alucoal were NKAZ's leading suppliers of alumina and pitch coke, the main raw materials used in the production of aluminum.

275.    BMT SA, and Alucoal were also the main purchasers of finished aluminum from NKAZ. Before BMT SA's, and Alucoal's contracts with NKAZ, BMT Ltd., was the primary supplier of raw materials to NKAZ and purchaser of aluminum from it.

276.    Beginning on or about March 21, 2000, the day after his appointment as External Manager, Chernyshev illegally repudiated NKAZ's contracts with BMT SA, Alucoal, and NKAZ. He gave no reason for the cancellations at the time.

277.    The contracts repudiated by Chernyshev included contracts that had been partially performed and contracts where NKAZ's obligation to perform was previously acknowledged by NKAZ.

278.    In the meantime, Chernyshev arranged for substitute contracts with Conspirator controlled companies and/or their affiliates for the purchase of alumina and for the sale of aluminum produced at NKAZ. These new contracts included an agency agreement, dated

February 22, 2000, that appointed a Sibirsky related company, known as Azial, as NKAZ's commissioned "agent" for NKAZ's sale of aluminum.

279.   The agency agreement between Azial and NKAZ was signed for NKAZ by V.V. Geintse, a former member of SibAl's Board of Directors, the Acting Executive Director of Sayansky Aluminum Zavod, and Chernyshev appointee to the post of NKAZ's acting general director in the bankruptcy.

280.   Azial prepared a contract, dated January 22, 2000 -- that is, before Azial's appointment as NKAZ's "agent" -- between itself and NKAZ, to deliver alumina to NKAZ.  As of January 22, 2000, Azial had no right or expectation of selling alumina to NKAZ because the plant had long term contracts in place with BMT, SA, and Alucoal.  Thus, Azial clearly knew in advance the outcome of the bankruptcy proceeding.

281.   Upon information and belief, when the contract was signed by NKAZ, on March 9, 2000, V.V. Geintse, the same individual who signed the agency agreement, again signed for NKAZ.

282.   On January 21, 2000, Azial also contracted with Unimetal, to provide 270,000 metric tons of NKAZ aluminum to Unimetal -- again, prior to Azial's appointment as NKAZ's "agent".

283.   The aluminum contract was provisionally valued at $334.8 million, and was apparently executed by the parties even though neither Azial nor Unimetal had a previous relationship with NKAZ and neither had an expectation that it had access to NKAZ product, unless the outcome of the bankruptcy was pre-arranged and known by Azial and Unimetal in advance.

-42-

A- 217

284.    The contract between Azial and Unimetal also identified the correspondent bank of Unimetal for monetary transactions related to the contract for aluminum as "Banque Nationale de Paris New - York USA."

285.    Upon information and belief, funds from the transactions related to the performance of the January 22, 2000 contract for delivery of aluminum were wired through Banque Nationale de Paris in New York, New York.

286.    The appointment of Azial as sales agent to NKAZ made no commercial sense because it created an unnecessary and inefficient middleman for the sale of NKAZ products.

287.    In addition, and as set forth below, the appointment of Azial as sales agent for NKAZ resulted in large losses in the millions of dollars to NKAZ from lost tax deduction opportunities, which money went to Azial and the Conspirators instead.

288.    Furthermore, the contract between NKAZ and Azial provided for less favorable terms to NKAZ than the repudiated contracts with BMT, SA, and Alucoal.

289.    The reason for the new contracts was to allow the Conspirators to divert profits from NKAZ to themselves.

290.    As with all the interrelationships between the defendants, Chernyshev and the Conspirators concealed the relationship between Azial, Unimetal and Sibirsky.

### THE ARREST OF NKAZ METAL:
### THE CAMDEN, BALTIMORE, AND NEW ORLEANS ARRESTS

291.    In 2000, BMT, Ltd., filed several actions, pursuant to the New York Convention on the Uniform Enforcement of Foreign Arbitral Awards, seeking to confirm and enforce a previously obtained $12 million Moscow Chamber of Commerce Arbitration award ("Arbitration Award") against NKAZ.

292.    Actions were filed in the state court in Camden, New Jersey, which was subsequently removed to the federal court, and in the federal courts of Baltimore, Maryland and New Orleans, Louisiana.

293.    Based upon documents produced in those cases, BMT, Ltd., has learned that the proceeds from the United States sales of NKAZ metal were being diverted from NKAZ to the Conspirators, to the detriment of the BMT, Ltd.

## THE BALTIMORE PROCEEDING

294.    In the Baltimore proceeding, BMT, Ltd., arrested approximately $4.5 million of NKAZ metal in order to satisfy the Arbitration Award.

295.    Discovery in the case revealed that the NKAZ metal had allegedly been transferred from Azial to Unimetal to Aluminum of Siberia (UK), an affiliate of Sibirsky, to MG Metals.

296.    However, instead of the funds being returned to NKAZ at the end of the transaction, Aluminum of Siberia (UK) diverted those funds to Fastact Development, Ltd., a Cyprus company controlled by the Conspirators. The diverted funds were wired through banks in the United States, including the correspondent bank, for A of S in this transaction, Citibank, New York.

## THE NEW ORLEANS PROCEEDING

297.    In the New Orleans proceedings, BMT, Ltd., arrested approximately $4 million of primary aluminum to satisfy the Arbitration Award.

298.    Discovery in the case revealed that the aluminum had allegedly been transferred from Azial to Unimetal to Runicom Trade Limited (now known as RUAL) to Glencore, Ltd. to Transworld (Aluminum), Inc.

-44-

299.    Again, however, rather than the proceeds of the sale being paid to NKAZ at the end of the transaction, the funds were wired through Chase Manhattan Bank and First Union International Bank (New York Branch), in the United States, and then laundered through the use of a bank on Vanuatu, an atoll in the South Pacific, to places unknown.

## THE CAMDEN PROCEEDING

300.    In the Camden, New Jersey case, BMT, Ltd., arrested approximately $1.5 million of NKAZ primary aluminum to satisfy the Arbitration Award.

301.    According to documents produced in that litigation, the funds to pay for the aluminum were allegedly wired through US banks, including Chase Manhattan Bank, New York, to the bank accounts of Metcare and Unimetal.

## THE FALSE CRIMINAL CHARGES AGAINST ZHIVILO

302.    Following BMT, Ltd.'s, success in arresting approximately $10 million of aluminum in the United States, Tuleyev announced that Mikhail Zhivilo had conspired with Alexander Tikhonov, a four-time Olympic biathlon champion, to murder Tuleyev. As a result, Tikhonov was arrested in Moscow and false charges were filed against Mikhail Zhivilo.

303.    Zhivilo subsequently traveled to France where he filed a petition for territorial asylum and was taken into custody, in February 2001. At the first hearing, the French Court summarily rejected Russia's request to extradite Zhivilo based on these false charges.

304.    The false allegations of murder are part of the Conspiracy to disadvantage the BMT Plaintiffs and continue the Conspirators' takeover of the Russian aluminum industry.

## NO HONOR AMONG THIEVES

305.    Subsequent to the Illegal Takeover, the Conspirators reached a final agreement to combine their holdings with the holdings of a powerful Russian oligarch and form Russian

Aluminum. The formation of Russian Aluminum effected the Conspirators' goal of establishing a monopoly over the Russian aluminum industry.

306.    As a result of the final deal with the Russian oligarch, and competition between this oligarch and Chubais, who owned UES, the Conspirators concluded that they no longer needed the support of UES or Kuzbass. Therefore, the Conspirators repudiated their agreement to compensate UES for its cooperation in the NKAZ bankruptcy and, through Chernyshev, sought to eliminate Kuzbass from the list of NKAZ's creditors.

307.    In connection with its efforts to eliminate Kuzbass's creditors' claim, before the First Creditors' Meeting Chernyshev, *inter alia*, recognized a claim by a false creditor with an amount virtually identical to that of Kuzbass, thus neutralizing Kuzbass's votes at the Creditors' Meeting.

308.    As a result, Chernyshev directed that NKAZ resume opposition to the various Kuzbass actions with the result that the Second Kuzbass Action, the very basis for the original bankruptcy, was reversed, on May 23, 2000. As a result of the reversal of the Second Kuzbass Action, Chernyshev, for a period of time, was able to remove Kuzbass from the creditors' list.

309.    By that time, however, the Conspirators through Chernyshev were firmly in control of NKAZ and the bankruptcy process aided by the corrupt decisions of the Russian courts; therefore, MIKOM was powerless to reacquire control of NKAZ, and the BMT Plaintiffs were completely shut out of the bankruptcy process, a fate that the Tumen Stay Order would have prevented if the Kemerovo court had honored it.

310.    Ultimately Kuzbass was able to restore its claim to the creditors' list.

311.    Since the Conspirators could no longer depend upon the Kuzbass votes, they orchestrated the recognition of additional fraudulent NKAZ debts in time for the Final Creditors'

-46-

Meeting, on March 6, 2001, to ensure that they maintained control of the Creditors' Meeting agenda. By so acting, the Conspirators were able to maintain control of the Final Creditors' Meeting.

**THE CHANGE IN OWNERSHIP OF NKAZ AND**
**THE SHAM BANKRUPTCY SETTLEMENT**

312. In or about August 2000, four companies purchased a controlling interest in NKAZ from its then shareholders, who were forced to sell at a distressed price due to the Illegal Takeover. The funds for the purchase of the controlling interest in NKAZ were wired through banks in the United States.

313. Upon information and belief, the Conspirators controlled the purchasing companies, directly or indirectly. As a result, the Conspirators took control of the ownership of NKAZ.

314. Upon information and belief, in the mid-1990's, Chernoi transferred funds obtained from his illegal activities to Blonde Management and Pan-American for Kislin to launder in the United States. Upon information and belief, these funds were wired from the United States in order to purchase the NKAZ shares as part of the Illegal Scheme.

315. Once in control of the shareholders of NKAZ, the Conspirators arranged for an end to the bankruptcy by gaining approval of a sham settlement agreement, using NKAZ's false creditors' votes at the Final Meeting of Creditors on March 6, 2001.

316. At the Final Creditor's Meeting, the false creditors narrowly controlled the agenda to force acceptance of a settlement agreement highly prejudicial to the legitimate creditors of NKAZ, including the BMT plaintiffs.

317. The corrupt Kemerovo court approved the settlement agreement on April 3, 2001.

318.    The sham settlement agreement provided for a "settlement" of creditors claims by giving them non-interest bearing promissory notes, payable in rubles, "upon demand but no earlier than March 6, 2021," that is, payable twenty years in the future.

319.    The sham settlement agreement caused no prejudice to the Conspirators' allied creditors since their claims were false to begin with.

320.    Thus, by ending the bankruptcy in the manner set forth herein, the Conspirators gained full control of NKAZ and all of its prospective profits without the obligation to pay any legitimate past debts or to honor NKAZ's previous commitments.

321.    At the current time, the Conspirators fully control NKAZ, and, through such control, are directing the sales of metal from NKAZ, and the purchase of raw materials by NKAZ, to benefit their affiliates, such as Metcare, RUAL, Bauxal and Unimetal.

322.    Furthermore, the Conspirators are siphoning the profits of NKAZ to their affiliates, such as Fastact, while avoiding any obligation to pay NKAZ's legitimate creditors, such as the BMT Plaintiffs and MIKOM.

### CHERNYSHEV'S CONCEALMENT OF HIS RELATIONSHIP WITH SIBERSKY AND THE FALSE AFFIDAVIT FILED IN THIS PROCEEDING

323.    At no time during the bankruptcy did Chernyshev reveal that he had any prior relationship with any participant in the bankruptcy.

324.    Indeed, in this very action, Chernyshev submitted an Affidavit stating, in paragraph 6, that prior to his appointment as External Manager in the bankruptcy, he was an employee of Sayan Agro and that he was never an employee of Sibirsky or any of its affiliates.

325.    In fact, Chernyshev, contrary to his statement, did have prior employment with Sibirsky Aluminum and its affiliates.  Sibirsky's own website, in Russian, proclaims that Sayan Agro is a member of Sibirsky and that SAZ founded Sayan Agro.

-48-

**A- 223**

326.    SAZ, the first aluminum plant taken over by the Conspirators, is a pillar of the Sibirsky Aluminum Group.

327.    Evidence of the close interrelationship between the Conspirators, the false creditors, Sibirsky, and Chernyshev is demonstrated by documents filed on or about April 22, 1999, in Sayanagorsk, that state, *inter alia*, that: Sayan Agro was owned in part by the SAZ (13.4%), ZAO Aktaniya (18.85%) and ZAO Klarus-Service (18.85%). ZAO Aktaniya and ZAO Klarus-Service, as set forth above, were among the additional false creditors claims recognized by Chernyshev before the First Creditors' Meeting.

328.    The extraordinary inter-relationship of the Conspirators, Sibirsky, Chernyshev, and the false creditors is also demonstrated by Chernyshev's relationship with Igor Nikolayenko ("Nikolayenko"), one of his assistant appointees in the NKAZ bankruptcy. Nikolayenko, in addition to his appointment in the NKAZ bankruptcy, was the general director of ZAO Aktaniya, a false creditor, general director of Energopromservice, *another* false creditor, and he was listed in 2000 as the head of Sibirsky's legal department.

329.    Nor was Nikolayenko's situation unique, V.V. Geintse, who signed the unfavorable Azial agency agreement and the alumina purchase contract for NKAZ, served as the Acting Executive Director of SAZ, parent of Chernyshev's former employer, an integral part of Sibirsky.

330.    The concealed close inter-relationships between the Conspirators, the false creditors, and Chernyshev is further demonstrated by the fact that Chernyshev appointed other Sibirsky employees as his assistants in the NKAZ bankruptcy, including Andrei Korobko and Y.G. Mazurenko.

-49-

A- 224

331.    Andrei Korobko, a Sibirsky employee, for instance, signed a $6.1 million contract for NKAZ that added a false creditors' claim needed to ensure Conspirator control at the Final Creditors' Meeting.

### THE KUZBASS COMPLAINT AGAINST CHERNYSHEV

332.    Attached hereto as Exhibit "B" is a true and correct copy of an administrative complaint (Russian with English translation) filed by Kuzbass, the jilted ally, against Chernyshev with the Federal Service for Financial Rehabilitation of Russia, on January 23, 2001.

333.    Attached hereto as Exhibit "C" is a true and correct copy of a supplemental letter to the administrative complaint (Russian with English translation) filed by Kuzbass in the above action, on April 19, 2000.

334.    Plaintiffs came into possession of these two documents in July 2001.

335.    The complaint alleges that Chernyshev ignored major debtors, repeatedly violated the law while serving in the bankruptcy, knowingly entered unfavorable contracts, and did not demand collection of accounts receivable from certain metal purchasers.

336.    Specifically, Kuzbass asserts that from February 2000 to March 10, 2000, Chernyshev increased the debt obligations of NKAZ by approximately $70 million by entering secured contracts that gave NKAZ nothing needed for its business activities.

337.    However, because the debts were secured with NKAZ property, these new creditors were placed in a preferred position on the NKAZ bankruptcy creditors' list.

338.    Kuzbass also asserts that during the period of external management, Chernyshev allowed the accounts receivable of NKAZ to increase from $60 million to $103 million.

339.    Considering that the original debt upon which the bankruptcy was based equaled approximately $26 million, Chernyshev's inaction in this regard can only be explained by the

ulterior motives of the Conspirators, to entirely take over and control NKAZ without regard to the false debts that were accumulating.

340.    In addition, Kuzbass details the economic disadvantage to NKAZ of the Azial agency agreement.  Specifically, the agency agreement gave Azial the right to benefit from a VAT exemption rightfully belonging to NKAZ, with a resultant loss to NKAZ of at least $25 million, almost enough to pay the original Second Kuzbass Action judgment and end the bankruptcy before it started.

### THE TAKEOVER OF GOK

### THE INITIAL EXTORTION

341.    Prior to December 1998, Khaidarov had worked for Chernoi and Makhmudov as a financial advisor. In December 1998, Khaidarov established an independent career and began to serve as the general director of GOK.  He was officially appointed to this position in April 1999.

342.    In April 1999, Khaidarov met two times with Chernoi and Makhmudov in Chernoi's apartment in the center of Paris regarding GOK.  Upon information and belief, Chernoi and Makhmudov paid for their travel with corporate credit cards issued and guaranteed by Blonde Management.

343.    At the second meeting, Chernoi told Khaidarov that "there were a lot of clever people like Felix Lvov, Boris Kantor, Yafiasov, but sometimes they die.  Don't be too clever. You have a chance to continue working with us.  To that end, you should persuade the shareholders of GOK to transfer their shares to us.  Some people refuse my offers.  But for the rest of their lives, they wear bullet proof jackets.  So what's the sense?  Think it over."  This was a direct threat on the life of Khaidarov if he did not cooperate with Chernoi.

344.    By May-June, 1999, the controlling shareholders of GOK agreed preliminarily to sell 20% of their shares to a company controlled by the Conspirators in response to the extortion. The GOK controlling shareholders hoped that this would satisfy the Conspirators.

345.    Makhmudov and Chernoi made a down payment of $5 million for these shares, which was wired through a bank in the United States to an account held on behalf of the GOK shareholders.

346.    Several months later, Makhmudov made a new demand. He told Khaidarov that the Conspirators needed a controlling share of GOK, and Chernoi demanded that Khaidarov arrange for additional shares of GOK to be transferred to the Conspirators.

347.    In response, the GOK controlling shareholders decided that it was impossible to cooperate or satisfy Chernoi and Makhmudov, short of simply giving up their interests for far less than their worth. As a result, the GOK shareholders returned the $5 million and the purported transfer of shares did not take place.

348.    This transfer also was made through a bank in the U.S.

### THE MALEVSKY EXTORTION

349.    Immediately thereafter, in November 1999, Khaidarov was asked to meet with Makhmudov at the Luxor Restaurant at the Metropole Hotel in Moscow.

350.    Shortly after the meeting began, Makhmudov called Malevsky, who then joined the meeting, accompanied by five armed thugs. Makhmudov demanded that Khaidarov arrange that the GOK controlling shareholders transfer one-half of their shares to Chernoi without payment.

351.    Khaidarov said he thought Makhmudov was crazy, but that he would transmit the message. Malevsky then told Khaidarov, "What do you think you're saying? This is the last time that you will leave here alive."

-52-

## THE BRIBERY OF GOVERNOR ROUSSEL

352.    As of 1999, Eduard Roussel ("Roussel") was the Governor of the Sverdlovsk Oblast, where GOK was located.

353.    In 1999, meetings were arranged between representatives of the Conspirators, including Makhmudov and Kozitsin (who replaced Khaidarov as general director of GOK), to pay Roussel for his "protection" and "help."

354.    In 1999, payments were made by Pan-American and Blonde Management through banks in the United States to MDM Bank for conversions into cash for payment at the direction of Roussel.  These payments included the illegal payment of $850,000 in cash for Roussel's election campaign -- a payment that was widely reported in the Russian press.

355.    In return for these payments, Roussel agreed to support the Conspirators' efforts to do business in Sverdlovsk Oblast.

## THE PHYSICAL TAKEOVER OF GOK

356.    On or about January 28, 2000, Makhmudov and Chernoi sent a small army of armed thugs into GOK to take over the company.  They were supported by the regional authorities.

357.    By threat of physical harm, Makhmudov and Chernoi caused four of the seven member board of directors of GOK to vote to remove Khaidarov as general director and to replace him with Andrey Kozitsin, an agent of the Conspirators.  This violated the charter of GOK, which required five board members to vote to remove the general director.

358.    The three remaining board members initially refused to succumb to the threats and filed criminal complaints with the Prosecutors of the Kachkanar and Sverdlovsk areas, requesting initiation of the criminal proceedings in connection with the illegal takeover.

-53-

359.    Immediately after the illegal takeover and the board meeting, an individual shareholder controlled by the Conspirators commenced a sham court action in the Kachkanar City Court to invalidate the illegal decision of the board which was a preemptive to prevent other shareholders from initiating their own actions. The court denied the claim on the following court day.

360.    Ultimately, the decision was appealed on the grounds that five votes were needed to remove Khaidarov. As a result of this appeal, Malevsky's people threatened the three resisting directors that their families would be killed. Two of the remaining directors then agreed to support the Conspirators and, in return, received bribes in the form of expensive automobiles and apartments in Moscow.

361.    Upon information and belief, these apartments and automobiles were purchased with cash from MDM Bank which had been wired through banks in the United States from Pan American, Blonde Investment, or another company associated with the Conspirators.

### MAKHMUDOV'S THREAT

362.    After the illegal takeover of GOK, one of Makhmudov's men met with Khaidarov on the day after he was released from the hospital.

363.    The man said that the Conspirators knew that Khaidarov and the GOK shareholders could fight them with complaints to the authorities and lawsuits in Russia.

364.    The man said that the Conspirators also knew that Khaidarov had relatives in Taskent and that his wife and son were then in England, and threatened harm to them if Khaidarov resisted the takeover.

## THE INITIAL EFFORTS TO FIGHT THE ILLEGAL TAKEOVER

365.    On or about March 4, 2000, shareholders of GOK conducted a meeting to invalidate the illegal decision of the board which removed Khaidarov as the general director.

366.    The mayor of Kachkanar attempted to prevent the meeting by issuing a decree to keep out of the town all non-residents and by blocking the road approaching the town with local police.

367.    Despite these efforts, the meeting of shareholders took place on a side of the road near Kachkanar.

368.    The shareholders adopted a resolution invalidating the decision of the illegal board meeting, elected a new board of directors, and expressed confidence in Khaidarov as general director of GOK

## MALEVSKY'S FINAL THREAT

369.    Malevsky met with Khaidarov at the Balchug-Kempinsky Hotel in Moscow in late February, early March 2000. There, he said to Khaidarov: "What are you doing?  It's going to end badly for you. Nobody will help. Not the FSB [Federal Securities Service]. Not the MVD [Ministry of Interior Affairs]."

370.    Malevsky was sending the message that the Conspirators controlled government agencies and that Khaidarov and the GOK shareholders had a "last chance" to give up.

## THE CREATION OF THE FALSE DEBT OF GOK

371.    Recognizing that the shareholders of GOK still had an opportunity to reacquire control, the Conspirators arranged for GOK to incur massive false debts prior to placing it in bankruptcy.

372.    The Conspirators and MDM Bank arranged for Kozytsin, who was purportedly acting as general manager of GOK, to enter into a number of sham transactions.

-55-

A- 230

373.    The end result of the sham transactions was that a small company, Leybout, during the period of several days in the middle of February, became a holder of demand promissory notes issued by GOK with the face value of about $39 million through the following scheme.

374.    First, Kozytsin, on or about January 28, 2000 -- the very day of the GOK Takeover -- had GOK enter into a Joint Venture Agreement (the "JV Agreement") with a Russian company named Svyatogor.  Pursuant to the JV Agreement, GOK was to contribute funds to the joint venture.

375.    Ural-Electromed owned 51% of Svyatogor's shares at that time.  At the time of his purported appointment as the general director of GOK, Kozytsin was one of the key employees of Ural-Electromed.  Thus, Kozytsin had clear (and concealed) conflict of interest entering into the purported JV Agreement.

376.    Subsequently, on or about February 4, 2000, the Conspirators arranged for MDM Bank to enter into a Credit Agreement with GOK for $15 million to be loaned to GOK and repaid within several days.  On February 4, 2000, MDM Bank loaned the $15 million to GOK, which Svyatogor purportedly guaranteed under a guaranty agreement (the "Guarantee Agreement").

377.    Upon information and belief, the money was transferred via a book entry to the GOK's account with MDM Bank.

378.    Under the terms of Guarantee Agreement, GOK was to pledge its promissory notes for approximately $25 million as "security" for Svyatogor's issuance of Guarantee.

379.    Subsequently to GOK's delivery to Svyatogor of its promissory notes, on February 10, 2000, GOK transferred to Svyatogor's account with MDM Bank about $10 million

-56-

as its contribution to the "Joint Venture." Upon information and belief, the remaining $5 million was also transferred to Svyatogor's account with MDM Bank.

380. On February 10, 2001, GOK "defaulted" on its obligation to repay MDM Bank for the $15 million loan.

381. The following day, Svyatogor paid $10 million to MDM Bank from its account with MDM Bank pursuant to the Guarantee. Upon information and belief, Svyatogor paid the remaining $5 million to MDM Bank from its account with MDM Bank.

382. Pursuant to the terms of the Guarantee Agreement, after the "default," Svyatogor became the holder of the promissory notes for $25 million.

383. Just 10 days thereafter, on or about February 21, Svyatogor transferred the promissory notes to Leybout.

384. Thus, as a result of this "transaction," the Conspirators arranged for $15 million to circulate on MDM Bank's books through GOK's and Svyatogor's accounts, and, in return, obtained $25 million of GOK notes.

385. In summary, through the use of various sham contracts during the period of five days from February 18 to February 23, Leybout accumulated a total of 53 GOK promissory notes with a face value of approximately $39 million.

386. These notes were purportedly issued by GOK under Kozytsin's management during the period from February 4 to February 23, creating over $39 million of false debt of GOK, which was held by Leybout.

### THE SHAM BANKRUPTCY OF GOK

387. Following the "last chance" meeting with Malevsky, the Conspirators arranged for a false bankruptcy to take place in order to cement their control over GOK, causing a local natural gas company to file an involuntary bankruptcy petition against GOK on March 24, 2000.

-57-

A- 232

388.    The gas company's receivables were not overdue under the terms of a prior settlement agreement with GOK, and thus under Russian Law, they could not be used as a basis for the bankruptcy petition.

389.    Nevertheless, on or about March 30, 2000, the Sverdlovsk Arbitrazh Court ("SAC") accepted the bankruptcy petition and appointed Oleg Kozyrev as provisional manger.

390.    Subsequent to his appointment, Kozyrev, without providing any justification, denied the recognition of a $7 million valid claim by Nexis arising from a certain loan agreement with GOK.

391.    On or about August 11, 2000, Kozyrev held the first meeting of creditors where Leybout's fraudulent claim amounted to 94% of creditor votes.

392.    As a result of the first creditors meeting, Kozyrev was nominated as external manager of GOK.

393.    Under Russian Law, an external manager has management authority over a company.  Thus, the appointment allowed the Conspirators to avoid the risk that a court could invalidate the decision to remove Khaidarov and return him to the position of the general director of GOK.

394.    Shortly thereafter, on or about August 22, 2000, the SAC held a hearing to approve the decision of the first meeting of the creditors.  The Sverdlovsk Oblast government controlled by Roussel filed a petition in support of the approval of the appointment of Kozyrev in order to send a signal to the Court, causing the SAC to approve the appointment of Kozyrev.

395.    After Kozyrev was appointed as external manager in August 2000, the Conspirators arranged for the Davis Plaintiffs to be removed from the registry of shareholders of

A- 233

GOK and for shares which belonged to them to be secretly transferred to Venitom, Unidale, and Investland.

396.     This tactic is a relatively common method in Russia by which organized crime groups seize control of economic enterprises.

### THE FRAUDULENT TRANSFER OF THE DAVIS SHARES

397.     On or about September 30, 2000, the Conspirators had Kozyrev change the registrar of shares to VRK Company, a "friendly" company organized by Ural-Electromed, the company which was used to create the false debt described above, and where Kozytsin was one of the key employees.

398.     In violation of Russian Law, no notice was ever published in a newspaper at least 45 days prior to the changing of the registrar.

399.     On or about October 18, 2000, the VRK Company registered a transfer of about 35 million shares of GOK from Davis to New Start Group Corporation ("New Start"), a company organized under the laws of the state of Delaware.

400.     In order to cloak the transfer with the appearance of legitimacy, the Conspirators arranged for Mr. Ashenbrenner, a prior agent of Davis, to submit to VRK a power of attorney authorizing him to transfer shares from Davis to New Start. This power of attorney, however, had been revoked on or about September 28, 2000 -- three weeks before the fraudulent transfer.

401.     Furthermore, in order to give the transfer of the Davis shares appearance of legality, the Conspirators, on or about October 20, 2000, arranged for New Start to make a wire transfer in the amount of $2 million to Davis' account with MDM Bank. The wire transfer was effected utilizing ABN-Amro Bank NV, New York, NY.

402.     Three days later, the Conspirators arranged for MDM Bank to wire the above $2 million from Davis's MDM Bank account to an account "titled Davis International (USA)" with

a bank in Latvia. This transfer was based on a forged payment order executed by Ashenbrener. At no time did Davis maintain an account with the Latvian bank or authorize opening of such account. At no time did Davis authorize Ashenbrener to execute any payment orders on its behalf.

403.    The Davis Shares, in whole or in part, are currently registered in the name of Investland, Unidale, and/or Venitome, having been transferred to them by New Start.

### THE FRAUDULENT TRANSFER OF OMNI'S SHARES

404.    Prior to 2000, Omni purchased its shares in GOK from various entities who had acquired the shares as a result of a judicial sale that occurred in September 1998.

405.    In spring 2000, NPRO Urals filed a lawsuit in the Chelyabinsk Arbitrazh Court (ChAC) to set aside the judicial sale.

406.    On August 1, 2000, ChAC ruled in favor of NPRO Urals and ordered that the shares be re-registered in the name of NPRO Urals.

407.    By decision dated October 16, 2000, the appellate division of ChAC ordered that the shares be re-registered, which occurred on or about November 15, 2000.

408.    the ChAC order was affirmed in January 2001.

409.    Contrary to Russian law, Omni was never notified of or participated in these proceedings and did not learn of the transfer until two months after it took place.

410.    Omni's shares are currently registered in whole or in part in the name of Investland, Unidale, and/or Venitome.

### THE FRAUDULENT TRANSFER OF FOSTON'S SHARES

411.    In 2000, three Russian plaintiffs sued Foston for a declaration that Foston was required to transfer its shares in the Solntsevo Intermunicipal Court (SIC) in Moscow.

-60-

412.    Foston was never notified of the proceedings and, instead, a forged power of attorney was submitted to the Court purportedly on behalf of Foston.

413.    On September 29, 2000, absent any opposition, the Court ordered the transfer of 1.2 million GOK shares owned by Foston to these companies, which are owned and controlled, directly or indirectly, by the Conspirators.

414.    Foston was never notified of the SIC proceedings, and Foston learned that its shares in GOK were transferred on October 31, 2000.

415.    On March 30, 2001, upon the application of Foston, the Moscow City Court reversed the decision and remanded the case to the SIC where the case is presently pending. Further, as a result of the forged power of attorney, Foston filed a criminal complaint. Shortly thereafter, the original file in the SIC court was stolen.

416.    As a result of the original decision, the shares are no longer in Foston's name and instead are owned in whole or in part by Investland, Unidale, and/or Venitome.

### THE FRAUDULENT TRANSFER OF HOLDEX'S SHARES

417.    In 2000, a suit was filed by GOK in the Kalmykia Arbitrazh Court (KaAC) against Polyprom, which was the company that sold its GOK shares to Holdex to declare that the sale of shares to Polyprom was invalid.

418.    By order dated November 22, 2000, the Court ruled in favor of GOK and ordered that the shares be re-registered based on the submission of a forged contract allegedly entered between GOK and Polyprom on January 18, 1999.

419.    In fact, Polyprom was registered on June 22, 1999, over half a year after the alleged contract was executed. Furthermore, contrary to Russian law, neither Polyprom nor Holdex were notified of, did not participate in, the proceedings. Thus, they did not learn about this decision until about two months after it was rendered.

-61-

A- 236

420.    On or about December 22, 2000, the GOK shares owned by Holdex were re-registered as a result of the illegal proceedings to another Russian company.

421.    On or about April 17, 2001, the appellate court reversed and remanded the KaAC decision on the basis that the contract for sale of shares was forged and the person whose signature was forged intended to petition the Prosecutor to commence criminal proceedings.

422.    Subsequently, KaAC held another hearing on this matter, however, like the previous proceedings in the KaAC, neither Holdex nor Polyprom were notified of the hearing.

423.    Ultimately, these shares were transferred in whole or in part to Investland, Unidale, and/or Venitome as a result of the above fraudulent litigation proceedings conducted at the direction of the Conspirators.

## THE SHAM SETTLEMENT AGREEMENT

424.    After the fraudulant transfer of shares was completed and the Conspirators no longer needed the bankruptcy proceedings, they decided to terminate the bankruptcy by having GOK enter into a sham settlement Agreement with creditors.

425.    To that end, on or about March 3, 2001, Kozyrev held a Second Meeting of Creditors.

426.    Prior to the Second Meeting, Kozyrev recognized Nexis' claim which he previously denied.

427.    The reason for such recognition was to include this claim under the GOK sham settlement agreement to prevent Nexis from enforcing the claim that was not recognized during the bankruptcy, as permitted by Russian Law.

428.    Based on Leybout's huge claim, a sham settlement agreement was approved which provided that the payments to creditors would be effected without interest pursuant to the

-62-

A- 237

following schedule: 5% in 2006, 7% in 2007, 9% in 2008, 9% in 2009, 10% in 2010, and 15% each year thereafter until paid.

429.    The GOK sham settlement agreement was intended to make the debt owed to legitimate creditors worthless while transferring control of GOK from the bankruptcy to the "new" shareholders.

430.    Ultimately, the shares owned by the Davis Plaintiffs were transferred, in whole or in part, to New Start, Venitom, Unidale and/or Investland.

431.    Each of these companies is owned and controlled, directly or indirectly, by the Conspirators.

432.    Upon information and belief, these companies were formed by a representative of the Conspirators, who telephoned Kislin in the United States and arranged with Kislin to create these companies.

433.    Upon information and belief, these companies were formed by Kislin, who telephoned an incorporation service and paid for the costs of incorporation, by check through the use of the United States mails or by wire through a United States bank.

434.    Upon information and belief, the costs of incorporation were paid by Blonde Management or Pan-American with funds received from the sale of metal from the enterprises controlled by the Conspirators.

### THE FALSE CRIMINAL CHARGES AGAINST KHAIDAROV

435.    In retaliation for the filing of the Russian litigation to set aside the fraudulent transfer of the shares, the Conspirators arranged for false criminal charges to be brought against Khaidarov.

436.    In July 2000, false criminal charges were filed as a result of a well-publicized incident in which the police planted drugs on Khaidarov while he was eating at the Starlight

-63-

Diner in Moscow. The police asked Khaidarov for his passport and then "found" a packet of heroin inside.False charges of rape were also brought against Khaidarov. As a result of these false charges and threats on his life, Khaidarov was forced to flee Russia in November 2000 and now resides in another country under protection.

## THE PREDICATE ACTS

437.    The Illegal Scheme was effected by a pattern of related acts of murder, bribery, mail and wire fraud, extortion, money laundering, illegal transactions in monetary instruments, and interstate and foreign travel in aid of racketeering (collectively, the "Predicate Acts").

438.    Each of the Defendants herein knowingly participated in the formation of the Illegal Conspiracy with one or more defendants and willingly participated in the Illegal Conspiracy by knowingly and intelligently carrying out the Predicate Acts detailed herein. Based on the nature of the Illegal Scheme, some of the details of the defendants' wrongdoing are exclusively within the possession of the defendants, preventing plaintiffs from pleading certain acts with greater particularity.

## MURDER

439.    Chernoi, through Malevsky, with the knowledge of Deripaska and Makhmudov, committed numerous acts of murder and attempted murder to effectuate the Illegal Scheme.

440.    Those acts included, but were not limited to, Chernoi, through the Izmailovo Mafia and with the knowledge of Deripaska and Makhmudov, as part of the takeover of KRAZ, arranging for the murders of American Felix Lvov, Chistyak, Siniy, Tomach, Lyapa, and Tsmik.

441.    Those acts included, but were not limited to, Chernoi attempting to have Zhivilo murdered in March 1996, shortly after Chernoi threatened Zhivilo.

A- 239

442.    Those acts included, but were not limited to, Chernoi, through the Izmailovo Mafia and with the knowledge of Deripaska and Makhmudov, attempting to have Kemerovo regional deputy governor Chirakadze assassinated on July 3, 1997 for his role in investigating the fraudulent claims of Kuzbass.

### Extortion

443.    Chernoi, Deripaska, Makhmudov and SibAl committed numerous threats of both physical harm and economic loss, on behalf of themselves and the entities they controlled.

444.    Those acts included, but were not limited to, Chernoi, Deripaska, Makhmudov and SibAl engaging in extortion to effect the takeover of BRAZ in 1998 and to prevent Alcoa and Reynolds from competing for control of BRAZ.

445.    Those acts included, but were not limited to, in late 1994/early 1995, Chernoi threatening NKAZ's supply of alumina unless MiiKOM and BMT Ltd. agreed to pay kickbacks to Chernoi and his allies.

446.    Those acts included, but were not limited to, in the fall of 1995, in Chicago, Deripaska threatening that the Zhivilos would be murdered if protection money was not paid to Chernoi and his allies.

447.    Those acts included, but were not limited to, on three separate occasions (once in the fall of 1995, once in the spring of 1996, and once in 1998), Chernoi threatening that Zhivilo would be murdered if protection money was not paid to Chernoi and his allies.

448.    BMT Ltd. and Alucoal paid protection money and kickbacks as a direct result of the threats made by Deripaska and Chernoi.

449.    Those acts included, but were not limited to, Chernoi's and Makhmudov's threats in April 1999 to kill Khaidarov if he did not persuade shareholders of GOK to sell some of their shares to Chernoi, Makhmudov and the entities controlled by them.

450.    Those acts included, but were not limited to, in November 1999, Makhmudov and Malevsky, who was accompanied by five armed thugs, threatening to kill Khaidarov if he could not persuade GOK shareholders to transfer one-half of their shares to Chernoi, Makhmudov and entities controlled by them.

451.    Those acts included, but were not limited to, in January 2000 and thereafter, Makhmudov, Chernoi and Malevsky threatening to kill the directors of GOK, and their families, if they opposed the takeover of the company.

452.    As a direct result of these threats, Makhmudov, Chernoi and Malevsky were able to wrest ownership of GOK from the Davis Plaintiffs.

453.    Those acts included, but were not limited to, an agent of Makhmudov telling Khaidarov that if he challenged the takeover of GOK in court, or lodged complaints with the police, his relatives in Tashkent and his wife and son in England would be killed.

### Bribery

454.    Chernoi, Deripaska, Makhmudov and SibAl, MDM Bank, Pan-American, Blonde Investment, Blonde Management and Kislin engaged in acts of bribery in order to facilitate the Illegal Scheme.

455.    Those acts included, but were not limited to, Makhmudov, through his agents acting under his control, paying $3 million in bribes to Tuleyev in 1999-2000 for the purpose of using Tuleyev's government position to fix the Kemerovo Court proceedings and to obtain the false indictment of Zhivilo, thus facilitating the illegal Takeover.

A- 241

456.    Those acts included, but were not limited to, Makhmudov and Deripaska, on behalf of themselves and Chernoi, agreeing to pay bribes to Tuleyev so that Tuleyev would use his position and power to aid the defendants in taking over NKAZ through the Sham Bankruptcy.

457.    Those acts included, but were not limited to, Makhmudov and Chernoi agreeing to pay bribes to at least two GOK directors in exchange for support of their takeover of GOK.

458.    Those acts included, but were not limited to, Makhmudov and Chernoi paying more than $850,000 in bribes to Eduard Roussel, the governor of Sverdlovsk Oblast, so that Roussel would allow them to use the police to take over GOK and would exercise his influence over the corrupt Sverdlovsk judiciary.

459.    As a direct result of these bribes, over $ 4 million (U.S.) were paid to Tuleyev and Roussel through entities owned and/or controlled by Chernoi, Deripaska and Makhmudov, including MDM Bank, Pan-American, Blonde Management, and Blonde Investments, and through the direct involvement of Kislin.

### Mail And Wire Fraud

460.    Chernoi's, Deripaska's, Makhmudov's and SibAl's takeover of SAZ in 1997-1998 was accomplished by fraud, including, but not limited to, the establishment of deceptively named companies in the Bahamas, to which Chernoi, Deripaska and Makhmudov fraudulently directed shipments of aluminum.

461.    Chernoi's, Deripaska's, Makhmudov's and SibAl's takeover of KRAZ in the late-1990s was accomplished by fraud, including, but not limited to, the filing of false criminal charges against a representative of KRAZ management, and the cancellation of contracts with Aldeco through rigged court proceedings.

462.    Chernoi's, Deripaska's, Makhmudov's and SibAl's takeover of BRAZ in 1998 was accomplished by fraud, including, but not limited to, the manipulation of the local energy

-67-

provider such that it filed false claims against the plant, enabling Chernoi, Deripaska and Makhmudov to block Alcoa's and Reynolds' acquisitions and allowing Chernoi, Deripaska and Makhmudov to gain a controlling interest at a distressed price.

463.    Chernoi, Deripaska, Makhmudov and SibAl wired funds necessary to accomplish the fraudulent takeover of SAZ, KRAZ, and BRAZ, and proceeds from those frauds, through banks in the United States to entities controlled by Chernoi, Deripaska and Makhmudov, including, but not limited to, MDM Bank, Pan-American, Blonde Management and Blonde Investments and through the direct involvement of Kislin.

464.    Chernoi's, Deripaska's, Makhmudov's and SibAl's takeover of NKAZ was accomplished by fraud, including, but not limited to, the manipulation of Kuzbass and the local prosecutor such that a $26 million false claim was filed against the plant, sending it into the Sham Bankruptcy.

465.    Chernoi's, Deripaska's, Makhmudov's and SibAl's takeover of NKAZ was accomplished by fraud, including, but not limited to, failing to disclose that Chernyshev was affiliated with SibAl, enabling his appointment as temporary, interim manager, and then external manager, whereupon he appointed SibAl's employees, recognized fraudulent claims made and filed by Chernoi, Deripaska and Makhmudov and Sibirsky-affiliated companies.

466.    Chernoi's, Deripaska's, Makhmudov's and SibAl's takeover of NKAZ was accomplished by fraud, including, but not limited to, fraudulently manipulating the Russian court system to the detriment of the BMT Plaintiffs and MIKOM.

467.    Chernoi's, Deripaska's, Makhmudov's and SibAl's takeover of NKAZ was accomplished by fraud, including, but not limited to, diverting to other entities, including entities in the United States, aluminum to which BMT SA and Alucoal were entitled, thus preventing

-68-

A- 243

BMT SA and Alucoal from obtaining the benefit of the contractual arrangements they had reached with NKAZ, and by laundering the proceeds from those sales, thus concealing and making it more difficult to trace and collect money that rightfully belonged to the BMT Plaintiffs.

468.    As part of their fraudulent takeover of NKAZ, Chernoi, Deripaska, and Makhmudov elicited 16 extortion payments of approximately $1.5 million each from BMT Ltd. and Alucoal between April 1996 and October 1999 including, but not limited, to the following specific wires through banks in the United States: (i) a payment dated April 7, 1999, to Transmetal with Chase Manhattan Bank in New York acting as correspondent bank for the transaction; (ii) a payment dated October 12, 1999 to Transmetal with Chase Manhattan Bank in New York acting as correspondent bank for the transaction; and (iii) a payment dated December 12, 1996, to Transmetal through the Bank of New York account number 803-309-3455.

469.    Chernoi's and Makhmudov's takeover of GOK was accomplished by fraud, including but not limited to, installing a puppet manager of the company and causing him to enter into sham transactions. These transactions were used to manufacture more than $39 million in false debt, which was then used by Chernoi and Makhmudov to install Kozyrev as manager of GOK.

470.    Chernoi's and Makhmudov's takeover of GOK was accomplished by fraud, including but not limited to, in May or June 1999, Chernoi and Makhmudov wired $5 million to the GOK shareholders -- who had been forced to surrender some of their shares -- through a bank in the United States. This was false and misleading in that it was intended to create the false impression that Chernoi and Makhmudov would not seek to obtain further shares of GOK.

A- 244

471.   Chernoi's and Makhmudov's takeover of GOK was accomplished by fraud, including, but not limited to, in 1999, Pan-American and Blonde Management made payments through banks in the United States to MDM Bank, which were used by Chernoi and Makhmudov to bribe Roussel.

472.   Chernoi's and Makhmudov's takeover of GOK was accomplished by fraud, including but not limited to, in early 2000, Pan-American and Blonde Management wired funds through United States banks to MDM Bank, with Kislin's assistance, which were used to purchase the apartments and automobiles that were then used to bribe the GOK directors.

473.   Chernoi's and Makhmudov's takeover of GOK was accomplished by fraud, including, but not limited to, causing a local natural gas company to file an involuntary bankruptcy petition against GOK on March 24, 2000, even though the gas company's receivables were not overdue.  This petition was supported by the local government, which was controlled by its corrupt governor, Roussel.

474.   The fraudulant transfer of the Davis Plaintiffs' shares was accomplished by fraud, including but not limited to, using the mail and wire on numerous occasions to establish New Start, Venitom, Unidale and Investland and to park the Davis Plaintiffs' stock with these sham entities.  In order to give the fraudulant transfer of Davis' shares the appearance of legality, Chernoi, Deripaska and Makhmudov, on or about October 20, 2000, arranged for New Start to make a wire transfer for $2 million to Davis' account with MDM Bank.  This wire transfer was effected utilizing ABN-Amro Bank NV, New York, New York.  It was a sham transaction in part because these funds were subsequently transferred without Davis' consent to an account controlled by Chernoi, Deripaska and Makhmudov.

-70-

475.    Chernoi, Deripaska and Makhmudov, Sibirsky, Russian Aluminum and RUAL, wired funds necessary to accomplish the fraudulent takeover of NKAZ, and proceeds from those frauds, through banks in the United States to entities controlled by the Chernoi, Deripaska and Makhmudov, including, but not limited to, MDM Bank, Pan-American, Blonde Management and Blonde Investments, with Kislin's assistance.

476.    Chernoi, Deripaska and Makhmudov wired funds necessary to accomplish the fraudulent takeover of GOK, and proceeds from the fraud, through banks in the United States, to entities controlled by the Chernoi, Deripaska and Makhmudov, including, but not limited to, MDM Bank, Pan-American, Blonde Management and Blonde Investments.

477.    Three million U.S dollars necessary to bribe Tuleyev so that he would use his influence in the Kemerovo region to aid the Illegal Scheme was wired through entities controlled by Chernoi, Deripaska and Makhmudov in the United States, including Pan-American, which wired three payments totaling $1 million in or about June/July of 1999, Blonde Management and Blonde Investments, which wired a payment of $500,000 in or about June/July of 1999, and Ferrotrade, which, upon information and belief, wired $1.5 million in June/July 1999.

478.    As part of their fraudulent takeover of GOK, Chernoi, Deripaska and Makhmudov paid bribes to Roussel by wires through banks in the United States to MDM Bank for the benefit of Roussel, including, but not limited to, a payment of $850,000 in cash for Roussel's election campaign.

479.    Chernoi, Deripaska and Makhmudov, Sibirsky, Russian Aluminum and RUAL, communicated with purchasers of aluminum in the United States by wire, telephone and United States mail, either from Sibirsky's offices in the United States (Sibirsky US) to purchasers in the

A- 246

United States and other countries, or from their offices in Russia to the United States and other countries.

480.    SibAl communicated by wire, telephone and United States Mail with Sibirsky U.S., Unimetal, Bauxal, Metcare, the Izmailovo Mafia, Chernoi, Deripaska and Makhmudov to coordinate, facilitate and monitor the Illegal Scheme.

481.    The use of the wires and mails by defendants also included, but are not limited to, the following specific transactions in which funds were wired through United States banks for the metal sold in Camden, Baltimore and New Orleans:

### LOUISIANA

July 19, 2000 – Wire transfer for US $5,670,009.75 from Bankers Trust Company on behalf of Trans-World (Aluminum) Inc. through Chase Manhattan Bank to the Lloyds Bank account of Trans-World (Aluminum) Ltd.

June 29, 2000 – Wire transfer for US $2,568,976.26 on behalf of Trans-World (Aluminum) Ltd. through Chase Manhattan Bank to the UBS AG account of Glencore Int'l AG

May 24, 2000 – Wire transfer for US $2,799,521.82 by UBS on behalf of Glencore International through Business Mediterranean Bank, Ltd. through correspondent bank First Union International (New York Branch), account number 200193651733 for credit to Runicom Trade Ltd.

### MARYLAND

May 2, 2000 – Wire transfer for US $288,741.68 from Barclays Bank, Plc, on behalf of MG Metal & Commodity Co. Limited to the Credit Agricole Indosuez account of Aluminum of Siberia (UK) Ltd., wired through its correspondent bank, Citibank, New York, account number 3801991.

May 4, 2000 – Wire transfer for US $2,726,655.61 from UEB on behalf of MG Metal & Commodity Co. Limited to the Credit Agricole Indosuez account of Aluminum of Siberia (UK) Ltd., wired through its correspondent bank, Citibank, New York, account number 3801991.

May 9, 2000 – Wire transfer for US $4,131,860.32 from UEB on behalf of MG Metal & Commodity Co. Limited to the Credit Agricole Indosuez account of Aluminum of Siberia (UK) Ltd., wired through its correspondent bank, Citibank, New York, account number 3801991.

-72-

A- 247

May 31, 2000 – Wire Transfer for US $700,000.00 from Credit Agricole Indosuez on behalf of Aluminum of Siberia (UK) Limited to Fastact Development Ltd.

May 16, 2000 – Wire Transfer for US $1,000,000.00 from Credit Agricole Indosuez on behalf of Aluminum of Siberia (UK) Limited to Fastact Development Ltd.

May 10, 2000 – Wire Transfer for US $9,000,000.00 from Credit Agricole Indosuez on behalf of Aluminum of Siberia (UK) Limited to Fastact Development.

May 8, 2000 – Wire Transfer for US $3,000,000.00 from Credit Agricole Indosuez on behalf of Aluminum of Siberia (UK) Limited to Fastact Development

### NEW JERSEY

June 19, 2000 – Wire transfer for US $203,610.35 from BNP Paribas to the benefit of Marc Rich & Co., Investments, the parent of NOVARCO Limited.

June 19, 2000 – Wire transfer for US $1,149,743.12 from BNP Paribas to the benefit of Marc Rich & Co., Investments, the parent of NOVARCO Limited, and then by Marc Rich & Co. to bank accounts of Metcare and Unimetal.

### Money Laundering

482.    Predicate acts of money laundering were committed by Chernoi, Deripaska, Makhmudov, NKAZ, SibAl, Sibirsky U.S., MDM Bank, Unimetal, Metcare, Bauxal, Pan-American, Blonde Management, Blonde Investments, Kislin, and later Russian Aluminum and RUAL, knowing that the proceeds of the sale of metal from NKAZ, KRAZ, BRAZ, and SAZ had been obtained through the Illegal Scheme, as detailed above.  Defendants' acts of money laundering included, but were not limited to, the following allegations.

483.    During the period of time from 1995/1996 through the present, Chernoi, Deripaska, Makhmudov, SibAl, Sibirsky U.S., Pan-American, Blonde Management, Blonde Investments, Kislin, MDM Bank, Russian Aluminum and RUAL, engaged in numerous transfers, through banks located in the United States and foreign countries, of the proceeds from sales of metal produced by NKAZ, KRAZ, BRAZ, and SAZ, pursuant to and in furtherance of the Illegal Scheme, with the intent of concealing and disguising the ownership of these proceeds.

-73-

A- 248

484.    During the period of time from 1998 through the present, Pan-American, Blonde Management, Blonde Investments and Kislin knowingly served as agents of Chernoi in laundering the proceeds of Chernoi's involvement in the Illegal Scheme by, among other acts, investing those proceeds in real estate in New York City, and ultimately by selling those holdings for sums in excess of 100 million U.S. dollars, with the intent of concealing and disguising the ownership of these proceeds.

485.    Throughout the Illegal Scheme, Pan-American, Blonde Investment, Blonde Management and Kislin wired funds from the United States to MDM Bank in Moscow, the bank managed and operated by Makhmudov. MDM Bank, at the direction of Chernoi, Makhmudov and Deripaska, transferred those funds in cash to finance and promote the carrying on of the Illegal Scheme, including the paying of bribes to, among others, Tuleyev and Roussel.

486.    The Illegal Scheme involved, among other acts, the following acts of specified unlawful activity: murder, bribery, extortion, mail and wire fraud, Hobbs Act violations and travel act violations, as alleged herein.

487.    During the period of time from early 2000 through the present, and after the Illegal Takeover, Unimetal, Metcare and RUAL sold aluminum produced by SibAl and Russian Aluminum at NKAZ and, on SibAl's and Russian Aluminum's behalf, transferred the proceeds from those sales through banks located in the United States with the intent of concealing and disguising the true owners of the proceeds.

488.    During the period of time from 2000 through the present, and after the Illegal Takeover, Bauxal and RUAL sold alumina and bauxite to NKAZ and then engaged in various transfers, through banks located in the United States, of the proceeds from those sales in order to conceal and disguise their source.

-74-

489.     During the period of time from 2000 through the present, Chernoi and Makhmudov sold vanadium mined at GOK and processed by companies they controlled to purchasers located in the United States. Thereafter, Chernoi and Makhmudov engaged in numerous transfers, through banks located in the United States and foreign countries, of the proceeds from sales of GOK vanadium, pursuant to and in furtherance of the Illegal Scheme with the intent of concealing and disguising the ownership of these proceeds.

### Illegal Transactions in Monetary Instruments

490.     As alleged herein in the non-exclusive examples of the metal sold in Camden, Baltimore and New Orleans, Chernoi, Deripaska and Makhmudov, through Russian Aluminum, RUAL, Sibirsky and NKAZ, knowingly bought and sold aluminum from the plants they illegally took-over. Further, Chernoi and Makhmudov knowingly sold vanadium mined from GOK.

491.     Proceeds obtained from NKAZ metal sales and GOK vanadium sales pursuant to the Illegal Scheme constitute "criminally derived property" in excess of $10,000 and were wired through banks in the United States, including, but not limited to, Chase Manhattan, Bank of New York and First Union.

492.     Proceeds obtained from KRAZ, BRAZ and SAZ metal sales and GOK vanadium sales pursuant to the Illegal Scheme constitute "criminally derived property" in excess of $10,000 and were wired through banks in the United States by MDM Bank, Pan-American, Blonde Management, Blonde Investments and Kislin.

493.     Proceeds from the Illegal Scheme, which constitute "criminally derived property" in excess of $10,000, were wired from the United States to MDM Bank in Moscow by Pan-American, Blonde Management, Blonde Investments and Kislin. MDM Bank and Makhmudov transferred those funds (amounting to approximately $35 million in any given year) in cash to

A- 250