502.    Defendants, acting through their Illegal Scheme, caused metals to be sold among the States, between the States and foreign countries, caused contracts to be breached, and thereby affected the worldwide market for aluminum and vanadium.

503.    MIKOM, NKAZ, the BMT Plaintiffs, the Davis Plaintiffs and the GOK Plaintiffs all were engaged in foreign commerce with the United States.

504.    As part of the takeover of BRAZ, Chernoi's, Deripaska's, Makhmudov's and SibAl's extortion damaged the financial expectations of Alcoa and Reynolds, both American companies engaged in interstate and foreign commerce.

505.    In furtherance of the Illegal Scheme, Chernoi, working through Pan-American, Blonde Management, Blonde Investments and Kislin, laundered over $100 million, including proceeds from the Illegal Scheme, including acts of extortion, through real estate investments in New York City.

506.    Those and other acts of defendants affected commerce in contravention of the Hobbs Act.

### Interstate and Foreign Travel

507.    The Predicate Acts also include interstate and foreign travel in aid of racketeering by Chernoi, Deripaska and Makhmudov acting as agents for Russian Aluminum, Sibirsky U.S., SibAl and NKAZ.

508.    The Illegal Scheme involved, among others, the following acts of unlawful activity: bribery, extortion, murder, money laundering, engaging in illegal monetary transactions and mail and wire fraud, as alleged herein.

509.    The acts of interstate and foreign travel in aid of racketeering included, but were not limited to, Deripaska traveling to Chicago with the intent to extort Zhivilo, and thereafter extorted Zhivilo.

A- 252

510.    Upon information and belief, the acts of interstate and foreign travel in aid of racketeering included, but were not limited to, Chernoi, Deripaska and Makhmudov, acting as agents for Russian Aluminum, Sibirsky U.S., SibAl and NKAZ, traveling from the United States to Russia to promote, manage, establish, and carry on the Illegal Scheme.

511.    Upon information and belief, the acts of interstate and foreign travel in aid of racketeering included, but were not limited to, Chernoi, Deripaska and Makhmudov acting as agents for Russian Aluminum, Sibirsky U.S., SibAl and NKAZ, traveling from Russia and United States to Switzerland, to open bank accounts to promote, manage, establish, and carry on the Illegal Scheme.

512.    Upon information and belief, the acts of interstate and foreign travel in aid of racketeering included, but were not limited to, Chernoi, Deripaska and Makhmudov acting as agents for Russian Aluminum, Sibirsky U.S., SibAl and NKAZ, traveling to the United States and internationally, to distribute the proceeds of the Illegal Scheme.

513.    Upon information and belief, the acts of interstate and foreign travel in aid of racketeering included, but were not limited to, Kislin traveling to and from Russia, on behalf of Pan-American and Blonde Management, to assist in the takeover of GOK and the transfer of shares owned by the Davis Plaintiffs to New Start, Venitom, Unidale and Investland.

514.    These allegations are based upon the involvement of defendants Sibirsky U.S., Pan-American and Blonde Management, all based in the United States, as well as Kislin, a U.S. citizen, in the Conspiracy and Predicate Acts described herein.

515.    These allegations are based upon the specific role of Blonde Management and Kislin in obtaining and arranging for the use of credit cards for Chernoi, Deripaska and Makhmudov in their travels to and from the United States.

-78-

A- 253

516.    The above Acts of interstate and foreign travel in aid of racketeering had substantial effects on interstate commerce within the United States, and foreign commerce between the United States and other nations.

### THE OVERALL ENTERPRISES RELATED TO THE ILLEGAL SCHEME TO TAKEOVER THE RUSSIAN METALS INDUSTRY

517.    Deripaska, Chernoi, Makhmudov, Malevsky, MDM Bank, Pan-American, Blonde Management, Blonde Investments, Kislin, Karam, Transmetal and Trans-Commodities together constitute an "association-in-fact," formed for the common purpose of taking over the aluminum, vanadium and other metals industries in Russia and diverting, appropriating, and distributing profits from the Illegal Scheme, continuing from the mid-1990's through today (the "Metals Enterprise").

518.    Deripaska, Chernoi, Makhmudov, Malevsky, MDM Bank, Pan-American, Blonde Management, Blonde Investments, Kislin, Karam, Transmetal, Trans-Commodities, Russian Aluminum, RUAL, SibAl, Sibirsky U.S., Bauxal, Metcare, Unimetal, NKAZ, KRAZ, BRAZ and SAZ constitute an "association-in-fact" formed for the common purpose of taking over the aluminum and other metals industries in Russia and diverting, appropriating, and distributing profits from the Illegal Scheme, continuing from the mid-1990's through today (the "Aluminum Enterprise").

519.    Deripaska, Chernoi, Makhmudov, Malevsky, MDM Bank, Pan-American, Blonde Management, Blonde Investments, GOK, Kislin, Karam, Transmetal, Trans-Commodities, New Start, Venitom, Unidale and Investland constitute an "association-in-fact" formed for the common purpose of taking over the vanadium and other metals industries in Russia and diverting, appropriating, and distributing profits from the Illegal Scheme, continuing from the mid-1990's through today ("Vanadium Enterprise").

-79-

520.    The above associations-in-fact engaged in and affected interstate and foreign commerce in the United States.

521.    Additionally, SAZ, KRAZ, BRAZ, NKAZ and GOK each constituted an enterprise pursuant to 18 U.S.C. § 1961(4), which engaged in and affected interstate and foreign commerce in the United States.

522.    Defendants were associated with SAZ, KRAZ, BRAZ, NKAZ and GOK, and conducted and participated in the affairs of SAZ, KRAZ, BRAZ, NKAZ and GOK, through a pattern of racketeering activity, as alleged herein.

523.    The associations-in-fact and enterprises alleged herein continue to operate today and to affect the Illegal Scheme by illicitly controlling NKAZ, SAZ, KRAZ, BRAZ and GOK.

524.    The associations-in-fact had continuity of structure and personnel because, from the 1990's through the current date, they featured a hierarchical structure dominated by Deripaska, Chernoi, and Makhmudov, wherein each of the above named entities and individuals performed, among others, the following roles:

i.    Deripaska: As alleged herein, Deripaska, along with co-defendants Chernoi and Makhmudov, owns, manages and controls Sibirsky, Russian Aluminum, RUAL, Pan-American, Transmetal, and Trans-commodities, and directs their day-to-day affairs. Deripaska, along with Chernoi and Makhmudov, conceived and implemented the Illegal Scheme, and the Predicate Acts were either specifically carried out by Deripaska or were carried out by others working for him, or for entities under his control, with Deripaska's specific knowledge and approval.

ii.    Chernoi: As alleged herein, Chernoi, along with co-defendants Deripaska and Makhmudov, owns, manages and controls Sibirsky, Russian Aluminum, RUAL, MDM Bank, Pan-American, Transmetal, Trans-commodities and GOK, and directs their day-to-day affairs. Chernoi and Makhmudov own and control Blonde Management and Blonde Investments. Chernoi, along with Deripaska and Makhmudov, conceived and implemented the Illegal Scheme, and the Predicate Acts were either specifically carried out by Chernoi or were carried out by others working for him, or for entities under his control, with Chernoi's specific knowledge and approval.

-80-

iii.  <u>Makhmudov</u>: As alleged herein, Makhmudov owns, manages and controls MDM Bank and directs its day-to-day affairs, and, along with co-defendants Chernoi and Deripaska, owns, manages and controls Sibirsky, Russian Aluminum, RUAL, Pan-American, Transmetal, Trans-commodities and GOK, and directs their day-to-day affairs. Makhmudov and Chernoi own and control Blonde Management and Blonde Investments. Makhmudov provided critical funding in furtherance of the Illegal Scheme through MDM Bank. Makhmudov, along with Deripaska and Chernoi, conceived and implemented the Illegal Scheme, and the Predicate Acts were either specifically carried out by Makhmudov or were carried out by others working for him, or for entities under his control, with Makhmudov's specific knowledge and approval.

iv.  <u>MDM Bank</u>: As alleged herein, MDM Bank is operated and controlled by Makhmudov and provides financing and financial structuring to Chernoi, Deripaska and Makhmudov through the maintenance of correspondent bank accounts at one or more banks in New York City. Pan-American, Blonde Management and Blonde Investments wired up to $35 million a year to MDM Bank for the use of Chernoi, Deripaska and Makhmudov in carrying out the Illegal Scheme. Chernoi, Deripaska and Makhmudov laundered funds obtained from the Illegal Scheme through bank accounts maintained by MDM Bank, and used these funds to, among other things, finance the bribes alleged herein, including, but not limited to, the bribes paid to Tuleyev and Roussel with the assistance of Pan-American, Blonde Management and Blonde Investments.

v.  <u>Sibirsky</u>: As alleged herein, Sibirsky includes various corporate entities affiliated with the conglomerate Sibirsky Aluminum and are, among others, the alter ego corporate entities through which Deripaska, Chernoi and Makhmudov committed various Predicate Acts and carried out and conducted the Illegal Scheme, as follows:

a.  <u>Bauxal</u>: As alleged herein, Bauxal is owned and controlled by Deripaska, Chernoi and Makhmudov and sold alumina and other raw materials to NKAZ and then performed the key functions necessary to divert and launder the proceeds from those sales through banks in the United States.

b.  <u>Metcare</u>: As alleged herein, Metcare is owned and controlled by Deripaska, Chernoi and Makhmudov and sold aluminum to third-parties in the United States and elsewhere and then performed the key functions necessary to divert and launder the proceeds from those sales through banks in the United States, including, but not limited to, the specific transaction and wires pertaining to the sale of metal in Camden.

c.  <u>Unimetal</u>: As alleged herein, Unimetal is owned and controlled by Deripaska, Chernoi and Makhmudov and sold aluminum to third-parties in the United States and elsewhere, pursuant to, for example, the contract that Unimetal entered into with Azial in January 2000, and then performed the key functions necessary to

-81-

A- 256

divert and launder the proceeds from those sales through banks in the United States, including, but not limited to, the specific transactions pertaining to the sale of metal in Camden, Baltimore and New Orleans and the specific wire transfer pertaining to the sale of metal in Camden.

d. Sibirsky US: As alleged herein, Sibirsky U.S. is owned and controlled by Deripaska, Chernoi, and Makhmudov, and serves as the Unites States office of SibAl and the United States headquarters for operating and managing the Illegal Scheme. Sibirsky U.S. provided substantial assistance in coordinating the activities of Deripaska, Chernoi, and Makhmudov in the United States by, among other things, providing facilities through which Deripaska, Chernoi, and Makhmudov communicated, whether by United States mail, wire or telephone, with entities and individuals in the United States that purchased aluminum, and by communicating with Sibirsky Russia by wire, telephone and United States mail for the purpose of coordinating, facilitating and monitoring the Illegal Scheme

e. SibAl: As alleged herein, SibAl is owned and controlled by Deripaska, Chernoi, and Makhmudov. SibAl is the entity though which Deripaska, Chernoi, and Makhmudov committed various Predicate Acts, as alleged herein, and carried out and conducted the Illegal Scheme.

vi. Russian Aluminum & RUAL: As alleged herein, Russian Aluminum is the alter ego corporate entity of, and is owned and controlled by, Chernoi, Deripaska, and Makhmudov, and is the successor in interest of Sibirsky, formed to serve as a conduit through which aluminum from the four illegally seized aluminum plants is sold in the United States and other countries through Russian Aluminum's trading arm, RUAL. Russian Aluminum directed and coordinated the sales of aluminum through RUAL after the seizure of the four plants knowing that such aluminum was obtained in a fraudulent and illegal manner and with the purpose, among others, of carrying out the Illegal Scheme by realizing the profits of the Illegal Scheme. Russian Aluminum also participated in the laundering of funds from these seizures by diverting the proceeds of post-takeover sales away from BRAZ, KRAZ, NKAZ, and SAZ and to Chernoi, Deripaska and Makhmudov.

vii. Pan-American: As alleged herein, Pan-American is owned and controlled by Chernoi, Deripaska and Makhmudov, and is operated by Kislin. Pan-American traded metal from the plants taken over in the Illegal Scheme and laundered the profits from those trades, through banks in the United States and through MDM Bank, for the benefit of Chernoi, Deripaska and Makhmudov and for the purpose of advancing the Illegal Scheme. At the direction of Chernoi, Deripaska and Makhmudov, Pan-American was also responsible for making over $1 million in bribe payments to Tuleyev in June and July of 1999.

viii. Blonde Management: As alleged herein, Blonde Management, the sister company of Blonde Investments, is owned and controlled by Chernoi and Makhmudov, and is managed and operated by Kislin. Blonde Management, along with the other entities identified herein, participated in the laundering of funds for Chernoi,

-82-

A- 257

Deripaska and Makhmudov by reinvesting Chernoi's ill-gotten proceeds in, among other things, New York real estate, which eventually sold for more than 100 million U.S. dollars. Blonde Management is also responsible for coordinating the financial affairs and arrangements of the Chernoi, Deripaska and Makhmudov in the United States, including, but not limited to, providing corporate credits cards to Chernoi, Deripaska, Makhmudov and Malevsky.

ix.    Blonde Investments: As alleged herein, Blonde Investments, the sister company of Blonde Management, is owned and controlled by Chernoi and Makhmudov, and is managed and operated by Karam and Kislin. Blonde Investments traded metal from the plants taken over in the Illegal Scheme and laundered the profits from those trades, through banks in the United States and through MDM Bank, for the benefit of Chernoi, Deripaska and Makhmudov and for the purpose of advancing the Illegal Scheme. At the direction of Chernoi, Deripaska and Makhmudov, Pan-American was also responsible for making over $500,000 in bribe payments to Tuleyev in June and July of 1999.

x.    Kislin: As alleged herein, Kislin operated and managed Pan-American, Blonde Investments and Blonde Management, and, as a result, is personally responsible for the actions of Pan-American, Blonde Investments and Blonde Management. These actions included, but are not limited to, the trading of metal and the laundering of proceeds through MDM Bank, the payment of bribes to Tuleyev and Roussel, the laundering of proceeds of the Illegal Scheme through New York real estate and the furnishing of credit cards to Chernoi, Deripaska, Makhmudov, Malevsky and various employees of Sibirsky for their use in their travels to effect the Illegal Scheme.

xi.    Karam: As alleged herein, Karam is the director of Sibirsky entity Alpro and A of S, and as such is engaged in trading aluminum on behalf of Chernoi, Deripaska and Makhmudov. Karam controls, and is also a director of, Blonde Investments, and as such is personally responsible for the acts of Blonde Investments including, but not limited to, trading of money and laundering proceeds of those trades through MDM Bank and the payment of bribes to Tuleyev and Roussel. Karam, acting on behalf of Alpro, and with Deripaska, set up deceptively named companies in the Bahamas for the purpose of fraudulently taking over SAZ.

xii.    Trans-Commodities: As alleged herein, Trans-Commodities is owned and controlled by Chernoi, Deripaska and Makhmudov. Trans-Commodities, along with the other entities identified herein, participated in the laundering of funds for Chernoi by transferring Chernoi's ill-gotten gains through bank accounts maintained by Trans-Commodities.

xiii.    Transmetal: As alleged herein, Transmetal is owned and controlled by Chernoi, Deripaska and Makhmudov. Transmetal, along with the other entities identified herein, participated in the laundering of funds for Chernoi by transferring Chernoi's ill-gotten gains through bank accounts maintained by Trans-Commodities. Transmetal also coordinated and facilitated the extortion payments

A- 258

alleged herein, including, but not limited to, receiving payments of approximately $24 million between April 1996 and October 1999 and, more specifically, payments dated April 7, 1999 and October 12, 1999 to Transmetal through Chase Manhattan bank in New York and a payment dated December 20, 1996 to Transmetal through Bank of New York (account number 803-309-3455).

xiv.    BRAZ:  As alleged herein, BRAZ manufactures aluminum and, after its takeover, is one of the alter ego corporate entities, among others, through which Deripaska, Chernoi and Makhmudov committed various Predicate Acts, as alleged herein, to carry out the Illegal Scheme.

xv.    KRAZ:  As alleged herein, KRAZ manufactures aluminum and, after its takeover, is one of the alter ego corporate entities, among others, through which Deripaska, Chernoi and Makhmudov committed various Predicate Acts, as alleged herein, to carry out the Illegal Scheme.

xvi.    NKAZ:  As alleged herein, NKAZ manufactures aluminum and, after its takeover, is one of the alter ego corporate entities, among others, through which Deripaska, Chernoi and Makhmudov committed various Predicate Acts, as alleged herein, to carry out the Illegal Scheme.

xvii.    SAZ:  As alleged herein, SAZ manufactures aluminum and, after its takeover, is one of the alter ego corporate entities, among others, through which Deripaska, Chernoi and Makhmudov committed various Predicate Acts, as alleged herein, to carry out the Illegal Scheme.

xviii.    GOK:  As alleged herein, GOK mines vanadium ore and, after its takeover, is one of the alter ego corporate entities, through which Deripaska, Chernoi and Makhmudov committed various Predicate Acts, as alleged herein to carry out the scheme.

xix.    Malevsky:  As alleged herein, Malevsky is a member of the Russian-American Izmailovo Mafia, who manages and controls that organization.  Together with Chernoi and Makhmudov, Malevsky conceived and implemented the Illegal Scheme, and the Predicate Acts were either specifically carried out by him, by others working for him, or by entities under his control.

xx.    Roussel:  As alleged herein, Roussel is the governor of Sverdlovsk Oblast, who manages and controls the affairs of that region.  Roussel provided critical assistance in connection with the takeover of GOK, including by permitting Sverdlovsk special forces to assist in the armed takeover of the Company.

xxi.    Tuleyev:  As alleged herein, Tuleyev is the governor of the Kemerovo Region of Russia, who accepted bribes from Chernoi, Deripaska and Makhmudov and agreed to exert his influence over the judiciary in the Kemerovo Region to force NKAZ into bankruptcy, thereby allowing the Illegal Takeover to proceed. Tuleyev also initiated false criminal charges against Zhivilo after Zhivilo rebuffed Tuleyev's attempted extortion.

xxii.   New Start:  As alleged herein, New Start is an alter ego of Deripaska, Chernoi and Makhmudov, and is one of the corporate entities through which Deripaska, Chernoi and Makhmudov stole the Davis Plaintiffs' shares in GOK.

xxiii.  Venitom:  As alleged herein, Venitom is an alter ego of Deripaska, Chernoi and Makhmudov, and is one of the corporate entities through which Deripaska, Chernoi and Makhmudov stole the Davis Plaintiffs' shares in GOK.

xxiv.   Unidale:  As alleged herein, Unidale is an alter ego of Deripaska, Chernoi and Makhmudov, and is one of the corporate entities through which Deripaska, Chernoi and Makhmudov stole the Davis Plaintiffs' shares in GOK.

xxv.    Investland:  As alleged herein, Investland is an alter ego of Deripaska, Chernoi and Makhmudov, and is one of the corporate entities through which Deripaska, Chernoi and Makhmudov stole the Davis Plaintiffs' shares in GOK.

525.    Defendants were associated with the above referenced associations-in-fact and they conducted and participated in these associations-in-fact enterprises through a pattern of racketeering activity, as alleged herein.

526.    The above associations-in-fact were separate and distinct from the pattern of racketeering in which defendants engaged because, among other reasons:  (a) the members of the associations-in-fact were coordinated and directed by Deripaska, Chernoi and Makhmudov to such a high degree and were assigned such well-defined roles to execute the complex and far-flung operations of the Illegal Scheme, that they existed separately and apart from the pattern of racketeering; and (b) the associations-in-fact had goals other than just racketeering, including, but not limited to, the continued operation of KRAZ, SAZ, BRAZ, and NKAZ as makers and sellers of aluminum.

## COUNT 1

### Violation of RICO § 1962(a)

### BMT Plaintiffs & MIKOM v. Deripaska, Chernoi, Makhmudov & SibAl

527.    The allegations of the paragraphs 1 through 526 are incorporated herein as if set out in full.

-85-

A- 260

528.    As alleged herein, Chernoi, Deripaska, Makhmudov and SibAl derived vast sums of money from their racketeering activities, including without limitation the extortion of money from NKAZ, the BMT Plaintiffs, MIKOM and Zhivilo.

529.    As alleged herein, Chernoi, Deripaska, Makhmudov and SibAl also derived substantial amounts of money from the takeover of BRAZ, KRAZ and SAZ.

530.    Chernoi, Deripaska, Makhmudov and SibAl then used such racketeering income to fund the Illegal Takeover of NKAZ.

531.    As a direct and proximate result of Chernoi's, Deripaska's, Makhmudov's and SibAl's use and investment of racketeering income, the BMT Plaintiffs and MIKOM suffered damages in an amount in excess of $900 million.

## COUNT II

### Violation of RICO § 1962(a)

#### BMT Plaintiffs v. Deripaska, Chernoi, Makhmudov, MDM Bank, Blonde Management, Blonde Investments, Pan-American, Kislin, Russian Aluminum, RUAL, Sibirsky U.S., SibAl, Bauxal, Metcare and Unimetal,

532.    The allegations of the paragraphs 1 through 531 are incorporated herein as if set out in full.

533.    As alleged herein, Deripaska, Chernoi, Makhmudov, MDM Bank, Blonde Management, Blonde Investments, Pan-American, Kislin, Russian Aluminum, RUAL, Sibirsky U.S., SibAl, Bauxal, Metcare and Unimetal conducted a complex scheme to divert and misappropriate assets that rightfully belonged to the BMT Plaintiffs.

534.    This diversion and misappropriation has made it virtually impossible for the BMT Plaintiffs to recover assets that rightfully belong to the BMT Plaintiffs.

-86-

535.    As a direct and proximate result of Deripaska's, Chernoi's, Makhmudov's, MDM Bank's, Blonde Management's, Blonde Investments', Pan-American, Kislin's, Russian Aluminum's, RUAL Trade's, Sibirsky U.S.'s, SibAl's, Bauxal's, Metcare's, and Unimetal's use and investment of racketeering income, the BMT Plaintiffs suffered damages in an amount in excess of $900 million.

## COUNT III

### Violation of RICO § 1962(a)

**MIKOM v. Deripaska, Chernoi, Makhmudov, MDM Bank, Blonde Management, Blonde Investments, Pan-American, Kislin, Russian Aluminum, RUAL, Sibirsky U.S., SibAl, Bauxal, Metcare, Unimetal and NKAZ**

536.    The allegations of the paragraphs 1 through 536 are incorporated herein as if set out in full.

537.    As alleged herein, Deripaska, Chernoi, Makhmudov, MDM Bank, Blonde Management, Blonde Investments, Pan-American, Kislin, Russian Aluminum, RUAL, Sibirsky U.S., SibAl, Bauxal, Metcare, Unimetal and NKAZ conducted a complex scheme to divert and misappropriate assets that rightfully belonged to MIKOM.

538.    This diversion and misappropriation has made it virtually impossible for MIKOM to recover assets that rightfully belong to MIKOM.

539.    As a direct and proximate result of Deripaska's, Chernoi's, Makhmudov's, MDM Bank's, Blonde Management's, Blonde Investments', Pan-American, Kislin's, Russian Aluminum's, RUAL Trade's, Sibirsky U.S.'s, SibAl's, Bauxal's, Metcare's, Unimetal's and NKAZ' use and investment of racketeering income, MIKOM suffered damages in an amount in excess of $3 million.

-87-

A- 262

## COUNT IV

### Violation of RICO § 1962(a)

### Davis and GOK Plaintiffs v. Deripaska, Chernoi, Makhmudov, Blonde Management, Blonde Investments, MDM Bank, Pan-American, Kislin, New Start, Venitom, Unidale and Investland

540.    The allegations of the paragraphs 1 through 539 are incorporated herein as if set out in full.

541.    As alleged herein, Deripaska, Chernoi, Makhmudov, Blonde Management, Blonde Investments, MDM Bank, Pan-American and Kislin derived vast sums of money from their racketeering activities, including the takeover of BRAZ, KRAZ, SAZ and NKAZ.

542.    Deripaska, Chernoi, Makhmudov, Blonde Management, Blonde Investments, MDM Bank, Pan-American and Kislin then used such racketeering income to fund the Illegal Takeover of GOK and to transfer the Davis Plaintiffs' shares in GOK to New Start, Venitom, Unidale and Investland.

543.    As a direct and proximate result of this use and investment of racketeering income, the Davis and GOK Plaintiffs have suffered damages in an amount in excess of $100 million.

## COUNT V

### Violation of § 1962(b)

### BMT Plaintiffs & MIKOM v. Deripaska, Chernoi, Makhmudov & SibAl

544.    The allegations of paragraphs 1 through 543 are incorporated herein as if alleged in full.

A- 263

545.    As alleged herein, Chernoi, Deripaska, Makhmudov and SibAl engaged in a pattern of racketeering activity specifically directed at acquiring and maintaining control of NKAZ.

546.    As alleged herein, Chernoi's, Deripaska's, Makhmudov's and SibAl's pattern of illegal activity resulted in them gaining control of NKAZ.

547.    As a direct and proximate result of the takeover of NKAZ, the BMT Plaintiffs and MIKOM suffered damages in an amount in excess of $900 million.

## COUNT VI

### Violation of RICO § 1962(b)

**Davis and GOK Plaintiffs v. Deripaska, Chernoi, Makhmudov, Blonde Management, Blonde Investments, MDM Bank, Pan-American, Kislin, New Start, Venitom, Unidale and Investland**

548.    The allegations of paragraphs 1 through ___ are incorporated herein as if alleged in full.

549.    As alleged herein, Deripaska, Chernoi, Makhmudov, Blonde Management, Blonde Investments, MDM Bank, Pan-American and Kislin engaged in a pattern of racketeering activity specifically directed at acquiring and maintaining control of NKAZ.

550.    As alleged herein, the pattern of illegal activity engaged in by Deripaska, Chernoi, Makhmudov, Blonde Management, Blonde Investments, MDM Bank, Pan-American and Kislin resulted in their gaining control of GOK and transferring the Davis Plaintiffs' shares in GOK to New Start, Venitom, Unidale and Ivestland.

551.    As a direct and proximate result of the takeover of GOK, the Davis and GOK Plaintiffs suffered damages in an amount in excess of $100 million.

-89-

A- 264

## COUNT VII

### Violation of RICO § 1962(c)

**BMT Plaintiffs v. Deripaska, Chernoi, Makhmudov, MDM Bank, Blonde Management, Blonde Investments, Pan-American, Kislin, Russian Aluminum, RUAL, Sibirsky U.S., SibAl, Bauxal, Metcare and Unimetal**

552.    The allegations of paragraphs 1 through 551 are incorporated herein as if set out in full.

553.    As alleged herein, defendants Deripaska, Chernoi, Makhmudov, MDM Bank, Pan-American, Blonde Management, Blonde Investments and Kislin actively participated in the operation and management of the Metals Enterprise through the above pattern of racketeering.

554.    As alleged herein, defendants Deripaska, Chernoi, Makhmudov, MDM Bank, Pan-American, Blonde Management, Blonde Investments, Kislin, Russian Aluminum, RUAL, SibAl, Sibirsky U.S., Bauxal, Metcare and Unimetal actively participated in the operation and management of the Aluminum Enterprise through the above pattern of racketeering.

555.    As alleged herein, defendants Deripaska, Chernoi, Makhmudov, MDM Bank, Pan-American, Blonde Management, Blonde Investments, Kislin, Russian Aluminum, RUAL, SibAl, Sibirsky U.S., Bauxal, Metcare and Unimetal actively participated in the operation and management of the SAZ, KRAZ and BRAZ enterprises.

556.    As a direct and proximate cause of the above pattern of racketeering, the BMT Plaintiffs suffered damages in an amount in excess of $900 million.

A- 265

## COUNT VIII

### Violation of RICO § 1962(c)

**MIKOM v. Deripaska, Chernoi, Makhmudov, MDM Bank, Blonde Management, Blonde Investments, Pan-American, Kislin, Russian Aluminum, RUAL, Sibirsky U.S., SibAl, Bauxal, Metcare, Unimetal and NKAZ**

557.    The allegations of paragraphs 1 through 556 are incorporated herein as if set out in full.

558.    As alleged herein, defendants Deripaska, Chernoi, Makhmudov, MDM Bank, Pan-American, Blonde Management, Blonde Investments and Kislin actively participated in the operation and management of the Metals Enterprise through the above pattern of racketeering.

559.    As alleged herein, defendants Deripaska, Chernoi, Makhmudov, MDM Bank, Pan-American, Blonde Management, Blonde Investments, Kislin, Russian Aluminum, RUAL, SibAl, Sibirsky U.S., Bauxal, Metcare, Unimetal and NKAZ actively participated in the operation and management of the Aluminum Enterprise through the above pattern of racketeering.

560.    As alleged herein, defendants Deripaska, Chernoi, Makhmudov, MDM Bank, Pan-American, Blonde Management, Blonde Investments, Kislin, Russian Aluminum, RUAL, SibAl, Sibirsky U.S., Bauxal, Metcare, Unimetal and NKAZ actively participated in the operation and management of the SAZ, KRAZ, BRAZ and NKAZ enterprises.

561.    As a direct and proximate cause of the above pattern of racketeering, the BMT Plaintiffs suffered damages in an amount in excess of $900 million.

A- 266

## COUNT IX

### Violation of RICO § 1962(c)

**Davis and GOK Plaintiffs v. Deripaska, Chernoi, Makhmudov, Blonde Management, Blonde Investments, MDM Bank, Pan-American, Kislin, GOK, New Start, Venitom, Unidale and Investland**

562.    The allegations of paragraphs 1 through 561 are incorporated herein as if set out in full.

563.    As alleged herein, defendants Deripaska, Chernoi, Makhmudov, MDM Bank, Pan-American, Blonde Management, Blonde Investments and Kislin actively participated in the operation and management of the Metals Enterprise through the above pattern of racketeering.

564.    As alleged herein, defendants Deripaska, Chernoi, Makhmudov, MDM Bank, Pan-American, Blonde Management, Blonde Investments, GOK, Kislin, New Start, Venitom, Unidale and Investland actively participated in the operation and management of the Vanadium Enterprise through the above pattern of racketeering.

565.    As alleged herein, defendants Deripaska, Chernoi, Makhmudov, MDM Bank, Pan-American, Blonde Management, Blonde Investments, GOK, Kislin, New Start, Venitom, Unidale and Investland actively participated in the operation and management of the GOK enterprise.

566.    As a direct and proximate result of this use and investment of racketeering income, the Davis and GOK Plaintiffs have suffered damages in an amount in excess of $100 million.

-92-

A- 267

## COUNT X

### Violation of § 1962(d)

**BMT Plaintiffs v. Deripaska, Chernoi, Makhmudov, MDM Bank, Blonde Management, Blonde Investments, Pan-American, Kislin, Russian Aluminum, RUAL, Sibirsky U.S., SibAl, Bauxal, Metcare and Unimetal**

567.    The allegations of paragraphs 1 through 566 are incorporated herein as if set out in full.

568.    Pursuant to the Illegal Scheme, defendants Deripaska, Chernoi, Makhmudov, MDM Bank, Blonde Management, Blonde Investments, Pan-American, Kislin, Russian Aluminum, RUAL, Sibirsky U.S., SibAl, Bauxal, Metcare and Unimetal conspired among themselves, and with others, to violate sections 1962(a), (b) and (c) by taking over NKAZ and the rest of the aluminum and other metals industries in Russia.

569.    Deripaska, Chernoi and Makhmudov knowingly agreed among themselves to take over and monopolize the aluminum and other metals industries in Russia and agreed to commit at least two Predicate Acts in furtherance thereof.

570.    This allegation is based upon various statements made by Makhmudov to Khaidarov that Makhmudov and Chernoi intended to take over NKAZ through the Sham Bankruptcy and statements concerning the specific manner in which the Illegal Scheme was to be accomplished.

571.    This allegation is based upon the fact that Deripaska was specifically involved in the discussions concerning illegal payments to Tuleyev in return for Tuleyev's assistance in taking over NKAZ.

572.    This allegation is based upon Chernoi's, Deripaska's and Makhmudov's participation in the Predicate Acts alleged herein.

-93-

A- 268

573.    Each of the remaining defendants knowingly agreed to participate in the

conspiracy to take over and monopolize the aluminum and other metals industries in Russia by

agreeing to participate in, among others, at least two of the following Predicate Acts in

furtherance of the Conspiracy.

i.      Russian Aluminum:  As alleged herein, Russian Aluminum agreed to participate in Predicate Acts of wire fraud, mail fraud, money laundering, illegal transactions in monetary instruments and travel act violations.

ii.     RUAL:  As alleged herein, RUAL agreed to participate in Predicate Acts of wire fraud, mail fraud, money laundering and illegal transactions in monetary instruments.

iii.    MDM Bank:  As alleged herein, MDM Bank agreed to participate in Predicate Acts of bribery, wire fraud, mail fraud, money laundering and illegal transactions in monetary instruments.

iv.     Sibirsky U.S.:  As alleged herein, Sibirsky U.S. agreed to participate in Predicate Acts of wire fraud, mail fraud, money laundering and illegal transactions in monetary instruments.

v.      SibAl:  As alleged herein, SibAl agreed to participate in Predicate Acts of extortion, bribery, wire fraud, mail fraud, money laundering, illegal transactions in monetary instruments, Hobbs act violations and travel act violations.

vi.     Bauxal:  As alleged herein, Bauxal agreed to participate in Predicate Acts of wire fraud, mail fraud, money laundering and illegal transactions in monetary instruments.

vii.    Unimetal:  As alleged herein, Unimetal agreed to participate in Predicate Acts of wire fraud, mail fraud, money laundering and illegal transactions in monetary instruments.

viii.   Metcare:  As alleged herein, Metcare agreed to participate in Predicate Acts of wire fraud, mail fraud, money laundering and illegal transactions in monetary instruments.

ix.     Pan-American:  As alleged herein, Pan-American agreed to participate in Predicate Acts of bribery, wire fraud, money laundering and illegal transactions in monetary instruments.

x.      Blonde Management:  As alleged herein, Blonde Management agreed to participate in Predicate Acts of bribery, wire fraud, money laundering and illegal transactions in monetary instruments.

A- 269

xi.   <u>Blonde Investments</u>: As alleged herein, Blonde Investments agreed to participate in Predicate Acts of bribery, wire fraud, money laundering and illegal transactions in monetary instruments.

xii.   <u>Kislin</u>: As alleged herein, Kislin agreed to participate in Predicate Acts of bribery, wire fraud, money laundering and illegal transactions in monetary instruments.

574.   Given the complexity and far-reaching nature of the Conspiracy, coupled with the number of instances in which each of these defendants engaged in the Predicate Acts alleged herein, the Predicate Acts committed by these defendants could not have been committed without coordination and agreement among these defendants to knowingly participate in the Conspiracy. This coordination and agreement is evidenced by, among other things, the following:

i.   The coordination and agreement necessary to accomplish money laundering required, for example, production of aluminum by NKAZ, sale of that aluminum by Russian Aluminum through RUAL to Unimetal or Metcare, and the movement of the proceeds from those sales through numerous bank accounts for the ultimate benefit of Chernoi, Deripaska and Makhmudov.

ii.   The coordination and agreement necessary to accomplish wire fraud required, for example, the formation of one of the fraudulent schemes by Chernoi, Deripaska and Makhmudov, for example, the takeover of SAZ by establishment of fraudulently named companies in the Bahamas to which aluminum of SAZ was diverted, the diversion of the funds derived from that operation by wire transfers through banks located in the United States to Pan-American, Blonde Management, Blonde Investments, and the investment of those funds by Kislin in New York real estate for Chernoi's benefit.

575.   As a direct and proximate cause of the above conspiracy, the BMT Plaintiffs suffered damages in an amount in excess of $900 million.

## COUNT XI

### Violation of § 1962(d)

**MIKOM v. Deripaska, Chernoi, Makhmudov, MDM Bank, Blonde Management, Blonde Investments, Pan-American, Kislin, Russian Aluminum, RUAL, Sibirsky U.S., SibAl, Bauxal, Metcare, Unimetal and NKAZ**

576.    The allegations of paragraphs 1 through 575 are incorporated herein as if set out in full.

577.    Pursuant to the Illegal Scheme, defendants Deripaska, Chernoi, Makhmudov, MDM Bank, Blonde Management, Blonde Investments, Pan-American, Kislin, Russian Aluminum, RUAL, Sibirsky U.S., SibAl, Bauxal, Metcare, Unimetal and NKAZ conspired among themselves, and with others, to violate sections 1962(a), (b) and (c) by taking over NKAZ and the rest of the aluminum and other metals industries in Russia.

578.    Deripaska, Chernoi and Makhmudov knowingly agreed among themselves to take over and monopolize the aluminum and other metals industries in Russia and agreed to commit at least two Predicate Acts in furtherance thereof.

579.    This allegation is based upon various statements made by Makhmudov to Khaidarov that Makhmudov and Chernoi intended to take over NKAZ through the Sham Bankruptcy and statements concerning the specific manner in which the Illegal Scheme was to be accomplished.

580.    This allegation is based upon the fact that Deripaska was specifically involved in the discussions concerning illegal payments to Tuleyev in return for Tuleyev's assistance in taking over NKAZ.

581.    This allegation is based upon Chernoi's, Deripaska's and Makhmudov's participation in the Predicate Acts alleged herein.

-96-

A- 271

582.    Each of the remaining defendants knowingly agreed to participate in the

conspiracy to take over and monopolize the aluminum and other metals industries in Russia by

agreeing to participate in, among others, at least two of the following Predicate Acts in

furtherance of the Conspiracy.

i.    Russian Aluminum: As alleged herein, Russian Aluminum agreed to participate in Predicate Acts of wire fraud, mail fraud, money laundering, illegal transactions in monetary instruments and travel act violations.

ii.    RUAL: As alleged herein, RUAL agreed to participate in Predicate Acts of wire fraud, mail fraud, money laundering and illegal transactions in monetary instruments.

iii.    MDM Bank: As alleged herein, MDM Bank agreed to participate in Predicate Acts of bribery, wire fraud, mail fraud, money laundering and illegal transactions in monetary instruments.

iv.    Sibirsky U.S.: As alleged herein, Sibirsky U.S. agreed to participate in Predicate Acts of wire fraud, mail fraud, money laundering and illegal transactions in monetary instruments.

v.    SibAl: As alleged herein, SibAl agreed to participate in Predicate Acts of extortion, bribery, wire fraud, mail fraud, money laundering, illegal transactions in monetary instruments, Hobbs act violations and travel act violations.

vi.    Bauxal: As alleged herein, Bauxal agreed to participate in Predicate Acts of wire fraud, mail fraud, money laundering and illegal transactions in monetary instruments.

vii.    Unimetal: As alleged herein, Unimetal agreed to participate in Predicate Acts of wire fraud, mail fraud, money laundering and illegal transactions in monetary instruments.

viii.    Metcare: As alleged herein, Metcare agreed to participate in Predicate Acts of wire fraud, mail fraud, money laundering and illegal transactions in monetary instruments.

ix.    Pan-American: As alleged herein, Pan-American agreed to participate in Predicate Acts of bribery, wire fraud, money laundering and illegal transactions in monetary instruments.

x.    Blonde Management: As alleged herein, Blonde Management agreed to participate in Predicate Acts of bribery, wire fraud, money laundering and illegal transactions in monetary instruments.

xi.  <u>Blonde Investments</u>: As alleged herein, Blonde Investments agreed to participate in Predicate Acts of bribery, wire fraud, money laundering and illegal transactions in monetary instruments.

xii.  <u>Kislin</u>: As alleged herein, Kislin agreed to participate in Predicate Acts of bribery, wire fraud, money laundering and illegal transactions in monetary instruments.

xiii.  <u>NKAZ</u>: As alleged herein, NKAZ agreed to participate in Predicate Acts of money laundering and illegal transactions in monetary instruments.

583.    Given the complexity and far-reaching nature of the Conspiracy, coupled with the number of instances in which each of these defendants engaged in the Predicate Acts alleged herein, the Predicate Acts committed by these defendants could not have been committed without coordination and agreement among these defendants to knowingly participate in the Conspiracy. This coordination and agreement is evidenced by, among other things, the following:

i.   The coordination and agreement necessary to accomplish money laundering required, for example, production of aluminum by NKAZ, sale of that aluminum by Russian Aluminum through RUAL to Unimetal or Metcare, and the movement of the proceeds from those sales through numerous bank accounts for the ultimate benefit of Chernoi, Deripaska and Makhmudov.

ii.  The coordination and agreement necessary to accomplish wire fraud required, for example, the formation of one of the fraudulent schemes by Chernoi, Deripaska and Makhmudov, for example, the takeover of SAZ by establishment of fraudulently named companies in the Bahamas to which aluminum of SAZ was diverted, the diversion of the funds derived from that operation by wire transfers through banks located in the United States to Pan-American, Blonde Management, Blonde Investments, and the investment of those funds by Kislin in New York real estate for Chernoi's benefit.

584.    As a direct and proximate cause of the above conspiracy, MIKOM suffered damages in an amount in excess of $3 million.

A- 273

## COUNT XII

### Violation of RICO § 1962(d)

**Davis and GOK Plaintiffs v. Deripaska, Chernoi, Makhmudov,
Blonde Management, Blonde Investments, MDM Bank, Pan-American, Kislin, New Start,
Venitom, Unidale and Investland**

585.    The allegations of paragraphs 1 through 584 are incorporated herein as if set out in full.

586.    Pursuant to the Illegal Scheme, defendants Deripaska, Chernoi, MDM Bank, Blonde Management, Blonde Investments, Pan-American, Kislin, GOK, New Start, Venitom, Unidale and Investland conspired among themselves, and with others, to violate sections 1962(a), (b) and (c) by taking over GOK and other metals industries in Russia.

587.    Deripaska, Chernoi and Makhmudov knowingly agreed among themselves to take over and monopolize the vanadium and other metals industries in Russia and agreed to commit at least two Predicate Acts in furtherance thereof.

588.    This allegation is based upon various statements made by Makhmudov to Khaidarov that Makhmudov and Chernoi intended to take over NKAZ and the striking similarities between the Illegal Takeover and the GOK Takeover.

589.    This allegation is based upon Chernoi's, Deripaska's and Makhmudov's participation in the Predicate Acts alleged herein.

590.    Each of the remaining defendants knowingly agreed to participate in the conspiracy to take over and monopolize the aluminum and other metals industries in Russia by agreeing to participate in, among others, at least two of the following Predicate Acts in furtherance of the Conspiracy.

    i.    <u>MDM Bank</u>: As alleged herein, MDM Bank agreed to participate in Predicate Acts of bribery, wire fraud, mail fraud, money laundering and illegal transactions in monetary instruments.

A- 274

ii. <u>Pan-American</u>: As alleged herein, Pan-American agreed to participate in Predicate Acts of bribery, wire fraud, money laundering and illegal transactions in monetary instruments.

iii. <u>Blonde Management</u>: As alleged herein, Blonde Management agreed to participate in Predicate Acts of bribery, wire fraud, money laundering and illegal transactions in monetary instruments.

iv. <u>Blonde Investments</u>: As alleged herein, Blonde Investments agreed to participate in Predicate Acts of bribery, wire fraud, money laundering and illegal transactions in monetary instruments.

v. <u>Kislin</u>: As alleged herein, Kislin agreed to participate in Predicate Acts of bribery, wire fraud, money laundering and illegal transactions in monetary instruments.

vi. <u>GOK</u>: As alleged herein, NKAZ agreed to participate in Predicate Acts of money laundering and illegal transactions in monetary instruments.

vii. <u>New Start</u>: As alleged herein, New Start agreed to participate in numerous acts of wire fraud and mail fraud.

viii. <u>Venitom</u>: As alleged herein, Venitom agreed to participate in numerous acts of wire fraud and mail fraud

ix. <u>Unidale</u>: As alleged herein, Unidale agreed to participate in numerous acts of wire fraud and mail fraud

x. <u>Investland</u>: As alleged herein, Investland agreed to participate in numerous acts of wire fraud and mail fraud

591. Given the complexity and far-reaching nature of the Conspiracy, coupled with the number of instances in which each of these defendants engaged in the Predicate Acts alleged herein, the Predicate Acts committed by these defendants could not have been committed without coordination and agreement among these defendants to knowingly participate in the Conspiracy. This coordination and agreement is evidenced by, among other things, the following:

i. The coordination and agreement necessary to accomplish the fraudulant transfer of the shares in GOK by, for example, the Conspirators, with Kislin's assistance, arranging for the payment of bribes by Pan-American, Blonde Management, and Blonde Investments, through financial institutions in the United States and well as MDM Bank in Moscow, while at the same time enlisting Kislin's services in the United States to arrange for the creation of four U.S. companies, New Start,

-100-

A- 275

Venitom, Unidale and/or Investland, to which these shares were ultimately fraudulently re-registered in whole or in part.

592.     As a direct and proximate result of the above conspiracy, the Davis and GOK Plaintiffs have suffered damages in an amount in excess of $100 million.

## COUNT XIII

### Intentional Interference with Contract

**BMT Plaintiffs and MIKOM v. Chernoi, Deripaska, Makhmudov, MDM Bank, Pan-American Blonde Management, Blonde Investments, Kislin, SibAl, Sibirsky U.S., Bauxal, Metcare and Unimetal**

593.     The allegations of paragraphs 1 through 592 are incorporated herein as if set out in full.

594.     Using improper means and without justification, defendants Chernoi, Deripaska, Makhmudov, MDM Bank, Pan-American, Blonde Management, Blonde Investments, Kislin, SibAl, Sibirsky U.S., Bauxal, Metcare and Unimetal knowingly induced NKAZ to breach its agreements with the BMT Plaintiffs and MIKOM.

595.     As a direct and proximate result of their unlawful conduct, the BMT Plaintiffs have suffered damages in excess of $900 million, and MIKOM has suffered damages in excess of $1 million.

## COUNT XIV

### Intentional Interference with Contract

**GOK Plaintiffs v. Chernoi, Deripaska, Makhmudov, MDM Bank, Pan-American Blonde Management, Blonde Investments, Kislin, New Start, Venitom, Unidale and Investland**

596.     The allegations of paragraphs 1 through 595 are incorporated herein as if set out in full.

597.     Using improper means and without justification, defendants Chernoi, Deripaska, Makhmudov, MDM Bank, Pan-American, Blonde Management, Blonde Investments, Kislin,

A- 276

New Start, Venitom, Unidale and Investland knowingly induced the GOK Plaintiffs to breach its agreements with Nexis and Polyprom.

598.    As a direct and proximate result of their unlawful conduct, the GOK Plaintiffs have suffered damages in excess of $100 million.

## COUNT XV

### Conversion

### Davis Plaintiffs v. Deripaska, Chernoi, Makhmudov, Blonde Management, Blonde Investments, MDM Bank, Pan-American, Kislin,  New Start, Venitom, Unidale and Investland

599.    The allegations in paragraphs 1 through 598 are incorporated herein as if set out in full.v

600.    As alleged herein, defendants New Start, Venitom, Unidale and Investland exercised undue dominion and control over the property of the Davis Plaintiffs by misappropriating the Davis Plaintiffs shares in GOK.

601.    As a direct and proximate result of the unlawful acts of defendants New Start, Venitom, Unidale and Investland, the Davis Plaintiffs have suffered damages in an amount in excess of $100 million.

A- 277

**WHEREFORE, Plaintiffs demand judgment against Defendants as follows:**

1.    Compensatory damages in excess of $900 million by the BMT Plaintiffs and MIKOM;

2.    Treble damages RICO in excess of $2.7 billion by the BMT Plaintiffs and MIKOM;

3.    Compensatory damages in excess of $100 million by the Davis and GOK Plaintiffs;

4.    Return of the GOK shares to the Davis Plaintiffs;

5.    Treble damages under RICO in excess of $300 by the Davis and GOK Plaintiffs;

6.    Costs and attorney fees under RICO;

7.    Such other relief as is just and proper.

-103-

**A- 278**

STROOCK & STROOCK & LAVAN LLP

By:

Robert Abrams, Esquire (BA-3744)
(A Member of the Firm)
180 Maiden Lane
New York, NY 10038
(212) 806-5400
Attorneys for BMT Plaintiffs and MIKOM

MARKS, LLC

By:

Bruce S. Marks, Esquire (BM-0991)
Eleven Penn Center
1835 Market Street
28th Floor
Philadelphia, PA 19103
(215) 569-8901
Attorneys for BMT Plaintiffs and MIKOM

HERRICK, FEINSTEIN LLP

By:

Raymond Hannigan, Esquire (RH-4403)
Two Park Avenue
New York, NY 10016
(212) 592-1400
Attorneys for Davis and Gok Plaintiffs

-104-

A- 279

Exhibit A

## ORGANIZATIONAL STRUCTURE OF THE CRIMINAL SCHEME

**(Listing of Main Participants and Companies)**

ISKANDER MAKHMUDOV

MIKHAIL CHERNOI

OLEG DERIPASKA

ANTON MALEVSKY

(Common Management)

Arnold Kislin    Joseph Karam
Blonde Management, Inc.    Blonde Investment, Ltd.
Pan American Corp.    Trans-Commodities & Transmetal

(Finance, Money Laundering)    (Metal Operations)    (Security, Extortion, Murder)

**MDM Bank**    Ismailovo Mafia

ALUMINUM    VANADIUM

| Production | Trading/ Money Laundering | False Creditors | Production | Trading/ Money Laundering |
|---|---|---|---|---|
| Russian Aluminum | RUAL | Energo-Prom | GOK | Ferrotrade |
| Sibirsky Aluminum | Bauxal | Flamstead | Newstart | |
| BRAZ; SAZ | Metcare | Eurasia | Venitom | |
| KRAZ; NKAZ | Unimetal | Aktaniya | Unidale | |
| Sayan Agro | FastAct | Klarus-Service | InvestLand | |
| Sibirsky Aluminum (US) | Alpro, SA | Medal | Leybout | |
| Aluminum of Siberia (UK) | Azial | Ros-Star | | |
| | | Leybout | | |

A- 281

**Exhibit B**




**КУЗБАССКОЕ ОТКРЫТОЕ
АКЦИОНЕРНОЕ ОБЩЕСТВО
ЭНЕРГЕТИКИ И ЭЛЕКТРИФИКАЦИИ**

## ОАО "КУЗБАССЭНЕРГО"
Россия. 650099, г. Кемерово-99
ГСП-2, пр. Кузнецкий, 30
А.Т. 215196 ВАТТ
тел. (3842)29-33-69
Факс (3842)29-37-77

_____ № 90-004/366
На № _____ от _____

Руководителю ФСФО России
Тайю Г.К.

129857, г. Москва, ул. Щепкина, 42

Заявитель жалобы: ОАО "Кузбассэнерго"
650099, г. Кемерово, пр. Кузнецкий, 30

Жалоба на действия внешнего управляющего ОАО "Новокузнецкий алюминиевый завод"
Чернышева С.А.

Определением арбитражного суда Кемеровской области от 20 марта 2000 г. по делу
№А27-610,774/2000-4 в отношении ОАО "Новокузнецкий алюминиевый завод" была
применена процедура внешнего управления, внешним управляющим был назначен
Чернышев С.А.

13 декабря 2000 г. ОАО "НКАЗ" было получено требование конкурсного кредитора
ОАО "Кузбассэнерго" о включении в реестр требований кредиторов ОАО "НКАЗ" с суммой
требований 1 млрд. 405 млн. рублей. В соответствии с требованиями п.1 ст. 75 ФЗ "О
несостоятельности (банкротстве)", к требованию были приложены документы, позволяющие
определить заявленные требования как установленные - вступившие в законную силу
решения и постановления апелляционной инстанции арбитражного суда Кемеровской
области по делам А27-6402/99-1, А27-8383/97-1 о взыскании с ОАО "НКАЗ" в пользу ОАО
"Кузбассэнерго" задолженности за потребленную электроэнергию.

По истечению двухнедельного срока, установленного п.2 ст.75 Закона для включения
в реестр заявленных требований, 28 декабря 2000 г. ОАО "Кузбассэнерго" направило
требование о созыве собрания кредиторов ОАО "НКАЗ", так как ОАО "Кузбассэнерго" с
учетом заявленной суммы обладает более чем третью от денежных обязательств должника.
Данное требование было получено ОАО "НКАЗ" 29 декабря 2000 г. В соответствии с
требованиями п.2 ст. 13 Закона, собрание должно быть созвано не позднее 15 января 2001 г.
Однако в связи с тем, что повестка созываемого собрания кредиторов содержало одним из
вопросов повестки дня вопрос об отстранении Чернышева С.А., внешний управляющий
проигнорировал законные требования крупнейшего кредитора должника - ОАО
"Кузбассэнерго" о созыве собрания. В нарушение требований п.2 ст. 75 Закона, внешний
управляющий Чернышев С.А. также не уведомил ОАО "Кузбассэнерго" о результатах
рассмотрения требований, установленных вступившими в законную силу решениями
арбитражного суда Кемеровской области.

Кроме того, за время исполнения обязанностей руководителя должника и внешнего
управляющего, Чернышев С.А. неоднократно нарушал действующее законодательство и
ущемлял права кредиторов, заключал заведомо не выгодные договоры, не истребовал
дебиторскую задолженность у покупателей металла, чем причинил значительный ущерб как
ОАО "НКАЗ", так и кредиторам.

ОАО "Кузбассэнерго" (конкурсный кредитор ОАО "НКАЗ") просит ФСФО России
провести проверку деятельности внешнего управляющего ОАО "НКАЗ" Чернышева С.А. в
соответствии с Положением об осуществлении сотрудниками Федеральной службы России

**KUZBASS OPEN
JOINT STOCK COMPANY
OF ENERGY INDUSTRY
AND ELECTRIFICATION
OAO "KUZBASSENERGO"**
Russia, 650099, Kemerovo-99
GSP-2, pr. Kuznetsky, 30
A.T. 215196 BATT
Tel. (3842)29-33-59
Fax (3842)29-37-77

Director of the FSFO of Russia
G.K. Tai

129857, Moscow, ul. Shchepkina,
42

Complainant: OAO "Kuz-
bassenergo"
650099, Kemerovo,
pr. Kuznetsky, 30

<u>23.01.2001</u>     No. <u>70-001/366</u>
for No. _____ dated _____

### Complaint relating to actions of S.A. Chernyshev, the external manager of the OAO "Novokuznetsky Aluminievy Zavod"

By determination of the arbitration tribunal of the Kemerovo Region dated 20 March 2000 with respect to the case No. A27-610, 774/2000-4 the procedure of external management was applied to the OAO "Novokuznetsky Aluminievy Zavod", S.A. Chernyshev was appointed as external manager.

On 13 December 2000 the OAO "NKAZ" received a demand of the bankrupt creditor OAO "Kuzbassenergo" to include the same in the register of claims of the creditors of the OAO "NKAZ" with the claim amount of 1 billion 405 million rubles. In accordance with the requirements of clause 1 Art. 75 of the Federal Law "On Insolvency (bankruptcy)" the demand was accompanied by documents allowing to state the alleged claim as established – effective decisions and ordinances issued by the appeal instance of the arbitration tribunal of the Kemerovo Region with respect to cases A27-6402/99-1, A27-8383/97-1 about collection of the debts for the electric energy consumed from the OAO "NKAZ" in favor of OAO "Kuzbassenergo".

On the expiry of the two week period fixed by clause 2 Art. 75 of the Law for entering the declared claims in the register, on 28 December 2000 the OAO "Kuzbassenergo" sent a request to hold a meeting of creditors of the OAO "NKAZ", because together with the claimed amount the OAO "Kuzbassenergo" holds more than one third of the money obligations of the debtor. This request was received by the OAO "NKAZ" on 29 December 2000. In accordance with the requirements of clause 2 Art. 13 of the Law the meeting should be convened not later than on 15 January 2001. However, due to the fact that the order of the meeting to be convened included the proposal to remove S.A.

Chernyshev, the external manager ignored the lawful demands of the major creditor of the debtor, i.e. OAO "Kuzbassenergo", to convene a meeting. In violation of the requirements clause 2 Art. 75 of the Law the external manager, S.A. Chernyshev, did not give any notice to the OAO "Kuzbassenergo" about the results of consideration of claims established by effective decisions of the arbitration tribunal of the Kemerovo region.

Moreover, in execution of his duties as director of the debtor and external manager S.A. Chernyshev repeatedly violated the legislation in force and infringed rights of the creditors, he concluded knowingly unfavorable contracts, did not demand the accounts receivables from the metal purchasers which substantially damnified both the OAO "NKAZ" and its creditors.

The OAO "Kuzbassenergo" (the bankrupt creditor of the OAO "NKAZ") asks the FSFO of Russia to carry out an inspection of the activities of S.A. Chernyshev, the external manger of the OAO "NKAZ", in accordance with the Regulation of performance by the officials of the Federal Service of Russia...

Exhibit C

**KUZBASS OPEN
JOINT STOCK COMPANY
OF ENERGY INDUSTRY
AND ELECTRIFICATION
OAO "KUZBASSENERGO"**
Russia, 650099, Kemerovo-99
GSP-2, pr. Kuznetsky, 30
A.T. 215196 BATT
Tel. (3842)29-33-59
Fax (3842)29-37-77

19.04.2001 ____ No. 70-001/1804 __
for No. _____ dated _____

FSFO of Russia
Chairman of the Central
Commission
129857, Moscow, ul. Shchepkina,
42
N.V. Kotsyuba

Copy: Siberian MTO FSFO RF
630091, Novosibirsk, Krasny pr.,
82
Yu. P. Parygin

Agency of the FSFO RF
for Kemerovo Region
650099, Kemerovo,
pr. Sovetsky, 58
S.N. Belogur

### Dear Natalya Vladimirovna!

In addition to our complaint about actions of S.A. Chernyshev, arbitration manager of the OAO "NKAZ" dated 23.01.2001 No. 70-001/366 we provide you with information about violations of the bankruptcy legislation by S.A. Chernyshev.

In the course of his activities as acting director of the Debtor and external manager of the OAO "NKAZ" S.A. Chernyshev concluded knowingly unfavorable contracts which resulted in increase of insolvency of the OAO "NKAZ".

1.  In the course of the supervision procedure S.A. Chernyshev acted as director of the Debtor for the period from 17 February 2000 until 20 March 2000. For such a short period – 1 month – the money obligations of the OAO "NKAZ" increased by 2 billion rubles. According to the report of the external manager this period gave rise to the debts to the following companies:

    -   OOO "AziAl" – 644 million rubles
    -   OOO "Resursy Yevrazil" – 281 million rubles
    -   OOO "Energopromservis" – 112 million rubles
    -   Flamstead Investments Ltd. – 738 million rubles

- OAO "Obyedinennaya kompaniya "Sibirsky Alyuminiy"
  – 172 million rubles;

Total: 1 billion 947 rubles

All these money obligations arose from contracts con-
cluded on behalf of the OAO "NKAZ" by virtue of powers of
attorney issued by S.A. Chernyshev. As they were arising
they were immediately secured by mortgage of the prop-
erty of the OAO "NKAZ" and included in the privileged 3rd
order. Moreover, according to these contracts the OAO
"NKAZ" obtained no property necessary for its business ac-
tivities. The most glaring example is the contract with
Flamstead Investments Limited.

On 21 February 2000 a contract was entered into by the
OAO "NKAZ" and the Flamstead Investments Limited com-
pany under number FL-21.2-04. According to clause 6.1 of
the contract the Vendor (the OAO "NKAZ") was obliged to
supply the Purchaser with 21 000 metric tons of primary
aluminum for the value of 26 040 000 US dollars by 5
March 2000. However, at the date of signing of the con-
tract all available aluminum and that being produced was
arrested pursuant to security measures taken in the course
of bankruptcy procedure. At the date of signing of the con-
tract the said foreign firm delivered its promissory notes
to the amount of 738 million rubles as a consideration for
the aluminum to be allegedly supplied. In connection with
the fact that the OAO "NKAZ" does not fulfill its obligations
to supply the aluminum by 5 March the foreign firm re-
claims money but not its notes according to clause 11.3 of
the contract. On 9 March the firm declares its demand to
include the same in the register of the bankrupt creditors
and as early as on 10 March it takes part in the meeting of
the creditors supporting S.A. Chernyshev as nominated ex-
ternal manager. It is clear that this bargain was a simula-
tion and was concluded on behalf of the OAO "NKAZ" for
the exclusive purpose of obtaining of approval of the
meeting of the creditors relating to the issues necessary
for S.A. Chernyshev.

The simulative nature of this bargain is also evidenced by
the following circumstances. The OAO "NKAZ" did not se-
cure wagons from the Ministry of Communication Lines for
transportation of this aluminum to the Purchaser. More-
over, even if the OAO "NKAZ" had shipped the whole
amount of the aluminum to be sold the delivery terms ac-

cording to the contract (FOB, DAF – Incoterms 90) could not be satisfied due to the duration of the railroad transportation.

The similar contracts entered into for the purpose of forming "voting" accounts payable were concluded with other firms specified above. The conditions of the contracts provided for delivery of various goods to the OAO "NKAZ" (the Purchaser) on the terms "free on storehouse of the Purchaser" or obligation of the Purchaser to pay in advance. The goods (raw stock, equipment) allegedly delivered to the OAO "NKAZ" pursuant to such contracts have not been delivered to the OAO 'NKAZ" until now, to the knowledge of the OAO "Kuzbassenergo".

Thus, it may be stated with certainty that in the period when the temporary manager of the OAO "NKAZ" acted as director of the Debtor he concluded several deals increasing the insolvency of the OAO "NKAZ" by a sum of approximately two billion rubles. Certainly, such activities of S.A. Chernyshev directly conflicts with the requirements provided by Art. 20 of the Federal Law "On insolvency (bankruptcy)" and may not be combined, in our opinion, with the status of arbitration manager.

2.  In execution of his duties as external manager S.A. Chernyshev did not act to protect the property of the Debtor and the interests of its creditors either.

For a period of the external management of the OAO "NKAZ" the (current) accounts payable reached 60 million US dollars (the data were extracted from the report of the external manager). To the contrary, the accounts receivable not only remained uncollected but also increased to 103 million US dollars. Nevertheless, the foreign economic conditions were favorable for the activities of the OAO "NKAZ" (stably high dollar exchange rate, aluminum price at the LME). It is evident that the external manager, at the minimum, did not take actions towards re-establishment of paying capacity of the OAO "NKAZ".

The contrary nature of the actions of S.A. Chernyshev is evidenced by the following data from his report relating to the results of his external management.

6

According to the Certificate of tax charge and payment, for 12 months of 2000 the OAO "NKAZ" was charged the export VAT amounting to – (minus) 489,5 million rubles. This line means that the OAO "NKAZ" is subject to refund of the value-added tax calculated as excess of the sum of VAT paid by the OAO "NKAZ" to the suppliers of inventory used for export production, over the sum of VAT obtained by the OAO "NKAZ" from the purchasers of the exports. Since the exports are exempt from VAT according clause 5 "a" of the Law of the Russian Federation "On value-added tax" this line should indicate the full amount of VAT paid by the OAO "NKAZ" to the suppliers of inventory used for export production.

According to Annex No. 4 to the report of the external manager the direct export by the OAO "NKAZ" totaled 227 million US dollars. Respectively, the amount of VAT subject to refund from the budget amounts (given the profitability of 10%) at least 40 million US dollars or 1,2 billion rubles.

The discrepancy of figures specified in the report implies that the OAO "NKAZ" did not export aluminum under direct contracts but used agency contracts with third companies which received the refund of export VAT. The direct losses from such activities equaled at least 700 million rubles.

We believe that the information provided by the OAO "Kuzbassenergo" is sufficient to initiate a comprehensive inspection of activities of the external manager of the OAO "NKAZ", S.A. Chernyshev, with involvement of independent experts. Taking into account the new presented data the OAO "Kuzbassenergo" insists on its demand to revoke the license of arbitration manager of 2 class issued to S.A. Chernyshev.

Annexes:

1.  Contract with the Flamstead Investments Limited dated 21.02.2000 No. FL-21.2-04;

2.  The promissory notes conveyance and acceptance deed dated 21.02.2000;

3.  The demand to include the Flamstead Investments Ltd in the register of claims of the creditors of the OAO "NKAZ" dated 09.03.2000;

A- 290

4.  The Letter of the Flamstead Investments Ltd about impossibility to return the promissory notes dated 08.03.2000;

5.  Mortgage contract with the Flamstead Investments Ltd dated 21.02.2000 No. FL-21.2-04/3;

6.  Contract with the OOO "AzIAI" dated 22.01.2000 No. 24/01-2000/126-00;

7.  Commission contract with the OOO "AzIAI" dated 22.02.2000 No. 106-00;

8.  Certificate of tax charge and payment by the OAO "NKAZ" for 12 months of 2000;

9.  Annex No. 4 to the Report of the external manager of the OAO "NKAZ" executed by S.A. Chernyshev.


Director General                    *(sgd.)*                    S.N.
Mikhaylov

*(seal)*



**КУЗБАССКОЕ ОТКРЫТОЕ**
**АКЦИОНЕРНОЕ ОБЩЕСТВО**
**ЭНЕРГЕТИКИ И ЭЛЕКТРИФИКАЦИИ**

**ОАО "КУЗБАССЭНЕРГО"**
Россия, 650099, г. Кемерово-99
ГСП-2, пр. Кузнецкий, 60
А.Т. 215195 ВАТТ
тел. (3842)29-11-69
Факс (3842)29-07-77

_13.09.2001_ № _70-001/1504_

На № _____ от _____

ФСФО РФ
Председателю Центральной комиссии
129857, г. Москва, ул. Щепкина, 42
Кошубе Н. В.

Копия: Сибирское МТО ФСФО РФ
630091, г. Новосибирск, Красный пр., 82
Парыгину Ю. П.

Агентство ФСФО РФ по Кемеровской области
650099, г. Кемерово, пр. Советский, 58
Белогуру С. Н.

Уважаемая Наталья Владимировна!

В дополнение к нашей жалобе на действия арбитражного управляющего ОАО «НКАЗ» Чернышева С.А. от 23.01.2001 г. № 70-001/366, сообщаем сведения о нарушенных законодательства о банкротстве Чернышевым С.А.

В ходе своей деятельности в качестве исполняющего обязанности руководителя Должника, а также внешнего управляющего ОАО «НКАЗ», Чернышевым С.А. заключались заведомо невыгодные сделки, что влекло увеличение неплатежеспособности ОАО «НКАЗ».

1. В ходе процедуры наблюдения Чернышев С.А. осуществлял обязанности руководителя Должника в период с 17 февраля 2000 г. по 20 марта 2000 г. За столь короткий период - 1 месяц - денежные обязательства ОАО «НКАЗ» выросли на 2 миллиарда рублей. В соответствии с отчетом внешнего управляющего в этот период появилась задолженность перед компаниями:
- ООО «АзияАл» - 644 млн. рублей;
- ООО «Ресурсы Евразии» - 281 млн рублей;
- ООО «Энергопромсервис» - 112 млн. рублей;
- Flamstead Investments Ltd. - 738 млн. рублей;
- ОАО «Объединенная компания «Сибирский алюминий» - 172 млн. рублей;
Итого: 1 млрд. 947 рублей.

Все эти денежные обязательства возникли из договоров, заключенных от имени ОАО «НКАЗ» по доверенностям, выданным Чернышевым С.А. По мере их возникновения, обязательства немедленно обеспечивались залогом имущества ОАО «НКАЗ» и включались в привилегированную 3 очередь. Причем по данным договорам ОАО «НКАЗ» не получал имущества, необходимого для хозяйственной

деятельности. Наиболее ярким примером является договор с Flamstead Investments Limited.

21 февраля 2000 г. между ОАО «НКАЗ» и компанией Flamstead Investments Limited был заключен договор № FL-21.2-04. В соответствии с п. 6.1 договора Продавец (ОАО «НКАЗ») обязан был поставить Покупателю 21 000 мт. первичного алюминия на сумму 26 040 000 долларов США до 5 марта 2000 г.. Причем на дату заключения договора весь имеющийся в наличии и выпускаемый первичный алюминий был арестован в рамках мер обеспечения, принятых в ходе процедуры банкротства. В день заключения договора указанная иностранная фирма передает свои векселя на сумму 738 млн. рублей в качестве оплаты за якобы поставляемый в будущем алюминий. В связи с тем, что ОАО «НКАЗ» не выполняет свои обязательства по поставке алюминия к 5 марта, иностранная фирма требует обратно уже не свои векселя, а деньги в соответствии с п. 11.3 договора. 9 марта предъявляет свои требования о включении в реестр конкурсных кредиторов и уже 10 марта участвует в собрании кредиторов, поддерживая Чернышева С.А. в качестве кандидата на пост внешнего управляющего. Очевидно, что данная сделка носит притворный характер и была заключена от имени ОАО «НКАЗ» исключительно с целью создания дополнительной кредиторской задолженности для проведения на собрании кредиторов нужных Чернышеву С.А. вопросов.

О притворности данной сделки также говорят следующие обстоятельства. ОАО «НКАЗ» не заказывались у МПС вагоны для транспортировки данного алюминия Покупателю. Кроме того, даже если бы ОАО «НКАЗ» отгрузил весь объем продаваемого алюминия, то условия поставки по договору (FOB, DAF – Инкотермс 90 – передача товара на границе либо при погрузке на судно) не могли быть выполнены по срокам движения железнодорожного состава.

Аналогичные контракты, заключенные с целью формирования «голосующей» кредиторской задолженности были заключены с другими фирмами, указанными выше. Условиями договоров была предусмотрена передача ОАО «НКАЗ» (Покупателю) различных товаров на условиях «франко-склад Продавца» либо обязанность Покупателя совершить предоплату. Товары (сырье, оборудование), якобы переданные ОАО «НКАЗ» по такого рода договорам, по данным ОАО "Кузбассэнерго", не поступили на ОАО «НКАЗ» до сих пор.

Таким образом, можно с уверенностью сказать, что в период исполнения временным управляющим ОАО «НКАЗ» обязанностей руководителя Должника, им были заключены несколько сделок, увеличивающих неплатежеспособность ОАО «НКАЗ» на сумму около двух миллиардов рублей. Очевидно, что такая деятельность Чернышева С.А. прямо противоречит требованиям, установленным ст. 20 ФЗ «О несостоятельности (банкротстве)», и не может, по нашему мнению, сочетаться со статусом арбитражного управляющего.

2. В ходе внешнего управления деятельность Чернышева С.А. также не была направлена на защиту имущества Должника и интересов кредиторов.

За время внешнего управления на ОАО «НКАЗ» кредиторская задолженность (текущая) достигла 60 млн. долларов (данные взяты из отчета внешнего управления). В то же время дебиторская задолженность за время внешнего управления не только не была взыскана, но и увеличилась до 103 млн. долларов. Причем внешнеэкономическая ситуация благоприятствовала деятельности ОАО «НКАЗ» (стабильно высокий курс доллара, цена алюминия на LME). Очевидно, что внешним управляющим, как минимум, не были предприняты действия, направленные на восстановление платежеспособности ОАО «НКАЗ».

Об обратном характере действий Чернышева С.А. свидетельствует следующие данные из его отчета по итогам внешнего управления.

В соответствии со Справкой по начислению и уплаты налогов ОАО «НКАЗ» за 12 месяцев 2000 г. НДС экспортный был начислен в размере – (минус) 489,5 млн. рублей. Данная строка обозначает, что ОАО «НКАЗ» подлежит возмещению из бюджета налог на добавленную стоимость, исчисленный как превышение суммы НДС, уплаченного ОАО «НКАЗ» поставщикам товарно-материальных ценностей, использованных при производстве экспортной продукции, и суммы НДС, полученного ОАО «НКАЗ» от покупателей экспортируемого товара. Поскольку в соответствии с пунктом 5 «а» Закона РФ «О налоге на добавленную стоимость» экспортируемые товары освобождаются от налога на добавленную стоимость, то по данной строке должна быть отражена вся сумма НДС, уплаченного ОАО «НКАЗ» поставщикам за ТМЦ, использованные при производстве экспортируемых товаров.

В соответствии с Приложением № 4 к отчету внешнего управляющего прямой экспорт ОАО «НКАЗ» составил 227 млн. долларов США. Соответственно, размер НДС, подлежащего возмещению из бюджета, составляет (с учетом рентабельности 10 %) не менее 40 млн. долларов США или 1,2 млрд. рублей.

Из противоречия цифр, представленных в отчете, можно сделать вывод, что ОАО «НКАЗ» не экспортировало алюминий по прямым договорам, а использовало агентские договоры со сторонними компаниями, которые и получали возмещение экспортного НДС. Прямые убытки от такой деятельности составили не менее 700 миллионов рублей.

Полагаем, что представленных ОАО "Кузбассэнерго" данных достаточно для проведения комплексной проверки деятельности арбитражного управляющего ОАО «НКАЗ» Чернышева С.А. с привлечением независимых специалистов. С учетом вновь представленных данных ОАО "Кузбассэнерго" поддерживает свое требование об отзыве у Чернышева С.А. лицензии арбитражного управляющего 2 категории.

Приложения:

1. Контракт с компанией Flamstead Investments Limited от 21.02.2000 г. № FL–21.2-04;
2. Акт приемки-передачи векселей от 21.02.2000 г.;
3. Требование о включении Flamstead Investments Ltd в реестр требований кредиторов ОАО НКАЗ» от 09.03.2000 г.;
4. Письмо Flamstead Investments Ltd о невозможности возврата векселей от 08.03.2000 г.;
5. Договор залога с Flamstead Investments Ltd от 21.02.2000 г. № FL -21.2-04/3;
6. Договор с ООО «АзиАл» от 22.01.2000 г. № 24/01-2000/126-00;
7. Договор комиссии с ООО «АзиАл» от 22.02.2000 г. № 106-00;
8. Справка по начислению и уплате налогов ОАО «НКАЗ» за 12 месяцев 2000 г.;
9. Приложение № 4 к Отчету внешнего управляющего ОАО «НКАЗ» Чернышева С. А. от 20.02.2001 г.

Генеральный директор  С.Н. Михайлов