additional grounds based on non-specific violations of Russian law.  Tuleyev also orchestrated the filing of this petition.  See id. ¶¶ 236-41.

### 7.    The Appointment of Chernyshev as Acting Manager

In order to accomplish the takeover plan, Chernyshev had to be appointed first Acting Manager and then External Manager of NKAZ so that he could run the day-to-day business of NKAZ, reject contracts with the Aluminum Plaintiffs, and replace them with contracts with companies controlled by the Conspirators.  On February 16 and 17, 2000, the bankruptcy court held hearings, which were riddled with violations of Russian procedural law and other indicia of corruption.  As expected, Chernyshev and Kuzbass based their applications, in part, on NKAZ's failure to comply with Chernyshev's wholly improper document demands and, incredibly, on NKAZ's failure to repay the Kuzbass debt, which it could not do because Kuzbass had arrested its assets.  See id. ¶¶ 243-48.

At the hearing, the court committed numerous violations of Russian law,  (1) refusing to grant NKAZ and the Aluminum Plaintiffs time to inspect documents submitted by Chernyshev at the hearing; and (2) refusing to permit NKAZ and the Aluminum Plaintiffs to present evidence, or to be heard by the Court, or to cross-examine witnesses.  See infra Point II.C.2.b.ii. Chernyshev, as an officer of the Court, submitted false testimony.  At the conclusion of the hearing, the court granted Chernyshev's and Kuzbass' applications.  See id. ¶¶ 242-48, 252-61. There is additional evidence that the result of this hearing was pre-ordained.

First, the accompanying declarations of Valery Grishkovetz and Sergey Kuznetsov confirm plaintiffs' allegations of widespread corruption in the Russian courts, and provide specific details on Tuleyev's practice of fixing bankruptcy proceedings with the Judges of the Kemerovo court, including judges involved in the NKAZ bankruptcy.  Grishkovetz was the

Director in charge of the Kemerovo Regional office of the Federal Insolvency Department, and he details four cases – including one involving the Kuzbass energy plant – in which Acting Managers in bankruptcy cases, who were allied with and working for Tuleyev, were appointed by the Kemerovo court after Tuleyev intervened and exerted his influence. See Declaration of Valery Grishkovetz. Kuznetsov was the head of the Anti-crisis Industry Management Center in Kemerovo, and later supervised the work of arbitrazh managers as a representative of Tuleyev's administration. His declaration describes precisely the same conduct concerning Tuleyev's ability to corrupt bankruptcy proceedings for the purpose of taking over legitimate enterprises. See Declaration of Sergey Alexeevich Kuznetsov.

Second, on January 21, 2000, almost one month before these hearings, two companies affiliated with Sibirsky – Azial and Unimetal – prepared contracts to sell NKAZ aluminum, and to sell alumina to NKAZ, even though neither company had any previous dealings with NKAZ and had no reason to believe that NKAZ would do business with them. Furthermore, and also before the February hearing, the Conspirators applied to Western banks for financing of future NKAZ aluminum trading. See id. ¶¶ 249-51.

### 8.    Chernyshev Solidifies Control Over the NKAZ Bankruptcy

After his appointment as the Acting Manager of NKAZ, Chernyshev took a number of steps on behalf of the Conspirators to solidify control over NKAZ. First, Chernyshev instructed NKAZ's attorneys not to contest the various Kuzbass actions relating to the inflated energy claims, even though it would have clearly been in NKAZ's best interest to defend those cases in order to reduce NKAZ's purported debt. See id. ¶¶ 261-64.

Second, Chernyshev recognized the claims of a number of false creditors (i.e., entities that were not in fact owed any money from NKAZ) affiliated with Sibirsky, who were not even

17

**A - 330**

entitled to vote in the bankruptcy. This enabled these creditors to control NKAZ creditor committee meetings, and to vote in favor of actions that furthered the real purpose of the bankruptcy – not to rehabilitate NKAZ (which did not need rehabilitating) but to transfer control of NKAZ to the Conspirators. Votes at creditor committee meetings are in direct proportion to the sums due each creditor, and at the first creditor committee meeting on March 10, 2000, Chernyshev was appointed External Manager. The court confirmed this vote on March 20, 2000. See id. ¶¶ 265-73.

Third, as External Manager, Chernyshev had the power to cancel contracts with the Aluminum Plaintiffs and replace them with contracts with companies affiliated with the Conspirators. Chernyshev repudiated, without any valid legal basis, the Aluminum Plaintiffs' contracts and replaced them with contracts with Sibirsky-affiliated companies. Two of these companies included Azial and Unimetal, which purported to enter into their contracts with NKAZ before the hearing in which Chernyshev was appointed Acting Manager and at a time when neither company did any business whatsoever with NKAZ. The correspondent bank for all transactions under the agreements was "Banquet National de Paris New York USA." See id. ¶¶ 274-90.

9.   **The Arrest of NKAZ Metal in the US
     and the Filing of False Criminal Charges Against M. Zhivilo**

Following BMT Lad's success in obtaining a $12 million arbitration award against NKAZ, BMT Ltd. filed actions in Maryland, New Jersey and Louisiana seeking to confirm and enforce the award. The common theme of all three actions is that NKAZ metal intended for sale to the Aluminum Plaintiffs was sold in the US, and proceeds from those sales diverted from NKAZ to the Conspirators and the companies they control. In total, approximately $10 million in aluminum was seized, although subsequently released. We provide considerable detail in the

Complaint on the entities through which various wire payments were made, and how these payments were made through banks located in the US. See id. ¶¶ 294-301.

Following commencement of these arrest proceedings, and in retaliation thereto, and much as they had done in the KRAZ takeover, Tuleyev announced that M. Zhivilo had conspired to murder Tuleyev. His alleged co-conspirator was arrested in Moscow, and false charges were filed against M. Zhivilo, who subsequently fled to France where a French court summarily rejected Russia's request to extradite M. Zhivilo. See id. ¶¶ 302-04.

### 10.   Defendants Turn Against Kuzbass and Chernyshev Recognizes Additional False Creditor Claims

In the meantime, the Conspirators consolidated a number of entities into defendant Russian Aluminum, and a power struggle ensued which caused the breakup of the alliance between Kuzbass and the Conspirators. As a result, Chernyshev sought to eliminate Kuzbass from the list of approved creditors, and he reversed his prior course of action and ordered NKAZ's attorneys to resume their opposition to Kuzbass' various lawsuits based on the inflated energy rates. This change of events gives rise to perhaps the greatest irony of this case, as the Second Kuzbass Action – the one that gave rise to the judgment that formed the basis of the petition that put NKAZ into bankruptcy – was dismissed on May 23, 2000. Thus, Chernyshev ultimately obtained the dismissal of the very action that MIKOM and pre-takeover NKAZ had argued all along was not a valid ground for commencement of the NKAZ bankruptcy proceeding, but which nonetheless paved the way for Chernyshev's appointment. See id. ¶¶ 305-11.[8]

---

[8]   By the final creditors' committee meeting on March 6, 2001, Kuzbass managed to restore its claim, and Chernyshev, in response, recognized still more false debt not simply to neutralize Kuzbass' vote, but to eliminate completely any impact Kuzbass may have sought to achieve.

**11.    Defendants Purchase Control of NKAZ and
Force a Sham Settlement of the NKAZ Bankruptcy**

In August 2000, four companies controlled by the Conspirators purchased a controlling interest in NKAZ at distressed prices through Gregory Louchanski, who was acting as the agent of the Conspirators.  Plaintiffs believe that the funds necessary to purchase these shares were obtained from Chernoi's prior illegal activities, and transferred through Blonde Management and Pan-American by Kislin (all US residents), and through banks located in the US.  Most recently, Louchanski was indicted in Italy for money laundering in connection with an entity called Becs International LLC.  Peter Berlin and Lucy Edwards pled guilty to money laundering in this District arising out of conduct related to Becs and other companies.  The Italian indictment identifies a wire from Louchansky's company, Nordex, to Becs, through a US bank, based on information provided by US authorities to the Italian prosecutor.  See Bernard Dec. Exs. 30, 31.

Soon thereafter, at the final creditors' committee meeting, the false creditors approved a "settlement" of the NKAZ bankruptcy in which creditors received non-interest bearing promissory notes, payable in rubles, twenty years hence.  The court approved this settlement on April 3, 2001.  Of course, the false creditors were not prejudiced by this unjust "settlement" because they never had valid claims against NKAZ.  The legitimate creditors, however, confront a situation in which NKAZ is controlled by the Conspirators and is used to benefit their affiliated companies and to siphon profits away from NKAZ.  See id. ¶¶ 312-22.

**12.    Chernyshev's False Affidavit and Kuzbass's Lawsuit Against Chernyshev**

Revelations concerning the level of corruption that attended the NKAZ bankruptcy continue to emerge.  Two developments are particularly noteworthy.

First, in connection with defendants' first motion to dismiss, Chernyshev submitted an affidavit in which he stated that prior to his appointment as External Manager he was never an

employee of Sibirsky or any of its affiliates, but that he was employed by a company called Sayan Agro. As it turns out, and according to SibAl's website, Sayan Agro was formed by SAZ, the first aluminum plant taken over by the Conspirators, and Sayan Agro is a member of the Sibirsky group. Moreover, two companies that filed false creditor claims in the NKAZ bankruptcy, claims which Chernyshev recognized, also own Sayan Agro. It also turns out that one of Chernyshev's assistants in the NKAZ bankruptcy was the General Director of one of these companies, and General Director of still another company that was another false creditor. This same individual was also listed, in 2000, as the head of Sibirsky's legal department. Other individuals involved in the creation of the false creditor claims, and who assisted Chernyshev in conducting his "duties" as External Manager, were Sibirsky employees. See id. ¶¶ 323-31.[9]

Second, on January 23, 2001, in a complete twist of alliances, Kuzbass filed a complaint against Chernyshev. Copies of the relevant pleadings filed by Kuzbass are annexed to the Complaint as Exs. B and C. In general terms, Kuzbass adds considerable insider detail concerning the extent to which Chernyshev increased NKAZ's debt – by approximately $70 million – and increased NKAZ's accounts receivable – from $60 million to $103 million. These figures establish that Chernyshev, whose duty as External Manager was to restore NKAZ to financial stability, was not interested in NKAZ's financial stability, but instead in transferring control of NKAZ to the Conspirators. See id. ¶¶ 332-40.

---

[9]    There are numerous other irreconcilable contradictions between, and false statements in, Chernyshev's First and Second Declarations, as set forth in plaintiffs' first letter application for discovery. See Bernard Dec. Ex. 10.

21

**D.    The GOK Takeover[10]**

The takeover of GOK was accomplished through methods that reveal a common modus operandi and a continuity of the predicate acts perpetrated by the defendants.

### 1.    The Initial Extortion of Khaidarov and GOK

Prior to December 1998, Jalol Khaidarov worked for Chernoi and Makhmudov as a financial adviser. He then established an independent career, and in April 1999 was appointed General Director of GOK. Thereafter, Khaidarov met twice with Chernoi and Makhmudov in Chernoi's apartment in Paris. At the second meeting, Chernoi threatened Khaidarov, just as he had done to M. Zhivilo, and said: "There were a lot of clever people like Felix Lvov, Boris Kantor, Yafiasov, but sometimes they die. Don't be too clever. You have a chance to continue working with us. To that end, you should persuade the shareholders of GOK to transfer their shares to us. Some people refuse my offers. But for the rest of their lives, they wear bullet proof jackets. So what's the sense? Think it over." See id. ¶¶ 341-48.

By May-June 1999, and in response to the extortion, the controlling shareholders of GOK agreed to sell 20% of their shares to a company controlled by the Conspirators for a fraction of their real value. The controlling shareholders hoped that this would satisfy the Conspirators. Makhmudov and Chernoi made a down payment of $5 million for these shares, which was wired through a bank in the US. But before the shares exchanged hands, Makhmudov demanded that the GOK shareholders transfer a controlling interest in GOK. In response, the GOK shareholders

---

[10]    Defendants New Start, Venitom, Unidale, and InvestLand offer a revisionist history of the litigation and facts surrounding GOK. See GOK Comity Mem. at 4-15. Putting aside that these "facts" directly conflict with the Izvestia article by defendants' own expert, see supra note 1 and accompanying text, the allegations of the Complaint must be accepted as true at this stage of the proceedings. Thus, these "facts," as well as the declarations of Oleg Kozyrev and Samir Kapura, whom plaintiffs have not been given leave to depose, should be ignored. See infra Point III.A.

withdrew their offer and returned the $5 million, again through a bank in the US. See id. ¶¶ 341-48.

Immediately thereafter, in November 1999, Khaidarov met Makhmudov in Moscow. Non-party RICO member Malevsky joined the meeting, accompanied by five armed thugs, and Makhmudov demanded that Khaidarov arrange for the transfer of one-half of the GOK shares without payment. Khaidarov told Makhmudov he was crazy; Malevsky then told Khaidarov: "What do you think you're saying? This is the last time you will leave here alive." See id. ¶¶ 349-51.

### 2.    Defendants Bribe Regional Governor Roussel

During this period, Eduard Roussel was the Governor of the Sverdlovsk region, where GOK was located. Following the same pattern of the NKAZ takeover, meetings were arranged in 1999 between representatives of the Conspirators, including Makhmudov, and Roussel, in which the Conspirators agreed to pay Roussel for his "protection" and "help." During that year, payments were made by Pan-American and Blonde Management (both US companies) through banks in the US to defendant MDM Bank for Roussel's benefit, including a payment of $850,000 in cash for Roussel's election campaign. In return, Roussel agreed to support the Conspirators' efforts to take over GOK. See id. ¶¶ 352-55.

### 3.    The Physical Takeover of GOK and the Extortion of Khaidarov and the Board of Directors

On or about January 28, 2000, Makhmudov and Chernoi sent a small cadre of armed thugs, supported by the regional authorities, into GOK to take over the company. By threat of physical harm, Makhmudov and Chernoi caused four of the seven members of GOK's board of directors to vote to remove Khaidarov as General Director and to replace him with an agent of the Conspirators. The three remaining board members initially refused to succumb to the threats

23

and filed criminal complaints concerning these actions. See id. ¶¶ 356-58.

In order to preempt the filing of a lawsuit by those opposed to the takeover, an individual shareholder controlled by the Conspirators commenced a sham court action. This shareholder sought to lose the action to create a precedent favorable to the Conspirators. As expected, on the very next day the court was open for business, the claim was rejected and the board of directors' vote upheld. Individuals opposed to the takeover appealed, but Malevsky threatened to kill the families of the three resisting if the appeal was pursued. As a result, two of the remaining directors agreed to support the Conspirators and, in return, received expensive automobiles and apartments in Moscow. Agents of defendant Makhmudov also threatened Khaidarov, and told him that they knew where Khaidarov's relatives lived, and that his wife and son were in England, and threatened to harm them if Khaidarov fought the takeover. See id. ¶¶ 356-64.

### 4. The GOK Shareholders Fight the Illegal Takeover and Malevesky's Final Threat to Khaidarov

On or about March 4, 2000, GOK shareholders conducted a meeting to invalidate the illegal decision of the board that removed Khaidarov as the General Director. The local mayor attempted to prevent the meeting by issuing a decree that prevented all non-residents from entering the town and by blocking the road approaching the town with local police. Despite these efforts, the meeting of shareholders took place on the side of the road. The shareholders adopted a resolution invalidating the decision of the board, elected a new board of directors and issued a vote of confidence in Khaidarov. In response, Malevsky met with Khaidarov in late February, early March 2000 and told him: "What are you doing? It's going to end badly for you. Nobody will help. Not the FSB [Federal Securities Service]. Not the MVD [Ministry of Interior Affairs]." See id. ¶¶ 365-70.

A - 337

### 5.    The Conspirators Create False GOK Debt and
###        Lay the Groundwork for Another Sham Bankruptcy

Recognizing that the shareholders of GOK still had an opportunity to re-acquire control, the Conspirators arranged for GOK to incur massive false debts and planned the same strategy they used with NKAZ of placing GOK into a false bankruptcy. The Conspirators and MDM Bank arranged for Andrey Kozitsin, an agent of the conspirators who was purportedly acting as General Manager of GOK, to enter into a number of sham transactions with a Russian company called Svyatogor, which, for no consideration, became a holder of demand promissory notes issued by GOK with a face value of over $25 million. This same technique was repeated with other entities, all of which transferred their GOK debt to a small company known as Lebaut. Over a five day period between February 18 and February 23, Lebaut accumulated a total of 53 GOK promissory notes with a face value of approximately $39 million for no consideration. See id. ¶¶ 371-86.[11]

Plaintiffs are not the only persons who believe that this transaction was a sham. Defendants' own expert, Sergei Zankofsky, described the transaction in an article published in Izvestia, a major Russian newspaper, entitled "Theory and Practice of Bankruptcy," as follows:

#### Theory

[The article describes the general scope of a legitimate bankruptcy proceeding]

#### Practice

However, the practice of application of the Bankruptcy Law reveals a completely different picture.

---

[11]   Just as Chernyshev in the NKAZ bankruptcy had ties with the defendants, plaintiffs have learned that a company called Ural-Electromed owned 51% of Svyatogor's shares at that time, and that Kozitsin was one of Ural-Electromed's officers. Thus, Kozitsin, like Chernyshev, had a clear (and concealed) conflict of interest. See id. ¶ 375.

25

It would be very strange if the dark minds did not think of a way to use bankruptcy in companies' takeovers.

The initiation of the bankruptcy proceedings turned out to be an extremely easy task: Any company is under a threat of bankruptcy if it is not able to pay off its debts of at least 500 minimal wages within three months. There are several ways to bring a company to the condition when it is not able to pay off its debts within three months. <u>One of them, the most "reliable," is through a "penetration" into its executive bodies. This happened, for example, with one large ore mining and processing plant. Immediately after it came to power, its new management took large bank loans with [a] repayment term of ten to fifteen days. Clearly, the issue of repayment was not even considered[,] thus very efficiently resolving the problem of the initiation of a bankruptcy.</u>

Bernard Dec. Ex. 14 (emphasis added).[12]

### 6.    The Sham GOK Bankruptcy

Utilizing a technique defendants had by now perfected, the Conspirators arranged for a false bankruptcy proceeding to be commenced against GOK. Again, using the local energy provider, defendants caused a local natural gas company to file, on March 24, 2000, an involuntary bankruptcy petition alleging that GOK had failed to pay for its energy, when GOK had sufficient funds to pay the debt. Nevertheless, on or about March 30, 2000, the local regional court accepted the bankruptcy petition and appointed Oleg Kozyrev as Provisional Manager.

Subsequent to his appointment, Kozyrev, without any justification, refused to recognize a substantial claim by Nexis and other creditors. He did, however, recognize the fraudulent claim of Lebaut so that, on or about August 11, 2000, when Kozyrev held the first meeting of creditors, Lebaut's fraudulent claim amounted to more than 70% of the total creditor votes, and he was nominated as GOK's External Manager. On or about August 22, 2000, having failed to give a

---

[12]    Plaintiffs assume that the underscored portion of this article refers to GOK, for the reasons set forth in note 1, <u>supra</u>.

SSL-DOCS2 70070518v7

number of creditors notice, the court held a hearing and approved this decision, after Roussel

filed a petition in support of Kozyrev's appointment.  See id. ¶¶ 387-95.

### 7.  The Fraudulent Transfer of the Vanadium Shareholders' Shares

After Kozyrev was appointed External Manager, the Conspirators arranged for the

Vanadium Shareholder Plaintiffs – US companies Davis and Holdex, and Foston and Omni – to

be removed from GOK's shareholder registry, and for their shares to be secretly transferred to

defendants Venitom, Unidale, New Start and InvestLand (all US companies).

. The fraudulent techniques are detailed in the Complaint, and the accompanying

declarations of Anatoly Kleymenov, Dov Rieger, Nikita Chervinsky, Marina Ashikhmina and

Joseph Traum, but can be summarized as follows:  (1) the Davis shares were transferred to

defendant New Start using a forged power of attorney, and a wire transfer, through ABN-Ambro

Bank NV, located in New York, of a purported payment to a dummy company with the name

"Davis International (USA)," again, using the same technique used in the SAZ takeover of

creating companies with similar names; (2) Omni's shares were transferred after the Conspirators

obtained a judgment in a court proceeding, the pendency of which Omni never received notice,

invalidating Omni's initial purchase of the shares; (3) Foston's shares were transferred in another

court proceeding of which it, too, did not receive notice, and in which another forged power of

attorney was used to accomplish the transfer; and (4) Holdex's shares were transferred after a

series of court proceedings of which Holdex never received notice.  See id. ¶¶ 396-423.

Plaintiffs believe that US defendants Venitom, Unidale, New Start and InvestLand were

incorporated by defendant Kislin (a New York resident), who in turn effected the incorporation

through defendants Blonde Management and Pan-American (also both US companies).  Given

the nature of the incorporation process, and the procedures for transferring shares, plaintiffs

27

A - 340

believe that defendants Kislin, Blonde Management and Pan-American utilized the US mails and wires to accomplish these transactions. See id. ¶¶ 430-34.

### 8. The Sham Settlement of the GOK Bankruptcy

Following the same pattern as the NKAZ takeover, once the GOK takeover was accomplished, a sham settlement was approved. On or about March 3, 2001, Kozyrev held a second meeting of creditors. In another ironic turn of events, prior to the second meeting, Kozyrev recognized part of plaintiff Nexis' claim, which was previously rejected, in order to include this claim in the sham settlement so that Nexis would be prevented from litigating these matters. Based on the huge false claim filed by Lebaut, see supra Facts D.5, a sham settlement agreement was approved which provided for gradual payments to creditors without interest beginning not later than December 2006 through 2014. See id. ¶¶ 424-29; see also Zanadvarov Dec. ¶¶ 114-15 and Ex. 66.

### 9. Defendants Arrange for False Criminal Charges to Be Filed Against Khaidarov and Drugs To Be Planted On Traum

The last aspect of the illegal takeover of GOK followed the same pattern as the illegal takeover of NKAZ, as the Conspirators arranged for the filing of false criminal charges against Khaidarov just as they had done with M. Zhivilo. This time, corrupted Russian police approached Khaidarov at a diner and asked to see his passport, in which they "found" a package of heroin. False rape charges were later filed against him. Khaidarov was forced to flee Russia in November 2000, and now resides, under government protection, in Israel, where Chernoi has been indicted for the equivalent of criminal fraud and money laundering. See id. ¶¶ 424-29.

The conspirators did virtually the same thing to Joseph Traum, director of plaintiff Davis International, LLC. As detailed in the accompanying declaration, Traum attempted to pay off the fabricated GOK debt to avoid the sham bankruptcy, and to persuade Chernoi to return the

28

A - 341

shares that belonged to the Vanadium Shareholder Plaintiffs. Not only were his efforts in vain, but Traum was threatened by Makhmudov on multiple occasions, and, during an orchestrated raid in his office in which "drugs" were found, Makhmudov called Traum and told him to leave Russia or face jail time on false narcotics charges. See Declaration of Joseph Traum ¶ 28.

## ARGUMENT

### I

### This Court Has Jurisdiction Over Plaintiffs' RICO Claims Because Defendants Engaged in a Pattern of Racketeering Activity in the US and Defendants' Illegal Activities Involved Substantial Conduct in, and Had a Substantial Effect Upon, the US

This Court has jurisdiction over plaintiffs' RICO claims because defendants engaged in a pattern of racketeering activity in the US, which is sufficient to establish RICO subject matter jurisdiction under Second Circuit precedent. Alternatively, if this Court adopts the conduct or effects test as defendants argue (and which it should not, given Second Circuit caselaw), plaintiffs satisfy either test because defendants, including the eight US defendants, engaged in material conduct in furtherance of their unlawful scheme in the US, and defendants' conduct had a substantial effect on commerce in the US, including harm to US plaintiffs.

### A.    Without the Benefit of Jurisdictional Discovery, Plaintiffs Need Only Make a Prima Facie Showing of Jurisdiction

When deciding a motion to dismiss for lack of subject matter jurisdiction, this Court has recognized that "the factual allegations contained in the complaint are accepted as true ... [and] all reasonable inferences must be drawn in plaintiff's favor." Zheng v. Reno, 166 F. Supp.2d 875, 877 (S.D.N.Y. 2001) (citing Conboy v. AT&T Corp., 241 F.3d 242, 246 (2d Cir. 2001)). It follows that a "defendant's motion should only be granted if it appears that the plaintiff can prove no set of facts in support of her claim that would entitle her to relief." Id. (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Because defendants obtained a stay of all fact discovery,

29

including jurisdictional discovery, "'the district court relies solely on the pleadings and supporting affidavits, [and] the plaintiff need only make a prima facie showing of jurisdiction.'" Id. (quoting Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994)). The Complaint satisfies that standard.[13]

### B. This Court Has Jurisdiction over Plaintiffs' RICO Claims Because Defendants Engaged in a Pattern of Racketeering Activity in the US

At "the heart of any RICO complaint is the allegation of a pattern of racketeering activity." Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S.143, 154 (1987) (emphasis in original). When that pattern of illegal activity takes place in the US, an extraterritorial analysis under the conduct or effects test is irrelevant under RICO.

In Alfaada v. Fenn, 935 F.2d 475, 479 (2d Cir. 1991), the Second Circuit reversed a district court decision that had dismissed federal securities fraud and RICO claims for lack of subject matter jurisdiction. Starting with the securities fraud claim, the court found that negotiations and communications in the US constituted "conduct material to the completion of the fraud," and that therefore subject matter jurisdiction existed over that claim. See 935 F.2d at 478-79 (quoting Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1046 (2d Cir.1983)). This is what is commonly referred to as the "conduct" test.

In contrast, in analyzing subject matter jurisdiction over the RICO claims, the Second Circuit, in reliance on the Supreme Court's decision in Agency Holding, held that a RICO plaintiff need only allege a "pattern of racketeering activity" in the US. Id. (quoting Agency

---

[13] In the event this Court determines that plaintiffs have not satisfied even this minimal standard, plaintiffs respectfully request, particularly in light of the substantial jurisdictional nexus plaintiffs have already demonstrated, that the Court grant plaintiffs leave to take jurisdictional discovery. See infra Point I.C.

SSL-DOCS2 70070518v7

Holding, 483 U.S. at 154) (emphasis in original).  Critically, the court sustained subject matter jurisdiction over the RICO claims without a conduct or effect analysis because the predicate acts – the securities fraud claims – occurred in the US:  "The sales [constituting securities fraud] to Lincoln American Investments and Al-Turki were predicate acts which occurred primarily in  the US, and hence, serve as a basis of subject matter jurisdiction for the RICO claims." Id. at 479-80.

This reading of Alfaada was confirmed by the Second Circuit's recent decision in  North South Finance Corp. v. Al-Turki, 100 F.3d 1046 (2d Cir. 1998).  There, the court specifically recognized that Alfaada sustained RICO subject matter jurisdiction because the predicate acts of securities fraud occurred primarily in the US.  See North South Finance Corp., 100 F.3d at 1052 n.7 ("In Alfaada, ... we were concerned primarily with subject matter jurisdiction over the plaintiffs' securities fraud claims under the conduct test.  Little additional analysis or discussion was needed to hold that subject matter jurisdiction existed over the RICO claims as well, since the securities fraud violations 'were predicate acts which occurred primarily in the US.'" (citations to Alfaada omitted)).

Judge Leisure reached the same conclusion in C.A. Westel de Venezuela v. American Telephone and Telegraph Co., No. 90 Civ. 6665 (PKL), 1992 WL 209641 (S.D.N.Y. Aug. 17, 1992).  There, the court held that in determining whether to assert subject matter jurisdiction in a RICO case, "the Court should not apply the 'conduct' and 'effects' tests as articulated in the securities law context, but rather should examine the nature of [plaintiff's] allegations of a pattern of racketeering activity." Id. at *16.  The court upheld jurisdiction over the RICO claims because plaintiffs had pled that defendants committed at least two acts of mail and wire fraud in furtherance of their scheme in the US. See id. at *17.  Notably, and in light of this pattern of

racketeering activity in the US, Judge Leisure rejected defendants' argument that the court

should dismiss the case because the bulk of defendants' actions took place in, and affected,

Venezuela:

> Even if [plaintiff's] injury to its business or property by reason of defendants'
> RICO violations occurred primarily or exclusively in Venezuela, the Court has
> subject matter jurisdiction with respect to [plaintiff's] RICO claim because
> [plaintiff] has alleged a pattern of racketeering in the US.  The court rejects
> defendants' argument – that the Court lacks subject matter jurisdiction with
> respect to the RICO claim because most of the conduct and effects alleged in the
> Complaint occurred primarily in Venezuela – because it is inconsistent with both
> the text of RICO and the Second Circuit's <u>Alfaada</u> decision.

<u>Id.</u> at *19; <u>see also</u> <u>Republic of Philippines v. Marcos</u>, 818 F.2d 1473, 1478-79 (9th Cir. 1987).

The courts in this District have overwhelmingly reached the same conclusion.  <u>See</u>

<u>Sumitomo Corp. v. Chase Manhattan Bank</u>, No. 99 Civ. 40004 (JSM), 2000 WL 1616960, at *2

(S.D.N.Y. Oct. 30, 2000) (alleged wire communications and transfers of funds from the US

sufficient to support subject matter jurisdiction of RICO claims); <u>Johnson Electric North</u>

<u>America v. Mabuchi Motor America Corp.</u>, 98 F. Supp.2d 480, 485 (S.D.N.Y. 2000) ("[W]here

racketeering activities, including mail or wire fraud, occur within the US, it is unnecessary to

apply any test for determining the extraterritorial reach of the [RICO] statute."); <u>United States v.</u>

<u>Approximately $25,681,268.80 in Funds (Plus Interest) in the Court Registry System</u>, No. 98

Civ. 2682 (LMM), 1999 WL 1080370, at *4 (S.D.N.Y. Nov. 30, 1999) ("[G]uidance is found in

analogous RICO case law holding that if the predicate acts are sufficient to confer jurisdiction

upon a court, then the 'conduct' or 'effects' tests need not be employed."); <u>Thai Airways Int'l</u>

<u>Ltd. v. United Aviation Leasing B.V.</u>, 842 F. Supp. 1567, 1571 (S.D.N.Y. 1994) ("There is no

need here to measure the extraterritorial reach of RICO . . . because the complaint alleges that

racketeering activities occurred in the US."); <u>Bank of Crete v. Koskotas</u>, No. 88 Civ. 8412

(KMW), 1991 WL 177287, at *5-6 (S.D.N.Y. Aug. 30, 1991) (wire transfers through New York

A - 345

sufficient to find subject matter jurisdiction).

### 1.    Defendants Engaged in a Pattern of Racketeering Activity in The US

As set forth below, this Court has subject matter jurisdiction because the Complaint alleges that defendants committed numerous predicate acts in the US, including: (1) mail and wire fraud; (2) money laundering; (3) illegal transactions in monetary instruments; (4) Hobbs Act violations; and (5) Travel Act violations. Defendants do not contend that plaintiffs failed to adequately plead the elements of these various predicate acts. The only issue before this Court, therefore, is whether plaintiffs have pled that two or more related predicate acts were committed by the defendants in the US, or put another way, whether this Court could exercise subject matter jurisdiction over them.

### a.    Defendants' Predicate Acts of Mail and Wire Fraud Occurred in the US

The mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343) are not limited to domestic frauds, and indeed, wholly foreign frauds are indictable if the fraud is furthered through the use of US mails or wires. See United States v. Trapilo, 130 F.3d 547, 552 (2d Cir. 1997) ("The statute reaches any scheme to defraud involving money or property, whether the scheme seeks to undermine a sovereign's right to impose taxes, or involves foreign victims and governments.") (collecting case and emphasis added); United States v. Gilboe, 684 F.2d 235, 237-28 (2d Cir 1982) (finding jurisdiction over international shipping fraud of Chinese government by Norwegian citizen because fraud was furthered by money wired through Manhattan banks to the Bahamas);[14] United States v. Approximately $25,681,268.80 in Funds, No. 98 Civ. 2682

---

[14]  When analyzing civil RICO, it is generally appropriate to look to criminal RICO cases, see e.g., Rich-Taubman Assoc. v. Stamford Restaurant Operating Co., 587 F. Supp. 875, 878 (S.D.N.Y. 1984), and indeed, in this very context, courts look to criminal RICO cases when

33

(LMM), 1999 WL 1080370, at *3 (S.D.N.Y. Nov. 30, 1999) ("[F]or a court to have jurisdiction over a wire fraud claim, 'what is proscribed is use of the telecommunication systems of the US.... Nothing more is required. The identity and location of the victim, and the success of the scheme, are irrelevant.'" (quoting Trapilo, 130 F.3d at 551 (2d Cir. 1997)).

The Complaint is replete with allegations of defendants' use of US banks to wire funds for use in the takeover of NKAZ, GOK and the other aluminum plants, and defendants have thus committed wire fraud in the US. See Complaint ¶¶ 131, 142, 147,157, 172, 174, 176, 196, 197, 284-85, 296, 299, 301, 312, 314, 460-81. For example, defendants (including Deripaska in Chicago) extorted approximately $24 million in 16 payments between April 1996 and October 1999, and utilized US banks to transfer these payments. See Complaint ¶¶ 172-76. The Complaint identifies the specific dates of three such payments: April 7, 1999, October 12, 1999, and December 20, 1996. Id. ¶ 174. And to facilitate their takeover of NKAZ, in June or July of 1999, defendant (and US Corporation) Pan-American wired three payments totaling one million dollars through US banks to Tuleyev for his support in rigging the NKAZ bankruptcy proceedings. Id. ¶ 196.

Similarly, a bribe of $500,000 was wired through US banks to Tuleyev in the Summer of 1999 by defendant Blonde Investment on behalf of all the defendants. Id. ¶ 197; see also First Declaration of Jalol Khaidarov, dated April 15, 2002, ¶¶ 11-16 (providing additional details on these payments) ("First Khaidarov Dec."). Moreover, Kislin, a NY resident, assisted and coordinated the transfer of these funds through two American companies which he controlled.

---

determining whether predicate acts occurred in the United States for jurisdictional purposes, see United States v. Approximately $25,829,681.00 in Funds, No. 98 Civ. 2682 (LMM), 1999 WL 108370 (S.D.N.Y. Nov. 30, 1999).

SSL-DOCS2 70070518v7

<u>Id.</u> ¶ 198.

The Complaint identifies twelve separate transactions, after the takeover of NKAZ,

whereby defendants diverted profits from the sale of NKAZ metal through US banks – including

Chase Manhattan and Citibank – to themselves, and to the detriment of plaintiffs. <u>Id.</u> ¶ 481.

These transactions – all in the spring and early summer of 2000 – diverted over $33 million in

aluminum sales that rightfully belonged to plaintiffs. <u>Id.</u> Those transactions constitute further

predicate acts committed by defendants in the US. <u>See</u> <u>Mezzonen v. Wright</u>, No 97 Civ. 9380

(LLM), 1999 WL 1037866, at *5-6 (S.D.N.Y. Nov. 16, 1999) (allegations of "post-investment

diversion of funds and the closely related concealment of those diversions" support mail and

wire fraud and money laundering predicate acts).

Defendants were similarly cavalier with US mails and wires in their fraudulent takeover

of GOK. <u>See</u> Complaint ¶¶ 345, 348, 354, 361, 401, 433. Specifically, defendants Pan-

American and Blonde Management (again, both US entities), wired bribe payments through

banks in the US to MDM bank, which then paid the bribes to Roussel. <u>Id.</u> ¶ 354. Included in

these payments was an $850,000 cash payment to Roussel's election campaign. <u>Id.</u> Likewise, in

early 2000, Pan-American and Blonde Management wired funds through US banks to MDM

Bank, which were used to purchase apartments and automobiles as bribes of GOK directors. <u>Id.</u>

¶ 361. These acts of mail and wire fraud provide additional examples of predicate acts

committed by defendants in the US.

Moreover, defendants, as part of their illegal takeover of GOK, defrauded three US

companies – Davis, Holdex and Nexis – and established four US companies – defendants New

Start, Venitom, Unidale and InvestLand – so that these companies could act as repositories for

the fraudulently obtained shares in GOK, and so that the loan made by US plaintiff Nexis would

not be repaid. See id. ¶¶ 390, 397-434. These four corporate defendants were established in the US by Kislin and companies under his control. See id. ¶¶ 432-34. Because obtaining these shares by fraud, and establishing these four US companies to receive those fraudulently obtained shares, necessarily entailed use of the mails and wires of the US, defendants committed predicate acts of mail and wire fraud in the US. See In re Sumitomo Copper Lit., 104 F. Supp.2d 314, 320 (S.D.N.Y. 2000) (holding that use of mails and wires can inferred from nature and complexity of a fraudulent scheme).

### b.     Defendants' Money Laundering Occurred in the US

The money laundering statute contains at least two different provisions that provide this Court with jurisdiction over defendants' illegal conduct. First, in what the Second Circuit has referred to as the "international money laundering" provision, the statute proscribes the transfer of funds "from a place in the US to or through a place outside the US or to a place in the US from or through a place outside the US." See 18 U.S.C. § 1956(a)(2); United States v. Zvi, 168 F.3d 49, 56 (2d Cir. 1999). Second, in a sub-section of the statute that specifically refers to "extraterritorial jurisdiction," the statute applies if: (i) the conduct is by a US citizen; or (ii) by a non-US citizen but "the conduct occurs in part in the US;" and (iii) the value of the transactions exceeds $10,000. See 18 U.S.C. § 1956(f). Conduct "occurs in part" in the US if a defendant "acts electronically" in the US, even if a defendant is never physically present in the US. See United States v. Approximately $25,681,268.80 in Funds, 1999 WL 1080370, at *3; see also United States v. Goodwin, 141 F.3d 394, 400 (2d Cir. 1997 (only a de minimis effect on US commerce necessary for money laundering prosecution).

First, in satisfaction of section 1956(a)(2), laundered funds were sent to and from the US, as defendants routinely used banks in the US to launder money obtained from their extortionate

and fraudulent acts, and their takeover of NKAZ and GOK. See Complaint ¶¶ 131, 142, 156-59, 171-72, 174-76, 294-96, 300-301, 482-89. For example, during the years 1994-95, Chernoi, on behalf of the conspirators, extorted MIKOM-managed NKAZ, and then laundered the proceeds of this extortion racket through US banks to companies he controlled, including the New York offices of Trans-Commodities. See id. ¶¶ 148-59.

Second, in satisfaction of section 1956(f), much of defendants' money laundering activity was managed by defendants Arnold Kislin, Blonde Management and Pan-American, all US citizens, using US banks. See id. ¶¶ 131, 164, 167, 175, 198, 314, 342, 354, 361, 434. And to the extent that the conduct did not involve Kislin or another US entity, the Complaint satisfies the other provision of section 1956(f) as defendants' money laundering activity occurred at least "in part" in the US, because defendants "acted electronically" in the US by using US banks.

Third, in some instances funds were physically laundered here in NY real estate. See Complaint ¶¶ 131, 484. Real estate records establish that defendant Chernoi purchased two pieces of real estate on Tenth Avenue in Manhattan in November 1998, and that he purchased a number of condominiums in Brightwater Towers in Brooklyn between January 1992 and April 1995. The public records concerning these transactions contain a number of assignments and other transactions with affiliated persons and entities in order to disguise the true owners of the properties. For example, the mortgage on the Tenth Avenue properties was assigned multiple times, including one assignment to "Michael Cherney" (which we believe to be an alias used by defendant Mikhail Chernoi) and a subsequent assignment from him to still another company. See Bernard Dec., Exs. 18, 19. A set of Michael Cherney's Israeli identification papers are also among the papers we found in this transaction. See id. Ex. 20.

With respect to the Brightwater Towers properties, a number of deeds and powers of

37

attorney were executed by Michael Cherney to purchase multiple units in the condominium. <u>See</u>
<u>id</u>. Ex. 18. The attorney on these transaction, and the individual to whom Michael Cherney
issued the powers of attorney, is Arik Kislin, who is related to defendant Kislin.[15]

c.     **Defendants' Illegal Transactions in Monetary**
                      **<u>Instruments Occurred in the US</u>**

      Many of the acts of money laundering and wire fraud discussed above also constitute
illegal transactions in monetary instruments, in violation of 18 U.S.C § 1957, and as such,
defendants committed predicate acts in the US as well. Section 1957 prohibits engaging in a
"monetary transaction in criminally derived property of a value greater than $10,000." 18 U.S.C.
§ 1957(a). Section 1957(d) limits the application of this statute to circumstances where: (1) the
offense takes place in the US; or (2) the offense takes place outside the US but the defendant is a
US Person.

      As detailed above, defendants Kislin, Blonde Management and Pan-American, all US
citizens, were involved in defendants' illegal scheme and the financial transactions related to the
scheme. For example, Kislin, through Blonde Management and Pan American, wired bribe
payments of $1,000,000 and $850,000, monies obtained as part of the illegal scheme, to Tuleyev
and Roussel. <u>See</u> Complaint ¶¶ 196, ,354, 493. These payments by US defendants out of the
US, and defendants' other transactions into or through the US, are transactions that take place in
the US for purposes of section 1957. <u>See</u> <u>United States v. Approximately $25,829,681.00</u>, No.
98 Civ. 2682 (LMM), 2002 WL 143679, at *4 (S.D.N.Y. Jan. 31, 2002) (section 1957(d)

---

[15]   Plaintiffs have obtained real estate records for a number of other transactions, both here in
New York and in other locations in the US, which we believe also evidence defendant
Chernoi's money laundering activities in the US, but which involve entities and individuals
from whom plaintiffs will need to obtain discovery in order to verify defendant Chernoi's
role.

38

**A - 351**

satisfied where funds were in a New York bank account, even if the funds were ultimately wired to London).

        **d.**    **Defendants' Violations of the**
                **Hobbs Act Occurred in the US**

In order to obtain jurisdiction over a Hobbs Act charge, a defendant's extortionate conduct must interfere with interstate or foreign commerce, see Stirone v. United States, 361 U.S. 212, 215 (1960); however, the effect need only be "slight, subtle or even potential." United States v. Shareef, 190 F.3d 71, 75 (2d Cir. 1999); see also United States v. Farrish, 122 F.3d 146, 148 (2d Cir. 1997). Indeed, wholly foreign extortions that affect interstate or foreign commerce are sufficient. See Wiwa v. Royal Dutch Petroleum Co., No. 96 Civ. 8386 (KMW), 2002 WL 319887, at *24 n.32 (S.D.N.Y. Feb 28, 2002) ("Thus, even if none of the extortionate acts occurred in the US, any such extortionate act is actionable under the Hobbs Act if it has the requisite effect on interstate commerce or commerce between the US and a foreign country.") (emphasis added); United States v. Ivanov, 175 F. Supp.2d 367, 374 (D. Ct. 2001) ("[I]t is immaterial whether [defendant's] alleged conduct can be said to have taken place entirely outside the US, because that conduct clearly constituted 'interference with interstate commerce by extortion.'" (quoting Stirone, 361 U.S. at 215)); United States v. Inigo, 925 F.2d 641, 648 (3d Cir. 1991) (locus of extortion does not matter; district court has jurisdiction over Hobbs Act charge so long as defendants' activities affected interstate commerce).

As part of their illegal scheme to take over the aluminum and vanadium businesses in Russia, defendants engaged in numerous acts of extortion. See Complaint ¶¶ 151-59, 165, 168-74, 189-92, 343, 346, 349-51, 357, 326-64, 369-70, 443-53, 496-502. Included among those acts is Deripaska's murder threat to Yuri Zhivilo in Chicago in 1995 – an act of extortion on US soil

that is clearly indictable under the Hobbs Act.[16]  Additionally, defendants committed many

extortionate acts overseas, including threats on the life of M. Zhivilo and threats on the lives of

Khaidarov and the GOK directors.  See supra Facts C.2, D.1, infra Point III.D.1.b.

These extortionate acts affected interstate and foreign commerce and therefore establish a

pattern of racketeering activity that occurred in the US.  To begin with, many of the extortion

attempts were successful and resulted in the payment of millions of US dollars through US

banks, like Chase Manhattan and Bank of New York, to defendants.  For example, as a result of

Deripaska's and Chernoi's threats to Zhivilo, approximately $24 million was paid to the

Conspirators and companies they control.  See id. ¶¶ 168-74.  The proceeds from these

extortions, as detailed above, were laundered through US banks and real estate investments in

New York by defendants, including American citizens Kislin, Blonde Management and Pan-

American.  See, e.g., id. ¶¶ 176, 131; Bernard Dec., Exs. 18, 19.

Moreover, the overall purpose of the criminal enterprises was to control the Russian

metals industry, and more specifically to take over NKAZ and GOK.  That illegal activity more

than satisfies the de minimis commerce requirement in the Hobbs Act.  The Complaint, for

example, describes plaintiffs' seizure of NKAZ-produced aluminum, which would have been

---

[16]  Defendants argue that this threat is legally irrelevant because it occurred five years before the
contracts at issue were rejected, and because Y. Zhivilo is not a plaintiff.  See Def. SMJ
Mem. at 22.  Defendants' five-year argument is particularly misleading as RICO specifically
requires proof of the commission of two predicate acts within a ten-year time frame, see
Chanayil v. Gulati, 169 F.3d 168, 170 (2d Cir. 1999), and the close-ended continuity
requirement, which defendants do not address, requires the pleading of predicate acts over as
far back a period of time as possible (for example, eight years), see GICC Capital Corp. v.
Technology Finance Group, Inc., 67 F.3d 463, 466 (2d Cir.) (citing Jacobson v. Cooper, 882
F.2d 717, 720 (2d Cir. 1989)).  The point about Y. Zhivilo not being a plaintiff is just as
misleading.  All plaintiffs are corporate entities, and corporate entities can only be threatened
through individuals.  As defendants well know, Y. Zhivilo was a Director and shareholder of
plaintiff BMT Ltd.

40

sold to the Aluminum Plaintiffs but for defendants' illegal acts, in Maryland, New Jersey and

Louisiana. See Complaint ¶¶ 294-301. In all, plaintiffs arrested approximately $10 million

worth of aluminum. Id. The monopolization of the Russian aluminum industry by defendants

also had the effect of squeezing Transworld Aluminum, a large, multi-national company with

offices in the US, and Aldeco (US), with an office in the US, out of that market. See Complaint

¶¶125-47. Finally, defendants' takeover of GOK affected interstate and foreign commerce

because not only did GOK and the Davis plaintiffs trade with US entities, see Complaint ¶ 503,

but plaintiffs Davis and Holdex, both US companies, lost their shares in GOK when they were

fraudulently transferred to four defendant companies in the US, and US plaintiff Nexis's loan

agreement with GOK was effectively cancelled. See id. ¶¶ 37, 397-403, 417-23.

Additionally, defendants' extortionate acts in connection with the BRAZ takeover, supra

Facts B.3, directly harmed US business interests. Alcoa and Reynolds Aluminum, both US

companies, each separately sought to purchase a controlling interest in BRAZ, but were

frustrated in their efforts by defendants' extortionate acts. See id. ¶¶ 144-46. In addition, the

murder of Lvov caused AIOC to file for bankruptcy. See id. ¶ 139. Harm to US companies

affects interstate commerce. See Inigo, 925 F.2d at 648 (Hobbs Act jurisdiction existed over

foreign extortion affecting DuPont).[17] In sum, defendants' extortions, and the schemes of which

---

[17] Defendants' acts of extortion concerning BRAZ, KRAZ, and SAZ are relevant to plaintiffs'
pattern allegations, and thus may be considered by the Court in this jurisdictional inquiry,
even though plaintiffs were not the intended victims of the particular extortionate predicate
acts relating to BRAZ See Def. SMJ Mem. at 17. In Terminate Control Corp v. Horowitz,
28 F.3d 1335 (2d Cir. 1994), the court recognized that "a pattern of racketeering activity may
be based upon predicate acts directed against nonplaintiffs as long as one act injures the
plaintiff so as to create standing for that plaintiff." Id. at 1347. The court ultimately did not
resolve this issue, but, citing cases from the Third and Seventh Circuits, found that this
"appears to be the correct reading of [section] 1964(c)." Id. (citing Kearny v. Hudson
Meadows Urban Renewal Corp., 829 F.2d 1263, 1268 (3d Cir. 1987); Marshall & Ilsley
Trust Co. v. Pate, 819 F.2d 806 (7th Cir. 1987)).

41

they were a part, had a substantial affect on interstate and foreign commerce in the US, let alone

a de minimis effect, which is all that is required.  See Farrish, 122 F.3d at 148.

e.    **Defendants' Violations of the
Travel Act Occurred in the US**

Defendants also committed Travel Act violations in the US.  See 18 U.S.C. § 1952.  A

violation of the Travel Act occurs when "(1) a person uses a facility of interstate or foreign

commerce, such as the telephone, (2) with intent to 'facilitate the promotion, management,

establishment, or carrying on, of any unlawful activity' and (3) thereafter performs an additional

act in furtherance of the specified unlawful activity."  United States v. Jenkins, 943 F.2d 167,

172 (2d Cir. 1991) (quoting 18 U.S.C. § 1952(a)).  The term "specified unlawful activity"

includes, inter alia, extortion, bribery, and violations of the money laundering statutes.  See 18

U.S.C. §§ 1952(b), 1956-57.

A number of actions described above under the rubric of mail and wire fraud – for

example Kislin's securing the incorporation of US defendants New Start, Venitom, Unidale and

InvestLand – are also violations of the Travel Act because:  (1) the US mails and wires were

necessarily used in connection with establishing these US entities; (2) the establishment of these

US companies to act as repositories for the fraudulently obtained GOK shares facilitated the

promotion, management, establishment and carrying on of defendants' scheme; and (3)

defendant Kislin performed multiple acts in the US in carrying out this illegal conduct.

Moreover, the Complaint contains a number of allegations of travel to and from the US by

defendants to carry out their illegal scheme.  Among other things, the Complaint alleges that

Deripaska traveled to the US to extort Y. Zhivilo in Chicago, that Chernoi, Deripaska and

Makhmudov, acting on behalf of all defendants, traveled to and from the US to open bank

accounts and distribute proceeds of the Illegal Scheme, and that Kislin traveled within the US

42

and abroad to help manage the scheme. See, e.g., Complaint ¶¶ 507-16.

C.    **Alternatively, Plaintiffs Satisfy Either the Cause or**
      **Effect Tests for Establishing Extraterritorial Jurisdiction**

The predicate acts discussed above occurred in the US and this Court thus has subject

matter jurisdiction without looking "for guidance to precedents concerning subject matter

jurisdiction for international securities transactions and antitrust matters." Def. SMJ Mem. at

13.[18] Nonetheless, should the Court determine that such an analysis is required, plaintiffs satisfy

either the conduct or the effects test.[19]

1.    **Defendants Engaged in Conduct in the US**
      **that was Material to their Overall Racketeering Scheme**

In North South Finance, the Second Circuit described the conduct test as follows:

> [W]e entertain suits by aliens only where conduct material to the completion of
> the fraud occurred in the US. Mere preparatory activities, and conduct far
> removed from the consummation of the fraud, will not suffice to establish
> jurisdiction. Only where conduct "within the US directly caused" the loss will a
> district court have jurisdiction over suits by foreigners who have lost money
> through sales abroad.

100 F.3d at 1051 (quoting Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1046 (2d Cir. 1983)).

Applying this test, plaintiffs have more than adequately alleged sufficient conduct by defendants

in the US to confer subject matter jurisdiction.

As set forth supra, Point I.A.1, the predicate acts committed by defendants in the US

were material to the completion of the fraud. Defendants engaged in predicate acts of mail and

---

[18] "Def. SMJ Mem." refers to Defendants Memorandum of Law In Support of Motion To
Dismiss The First Complaint For Lack of Subject Matter Jurisdiction, Failure to State A
Claim And Failure to Plead Fraud With Particularity, dated January 30, 2002.

[19] The Second Circuit has not adopted either test for RICO. Rather, North South accepted the
test because the plaintiff did not contend otherwise. See North South, 100 F.3d at 1049,
1052.

43

wire fraud, money laundering and extortion, all of which were necessary and material to their scheme of infiltrating the aluminum and vanadium sectors of the Russian metals industry. See Madanes v. Madanes, 981 F. Supp 241, 250 (S.D.N.Y. 1997) (finding subject matter jurisdiction where "numerous acts of mail and wire fraud designed to mask the Defendants' malfeasance and otherwise further the goals of the alleged enterprise"); see also United States v. Kim, 246 F.3d 186, 189 (2d Cir. 2001) (finding subject matter jurisdiction over "foreign" mail and wire fraud claims where fraud was "furthered by wire transmissions to and from New York" by a US citizen). Additionally, defendants' establishment of four US companies, and defrauding of three others, in order to take over GOK, is certainly "conduct material to the completion of [defendants'] fraud." Psimenos v. E.F. Hutton Corp., 722 F.2d 1041, 1046 (2d Cir. 1983).

Similarly, the presence of US defendants Kislin, Blonde Management, Pan-American and Sibirsky Aluminum (US) furthered defendants' overall scheme by providing a conduit and connection to the US. Without this connection, defendants' scheme would not have succeeded. Kislin is responsible for nearly all of defendants' financial maneuverings in the US, and a substantial amount of their activity abroad. See, e.g., Complaint ¶ 475. For example, Kislin, Blonde Management and Pan-American were also responsible for the payment of over two million US dollars in bribes to Tuleyev and Roussel, see id. ¶¶ 196-97, 354, as well as incorporating the US companies that now hold plaintiffs' GOK shares. See id. ¶¶ 432-34. And among other things, plaintiffs also allege that defendants Chernoi, Deripaska, and Makhmudov traveled to the US as part of their illegal scheme. See e.g., Complaint ¶¶ 509-13. That travel included Deripaska's attendance at an aluminum trade conference in Chicago where he made extortionate threats as part of defendants' scheme. See id. ¶¶ 163-65. In short, but for these material and significant aspects of their racketeering activities, defendants could not have

44

accomplished their illegal scheme, and plaintiffs thus satisfy the conduct test.

### 2. Defendants' Overseas Racketeering Activity Had a Substantial Effect on Commerce in the US

As borrowed from securities fraud precedent, a district court may assert jurisdiction over a RICO action "whenever a predominantly foreign transaction has substantial effects in the US." North South Finance, 100 F.3d at 1051 (quoting Consolidated Gold Fields PLC v. Minorco, SA, 871 F.2d 252, 261-62 (2d Cir. 1989). Like the antitrust laws, RICO can be applied if foreign "conduct is intended to and actually does have an effect on US imports or exports which the state reprehends." Id. at 1052 (citing United States v. Aluminum Co. of America, 148 F.2d 416, 443-44 (2d Cir. 1945). Defendants' conduct satisfies this standard.

First, defendants, as part of their illegal scheme, defrauded Davis, Holdex and Nexis – all US companies – out of their shares in GOK and a loan agreement with GOK, directly harming those three US companies. See Complaint ¶¶ 397-403, 417-23. And as part of that fraud, defendants transferred the GOK shares to newly formed (by defendants) US companies New Start, Venitom, Unidale and InvestLand. See id. ¶¶ 397-434. The looting of GOK was therefore committed at the expense of three US companies, and for the benefit of four. This is not, therefore, and as defendants insist, a "'controversy involving foreign victims who sold a foreign entity to foreign defrauders in a foreign transaction.'" Def. SMJ Mem. at 15.

Second, defendants' takeover of GOK and NKAZ directly caused plaintiffs to lose sales in the US. See, e.g., Complaint ¶¶ 291-301. Prior to the taking of any discovery, plaintiffs have already learned of over $33 million in NKAZ metal sales to the US in May through July 2000 alone. See id. ¶ 481. Those substantial lost sales satisfy the effects test. See Johnson Electric, 98 F. Supp.2d at 486-87 (after finding jurisdiction because predicate acts occurred in the US, reconfirming subject matter jurisdiction because "loss of sales and potential US customers"

45

amounts to a substantial effect).[20]

Third, defendants' racketeering activity had substantial effects on the banking and aluminum industries in the US. Defendants' pervasive use of the wires to send funds necessary for the accomplishment of their scheme to, from and through US banks has a substantial effect on those banks. See, e.g., Complaint ¶¶ 460-81. Similarly, in their money laundering activities, through the use of US banks and NY real-estate, defendants have substantially affected markets in the US. See, e.g., id. ¶¶ 482-89. And in their attempts to consolidate the aluminum industry in Russia, defendants have harmed US aluminum companies, including ALCOA and Reynolds Aluminum, whose offers to purchase the BRAZ aluminum plant were thwarted by defendants scheme, and Aldeco (US) who had contracts to purchase aluminum from KRAZ that were terminated as a result of defendants' Illegal Scheme, and Transworld (US), whose trading with KRAZ was disrupted. See id. ¶¶ 103-104 & 143-46.[21] These effects on the commerce of the US and US companies suffice to establish jurisdiction under the effects test. See Wiwa v. Royal Dutch Petroleum Co., No. 96 Civ. 8386 (KMW), 2002 WL 319887, at *22 (S.D.N.Y. Feb. 28, 2002) (finding RICO subject matter jurisdiction under effects test because "corporate

---

[20]  Plaintiffs have also obtained evidence concerning the substantial US sales activities of the Sibirsky group. Annexed to the Bernard Dec. as Ex. 29 is a printout from a report that details daily trading activity of various Sibirsky entities. The data for August, 2002 contains approximately sixty shipments of aluminum from Russia, and an entity listed as "Rual Trdg." (defendant here is Rual Trade Ltd.), to an entity listed as "Sibirsky Aluminum Products" in Harrison, NY (defendant here is Sibirsky Aluminum Products USA Corp.), to ports all across the US, including, New York, Boston and Baltimore. As noted infra, notes 23, 47, both Sibirsky and Russian Aluminum maintain an office in Harrison, NY.

[21]  For the reasons set forth supra, note 17, this Court can consider the harm suffered by these non-parties.

defendants' racketeering activities, if proven, have effects on the US economy").[22]

Finally, defendants, through Chernoi and the Izmailovo Mafia, have caused at least one US citizen, Felix Lvov, to be murdered in furtherance of their illegal scheme. See Complaint ¶¶ 138-39, 162-65; Second Declaration of Yuri Zhivilo, dated September 18, 2002 ("2d Y. Zhivilo Dec.") at ¶ 6. In addition to the effect on Lvov and his family, subsequent to Lvov's murder, Lvov's company, AIOC Corp., filed for bankruptcy. See id. ¶¶ 138-39.

### D.    Regardless of the Test, at this Stage of the Litigation, Under the Deferential Standards that Apply Where Plaintiffs Have Not Obtained Any Discovery, This Court Can Assert Jurisdiction

In sum, prior to taking any jurisdictional discovery, plaintiffs have established a number of critical jurisdictional facts. These facts should be viewed by the Court in light of the deferential standard of review that applies at this stage of the proceedings: All of plaintiffs' factual allegations are accepted as true, all reasonable inferences are drawn in plaintiffs' favor, and plaintiffs need only make a prima facie showing of jurisdiction. See supra Point I.A.

The facts already alleged or established lead to the inference that jurisdictional discovery would reveal, among other things: (1) additional US residents who worked with Kislin, and the

---

[22]    Defendants cite Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 989 (2d Cir. 1975) and Kruman v. Christie's Int'l PLC, 129 F. Supp.2d 620, 625-26 (S.D.N.Y. 2001) for the proposition that "allegations of generalized financial or market effects in the US are insufficient to support jurisdiction." Def. SMJ Mem. at 18. The authority we rely upon, for the opposite holding, Wiwa, is a RICO decision, whereas Bersch was a securities fraud case and Kruman an antitrust case. As the Second Circuit has recognized, precedents in the securities fraud and antitrust contexts do not necessarily apply when determining the extraterritorial application of RICO. See North South Finance, 100 F.3d at 1052. This is particularly the case with Bersch, which explicitly recognized that its holding derived strong support from the statutory language of the Securities Exchange Act. See 519 F.2d at 989. Furthermore, the Second Circuit overturned the Kruman court's holding that subject matter jurisdiction over antitrust activity outside the US cannot be premised on effects on US markets. See Kruman v. Christie's Int'l PLC, 284 F.3d 384, 403 (2d Cir. 2002) (antitrust laws may be invoked by "plaintiffs injured in foreign markets by [foreign] conduct that negatively affects our [US] markets").

SSL-DOCS2 70070518v7

US companies he manages, to carry out defendants' Illegal Scheme;[23] (2) additional evidence of

sales and other actions by the defendants in the US aluminum market;[24] (3) additional real estate

bought by the defendants in the US to launder the proceeds of their illegal activities; (4)

additional travel to and from the US by the Conspirators to coordinate the Illegal Scheme; (5)

additional predicate acts committed by the defendants in the US, including details on Ivankov's

criminal activity in New York; and (6) additional interests of other non-party US entities

adversely affected by defendants' illegal conduct.  As a result, this Court should deny

defendants' subject matter jurisdiction motion.

## II

### This Action Should Not Be Dismissed on the Ground of Forum Non Conveniens Because Plaintiffs Cannot Obtain Justice in Russia and this Action Involves Substantial US Conduct

Dismissal on the grounds of forum non conveniens is an extraordinary remedy that

---

[23]  For example, plaintiffs have already obtained information concerning other US corporate entities affiliated with Sibirsky, including: (1) Sibirsky Aluminum Products USA Corp., f/k/a Samara Rolled Products Corp., incorporated in Delaware in 1999; and (2) Sibirsky Aluminum Bauxite Inc., incorporated in Delaware in 1999 and subsequently merged with the Delaware Sibirsky entity in 2001.  See Bernard Dec. Ex. 22, 21.  Both entities are registered to do business in New York.  See Bernard Dec. Ex. 28.  In addition, Russian Aluminum has also incorporated a Rual Trade USA Corp. in Delaware.  See Bernard Dec. Ex. 23.

[24]  In addition to the sales data set forth supra, note 20, Russian Aluminum, on its web page at www.rusal.ru, contains various powerpoint presentations, including one entitled "RUSAL: Leading Russia's Next Wave: Thinking Globally."  From the face of the document, this presentation was made in New York on March 14, 2002 at the Sixth Annual Conference on Investing in Russian and CIS.  On page seven, after noting its estimated annual revenue for 2001 at US $4.1 billion, it notes that 14% of this revenue is derived from sales in the "Americas," which we note is more than its sales in Russia (13%).  See Bernard Dec. Ex. 24.

The latest Dun & Bradstreet report for defendant Sibirsky Aluminum Products USA Corp., located in Harrison, New York, reports annual sales for the year 2000 at US $118,729,785, accounts receivable of almost US $10 million, and cash and inventory of approximately US $5 million.  See Bernard Dec. Ex. 27.

48

should only rarely be granted.[25]  See Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 721 (1996).

A plaintiff's choice of forum is entitled to a great degree of deference and should not be

disturbed lightly.  See Koster v. (American) Lumbermens Mut. Casualty Co., 330 U.S. 518, 524

(1947).  Only "when an alternative forum has jurisdiction to hear the case, and when trial in the

chosen forum would 'establish . . . oppressiveness and vexation to a defendant . . . out of all

proportion to plaintiff's convenience', or make a trial in plaintiff's chosen forum . . .

inappropriate because of consideration affecting [the] court's own administrative and legal

problems'" should a court grant a forum non conveniens motion.  Piper, 454 U.S. at 241 (quoting

Koster, 330 U.S. at 524 (emphasis added)).  The analysis involves two steps.  First, the

defendants bear the burden of establishing an adequate alternative forum elsewhere; second, the

defendants must prove that the balance of public and private interest factors tilt "strongly" in

favor of the foreign forum.  See Mastercard Int'l Inc. v. Argencard Sociedad Anonima, No. 01

Civ. 3027 (JGK), 2002 WL 432379, at *6 (S.D.N.Y. March 20, 2002) (quoting Alfaada v. Fenn,

159 F.3d 41, 45-46 (2d Cir. 1996)).

      Plaintiffs (including three US citizens) have chosen this forum for entirely legitimate

reasons and defendants (including eight US citizens) have not carried their burden of

demonstrating that the Russian judicial system either generally, or in the context of this dispute,

is adequate.  As the Complaint and numerous sworn declarations accompanying this

memorandum of law make clear, defendants have already bribed officials to corrupt Russian

---

[25]  A motion to dismiss for forum non conveniens can only be decided after a court determines that it has subject matter jurisdiction.  See Gulf Oil, 330 U.S at 504 ("[T]he doctrine of forum non conveniens can never apply if there is an absence of jurisdiction.").  In light of the Supreme Court's directive that federal courts have an "unflagging" duty to exercise their jurisdiction, see Colorado River Water Cons. Dist. v. United States, 424 U.S. 800, 817-18 (1976), in the Tenth Circuit, forum non motions are denied if US law is applicable, see Needham v. Phillips Petroleum Co. of Norway, 719 F.2d 1481, 1483 (10th Cir. 1983).

SSL-DOCS2 70070518v7

A - 362

judicial proceedings in order to prevent plaintiffs from obtaining a fair and just resolution of their claims. Put simply, defendants have not met their burden of proof that Russia is an adequate alternative forum.

Even assuming Russia were an adequate alternative forum, which it is not, defendants have not met their burden of proof that litigation in New York – a location in which all defendants do business – would "establish ... oppressiveness and vexation . . . out of all proportion to plaintiff's convenience." Rather, four of plaintiffs' central witnesses cannot travel to Russia either because of false criminal charges filed against them and procured by defendants, or because of defendants' threats of violence. In contrast, defendants point to no witnesses or documents which are available in Russia, but which are not available in the US. Nor have defendants proven that considerations affecting this court's "own administrative and legal problems" strongly favor Russia. To the contrary, this lawsuit involves claims by three US citizens against eight other US citizens, and it involves unlawful actions and crimes committed by all defendants in the US in violation of US law. In short, as we demonstrate below, consideration of the private and public interest factors does not strongly favor dismissal of this suit to Russia.

## A.    This Court Should Apply a Summary Judgment Standard to Defendants' Forum Non Motion

This Court should treat defendants' forum non motion like a motion for summary judgment, and deny it if plaintiffs have raised genuine issues of material fact on the issues of corruption and fraud. A typical forum non motion raises only issues concerning the location of sources of proof, but this case is different. Defendants' motions attack core elements of plaintiffs' case; namely, whether defendants corrupted certain proceedings in Russia.

"[W]here jurisdiction is so intertwined with the merits that its resolution depends on the

50

resolution of the merits, the trial court should employ the standard applicable to a motion for summary judgment." <u>London v. Polishook</u>, 189 F.3d 196, 198 (2d Cir. 1999) (internal quotation marks and citation omitted); <u>see also</u> <u>American Protein Corp. v. AB Volvo</u>, 844 F.2d 56, 62 (2d Cir. 1988) (holding, in resolving a lack of personal jurisdiction defense, that "[j]urisdiction is thus intertwined with the merits of [defendant's] liability"). This specific rule has been applied in the context of resolving forum non motions. <u>See, e.g.</u>, <u>In re American President Lines, Ltd.</u>, 890 F. Supp. 308, 314 (S.D.N.Y. 1995) ("It is proper for a motion concerning the doctrine of forum non conveniens to proceed as one for summary judgment when such motion turns on factual matters outside the pleadings.") (collecting cases); <u>Eastman Kodak Co. v. Kavlin</u>, 978 F. Supp. 1078, 1087 (S.D. Fla. 1997) (denying forum non motion where corruption in the Bolivian judiciary was at issue because "the very merits of the case are bound up in the allegations" of corruption, and the parties presented "so many contested portrayals of the events" that "the Court cannot draw a conclusive judgment as to which side (if either) is telling the true story.").

This standard is particularly appropriate in this case given the factual assault, via fact and expert affidavits, with accompanying documents, that defendants filed in support of their motions, all without the benefit of giving plaintiffs any discovery of the underlying factual materials. <u>See, e.g.</u>, <u>Horsehead Resource Development Co. v. B.U.S. Environmental Services, Inc.</u>, 928 F. Supp. 287, 290 (S.D.N.Y. 1996) (granting motion to reargue and vacating prior dismissal of complaint under Rule 12(b)(1) because, even though "under certain circumstances [a court] is entitled to make factual determinations in ruling on a motion to dismiss," in this particular case defendants had made "a factual assault [on the complaint]. . . via affidavits and exhibits") (internal quotation marks and citation omitted); <u>Equal Employment Opportunity Commission v. New Cherokee Corp.</u>, 829 F. Supp. 73, 77 (S.D.N.Y. 1993) ("Rule 12(b)(1)

51

motions involve an assertion that subject matter jurisdiction is lacking. When a factual assault of this kind is made via affidavits and exhibits, the District Court should consider it under the summary judgment standard."). It makes no difference that plaintiffs deposed defendants' corruption experts, as plaintiffs have had no discovery of the massive (and contradictory) factual record submitted by defendants in their moving papers.[26]

Finally, in the event that this Court determines that the record evidence accompanying this opposition is insufficient to defeat defendants' motions, including defendants' subject matter jurisdiction motion, plaintiffs renew their request for discovery, as this Court contemplated in its June 24, 2002 Order. See Bernard Dec. Ex. 6 ("[I]f the Court were to conclude that the record should be supplemented or that further exploration of any issues were necessary, the Court could always order discovery at that time.").

**B.    This Court Should Not Deviate From the Normal
Rule of Deference To Plaintiffs' Choice of Forum**

Analysis of a motion to dismiss based on forum non conveniens must "begin with the assumption that the plaintiff's choice of forum will stand." Iragorri v. United Technologies Corp., 274 F.3d 65, 71 (2d Cir. 2001) (en banc). A plaintiff's choice of forum is thus entitled to a presumption of convenience and "should rarely be disturbed." Gulf Oil v. Gilbert, 330 U.S. 501, 508 (1947); see Mastercard Int'l, 2002 WL 432379 at *6 ("A plaintiff should not be deprived of the presumed advantages of litigating in its home forum."); Wiwa v. Royal Dutch Petroleum, 226 F.3d 88, 101 (2d Cir. 2000) ("substantial deference" due to plaintiff's choice).

---

[26] By decision dated May 13, 2002, Magistrate Judge Maas granted plaintiffs the right to depose defendants' experts, but denied plaintiffs the right to depose defendants' fact witnesses or to obtain documents. By decision dated June 24, 2002, this Court affirmed Magistrate Judge Maas' decision. Copies of these rulings are annexed to the Bernard Dec. as Exs. 5 and 6, respectively. Plaintiffs have thus had no opportunity to test the factual assumptions behind the experts' opinions.

52

Although deference is accorded all plaintiffs who bring suit in the district courts of the US, see Iragorri, 274 F.3d at 71, the degree of deference increases where, as in this case, domestic entities are included among plaintiffs, see Wiwa, 226 F.3d at 101; Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 n.23 (1981) (choice of forum by US citizens and residents entitled to greater deference than stranger's choice); Koster, 330 U.S. at 524 (convenience of plaintiff suing "in his home forum will normally outweigh the inconvenience the defendant may have shown"). Furthermore, "[t]he plaintiff's choice is afforded even greater deference, where, as here, an American plaintiff is filing suit against a foreign defendant." Mastercard Int'l, 2002 WL 432379, at *6-7. The increased deference given to American plaintiffs applies regardless of the particular district court in which an American plaintiff decides to litigate. See Iragorri, 274 F.3d at 73.

Defendants make a half-hearted argument that plaintiffs' choice of New York as the forum to litigate this dispute is not entitled to any weight or deference because plaintiffs' claims as they relate to the takeover of NKAZ are separate and distinct from the takeover of GOK. See, e.g., Def. Forum Non Mem. at 2.[27]  Defendants also argue that plaintiffs' choice of forum is not entitled to deference because a foreign plaintiffs' choice is generally entitled to less deference than domestic plaintiffs' choices. See id. (citing Iragorri, 274 F.3d at 71).

Defendants are wrong because they ignore that this lawsuit is about the actions of the same core group of US-based defendants, whose pattern of US-based illegal activity harmed US-based plaintiffs. As discussed above, Chernoi, Makhmudov, Deripaska, and Kislin utilized bribery and extortion, and fixed bankruptcies, to take over both NKAZ and GOK through the

---

[27] "Def. Forum Non Mem." refers to defendants' Memorandum of Law In Support of Motion To Dismiss The First Complaint On Forum Non Conveniens Grounds, dated January 30, 2002.

53

same New York based companies – Pan-American and Blonde Management – through the same banks in New York with which defendant MDM Bank had a correspondent relationship. And, among other US-based claims, defendants fraudulently obtained shares from two US companies and transferred them to four other US companies. See Complaint ¶¶ 397-434.

Together, the illegal actions related to the takeover of GOK and NKAZ demonstrate a pattern of racketeering activity, and reflect a series of common transactions or occurrences. The claims filed by the GOK plaintiffs were thus properly joined with the claims relating to NKAZ, and a motion to sever not only would have been futile, but was, moreover, never made. See Kovian v. Fulton County Nat'l Bank and Trust Co., No. 86-CV-154, 1990 WL 36809, at *9 (N.D.N.Y. March 28, 1990) (pattern requirement in RICO "broadens the power of joinder in a civil action").

Defendants similarly err when they attempt to portray plaintiffs as being primarily based in Russia. Plaintiffs are international corporations, three of which are incorporated in the US. See Complaint ¶¶ 32-37. Only two plaintiffs are incorporated in Russia. Of these two, Polyprom, Ltd., is a subsidiary of plaintiff Nexis Products LLC, a company organized under the laws of Utah. See id. ¶¶ 37-38. The President of the other, MIKOM, is Mikhail Zhivilo, who cannot travel to Russia due to the threats of false arrest and violence at the hands of defendants.[28] See id. ¶¶ 12, 302-04. The other plaintiffs are companies organized in various countries throughout Europe. See id. ¶¶ 23-40. In short, plaintiffs chose a forum, the US, that has the highest concentration of individual plaintiffs in this case. There is little basis, therefore, to question plaintiffs' choice of a New York forum (especially as compared to Russia), as it is

---

[28] A more detailed discussion of the false criminal charges and Mr. Zhivilos' inability to travel to Russia appears infra, Point III.D.1.b.

54

"more convenient for a U.S. resident plaintiff to sue in a US court than in a foreign country, even

[if] it is not the district in which the plaintiff resides." Iragorri, 274 F.3d at 73.

Finally, and as detailed herein, plaintiffs simply cannot obtain justice, much less a fair

hearing of this case, in Russia because defendants have demonstrated the willingness and the

means to corrupt the Russian judicial system. This fact obviates any claim of an improper

motivation for choosing a New York forum. See Iragorri, 274 F.3d at 71-72 (great deference due

plaintiff that has bone fide reasons for litigating in US forum).

## C.    Defendants Have Not Met Their Burden of Proving that Russia is an Adequate Forum for this Litigation

### 1.    Corruption is a Valid Basis for Finding a Foreign Forum Inadequate

A prerequisite for forum non conveniens dismissal is the presence of an adequate

alternative forum. See, e.g., Gulf Oil, 330 U.S. at 506-07; Blanco v. Banco Industrial de

Venezuela, S.A., 997 F. 2d 974, 980 (2d Cir. 1993). Ordinarily, "[a]n alternative forum is ...

adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits

litigation of the subject matter of the dispute." Bank of Credit and Commerce Int'l (Overseas)

Ltd. v. State Bank of Pakistan, 273 F.3d 241, 246 (2d Cir. 2001). Dismissal, however, would be

improper where "the remedy provided by the alternative forum is so clearly inadequate or

unsatisfactory that it is no remedy at all." Piper, 454 U.S. at 254. In this case, where the

corruption in the alternative forum is manifest, forum non conveniens dismissal is inappropriate.

See Eastman Kodak Co., v. Kavlin, 978 F. Supp. 1078, 1085 (S.D. Fla. 1997).

In Eastman Kodak, the court confronted a forum non conveniens motion concerning a

corrupted forum remarkably similar to the circumstances in this case. Defendants were the long

time distributor of Kodak products in Bolivia.[29]  Kodak had become dissatisfied with defendants' services and announced that a new Kodak agent would succeed defendants as Kodak's distributor.  Defendants, in an effort to retain their distributorship, caused criminal charges to be brought against the new agent/distributor, and through corruption of the Bolivian judiciary, Kodak's new agent/distributor was imprisoned after a hearing during which it became clear that the Bolivian Judge was biased.  See 978 F. Supp. at 1080-81.

Following a meeting between Kodak's lawyer and a representative of defendants, Kodak acquiesced to certain of defendants' demands, and shortly thereafter defendants dropped the criminal charges, and Kodak's agent/distributor was released.  But subsequent to the release of Kodak's agent/distributor, defendants caused false criminal charges to be filed against Kodak's lawyer and other persons affiliated with Kodak.  All of these individuals were convicted in absentia.  Defendants then filed suit in Bolivia based on the agreement Kodak alleged was coerced, and Kodak brought suit in Florida seeking, among other things, a declaratory judgment that it was not liable to defendant.  See id. at 1081-82.

In determining whether the defendants met their burden of proving the adequacy of Bolivia as an alternative forum, the court summed up plaintiffs' position as follows:

> Plaintiffs essentially argue that the Courts of Bolivia are so corrupt and slow as to make fair and timely resolution of their claims highly unlikely.  Furthermore, they repeat their allegations concerning the special influence that [defendant] has over the Bolivian justice system and the company's willingness to wield its power ruthlessly to Kodak's detriment.

Id.

The court denied defendants' forum non conveniens motion based upon plaintiffs'

---

[29]  These facts were reported by the district court after allowing the parties discovery on personal jurisdiction and forum non conveniens.  See Eastman Kodak, 978 F. Supp. at 1082.

SSL-DOCS2 70070518v7

showing of corruption of the Bolivian justice system, including the following proof: (1) comments by the Bolivian Minister of Justice, who was quoted in the Bolivian press as saying that "the administration of justice in [this] nation, in many cases, is clouded by the intrusion of powerful pressures by political and economic groups;" (2) affidavits of plaintiffs' experts detailing the Bolivian judiciary's reputation of susceptibility to outside influences and bribery, including the use of false criminal charges to coerce commercial settlements; and (3) a US State Department report which indicated that particular judges and cases brought in Bolivian courts were subject to corrupting influences. Id. at 1085-86.

Significantly, the court held that, at the pre-trial stage of the proceedings, it could not "draw a conclusive judgment as to which side (if either) is telling the true story." Id. The court reasoned that if plaintiffs' allegations that defendants would use their power and connections to influence the case in Bolivia "[were] true, [this] would certainly make the Bolivian forum inadequate, and demonstrate substantial prejudice to [plaintiffs] if they had to litigate in Bolivia." Id. It thus held that "in light of the expert declarations, plaintiffs' story is plausible at least," and that therefore "defendants [had] not met their burden of proving the existence of an adequate alternative forum." Id. at 1087.

Judge Jon O. Newman, sitting by designation in the Eleventh Circuit, adopted the Eastman Kodak court's reasoning in Leon v. Millon Air, Inc., 251 F.3d 1305 (11th Cir. 2001). In Leon, Judge Newman noted that while courts are reluctant to find alternative fora so corrupt as to be inadequate, "extreme amounts of partiality or inefficiency may render the alternative forum inadequate." Id. at 1312 (citing Bhatnagar v. Surrendra Overseas Ltd., 52 F.3d 1220, 1227-31 (3d Cir. 1995)). Judge Newman also explicitly adopted Eastman Kodak's allocation of the burden of proof: "[D]efendants have the ultimate burden of persuasion, but only where the

SSL-DOCS2 70070518v7

A - 370

plaintiff has substantiated his allegations of serious corruption or delay." <u>Id.</u> In other words,

"where plaintiff produces significant evidence documenting the partiality ... and these conditions

are so severe as to call the adequacy of the forum into doubt, then the defendant has the burden

to persuade the district court that the facts are otherwise." <u>Id.</u> at 1312-13 (citing <u>Eastman Kodak,</u>

978 F. Supp. at 1087).

  In adopting this approach, Judge Newman specifically cited and addressed the same

Second Circuit authority defendants rely upon in attempting to convince this Court that

corruption in a foreign forum is not a sufficient ground for denying a forum non motion.

Historically, Judge Newman noted, "the Second Circuit has said that 'considerations of comity

preclude a court from adversely judging the quality of a foreign justice system absent a showing

of inadequate procedural safeguards.'" <u>Id.</u> at 1312 (quoting <u>PT United Can Co. v. Crown, Cork</u>

<u>& Seal Co.,</u> 138 F.3d 65, 73 (2d Cir. 1998)). According to Judge Newman, however, that

position has evolved and the Second Circuit, in <u>Bridgeway Corp. v. Citibank,</u> 201 F.3d 134, 141-

42 (2d Cir. 2000), has moved away from the sweeping dicta of <u>PT United</u> and the other

authorities defendants rely upon: "[M]ore recently, [the Second Circuit] has indicated a

willingness to reject judgments of dysfunctional foreign legal systems." <u>Leon,</u> 251 F.3d at

1312.[30]

---

[30] The Second Circuit cited <u>Leon</u> in affirming a forum non dismissal to Ecuador and rejecting a
claim that Ecuador was a corrupt foreign forum. <u>See</u> <u>Aguinda v. Texaco, Inc.,</u> 2002 WL
1880105, at *6 (2d Cir. Aug. 16, 2002). The District Court in <u>Aguinda</u> held that the evidence
of corruption in Ecuador was insufficient, and the Second Circuit found that the District
Court had not abused its discretion in making that finding. Although the Second Circuit
affirmed, the fact that the Second Circuit entertained the corruption argument belies
defendants' assertion that such inquiries are inappropriate. If defendants were correct, the
Second Circuit would have simply cited the same cases defendants cite, rather than ruling
upon the specific findings made by the District Court. Finally, given the nature of the
citation to <u>Leon</u> in <u>Aguinda,</u> it would be disingenuous to suggest that the Second Circuit

SSL-DOCS2 70070518v7

In <u>Bridgeway</u>, the Second Circuit affirmed Judge Chin's refusal to enforce a judgment

obtained in Liberia on the ground of corruption in the Liberian courts. <u>See</u> <u>Bridgeway</u>, 201 F.3d

at 144. As in <u>Eastman Kodak</u>, Judge Chin and the Second Circuit found persuasive the expert

and US State Department reports of widespread corruption in the Liberian judicial system. <u>Id.</u> at

142. Those reports demonstrated that at the time judgment was entered, Liberian judges and

judicial officers were "subject to political and social influences [and] ... simply did not provide

for impartial tribunals" and, overall, "corruption and incompetent handling of cases were

prevalent." <u>Bridgeway Corp. v. Citibank</u>, 45 F. Supp.2d 276, 287 (S.D.N.Y. 1999). Under those

circumstances, the judgment of a Liberian court could not be enforced, as the Liberian judicial

system did "not provide impartial tribunals or procedures compatible with the requirements of

due process." <u>Id.</u> at 288; <u>see also</u> <u>Bridgeway</u>, 201 F.3d at 139.

The framework established by Judge Newman in <u>Leon</u>, and reflected in <u>Bridgeway</u> and

<u>Eastman Kodak</u>, is, as Judge Newman recognized, consistent with existing Second Circuit

precedent and should be adopted by this Court.[31] Defendants' arguments to the contrary ignore

<u>Eastman Kodak</u>, <u>Leon</u> and <u>Bridgeway</u>, and are not persuasive.

Defendants principally rely on <u>Pavlov v. Bank of New York</u>, 135 F. Supp.2d 426

(S.D.N.Y.), <u>vacated and remanded</u>, No. 01-7434, 2002 WL 63576 (2d Cir. Jan. 14, 2002), and

cases cited in that opinion, for the proposition a district court is without authority to deny a

forum non motion on the ground of corruption in the alternative forum. <u>See</u> Def. Forum Non

---

adopted <u>Leon</u>, though it is fair to say that Judge Newman is correct that the Second Circuit is
increasingly willing to rule on the adequacy of foreign forum.

[31] Judge Newman's reliance on <u>Bridgeway</u> (a comity decision) in the context of a forum non
analysis also establishes the propriety of looking to that broad body of law in establishing a
framework for resolving forum non motions. <u>See</u> <u>infra</u>, Part III.B.2.

Mem. at 33-34. Defendants' reliance is misplaced. First, the Second Circuit has held that district courts have a duty to independently analyze forum non conveniens motions, and cannot simply rely on other courts' determinations of the adequacy of alternative fora. See Jota v. Texaco, Inc., 157 F.3d 153, 159 (2d Cir. 1998).

More directly, Pavlov recognized that corruption of a foreign judicial system can be a basis for denying a forum non motion, quoting from the Supreme Court's holding in Piper that there are circumstances where "the remedy offered by the other forum is clearly unsatisfactory." Pavlov, 135 F. Supp.2d at 433. But based on the inadequate record plaintiffs compiled, the court concluded that "on the basis of the sort of broad brush, hearsay accounts upon which plaintiffs'" allegations of corruption rest, "it would be inappropriate for [the Court] to pass judgment on [the Russian legal] system." Id. at 434. In short, Pavlov acknowledged that dismissal may be inappropriate where the remedy in the other forum is "clearly unsatisfactory" but held, on the limited record offered by plaintiffs, that such a showing had not been made.[32] Nothing in Pavlov, therefore, is incompatible with Eastman Kodak and Leon.[33]

---

[32] The Pavlov plaintiffs did not obtain declarations from former Russian government officials concerning specific acts of corruption, as plaintiffs have obtained here, nor did defendants' expert in Pavlov publish an article that confirmed the core of plaintiffs' allegations, as is the case here. As compared to the detailed and specific record plaintiffs provide herein, the showing made by plaintiffs in Pavlov is meager, to say the least, as the Court can discern from the expert affidavit submitted by the Pavlov plaintiffs. See Bernard Dec. Ex. 32.

[33] The other cases cited by defendants are to the same effect, i.e., to the extent they refuse to deny a forum non motion on grounds of corruption in the alternative forum, it is because plaintiffs in these cases failed to make an adequate showing. See Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine, 158 F. Supp.2d 377, 384-85 (S.D.N.Y. 2001) (holding that "bare denunciations and sweeping generalizations" together with "conclusory allegations of corruption ... are insufficient to render Ukraine an inadequate forum); Moscovitus v. Magyar Cukor Rt., No. 00 Civ. 0031 (VM), 2001 WL 767004, at *3 (S.D.N.Y. July 9, 2001) (anecdotal evidence of corruption not probative of Hungarian judicial system); Parex Bank v. Russian Savings Bank, 116 F. Supp.2d 415, 423 (S.D.N.Y. 2000) (holding that Russia was adequate forum, but that "conclusory allegations of judicial

60