In sum, Eastman Kodak, and Judge Newman's adoption of it in Leon as consistent with the Second Circuit's decision in Bridgeway, establish that corruption in a foreign forum can be a valid ground for denying a forum non motion. As Judge Newman held in Leon, "where the plaintiff produces significant evidence documenting the partiality ... and these conditions are so serious as to call the adequacy of the forum into doubt, then the defendant has the burden to persuade the District Court that the facts are otherwise." 251 F.3d at 1312-13. We turn now to a discussion of the evidence plaintiffs have amassed, even without discovery, that satisfies this standard.

**2. The Russian Judicial System Can Be Influenced by Corruption and Defendants Have Engaged in Specific Acts of Corruption**

In Eastman Kodak, the court refused to dismiss a case on forum non grounds where plaintiffs presented proof of corruption that included the following: (1) comments by the Bolivian Minister of Justice concerning the state of the Bolivian judiciary; (2) affidavits of plaintiffs' experts detailing the corruption of the Bolivian judiciary; and (3) a US State Department report. See 978 F. Supp. at 1085-86. Here, plaintiffs' proof of corruption far exceeds what was found sufficient in Eastman Kodak, as we detail below.

**a. General Evidence of Corruption**

**i. Valery Grishkovetz and Sergey Alexeevich Kuznetsov Provide Direct Evidence that Governor Tuleyev Regularly Corrupted Judicial Proceedings**

Valery Grishkovetz affirms in his declaration that while working as the Director in

---

bias insufficient to support" finding of an inadequate alternative forum); PT United, 138 F.3d 65 (plaintiff failed to advance a corruption theory); Blanco, 997 F.2d at 982 (holding that Venezuela was an adequate forum because "no convincing showing [was] made of those rare circumstances that render the proposed alternative forum clearly unsatisfactory").

charge of the Kemerovo Regional office of the Federal Insolvency Department, he fixed bankruptcy cases in order to obtain the results sought by Kemerovo's Governor, Tuleyev. This point is so important and powerful it necessitates repeating. The person in charge of the key government agency responsible for administering bankruptcies in Kemerovo admits that he fixed bankruptcy proceedings on behalf of the Regional Governor's office, which is precisely what plaintiffs allege happened here.

Grishkovetz' testimony confirms the critical allegations raised by plaintiffs: The Russian judiciary is particularly susceptible to corruption and the regional governor in Kemerovo corrupted bankruptcy proceedings in Russia in order to accomplish illegal takeovers of companies through the same judges involved in the NKAZ bankruptcy. While Grishkovetz' declaration speaks for itself, we emphasize the following:

- Prior to the events at issue in this litigation, Tuleyev corrupted the bankruptcy proceeding of Kuzbass – the entity that supplied NKAZ with electricity – precisely in order to gain control over an entity that, because it supplied power to many industries in the region, could be used to force other companies into bankruptcy, Grishkovetz Dec. ¶¶ 11-25, which is precisely what happened here;

- Grishkovetz provides details surrounding four instances in which Tuleyev sought, and obtained, Grishkovetz' assistance in corrupting judicial proceedings by obtaining the appointment of a bankruptcy manager who was in fact working for Tuleyev, id. ¶¶ 11-55, which again is precisely what happened here;

- In each of these four cases of corruption, Grishkovetz conducted ex parte meetings with Judge Segodina on the Kemerovo Arbitrazh court in order to obtain her agreement to assist Tuleyev in manipulating and fixing bankruptcy proceedings. Id. ¶¶ 22, 34, 42-44, 50-53. Judge Segodina is the same judge who decided the merits of the NKAZ case, including the decision to remove MIKOM from management, to recognize Sibirsky's false claim and to approve the sham settlement agreement. See Declaration of Igor Rekhovsky, dated September 16, 2002 ("Rekhovsky Dec.") ¶¶ 144-48.[34]

---

[34] Orders signed by Judge Segodina include the order dated February 17, 2000 removing MIKOM from management (Rekhovsky Dec. Ex. 58); order dated March 20, 2000 imposing external management on NKAZ (Rekhovsky Dec. Ex. 33); order dated February 28, 2001

The accompanying declaration of Sergey Kuznetsov corroborates Grishkovetz' experience, and confirms that Tuleyev routinely corrupted bankruptcy proceedings for the purpose of taking over companies. Kuznetsov was the head of the Anti-crisis Industry Management Center in Kemerovo and later supervised the work of arbitrazh managers as a representative of Tuleyev's administration. Again, while the declaration speaks for itself, we emphasize the following:

- In December 1997, Tuleyev, through his deputy, instructed Kuznetsov to issue a false report that an external manager was harming the creditors of a company, and to convince the creditors to petition the Kemerovo Arbitrazh Court for the manager's removal. Kuznetsov did as he was told, and the court, per Judges Kondrasheva and Segodina, removed the external manager on August 14, 1998. See Declaration of Sergey Alexeevich Kuznetsov, dated September 16, 2002 ("Kuznetsov Dec.") ¶¶ 8-16.

- Kuznetsov, like Grishkovetz, met with Judge Segodina ex parte – the same judge responsible for the flawed decisions in the NKAZ bankruptcy. See Rekhovsky Dec. ¶¶ 144-48.

- On July 15, 1998, the Kemerovo Arbitrazh Court appointed Kuznetsov as Provisional Manager of Kuznetsky Metallurgical Kombinat ("KMK"), per Tuleyev's instructions. After Kuznetsov refused to do Tuleyev's bidding, Kuznetsov was forcibly removed as KMK's manager in a military raid on the plant. See Kuznetsov Dec. ¶¶ 17-35.

These two insider declarations, and the six separate instances of corruption they describe, establish a pattern and practice of corruption in the Russian courts by the same individual that plaintiffs allege corrupted the NKAZ proceedings. In contrast, defendants have offered no evidence, expert or otherwise, regarding the actual practices of the Kemerovo courts, and defendants have not, therefore, met their burden that these courts offer an adequate forum.

---

recognizing Sibirsky's false claim (Rekhovsky Dec. Ex. 66); and the order dated April 3, 2001 approving the sham settlement agreement (Rekhovsky Dec. Ex. 170).

### ii. Professor Ethan Burger Provides Substantial Evidence of the General Corruption Problems that Permeate the Russian Judiciary

Professor Burger teaches at the American University School of International Service, and is a Project Director with the University's Transnational Crime and Corruption Center ("TraCCC") where he teaches classes on corruption in Russia. In addition to his other credentials, Professor Burger has day-to-day oversight responsibilities for TraCCC's Moscow and St. Petersburg research centers, and through an affiliate at the Institute of State and Law in Moscow, TraCCC is conducting a study dealing with judicial corruption and judicial ethics in Russia. He has made numerous presentations on the issues of corruption in Russia and the Russian judiciary, and has authored articles dealing with this subject, as well as with Russia's bankruptcy law. Professor Burger has made dozens of trips to, and spent two years living in, Russia, and has worked as a practicing attorney in Russia. See Burger Dec. ¶¶ 15-17.

Professor Burger concludes that the Russian courts will not provide plaintiffs with an adequate alternative forum for conducting this litigation because of widespread corruption in the Russian judiciary, and defendants' particular ability to corrupt judicial proceedings, a matter which Professor Burger also examines in greater detail in connection with the NKAZ proceedings and which we address supra, Point II.C.2.b.ii. See Burger Dec. ¶¶ 200-204.[35]

In reaching his conclusion concerning the corruptibility and inadequacy of the Russian courts, Professor Burger reviews and summarizes a considerable volume of literature, studies, speeches and other data that supports his conclusion, some of which we highlight below.

---

[35] Professor Burger's conclusions are supported by two of plaintiffs' other experts, Professors Golubev and Telyukina, infra Points II.C.2.b.ii; II.C.2.c.ii.

**(a) <u>Statements by Russian President Putin and Other Top Russian Government Officials</u>**

Professor Burger cites to compellingly candid statements by Russian government officials, including Russia's President, regarding corruption in the judiciary:

- <u>Russian President Putin</u>: In his April 3, 2001 Annual Address to the Federal Assembly, Russian President Putin recognized that judicial decisions in Russia are "<u>often based</u>" on a party's ability to corrupt proceedings, and that decisions are "<u>in many cases</u>" not based on the rule of law:

> Today, judicial reform is extremely necessary for us. The domestic judicial system lags from life and in practice does little to help the conduct of economic transformations. <u>Not only for entrepreneurs, but also for many people, trying legally to restore their own rights, the courts have not become timely, correct and fair. I don't say "always," but in many cases, unfortunately, this is so</u>. . . . Now [I would like to address] the business climate in this country. Unfortunately, ownership rights are still badly protected. The quality of corporate governance remains poor. Wars between contenders for ownership do not cease even after courts render their decisions. <u>And the decisions themselves are often based not on the laws but on the pressure of interested parties</u>. Burger Dec. ¶¶ 25 (emphasis added).

- <u>Former Moscow Judge Sergei Pashin</u>: In a June 2001 lecture at the John F. Kennedy School of Government at Harvard, Judge Pashin commented:

> "It is typical that the record of hearings will be falsified by the judge," and that the dismissal of 20 judges in 1999 for this offense is, according to the Judge, "only the tip of the iceberg." Burger Dec. ¶¶ 54-55.

- <u>Russian Procurator General Dirt Ustinov</u>: In his May 15, 2002 Annual Report to the Federation Council (the upper Chamber of the Russian legislature), Russia's highest ranking law enforcement officer confirmed plaintiffs' core allegations of corruption in the Russian judiciary:

> There were more than 11,000 rulings on bankruptcy [by Russian arbitrazh courts], and only in 60 cases, that is 0.05%, did companies succeed in re-establishing their solvency before the declaration of bankruptcy. As a member of the Federation Council, you know better that anyone that bankruptcy is, essentially, doing away with viable enterprises, which are

> socially and economically significant, having at their disposal valuable property and unique products. Burger Dec. ¶¶ 41-42.

- Chairwomen of the Federal Service of Russia for Financial Rehabilitation and Bankruptcy ("Federal Service"), Tatiana Trefilova: In an August 2001 interview, Ms. Trefilova, who headed the agency responsible for supervising bankruptcies on behalf of the government, quantified the extent of the corruption problems in Russia's bankruptcy courts: 30-50% of bankruptcies are so-called ordered bankruptcies, i.e., bankruptcies ordered by a competitor on often-flimsy grounds. In 2001, the Federal Service reviewed 27,000 bankruptcy cases for possible misconduct, and in at least 30-50% of these cases found that the creditors sought a change in ownership over the debtor, as opposed to a resolution of their claims. See Burger Dec. ¶ 62.

  Professor Golubev, another one of plaintiffs' experts on Russian bankruptcy law, see infra Point II.C.2.a.ii.(c), cites another example of Ms. Trefilova's critique of Russian bankruptcy courts:

  > [N]owadays in some regions [of Russia] the bankruptcy procedure has simply turned into an instrument of taking revenge over political and economic competitors. Golubev Dec. ¶ 20.

- Author of the Current, and the Proposed Revised, Russian Bankruptcy Law, V.V. Vityansky: The scholar who wrote Russia's current bankruptcy laws stated that Russian bankruptcy proceedings are frequently used for illegitimate and illegal purposes:

  > As for the participants in the debtor's bankruptcy, many of them are absolutely not interested in the effective use of the Bankruptcy Law pursuant to its direct purpose. They consider the insolvency institution exclusively as the property redistribution instrument. . . . Golubev Dec. ¶ 19.

- Head of the Department of Regulation of Business Activity of the Ministry of Economic Development and Trade of the Russian Federation, Tseren Tserenov: Still another high ranking Russian official confirms the severe corruption problems in the Russian courts:

  > "In [Russia], bankruptcy is used as a mechanism for the elimination of competitors, for fraudulent seizure of an enterprise, and for tax evasion. Practically, the existing law fails to perform its functions such as the removal of ineffective businesses and owners from the market, and does not permit good faith creditors to collect their financial assets." Golubev Dec. ¶ 21.

(b) State Department Reports

Professor Burger also cites to US State Department reports, which the Second Circuit relied upon in Bridgeway. See 201 F.3d at 144. In a May 2000 statement, the State Department confirmed that President Putin's views are shared at the highest levels of the US government:

- The US State Department: The May 2000 edition of the State Department's Background Notes on Russia confirms that President Putin's views are shared at the highest levels of the US government:

> Russia's judiciary and justice systems are weak. Numerous matters which are dealt with by administrative authority in European countries elsewhere remain subject to political influence in Russia. . . . In the past 3 years, the Russian Government has begun to reform the criminal justice system and judicial institutions, [but d]espite these efforts, judges are only beginning to assert their constitutionally mandated independence from other branches of government.

The Department of State was even more explicit in its Country Report on Human Rights for Russia:

> [T]he judiciary often was subject to manipulation by central and local political authorities and are plagued by large case backlogs and trial delays. . . . The Constitution provides for an independent judiciary, and there are signs of limited judicial independence; however, the judiciary does not yet act as an effective counterweight to other branches of government. Efforts to establish an independent judiciary continue . .... The judiciary still lacks sufficient resources and is subject to corruption. . . . Low salaries and lack of prestige make it difficult to attract talented new judges and contribute to the vulnerability of existing judges to bribery and corruption.

Burger Dec. ¶¶ 43-48 (emphasis added).

(c) Scholarly Articles and Studies

Professor Burger also discusses a large number of scholarly articles and studies on the problems of corruption in the Russian courts, including the following:

- Statistical Report and Analysis: In a monograph entitled "Capture of Bankruptcy: Theory and Evidence from Russia," three Russian scholars

conclude that the current legal system in Russia is undermined by the capture of local divisions of the arbitrazh courts by political leaders and oligarchs. The data they collected indicates that the imposition of external management (i.e., the positions held by Chernyshev and Kozyrev) on an enterprise is positively correlated to a number of factors, including the size of the enterprise, the profitability of the industry in which it operates and the strength of the regional governor's office in which the enterprise operates. Among other findings, these researchers found that a disproportionately high number of Russian enterprises were placed under external management in Kemerovo, where the NKAZ proceedings were held. See Burger Dec. ¶¶ 70-71.

- Important US Scholarship: Stanford University Law Professor Bernard Black has written about the problems of corruption in the Russian judiciary, most recently in an article co-authored by him in the Stanford Law Review. Among other points, he addresses the "home-court bias" in Russian trial courts, and a bankruptcy proceeding marked by "an atmosphere of unprecedented pressure on the court system" in which one Judge was not only threatened, but actually beaten. See Burger Dec. ¶¶ 34-37.

- Public Surveys and Other Data: Professor Burger cites a number of surveys, public opinion polls and other data to support his conclusions, as detailed in his report. See Burger Dec. ¶¶ 21-23, 31-33.

In sum, Professor Burger's report, as supported by the statements of Russian government officials, US State Department reports, and scholarly studies and articles, establishes that Russia is an inadequate alternative forum and that plaintiffs will not be able to receive a fair and just resolution of their claims in Russia.

**b. Fact and Expert Evidence that Defendants Corrupted the NKAZ Bankruptcy Proceedings**

In addition to evidence concerning general corruption in Russian, plaintiffs submit the following fact and expert declarations establishing the corruption of the NKAZ proceedings, which also corroborates the evidence of general corruption addressed above.

**i. Igor Rekhovsky and Jalol Khaidarov Detail the Corruption of the NKAZ Bankruptcy Proceedings**

A former employee of defendants Chernoi and Makhmudov, Jalol Khaidarov discusses Makhmudov's admission, in 1999, that he, Chernoi and Deripaska planned to take over NKAZ

through a sham bankruptcy in Kemerovo. See First Khaidarov Dec. ¶ 8, Bernard Dec. Ex. 38. In subsequent discussions with other members of defendants' criminal enterprise, including specifically defendant Makhmudov, Mr. Khaidarov was told that the takeover would be accomplished through bribe payments to Tuleyev, and he subsequently learned the details of the arrangement with Tuleyev. See id. ¶¶ 9-16.

Providing additional details of this scheme, Igor Rekhovsky explains in the accompanying declaration his background as a Russian attorney who has spent the bulk of his professional career practicing in Novokuznetsk, the city where NKAZ is located, first as an Assistant Procurator and then as counsel to Kuznetsky Metallurgical Kombinat ("KMK"), a giant steel mill, NKAZ and then MIKOM. Rekhovsky is intimately familiar with the machinations of Governor Tuleyev, and, as counsel to NKAZ and MIKOM during the NKAZ bankruptcy proceedings, he has first-hand knowledge of the actions of the Kemerovo Arbitrazh Court and the conduct of Chernyshev and his "takeover team."

In his capacity as counsel to NKAZ, Rekhovsky worked with Chernyshev and his assistants, who referred to themselves as the "takeover team," and learned of their connections to Sibirsky Aluminum. And while Chernyshev was Provisional Manager of NKAZ, Rekhovsky personally participated in answering over 90 document demands made by Chernyshev, over a period of approximately 24 days, on NKAZ. We summarize his testimony below:

- The "Takeover Team": One day after Chernyshev became Provisional Manager of NKAZ, on January 20, 2000, Rekhovsky overheard three members of Cherneyshev's staff – who he identifies by name – refer to themselves as the "takeover team." These same individuals were also complaining about the amount of time they had to spend away from home because they were used by Sibirsky to take control over different companies. See Rekhovsky Dec. ¶ 84;

- The "Takeover Team's" Relationship to Sibirsky: Rekhovsky learned that approximately 30 of Cherneyshev's assistants were in some way affiliated with Sibirsky, many as employees of SAZ, the Sibirsky subsidiary that employed



SSL-DOCS2 70070518v7

Chernyshev and which Sibirsky took over using similar tactics. See supra Facts B.1. The declaration identifies these people by name, and some were high-ranking officials at Sibirsky. See id. ¶ 85;

- Defendants' Admissions Regarding their Takeover Efforts: An article dated February 8, 2000 from Kommersant, a Russian newspaper, entitled "Oleg Deripaska: I Control the Shareholder's Meeting," describes Sibirsky's interest in NKAZ and reveals that Sibirsky advised Kuzbass in connection with the bankruptcy. See id. ¶ 87-88;

- Chernyshev's Unreasonable Document Demands: Between January 19 and February 14, 2000, Chernyshev submitted approximately 92 document demands, with countless sub-parts and sub-demands, which required the production of hundreds of thousands of pages of documents and thousands of hours of work. The nature and timing of these demands makes clear beyond any doubt that Chernyshev did not act in good faith and that these document demands were designed only to ensure non-compliance on the part of NKAZ and MIKOM, and thus create a fabricated basis for seeking MIKOM's removal. Rekhovsky summarizes a handful of the demands in his declaration, 74 of which are attached as Exhibit 52 to his declaration. Exhibit 54 contains a table summarizing almost all of the demands. See id. ¶¶ 89-121. We provide short summaries of three representative demands below:

  - Demand No. 2 was submitted to NKAZ on January 20, 2000 and requested information on all non-liquid assets, the costs of unfinished construction work, detailed information on all accounts receivable and the list of shareholders. A response was required by 5 p.m. of the same day it was served. It was clearly impossible to provide the required information in just several hours. See id. ¶ 96, Exhibit 54.

  - Demand No. 6 was served at 3 p.m. on January 21, 2000 and required a response within two hours by 5 p.m. on the same day. The demand contained sixteen requests for extremely detailed information, including information on nearly every contract in which NKAZ was a party, detailed accounting of inventory both at the plant and stored in all ports and railway stations, and information about all shipments, including invoices. It would have required production of approximately 50,000 pages of documents. See id. ¶ 99, Exhibit 54.

  - Demand No 87, dated February 10, 2000, was received at 1:30 p.m. and called for a response at 1:30 p.m., i.e., it was due at the time it was received. This demand required information on the shipment of products manufactured by NKAZ during "the period between January 2 and 12.00 p.m., January 10, 2000." See id. ¶ 120, Exhibit 54.

Rekhovsky's knowledge of corruption in Kemerovo and the NKAZ bankruptcy is not

limited to Chernyshev. As the former Head of the Legal Department for KMK, and then as counsel to NKAZ and MIKOM, Rekhovsky is well aware of Tuleyev's illegal conduct, as we detailed above in the declarations of Grishkovetz and Kuznetsov. His testimony regarding Tuleyev's unlawful behavior is extensive, and includes Tuleyev's creation of what can only be described as a slush fund, Tuleyev's efforts to force contribution payments to that fund, and the retribution Tuleyev imposed, including imposition of sham bankruptcies, on those, including MIKOM and M. Zhivilo, who refused to comply with his unlawful demands. See Rekhovsky Dec. ¶¶ 13-22.

Rekhovsky also describes specific hearings and meetings he attended where the courts revealed their complicity in Tuleyev's corrupt plans:

- Tuleyev Exerts His Influence Over Judges Presiding Over the NKAZ Bankruptcy: Rekhovsky witnessed Tuleyev's influence over the Kemerovo Arbitrazh Court first hand, at a meeting with the Chairman of that court, Judge Matvienko, in January 2000. At that meeting, Rekhovsky planned to express his concerns about the NKAZ bankruptcy. As Chairman of the Court, Judge Matvienko is responsible for the proper operation of the court, and he was not a sitting judge on the NKAZ bankruptcy at the time. Remarkably, Judge Matvienko summoned the Judge who was presiding over the NKAZ bankruptcy, Judge Moskvitina, to the meeting in order to demonstrate to Rekhovsky that he could influence Judge Moskvitina.[36] After hearing NKAZ's concerns regarding the bankruptcy proceedings, and in particular Rekhovsky's concern about a stoppage in production at NKAZ, Judge Matvienko responded that "ours" (meaning Cherneyshev and his backers) would not permit the plant to stop. Judge Matvienko then pointed to a stack of NKAZ petitions for relief on his desk, despite the fact that he had not been assigned to the bankruptcy, and said that no petitions would be heard unless and until he himself authorized them. See id. ¶ 75-78.

- Further Evidence of Tuleyev's Corruption of Court Proceedings: Prior to the February 16-17, 2000 hearing to remove MIKOM, Tuleyev's agent (Kirikov)

[36] Orders signed by Judge Moskvitina include the order dated January 19, 2000 accepting the Kuzbass petition; the order dated January 19, 2000 imposing the conservatory arrest on all of NKAZ's assets (Rekhovsky Dec. Ex. 37); and the order dated January 27, 2000 accepting the prosecutor's petition.

met with the Judge presiding over that hearing, Judge Segodina, to discuss Tuleyev's directive to remove MIKOM. A number of Tuleyev's representatives attended this hearing and voiced their support of MIKOM's removal. Not surprisingly, MIKOM was removed and Cherneyshev was installed as manager of NKAZ at the hearing. See id. ¶¶ 134-37, 143, 149.[37]

- The Local Mayor Confirms the Corruption: Towards the end of January, 2000, after Chernyshev had been appointed provisional manager, Tuleyev requested that S.D. Martin, the Mayor of Novokuznetsk, arrange a meeting between NKAZ and Cherneyshev. The meeting took place, and Rekhovsky attended. After the meeting, which everyone was told was being held at Tuleyev's request, the Mayor told NKAZ's representative that he should not be "foolish" and make the same mistakes as KMK, and that he should stop resisting Cherneyshev and Sibirsky. See id. ¶ 134-35.

In sum, Khaidarov describes defendants' admissions that they intended to take over NKAZ through a sham bankruptcy, and the details he learned of how Tuleyev was to be bribed, and Rekhovsky provides critical evidence concerning Chernyshev's "takeover" team and the corruption of the NKAZ bankruptcy proceeding. Again, we emphasize that these specific details have been provided prior to plaintiffs taking any discovery, and given the procedural posture of this motion, are more than sufficient to demonstrate defendants' failure to meet their burden of proof on the adequacy of Russia as an alternative forum.

**ii. Expert Opinions of Professors Golubev and Burger Offer Multiple Instances of Specific Corruption in the NKAZ Bankruptcy**

Two experts retained by plaintiffs reviewed and analyzed the NKAZ bankruptcy proceedings, and opine that those proceedings were not conducted in accordance with Russian law. As noted above, supra Point II.C.2.a.ii, Professor Burger, who has, among other qualifications, authored an article dealing with Russian bankruptcy issues for the BNA's Eastern

---

[37] Rekhovsky learned of this meeting from an individual who works for the Court and who was present at the meeting, but who requested anonymity out of fear for his safety. See Rekhovsky Dec. ¶ 136.

Europe Reporter, opines that the NKAZ bankruptcy was corrupted and orchestrated to allow the defendants to seize control of NKAZ, and not to ensure payment of legitimate creditors.

Professor Golubev also opines on these matters. His qualifications include assisting in the drafting of the Russian bankruptcy law, and serving as the deputy head of the Federal Department of Bankruptcy of the State Property Committee and the head of the Russian Association of Independent Experts and Anti-crisis Managers.[38] After reviewing the relevant documents and material pertaining to the case, Professor Golubev concludes: (1) that a significant number of actions and decisions of the participants in the NKAZ bankruptcy proceeding are not consistent with Russian law, or general concepts of good faith and reasonableness; and (2) that the NKAZ bankruptcy proceeding was not filed for legitimate purposes and instead was filed for the purpose of illegally taking over NKAZ. See Golubev Dec. ¶ 203. We summarize the experts' opinions below:

- Absence of Jurisdiction: The Kemerovo Court that presided over the NKAZ bankruptcy lacked jurisdiction to hear the case because NKAZ was registered in a different region, and because a bankruptcy case can only be brought in the region in which a company is registered. See Golubev Dec. ¶¶ 45-53; Burger Dec. ¶¶ 142-143.

- Unenforceable Judgment: The bankruptcy petition that commenced the bankruptcy case against NKAZ was based on an unenforceable judgment. As detailed above, see supra Point II.C.2.b.i, Kuzbass filed a bankruptcy petition based on NKAZ's failure to pay an illegally inflated debt for energy. NKAZ appealed the decision awarding Kuzbass judgment on that claim, and obtained a stay of enforcement with respect to that judgment. Under Russian law, a judgment that has been stayed cannot serve as the basis for a bankruptcy claim. See Golubev Dec. ¶¶ 54-64; Burger Dec. ¶¶ 144-147.

---

[38] He is also a member of the Supreme Expert Council of the Federal Service of Russia on Financial Rehabilitation and Bankruptcy, the leading government organization with oversight responsibility for various aspects of bankruptcy proceedings. He has also authored numerous articles on bankruptcy, including commentary to the Russian bankruptcy law. See Golubev Dec. ¶¶ 7-16.

- Unprecedented Sequence of Events: On January 19, 2000, in an incredible convergence of events, the following took place: (1) Chernyshev registered to become an Arbitrazh Manager with the Kemerovo court; (2) Kuzbass filed its petition to declare NKAZ bankrupt; (3) the Kemerovo court accepted the petition and initiated bankruptcy proceedings against NKAZ; (4) the court imposed an arbitrazh management procedure and appointed Chernyshev arbitrazh manager; (5) Kuzbass filed a petition to impose conservatory measures; and (6) the court imposed conservatory measures. This sequence of events is, according to Professor Golubev, "highly unusual" and supports his view that the purpose of this bankruptcy was to take over NKAZ. See Golubev Dec. ¶¶ 65-66.

- Chernyshev's Lack of Qualifications: Chernyshev's application to become Arbitrazh Manager was critically defective because he failed to comply with the timing requirements concerning registration of his license, and because the Court did not have all of the necessary information from him to determine if he was qualified to serve in that capacity. In fact, his license was suspended by one court, and he was thereafter specifically prohibited from serving as an abritrazh manager. See Golubev Dec. ¶¶ 68-79; Burger Dec. ¶¶ 133-138.

- Unlawful Bankruptcy Petition: The bankruptcy petition filed by the Kemerovo prosecutor violated Russian law, and contained other indicia of collusion and corruption: (1) the petition failed to satisfy the criteria necessary to establish an intentional bankruptcy at NKAZ, including failure to serve the petition on NKAZ; (2) though the filing of a petition claiming intentional bankruptcy is exceedingly rare, it is common when such a petition is filed for the prosecutor to obtain a report from a federal agency detailing the debtor's financial problems, and here the prosecutor failed to do that; (3) Professor Golubev, who is a member of the Supreme Expert Council to this federal agency, performed the review that should have been requested and found that there were no indications of an intentional bankruptcy; and (4) the prosecutor's complaint should never have been accepted by the Court because the same issues were already raised in the Kuzbass complaint. See Golubev Dec. ¶¶ 80-90; Burger Dec. ¶¶ 148-155.

- Unjustified Imposition of Conservatory Measures: The extraordinary conservatory measures imposed by the Kemerovo court on the very same day it accepted Kuzbass' petition – freezing all of NKAZ's accounts and assets – were contrary to provisions of Russian law and unnecessary. By preventing NKAZ from paying creditors' legitimate claims as they became due, the court's order only pushed NKAZ further into bankruptcy. The court's reason for granting this relief is contrary to Russian law, and was unnecessary because assets sufficient to satisfy Kuzbass' claim had already been attached. See Golubev Dec. ¶¶ 91-96; Burger Dec. ¶¶ 156-162.

- Unlawful Removal of MIKOM: The removal of MIKOM as NKAZ's managing agent was accomplished at a hearing held on February 17, 2000, and that

hearing was riddled with violations of Russian law and bad faith conduct: (1) plaintiff BMT SA was denied the right to examine Chernyshev at the hearing, and was denied the right to use a translator's services; (2) the grounds for seeking MIKOM's removal were "simply preposterous" because they were based on NKAZ's failure to pay its electricity bills when the conservatory measures imposed by the Court prevented NKAZ from paying those bills; and (3) Chernyshev sought the removal in bad faith, based on the submission of the wholly improper and outrageous document demands, described supra Point II.C.2.b.i. See Golubev Dec. ¶¶ 97-112; Burger Dec. ¶¶ 169-173.

- Chernyshev's Illegal Rejection of Certain Plaintiffs' Claims: The illegal takeover culminated in Chernyshev's decision to reject some of the Aluminum Plaintiffs' claims, or to deny certain Aluminum Plaintiffs the right to attend creditors' committee meetings so that Sibirsky affiliated entities could control the NKAZ bankruptcy. The rejection of these claims was illegal and improper, as follows:

  - Plaintiff Alucoal's claims against NKAZ were set-off with NKAZ claims against Aluocoal, and this was not only illegal under Russian law, it also was intended to, and did in fact, deprive Alucoal of the ability to participate in creditors' committee meetings. See Golubev Dec. ¶¶ 113-21;

  - Plaintiff BMT Lad's claims should have been entered on the claims register because they were valid and established under Russian law. Just as importantly, the court hearings concerning the claims were unlawfully conducted because BMT Ltd. was not present and never received notification of the hearing. Although Chernyshev claims to have sent a telegram to BMT Ltd. (which has never been produced) notifying it of the hearing, that telegram was purportedly sent five days before the petition for the hearing was filed and thus could not have been mailed when claimed because the petition to which the notice would have had to refer had not even been filed. See Golubev Dec. ¶¶ 122-47.

- Fabricated Claims and Improper Voting of New Creditors: Necessary to accomplishing the illegal takeover of NKAZ was the creation of false claims by creditors who were not owed any money. Chernyshev included a tremendous number of false claims sufficient in monetary value to control creditors' committee meetings. The inclusion of these claims violated Russian law because a claim can only be registered if it existed at the time a bankruptcy petition is filed, and all of these claims were based on post-filing debt, and none of these companies did any business with NKAZ prior to commencement of the bankruptcy. The Kemerovo court, in accepting these clearly fabricated claims, abdicated its duty to oversee the bankruptcy proceedings and to oversee Chernyshev's actions. See Golubev Dec. ¶¶ 148-58; Burger Dec. ¶¶ 163-168.

- The Fabricated Furnace Contract with Defendant Sibirsky: A typical example of the false claims filed by these new creditors is a contract between NKAZ and defendant Sibirsky for the purported delivery of a new furnace. The details and timing sequence of this contract speak volumes about defendants' ability to corrupt court proceedings, as Professor Burger explains.

  On February 21, 2000, only two business days after Chernyshev was granted the authority to enter into contracts with third-parties, NKAZ and defendant Sibirsky entered into a contract whereby NKAZ was to purchase a furnace from Sibirsky for approximately US $6.2 million. NKAZ agreed to take delivery of the furnace at Sibirsky's warehouse within five days after the signing of the contract. According to an "Act of Acceptance" dated February 25, 2000, NKAZ took paper possession of the equipment at Sibirsky without the furnace having been physically delivered to NKAZ (whether the furnace even existed is a matter that will have to await further discovery). NKAZ was required to pay Sibirsky for the furnace within five days after the paper delivery, payment was never made and the Kemerovo Court ruled that Sibirsky thus held a valid claim against NKAZ. This is typical of the methods by which defendants created fabricated claims against NKAZ. See Golubev Dec. ¶¶ 173-177; Burger Dec. ¶¶ 174-178.

- The Illegal First Creditors' Committee Meeting: The first creditors' committee meeting was illegally held, not only because of the inclusion of the false creditor claims, but also because plaintiffs BMT Ltd. and Alucoal were excluded, and because the meeting was not chaired by Chernyshev. See Golubev Dec. ¶¶ 159-68; Burger Dec. ¶¶ 163-168.

- Approval of the Sham Settlement Agreement: Still another startling indicia of the corruption that permeated this bankruptcy proceeding is the approval by the so-called creditors of the settlement agreement, which provides that creditors would be paid in twenty years, in rubles, without interest and with a waiver of any right to make additional claims for penalties and other costs. As Professors Golubev and Burger conclude, because it is impossible to imagine a creditor with a legitimate claim approving such a settlement, this approval is another indication that this bankruptcy was intended to take over a legitimate business. See Golubev Dec. ¶¶ 178-84; Burger Dec. ¶¶ 179-181.

Based on these deviations from Russian law, Professors Burger concludes that the bankruptcy of NKAZ was orchestrated to allow Sibirsky and the other defendants to seize control of NKAZ, and not to ensure payment of legitimate creditors. Professor Golubev concludes that a significant number of the actions and decisions of the participants of the NKAZ bankruptcy proceedings did not comply with Russian law, existing legal practice, and concepts

of good faith and reasonableness, and that the NKAZ bankruptcy proceedings have signs of the category of bankruptcies aimed at the takeover of a business and redistribution of property.

c. **Fact and Expert Evidence that Defendants Corrupted the GOK Bankruptcy Proceedings**

Plaintiffs have also submitted fact and expert declarations which establish that the GOK bankruptcy was corrupted – a fact which we believe was confirmed by defendants' own expert. See supra note 1. Moreover, in a report filed by a Russian prosecutor concerning the GOK bankruptcy, the prosecutor disclosed that the Institute where defendants' expert worked concluded that there were "objective signs of intentional bankruptcy" in the GOK proceedings, i.e., that the proceedings were corrupted. See Bernard Dec. Ex. 36.

i. **Fact Witness Statements**

Like the NKAZ Bankruptcy, the GOK bankruptcy proceedings were the result of fraud from their very inception, and were used by the defendants to seize control over GOK. The evidence demonstrates as follows:

- Defendants Admit Their Involvement in the Illegal Takeover of GOK: Joseph Traum, the managing director of plaintiff Davis International, affirms that both Chernoi and Makhmudov admitted, in January 2000, that they were responsible for the takeover. See Declaration of Joseph Traum, dated September 14, 2002 ¶ 11 ("Traum Dec."). Those admissions are corroborated by Makhmudov's repeated threats of Traum, threats that were made in an effort to prevent Traum from rescuing GOK. See Traum Dec. ¶¶ 13-18, 27-31.

- Defendants Used Threats to Take Over GOK, which was a Precursor to Bankruptcy: Although the sham bankruptcy would be commenced in March 2000, the seeds were sown months earlier. Mr. Zanadvarov, a former GOK board member, explains that in January 2000, the Chernoi Makhmudov Group threatened Zanadvarov and his family, and attempted to bribe him, in an effort to induce him to support their takeover of GOK. See Zanadvarov Dec. ¶¶ 10-16. Defendants threatened other directors, including Adildjan Djuraev and Damir Gareev. Id. ¶¶ 17-25.

- GOK Was Solvent at the Time of the Bankruptcy: The bankruptcy proceedings never should have been commenced because GOK was solvent and could have

paid off the debts used by the defendants as a pretext for commencing the bankruptcy. See Zanadvarov Dec. ¶¶ 7-10. Further, both before and after the commencement, various creditors were prepared to pay off GOK's debts. But GOK's management ignored the creditors' attempts to do so, as did the Court presiding over the sham bankruptcy. See Traum Dec. ¶¶ 4-9; Zanadvarov Dec. ¶¶ 78-80; Declaration of Marina Ashikhmina, dated September 12, 2002 ("Ashikhmina Dec.") ¶¶ 9-10.[39]

- The Defendants Caused their Agent, Kozitsin, to Commence the Bankruptcy: The sham proceeding was brought by Kozitsin, the GOK general director who was installed by the defendants. Tellingly, at the time he became a GOK director, he also was the general director of Uralsk Mining Metallurgical Company ("UGMK"), a company controlled by the Chernoi Makhmudov Group. Further, throughout the bankruptcy proceedings, Kozitsin and top UGMK officials referred to GOK as "a structural part" of UGMK. See Declaration of Gennady Bukharin, dated September 4, 2002 ("Bukharin Dec.") ¶¶ 20-24.

- The Sham Debt: The day that Kozitsin became GOK general director, GOK entered into a sham transaction with a company called Svyatagor in order to create a creditor that was an alter ego of the Chernoi Makhmudov Group and who would be able to control the creditors' committee: Svyatagor was an affiliate of UGMK, and, as noted above, Kozitsin was general director of UMGK. See Zanadvarov Dec. ¶¶ 28-32. As former GOK director Zanadvarov explains in his declaration, GOK borrowed $15 million from MDM Bank, which GOK could not repay, and which it was required to repay within less than one week. It then transferred those funds to Svyatagor -- who had guaranteed repayment to MDM Bank -- and pledged 36 promissory notes with a face value of $25 million as security for the guarantee. (Svyatagor assigned these notes to a company known as Lebaut).

  After GOK's default, MDM Bank demanded repayment from Svyatagor as guarantor, and Lebaut demanded that GOK repay the $25 million in promissory notes by 6:00 p.m. on the very day that it issued its demand. In short, GOK received no benefit whatever from this alleged transaction, the only result of which was to create a creditor with a claim of $25 million. At the same time, Svyatagor had received more than $25 million in promissory notes for no cash outlay.[40] Interestingly, Lebaut purchased notes from other entities -- Teksi-

[39] In her expert declaration, Tatiana Yastrebova explains in detail GOK's financial situation at the time the bankruptcy proceeding was commenced, as well as GOK's ability to repay the Krasgaz debt that served as a pretext for the commencement of the bankruptcy. See Yastrebova Dec. ¶¶ 2-22, 36-38.

[40] As detailed in the expert declaration of Tatiana Yastrebova, the losses incurred by GOK in connection with the Svyatagor transaction were not reflected in GOK's financials. Instead,

Stock and UBA -- both of which share the same mailing address and telephone number as Lebaut. See Zanadvarov Dec. ¶¶ 37-58; Yastrebova Dec. ¶¶ 22-31.

- The Sham Failure to Pay Krasgaz Which Led to the Bankruptcy: As part of their scheme, defendants arranged for one of GOK's creditors -- Krasgaz -- to petition for bankruptcy. That defendants were responsible for the Krasgaz filing is evidenced by the fact that (a) GOK and Krasgaz had reached an agreement pursuant to which GOK would pay Krasgaz on a current basis and would reduce its outstanding debt in accordance with a payment plan; (b) GOK's debt was reduced substantially by the end of 1999; (c) notwithstanding this, as soon as Kozitsin took over management of GOK, Krasgaz sent a letter to Kozitsin demanding payment in full; and (d) Kozitsin acknowledged the debt, but refused to make a payment, even though GOK had funds sufficient to pay the debt in full. See Zanadvarov Dec. ¶¶ 59-70; see also Yastrebova Dec. ¶¶ 14-22.

- The Sham Bankruptcy Hearing Appointing Defendants' Agent as Manager: Prior to Kozyrev's appointment as external manager, at a hearing on August 22, 2000, Nexis attempted to present the findings of a study which showed that the bankruptcy had been intentional. However, the Court denied Nexis and another creditor an opportunity to be heard on this issue, and appointed Kozyrev as external manager, ordering that the GOK plant be managed under his supervision. See Zanadvarov Dec. ¶¶ 71-77, 81-86; Bukharin Dec. ¶¶ 27-29; Ashikhmina Dec. ¶¶ 5-10.

- Bankruptcy Manager Kozyrev Did Not Act in GOK's Best Interests and Ignored Legitimate Claims: Although one obligation of a temporary manager is to explore the possibility of repaying outstanding debt and dismissing the bankruptcy, Kozyrev ignored offers by various shareholders to pay debts. See Zanadvarov Dec. ¶¶ 66-68. Further, Kozyrev rejected numerous creditors' claims – which amounted to 54% of GOK's credit indebtedness -- that were "established claims" under Russian bankruptcy law -- i.e., claims which the manager did not have discretion to reject. See Bukharin Dec. ¶¶ 6-19, 30-37; Zanadvarov Dec. ¶¶ 90-104.

- Bankruptcy Manager Kozyrev Blesses the Fabricated Lebaut Claim: As noted above, Lebaut received $25 million in promissory notes as a result of the false Svyatagor debt. Fulfilling his role in defendants' scheme, Kozyrev approved the Lebaut claim, which amounted to nearly 70% of the outstanding votes on the creditors' committee, notwithstanding the fact that Lebaut's claim was not even

---

they were reflected as working assets of the company. See Yastrebova Dec. ¶¶ 21-31. GOK did so in order to disguise the intentional nature of the bankruptcy: A sudden deterioration in a company's financial performance – here, a 501 million ruble loss from the sham Svyatagor transaction – is a telltale sign of intentional bankruptcy in Russia. Id. ¶¶ 30-31, 46.

an "established claim." Kozyrev refused to hear any objections to the inclusion of the Lebaut claim. See Zanadvarov Dec. ¶¶ 105-10.

- The Sham Settlement/Reorganization Agreement: Having rejected the claims of legitimate creditors, and having accepted the claims of illegitimate creditors like Lebaut, Kozyrev ensured that the settlement agreement/reorganization plan would be approved. By virtue of having been excluded from the claims registry, Polyprom and other legitimate creditors were prohibited from voicing their objections at the hearing to approve the plan. The settlement agreement was approved, but its central terms belied the sham nature of the transaction: under the agreement, payments to creditors like Krasgaz (who initiated the bankruptcy proceeding) would not begin until March 1, 2008. See Zanadvarov Dec. ¶¶ 112-120.

In sum, a number of witnesses offer compelling evidence of defendants' corruption of the proceedings involving GOK. That evidence includes: defendants' admissions to Joseph Traum that they were responsible for the GOK takeover, defendants' threats of various GOK directors to induce them to support the takeover, Kozitsin's inexplicable refusal to pay Krasgaz, and the sham creation of the Lebaut debt.

**ii. Expert Witness Statements**

Plaintiffs' expert, Professor Marina Telyukina, an authority on Russian Bankruptcy Law, concludes that: (1) the defendants used bankruptcy proceedings as a means of taking over GOK; and (2) the GOK bankruptcy was an "ordered" or sham bankruptcy, designed not to resuscitate the company, but to wrest control from legitimate creditors and shareholders. Professor Telyukina, the author of more than 80 publications concerning Russian bankruptcy law, as well as a law professor and senior researcher at the Institute of the State and Law of the Russian Academy of Sciences, explains the basis for her conclusions:

- "I have observed, and many Russian legal scholars have commented, that, unfortunately, the Bankruptcy Law has become an instrument for illegally redistributing property; in effect, putative creditors use the Bankruptcy Law to take over legitimate businesses." Telyukina Dec. ¶¶ 10-15 (citing Professor Yakovlev, Professor Vitryansky, Professor Popondopulo).

- The Supreme Arbitrazh Court of Russia itself directed lower courts "to keep in mind that bankruptcy proceedings can be used to redistribute property and to get rid of competitors." Id. ¶ 16.

- In the GOK bankruptcy, the telltale signs of an "ordered" bankruptcy were present. Id. ¶¶ 18, 19:

  - Failure to Satisfy Claims Prior to Commencement of Bankruptcy: Professor Telyukina concludes that Kozitsin, who was installed by the defendants, could have prevented Krasgaz from initiating the bankruptcy proceeding. GOK was solvent at the time Krasgaz presented its claim and had sufficient funds to pay the debt. Rather than pay the debt or negotiate with Krasgaz, Kozitsin acknowledged and refused to pay the debt, despite Krasgaz' threats to put the company into bankruptcy. Id. ¶¶ 49-56. Such conduct, according to Professor Telyukina, "was directly tailored" to force GOK into bankruptcy and demonstrates that "Kozitsin intentionally sent GOK into bankruptcy proceedings." Id. ¶ 55.

  - Failure to Attempt to Restore Solvency: Kozitsin, Kozyrev and, subsequently, the Court, ignored various shareholders' and creditors' attempts to repay GOK's debt and rescue the company from bankruptcy, indicating bias by all participants and the improper nature of the bankruptcy. Id. ¶¶ 54, 61-67.

  - Creation of False Debt: Based upon her detailed review of the Svyatagor/Lebaut transactions, which resulted in Lebaut holding 65% of GOK debt, Professor Telyukina found that the transactions violated Russian law in numerous respects, served no rational business purpose, and gave Lebaut the power to control the course of the bankruptcy. See id. ¶¶ 23-48.

  - Purchase of Creditor Claims for Improper Reasons: As noted above, Lebaut acquired large blocks of GOK creditor claims, which took the form of GOK promissory notes, to obtain control over the planned GOK bankruptcy. Id.

  - Acknowledgment of False Claims: The Lebaut claim was recognized by Kozyrev, and subsequently the Arbitrazh court, despite the fact that the Lebaut claim was based upon patently improper transactions with Svyatagor. Id.

  - Exclusion of Legitimate Claims: Based upon her review of the proceedings, Professor Telyukina concludes that Kozyrev excluded the claims of a number of legitimate creditors to deprive them of standing to challenge his actions in the bankruptcy or to participate in creditors'

meetings. These creditors held claims that were "established," -- i.e., they had been acknowledged by the debtor, and could only be rejected through an application to the Court -- yet Kozyrev refused to recognize these claims. See id. ¶¶ 83-102.

- Bias of Debtor's Management, the External Manager, and the Court: Based upon her review of the proceedings, Professor Telyukina found that: (a) Kozitsin, who was responsible for the creation of the false debt and for putting GOK into bankruptcy, acted improperly, (b) Kozyrev, the external manager, failed to properly analyze GOK's financial condition and took great steps to exclude any potential opponents to the bankruptcy, and (c) the Court, which turned a blind eye to numerous due process and other violations, rubber stamped the proceedings. Id. ¶¶ 49-80.

- Sham Settlement Agreement: Professor Telyukina, who has had extensive experience with bankruptcy settlement agreements, concluded that the GOK settlement agreement contained terms of debt repayment that no rational creditor would accept. Kozyrev only obtained approval of this agreement because the vast majority of outstanding debt amounted to sham debts. Id. ¶¶ 103-10.

Professor Telyukina also reached the conclusion, on the basis of an extensive review of the pertinent decisions, that the Courts were demonstrably and unjustifiably biased in favor of the defendants, and were complicit in the defendants' wrongdoing. In so finding, Professor Telyukina emphasized the Courts': (a) unexplained and inexplicable refusal to hear objections to the Lebaut transaction at the August 22, 2000 and other hearings, id. ¶ 34, 39-47; (b) unfounded refusal to permit Nexis Products LLC to pursue an appeal based upon a perceived defect in the apostille on a power of attorney, id. ¶¶ 45-47, 108-10; (c) utter failure to comply with basic provisions concerning the appointment of a provisional manager, id. ¶¶ 57-60; and (d) unexplained decision to the change of the hearing on the appointment of an external manager from September 27, 2000 to August 22, 2000 – a decision made on August 15, just one week before the new hearing date, and the same day the request was made, the purpose and effect of which was to prevent various creditors from having standing to challenge various actions, and to

divest GOK's shareholders of control through the appointment of an external manager. Id. ¶¶ 72-80. See Zanadvarov Dec. ¶¶ 81-86.

d. **Fact and Expert Evidence Concerning the GOK Shareholders Proceedings**

Plaintiffs also offer fact and expert declaration concerning the fraudulent GOK shareholder proceedings, which demonstrate that Russia is not an adequate alternate forum.

i. **Fact Witness Statements**

Defendants brought a number of proceedings involving GOK's shareholders and, through patent corruption of those proceedings, wrongfully misappropriated the plaintiffs' shares in GOK. Indeed, defendant Makhmudov asserted in a conversation with a representative of Davis International, L.L.C. that resort to the Russian courts would be futile since he and the conspirators controlled them. See Traum Dec. ¶¶ 14-16.

The evidence demonstrates as follows:

- Theft of Omni Shares: As of September 2000, Omni owned more than 34 million shares of GOK, representing nearly 18% of the outstanding shares of GOK. Omni had acquired a significant number of these shares from Profit House, which, in turn, had acquired them in a judicial sale involving NPRO Urals. Despite the fact that Omni owned these shares as a matter of public record, NPRO Urals brought an action to recover them from Profit House without joining Omni. Incredibly, the Court ignored Omni's basic rights of notice and opportunity to be heard, and awarded the shares to NPRO Urals. See Declaration of Dov Rieger, dated September 15, 2002 ("Rieger (Omni) Dec.") ¶¶ 2-9.

- Theft of Holdex and Polyprom Shares: Holdex owned more than 2 million shares in GOK, which it had purchased from Polyprom on January 21, 2000. Polyprom, in turn, had purchased those shares from GOK on January 18, 2000. Despite the fact that Holdex' ownership of these shares was a matter of public record, GOK commenced a proceeding to recover those shares from Polyprom without providing notice and an opportunity to be heard to Holdex. See Declaration of Dov Rieger, dated September 15, 2002 ("Rieger (Holdex) Dec.") ¶¶ 5-20; Declaration of Nikita Chervinsky, dated September 12, 2002 ("Chervinsky Dec.") ¶¶ 8-18. Notwithstanding Holdex' absence, the Kalmykia Arbitrazh Court ruled in GOK's favor. Although this decision was subsequently

reversed, and Holdex was ultimately made a party to the case, the appellate instance of the KaAC subsequently ruled in favor of defendants, using forged documents that had been submitted by defendants as a basis for its ruling. See id.

- Corruption of Polyprom/Holdex Proceedings on Remand: The decision of the lower court was reversed and the case was remanded. On remand, however, the Court inexplicably rejected Chervinsky's witness statement, which explained that the January 1999 document was a forgery, and accepted the word of a corrupt notary. After another reversal, on March 12, 2002, the KaAC issued another decision in favor of GOK. Polyprom and Holdex did not attend this hearing, however, because the defendants had submitted forged telegrams to the Court, which falsely indicated that the parties had consented to a March 12, 2002 court date. See Chervinsky Dec. ¶¶ 11-17.

- Fraudulent Misappropriation of Foston's Shares: As of September 25, 2000, Foston owned nearly 38 million shares in GOK. In December 2000, however, Foston's attorney -- Marina Ashikhmina -- learned that, pursuant to a court execution of the Solntsevo Intermunicipal Court, nearly all of Foston's shares had been removed from the share registry by AOZT VRK, the entity that maintained the registry. See Ashikhmina Dec. ¶¶ 23-28. Those shares were transferred to an entity controlled by defendant Makhmudov. See Ashikhmina Dec. ¶¶ 29. See also Declaration of Sinish Vuich, dated September 12, 2002 ("Vuich Dec.") ¶¶ 4-11.

  Ms. Ashikhmina's investigation into the circumstances of the transfer revealed a patent corruption of the Solntsevo Court. Specifically, the court file was missing, but there was a letter purportedly on behalf of the Supreme Court requesting a copy of the file. The Supreme Court, however, stated that it had never issued a demand for the file, that the demand was fraudulent, and that the person who purportedly made the request was not a Supreme Court employee. See Ashikhmina Dec. ¶¶ 27-32. Further, the decision of the Solntsevo Court was based upon forged documents. See Ashikhmina Dec. ¶ 36.

  Defendants' corruption of the court system did not end there. Foston appealed the ruling of the Solntsevo Court, which had refused to order the return of Foston's shares. In connection with that appeal, defendants submitted forged letters to the Court, purportedly on behalf of Foston, indicating that Foston did not wish to exercise its right of appeal and revoking Ashikhmina's power of attorney. Further, defendants also sent a telegram to the Court, purportedly on behalf of Ms. Ashikhmina, stating that she did not have the power to pursue an appeal. This, again, was a forgery. Id. ¶¶ 37-57.

#### ii. Expert Witness Statement

In his expert witness statement, Anatoly Kleymenov concludes that the decisions of the

courts which resulted in the theft of the shares of Holdex, Omni and Foston were the result of gross violations of substantive and procedural Russian legal norms, and that the decisions were procured through fraud. See Kleymenov Dec. ¶ 12. In particular, Mr. Kleymenov concludes that the defendants' attempts to obtain ownership of shares without providing notice to the entities that were the owners of record -- and the Courts' willingness to entertain those claims in the absence of those parties -- violated well-settled Russian law, which requires notifying and joining the record owners as defendants. Id. ¶¶ 52-59, 70-76, 98-105.

**e. Defendants' Expert Arguments Concerning the Alleged Fairness of the Russian Judiciary are Conclusory and Without Merit**

Against this backdrop of specific evidence of corruption, both generally and in the context of these two proceedings, defendants' affidavits to the contrary are insufficient to support this motion. First, and most importantly, because this Court should treat this motion like a summary judgment motion, the motion should be denied because plaintiffs clearly have raised triable issues of fact as to the matters of corruption. This Court should not attempt to resolve those disputes on this motion, but rather it should recognize that they exist and deny the motions to dismiss until a fact finder can resolve these conflicting claims.

Second, the accompanying motions to strike the expert reports of defendants' experts Professor Paul B. Stephan III and Sergei Zankovsky detail why the background and experience of these two experts render them unqualified to opine about the matters set forth in their opinions.[41] Although we will refrain from repeating these at length, we emphasize the following.

Professor Stephan cannot read Russian without an English translation, and therefore

---

[41] Defendants also offer the expert report of Professor Petrushkin. However, his report merely sets forth various provisions of Russian law, and he does not apply it to the relevant Russian proceedings and offers no real opinion as to the practical reality of the Russian judicial system.

cannot read Russian legal treatises and commentaries, has only been to Russian once in the past five years, has not observed Russian judicial proceedings, and has had no contact with Russian attorneys or judges for five years, with the exception of a personal friend. In addition, he cites to no scholarly studies, legal articles, or any other source to support his opinion, and he admits that he failed to conduct any review of the record in either the GOK or NKAZ litigation, including review of the underlying motions and evidence. See Memorandum of Law in Support of Plaintiffs' Motion to Strike the Expert Report of Professor Paul A. Stephan, dated September 20, 2002. His opinion, therefore, even if the Court decides to consider it, which it should not, is entitled to no weight.

Zankovsky broadly opines that Chernyshev and the courts presiding over the NKAZ bankruptcy handled this litigation in good faith, but he never reviewed anything other than what defendants' counsel provided him, i.e., the Chernyshev declaration, and the exhibits attached thereto. He never spoke to Chernyshev, he never met with any of NKAZ's employees, he did nothing to determine if the false creditors were in fact affiliated with Sibirsky, and he did nothing to determine if defendants bribed Tuleyev and used his influence to affect the outcome of the NKAZ bankruptcy. See Memorandum of Law in Support of Plaintiffs' Motion to Strike the Expert Report of Professor Sergey Zankovsky, dated September 20, 2002. Accordingly, in the event the Court decides not to strike his report, the Court should give it no weight.

**f. Defendant Russian Aluminum's Admission Concerning Corruption in the Russian Courts**

In addition to all of the evidence detailed above, plaintiffs have also obtained a publicly filed disclosure statement issued by a Russian company called Sibneft, or OAO Siberian Oil Company. Sibneft owns 50% of defendant Russian Aluminum and the disclosure statement was filed in connection with Sibneft's offering of certain loan participation notes. Under the heading

"Investment Considerations Relating to Russia," Sibneft made statements that directly contradict defendants' position that the Russian courts provide a fair and adequate alternative forum for resolving plaintiffs' claims.

Under the sub-heading "Legal and Regulatory Risks," Sibeneft admits that Russian courts face a corruption problem, and that there can be no guarantee that foreign investors will be able to obtain "effective redress" in the Russian courts:

> The following aspects of Russia's legal system create uncertainty with respect to many of the legal and business decisions that Sibneft's management makes:
>
> . . .
>
> - Russia has a judiciary with limited experience in interpreting and applying market-oriented legislation and which is vulnerable to economic and political influence; and
> - Russia has weak enforcement procedures for court judgments and there is no guarantee that a foreign investor will obtain effective redress in a Russian court.

See Bernard Dec. Ex. 9.[42] The statement that Russia's judiciary is "vulnerable to economic and political influence" is a sanitized way of saying that the Russian judiciary is capable of being influenced by corruption, which is precisely plaintiffs' position. The statement concerning the absence of a "guarantee" that foreign investors will be able to obtain "effective redress in a Russian court" directly supports plaintiffs' position that foreign litigants in Russian courts cannot obtain a fair and just resolution of their claims. Defendants, in addition to their expert, have therefore taken inconsistent positions on this critical questions, and their arguments are thus entitled to no weight.[43]

---

42 Plaintiffs made an application for discovery based, inter alia, on this document, which was denied by the Court. See Bernard Dec. Exs. 8, 10.

43 Defendants' argument that BMT Ltd took an inconsistent position in an action in Guernsey is without merit. See Def. Forum Non Mem. at 14-16. This action was filed by an individual,

### 3. Russia is an Inadequate Forum for this Litigation Because it Does not Allow for Sufficient Discovery And Parties Cannot Compel the Testimony of Witnesses and Engage in Cross-Examination

In addition to the problem of corruption in the Russian courts, Russia is an inadequate alternative forum because plaintiffs would not be able to obtain sufficient discovery in Russia or cross-examine witnesses,[44] and in a complex fraud claim such as this one, that is tantamount to dismissing plaintiffs' claims.

In Lacey v. Cessna Aircraft Co., 932 F.2d 170 (3d Cir. 1991), Judge Becker, writing for the court, reversed a forum non dismissal because of plaintiffs' inability, under the law of British Columbia, to obtain documents from non-parties. Although the District Court had conditioned its dismissal order on defendants providing plaintiff with all relevant witnesses and documents, the Third Circuit held that the District Court must consider plaintiffs' inability to obtain documents from non-parties. See id. at 183-86. The court recognized that although courts

---

Ruslan Shamurin, who had a business dispute with Yuri and Mikhail Zhivilo. A motion to dismiss on forum non grounds was filed – before defendants here effected the filing of false criminal charges against M. Zhivilo – because there was no evidence that Mr. Shamurin had the ability to corrupt the Russian judiciary and the dispute concerned the ownership of an apartment in Russia over which the Russian courts exercise mandatory jurisdiction. In sharp contrast, this litigation concerns parties who have demonstrated a specific and verifiable ability to corrupt proceedings in the Russian courts. Unlike the instant matter, where some of Russia's most powerful and wealthy individuals and corporations have demonstrated an ability to corrupt judicial proceedings in Russia, BMT Ltd. had no evidence that Mr. Shamurin was capable of doing the same. Finally, neither plaintiffs' counsel Bruce S. Marks, nor his former firm, were counsel in Guernsey, and thus they never argued that Russia was an adequate forum, as defendants suggest. See id. In any event, BMT Ltd. cannot be estopped from arguing the inadequacy of Russia as an alternative forum, as the Guernsey court denied the forum non motion. See AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc., 84 F.3d 622, 628 (2d Cir. 1996).

[44] Russian law gives parties a right to cross-examine witnesses, as our experts have explained, but the unfortunate reality of litigation in Russia, as this case demonstrates, is that parties are routinely denied that right.

generally do not give weight to the unavailability of discovery in the alternative forum, courts must be flexible enough to consider "atypical" cases where a forum non dismissal, due to the unavailability of discovery, is tantamount to a dismissal of a plaintiff's claims. See id. at 186; see also Manela v. Garantia Banking Ltd., 940 F. Supp. 584, 591 (S.D.N.Y. 1996) ("While the Court is not prepared to say that unavailability of document discovery would never render an alternative forum inadequate. . . the circumstances in which that might be so would be rare indeed, and this is not such a case.").

This is precisely the case here. As Professor Burger explains in the accompanying declaration, Russian law does not provide for the taking of depositions or the propounding of interrogatories, so that while a judge can order the production of a specific document from a party, in most cases, parties will have no idea what to ask for. See Burger Dec. ¶ 87. In a complex fraud case such as this one, where the precise mechanism used to effectuate the fraudulent scheme, and the details and individuals involved in the scheme, mostly lies in documents and testimony unavailable to plaintiffs absent discovery, a dismissal of this case to Russia is tantamount to a dismissal of plaintiffs' claims.

In addition, a complex fraud case can hardly be prosecuted without the opportunity to compel witness testimony and cross-examine witnesses. Yet, defendants' legal expert, Zankofsky, states that neither is available in Russia. See Zankofsky Dec. ¶ 77 ("The cross-examination of witnesses, aimed at determining whether evidence presented is truthful, simply does not exist in Russian law. . . . Indeed, Russian arbitrazh courts have no authority to summon witnesses, either on their own initiative, or a the request of the parties."). While plaintiffs disagree that this is the law in theory, plaintiffs do not disagree that this is the law in practice, making litigation of a fraud claim in Russia impossible.

**D. Defendants Have Not Met Their Burden of Proof that Litigation in New York Would Be Oppressive and Vexatious Out of All Proportion to Plaintiff's Convenience**

Even if this Court determines that Russia is an adequate alternative forum, defendants bear the heavy burden of establishing that litigation in New York would be oppressive and vexatious out of all proportion to plaintiffs' convenience in light of the private and public interest factors identified by the Supreme Court in Piper. We address each of these factors below and demonstrate that even if this Court concludes that Russia is an adequate alternative forum, defendants have not met their burden of establishing that the balancing of the private and public interest factors "strongly" favors dismissal of this lawsuit to Russia.

**1. Defendants Have Not Established that the Private Interest Factors Strongly Favor Dismissal to Russia**

Defendants have not satisfied their burden of establishing that the private interest factors identified by the Supreme Court weigh strongly in favor of dismissal. The private interest factors include: (1) ease of access to sources of proof; (2) availability and cost of compulsory process for unwilling witnesses; (3) any obstacles to a fair trial; and (4) in general, all other factors relating to the expeditious and efficient adjudication of the dispute. See Gilbert, 330 U.S. at 508. We address each in turn below.

**a. Defendants Have Not Met Their Burden of Showing Access to Sources of Proof Would Be Easier In Russia**

Defendants argue that because some witnesses in this case are Russian, and that a large number of documents are written in Russian, this private interest factor strongly favors dismissal. See Def. Forum Non. Mem. at 35-39. This argument is flawed because it misconstrues the allegations in the Complaint, ignores the location of key documents and witnesses in the US, and

ignores the lesser importance that courts, including the Second Circuit, place on this factor in the modern era.

Defendants go to great lengths to point out to the Court all of the allegations, and related witnesses and documents, that involve Russia. See id. Defendants ignore, however, that this RICO case involves the commission of predicate acts in the US by US-based defendants, and the use of the US by foreign defendants to further criminal activity. As we detailed supra, Point I.B.1, this case is about predicate acts of wire fraud, money laundering and other illegal activity that took place in the US. Plaintiffs identify a litany of specific wire transfers, all of which occurred through US-based banks, and all of which will therefore involve document discovery here in the US. See id. Furthermore, subsequent to the Illegal Takeover, defendants sold NKAZ metal to various companies based in the US. See Complaint ¶¶ 148-154. Documents related to these transactions again are more accessible here than in Russia. In addition, plaintiffs have learned that various banks provided financing to defendants, including Citibank and Credit Suisse, both of which maintain offices in the US. Again, plaintiffs' access to these documents, which are likely to confirm the real ownership structure behind Russian Aluminum and Sibirsky Aluminum, will be greater if this lawsuit continues here in the US.

Defendants also gloss over the central role in their illegal scheme played by defendants Arnold Kislin, Blonde Management, Pan-American and Sibirsky (US), all of whom are US citizens and/or residents. As we detail in the Complaint, Kislin and the companies he control played a critical role in the commission of these predicate acts. See id. ¶¶ 131, 164, 167, 175, 198, 314, 342, 354, 361, 434. Kislin also assisted defendant Chernoi in laundering extortion money through real-estate investments in New York. See id. ¶¶ 131, 484. Moreover, Kislin played a key role in defendants' fraudulent transfer of the GOK shares. Again, defendants

defrauded three US companies and established four US companies so that these companies could act as repositories for the fraudulently obtained shares in GOK. See id. ¶¶ 397-434. Kislin, and the companies under his control, established these four defendant companies. See id. ¶¶ 432-34. Metal which should have been sold to plaintiffs was sold through Sibirsky (US) and the proceeds then laundered. See supra note 20. All of this conduct, and these defendants, will therefore involve substantial discovery from US citizens and residents. See Herbstein v. Bruetman, 743 F. Supp. 184, 189 (S.D.N.Y. 1990) (denying forum non motion where documents and testimony would be obtained in both the US and Argentina because it would be equally difficult for the Argentine court to translate English documents and testimony).

A wealth of other documents is similarly located in the US, not Russia. For example, as detailed in an article published by Fortune on June 12, 2000, Capitalism in a Cold Climate (annexed to the Bernard Dec. as Ex. 4), Kroll Associates was commissioned to conduct an investigation of Trans World, and the roles played by the Chernoi brothers and David and Simon Reuben "in the hopes that a positive report would be made public." Id. at 197. Fortune reported that, though Kroll would not confirm it, "a positive report seems unlikely." As a result of that article, we sought leave of this Court to serve Kroll with a preservation subpoena in order to preserve any documents it obtained during its investigation. By Order dated April 2, 2001, this Court granted plaintiffs leave to serve this (as well as other) preservation subpoenas, and plaintiffs subsequently served preservation subpoenas on Kroll, as well as on five banks used by the defendants and three of defendants' trading partners, all of whom are located in the US. See Bernard Dec. Ex. 1. These documents are much more (if not only) accessible to plaintiffs if this lawsuit continues here in the US.

Finally, defendants ignore that courts place less emphasis on this factor today than the

Supreme Court did in 1947 when it decided Gulf Oil. It has been twenty years since the Second Circuit declared that:

> Advances in modern telecommunications and jet travel may further circumscribe a district court's discretion in dismissing a suit on the ground of forum non conveniens.

Overseas Programming Cos. Ltd. v. Cinematographische Commerz-Anstalt, 684 F.2d 232, 233 n.1 (2d Cir. 1982); see also Manu Int'l, S.A. v. Avon Products, Inc., 641 F.2d 62, 65 (2d Cir. 1981) ("[T]here has been much recent sentiment in this Circuit for evaluating the forum non conveniens factors in light of the increased speed and ease of travel and communication which makes, especially when a key issue is the location of witnesses, no forum 'as inconvenient (today) as it was in 1947 [the year Gulf Oil was decided].'"(citation omitted)).

Indeed, more than a quarter-century ago, technological advances caused Judge Oakes to "wonder whether the entire doctrine of forum non conveniens should not be reexamined in light of the transportation revolution that has occurred since [1947]." Fitzgerald v. Texaco, Inc., 521 F.2d 448, 456 (2d Cir. 1975) (Oakes, J., dissenting). And some twenty years ago, Judge Newman summarized the point as follows:

> [T]he assessment of whether the balance of public and private interests strongly overcomes the plaintiff's choice of forum must be made in light of the realities of modern transportation and communications. A forum is not necessarily inconvenient because of its distance from pertinent parties or places if it is readily accessible in a few hours of air travel. It will often be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit. Jet travel and satellite communications have significantly altered the meaning of "non conveniens."

Calavo Growers of California v. General Belgium, 632 F.2d 963, 969 (2d Cir. 1980) (Newman, J., concurring) (emphasis added).

In light of these advances, the bottom line is that the location of documents "will be accorded less weight." Allstate Life Ins. Co. v. Linter Group Ltd., 782 F. Supp. 215, 225

(S.D.N.Y. 1992); see also DiRenzo v. Philip Services Corp., 294 F.3d. 21, 30 (2d Cir. 2002) (holding that "less weight" should be accorded this factor, even though "the bulk" of the documents at issue were located in Canada, because defendants "failed to explain how transporting the documents or copies of them would be oppressive or vexatious"). Neither is the location of witnesses and the availability of compulsory process over non-parties the "critical difference" defendants make it out to be. Def. Forum Non Mem. at 39. These potential problems can easily be overcome through the use of depositions and letters rogatory. See DiRenzo, 294 F.3d at 30 (citing Overseas Programming, 684 F.2d at 235). This is particularly true of documents in the possession, and witnesses under the control, of the party defendants.[45] Those documents and witnesses are equally available in both the US and Russia, and are more easily accessible here under the discovery provisions of the Federal Rules of Civil Procedure.

In fact, defendants' very submissions in connection with this motion to dismiss fully support the Second Circuit's view that this factor is entitled to less weight. Defendants submitted lengthy and detailed fact affidavits from no fewer than eight expert, fact and non-party witnesses, and annexed a tremendous volume of relevant documents. Surely if defendants can amass the volume of documentary evidence that they submitted in connection with the pending motions, as well as the witness statements from experts, parties and non-parties, it cannot be said that the location of documents and witnesses in Russia is so burdensome as to establish "oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience." Koster, 330 U.S. at 524; see also Manela v. Garantia Banking Limited, 940 F. Supp. 584, 594

45 Although MDM Bank cites Pavlov for the proposition that this Court lacks "the ability to compel the production of documents or witnesses from Russia," MDM Mem. at 7, MDM Bank cites to no non-party documents or witnesses which are outside of the Court's power. Plainly, this Court can compel the production of party documents and witnesses.

n.17 (S.D.N.Y. 1996) (following Judge Newman's concurring opinion in Calavo, denying forum non motion and holding that "the geographical location of witnesses is not determinative, particularly in light of the ease of modern transportation an communication"); Hatzlachh Supply Inc. v. Tradewind Airways Ltd., 659 F. Supp 112, 116-17 (S.D.N.Y. 1987) (following Overseas Programming and denying forum non conveniens motion where documentary evidence was within defendant's control); Schechter v. Banquet Commerciale Privee, No. 90 Civ. 6051 (MBM), 1991 WL 105217, at *12 (S.D.N.Y. Jun 11, 1991) (same).

**b. Defendants Have Not Met Their Burden of Proving Inconvenience to Witnesses Should This Case Remain in the US**

One of the most important private interests identified in Gulf Oil is the ability to obtain the attendance of witnesses in the alternative forum. See Gulf Oil, 330 U.S. at 508. Where witnesses are unable or fearful of attending proceedings in the alternative forum, forum non conveniens dismissal is inappropriate. See Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142 (2d Cir. 2000). In Guidi, in reversing a dismissal on forum non conveniens grounds, the Second Circuit held that where plaintiffs were the victims, or the widows of victims, of religious extremist violence in Egypt, "the substantial and unusual emotional burden on Plaintiffs if they were required to travel to Egypt" tilted the balance of convenience to the New York forum. Id. at 147.

A number of other courts have reached the same result under similar circumstances. See, e.g., Iragorri, 274 F.3d at 75 (after remanding case, noting that "plaintiffs claim they fear for their safety in Cali and that various witnesses on both sides may be unwilling to travel to Cali; if these concerns are warranted, they appear highly relevant to the balancing inquiry that the District Court must conduct"); In re Bridgestone/Firestone, Inc., 190 F. Supp.2d 1125, 1143

(S.D. Ind. 2002) (denying forum non motion in part because of physical threats to litigants and witnesses arising from the volatile political situation in Columbia); Cabiri v. Assasie-Gyimah, 921 F. Supp. 1189, 1199 (S.D.N.Y. 1996) ("[T]he Court is unconvinced that the courts of Ghana provide an adequate alternative forum for this action . . . [because plaintiff] would be putting himself in grave danger were he to return to Ghana."); Rasoulzadeh v. Associated Press, 574 F. Supp. 854, 861 (S.D.N.Y. 1983), judgment aff'd, 767 F.2d 908 (2d. Cir. 1985) (Iranian courts held unavailable because "if the plaintiffs returned to Iran to prosecute this claim, they would probably be shot").

Defendants' actions have made Russia a hostile place to visit, much less in which to litigate, for plaintiffs. Defendants have used violence and vandalism to intimidate plaintiffs, including threats on the lives of key witnesses.[46] As least four of plaintiffs' key witnesses cannot travel to Russia out of fear for their lives or arrest by corrupted officials on false criminal charges – a fear created by defendants' unlawful actions.

Yuri Zhivilo, as a Vice-President of MIKOM, has a wealth of relevant information about the case, and also has a reasonable fear of violence at the hands of defendants. In his declaration, he describes the specific threat defendant Deripaska made on his life. See Second Declaration of Yuri Zhivilo, dated September 18, 2002 ("Second Y. Zhivilo Dec.") ¶¶ 4-10. Shortly after the

---

[46] In addition, the Moscow office of MIKOM was ransacked and its employees intimidated. The accompanying declaration of Andrei A. Ignatenko, current Vice-President/Acting President of MIKOM, dated September 16, 2002 ("Ignatenko Dec."), describes in detail those intimidation techniques: On August 7, 2000 an investigator from the Siberian federal district department of the Prosecutor General's office of Russia, along with a platoon of masked, camouflaged and machine-gun armed individuals, invaded MIKOM's Moscow offices by breaking the lock, purportedly to conduct a search of the premises in relation to the alleged attempted murder of Tuleyev. See Ignatenko Dec. ¶¶ 4-11. During the search, MIKOM personnel were lined-up against the wall with machine-guns pointed at them, and a shot was fired, despite the total lack of resistance to the search. Id. ¶¶ 8, 16-28, Ex. A.

murder of American Felix Lvov, Deripaska told Mr. Y. Zhivilo, at a conference in Chicago, that if he and his brother did not acquiesce to the demands of Deripaska and Chernoi, then "the same thing" would happen to the Zhivilo brothers that "happened to Lvov." See id. ¶ 6. Mr. Y. Zhivilo legitimately fears for his life, and, like his brother, also fears false arrest, were he to return to Russia to testify in these proceedings. His resulting refusal to do so is clearly justified. See id. ¶¶ 12-16.

Mikhail Zhivilo, President of MIKOM and Yuri's brother, also has important information concerning defendants' scheme, and also is unable to travel to Russia for fear of his life. He will testify to, among other things, the solvency and operation of NKAZ before the illegal bankruptcy, extortion and violence by defendants in their effort to wrest control of NKAZ from MIKOM, and the corruption of the bankruptcy process by defendants' agent Cherneyshev. See Declaration of Mikhail Zhivilo, dated April 16 2002 ("First M. Zhivilo Dec") ¶¶ 11-84 annexed as Ex. 34 to the Bernard Dec. Mr. Zhivilo, however, is also the victim of defendants' unlawful scheme, a scheme that included the filing of false attempted murder charges against him by the Regional Governor that defendants bribed. See Second Declaration of Mikhail Zhivilo, dated September 16, 2002 ("Second M. Zhivilo Dec.") ¶¶ 25-29; Declaration of Jalol A Khaidarov, dated April 15, 2002 (" First Khaidarov Dec.") ¶¶ 8-16 annexed as Exhibit 35 to the Bernard Dec. In France, Mr. Zhivilo successfully fought extradition to Russia on these charges, but the charges remain enforceable in Russia and, were he to travel to Russia to participate in this lawsuit, he would be arrested. See id. ¶ 29.

Mikhail Zhivilo has also been the victim of physical violence, and threatened physical violence, at the hands of defendants. He was first threatened in the autumn of 1995, when he was summoned to a meeting in Tel Aviv with defendant Chernoi. Like Deripaska in Chicago,

Chernoi insisted that M. Zhivilo acquiesce to the Conspirators' demands, threatening that "Yaponchik," a member of the Izmailovo mafia subsequently imprisoned in the US, would "become involved in the business" if he did not. See Second M. Zhivilo Dec. ¶ 17. In fact, M. Zhivilo escaped an attempt on his life in March of 1996, after which Chernoi told him that if "it" did not happen the first time, then "it" would definitely happen the second time. See id. ¶¶ 20-21. The threats did not stop even after M. Zhivilo arranged for protection payments to be paid, and in 1998, at a World Cup soccer game, Chernoi again threatened M. Zhivilo, this time invoking the name of Malevsky, the Russian head of the Ismailovo mafia. See id. ¶¶ 22-24. Mr. M. Zhivilo is acutely aware of defendants' capacity for violence and, along with the false criminal charges, is therefore more than justified in refusing to return to Russia. See id. ¶ 30.

Jalol Khaidarov, the former director of GOK and a former business associate of defendants, has provided highly probative details of defendants' illegal scheme and operation, and of the specific bribes that were paid to the Regional Governor to exert his influence over the NKAZ bankruptcy proceedings. See First Khaidarov Dec. ¶¶ 2-16. In part because of that knowledge, Russia remains a dangerous place for Mr. Khaidarov, as defendants have caused false narcotics and rape charges to be filed against him. See id. ¶¶ 30-31; Second Declaration of Jalol A. Khaidarov, dated September 15, 2002 ("2d Khaidarov Dec.") ¶¶ 15-16.

Defendants also personally threatened Mr. Khaidarov in the course of their takeover of GOK. In April of 1999, at a meeting in Chernoi's Moscow apartment attended by Malevsky and Makhmudov, Chernoi told Khaidarov that his life would be at risk if he did not arrange to have shares in GOK transferred to the Conspirators. See 2d Khaidarov Dec. ¶ 6. At a separate meeting in November of 1999 at the Metropole Hotel in Moscow with Malevsky and Makhmudov, the threat to Khaidarov was repeated, and Malevsky specifically advised

Khaidarov that "[t]his is the last time you will leave here alive." See Complaint ¶¶ 349-51; Second Khaidarov Dec. ¶¶ 7-11. These threats and others led to Mr. Khaidarov's fleeing to another country, where he is provided personal security. See 2d Khaidarov Dec. ¶¶ 17. Like M. Zhivilo, it is impossible for Mr. Khaidarov to return to Russia to testify due to the threat of false arrest and physical violence. See id. ¶ 18.

Finally, Joseph Traum, the director of Davis International, LLC, had his offices raided by Russian police acting at the behest of Makhmudov and the Conspirators in April of 2001. See Traum Dec. ¶ 30. The raid followed numerous specific threats to his "freedom" through which Makhmudov attempted to obtain Davis' shares in GOK and, later, Traum's silence regarding the illegal transfer of those shares. See id. ¶¶ 17-20, 29. Incredibly, during the raid, Makhmudov called Traum and told him to leave Russia or face jail time on false narcotics charges. Id. ¶ 30. Traum was able to avoid imprisonment that night with the help of Israeli authorities, but when Makhmudov subsequently threatened his life, he fled Russia. He believes he will be killed if he returns. Id. ¶¶ 32-33.

As is clear from this summary of declarations from only some of plaintiffs' key witnesses, a forum non dismissal to Russia would, in reality, mean the death of this case, because of the risk of death to these witnesses. The need for live testimony in this case from individuals like Messrs. M. Zhivilo, Y. Zhivilo, Khaidarov, and Traum is particularly acute, and plaintiffs would not be able to present this testimony if this case is dismissed to Russia. See Cromer Finance Ltd. v. Berger, 158 F. Supp.2d 347, 359 (S.D.N.Y. 2001) ("[P]articularly where plaintiffs have alleged fraud . . . 'live testimony of key witnesses is necessary so that the trier of fact can assess the witnesses' demeanor.'" (quoting Allstate, 994 F.2d at 1001)).

In contrast, defendants point to no witnesses who are available to testify in Russia, but

who cannot testify in the US. In fact, one key defendant, Mr. Kislin, is a resident of New York, and another, Mikhail Chernoi, owns considerable real estate in New York. Sibirsky Aluminum (US) maintains an office in New York, as does Russian Aluminum.[47] MDM Bank is a member of the US-Russia Business Counsel, and a sponsor of its annual meeting, scheduled in Washington, DC next month. See Bernard Dec. Ex. 33. These defendants can hardly claim inconvenience in the very forum or country in which they live, do business, or invest. In short, because many of plaintiffs' key witnesses simply cannot return to Russia because of plaintiffs' illegal acts, and because defendants point to no witnesses who cannot testify here in the US, this factor tilts strongly in favor of this case remaining in the US.

**c. Defendants Have Not Met Their Burden of Showing that Any Other Private Interest Favors Adjudication of this Dispute in Russia**

Defendants offer no evidence, or even real arguments, that the other private interest factors – obstacles to a fair trial and all other factors relating to the expeditious and efficient adjudication of the dispute – favor Russia over the US. And as we have detailed herein, the obstacles to a fair trial in Russia are overwhelming – including defendants' threats and intimidation of key witnesses and their past and demonstrated ability to corrupt judicial proceedings in Russia for their benefit. Under these circumstances, these additional private interest factors do not favor defendants and, indeed, demonstrate why dismissal of this case to Russia would be inappropriate.

[47] Russian Aluminum's web site, at www.rusal.ru, lists their New York office as being in Harrison, New York, at an address that appears to be right next door to Sibirsky's New York office. See Bernard Dec. Exs. 25, 28. For additional discussion of Russian Aluminum's and Sibirsky's extensive trading and other activity in the US, see supra note 20 (Sibirsky's substantial sales activity in the US), note 24 (Russian Aluminum's presentation on its global reach at a recent NY sales conference, and the Dun & Bradstreet report on Sibirsky's US trading office).

**2. Defendants Have Not Met Their Burden That The Public Interest Factors Favor A Dismissal of this Lawsuit to Russia**

Defendants must also prove that consideration of the public interest factors weighs in their favor. The public interest factors include: (1) the relative backlog and other administrative difficulties in the two jurisdictions; (2) the fairness of placing the burdens of jury duty on the citizens of the state with the greater interest in the dispute; (3) the local interest in adjudicating localized disputes; and (4) the appropriateness of having the jurisdiction whose law will govern adjudicate the dispute in order to avoid difficult problems in conflicts of laws. See Gilbert, 330 U.S. at 508-09. Defendants have not met their burden.

**a. There Is No Backlog or Other Administrative Impediment to Trying This Case in New York**

Defendants barely make any argument in connection with this factor, and only contend that there is an average of 22 months to trial in the Southern District of New York, compared to a wait of two months to trial in Russia. See Def. Forum Non. Mem. at 40. But defendants cite no authority for the proposition that a difference of 20 months in time to trial is so substantial a difference as to tip the balance of this factor in defendants' favor; rather, that such a complex case would be scheduled for trial in Russia in only two months of preparation underscores its complete lack of discovery and other means of obtaining evidence. See, e.g., Herbstein v. Bruetman, 743 F. Supp. at 189 ("A case may not be dismissed simply because New York is a congested center for litigation, and defendants made no showing that New York is prohibitively congested.").

In fact, the case law supports just the opposite conclusion, as a number of courts have recognized that the relevance of this factor has been increasingly diminished in recent times, and no recent decision in this District has noted a backlog sufficient to warrant a forum non

dismissal. See, e.g., Calavo Growers, 632 F.2d at 969 ("There is an understandable temptation in a busy district like the Southern District of New York to transfer cases that can as appropriately or even slightly more appropriately be tried elsewhere. That temptation must be resisted.") (Newman, J., concurring); Cromer Finance Ltd. v. Berger, 158 F. Supp.2d at 355 ("While the docket in the Southern District is an active one, courts in this district have shown themselves more than able to address the issues that arise in complex actions in an expeditious and comprehensive manner.").

**b. The US Has a Strong Interest in Protecting Its Citizens From Criminal Conduct and Preventing America from Being Used as a Base For Criminal Conduct and There Is, Therefore, No Unfairness in Asking a New York Jury to Resolve this Dispute**

Contrary to defendants' assertions, see Def. Forum Non Mem. at 39-44, the US and New York have an interest in this case and therefore the public interest factors pertaining to the forum's interest in the case – the fairness of placing the burdens of jury duty on the citizens of the state with the greater interest in the dispute and the local interest in adjudicating localized disputes – do not strongly favor an alternative forum. See Gulf Oil, 330 U.S. at 508-09.

Defendants' illegal scheme defrauded two US companies of their shares in GOK, and one US company of its right to receive payment on a loan. See Complaint ¶¶ 390, 397-423. Furthermore, defendants established four US companies to receive the stolen GOK shares. See id. ¶ 430-34. The US has an obvious interest in seeing that its companies are not victims of organized criminal activity, and that corporations established under US law are not utilized to perpetrate frauds against other US companies. See, e.g., Herbstein v. Bruetman, 743 F. Supp. at 189 ("US courts have a definite relation to the litigation, when a fraud allegedly is perpetrated

against one of its residents.").[48]

Similarly, defendants should not be allowed to use the US and its institutions as a staging ground for their illegal activity. Defendants' use of US banks to finance their illegal scheme was pervasive. See, e.g., Complaint ¶¶ 176, 197, 285, 345, 354. Defendants Arnold Kislin, Blonde Management and Pan American are US citizens and residents, and worked with the other defendants to pay bribes to Tuleyev and Roussel, as well as to provide credit cards to the other defendants for use in their illegal activities. See, e.g., Complaint ¶¶ 58, 198, 354. Defendants also used banks located in the US to launder the proceeds from the takeovers of NKAZ and GOK. See Complaint ¶¶ 482-89. And defendant Chernoi, with the help of Kislin and others, laundered some of his ill gotten gains through real estate investments in New York. See Complaint ¶ 484; supra Point I.B.1.b. Finally, defendant Deripaska threatened Y. Zhivilo in Chicago as part of the illegal scheme to takeover NKAZ. See Second Y. Zhivilo Dec. ¶ 3. And that threat implicated defendants in the murder of a US citizen, Felix Lvov. See id. ¶ 7; Complaint ¶¶ 138-39, 162-65.

Notably, the US has already concluded that the resources of our federal prosecutors, and the time of our citizens, are properly allocated to addressing this threat, as evidenced by the prosecution and conviction of defendants' ally, Vyacheslav Ivankov (a/k/a "Yaponchik") in the Eastern District of New York. See supra Facts C.2; see also United States v. Abelis, 146 F.3d 73, 77 (2d Cir. 1998) (Koeltl, J.) (affirming Ivankov's conviction, which concerned substantial criminal activity in New York).

---

[48] Herbstein was recently cited by the Second Circuit with approval on this particular point, albeit in an unpublished decision. See Alnwick v. European Micro Holdings, Inc., No. 01-754829, 2002 WL 407940, at *3 (2d Cir. Mar 15, 2002).

**c. US Law Governs this RICO Litigation and the Issues Involving Russian Law Do Not Pose Such an Insurmountable Burden So as to Warrant Dismissal**

Defendants point to a range of allegations in the Complaint that entail application of Russian law, and argue from these citations that "Russian law applies to virtually all of Plaintiffs' claims." See Def. Forum Non. Mem. at 42-43. But much as defendants ignore the US-based parties to this lawsuit, and the allegations of US-based illegal activity, defendants similarly ignore that the predicate acts that occurred in the US are governed by US law, see supra, Point I.B.1, and that plaintiffs' primary RICO claims are just that – RICO claims governed by US law. Thus, while plaintiffs do not dispute that some issues in this lawsuit involve application of Russian law, defendants err in suggesting that Russian law is exclusively at issue. At the end of the day, a jury will be charged on US law both for the underlying predicate acts – involving wire fraud, money laundering, extortion and Hobbs and Travel Act violations – and the basic elements of RICO. This factor, therefore, does not weigh strongly in defendants' favor. See In re American President Lines, Ltd., 890 F. Supp. 308, 316-17 (S.D.N.Y. 1995) ("On the whole, given that both U.S. and Korean law apply to different aspects of the case, this factor does not weigh strongly in favor of dismissal.").

In addition, defendants grossly overstate the burden of addressing issues of Russian law, particularly when they have already offered no fewer than three declarations, totaling approximately 109 pages in length, from purported experts on Russian law in conjunction with moving to dismiss. One of these declarations – submitted by Sergei Zankofsky – was introduced for the express purpose of addressing "the [alleged] conformity of the recently concluded NKAZ bankruptcy with Russian law." Zankofsky Dec. ¶ 5. Thus, as to many of the sixteen points of Russian law identified by defendants in their memorandum of law as having been raised in this

lawsuit, see Def. Forum Non. Mem. at 42-43, defendants have already submitted expert testimony and therefore cannot complain about the burdens of addressing Russian law.

In any event, and especially in light of these submissions, this factor is also entitled to less weight than defendants contend, as Judge Mukasey has observed: "Additionally, although the application of foreign law is a complicating factor, it is not an uncommon or impossible burden. As the Second Circuit has admonished: '[W]e must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform.'" Schechter v. Banquet Commerciale Privee, 1991 WL 105217 at *13 (S.D.N.Y. Jun 11, 1991) (quoting Manu International, S.A. v. Avon Products, Inc., 641 F.2d 62, 68 (2d Cir. 1981)); see also Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 47 (2d Cir. 1996) ("But even if this case raises complicated choice of law questions and requires the exclusive application of foreign law as suggested by [defendant], it is well-established that the need to apply foreign law is not alone sufficient to dismiss under the doctrine of forum non conveniens.").

Finally, in regard to the corrupt bankruptcies of NKAZ and GOK, plaintiffs note that many of the key issues are factual, not legal. At this point, plaintiffs are entitled to the assumption that the allegations in the Complaint, and all reasonable inferences therein, are true. It can therefore be assumed that discovery will establish that defendants bribed Russian court officials, created false debts in the bankruptcy proceedings and arranged for the improper cancellation of plaintiffs' contracts and replacement with less favorable contracts with defendants. Based on this assumption, there may be little need to even address the legality of Russian court decisions. Factual proof that these judgments were based on bribery and the perjured testimony of court appointed bankruptcy officials would be virtually dispositive of plaintiffs' claims, without the need to address Russian law issues.