## III

### The Complaint Should Not Be Dismissed on Comity Grounds Because the Judgments Defendants Rely Upon Were Obtained by Fraud and the Principles of Collateral Estoppel and Res Judicata Implicated by Their Motion Either Do Not Apply or Have Not Been Satisfied

Defendants contend that the doctrine of international comity requires dismissal of this action because plaintiffs are improperly seeking to use this Court "as an appellate court with respect to" the Russian proceedings and to "re-contest issues raised, litigated, and decided (or pending) in Russian courts." GOK Defendants Mem. at 4.[49] Defendants are wrong for a number of reasons.

**A.    This Motion Cannot Be Resolved at this Stage Because Plaintiffs' Allegations of Fraud and Corruption Must be Accepted as True, or, Alternatively, Because Plaintiffs Raise Disputed Issues of Fact Regarding these Matters**

Comity is an "affirmative defense" and the moving party carries the "burden of proving that" dismissal is warranted. See Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 999 (2d Cir. 1993). This is not a typical comity motion, as defendants' arguments, raised on a motion to dismiss without the benefit of plaintiffs receiving any fact discovery, cut to the core of plaintiffs' allegations of fraud and corruption. Those issues cannot be resolved at this stage of the proceedings on a motion to dismiss, where plaintiffs' allegations must be accepted as true.

In Allstate Ins. Co. v. Administratia Asigurarilor de Stat, 962 F. Supp. 420, 426 (S.D.N.Y. 1997), the defendant interposed a defense of comity based on a decision obtained in Romania that declared void the very agreement on which plaintiffs sued. Unlike this case, the defendants in Allstate filed a summary judgment motion raising the comity defense, not a motion to dismiss. The court reviewed the summary judgment standard and the elements of comity,

---

[49]    "GOK Defendants Mem." refers to the Memorandum of Law in Support Of Motion Of New Start Group Corp., Venitom Corp., Unidale, LLC and InvestLand, LLC To Dismiss The First Complaint On The Ground Of Comity, dated January 30, 2002.

noting particularly that the moving party has the burden of proving that the foreign decision on which it seeks to rely was not procured by fraud and the foreign court had jurisdiction to hear the case. See id. at 425.

The court denied the motion, holding that defendants did not meet their burden of showing an absence of material issues of fact with respect to the jurisdiction of the Romanian court or proving that the Romanian courts were fair:

> Based on [defendant's] submissions, this Court cannot determine with any certainty the existence of several of the prerequisites to enforcing the Bucharest Judgment on comity grounds. For example, this Court has nothing but the parties' conflicting statements – neither of which is submitted with evidentiary support – that the Bucharest Court possessed jurisdiction over [plaintiff]. In addition, the Bucharest Judgment was allegedly entered into in 1983, long before the Romanian government was democratized, and therefore this Court cannot find that the Bucharest Judgment was achieved "under a system of jurisprudence likely to secure an impartial administration of justice," Restatement (Second) of Conflict of Laws § 98 cmt c, especially because [defendant] has submitted no evidence upon which this Court could base such a finding.

Id. at 426 (emphasis added).

Indeed, no case of which we are aware has decided a comity defense on a motion to dismiss – one way or the other – where fraud or court corruption has been alleged. See, e.g., Bridgeway Corp. v. Citibank, 45 F. Supp.2d 276 (S.D.N.Y. 1999) (summary judgment motion to enforce Liberian Judgment denied); S.C. Chimexim, S.A. v. Velco Enters. Ltd., 36 F. Supp. 2d 206 (S.D.N.Y. 1999) (summary judgment granted to post-soviet Romanian money judgment); Hilton v. Guyot, 159 U.S.113 (1895) (at trial, defendant's offers of proof on fraudulent French judgment refused; Supreme Court remands with instructions to allow introduction of evidence).

Plaintiffs have alleged pervasive corruption in the Russian court system and specific corruption in the proceedings defendants assert preclude this case. In addition to the allegations in the Complaint, which are sufficient to defeat defendants' Rule 12(b)(6) comity motion,

107

plaintiffs have submitted a cavalcade of evidence of fraud in those proceedings and the partiality

of Russia's judicial system. Even under a summary judgment standard, let alone on the basis of

a Rule 12(b)(6) motion, that evidence is sufficient to defeat this motion.

**B.    This Court Should Not Extend Comity to the Decisions of the Russian Courts Because Those Decisions Were Procured by Fraud in an Unfair System and to Do So Would be Contrary to US Interests**

In Pravin Banker Assoc., Ltd. v. Banco Popular Del Peru, 109 F.3d 850 (2d Cir. 1997),

the Second Circuit explained that comity is a "rule of practice, convenience, and expediency,

rather than of law." Id. at 854 (internal quotation omitted). There are several circumstances in

which US courts will not recognize the decisions of a foreign proceeding if: (1) the foreign

forum does not offer "a full and fair trial . . .under a system of jurisprudence likely to secure an

impartial administration of justice," Hilton v. Guyot, 159 U.S. at 202-03, or does not operate

under a system which "abides by fundamental standards of procedural fairness," Allstate Life

Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 999 (2d Cir. 1993) (quotation omitted); (2) there

was "fraud in procuring" a judgment in a foreign forum, Hilton, 159 U.S. at 202; Alesayi

Beverage Corp. v. Canada Dry Corp., 947 F. Supp. 658, 663 (S.D.N.Y. 1996), judgment aff'd,

122 F. 3d 1055 (2d Cir. 1997); or (3) recognizing the foreign decision or proceeding would be

contrary to the policies or prejudicial to the interests of the US." Pravin Banker, 109 F.3d at

854.[50]

---

[50]    Similar rules obtain in the context of foreign bankruptcy proceedings. Thus, pursuant to "general principles of comity as well as the specific provisions of [Bankruptcy Code] section 304, federal courts will recognize foreign bankruptcy proceedings provided that foreign laws comport with due process and fairly treat claims of local creditors." Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 714 (2d Cir. 1987). Comity will not be extended unless the moving party can prove that the "proceedings do not violate the laws or public policy of the US" and that the foreign proceedings "abide by fundamental standards of procedural fairness." Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 249 (2d Cir. 1999).

SSL-DOCS2 70070518v7

Here, defendants cannot prevail on their comity defense because plaintiffs have alleged (and supported with fact and expert declarations) evidence to support any one of the three grounds for denying a comity motion set forth above.

### 1.    The Russian Judicial System Is Not Fair and Impartial

We will not repeat what we have already detailed concerning corruption and the fundamental unfairness of adjudicating plaintiffs' claims in Russia.  See supra Point II.C.  Under a Rule 12(b)(6) standard, it would be inappropriate for this Court to resolve these issues at this stage of the proceedings in the context of these motions.  Putting that aside, at a minimum, plaintiffs and defendants have offered conflicting evidence concerning the fairness of the Russian judicial system, which raises genuine issues of fact that cannot be resolved at this time, let alone without discovery.

### 2.    The Russian Proceedings Were Permeated With Fraud

It is well established that even if a foreign judicial system abides by fundamental standards of fairness, a judgment or decision of a foreign court will not be recognized if the decision or judgment was "fraudulently obtained."  Hilton, 159 U.S. at 206; Bridgeway Corp. v. Citibank, 45 F. Supp.2d 276, 285 (S.D.N.Y. 1999), aff'd, 201 F.3d 134 (2d Cir. 2000); S.C. Chimexim S.A., 36 F. Supp.2d at 211; Alesayi Beverage Corp., 947 F. Supp. at 663.[51]  To this end, the Restatement (Third) of Foreign Relations Law provides that "a court in the US need not recognize a judgment of the court of a foreign state if . . . (c) the judgment was obtained by fraud."  Restatement (Third) of Foreign Relations Law § 482(2)(c) (1987).

---

[51]    The Second Circuit rejected any distinction between intrinsic or extrinsic fraud in Gleason v. Jandrucko, 860 F.2d 556, 560 (2d Cir. 1988).  In any case, bribery or improper influence of judges, concerted fraudulent conduct by attorneys, and fraud by court officers, such as bankruptcy managers, certainly constitutes extrinsic fraud on the court.

109

As the Second Circuit ruled in <u>Diorinou v. Mezitis</u>, 237 F.3d, 133 (2d Cir. 2001),
"[a]lthough deference as a matter of comity often entails consideration of the fairness of a
foreign adjudicating system, a case specific inquiry is sometimes appropriate." 237 F.3d at 143
(citation omitted); <u>see</u> <u>also</u> <u>de la Mata v. American Life Ins. Co.</u>, 771 F. Supp. 1375 (D. Del.
1991), <u>aff'd</u>, 961 F.2d 208 (3d Cir. 1992) (court refused to recognize Bolivian judgment on
ground that it was "tainted with fraud" where plaintiff failed to disclose certain information to
Court). The <u>Diorinou</u> court relied, in part, upon the Restatement (Third) of Foreign Relations
Law § 483 cmt. b., <u>see</u> <u>Diorinou</u>, 237 F.3d at 143, which provides as follows: "Evidence that the
judiciary was dominated . . . by an opposing litigant . . . would support a conclusion that a legal
system was one whose judgments are not entitled to recognition. . . . Also, a particular case may
disclose such defects as to make the particular judgment not entitled to recognition."

Applying these principles here, plaintiffs' allegations that the Russian decisions were
obtained by fraud and in corrupted courts should be assumed to be true, which is sufficient to
defeat the motion. Alternatively, plaintiffs have submitted an abundance of evidence, including
fact and expert declarations, supporting their allegations that the decisions were obtained by
fraud in corrupted courts, which, at a minimum, creates genuine issues of fact, without even
taking into account that plaintiffs have yet to obtain fact discovery.

### 3.    Recognition of the Russian Judgments Would Be Contrary to the Interests of the US

It is blackletter law that a court should not recognize a foreign decision or proceeding if
recognition "would be contrary to the policies or prejudicial to the interests of the US." <u>Pravin</u>
<u>Banker Assoc., Ltd.</u>, 109 F.3d at 854.[52] Here, the US' interests include the application of the

---

[52]    NKAZ cites the Second Circuit's decision in <u>Finanz AG Zurich v. Banco Economico</u>, 192
F.3d 240, 246 (2d Cir. 1999) to suggest that the Court need only be "satisfied that the rights

SSL-DOCS2 70070518v7

RICO statute to prohibit parties – eight of which are US citizens or companies – from engaging in racketeering acts in the US, using US financial institutions to commit those acts, and harming US (and foreign) companies through their illegal enterprise activities. See Panix Promotions Ltd. v. Lennox Lewis, No. 01 Civ. 2709 (HB), 2002 WL 72932, at *4 (S.D.N.Y. Jan. 17, 2002) (RICO must be "read broadly" and "liberally construed to effectuate its remedial purposes," encompassing organized crime and other racketeering activity); Alfadda v. Fenn, 935 F.2d 475 (2d Cir. 1991) (RICO applies to foreign defendants and to foreign enterprises).

Were the Court to defer to the Russian proceedings, these important interests would not be served. As detailed herein at great length, defendants, eight US and several foreign citizens and entities, committed mail and wire fraud in the US, used funds wired from the US to bribe Russian officials, laundered money in the US, made threats to carry out their illegal acts in the US, and murdered a US citizen. Defendants should not be permitted to hide behind decisions of the Russian judicial system, which were fraudulently obtained through defendants' racketeering activity, to avoid responsibility for their RICO violations.

## C.    The Res Judicata and Collateral Estoppel Branch of the Comity Doctrine Either Does Not Apply or Has Not Been Satisfied

As the Second Circuit explained in Diorinou v. Mezitis, 237 F.3d 133, 139 (2d Cir. 2001), there are a variety of concepts which fall under the concept of comity, including when "a domestic court considers whether to accept the adjudication of a foreign tribunal on a cause of action or a particular issue." Id. at 139-40. As the court recognized, this branch of the comity

---

of United States citizens would not be prejudiced." NKAZ Comity Mem. at 15. This point ignores that this case is brought by three US companies, and that in Finanz the Second Circuit, quoting Hilton, recognized that the Court should be equally concerned about "the rights of . . . other persons who are under the protection of its laws." Id.

SSL-DOCS2 70070518v7

doctrine is akin to collateral estoppel and res judicata, see id. at 140, and courts require parties asserting this type of comity defense to plead and prove all the required elements of these affirmative defenses. See, e.g., Alfadda v. Fenn, 966 F. Supp. 1317, 1325 (S.D.N.Y. 1997), judgment aff'd, 159 F.3d 41 (2d Cir. 1998) (defendants sought recognition of French judgment in action involving federal question, Court engaged in issue preclusion or collateral estoppel analysis under federal common law); Alesayi Beverage Corp. v. Canada Dry Corp., 947 F. Supp. 658, 664-66 (S.D.N.Y. 1996) (conducting res judicata and issue preclusion analysis of Saudia Arabian judgments and concluding that collateral estoppel did not bar litigation of issue in the US that had been litigated in Saudi Arabia), aff'd, 122 F.3d 1055 (2d Cir. 1997); Gordon and Breach Sci. Publishers S.A. v. Am. Inst. of Physics, 905 F. Supp. 169, 179 n.9 (S.D.N.Y. 1995) (refusing to give preclusive effect to Swiss and German judgments).

Although defendants' comity motion falls under this branch of the comity doctrine, they fail to address it in these terms. We do so below, and their motion should be denied.

### 1.    These Defenses Cannot Be Resolved at this Stage of the Proceedings Because Plaintiffs Allege that the Judgments Were Procured by Fraud in Corrupted Courts

For the reasons explained in Allstate Ins. Co., supra Point III.A, issues concerning the adequacy of a judicial system and whether defendants obtained judgments through fraud cannot be resolved on a summary judgment motion, let alone on a motion to dismiss, where plaintiffs have made the allegations and presented the evidence in this record. This result is all the more appropriate here where defendants have not provided any discovery, except two depositions limited to general issues concerning the Russian courts.

A - 425

2.    **Defendants' Comity Motion Should be Denied Because**
      **Russian Law Applies and Defendants Have Failed to**
      <u>**Offer any Evidence of the Applicable Russian Law**</u>

The decision as to whether federal or state law choice of law rules control (and then

which law governs the underlying issue) is a difficult one, particularly in the instant case, where

the court exercises federal question over the RICO claims, and diversity and supplemental

jurisdiction over the non-RICO causes of action. The case law is conflicting and confusing. <u>See</u>

<u>generally</u> <u>Alfaada v. Fenn</u>, 966 F. Supp. 1317 (S.D.N.Y. 1997), <u>judgment aff'd</u>, 159 F.3d 41 (2d

Cir. 1998). Though <u>Alfaada</u> ultimately held that the Court should apply federal choice of law in

a federal question case, and then applied federal common law on the underlying issue, other

courts have held that foreign law should apply to the underlying issue, <u>see</u> <u>id</u>. at 1327, as has the

Restatement (Third) of Foreign Relations Law, <u>see</u> Restatement (Third) Foreign Relations Law §

481 cmt. c (1986) ("As in the case of a sister-State judgment, a judgment of a foreign country

ordinarily has no greater effect in the US than in the country where the judgment was

rendered."); <u>see</u> <u>also</u> Restatement (Second) of Conflict of Laws § 98 cmt. f (Pocket Part 1988)

Without engaging in a lengthy and detailed analysis of these issues – given defendants'

failure to address either – we respectfully submit that federal choice of law should govern the

RICO claim and that under federal choice of law, Russian law should govern a determination of

the preclusive scope (if any) of the Russian judgments and decisions. <u>See</u> Restatement (Third)

Foreign Relations Law § 481 cmt. c; <u>see</u> <u>also</u> <u>Watts v. Swiss Bank Corp.</u>, 27 N.Y.2d 270 (1970).

Importantly, however, this case involves a further complicating factor, as plaintiffs have also

invoked supplemental jurisdiction with respect to the non-RICO claims, and diversity

SSL-DOCS2 70070518v7

jurisdiction likely exists.[53]  See Complaint Counts XIII-XV.  To the extent that defendants'

comity motion seeks dismissal of these claims, the choice of law rule with respect to diversity

cases is more appropriate.  Under that rule, federal courts look to the choice of law rule of the

forum state.  New York law, in turn, looks to the law of the foreign state for purposes of

determining what, if any, preclusive effect to give a foreign judgment.  See Voreep v. Tarom

Romanian Air Transport, No. 96 Civ. 1384 (LMM), 1999 WL 311811, at *3-*4 (S.D.N.Y. May

18, 1999).

        Accordingly, Russian law should govern what preclusive effect, if any, to give to the

various decisions defendants rely upon.  Defendants, however, have not offered any arguments,

expert or otherwise, on what that law is, though it was their burden to do so.  See, e.g. In re

Circle Trading Corp., 26 F.2d 193, 195 (2d Cir. 1928) (party relying on foreign law had burden

of proof to establish its position); In re Application of Chase Manhattan Bank, 191 F. Supp. 206,

209 (S.D.N.Y. 1961) ("The party relying on foreign law has the burden of proof.  It must

establish precisely what the law is and how it is interpreted.  Generally affidavits are the minimal

formal requirements."), aff'd, 297 F.2d 611 (2d Cir. 1962).  Because defendants have not met

their burden of proving the applicable Russian law, their motion should be denied.

**a.    Plaintiffs' Claims Are Not Barred Under the Russian
Russian Law of Res Judicata Because the Parties to
<u>this Litigation Were Not the Parties to the Russian Litigations</u>**

        Plaintiffs have obtained an expert declaration from Professor Tamara Abova, who is the

head of the Civil Research Center at the Institute of State and Law of the Russian Academy of

---

[53]  Plaintiffs do not know the state of incorporation or principal place of business for defendant
Pan-American Corp, though we know it is incorporated in a state in the United States.  See
Complaint ¶ 54.  Once plaintiffs are able to determine these facts, and assuming they support
an allegation of diversity, we will seek leave to amend the Complaint accordingly.  See 28
U.S.C. § 1653.

Sciences.  She is the author of more than 120 articles on Russian law.  As the Second Abova

Declaration and Russian statutes cited therein make clear, in order for a decision to have res

judicata claim preclusion effect, it must be between the same parties, on the same subject, and on

the same cause of action actually decided in the matter.  See Second Declaration of Tamara

Abova ¶¶ 8-20.  Based on this standard, Russian res judicata principles (and collateral estoppel)[54]

do not apply, as explained below.

### i.    BMT SA's, BMT LTD.'s, and Alucoal's Claims

None of the defendants to BMT SA's , BMT Lad's, and Alucoal's claims in this action

were parties to the NKAZ bankruptcy, with the exception of Sibirsky, which was a party only in

regard to its fabricated creditor claims.  However, BMT Ltd. and Alucoal were no longer parties

to the NKAZ bankruptcy at that point, or thereafter when the final judgment approving the

settlement agreement was entered, because their claims had been improperly denied by

Chernyshev.  Thus, res judicata under Russian law cannot bar their claims.  As for BMT SA,

defendants cite to no decisions of the Russian courts, let alone a judgment, in which BMT SA

and Sibirsky were adverse parties.  Thus, res judicata does not apply to BMT SA in regard to

Sibirsky.

Furthermore, in regard to all of the Aluminum Plaintiffs, including MIKOM, defendants'

corruption of the NKAZ bankruptcy was not litigated in the proceedings defendants rely upon.

As a result, the claims in the Russian proceedings litigated by the Aluminum Plaintiffs do not

concern the "same matter" and the "same grounds," and, therefore, the Russian judgments or

---

[54]    To the extent that Russian law provides for collateral estoppel, it also requires the parties to
be identical.  See Second Abova Declaration ¶ 8-20.

SSL-DOCS2 70070518v7

decisions have no preclusive effect under Russian law.[55]

### ii.    MIKOM's Claims

None of the defendants to MIKOM's claims in this action were party to the NKAZ bankruptcy, except NKAZ as a participant in its own bankruptcy, and Sibirsky in regard to its fabricated creditor claims. As for NKAZ, defendants cite to no Russian judgments where MIKOM was adverse to NKAZ. To the contrary, MIKOM and NKAZ asserted the same position in opposing the bankruptcy and MIKOM's removal as manager of NKAZ. Only Kuzbass and Chernyshev were adverse in that action, not NKAZ. As for Sibirsky, defendants again cite to no judgments where MIKOM and Sibirsky were both parties. Like BMT Ltd and Alucoal, none of MIKOM's claims were recognized by Chernyshev, and MIKOM was therefore no longer a party to the NKAZ proceedings by the time the final judgment approving the settlement agreement was rendered. Thus, res judicata does not apply to MIKOM's claims.

### iii.    The Vanadium Plaintiffs' Claims

None of the defendants to the Vanadium Plaintiffs' claims in this action were parties to any action in Russia where the Vanadium Plaintiffs were also parties. The Russian concept of res judicata is therefore simply inapplicable.

**3.    Even if US Law Applies, Neither Res Judicata nor Collateral Estoppel Applies Because the Parties Are Not Identical, Plaintiffs Did Not Litigate Many of the Issues Raised Here and the Russian System Did Not Provide for a Full and Fair Opportunity to Resolve the Claims**

To the extent the Court determines to apply the US law of res judicata, or the even broader concept of collateral estoppel, a party seeking to prevail on this defense must

---

[55] NKAZ argues that the Aluminum Plaintiffs' claims for lost profits is barred under Russian law because the contracts were repudiated by Chernyshev. See NKAZ Comity Mem. at 11-13. However, as explained herein, if the Russian proceedings were corrupted, particularly by Chernyshev, such a limitation on damages would obviously not apply.

116

demonstrate that: (1) "the issues of both proceedings [are] identical, (2) the relevant issues were

actually litigated and decided in the prior proceeding, (3) there must have been a full and fair

opportunity for the litigation of the issues in the prior proceeding, and (4) the issues were

necessary to support a valid and final judgment on the merits." Alfadda, 966 F. Supp. at 1330;

see also Alesayi, 947 F. Supp. at 666 ("[T]he party seeking the benefit of collateral estoppel

bears the burden of proving that the issues resolved in a prior proceeding and those raised

currently are identical").[56]    The requirement that the party had a full and fair opportunity to

litigate "is constitutionally mandated; when parties currently before an American court were not

parties to the foreign action, the Due Process Clause prohibits application of the rule of collateral

estoppel against them." Gordon and Breach Sci. Publ., S.A. v. Harwood Academic Publ., 905 F.

Supp. 169, 179 n.9 (S.D.N.Y. 1995).

> **a.    Plaintiffs Did Not Have a Full and Fair Opportunity
> to Litigate in Russia Because of the Inadequate Russian
> Judicial System and the Fraud Perpetrated by Defendants**

Again, we have addressed at length the procurement by fraud of the judgments

defendants rely upon, and the corruption in the Russian courts. See supra Points II.C, III.B.

Thus, the motion should be denied, whether this Court adopts a Rule 12(b)(6) standard, as it

should, or the summary judgment standard. In addition, in Parklane Hosiery Co. v. Shore, 439

U.S. 322 (1979), the Supreme Court recognized that it would be unfair to apply collateral

estoppel if a party was forced to litigate in a forum "and . . . was unable to engage in full scale

discovery or call witnesses . . . [and where the] differences in available procedures may

sometimes justify not allowing a prior judgment to have estoppel effect in a subsequent action

---

[56]  In Alesayi, the Court noted that issues are not identical if "the standards governing them are
significantly different." Id.

SSL-DOCS2 70070518v7

even between the same parties." <u>Id.</u> at 331 n.5. In the instant case, all plaintiffs were forced to litigate in Russia, where discovery, the right to cross-examine witnesses, and the right to compel witnesses, among other basic procedural benchmarks, is essentially non-existent. Thus, for this reason as well, it would be inappropriate to give res judicata or collateral estoppel effect to the Russian judgments.

**b.     Plaintiffs Did Not Actually Litigate Many of the Issues Raised by Defendants, and to the Extent Litigated, the <u>Russian System Did Not Provide for Appellate Review</u>**

Application of collateral estoppel also requires that the issues on which defendants seek to preclude litigation have been "actually litigated and decided" in prior proceedings. With respect to each plaintiff, a host of issues raised in this action have not been litigated in the Russian proceedings:

- <u>BMT SA</u>: Although BMT SA's claims were accepted in the NKAZ bankruptcy, its breach of contract claims were never litigated in Russia. Russian law did not permit BMT SA to contest, and BMT SA did not contest, the illegal cancellation of its contracts in the bankruptcy. <u>See</u> Zankovsky Dec. ¶¶ 108-111.

- <u>BMT Ltd.</u>: BMT Lad's claims were illegally rejected in the NKAZ bankruptcy in court proceedings for which it never received notice. <u>See</u> Golubev ¶¶ 128-34. Russian law did not provide for appellate review of this proceeding, <u>see id.</u> ¶ 130 n.25, and defendants do not assert that Russian law permitted BMT Ltd. to contest, and BMT Ltd. did not contest, the illegal cancellation of its contracts in the bankruptcy. In fact, defendants expressly admit that such claims were preserved following the termination of the bankruptcy. <u>See</u> Stephan Dec. ¶ 31.

- <u>Alucoal</u>: Alucoal's claims were illegally setoff and its contracts illegally terminated in the NKAZ bankruptcy. Defendants do not assert that Russian law permitted Alucoal to contest, and it did not contest, the illegal cancellation of its contracts in the bankruptcy. In fact, defendants expressly admit that such claims were preserved following the termination of the bankruptcy. <u>See</u> Stephan Dec. ¶ 31.

- <u>MIKOM</u>: MIKOM's contract with NKAZ was illegally terminated in the bankruptcy proceeding. MIKOM's claim for the illegal cancellation of its management contract was never contested in the bankruptcy because the contract provided for arbitration in Moscow. However, the false criminal charges and threats of violence against Mikhail Zhivilo, MIKOM's principal, and his brother, Yuri,

118

**A - 431**

render arbitration against NKAZ in Russia impossible.[57]  See supra Point II.D.1.b.

- Davis:  Davis' shares in GOK were illegally transferred as a result of a power of attorney which was forged by defendants.  See Traum Dec. ¶¶ 21-22.  There has been no litigation in Russia or any other forum on its claims, other than the instant action.

- Holdex:  Holdex's shares in GOK were illegally transferred in a Russian proceeding to which it was not made a party in blatant violation of Russian law, as set forth in the accompanying Kleymenov Declaration.  See Kleymenov Dec. ¶¶ 17-50.  Holdex has not been a party to a Russian proceeding which determined that it was not the owner of these shares.  See Rieger (Holdex) Dec. ¶¶ 7-13; Chervinsky Dec. ¶¶ 16-17.

- Foston:  Foston's shares in GOK were illegally transferred in Russian proceedings for which it never received notice, though it was named as a party on the face of the pleading.  At these proceedings, Foston was fraudulently represented by an unauthorized individual.  These violations of Russian law are explained in greater detail in the accompanying Kleymenov Declaration.  See Kleymenov Dec. ¶¶ 66-94.  Foston has not been a party to a Russian proceeding which determined that it was not the owner of these shares.  See Ashikhmina Dec. ¶¶ 22-57.

- Omni:  Omni's shares in GOK were illegally transferred in a Russia proceeding to which it was not made a party in blatant violation of Russian law, as set forth in the accompanying Kleymenov Declaration.  See Kleymenov Dec. ¶¶ 51-65.  Omni has not been a party to a Russian proceeding which determined that it was not the owner of these shares.  See Rieger (Omni) Dec. ¶¶ 3-12.

- Nexis:  Nexis' claim was illegally rejected in the GOK bankruptcy, and Russian law did not provide for appellate review of this decision.  See Telyukina Dec. ¶ 88.  Its breach of contract claims were never litigated in Russia and defendants expressly admit that such claims were preserved following the termination of the bankruptcy.  Stephan Dec. ¶ 31.

- Polyprom:  Polyprom's contracts with GOK were illegally cancelled in the GOK bankruptcy.  Under Russian law, Polyprom did not have a right to contest and did not contest this illegal conduct.  In fact, defendants expressly admit that such claims were preserved following the termination of the bankruptcy.  See id., Stephan Dec. ¶ 31.

    c.    **The Parties are Not Identical**

    As we explained supra, the parties to this litigation and the litigations defendants rely

---

[57]  See Continental Grain Export v. Ministry of War-Etka, 603 F. Supp. 724 (S.D.N.Y. 1984) (forum selection clause unenforceable that would require plaintiffs to litigate in Iranian courts that were hostile and biased toward their claims).

119

upon are not identical, see supra Point II.C.2.a, and thus res judicata does not apply, see In re

Teltronics Servs., Inc., 762 F.2d 185, 190 (2d Cir. 1985) (res judiciata requires identity of

parties).

**D.     This Court Should Not Defer to the Pending
        Proceedings Related to the Vanadium Shareholder Plaintiffs**

Defendants, in a few undeveloped references, argue that the Court should dismiss this

action on comity grounds in light of proceedings pending in Russia.  See GOK Def. Mem. at 4.

Though defendants do not develop the point beyond that, there are three cases pending in Russia

regarding the illegal transfer of the Vanadium Shareholders' shares in GOK in which these

plaintiffs are named as defendants.  Equally as undeveloped by defendants is the special rule that

attaches to a comity motion where proceedings are pending in a foreign forum.

**1.     This Court Should Not Depart from the General Rule
        that Permits Parallel Proceedings in Different Forums**

In Mastercard Int'l, Your Honor articulated the rule concerning parallel proceedings in

this Circuit, as follows: "'[P]arallel proceedings on the same in personam claim should

ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one

which can be pled as res judicata in the other.'" 2002 WL 432379, at *9 (quoting Laker Airways

Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 926-27 (D.C. Cir. 1984)).  As Your Honor

noted, Laker was cited with approval in the leading Second Circuit case on this issue.  See China

Trade & Development Corp. v. M.V. Choong Yong, 837 F.2d 33, 36 (2d Cir. 1987)).

Though this rule is often raised in the context of an application for an anti-foreign suit

injunction, it is also applicable in the comity context where one party seeks a dismissal on the

ground that a US court should extend comity to a pending foreign proceeding.  See, e.g., United

Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., No. 01 Civ. 2491 (GEL), 2002 WL

389155, at *9 (S.D.N.Y. March 11, 2002) (holding that party invoking comity doctrine should have addressed "principles that guide district courts when deciding whether to abstain from exercising jurisdiction out of deference to parallel proceeding pending in other countries," or "concurrent jurisdiction" and discussing China Trade); US Fidelity and Guaranty Co. v. Braspetro Oil Services Co., No. 97 Civ. 6124 (JGK), 1999 WL 307666, at *18 n.10 (S.D.N.Y. May 17, 1999), aff'd 199 F.3d 94 (2d Cir. 1999) (holding that only in "rare circumstances" will a court abstain from exercising concurrent jurisdiction where the principles of, inter alia, "comity" so require); Herbstein v. Bruetman, 743 F. Supp. 184, 187-88 (discussing China Trade and this rule in the context of a comity motion).

Applying this rule here, defendants have made no showing why any pending proceedings in Russia concerning the Vanadium Shareholders' claims should overcome the strong presumption that parallel proceedings are appropriate. This rule is all the more applicable here given the lack of identity between the parties in this case and in the pending Russian cases, see supra Point II.C.2.a, and because defendants have an established history of manipulating and corrupting judicial proceedings in Russia.

### 2.    None of the Current Defendants Is a Party to the Pending Proceedings

In addition, "comity requires that the parties and issues in both litigations are the same or sufficiently similar, such that the doctrine of res judicata can be asserted." Herbstein, 743 F. Supp. at 188; see also Calzaturificio Rangoni S.p.A. v. US Shoe Corp., 868 F. Supp. 1414, 1419 (S.D.N.Y. 1994). None of the US defendants who fraudulently obtained the GOK shares are parties to the Russian proceedings.

### 3.    This Court Should Not Defer to the Pending Proceedings Because Defendants Have Already Corrupted these Proceedings

For the reasons already discussed above, this Court should not defer to pending

SSL-DOCS2 70070518v7

proceedings in Russia, given the corrupted nature of the Russian courts, and defendants' role in this corruption. See supra Point III.C.2.

# IV

## Plaintiffs Have Standing to Assert their RICO Claims

Defendants maintain that plaintiffs do not have standing to assert a RICO claim because (a) "the bulk of the so-called predicate acts that Plaintiffs allege consist of foreign conduct and are not predicate acts within the meaning of RICO," and (b) Plaintiffs purportedly have failed to allege that their injuries were "factually or proximately caused" by predicate acts occurring in the US. See Def. SMJ Mem. at 19. Nothing could be further from the truth.

Defendants' first argument should be rejected out of hand for the reasons discussed supra, Point I.B.1; namely, this lawsuit consists of numerous predicate acts committed in the US and therefore it is not necessary to consider the predicate acts that occurred outside the US. Nonetheless, criminal acts perpetrated abroad, and as part of a scheme to defraud, are actionable under RICO and constitute RICO predicate acts, as a recent decision in this District specifically held. Equally meritless is defendants' assertion that plaintiffs do not have standing to assert a RICO claim because of a failure to allege causation. The Complaint is replete with allegations which demonstrate a direct causal link between the defendants' criminal conduct and plaintiffs' injuries.

## A.    Predicate Acts Occurring Outside the US Are Sufficient to Confer Standing

Contrary to defendants' assertions, unlawful acts that occur in a foreign country constitute predicate acts within the meaning of RICO. In Wiwa v. Royal Dutch Petroleum Co., No. 96 Civ. 8386 (KMW), 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002), defendants, like the defendants here, sought dismissal of plaintiffs' RICO claims on the ground that the predicate acts

122

alleged by plaintiffs – bribery, murder, arson and extortion – are "invalid because they occurred in Nigeria and thus do not plead violations of the laws of a state or the US." Id. at *24.

Rejecting defendants' arguments, the court held in unmistakable terms that "allegations of predicate acts outside of the US are sufficient to meet the requirements of § 1962(c)." Id. at * 82. Reasoning from Second Circuit precedent, the court held that the location of the predicate acts "is best categorized as a procedural obstacle to conviction of the sort that plaintiffs are not required to satisfy in order to allege a predicate act under RICO." Id. (emphasis added) (citing United States v. Coonan, 938 F.2d 1553, 1564 (2d Cir. 1991)). The court followed Second Circuit reasoning "that 'under RICO . . . state offences are included by generic designation' and that 'references to state law serve merely a definitional purpose, to identify generally the kind of activity made illegal by the statute.'" Id. (quoting United States v. Bagaric, 706 F.2d 42, 62 (2d Cir. 1983), abrogated on other grounds by, National Org. for Women, Inc. v. Scheidler, 510 U.S. 249 (1994)). Here, the few predicate acts that do not vest this Court with subject matter jurisdiction, see supra Point I.B.1.A, certainly meet the "generic definition" of murder and bribery: Defendants unjustifiably killed people and transferred money to public officials in return for illegal favors.

The Wiwa Court also observed that "it would make little sense for the Second Circuit to endorse a subject matter jurisdiction test for RICO [the effects test] that contemplates 'conduct occurring outside the US' if such conduct could not form the predicate acts necessary to plead a RICO claim." Id. (quoting North South Finance, 100 F.3d at 1052). Accordingly, any of the few predicate acts that do not confer subject matter jurisdiction upon the Court and that took place outside the US constitute RICO predicate acts because they had a substantial effect in the US. See supra Point I.C.2.

123

**B.**     **Plaintiffs Allege a Direct Relationship**
           **Between the RICO Violations and their Injuries.**

A plaintiff has standing to assert a RICO claim if there are allegations of: (1) racketeering activity in violation of section 1962; (2) "injury to business or property;" and (3) causation of the injury "by a pattern of racketeering activity violating section 1962 or by individual RICO predicate acts." Hecht v. Commercial Clearing House, Inc., 897 F.2d 21, 23 (2d Cir. 1990). In connection with the causation requirement, a plaintiff must demonstrate both "but for" and proximate causation. Id. This requires evidence of a "direct relation between the injury asserted and the injurious conduct alleged." See Holmes v. Sec. Investor Prot. Corp., 503 U.S. 268, 112 S.Ct. 1311, 1318 (1992). The "critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party." Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 238-39 (2d Cir. 1999), cert. denied, 528 U.S. 1080 (2000).

Defendants do not maintain that plaintiffs have alleged an injury derivative of an injury to a third party. Nor do they assert that plaintiffs have failed to allege a direct causal connection between the predicate acts that occurred in Russia and plaintiffs' injury. Instead, having argued that this Court should not consider extra-territorial criminal acts as RICO predicate acts, defendants maintain that plaintiffs lack standing because they have not alleged a direct relationship between any predicate acts committed in the US and plaintiffs' injury. See Def. SMJ Mem. at 21-22.

Defendants ignore a host of allegations that establish a direct relationship between a pattern of racketeering activity and plaintiffs' injury. Thus, the Complaint alleges a scheme "to take over and monopolize the Russian aluminum and other metals industries," which was accomplished through murder, bribery, extortion, mail and wire fraud, and money laundering,

including "threats of physical violence, mail and wire fraud, and money laundering in the US in furtherance of the Illegal Scheme." Complaint ¶¶ 1-3.

Among other things, the Complaint alleges: (1) numerous acts of extortion relating to both NKAZ and GOK, see Complaint ¶¶ 443-453, including threats by Deripaska and Chernoi, which caused BMT Ltd. and Alucoal to pay protection money, and threats to kill Khaidarov and various directors of GOK if they did not permit the defendants to wrest ownership of GOK from the Vanadium Shareholders, id.; (2) numerous acts of bribery, including payments of millions of dollars to bribe Tuleyev and Roussel, which led directly to defendants' illegal seizure of NKAZ and GOK, see id. ¶¶ 454-459; (3) numerous acts of mail and wire fraud, including the use of the US mail and wire to bribe Tuleyev, Roussel, and GOK directors in order to seize control of NKAZ and GOK, and to establish New Start, Venitom, Unidale and InvestLand, resulting in the parking of the Vanadium Shareholders' stock in those entities, see id. ¶¶ 460-481; and (4) numerous acts of money laundering, illegal transactions in monetary instruments, and Hobbs Act violations, see id. ¶¶ 482-506.

As the Complaint also makes clear, plaintiffs have alleged a "direct relation between the injur[ies] asserted and the injurious conduct alleged." Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268, 1318 (1992). Far from "derivative of an injury to a third party," Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 238-39 (2d Cir. 1999), cert. denied, 528 U.S. 1080 (2000), the damages sustained by plaintiffs were suffered by the plaintiffs directly, which is not surprising, given that plaintiffs were the intended targets and victims of defendants' scheme.

Put simply, defendants extorted money from plaintiffs, threatened plaintiffs with physical harm in order to insure that these payments would continue to made, bribed officials to effect

125

illegal takeovers of legitimate businesses with whom plaintiffs had business relationships,

fraudulently transferred shares of companies in order to wrest control of businesses away from

plaintiffs and finally, and among other illegal acts, transferred and laundered funds obtained

through this illegal scheme through banks in the US for purposes of preventing plaintiffs from

obtaining said funds. Accordingly, plaintiffs easily satisfy the RICO standing requirement

because these acts directly caused plaintiffs to suffer harm.

V

**Plaintiffs Satisfy Their Pleading Obligations
Because the Complaint Is More than Sufficiently Detailed
<u>and Because RICO's Pleading Elements Have Been Specifically Alleged</u>**

In a shotgun approach, and with little analysis, defendants attack the Complaint for

failure to comply with Federal Rules of Civil Procedure 9(b) and 12(b)(6). Defendants alternate

between misreading the Complaint and misapplying the little case law they cite. As we

demonstrate below, plaintiffs have more than met their pleading burden in this case.

**A.     The Complaint Provides More than
        <u>Sufficient Detail to Satisfy Rule 9(b)'s Pleading Requirements</u>**

In ruling upon a motion to dismiss under Rule 9(b), a district court must view the

complaint in the light most favorable to the plaintiff, accept all allegations contained therein as

true and draw all reasonable inferences in favor of the plaintiff. See <u>McLaughlin v. Anderson</u>,

962 F.2d 187, 192 (2d. Cir. 1992). Only plaintiffs' fraud allegations are subject to the strictures

of Rule 9(b); the RICO claims and the other predicate acts on which they are based need not be

pled with any particularity. See, e.g., <u>Hecht v. Commerce Clearing House, Inc.</u>, 897 F.2d 21, 26

n. 4 (2d. Cir. 1990) (refusing to apply 9(b) standards to RICO conspiracy allegation); <u>Mezzonen</u>

<u>v. Wright</u>, No. 97 Civ. 9380 (LMM), 1999 WL 1037866, *8 (S.D.N.Y. Nov. 16, 1999) (money

laundering); <u>McLaughlin</u>, 962 F.2d at 194 (extortion).

126

1.    **Plaintiffs Have Not Engaged in
       Impermissible Group Pleading**

Defendants' complaints about alleged impermissible "group pleading" are belied by their

own specific attack on the allegations in the Complaint, and reveal a fundamental

misunderstanding of Rule 9(b). Defendants engaged in a highly complex scheme to take over

the aluminum and vanadium industries in Russia, the exact parameters of which plaintiffs could

not possibly know without discovery – discovery that defendants have repeatedly resisted. But

rather than deny the allegations and defend the claims on the merits, defendants excerpt isolated

language from the Complaint in an effort to create generalities from specifics, vagueness from

detail. As we demonstrated below, the Complaint satisfies Rule 9(b).

a.    **Plaintiffs' Specific Allegations of Fraud Apprise
       Each Defendant of its Role in the Scheme**

Rule 9(b) is not designed to be an insurmountable pleading hurdle, shielding defendants

from liability for their fraudulent conduct. Rather, it is a procedural mechanism designed to

ensure that defendants are adequately apprised of their wrongdoing.[58] See Ross v. Bolton, 904

F.2d 819, 823 (2d Cir 1990). In this respect, it is essential that Rule 9(b) be read "together with

Rule 8(a), which calls for a 'short and plain statement' of claims for relief." DiVittorio v.

---

[58]    Defendants stress one of the other theories often cited to support the heightened standards of
Rule 9(b), a concern for the reputational interests of defendants and the stigmatizing effect of
RICO allegations. See Def. SMJ Mem. at 24. In opposing defendants' motion for a gag
order, we established that defendants are in no position to complain that their reputations
have been tarnished by this lawsuit. More recently, the front page of the New York Times
described how defendant Deripaska continues to take over companies using the same
techniques of violence and corruption he used in this case. The article discusses Deripaska's
efforts to take over a large pulp and paper mill, and how Deripaska and others are "seeking to
entwine their companies with the West" and, quoting a Russian politician, how "[t]here is
much manipulation in the courts and law enforcement[.] It is a kind of corporate, partly
criminal system - a legal marriage between business and power." See Sabrina Tavernise,
Handful of Corporate Raiders Transform Russia's Economy, N.Y.T., August 13, 2002,
Bernard Dec. Ex. 29.

Equidyne Extractive Industries, Inc., 822 F.2d 1242, 1247 (2d Cir 1987) (citation omitted).

The best proof of plaintiffs' compliance with Rule 9(b) is the voluminous and highly specific fact affidavits defendants submitted in moving to dismiss, including the declarations of Sergei Chernyshev (166 paragraphs, 150 exhibits), Oleg Kozyrev (59 paragraphs, 37 exhibits) and Samir Kapura (126 paragraphs, 57 exhibits). See, e.g., Pellman v. Cinerama, Inc., 503 F. Supp. 107, 111 (S.D.N.Y. 1980) (denying Rule 9(b) motion in part because "[d]efendants' vigorous factual attack on the allegations demonstrates that they have ample information with which to present their defense, and they can acquire additional details in discovery").

In any event, the Complaint contains detailed allegations with respect to each defendant's involvement in the overall RICO scheme and the underlying predicate acts. Paragraph 524 of the Complaint, for example, identifies each individual defendant, as well as other persons and entities, in separately numbered subparagraphs, and describes each actor's role in the scheme to monopolize the Russian aluminum and vanadium industries. Similarly, the chart annexed as exhibit A to the Complaint diagrams the hierarchy of defendants' Illegal Scheme, and lists each individual defendant's place within that hierarchy. The chart condenses and simplifies an admittedly labyrinthine scheme, but defendants cannot avoid this lawsuit because their machinations were opaque and clandestine.

Briefly, and without recounting all of the detail set forth in the Statement of Facts, the Complaint is replete with allegations specific to defendants Chernoi, Deripaska and Makhmudov. Deripaska, for example, acting on behalf of the conspirators, set up sham companies in the Caribbean to facilitate the takeover of SAZ, see id. ¶¶ 130-34, and threatened Yuri and Mikhail Zhivilo in Chicago, see id. ¶ 165. Among other illegal activity, Chernoi, acting for the conspirators, directed the takeover of KRAZ through murder, see id. ¶¶ 135-39, and

SSL-DOCS2 70070518v7

extorted money from the Aluminum Plaintiffs which was subsequently laundered in the US, <u>see</u> <u>id.</u> ¶¶ 151-59. And Makhmudov, among other things, acting for the Conspirators, extorted Khaidarov, the former Director of GOK, <u>see</u> <u>id.</u> ¶¶ 362-64, and met with Governor Roussel to arrange for his "help" in taking over GOK, <u>see</u> <u>id.</u> ¶ 353. [59]

     The Complaint also supplies detailed allegations with respect to the other individual defendant, New York resident Arnold Kislin. Among other things, Kislin also facilitated the payment of bribes to Governor Tuleyev for his cooperation in the illegal takeover of NKAZ. <u>See</u> <u>id.</u> ¶ 198. Additionally, Kislin formed New Start, Venitom, Unidale and InvestLand, the four US companies to which the Davis Plaintiffs' shares in GOK were fraudulently transferred. <u>See</u> <u>id.</u> ¶ 433.

     Plaintiffs are similarly clear with respect to the role of each corporate defendant in the Illegal Scheme to take over NKAZ and GOK. The corporate defendants are alleged to have furthered the scheme in the following ways, among others:

- <u>Blonde Management, Inc.</u>: Provided corporate credit cards for the use of Chernoi, Deripaska and Makhmudov, <u>see, e.g.,</u> Complaint ¶ 58, 167; laundered money for Chernoi and the other Conspirators, including the laundering of money through New York real-estate investments, <u>see, e.g.,</u> <u>id.</u> ¶¶ 57, 314; and with defendant Pan-American, wired US $850,000 in bribe money to Roussel for his cooperation in the takeover of GOK, <u>see</u> <u>id.</u> ¶ 354.

- <u>Blonde Investments Corp.</u>: In June/July 1999, wired a payment of US $500,000 in bribe money to Tuleyev for his cooperation in the illegal scheme, <u>see</u> <u>id.</u> ¶ 197.

- <u>Pan-American Corp.</u>: In June and July 1999, wired three payments, totaling US $1,000,000, in bribe money to Tuleyev for his cooperation in the illegal scheme, <u>see</u> <u>id.</u> ¶ 196; and with Blonde Management, wired US $850,000 in bribe money

---

[59]  In this respect, Makhmudov acted both on behalf of the other conspirators and as a conspirator himself. Defendants are therefore not "forced to figure out if Plaintiffs are saying that Makhmudov is a representative of the 'Conspirators' or if he is actually a 'Conspirator.'" Def. SMJ Mem. at 26. As Makhmudov and the rest of the defendants well know, he is both.

to Roussel for his cooperation in the takeover of GOK, see id. ¶ 354.

- <u>MDM Bank</u>: Acted as the Russian bank through which money was laundered and bribes were paid to Roussel and Tuleyev, see, e.g., id. ¶¶ 69, 354; and entered into sham transactions that created the false debt that served as the basis for the GOK bankruptcy, see id. ¶¶ 372-85.

- <u>Sibirsky Aluminum</u>: Acted as the conglomerate corporate vehicle through which Deripaska, Chernoi and Makhmudov affected the Illegal Scheme, see, e.g., id. ¶ 52; employed Chernyshev and directed his actions during the NKAZ bankruptcy, see id. ¶¶ 323-31; and through companies it owned or controlled, filed false bankruptcy claims in the NKAZ bankruptcy that Chernyshev accepted, leading to the takeover of NKAZ, see id. ¶¶ 265-68.

- <u>Sibirsky US</u>: Served as the US headquarters of Sibirsky both before and after the takeover of NKAZ, and facilitated the illegal activities of Deripaska, Chernoi and Makhmudov in the US, see id. ¶524(v)(d).

- <u>Bauxal Management S.A.</u>: An affiliate of Sibirsky and Russian Aluminum that sold bauxite and other raw materials to NKAZ post-takeover and engaged in money laundering in order to disguise the source of the proceeds from those sales, see, e.g., id. ¶ 488.

- <u>Metcare Management, S.A.</u>: An affiliate of Sibirsky and Russian Aluminum that sold the aluminum produced by NKAZ post-takeover into US, and engaged in numerous bank transfers in an attempt to conceal and disguise the true owners of the proceeds, see, e.g., id. ¶¶ 487.

- <u>Unimetal Limited, S.A.</u>: An affiliate of Sibirsky[60] and Russian Aluminum that contracted with Sibirsky-affiliate Aziel to sell NKAZ-produced aluminum before Aziel had the nominal right to sell any NKAZ aluminum, thus providing further evidence that the NKAZ bankruptcy was pre-arranged, see id. ¶ 282-85; and sold the aluminum produced by NKAZ post takeover into the US and

---

[60] The exact relationship between Unimetal and Sibirsky, like the relationship between all of the defendants, see supra Point V.A.1.B, has been hidden from plaintiffs by defendants' illegal acts. Defendants' contention, therefore, that the Complaint violates Rule 9(b) because at one point "Unimetal is deemed part of 'Sibirsky' (¶ 52), and yet is later alleged to be separate from 'Sibirsky' (¶¶ 249, 290)," see Def. SMJ Mem. at 26, is ridiculous. There is no inconsistency or confusion. For convenience sake, plaintiffs at times refer to all of the Sibirsky-affiliated companies as "Sibirsky," see Complaint ¶ 52, and later say that Unimetal is "affiliated" with Sibirsky and that there is an "interrelationship" between Sibirsky and its affiliates Aziel and Unimetal, see id. ¶¶249, 290. In any event, discovery, which defendants have strenuously sought to avoid, will clarify what defendants already know about the precise nature of the corporate relationship between Sibirsky and its affiliated companies.

130

engaged in numerous bank transfers in an attempt to conceal and disguise the true owners of the proceeds, see, e.g., id. ¶¶ 487.

- Rual Trade Ltd.: The trading arm of Russian Aluminum, see id. ¶ 71; sold aluminum produced at SAZ, BRAZ, KRAZ and post-takeover NKAZ, and engaged in numerous bank transfers in an attempt to conceal and disguise the true owners of the proceeds, see, e.g., id. ¶ 73.

- Russian Aluminum: Acts as a vertically integrated conglomerate corporate vehicle[61] through which aluminum from SAZ, BRAZ, KRAZ and NKAZ is produced and sold, see id. ¶ 524.

- New Start Group Corp.: Acquired 35 million shares in GOK that belonged to plaintiff Davis International through a fraudulent transfer as part of the illegal scheme to take over GOK, see id. ¶¶ 399-402.

- Venitom Corp., Unidale and InvestLand: Acquired the Davis Plaintiffs' shares in GOK through fraudulent transfers as part of the illegal scheme, see, e.g., id. ¶ 430.

### b. The Complaint Pleads Fraud with Sufficient Particularity Because Information Describing the Exact Parameters of the Fraud is in Defendants' Exclusive Possession

To the extent that the Complaint groups some defendants together with respect to some allegations, there is no violation of Rule 9(b) because such allegations are permissible in complex cases where information concerning the particular fraudulent acts of individual defendants is in defendants' exclusive possession.

In Luce v. Edelstein, 802 F.2d 49 (2d Cir. 1986), plaintiffs charged defendants with securities fraud in connection with a real-estate investment, and referred to them collectively as "defendants" in the complaint. The Court of Appeals held that this was permissible "where, as here, defendants are insiders or affiliates participating in the offer of the securities in question."

---

[61] The Complaint makes clear that Russian Aluminum is the culmination of the Illegal Scheme, and includes all Sibirsky-related entities. See, e.g., Complaint ¶ 72. Defendants' protestations of confusion, see Def. SMJ Mem. at 26, n.21, are baseless.

Id.; see also DiVittorio 822 F.2d at 1247 (recognizing insider/affiliate exception to Rule 9(b));

P&P Marketing, Inc. v. Ditton, 746 F. Supp 1354, 1362 (N.D. Ill. 1990). The insider exception

applies with equal force to RICO claims. See Asdourian v. Konstàntin, 77 F. Supp 2d 349, 354

(E.D.N.Y. 1999) (applying Luce in a RICO case).

Rule 9(b)'s requirements are also relaxed when the information necessary to fully detail

the fraud is "peculiarly within the opposing party's knowledge." DiVittorio, 822 F.2d at 1247;

see also Grunwald v. Bornfreund, 668 F. Supp 128, 131 (E.D.N.Y. 1987) ("In action involving

multiple defendants, Rule 9(b) requires the plaintiff to plead facts from which fraud may be

reasonably inferred as to each defendant. However, pleading requirements may be relaxed when

the information is exclusively within the defendant's knowledge so long as the factual basis for

allegations based upon information and belief are adequately set forth."). This standard is

especially appropriate when a complaint is being judged before any discovery has taken place, as

it is here. See, e.g., First Interregional Advisors Corp. v. Wolff, 956 F. Supp. 480, 485 (S.D.N.Y.

1997). The key question is whether the complaint puts defendants on notice of their

wrongdoing. See id.; Sommerville v. Major Exploration, Inc., 576 F. Supp. 902, 910 (S.D.N.Y.

1983) ("The pleadings, in this regard, adequately inform defendants of the charges against them,

and defendants can obtain a more detailed factual basis, if they wish, through discovery.").

Defendants identify three separate groupings that they claim are improper in the

Complaint: "Conspirators," "Sibirsky" or "Defendants." See Def. SMJ Mem. at 25. The use of

those terms is for the most part shorthand. When plaintiffs use the term "Defendants" in the

Complaint, for example, it is generally in lieu of listing every defendant by name. The first six

instances of alleged "improper" use of the term "Defendants" in the Complaint occur in the

introductory section and refer to the "Defendants' illegal scheme." See id. (citing Complaint ¶¶

132

5, 94, 97, 99, 102, 104). In all of those cases the Complaint later makes specific allegations with respect to individual defendants. The final six instances where defendants complain about use of the term "Defendants" occur when describing the predicate acts and generally refer to all of the defendants or "defendants' illegal scheme." See id. (citing Complaint ¶¶ 438[62], 481, 495, 502, 506, 525).[63]

Defendants' complaints about plaintiffs' use of the term "Sibirsky" to refer to all of the corporate defendants in the Sibirsky Aluminum empire are similarly without merit. In all cases the term acknowledges the fact that these companies are affiliated to such a degree that it is fair to group them together for pleading purposes. See Luce, 802 F.2d at 55. For example, paragraph 52 of the Complaint, which defendants claim is "clearly improper," defines the term Sibirsky, and indicates that all of the constituent companies are alter egos of each other and of Chernoi, Deripaska, and Makhmudov. See also Complaint ¶¶ 66 (Makhmudov owns and controls Sibirsky with Chernoi and Deripaska), ¶¶ 325, 327 & 330-31 (describing the interrelationships of the Sibirsky companies and how Chernyshev was therefore an insider).

The Complaint defines the "Conspirators" as Chernoi, Deripaska and Makhmudov. See Complaint ¶ 2. The use of the term "Conspirators" is entirely proper, as the nature of the

---

[62]    Ironically, in this allegation, plaintiffs claim that "some of the details of defendants' wrongdoing are exclusively within the possession of the defendants, preventing plaintiffs from pleading certain acts with greater particularity." Complaint ¶ 438.

[63]    For example, paragraph 438, in addition to explaining why the broad term "defendants" is sometimes used when detailing the predicate acts, see supra note 51, alleges that "[e]ach of the Defendants herein knowingly participated in the formation of the Illegal Conspiracy with one or more defendants and willingly participated in the Illegal Conspiracy by knowingly and intelligently carrying out the Predicate Acts detailed herein." As indicated in that paragraph, the Complaint proceeds to describe each defendant's role in the conspiracy and details a pattern of racketeering activity with respect to each defendant. See, e.g., Complaint ¶¶ 524, 573-74.

SSL-DOCS2 70070518v7

relationship between Chernoi, Deripaska and Makhmudov is adequately alleged. The Complaint

describes the agreement among the three to effect the Illegal Scheme, id. ¶ 124, and describes

numerous instances where they acted in concert; for example, Chernoi's and Deripaska's

overlapping threats towards the Zhivilo brothers in the mid-1990s, id. ¶ 160-70. Moreover, in a

declaration submitted in conjunction with plaintiffs' opposition to these motions, Khaidarov

describes the agreement between Chernoi, Deripaska and Makhmudov to takeover NKAZ. See

Khaidarov Dec. at ¶¶ 8-16.

In sum, plaintiffs adequately alleged the acts committed by individual defendants, and in

cases like these, it is important

> [to] recognize that a plaintiff may not be able to plead the precise role of each
> defendant when a group of defendants has acted in concert to cause the
> complained of injury. Under those circumstances, it is appropriate to plead the
> actions of the group and leave development of individual liability questions until
> some discovery has been undertaken, rather than to dismiss the plaintiff because
> he does not have what may be concealed information.

Jackson v. First Federal Savings of Arkansas, 709 F. Supp. 863, 878 (E.D. Ark. 1988).

### 2. Plaintiffs' Allegations of Mail and Wire Fraud Satisfy Rule 9(b) Because They Provide Detailed Accounts of Defendants' Fraudulent Scheme

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or

mistake, the circumstances constituting the fraud or mistake shall be stated with particularity."

(emphasis added). The elements of a mail or wire fraud are: (1) a scheme or artifice to defraud;

and (2) the use of a mail or wire in furtherance of that fraud. See Pereira v. United States, 347

U.S. 1, 8 (1954). As the language of Rule 9(b) and the elements of a mail and wire fraud claim

make clear, and as confirmed by the cases discussed below, Rule 9(b) only requires plaintiffs to

plead with particularity the "scheme or artifice to defraud" element of mail and wire fraud.

Plaintiffs are not required to plead the second element – use of the mail or wires – with

134

particularity. Defendants fail to address this critical distinction, and thus misapply Rule 9(b).

The first element of mail and wire fraud, a scheme or artifice to defraud, is "measured by a 'nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" United States v. Trapilo, 130 F.3d 547, 550 n.3 (2d Cir. 1997) (quoting United States v. Van Barta 635 F.2d 999, 1005 (2d Cir. 1980)). A complaint that alleges a scheme with these characteristics is sufficient to satisfy the first element of mail and wire fraud. See, e.g., United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000) (bribery can be scheme or artifice to defraud); In re Sumitomo Copper Litigation, 995 F. Supp 451, 455 (S.D.N.Y. 1998) (scheme to corner and manipulate copper market); Trapilo, 130 F.3d at 550 (smuggling); Schmuck v. United States, 489 U.S. 705, 711 (1989) (turning back odometers on used cars).

Defendants do not seriously contend that the fraudulent scheme detailed in the Complaint fails to satisfy Rule 9(b), which is not surprising, since plaintiffs' one hundred page pleading – devoted almost exclusively to defendants' fraudulent scheme – is patently sufficient to satisfy this particular aspect of Rule 9(b)'s requirements of mail and wire fraud allegations. Again, we will refrain from detailing here, among other acts, the bribes defendants paid, the false bankruptcy and creditor claims defendants filed, the sham bankruptcy settlements they concocted and the fraudulent transfer of the Vanadium Plaintiffs' shares. See supra Point I.B.1. Given the absence of any non-conclusory argument that plaintiffs' allegations with respect to defendants' scheme to defraud are not specifically pled, plaintiffs satisfy Rule 9(b) because "the nature of the RICO scheme is sufficiently pleaded so as to give notice to the defendants." First Interregional Advisors Corp. v. Wolff, 956 F. Supp 480 (S.D.N.Y. 1997).

With respect to the second element of mail and wire fraud, the use of the mails or wires

135

in furtherance of the scheme or artifice to defraud, Rule 9(b) does not require plaintiffs to plead

specific mailings or wirings in a case such as this.  In <u>Mezzonen v. Wright</u>, the court

distinguished between cases where the communications are themselves fraudulent and cases

where the communications are not in and of themselves fraudulent, but rather are made in

furtherance of a fraudulent scheme – the latter need not satisfy Rule 9(b):

> When a court considers whether a plaintiff has sufficiently alleged the second
> element of mail or wire fraud, Rule 9(b) requires that an important distinction be
> made between communications that are per se fraudulent, <u>i.e.</u>, they contain false
> or misleading information, and those communications that are, rather, in
> furtherance of the larger scheme to defraud but not per se fraudulent.

No. 97 Civ. 9380 (LMM),1999 WL 1037866, at *7 (S.D.N.Y, Nov. 16, 1999).  It is only in the

per se fraudulent cases that Rule 9(b) requires a complaint to "specify the fraud involved,

identify the parties responsible for the fraud, and where and when the fraud occurred."

<u>Sumitomo</u>, 995 F. Supp. at 456.  Where, however, as in this case, the mails and wires are not

themselves alleged to be fraudulent, "a detailed description of the underlying scheme and the

connection therewith of the mail and/or wire communications is sufficient to satisfy Rule 9(b)."

<u>Id.</u>; <u>see also</u> <u>Spira v. Nick</u>, 876 F. Supp. 553, 559 (S.D.N.Y. 1995) (no "useful purpose" in

requiring a RICO plaintiff to specifically plead each mailing).

   The Complaint alleges such use of the mails and wires.  Among other mailings and wires,

defendants:  wired bribe money to Tuleyev and Roussel from the US in order to accomplish the

Illegal Takeover (Complaint ¶¶ 196-98, 354); laundered proceeds of their illegal scheme using

US wires (<u>see</u> <u>e.g.</u>, <u>id.</u> ¶ 482); and used the US mails and wires to establish the defendants New

Start, Venitom, Unidale and InvestLand as US companies (<u>id.</u> ¶¶ 431-34).  Moreover, the

fraudulent scheme alleged in the Complaint – with the transfer and laundering of tens of millions

of US dollars, both through companies and individuals located in the US, and through the

purchase of real estate in the US – by its very nature involved the use of the US mails and wires. That is also sufficient to satisfy Rule 9(b) in a case such as this. See In re Sumitomo Copper Litigation, 104 F. Supp.2d 314, 320 (S.D.N.Y. 2000) ("In light of the complaint's allegations, it is certainly reasonable to infer that mail and/or telephone communications were used in furtherance of defendants' scheme."). Plaintiffs' allegations more than meet the mailing/wiring jurisdictional requirement, for "[i]t is sufficient for the mailing to be incident to an essential part of the scheme, or a step in the plot." Schmuck, 489 U.S. at 710-11 (citations omitted).

Defendants simply ignore this entire body of case law, and instead contend that plaintiffs have provided an insufficient level of detail with respect to particular mails and wires. See Def. SMJ Mem. at 27-30. More specifically, defendants argue that plaintiffs "consistently fail to plead particulars such as the time or place of these alleged uses of mails and wires or who received the funds sent by mail or wire." Def. SMJ Mem. at 28. As explained above, however, plaintiffs' mail and wire fraud allegations need not identify any false or misleading statements. See United States v. Trapilo, 130 F.3d at 550 n.3; see also Sumitomo, 995 F. Supp at 455 (rejecting defendants' "assertion that each element of common law fraud must be pled to satisfy the first prong of the mail and wire fraud statutes [scheme or artifice to defraud]"). Defendants' error stems from their reliance entirely on cases in which the mailing or wire was itself alleged to be fraudulent, which is not the case here.[64]

---

[64]    See Tavakoli-Azar v. Crescent Management, Inc., No. 97 Civ. 0696 (PKL), 1999 WL 1052016, at *3 (S.D.N.Y. Nov. 19, 1999) (plaintiffs apparently alleged misleading phone calls and mailings as basis for mail and wire fraud claims); B.V. Optische Industrie de Oude Delft v. Hologic, Inc., 909 F. Supp 162, 169 (S.D.N.Y. 1995) (mail and wire fraud based on "filing of fraudulent patent applications"); Manela v. Gottlieb, 784 F. Supp. 84, 87 (S.D.N.Y. 1992) (no mail or wire fraud allegations; securities fraud allegations based on "materially false and misleading statements"); McLaughlin v. Anderson, 962, F.2d 187, 191 (2d Cir. 1992) (mail fraud allegations based, inter alia, on misleading HUD prospectus and bid kit); C.A. Westel de Venezuela v. American Telephone and Telegraph Co., No. 90 Civ. 6665

137

Finally, defendants are mistaken that just because some defendants are only alleged to have participated in mail and wire fraud generally, and the Complaint contains no specifics with respect to their use of US mails or wires, plaintiffs have failed to plead mail and wire fraud. Def. SMJ Mem. at 29. Again, defendants simply misread the mail and wire fraud statute. Rather than requiring each defendant to participate in a mailing or wiring, the mail and wire fraud statute contemplates that

> each defendant would be indictable for mail fraud if he or she knowingly adhered to a fraudulent scheme and one or more mailings foreseeably were made in furtherance of that scheme, irrespective of by whom the mailings were made. Each would be indictable, moreover, for each mailing so made.

Spira, 876 F. Supp. at 560 (citing United States v. Weatherspoon, 581 F.2d 595, 601 (7th Cir. 1978)).

**B.    The Complaint Adequately States Violations
        of the Racketeer Influenced Corrupt Organizations Act**

As this Court is well aware, "when deciding a motion to dismiss an action for failure to state a claim upon which relief may be granted, the court 'must accept the material facts alleged in the complaint as true.'" Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir. 1995) (quoting Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994)). The court "must not dismiss the action 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [the plaintiff's] claim which would entitle [the plaintiff] to relief.'" Cohen, 25 F.3d at 1172 (quoting Conley v. Gibson, 355 U.S. 41, 45-46, (1957)). On a Rule 12(b)(6) motion, the court should not

---

(PKL), 1992 WL 209641, at *2 (S.D.N.Y. Aug 17, 1992) (RICO allegations based on scheme to defraud through "false or fraudulent pretenses, representations, or promises transmitted by the postal service or by wire"); Atlantic Gypsum Co., Inc. v. Lloyds International Corp., 753 F. Supp. 505, 512 (S.D.N.Y. 1990) (loan correspondence alleged to be fraudulent); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989) (no mail or wire fraud allegations; securities fraud allegations based on false reports of future revenue potential).

"weigh the evidence that might be presented at a trial but merely ... determine whether the complaint itself is legally sufficient." Festa v. Local 3 International Brotherhood of Electrical Workers, 905 F.2d 35, 37 (2d Cir. 1990). Furthermore, the legislative history of RICO indicates that the statute is to be liberally construed to effectuate its remedial purposes. See Pub. L. 91-452, S 904(a), 84 Stat. 947; Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 498 (1985). Plaintiffs easily satisfy this liberal pleading standard, and their RICO claims should therefore not be dismissed.

### 1.    Plaintiffs Properly Allege Defendants' Pattern of Racketeering Activity

As we have demonstrated throughout this memorandum of law, plaintiffs' Complaint more than adequately alleges a pattern of racketeering activity. Defendants' conclusory assertions that the Complaint is deficient in that regard because "conduct occurring outside of the US ... does not meet the definition of Racketeering activity," and because "plaintiffs have failed to plead acts of mail and wire fraud with sufficient particularity," Def. SMJ Mem at 31,[65] are without merit. Briefly, we have already established, see supra Point I.B.1, that the majority of predicate acts were in fact committed in the US, that racketeering activity which takes place overseas can form the basis of a predicate act, see supra Point IV.A, and that the Complaint pleads defendants' scheme to defraud with the particularity required by Rule 9(b), see supra Point V.A.

---

[65]    With the exception of arguing (incorrectly) that the predicate acts set forth in the Complaint are insufficient because they occurred outside the US, or that mail and wire fraud was not pleaded with sufficient particularity, defendants do not take issue with plaintiffs' pleading of the predicate acts.

SSL-DOCS2 70070518v7

2.    **Defendants Violated 18 U.S.C. § 1962(c) Because They
      All Participated in a Pattern of Racketeering Activity**

Defendants contend that the Complaint does not plead the elements of a section 1962(c)

claim because: (1) it fails to plead a pattern of racketeering activity, (2) it fails to distinguish the

RICO persons from the RICO enterprises, and (3) it fails to demonstrate that defendants actually

conducted the affairs of the enterprises. Def. SMJ Mem. at 36. As discussed supra, Point I.B.1,

plaintiffs have more than met their pleading burden with respect to alleging a pattern of

racketeering activity, and to avoid redundancy, those arguments will not be repeated here. With

respect to defendants' other two arguments, we address below why both are completely without

merit and why plaintiffs' 1962(c) claims should not be dismissed.

a.    **Plaintiffs Adequately Distinguish Defendants
      from the Enterprises in which They Participated**

Defendants contend that the Complaint fails to state a section 1962(c) claim because

"there is substantial overlap between the RICO persons[66] and the alleged enterprise." See Def.

SMJ Mem. at 37. Defendants are wrong on both the law and the facts.

As a factual matter, defendants simply fail to set forth accurately the allegations in the

Complaint. Plaintiffs plead the existence of an overarching Metals Enterprise, specific

Aluminum and Vanadium Enterprises, and plant-specific enterprises of SAZ, KRAZ, BRAZ,

NKAZ and GOK. See Complaint ¶¶ 517-23. Neither SAZ, KRAZ, BRAZ nor GOK are RICO

persons, though all are individual enterprises, and Counts VII, VIII and IX of plaintiffs' section

1962(c) claims all allege that defendants are liable for their participation in the operation and

---

[66]    The terms "RICO person" and "RICO defendant" have the same meaning in this context, and
        are used herein interchangeably.

SSL-DOCS2 70070518v7

**A - 453**

management of these enterprises. <u>See</u> <u>id.</u> ¶¶ 555, 560 & 565.[67]

Moreover, with respect to the Aluminum, Vanadium and Metals Enterprises, the

Complaint lists no fewer than four significant actors in each that are not RICO persons. Anton

Malevsky, who is not a defendant,[68] is a member of all three enterprises, and is described in

numerous places in the Complaint as a significant participant in the Illegal Scheme. <u>See, e.g.,</u>

Complaint ¶¶ 75, 166, 349, Ex. A. Joseph Karam, also not a defendant, and also a part of all

three enterprises, is involved in many of the enterprises' fraudulent financial activities. <u>See e.g.,</u>

<u>id.</u> ¶¶ 50, 524, Ex. A. Transmetal and Trans-Commodities, also not defendants, and also part of

all three enterprises, are similarly situated. <u>See, e.g., id.</u> ¶¶ 64-5, 524, Ex. A. In addition, the

Aluminum Enterprise consists of SAZ, BRAZ and KRAZ, and the Vanadium Enterprise consists

of GOK, none of which are RICO defendants in this action. <u>See id.</u> ¶¶ 518-19. The inclusion of

these non-RICO persons in the enterprises is more than sufficient to defeat defendants'

arguments. <u>See</u> <u>Jacobson v. Cooper</u>, 882 F.2d 717, 720 (2d Cir. 1989) ("[T]here is no complete

identity between the RICO persons and the RICO enterprise … [w]here the overlap between the

defendants and the alleged RICO enterprise is only partial, a RICO claim may be sustained.").

In addition to defendants' inaccurate rendition of the facts, defendants' conclusory

summary of the law is equally flawed. Relying solely on this Court's decision in <u>RCM</u>

<u>Executive Gallery Corp. v Rols Capital Co.,</u> No. 93 Civ. 8571 (JGK), 1997 WL 27059, at *6-7

(S.D.N.Y. Jan. 23, 1997), defendants contend that the rule in this Circuit requiring that the RICO

---

[67] Regrettably, this section of the Complaint contains a drafting error. Count IX, in the list of defendants appearing immediately under the heading, includes as a defendant GOK, which is not a defendant.

[68] Subsequent to the filing of the Complaint, Malevsky died in what some have claimed was a sky-diving accident in South Africa.

141

persons and enterprise be "separate and distinct" prohibits "substantial overlap" between the two.
See Def. SMJ Mem at 37. Defendants' sleight-of-hand transition from the "separate and distinct" standard to the concept of "substantial overlap" obfuscates the meaning of these terms.

Defendants misread this Court's holding in RCM. There, Your Honor held that the enterprise was not sufficiently distinct from the RICO persons sued because plaintiffs in RCM "offer[ed] no factual allegations that the [defendant] partnership and the individual defendants had any association aside from the ordinary business of the partnership." Id. at *8. The issue, therefore, is not one of simple identity, or "overlap" as defendants would term it, but rather involves a comparison between the conduct of the RICO persons as compared to the conduct of the enterprise. This is precisely what the Second Circuit held in Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256 (2d Cir. 1995), which was specifically distinguished in RCM, see 1997 WL 27059, at *8 n.7. There, even though the three RICO defendants were also the sole and only members of the RICO enterprise, the court held that plaintiffs satisfied the separate and distinct requirement because, in terms of functionality, the conduct of the RICO persons was different from their collective conduct as a RICO enterprise. See Securitron Magnalock Corp., 65 F.3d at 263 ("Despite [the individual defendant's] links to each corporation, he, along with the two corporations, clearly is a RICO person as well as a member of a RICO enterprise. Moreover, the defendants together constitute an enterprise that, while consisting of no more than those three RICO persons, is distinct from each of them.") (emphasis added).

Thus, plaintiffs satisfy the "separate and distinct" requirement as interpreted in RCM and Securitron. The enterprises in this case consist of a number of individuals and corporations that engaged in separate and distinct business activities – banking, metal trading, metal production, raw material sales and the transacting of various financial and investment functions – that when

142

joined together in the various enterprises alleged in the Complaint, served the common purpose

of illegally taking over the aluminum and vanadium industries. See Complaint ¶ 524. In short,

plaintiffs satisfy the separate and distinct pleading requirement because the RICO enterprises are

functionally distinct from the roles and activities of each of the RICO defendants. See

Securitron, 65 F.3d at 263; Riverwoods Chappaqua Corp.v. Marine Midland Bank, N.A., 30

F.3d 399, 444 (2d Cir. 1994) ("[A] corporate entity may be held liable under section 1962(c)

where it associates with others to form an enterprise that is sufficiently distinct from itself.").

     Finally, defendants make much ado about nothing when they claim that plaintiffs'

inclusion of NKAZ in the Aluminum Enterprise is "beyond comprehension" because it is

"curious how Plaintiffs could possibly claim that NKAZ was perpetrating predicate acts in an

attempt to take itself over." Def. SMJ Mem. at 37. The inclusion of NKAZ is both logical and

easy to understand, and plaintiffs do not claim that NKAZ was attempting to take itself over.

The critical point of distinction is the difference between NKAZ pre-takeover, and NKAZ post-

takeover. Pre-takeover, plaintiff MIKOM managed NKAZ, and NKAZ was an innocent party in

this matter. After NKAZ was taken over by the defendants, however, MIKOM was ousted as

manager and NKAZ participated in the misappropriation of assets that rightfully belonged to

plaintiffs, and participated in mail and wire fraud as well as money laundering to the detriment of

plaintiffs. This is the conduct that gives rise to NKAZ's inclusion in the Aluminum Enterprise,

and there is nothing "curious" or inconsistent about NKAZ's role. In fact, Your Honor

contemplated this precise scenario in RCM. See 1997 WL 27059, at *8 n.8 ("[A] plaintiff is free

to allege that it is a RICO enterprise or part of a RICO enterprise such as when a plaintiff alleges

143

that it is a legitimate business infiltrated by the racketeering defendants.").[69]

### b.    The Metals Enterprise is Adequately Pled

Defendants also argue that the Complaint does not properly allege the Metals Enterprise

because "[t]here is no showing of hierarchy or organization pertaining to the 'metals enterprise';

no detail is provided of any metals enterprise's operations functioning as a continuing unit; nor is

there even a showing that the 'metals enterprise' was the proximate cause of any injury." Def.

SMJ Mem. at 32. How defendants could possibly make that argument after reading the

Complaint in any detail is puzzling.

The Complaint describes how certain defendants and others defined as the Metals

Enterprise oversaw the Illegal Scheme to takeover the aluminum and vanadium industries in

Russia. See Complaint ¶ 517. It describes how certain members of the Metals Enterprise

occupied leadership roles (Chernoi, Deripaska, Makhmudov and Malevsky), and certain other

members (Kislin, Karam, Blonde Management, Blonde Investments, Pan-American and Trans-

Commodities) provided supervision and financial support to the two prongs of the Metals

Enterprise – the Aluminum Enterprise and the Vanadium Enterprise. Id. ¶¶ 517, 524. Plaintiffs

---

[69]    This is also the point in paragraph 560 of the Complaint, which defendants characterize as an
"especially egregious example of Plaintiffs' nonsensical allegations." Def. SMJ Mem. at 37
n.29. Defendants claim that because plaintiffs allege that NKAZ participated in the operation
and management of the SAZ, KRAZ, BRAZ enterprises, and because those enterprises were
taken over in 1997, the mid-1990s and 1998, at a time when plaintiff MIKOM was managing
NKAZ, plaintiffs are in essence alleging that plaintiff MIKOM participated in the RICO
violations alleged in the Complaint. Again, plaintiffs obviously do not claim that MIKOM
had anything to do with the illegal takeover of SAZ, KRAZ and BRAZ. The critical flaw in
defendants' convoluted argument is the assumption that the racketeering activity engaged in
by these enterprises began and ended at the time of their take over; quite the contrary, it
continues to this day in the form of diversion of assets, money laundering and mail and wire
fraud. Only after the sham bankruptcy that led to NKAZ's take over by the defendants, and
the ouster of MIKOM as NKAZ's manager, did NKAZ engage in racketeering activity in
connection with the SAZ, KRAZ and BRAZ enterprises, and, therefore, MIKOM had
nothing to do with the illegal activity of those enterprises.

have even included a chart, Exhibit A to the Complaint, outlining the hierarchy of defendants'

Illegal Scheme. The Complaint also describes how these enterprises acted and continue to act by

taking over SAZ, BRAZ, KRAZ, NKAZ and GOK and diverting profits from these plants. <u>See,</u>

<u>e.g.</u>, <u>id.</u> ¶¶ 527-66.

Finally, defendants exhibit a fundamental misunderstanding of the RICO statute when

they demand that plaintiffs demonstrate that the enterprises proximately caused the injuries

complained of. Depending on the particular provision of 18 U.S.C. § 1962 invoked, plaintiffs

have to show, and do show, injury caused by defendants investment of racketeering income, <u>see</u>

18 U.S.C. 1962(a), defendants' acquisition or maintenance of an enterprise through racketeering

activity, <u>see</u> <u>id.</u> § 1962(b), defendants' conducting or participating in an enterprise through

racketeering activity, <u>see</u> <u>id.</u> § 1962(c), or defendants' conspiracy to violate § 1962(a), (b) or (c),

<u>see</u> <u>id.</u> § 1962(d). There simply is no "enterprise injury" requirement in the RICO statute.

c.    **Plaintiffs Satisfy the <u>Reeves</u>**
      **<u>Operation and Management Test</u>**

Defendants' final argument is that "plaintiffs fail to allege how each of the individual

defendants 'led, ran, managed, or directed' the various enterprises. Mere participation is not

enough." Def. SMJ Mem. at 38. That is defendants' entire argument on that point. Defendants

do not say for which of the 20 defendants plaintiffs' pleading is inadequate, and they do not

specify in what manner the Complaint is inadequate under <u>Reeves</u>.

In <u>Reeves v. Ernst & Young</u>, 507 U.S. 170 (1993), the Supreme Court held that section

1962(c) requires a defendant to have "<u>some</u> part in directing the enterprise's affairs." 507 U.S. at

179 (emphasis in original). Under that test, liability attaches "not just [to] upper management

but also [to] lower rung participants in the enterprise who are under the direction of upper

management." <u>Id.</u>; <u>see</u> <u>also</u> <u>Mezzonen v. Wright</u>, No. 97 Civ. 9380 (LMM), 1999 WL 1037866,

145

at *10 (S.D.N.Y. Nov. 16, 1999). Application of <u>Reeves</u> is extremely fact intensive and most often involves factual questions that are not suitable for resolution on a motion to dismiss. <u>See</u> <u>United States v. Allen</u>, 155 F.3d 35, 42 (2d Cir 1998); <u>Friedman v. Hartman</u>, No 91 Civ. 1523 (PKL), 1994 WL 376058, at *2 (S.D.N.Y. July, 15, 1994); <u>Bank Brussels Lambert v. Credit</u> <u>Lyonnais (Suisse) S.A.</u>, No. 93 Civ. 6876 (LMM), 2000 WL 1694322, at *4 (S.D.N.Y. Nov. 13, 2000).

Even though <u>Reeves</u> does not impose a pleading requirement, plaintiffs have more than adequately alleged each defendants' operation or control over an enterprise. Given defendants' completely conclusory and insufficient arguments concerning the <u>Reeves</u> standard, we simply note here, without recounting the detail set forth therein, that the Complaint contains a detailed description of the role of each member of the various enterprises. <u>See</u> Complaint ¶ 524 (enumerating, in separately numbered subparagraphs, each defendant's involvement in the enterprises).

### 3.    Plaintiffs Adequately Plead a Violation of 18 U.S.C. § 1962(b) Because Defendants Acquired and <u>Maintained Enterprises through Racketeering Activity</u>

Pointing to case-law indicating that the injury from a violation of 1962(b) must derive from defendants' acquisition or maintenance of an enterprise, as distinct from the predicate acts themselves, <u>see</u> Def. SMJ Mem. at 35 (citing <u>Kaczmarek v. Int'l Business Machines Corp.</u>, 30 F. Supp.2d 626, 629 (S.D.N.Y. 1998)), defendants contend that plaintiffs' section 1962(b) claims fail "because plaintiffs do not allege the distinct injuries required under § 1962(b)." <u>Id.</u> Defendants offer no analysis of <u>Kaczmarek</u> and do not make any attempt to apply it to the Complaint. But plaintiffs have alleged distinct injury from defendants' acquisition of NKAZ and GOK. When they acquired NKAZ through their racketeering activity, MIKOM lost its

146

management contract with NKAZ, and the other Aluminum Plaintiffs lost their exclusive

contracts with the plant to supply raw materials and buy finished aluminum. The GOK plaintiffs

were substantial shareholders in GOK; they were injured by defendants' acquisition of GOK

because they lost their shares. Such illicit takeovers of legitimate businesses are at the heart of

section 1962(b) claims. See McCain v. Phoenix Resources, Inc., No. 84 Civ. 0901 (SWK), 1989

WL 146212, at *16 (S.D.N.Y. Nov. 17 1989).

Defendants' next argument is a retread of the same flawed position that they advance

throughout their moving memoranda that plaintiffs have not alleged any racketeering activity.

See Def. Mem. at 35-6.[70] As we demonstrate throughout this brief, that claim is without merit

because defendants committed numerous predicate acts of racketeering as defined in 18 U.S.C. §

1961. See supra Points I.A.1, IV.A, V.B.1.

### 4. Plaintiffs Adequately Plead a Violation of 18 U.S.C. § 1962(a) Because Defendants Injured Plaintiffs by Investing Racketeering Income in Various Enterprises

Defendants' claim that plaintiffs have not met their burden of pleading a section 1962(b)

claim because the Complaint does not allege "injury as a result of the use and investment of

racketeering income in an enterprise." See Def. SMJ Mem. at 33. This argument is without

merit.

In Ouaknine v. MacFarlane, 897 F.2d 75 (2d Cir 1990), the court held that the essence of

a section 1962(a) claim is plaintiffs' injury from defendants' investment of "income derived

from a pattern of racketeering activity to acquire an interest in, establish, or operate an

---

[70] Defendants are correct when they point out that paragraph 549 contains a typographical error. See Def. Mem. at 36 n.28. That paragraph should read: "As alleged herein, Deripaska, Chernoi, Makhmudov, Blonde Management, Blonde Investments, MDM Bank, Pan-American and Kislin engaged in a pattern of racketeering activity specifically directed at acquiring and maintaining control of GOK [not NKAZ]."

147

enterprise." 897 F.2d at 82. Plaintiffs' section 1962(a) allegations satisfy this standard.

Count I of the Complaint (¶¶ 527-32) alleges how certain defendants' extortion and takeovers of the SAZ, KRAZ and BRAZ aluminum plants provided them with the money to finance the takeover of NKAZ. Defendants' investment of this income into the Aluminum Enterprise thus divested MIKOM of its management role and caused the cancellation of the Aluminum Plaintiffs' contracts with NKAZ. See Complaint ¶¶ 531, 243, 247-90. These allegations adequately state a 1962(a) claim. See First Interregional Advisors Corp. v. Wolff, 956 F. Supp 480, 487 (S.D.N.Y. 1997) (money used to fund RICO enterprise injured plaintiff and sustained a section 1962(a) claim); Sperber Adams Assocs. v. JEM Management Assocs. Corp., No. 90 Civ. 7405 (JSM), 1992 WL 138344, at *5 (S.D.N.Y. June 4, 1992) ("Because a violation of § 1962(a) entails the investment of racketeering income in an enterprise, an injury caused by violation of this Section by definition is an investment injury.").

Counts II and III of the Complaint (¶¶ 532-39) allege violations of section 1962(a) based on defendants' misappropriation of NKAZ assets that rightfully belonged to plaintiffs. Far from being the "first time in the Complaint that defendants learn they are accused of diverting and misappropriating BMT assets," Def. SMJ Mem. at 34 n.26, this misappropriation goes to the heart of the Complaint. MIKOM entered into a long-term contract to manage NKAZ, and the Aluminum Plaintiffs entered into contracts to sell raw materials to, and buy aluminum from, NKAZ. Defendants' racketeering activities resulted in their control of NKAZ, and their subsequent diversion and misappropriation of the objects of MIKOM's and the Aluminum Plaintiffs' contracts caused plaintiffs injury. These allegations of defendants' diversion and misappropriation of plaintiffs' assets adequately plead a 1962(a) claim. See Pahmer v. Greenberg, 926 F. Supp 287, 302 (E.D.N.Y. 1996) (injury based on misappropriation of

148

partnership assets is investment injury under section 1962(a)).

Count IV of the Complaint (¶¶540-43), also satisfies the standard announced in Ouaknine. It describes how defendants used the proceeds from their racketeering activity in the Aluminum Enterprise, including the revenue obtained through their fraudulent takeovers of SAZ, BRAZ, KRAZ and NKAZ, and invested those proceeds into the Vanadium Enterprise, resulting in the takeover of GOK. Defendants' claim that Count IV is deficient because it fails "to allege the investment of funds [and] … fail[s] to allege an injury caused by such investment." Def. SMJ Mem. at 34. But that is simply untrue. Paragraph 542 of the Complaint alleges that defendants "used such racketeering income to fund the illegal takeover of GOK." Similarly, paragraph 543 alleges that "[a]s a direct and proximate result of this use and investment of racketeering income, the Davis and GOK plaintiffs have suffered damages." Plaintiffs have properly alleged the necessary elements of this 1962(a) claim, and therefore it should not be dismissed. See Bank Brussels Lambert, 2000 WL 1694322, at *6.

### 5. Plaintiffs Adequately Plead a Violation of 18 U.S.C. § 1962(d) Because Defendants Conspired to Violate the RICO Statute

Defendants contend that plaintiffs have failed to plead a section 1962(d) claim because plaintiffs have not pled violations of sections 1962(a), (b), or (c). See Def. SMJ Mem. at 38-39. For the reasons set forth above, plaintiffs have adequately pled violations of sections 1962(a), (b), and (c), and plaintiffs therefore adequately plead a violation of section 1962(d).

### C. If Plaintiffs Have Not Adequately Pled Violations of the RICO Statute, or Have not Complied with Rule 9(b), Plaintiffs Should be Given Leave to Replead

If this Court determines that plaintiffs have not met their pleading obligations, plaintiffs should be given leave to amend. As the Second Circuit has observed, "complaints dismissed

under Rule 9(b) are 'almost always' dismissed with leave to amend." Luce v. Edelstein, 802

F.2d at 56 (quoting 2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 9.03, at 9-34 (2d ed.

1986))). Similarly, Your Honor has observed that plaintiffs "should be given every opportunity"

to replead RICO claims adequately. Butala v. Agashiwala, No. 95 Civ. 936 (JGK), 1997 WL

79845, at *9 (S.D.N.Y. Feb. 24, 1997).

That plaintiffs have already amended their complaint twice is of no moment because

neither amendment was in response to a finding that claims were inadequately pled. The First

Amended Complaint was filed as of right pursuant to Rule 15(a) to reflect newly obtained

information, and to add new parties and claims, including the Vanadium Plaintiffs. The Second

Complaint was filed pursuant to a Stipulation and Order entered between the parties and

approved by the Court, and it altered only four paragraphs. See Stipulation and Order, dated

Feb. 26, 2002. In cases like this one, "where [a] plaintiff has amended a complaint to state newly

added claims but has not yet had a chance to replead fraud with greater specificity, [the court]

will permit repleading." Official Publications, Inc. v. Kable News Co., 884 F.2d 664, 669 (2d.

Cir. 1989). Likewise, "it is only when a court dismisses a complaint for failure to plead fraud

with particularity, and the plaintiff's Complaint again fails to comply, that the complaint should

be dismissed without leave to replead." Beverly Hills Design Studio (N.Y.) Inc. v. Morris, No.

88 Civ. 5886 (LLS),1989 WL 85867, at *6 (S.D.N.Y. July 26, 1989).

SSL-DOCS2 70070518v7

A - 463

## CONCLUSION

For the reasons set forth above, defendants' motions to dismiss should be denied.

Dated:  New York, New York
        September 20, 2002

                                    STROOCK & STROOCK & LAVAN LLP

                              By:   _____
                                    Robert Abrams, Esq. (RA-3744)
                                    Brian M. Cogan (BMC-1876)
                                    Alan M. Klinger (AMK-9744)
                                    (Members of the Firm)
                                    180 Maiden Lane
                                    New York, NY  10038
                                    (212) 806-5400
Of Counsel                          *Attorneys for the Aluminum Plaintiffs and*
   James Bernard                     *MIKOM*
   Jacob Miota

                                    MARKS & SOKOLOV, LLC

                              By:   _____
                                    Bruce S. Marks, Esq. (BM-0991)
                                    (A Member of the Firm)
                                    Eleven Penn Center
                                    1835 Market Street, 28th Floor
                                    Philadelphia, PA  19103
                                    (215) 569-8901
Of Counsel:                         *Attorneys for the Aluminum Plaintiffs and*
   Gene Burd                         *MIKOM*
   David Niles
   Yaroslav Brisiuck

                                    HERRICK, FEINSTEIN LLP

                              By:   _____
                                    Raymond Hannigan, Esq. (RH-4403)
                                    David Meisels, Esq. (DM-2514)
                                    (Members of the Firm)
                                    Two Park Avenue
                                    New York, NY  10016
                                    (212) 592-1400
                                    *Attorneys for the Davis and GOK Plaintiffs*