region of Russian, one filed in a Moscow arbitrazh court, and two in the Sverdlovsk arbitrazh court. Some of these suits were brought by individuals or firms who were GOK shareholders, and some by D.A. Khaidarov, the ousted general director. The claims included alleged violations of GOK's charter, alleged violations of the Law on Joint Stock Companies, and infringements of Khaidarov's rights under Russian labor law.

43. In three of the Moscow suits and in the lawsuits brought in both the courts of general jurisdiction and arbitrazh courts of Sverdlovsk, the claims were rejected, some on substantive grounds and others on the basis of improper venue or failure to prosecute. (GOK Exhibits 55, 58, 59, 60, 61) In particular, the Sverdlovsk regional court, in an order issued February 15, 2000, upheld the February 1, 2000, decision of the Kachkanar court determining that the complaining stockholder had failed to present any legal reason for negating the actions of the meeting. (GOK Exhibits 41, 42) In the other suits the ousted management initially enjoyed some success in the lower courts, but in no case did it ultimately prevail. In two of the Moscow shareholder suits, in two of Khaidarov's Moscow suits, and in the shareholder suit brought in the Moscow arbitrazh court, the first-instance court ruled that the January 28 meeting violated Russian law and that its decisions therefore were invalid. Each of these decisions was reversed either by the first-instance court itself or on appeal. The April 10, 2000, order of the Perovsky court in Moscow declaring the board meeting invalid, in the lawsuit brought by shareholder A.V. Anikeev, was withdrawn by that court on September 25, 2000, due to the superseding bankruptcy proceedings. (GOK Exhibits 52, 53) The Moscow city court upheld the latter decision on October 26, 2000. (GOK Exhibit 54) After holding additional hearings and gather new evidence, the Perovsky court on December 13, 2000, determined that the January 28 board meeting had complied with Russian law. (GOK Exhibit 50) The September 19, 2000, order of the Meshchansky court in Moscow in

25

the lawsuit brought by shareholder V.V. Volnov, which invalidated the January 28 meeting, was reversed on substantive grounds by the Moscow appellate court on March 8, 2001. (GOK Exhibits 44, 43) The first lawsuit brought in Moscow by Khaidarov led to an order by the Tverskoy local court on February 7 forbidding implementation of the board decisions. (GOK Exhibit 57) That court withdrew its order and dismissed Khaidarov's suit on May 30, 2000, on the ground that the proper venue was Kachkanar and not Moscow. (GOK Exhibit 56) Khaidarov then refilled a new suit that added at least one defendant resident in Moscow. On November 21, 2000, the Tverskoy court invalidated the January 28 meeting. (GOK Exhibit 46) On appeal, the Moscow city court on March 26, 2001, determined that all the persons sued were alleged to have acted in the capacity as directors and officials of GOK, and that the suit therefore should have been brought in Kachkanar. (GOK Exhibit 45) It therefore reversed the Tverskoy court's decision. On remand, the Tverskoy court on June 22, 2001, implemented the decision of the appellate court and dismissed Khaidarov's suit on venue grounds. (GOK Exhibit 67) The November 16, 2000, order of the Moscow arbitrazh court in the lawsuit brought by Rendex, a Russian enterprise owning stock in GOK, which also invalidated the January 28, 2000, meeting, was reversed by the appellate branch of the Moscow arbitrazh court on February 22, 2001, and the Moscow Circuit Federal Arbitrazh Court in turn upheld the decision of the appellate branch on April 26, 2001. (GOK Exhibits 48, 47, 49)

44. In three different suits brought in Moscow by Khaidarov to overturn the January 28, 2000, board meeting, the courts determined that venue was improper. In one instance, the second suit brought in the Tverskoy court, the court determined that Khaidarov had improperly characterized the status of newly added respondents in an attempt to obtain a Moscow forum. These decisions

A - 504

indicate how the Russian legal system operates in practice to suppress duplicative lawsuits and improper forum shopping.

45. The judicial opinions I have reviewed indicated that the core legal issue in all of these lawsuits involved the effect of a provision of the GOK charter that gave the incumbent managing director what amounted to a veto over decisions to convene meetings of the board of directors. The appellate courts of general jurisdiction in Moscow and Sverdlovsk and the Moscow arbitrazh court appellate branch and the Moscow Circuit Federal Arbitrazh Court all agreed that this provision violated the requirements of the Law on Joint Stock Companies by giving the managing director the power to thwart actions of the corporate body responsible for supervising his actions. In my opinion, these courts correctly interpreted Article 68 of that Law, which specifies the persons who have a right to convene a meeting of the board of directors and does not authorize any impairments of this right. Moreover, whether this determination represents a correct interpretation of the Law on Joint Stock Companies is a question that the Russian courts are uniquely qualified to answer, and that a U.S. court would have great difficulty addressing. Persons aggrieved by the outcome of the many Russian cases remain free to seek supervisory review by either the Russian Supreme Court or the Supreme Arbitrazh Court.

46. Additional issues resolved by the Russian courts on the merits were the presence of a valid quorum at the January 28, 2000, meeting and the permissibility of absentee voting at the meeting. Resolution of these issues turn on questions of fact, as well as the interpretation of the Law on Joint Stock Companies and GOK's charter. A U.S. court would have great difficulty addressing these questions, while the Russian courts that already have done so appear to have acted in accordance with norms of due process and fundamental fairness.

27

47. Shortly after the January 28, 2000, meeting of the board of directors, GOK shareholders brought lawsuits in both the Kachkanar court of general jurisdiction (in the case of an individual shareholder) and the Sverdlovsk arbitrazh court (in the case of an legal-person shareholder) to enjoin the then-registrar of GOK shareholders from changing any entries in the registry and to require GOK not to hold any shareholder meetings until the court had resolved all disputes over the proper constitution of the shareholder list. The court of general jurisdiction forbade the holding of any shareholder meetings in an order dated February 15, 2000 (GOK Exhibit 63), and arbitrazh court followed suit on February 29 (GOK Exhibit 64). Later court decisions indicate that, in apparent defiance of those orders, shareholders supporting the ousted management convened an extraordinary meeting on March 4, 2000. Shareholders opposed to the ousted management filed suit in both Moscow and Kachkanar to challenge the validity of this shareholder meeting. The Moscow suit resulted in a court order on April 5, 2000, upholding the meeting (GOK Exhibit 66), but the Moscow Appellate Court on March 6, 2001, determined that the nominal plaintiffs had not sought to institute the suit and that the lawyer purporting to represent their interests in that case had no authority to do so (GOK Exhibit 65). Accordingly, the appellate court ordered dismissal of the complaint on procedural grounds. In the interim, the Kachkanar court on August 14, 2000, determined that the meeting was illegal, both because the shareholder seeking to convene the meeting had failed to comply with the requirements of the Law on Joint Stock Companies and GOK's charter, and because the meeting violated the injunctions issued by the Kachanar court and the Sverdlovsk arbitrazh court (GOK Exhibit 62). I am not aware of any subsequent appeals of these decisions.

48. On September 5, 2000, the GOK board of directors entered into a contract with Bookkeeping Registry Company (referred to in the amended complaint as VRK) to maintain the registry of

shareholders, replacing the contract that GOK had had with Panorama Registry Company. Both a shareholder and Khaidarov filed suits in courts of general jurisdiction in St. Petersburg attacking this decision, and Rendex challenged the decision in the Moscow arbitrazh court. The St. Petersburg courts upheld the Bookkeeping contract as lawful in decisions dated December 20, 2000, and January 12, 2001. (GOK Exhibits 72, 73) In a suit brought by, among others, Davis International, LLC, Foston Management Ltd., Holdex LLC, and Omni Trusthouse, Ltd., the Moscow arbitrazh court on March 20, 2001, also upheld as lawful the decision of GOK to replace its registrar. (GOK Exhibit 69) The court found in particular that the petitioners had received proper notice of the change in registrars. The appellate branch of the Moscow arbitrazh court affirmed on June 26, 2001 (GOK Exhibit 70), and the Moscow Circuit Federal Arbitrazh Court in turn affirmed on September 5, 2001 (GOK Exhibit 71).

49. On August 1, 2000, the Chelyabinsk arbitrazh court determined that GOK's then registrar, Panorama, wrongfully transferred GOK shares belonging to NPRO Ural pursuant to an order of the Russian Tax Service, even though a reviewing court had overturned the Tax Service's order. (GOK Exhibit 83) According to the amended complaint, these shares eventually had been transferred to Omni Trusthouse, Ltd. (Omni). The Chelyabinsk court ordered the reversal of the transfer on GOK's registry. On October 16, 2000, the appellate branch of that court ordered the dismissal of the lawsuit as to two respondents–Amber Star OOO and Gidromashservis OOO–on the ground that they had not received proper notice of the suit and had not entered an appearance. (GOK Exhibit 84) As to all other respondents, including Panorama and Bookkeeping, the appellate branch upheld the order reversing the transfer and in particular rejected the claim of Profit House, one of the respondents, that it was an acquirer in good faith. On January 4, 2001, the Urals Circuit Federal Arbitrazh Court upheld the decision of the appellate branch. (GOK

Exhibit 85) The court noted that its ruling did not extend to persons not party to the case that might currently hold the shares in question. As this observation indicates, Omni Trusthouse, Ltd., which had not been a party to the Chelyabinsk litigation, remained free to assert its status as an acquirer in good faith of the shares at issue, and in particular continued to have the right to demand that GOK and Bookkeeping recognize its ownership. A refusal to accede to Omni's demand would be subject to review by the Sverdlovsk arbitrazh court.

50. Two separate lawsuits in Moscow's courts of general jurisdiction have involved stock acquired by some of the plaintiffs in this litigation. Both suits have left their holdings intact, in part due to courts' recognition of the good-faith-acquirer defense. On July 13, 2000, the Meshchansky local court, a Moscow court of general jurisdiction, determined that Nexus Products, LLC, as well as two other persons, had acquired shares of GOK stock from Ural Start OOO, a Russian entity, at a time when Ural Start was the recognized owner of the shares, and that no evidence had been presented that Nexus Products or the other parties knew of any impairment to Ural Start's right to dispose of those shares. (GOK Exhibit 93) The court therefore ruled that Nexus Products had no obligation to return the stock, regardless of whether Ural Start in fact did not own those shares.

51. On September 29, 2000, the Solntsevsky local court, a Moscow court of general jurisdiction, determined that the former registrar, Panorama, had wrongfully transferred shares belonging to three Russian entities to Ural Start pursuant to a forged order to execute a judgment that in fact had been reversed on appeal. (GOK Exhibit 86) The court's opinion states that Foston and the other respondents covered by the suit, including Davis International, LLC, Holdex, LLC, Omni Trusthouse, Ltd., and Nexis Products LLC, were represented and asserted an acquirer-in-good-faith defense. The court determined Foston Management, Ltd. had not proved its status as an

30

acquirer in good faith and required the transfer of Foston's stock back to the Russian entities that claimed it. The Moscow City Court on March 30, 2001, reversed the decision of the Solntsevsky court on the ground that that court had not given Foston Management adequate notice of the dispute. (GOK Exhibit 87) Subsequently, in a decision dated November 30, 2001, the Solntsevsky court withdrew its judgment on the ground that E.N. Ivanov, the one individual defendant in the case, had established his status as a good faith acquirer within the meaning of Article 302 of the Civil Code. (GOK Exhibit 88) With only firms remaining in the dispute, the court determined that it lacked jurisdiction and directed the petitioners to pursue their claim in the arbitrazh court system. The parties remain free to pursue this matter in the arbitrazh courts and to appeal the decision of the Solntsevsky court.

52. On November 22, 2000, the Kalmykia arbitrazh court issued an order invalidating the prior conveyance of a large block of GOK stock from Vanadium Trading House OOO, a limited liability company that conducted financial operations on behalf of GOK, trading house to Polyprom OOO. (GOK Exhibit 78) The court ruled that the person signing the sales contract lacked the authority to do so, and that, in addition, under the Russian law governing limited liability companies Vanadium Trading House OOO could not sell such a large block without the approval of GOK's board of directors. On April 17, 2001, the North Caucasus Circuit Federal Arbitrazh Court reversed that decision on the grounds of insufficient evidence to justify the order. (GOK Exhibit 79) That court, however, did reject Polyprom's claim that it had not received sufficient notice of the suit. On remand, the Kalmykia arbitrazh court considered additional evidence and on July 5, 2001, ordered the reversal of the earlier sale of GOK stock to Polyprom. (GOK Exhibit 80) On September 10, 2001, that court ordered that Holdex LLC be brought into the case as party. (GOK Exhibit 82) The appellate branch of that court upheld these

31

decisions on November 9, 2001. (GOK Exhibit 81) I am unaware of any subsequent appeal. It appears from the body of judicial opinions that Polyprom fully participated in the litigation leading to the three 2001 decisions, and that Holdex was represented in the proceedings after its inclusion in the suit.

53. Two common threads through all of these lawsuits are the correct interpretation of the Russian law of corporate governance and the existence of particular facts, such as whether particular documents were forged or otherwise altered. Both of these questions are matters for which a Russian court has unique expertise, and that a U.S. court would have great difficulty resolving. In particular, determining whether particular contracts, powers of attorney, and other legal documents, all prepared in Russian for Russian legal purposes, complied with the requirements of Russian law would present great problems for a U.S. court.

54. In the course of the Russian litigation, the courts demonstrated sensitivity to the basic requirements of due process. The Russian Civil Procedure Code and Arbitrazh Procedure Code condition all judicial orders on the provision of notice and an opportunity to be heard to the respondent. Where violations of these norms occur, the appellate courts have demonstrated their capacity to reverse any unlawful judicial action. In the course of the case instituted in the Tverskoy court, for example, the Moscow appellate court of general jurisdiction on March 26, 2001, overturned the November 21, 2000, order of the first-instance court on the ground that the members of the GOK board, respondents in that case, had not received notice of the suit. In the dispute over the shares alleged to have been transferred improperly to Ural Start, the Moscow court reversed the September 29, 2000, decision of the Solntsevsky court on the ground that it had not given adequate notice of the suit to several of the persons who are plaintiffs in this

32

litigation. And in the Kalmykia litigation, an appellate court fully considered the issue of whether Polyprom had received proper notice of the suit.

<u>The Effect of an Agreement to Arbitrate</u>

55. I have reviewed a power of attorney signed by what appears to be representatives of Davis International designating Eugen Aschenbrenner as a person entitled to transact on behalf of Davis, and a contract signed by Aschenbrenner on behalf of Davis selling Vanadium shares to Newstart Group Corp. (GOK Exhibits 89, 90) The power of attorney states that it is to remain in effect until December 3, 2000, and the contract of sale is dated October 6, 2000. The contract of sale contains a governing law clause that specifies that "any dispute or disagreement arising between the Purchaser and the Seller under, or in connection with, this Agreement" shall be subject to arbitration in the London Court of Arbitration. Under the Russian Code of Civil Procedure and the Arbitrazh Procedure Code, as well as the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, to which Russia is a party, a Russian court would entertain a motion to defer judicial proceedings relating to the ownership of the stock pending referral of the dispute to the designated arbitration forum. A Russian court then would determine whether to enforce the arbitration award, based on the criteria contained in the New York Convention. In particular, the Russian courts would consider the arbitration contemplated in the sales contract as a "foreign arbitration" within the meaning of the New York Convention.

<u>The Legitimacy of the Russian Court Proceedings Concerning GOK</u>

56. The arbitrazh courts in Moscow, Sverdlovsk, Kalmykia, and Chelyabinsk and manifold courts of general jurisdiction in Moscow, Sverdlovsk and St. Petersburg have addressed claims that the ousting of GOK's incumbent management in January 2000 and the subsequent disputes

33

over governance and ownership, including the Sverdlovsk bankruptcy proceedings, entailed violations of Russian law. Some of these courts also have addressed claims that various judicial determinations lacked validity because of improper notice given to the subject of the litigation. The Russian courts have considered these claims conscientiously and demonstrated a capacity both to uncover procedural violations in lower court proceedings, including lack of notice, and to apply a body of substantive law that conforms to acceptable standards of commercial practice. Based on my review of the judicial decisions discussed in this declaration, I am unaware of any reason for a U.S. court not to give comity to their determinations.

Conclusion

57. For all these reasons, I believe that Russia would provide an adequate alternative forum for litigation of the sort that has been brought against defendants in this action. I also believe that the various decisions reached by the Russian courts involving the interests at stake in this litigation appear to have complied with basic standards of fairness and do not violate any public policy of the United States.

34

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 28, 2002, at Charlottesville, Virginia.

_____
Paul B. Stephan III

35

A - 513

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

BASE METAL TRADING, S.A.; BASE METAL          :
TRADING, LTD; ALUCOAL HOLDINGS, LTD; MIKOM;   :
DAVIS INTERNATIONAL, LLC; HOLDEX, LLC; FOSTON :   Docket No. 00 Civ. 9627
MANAGEMENT, LTD.; OMNI TRUSTHOUSE, LTD;       :
NEXIS PRODUCTS, LLC; and POLYPROM, LTD.,      :
                                              :
          Plaintiffs,                         :
          v.                                  :
                                              :
RUSSIAN ALUMINUM; RUAL TRADE, LTD.;           :
SIBIRSKY ALUMINUM PRODUCTS USA CORP           :
   a/k/a SIBIRSKY ALUMINUM (US);              :
SIBIRSKY ALUMINUM (Russia);                   :
BAUXAL MANAGEMENT, S.A.; METCARE              :
MANAGEMENT, S.A.; UNIMETAL                    :
LIMITED, S.A.; OLEG DERIPASKA; MIKHAIL        :
CHERNOI; BLONDE MANAGEMENT, INC.;             :
BLONDE INVESTMENTS CORP.;                     :
PAN-AMERICAN CORP.; ARNOLD KISLIN;            :
ISKANDER MAKHMUDOV; MOSKOVSKIY                :
DELOVOI MIR BANK; NOVOKUZNETSK                :
ALUMINUM ZAVOD; NEW START GROUP               :
CORP.; VENITOM CORP.; UNIDALE LLC; and        :
INVESTLAND, LLC                               :
          Defendants.                         :
-----------------------------------------------------------------------x


**DECLARATION OF PAUL B. STEPHAN III**


    I, Paul B. Stephan III, declare:

1. Defendants Russian Aluminum et al. have requested that I supplement my declaration of

January 28, 2002, in light of the submissions made to this court by plaintiffs on September 20,

2002. I wish to correct certain misstatements found in plaintiffs' submissions and to respond to

other statements contained therein.

1

A - 514

2. I incorporate by reference paragraphs 1-4 of my declaration of January 28, 2002, which describe my qualifications as an expert on questions of Russian law.

My Ability to Speak Russian

3. I am amazed and dismayed by the assertion of plaintiffs that I am unable to read the Russian language. In my deposition, I stated clearly that I could read Russian, but believed it inadvisable to do so in the adversarial setting of the deposition without having the opportunity to compare the English translation of the Russian text on which deposing counsel was relying. It was my impression at the time that Mr. Bernard, the deposing counsel, could not read Russian, and I knew that most of the counsel whom I was assisting could not. Under those conditions, I insisted on having available the English translation on which these counsel would have to rely. Upon receiving both texts, I proceeded to correct several inaccuracies in the Russian translation. I would have thought that these corrections would have provided sufficient evidence of my ability to read Russian.

4. I find it particularly disturbing that the plaintiffs' counsel, in providing their Russian declarants with a summary of my deposition, stated baldly that "Stephan stated that he cannot read a Russian language text without a translation. (Dep. 186, 189)" (Exhibit 94 to Golubev Decl). The cited portions of my deposition provide no support for that statement. Nonetheless, Declarants Golubev and Telyukina both repeated this assertion and used it as a basis for attacking my credentials. (Golubev Decl. ¶ 192; Telyukina Decl. ¶¶ 113, 114).

5. If any further evidence is needed as to my ability to read Russian, I would note two works cited in my curriculum vita, attached as Appendix A to my January 28, 2002, declaration in this case.   These are INTERNATIONAL LAW AND INTERNATIONAL SECURITY—A U.S.-SOVIET DIALOGUE ON THE MILITARY AND POLITICAL DIMENSIONS (1991) (co-editor-in-chief with Boris

2

M. Klimenko), a joint study with the USSR Diplomatic Academy, published in the Soviet Union as Международное право и международная безопасность—Диалог советских и американских экспертов (1991), and THE MOSCOW CONFERENCE ON LAW AND ECONOMIC COOPERATION (edited with James R. Silkenat 1991), published in the Soviet Union as Тезицы выступлений советских и американских докладов—Московская конференция право и экономическое сотрудничество (1991). In the former work I supervised and checked the translation of the English-language articles into Russian. In the latter work, I personally translated about half of the Russian submissions into English. These texts are available for review and comparison. Also available for review is my translation of the RSFSR Regulation on Privatization in 1992, which appears beginning at page 1031 of Documents for International Business and Economics—Law and Policy (1996 ed.). I further declare that I personally read all of the Russian legal materials cited in my prior declarations in Russian, comparing in each case the English translations on which the counsel with whom I worked relied. I frequently provided corrections to the English translations.

My Contacts with Russian Legal Specialists

6. I also take strong exception to the claim that I have had little contact with Russia or Russian legal specialists. Plaintiffs' motion to strike my declarations and their brief opposing the motion to dismiss the complaint make assertions about my lack of contacts. These remarks are mirrored in statements by Burger, Golubev and Telyukina to the effect that my declaration is based on "descriptions of how the system is designed to work" rather than "the reality facing litigants in the Russian court system." (Burger Decl. ¶ 4; Golubev Decl. ¶ 187; Telyukina Decl. ¶¶ 112, 115 "[Stephan] has essentially no experience in the Russian judicial system"). These assertions bear no relation to reality. I am especially startled to find such criticism coming from a person who

3

completed her legal education only five years ago (Telyukina Decl. ¶ 5) and someone with no legal training at all (Golubev Dec. ¶ 7). To respond to these attacks, I will describe my work with Soviet and Russian judges, experiences that I mentioned, but did not give a detailed account of, in my earlier declaration.

7. I began my professional career, before attending law school, working as an analyst for the Office of Current Intelligence of the Central Intelligence Agency, specializing on Soviet politics and the economy. One condition of holding the security clearances that I had was promising not to travel to so-called "threat of capture" countries without CIA permission, a commitment that expired by its own terms in 1982. In that year I first traveled to the Soviet Union to meet with various government officials and academic specialists in politics, securities studies and international law. I have lost count of the number of trips I have made to the Soviet Union and its successor states since then, but the total is approximately fifty. I also organized my first academic conference in the United States on the Soviet Union in 1982, under the auspices of the University of Virginia's Center for Law and National Security. I observed a trial in the Soviet Union in 1986, the first of many such observations of first-instance proceedings in Soviet and, later, Russian courts.

8. My work in the Soviet Union intensified during the period of transition from communism. At the behest of the American Bar Association, I began in 1989 to work closely with the founding members of the U.S.S.R.'s Union of Jurists to organize a joint ABA-Union of Jurists conference on law and economic cooperation. This event was held in the Kremlin Palace in 1990 and President Gorbachev attended. It was through my work on this conference that I first got to know Professor Venyamin Yakovlev, who became U.S.S.R. Minister of Justice, a close advisor on legal affairs to President Gorbachev, and then the President of the High Arbitrazh Court. Over a

4

two-year period I organized a joint Soviet-American research project on international law and international security, an effort funded by the MacArthur Foundation that resulted in the publication of the text, International Law and International Security—A U.S.-Soviet Dialogue on the Military and Political Dimensions, in both Russia and the United States. At least in Russia, this text is still used in higher education programs. Beginning in 1990, I worked as an advisor to the Washington, D.C.-based law firm of Wilmer Cutler & Pickering, with the principal purpose of advising clients on investment and other transactions in the former states of the Soviet Union. I served as a guest professor at the U.S.S.R. Foreign Ministry's Institute for Foreign Relations, one of the premier undergraduate educational institutions in the Soviet Union, during the summer of 1991. Previously I had lectured at the Ministry's Diplomatic Academy, only the second American to do so. I was one of the principal American speakers at a conference on comparative federalism organized by the Gorbachev Foundation, an event that happened to occur in Moscow during the last week of the Soviet Union's existence in December 1991 and which was attended by leading figures in the judiciary and politics from both countries.

9. My involvement with Russian legal specialists increased after the end of the Soviet Union. From 1991 I served as an advisor to ABA President Sandy D'Alemberte in the process leading to the extension of the activities of the ABA's Central and East European Law Initiative (CEELI) to the former Soviet states, and thereafter sat on CEELI's advisory board for a number of years. I led CEELI's first delegation to Moscow in the summer of 1992, where I worked closely with the State and Law Directorate of the Office of the President as well as with the Constitutional Court, the Supreme Court and the High Arbitrazh Court on the design of the legal system and training for judges. As part of this visit I, along with the other members of the U.S. delegation (two federal judges and a state supreme court justice), conducted training sessions for Russian judges

and inspected the Ministry of Justice's training facility in Moscow. The following year I began working with the U.S. Department of Treasury to provide technical assistance regarding fiscal matters. I eventually put together a team comprising three of my former students, as well as a number of other lawyers and tax specialists, who resided full time in Moscow. Between 1993 and 1997 I made roughly twenty trips to Moscow, as well as other countries in Central and Eastern Europe, working on this project. While involved to some degree in all aspects of this program, I concentrated on taxpayer disputes and the role of the judiciary in the enforcement of the tax law. As a result, I both worked with the High Arbitrazh Court to organize training sessions and surveyed Russian lawyers who appeared before the arbitrazh courts on tax matters. And from 1993 through 1996 I served on the advisory board of the principal USAID-funded project to provide technical assistance to Russian judges, namely that headed by Professor Maggs and Sharlet. This and the preceding paragraphs do not provide an exhaustive account of my work in Russia and the Soviet Union, but touch most of the highlights.

10. I concede that I have little direct experience as a trial attorney in any court, U.S. or Russian. I have done *pro bono publico* work representing a taxpayer in the U.S. Tax Court (a proceeding that ended with the Internal Revenue Service conceding the case) but otherwise I have not represented any client in any first-instance or trial court proceeding. I consider my lack of experience as a litigator, and not any unfamiliarity with Russian law or language, as a sufficient reason not to offer my services to represent clients in Russian court proceedings. I regard myself as ethically obligated not to offer such a service, even if the regulatory regime of the court in question does not itself impose any bar to my participation. Thus, while the rules of the arbitrazh courts until recently may have allowed me, or indeed even someone like Golubev with no legal training, to represent clients in bankruptcy proceedings (Golubev Decl. ¶¶ 7, 191), I would

6

A - 519

regard my doing so as unethical.

<u>My Familiarity with the Issue of Corruption</u>

11.Burger, Golubev and Telyukina make statements to the effect that I show no familiarity with the issue of corruption in Russian law (Burger Decl. ¶ 85; Golubev Decl. ¶ 187; Telyukina Decl. ¶ 112). In response, I will both cite my published scholarship, with which Mr. Bernard showed some familiarity during my deposition, and recount my work with U.S. legal authorities on the question of corruption in Russia. My published articles discuss extensively patterns of corruption that exist in the Russian system as a reflection of its Soviet heritage. As I stated in my deposition, it is my judgment that because under the Soviet system the judiciary did not play a significant role in private economic transactions, there is not a comparable tradition of corrupting judges. My aforementioned curriculum vita refers to my work with U.S. authorities, but in light of the claims made, I feel the need to elaborate on my experience. First, in the fall of 1994, the staff of the FBI Academy in Quantico requested that I, along with my University of Virginia colleagues Alan Lynch and Paul Shoup (both professors in the Government Department and specialists in Soviet and post-Soviet studies), organize a program to prepare the Bureau for the anticipated expansion of its working relationships with the police ministries of the former Soviet states, as well as those of the former socialist states of Central and Eastern Europe. Throughout the second half of the 1990s, once regular FBI assignments in Moscow and the other former Soviet states commenced, I frequently provided instruction at the Academy to Bureau agents on Russian law and the problem of corruption. Not only did I teach in this program, but I also debriefed FBI agents who were returning from these assignments. Corruption was a common topic of discussion. The leadership of the Academy appreciated my work sufficiently to invite me to provide special lectures on Russian law to other groups not on their way to Moscow, including

A - 520

prosecutors and state police officials.

12. Second, as I discussed in my January 28, 2002, declaration and indicate on my curriculum vita, I have a close ongoing working relationship with Richard Dean, the head of the CIS practice group for the multinational law firm Coudert Brothers. Not only has Mr. Dean taught with me annually for the last ten years, but we consult frequently on questions of professional interest relating to Russian law. Our seminar commences with an analysis of the U.S. Foreign Corrupt Practices Act and criminal legislation on money laundering, which we apply to the transactional environment in Russia. Since the enactment of the 1998 Law on Bankruptcy, we also include a class on Russian bankruptcy rules and procedures in our seminar. Mr. Dean and I update these materials annually and draw heavily on Mr. Dean's practice for examples and insights. I also advise Mr. Dean in this practice, and he provides me another source of information about current events in the Russian legal community.

13. Third, the U.S. Court of Appeals for the Fourth Circuit has recognized my expertise in Russian law and Russian judicial practice by inviting me to be the sole outside speaker to the executive session of the Circuit's 2001 Judicial Conference, where I addressed the challenges and accomplishments of law and judicial reform in Russia. In addition, many judges, both federal and state, have studied Soviet and Russian law in my course offered as part of Virginia's LL.M. in the Judicial Process. These students can attest that the course I offer focuses not on the theoretical or idealized aspects of Russian law, but on the practical realities of the actual operation of this legal system, as informed by economic, sociological, and psychological tools and analysis as well as my own direct observations.

My Familiarity with Scholarly Studies of Russian Law and Legal Practice

14. I further take exception to plaintiffs' assertions that I have demonstrated little familiarity with

8

the secondary literature on Russian law. I would think that a review of my published scholarship, and the citations contained therein, would be sufficient to contradict that assertion. The reference in plaintiffs' motion to strike (P. 4) to my reliance on "a couple of publications" is taken out of context. In that deposition colloquy, I responded to a narrow and specific question, namely my knowledge of quantitative studies based on reliable methodology that provided a basis for a judgment that Russian courts provide an adequate forum for legal disputes, including those in which foreigners were parties. I did not assert or even suggest that my opinion rested entirely on those articles, as plaintiffs assert. I admit that my poor memory for names limited my ability to respond at the time of the deposition. Having refreshed my memory, I hereby declare that the name of the scholar whose name I could not recall is Glenn Hendrix, and the specific paper I had in mind was "The Experience of Foreign Litigants in Russia's Commercial Courts," in Assessing the Value of Law in Transition Economies 94 (Peter Murrell ed. University of Michigan 2001). Plaintiffs apparently are familiar with this article, although their expert does not discuss its findings, and in particular its conclusion that foreign parties do not appear to suffer significant discrimination in the arbitrazh courts. (Burger Decl., Ex. 65). I mentioned the work of Kathryn Hendley as a collective whole, not any one article. After the deposition, I returned to my office to find on my desk her "Suing the State in Russia," 18 Post-Soviet Affairs 122 (2002). This article adds to the empirical evidence she has accumulated and reported in her earlier work, all of which supports the conclusion that the arbitrazh court system operates in a reasonably effective and even-handed manner. Once one broadens the inquiry from careful empirical work based on reliable methodology, which was the subject of my response to Mr. Bernard's question, the literature and my familiarity with it is correspondingly greater. I believe my published work, all of which is cited in the aforementioned curriculum vita, speaks for itself.

9

My Conception of My Role as an Expert in Russian Law

15. Burger, Golubev and Telyukina criticize what they describe as my methodology in reaching the determinations stated in my January 28, 2002, declaration regarding the adequacy of the Russian legal process in the arbitrazh courts. They purport to apply a different methodology themselves. Burger describes his approach, in contrast to my own, as one where he sought to make a de novo determination of the issues of fact and law addressed by Russian courts in the numerous lawsuits that already have been brought concerning the subject of this litigation. (Burger Decl. ¶¶ 78, 132-97). He also has assumed the factual accuracy of pleadings made by the plaintiffs in various Russian lawsuits. (Burger Decl. ¶ 7). Golubev and Telyukina similarly conduct a de novo review of the determinations of fact and law made by the Russians courts, and appear to assume the factual correctness of the assertions made by the plaintiffs and other persons interested in and disappointed by the outcomes of the Russian litigation. (Golubev Decl. ¶¶ 194-95 ("Absent an independent review of the record, it was objectively impossible for Zankovsky [sic  Stephan is meant] to perform his function as an expert."); Telyukina Decl. ¶¶ 22-110).

16. I do not regard my function as an expert on questions of Russian law as extending to the formation of an opinion whether, had I seen all the evidence presented to a Russian tribunal, I would have resolved the questions presented in an identical fashion. Nor do I regard my function as depending on the acceptance of the factual accuracy of the representation of matters of facts subject to litigation by persons interested in the outcome of those lawsuits. To the contrary, I have considered whether the court decisions on their face seem to comply with Russian law as I understand it, whether the determinations of fact contained in those decisions appear to be the product of an adequate evidentiary process, whether appellate review of those decisions has

10

**A - 523**

offered interested parties an opportunity to challenge any legal or factual errors, whether the appellate decisions also comply with Russian law as I understand it, and whether other avenues to challenge the court decisions were open and have remained open. As I observed in my prior declaration (see "Russian Court Decisions Reviewed"), the many Russian lawsuits in the NKAZ and GOK cases have resulted in at least 13 decisions by four different federal circuit courts, as well as numerous decisions by the appellate branches of at least five different local courts. The declarations of Burger, Golubev and Telyukina fail to demonstrate any infirmities in these two levels of appellate review, other than that plaintiffs and their associates express dissatisfaction with the outcomes. To the contrary, their declarations do not even acknowledge the existence of many of these decisions.

My Response to Assertions by Burger, Golubev and Telyukina

17. The declarations of Burger, Golubev and Telyukina in particular do not discuss Russian administrative and criminal investigations into the conduct of defendants and associated persons that resulted in determinations of no reason to prosecute. In particular, the investigatory authorities in Sverdlovsk opened a criminal investigation into the GOK bankruptcy in May 2001, and concluded in November 2001 that the new managers of GOK had not participated in an intentional bankruptcy or violated any other criminal laws. (Bernard Decl. Ex. 36). This determination is not, of course, res judicata under Russian law, in the sense that these or any other criminal investigators remain free to reopen this case in light of new evidence. It is, however, relevant that proper authorities have investigated the charges levied by Burger, Golubev and Telyukina and reached a conclusion opposite from the one they have drawn. Similarly, Burger, Golubev and Telyukina make no mention of the determination of the Federal Financial Recovery and Bankruptcy Service, dated August 18, 2000, to the effect that the GOK

11

proceeding had no evidence of intentional bankruptcy. (Declaration of Oleg. Kozyrev and Samir Kapoura, Ex. 23). While this administrative determination also has no res judicata effect, as evidenced by the subsequent criminal investigation, it also indicates that the proper authorities have investigated the plaintiffs' charges and rejected them.

18. In Paragraph 24 of my January 28, 2002, Declaration, I stated that "I am confident that the plaintiffs, if they could prove that the defendants acted in an unlawful manner to injure their business interests, could obtain a satisfactory and sufficient remedy from the Russian courts." It is worth noting that events subsequent to the submission of my Declaration demonstrate that the Russian courts remain open to plaintiffs' claims, and the plaintiffs continue to participate in litigation in those courts. In particular, Khaidarov's ongoing attack on the January 28, 2002, GOK board decision to terminate his position as general director resulted in a decision on April 30, 2002 by the Kachanar court of general jurisdiction. That court fully considered his claim and rejected it on the merits. On September 24, 2002, the Kachanar regional court refused to hear Khaidarov's appeal of this decision because he had failed to file his appeal within the statutory deadline and his lawyer had failed to appear for a hearing on whether cause existed for extending that deadline. At the same time, the dispute over the ownership of GOK shares transferred to some of plaintiffs in 1998 and 1999 by the former registrar, Panorama, continues to unfold before the Sverdlovsk arbitrazh court. The most recent decision of that court of which I am aware, dated October 3, 2002, has granted an extension of time to hear the case because of its concern that plaintiffs Nexis Products LLC and Foston Management Ltd., among other parties, had not received adequate notice of the litigation. These decisions illustrate the continuing availability of the Russian courts as a forum to bring plaintiffs' claims.

19. Declarants have depicted me as having made several errors on matters of Russian law that,

they assert, demonstrate my inadequacy as an expert on this subject. In each case, the instances cited reflect either a misinterpretation of what my declaration stated or an implausible construction of Russian law. To cite only some examples, Burger seeks to impeach my understanding of the comity doctrine under Russian law. Article 1189 of the Civil Code, which he quotes, makes clear that Russian courts will respect the resolution by foreign courts of questions within their competence without any formal requirements of mutuality. (Burger Decl. ¶ 90). That the Russian doctrine of comity does not extend to the execution (not, as Burger would have it, the application) of foreign judgments is beside the point: There is no question in this case of executing any Russian court judgment, but only of showing deference to the resolution by Russian courts of matters of fact and law within their jurisdiction. Golubev contends that I am misinformed about the availability of further Russian judicial review of the court decisions involved in this litigation. (Golubev Decl. ¶ 189). In the same paragraph, however, Golubev confirms my point: The plaintiffs still can petition the High Arbitrazh Court to review these proceedings. If they could support their remarkable claims of grave judicial error, corruption and fraud, I would expect that that Court would exercise jurisdiction. Golubev further states that I was revealing ignorance of the Russian law in making the factually correct statement that dissatisfied persons purporting to be creditors of NKAZ had failed to appeal the court's determination. (Golubev Decl. ¶190). Before the March 12, 2001, decision of the Russian Constitutional Court, there was some doubt whether the provisions of the Arbitrazh Procedure Code, which did authorize appeals, was implicitly restricted by the failure of the Law on Bankruptcy expressly to provide for immediate appellate review of certain questions. Those doubts were resolved by the Constitutional Court's decision. It remains true that the putative creditors to whom I referred made no effort to seek judicial review of the arbitrazh court's

13

approval of Chernyshev's decision by any level of appellate court, either before or after the Constitutional Court's decision.

20. The briefs in support of the motion to strike and in opposition to the motion to dismiss, as well as the declarations of Burger, Golubev and Telyukina, further criticize my declaration for failure to specify exactly what bases and sources I relied upon in reaching my opinion. The plaintiff's brief in opposition to the motion to dismiss in particular states that I "cite no scholarly studies, legal articles, or any other sources to support [my] opinion." (P. 86). Burger, Golubev and Telyukina also criticize me for not separately discussing statements by political figures, newspaper stories, or secondary literature criticizing the Russian legal system in general, and the bankruptcy system in particular. I did discuss the bases of my opinion in my deposition, and here will note only briefly why I do not take at face value the published claims to which the declarants give so much credence. To summarize, my opinion as to questions of Russian law rests on more than thirty years of study of Russian and Soviet history, politics and law, and twenty years of direct experience working in the Soviet Union and Russia. I take pride in the fact that federal judges in two reported decisions have relied on my opinions as to matters of Russian law, and that dozens of federal and state judges have studied the subject under my supervision.

21. Golubev and Telyukina in particular tax me with a lack of familiarity with what they describe as "leading treatises" on Russian bankruptcy law. To the contrary, the works cited by Golubev and Telyukina represent the conclusions of persons currently occupying official positions within the Federal Bankruptcy Service or the judiciary, not the disinterested scholarly analysis that characterizes influential scholarship. I mean no disrespect to the commentary of Vitransky, to cite only one example drawn from the Golubev and Telyukina declarations, when I observe that this text may provide useful guidance to workers in the field, but is not an

14

authoritative interpretation of the law comparable to the influential treatises used in continental legal scholarship, including Russian law.

22. A common thread to the declaration of Burger, Golubev and Telyukina is that Russian bankruptcy law is exceptional, in the sense that knowledge of and experience with other aspects of Russian law has little or no bearing on one's understanding of Russian bankruptcy law. The most extreme statement of this position comes in Telyukina's declaration, where she asserts that my qualifications as an expert on Russian law must be disregarded because I have not spent much time inside Russia since 1998, the year the current Law on Bankruptcy was enacted. (Telyukina Decl. ¶ 113). I strongly disagree with this position. Russia does not have a separate system of bankruptcy courts, unlike the United States, and for the most part bankruptcy proceedings involve the application of rules derived from the Civil Code, the various versions of Russian company law, Russian administrative law, and other subjects of general significance. The Law on Bankruptcy presents refinements on the fundamental laws governing arbitrazh courts and arbitrazh court procedure, and does not represent a radical departure from preexisting legal norms.

23. The statement by Telyukina described in the prior paragraph may be understood as implying that Russia had no bankruptcy law before 1998. The implication, if that was what was meant, would be incorrect. The Federal Law of November 19, 1992, on Insolvency (Bankruptcy) of Enterprises was in effect until the 1998 Law superseded it, and various provisions of Part I of the Civil Code, which went into effect in 1995, deal with both individual and enterprise bankruptcies. The 1995 Arbitrazh Procedure Code specified the role of the arbitrazh courts in these proceedings. Criticism of this body of legislation led to the enactment of the 1998 Law, but one should not be left with the impression that the 1998 Law appeared in a vacuum.

15

24. Burger, Golubev and Telyukina cite numerous criticisms of Russian bankruptcy law by a variety of political, governmental, academic and journalistic figures. To understand this criticism, it is helpful to see Russian bankruptcy law in its particular context. At the time of the enactment of the 1998 Law on bankruptcy, a very large number of Russian firms continued to survive only because of nonenforcement of legitimate commitments for which they were obligated, including unpaid taxes, wages and suppliers' bills. A large portion of these firms had no economically rational basis for existing, in the sense that they subtracted rather than added value from the inputs they consumed to make their products. The propensity of some managers to keep firms alive mostly to obtain private benefits, rather than to sustain workers and surrounding communities, also was remarked upon by Russian and foreign observers. See, for example, the 1998 review essay by Richard Ericson, a professor of economics at Columbia University who specializes in the Soviet and post-Soviet economy, which notes the extent of these problems at that time. Richard E. Ericson, Economists and the Russian Transition, 57 Slavic Review 609 (1998). As a result, the architects of the 1998 Law on Bankruptcy chose to make it relatively easy, compared to U.S. law, for creditors to obtain the ouster of incumbent managers and to replace them with court-appointed managers certified by the federal bankruptcy authorities. One of the intellectual influences on the Russians was the work of my former colleague Barry Adler, now a professor at New York University Law School and a consultant to the drafters of the Russian law. Adler has argued that U.S. law too often allows incumbent managers to prolong the existence of firms that need closing down and that eventually do fail, at great overall loss. Representative of his work is Barry Adler, Finance's Theoretical Divide and the Proper Role of Insolvency Rules, 67 S. Calif. L. Rev. 1107 (1994). The Russian drafters chose a balance different from those aspects of U.S. law that Adler criticizes, preferring to

16

displace incumbents sooner rather than later.

25. The policy choice to prefer rapid ejection of managers that have run up losses, rather than protecting incumbents from unhappy creditors, is inevitably controversial. Either strategy may encourage opportunism by creditors or managers, and neither can work a perfect fit in all cases. I regard much of the criticism of the 1998 Law on Bankruptcy now heard in Russia as a validation of the old aphorism that the neighbor's grass is always greener. By this I mean that Russians have become familiar with the possible costs of early dismissal of incumbent managers, including the upsetting of prior business relationships and a reduction in the discretion that incumbent managers have to take risks involving a firm's future. At the same time, some Russians seem to have forgotten the costs of insider abuses and the waste associated with the continued existence of loss-generating firms that led to the enactment of the Law on Bankruptcy in the first place. The larger point, I believe, is that Russian bankruptcy law, in both design and practice, reflects legitimate and arguably desirable policy choices, and is not a subterfuge for defrauding innocent investors. The debate in Russia over this law should be understood as largely a debate over those policy choices.

26. Burger criticizes my declaration for failure to attach great significance to the secondary sources on which he so heavily relies for his conclusion that the Russian legal system is completely and irredeemably corrupted. The topic of corruption in Russia is one that has attracted considerable attention in recent years, and one that I have studied and written about extensively. Based on my research, I would argue that two things are true: (1) both perceptions of corruption and actual corrupt behavior in Russia constitute very complex phenomena, and easy, glib generalizations about them are likely to be misleading; and (2) Russian public figures and outside observers often have their own agenda and, consciously or unconsciously, slant their

17

remarks to reflect those concerns.

27. One can find, in both the scholarly literature and the popular press, blanket claims about the extent of corruption of the Russian judiciary. A popular perception does exist, as the survey evidence Burger cited indicates. But the empirical basis for the perception has not been established. Sometimes the claims come from politicians and other persons with a political agenda. At other times they come from persons whose funding depends on convincing others that a serious problem exists. But I am aware of no careful, systematic empirical study that identifies the extent and nature of the problem. Those studies cited by Burger have, in my judgment, serious flaws, most particularly an inadequate specification of the variable (corruption) that the studies purport to measure. For the reasons already given, I have difficulty taking on faith the claims in the popular press, and the academic literature that in turn relies on those claims and other anecdotal evidence.

28. Since the dissolution of the Soviet Union, the President of the Russian Federation has had as his consistent policy an effort to increase his control over the selection, supervision and promotion of Russian judges. The Russian Federation inherited a system that placed these functions in the Ministry of Justice. This practice is common to most continental European legal systems, but in Russia it presented specific problems because of the former Soviet practice of exercising another layer of control over judges through the Communist Party structure. Both Presidents Yel'tsin and Putin have attempted to alter this status quo in favor of increasing the influence of the presidency over the appointment and supervision of the judiciary.

29. Burger cites several statements by President Putin as evidence of the inadequacy of the Russian judicial system. (Burger Decl. ¶ 25). Based on my prior experience with the Russian Presidency and my study of that country, I have interpreted President Putin's many various

18

remarks about judicial inadequacy as primarily motivated by the policy of expanding presidential influence over the judiciary. Accordingly, I have interpreted his statements as reflecting that political agenda, and not as an appropriate basis for an opinion about the reality of Russian judicial practice.

30. Burger cites a reported statement by Sergey Pashin as evidence of the inadequacy of the Russian judicial system. (Burger Decl. ¶¶ 54-55). I came into contact with Sergey Pashin in 1992 and have remained in touch with him since then. He has many admirable qualities, but his conflict with the Moscow regional court that led to his removal from the bench has made it impossible for him to give a disinterested or, in my view, fully accurate picture of the Russian judiciary.

31. Burger cites an article by Professor Bernard Black as evidence of the inadequacy of the Russian judicial system. (Burger Decl. ¶¶ 34-37). As a colleague of Professor Black in various projects, and as someone who occasionally worked out of the same suite of offices with him in Moscow, I am well aware of his work on Russian business law. His views on U.S. corporate law are controversial but always interesting, and his reputation in that field is as a serious scholar. I use his articles on Russia in my own classes, although I caution my students carefully to compare his 2000 Stanford Article with his 1996 article in the Harvard Law Review. A comparison of the two articles indicates that Professor Black at different times has embraced strong but contradictory perceptions of the Russian legal system, and his perceptions may change once again. As he reveals in footnote 80 of his Stanford article, Black served as legal advisor to persons who were aggrieved by the Russian judicial decisions that he criticizes in this article.

32. Burger cites statements issued by the U.S. Department of State as evidence of the inadequacy of the Russian legal system. (Burger Decl. ¶¶ 43-48). During the time I worked in

19

Moscow I necessarily coordinated my activities with both the Embassy and the USAID staff resident there. It is my firm impression that no one in the State Department conducted a systematic, independent review of the performance of Russian judges. The reports published by the State Department, in my judgment, constitute a replaying of the popular accounts I discussed in paragraph twenty-seven above, coupled with an understandably cautious inclination to emphasize potential risks to U.S. persons considering investments or other business transactions in Russia. The State Department's reports about the state of the judiciary in many countries are equally critical, and to some degree reflect an institutional bias against making statements that run the risk of disappointing U.S. business people.

33. Based on my work with Russian judges at both the highest and lower levels of the judicial system, I have formed the impression that given the difficult context in which they operate, Russian judges on the whole, and with obvious exceptions, do a reasonably good job of carrying out their function. As I observed in paragraph 11 of my Declaration of January 28, 2002, many problems exist, including the political and economic instability, the existence of corruption within the government bureaucracy, and the uncertain funding of judicial salaries. Incidents of judicial misconduct undoubtedly take place, but the same may be said of almost any country's judiciary, the United States included. In considering whether the Russian courts offer an adequate alternative forum for purposes of applying the forum non conveniens doctrine, I have not addressed the question of whether one can say with certainty whether foreign persons such as the plaintiffs here would receive a flawless trial in Russia. Rather, I have stated, "It is realistic for persons who litigate in these courts to expect a fair and disinterested resolution of business disputes based on the law and evidence."

20

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.  Executed on October 17, 2002, at Charlottesville, Virginia.


Paul B. Stephan III

A - 534

Bruce S. Marks (BM 0991)
Marks & Sokolov, LLP
1835 Market Street, 28th Floor
Philadelphia, PA 19103
(215) 569-8901
Counsel for Plaintiff

Harris N. Cogan (HC 9313)
Blank Rome Tenzer Greenblatt LLP
405 Lexington Avenue
New York, New York 10174
(212) 885-5000
Counsel for Plaintiff

## 02 CV 1499

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| **NOREX PETROLEUM LIMITED** | **COMPLAINT** |
| **Plaintiff** | |
| v. | |
| **ACCESS INDUSTRIES, INC.;** **RENOVA, INC.;** **LEONARD BLAVATNIK;** **VICTOR VEKSELBERG;** | **JURY TRIAL DEMANDED** |
| **ALFA GROUP CONSORTIUM;** **CROWN FINANCE FOUNDATION;** **CTF HOLDINGS LTD;** **ALFA FINANCE HOLDINGS, SA;** **CROWN LUXEMBOURG HOLDINGS SA;** **ELLIOT SPITZ;** | |
| **TYUMEN OIL COMPANY;** **SIMON KUKES;** **JOSEPH BAKALEYNIK;** | |
| **LT ENTERPRISES LIMITED;** **SANDWELL ENTERPRISES LIMITED;** **EASTMOUNT PROPERTIES LIMITED; and** **ASTONS CORPORATE MANAGEMENT;** | |
| **Defendants.** | |

---

Plaintiff Norex Petroleum Limited ("Norex") complains, as follows:

## INTRODUCTION

1.      The instant case concerns injuries to the business and property of Norex as a result of a massive racketeering and money laundering scheme beginning in the 1990's operated and directed by American citizens, residents and companies, including Access Industries, Inc., Renova, Inc., Leonard Blavatnik, and Victor Vekselberg in conspiracy with American citizens Simon Kukes, Joseph Bakaleynik, and Elliot Spitz of the "Alfa Group Consortium" (the "Illegal Scheme") to takeover a substantial portion of the Russian oil industry through their control and use of the Tyumen Oil Company and its subsidiaries and affiliates ("TNK") based on an overall criminal structure, which is set forth in Exhibit A.

2.      The Illegal Scheme included the illegal takeover (the "Illegal Takeover") of Yugraneft, another Russian oil company of which Norex was majority shareholder, which was effected by TNK in the "old fashioned way" – through fraudulent representations, sheer physical force of armed thugs, and corruption of the local government, legal system and law enforcement, which refused to intervene and protect Norex's rights.

3.      Immediately following the Illegal Takeover of Yugraneft, TNK seized its assets, including over $40 million which were held as dollar and ruble cash deposits and savings certificates and in excess of $500 million worth of oil production facilities, reserves, and receivables due from companies controlled by TNK.

4.      The Illegal Scheme has been masterminded, operated and directed by Access, Renova, Blavatnik, Vekselberg, Kukes, and Bakaleynik, through offices in New

2

York City, and Spitz, through offices in London and New York, and through mail and wire communications originating from and sent to the United States and travel between foreign jurisdictions and the United States.

5.      In furtherance of the Illegal Scheme, Blavatnik, Vekselberg, Kukes, Bakaleynik, and Spitz, through their allies and companies which they control, directly or indirectly, in conspiracy with Alfa Group, committed or attempted to commit numerous criminal acts, including, but not limited to, bribery, extortion, mail and wire fraud, money laundering, illegal transactions in monetary instruments, violation of the Travel Act, and tax fraud in furtherance of the Illegal Scheme.

6.      The Illegal Scheme included, upon information and belief, bribes paid to Russian government officials in order to enable Access/Renova and Alfa to take and maintain control of TNK during its privatization in 1997 and 1999 and bribes in order to enable TNK to take and maintain control of Yugraneft.

7.      The Illegal Scheme included corruption related to the insolvency and eventual bankruptcy and reorganization of Nizhnevartovsk Nefte Gaz ("NNG"), corruption of Russian bankruptcy proceedings of Kondpetroleum and Chernogorneft, which were subsidiaries of the Russian oil company, Sidanco, and legal proceedings related to Yugraneft.

8.      During these corrupted bankruptcies, certain Defendants arranged for the sale of oil to TNK and export of oil to Alfa owned "Crown Group" at well below market prices and then effected rigged auctions of the assets of the bankrupt companies in order to obtain their petroleum reserves, to the detriment of Sidanco and its shareholders,

3