including BP-Amoco and the Harvard University Endowment Fund, as well as Norex, a creditor of both Chernogomeft and Nizhnevartovsk Nefte Gaz.

9.    These proceedings were so brazenly corrupted that Madeline Albright, Secretary of State during the administration of President Clinton, instructed the United States Export-Import Bank in 2000 not to guaranty loans for the sale of American manufactured equipment to TNK – a restriction only rescinded when TNK agreed to return some of the illegally stripped assets to the beneficial ownership of Sidanco.

10.    In addition, in 2001, as reported by the Financial Times, the European Bank for Reconstruction and Development, placed the Alfa Group owned Alfa Bank on its "black list" on the basis of its business practices, making it no longer eligible for loans.

11.    The Illegal Scheme included the agreed upon diversion of profits from TNK to some Defendants, in part through the issuance of invoices for fabricated services by secretly related offshore shell companies, in order to fraudulently avoid sharing such profits with TNK's other shareholders, including the Russian government and American interests, and in violation of Russian and English tax law.

12.    The various offshore shell companies which were secretly controlled by some Defendants, and operated in part by Astons Corporate Management, and received such funds include LT Enterprises Limited, Sandwell Enterprises Limited, and Eastmount Properties Limited.

13.    Tens of millions of dollars were wired through banks in the United States from the Crown Group to these offshore shell companies to pay invoices for fabricated

A - 538

.

services in order to create a slush fund, as evidenced by the invoices from Isle of Man based Sandwell and Bahamas based LT Enterprises attached as Exhibit B.

14.    These funds were then either kicked back to certain Defendants or, upon information and belief, used to bribe Russian government officials.

15.    The Illegal Scheme included a massive tax fraud by which monies laundered through the slush funds were paid to the offshore accounts, i.e. "o/s" of American and UK citizens, who concealed such payments from taxation in violation of American and English tax law, as evidenced by the email attached hereto as Exhibit C.

16.    In addition, some Defendants arranged a scheme by which the Crown Group submitted false invoices to TNK in order to further divert its profits to the Crown Group and then to offshore slush fund companies, as evidenced by the email attached hereto as Exhibit D.

17.    Russian President Vladimir Putin stated in his 2001 annual address that "We practically are standing before a dangerous boundary, when a judge or other law enforcer can at will choose a rule, which seems to him the most appropriate. As a result, along with the 'shadow economy' we already have a kind of 'a shadow justice' taking shape."

18.    President Putin also noted in 2001 that while corruption is the "misfortune of many countries... in Russia, this has reached such a magnitude that the government has no right to ignore it."

19.    As a result of the Illegal Scheme and Illegal Takeover, Norex has lost its interest in Yugraneft, which has an estimated value in excess of $500 million.

A - 539

20.    As compensation for its loss, Norex seeks compensatory and treble damages in excess of $1.5 billion for violation of RICO, 18 U.S.C. §1961 et seq., costs, and attorney fees.

## JURISDICTION AND VENUE

21.    Jurisdiction lies in this Court pursuant to 28 U.S.C. § 1331 and 1337(a), 18 U.S.C. § 1964(c) because this case arises under the laws of the United States, based on claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

22.    Venue is proper in this District under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because events and transactions have taken place in this District.

## STATEMENT OF PATTERN OF RACKETEERING ACTIVITIES

23.    At relevant times from 1997 to date, Defendants conspired with one another to defraud Norex and others and to obtain the property of the Norex and others through illegal conduct including extortion, bribery and threatened acts of violence.

24.    The complex scheme to defraud and racketeering activities through which the Defendants succeeded in taking illegally the property of Norex and others consisted of an intricate pattern of individual transactions and group transactions.

25.    In carrying out the scheme to defraud Norex and other victims, Defendants engaged, inter alia, in conduct in violation of criminal statutes including mail and wire fraud, 18 U.S.C. §1341 and §1343; interference with commerce by threats and violence, 18 U.S.C. § 1951; interstate and foreign travel in aid of racketeering enterprises, 18 U.S.C. § 1952; laundering of monetary instruments, 18 U.S.C. § 1956, and money laundering, 18 U.S.C. §1957.

6

26.    The activities of the Defendants in the formation and execution of the scheme and artifice to defraud, acts of extortion, bribery and threatened violence, caused and continue to cause pervasive and substantial harm to persons engaged in interstate and foreign commerce, including harm to persons and businesses engaged in the petroleum industry worldwide, including the loss in value of the holdings of numerous Americans who have invested in various companies adversely affected by Defendants, including J.I.V., LLC., the owner of Norex, BP-Amoco and its American shareholders, the American shareholders of OAO Chernogorneft and numerous American companies which will not do business in Russia because of the conduct of the Defendants.

27.    Further, some Defendants apparently corruptly influenced the courts and certain governmental bureaus of the Russian Federation, which, upon information and belief, were manipulated illegally through bribery to achieve Defendant's ends.

28.    During the relevant times, and in furtherance of and for the purpose of executing the scheme and artifice to defraud, Defendants on numerous occasions used and caused to be used interstate and foreign wire facilities as a means to obtain money and property by means of false pretenses, constituting the offense of wire fraud, in violation of 18 U.S.C. § 1343.

29.    During the relevant times, and in furtherance of and for the purpose of executing the scheme and artifice to defraud, Defendants conspired to, attempted to or did obstruct, delay or affect commerce by extortion as defined in, and in violation, of 18 U.S.C. § 1951(b)(1) and (2).

30.    During the relevant times, and in furtherance of and for the purpose of executing the scheme and artifice to defraud, Defendants traveled in interstate and

7

foreign commerce and used the mail, and caused others to do so, with the intent to commit acts of violence in furtherance of unlawful activity and to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, in violation of 18 U.S.C. § 1952.

31.    During the relevant times, Defendants knowingly and intentionally transported, transmitted and transferred, and attempted to do so, monetary instruments and funds from inside the United States to or through a place outside the United States, and to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, in violation of 18 U.S.C. § 1956.

8

## PARTIES AND OTHER IMPORTANT ENTITIES

### PLAINTIFF

32.   **Plaintiff Norex Petroleum Limited** ("Norex") is a corporation organized under the laws of Cyprus and maintains a representative office and conducts, through affiliates, business in Calgary, Canada and is owned by J.I.V. LLC, which is organized under the laws of California.

33.   At the time relevant thereto Norex was the majority shareholder of Yugraneft and lost the value of its interest when Yugraneft was seized through fraudulent representations and physical force and also was harmed by the illegal interference in its contractual relationships with Yugraneft as part of the Illegal Scheme, as described herein.

34.   Norex is a "person" within the meaning of 18 U.S.C. §1961(3) and 1964(c).

### DEFENDANTS

### THE ACCESS/RENOVA DEFENDANTS

35.   **Defendant Access Industries, Inc.** ("Access") is a company organized under the laws of the State of New York and maintains its principal place of business in New York City.

36.   **Defendant Renova, Inc.** ("Renova") is a company organized under the laws of the State of New York and maintains a place of business in New York City.

37.   **Defendant Leonid Blavatnik** ("Blavatnik") is a citizen of the United States who maintains a residence in New York City and owns and controls, directly or indirectly, Access and Renova.

9

38.    **Defendant Victor Vekselberg** ("Vekselberg") is a permanent resident of the United States and owns and controls, directly or indirectly, Renova.

39.    Access and Renova ("Access/Renova") own and control, directly or indirectly, approximately 50% of the Tyumen Oil Company.

## THE ALFA-CROWN DEFENDANTS

40.    **Defendant Alfa Group Consortium** ("Alfa Group") is an unincorporated association of various affiliated companies set forth below.

41.    The Alfa Group consists of Crown Finance Foundation; CTF Holdings Ltd; Alfa Finance Holdings, SA; Crown Luxembourg Holdings SA, OAO Alfa Bank; Alfa Capital Markets (USA), Inc; Crown Commodities Ltd; Crown Trade and Finance Limited; Crown Resources, AG; Crown Resources (USA), Inc.; OOO Alfa-Eco[1]; and various other related companies whose identities are yet to be determined.

42.    **Defendant Crown Finance Foundation** ("CFF") is a "foundation" (similar to a business trust) organized under the laws of Liechtenstein, a country known for its bank secrecy law.

43.    Upon information and belief, the beneficial owners of CFF are Russian oligarch Mikhail Fridman ("Fridman"), Alexey Kuzmichev ("Kuzmichev"), and German Khan ("Khan").

44.    **Defendant CTF Holdings Ltd** ("CTF Holdings") is a company organized under the laws of Gibraltar.

45.    CTF Holdings is owned and controlled by CFF.

---

[1] OOO stands for a limited liability company in Russian.

10

A - 544

46.    **Defendant Alfa Finance Holdings, SA** ("Alfa Finance") is a company organized under the laws of Luxembourg and shall include any predecessor company.

47.    Alfa Finance is owned and controlled by CTF Holdings.

48.    Alfa Finance is the holding company which owns the banking, financial, and industrial divisions of the Alfa Group.

49.    **Defendant Crown Luxembourg Holdings, S.A.** ("Crown Luxembourg") is a company organized under the laws of Luxembourg and shall include any predecessor company.

50.    Crown Luxembourg is owned and controlled, directly or indirectly by CTF Holdings.

51.    Crown Luxembourg is the holding company which owns the trading division of the Alfa Group.

### The Alfa Banking and Financial Division

52.    The banking and financial division of the Alfa Group consists of Alfa Bank, Alfa Capital Markets (USA), Inc. and other companies.

53.    **OAO Alfa Bank** ("Alfa Bank") is a bank organized under the laws of the Russian Federation and a member of the Alfa Group[2].

54.    **Alfa Capital Markets (USA), Inc.** ("Alfa Capital Markets") is a corporation organized under the laws of the United States, maintains an office in New York City, and is a member of the Alfa Group.

55.    Upon information and belief, Alfa Capital Markets is used to structure the laundering of the proceeds of the Slush Fund for investment in the United States, such as

---

[2] "OAO" stands for Open Stock Company in Russian which provides for the company to have more than 50 shareholders.

11

the recent acquisition of Golden Telecom, Inc., a publicly held American company, by the Alfa Group.

56.    Alfa Bank and Alfa Capital Markets are owned and controlled, directly or indirectly, by Alfa Finance.

### The Crown Trading Division

57.    The commodities trading division consists of the "Crown Group" of companies which is owned and controlled, directly or indirectly, by Crown Luxembourg.

58.    **Crown Commodities Ltd.** ("Crown Commodities") is a company organized under the laws of England and Wales and a member of the Crown Group.

59.    **Crown Trade and Finance Limited** ("CTF Ltd") is a company organized under the laws of Gibraltar and a member of the Crown Group.

60.    **Crown Resources A.G.** ("Crown AG") is a company organized under the laws of Switzerland and a member of the Crown Group.

61.    **Crown Resources (USA) Inc.** ("Crown Resources") is a corporation organized under the laws of the United States and maintains a place of business in New York City and a member of the Crown Group.

62.    The Crown Group trades oil and other commodities.

63.    **Defendant Elliot Spitz** ("Spitz") is a citizen of the United States who managed and operated the Crown Group.

64.    **OOO Alfa-Eco** ("Alfa-Eco") is a company organized under the laws of the Russian Federation which was used by the Alfa Group for trading purposes and a member of the Alfa Group.

12

### The Industrial Division

65.    The industrial division consists of various companies which own and control, directly or indirectly, industrial companies.

66.    Alfa Finance owns and controls, directly or indirectly, approximately 50% of the Tyumen Oil Company.

### THE TNK DEFENDANTS

67.    **Defendant OAO Tyumen Oil Company ("TNK")** is a company organized under the laws of the Russian Federation and does business in the United States.

68.    **Defendant Simon Kukes ("Kukes")** is a citizen of the United States and is the President and Chief Executive Officer of TNK.

69.    **Defendant Joseph Bakaleynik ("Bakaleynik")** is a citizen of the United States and is the First Vice President of TNK.

70.    **German Khan ("Khan")** is the First Vice President and Executive Director of TNK.

71.    **Igor Nam ("Nam")** is an officer of TNK.

72.    **Alexander Berman** was an officer of an affiliate of TNK who was illegally instated as the General Director of Yugraneft as part of the seizure.

73.    **OAO TNK-Nyagan ("TNK-NG")** is a company organized under the laws of the Russian Federation which is wholly owned by TNK and was used as TNK's vehicle in the corrupt bankruptcy of Kondpetroleum.

74.    **OAO TNK-Nizhnevartovsk ("TNK-NV")** is a company organized under the laws of the Russian Federation which is managed and controlled by TNK and was

13

used as TNK's vehicle to strip assets from Chernogorneft in the corrupt bankruptcy of Chernogorneft.

75.    TNK is operated and managed by Americans Simon Kukes and Joseph Bakaleynik and owned, directly or indirectly, approximately 50% by Access/Renova and approximately 50% by Alfa Group.

76.    During all relevant times, the Chairman of the Board of TNK was the Governor of the Tyumen Oblast, first Leonid Roketsky and then Sergey Sobyanin.

### THE "SLUSH FUND" COMPANIES

77.    **Defendant LT Enterprises Limited ("LT")** is a company organized under the laws of the Bahamas and is controlled, directly or indirectly, by Spitz and Kuzmichev.

78.    **Defendant Sandwell Enterprises Limited ("Sandwell")** is a company organized under the laws of the Isle of Man and is controlled, directly or indirectly, by Spitz and Kuzmichev.

79.    **Defendant Eastmount Properties Limited ("Eastmount")** is a company organized under the laws of the Isle of Man and is controlled, directly or indirectly, by Spitz and Kuzmichev.

80.    **LT, Sandwell, and Eastmount** (collectively, the "Slush Fund Companies") are some of the companies operated by the Alfa Group which submitted invoices for fabricated services to the Crown Group and in turn received over a $100 million wired through banks in the United States during the period of the Illegal Scheme.

14

A - 548

81.   These "slush funds" were used to secretly pay salaries and bonuses to some Defendants and, upon information and belief, to bribe Russian government officials.

82.   Kuzmichev, through Eastmount, was the recipient of millions of dollars of salary and bonus payments which were hidden from UK and Russian tax authorities.

83.   **Futura SA ("Futura")** is a company organized under the laws of Panama.

84.   Futura is owned and controlled, directly or indirectly, by Spitz.

85.   Spitz, through Futura, was the recipient of millions of dollars of salary and bonus payments diverted through Eastmount, which were hidden from American tax authorities.

86.   Spitz and Kuzmichev arranged for millions of dollars of salary and bonus payments to other Crown employees to be paid through the Slush Fund Companies, which were hidden from American, English, and Russian tax authorities.

### THE CORPORATE MASTERMINDS

87.   **Defendant Astons Corporate Management ("Astons")** is a company organized under the laws of the Isle of Man with its principal place of business in the Isle of Man.

88.   Astons operated and controlled the organization and operation of a number of slush fund companies in the Isle of Man on behalf of Access/Renova and Alfa, including Defendants Sandwell and Eastmount, as well as dozens of other related companies, including Owl Investments Limited, Wheatstone Investments Limited, Fairfax Services Limited, Lamport Limited, Ringford, Inverforth Properties Limited,

15

Redhill Properties Limited, Wasdale Limited, Watford Limited, Beechville Trading Limited, and Banstead Enterprises Limited.

89.    Astons created many of these companies for employees of Access/Renova and/or Crown so that they could open bank accounts at the National Westminster Bank located on the Isle of Man in order to receive secret salary and bonus payments which were concealed from taxing authorities in the United States, UK, and Russia.

90.    Astons, through its employees and officers, such as G. Caine, also sent invoices and statements of account for millions of dollars of fabricated services to Crown, as evidenced by Exhibit B.

91.    Based on its involvement in creating and operating the Slush Fund Companies and their bank accounts, Astons knew that it was participating in the Illegal Scheme by directly effecting various illegal activities, including money laundering and tax fraud, so that Access/Renova and the Alfa Group could effect the Illegal Scheme.

92.    Each Defendant is a "person" within the meaning of 18 U.S.C. §1961(3) and 1964(c).

A - 550

## RUSSIAN VICTIMS OF THE ILLEGAL SCHEME

93.    ZAO Yugraneft Corporation ("Yugraneft") is a company organized under the laws of the Russian Federation, which was illegally seized using fraudulent documents and armed thugs as part of the Illegal Scheme, as detailed here.[3]

94.    OAO Siberian Far Eastern Oil Co. ("Sidanco") is a company organized under the laws of the Russian Federation, which owned the majority interests of its subsidiaries, Kondpetroleum and Chernogorneft, and was harmed by the corrupt bankruptcies of these subsidiaries.

95.    OAO Kondpetroleum ("Kondpetroleum") is a company organized under the laws of the Russian Federation, which was stripped of its assets as the result of a corrupt bankruptcy proceeding, which were part of the Illegal Scheme, as described herein.

96.    OAO Chernogorneft ("Chernogorneft") is a company organized under the laws of the Russian Federation, which was stripped of its assets, including its shares in Yugraneft, as the result of a corrupt bankruptcy proceeding, which were part of the Illegal Scheme, as described herein.

97.    OAO Nizhnevartovsk Nefte Gaz ("NNG") is a company organized under the laws of the Russian Federation, of which 38% was owned by TNK, and over which TNK obtained full control through corrupt proceedings, as described herein.

---

[3] "ZAO" stands for Closed Stock Company, which is authorized to have no more than 50 shareholders.

17

## AMERICAN INTERESTS HARMED BY THE ILLEGAL SCHEME

98.    Numerous American interests have been harmed by the Illegal Scheme, including those set forth below.

99.    BP, plc. formerly known as BP-Amoco ("BP-Amoco") is a company with various subsidiaries and many shareholders in the United States.

100.    BP-Amoco was a shareholder of Sidanco at all relevant times.

101.    The Harvard University Endowment Fund ("Harvard") is an unincorporated fund owned by Harvard University.

102.    Harvard was a shareholder in Kantupan Holdings Co. Ltd. ("Kantupan"), an investment vehicle which, directly or indirectly, owned 40% of Sidanco, at all relevant times.

103.    BP-Amoco and Harvard were harmed by the false bankruptcies of Kondpetroleum and Chernogorneft by which the assets of these companies were stripped as part of the Illegal Scheme, destroying the value of Sidanco's interests therein, as described herein.

104.    Upon information and belief, citizens of the United States were shareholders of American Depository Receipts ("ADR's") of Chernogorneft (collectively, the "Chernogorneft American Investors"), which were managed by the Bank of New York in New York City.

105.    The Chernogorneft American Investors were harmed by the corrupt Chernogorneft bankruptcy, the illegal diversion of profits from Chernogorneft to TNK and Crown Group and the Slush Fund Companies as part of the Illegal Scheme, as described herein.

18

106.    Upon information and belief, citizens of the United States were shareholders of TNK subsidiaries (collectively, the "TNK American Investors").

107.    The TNK American Investors were harmed by the illegal diversion of profits from TNK to the Crown Group and then to the Slush Fund Companies as part of the Illegal Scheme, as described herein.

19

## BACKGROUND

108.    Unlike countries with long developed free-market systems, the economic system that emerged in Russia following the dissolution of the Soviet Union in 1992 was largely unchecked by government laws or agency regulations.

109.    As a result of privatization of the petroleum, banking, and other industries, there emerged a group of wealthy and politically influential individuals commonly known in Russia as "oligarchs."

110.    These oligarchs often have direct connections with Russian organized criminal enterprises which they use to extort other businessmen and exert their influence over the Russian legal and bureaucratic mechanisms, which provide special favors to them.

111.    In the absence of effective government regulation and law enforcement, these oligarchs use their wealth to influence local, regional and national officials, including judges, to issue decisions favorable to businesses operated or controlled by the oligarchs.

112.    According to the Harvard University's Belfer Center for Science and International Affairs acting in cooperation with the Strengthening Democratic Institutions Project (SDI), "Russia's oligarchic groups exert considerable control over the country's economic policies, politics in general and the Media – politics can be said to have been somewhat privatized during the nation's economic privatization."

113.    On September 21, 1999, Arnaud De Borchgrave, Director of the Global Organized Crime Project, Center for Strategic and International Studies, gave sworn

20

testimony before the United States House of Representatives Committee on Banking and

Financial Aid Services on the status of economic crime within the Russian Federation.

114.    De Borchgrave testified that according to research conducted by the

Russian Organized Crime Taskforce, as published in the <u>Russian Organized Crime</u>

report, Russia's court system is ineffective, does not consistently enforce established

contract and commercial rights, has limited enforcement powers, and has become a de

facto adjudicator for companies operated by economic criminals.

115.    The report further points out that corruption pervades every level of

Russia's bureaucracy and has infiltrated the Russian banking system and financial

markets.

116.    The report cautioned "the lack of a formal legal infrastructure which is

applied uniformly and publicly to all citizens, foreigners and companies operating in

Russia, allows criminal groups to escape due process of the law and legitimate business

and citizens to be victimized."

117.    According to testimony before the Congress of the United States of

America, the Russian government's anti-corruption program has been unsuccessful due

to a lack of resources and the fact that salaries of government officials are so near the

poverty level, that it is virtually impossible to eliminate corruption at the local levels.

21

## THE ILLEGAL SCHEME

118.    As described below, Defendants engaged in an illegal scheme and artifice (the "Illegal Scheme") which is open-ended and which was intended to defraud Norex and other persons.

119.    Defendants have conspired together and acted in concert to commit numerous acts of fraud, violence, and other illegal activity in furtherance of the Illegal Scheme.

120.    The Illegal Scheme has been used to defraud multiple victims and poses a substantial societal harm, in particular by defrauding persons in the United States.

## THE CORRUPT 1997 TNK PRIVATIZATION

121.    After the collapse of the Soviet Union in 1992, the Russian Federation began to privatize the Russian oil industry.

122.    In the industry, vertically integrated holding companies were established, each of which included a number of subsidiaries, including oil production units, refineries, and marketing units.

123.    In 1997, TNK was partially privatized, with a 40% controlling stake purchased by Access/Renova and the Alfa Group, through joint venture investment vehicle known as ZAO Novy Holding.

124.    The 1997 privatization of TNK was corrupt and scandalous, even by Russian standards.

22

A - 556

125.    Rather than providing for the sale of 40% of TNK's shares in a fair auction, the State Property Committee, headed by Alfred Koch ("Koch"), required any bidder to also own a certain refining unit, a controlling share of a company developing submersible oil pumps, and certain patents.

126.    Not surprisingly, the companies which owned the refining unit, the controlling share of the submersible oil pump company, and certain patents were controlled by Access/Renova and the Alfa Group.

127.    A successful bidder was then required to purchase these three assets at a price in excess of $90 million, which was far in excess of their worth, and, further, assume the risk that Access/Renova and Alfa, might resist such a sale.

128.    In essence, this rigged structure guaranteed that Access/Renova and Alfa would be the winner of the auction at the minimum bid (which included a requirement to invest certain funds in TNK), which was set hundreds of millions of dollars below the true value of such an interest in TNK.

129.    For example, a special investigation by the General Accounting Chamber of Russia determined that the 1997 privatization violated numerous aspects of Russian law and plainly was concluded to favor the successful bidder.

130.    Among the sixteen counts of violations of Russian laws and regulations listed by the General Accounting Chamber, was that the State Property Committee responsible for privatization failed to verify the legality of the source of funds used by Novy Holding to purchase its interest in TNK.

131.    Upon information and belief, Access/Renova and Alfa paid bribes through the wiring of funds through banks in the United States to Koch and other Russian

23

government officials in order to obtain their support for the corrupt privatization of TNK in 1997.

132.    Such allegation is based on common knowledge that Russian government officials were routinely bribed during privatization of state industries.

133.    Such allegation is based on the lack of any other credible explanation for the requirement that the three assets be owned by the successful bidder and, further, by the failure of the State Property Committee to compel the fulfillment of all investment conditions – even in violation of an edict by then President Boris Yeltsin that prohibited the transfer of title to the shares in TNK until all investment conditions were fulfilled.

### THE CORRUPT 1999 TNK PRIVATIZATION

134.    Ultimately, in 1999, TNK was fully privatized, with the remaining portion of its shares sold to Access/Renova and the Alfa Group, this time through ZAO Noviye Prioritety.

135.    The 1999 final privatization of TNK was equally corrupt.

136.    Once again, the terms of the privatization were set by the State Property Committee in a fashion unduly favorable to Access/Renova and Alfa.

137.    The minimum price set for the 1999 auction was so low (and obviously corrupted) that the Russian Duma even passed a resolution urging the cancellation of the sale.

138.    Nonetheless, despite the Duma's resolution, the 1999 auction resulted in Access/Renova and Alfa acquiring the remaining shares.

A - 558

## RUSSIAN BANKRUPTCIES

139.    Unfortunately, because of corruption in the Russian judiciary, which is "influenced" by powerful Russian business interests, such as Access/Renova, Alfa, and TNK, the Russian bankruptcy process is used as an aggressive weapon by corporate predators to acquire victim companies or their assets.

140.    The typical blueprint for "bankruptcy theft" in Russia by a corporate predator is the following:

   a.    Arrange for the filing of a petition placing the corporate victim into involuntary bankruptcy, often through connections with the local federal or regional government, even if the victim is solvent and able to pay its debts;

   b.    Arrange for the appointment of a "friendly" external manager (similar to a trustee under American bankruptcy law) of the victim through the corrupt Russian court system and, thus, taking control of the victim from its management and shareholders;

   c.    Direct the external manager to cancel contracts for the sale of the victim's product with the existing trading partners and replace them with contracts with the predator's affiliated companies, often at prices well below market, thus diverting profits from the victim to the predator;

   d.    Obtain control of the creditors' committee, which decides various issues during the bankruptcy either by forcing other claimants to sell their claims to the predator, arranging for the external manager to create sham claims in favor of the predator, or arrangement for the preferential payment of creditors unfriendly to the predator (and thus eliminating them from voting);

   e.    Once the profits are stripped from the victim, have the external manager declare that it cannot exist as a continuing entity and then liquidate its assets through a rigged judicial auction by which the predator acquires the assets for a pittance of their real worth.

141.    As stated by the Head of the Russian Federal Service for Financial Recovery Tatiana Trefilova, bankruptcy "is a weapon used against economic and political rivals."

25

A - 559

142.    According to the Russian Duma Speaker Gennadiy Seleznev, "bankruptcy has become an instrument for redistribution of property."

143.    Access/Renova and Alfa followed the above blueprint to the letter in regard to NNG, Kondpetroleum, and Chernogorneft.

## THE CORRUPT NIZHNEVARTOVSK NEFTE GAZ PROCEEDINGS

144.    Nizhnevartovsk Nefte Gaz ("NNG") is an oil company located in the Khanty-Mansiysky Autonomous District of Russia which is part of the Tyumen Oblast (Region).

145.    In 1997, after acquiring 40% of TNK, Access/Renova and Alfa Group arranged through corrupted governmental officials to divert flow of oil from NNG to TNK.

146.    As a result, TNK was able to take over NNG and force it into bankruptcy proceedings which resulted into stripping of assets of NNG and their transfer to other TNK controlled companies.

147.    Norex's interests were thus directly and adversely affected by the corrupt NNG Bankruptcy and Reorganization and stripping of assets, because, Yugraneft, in which Norex was the majority shareholder, did not receive the oil owed to it by NNG.

26

## THE CORRUPT KONDPETROLEUM BANKRUPTCY

148.   Kondpetroleum, a subsidiary of Sidanco at all relevant times, is located in the Khanty-Mansiysky Autonomous District of Russia, which is part of the Tyumen Oblast (Region).

149.   During the time of the bankruptcy, the governor of the Tyumen Oblast was Leonid Roketsky, who also was the chairman of TNK's Board of Directors.

150.   In September 1998, the Kondpetroleum bankruptcy was initiated.

151.   During the bankruptcy, TNK arranged for the appointment of its handpicked candidate, Boris Nuriev ("Nuriev") as Kondpetroleum's external manager.

152.   Nuriev immediately cancelled most of the oil sale contracts with Sidanco, and, not surprisingly, replaced them with contracts with TNK controlled entities eventually diverting the oil flows to Crown Group.

153.   These sales of oil were at drastically reduced prices, resulting in the diversion of millions of dollars of profit to Crown Group.

154.   As a result of these diverted profits, the external manager "found" that Kondpetroleum was insolvent and proposed sale of assets, which was approved by the corrupt court on December 7, 1998.

155.   Bidders other than TNK were wrongfully obstructed from bidding in the auction process.

156.   As a result, on October 21, 1999, the assets of Kondpetroleum were auctioned to a TNK affiliate created for the purposes of this bankruptcy, at approximately one-third of their appraised value.

A - 561

## THE CORRUPT CHERNOGORNEFT BANKRUPTCY

157.    Chernogorneft is also located in the Khanty-Mansiysky Autonomous District of Russia which is part of the Tyumen Oblast (Region).

158.    In October 1998, the bankruptcy of Chernogorneft was initiated.

159.    During the bankruptcy, TNK arranged for the appointment of its handpicked candidate, Vasily Bikin, as the external manager on May 27, 1999.

160.    Shortly thereafter, Bikin was replaced with another TNK ally, Alexander Gorshkov ("Gorshkov") as the external manager on August 3, 1999.

161.    In order to take control of the creditors' committee of Chernogorneft, TNK arranged for Alfa Bank to lend Chernogorneft $15 million in order to pay a debt owed to the United States Export-Import Bank ("Ex-Im Bank"), providing an illegal preference to the Ex-Im Bank over Chernogorneft's other creditors.

162.    Additionally, in order to take control of the creditor's committee of Chernogorneft, TNK arranged for the illegal reduction of the $35 million debt to the European Bank of the Reconstruction and Development ("EBRD") to $26 million, providing an illegal preference to the EBRD over Chernogorneft's other creditors.

163.    The purpose of this was to remove the Ex-Im Bank and EBRD as creditors, thus strengthening TNK's control over the creditors' committee.

164.    At TNK's direction, Bikin and Gorshkov arranged for the sale of Chernogorneft oil through TNK-controlled entities, which, in turn, directed the oil flows to the Crown Group, at below market prices in order to divert the revenues and profits of Chernogorneft to the Crown Group.

28

165.   Gorshkov later stopped the export of oil in order to cause Chernogorneft to be unable to pay its debts.

166.   Following the diversion of profits from Chernogorneft to the Crown Group, Gorshkov made the determination that Chernogorneft was insolvent and that its assets needed to be sold at auction.

167.   The conduct of Gorshkov was so blatantly illegal that his license was revoked by the Federal Service of Russia for Insolvency Proceedings in October 1999.

168.   Even though Gorshkov's license was revoked at that time, in October 1999, he presided over the TNK-controlled creditors' committee which approved the terms of the sale of Chernogorneft's assets at a bankruptcy auction.

169.   Not surprisingly, the terms of the auction were designed to discourage any persons other than TNK from participating and, in fact, only two bidders attended the auction: TNK and TNK-NV.

170.   Furthermore, Gorshkov's actions in preparing the auction essentially precluded other companies from participating in it.

171.   For example, despite Sidanco's request for a list of assets to be auctioned, Gorshkov refused to provide such, alleging he did not have enough paper on which to print the list.

172.   In fact, no requested documents were provided to Sidanco prior to the rigged auction.

173.   Ultimately, the auction was held despite several decisions of Russian courts prohibiting the sale and the assets of Chernogorneft were transferred to TNK-NV

A - 563

at below market prices, including its shares in Yugraneft which violated Norex's right of first refusal set forth in the Yugraneft shareholders agreement.

174.    Norex's interests were, thus, directly and adversely affected by the corrupt Chernogorneft bankruptcy because its right of first refusal for Chernogorneft's shares in Yugraneft was violated, and, further, Yugraneft, in which Norex was majority shareholder, did not receive the oil owed to it by Chernogorneft.

### SECRETARY OF STATE MADELINE ALBRIGHT'S INTERVENTION ON BEHALF OF AMERICAN INTERESTS TO BLOCK THE EX-IM BANK GUARANTEE OF LOANS TO TNK

175.    As a result of the theft of the assets and profits of Kondpetroleum and Chernogorneft through the corrupt bankruptcies, American investors in Sidanco took legal action.

176.    An action was filed in the Supreme Court of New York against instant Defendants Blavatnik, Access, Renova, and TNK by an investment fund owned, in part, by Harvard.

177.    In addition, BP-Amoco initiated a major campaign in Washington, DC to block Export-Income Bank guaranties of loans to TNK for the purchase of equipment from various American manufacturers.

178.    Ultimately, by letter dated December 21, 1999, a copy of which is attached hereto as Exhibit E, Secretary of State Madeline Albright directed that it would be in the national interest and clearly and importantly advance United States policy if the Ex-Im Bank did not approve the loan guaranty in response to BP-Amoco's complaint about the transparently corrupt nature of the Kondpetroleum and Chernogorneft bankruptcies

A - 564

179.   As a result of this action, BP-Amoco and aligned interests settled their dispute with Access/Renova and Alfa, which resulted in the return of assets purloined from Chernogorneft to Sidanco although such action did not remedy the harm to Norex and Yugraneft.

A - 565

## YUGRANEFT'S DISPUTE WITH TNK

### YUGRANEFT

180.    In October 1991, Yugraneft was formed.

181.    As of 1999, Norex owned 60% of the shares of Yugraneft and Chernogorneft owed 40% of the shares.

182.    In 1999, an audit of the books and records of Yugraneft determined that Chernogorneft had not contributed the full amount of capital to Yugraneft for its 40% share.

183.    Ultimately, Chernogorneft's interest in Yugraneft was reduced based on the determination of the firm's auditors, and, as a result, Norex's interest in Yugraneft increased to 97.3%.

184.    During all relevant times, Yugraneft maintained a corporate headquarters in Nizhnevartovsk, operating and oil production facilities in Nizhnevartovsk region and a representative office in Moscow.

### THE DISPUTE OVER THE 70,000 TONS

185.    In December 1993, Yugraneft lent 300,000 metric tons of oil to Chernogorneft.

186.    As of November 1998, the balance of oil owed to Yugraneft was approximately 70,000 metric tons of oil.

187.    In October 1998, the corrupt bankruptcy was initiated against Chernogorneft and by May 1999, an external manager of Chernogorneft controlled by TNK had been appointed.

32

188.    Throughout the bankruptcy proceedings, Yugraneft, while controlled by Norex, attempted to enforce its rights for the return of the oil.

189.    Such efforts were unsuccessful.

## THE DISPUTE OVER THE 102,000 TONS

190.    In May 1996, Yugraneft loaned 290,000 metric tons of oil to Nizhnevartovsk Nefte Gaz ("NNG"), and owned 38% by TNK (which was yet to be privatized).

191.    As of mid, 1997, the NNG owed a balance of approximately 102,000 metric tons.

192.    In the fall, 1997, corrupt proceedings were initiated against NNG in order to remove its then management in order to facilitate the corrupt privatization of TNK and establish full control over NNG.

193.    In January 1998, Yugraneft and NNG executed a verification act confirming the amount of oil owed shortly before TNK obtained effective control of NNG to be approximately 102,000 metric tons.

194.    Subsequently, a person controlled by TNK was appointed as the external manager of NNG.

195.    During the ensuing two years, Yugraneft attempted to enforce its rights for the return of the oil.

196.    Such efforts were unsuccessful.

197.    Ultimately, after the illegal seizure of Yugraneft by TNK, this debt was settled for a song.

33

### THE CONVERSATION BETWEEN KHAN AND ROTZANG

198.    Alexander Rotzang ("Rotzang"), the Chairman of the Board of Norex, the majority shareholder of Yugraneft, spoke with Khan while in San Francisco, CA in November 1999.

199.    Khan demanded that Yugraneft forget about repayment of the oil owed to it and threatened that if Yugraneft did not forget that TNK "would run over Yugraneft like a steamroller" and that "we eliminate those who go against us."

### THE AUGUST 2000 MEETING WITH KHAN

200.    In August 2000, Lyudmilla Kondrashina ("Kondrashina"), the general director of Yugraneft, met with German Khan ("Khan"), an officer of TNK.

201.    At that meeting, Khan told Kondrashina that Yugraneft should accept 30% of the value of the 70,000 and 102,000 tons of oil as settlement.

202.    Khan threatened Kondrashina that if Yugraneft did not accept its offer that Yugraneft would get nothing because TNK has its "own people at all levels of government."

203.    Yugraneft refused this offer and continued its efforts to collect the 70,000 and 102,000-ton debts without success.

### THE JANUARY 2001 MEETING WITH KHAN

204.    In January 2001, Kondrashina met again with Khan.

205.    Khan warned Kondrashina that unless Yugraneft accepted the offer on the debts of oil that in a few months TNK would take over Yugraneft.

A - 568

206.    Khan also stated that it would be fruitless to pursue litigation because TNK "controlled" Russia's Supreme Arbitration Court where commercial disputes were ultimately decided.

207.    In retrospect, it is clear that at this point, Access/Renova and Alfa had agreed upon a plan, which was directed by the Alfa Group on the one hand and Access/Renova, including Blavatnik and Vekselberg in their offices in New York on the other, to take over Yugraneft through corrupted court proceedings and the use of pure physical force.

### THE SCHEDULING OF THE YUGRANEFT SHAREHOLDERS' MEETING

208.    In May 2001, TNK, through its subsidiary TNK-NV which had purportedly obtained ownership of the shares of Yugraneft from Chernogorneft as a result of the rigged bankruptcy auction, demanded that Yugraneft hold a shareholder's meeting.

209.    At the time when the TNK-NV's demand was made, neither TNK nor TNK-NV was registered shareholders of Yugraneft.

210.    At the same time, Norex submitted a demand to Yugraneft to hold a shareholders meeting.

211.    The meeting was then scheduled for June 28, 2001.

### THE JUNE 2001 MEETING WITH KHAN

212.    In June 2001, Kondrashina met with Khan again.

213.    Khan bluntly asked Kondrashina to betray the shareholders of Yugraneft.

214.    Khan directly asked her how much money she needed to betray Yugraneft.

215.    Kondrashina refused the bribe opportunity.

35

**A - 569**

216.    Khan then warned her to "stay in the shadows" during the TNK's fight for Yugraneft.

## THE ILLEGAL TAKEOVER OF YUGRANEFT

### The Ex Parte Court Action

217.    Just a few days prior to the scheduled Yugraneft shareholders meeting, on June 25, 2001, TNK, through its subsidiary TNK-NV, filed a complaint in the Russian courts and petitioned to arrest a major portion of the shares of Yugraneft held by Norex.

218.    TNK-NV falsely represented that it had obtained legal ownership of shares in Yugraneft from the auction of Chernogorneft's assets – even though the shareholders agreement between Chernogorneft and Norex provided Norex with the right of first refusal to purchase any shares of Yugraneft offered for sale by Chernogorneft.

219.    TNK-NV also falsely represented that Norex had been served with the complaint which was required to be filed prior to or with the petition seeking to arrest its shares.

220.    On June, 26, 2001, the Russian court enjoined Norex from voting a major portion of its Yugraneft shares and prohibited Yugraneft from counting a major portion of Norex's shares at any shareholders meeting, even though Norex was never served or notified of the hearing and TNK-NV was not listed as a shareholder of Yugraneft.

221.    Upon information and belief, the proceedings were designed to control illegally the shareholders meeting of Yugraneft of June 28, 2001.

### The Shareholders' Meeting

222.    On June 28, 2001, a Yugraneft's shareholders' meeting was held at its offices in Moscow.

A - 570

223.    A representative of Norex attended the meeting.

224.    No representatives of Chernogorneft, the registered owner of the remaining shares of Yugraneft, attended the meeting, although it had been duly notified.

225.    Norex voted its shares which had not been arrested in favor of re-electing Kondrashina as the general director of Yugraneft.

226.    No votes were cast against her reelection.

### The Fraudulent Takeover

227.    On June 29, 2001, TNK took over the offices of Yugraneft in Nizhnevartovsk.

228.    Alexander Berman, an officer of a TNK affiliate, accompanied by six TNK attorneys and at least 16 thugs wearing military style fatigues and armed with machine guns invaded Yugraneft's office in Nizhnevartovsk.

229.    Their legal authority was a purported shareholders meeting of Yugraneft on June 28 at which Berman was allegedly elected as general director of Yugraneft, allegedly attended by Norex.

230.    Such a meeting never took place.

231.    On the same day, TNK sent security guards to inspect Yugraneft's field operations and, a few days later, on July 6, 2001, TNK security guards armed with handguns and machine guns took over the oil field and field office.

232.    The TNK thugs cut off phone and Internet service in order to prevent the Yugraneft employees from communicating with the outside world.

233.    On July 17, Kukes, the president of TNK, came to Yugraneft's field operations and informed the employees that Yugraneft had been taken over by TNK.

37

234.    He informed them that they were required to either sign employee agreements with TNK or leave.

235.    Amazingly, after the seizure of Yugraneft, Khan admitted in a media interview that TNK decided to take over Yugraneft because it was unwilling to accept the 30% offer for the return of oil owed to Yugraneft.

## THE THREATS BY TNK

236.    In July 2001, a Russian court issued an order enjoining Berman from acting as the General Director of Yugraneft.

237.    On or about August 1, 2001, Kondrashina, Alexander Radov, an attorney for Yugraneft (pre-takeover), together with attorney Alexey Timoshkin, came to the offices of Yugraneft with a marshal in order to enforce the order.

238.    When Radov arrived at the Yugraneft office, one of the leaders of TNK's security stated, "We know who you are and where you live.  Why do you need problems?"

239.    Shortly thereafter, Nam, along with TNK armed thugs, came to Yugraneft's offices.

240.    Nam called the local chief marshal, who then came to Yugraneft's office, and, instead of enforcing the order, based on the false minutes of the non-existent shareholders' meeting, instructed Kondrashina and the others to leave.

241.    During this encounter, Nam picked up the telephone and instructed someone to give orders to J. Paznikov, the chief judge of the Nizhnevartovsk Regional court to dismiss the order.

242.    Such an order was entered by J. Paznikov the next day.

38

243.    During this encounter, Nam told Kondrashina that she should stop fighting TNK, that TNK controlled the local government and that if she came over to their side that she would be offered the position of Deputy Mayor of Nizhnevartovsk.

244.    During the initial part of this encounter, Timoshkin arranged for videotaping of the effort to enforce the order.

245.    When Nam arrived, security guards of TNK prevented further videotaping.

246.    Later, Mr. Sidorov, the head of TNK's local security, demanded that Timoskin turn over the videotape.

247.    A representative of TNK then offered Timoskin $100,000 for the videotape.

248.    When Timoskin refused the offer, the TNK representative stated, "Do you have life insurance?  You might need it because anything can happen.  It might happen that some drunk will meet you near your house and nobody will be able to trace it to anything."

249.    This was an obvious attempt to threaten Timoskin.

250.    Also, after the meeting, Mr. Belevtsov, the chief of a TNK legal department, asked Radov to "step outside."

251.    Belevtsov stated, "Why do you need these problems?  Let's talk about your working for TNK."

252.    This was an obvious attempt to threaten and bribe Radov.

39

## THE STRIPPING OF YUGRANEFT ASSETS

253.    Following the Illegal Takeover, TNK stripped Yugraneft of its assets including ruble denominated bank deposits, dollar denominated bank deposits, ruble denominated savings certificates (known as "veksels" in Russia), and dollar denominated savings certificates.

254.    The stripped assets included the transfer of $40 million (including $24 million in dollar denominated accounts) to accounts at Alfa Bank for no apparent consideration.

255.    The net result was to strip the cash from Yugraneft and transfer it to Alfa Bank for use by the Defendants.

## THE FORGED YUGRANEFT CORPORATE DOCUMENTS

256.    As part of its justification for the Illegal Takeover of Yugraneft, TNK-NV produced "minutes" of a shareholders meeting which allegedly took place on June 28, 2001 which was allegedly attended by Norex and TNK-NV at which the shareholders allegedly voted to replace Kondrashina with Berman as Yugraneft's general director.

257.    The attendance of Norex was critical for such meeting because without Norex's attendance a quorum would not have been present.

258.    Such "minutes" were fabricated – Norex never attended such a meeting at which Kondrashina was replaced by Berman as Yugraneft's general director.

## THE USE OF ARRANGED CRIMINAL PROCEEDINGS

259.    In order to deter Norex and the legally elected officers of Yugraneft from opposing the Illegal Takeover of Yugraneft, the Defendants arranged for false criminal

40

A - 574

proceedings to be brought against Rotzang, the chairman of Norex, and Kondrashina, the General Director of Yugraneft.

260.    The use of false criminal proceedings is a typical tool used by corrupt businesspersons in Russia to wipe out adversaries and is possible because of the generally corrupt nature of Russian government, particularly at local levels.

261.    The false criminal proceedings include an investigation of Kondrashina who was alleged by TNK of embezzling certain Sberbank savings certificates, which were in her possession because she was the legitimate General Director of Yugraneft.

262.    The purpose of this "investigation" was to both intimidate Kondrashina and to use the criminal proceedings for TNK to gain control over the bonds.

263.    The false criminal proceedings include the investigation of Rotzang for using savings certificates to pay legitimate debts of Yugraneft.

264.    The purpose of this "investigation" was to both intimidate Rotzang and to use the criminal proceedings for TNK to gain control over the certificates.

265.    The false criminal proceedings were instigated by TNK and were designed to intimidate persons from cooperating with Norex and Kondrashina, the legitimate General Director of Yugraneft.

## THE ROLE OF TNK AND THE CROWN GROUP IN REGARD TO THE SALE OF YUGRANEFT OIL AFTER THE ILLEGAL TAKEOVER

266.    Subsequent to the Illegal Takeover of Yugraneft, oil from Yugraneft has been converted and sold by TNK and the Crown Group.

267.    Yugraneft oil for the Russian domestic market has been converted and sold through TNK.

41

A - 575

268.    Yugraneft oil for the foreign markets has been converted and sold through TNK and the Crown Group and substantial revenues received by them through wires through banks in the United States.

## THE SLUSH FUND AND MASSIVE TAX FRAUD

269.    After its takeover of TNK, the Alfa and Access/Renova sides arranged for all petroleum exported by TNK to be sold through Crown Enterprise.

270.    The trading between TNK and the Alfa/Crown affiliates were designed for TNK to sell product at a greatly lowered price in order to transfer the profits from Russia to offshore structures controlled by Access/Renova Groups and Alfa.

271.    This resulted in a massive tax fraud on the Russian government and the improper diversion of profits from TNK to Alfa/Crown, to the detriment of TNK's other shareholders, including the Russian government from 1997 through 1999.

272.    In order to effect this aspect of the Illegal Scheme, Access/Renova and Alfa/Crown, through Astons, established offshore companies which were purportedly independent from TNK but which Access/Renova and Alfa secretly controlled.

273.    These companies included the Slush Fund Companies.

274.    The Slush Fund Companies would send invoices for fabricated services to Crown Group companies.

275.    In return, the Crown Group companies wired tens of millions of dollars to the Slush Fund Companies through banks in the United States.

276.    One effect of the Slush Fund was to hide the fact that profits were diverted from TNK to the Crown Group.

42

277.   A second effect of the Slush Fund was to create a fund which was used to pay salary and bonuses to members of the Conspiracy, including Spitz.

278.   Spitz, through Futura, personally received millions of dollars through the Slush Fund.

279.   Upon information and belief, a third effect of the Slush Fund was to create a fund used to pay bribes to Russian government officials.

280.   A critical aspect of the Illegal Scheme was worldwide tax evasion, which permitted some Defendants to keep a much larger portion of the profits than would have occurred if all income was properly declared and all taxes properly paid.

281.   Thus, these Defendants accumulated tremendous wealth which was used to effect further acquisitions and, upon information and belief, bribe Russian government officials, all in furtherance of the Illegal Scheme.

### The Crown Commodities UK Tax Fraud

282.   Defendants created a plan by which Crown Trade and Finance Limited, which was based in Gibraltar, would purportedly act as a principal in its trading with TNK's oil.

283.   In fact, Crown Trade and Finance Limited was a mere shell corporation; all real trading was done in London by Crown Commodities.

284.   Nonetheless, Crown Commodities falsely represented to the Inland Revenue in the United Kingdom that it was merely acting as a service agent for Crown Trade and Finance Limited so that it could limit its profits to 10% of its costs.

285.   Crown Commodities, acting as a principal in regard to all trading of petroleum sourced from the TNK, should have been liable in the United Kingdom for

43

taxes on the worldwide income earned from its trading; the activities of the Gibraltar office were limited to literally rubber-stamping contracts with a rubber stamp signature facsimile.

286.    As a result of the UK tax fraud, Crown Commodities avoided over $30 million in taxes and penalties.

287.    Ultimately, upon information and belief, Crown Commodities function may have been replaced with Crown Resources AG, which registered a branch in England in order to continue the same illegal activities, much in the same way as previously conducted.

### The Crown Management US and UK Tax Fraud

288.    Crown established a system by which it only reported base salaries for its management, such as Spitz and Kuzmichev.

289.    Such base salaries were supplemented by periodic bonus payments made to offshore accounts established by Astons and controlled by management, including Eastmount Properties, which was controlled by Kuzmichev, as evidenced by the email attached hereto as Exhibit C, and Futura, which was controlled by Spitz.

290.    Upon information and belief, such income was never declared for tax purposes by Crown employees, such as Kuzmichev in the United Kingdom or Spitz in the United States.

### The Sham Invoice Fraud

291.    Pursuant to certain contracts between TNK and Crown, Crown purported to act as an agent for TNK, responsible for accounting for the profits which it made on trading to TNK.

44

292.    In practice, it was intended for Crown to act as a principal and for all trading profits to accrue to Crown.

293.    In order to conceal the real trading profits, Crown and TNK adopted a plan called "Rondo" by which Crown would issues sham invoices for the sale of petroleum, as evidenced by the email attached as Exhibit D.

294.    This plan involved the initial sale of petroleum received by Crown from TNK to a third party at an agreed-upon lower price.

295.    A copy of this sham invoice was then submitted to TNK for accounting and tax evasion purposes.

296.    In the meantime, Crown arranged for a second transaction by which the third party would resell the petroleum to Crown at this lowered price and then Crown would resell the petroleum to the third party at a higher, market price.

297.    The effect of this plan was to hide the true profit and price actually received by Crown from the sale of petroleum received from TNK to the detriment of its non Access/Renova and Alfa shareholders, including American shareholders of TNK controlled companies and the Russian government, which was a shareholder of TNK.

298.    This plan also perpetrated a tax (as well as customs) fraud on Russia because the true profit from the sale of oil was transferred from TNK to a Crown company located outside of Russia such as the UK (and then transfers the profit to one of the Slush Fund Companies through the invoices for fabricated services).

### The Diverted Address Commissions

299.    In the oil brokerage business, it is normal business practice for traders, such as the Crown Group, to arrange for the charter of vessels with shipbrokers.

45

A - 579

300.    It is also normal for the shipbrokers to pay an "address commission" of a percent of the cost of the vessel charter to the trader for selecting such shipbroker.

301.    Such address commission is normally 1 to 2 percent of the cost of chartering the vessel.

302.    In order to divert funds to the Slush Fund Companies, the Crown Group arranged with shipbrokers, such as Simpson Spence & Young ("Simpson"), which has offices in Stamford, Connecticut and London, England, to strike the "address commission" provision from its agreements and, instead, pay the address commissions to various Slush Fund Companies controlled by Defendants, including Eastmount, Ringford Trading Limited and Fulbrook Trading Limited.

303.    The diversion of such payments also operated as a tax fraud on Inland Revenue in the United Kingdom because the true income of Crown was understated and the true incomes of the Defendants, such as Spitz, who received bonus payments from this fund were understated.

304.    Upon information and belief, such payments amounted to tens of millions of dollars.

46

## THE ENTERPRISES

305.    Each enterprise defined below is an "enterprise" within the meaning of 18 U.S.C. §1961(4) and 1962(c).

### Alfa Group Enterprise

306.    Crown Finance Foundation, CTF Holdings, Alfa Finance, Crown Luxembourg, Crown Commodities Ltd, Crown Trade and Finance Limited, Crown Resources AG, TNK, TNK, TNK-NV, TNK- Nyagan, Alfa Bank, Alfa Eco, LT Enterprises; Sandwell Enterprises; and Eastmount Properties (collectively, the "Alfa Group") is an enterprise operated and controlled, directly or indirectly, by Fridman, Kuzmichev, and Khan.

### Alfa Holding Enterprise

307.    The Crown Finance Foundation, CTF Holdings, Alfa Finance, and Crown Luxembourg (collectively, the "Alfa Holding Enterprise") is an enterprise operated and controlled, directly or indirectly, by Fridman, Kuzmichev, and Khan.

### Access/Renova Enterprise

308.    Access and Renova (collectively, "Access/Renova Enterprise") is an enterprise operated and controlled, directly or indirectly, by Blavatnik and Vekselberg.

### Crown Enterprise

309.    Crown Commodities Ltd, Crown Trade and Finance Limited, Crown Resources AG, and Crown Resources (USA), Inc. (collectively, the "Crown Enterprise") is an enterprise operated and controlled, directly or indirectly, by Crown Finance Foundation, CTF Holdings, Crown Luxembourg, Fridman, Kuzmichev, Khan, and Spitz.

A - 581

### TNK Enterprise

310.    TNK, TNK-NV, TNK-Nyagan, and NNG (collectively, the "TNK Enterprise") is an enterprise operated and controlled, directly or indirectly, by Crown Finance Foundation, CTF Holdings, Alfa Finance, Fridman, Kuzmichev, Khan, Kukes, Bakaleynik, Access/Renova, Blavatnik, and Vekselberg.

### Slush Fund Enterprise

311.    LT Enterprises, Sandwell, and Eastmount (collectively, the "Slush Fund Enterprise") is an enterprise operated and controlled, directly or indirectly, by Crown Finance Foundation, CTF Holdings, Alfa Finance, Crown Luxembourg, Fridman, Kuzmichev, Khan, Kukes, Bakaleynik, Spitz, Access/Renova, Blavatnik, and Vekselberg.

### Astons Enterprise

312.    Astons is an enterprise controlled by G. Caine and other persons whose identity is unknown.

### Kondpetroleum, Chernogorneft, NNG Enterprises

313.    Kondpetroleum, Chernogorneft, and NNG are each enterprises operated and controlled by Crown Finance Foundation, CTF Holdings, Alfa Finance, TNK, Fridman, Kuzmichev, Khan, Kukes, Bakaleynik, Spitz, Access/Renova, Blavatnik, and Vekselberg.

### Yugraneft Enterprise

314.    Yugraneft is an enterprise operated and controlled, directly or indirectly, by Crown Finance Foundation, CTF Holdings, Alfa Finance, TNK, Fridman, Kuzmichev, Khan, Kukes, Bakaleynik, Access/Renova, Blavatnik, and Vekselberg.

A - 582

### Alfa/Access/Astons Enterprise ("AAA Enterprise")

315.    Crown Finance Foundation, CTF Holdings, Alfa Finance, Crown Luxembourg, Crown Commodities, Crown Trade and Finance Limited, Crown Resources AG, Crown Resources (USA), Inc., TNK, TNK-NV, TNK- Nyagan; LT Enterprises, Sandwell, Eastmount, Futura, Access/Renova, and Astons constitute an "association-in fact" enterprise (collectively, the "Alfa/Access/Astons Enterprise" or "AAA Enterprise" or "AAA Association") formed for the purpose of the takeover of a substantial portion of the Russian petroleum industry.

316.    The association in fact is different from its members in that the association in fact exists in order to provide a structure to the criminal activities of the AAA Association.

317.    Each member of the association has a defined role in regard to the criminal activities of the AAA Association.

318.    Crown Finance Foundation, CTF Holdings, Alfa Finance, and Crown Luxembourg provide holdings companies which direct the activities of its subsidiary companies and provide a legal and financial framework for the AAA Association in regard to the interests of the Alfa Group.

319.    Access and Renova provide holding companies which direct the activities of its subsidiary companies and provide a legal and financial framework for the AAA Association in regard to the interests of Blavatnik and Vekselberg.

320.    Crown Commodities, Crown Trade and Finance Limited, Crown Resources AG, and Crown Resources (USA) Inc. provide trading companies for the AAA Association by which oil taken from Russia can be sold in the world market from which

49

the proceeds are then laundered through the Slush Fund Companies and for the furtherance of communications among the Defendants.

321.    TNK, TNK NV, and TNK-Nyagan provide operating companies for the AAA Association for drilling and shipment of oil from Russia to the Crown trading companies.

322.    TNK, TNK NV, and TNK-Nyagan also provide operating companies with armed security forces for the AAA Association which can be used to seize other companies in Russia, as occurred with Yugraneft.

323.    LT Enterprises, Sandwell, and Eastmount provide offshore slush fund companies by which proceeds from the sale of oil are laundered and transactions are effected as part of the tax frauds on Russia, UK, and United States by the AAA Association.

324.    Astons provides administrative, financial, and accounting services in order to manage the various money laundering and tax fraud programs of the AAA Association.

325.    The above enterprises each constituted an enterprise pursuant to 18 U.S.C. § 1961(4) which engaged in and affected interstate and foreign commerce in the United States.

326.    The above enterprises continue to operate today and to affect the Illegal Scheme by illegally controlling Yugraneft.

327.    The above enterprises had continuity of structure and personnel because, from 1997 through the current date, they featured a hierarchical structure wherein each of

A - 584

the above and below named entities and individuals performed, among others, the

following roles:

a. Alfa Group Enterprise: The Alfa Group is an enterprise consisting of its various, affiliated companies, including the Alfa Holding Enterprise and Crown Enterprise and their various subsidiary companies, which was controlled by the Alfa Holding Enterprise.

b. Alfa Holding Enterprise (Crown Finance Foundation, CTF Holdings, Alfa Finance, and Crown Luxembourg): The Alfa Holding Enterprise provides an overall legal and financial structure for the control of subsidiary enterprises including the Crown Enterprise, TNK Enterprise, Slush Fund Enterprise, and Kondpetroleum, Chernogorneft, and NNG Enterprise. All conduct of the subsidiary Enterprises was ultimately directed by the Alfa Holding Enterprise. This Enterprise raises capital to fund the Illegal Scheme.

c. Fridman, Kuzmichev, and Khan operate and control the Alfa Holding Enterprise, including the direct involvement of Kuzmichev with the money laundering and tax fraud activities of the Crown Enterprise and the Slush Fund Enterprise.

d. Crown Enterprise (Crown Commodities Ltd, Crown Trade and Finance Limited, Crown Resources AG, and Crown Resources (USA) Inc.): The Crown Enterprise provides the trading operations and coordinates the money laundering with the Slush Fund Enterprise.

e. Spitz: Spitz, along with Fridman, Kuzmichev, and Khan, operates and controls the Crown Enterprise, including its money laundering and tax fraud activities.

f. TNK Enterprise (TNK, TNK NV, and TNK-Nyagan): The TNK Enterprise provides oil production, oil shipment, oil refining, domestic sales services, and armed security services.

g. Kondpetroleum, Chernogorneft, and NNG Enterprise: This enterprise provides oil which is sold at below market prices to TNK and/or Crown and from which the proceeds are then laundered through the Slush Fund Companies.

h. Kukes and Bakaleynik: Kukes and Bakaleynik, along with Fridman, Kuzmichev, and Khan, operate and control the TNK Enterprise, including its involvement in the corrupt bankruptcies of Kondpetroleum, Chernogorneft, and NNG, and the Illegal Takeover of Yugraneft, including operation of the arrangement by which oil is sold to the Crown

A - 585

Enterprise from which proceeds are ultimately laundered through the Slush Fund Enterprise.

i. Slush Fund Enterprise (LT Enterprises, Sandwell, and Eastmount): The Slush Fund Enterprise provides the offshore companies through which the money laundering and tax fraud is effected and is ultimately controlled by Access/Renova and Alfa.

j. Access/Renova Enterprise: Access and Renova provides an overall legal and financial structure for Blavatnik and Vekselberg for the control of subsidiary enterprises including the TNK Enterprise, Slush Fund Enterprise, and Kondpetroleum, Chernogorneft, and NNG Enterprise. All conduct of the subsidiary above enterprises was ultimately directed by Access/Renova. This enterprise raises capital to fund the Illegal Scheme.

k. Blavatnik and Vekselberg: operate and control the Access/Renova Enterprise.

l. Astons Enterprise: Astons operates and manages the Slush Fund Companies, including the preparation of the invoices by G. Caine for the fabricated services and coordination and accounting for the money laundering and tax fraud.

328.    The above enterprises were separate and distinct from the pattern of

racketeering in which Defendants engaged because, among other reasons: (a) the

members of the Enterprises were coordinated and directed to such a high degree and were

assigned such well-defined roles to execute the complex and far-flung operations of the

Illegal Scheme, that they existed separately and apart from the pattern of racketeering;

and (b) the Enterprises had goals other than just racketeering, including, but not limited

to, the continued operation of TNK and the Crown Group as producers and sellers of

petroleum and Astons as the mangers of offshore corporations.

## THE PREDICATE ACTS

329.    The Illegal Scheme was effected by a pattern of related acts of actual or attempted bribery, mail and wire fraud, extortion, money laundering, illegal transactions in monetary instruments, and interstate and foreign travel in aid of racketeering (collectively, the "Predicate Acts") which were agreed upon and coordinated among the Defendants as part of the conspiracy among Defendants to effect the Illegal Scheme.

330.    Each of the Defendants knowingly participated in the formation of the Illegal Scheme with one or more defendants and willingly participated in the Illegal Scheme by knowingly and intelligently carrying out the Predicate Acts detailed herein.

331.    Based on the nature of the Illegal Scheme, some of the details of the Defendants' wrongdoing are exclusively within the possession of the Defendants, preventing Norex from pleading certain acts with greater particularity.

332.    The Illegal Scheme began no later than 1997 and has continued through the filing of this action, with the continued Illegal Takeover of Yugraneft.

### Bribery

333.    The Illegal Scheme included predicate acts of actual or attempted bribery as described herein as part of a scheme and artifice to defraud.

334.    Upon information and belief, Russian government officials were bribed in order to obtain their cooperation in the Corrupt 1997 TNK Privatization, the Corrupt 1999 TNK Privatization, the Corrupt Kondpetroleum Bankruptcy, the Corrupt Chernogorneft Bankruptcy, the Corrupt Nizhnevartovsk Nefte Gaz Bankruptcy and Reorganization, and the Illegal Takeover of Yugraneft.

335.    Khan attempted to bribe Kondrashina at the August, 2000 meeting.

336.    Khan attempted to bribe Kondrashina at the June, 2001 meeting.

337.    Nam attempted to bribe Kondrashina at the August, 2001 meeting.

338.    TNK attempted to bribe Timoskin at the August, 2001 meeting.

339.    Belevtsov attempted to bribe Timoskin at the August, 2001 meeting.

### Extortion

340.    The Illegal Scheme included predicate acts of actual or attempted extortion through threats of physical threat or economic loss as described herein in violation of 18 U.S.C. §1951.

341.    The Corrupt Kondpetroleum Bankruptcy was used to extort economic benefits from Sidanco's shareholders, including BP-Amoco and Kantupan.

342.    The Corrupt Chernogomeft Bankruptcy was used to extort economic benefits from Sidanco's shareholders, including BP-Amoco and Kantupan, and from Yugraneft.

343.    The Corrupt NNZ Bankruptcy was used to extort economic benefits from Yugraneft.

344.    Khan threatened Rotzang in November, 1999.

345.    Khan threatened Kondrashina at the August, 2000 meeting in order to extort concessions from Yugraneft.

346.    Khan threatened Kondrashina at the January, 2001 meeting in order to extort concessions from Yugraneft.

347.    Khan threatened Kondrashina at the June, 2001 meeting in order to extort concessions from Yugraneft.

54

348.  TNK took over Yugraneft in June and July, 2001 through physical force and the threat of physical harm.

349.  TNK threatened Radov on August 1, 2001.

350.  Nam threatened Kondrashina in August, 2001.

351.  TNK threatened Timoskin in August, 2001.

352.  Belevtsov threatened Timoskin in August, 2001.

353.  TNK obtained control over Yugraneft through extortion as reflected by the threat of the armed thugs.

**Mail and Wire Fraud**

354.  The Illegal Scheme included predicate acts of mail and wire fraud as described herein in violation of 18 U.S.C. §1341 and §1343.

355.  Upon information and belief, the predicate acts of mail and wire fraud included wiring funds through banks in the United States in order to bribe Russian government officials involved in the Corrupt 1997 TNK Privatization, the Corrupt 1999 TNK Privatization, the Corrupt NNG Proceedings, the Corrupt Kondpetroleum Bankruptcy, the Corrupt Chernogorneft Bankruptcy, and the Illegal Takeover of Yugraneft.

356.  Upon information and belief, the predicate acts of mail and wire fraud included telephone, telefax, and mail communications between persons and entities located in the United States, such as Access, Renova, Blavatnik, Vekselberg, and Crown Resources (USA) Inc. on the one hand, and persons located outside of the United States on the other hand in order to effect the Illegal Scheme, including the Corrupt 1997 TNK Privatization, the Corrupt 1999 TNK Privatization, the Corrupt Nizhnevartovsk Nefte

55

A - 589

Gaz Takeover and Bankruptcy, the Corrupt Kondpetroleum Bankruptcy, the Corrupt Nizhnevartovsk Nefte Gaz Bankruptcy, the Corrupt Chernogorneft Bankruptcy, and the Illegal Takeover of Yugraneft through fraudulent representations and the threat of physical force.

357.    The predicate acts of mail and wire fraud included millions of dollars through banks in the United States in order to purchase a 40% interest in TNK through the rigged auction in 1997 in the Corrupt 1997 TNK Privatization.

358.    The predicate acts of mail and wire fraud included wiring millions of dollars through banks in the United States in order to purchase the remaining interest of TNK through the rigged auction in 1999 in the Corrupt 1999 TNK Privatization.

359.    The predicate acts of mail and wire fraud included wiring millions of dollars through banks in the United States obtained through the sale of oil of Kondpetroleum through the Corrupt Kondpetroleum Bankruptcy in 1998 and 1999.

360.    The predicate acts of mail and wire fraud included wiring millions of dollars through banks in the United States in order to purchase the assets of Kondpetroleum through the Corrupt Kondpetroleum Bankruptcy in 1999.

361.    The predicate acts of mail and wire fraud included wiring millions of dollars through banks in the United States obtained through the sale of oil of Chernogorneft through the Corrupt Chernogorneft Bankruptcy in 1998 and 1999.

362.    The predicate acts of mail and wire fraud included wiring approximately $15 million through banks in the United States in order to repay the Ex-Im Bank loan in 1999 as part of the successful effort to takeover Chernogorneft thorough the Corrupt Chernogorneft Bankruptcy.

A - 590

363.    The predicate acts of mail and wire fraud included wiring millions of dollars through banks in the United States in order to purchase the assets of Chernogorneft through the Corrupt Chernogorneft bankruptcy in 1999.

364.    The predicate acts of mail and wire fraud included wiring millions of dollars through banks in the United States in order to make payments from the Crown Group to the Slush Fund Companies as part of the Massive Tax Fraud.

365.    The predicate acts of mail and wire fraud included wiring millions of dollars through banks in the United States in order to make payments from the Slush Fund Companies to Futura, as part of the Massive Tax Fraud.

366.    The predicate acts of mail and wire fraud included wiring millions of dollars through banks in the United States from the sale of Yugraneft oil after the Illegal Takeover.

367.    The predicate acts of mail and wire fraud included wiring millions of dollars through banks in the United States from the illegal conversion of dollar denominated bank deposits and debentures of Yugraneft after the Illegal Takeover.

368.    The predicate acts of mail and wire fraud included the conversion during which Khan attempted to extort Rotzang.

369.    The predicate acts consisted of mail and wire fraud including Astons arranging for the wiring of millions of dollars through banks in the United States derived from the sham invoicing in order to facilitate money laundering and tax fraud.

### Money Laundering

370.    The Illegal Scheme included predicate acts of money laundering regarding the transfers of funds as described herein in violation of 18 U.S.C. §1957.

57

371.    As part of the Illegal Scheme, the proceeds of the sale of oil from Kondpetroleum, Chernogorneft, NNG and TNK were laundered through the Crown Group through the payment of false invoices to the Slush Fund Companies in dollar denominated wires through banks in the United States as part of the Massive Tax Fraud scheme and in order to create a slush fund to bribe Russian government officials.

372.    After the Illegal Takeover, the proceeds of the sale of oil from Yugraneft were laundered through the sale of Yugraneft's oil in the domestic market through TNK and the international market through the Crown Group in dollar denominated wire transfers through banks in the United States so that Defendants could appropriate the assets of Yugraneft.

373.    Upon information and belief, some of the profits of these proceeds were laundered through the Slush Fund Companies as part of the Massive Tax Fraud scheme and in order to create a slush fund to bribe Russian government officials.

374.    The predicate acts of money laundering of the Illegal Scheme were in furtherance of the following actual or attempted acts of specified unlawful activity: bribery, extortion, mail and wire fraud, illegal transactions in monetary instruments, and Travel Act violations, as alleged herein.

### Illegal Transactions in Monetary Instruments

375.    The Illegal Scheme included predicate acts of illegal transactions in monetary instruments as described herein in violation of 18 U.S.C. §1956.

376.    Proceeds obtained from the sale of oil of NNG, Kondpetroleum, and Chernogorneft, pursuant to the Illegal Scheme constitute "criminally derived property" in excess of $10,000 and were wired through banks in the United States.

377.    Proceeds obtained from the sale of oil obtained from Yugraneft pursuant to the Illegal Scheme constitute "criminally derived property" in excess of $10,000 and were wired through banks in the United States.

378.    Proceeds obtained from the conversion of Yugraneft's dollar denominated bank deposits and debentures pursuant to the Illegal Scheme constitute "criminally derived property" in excess of $10,000 and were wired through banks in the United States.

379.    Some of these proceeds were laundered through the Slush Fund Companies as part of the Massive Tax Fraud scheme and in order to create a slush fund to bribe Russian government officials.

380.    The predicate acts of illegal transactions in monetary instruments of the Illegal Scheme were in furtherance of the following actual or attempted acts of specified unlawful activity: bribery, extortion, mail and wire fraud, money laundering, and interstate and foreign travel, as alleged herein.

### Interstate and Foreign Travel

381.    The Illegal Scheme included predicate acts of interstate and foreign travel in aid of racketeering as described herein in violation of 18 U.S.C. §1952.

382.    In order to effect the Illegal Scheme, including the Corrupt 1997 TNK Privatization, the Corrupt 1999 TNK Privatization, the Corrupt Nizhnevartovsk Nefte Gaz Bankruptcy, the Corrupt Kondpetroleum Bankruptcy, the Corrupt Chernogorneft Bankruptcy, and the Illegal Takeover of Yugraneft, various Defendants and their agents traveled to and from the United States to Russia, including Blavatnik, Vekselberg, Kukes, Bakaleynik, Khan, Spitz, from 1997 through the filing of the instant action.

A - 593

383.    The predicate acts of interstate and foreign travel in aid of racketeering of

Illegal Scheme were in furtherance of the following actual or attempted acts of unlawful

activity: bribery, extortion, money laundering, illegal transactions in monetary

instruments, and mail and wire fraud, as alleged herein.

A - 594

## COUNT I

### Violation of RICO § 1962(a)

**Norex v. Access Industries, Inc.; Renova, Inc.; Leonard Blavatnik; Victor Vekselberg; Alfa Group; Crown Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings; Crown Luxembourg; TNK; Sandwell; LT Enterprises; and Eastmount**

384.    The allegations of the above paragraphs are incorporated herein as if set out in full.

385.    The above Defendants received income from a pattern of racketeering, as described below.

386.    The above Defendants received income as a result of the Corrupt 1997 TNK Privatization, which was effected through bribery, mail and wire fraud, money laundering, illegal transactions in monetary instruments, and violations of the Travel Act.

387.    The above Defendants received income as a result of the Corrupt 1999 TNK Privatization, which was effected through bribery, mail and wire fraud, money laundering, illegal transactions in monetary instruments, and violations of the Travel Act.

388.    The above Defendants received income from the Corrupt NNG Takeover and Bankruptcy, which was effected through bribery, economic extortion, mail and wire fraud, money laundering, illegal transactions in monetary instruments, and violations of the Travel Act.

389.    The above Defendants received income from the Corrupt Kondpetroleum Bankruptcy, which was effected through bribery, economic extortion, mail and wire fraud, money laundering, illegal transactions in monetary instruments, and violations of the Travel Act.

A - 595

390.    The above Defendants received income from the Corrupt Chernogorneft Bankruptcy, which was effected through bribery, economic extortion, mail and wire fraud, money laundering, illegal transactions in monetary instruments, and violations of the Travel Act.

391.    The above Defendants received income from the Massive Tax Fraud, which was effected through mail and wire fraud, money laundering, illegal transactions in monetary instruments, and violations of the Travel Act.

392.    A part of such income or its proceeds were used, directly or indirectly, to acquire an interest in Yugraneft and to operate Yugraneft through the Illegal Takeover within the meaning of 18 U.S.C §1961(1)(B) and §1961(5) in violation of 18 U.S.C. §1962(a).

393.    As a direct and proximate result of above Defendants' use and investment of racketeering income in the Illegal Takeover of Yugraneft, Norex has suffered damages in an amount in excess of $500 million.

A - 596

## COUNT II

### Violation of RICO § 1962(b)

**Norex v. Access Industries, Inc.; Renova, Inc.; Leonard Blavatnik; Victor Vekselberg; Alfa Group; Crown Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings; Crown Luxembourg; TNK; Simon Kukes; and Joseph Bakaleynik**

394.    The allegations of the above paragraphs are incorporated herein as if set out in full.

395.    The above Defendants, through a pattern of racketeering, acquired and maintained, directly or indirectly, an interest and control of Yugraneft through the Illegal Takeover in violation of 18 U.S.C. §1962(b).

396.    The pattern of racketeering which enabled these Defendants to acquire and maintain an interest in Yugraneft included bribery, extortion, mail and wire fraud, money laundering, illegal transactions in monetary instruments, and violations of the Travel Act set forth above.

397.    As a direct and proximate result of the above Defendants' acquisition and maintenance of an interest and control of Yugraneft within the meaning of 18 U.S.C. § 1961(1)(B) and 1961(5) through the Illegal Takeover through their pattern of racketeering, Norex suffered damages in an amount in excess of $500 million.

63

## COUNT III

### Violation of RICO § 1962(c)

### Norex v. All Defendants

398.    The allegations of the above paragraphs are incorporated herein as if set

out in full.

### Access/Alfa/Astons Enterprise

399.    All Defendants conducted and participated in the conduct of the

Access/Alfa/Astons Enterprise (association in fact) through a pattern of racketeering

activity.

400.    The pattern of racketeering included bribery, mail and wire fraud, money

laundering, illegal transactions in monetary instruments, and violations of the Travel Act

in regard to the Corrupt 1997 TNK Privatization effected by the Alfa Group; Crown

Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings; Access Industries, Inc.;

Renova. Inc.; Blavatnik, and Vekselberg.

401.    The pattern of racketeering included bribery, mail and wire fraud, money

laundering, illegal transactions in monetary instruments, and violations of the Travel Act

in regard to the Corrupt 1999 TNK Privatization effected by the Alfa Group; Crown

Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings, Crown Luxembourg;

Kukes; Bakaleynik; Access Industries, Inc.; Renova, Inc.; Blavatnik, and Vekselberg.

402.    The pattern of racketeering included bribery, economic extortion, mail and

wire fraud, money laundering, illegal transactions in monetary instruments, and

violations of the Travel Act in regard to the Corrupt NNG Reorganization effected by the

Alfa Group; Crown Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings;

A - 598

TNK; Simon Kukes; Joseph Bakaleynik; Access Industries, Inc.; Renova, Inc.; Blavatnik, and Vekselberg.

403.    The pattern of racketeering included bribery, economic extortion, mail and wire fraud, money laundering, illegal transactions in monetary instruments, and violations of the Travel Act in regard to the Corrupt Kondpetroleum Bankruptcy effected by the Alfa Group; Crown Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings; TNK; Simon Kukes; Joseph Bakaleynik; Access Industries, Inc.; Renova, Inc.; Blavatnik, and Vekselberg.

404.    The pattern of racketeering included bribery, economic extortion, mail and wire fraud, money laundering, illegal transactions in monetary instruments, and violations of the Travel Act in regard to the Corrupt Chernogorneft Bankruptcy effected by the Alfa Group; Crown Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings; TNK; Simon Kukes; Joseph Bakaleynik; Access Industries, Inc.; Renova, Inc.; Blavatnik, and Vekselberg.

405.    The pattern of racketeering included mail and wire fraud, money laundering, illegal transactions in monetary instruments, and violations of the Travel Act in regard to the Massive Tax Fraud effected by the Alfa Group; Crown Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings; Crown Luxembourg; TNK; Simon Kukes; Joseph Bakaleynik; Crown Commodities, Ltd; Crown Trade and Finance Limited; Elliot Spitz; LT Enterprises; Sandwell Enterprises; Eastmount Properties; Access Industries, Inc.; Renova, Inc.; Blavatnik, Vekselberg; and Astons.

406.    The pattern of racketeering included bribery, economic extortion, mail and wire fraud, money laundering, illegal transactions in monetary instruments, and

A - 599

violations of the Travel Act in regard to the Illegal Takeover of Yugraneft by the Alfa Group; Crown Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings; Crown Luxembourg; TNK; Simon Kukes; Joseph Bakaleynik; Crown Trade and Finance Limited; Crown Resources, AG; Access Industries, Inc.; Renova, Inc.; Blavatnik; and Vekselberg.

### Access/Renova Enterprise

407.    Blavatnik and Vekselberg conducted and participated in the conduct of the Access/Renova Enterprise through a pattern of racketeering activity.

408.    The pattern of racketeering included the illegal activity set forth above in regard to the Corrupt 1997 TNK Privatization, the Corrupt 1999 TNK Privatization; the Corruption NNG Takeover and Reorganization; the Corrupt Kondpetroleum Bankruptcy; the Corrupt Chernogorneft Bankruptcy; the Massive Tax Fraud, and the Illegal Takeover.

### Crown Enterprise

409.    The Alfa Group; Crown Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings; Crown Luxembourg; TNK; Access; Renova; Blavatnik; Vekselberg; and Elliot Spitz; conducted and participated in the conduct of the Crown Enterprise through a pattern of racketeering activity.

410.    The pattern of racketeering included the illegal activity set forth above in regard to the Corrupt Chernogorneft Bankruptcy; the Corrupt Kondpetroleum Bankruptcy; the Corrupt NNG Reorganization; the Massive Tax Fraud, and the Illegal Takeover.

A - 600

## TNK Enterprise

411.    The Alfa Group; Crown Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings; Simon Kukes; Joseph Bakaleynik; Access Industries, Inc.; Renova, Inc.; Leonard Blavatnik, and Victor Vekselberg conducted and participated in the conduct of TNK Enterprise's affairs through a pattern of racketeering activity.

412.    The pattern of racketeering included the illegal activity set forth above in regard to the Corrupt NNG Takeover and Reorganization; the Corrupt Kondpetroleum Bankruptcy; Corrupt Chernogorneft Bankruptcy; the Massive Tax Fraud, and the Illegal Takeover.

## Slush Fund Enterprise

413.    The Alfa Group; Crown Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings; Crown Luxembourg; Elliot Spitz; Access Industries, Inc.; Renova, Inc.; Leonard Blavatnik, Victor Vekselberg, and Astons conducted and participated in the conduct of the Slush Fund Enterprises through a pattern of racketeering activity.

414.    The pattern of racketeering included the illegal activity set forth above in regard to the Corrupt NNG Takeover and Reorganization; the Corrupt Kondpetroleum Bankruptcy; Corrupt Chernogorneft Bankruptcy; the Massive Tax Fraud, and the Illegal Takeover.

## NNG, Kondpetroleum, and Chernogorneft Enterprises

415.    The Alfa Group; Crown Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings; TNK; Simon Kukes; Joseph Bakaleynik; Inc.; Access, Renova, Blavatnik, and Vekselberg conducted and participated in the conduct of Chernogorneft, Kondpetroleum, and NNG Enterprises through a pattern of racketeering.

A - 601

416.    The pattern of racketeering included bribery, economic extortion, mail and wire fraud, money laundering, illegal transactions in monetary instruments, and violations of the Travel Act in regard to the Corrupt Chernogorneft Bankruptcy, the Corrupt Kondpetroleum Bankruptcy, and the Corrupt NNG Takeover and Reorganization.

### Yugraneft Enterprise

417.    The Alfa Group; Crown Finance Foundation; CTF Holdings, Ltd; Alfa Finance Holdings; TNK; Simon Kukes; Joseph Bakaleynik; Access; Renova; Blavatnik, and Vekselberg conducted and participated in the conduct of Yugraneft through a pattern of racketeering.

418.    The above Defendants managed, conducted, and participated in the conduct of the above enterprises through a pattern of racketeering within the meaning of 18 U.S.C. §1961(A) and (B) including bribery, economic extortion, mail and wire fraud, money laundering, illegal transactions in monetary instruments, and violations of the Travel Act in regard to the Illegal Takeover of Yugraneft.

419.    Defendants, in combination and concert with others, devised and intended to devise a scheme in order to defraud Norex and to obtain money and property from Norex by means of false and fraudulent pretenses, extortion, and bribery, as described above.

420.    As a direct and proximate cause of the above pattern of racketeering, Norex suffered damages in an amount in excess of $500 million.

A - 602