# UNCONTESTED DIRECT EVIDENCE OF CORRUPTION AND OTHER CRIMINAL CONDUCT BY DEFENDANTS

## CORRUPTION OF JUDICIAL PROCEEDINGS AFFECTING PLAINTIFFS



# UNCONTESTED DIRECT EVIDENCE OF CORRUPTION AND OTHER CRIMINAL CONDUCT BY DEFENDANTS

## CORRUPTION OF JUDICIAL PROCEEDINGS AFFECTING PLAINTIFFS

# UNCONTESTED DIRECT EVIDENCE OF CORRUPTION AND OTHER CRIMINAL CONDUCT BY DEFENDANTS

## CORRUPTION OF OTHER JUDICIAL PROCEEDINGS IN KEMEREVO BY DEFENDANTS AND THEIR ALLIES



# UNCONTESTED DIRECT EVIDENCE OF CORRUPTION AND OTHER CRIMINAL CONDUCT BY DEFENDANTS

## CORRUPTION OF OTHER JUDICIAL PROCEEDINGS IN KEMEREVO BY DEFENDANTS AND THEIR ALLIES



# UNCONTESTED DIRECT EVIDENCE OF CORRUPTION AND OTHER CRIMINAL CONDUCT BY DEFENDANTS

## CORRUPTION OF THE CRIMINAL JUSTICE SYSTEM
## AFFECTING PLAINTIFFS



## UNCONTESTED DIRECT EVIDENCE OF CORRUPTION AND OTHER CRIMINAL CONDUCT BY DEFENDANTS

**EXTORTION**



# UNCONTESTED DIRECT EVIDENCE OF CORRUPTION AND OTHER CRIMINAL CONDUCT BY DEFENDANTS

## EXTORTION



# SERGEI ZANKOVSKY: THEORY AND PRACTICE OF BANKRUPTCY

\* \* \*

## Theory

The initial purpose of the Law "On Insolvency (Bankruptcy)" was to provide equal protection of proprietary rights of the debtor and its creditors within the bankruptcy proceedings.

\* \* \*

## Practice

However, the practice of application of the Bankruptcy Law reveals a completely different picture.

It would be very strange if the dark minds did not think of a way to use bankruptcy in companies' takeovers.

The initiation of the bankruptcy proceedings turned out to be an extremely easy task: any company is under a threat of bankruptcy if it is not able to pay off its debts of at least 500 minimal wages within three months. There are several ways to bring a company to the condition when it is not able to pay off its debts within three months. One of them, the most "reliable", is through a "penetration" into its executive bodies. This happened, for example, with one large ore mining and processing plant. Immediately after it came to power, its new management took large bank loans with the repayment term of ten to fifteen days. Clearly, the issue of repayment was not even considered thus very efficiently resolving the problem of the initiation of a bankruptcy. The above is just an initial phase, a preliminary stage in gaining control over the company. The main events develop later, in the course of the bankruptcy proceedings, when a creditors' meeting and an arbitrazh manager come into play. The final result of these proceeding depends solely on their interaction.

## Goals and Tasks

By definition, the goal of any creditor is get their money back.

However, things go completely different when the only goal of the creditors is to create prerequisites for gaining control over the company. In such a case it is in their interests to file a petition with the court seeking to remove any arbitrazh manager who intends to act in compliance with the law on bankruptcy. They are interested in quickly declaring the debtor bankrupt and, therefore, actively resist the possibility of a settlement with the debtor.

* * *

## The All-Powerful Manager

As to the arbitrazh manager, his main goal is to act within the framework established by the law on bankruptcy, taking into account the interests of the debtor as well as its creditors. The first obstacle to that are poorly qualified managers.

Negative tendencies become clear when the manager attempts to orchestrate the company's takeover, especially since the law on bankruptcy grants him a wide range of powers. As early as at the supervision stage, an (arbitrazh) manager can demand the removal of the debtor's manager and then assume his responsibilities. Furthermore, a manager is able to force an introduction of the competitive proceedings, the final stage in a bankruptcy, which usually ends in liquidation of the debtor.

In his interactions with the creditors, the sham manager's goal is to create such a composition of creditors that would only make decisions necessary for the retention of control over the company. One of the manager's functions, i.e. determining the pool of debtor's creditors and the total amount of their claims, serves as an instrument in achieving that goal. In violation of the law, the manager can use this function to refuse to include the claims filed by the "inconvenient" creditors in the register of creditors' claims. Since for a certain period of time the manager runs the company and can independently dispose of its property, he is also able to create false debts to engage "useful" in his opinion persons as creditors.

# DEFENDANTS' POST-ARGUMENT SUBMISSIONS 2-20-03

# WINSTON & STRAWN

35 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60601-9703

43 RUE DU RHONE
1204 GENEVA, SWITZERLAND

36TH FLOOR
333 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-1543

MICHAEL D. BURROWS
(212) 294-4616
mburrows@winston.com

200 PARK AVENUE
NEW YORK, NEW YORK 10166-4193

(212) 294-6700

FACSIMILE (212) 294-4700

www.winston.com

31 AVENUE VICTOR HUGO
75116 PARIS, FRANCE

1400 L STREET, N.W.
WASHINGTON, D.C. 20005-3502

February 20, 2003

**BY HAND**

Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street, Room 1030
New York New York 10007

Re:     **Base Metal Trading SA, et al. v. Russian Aluminum, et al.**
             **00 Civ. 9627 (JGK)**

Dear Judge Koeltl:

As Your Honor's directed at the recent oral argument, we are enclosing two copies of charts of the GOK and NKAZ contracts as well as the declarations of Professor Maggs and Paul Stephan both dated February 19, 2003 (with exhibits providing the Court with the relevant Russian statutes), describing remedies available to the plaintiffs in Russia. In that regard, in addition to the consents to jurisdiction already provided by the defendants, the defendants will, if Your Honor deems it appropriate, consent to venue in Moscow -- thus avoiding any allegation of advantage which might otherwise pertain in Kemerovo and Kachkanar.

Also submitted herewith are letters from Reynolds Tilberg, counsel for NKAZ, and Peter Meghian counsel for GOK. These letters address plaintiffs' chart of Russian court decisions which was served on defendants on the morning of the oral argument.

Finally, we are enclosing two copies of defendants' CD ROM which has been updated to include the charts (chronologies) of Russian Court decisions which were submitted on

WINSTON & STRAWN

Honorable John G. Koeltl
February 20, 2003
Page 2

February 7th and referred to during defendants' oral argument.  These CD ROMs supercede and should be substituted for the earlier versions sent to Your Honor.

Respectfully submitted,

Michael D. Burrows
On behalf of all defendants

MDB:dkm

cc:    James Bernard, Esq. - Stroock Stroock & Lavan LLP (by hand)
Raymond Hannigan, Esq. - Herrick Feinstein LLP (by hand)
Bruce S. Marks - Marks & Sokolov(by Fed Ex)
defendants' counsel (by Fed Ex)

# HOGAN & HARTSON
### L.L.P.

IRA M. FEINBERG
PARTNER
(212) 918-3609
IMFEINBERG@HHLAW.COM

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

February 20, 2003

**By Hand**

Hon. John G. Koeltl
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

<u>Base Metal Trading, S.A., et al. v. Russian Aluminum et al.</u>
<u>Docket No. 00 Civ. 9627 (JGK)</u>

Dear Judge Koeltl:

On the morning of February 10, 2003, shortly before oral argument on the defendants' motions to dismiss, plaintiffs provided the Court and counsel with a notebook containing charts and other materials relating to the pending motions. Counsel for NKAZ did not have an opportunity to review plaintiffs' notebook before oral argument, and thus could not respond at that time. Since then, we have reviewed plaintiffs' notebook carefully, and found that the portions relating to the NKAZ bankruptcy contain a number of errors and other objectionable matters that we believe are important to call to the Court's attention.

1. Plaintiffs have included in their charts new allegations, which are not supported by anything in the record and are made for the first time in these charts. <u>See, e.g.</u>, charts of NKAZ bankruptcy litigation ▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓ (stating that "Plaintiffs have recently become aware" of new allegations of supposed corruption). We respectfully urge the Court to disregard these allegations.

2. The legal discussion in the footnotes to plaintiffs' charts contains several errors and mischaracterizations. For example, in footnote 2, plaintiffs claim that they could not have relied on the March 12, 2001 decision of the Russian Constitutional Court, which held unconstitutional the Bankruptcy's Law's

WASHINGTON, DC
BERLIN  BRUSSELS  LONDON  PARIS  BUDAPEST  PRAGUE  WARSAW  MOSCOW  TOKYO
NEW YORK  BALTIMORE  McLEAN  MIAMI  DENVER  BOULDER  COLORADO SPRINGS  LOS ANGELES

**A - 690**

restrictions on appeals of interlocutory orders in bankruptcy proceedings, because that ruling did not have retroactive effect. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ This contention is wrong, and plaintiffs' effort to find support for their argument in the article by Judge V. Anishina, which defendants submitted as Exhibit 2 to the Declaration of Sergey Komolov, is based on a mischaracterization of what Judge Anishina said.

Plaintiffs quote Judge Anishina as saying that decisions of the Constitutional Court "have no retroactive force," and that therefore "a citizen [who] did not apply to the Constitutional Court and after [a ruling that a law was unconstitutional] seeks for review of a case" would not have the right to seek review based on that decision. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ However, plaintiffs have taken this statement out of context. The quoted portion of Judge Anishina's article makes clear that this comment only applies to situations where someone was trying to reopen decisions "that have long entered into legal force and have been enforced" ▓▓▓ – in other words, e.g., to efforts to seek to reopen a money judgment that has long since become final and has been collected. In contrast, Judge Anishina makes clear in the very next sentence of her article that the Constitutional Court ruling would be applicable to court decisions or orders that had not yet become final (or "entered into legal force"), as well as to court judgments that were final but had not yet been enforced. As Judge Anishina explains:

> The decisions that have not entered into force and the decisions that have entered into force but have not been enforced . . . are to be reviewed upon application of interested persons. The decisions that have not entered into force are to be reviewed by way of cassation (appeal), the decisions that have entered into force, by way of review . . . o[n] the basis of newly revealed circumstances or pursuant to supervisory procedure [i.e., petition to the Supreme Arbitrazh Court], depending on the body to which the citizen made a filing.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

Here, the relevant decisions of the bankruptcy court had clearly not been "enforced" at the time of the Constitutional Court ruling. The Constitutional Court's ruling was issued on March 12, 2001, at a time when the bankruptcy proceedings were still open and there was no final determination of the bankruptcy. The bankruptcy proceedings were not officially terminated in the Arbitrazh Court until that Court approved the amicable settlement agreement on April 3, 2001, and that decision was subject to an appeal, which was not decided until September 6, 2001. Thus, before April 3, 2001, plaintiffs could have applied for leave to appeal the Arbitrazh Court's interlocutory rulings, and sought to delay approval of the

2