# STROOCK

By Hand

February 20, 2003

James L. Bernard
212-806-5684
JBERNARD@Stroock.com

Honorable John G. Koeltl
United States District Judge
United States District Court - S.D.N.Y.
500 Pearl Street - Room 1030
New York, New York 10007

Re:    Base Metal Trading, S.A. et al. v. Russian Aluminum et al.
       Docket No. 00 Civ. 9627 (JGK)

Dear Judge Koeltl:

We represent the Aluminum Plaintiffs and write on behalf of all plaintiffs to provide the Court with the supplemental material addressed at the February 10 hearing. Enclosed, please find the following items: (1) Declaration of the Honorable Sergey Borisovich Zaitsev, dated February 19, 2003, concerning various aspects of Russian law; (2) Second Declaration of Joseph Traum, dated February 19, 2003, concerning the US plaintiffs; (3) additional contracts referred to in the various papers but not otherwise part of the record; and (4) a revised version of plaintiffs' 1-Brief with the charts we presented at the hearing and links to the underlying material.

First, as the Court recognized at the February 10 hearing, a foreign forum is only adequate if the foreign forum's laws provide plaintiffs with the opportunity to assert their claims. See, e.g., Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22 (1981) ("[D]ismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute."); Parex v. Russian Savings Bank, 116 F. Supp.2d 415, 426-27 (S.D.N.Y. 2000) (holding that Russia was not an adequate alternative forum because Russian law did not recognize cause of action for breach of specific contract). In the accompanying declaration, Judge Zaitsev, who served in

**A - 745**

Honorable John G. Koeltl
February 20, 2003
Page 2

various courts, including the Moscow Arbitrazh Court, addresses why Russian law is not adequate in this regard, and we summarize the key points below:[1]

- In order to assert claims for damages under the applicable provisions of the Russian Civil Code, plaintiffs must first return to the corrupt courts that issued the underlying orders and move those courts to vacate these orders. See ZaitsevDec. ¶¶ 20-27; 35-49; 55-60. Furthermore, these orders can only be vacated if the individuals responsible for the corruption are first convicted of criminal wrongdoing. See Zaitsev Dec. ¶¶ 22-27; 43-49.

- Russian law does not currently recognize a cause of action for tortious interference with contract, nor could plaintiffs assert a claim for unjust enrichment arising from the corrupted bankruptcies because plaintiffs' property rights in the improperly repudiated contracts were not directly transferred to defendants. See Zaitsev Dec. ¶¶ 35-66. Russian law does not otherwise provide an independent cause of action for fraud. See Zaitsev Dec. ¶¶ 67-73.

- Plaintiffs cannot appeal these orders to the Supreme Arbitrazh Court ("SAC") on the ground that the proceedings were corrupted because the SAC can only review evidence in the record of the proceedings below, and this evidence may not be considered until the individuals responsible for the corruption are convicted of criminal wrongdoing. Even if plaintiffs could obtain review, review by the SAC is highly discretionary (only 570 of 16,867 applications were granted in 2001) and even if the orders were vacated, the actions would be remanded back to the same courts that issued the corrupt orders in the first place. See Zaitsev Dec. ¶¶ 28-34.

- Although Russian courts may compel witnesses to testify, oral testimony is almost never offered into evidence in the arbitrazh courts, which rely almost exclusively on written evidence. Russian courts also do not provide for pre-trial depositions of witnesses, nor do they generally compel the production of documents. See Zaitsev Dec. ¶¶ 74-85.

Defendants do not disagree with Judge Zaitsev's conclusion that plaintiffs must return to the corrupt courts that issued the underlying orders, and move those courts to have

---

[1]    Because Judge Zaitsev can also speak to the issue of corruption in the Moscow arbitrazh courts from personal experience, he addresses this point as well. See Zaitsev Dec. ¶¶ 86-96.

Honorable John G. Koeltl
February 20, 2003
Page 3

those orders vacated. At the hearing on February 10, Mr. Burrows took the same position:

> MR. BURROWS: . . . If that happened here, Your Honor, if there was a bankruptcy here, and it was hopelessly tainted, and people were corrupted and bribed, it would end up -- it would end up here with Your Honor, and then it would end up at the Second Circuit.
>
> And if it was a bankruptcy that was then -- that then came to Your Honor, we would make those allegations right here. We would say Judge, here's what happened below, this is what happened to this witness, this is what happened to this witness, and this judge was influenced, and he got a call from the governor. We would make those allegations, and you would hear it. You wouldn't send us to -- where would you send us? You wouldn't send us to state court. You wouldn't send us anywhere else. You would hear that right here, because that's the jurisdiction, and I suggest to you that the --
>
> . . .
>
> MR. BURROWS: Your Honor, if there was a bankruptcy in California, and someone took an appeal from it, started a separate action in front of Your Honor, you would very quickly send them to the District Court in California. You wouldn't hear that case.

Transcript of Oral Argument at pp. 26-28; annexed hereto as Ex. D.

Second, in the accompanying declaration of Joseph Traum, we provide the Court with the information it requested concerning the US plaintiffs (as well as information concerning Mr. Traum traveling to the US in connection with the US Plaintiffs' co-operation with an FBI investigation of defendants' criminal activity in the US). In short, the information in Traum's declaration establishes that the US plaintiffs are bona fide US companies entitled to the full deference given to US plaintiffs in the forum non analysis. In any event, as we noted at the hearing, in Blanco v. Banco Industrial, 997 F.2d 974, 981 (2d Cir. 1993), the court held "that when a treaty with a foreign nation accords its nationals access to our courts equivalent to that provided American citizens, identical forum non conveniens standards must be applied to such nationals by American courts." To the extent the Court deems it relevant that some of the owners and principals of the US plaintiffs are Israeli citizens, because the US maintains such a

Honorable John G. Koeltl
February 20, 2003
Page 4

treaty with Israel, these US plaintiffs are still entitled to the same deference as any other US plaintiff. As we indicated at the hearing, the same is true for other plaintiffs who are not US entities.[2]

Third, at the February 10 hearing, the Court inquired about the contracts referred to in the papers, and the forum selection clauses they contain. For the Court's convenience, we summarize this information for the U.S. and other non-Russian plaintiffs[3] in the chart annexed hereto as Ex. A.[4]   None of these plaintiffs consented to the jurisdiction of the Russian courts in any transaction related to NKAZ or GOK; rather, all the contracts provide for arbitration in either Stockholm, Zurich, Tel Aviv or Moscow. And as set forth in the accompanying Traum declaration, and summarized in the chart, contracts related to the claims brought by the US plaintiffs, though not cited in the Amended Complaint, contain New York forum selection clauses.

Finally, we emphasize that, with the exception of MIKOM, the Aluminum Plaintiffs have not filed any claims against defendant NKAZ in this action. This disposes of the point defendants frequently raise in connection with the arbitrations because none of

---

[2]    The relevant provisions of the treaties we provided the Court at the February 10 hearing are as follows: (1) Israel Treaty - Article V, section 1 (p. 3); (2) Russia Treaty - Article XII, section 1 (p. 9); (3) UK Treaty - Article 1; and (4) Swiss Treaty - Article 1 (p. 2).

[3]    Only two plaintiffs are Russian entities, MIKOM and Polyprom. See Amended Complaint ¶¶ 29-31, 38-39. MIKOM's contract with NKAZ is annexed to the Second Declaration of Sergei Chernyshev as Ex. 1, and Polyprom's contracts with GOK are annexed to the Declaration of Gennady Bukharin as Exs. 2, 5, 7, 10, 12, 14 and 16. These contracts contain forum selection clauses for the Russian courts, but were entered into at a time when defendants had not infiltrated either NKAZ or GOK and had not corrupted judicial proceedings involving either plaintiff.

[4]    Paragraph 37 of the Amended Complaint refers to various loan agreements between plaintiff Nexis Products LLC and GOK. These contracts are also summarized in the Chart annexed hereto as Ex. A., but because they are not otherwise part of the record, we annex them hereto as Exs. B and C.

A - 748

Honorable John G. Koeltl
February 20, 2003
Page 5

the defendants to the Aluminum Plaintiffs' claims are parties to those arbitrations, and MIKOM has not commenced any arbitrations.

We thank the Court for its consideration of this matter.

Respectfully submitted,

*[signature]*

James L. Bernard

cc:   Michael Burrows, Esq. (by hand)
      Ira Feinberg, Esq. (by hand)
      Peter J. Venaglia, Esq. (by hand)
      All Other Counsel (by Federal Express)

STROOCK & STROOCK & LAVAN LLP · NEW YORK · LOS ANGELES · MIAMI
180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212.806.5400 FAX 212.806.6006 WWW.STROOCK.COM

A - 749

Exhibit A

## CONTRACTS WITH U.S. AND OTHER NON-RUSSIAN PLAINTIFFS

| Date | Contract Number | Parties to the Contract | Forum Selection | Record Location |
|---|---|---|---|---|
| January 14, 2000 | 56-00 | NKAZ – BMTSA | Arbitration – Stockholm | Chernyshev Ex. 4<br><br>Complaint ¶ 24 |
| January 10, 2000 | BSA-R-066/99 | NKAZ – BMTSA | Arbitration – Stockholm | Chernyshev Ex. 5<br><br>Complaint ¶ 24 |
| December 24, 1999 | 924-99 | NKAZ – BMTSA | Arbitration – Stockholm | Chernyshev Ex. 6<br><br>Complaint ¶ 24 |
| March 9, 1999 | BSA-R-003/99 | NKAZ –BMTSA | Arbitration – ICAC Moscow | Chernyshev Ex. 7<br><br>Complaint ¶ 24 |
| June 15, 1999 | BSA-R-014/99 | NKAZ - BMTSA | Arbitration – ICAC Moscow | Chernyshev Ex. 8<br><br>Complaint ¶ 24 |
| July 19, 1999 | 640-99 | NKAZ – BMTSA | Arbitration – ICAC Moscow | Chernyshev Ex. 9<br><br>Complaint ¶ 24 |
| July 19, 1999 | 641-99 | NKAZ – BMTSA | Arbitration – ICAC Moscow | Chernyshev Ex. 10<br><br>Complaint ¶ 24 |
| November 2, 1999 | N-RM-0002/99 | NKAZ - BMTSA | Arbitration – ICAC Moscow | Chernyshev Ex. 11<br><br>Complaint ¶ 24 |
| October 20 1999 | Framework Agreement | NKAZ - BMTSA | Arbitration – Stockholm | Chernyshev Ex. 12<br><br>Complaint ¶ 24 |

---

BMT S.A., Alucoal and BMT Ltd. each entered into consolidated arbitration agreements with NKAZ that called for arbitration of all disputes under all of their contracts in Zurich, Stockholm and Cyprus, respectively. The validity of those agreements is disputed by defendant NKAZ. We therefore are listing here only the original forum selection provisions.

1

| Date | Contract Number | Parties to the Contract | Forum Selection | Record Location |
|------|-----------------|-------------------------|-----------------|-----------------|
| January 23, 1998 | 41-98 | NKAZ – Base Metal Trading Ltd. | Arbitration – ICAC Moscow | Chernyshev Ex. 13<br><br>Complaint ¶ 26 |
| June 10, 1998 | 50/98 | NKAZ – Base Metal Trading Ltd. | Arbitration – ICAC Moscow | Chernyshev Ex. 14<br><br>Complaint ¶ 26 |
| August 10, 1998 | 60/98 | NKAZ – Base Metal Trading Ltd. | Arbitration – ICAC Moscow | Chernyshev Ex. 15<br><br>Complaint ¶ 26 |
| January 14, 2000 | 58-00 | NKAZ – Alucoal | Arbitration – Stockholm | Chernyshev Ex. 16<br><br>Complaint ¶ 28 |
| January 14, 2000 | 57-00 | NKAZ – Alucoal | Arbitration – Stockholm | Chernyshev Ex. 17<br><br>Complaint ¶ 28 |
| December 23, 1999 | 923-99 | NKAZ – Alucoal | Arbitration – Stockholm | Chernyshev Ex. 18<br><br>Complaint ¶ 28 |
| March 5, 1999 | 275-99 | NKAZ – Alucoal | Arbitration – ICAC Moscow | Chernyshev Ex. 19<br><br>Complaint ¶ 28 |
| March 10, 1999 | AL10/99 | NKAZ – Alucoal | Arbitration – ICAC Moscow | Chernyshev Ex. 20<br><br>Complaint ¶ 28 |
| May 5, 1999 | 478-99 | NKAZ – Alucoal | Arbitration – ICAC Moscow | Chernyshev Ex. 21 . .<br><br>Complaint ¶ 28 |

2

A - 752

| Date | Contract Number | Parties to the Contract | Forum Selection | Record Location |
|---|---|---|---|---|
| February 1, 1999 | 607-99 | NKAZ – Alucoal | Arbitration – ICAC Moscow | Chernyshev Ex. 22<br><br>Complaint ¶ 28 |
| September 23, 1999 | AL99/25 | NKAZ – Alucoal | Arbitration – ICAC Moscow | Chernyshev Ex. 23<br><br>Complaint ¶ 28 |
| October 14, 1999 | AL-R-005/99 | NKAZ – Alucoal | Arbitration – Zurich | Chernyshev Ex. 24<br><br>Complaint ¶ 28 |
| October 22, 1999 | Framework Agreement | NKAZ - Alucoal | Arbitration – Stockholm | Chernyshev Ex. 25<br><br>Complaint ¶ 28 |
| July 13, 1999<br><br>Amended November 25, 1999 | SWER/07-99 | GOK – Nexis Products LLC | As amended, Courts of New York State | Complaint ¶ 37<br><br>Letter from James Bernard to Judge Koeltl of February 20, 2003, Ex. B; Second Traum Dec ¶ 40, Ex. 4 |
| July 15, 1999 | Assignment Agreement | Nexis Products LLC – Northwest Systems Ltd. (assignment of GOK debt) | Arbitration – Zurich or Tel-Aviv | Complaint ¶ 37<br><br>Letter from James Bernard to Judge Koeltl of February 20, 2003, Ex. C |
| September 28, 1999 | KGOK 28/09-99 | Davis – Amber Star LLC (Purchase of GOK shares) | Courts of New York State | Second Traum Dec. ¶ 10, Ex. 1** |
| March 15, 1999 | 001-99/A | Davis – Lenex (Purchase of GOK shares) | Courts of New York State | Second Traum Dec. ¶ 10, Ex. 2** |

---

** The contracts whereby the Davis Plaintiffs acquired their shares in GOK are not specifically referenced in the Complaint, but are annexed to the Second Declaration of Joseph Traum, dated February 19, 2003.

3

| Date | Contract Number | Parties to the Contract | Forum Selection | Record Location |
|------|-----------------|-------------------------|-----------------|-----------------|
| September 28, 1999 | 003-99/A | Davis – Lenex (Purchase of GOK shares) | Courts of New York State | Second Traum Dec. ¶ 10, Ex. 2[**] |
| January 20, 2000<br><br>Amended January 26, 2000 | KGOK-001/a | Holdex – Polyprom (Purchase of GOK shares) | As Amended, Courts of New York State | Second Traum Dec. ¶ 10, Ex. 3[**] |

4

A - 754

Agreement
between "Nexis Products L.L.C." and
JSV "Kachkanarsky GOK "Vanadium"

New York, 25ᵗʰ of November, 1999

Соглашение
между «Нексиз Продактс Эл.Эл.Си» и
ОАО «Качканарский ГОК «Ванадий»

г. Нью-Йорк, 25 ноября 1999г.

The company "Nexis Products L.L.C.", hereinafter referred to as "the Company", in the person of Joseph M. Traum, acting in accordance with the General Power of Attorney made 9ᵗʰ day of October, 1999, from the one hand, and

Joint Stock Venture "Kachkanarsky GOK "Vanadium", hereinafter referred to as "The Venture", in the person of General Director Khaydarov D.A., acting in accordance with the Articles of Organization, from the other hand,

further named together as "the Parties", have concluded the present Agreement about the following:

Компания «Нексиз Продактс Эл.Эл.Си.», именуемая в дальнейшем «Компания», в лице Джозефа М. Траума, действующего на основании Генеральной доверенности от 09.10.1999 г., с одной стороны, и

Открытое акционерное общество «Качканарский ГОК «Ванадий», именуемое в дальнейшем «Общество», в лице Генерального директора Хайдарова Д.А., действующего на основании Устава, с другой стороны,

в дальнейшем именуемые совместно «Стороны», подписали настоящее Соглашение о нижеследующем:

1. The Parties agreed to amend the Loan Agreement No. SWER/07-99 dated 13.07.1999 by adding the point 4.5. of the following content: "In case the terms of the loan refunding is broken the Venture shall pay the Company a penalty: in 0,1 % of the non-refunded loan's amount calculating for each day of a delay".

1. Внести в Договор займа №SWER/07-99 от 13.07.1999 г. пункт 4.5. следующего содержания: «В случае нарушения срока возврата займа Общество обязано выплатить Компании неустойку в размере 0,1% от суммы невозвращенного в срок займа за каждый день просрочки».

2. As the Company's place of incorporation is the United States of America the point 5.4. of the Loan Agreement №SWER/07-99 dated 13.07.1999 is to be altered and read as follows: "This Contract is made in and intended to be performed in and enforced in accordance with the laws of State New York and Federal Laws of the United States, without regard to its conflict of laws rules. The Parties hereby undertake to use good faith efforts to settle all the disputes arising under this Contract by way of mutual negotiations. Should the Parties fail to reach the settlement the Parties deem the jurisdiction of The US Courts as a proper forum. All the disputes, including without limitation claims of breach of agreement, fraud in the inducement and negligence, shall be adjudicated in a court of the State of New York, USA.

2. В связи с тем, что местом регистрации Компании являются Соединенные Штаты Америки, внести изменения в пункт 5.4. Договора займа №SWER/07-99 от 13.07.1999г. и читать его в следующей редакции: «Данный Договор совершен в соответствии с законами штата Нью-Йорк и федеральными законами США, без отношения к конфликту их законов. Стороны обязуются в разумных пределах разрешать все споры, возникающие по данному Договору, путем взаимных переговоров. При отсутствии согласия Сторон, Стороны в качестве подходящего форума признают юрисдикцию судов США. Все споры, в том числе без исковой давности претензий в нарушении Договора, обмане во встречном удовлетворении и халатности, стороны будут разрешать в суде штата Нью-Йорк, США.

3. The point 5.5. of the Loan Agreement №SWER/07-99 dated 13.07.1999 is to be cancelled.

3. Отменить пункт 5.5 Договора займа №SWER/07-99 от 13.07.1999г.

1

4. The parties ascertain and confirm that as on today the total outstanding balance of the Venture against the Company amounts to 13,896,100.00 (Thirteen million eight hundred ninety six and one hundred and 00/100) US Dollars consisting of:

(a) 7,000,000.00 (Seven million and 00/100) US Dollars as unpaid debt under the Loan Agreement No. SWEP/07-99 dated 13.07.1999,

(b) 6,896,100.00 (Six million eight hundred ninety six thousand and one hundred and 00/100) US Dollars as unpaid debt under Loan Agreement No. 234.0113 dated 13.07.1999, the repayment of which has been assigned to the Company according to the Assignment Agreement dated 15.07.1999 signed and concluded between "Northwest Systems Limited" (as the Assignor) and the Company (as the Assignee).

In case of Venture's delay to refund the amount aforesaid within the terms stipulated by the loan agreements the Company has the right to settle disputes in accordance with the point 2 of the present Agreement.

4. Стороны констатируют, что на сегодняшнюю дату общая задолженность Общества перед Компанией составляет 13,896,100.00 (Тринадцать миллионов восемьсот девяносто шесть тысяч сто) долларов США, и состоит из:

(а) 7,000,000.00 (Семь миллионов) долларов США - в виде невозвращенного долга по Договору займа №SWEP/07-99 от 13.07.1999г.,

(b) 6,896,100.00 (Шесть миллионов восемьсот девяносто шесть тысяч сто) долларов США - в виде невозвращенного долга по Договору займа №234.0113 от 13.07.1999г., истребование которого было уступлено Компании согласно Договору уступки от 15.07.1999г., подписанному и заключенному между «Нортвест Система Лимитед» (как Цедентом) и Компанией (как Цессионарием).

В случае задержки Обществом возврата указанной суммы в сроки, определенные договорами займа, Компания имеет право разрешать споры в соответствии с положениями пункта 2 настоящего Соглашения.

### ADDRESSES AND SIGNATURES OF THE PARTIES

**The Company:**
"NEXUS PRODUCTS L.L.C"
Legal address: Suite 104, 47 West 200 South, Salt Lake City, Utah 84101, USA

**The Venture:**
JSV "Kachkanarsky GOK "Vanadium"
Legal address:
2, Sverdlova street, Kachkanar, Sverdlovsk region, 624356, Russia

### АДРЕСА И ПОДПИСИ СТОРОН

**Компания:**
«НЕКСИЗ ПРОДАКТС Эл.Эл.Си»
Юридический адрес: Сьют 104, 47 Вест 200 Саут, Солт Лейк Сити, Юта 84101, США

**Общество:**
ОАО «Качканарский ГОК «Ванадий»
Юридический адрес: 624356, Россия, Свердловская область, г.Качканар, улица Свердлова, 2

The Company/Компания



The Venture/Общество



2

**A - 756**

## LOAN AGREEMENT No. SWER/07-99

Moscow                                                           July 13, 1999

    Nexis Products LLC, hereinafter referred to as "Company," represented by Director Mr. Sidney Tavarez, acting on the basis of the Statutes, party of the first part, and

    Joint Stock Company Kachkanar Iron Ore Mining & Dressing Concern "Vanadiy," hereinafter referred to as "Concern," represented by General Director D.A. Khaidarov, acting on the basis of the Statutes, party of the second party,

    hereinafter jointly referred to as the "Parties," have executed this Loan Agreement, hereinafter referred to as "Agreement," regarding the following:

### I. SUBJECT OF THE AGREEMENT.

1.1. Company shall provide to Concern as an interest-free loan (hereinafter "Loan") funds in the amount of 7,000,000 (seven million) US dollars, and Concern shall repay the Loan as stipulated herein.

1.2. The Loan is being extended to Concern to replenish its current assets.

### II. LENDING PROCEDURE.

2.1. The Loan shall be extended in a lump sum by the transfer of funds to Concern's account in an amount not to exceed that stated in paragraph 1.1 hereof.

2.2. The Loan extended hereunder shall be repaid within 180 (one hundred and eighty) days from its effective date, i.e. by January 8, 2000.

2.3. Company shall make the funds available within 5 (five) banking days from the Agreement's date of execution.

2.4. The effective date of the Loan shall be the date the funds are deposited in Concern's hard currency current account specified in section VI hereof.

### III. LOAN SECURITY AND REPAYMENT PROCEDURE.

3.1. Concern guarantees repayment of the Loan.

3.2. Concern shall be liable hereunder to the full extent of its fixed and current assets.

3.3. The Parties shall execute a security contract, which will be an integral part hereof.

3.4. Concern shall repay the Loan in either a lump sum or installments in US dollars by transferring funds from its current hard currency account to Company's hard currency account at SCB Moscow Business World, Moscow.

### IV. RIGHTS AND RESPONSIBILITIES OF THE PARTIES.

4.1. Company shall:
-     extend the Loan within 5 (five) banking days from the Agreement's execution date.

4.2. Company has the right to:

- monitor the intended use of the funds made available to Concern hereunder;
- demand that Concern provide the documents necessary to monitor the intended use of the funds,
- call the loan if Concern breaches any provision hereof.

4.3. Concern shall

- use the funds as intended, i.e., exclusively for the purposes stipulated in paragraph 1.2. hereof;
- provide, at Company's request, the documents necessary to monitor the intended use of the Loan, as well as estimates of receipt of funds to repay the loan;
- immediately notify Company of all circumstances which could affect Concern's proper execution of its obligations hereunder, including the loss or deterioration of the Loan security conditions.

4.4. Concern has the right:

- to demand that the funds be made available within 5 (five) banking days from the Agreement's date of execution;
- repay the Loan early with Company's written approval.

## V. ADDITIONAL PROVISIONS

5.1. This Contract is effective upon signing and until the full performance by the Parties of all obligations undertaken by them.

5.2. The Parties agree to maintain confidentiality with regard to the terms of this Contract, and with regard to any commercial, financial and other information that becomes known to them in connection with the execution and performance of this Contract.

5.3. The Parties shall guarantee under liability that this Contract is executed (signed) by authorized persons and, if necessary, will be confirmed (approved) by the management bodies of the Parties that have the authority to make such confirmation (approval) in accordance with the foundation documents of the Parties.

5.4. All disputes and disagreements under this Contract shall be resolved by the Parties through negotiation. If agreement is not reached, disputes shall be considered by the Arbitration Court of the City of Moscow.

5.5. In all other matters that are not regulated by this Contract, the Parties shall be guided by current law of the Russian Federation.

5.6. Neither Party shall bear liability for partial or total nonperformance of its obligations if such nonperformance was caused by circumstances beyond their control (natural disaster, conduct of military activities, change in law, etc.) that such Party could neither foresee nor prevent by reasonable measures.

5.7. All changes and supplements to this Contract shall be valid only if they are made in written form, signed by the authorized representatives of the parties and sealed with the appropriate seals, after which they shall become integral parts of this Contract.

5.8. This Contract is made in two originals having identical legal effect, one retained by each of the parties.

## VI. REQUISITES AND SIGNATURES OF THE PARTIES

*The Company:*
Nexis Products L.L.C.
47 West 200 South. Suite 104
Salt Lake City, Utah 84101 USA
Bank requisites:
Hard-currency account No. 40807840200020021808, Moskovskiy Delovoy Mir Joint Stock Commercial Bank, 14 Zhitnaya St., Moscow 117049

*The Joint Stock Company:*
Vanadiy Mining Enrichment Plant of Kachkanar OJSC
2 Sverdlov St., Kachkanar, Sverdlovsk Oblast 624356 Russia
Taxpayer ID No. 6615001962, OPKO 00186938
Current account No. 40702840400020121865, Moskovskiy Delovoy Mir Joint Stock Commercial Bank, 14 Zhitnaya St., Moscow
Correspondent account 30101810900000000466, BIK 044525466

| The Company: | The Joint Stock Company: |
|---|---|
| [signature] | [signature] |
| Sydney Tavarez | D.A. Khaydarov |
| | [round stamp: Vanadiy Mining Enrichment Plant of Kachkanar Open Joint Stock Company; city of Kachkanar] |

ДОГОВОР ЗАЙМА № SWER/07-99

г. Москва                                                                «13» июля 1999 г.

Компания «Нэксис Продактс Эл.Эл.Си.», именуемая в дальнейшем «Компания», в лице Директора г-на Сиднея Таварез, действующего на основании Устава с одной стороны и

Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий»», именуемое в дальнейшем «Общество», в лице Генерального директора Хайдарова Д. А., действующего на основании Устава, с другой стороны,

в дальнейшем совместно именуемые «Стороны», заключили настоящий Договор займа, именуемый в дальнейшем «Договор», о нижеследующем:

## I. ПРЕДМЕТ ДОГОВОРА.

1.1. Компания предоставляет обществу в качестве беспроцентного займа (далее «Заем») денежные средства на сумму 7000000,00 (Семь миллионов) долларов США, а Общество обязуется возвратить предоставленный Заем в порядке, предусмотренном настоящим Договором.

1.2. Заем предоставляется Обществу на пополнение оборотных средств.

## II. ПОРЯДОК ПРЕДОСТАВЛЕНИЯ ЗАЙМА.

2.1. Заем предоставляется единовременно, путем перечисления средств на счет Общества, в размере, не превышающем суммы, указанной в пункте 1.1. настоящего Договора.

2.2. Заем, предоставляемый по настоящему Договору, должен быть возвращен не позднее 180 (Сто восемьдесят) дней с даты его оформления, т.е. не позднее «08» января 2000 года.

2.3. Компания предоставляет денежные средства в течение 5 (Пяти) банковских дней с даты заключения Договора.

2.4. Датой предоставления Займа считается дата зачисления денежных средств на текущий валютный счет Общества, указанный в разделе VI настоящего Договора.

## III. ОБЕСПЕЧЕНИЕ И ПОРЯДОК ВОЗВРАТА ЗАЙМА.

3.1. Общество гарантирует возврат предоставленного Займа.

3.2. Общество несет ответственность по настоящему Договору всем принадлежащим ему имуществом и оборотными средствами.

3.3. Стороны обязуются заключить договор залога, который будет являться неотъемлемой частью настоящего договора займа.

3.4. Возврат Займа осуществляется Обществом единовременно, либо по частям в долларах США путем перечисления денежных средств с текущего валютного счета Общества на валютный счет Компании в АКБ «Московский Деловой Мир», г. Москва.

## IV. ПРАВА И ОБЯЗАННОСТИ СТОРОН.

4.1. Компания обязуется:
* предоставить Заем в течение 5 (Пяти) банковских дней с даты заключения Договора.

4.2.Компания имеет право:
* контролировать целевое использование средств, предоставленных Обществу по настоящему Договору;
* требовать от Общества предоставления документов, необходимых для контроля за целевым использованием денежных средств;
* требовать от Общества досрочного возврата Займа при нарушении им любого из положений настоящего Договора.

4.3. Общество обязуется:
* соблюдать целевой характер использования предоставленных средств, т.е. направлять предоставленные средства исключительно на цели, предусмотренные пунктом 1.2. настоящего Договора;
* предоставлять по требованию Компании документы, необходимые для осуществления контроля за целевым использованием Займа, а также расчеты поступления средств, направляемых в его погашение;
* незамедлительно извещать Компанию обо всех обстоятельствах, способных повлиять на надлежащее исполнение Обществом обязательств по настоящему Договору, в том числе об обстоятельствах утраты или ухудшения условий обеспечения Займа.

4.4. Общество имеет право:
* требовать предоставления средств в течение 5 (Пяти) банковских дней с даты заключения Договора;
* досрочно по письменному согласованию с Компанией, возвратить предоставленный Заем.

## V. ДОПОЛНИТЕЛЬНЫЕ УСЛОВИЯ.

5.1. Настоящий Договор действует с момента подписания и до полного исполнения Сторонами всех взятых на себя обязательств.

5.2. Стороны обязуются соблюдать конфиденциальность в отношении условий настоящего Договора, а равно в отношении любой коммерческой, финансовой и прочей информации, ставшей им известной в связи с заключением и исполнением настоящего Договора.

5.3. Стороны гарантируют и несут ответственность в том, что настоящий Договор заключен (подписан) уполномоченными лицами и при необходимости будет утвержден (одобрен) органами управления Сторон, имеющими на это утверждение (одобрение) соответствующие полномочия согласно учредительных документов Сторон.

5.4. Все споры и разногласия по настоящему Договору разрешаются сторонами путем переговоров, а при не достижении согласия, спор подлежит передаче на рассмотрение в Арбитражный суд г. Москвы.

5.5. Во всем остальном, что не урегулировано настоящим Договором, Стороны руководствуются действующим законодательством Российской Федерации.

5.6. Ни одна из Сторон не будет нести ответственность за полное или частичное неисполнение принятых на себя обязательств, если оно будет вызвано действием обстоятельств непреодолимой силы (стихийные бедствия, проведение боевых действий, изменения в законодательстве и т.п.), которые данная сторона не могла ни предвидеть, ни предотвратить разумными мерами.

5.7. Все изменения и дополнения к настоящему Договору действительны лишь в том случае, если они совершены в письменной форме, подписаны уполномоченными представителями сторон и скреплены соответствующими печатями, после чего становятся неотъемлемой частью настоящего Договора.

5.8. Настоящий Договор составлен в двух экземплярах, имеющих равную юридическую силу, по одному для каждой из сторон.

## VI. РЕКВИЗИТЫ И ПОДПИСИ СТОРОН.

*Компания:*
«Нэксиз Продактс Эл.Эл.Си.»
47 Вест 200 Сауз, Сьют 104, Солт Лейк Сити, Юта 84101, США.
Банковские реквизиты:
Валютный счет № 40807840200020021808 в АКБ «Московский Деловой Мир»,
117049, г. Москва, ул. Житная, д. 14.

*Общество: —*
ОАО «Качканарский горно-обогатительный комбинат «Ванадий»»
624356, Россия, Свердловская область. г. Качканар, ул. Свердлова, 2.
ИНН 6615001962, ОКПО 00186938,
р/с № 40702P404000201211P65 ___ в АКБ «Московский Деловой Мир»
г. Москва, ул. Житная, д.14,
к/с 30101810900000000466, БИК 044525466

Компания:                                                   Общество:

/Станей Таварс/                                        /Хайларов Д.А./

A - 762

**Exhibit B**

## ASSIGNMENT AGREEMENT

## ДОГОВОР УСТУПКИ

July 15, 1999

«15» июля 1999г.

THIS ASSIGNMENT AGREEMENT (the "Agreement") entered into affect on July 15, 1999 (the "Effective Date"), is made by and between

NORTHWEST SYSTEMS LIMITED a company incorporated in Ireland and having its registered office at Sandford Office Suites, 1/6 Sandford Road, Dublin 6, (the "Assignor"), in the person of its sole and only beneficial owner, Mr Riger Dov, of Israeli citizenship with passport No. 9025589 issued by the Ministry of Internal Affairs of the State of Israel, and

NEXIS PRODUCTS L.L.C., a company incorporated in USA and having its registered office at 47 West 200 South, Suite 104, Salt Lake City, Utah, 84101 USA (the "Assignee"), acting in the person of its sole and only beneficial owner, Mr Joseph Moshe Traum, holder of Israeli Passport No. 9008563 Issued by the Ministry of Internal Affairs of the State of Israel,

WHEREAS: The Assignor has the right to recover from the Joint Stock Company "Kachkanarskiy GOK "Vanadiy" (the "Debtor") an amount of USD 6,896,100.00 (Six million and eight hundred ninety six thousand and one hundred U.S. Dollars and 00/100) (the "Debt"), according to the Loan Agreement No. 234.0113 dated July 13, 1999 ("Loan Agreement") and fully granted by the Assignor to the Debtor on July 15, 1999 by cash money transfer in favor of the Debtor on to the account No.40702840700021121865 in Moscow Business World Bank, Moscow.

WHEREAS: The Assignor wishes to assign the Assignee the Debt, and all the rights against the Debtor under the Loan Agreement (the "Rights") and the Assignee wishes to acquire the Debt and Rights, on the terms and conditions set forth herein;

NOW THEREFORE In consideration of the premises and the mutual covenants contained in this Agreement, the Assignor and the Assignee hereby agree as follows;

НАСТОЯЩИЙ ДОГОВОР УСТУПКИ («Договор»), вступивший в силу 15 июля 1999г. («День вступления в силу»), заключен между

НОРТВЕСТ СИСТЕМЗ ЛИМИТЕД, компанией созданной в Ирландии и имеющей свой зарегистрированный офис по адресу: Сэндфорд Офис Сьютс, 1/6 Сэндфорд Роуд, Дублин 6, («Цедента»), в лице своего единого и единственного собственника, г-на Ригер Дова, гражданина Израиля имеющего паспорт № 9025589 выдан Министерством Внутренних Дел государства Израиль, и

НЕКСИЗ ПРОДАКТС Эл.Эл.Си., компанией созданной в США и имеющей свой зарегистрированный офис по адресу: 47 Вест 200 Саут, Сьют 104, Солт Лейк Сити, Юта, 84101 США («Цессионария»), и лице своего единого и единственного собственника, г-на Джозеф Моше Траум, гражданина Израиля имеющего паспорт № 9008563 выдан Министерством Внутренних Дел государства Израиль.

ПРИНИМАЯ ВО ВНИМАНИЕ, что Цедент имеет право взыскать с открытого акционерного общества «Качканарский ГОК «Ванадий» («Должника») сумму 6.896.100,00 Долларов США (Шесть миллионов восемьсот девяносто шесть тысяч сто долларов США) («Долг»), в соответствии с Договором займа №234.0113, датированным «13» июля 1999г. («Договор займа»), полностью предоставленную Цедентом Должнику «15» июля 1999г. путем денежного перевода в пользу Должника на счет №40702840700021121865 в банке Московский Деловой Мир, г.Москва,

ПРИНИМАЯ ВО ВНИМАНИЕ, что Цедент желает уступить Цессионарию Долг, и все права по отношению к Должнику по Договору займа («Права»), а Цессионарий желает принять Долг и Права на сроки и условиях, установленных ниже;

ВСЛЕДСТВИЕ ЧЕГО, учитывая вышеизложенное и взаимные обязательства, содержащиеся в данном Договоре, Цедент и Цессионарий согласились о нижеследующем;

- 1 -

A - 764

| | |
|---|---|
| **1.  ASSIGNMENT OF THE DEBT AND THE RIGHT** | **1.  УСТУПКА ДОЛГА И ПРАВА** |

1.1.  The Assignor hereby assign, convey, sell and transfer to the Assignee, on the Effective Date, the Debt and the Rights by passing to the Assignee:

* The Loan Agreement No. 234.0113 in origin dated July 13, 1999 and signed between the Assignor and the Debtor (the "Loan Agreement"),
* The original payment instruction No. 6 dated July 15, 1999 and signed and stamped by the bank Moscow Business World confirming the payment of the Debt in favor of the Debtor.

1.2.  The Assignee hereby accept from the Assignor, on the Effective Date, the Debt and the Rights by receiving from the Assignor:

* The Loan Agreement No. 234.0113 in origin dated July 13, 1999 and signed between the Assignor and the Debtor (the "Loan Agreement"),
* The original payment instruction No. 6 dated July 15, 1999 and duly signed and stamped by the bank Moscow Business World confirming the payment of the Debt in favor of the Debtor.

1.3.  The Assignor acknowledges that the assignment of the Debt and the Rights under this Agreement is irrevocable and that on the Effective Date the Assignee will have full and complete title, rights and interest from the Debt and the Rights.

**2. THE CONSIDERATION**

2.1.  In consideration of the assignment and transfer of the Debt and the Rights the Assignee undertakes to pay the Assignor the amount of USD 6,800,000.00 (Six million and eight hundred thousand U.S. Dollars) (The "Consideration").

2.2.  The Assignor acknowledges that the Consideration constitutes good valuable and adequate indemnification for the Debt and the Rights.

2.3.  The Consideration shall be paid to the Assignor within 12 months from date the total Debt is obliged to be paid by the Debtor in accordance with the Loan Agreement or within 60 days from the date the Assignee actually receives the repayments of the Debt or part thereof, whichever is earlier to happen (the "Payment Date").

**3.  THE ASSIGNOR UNDERTAKINGS**

The Assignor undertakes as follows:

1.1.  Цедент уступает, передает, продает и переводит Цессионарию в День вступления в силу Долг и Права путем передачи Цессионарию:

* Оригинала Договора займа № 234.0113 датированного «13» июля 1999г. и подписанного между Цедентом и Должником («Договор займа»),
* Оригинала заявления на перевод № 6 датированного «15» июля 1999г. к подписанного и заверенного печатью банка Московский Деловой Мир подтверждающего платеж Долга в пользу Должника.

1.2.  Цессионарий принимает от Цедента в День вступления в силу Долг и Права приемкой от Цедента:

* Оригинала Договора займа № 234.0113 датированного «13» июля 1999г. и подписанного между Цедентом и Должником («Договор займа»),
* Оригинала заявления на перевод № 6 датированного «15» июля 1999г. и подписанного и заверенного печатью банка Московский Деловой Мир подтверждающего платеж Долга в пользу Должника.

1.3.  Цедент установил, что уступка Долга и Прав по данному Договору являются окончательной и что в День вступления в силу Цессионарий приобретает полные права и выгоды от Долга и Прав.

**2.  КОМПЕНСАЦИЯ**

2.1.  В виде компенсации за уступку и перевод Долга и Прав Цессионарий обязуется выплатить Цеденту сумму в 6,800,000.00 долларов США (Шесть миллионов восемьсот тысяч Долларов США) («Компенсация»).

2.2.  Цедент установил, что Компенсация представляет собой надлежащее и адекватное возмещение за Долг и Права.

2.3.  Компенсация будет выплачена Цеденту в течение 12 месяцев с Даты обязательства возврата Долга Должником или в течение 60 дней с даты, когда Цессионарий фактически получит оплату долга или его части, в зависимости от того, что произойдет ранее («День платежа»).

**3. ОБЯЗАТЕЛЬСТВА ЦЕДЕНТА**

Цедент обязуется:

- 2 -

A - 765

3.1 To organize an acknowledgement of existence of the Assignment Agreement to the Debtor by cosigning and witnessing the Agreement by the General manager of the Debtor,

3.2 To inform officially the Debtor about signing of this Assignment Agreement as required by the legislation of the Russian Federation,

3.3 To transfer to the Assignee any other document, deeds assignments and power of attorney as shall be required by the Assignee to give publicity to the assignment under this Agreement,

3.4 To take together with the Debtor all further actions including reforming the Loan Agreement with Moscow Business World Bank and Central Bank of the Russian Federation in order to give publicity of this assignment to everyone who has to be witnessed about its existence.

## 4.  PARTIES IN INTEREST

4.1 This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, unless otherwise agreed by both parties in writing.

4.2 Any assignment of the rights or obligations hereunder by either of the parties, whether in whole or in part shall only be made with the prior written consent of the other party. Any attempted assignment not made in accordance with the provisions of this subsection shall be void and of no effect.

## 5.  DISPUTE RESOLUTION

5.1.    **Disputes Generally.** The parties hereby undertake to use good faith efforts to settle all disputes arising under this Agreement. Failing settlement, all disputes, including without limitation claims of breach of contract, fraud in the inducement and negligence shall be referred to binding arbitration in Zurich, Switzerland, or in Tel-Aviv, Israel.

5.2. **Language.** Unless otherwise mutually agreed upon by the parties, the arbitration will be conducted in the English language.

## 6.  COUNTERPARTS

This Agreement is executed in two copies, one copy for the Assignor, one copy for the Assignee.

3.1 Организовать уведомление Должника о существовании Договора уступки путем его ознакомления и подписания Договора Генеральным директором Должника,

3.2 Официально уведомить Должника о подписании данного Договора уступки как это требует законодательство Российской федерации,

3.3 Передать Цессионарию любой другой документ, акты уступок и доверенность по требованию Цессионария, чтобы публично подтвердить права по уступке по данному Договору,

3.4 Предпринять вместе с Должником все дальнейшие действия, включая переоформление Договора займа в банке Московский Деловой Мир и Центральном банке Российской Федерации чтобы публично подтвердить права по уступке каждому кто должен быть уведомлен об его существовании.

## 4. ЗАИНТЕРЕСОВАННЫЕ СТОРОНЫ

4.1 Данный Договор связывает и действует исключительно в интересах каждой из упомянутых сторон Договора, и ничто в данном Договоре, ясно выраженное или вытекающее из обстоятельств, не предполагает или не будет наделять любое иное лицо любым правом, преимуществом или средством защиты права любого характера по или на основании данного Договора, пока об ином стороны не согласятся письменно.

4.2 Любая уступка прав или обязательств в силу настоящего Договора одной из сторон как в целом, так и частично может быть осуществлена только с предварительного письменного согласия другой стороны. Любая иная попытка уступки, предпринятая в нарушение условий данного подпункта будет недействительной и не имеющей силы.

## 5. РАЗРЕШЕНИЕ СПОРОВ

5.1 Общие споры. Стороны настоящим обязуются на разумном основании разрешить все споры, возникающие по данному Договору. В случае невозможности достижения согласия все споры, в том числе без исковой давности претензий в нарушении Договора, обмане во встречном удовлетворении и халатности будут рассматриваться в соответствующем арбитраже в Цюрихе, Швейцария, либо в Тель-Авиве, Израиль.

5.2. Язык. Арбитраж будет проводиться на английском языке, если стороны не достигнут обоюдного согласия об ином.

## 6. ДУБЛИКАТЫ

Данный Договор исполнен в двух экземплярах, один для Цедента, один для Цессионария.

- 3 -

Exhibit C

7. **AMENDMENTS**

This Agreement shall not be amended, altered or modified except by an instrument in writing duly executed by each of the parties hereto.

7. ВНЕСЕНИЕ ИЗМЕНЕНИЙ.

Данный Договор не может быть исправлен, переделан или изменен кроме как документ в письменном виде, надлежащим образом исполняемый каждой из сторон настоящего Договора.

**THE ASSIGNOR/ ЦЕДЕНТ**

By: Riger Dov/ Ригер Дов





**THE ASSIGNEE/ ЦЕССИОНАРИЙ**

Joseph Moshe Traum/ Джосеф Моше Траум





**THE DEBTOR/ ДОЛЖНИК**

I am familiarized with the text of the Agreement/ С текстом Договора ознакомлен
General director of the JSV "Kachranarskiy GOK "Vanadiy"/ Генеральный директор ОАО «Качканарский ГОК «Ванадий»

Khaidarov Jalol / Хайдаров Джалол



- 4 -

A - 768

## LETTER OF ADVICE

**July 15, 1999**

WHEREAS, NORTHWEST SYSTEMS LIMITED is a company incorporated in Ireland (Registration number 253942) and having its registered office at the address: Sandford Office Suites, 1/6 Sandford Road, Dublin 6,

WHEREAS, on July 13, 1999 the Loan Agreement No. 234.0113 (further the "Loan Agreement") between Nortwest Systems Limited and Joint Stock Company "Kachkanarskiy GOK "Vanadiy" ("the Debtor") has been signed stipulating granting by our company to the Debtor a free-interest loan for the period of 180 days

WHEREAS, in accordance with the Loan Agreement on July 15, 1999 a loan amounting to USD 6,896,100.00 (Six million and eight hundred ninety six thousand and one hundred U.S. Dollars) ("the Debt") has been granted to the Debtor by cash money transfer in favor of the Debtor to the account No 40702840700021121865 in Moscow Business World, Moscow,

WHEREAS, that I, Riger Dov, of Israeli citizenship with passport No. 9025589 issued by the Ministry of Internal Affairs of the State of Israel, am the sole and only beneficial owner of the company,

I notify you that:

• On July 15, 1999 I, the sole and only beneficial owner of the company, have signed the Assignment Agreement ("Agreement") with company NEXIS PRODUCTS L.L.C., having its registered office at 47 West 200 South, Suite 104, Salt Lake City, Utah, 84101 USA,

• According to said Agreement the Debt of JSC Joint Stock Company "Kachkanarskiy GOK "Vanadiy" amounting to USD 6,896,100.00 (Six million and eight hundred ninety six thousand and one hundred U.S. Dollars) granted on July 15, 1999 as well as all the Rights deriving from the Loan Agreement, have been assigned to NEXIS PRODUCTS L.L.C. company as Assignee,

• According to said Agreement, all the original documents relative to Loan Agreement including the original of the Loan Agreement, have been passed to the Assignee,

• According to said Agreement the assignment of the Debt and the Rights is irrevocable,

Sincerely yours,

I, Khidarov Jalol, General director of Joint Stock Company "Kachkanarskiy GOK "Vanadiy", 624356 Russia, Sverdlovsk region, Kachkanar, Sverdlova street, 2, by my signature confirm and testimony the receipt of this Letter of Advice this day of July 15, 1999.

---

## УВЕДОМЛЕНИЕ

«15» июля 1999г.

ПРИНИМАЯ ВО ВНИМАНИЕ, что компания НОРТВЕСТ СИСТЕМЗ ЛИМИТЕД, созданная в Ирландии (регистрационный номер 253942) и имеющая свой зарегистрированный офис по адресу: Сэндфорд Офис Сьютс, 1/6 Сэндфорд Роуд, Дублин 6,

ПРИНИМАЯ ВО ВНИМАНИЕ, что «13» июля 1999г. между Нортвест Системз Лимитед и Открытым акционерным обществом «Качканарский ГОК «Ванадий» («Должник») подписан Договор займа № 234.0113 (далее «Договор займа») предусматривающий предоставление нашей компанией Должнику беспроцентного займа на срок 180 дней,

ПРИНИМАЯ ВО ВНИМАНИЕ, что в соответствии с Договором займа Должнику «15» июля 1999г. предоставлен заем в сумме 6,896,100.00 Долларов США (Шесть миллионов восемьсот девяносто шесть тысяч сто долларов США) («Долг») путем денежного перевода в пользу Должника на счет № 40702840700021121865 в банке Московский Деловой Мир, г.Москва,

ПРИНИМАЯ ВО ВНИМАНИЕ, что Я, Ригер Дов, гражданин Израиля, имеющий паспорт № 9025589 выданный Министерством Внутренних Дел государства Израиль, являюсь единым и единственным собственником компании,

Я Вас уведомляю что:

• «15» июля 1999г., мною, единым и единственным собственником компании, подписан Договор уступки («Договор») с компанией НЕКСИЗ ПРОДАКТС Эл. Эл. Си., с зарегистрированным офисом по адресу: 47 Вест 200 Саут, Сьют 104, Солт Лэйк Сити, Юта, 84101 США.

• Согласно указанному Договору Долг ОАО «Качканарский ГОК «Ванадий» в размере 6,896,100 Долларов США (Шесть миллионов восемьсот девяносто шесть тысяч) по Договору займа, образования «15» июля 1999г. и все Права вытекающие из Договора займа уступлены компании НЕКСИЗ ПРОДАКТС Эл. Эл. Си. как Цессионарию,

• Согласно указанному Договору, Цессионарию переданы все оригиналы документов, являющиеся Договора займа, в т.ч. и оригинал Договора займа,

• Согласно указанному Договору уступка Долга и Прав является окончательной.

С уважением,

Riger Dov / Ригер Дов

Я, Хайдаров Джалол, Генеральный директор Открытого акционерного общества «Качканарский ГОК «Ванадий», 624356 Россия, Свердловская область, г. Качканар, ул. Свердлова 2, своей подписью заявляю и подтверждаю получение данного уведомления «15» июля 1999г.

Khidarov Jalol / Хайдаров Джалол

# LOAN AGREEMENT No. 234.0112

Moscow                                                      December 17, 1998

Northwest Systems Limited, hereinafter referred to as "Company," represented by Director James William Grassick, acting on the basis of the Charter, on one side, and

Open Joint Stock Company Kachkanar Iron Ore Mining & Processing Concern "Vanadiy," hereinafter referred to as "Concern," represented by General Director D.A. Khaidarov, acting on the basis of the Charter, on the second side, hereinafter jointly referred to as the "Parties," have executed this Loan Agreement, hereinafter referred to as "Agreement," regarding the following:

## I. SUBJECT OF THE AGREEMENT.

1.1. Company shall provide to Concern as an interest-free loan (hereinafter "Loan") funds in the amount of 6,900,000.00 (six million nine hundred thousand) US dollars, and Concern shall repay the Loan as stipulated herein.
1.2. The Loan is being extended to Concern pay for agreement, bills of suppliers of materials, transportation services, works performed, services rendered and transactions with securities.

## II. LENDING PROCEDURE.

2.1 The Loan shall be extended in a lump sum by the transfer of funds to Concern's account in a an amount not to exceed that stated in paragraph 1.1 hereof.
2.2 The Loan extended hereunder shall be repaid within 180 (one hundred and eighty days) from its date of its effect.
2.3 Company shall make the funds available within 2 (two) banking days from the date of receipt of respective request.
2.4 The date of the effect of the Loan shall be the date the funds are deposited in Concern's account specified in section VI hereof.

## III.    LOAN SECURITY

3.1 Concern guarantees repayment of the Loan.
3.2 Concern shall be liable hereunder to the full extent of its fixed and current assets.

## IV.    RIGHTS AND RESPONSIBILITIES OF THE PARTIES

4.1 Company shall:

extend the Loan within 2 (two) banking days from the from the date of receipt of a request.

4.2 Company has the right to:
- monitor the intended use of the funds made available to Concern hereunder;
- demand that Concern provide the documents necessary to monitor the intended use of the funds,
- call the loan if Concern breaches any provision hereof.

4.3 Concern shall:
- use the funds as intended, i.e., exclusively for the purposes stipulated in paragraph 1.2 hereof;
- provide, at Company's request, the documents necessary to monitor the intended use of the Loan, as well as estimates of receipt of funds to repay the loan;
- immediately notify Company of all circumstances which could affect Concern's proper execution of its obligations hereunder, including the loss or deterioration of the Loan security conditions.

4.4 Concern has the right:
- to demand that the funds be made available within 2 (two) banking days from the date of receipt of a request by the Company;
- repay the Loan early with Company's written approval.

## V.    ADDITIONAL PROVISIONS

5.1 This Contract is effective upon signing and until the full performance by the Parties of all obligations undertaken by them.

5.2 The Parties agree to maintain confidentiality with regard to the terms of this Contract, and with regard to any commercial, financial and other information that becomes known to them in connection with the execution and performance of this Contract.

5.3 All disputes and disagreements under this Contract shall be resolved by the Parties through negotiation. If agreement is not reached, disputes shall be considered by the Arbitrazh Court of the City of Moscow.

5.4 In all other matters that are not regulated by this Contract, the Parties shall be guided by current law of the Russian Federation.

5.5 Neither Party shall bear liability for partial or total nonperformance of its obligations if such nonperformance was caused by circumstances beyond their control (natural disaster, conduct of military activities, change in law, etc.) that such Party could neither foresee nor prevent by reasonable measures.

5.6 All changes and supplements to this Contract shall be valid only if they are made in written form, signed by the authorized representatives of the parties and sealed with the appropriate seals, after they shall become integral parts of this Contract.

5.7 This Contract is made in two originals having identical legal effect, one retained by each of the parties.

## VI.    REQUISITES AND SIGNATURES OF THE PARTIES

**The Company:**
Northwest Systems Limited

Stanford Office Suits, 1-6 Stanford Road, Dublin 6, Ireland
Bank information:
Hard-currency account no. 40807840300020022150 in Moskovskiy Delovoy Mir Joint Stock
Commercial Bank, 14 Zhitnaya St., Moscow 117049

*The Concern*;
Open Joint Stock Company, Kachkanar Ore Mining and Processing Concern Vanadiy,
Sverdlovsk Oblast OJSC
2 Sverdlova St., Kachkanar, Sverdlovsk Oblast 624356 Russia
Taxpayer ID No. 66150001962, OPKO 00186938
Current account No. 40702810000000003170 Commercial Bank Ural Bank of Reconstruction and
Development, Ekhaterinbourg, 95 Kuibysheva St.
Correspondent account 30101810900000000795, BIK 046577795
Current account: 40702840500000002078

| The Company: | The Concern: |
|---|---|
| [signature]<br>James William Grassick | [signature]<br>D.A. Khaydarov<br>[round stamp: Vanadiy Mining Enrichment Plant<br>of Kachkanar Open Joint Stock Company; city of<br>Kachkanar] |

A - 772

ДОГОВОР ЗАЙМА № 234.0112

г. Москва                                                                «17» декабря 1998 г.

Компания «Нортвест Системз Лимитед», именуемая в дальнейшем «Компания», в лице в лице Директора г-на Джеймса Вильяма Грассиха, действующего на основании Устава с одной стороны и Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий»», именуемое в дальнейшем «Общество», в лице Генерального директора Хайдарова Д. А., действующего на основания Устава, с другой стороны, в дальнейшем совместно именуемые «Стороны», заключили настоящий Договор займа, именуемый в дальнейшем «Договор», о нижеследующем:

## I. ПРЕДМЕТ ДОГОВОРА.

1.1. Компания предоставляет обществу в качестве беспроцентного займа (далее «Заем») денежные средства на сумму 6900000,00 (Шесть миллионов девятьсот тысяч) долларов США, а Общество обязуется возвратить предоставленный Заем в порядке, предусмотренном настоящим Договором.

1.2. Заем предоставляется Обществу на оплату договоров, счетов поставщиков за материалы, оборудование, транспортные услуги, выполненные работы, предоставленные услуги и на осуществление операций с ценными бумагами.

## II. ПОРЯДОК ПРЕДОСТАВЛЕНИЯ ЗАЙМА.

2.1. Заем предоставляется единовременно, путем перечисления средств на счет Общества, в размере, не превышающем суммы, указанной в пункте 1.1. настоящего Договора.

2.2. Заем, предоставляемый по настоящему Договору, должен быть возвращен не позднее 180 (Сто восемьдесят) дней с даты его оформления.

2.3. Компания предоставляет денежные средства в течение 2 (Двух) банковских дней со дня получения соответствующего заявления.

2.4. Датой оформления Займа считается дата зачисления денежных средств на счет Общества, указанного в разделе VI настоящего Договора.

## III. ОБЕСПЕЧЕНИЕ ЗАЙМА

3.1. Общество гарантирует возврат предоставленного Займа.

3.2. Общество несет ответственность по настоящему Договору всем принадлежащим ему имуществом и оборотными средствами.

## IV. ПРАВА И ОБЯЗАННОСТИ СТОРОН.

4.1. Компания обязуется:

■ предоставить Заем в течение 2 (Двух) банковских дней с даты получения заявления.

4.2. Компания имеет право:

■ контролировать целевое использование средств, предоставленных Обществу по настоящему Договору;

■ требовать от Общества предоставления документов, необходимых для контроля за целевым использованием денежных средств;

■ требовать от Общества досрочного возврата Займа при нарушении им любого из положений настоящего Договора.

4.3. Общество обязуется:

■ соблюдать целевой характер использования предоставленных средств, т.е. направлять предоставленные средства исключительно на цели, предусмотренные пунктом 1.2. настоящего Договора;

■ предоставлять по требованию Компании документы, необходимые для осуществления контроля за целевым использованием Займа, а также расчеты поступления средств, направляемых в его погашение;

■ незамедлительно известить Компанию обо всех обстоятельствах способных повлиять на надлежащее исполнение Обществом обязательств по настоящему Договору, в том числе об обстоятельствах утраты или ухудшения условий обеспечения Займа.

4.4. Общество имеет право:

■ требовать предоставления средств в течении 2 (Двух) банковских дней с даты получения заявления Компанией;

■ досрочно по письменному согласованию с Компанией, возвратить предоставленный Заем.

## V. ДОПОЛНИТЕЛЬНЫЕ УСЛОВИЯ.

5.1. Настоящий Договор действует с момента подписания и до полного исполнения Сторонами всех взятых на себя обязательств.

5.2. Стороны обязуются соблюдать конфиденциальность в отношении условий настоящего Договора, а равно в отношении любой коммерческой, финансовой и прочей информацией, ставшей им известной в связи с заключением и исполнением настоящего Договора.

5.3. Все споры и разногласия по настоящему Договору разрешаются сторонами путем переговоров, а при не достижении согласия, спор подлежит передаче на рассмотрение в Арбитражный суд г. Москвы.

5.4. Во всем остальном, что не урегулировано настоящим Договором, стороны руководствуются действующим законодательством Российской Федерации.

5.5. Ни одна из Сторон не будет нести ответственность за полное или частичное неисполнение принятых на себя обязательств, если оно будет вызвано действием обстоятельств непреодолимой силы (стихийное бедствие, проведение боевых действий, изменения в законодательстве и т.п.), которая данная сторона не могла ни предвидеть, ни предотвратить разумными мерами.

5.6. Все изменения и дополнения к настоящему Договору действительны лишь в том случае, если они совершены в письменной форме, подписаны уполномоченными представителями сторон и скреплены соответствующими печатями, после чего становятся неотъемлемой частью настоящего Договора.

5.7. Настоящий Договор составлен в двух экземплярах, имеющих равную юридическую силу, по одному для каждой из сторон.

## VI. РЕКВИЗИТЫ И ПОДПИСИ СТОРОН.

**Компания:**
«Нортвест Системс Лимитед»
Стенфорд Офис Сьютс, 1-6 Стенфорд Роуд, Дублин 6, Ирландия.
Банковские реквизиты:
Валютный счет № 40807843030020022130 в АКБ «Московский Деловой Мир»,
117049, г. Москва, ул. Житная, д. 14.

**Общество:**
ОАО «Качканарский горно-обогатительный комбинат «Ванадий»»
624356, Россия, Свердловская область, г. Качканар, ул. Свердлова, 2.
ИНН 6615001962, ОКПО 00186938,
р/с 40702810000000003170 в КБ «Уральский банк реконструкции и развития»
г. Екатеринбург, ул. Куйбышева, 95.
к/с 30101810900000000795, БИК 046577795
тек/с 40702840500000002078

**Компания:** _____ Джеймс Вильям Грасони

**Общество:** _____ Хайларов Д.А.

**Дополнение № 1**
**К ДОГОВОРУ ЗАЙМА № 234.0112**

г. Москва                                                      «19» января 1999 г.

Компания «Нортвест Системз Лимитед», именуемая в дальнейшем «Компания», в лице Директора г-на Джеймса Вильяма Грассихя, действующего на основании Устава с одной стороны и Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий», именуемое в дальнейшем «Общество», в лице Генерального директора Хайдарова Д. А., действующего на основании Устава, с другой стороны, в дальнейшем совместно именуемые «Стороны», заключили настоящее Дополнение № 1, именуемое в дальнейшем «Дополнение», к Договору займа № 234-0112 от 17.12.98 г., именуемый в дальнейшем «Договор», о нижеследующем:

1. Пункт 2.4. раздела II Договора изложить в следующей редакции:

«2.4. Датой оформления Займа считается дата зачисления денежных средств на транзитный валютный счет Общества № 40702840800021021865 в АКБ «Московский Деловой Мир», 117049, г. Москва, ул. Житная, д. 14.»

2. Все остальные положения Договора остаются в силе.

3. Настоящее Дополнение является неотъемлемой частью Договора.

**Компания:**                                                 **Общество:**

_____ Джеймс Вильям Грассихя             _____ Хайдаров Д.А.

**Exhibit D**

RussianAluminum2-10-03.txt

Page 1

```
01   UNITED STATES DISTRICT COURT
02   SOUTHERN DISTRICT OF NEW YORK
03
04   ----------------------------x
05   BASE METAL TRADING, et al.,
06
07                  Plaintiffs
08                                 DOCKET NO.: CV-00-9627 (JGK)
09         -vs-                    New York, New York
10                                 February 10, 2003
11   RUSSIAN ALUMINUM, et al,
12
13
14                  Defendants
15   ----------------------------x
16
17   TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
18
19   BEFORE THE HONORABLE JOHN G. KOELTL
20   UNITED STATES DISTRICT JUDGE
21
22
23   A P P E A R A N C E S:
24
25   For the Plaintiffs
26
27   For Base Metal:           BRUCE S. MARKS, ESQ.
28                             Marks & Sokolov LLP
29                             1835 Market Street
30                             Philadelphia, PA  19103
31
32                             JAMES BERNARD, ESQ.
33                             ROBERT ABRAMS, ESQ.
34                             BRIAN M. COGAN, ESQ.
35                             ALAN M. KLINGER, ESQ.
36                             JACOB E. MIOTA, ESQ.
37                             Stroock & Stroock & Lavan LLP
38                             180 Maiden Lane
39                             New York, NY  10038
40
41
42   Audio Operator:          No Audio Operator
43
44   Proceedings Recorded by Electronic Sound Recording
45   Transcript Produced by Transcription Service
46   ---------------------------------------------------------------
47   KRISTIN M RUSIN
48   328 Flatbush Avenue, Suite 251
49   Brooklyn, New York 11238
50   (718) 789-0620
```

Page 2

```
01   ADDITIONAL APPEARANCES
02
03   For the Plaintiffs
04
05   For the Davis Plaintiffs:    DAVID MEISELS, ESQ.
06                                Herrick Feinstein
07                                2 Park Avenue
                                     Page 1
```

RussianAluminum2-10-03.txt

```
06   Arbitrage Court.
07           The decisions I'm going to discuss are the circuit
08   court decisions, where the allegations of corruption are weak,
09   and where the plaintiffs certainly had opportunity to raise
10   these concerns.  At some point, Your Honor, in the -- in any
11   legal system, they just run out of appeals.  And they just have
12   to be categorized as unhappy litigants.
13           I would like to direct your attention, in addition to
14   the order I just discussed, which you're obviously familiar
15   with, there was another order on the GOK side.
16           THE COURT:  No, but before we get to that, --
17           MR. BURROWS:  Yes.
18           THE COURT:  -- you know, I realize that -- I realize
19   that argument, but we deal -- and I realize that there are
20   appeals going on on the G O K side, and I also understand the
21   argument that with respect to some of the issues that they
22   raise that they are free to bring a separate action because, as
23   I understand it, if a claim is dismissed in bankruptcy they can
24   bring a separate proceeding.  I understand all of that.  And
25   that, I understand you argue, goes into the analysis of whether
```

Page 25

```
01   there is an adequate alternative forum.
02           The case is complex because there are a lot of
03   decisions and a lot of issues.  Over these issues is the
04   plaintiffs' claim of RICO here, which you say could be brought
05   in Russia as a fraud claim.  But if they brought it as a fraud
06   claim in Russia, that would not be an appeal from -- I assume;
07   you can correct me if I'm wrong -- an appeal from a dismissal
08   of claim in bankruptcy.  That would be a separate case that
09   argues that they have been defrauded.
10           And some Russian court would then have to answer the
11   question of what is the binding effect of these past decisions
12   of the -- what they allege are allegedly corrupt bankruptcy
13   courts.  But that court, whichever that court is, is -- and
14   again, you can correct me if I'm wrong, but that is the court
15   that's out there as to which a large part of the analysis of is
16   there an adequate alternative forum in Russia.
17           That's the court that we have to ask the question has
18   there been a showing of such systemic corruption that they
19   can't -- the plaintiffs cannot get a fair proceeding in Russia.
20   And the answer to that question doesn't depend on whether the
21   bankruptcy proceeding was or was not in any way tainted.
22           MR. BURROWS:  I understand your question, Your Honor.
23   I think I have two responses.  First of all, our position
24   [indiscernible] cases get toward the top of the pyramid the
25   court -- whether it's the circuit court, or the Supreme
```

Page 26

```
01   Arbitrage Court -- is the competent place and the appropriate
02   place to raise those concerns.
03           Maybe there are two separate courts that should hear
04   this, one on the GOK side, and one on the NKAZ side.  But Your
05   Honor's point is have we addressed the fact that what we're
06   talking about is a separate proceeding, perhaps, or two
07   separate proceedings, perhaps two separate proceedings, in some
08   forum in Russia, challenging the entire structure of all these
09   -- these hundred and nineteen decisions, which is what they're
10   asking you to do, and you're saying could they do it in Russia.
11           If that is not addressed in our opinions, Your Honor,
12   which I believe it is not, and Your Honor would like us to
```
Page 12

RussianAluminum2-10-03.txt
13    address it, I would request the opportunity to do that, and I
14    would put that question to Professor Stephan.  But I have your
15    point.
16                THE COURT:  Okay.  Because what -- what good does it
17    do to say that the alternative to a RICO claim in the United
18    States is a fraud claim in Russia if there's no forum that can
19    hear a fraud claim?
20                One would think -- and I -- and maybe it's answered
21    in the papers, and you can direct me to it, but one would think
22    that the possibilities are that a fraud claim can be raised
23    somewhere in the course of the arbitration proceedings --
24    bankruptcy proceedings, or that it can be raised in a separate
25    -- in a separate proceeding.

      Page 27

01                MR. BURROWS:  Again, Your Honor, we believe that the
02    correct forum for that -- that fraud claim is the bankruptcy
03    proceedings as they work their way up the appellate level.  If
04    that happened here, Your Honor, if there was a bankruptcy here,
05    and it was hopelessly tainted, and people were corrupted and
06    bribed, it would end up -- it would end up here with Your
07    Honor, and then it would end up at the Second Circuit.
08                And if it was a bankruptcy that was then -- that then
09    came to Your Honor, we would make those allegations right here.
10    we would say Judge, here's what happened below, this is what
11    happened to this witness, this is what happened to this
12    witness, and this judge was influenced, and he got a call from
13    the governor.  we would make those allegations, and you would
14    hear it.
15                You wouldn't send us to -- where would you send us?
16    You wouldn't send us to state court.  You wouldn't send us
17    anywhere else.  You would hear that right here, because that's
18    the jurisdiction, and I suggest to you that the --
19                THE COURT:  It's not -- it's not -- it's not
20    inconceivable that parties could bring a claim in another -- in
21    another federal forum and argue that their rights have been
22    denied, find a basis for jurisdiction under another statute,
23    and then the defendants would come in and argue that for the
24    convenience of the parties and witnesses it ought to be
25    transferred back to the -- to the jurisdiction which -- about

      Page 28

01    which allegations are being made.
02                MR. BURROWS:  Your Honor, if there was a bankruptcy
03    in California, and someone took an appeal from it, started a
04    separate action in front of Your Honor, you would very quickly
05    send them to the District Court in California.  You wouldn't
06    hear that case.
07                THE COURT:  Okay.
08                MR. BURROWS:  Thank you, Your Honor.  I wanted to
09    direct Your Honor to two other agency decisions, one -- the
10    first involving GOK, which is an August 18th, 2001 opinion of
11    the Federal Service of Russia on Financial Rehabilitation and
12    Bankruptcy.  It found no evidence of intentional bankruptcy.
13    It looked at the GOK bankruptcy and found it to be legitimate.
14    That is discussed in our reply brief at page sixteen.
15                On the NKAZ side the Federal Service on Financial
16    Rehabilitation and Bankruptcy -- the same federal service
17    overseeing bankruptcies -- on September 12th, 2001, and by
18    order of October 8th, 2001, found no violations in the actions
19    of the arbitrage manager, Mr. Chernyshev.
                                        Page 13

RussianAluminum2-10-03.txt
20      And that -- those minutes and that order are Exhibits
21   139 and one forty to Mr. Chernishev's declaration.  Both
22   bankruptcies, Your Honor, were reviewed and approved, not just
23   by the courts, but by the watchdog agency.
24      Your Honor will recall also on the issue of forum
25   selection the action in Guernsey involving counsel's then-law

Page 29

01   partner in that case, BMT Limited, one of the plaintiffs here,
02   a Guernsey company, Your Honor, a Guernsey company sued in its
03   own jurisdiction, argued that the lawsuit should be dismissed
04   on forum non conveniens grounds and instead be brought in
05   Russia.  BMT Limited argued that Russia would provide an
06   appropriate judicial environment and that the court there would
07   be better able to deal with the case.
08      The court in Guernsey, the judge having been made
09   aware of this case before Your Honor, said how then can the
10   same client claim that this plaintiff can obtain justice in
11   Russia if its statements in the American case are true.
12      Plaintiffs' evidence, Your Honor, of corruption is
13   general, vague, and sensationalized.  It seeks to take
14   advantage of media reports regarding the Russian mafia.
15   However, when put to its proof -- when put to their proof, Your
16   Honor, the plaintiffs have no credible allegations of
17   corruption regarding what I suggest to Your Honor are the four
18   most important decisions by the Russian courts.
19      On the NKAZ side, Your Honor, there is a decision of
20   the West Siberian Circuit -- Federal Circuit on July 3rd, 2000.
21   And there's another -- there's another NKAZ decision, Your
22   Honor, of the same circuit, the West Siberian circuit, on
23   September 6th, 2001.
24      I suggest, Your Honor, that those decisions, which
25   are -- which are items thirty two and forty one of defendants'

Page 30

01   chart -- I suggest that those decisions provide significant
02   evidence that the lower court, the arbitrage court, was correct
03   in finding that NKAZ was insolvent and properly ordered
04   external management.  That's what the July 3rd decision says,
05   item thirty two in our chart, Your Honor.  It upheld the lower
06   court decision, and it basically approved the bankruptcy
07   proceedings.
08      Now, the allegations of corruption from the
09   plaintiffs are as follows.  One of their experts, Viktor
10   Golubev, said that he found the court's reasoning -- this is
11   the circuit court, Your Honor -- found the court's reasoning
12   strange, to say the least.  And he said that in violation of
13   Article 31, the court failed to consider the company's location
14   as of the moment of the filing of the bankruptcy case and
15   instead considered the location at later points during the
16   consideration of the bankruptcy.  That's an allegation of
17   corruption.
18      Another of plaintiffs' declarants, Mr. Rekhovsky,
19   said that the [indiscernible] appeals court -- that's the one
20   we were talking about, the West Siberian circuit -- ruled
21   against creditors on July 3rd, 2000, relying mainly on the
22   collusive, unopposed February 28th holding of the
23   [indiscernible] court, and that's an allegation of corruption.
24      Decision number -- number forty one on the chart,
25   Your Honor, the same circuit, affirmed the lower court holding

Page 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
BASE METAL TRADING, SA, et al.,                  :

                 Plaintiffs,          :          Docket No. 00 CIV. 9627 (JGK)

      -against-                              :

RUSSIAN ALUMINUM, et al.,                        :

              Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**Second Declaration and Exhibits of Joseph Traum**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BASE METAL TRADING SA, et al.                    Docket No. 00 Civ. 9627

Plaintiffs,

v.

RUSSIAN ALUMINUM, et al.,

Defendants.

## SECOND DECLARATION OF JOSEPH TRAUM

I, Joseph Traum, pursuant to the provisions of 28 U.S.C. § 1746, hereby declare
as follows:

1.       I am authorized to make this supplemental declaration on behalf of Davis
International, LLC;  Holdex, LLC;  and Nexis Products LLC.

2.       I am an international businessman and native citizen of Israel.

3.       I lived two years in the United States and speak fluent English as well as
Hebrew; my Russian is not fluent.

### DAVIS INTERNATIONAL, LLC

4.       Davis International, LLC ("Davis") was organized by two nominee
members under the laws of West Virginia on December 1, 1998.

5.       Two offshore corporate services companies served as nominee members
solely for organizational purposes; they played no role in the operational management of
the company and held no beneficial interest in the company.

A - 783

6.        Nominee registration is common in doing business in Russia in order to maintain the confidentiality of the identity of the beneficial owners for reasons of personal safety.

7.        Davis maintains its registered address at 1205 Wilkie Drive, Charleston, WV 25314.

8.        Davis was organized for the purpose of serving as a holding company to own various investments, including the shares in Kachkanarsky GOK ("GOK") that are at issue in this case.

9.        Davis was organized in the United States because of its stable legal and economic systems and well before it was known that certain Defendants would attempt to illegally take its shares in GOK.

10.        Davis purchased shares in GOK from Amber Star, LLC, which is organized under the laws of the United States, pursuant to a contract dated September 28, 1999, which provided for the resolution of disputes in the courts of New York state, a copy of which is attached hereto as Exhibit 1.

11.        Davis also purchased shares in GOK from Lenex, pursuant to contracts dated March 15, 1999 and September 28, 1999, copies of which are attached hereto as Exhibit 2, which provided for the resolution of disputes in the courts of New York State.

12.        One of Davis's members, Sara Ofen, is a citizen of the United States; I am the other member.

13.        Ms. Ofen speaks fluent English; she speaks no Russian.

14.        Isaac Savion, a citizen of the United States, is an officer of Davis.

15.        Mr. Savion speaks fluent English; he speaks no Russian.

2

16.    None of the members or officers of Davis are Russian citizens.

17.    I am the person most knowledgeable about the facts concerning the instant RICO action in regard to Davis.

18.    As explained in greater detail in my first declaration, I am unwilling to travel to Russia for fear of false criminal prosecution and threats on my life.

19. I was also advised by Organized Crime Department of the Israeli Police Force not to travel to Russia because of the threats on my life arising from my involvement with GOK.

20.    No members or officers of Davis are willing to travel to Russia because of the threats to me and the warnings of the Israeli police.

## HOLDEX, LLC

21.    Holdex, LLC ("Holdex") was organized by two nominee members under the laws of Texas on September 29, 1999, before the illegal seizure of GOK in January 2000.

22.    The nominee members were used for Holdex in the same manner and for the same reasons as Davis.

23.    Holdex maintains its registered address at 707 W 7th Street, Austin, TX 78701.

24.    Holdex was organized for the purpose of serving as a holding company to own various investments, including shares of Kachkanarsky GOK.

25.    Holdex was organized in the United States because of its stable legal and economic systems and well before it was known that certain Defendants would attempt to illegally take its shares in GOK.

3

A - 785

26.     Holdex purchased shares in GOK from Polyprom, pursuant to a contract dated January 20, 2000, which provided for the resolution of disputes in the courts of New York state pursuant to an amendment dated January 26, 2000, copies of which are attached hereto as Exhibit 3.

27.     Simha Eizenberg and Dov Rieger, are native citizens of Israel, and the beneficial owners of Holdex.

28.     Simha Eizenberg and Dov Rieger speak fluent English and Hebrew; they speak no Russian.

29.     Messrs. Eizenberg and Rieger are not willing to travel to Russia because of the threats to me and the warnings of the Israeli police.

### NEXIS PRODUCTS, LLC

30.     Nexis Products, LLC ("Nexis Products") was organized by two nominee members under the laws of Utah on October 9, 1996.

31.     The nominee members were used for Nexis Products in the same manner and for the same reasons as Davis and Holdex.

32.     Nexis Products maintains its registered address at 1108 E. South Union Avenue, Midvale, Utah, 84047.

33.     At all times I have been the beneficial owner of Nexis Products.

34.     Nexis Products was organized for the purposes of serving as an operating company for various investments, including more than US $13 million for trade financing with Kachkanarsky GOK and more than US $ 4.5 million in investments in trade with a fertilizer plant in Kazakhstan.

4

35.    Nexis Products owns shares in a company which owns real estate in Canada and which is in the process of establishing an "e-commerce" business.

36.    Prior to the Illegal Seizure of GOK, Nexis Products planned to open a center in San Diego, CA to refurbish electronic products, such as DVD players, stereo speakers, etc., to compliment its planned "e-commerce" business in Canada.

37.    However, as a result of the losses suffered by its loss of the value in its shares in GOK, Nexis Products has not yet effected its plan.

38.    Nexis Products was organized in the United States because of its stable legal and economic systems and well before the illegal seizure of GOK in January, 2000.

39.    Nexis Products and Gok affirmed the outstanding balance owed under a loan agreement dated July 13, 1999 by agreement dated November 25, 1999, which provided for the resolution of disputes in the courts of New York state, a copy of which is attached hereto as Exhibit 4.

40.    Isaac Savion, who is a US citizen, is an officer of Nexis Products.

41.    Neither Mr. Savion nor myself are willing to travel to Russia because of the threats to me and the warnings of the Israeli police.

**COOPERATION WITH THE FBI**

42.    On behalf of Davis, Holdex, and Nexis Products, I, along with Jalal Khaidarov, have cooperated with the ongoing FBI investigation of Mikhail Chernoi and Arnold Kislin in the United States and Israel in regard to their criminal activities and involvement with the "Izmailovo Mafia" (which was headed by Vyachaslav Ivankov in the United States and Anton Malevsky in Russia) and the harm this has caused Davis, Holdex, and Nexis Products.   This has involved numerous trips to the United States.

5

I have executed this affidavit outside of the United States of America and declare under the penalty of perjury pursuant to the laws of the United States that the foregoing is true to the best of my knowledge and belief.

19 FEB. 2003

**Exhibit 1**

**CONTRACT № KGOK-28/09-99**
**on purchase-sale of securities**

*New York, 1999/09/28*

The company "Amber Star L.L.C.", hereinafter referred to as "The SELLER", in the person of Alexander Morgunov, acting in accordance with the General Power of Attorney made 9th day of November, 1998, from the one part, and

the company "Davis International L.L.C.", hereinafter referred to as "The BUYER", in the person of Joseph M. Traum, acting in accordance with the General Power of Attorney made 3rd day of December 1998, from the other part,

have concluded the present contract, hereinafter referred to as "The Contract", about the following:

## 1. SUBJECT OF THE CONTRACT

1.1. The SELLER undertakes to transfer to the property of the BUYER and the BUYER undertakes to accept and to pay the following securities further referred to as "The Securities" of the Issuer, indicated below, further referred to as "The Issuer", under terms, stipulated by the present Contract:

Securities: common registered shares

Issuer: Joint Stock Venture "Kachkanarsky GOK «Vanadium»"

Nominal value: 1 (one) RUR.

Code of state registration: 1st release – #62-1П-290, 2nd release – #62-1-1396

Quantity: 5 537 031 (Five million five hundred thirty seven thousand thirty one) shares.

1.2. The value of a transaction: 553 703 (Five hundred fifty three thousand seven hundred three) US dollars.

## 2. ORDER PROCEDURE: PAYMENT

2.1. The SELLER undertakes to transfer the Securities to the BUYER's account with the Register of the Issuer's shareholders as well as to pass to the SELLER original documents certifying such transfer. All necessary actions for such a transfer will be done by the SELLER and for his account.

2.2. A term for Securities' transfer to the BUYER's account in the Register of the Issuer's shareholders is determined to be within 70 (Seventy) calendar days from the date of signing of the present Contract.

2.3. The BUYER undertakes to pay the full value of the transaction in accordance with the point 1.2 of the

---

**ДОГОВОР № KGOK-28/09-99**
**купли-продажи ценных бумаг**

*г. Нью-Йорк, 28.09.1999*

Компания "Амбер Стар Эл. Эл. Си.", именуемая в дальнейшем "ПРОДАВЕЦ", в лице Александра Моргунова, действующего на основании Генеральной доверенности от 09 ноября 1998 г., с одной стороны, и

компания "Дэвис Интернэшнл Эл.Эл.Си.", именуемая в дальнейшем "ПОКУПАТЕЛЬ", в лице Джозефа М. Траума, действующего на основании Генеральной доверенности от 03 декабря 1998 г., с другой стороны,

заключили настоящий договор, именуемый в дальнейшем "Договор", о нижеследующем:

## 1. ПРЕДМЕТ ДОГОВОРА

1.1. ПРОДАВЕЦ обязуется передать в собственность ПОКУПАТЕЛЮ, а ПОКУПАТЕЛЬ обязуется принять и оплатить следующие ценные бумаги (в дальнейшем "ЦБ") эмитента, указанного ниже (в дальнейшем "Эмитент"), на условиях, предусмотренных настоящим Договором:

вид ЦБ: акции обыкновенные именные

Эмитент: Открытое акционерное общество "Качканарский ГОК «Ванадий»"

Номинальная стоимость: 1 (один) российский рубль.

Код государственной регистрации: 1-ый выпуск – №62-1П-290; 2-ой выпуск – №62-1-1396

Количество: 5 537 031 (Пять миллионов пятьсот тридцать семь тысяч тридцать одна) штука.

1.2. Сумма сделки: 553 703 (Пятьсот пятьдесят три тысячи семьсот три) долларов США.

## 2. ПОРЯДОК РАСЧЕТОВ: ОПЛАТА

2.1. ПРОДАВЕЦ обязуется осуществить перевод ЦБ на счет ПОКУПАТЕЛЯ в реестре акционеров Эмитента и предоставить ПОКУПАТЕЛЮ оригиналы документов, подтверждающих выполненный перевод. Все необходимые действия по вышеуказанному переводу ЦБ осуществляются ПРОДАВЦОМ и за его счет.

2.2. Срок для перевода ЦБ на счет ПОКУПАТЕЛЯ в реестре акционеров Эмитента устанавливается в течение 70 (Семьдесят) календарных дней с даты подписания настоящего Договора.

2.3. ПОКУПАТЕЛЬ обязуется оплатить полную сумму сделки, указанную в пункте 1.2

1

A - 790

present Contract within 30 (thirty) days following the signing of the Contract.

## 3. TRANSFER OF THE TITLE

3.1. The BUYER obtains the title of the Securities as well as all the rights certifying by the Securities at the moment of complete payment of the transaction's value under the point 2.3. of the Contract.

Until the BUYER's full payment in accordance with the terms of the point 2.3. of the Contract, the title of the Securities remains with the SELLER.

## 4. GUARANTEES

4.1. The SELLER hereby guarantees the BUYER that the Securities transferring under the present Contract are free of any charges and withholdings of third parties.

The SELLER guarantees that he possesses full and absolute right of disposal of the indicated Securities and that the said Securities are not pledged under any Loan, are free of any blocking or lien of any nature, and are not a subject of any trial.

The SELLER guarantees that until the BUYER fully completes the payment as stated in the point 2.3. of the Contract the SELLER will not take any action referring to sale, to pledge or in any other way to block or to transfer the Securities to anybody except to the BUYER according to the point 2.1 of the Contract.

4.2. The BUYER guarantees that he will not take any action referring to sale, to pledge or to block or transfer of the Securities till the moment of complete payment in accordance with the point 2.3. of the Contract.

4.3. Excepting the case the present Contract is cancelled, any dividends, interests, income or any other allocation over the Securities, indicated in point 1.1. of the present Contract, due to the SELLER after the transfer of the right of property on the Securities as well as of all the rights, certified by the Securities to the BUYER, the SELLER undertakes to transfer them to the BUYER within 20 (twenty) banking days following the day of receipt of such an income.

## 5. RESPONSIBILITY OF THE PARTIES

5.1. In case of the SELLER breaches to fulfil the terms of the point 2.2. of the Contract, as well as the BUYER breaches the terms of the point 2.3. of the Contract, breaching party shall pay to another party a penalty of 0,1% of the value of transaction for every calendar day of such a delay till the date of complete fulfilment of the obligations. Payment of the penalty under the present Contract does not release the breaching party from fulfilment of his obligations under the present Contract.

5.2. In the case the SELLER fulfils his undertakings stated in the points 2.1, 2.2 and 4.1 of the Contract, and the BUYER fails to pay for the Securities according to the point 2.3 of the Contract, the SELLER is unconditionally entitled to unilaterally cancel the Contract

настоящего Договора, в течение 30 (тридцати) дней с момента подписания Договора.

## 3. ПЕРЕХОД ПРАВ

3.1. ПОКУПАТЕЛЬ приобретает право собственности на ЦБ, а равно все права, удостоверяемые ЦБ, в момент полной оплаты суммы сделки по пункту 2.3 Договора.

До полного расчета ПОКУПАТЕЛЯ по условиям пункта 2.3 Договора, право собственности на ЦБ принадлежат ПРОДАВЦУ.

## 4. ГАРАНТИИ

4.1. ПРОДАВЕЦ гарантирует ПОКУПАТЕЛЮ отсутствие каких-либо прав третьих лиц на передаваемые в соответствии с настоящим Договором ЦБ.

ПРОДАВЕЦ гарантирует, что имеет полное и безусловное право распоряжаться указанными ЦБ, а также то, что названные ЦБ не являются предметом обеспечения обязательств, не состоят под арестом или любым иным обременением и не являются предметом судебного разбирательства.

ПРОДАВЕЦ гарантирует, что до момента совершения полной оплаты ПОКУПАТЕЛЕМ, как указано в пункте 2.3 Договора, ПРОДАВЕЦ не предпримет никаких действий для продажи, передачи в залог или иному обременению или переводу ЦБ кому-либо, кроме ПОКУПАТЕЛЯ, согласно пункту 2.1 Договора.

4.2. ПОКУПАТЕЛЬ гарантирует, что не предпримет никаких действий для продажи, передачи в залог или иному обременению или переводу ЦБ до момента полной их оплаты в соответствии с пунктом 2.3 Договора.

4.3. Кроме случая аннулирования настоящего Договора, любые дивиденды, проценты, доходы или иные распределения на ЦБ, указанные в пункте 1.1 настоящего Договора, начисленные ПРОДАВЦУ после перехода права собственности на ЦБ, а равно все права, удостоверяемые ЦБ, к ПОКУПАТЕЛЮ, ПРОДАВЕЦ обязуется перечислить ПОКУПАТЕЛЮ в течение 20 (двадцати) банковских дней следующих за днем получения им такого дохода.

## 5. ОТВЕТСТВЕННОСТЬ СТОРОН

5.1. В случае нарушения ПРОДАВЦОМ сроков выполнения условия пункта 2.2 Договора, либо нарушения ПОКУПАТЕЛЕМ сроков выполнения пункта 2.3 Договора, нарушившая свои обязательства Сторона обязана выплатить другой Стороне неустойку в размере 0,1% от суммы сделки за каждый календарный день просрочки до даты полного выполнения обязательств. Уплата неустойки по настоящему Договору не освобождает нарушившую свои обязательства Сторону от выполнения обязательств по настоящему Договору.

5.2. В случае если ПРОДАВЕЦ выполнит свои обязательства, указанные в пунктах 2.1, 2.2 и 4.1 Договора, а ПОКУПАТЕЛЬ не совершит оплату за ЦБ согласно условиям пункта 2.3 Договора, ПРОДАВЕЦ имеет безусловное право расторгнуть Договор в

2.

and the BUYER undertakes to take actions to retransfer the Securities back to the SELLER's account.

5.3. In case the terms of the point 4.1. of the Contract are false, or in the case of SELLER's failure to fulfill the terms of the point 3.1. under any reasons, related to or beyond him, including the event of absence of the Securities on the BUYER's account at the moment of the payment clearing full value of the transaction, the BUYER has absolute right to unilaterally cancel the Contract, and the SELLER shall fully refund the paid amount of the transaction to the BUYER.

Moreover, being irrespective to whether the BUYER will cancel the Contract or not, the SELLER shall pay to the BUYER a penalty of 100 (one hundred) per cents of the value of transaction and a forfeit of 0,1 % of the value of the transaction for each day of a delay following from the date the BUYER covers the payment's full amount till execution of all the terms and provisions of the Contract by the SELLER.

## 6. CANCELLATION OF A CONTRACT

6.1. The present Contract may be cancelled by the Parties only under their mutual agreement fixed in written form, except for the case, indicated in the points 5.2. and 5.3. of the Contract.

## 7. FORCE-MAJEURE CIRCUMSTANCES

7.1. Neither of the Parties bears responsibility for non-performance, inopportune or unduly fulfillment of their obligations under the present Contract if the indicated non-performance, inopportune or unduly fulfillment are due only to coming and/or affection of force-majeur circumstances.

7.2. Unless otherwise stipulated by the Parties, occurrence of force-majeur circumstances extends a period of the present Contract fulfillment for the term they remain in force.

7.3. Release of the obliged party from responsibility for non-performance, inopportune or unduly fulfillment of any unfeasible obligation under the present Contract, including force-majeur circumstances, does not entail release of this party from responsibility for fulfillment of its other obligations, not considered by the Parties unrealizable under the present Contract.

## 8. APPLICABLE LAW

8.1. This Contract is made in and intended to be performed in and enforced in accordance with the laws of State New York and Federal Laws of the United States, without regard to its conflict of laws rules. The Parties hereby undertake to use good faith efforts to settle all the disputes arising under this Contract by way of mutual negotiations. Should the Parties fail to reach the settlement the Parties deem the jurisdiction of the US Courts as a proper forum. All the disputes, including without limitation claims of breach of agreement, fraud in

---

5.3. В случае несоответствия действительности условий, предусмотренных пунктом 4.1 Договора, или в случае невозможности выполнения ПРОДАВЦОМ по любым зависящим или независящим от него обстоятельствам условий пункта 3.1, в том числе при отсутствии ЦБ на счету ПОКУПАТЕЛЯ на момент полной оплаты им суммы сделки, ПОКУПАТЕЛЬ имеет безусловное право расторгнуть Договор в одностороннем порядке и ПРОДАВЕЦ обязан возвратить ПОКУПАТЕЛЮ уплаченную сумму сделки.

При этом независимо от того, расторгнет ПОКУПАТЕЛЬ договор, или нет, ПРОДАВЕЦ обязан выплатить ПОКУПАТЕЛЮ штраф в размере 100 (ста) процентов от суммы сделки, и пени в размере 0,1 % от суммы сделки за каждый день просрочки, начиная с даты совершения ПОКУПАТЕЛЕМ полной оплаты до выполнения ПРОДАВЦОМ всех условий Договора.

## 6. РАСТОРЖЕНИЕ ДОГОВОРА

6.1. Настоящий Договор может быть расторгнут Сторонами только по взаимному согласию, выраженному в письменной форме, за исключением случаев, указанных в пунктах 5.2 и 5.3 Договора.

## 7. ФОРС-МАЖОР

7.1. Ни одна из Сторон не несет ответственности в случае невыполнения, несвоевременного или ненадлежащего выполнения своих обязательств по настоящему Договору, если указанные невыполнение, несвоевременное или ненадлежащее выполнение обусловлены исключительно наступлением и/или действием обстоятельств непреодолимой силы (форс-мажорных обстоятельств).

7.2. Наступление форс-мажорных обстоятельств вызывает увеличение срока исполнения настоящего Договора на период их действия, если Стороны не договорятся об ином.

7.3. Освобождение обязанной Стороны от ответственности за неисполнение, несвоевременное и/или ненадлежащее исполнение какого-либо неисполнимого обязательства по настоящему Договору, в том числе и по форс-мажорным обстоятельствам, не влечет освобождение этой Стороны от ответственности за исполнение иных ее обязательств, не признанных Сторонами неисполнимыми по настоящему Договору.

## 8. ЗАКОНОДАТЕЛЬСТВО

8.1. Данный Договор совершен в соответствии с законами штата Нью-Йорк и федеральными законами США, без отношения к конфликту положений их законов. Стороны настоящим обязуются в разумных сроках разрешать все споры, возникающие по данному Договору, путем взаимных переговоров. При отсутствии согласия сторон, Стороны в качестве подходящего форума признают юрисдикцию судов США. Все споры, в том числе без исковой давности претензий в нарушении

3

A - 792

the inducement and negligence, shall be adjudicated in a court of the State of New York, USA.

Договора, обмена во встречном удовлетворении и халатности, будут разрешаться в суде штата Нью-Йорк, США.

## 9. OTHER PROVISIONS

9.1. All alterations, additions and appendices to the present Contract shall be done in written form and shall be signed by duly authorized representatives of the Parties.

9.2. The present Contract comes into force from the moment it's signing by both Parties and remains in force until fulfillment by the Parties of their obligations, arising from the provisions of the present Contract.

9.3. The present Contract is executed in 2 (two) copies (in Russian and in English languages) having equal legal force, one copy for the Buyer, one copy for the Seller.

## 9. ПРОЧИЕ ПОЛОЖЕНИЯ

9.1. Все изменения, дополнения и приложения к настоящему Договору должны быть совершены в письменной форме и подписаны уполномоченными представителями Сторон.

9.2. Настоящий Договор вступает в силу с момента его подписания обеими Сторонами и действует до полного исполнения Сторонами обязательств, вытекающих из положений данного Договора.

9.3. Настоящий Договор составлен в 2-х экземплярах (на русском и английском языках), имеющих одинаковую юридическую силу, один из которых находится у Покупателя, другой – у Продавца.

## 10. ADDRESSES AND BANKING DETAILS OF THE PARTIES

**The SELLER:** Amber Star L.L.C.,
**Legal address:**318 N. Carson Street, Carson City,
NV 89701, USA.
**Banking details:** Acc. No. 07010207
**BENEFICIARY'S BANK:** JS "MULTIBANKA"
57, Elizabetes Street, Riga, LV-1772 Latvia
**SWIFT :** MULTLV2X
**CORESPONDING BANK:** Credit Lyonnais New York Branch
New York, USA
Acc. No. 0138715000100 (of JS "Multibanka")
SWIFT: CRLYUS33

**The BUYER:** Davis International L.L.C.
**Legal address:** 1205 Wilde Drive, Charleston, WV
25314-1726, West Virginia, USA.
**Banking details:** Acc. No. 07010411
BENEFICIARY'S BANK: JS "MULTIBANKA"
57, Elizabetes Street, Riga, LV-1772 Latvia
SWIFT : MULTLV2X
CORESPONDING BANK: Credit Lyonnais New York Branch
New York, USA
Acc. No. 0138715000100 (of JS "Multibanka")
SWIFT: CRLYUS33

## 10. АДРЕСА И РЕКВИЗИТЫ СТОРОН

**ПРОДАВЕЦ:** «Амбер Стар Эл.Эл.Си.»
**Юридический адрес:** 318 Н. Карсон стрит,
Карсон Сити, НВ 89701, США
**Банковские реквизиты:** Счет №07010207
**Банк бенефициара:** «Мультибанка»
57, Елизабетес стрит, Рига, LV-1772, Латвия
**SWIFT: MULTLV2X**
Банк корреспондент: Кредит Лионнаис Нью-Йорк
Отделение, Нью-Йорк, США
Счет №0138715000100 («Мультибанка»)
SWIFT: CRLYUS33

**ПОКУПАТЕЛЬ:** «Дэвис Интернэшнл Эл.Эл.Си.»
**Юридический адрес:** 1205 Уилди Драйв,Чарльстон
WV 25314-1726, Западная Вирджиния, США
**Банковские реквизиты:** Счет №07010411
Банк бенефициара: «Мультибанка»
57, Елизабетес стрит, Рига, LV-1772, Латвия
SWIFT: MULTLV2X
Банк корреспондент: Кредит Лионнаис Нью-Йорк
Отделение, Нью-Йорк, США
Счет №0138715000100 («Мультибанка»)
SWIFT: CRLYUS33

The SELLER/ПРОДАВЕЦ:



The BUYER/ПОКУПАТЕЛЬ:



4

**Exhibit 2**