AGREEMENT # 001-99/A
For sale and purchase of securities

Moscow                                                    March 15, 1999

Limited Liability Company Leneks, hereinafter "Seller", in the person of the Director Sinisha Vuich, acting on the basis of the Charter, on one side, and

The company Davis International LLC, hereinafter, "Purchaser", in the person of Joseph M. Traum, acting on the basis of the General power of attorney dated December 3, 1998, on the other side,

Jointly named "Parties", concluded the present agreement, hereinafter "Agreement", about the following:

## 1. SUBJECT OF THE AGREEMENT

1.1. The Seller us obligated to transfer into the Purchaser's ownership, and the Purchaser is obligated to accept the following securities (hereinafter "SHARES") of the issuer indicated below (hereinafter "Issuer") and to pay for them, on conditions as provided by the present agreement:

| | |
|---|---|
| *Type of securities* | Ordinary, nominal non-documentary shares |
| *Issuer of securities* | Open Joint Stock Company Kachkanar Ore Mining and Processing Plant Vanadiy (hereinafter "Issuer") |
| *Registration # Of Issuer* | 0422 series III-IK, registered by the Resolution of the Head of Administration of the city of Kachkanar # 348 dated April 15, 1993 |
| *Location of the issuer* | Russia, Sverdlovsk Region, Kachkanar, 2 Sverdlova Street |
| *Holder of Register of Issuer's shareholders* | Company- registrar Panorama 101000 Moscow, 13A Bolshoi Kharitonievskiy pereulok, office 8A |
| *Nominal cost* | 1 (one) ruble |
| *Amount of securities* | 29,520,062 (Twenty nine million five hundred twenty thousand sixty two ) |
| *Cost of one share* | 1,105 (One point one hundred five) rubles |
| *Total amount of the transaction* | 32,619,668.51 (Thirty two million six hundred nineteen thousand six hundred sixty eight) rubles 51 kopeks |

1.2. The amount of the transaction constitutes 32,619,668.51 (Thirty two million six hundred nineteen thousand six hundred sixty eight) rubles 51 kopeks.

## 2. ORDER OF PAYMENTS

2.1. The Seller is obligated to transfer SHARES to the Purchaser's account in the register of Issuer's shareholders and to provide originals of the documents confirming that the transfer was performed to the Purchaser. The Seller performs all actions necessary for the above transfer of SHARES at its own expense.

2.2. The SHARES shall be transferred to the Purchaser's account in the register of shareholders of the Issuer within 70 (seventy) calendar days from the date of execution of the present Agreement.

2.3. The Purchaser is obligated to pay the full amount of the transaction indicated in section 1.2 of the present agreement within 30 days (thirty days) from the date of execution of the present Agreement.

## 3. TRANSFER OF RIGHTS

3.1. The Purchaser acquires the right of ownership to SHARES as well as all rights attested by SHARES as of the moment of full payment of the amount of the transaction in accordance with the section 2.3. of the Agreement.

Prior to Purchaser's full payment in accordance with the section 2.3. of the Agreement, right of ownership to SHARES belongs to the Seller.

## 4. GUARANTEES

4.1. The Seller guarantees to the Purchaser that no third persons have any rights to the SHARES that are being transferred in accordance with the present Agreement.

The Seller guarantees that it has complete and unconditional right to dispose of the above SHARES and that the above SHARES are not an object securing obligations, not arrested or burdened otherwise and not a subject to judicial proceedings.

The Seller guarantees that prior to the moment of the full payment by the Purchaser as indicated in section 2.3. of the Agreement, it will not undertake any actions aimed at sale, transfer of SHARES as a collateral or burden the SHARES in any other way or transfer SHARES to anybody apart from the Purchaser in accordance with the section 2.1. of the Agreement.

4.2. The Purchaser guarantees that it will not undertake any actions aimed at sale, transfer of SHARES as a collateral or burden the SHARES in any other way or transfer of SHARES until the moment of full payment for the SHARES in accordance with section 2.3. of the Agreement.

4.3. Apart from the case of annulment of the present Agreement, the Seller is obligated to transfer any dividends, interest, receipts, or other distributions upon the SHARES indicated in section 1.1. of the present Agreement accrued to the Seller after the transfer of the right of ownership to SHARES as well as all rights attested by SHARES, to the Purchaser within 20 (twenty) banking days following the day of the receipt of such income.

## 5. LIABILITY OF THE PARTIES

5.1. In case of violation by the Seller of the terms of performance indicated in section 2.2. of the Agreement, or violation by the Purchaser of the terms of performance indicated in section 2.3. of he Agreement, the Party that breached its obligations is obligated to pay the forfeit in the amount of 0.1% from the amount of the transaction for every calendar day of the delay of performance until the full performance of obligations to the other Party. Payment of the forfeit upon the present Agreement does not exempt

the party that breached its obligations from performance of obligations upon the present Agreement.

5.2. If the seller performed its obligations indicated in sections 2.1., 2.2. and 4.1. of the Agreement and the Purchaser failed to pay for SHARES in accordance with the conditions of the section 2.3 of the Agreement, the Seller has an unconditional right to unilaterally terminate the Agreement and the Purchaser is obligated to perform actions aimed at transfer of SHARES back to the account of the Seller.

5.3. In case when the conditions of the section 4.1. are inconsistent with the reality or in case of impossibility for the Seller to perform the conditions of the section 3.1. due to any circumstances depending on or independent from it, including the case of lack of SHARES at the Purchaser's account as of the moment of its full payment of the amount of the transaction, the Purchaser has unconditional right to unilaterally terminate the Agreement and the Seller is obligated to return the paid amount of the transaction to the Purchaser.

At that, the Seller is obligated to pay to the Purchaser a fine in the amount of 100 % (one hundred) from the amount of the transaction and a forfeit in the amount of 0.1% from the amount of the transaction for every calendar day of the delay of performance from the date of full payment until execution by the Seller of all the conditions of the Agreement, independently of the fact whether or not the Purchaser terminated the Agreement.

## 6. TERMINATION OF THE AGREEMENT

6.1. The Present Agreement can be terminated by the Parties only upon the mutual agreement expressed in writing except for the cases indicated in sections 5.2 and 5.3 of the Agreement.

## 7. FORCE-MAJEUR

7.1. Neither Party shall be liable in case of failure to perform untimely or improper performance of its obligations upon the present Agreement if the above failure to perform untimely or improper performance was caused exclusively by occurrence and/or action of insurmountable circumstances (force-majeur circumstances).

7.2. The occurrence of force-majeur circumstances causes increase of the term of performance of the present Agreement for the period of its duration, unless the Parties agreed otherwise.

7.3. Relief of the obligated party from liability for failure to perform, untimely or improper performance of any unrealizable obligation upon the present Agreement, including due to force-majeur circumstances, does not cause relief of such party from liability for failure to perform its other obligations, which the Parties to the present Agreement do not recognize as unrealizable.

## 8. LEGISLATION

8.1. The present Agreement is executed in accordance with laws of the state New York and the federal laws of the USA irrespective of the conflict of provisions of their

laws. The Parties are obligated to reasonably settle all the disputes arising in connection with the Agreement by the means of mutual negotiations. In case of lack of agreement, the Parties recognize jurisdiction of the USA courts as a proper forum. All disputes including claims with no applicable statute of limitations with regard to violation of the Agreement, fraud or breach of duty to perform and negligence shall be resolved in the court of the state New York, USA.

### 9. OTHER CONDITIONS

9.1. All amendments, additions and attachments to the present Agreement shall be executed in writing and signed by authorized representatives of the Parties.

9.2. The present Agreement becomes effective from the moment of its signing by both Parties and is valid until the full performance by the Parties of obligations resulting from the provisions of the present Agreement.

9.3. The present Agreement is executed in two versions (in Russian and in English languages) with equal legal power, one for the Purchaser, and another one for the Seller.

### 10. LEGAL ADDRESSES OF THE PARTIES

**Seller**:
LLC Leneks
113054 Moscow 25 Bakhrushina St., App.1

Account # 40702810600020021782 in Joint Stock Bank Moscow Business World, correspondent account # 30101810900000000466, BIK 044525466

**Purchaser:**
Company Davis International LLC
1205 Wilkie Drive, Charleston, WV 25314-1726 West Virginia, USA

Hard currency account # 40807840000020022528 in Joint Stock Bank Moscow Business World, correspondent account # 30101810900000000466, BIK 044525466

### 11. SIGNATURES OF THE PARTIES

From the Seller

[signed]

S. Vuich        [Seal]

From the Purchaser

[signed]

D. Traum        [Seal]

AGREEMENT # 003-99/A
For sale and purchase of securities

Moscow                                                    September 28, 1999

    Limited Liability Company Leneks, hereinafter "Seller", in the person of the Director Sinisha Vuich, acting on the basis of the Charter, on one side, and

    The company Davis International LLC, hereinafter, "Purchaser", in the person of Joseph M. Traum, acting on the basis of the General power of attorney dated December 3, 1998, on the other side,

    Jointly named "Parties", concluded the present agreement, hereinafter "Agreement", about the following:

## 1. SUBJECT OF THE AGREEMENT

    1.1. The Seller us obligated to transfer into the Purchaser's ownership, and the Purchaser is obligated to accept the following securities (hereinafter "SHARES") of the issuer indicated below (hereinafter "Issuer") and to pay for them, on conditions as provided by the present agreement:

| | |
|---|---|
| *Type of securities* | Ordinary, nominal non-documentary shares |
| *Issuer of securities* | Open Joint Stock Company Kachkanar Ore Mining and Processing Plant Vanadiy (hereinafter "Issuer") |
| *Registration # Of Issuer* | 0422 series III-IK, registered by the Resolution of the Head of Administration of the city of Kachkanar # 348 dated April 15, 1993 |
| *Location of the issuer* | Russia, Sverdlovsk Region, Kachkanar, 2 Sverdlova Street |
| *Holder of Register of Issuer's shareholders* | Company- registrar Panorama 101000 Moscow, 13A Bolshoi Kharitonievskiy pereulok, office 8A |
| *Nominal cost* | 1 (one) ruble |
| *Amount of securities* | 48,929 (Forty eight thousand nine hundred twenty nine) |
| *Cost of one share* | 1,105 (One point one hundred five) rubles |
| *Total amount of the transaction* | 54,067 (Fifty four thousand sixty seven) rubes |

    1.2. The amount of the transaction constitutes 54,067 (Fifty four thousand sixty seven) rubes.

## 2. ORDER OF PAYMENTS

    2.1. The Seller is obligated to transfer SHARES to the Purchaser's account in the register of Issuer's shareholders and to provide originals of the documents confirming that the transfer was performed to the Purchaser. The Seller performs all actions necessary for the above transfer of SHARES at its own expense.

2.2. The SHARES shall be transferred to the Purchaser's account in the register of shareholders of the Issuer within 70 (seventy) calendar days from the date of execution of the present Agreement.

2.3. The Purchaser is obligated to pay the full amount of the transaction indicated in section 1.2 of the present agreement within 30 days (thirty days) from the date of execution of the present Agreement.

### 3. TRANSFER OF RIGHTS

3.1. The Purchaser acquires the right of ownership to SHARES as well as all rights attested by SHARES as of the moment of full payment of the amount of the transaction in accordance with the section 2.3. of the Agreement.

Prior to Purchaser's full payment in accordance with the section 2.3. of the Agreement, right of ownership to SHARES belongs to the Seller.

### 4. GUARANTEES

4.1. The Seller guarantees to the Purchaser that no third persons have any rights to the SHARES that are being transferred in accordance with the present Agreement.

The Seller guarantees that it has complete and unconditional right to dispose of the above SHARES and that the above SHARES are not an object securing obligations, not arrested or burdened otherwise and not a subject to judicial proceedings.

The Seller guarantees that prior to the moment of the full payment by the Purchaser as indicated in section 2.3. of the Agreement, it will not undertake any actions aimed at sale, transfer of SHARES as a collateral or burden the SHARES in any other way or transfer SHARES to anybody apart from the Purchaser in accordance with the section 2.1. of the Agreement.

4.2. The Purchaser guarantees that it will not undertake any actions aimed at sale, transfer of SHARES as a collateral or burden the SHARES in any other way or transfer of SHARES until the moment of full payment for the SHARES in accordance with section 2.3. of the Agreement.

4.3. Apart from the case of annulment of the present Agreement, the Seller is obligated to transfer any dividends, interest, receipts, or other distributions upon the SHARES indicated in section 1.1. of the present Agreement accrued to the Seller after the transfer of the right of ownership to SHARES as well as all rights attested by SHARES, to the Purchaser within 20 (twenty) banking days following the day of the receipt of such income.

### 5. LIABILITY OF THE PARTIES

5.1. In case of violation by the Seller of the terms of performance indicated in section 2.2. of the Agreement, or violation by the Purchaser of the terms of performance indicated in section 2.3. of he Agreement, the Party that breached its obligations is obligated to pay the forfeit in the amount of 0.1% from the amount of the transaction for every calendar day of the delay of performance until the full performance of obligations to the other Party. Payment of the forfeit upon the present Agreement does not exempt

the party that breached its obligations from performance of obligations upon the present Agreement.

5.2. If the seller performed its obligations indicated in sections 2.1., 2.2. and 4.1. of the Agreement and the Purchaser failed to pay for SHARES in accordance with the conditions of the section 2.3 of the Agreement, the Seller has an unconditional right to unilaterally terminate the Agreement and the Purchaser is obligated to perform actions aimed at transfer of SHARES back to the account of the Seller.

5.3. In case when the conditions of the section 4.1. are inconsistent with the reality or in case of impossibility for the Seller to perform the conditions of the section 3.1. due to any circumstances depending on or independent from it, including the case of lack of SHARES at the Purchaser's account as of the moment of its full payment of the amount of the transaction, the Purchaser has unconditional right to unilaterally terminate the Agreement and the Seller is obligated to return the paid amount of the transaction to the Purchaser.

At that, the Seller is obligated to pay to the Purchaser a fine in the amount of 100 % (one hundred) from the amount of the transaction and a forfeit in the amount of 0.1% from the amount of the transaction for every calendar day of the delay of performance from the date of full payment until execution by the Seller of all the conditions of the Agreement, independently of the fact whether or not the Purchaser terminated the Agreement.

## 6. TERMINATION OF THE AGREEMENT

6.1. The Present Agreement can be terminated by the Parties only upon the mutual agreement expressed in writing except for the cases indicated in sections 5.2 and 5.3 of the Agreement.

## 7. FORCE-MAJEUR

7.1. Neither Party shall be liable in case of failure to perform untimely or improper performance of its obligations upon the present Agreement if the above failure to perform untimely or improper performance was caused exclusively by occurrence and/or action of insurmountable circumstances (force-majeur circumstances).

7.2. The occurrence of force-majeur circumstances causes increase of the term of performance of the present Agreement for the period of its duration, unless the Parties agreed otherwise.

7.3. Relief of the obligated party from liability for failure to perform, untimely or improper performance of any unrealizable obligation upon the present Agreement, including due to force-majeur circumstances, does not cause relief of such party from liability for failure to perform its other obligations, which the Parties to the present Agreement do not recognize as unrealizable.

## 8. LEGISLATION

8.1. The present Agreement is executed in accordance with laws of the state New York and the federal laws of the USA irrespective of the conflict of provisions of their

laws. The Parties are obligated to reasonably settle all the disputes arising in connection with the Agreement by the means of mutual negotiations. In case of lack of agreement, the Parties recognize jurisdiction of the USA courts as a proper forum.    All disputes including claims with no applicable statute of limitations with regard to violations of the Agreement, fraud or breach of duty to perform and negligence shall be resolved in the court of the state New York, USA.

## 9. OTHER CONDITIONS

9.1. All amendments, additions and attachments to the present Agreement shall be executed in writing and signed by authorized representatives of the Parties.

9.2. The present Agreement becomes effective from the moment of its signing by both Parties and is valid until the full performance by the Parties of obligations resulting from the provisions of the present Agreement.

9.3. The present Agreement is executed in two versions (in Russian and in English languages) with equal legal power, one for the Purchaser, and another one for the Seller.

## 10. LEGAL ADDRESSES OF THE PARTIES

**Seller:**
LLC Leneks
113054 Moscow 25 Bakhrushina St.,
App.1

Account # 40702810600020021782
in Joint Stock Bank Moscow Business
World, correspondent account
# 30101810900000000466, BIK
044525466

**Purchaser:**
Company Davis International LLC
1205 Wilkie Drive, Charleston, WV
25314-1726 West Virginia, USA

Hard currency account #
40807840000020022528 in Joint Stock
Bank Moscow Business World,
correspondent account
# 30101810900000000466, BIK
044525466

## 11. SIGNATURES OF THE PARTIES

From the Seller

[signed]

S. Vuich        [Seal]

From the Purchaser

[signed]

D. Traum        [Seal]

**ДОГОВОР № 001-99/А**
купли-продажи ценных бумаг

*г. Москва* «15» марта 1999г.

Общество с ограниченной ответственностью «Ленэкс», именуемое далее «Продавец», в лице Директора Синиши Вуича, действующего на основании Устава, с одной стороны, и Компания «Дэвис Интернешнл Эл.Эл.Си.», именуемая далее «Покупатель», в лице Джосефа М. Траума, действующего на основании Генеральной доверенности от 03 декабря 1998 г., с другой стороны, совместно именуемые «Стороны», заключили настоящий договор, далее «Договор», о нижеследующем:

## 1. ПРЕДМЕТ ДОГОВОРА

1.1. Продавец обязуется передать в собственность Покупателю, а Покупатель обязуется принять и оплатить следующие ценные бумаги (в дальнейшем – «АКЦИИ») эмитента, указанного ниже (в дальнейшем «Эмитент»), на условиях, предусмотренных настоящим Договором:

| Вид ценных бумаг | Обыкновенные, именные, бездокументарные акции |
|---|---|
| Эмитент ценных бумаг | Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий» (далее – Эмитент) |
| Регистр. № Эмитента | 0422 серия III-ИК, зарегистрировано постановлением Главы Администрации г. Качканар № 348 от 15.04.1993 г. |
| Место нахождения эмитента | Россия, Свердловская обл., г. Качканар, ул. Свердлова, д.2 |
| Держатель реестра акционеров эмитента | Компания - регистратор «Панорама» 101000 г. Москва, Б. Харитоньевский пер., д. 13А, офис 8А |
| Номинальная стоимость | 1 (один) рубль |
| Количество ценных бумаг | 29 520 062 (Двадцать девять миллионов пятьсот двадцать тысяч шестьдесят две) штуки |
| Стоимость одной акции | 1,105 (Одна целая сто пять тысячных) рублей |
| Общая сумма сделки | 32 619 668,51 (Тридцать два миллиона шестьсот девятнадцать тысяч шестьсот шестьдесят восемь) рублей 51 копейка |

1.2. Сумма сделки составляет 32 619 668,51 (Тридцать два миллиона шестьсот девятнадцать тысяч шестьсот шестьдесят восемь) рублей 51 копейка.

## 2. ПОРЯДОК РАСЧЕТОВ

2.1. Продавец обязуется осуществить перевод АКЦИЙ на счет Покупателя в реестре акционеров Эмитента и предоставить Покупателю оригиналы документов, подтверждающих выполненный перевод. Все необходимые действия по вышеуказанному переводу АКЦИЙ осуществляются Продавцом и за его счет.

2.2. Срок для перевода АКЦИЙ на счет Покупателя в реестре акционеров Эмитента устанавливается в течение 70 (Семидесяти) календарных дней с даты подписания настоящего Договора.

2.3. Покупатель обязуется оплатить полную сумму сделки, указанную в пункте 1.2 настоящего Договора в течение 30 (тридцати дней) с даты подписания Договора.

## 3. ПЕРЕХОД ПРАВ

3.1. Покупатель приобретает право собственности на АКЦИИ, а равно все права, удостоверяемые АКЦИЯМИ, в момент полной оплаты суммы сделки по пункту 2.3

- 1 -

A - 803

Договора.

До полного расчета Покупателя по условиям пункта 2.3 Договора, права собственности на АКЦИИ принадлежат Продавцу.

## 4. ГАРАНТИИ

4.1. Продавец гарантирует Покупателю отсутствие каких-либо прав третьих лиц на передаваемые в соответствии с настоящим Договором АКЦИИ.

Продавец гарантирует, что имеет полное и безусловное право распоряжаться указанными АКЦИЯМИ, а также то, что названные АКЦИИ не являются предметом обеспечения обязательств, не состоят под арестом или любым иным обременением и не являются предметом судебного разбирательства.

Продавец гарантирует, что до момента совершения полной оплаты Покупателем, как указано в пункте 2.3 Договора, Продавец не предпримет никаких действий для продажи, передачи в залог или иному обременению или переводу АКЦИЙ кому-либо, кроме Покупателя, согласно пункту 2.1 Договора.

4.2. Покупатель гарантирует, что не предпримет никаких действий для продажи, передачи в залог или иному обременению или переводу АКЦИЙ до момента полной их оплаты в соответствии с пунктом 2.3 Договора.

4.3. Кроме случая аннулирования настоящего Договора, любые дивиденды, проценты, доходы или иные распределения на АКЦИИ, указанные в пункте 1.1 настоящего Договора, начисленные Продавцу после перехода права собственности на АКЦИИ, а равно всех прав, удостоверяемых АКЦИЯМИ к Покупателю, Продавец обязуется перечислить Покупателю в течение 20 (двадцати) банковских дней следующих за днем получения им такого дохода.

## 5. ОТВЕТСТВЕННОСТЬ СТОРОН

5.1. В случае нарушения Продавцом сроков выполнения условия пункта 2.2 Договора, либо нарушения Покупателем сроков выполнения пункта 2.3 Договора, нарушившая свои обязательства Сторона обязана выплатить другой Стороне неустойку в размере 0,1% от суммы сделки за каждый календарный день просрочки до даты полного выполнения обязательств. Уплата неустойки по настоящему Договору не освобождает нарушившую свои обязательства Сторону от выполнения обязательств по настоящему Договору.

5.2. В случае если Продавец выполнит свои обязательства, указанные в пунктах 2.1, 2.2 и 4.1 Договора, а Покупатель не совершит оплату за АКЦИИ согласно условиям пункта 2.3 Договора, Продавец имеет безусловное право расторгнуть Договор в одностороннем порядке и Покупатель обязуется осуществить действия по переводу АКЦИЙ обратно на счет Продавца.

5.3. В случае несоответствия действительности условий, предусмотренных пунктом 4.1 Договора, или в случае невозможности выполнения Продавцом по любым зависящим или независящим от него обстоятельствам условий пункта 3.1, в том числе при отсутствии АКЦИЙ на счету Покупателя на момент полной оплаты им суммы сделки, Покупатель имеет безусловное право расторгнуть Договор в одностороннем порядке и Продавец обязан возвратить Покупателю уплаченную сумму сделки.

При этом независимо от того, расторгнет Покупатель договор, или нет, Продавец обязан выплатить Покупателю штраф в размере 100 (сто) процентов от суммы сделки, и пени в размере 0,1 процента от суммы сделки за каждый день просрочки, начиная с даты совершения Покупателем полной оплаты и до выполнения Продавцом всех условий Договора.

## 6. РАСТОРЖЕНИЕ ДОГОВОРА

6.1. Настоящий Договор может быть расторгнут Сторонами только по взаимному согласию, выраженному в письменной форме, за исключением случаев, указанных в пунктах 5.2 и 5.3 Договора.

## 7. ФОРС-МАЖОР

- 2 -

A - 804

7.1. Ни одна из Сторон не несет ответственности в случае невыполнения, несвоевременного или ненадлежащего выполнения своих обязательств по настоящему Договору, если указанные невыполнение, несвоевременное или ненадлежащее выполнение обусловлены исключительно наступлением и/или действием обстоятельств непреодолимой силы (форс-мажорных обстоятельств).

7.2. Наступление форс-мажорных обстоятельств вызывает увеличение срока исполнения настоящего Договора на период их действия, если Стороны не договорятся об ином.

7.3. Освобождение обязанной Стороны от ответственности за неисполнение, несвоевременное и/или ненадлежащее исполнение какого-либо неисполнимого обязательства по настоящему Договору, в том числе и по форс-мажорным обстоятельствам, не влечет освобождение этой Стороны от ответственности за исполнение иных ее обязательств, не признанных Сторонами неисполнимыми по настоящему Договору.

## 8. ЗАКОНОДАТЕЛЬСТВО

8.1. Данный Договор совершен в соответствии с законами штата Нью-Йорк и федеральными законами США, без отношения к конфликту положений их законов. Стороны настоящим обязуются в разумных пределах разрешить все споры, возникающие по данному Договору, путем взаимных переговоров. При отсутствии согласия сторон, Стороны в качестве подходящего форума принимают юрисдикцию судов США. Все споры, в том числе без исковой давности претензий в нарушении Договора, обмане во встречном удовлетворении и халатности, будут разрешаться в суде штата Нью-Йорк, США.

## 9. ПРОЧИЕ УСЛОВИЯ

9.1. Все изменения, дополнения и приложения к настоящему Договору должны быть совершены в письменной форме и подписаны уполномоченными представителями Сторон.

9.2. Настоящий Договор вступает в силу с момента его подписания обеими Сторонами и действует до полного исполнения Сторонами обязательств, вытекающих из положений данного Договора.

9.3. Настоящий Договор составлен в 2-х экземплярах (на русском и английском языках), имеющих одинаковую юридическую силу, один из которых находится у Покупателя, другой – у Продавца.

## 10. ЮРИДИЧЕСКИЕ АДРЕСА И РЕКВИЗИТЫ СТОРОН

**Продавец:**
ООО «Ленэкс».
113054, г.Москва, ул.Бахрушина, д.25, к.1

р/счет № 40702810600020021782
в АКБ «Московский Деловой Мир», к/счет
№30101810900000000466, БИК 044525466.

**Покупатель:**
Компания «Дэвис Интернешнл Эл.Эл.Си.»
1205 Уэнни Драйв, Чарльстон, WV 25314-
1726 Западная Вирджиния, США
вал.счет № 40807840000020022528 в АКБ
«Московский Деловой Мир», к/счет
№30101810900000000466, БИК 044525466.

## 11. ПОДПИСИ СТОРОН

**От Продавца:**

**От Покупателя:**

С. Вуич

Д. Траум

"ЛЕНЭКС"

- 3 -

A - 805

ДОГОВОР № 003-99/А
купля-продажи ценных бумаг

г. Москва                                              «28» сентября 1999г.

Общество с ограниченной ответственностью «Ленэкс», именуемое далее «Продавец», в лице Директора Сийкша Вунча, действующего на основании Устава, с одной стороны, и Компании «Дэвис Интернешнл Эл.Эл.Си.», именуемая далее «Покупателем», в лице Джосефа М. Трауша, действующего на основании Генеральной доверенности от 03 декабря 1998 г., с другой стороны,

совместно именуемые «Стороны», заключили настоящий договор, далее «Договор», о нижеследующем:

## 1. ПРЕДМЕТ ДОГОВОРА

1.1. Продавец обязуется передать в собственность Покупателю, а Покупатель обязуется принять и оплатить следующие ценные бумаги (в дальнейшем – «АКЦИИ») эмитента, указанного ниже (в дальнейшем «Эмитент»), на условиях, предусмотренных настоящим Договором:

| Вид ценных бумаг | Обыкновенные, именные, бездокументарные акции |
|---|---|
| Эмитент ценных бумаг | Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий» (далее – Эмитент). |
| Регистр. № Эмитента | 0422 серия Ш-ИК, зарегистрировано постановлением Главы Администрации г. Качканар № 348 от 15.04.1993 г. |
| Место нахождения эмитента | Россия, Свердловская обл., г. Качканар, ул. Свердлова, д.2 |
| Держатель реестра акционеров эмитента | Компания –регистратор «Панорама» 101000 г. Москва, Б. Харитоньевский пер., д. 13А, офис 8А |
| Номинальная стоимость ценных бумаг | 1 (один) рубль. |
| Количество ценных бумаг | 48.929 (Сорок восемь тысяч девятьсот двадцать девять) штук. |
| Стоимость одной акции | 1,105 (Одна целая сто пять тысячных) рублей. |
| Общая сумма сделки | 54.067 (Пятьдесят четыре тысячи шестьдесят семь) рублей. |

1.2. Сумма сделки составляет 54067 (Пятьдесят четыре тысячи шестьдесят семь) рублей.

## 2. ПОРЯДОК РАСЧЕТОВ

2.1. Продавец обязуется осуществить перевод АКЦИЙ на счет Покупателя в реестре акционеров Эмитента и предоставить Покупателю оригиналы документов, подтверждающих выполненный перевод. Все необходимые действия по вышеуказанному переводу АКЦИЙ осуществляются Продавцом и за его счет.

2.2. Срок для перевода АКЦИЙ на счет Покупателя в реестре акционеров Эмитента устанавливается в течение 70 (Семидесяти) календарных дней с даты подписания настоящего Договора.

2.3. Покупатель обязуется оплатить полную сумму сделки, указанную в пункте 1.2 настоящего Договора в течение 30 (тридцати) дней с даты подписания Договора.

## 3. ПЕРЕХОД ПРАВ

3.1. Покупатель приобретает право собственности на АКЦИИ, а равно все права, удостоверяемые АКЦИЯМИ, в момент полной оплаты суммы сделки по пункту 2.3 Договора.

До полного расчета Покупателя по условиям пункта 2.3 Договора, права собственности на АКЦИИ принадлежат Продавцу.

A - 806

## 4. ГАРАНТИИ

4.1. Продавец гарантирует Покупателю отсутствие каких-либо прав третьих лиц на передаваемые в соответствии с настоящим Договором АКЦИИ.

Продавец гарантирует, что имеет полное и безусловное право распоряжаться указанными АКЦИЯМИ, а также то, что названные АКЦИИ не являются предметом обеспечения обязательств, не состоят под арестом или любым иным обременением и не являются предметом судебного разбирательства.

Продавец гарантирует, что до момента совершения полной оплаты Покупателем, как указано в пункте 2.3 Договора, Продавец не предпримет никаких действий для продажи, передачи в залог или иному обременению или переводу АКЦИЙ кому-либо, кроме Покупателя, согласно пункту 2.1 Договора.

4.2. Покупатель гарантирует, что не предпримет никаких действий для продажи, передачи в залог или иному обременению или переводу АКЦИЙ до момента полной их оплаты в соответствии с пунктом 2.3 Договора.

4.3. Кроме случая аннулирования настоящего Договора, любые дивиденды, проценты, доходы или иные распределения на АКЦИИ, указанные в пункте 1.1 настоящего Договора, начисленные Продавцу после перехода права собственности на АКЦИИ, а равно всех прав, удостоверяемых АКЦИЯМИ к Покупателю, Продавец обязуется перечислить Покупателю в течение 20 (двадцати) банковских дней следующих за днем получения им такого дохода.

## 5. ОТВЕТСТВЕННОСТЬ СТОРОН

5.1. В случае нарушения Продавцом сроков выполнения условия пункта 2.2 Договора, либо нарушения Покупателем сроков выполнения пункта 2.3 Договора, нарушившая свои обязательства Сторона обязана выплатить другой Стороне неустойку в размере 0,1% от суммы сделки за каждый календарный день просрочки до даты полного выполнения обязательств. Уплата неустойки по настоящему Договору не освобождает нарушившую свои обязательства Стороны от выполнения обязательств по настоящему Договору.

5.2. В случае если Продавец выполнит свои обязательства, указанные в пунктах 2.1, 2.2 и 4.1 Договора, а Покупатель не совершит оплату за АКЦИИ согласно условиям пункта 2.3 Договора, Продавец имеет безусловное право расторгнуть Договор в одностороннем порядке и Покупатель обязуется осуществить действия по переводу АКЦИЙ обратно на счет Продавца.

5.3. В случае несоответствия действительности условий, предусмотренных пунктом 4.1 Договора, или в случае невозможности выполнения Продавцом по любым зависящим или независящим от него обстоятельствам условий пункта 3.1, в том числе при отсутствии АКЦИЙ на счету Покупателя на момент полной оплаты им суммы сделки, Покупатель имеет безусловное право расторгнуть Договор в одностороннем порядке и Продавец обязан возвратить Покупателю уплаченную сумму сделки.

При этом независимо от того, расторгнет Покупатель договор, или нет, Продавец обязан выплатить Покупателю штраф в размере 100 (сто) процентов от суммы сделки, и пени в размере 0,1 процента от суммы сделки за каждый день просрочки, начиная с даты совершения Покупателем полной оплаты и до выполнения Продавцом всех условий Договора.

## 6. РАСТОРЖЕНИЕ ДОГОВОРА

6.1. Настоящий Договор может быть расторгнут Сторонами только по взаимному согласию, выраженному в письменной форме, за исключением случаев, указанных в пунктах 5.2 и 5.3 Договора.

## 7. ФОРС-МАЖОР

7.1. Ни одна из Сторон не несет ответственности в случае невыполнения, несвоевременного или ненадлежащего выполнения своих обязательств по настоящему Договору, если указанные

-- 2 --

A - 807

невыполнение, несвоевременное или ненадлежащее выполнение обусловлены исключительно наступлением и/или действием обстоятельств непреодолимой силы (форс-мажорных обстоятельств).

7.2. Наступление форс-мажорных обстоятельств вызывает увеличение срока исполнения настоящего Договора на период их действия, если Стороны не договорятся об ином.

7.3. Освобождение обязанной Стороны от ответственности за неисполнение, несвоевременное и/или ненадлежащее исполнение какого-либо неисполнимого обязательства по настоящему Договору, в том числе и по форс-мажорным обстоятельствам, не влечет освобождение этой Стороны от ответственности за исполнение иных ее обязательств, не признанных Сторонами неисполнимыми по настоящему Договору.

## 8. ЗАКОНОДАТЕЛЬСТВО

8.1. Данный Договор совершен в соответствии с законами штата Нью-Йорк и федеральными законами США, без отношения к конфликту положений их законов. Стороны настоящим обязуются в разумных пределах разрешать все споры, возникающие по данному Договору, путем взаимных переговоров. При отсутствии согласия сторон, Стороны в качестве подходящего форума признают юрисдикцию судов США. Все споры, в том числе без исковой давности претензий в нарушении Договора, обмане во встречном удовлетворении и халатности, будут разрешаться суде штата Нью-Йорк, США.

## 9. ПРОЧИЕ УСЛОВИЯ

9.1. Все изменения, дополнения и приложения к настоящему Договору должны быть совершены в письменной форме и подписаны уполномоченными представителями Сторон.

9.2. Настоящий Договор вступает в силу с момента его подписания обеими Сторонами и действует до полного исполнения Сторонами обязательств, вытекающих из положений данного Договора.

9.3. Настоящий Договор составлен в 2-х экземплярах (на русском и английском языках), имеющих одинаковую юридическую силу, один из которых находится у Покупателя, другой – у Продавца.

## 10. ЮРИДИЧЕСКИЕ АДРЕСА И РЕКВИЗИТЫ СТОРОН

**Продавец:**
ООО «Ленэкс»,
113054, г.Москва, ул.Бахрушина, д.25, к.1

р/счет № 40702810600020021782
в АКБ «Московский Деловой Мир», к/счет
№30101810900000000466, БИК 044525466.

**Покупатель:**
Компания «Дэвис Интернешнл Эл. Эл. Си.»
1205 Уилки Драйв, Чарльстон, WV 25314-1726 Западная Вирджиния, США
вал.счет № 40807840000020022528 в АКБ
«Московский Деловой Мир», к/счет
№30101810900000000466, БИК 044525466.

## 11. ПОДПИСИ СТОРОН

От Продавца:

С. Вуич

От Покупателя:

Д. Траум

A - 808

**Exhibit 3**

AGREEMENT # KGOK-001/a
for purchase and sale of securities

Moscow                                                    January 20, 2000

     Limited Liability Company Poliprom, hereinafter "Seller", in the person of the Director General Bukharin G.M. acting on the basis of the Charter, on one side, and
     Company Holdex L.L.C., hereinafter "Purchaser", in the person of representative Ievleva I.V., acting on the basis of the power of attorney of October 11, 1999, on the other side,
     hereinafter jointly "Parties", separately "Party", concluded the following agreement ("Agreement"):

## 1. Subject of the Agreement

1.1 The Seller transfers securities indicated in section 1.2 of the Present agreement, and the Purchaser is obligated to pay for the mentioned securities to the Seller and to accept the securities in ownership.

1.2 The information about securities, which are a subject of sale and purchase pursuant to section 1.1 of the present agreement:

| | |
|---|---|
| Issuer of securities | Open Joint Stock Company Kachkanar Ore Mining and Processing Plant Vanadiy |
| Registration # of the issuer | 0422 series III-IK, registered by the order of the Head of Kachkanar City Administration # 348 of April 15, 1993 |
| Location of the issuer | Russia, Sverdlovsk region, Kachkanar, 2 Sverdlova St. |
| Category (type) of securities | Ordinary nominal non-documentary shares |
| Form of issue of securities | Non-documentary: in a form of a record on accounts |
| State registration number of issue of securities | First issue – 62-1p-290 of July 12, 1993<br>Second issue – 62-1-1396 of June 13, 1996 |
| Holder of shareholders register of issuer | CJSC Company-registrar Panorama   101000 Moscow, Bolshov Kharitonievskiy Pereulok 13A, office 8A |
| Securities face value | 1 (one) ruble |
| Amount of securities of the first issue: | 9,759 (nine thousand seven hundred fifty eight) |
| Amount of securities of the second issue: | 2,298,225 (two million two hundred ninety eight thousand two hundred twenty five) |
| Total amount of securities: | 2,307,984 (two million three hundred seven thousand nine hundred eighty four) |
| Total amount of transaction pursuant to agreement: | 5,580,000 (Five million five hundred eighty thousand) |

## 2. Order of payments

2.1 The Purchaser is obligated to pay for the securities indicated in section 1.2 of the present agreement by the means of transfer of monetary funds from the type "I" account to the account of the "Seller".

2.2 The Purchaser shall pay for the securities indicated in section 1.2 of the present agreement within 30 (thirty) days from the moment of the conclusion of the present agreement.

### 3.  Order of registration of transition of the securities ownership rights

3.1 Within 5 days after execution of the agreement the Seller is obligated to reregister shares on the name of the Purchaser in the register of the issuer's shareholders and to provide notification with regard to transition of the securities ownership rights from the Seller to the Purchaser.

3.2 The Parties share the expenditures connected with reregistration of securities ownership rights in the register of owners of the issuer's nominal securities upon agreement.

### 4.  Liability of the parties

4.1 If the Purchaser violates the terms indicated in section 2.2 of the present Agreement, it should pay to the Seller fine in the amount of 0.2 (two tenths) percent from the amount of the present Agreement for each day of the delay.

4.2 If the Purchaser violates the terms indicated in section 2.2 of the present Agreement for more than 10 (ten) banking days, the Seller shall have a right to unilaterally terminate the present Agreement. In this case, the Purchaser is obligated to reregister the received shares to the name of the Seller in the shareholders register and to pay to the Seller a fine for the refusal to execute the Agreement in the amount of 10 (ten) percent from the amount of the present Agreement within three days from the moment of termination of the Agreement.

4.3 If the Seller violates the terms for reregistartion of shares indicated in section 2.2 of the present Agreement, it should pay to the Purchaser a fine in the amount of 0.2 (two tenths) percent from the amount of the present agreement for each day of the delay.

### 5. . Term of the Agreement.  Order of change and termination of the Agreement

5.1 The parties shall make all efforts to resolve disputes and disagreements in a framework of the present Agreement and to reach bilateral agreements. If the parties failed to reach agreements, the disputes shall be subject to consideration of the Moscow Arbitrazh Court.

5.2 The Agreement becomes effective from the moment of its execution and shall be terminated after the parties completely perform their obligations under the present Agreement, or after the provisions of the present Agreement regarding its termination became effective.

5.3 All the changes, additions, and agreements to the present Agreement will be valid only if they are executed in a written form, signed by the authorized representatives of both parties and attested by seals.

5.4 The Agreement can be changed, terminated or invalidated only on the grounds and in the order as provided by the current legislation and the present Agreement.

5.5 In regard to all circumstances connected with execution of the present agreement, which are not directly regulated by the present agreement, the parties shall be guided by the requirements of the present legislation.

### 6.  Registered addresses and Banking information of the parties

**The Seller**
LLC Poliprom
358000 Republic of Kalmykia, Elista
249 Lenina St., off. 505
EIN 0814113973
Account # 40702810800090000040 in the Elista Branch of Joint Stock Commercial Bank Moscow Business World,
Account # 30301810600011680006
BIK 044525466

**The Purchaser**
The Company Holdex LLC
707 W. 7th Street, Austin, Texas 78701, USA
Account type "I"
408058104000000000028
In the of Joint Stock Commercial Bank Tsentrokredit, Moscow
Account # 30101810700000000514
BIK 044583514

Signatures of the parties:

The Seller:

[signed] /Bukharin G.M./
[seal]

The Purchaser:

[signed] /Ievleva I.V./

**PAYMENT ORDER # 1** February 17, 2000          via mail       0401060

Five million five hundred eighty thousand rubles 00 kopeks

| EIN 0000000000 Kompany Holdex LLC | The amount | 5580000.00 | | |
|---|---|---|---|---|
| | Account # | 408058104000000000028 | | |
| Payer | | | | |
| Joint Stock Commercial Bank Tsentrokredit, Moscow, 32 Pyatnitskaya St. | BIK | 044583514 | | |
| | Account # | 30101810700000000514 | | |
| Bank of the Payer | | | | |
| Joint Stock Commercial Bank Tsentrokredit, Moscow, 32 Pyatnitskaya St. | BIK | 044583514 | | |
| | Account # | 30101810700000000514 | | |
| Bank of the recipient | | | | |
| LLC Poliprom EIN 0814113973 | Account # | 40702810100000001077 | | |
| | Form of payment | 01 | Payment term | 02/17/00 |
| | Purpose of the payment | | Payment priority | 5 |
| Recipient | Code | | Reserve field | |

Purpose of payment, denomination of goods, works carried out, services performed, ## and dates of commercial documents, agreements, VAT

Payment for 2307984 ordinary nominal shares of Open Joint Stock Company Kachkanar Ore Mining and Processing Plant Vanadiy with face value of 1 ruble pursuant to Sale and Purchase agreement # KGOK-001\A of January 20, 2000. Without VAT.

| Signatures | Bank notes |
|---|---|
| [signed] | |
| ——— | AKB Tsentrocredit BIK 044583514 |
| | Account # 30101810700000000514 |
| | February 17, 2000 |
| | Paid |
| | Mikishola M.B. |
| | Accepted _____ [signed] |

A - 813

Addition
To the agreement #KGOK-001/A of January 20, 2000
Between OOO[1] Poliprom and Holdex LLC

Moscow                                                    January 26, 2000

     Limited Liability Company Poliprom, hereinafter "Seller", in the person of the Director General Bukharin G.M., acting on the basis of the Charter, on one side and
     Company Holdex LLC, hereinafter "Purchaser", in the person of its Representative Ievleva I.V., acting on the basis of the power of attorney dated October 11, 1999 on the other side,
     Jointly named "Parties", and each separately named "Party", signed the present Addition to the Agreement for sale and purchase of securities # KGKO-001/A of January 20, 2000 concluded between OOO Poliprom and company Holdex LLC (hereinafter "Agreement") about the following:

     1.     To change section 5.1 of the Agreement and read it in the following wording: "5.1 The present Agreement is executed in accordance with laws of the state New York and the federal laws of the USA irrespective of the conflict of provisions of their laws. The Parties are obligated to reasonably settle all the disputes arising in connection with the Agreement by the means of mutual negotiations. In case of lack of agreement, the Parties recognize jurisdiction of the USA courts as a proper forum. All disputes including claims with no applicable statute of limitations with regard to violations of the Agreement, fraud or breach of duty to perform and negligence shall be resolved in the court of the state New York, USA."
     2.     To remove from the Agreement sections 5.4. and 5.5.
     3.     The present Addition is a part and parcel of the Agreement and becomes effective from the moment of its signing.

Seller:                                                    Purchaser:
     [Signed] /Bukharin G.M./               [Signed] /Ievlena I.V./
     [Seal]                                 [Seal]

---

[1] Russian for Limited Liability Company, - translator's note

**A - 814**

## ДОГОВОР № KGOK-001/А
### купли-продажи ценных бумаг

*г. Москва*                                                                 *«20» января 2000г.*

Общество с ограниченной ответственностью «Полипром», именуемое в дальнейшем «Продавец», в лице Генерального директора Бухарина Г.М., действующего на основании Устава, с одной стороны, и

Компания «Холдэкс Эл.Эл.Си.», именуемая в дальнейшем «Покупатель», в лице Поверенного Иевлевой И.В., действующей на основании Доверенности от 11.10.1999г., с другой стороны,

именуемые совместно «Стороны» и каждый по отдельности «Сторона», заключили настоящий договор (далее по тексту - «Договор») о нижеследующем:

### 1. Предмет Договора

1.1. Продавец передает ценные бумаги, указанные в п.1.2 настоящего Договора, а Покупатель обязуется оплатить Продавцу стоимость указанных ценных бумаг и принять их в собственность.

1.2. Сведения о ценных бумагах (далее - ЦБ), являющихся предметом купли-продажи в соответствии с п.1.1 настоящего договора:

| | |
|---|---|
| Эмитент ЦБ: | Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий» |
| Регистр. № Эмитента: | 0422 серия III-НК, зарегистрировано постановлением Главы Администрации г. Качканар № 348 от 15.06.1993г. |
| Место нахождения Эмитента: | Россия, Свердловская обл., г. Качканар, ул. Свердлова, д. 2 |
| Категория (тип) ЦБ: | Обыкновенные именные акции бездокументарной формы |
| Форма выпуска ЦБ: | Бездокументарная – в виде записи на лицевых счетах |
| Государственный регистрационный номер выпуска ЦБ: | Первый выпуск - 62-1п-290 от 12 июля 1993 г. Второй выпуск - 62-1-1396 от 13 июня 1996 г. |
| Держатель реестра акционеров Эмитента: | ЗАО «Компания – регистратор «Панорама» |
| | 101000 г. Москва, Б. Харитоньевский пер., д. 13А, офис 8А |
| Номинальная стоимость ЦБ | 1 (один) рубль |
| Количество ЦБ 1-го выпуска: | 9 759 (Девять тысяч семьсот пятьдесят девять) штук. |
| Количество ЦБ 2-го выпуска: | 2 298 225 (Два миллиона двести девяносто восемь тысяч двести двадцать пять) штук. |
| Общее количество ЦБ: | 2 307 984 (Два миллиона триста семь тысяч девятьсот восемьдесят четыре) штуки. |
| Общая сумма сделки по Договору: | 5 580 000 (Пять миллионов пятьсот восемьдесят тысяч) рублей |

### 2. Порядок расчетов

2.1. Покупатель обязуется произвести полную оплату ценных бумаг, указанных в п. 1.2 настоящего Договора, путем перечисления денежных средств со счета типа «И» на расчетный счет Продавца.

2.2. Оплата ценных бумаг, указанных в п. 1.2 настоящего Договора, осуществляется Покупателем в течение 30 (Тридцати) дней с даты заключения настоящего Договора.

### 3. Порядок регистрации перехода прав собственности на ценные бумаги

3.1. Продавец обязуется в течении 5-ти дней после подписания договора перерегистрировать пакет ЦБ на имя Покупателя в реестре акционеров Эмитента и предоставить последнему уведомление о проведении операции по переходу прав собственности на ценные бумаги от Продавца к Покупателю.

3.2. Расходы по перерегистрации прав собственности на ценные бумаги в реестре владельцев именных ценных бумаг Эмитента акций Стороны несут по соглашению.

### 4. Ответственность Сторон

4.1. В случае нарушения Покупателем сроков, указанных в п. 2.2 настоящего договора, Покупатель обязан уплатить Продавцу пеню в размере 0,2 (ноль целых две десятых) процента от суммы настоящего Договора за каждый день просрочки.

4.2. В случае нарушения Покупателем сроков, указанных в п. 2.2 настоящего Договора, более чем на 10 (Десять) банковских дней, Продавец вправе в одностороннем порядке расторгнуть настоящий Договор. При этом Покупатель обязан в трехдневный срок с даты расторжения договора перерегистрировать полученные акции на имя Продавца в реестре акционеров и заплатить Продавцу штраф за отказ от исполнения Договора в размере 10 (Десять) процентов от суммы настоящего Договора.

4.3. В случае нарушения Продавцом сроков перерегистрации акций, указанных в п. 3.1 настоящего договора, Продавец обязан уплатить Покупателю пеню в размере 0,2 (ноль целых две десятых) процента от суммы настоящего Договора за каждый день просрочки.

## 5. Срок действия договора. Порядок его изменения и расторжения

5.1. Стороны прилагают все усилия, чтобы решить в рамках реализации настоящего Договора споры и разногласия путем переговоров и достижения двусторонних соглашений. Если соглашения не будут достигнуты, споры подлежат рассмотрению в Арбитражном суде г. Москвы.

5.2. Договор вступает в силу с момента его подписания и должен быть прекращен полным исполнением Сторонами принятых на себя по Договору обязательств, либо вступивших в силу норм настоящего договора о его расторжении.

5.3. Все изменения, дополнения, соглашения к настоящему договору действительны лишь в том случае, если они составлены в письменной форме и подписаны уполномоченными представителями обеих Сторон, а также заверены печатями.

5.4. Договор может быть изменен, расторгнут, признан недействительным только по основаниям и в порядке, предусмотренным действующим законодательством и настоящим договором.

5.5. Во всех обстоятельствах, связанных с реализацией настоящего договора, которые прямо не урегулированы настоящим договором. Стороны руководствуются требованиями действующего законодательства.

## 6. Юридические и банковские адреса Сторон

**Продавец:**
ООО «Полипром»
358000, Республика Калмыкия, г. Элиста,
ул. Ленина, д.249, к.505, ИНН 0814113973,
расч./счет № 40702810800090000040
в Филиале АКБ «Московский Деловой Мир»,
г. Элиста, кор./счет № 30301810600011680006,
БИК 044525466.

**Покупатель:**
Компания «Холдэкс Эл.Эл.Си»
707 W. 7th Street, Austin, Техас 78701, USA
расчетный счет типа «И» 40702810800000002 9
в АКБ «Центрохредит», г. Москва,
корр. счет № 30101810700000000514
БИК 044583514

Подписи сторон:

**Продавец:**                                    **Покупатель:**

_____ /_____ Г.М./          _____ /Иевлева И.В./

ПЛА⎯ЖНОЕ ПОРУЧЕНИЕ № 1     **17.02.2000**     почтой     | 0401060 |
Дата     Вид платежа

Сумма
прописью | Пять миллионов пятьсот восемьдесят тысяч рублей 00 копеек

| ИНН 0000000000 Компания "Холдэкс Эл.Эл.Си" | Сумма | 5580000-00 |
|---|---|---|
| | Сч. № | 40805810400000000028 |
| **Плательщик** | БИК | 044583514 |
| АКБ "Центрокредит" г.Москва, ул.Пятницкая, д.32 | Сч. № | 30101810700000000514 |
| **Банк плательщика** | БИК | 044583514 |
| АКБ "Центрокредит" г. Москва, ул.Пятницкая, д.32 | Сч. № | 30101810700000000514 |
| **Банк получателя** | Сч. № | 40702810100000001077 |
| ООО "Полипром" ИНН 0814113973 | | |

| | Вид.оп. | 01 | Срок плат. | 17.02.2000 |
|---|---|---|---|---|
| | Наз.пл. | | Очер плат. | 5 |
| | Код | | Рез. поля | |

**Получатель**

Назначение платежа, наименование товара, выполненных работ, оказанных услуг, №№ и даты товарных документов, договоров, НДС

От⎯та за обыкновенные именные акции "Качканарский ГОК "Ванадий" номинальной стоимостью один рубль
в к⎯честве 2307984 штуки по Договору купли-продажи № KGOK-001\A от 20.01.2000 г. Без НДС.

Подписи        Отметки банка

М.П.

АКБ Центрокредит БИК 044583514
к/с 30101810700000000514

1 7 ФЕВ 2000

ПРИНЯТО

**Дополнение**
**к договору № KGOK-001/A от 20.01.2000г.**
**между ООО «Полипром» и компанией «Холдэкс Эл.Эл.Си.»**

г. Москва                                                                                  «26» января 2000г.

Общество с ограниченной ответственностью «Полипром», именуемое в дальнейшем «Продавец», в лице Генерального директора Бухарина Г.М., действующего на основании Устава, с одной стороны, и

Компания «Холдэкс Эл.Эл.Си.», именуемая в дальнейшем «Покупатель», в лице Поверенного Исалевой И.В., действующей на основании Доверенности от 11.10.1999г., с другой стороны,

именуемые совместно «Стороны» и каждый по отдельности «Сторона», подписали настоящее Дополнение к Договору купли-продажи ценных бумаг № KGOK-001/A от 20.01.2000г., заключенному между ООО «Полипром» и компанией «Холдэкс Эл.Эл.Си.» (далее по тексту – Договор) о нижеследующем:

1.  Внести изменения в пункт 5.1 Договора и читать его в следующей редакции: «5.1. Данный Договор совершен в соответствии с законами штата Нью-Йорк и федеральными законами США, без отношения к конфликту их законов. Стороны обязуются в разумных пределах разрешать все споры, возникающие по данному Договору, путем взаимных переговоров. При отсутствии согласия сторон, в качестве подходящего форума признают юрисдикцию судов США. Все споры, в том числе без исковой давности претензий в нарушении Договора, обмане во встречном удовлетворении и халатности, стороны будут разрешать в суде штата Нью-Йорк, США».

2.  Исключить из Договора пункт 5.4. и пункт 5.5.

3.  Настоящее Дополнение является неотъемлемой частью Договора и вступает в действие с момента его подписания.

Продавец:                                                        Покупатель:

/Бухарин Г.М./                                                /Исалева И.В./

**Exhibit 4**

Agreement
between "Nexis Products L.L.C." and
JSV "Kachkanarsky GOK "Vanadium"

New York, 25th of November, 1999

The company "Nexis Products L.L.C.", hereinafter referred to as "the Company", in the person of Joseph M. Traum, acting in accordance with the General Power of Attorney made 9th day of October, 1999, from the one hand and

Joint Stock Venture "Kachkanarsky GOK "Vanadium", hereinafter referred to as "The Venture", in the person of General Director Khaydarov D.A., acting in accordance with the Articles of Organization, from the other hand;

further named together as "the Parties", have concluded the present Agreement about the following:

1. The Parties agreed to amend the Loan Agreement No. SWER/07/99 dated 13.07.1999 by adding the point 4.6 of the following content: "In case the violation of the terms of return the Venture shall pay the Company the penalty in 0.1 % of the non-returned (loan's) amount calculating for each day of a delay".

2. As the Company's place of incorporation is the United States of America the point 5.4. of the Loan Agreement No.SWER/07/99 dated 13.07.1999 is to be altered and read as follows: "This Contract which is concluded in compliance with and governed by the laws of the State of New York (without reference to that State's rules concerning choice of law rules). The Parties hereby undertake to use possible efforts to settle all the disputes arising from this Contract by way of amiable solutions. Should the Parties fail to reach the settlement the Parties shall the jurisdiction of the US Courts as a "competent". All the disputes arising without limitation arising out of and in connection with the documents and instruments shall be adjudicated in a court of the State of New York, USA.

3. The point 5.5. of the Loan Agreement No.SWER/07/99 dated 13.07.1999 is to be canceled.

Соглашение
между «Нексис Продактс Эл.Эл.Си.» и
ОАО «Качканарский ГОК «Ванадий»

в. Нью-Йорк,   25 ноября 1999г.

Компания «Нексис Продактс Эл.Эл.Си.», выступая в дальнейшем «Компания», в лице Джозефа М. Траума, действующего на основании Генеральной доверенности от 09.10.1999 г., с одной стороны, и

Открытое акционерное общество «Качканарский ГОК «Ванадий», именуемое в дальнейшем «Общество», в лице Генерального директора Хайдарова Д.А., действующего на основании Устава, с другой стороны,

в дальнейшем именуемые совместно «Стороны», подписали настоящее Соглашение о нижеследующем:

1. Внести в Договор займа №SWER/07/99 от 13.07.1999 г. пункт 4.6. следующего содержания: «В случае нарушения сроков возврата займа Общество выплачивает Компании неустойку в размере 0,1% от суммы невозвращенного в срок займа за каждый день просрочки».

2. В связи с тем, что местом регистрации Компании являются Соединенные Штаты Америки, пункт 5.4. Договора займа №SWER/07/99 от 13.07.1999г. изменить и читать в следующей редакции: «Настоящий Договор заключен в соответствии и регулируется законами штата Нью-Йорк (за исключением законов США, регулирующих выбор права). Стороны обязуются приложить возможные усилия по разрешению всех споров, вытекающих по данному Договору, путем дружеских соглашений. При неуспехе достичь Стороны соглашения, Стороны признают юрисдикцию судов США как «компетентных». Все споры, в том числе вытекающие из и в связи с документами и инструментами будут разрешены в суде штата Нью-Йорк, США.

3. Отменить пункт 5.5. Договора займа №SWER/07/99 от 13.07.1999г.

1

4) The parties ascertain and confirm that as on today the total outstanding balance of the Venture against the Company amounts to 13,896,100.00 (Thirteen million eight hundred ninety six and one hundred and 00/100) US Dollars consisting of:

(a) 7,000,000.00 (Seven million and 00/100) US Dollars, as unpaid debt under the Loan Agreement No. SWER/07-99 dated 13.07.1999.

(b) 6,896,100.00 (Six million eight hundred ninety six thousand and one hundred and 00/100) US Dollars as unpaid debt under Loan Agreement No. 234.0113 dated 13.07.1999, the repayment of which has been assigned to the Company according to the Assignment Agreement dated 15.07.1999 signed and concluded between Northwest Systems Limited (as the Assignor) and the Company (as the Assignee).

In case of Venture's delay to refund the amount aforesaid within the terms stipulated by the loan agreements the Company has the right to settle disputes in accordance with the point 2 of the present Agreement.

4. Стороны констатируют, что на сегодняшнюю дату общая задолженность Общества перед Компанией составляет 13,896,100.00 (Тринадцать миллионов восемьсот девяносто шесть тысяч сто) долларов США, и состоит из:

(а) 7,000,000.00 (Семь миллионов) долларов США - в виде непогашенного долга по Договору займа № SWER/07-99 от 13.07.1999г.

(б) 6,896,100.00 (Шесть миллионов восемьсот девяносто шесть тысяч сто) долларов США - в виде непогашенного долга по Договору займа № 234.0113 от 13.07.1999г., истребование которого было уступлено Компании, согласно Договору уступки от 15.07.1999г., подписанному и заключенному между «Нортвэст Системз Лимитед» (как Цедентом) и Компанией (как Цессионарием).

В случае задержки Обществом возврата указанной суммы в сроки, определенные договором займа, Компания имеет право разрешить споры в соответствии с положениями пункта 2 настоящего Соглашения.

ADDRESSES AND SIGNATURES
OF THE PARTIES

АДРЕСА И ПОДПИСИ
СТОРОН

The Company:
«NEDIX PRODUCTS L.L.C»
Legal address: Suite 104, 47 West 200 South,
Salt Lake City, Utah 84101,USA

Компания:
«НЕДИКС ПРОДАКТС Эл.Эл.Си.»
Юридический адрес: Сьют 104, 47 Вест 200
Саут, Солт Лэйк Сити, Юта 84101, США

The Venture:
JSV "Kachkanarsky GOK "Vanadium"
Legal address:
2, Sverdlova street, Kachkanar, Sverdlovsk
region, 624356, Russia

Общество:
ОАО «Качканарский ГОК «Ванадий»
Юридический адрес: 624356, Россия,
Свердловская область, г.Качканар, улица
Свердлова, 2.

The Company/Компания



The Venture/Общество





## LOAN AGREEMENT No. SWER/07-99

Moscow                                                                July 13, 1999

Nexis Products LLC, hereinafter referred to as "Company," represented by Director Mr. Sidney Tavarez, acting on the basis of the Statutes, party of the first part, and

Joint Stock Company Kachkanar Iron Ore Mining & Dressing Concern "Vanadiy," hereinafter referred to as "Concern," represented by General Director D.A. Khaidarov, acting on the basis of the Statutes, party of the second party,

hereinafter jointly referred to as the "Parties," have executed this Loan Agreement, hereinafter referred to as "Agreement," regarding the following:

## I. SUBJECT OF THE AGREEMENT.

1.1. Company shall provide to Concern as an interest-free loan (hereinafter "Loan") funds in the amount of 7,000,000 (seven million) US dollars, and Concern shall repay the Loan as stipulated herein.

1.2. The Loan is being extended to Concern to replenish its current assets.

## II. LENDING PROCEDURE.

2.1. The Loan shall be extended in a lump sum by the transfer of funds to Concern's account in an amount not to exceed that stated in paragraph 1.1 hereof.

2.2. The Loan extended hereunder shall be repaid within 180 (one hundred and eighty) days from its effective date, i.e. by January 8, 2000.

2.3. Company shall make the funds available within 5 (five) banking days from the Agreement's date of execution.

2.4. The effective date of the Loan shall be the date the funds are deposited in Concern's hard currency current account specified in section VI hereof.

## III. LOAN SECURITY AND REPAYMENT PROCEDURE.

3.1. Concern guarantees repayment of the Loan.

3.2. Concern shall be liable hereunder to the full extent of its fixed and current assets.

3.3. The Parties shall execute a security contract, which will be an integral part hereof.

3.4. Concern shall repay the Loan in either a lump sum or installments in US dollars by transferring funds from its current hard currency account to Company's hard currency account at SCB Moscow Business World, Moscow.

## IV. RIGHTS AND RESPONSIBILITIES OF THE PARTIES.

4.1. Company shall:
*    extend the Loan within 5 (five) banking days from the Agreement's execution date.

4.2. Company has the right to:

- monitor the intended use of the funds made available to Concern hereunder;
- demand that Concern provide the documents necessary to monitor the intended use of the funds,
- call the loan if Concern breaches any provision hereof.

4.3. Concern shall

- use the funds as intended, i.e., exclusively for the purposes stipulated in paragraph 1.2. hereof;
- provide, at Company's request, the documents necessary to monitor the intended use of the Loan, as well as estimates of receipt of funds to repay the loan;
- immediately notify Company of all circumstances which could affect Concern's proper execution of its obligations hereunder, including the loss or deterioration of the Loan security conditions.

4.4. Concern has the right:

- to demand that the funds be made available within 5 (five) banking days from the Agreement's date of execution;
- repay the Loan early with Company's written approval.

## V. ADDITIONAL PROVISIONS

5.1. This Contract is effective upon signing and until the full performance by the Parties of all obligations undertaken by them.

5.2. The Parties agree to maintain confidentiality with regard to the terms of this Contract, and with regard to any commercial, financial and other information that becomes known to them in connection with the execution and performance of this Contract.

5.3. The Parties shall guarantee under liability that this Contract is executed (signed) by authorized persons and, if necessary, will be confirmed (approved) by the management bodies of the Parties that have the authority to make such confirmation (approval) in accordance with the foundation documents of the Parties.

5.4. All disputes and disagreements under this Contract shall be resolved by the Parties through negotiation. If agreement is not reached, disputes shall be considered by the Arbitration Court of the City of Moscow.

5.5. In all other matters that are not regulated by this Contract, the Parties shall be guided by current law of the Russian Federation.

5.6. Neither Party shall bear liability for partial or total nonperformance of its obligations if such nonperformance was caused by circumstances beyond their control (natural disaster, conduct of military activities, change in law, etc.) that such Party could neither foresee nor prevent by reasonable measures.

5.7. All changes and supplements to this Contract shall be valid only if they are made in written form, signed by the authorized representatives of the parties and sealed with the appropriate seals, after which they shall become integral parts of this Contract.

5.8. This Contract is made in two originals having identical legal effect, one retained by each of the parties.

## VI. REQUISITES AND SIGNATURES OF THE PARTIES

*The Company:*
Nexis Products L.L.C.
47 West 200 South, Suite 104
Salt Lake City, Utah 84101 USA
Bank requisites:
Hard-currency account No. 40807840200020021808, Moskovskiy Delovoy Mir Joint Stock Commercial Bank, 14 Zhitnaya St., Moscow 117049

*The Joint Stock Company:*
Vanadiy Mining Enrichment Plant of Kachkanar OJSC
2 Sverdlov St., Kachkanar, Sverdlovsk Oblast 624356 Russia
Taxpayer ID No. 6615001962, OPKO 00186938
Current account No. 40702840400020121865, Moskovskiy Delovoy Mir Joint Stock Commercial Bank, 14 Zhitnaya St., Moscow
Correspondent account 30101810900000000466, BIK 044525466

| The Company: | The Joint Stock Company: |
|---|---|
| [signature] | [signature] |
| Sydney Tavarez | D.A. Khaydarov |
| | [round stamp: Vanadiy Mining Enrichment Plant of Kachkanar Open Joint Stock Company; city of Kachkanar] |

A - 824

ДОГОВОР ЗАЙМА № SWER/07-99

г. Москва                                                          «13» июля 1999 г.

Компания «Нэксис Продактс Эл.Эл.Си.», именуемая в дальнейшем «Компания», в лице Директора г-на Сиднея Тавареза, действующего на основании Устава с одной стороны и

Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий»», именуемое в дальнейшем «Общество», в лице Генерального директора Хайдарова Д. А., действующего на основании Устава, с другой стороны,

в дальнейшем совместно именуемые «Стороны», заключили настоящий Договор займа, именуемый в дальнейшем «Договор», о нижеследующем:

## I. ПРЕДМЕТ ДОГОВОРА.

1.1. Компания предоставляет обществу в качестве беспроцентного займа (далее «Заем») денежные средства на сумму 7000000,00 (Семь миллионов) долларов США, а Общество обязуется возвратить предоставленный Заем в порядке, предусмотренном настоящим Договором.

1.2. Заем предоставляется Обществу на пополнение оборотных средств.

## II. ПОРЯДОК ПРЕДОСТАВЛЕНИЯ ЗАЙМА.

2.1. Заем предоставляется единовременно, путем перечисления средств на счет Общества, в размере, не превышающем суммы, указанной в пункте 1.1. настоящего Договора.

2.2. Заем, предоставляемый по настоящему Договору, должен быть возвращен не позднее 180 (Сто восемьдесят) дней с даты его оформления, т.е. не позднее «01» января 2000 года.

2.3. Компания предоставляет денежные средства в течение 5 (Пяти) банковских дней с даты заключения Договора.

2.4. Датой предоставления Займа считается дата зачисления денежных средств на текущий валютный счет Общества, указанный в разделе VI настоящего Договора.

## III. ОБЕСПЕЧЕНИЕ И ПОРЯДОК ВОЗВРАТА ЗАЙМА.

3.1. Общество гарантирует возврат предоставленного Займа.

3.2. Общество несет ответственность по настоящему Договору всем принадлежащим ему имуществом и оборотными средствами.

3.3. Стороны обязуются заключить договор залога, который будет являться неотъемлемой частью настоящего договора займа.

3.4. Возврат Займа осуществляется Обществом единовременно, либо по частям в долларах США путем перечисления денежных средств с текущего валютного счета Общества на валютный счет Компании в АКБ «Московский Деловой Мир», г. Москва.

## IV. ПРАВА И ОБЯЗАННОСТИ СТОРОН.

4.1. Компания обязуется:
*   предоставить Заем в течение 5 (Пяти) банковских дней с даты заключения Договора.

4.2. Компания имеет право:
*   контролировать целевое использование средств, предоставленных Обществу по настоящему Договору;
*   требовать от Общества предоставления документов, необходимых для контроля за целевым использованием денежных средств;
*   требовать от Общества досрочного возврата Займа при нарушении им любого из положений настоящего Договора.

4.3. Общество обязуется:
*   соблюдать целевой характер использования предоставленных средств, т.е. направлять предоставленные средства исключительно на цели, предусмотренные пунктом 1.2. настоящего Договора;
*   предоставлять по требованию Компании документы, необходимые для осуществления контроля за целевым использованием Займа, а также расчеты поступления средств, направляемых в его погашение;
*   незамедлительно извещать Компанию обо всех обстоятельствах, способных повлиять на надлежащее исполнение Обществом обязательств по настоящему Договору, в том числе об обстоятельствах утраты или ухудшения условий обеспечения Займа.

4.4. Общество имеет право:
*   требовать предоставления средств в течение 5 (Пяти) банковских дней с даты заключения Договора;
*   досрочно по письменному согласованию с Компанией, возвратить предоставленный Заем.

A - 825

## V. ДОПОЛНИТЕЛЬНЫЕ УСЛОВИЯ.

5.1. Настоящий Договор действует с момента подписания и до полного исполнения Сторонами всех взятых на себя обязательств.

5.2. Стороны обязуются соблюдать конфиденциальность в отношении условий настоящего Договора, а равно в отношении любой коммерческой, финансовой и прочей информацией, ставшей им известной в связи с заключением и исполнением настоящего Договора.

5.3. Стороны гарантируют и несут ответственность в том, что настоящий Договор заключен (подписан) уполномоченными лицами и при необходимости будет утвержден (одобрен) органами управления Сторон, имеющими на это утверждение (одобрение) соответствующие полномочия согласно учредительных документов Сторон.

5.4. Все споры и разногласия по настоящему Договору разрешаются сторонами путем переговоров, а при не достижении согласия, спор подлежит передаче на рассмотрение в Арбитражный Суд г. Москвы.

5.5. Во всем остальном, что не урегулировано настоящим Договором, Стороны руководствуются действующим законодательством Российской Федерации.

5.6. Ни одна из Сторон не будет нести ответственность за полное или частичное неисполнение принятых на себя обязательств, если оно будет вызвано действием обстоятельств непреодолимой силы (стихийные бедствия, проведение боевых действий, изменения в законодательстве и т.п.), которые данная сторона не могла ни предвидеть, ни предотвратить разумными мерами.

5.7. Все изменения и дополнения к настоящему Договору действительны лишь в том случае, если они совершены в письменной форме, подписаны уполномоченными представителями сторон и скреплены соответствующими печатями, после чего становится неотъемлемой частью настоящего Договора.

5.8. Настоящий Договор составлен в двух экземплярах, имеющих равную юридическую силу, по одному для каждой из сторон.

## VI. РЕКВИЗИТЫ И ПОДПИСИ СТОРОН.

**Компания:**
«Нэксис Продактс Эл.Эл.Си.»
47 Вест 200 Сауз, Сьют 104, Солт Лейк Сити, Юта 84101, США.
Банковские реквизиты:
Валютный счет № 40807840200020021808 в АКБ «Московский Деловой Мир»,
117049, г. Москва, ул. Житная, д. 14.

**Общество:**
ОАО «Качканарский горно-обогатительный комбинат «Ванадий»»
624356, Россия, Свердловская область., г. Качканар, ул. Свердлова, 2.
ИНН 6615001962, ОКПО 00186938,
р/с № 40702840400020121865   в АКБ «Московский Деловой Мир»
г. Москва, ул. Житная, д.14,
к/с 30101810900000000466, БИК 044525466

Компания:                                      Общество:

/Санисей Таварес/                              /Хайдаров Д.А./

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
BASE METAL TRADING, SA, et al.,                    :

                       Plaintiffs,       :       Docket No. 00 CIV. 9627 (JGK)

         -against-                              :

RUSSIAN ALUMINUM, et al.,                          :

                   Defendants.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X


**<u>Declaration and Exhibits of Sergev B. Zaitsev</u>**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BASE METAL TRADING SA, et al.,                    Docket No. 00 Civ. 9627

Plaintiffs,

v.

RUSSIAN ALUMINUM, et al.,

Defendants.

---

## EXPERT REPORT OF SERGEY B. ZAITSEV

I, Sergey Borisovich Zaitsev, pursuant to the provisions of 28 U.S.C. § 1746, hereby declare as follows:

### QUESTIONS PRESENTED

1.   I have been asked by counsel for plaintiffs to provide my expert opinion on the following questions:

   a.   What are the requirements for prosecuting a civil cause of action based on economic harm suffered as a result of corruption of legal proceedings under Russian law?

   b.   Does Russian procedural law provide for compulsory attendance of witnesses, witness testimony and cross-examination of witnesses in the arbitrazh courts in theory or in practice?

   c.   Is the risk of corruption of legal proceedings any different in Moscow than regions such as Sverdlovsk, Kemerevo, and Tyumen when powerful Russian interests are parties?

## CONCLUSIONS

2. My conclusions are as follows:

   a. A prerequisite for a civil cause of action for harm suffered as a result of
   the corruption of judicial proceedings is the prior reversal of the judicial
   acts which were rendered in the proceedings.  The only procedure under
   Russian law to reverse a judicial act based on corruption of judicial
   proceedings is a revision of the judicial act in the court that rendered it
   based on the newly revealed circumstances ("collateral attack", *transl.).*
   Such an attack requires the criminal conviction of the bankruptcy
   managers or judges who committed the illegal acts.

   b. Although Russian procedural codes provide for the compulsory attendance
   of witnesses, witness testimony and examination of witnesses, in practice
   these procedures are not utilized, as reflected in the report of defendants'
   expert Sergey Zankovsky.

   c. The risk of corruption of legal proceedings in Moscow is as great as in any
   other region when powerful Russian interests are involved.

## QUALIFICATIONS

3.   I am a citizen of the Russian Federation and an attorney authorized to practice
law in Russia.

4.   I am a retired judge who served in the Soviet and, subsequently, Russian judicial
system for almost 20 years.

5.   I was a judge of the Zheleznodorozhny District Court in the City of Novosibirsk
from 1978 to 1985.

2

6. I was a judge of the Novosibirsky Regional Court from 1985 to 1996.

7. I was a judge of the Federal Arbitrazh Court for the District of Moscow from 1996 to 1997 when I retired from the judgeship.

8. During my tenure as a judge, I participated in hundreds of cases.

9. After retirement, I was Chief General Counsel for the State Customs Committee of the Russian Federation from 1997 to 2000.

10. In this position I took part in drafting the Customs Code of the Russian Federation. I retired from the state service with the rank of Major General of the Customs Service.

11. I am currently in private practice.

## DOCUMENTS REVIEWED

12. In connection with this report, I have reviewed various materials, including:

    a.  Second Amended Complaint;

    b.  Expert declaration of Professor Ethan Burger (summary);

    c.  Expert declaration of Viktor Golyubev;

    d.  Expert declaration of Marina Telyukina;

    e.  Second Expert Declaration of Paul A. Stephan, III (selected paragraphs);

    f.  Second Expert Declaration of Igor Petrukhin;

    g.  Second Expert Declaration of Sergey Zankovsky.

## ASSUMPTIONS

13. For purposes of this report, I have been instructed to assume the following:

    a.  The "Aluminum Plaintiffs" suffered losses because NKAZ failed to repay monies owed to them, and repudiated contracts with them, as a result of

3

A - 831

the corruption of the NKAZ bankruptcy proceedings by the acts of the external bankruptcy manager and judges. This corruption was in turn caused by certain defendants.

b. The judicial acts related to the NKAZ bankruptcy are in legal force and there have been no criminal convictions of any persons for corrupting the NKAZ bankruptcy proceedings.

c. Certain "Vanadium Plaintiffs" have suffered losses because GOK failed to repay monies owed to them and repudiated contracts with them as a result of the corruption of the GOK bankruptcy proceedings by the acts of the external bankruptcy manager and judges. This corruption was in turn caused by certain defendants.

d. The judicial acts related to the GOK bankruptcy are in legal force and there have been no criminal convictions of any persons for corrupting the GOK bankruptcy proceedings.

e. Certain "Davis Plaintiffs" have lost their ownership interests in shares of GOK as a result of the corruption of the "GOK Shareholder Proceedings" by the acts of certain judges, which acts were in turn caused by certain defendants.

f. The judicial acts related to the GOK Shareholder Proceedings are in legal force and there have been no criminal convictions of any persons for corrupting the GOK Shareholder Proceedings.

g. Corruption is defined as the abuse of judicial power or administrative functions of the court in violation of the criminal laws which harms the

4

legitimate rights and interests of persons in violation of the Constitution of Russian Federation, its laws and regulations.

## BACKGROUND ON RUSSIAN LAW

14. Russia is a civil law country. Generally, the sources of law are the Russian constitution, codes and laws adopted by the legislature. Court decisions are not laws and are not judicial precedent. Resolutions issued by the Supreme Arbitrazh Court of Russia, the Supreme Court of Russia are binding for arbitrazh and general jurisdiction courts respectively and resolutions issued by the Russian Constitutional Court are binding for all the courts.

15. The basic legal principles of the civil law are defined in the Civil Code. Part I of the Civil Code was enacted on January 1, 1995, Part II was enacted on March 1, 1996, and Part III was enacted on March 1, 2002.[1]

16. Along with the Civil Code, the Russian legislature has enacted several other codes including the new Arbitrazh Procedural Code which was enacted in 2002 instead of the Arbitrazh Procedure Code 1995 (1995 APC and 2002 APC).[2] The criminal laws are set forth in the Criminal Code which was adopted in 1997.[3]

17. The interpretation of laws by the arbitrazh courts is conducted considering directives issued by the Supreme Arbitrazh Court, which the lower arbitrazh courts must follow.[4]

18. The writings of legal scholars, while obviously not binding, play an important role in the interpretation of laws. These writings are normally published in the form of articles or commentaries to the laws.

5

19. The courts relevant to this declaration are the first instance arbitrazh court (trial court), appellate arbitrazh court (appellate courts), circuit arbitrazh courts (cassation appellate courts), and the Supreme Arbitrazh Court.

## DISCUSSION

**Harm Caused By The Corruption Of Legal Proceedings
Can Only Be Remedied After A Successful Attack
On The Judicial Acts In The Courts In Which The Corruption Occurred
Following a Criminal Conviction of the Persons Involved**

20. In order to assert a civil claim for harm suffered as a result of the corruption of legal proceedings (as discussed below), plaintiffs must establish that defendants' conduct was unlawful. However, in order for defendants' conduct to be held unlawful, the underlying judicial acts rendered in the proceedings must first be set aside. As explained below, this can only occur if Plaintiffs obtain an order from the courts involved in the underlying proceedings setting aside the Judicial Acts in question, and this can only occur if the persons responsible for the underlying corruption are first convicted of criminal wrongdoing.

21. An application for protest with the Supreme Arbitrazh Court based on the corruption of Judicial Acts cannot be granted because such an application must be based on evidence in the civil record, which requires the plaintiffs first to follow the procedure outlined above.

**A Collateral Attack on Judicial Acts Based on Corruption
Can Only Be Brought in the Court In Which The Corruption Occurred
After the Criminal Conviction of the Person Who Effected the Corruption**

22. There is only one procedure in Russian law by which a Judicial Act may be invalidated based on corruption of the original proceedings.

6

23. Article 309 of the 2002 APC, entitled "Right of the Arbitrazh Court to Revise a

Judicial Act in Accordance with Newly Revealed Circumstances," provides as follows:

> The arbitrazh court may revise a judicial act it has adopted,
> which has come into legal force, in accordance with newly
> revealed circumstances, on the grounds and in the order,
> envisaged in the present Chapter.

24. Pursuant to Article 311 of the 2002 APC, entitled "Grounds for Revising Judicial

Acts," a legal act may be revised based on various acts of corruption[5] only as follows:

> The following shall be seen as a ground for revising judicial
> acts in accordance with newly revealed circumstances ...
>
> 2) the falsification of a proof or deliberately wrong
> conclusions of the expert, or the deliberately falsified
> testimony of the witness, or the deliberately incorrect
> translation, which has entailed the adoption of an illegal or an
> unsubstantiated judicial act in the given case, established by a
> court sentence that has come into legal force;
>
> 3) the criminal actions of the person, taking part in the case,
> or of his representative, or the criminal actions of the judge,
> committed in considering the given case, established by a
> court sentence that has come into legal force.

25. Put succinctly, Article 311(2) & (3) of the 2002 APC requires the criminal

conviction of the persons(s) who committed the illegal acts of corruption before an

application to revise a prior judicial act based on newly revealed circumstances can be

granted. If such a criminal conviction was obtained, Article 310 of the 2002 APC,

entitled "Arbitrazh Courts, Revising Judicial Acts in Accordance with the Newly

Revealed Circumstances," makes clear that the request to revise must be made in the

same court which rendered the original decision:

> The decision or the resolution, adopted by the arbitrazh court
> of the first instance and put into legal force, shall be revised
> in accordance with the newly revealed circumstances by the
> court which has adopted this decision or resolution.

7

26. Moreover, pursuant to Article 16 of the Federal Law "On Status of Judges in the Russian Federation" (Exhibit "22"), criminal proceedings against an arbitrazh court judge may only be taken by the General Public Prosecutor of Russia on the basis of a decision of a three judge panel of the Supreme Court and with the consent of the Higher Qualification Panel of Judges of the Russian Federation, which is the state body responsible, inter alia, for supervising judges. Thus, the criminal prosecution, let alone conviction, of judges is very rare.

27. Here, there have been no criminal convictions of the individuals responsible for the corruption, and thus an application under Article 311 cannot be granted.[6]

### Plaintiffs Cannot Obtain Review By the Supreme Arbitrazh Court Where An Application For Protest Is Based On Evidence Of Corruption Not In The Record

28. Although Russian law recognizes a form of discretionary review to the Supreme Arbitrazh Court, known as revision of a judicial act by the way of supervision, an application to bring a protest can only be granted based upon circumstances in the record of the civil proceedings below. Thus, where, as here, a party alleges that proceedings were corrupted, and the evidence of that corruption, including any convictions of the persons involved, is not in the underlying record, an application of protest to the Supreme Arbitrazh Court may not be granted.

29. Russian law recognizes a direct appeal from court orders. Such an appeal may be filed with the appellate court (Art. 257 of the 2002 APC) or to a cassation appellate court (Art. 273 of the 2002 APC), or, ultimately, by filing an application for protest to the Supreme Arbitrazh Court pursuant to Article 292 of the 2002 APC.[7]

8

30. Pursuant to Article 292(2) of the 2002 APC, entitled "Revising Judicial Acts by Way of Supervision," a judicial act may be set aside as follows:

> The persons, taking part in the case, and the other persons in the situations, envisaged in this Code, have the right to dispute a judicial act by way of supervision, if they believe that this act has essentially infringed upon their rights and lawful interests in the sphere of the business and other economic activity as a result of a violation or of an incorrect application by the arbitrazh court, which has passed the disputed judicial act, of the norms of substantive law or of the norms of procedural law.

31. Thus, pursuant to Article 292(2), an application for protest may only be granted based on matters which were raised and decided in the lower courts.[8]

32. As applied here, Article 292(2) means that plaintiffs' claims of corruption may not be protested to the Supreme Arbitrazh Court until those claims are first made in the courts which rendered the underlying orders, which cannot be accomplished until the persons responsible for the corruption are convicted of criminal offenses, as required by Article 311 of 2002 APC.

33. As noted above, review by the Supreme Arbitrazh Court of applications for a protest is discretionary. Applications are granted only in the rarest of circumstances. For example, in 2001, 16,867 applications to bring protests were filed and only 570 were granted.[9]

34. Finally, even if the Supreme Arbitrazh Court reversed a judicial act related to the NKAZ or GOK bankruptcies for a reason other than corruption, the Supreme Arbitrazh Court would remand that case for reconsideration to the same arbitrazh court in the region which originally considered the matter, i.e., the Kemerovo or Sverdlovsk regions. See Article 305(1)§2 of the 2002 APC.[10]

9

A - 837

### Chapter 59 Of The Russian Civil Code Does Not Provide
### A Cause Of Action For Corrupting Legal
### Proceedings While The Judicial Acts Are Still in Force

35.  Chapter 59 of the Civil Code contains the general provisions of Russian law

which provide for various causes of action under the concept of delict (tort).

36. Article 1064 of Chapter 59 "Obligations as Consequence of Causing Harm"

provides as follows:

> General Grounds for Liability for Damage
>
> 1.  The harm caused to the person or property of an individual, and also the damage done to the property of a legal entity shall be subject to full compensation by the person who caused the harm .
> . . .
> 2.  A person who has caused harm shall be relieved from compensation of harm if it is proved that the harm was caused not through his fault. . . .

37.  In order to establish a cause of action under Art. 1064, the claimant must allege:

(i) occurrence of harm to a person or property; (ii) caused by an action; (iii) which is

unlawful; (iv) through the fault of the person responsible.[11]  As explained below, Russian

law does not recognize a cause of action based on the assumptions which I have been

instructed to make and the facts alleged in regard to the corrupted bankruptcies.

### There Can Be No Claim of Unlawful Conduct As A Matter of Law
### While the Underlying Judicial Acts Are Still in Force

38.  First, and foremost, the harm to property must be caused by unlawful conduct.

However, such conduct cannot be unlawful if the underlying Judicial Acts are still in

legal force.

39. Art. 8(1) of the Civil Code provides:

> Civil rights and obligations shall arise from the grounds, stipulated by the law and by the other legal acts, as well as

10

from the actions of the citizens and of the legal entities, which, though not stipulated by the law or by such acts, still generate, by force of the general principles and of the meaning of the civil legislation, the civil rights and duties. In conformity with this, the civil rights and duties shall arise ...

2) from acts of State bodies and agencies of self-government bodies, which have been provided for by law as a ground for civil rights and duty to arise;

3) from judicial decision, which has established the civil rights and duties ...

40.    Russian courts are required to recognize Judicial Acts which are in legal force pursuant to Article 16(1) of the 2002 APC, which provides as follows: "Effective judicial acts of an arbitrazh court shall be mandatory for bodies of state power, bodies of local self-government, other bodies, organizations, officials, and citizens, and shall be enforceable on the whole territory of the Russian Federation."

41.    Accordingly, as long as the Judicial Acts concerning the corrupted legal proceedings related to the NKAZ and GOK bankruptcies are still in legal force, the conduct in question cannot be unlawful because the contracts were repudiated in bankruptcy proceedings approved by the relevant arbitrazh court.

42.    For the reasons stated above, these Judicial Acts can only be set aside based on corruption by a collateral attack made in the arbitrazh court which rendered them after the criminal conviction of the person involved in the corruption. Therefore, there is simply no cause of action for plaintiffs under Chapter 59 at the present time.

### A Claim Against the Government Also Requires the Underlying Judicial Acts To Be Reversed And a Sentence Imposed In A Criminal Case

43.    Typically, when a contract is breached, the aggrieved party brings claims against the other party to the contract under a breach of contract theory. See Art. 393 of the Civil

11

Code ("A debtor shall be obliged to compensate the creditor for losses caused by the failure to perform or improper performance of a [contractual] obligation.").

44. I am aware of no decision of the Supreme Arbitrazh Court which interprets the concept of causation to include a claim that defendants unlawfully interfered with contracts by corrupting legal proceedings. To the extent that the contracts were repudiated as a result of corruption, it is likely that the harm would be deemed to be caused by the actions of the courts. In such a case, the government would be responsible to make good for the harm.

45. Specifically, Article 1069 of the Civil Code states:

> Harm caused to a citizen or juridical person as a result of the illegal actions (or failure to act) of state agencies, agencies of local self-government, or officials of these agencies, including as a result of the issuance of an act of a State agency or agency of local self-government which does not correspond to a law or other legal act, shall be subject to compensation.

46. To state a claim under Article 1069 two conditions must be met.

47. First, "the requisite condition for compensation of harm caused by an act of state agency is prior repeal of the act or its recognition invalid."[12] This, of course, cannot occur until the underlying judicial act is set aside pursuant to Art. 311 of the 2002 APC, which requires a prior criminal conviction.

48. Second, in regard to harm caused by the unlawful conduct of courts, Article 1070(2) of the Civil Code requires the criminal conviction of the judge involved in the corruption of decisions addressing the merits of a case: "The harm, caused when effectuating justice shall be compensated if the fault of the judge has been established by the [criminal] judgment of a court which has entered into legal force." Thus, again, a criminal conviction is required.[13]

12

49. Given that claims against the government require reversal of the underlying

judicial acts by the court in which they were entered based on a criminal conviction, any

claim against the defendants would require the same, as set forth in Article 311 of the

2002 APC.

**Chapter 60 Of The Russian Civil Code Does Not Provide
A Civil Cause Of Action For Corrupting Legal Proceedings
While the Judicial Acts Are Still in Force**

50. Chapter 60 of the Civil Code provides causes of action for the return of property

as a consequence of unjust enrichment.

51.    Article 1102, the general provision governing the Chapter, provides:

> 1. A person who, without grounds established by a law,
> other legal acts, or transaction, acquired or saved property
> (acquirer) at the expense of another person (victim) shall be
> obliged to return to the latter property unjustly acquired or
> saved (unjust enrichment), except for instances provided
> for by Article 1109 of the present Code.

> 2. The rules provided for by the present Chapter shall be
> applied irrespective of whether the unjust enrichment was
> the result of the behavior of the acquirer of the property, the
> victim himself, third persons, or whether it occurred outside
> their will.

52.  In order to establish a cause of action under Article 1102, the claimant must

allege that (i) a person (ii) without grounds established by law (iii) acquired property of

another person or saved property at the expense of another person.

53.  As explained below, Russian law does not recognize a cause of action for unjust

enrichment because the relevant Judicial Acts are still in legal force.

54.  In addition, Russian law would not recognize a cause of action for unjust

enrichment based on the contracts repudiated in the NKAZ and GOK bankruptcies

because plaintiffs' property rights were not transferred to defendants.

13

### There Can Be No Unjust Enrichment
### While the Underlying Legal Acts Are Still In Force

55. First (and foremost), in order for unjust enrichment to arise, there must be a lack of legal grounds for the acquisition (or saving) of property.

56. As one prominent scholar has observed: "The main condition for the arising of [the obligations of unjust enrichment] is enrichment without the legal ground in case of transfer of a valuable from one person to the other."[14]

57. And another is in agreement: "It is necessary that the acquisition (saving) of property by one person at the expense of another person took place without existence of sufficient grounds for it, which are provided by a law or a transaction."[15]

58. The Supreme Arbitrazh Court has also emphasized that "pursuant to Article 1102(1) of the Civil Code of the Russian Federation, in order to determine that unjust enrichment took place, it is necessary for a person to lack grounds (legal facts) that give him the right to receive property. Such grounds can comprise contracts, transactions and other grounds provided by Article 8 of the Civil Code that give rise to civil rights and duties."[16]

59. Pursuant to Article 8(1) of the Civil Code, a court decision constitutes legal grounds for obtaining property. Also, as explained previously, pursuant to Article 16(1) of the 2002 APC, courts are required to recognize Judicial Acts which are in legal force.

60. Thus, as a matter of law, there can be no unjust enrichment if the Judicial Acts in question are still in legal force and the contracts repudiated as a result.

### There Can Be No Claim Related to the Repudiated Contracts
### Because No Property of the Victims Was Acquired By Defendants

14

61. In order to be liable under Article 1102, the defendant must have acquired the property of the victim (or saved property) at the expense of the victim. *See* Art.1102(1).[17] In regard to the NKAZ and GOK plaintiffs who traded with NKAZ or GOK and who were harmed by the corrupt bankruptcies, the defendants did not acquire property of the victim plaintiffs (or saved their property at the expense of the victim plaintiffs).

62. Rather, although these plaintiffs were obviously harmed by the corrupted bankruptcies, the benefits certain defendants obtained were different from the property rights which plaintiffs lost as a result of the repudiation of their contracts. The benefits were obtained by effecting new contracts with NKAZ and GOK, and not directly from the repudiated contracts of the victim plaintiffs.

63. This interpretation is confirmed by Article 1106, which discusses the consequences of the improper transfer of intangible property rights and provides:

> A person who has transferred by means of assignment of a demand or otherwise a right belonging to him to another person on the basis of a nonexistent or invalid obligation shall have the right to demand the restoration of his previous position, including the return to him of documents certifying the transferred right.

64. This could occur in the event of an assignment, for example, if the signature of the victim was forged on an assignment or an assignment was effected by an unauthorized person.

65. However, as stated above, here there was no assignment; rather, plaintiffs' contracts with NKAZ and GOK were repudiated and replaced with new contracts.

66. In regard to the GOK shareholder plaintiffs, certain Defendants acquired GOK shares and, thus, this provision would clearly be satisfied as to those defendants which

15

received the shares, i.e. New Start Group Corp., Venitom Corp., Unidale, LLC, and Investland, LLC..

### Russian Law Does Not Provide
### A Separate Civil Cause Of Action For Fraud

67.  Russian law does not recognize an independent civil cause of action for fraud.

68.  The Russian word for fraud or deceit is used in the Civil Code (Article 179 (allowing a transaction to be set aside for fraud), 812 (allowing a loan agreement to be set aside for fraud), 951 (allowing an insurance agreement to be set aside for fraud), 1062 (allowing for the recovery of gambling losses effected by fraud)).

69.  In the Criminal Code, the Russian words for fraud or deceit (Articles 141, 150, 200, 339), fraudulent means (Articles 159, 165, 240), and fraudulent methods (Article 188) are used in numerous provisions.

70.  Although the concept of fraud is explicitly mentioned in both the Civil Code and the Criminal Code, the Civil Code does not recognize a specific cause of action for fraud; rather, claims for tort (delict) are governed generally by Chapters 59 and 60 of the Civil Code.

71. In the absence of a recognized basis in law for bringing a claim, a plaintiff cannot assert a claim under Russian law:

> [I]n order for [the plaintiff's] claim to be granted, it is necessary that his claim be based not exclusively on facts, but also on a corresponding [substantive] law provision. Only a right, which is grounded in law, can be protected....[18]

72. In other words:

> The law requires that plaintiff points to an alleged right, makes reference to the law or other legal normative acts, which, in his opinion, were violated by the defendant. This constitutes a legal basis for a claim.[19]

16