WV SOS Corporation - Search Results                              Page 1 of 1



**Name:**       DAVIS INTERNATIONAL L.L.C.
**Type:**    LLC      **Eff Date:**   12/1/98   **Ch Type:**   D       **Term Date:**   12/1/28
**Sec Type:**           **Fil Date:**   12/1/98   **Class:**     P       **Term Reas:**   X

| Main | Addresses | Officers | DBAs | Names | Mergers | Subsidiaries |
| Amendments | Ann Reports | Dissolutions | Results | New Search | Logoff | |

### Officer Information

| Organizer | Member |
|---|---|
| JANET M. CARUCCIO | JOSEPH M. TRAUM |
| 1220 . MARKET ST. STE. 606 | 48 HAAGIVA STR. |
| | SAVYON, 56000 |
| City  State/Pr  Country  Zip | City  State/Pr  Country  Zip |
| WILMINGTON DE            19801 | .              ISR |

| Organizer | Member |
|---|---|
| . | JOSEPH M. TRAUM |
| | 48. HAAGIVA STR. |
| . | SAVYON, 56000 |
| City  State/Pr  Country  Zip | City  State/Pr  Country  Zip |
| . | .              ISR |

| Manager | Member |
|---|---|
| . | . |
| City  State/Pr  Country  Zip | City  State/Pr  Country  Zip |
| . | . |

| Manager | Member |
|---|---|
| . | . |
| City  State/Pr  Country  Zip | City  State/Pr  Country  Zip |
| . | . |

A - 924

9

CERTIFICATE OF FORMATION

OF

HoldEx L.L.C.

**FILED**
In the Office of the
Secretary of State of Texas

SEP 2 9 1999

Corporations Section

**FIRST:** The name of the limited liability company ("Company") is HoldEx L.L.C.

**SECOND:** The address of its registered agent in the State of Texas is 707 W. 7th Street, Austin, TX 78701. The name of its registered agent at such address is ChoicePoint Services, Inc.

**THIRD.** The purpose of the Company shall be to engage in any lawful act or activity for which a limited liability company may be formed under the Limited Liability Company Act of the State of Texas.

**FOURTH:** The Company shall exist for a period of thirty (30) years from the date the Texas Secretary of State issues a Certificate of Formation, unless provided otherwise by the limited liability company agreement ("Operating Agreement").

**FIFTH:** The total amount of cash and a description and agreed upon value of property other than cash contributed will be $50,000 (U.S. dollars fifty thousand).

**SIXTH:** Additional contributions shall be made at such times and in such amounts as may be set forth in the Operating Agreement.

**SEVENTH:** Management of the Company is vested in the members in accordance with their ownership interests, unless this is varied by the Operating Agreement. A member may not assign, wholly or partially, the right to participate in management without the written consent of all members. The initial two members of the Company shall be:

Star Group Finance And Holdings, Inc.    WorldFund, Inc.
Suite 302    Suite 302
East Building No. 34/20    East Building No. 34/20
Cuba Avenue & 34th St.    Cuba Avenue & 34th St.
Panama City 5, Panama    Panama City 5, Panama

**EIGHTH:** The name and mailing address of the Organizer forming the Company at the instruction of its members is Janet M. Caruccio, 1220 N. Market Street, Suite 606, Wilmington, DE 19801.

**IN WITNESS WHEREOF,** the undersigned has executed this Certificate of Formation of HoldEx L.L.C. this twenty eighth day of September, 1999.

Janet M. Caruccio, Organizer

10

**WINDOW ON STATE GOVERNMENT**          CAROLE KEETON STRAYHORN   Texas Comptroller of Public Accounts



**Texas Taxes**

**Certification of Account Status**

Detailed Instructions

## Officers and Directors
### HOLDEX L L C

Return to: Corporation Search Results
Return to: Corporation Search

Officer and director information on this site is obtained from the most recent Public Information Report (PIR) processed by the Secretary of State (SOS). PIRs filed with annual franchise tax reports are forwarded to the SOS. After processing, the SOS sends the Comptroller an electronic copy of the information, which is displayed on this web site. The information will be updated as changes are received from the SOS.

You may order a copy of a Public Information Report from open.records@cpa.state.tx.us or Comptroller of Public Accounts, Open Government Division, PO Box 13528, Austin, Texas 78711.

| Title: | Name and Address: | Expiration/Resignation Date: |
|---|---|---|
| *MM* | **STAR GROUP FINANCE AND HOLDINGS, IN** SUITE 302, EAST BLDG.,NO. 34/20 + PANAMA CITY, YY | |
| *MM* | **WORLDFUND, INC.** SUITE 302, EAST BLDG.,NO. 34/20+ PANAMA CITY, YY | |

Carole Keeton Strayhorn
Texas Comptroller of Public Accounts

Window on State Government
Contact Us
Privacy and Security Policy

http://ecpa.cpa.state.tx.us/coa/servlet/cpa.app.coa.CoaOfficer                2/13/03

A - 928

11

Certification of Account Status - Officers and Directors                 Page 1 of 1

WINDOW ON STATE GOVERNMENT                     CAROLE KEETON STRAYHORN    Texas Comptroller of Public Accounts



# Texas Taxes

## Certification of Account Status
Detailed Instructions

## Officers and Directors
### HOLDEX L L C

Return to: Corporation Search Results
Return to: Corporation Search

Officer and director information on this site is obtained from the most recent Public Information Report (PIR) processed by the Secretary of State (SOS). PIRs filed with annual franchise tax reports are forwarded to the SOS. After processing, the SOS sends the Comptroller an electronic copy of the information, which is displayed on this web site. The information will be updated as changes are received from the SOS.

You may order a copy of a Public Information Report from open.records@cpa.state.tx.us or Comptroller of Public Accounts, Open Government Division, PO Box 13528, Austin, Texas 78711.

| Title: | Name and Address: | Expiration/Resignation Date: |
|--------|-------------------|------------------------------|
| *DIRECTOR* | **EIZENBERG SIMHA**<br>33/A RADAY U<br>BUDAPEST, HU 1092 | |

Carole Keeton Strayhorn
Texas Comptroller of Public Accounts

Window on State Government
Contact Us
Privacy and Security Policy

A - 930

12

## DEFENDANTS' SUMMARY OF NKAZ CONTRACTS

| No. | Contract | Date | Stated Place of Execution | Parties | Subject | Forum Selection Clause | Choice of Law | Citation[1] |
|---|---|---|---|---|---|---|---|---|
| | **MIKOM Contracts:** | | | | | | | |
| 1 | 270-97 | 06/21/96 | Novokuznetsk | NKAZ and MIKOM | Management of NKAZ | Arbitrazh Court, Moscow (¶ 3.2) | Russian Law (¶ 2.2.1) | Chernyshev ¶¶ 14-15, Ex. 1; Compl. ¶¶ 29-31 |
| 2 | Amendment No. 1 to 270-97 | 06/27/96 | Moscow | NKAZ and MIKOM | Management of NKAZ | Governed by Original Contract | Governed by Original Contract | Chernyshev Ex. 2 |
| 3 | Amendment No. 2 to 270-97 | 01/22/97 | Moscow | NKAZ and MIKOM | Management of NKAZ | Arbitrazh Court, Moscow (¶ 3.1.5) | Russian Law (¶ 3.2.1) | Chernyshev ¶¶ 14-15, Ex. 3; Compl. ¶¶ 29-31 |
| | **BMT S.A. Contracts:** | | | | | | | |
| 4 | USA-R-003/99 | 03/09/99 | Moscow | NKAZ and BMT S.A. | Sale of coke | Arbitration at International Commercial Arbitration Court of the Russian Federation Chamber of Commerce and Industry[2] (¶ 10.1) | Russian Law (¶ 10.2) | Chernyshev ¶ 17, Ex. 7; Compl. ¶ 24 |
| 5 | 640-99 | 05/19/99 | Fribourg, Switzerland | NKAZ and BMT S.A. | Sale of pluggable crane | Arbitration, Moscow (¶ 12) | Not Specified | Chernyshev ¶ 17, Ex. 9; Compl. ¶ 24 |

[1] Each NKAZ contract is attached as an exhibit to the Second Declaration of Sergei Chernyshev, dated January 27, 2002.

[2] Hereinafter referred to as "Arbitration, Moscow."

A - 932

Prof. Stephan

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

BASE METAL TRADING, S.A.; BASE METAL                    :

TRADING, LTD; ALUCOAL HOLDINGS, LTD; MIKOM;

DAVIS INTERNATIONAL, LLC; HOLDEX, LLC; FOSTON           :

MANAGEMENT, LTD.; OMNI TRUSTHOUSE, LTD;

NEXIS PRODUCTS, LLC; and POLYPROM, LTD.,                :

                           Plaintiffs,          :          00 Civ. 9627 (JGK)

         v.

RUSSIAN ALUMINUM; RUAL TRADE, LTD.;                     :

SIBIRSKY ALUMINUM PRODUCTS USA CORP.

      a/k/a SIBIRSKY ALUMINUM (US);                     :

SIBIRSKY ALUMINUM (Russia);

BAUXAL MANAGEMENT, S.A.; METCARE                        :

MANAGEMENT, S.A.; UNIMETAL

LIMITED, S.A.; OLEG DERIPASKA; MIKHAIL                  :

CHERNOI; BLONDE MANAGEMENT, INC.;

BLONDE INVESTMENTS CORP.;                               :

PAN-AMERICAN CORP.; ARNOLD KISLIN;

ISKANDER MAKHMUDOV; MOSKOVSKIY                          :

DELOVOI MIR BANK; NOVOKUZNETSK

ALUMINUM ZAVOD; NEW START GROUP                         :

CORP.; VENITOM CORP.; UNIDALE LLC; and

INVESTLAND, LLC                                         :

                Defendants.

-------------------------------------------------------x

### DECLARATION OF PAUL B. STEPHAN III

I, Paul B. Stephan III, declare:

1.    My name is Paul B. Stephan III. My qualifications and experience are described in paragraphs 1–4 of my Declaration of January 28, 2002, and paragraphs 3-9 of my Declaration of October 17, 2002, and I repeat and affirm here the statements made in those Declarations.

2.    I submit this Declaration on behalf of Defendants Russian Aluminum et al. to supplement my Declaration of February 19, 2003, in light of the Declaration submitted February 20, 2003, by plaintiff's expert Sergey B. Zaitsev. In particular, I will address four issues: (1) the requirements for obtaining supervisory review of a Russian court judgment; (2) the requirements for attacking a Russian court judgment on the basis of newly discovered circumstances; (3) the substantive Russian law that would provide a cause of action for a suit in Russia based on fraud; (4) the availability of testimonial evidence and compelled testimony in Russian litigation. In summary, I conclude that Russian law permits the exercise of a higher court's supervisory power even in the absence of an intervening criminal conviction that impugns the earlier civil judgment; that Russian law provides for reopening a settled judgment on grounds besides an intervening criminal conviction; that Russian civil law does provide a tort action for fraud; and that all Russian courts, including arbitrazh courts, have the capacity to take testimonial evidence and to order reluctant witnesses to testify.

Supervisory Review under the Arbitrazh Procedure Code and the Civil Procedure Code of the Russian Federation

3.    In paragraphs 20-21 of his Declaration, Mr. Zaitsev argues that the victim of corrupted judicial proceedings cannot obtain civil redress in a Russian court until after a criminal court has established that the corruption took place. In paragraphs 28-33 of his Declaration, he seems to suggest in particular that no Russian court can exercise supervisory review, the subject of paragraphs 6 and 8 of my February 19, 2003 Declaration, in the absence of a criminal judgment regarding the judicial proceeding. This suggestion, if it is what Mr. Zaitsev meant, is incorrect

4.    To elicit an exercise of supervisory review, the person dissatisfied with a lower court judgment must persuade the reviewing court that the earlier judgment was essentially unlawful. Arbitrazh Procedure Code (APC) Article 292(2) (referring to an erroneous interpretation or incorrect application of law as the basis for review); Civil Procedure Code 376(1) (same). Showing that the earlier proceeding generated a criminal conviction is an excellent

2

**A - 935**

means of demonstrating its shortcomings, but it is not the only means. A person need only present the court exercising supervisory review with persuasive evidence of errors in the proceedings that resulted in a miscarriage of justice. If the court exercising this review is persuaded that further evidence is needed to establish the claim of error, it can remand the case to a lower court for further collection of evidence. APC Article 305(1)2) (authorizing remand for new hearing before different judges); CPC 390(1)2) (authorizing remand). I note that the allegations in plaintiffs' complaints and several of the affidavits, in particular those of Berger, Golubev, and Telyukina, assert that several of the Russian court decisions at issue were manifestly wrong on their face, independent of any evidence of improper influence. These assertions, if true, would provide a sufficient basis for the exercise of supervisory review independent of any criminal conviction.

5.      Supervisory review by the High Arbitrazh Court is not frequent, but the success rate of persons seeking this review is slightly better than that of U.S. litigants seeking a writ of certiorari from the Supreme Court of the United States. Given the extraordinary nature of the allegations made by plaintiffs in this case, I believe that credible evidences of the claim's basis in reality would be sufficient to elicit an exercise of supervisory review by a Russian Court.

Review Based on Newly Discovered Circumstances under the Arbitrazh Procedure Code and the Civil Procedure Code of the Russian Federation

6.      In paragraph 24 of his Declaration, Mr. Zaitsev quotes paragraphs (2) and (3) of Article 311 of the APC, which prescribe grounds for reopening a judgment based on newly discovered circumstances. Mr. Zaitsev correctly notes that these paragraphs assume a prior criminal conviction impugning the judgment in question. What he does not observe is that Article 311 has five other grounds specified. Article 311(1), for example, permits reopening of a judgment based on a showing that the persons aggrieved by the judgment was unaware at the time of the decision of circumstances essential to the case. For a virtually identical provision regarding the courts of general jurisdiction, see Article 392(2)1). Evidence of fraud or related misconduct, unknown to the litigant at the time of proceedings, would satisfy this ground.

7.      I do not quarrel with Mr. Zaitsev that Russian law provides a powerful set of remedies for persons who have been victimized by miscarriages of justice, once the state through a criminal prosecution has established the miscarriage. I also do not understand him to be disputing that Russian law allows the victim of a miscarriage of

3

A - 936

justice an additional source of redress through a civil proceeding that parallels a criminal prosecution under Article 44 of the Russian Criminal Procedure Code. I disagree, rather, with his assertion that victims have no means of legal relief in the absence of criminal proceedings.

Civil Redress for Fraud under Russian Civil Law

8.    In paragraph 37 of his Declaration, Mr. Zaitsev states that "Russian law does not recognize a cause of action based on the assumptions which I have been instructed to make and the facts alleged in regard to the corrupted bankruptcies." The salient fact for Mr. Zaitsev, in reaching this conclusion, appears to be that no criminal conviction as yet has resulted from the conduct alleged by Plaintiffs. In particular, he seems to infer from the existence of ample means of civil relief in cases where a conviction has occurred, including potential claims against the state under Article 1070 of the Russian Civil Code (Zaitsev Decl. ¶¶ 45-48), that no means exist in the absence of a conviction. This is, of course, a false inference.

9.    In paragraph 9 my Declaration of February 19, 2003, I discussed specifically how a person injured by fraud had a private cause of action under the Civil Code that exists independently of any rights derived from the criminal prosecution or conviction of the injurer. Professor Petrukhin made the identical point in paragraphs 23-31 of his Declaration of January 26, 2002. I do not read Mr. Zaitsev as contradicting our analysis. In paragraph 70 of his Declaration, he states that, "Although the concept of fraud is explicitly mentioned in both the Civil Code and the Criminal Code, the Civil Code does not recognize specific cause of action for fraud; rather, claims for tort (delict) are governed generally by Chapters 59 and 60 of the Civil Code." If I understand his position, he is stating that no provision in Chapter 59 or 60 of the Civil Code provides a separate and distinct cause of action for injury caused for fraud. But he does not dispute that the provisions of those Chapters that define wrongful conduct creating a duty to compensate include fraudulent actions resulted in harm to the defrauded party. This is my position as well. Put somewhat differently, the Russian Civil Code contains no provision stating that the violation of the legal duty not to injure through fraud is different from the violation of the other legal duties governed by Russian tort law, as set out in Chapter 59 and 60 of the Civil Code. Articles 1070-71 of the Civil Code, which do require proof of a criminal conviction, do not involve general principles of tort liability, but rather the liability of the Russian Federation for misconduct by Russian officials. These provisions do not apply in cases where relief is sought not from the state, but from the wrongdoers.

4

10.    I also do not agree with Mr. Zaitsev that Russian law provides no remedy for victims of improper interference with contractual rights. His discussion of this issue in paragraphs 61-66 seems to assume that victims of wrongfully repudiated contracts have a cause of action under the Civil Code only to the extent that the contracts involve specific property, and then only to the extent that third parties acquire possession of the property subject to the repudiated contracts. This is an excessively narrow interpretation of the range of legal rights and duties that rest on Chapters 59 and 60 of the Civil Code, which generally grants relief for injuries caused by a violation of a legal duty. As I stated in Paragraph 23 of my Declaration of January 28, 2002, "The Russian Civil Code now in effect provides full remedies for conversion of property and breach of contract rights, including for indirect involvement or participation in conversion, and for injuries due to fraud." I also observed there that "Russian law would provide a means of compensating injuries caused by illegal-interference with contractual rights, even though it is not exactly equivalent to the common law tort of intentional interference with contractual rights."

Testimonial Evidence in Arbitrazh Court Procedures

11.    Mr. Zaitsev acknowledges in paragraphs 74-78 of his Declaration that arbitrazh courts have the authority to summon witnesses and to take testimonial evidence. He argues, however, that testimonial evidence in practice plays little role in the deliberations of the arbitrazh courts. In particular, in paragraph 79 of his Declaration, he states that "in my years of practice as a judge in the arbitrazh court, I am unaware of any case in which arbitrazh courts admitted witness testimony as an evidentiary basis for a holding."

12.    On it face, this statement by Mr. Zaitsev is a bit obscure. Arbitrazh courts take testimony all the time. What I take Mr. Zaitsev to mean is that, in providing written opinions justifying their decisions, arbitrazh court judges in his experience did not cite the testimony they took as the principal basis for their rulings. His footnote 20 provides some explanation as to why arbitrazh judges are reluctant to cite their own summaries of witness testimony as a basis for their decisions, out of a concern that the citation might seem self-serving.

13.    Mr. Zaitsev's assertions thus go to the weight that arbitrazh court judges attach to testimonial evidence, and not to their capacity to gather and assess such evidence. In this respect as in others, Russia's legal system resembles that of other continental civil law countries, including those of France, Germany and Switzerland. In these countries, the confrontation between the parties' lawyers and a witness before a jury plays a diminished role, in part because the civil law jury operates very differently from the Anglo-American jury institution. This does not mean,

5

however, that witness testimony is not used or challenged. Mr. Zaitsev states as much when, in Article 83 of his Declaration, he expresses surprise that the statements of Mr. Chernyshev went uncontested during the NKAZ proceedings.

14.    Mr. Zaitsev also seems to state that arbitrazh court judges rarely compel witness testimony. He does not assert, however, that the courts lack coercive powers, but rather that they seldom have the need to exercise them. It should be clear, however, that Russian courts have the power to compel witness testimony and, when thwarted by a recalcitrant witness, will exercise them. Perhaps the most famous instance of the exercise of this power involved the civil trial of the Communist Party of the Soviet Union conducted by the Russian Constitutional Court. In 1992, that Court called former President Gorbachev to testify and, when he refused, ordered his passport suspended and threatened to jail him. While the political circumstances of that case were unique, the basic power exercised by the Constitutional Court was no different from that held by all Russian courts, including the arbitrazh courts.

15.    In paragraph 84 of his Declaration, Mr. Zaitsev states that Russian courts have no procedure equivalent to pretrial depositions in U.S. courts, and that compelled discovery of documents is "rather complicated." No civil law country with which I am familiar, including France, Germany and Switzerland, provide for pretrial depositions of witnesses. Because the trial procedures for civil claims in these jurisdictions are more fluid, and less concentrated than the Anglo-American trial, these systems do not need a clear demarcation between the pretrial and trial stages of the proceeding. The means of gathering testimony they do possess, which Russia also employs, remain fully adequate. Finally, the civil law judge, including Russian judges, has considerable discretion regarding the decision to order production of documents for trial. This discretion, however, should not be confused with the absence of power.

6

A - 939

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct. Executed on February 24, 2003, at Charlottesville, Virginia.

Paul B. Stephan III

# PLAINTIFFS' POST-ARGUMENT SUBMISSIONS 2-25-03

# STROOCK

By Hand

James L. Bernard
212-806-5684
JBERNARD@stroock.com

February 25, 2003

Honorable John G. Koeltl
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    Base Metal Trading, S.A., et al. v. Russian Aluminum, et al.
       Docket No. 00 Civ. 9627 (JGK)

Dear Judge Koeltl:

We represent the Aluminum Plaintiffs and write on behalf of all plaintiffs to respond to defendants' February 20, 2000 submissions.

**I.    Plaintiffs are Entitled to Full Deference in the Forum Non Analysis and this Case Involves Substantial US Contacts**

Defendants' extended discussion of the Russian appellate process and Russian law should not distract this Court from this critical and central point: This case is about three US and five non-Russian plaintiffs who were harmed by a pattern of racketeering activity that was centered in the US and orchestrated by eight US and five non-Russian defendants. To emphasize this point, and in response to defendants' chart concerning the location of defendant Russian Aluminum's operations (but not of the eight US defendants or their Western conspirators), we annex hereto a chart reflecting the location of the entities identified in the papers submitted to the Court. That chart graphically demonstrates that this case is about an international criminal enterprise with a base of operations in the US and the West. See Ex. A

With that, we turn to each of defendants' submissions. Submitted herewith in response, and summarized below, are the Second Declarations of Victor Golubev and Judge Sergey B. Zaitsev, which further demonstrate defendants' failure to meet their burden of establishing that Russia is an adequate alternative forum for this litigation.

Honorable John G. Koeltl
February 25, 2003
Page 2

II.    **Nothing in Pretrukhin's Declaration Establishes
the Adequacy of Russia as an Alternative Forum**

   A.    **The Russian Criminal Code Does Not
Create an Adequate Alternative Forum**[1]

The bulk of Petrukhin's declaration is devoted to describing various aspects of Russia's criminal code. See Third Petrukhin Dec. ¶¶ 6-33. Petrukhin's argument can be summarized as follows: (1) Russia has a criminal code; (2) the crimes the four individual defendants[2] committed are covered by the criminal code; (3) even though the crimes committed by these defendants have not been investigated, let alone prosecuted, they could still be prosecuted; and (4) if these defendants were convicted of these crimes, those criminal convictions would enable plaintiffs to prevail on their civil claims for damages against these defendants.

This convoluted argument does not satisfy defendants' burden of demonstrating that Russia is an adequate alternative forum. See Second Zaitsev Dec. ¶¶ 72-75. Simply put, the adequacy of the civil remedies available in a foreign forum cannot turn on the unsubstantiated possibility of criminal convictions over which civil plaintiffs have no control. At least one court refused to dismiss an action on forum non conveniens grounds for this reason. See National Hockey League Players' Assoc. v. Plymouth Whalers Hockey Club, No. 01-70968, 1992 WL 233875, at *1164 (E.D. Mich. Sept. 27, 2001) ("[T]he evidence suggests that the Commissioner and Attorney General of Canad[a] are unlikely to pursue to prosecution any complaint that Plaintiff would make. Hence, the Court finds that Plaintiff does not have an adequate forum in Canada.").

That Petrukhin would devote such a large part of his declaration to this issue is particularly ironic given his public position, prior to being retained by defendants in this case, concerning the lack of independence in the Russian judiciary with respect to criminal prosecutions. In an article entitled "Judicial Power Crushed by the Police Boots," Petruhkin had this to say about the lack of independence of Russia's judiciary: "The materials published in the press allow us to conclude with deepest regret that the independence of our judicial power is being violated blatantly and with impunity, and that the idea of a lawful state in Russia ("the state of judges") is becoming more and more illusive." See Ex. B.

---

[1]    Stephan addresses a similar point at paragraph 10 of his declaration, but to avoid repetition we address those arguments here.

[2]    Russia's criminal code does not apply to corporations, it only applies to individuals. See Stephan Dec. ¶ 14 ("Russian Criminal Law applies only to individuals, and not to firms as such.").

STROOCK & STROOCK & LAVAN LLP · NEW YORK · LOS ANGELES · MIAMI
180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212.806.5400 FAX 212.806.6006 WWW.STROOCK.COM

Honorable John G. Koeltl
February 25, 2003
Page 3

Finally, the likelihood of obtaining a criminal conviction of a Russian judge is virtually non-existent, see First Zaitsev Dec. ¶ 26; Second Zaitsev Dec. ¶¶ 49-52. In contrast, as we explained at the February 10 hearing, plaintiffs can prevail on their RICO claims by establishing, for example, that external manager Chernyshev corrupted the NKAZ bankruptcy proceedings and external manager Kozyrev corrupted the GOK bankruptcy proceedings, something that defendants' own expert, Professor Zankovsky already concluded in his article.

      **B.**     **Petrukhin Admits that Plaintiffs' Claims Must**
               **First be Submitted in the Same Corrupt Courts**
               **After Obtaining Criminal Convictions**

Petrukhin admits that the two relevant provisions of Article 311 of the 2002 APC for vacating judicial decisions procured through corruption are subsections (2) and (3), both of which require criminal convictions, and not the five other provisions Stephan notes but does not discuss, or the one provision Mr. Feinberg discusses. See Third Petrukhin Dec. ¶¶ 29-32. Petrukhin also admits that Article 311 applications, regardless of which sub-division applies, are made to the same courts that issued the corrupt orders at issue. See Third Petrukhin Dec. ¶ 32. See generally Second Zaitsev Dec. ¶¶ 81-83.[3]

      **C.**     **Russian Law Does Not Provide a Cause of Action**
               **For Tortious Interference with Contract and the**
               **Other Claims Petrukhin Addresses are Not Available**

Sections of Petrukhin's and Stephan's declarations suggest that Russian law provides a cause of action for tortious interference with contract. See, e.g., Second Petrukhin Dec. ¶ 25, dated January 26, 2002.

First, Petrukhin's more specific references to Articles 1063, 1102 and 1107 of the Civil Code, see Third Petrukhin Dec. ¶ 28, were addressed in Judge Zaitsev's first declaration, see paragraphs 35-42 and 50-66, and second declaration, see paragraphs 35-41 and 77-80. In brief, in all of these references, in addition to not detailing in the slightest the various elements of such a claim, Petrukhin ignores that no claim can be made until the underlying orders are vacated, which requires an application under Article 311(2)&(3) in the courts that rendered them after criminal convictions of the persons involved. See Second Zaitsev Dec. ¶¶ 22-32.

Second, Petrukhin fails to address that the Supreme Arbitrazh Court has yet to recognize a claim for tortious interference with contract. We recently learned that Professor Sergei Lebedev, a Russian law professor who served as the expert for defendant NKAZ in the Stockholm and Zurich arbitrations, convinced a Texas court that no cause of action for tortious interference with contract exists under Turkmen law, based on his analysis of the virtually identical provisions of Russian law. See EA Oil

---

[3]    Again, this is the same position Mr. Burrows took at the hearing on February 10.

STROOCK & STROOCK & LAVAN LLP · NEW YORK · LOS ANGELES · MIAMI
180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212.806.5400 FAX 212.806.6006 WWW.STROOCK.COM

Honorable John G. Koeltl
February 25, 2003
Page 4

<u>Service, Inc. v. Mobil Exploration & Producing Turkmenistan, Inc.</u>, No. 14-99-00706-CV, 2000 WL 552406, at *4-*6. (Tx. Ct. App. May 4, 2000).

This is nothing new for defendants' experts. Incredibly, <u>all</u> of their experts have taken public positions, prior to being paid to offer their opinions in this case, contrary to the positions they ask this Court to accept.[4]

Most recently, we uncovered two articles written by Petrukhin, who attested to the fairness of the Russian judicial system, one of which is cited above. In the other article, he states as follows: "Due to the lack of financing of judicial system the courts do not have enough monies for payment for business trips, summoning witnesses and victims, conducting expert examinations, renting premises, renovation of buildings, delivery of fuel, mailing, and payment for public utilities. Therefore, contrary to Art. 124 of the Constitution of Russia, <u>financing of courts is openly or secretly conducted not only by the federal budget but also budgets of subjects [regions of Russia] of the [Russian] Federation, which places courts in a position of dependence on the local powers</u>." <u>See</u> Ex. C; Second Zaitsev Dec. ¶¶ 53-59. This is precisely what happened in the bankruptcies with Governors Tuleyev and Roussel.

### D. Petrukhin's Cursory Discussion of Supreme Arbitrazh Court Review Is Either Ambiguous or Inaccurate

Petruhkin's discussion of the procedures for review available in the Supreme Arbitrazh Courts is ambiguous at best. He claims that if "serious procedural violations, such as falsification of evidence, are established there is a high probability that the decision would be reviewed." Third Petruhkin Dec. ¶ 33. The "high probability" that a decision would be reviewed is far from a ringing endorsement of adequacy, even if he substantiated this claim, which he does not. In any event, he ignores the point Judge Zaitsev made in his initial declaration: Appeals can only be based on evidence in the record, just as in the US. <u>See</u> First Zaitsev Dec. ¶¶ 28-34. This is consistent with Stephan's statement that the process of review by the SAC is similar to the process of certiorari in the US Supreme Court. <u>See</u> Stephan Dec. ¶ 6. In short, just as the US Supreme Court could not grant certiorari in a case to consider evidence outside the record that a judgment was procured by corruption, so, too, is the SAC prohibited from considering such evidence. <u>See</u> Second Zaitsev Dec. ¶¶ 17-21; 84-88.

---

[4]    Zankovsky authored an article in which he discussed the various means used to illegally put Russian companies into bankruptcy, and the specific techniques used to put what we have assumed to be GOK into bankruptcy. Stephan authored an article in which he admits that corruption is "pervasive" in Russian society, that it is "difficult, if not impossible" to change that behavior and that Russians, as a result, have learned to "disregard a wide range of legal rules." Both of these matters are addressed in our motions to strike their respective expert reports.

A - 945

Honorable John G. Koeltl
February 25, 2003
Page 5

**E.    The Availability of Commercial Arbitrations
Against NKAZ Does Not Address the Adequacy of
the Alternative Forum Against the Other Defendants**

Finally, Petruhkin raises the availability of arbitration. See Third Petruhkin Dec. ¶¶ 34-35. But the availability of an arbitration mechanism against defendant NKAZ (none of the other defendants are parties to a contract with plaintiffs), does not address the substantive legal question of whether Russian law provides a cause of action similar to a RICO action brought against all defendants in this action. See Second Zaitsev Dec. ¶¶ 89-90. All the more so when NKAZ has taken the position in the arbitrations that they should be dismissed on res judicata grounds because of the judgments in the corrupt bankruptcies.[5]

**III.   Nothing in Stephan's Declaration Establishes
the Adequacy of Russia as an Alternative Forum**

**A.    Stephan is Not Qualified to Address the
Mechanics of Russian Civil and Bankruptcy Law**

Stephan's declaration on Russian law, and in particular his discussion of bankruptcy related legal issues, if considered at all, should be viewed in the context of the points raised in our motion to strike his expert report based on his lack of qualifications. In particular, we emphasize the following from his deposition testimony:

- Professor Stephan has never published an article on Russian bankruptcies or the Bankruptcy Law because, by his own admission, his work is generally "more conceptual" concerning "thematic problems" and not what he describes as "tool book scholarship" or the "cook book aspects" of Russian bankruptcy law.

- When asked what he meant by "cook book aspects" of Russian bankruptcy law, Stephan testified: "I don't desire to put myself in the position [of someone] who could, without assistance, take a client through the bankruptcy procedure."

- Professor Stephan has not observed or attended any trials in Russia since 1998, has never appeared in Russian courts as attorney of record and has never advised any clients in connection with bankruptcy matters in the arbitrazh courts.

---

[5]   See Zurich Arbitration Award § XII at p. 88, submitted by letter from Mr. Burrows dated January 23, 2003.

SSL-DOCS2 70101464v1

STROOCK & STROOCK & LAVAN LLP · NEW YORK · LOS ANGELES · MIAMI

180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212.806.5400 FAX 212.806.6006 WWW.STROOCK.COM

A - 946

Honorable John G. Koeltl
February 25, 2003
Page 6

<u>See</u> Stephan Strike Mem. at 3-5.[6] Stephan's lack of experience with the reality of Russian litigation is strikingly evident in his declaration. In paragraph 8, he engages in an analysis of the Russian Civil Procedure Code ("CPC"), and the procedures for appeals from courts of general jurisdiction, without addressing how any of that is relevant to any issues before this Court when bankruptcy litigation takes place in the arbitrazh courts, not the courts of general jurisdiction. <u>See</u> Second Zaitsev Dec. ¶¶ 33-34 (noting that some of the GOK shareholder litigation took place in the courts of general jurisdiction, and that the CPC could possibly be relevant only to that).

**B.    Judicial Orders Obtained By Corruption**
**<u>Cannot be Reversed through Appellate Review</u>**

Stephan contends that the "normal way" of challenging "fraudulently procured judicial decisions" is through appellate review. <u>See</u> Stephan Dec. ¶ 4. This is simply wrong. As explained above, review by the appellate courts in Russia, just as in the US, is limited to evidence in the record, and the fraudulent procurement of a judgment must first be challenged in the court that issued the judgment, which, in Russia, first requires a criminal conviction of the persons responsible for the wrongdoing. <u>See</u> Second Zaitsev Dec. ¶¶ 5-21.

**C.    Article 311 of the APC Requires a Criminal Conviction**
**and Can Only Be Asserted in the Court that Issued the**
**Orders and No Civil Cause of Action Can be Brought**
**<u>Until this Procedure is Followed</u>**

In typically conclusory fashion, Stephan simply notes that Article 311 contains "seven different circumstances affecting the reliability or integrity of the prior proceedings" and that only two of these seven require a criminal conviction. <u>See</u> Stephan ¶ 7. Stephan never explains how any one of the remaining five subsections (for example, the one dealing with decisions by the European Court for Human Rights that a particular act violates the Convention on the Protection of Human Rights and Basic Freedoms) has any bearing whatsoever to this action. In contrast, Judge Zaitsev explains why the only two relevant provisions under Article 311 are subsections (2) and (3), which is confirmed by Petrukhin in his declaration, <u>see</u> Third Petrukhin Dec. ¶¶ 29-32, both of which require criminal convictions. <u>See</u> Second Zaitsev Dec. ¶¶ 22-32.

Although neither of defendants' purported Russian law experts addresses sub-section (1) of Article 311 regarding newly discovered evidence, Mr. Feinberg does in his letter. Judge Zaitsev does as well, and this provision does not apply. Russian practice limits this provision to evidence related to the merits of the dispute. To do otherwise renders subsections (2) and (3), which specifically deal with corruption,

---

[6]    <u>See</u> Stephan Depo. Tr. 13-14, 64, 142, 167-68; Bernard Dec. Ex. 11.

STROOCK & STROOCK & LAVAN LLP · NEW YORK · LOS ANGELES · MIAMI
180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212.806.5400 FAX 212.806.6006 WWW.STROOCK.COM

Honorable John G. Koeltl
February 25, 2003
Page 7

irrelevant. Mr. Feinberg's interpretation ignores the general rule in Russia, equally true under US law, that where a statute contains specific provisions dealing with precisely the circumstances at issue, those specific provisions cannot be circumvented by reliance on a more general provision. See Second Zaitsev Dec. ¶¶ 25-28.

Stephan's misunderstanding of Article 311 leads to a similarly erroneous conclusion about the availability of civil causes of action under Russian law. Stephan argues that claims for damages under Chapters 59 and 60 of the Russian Civil Code "are not predicated on prior proof of a criminal misconduct." Stephan Dec. ¶ 9. While generally true, this is not the case on these facts because the conduct at issue cannot be wrongful while the corrupted judicial acts are still in legal force. Plaintiffs' claims can only be brought if the underlying judicial orders are vacated, and those orders can only be vacated pursuant to Article 311(2)&(3), which require criminal convictions. See Second Zaitsev Dec. ¶¶ 35-41.

> **D.    The Problems of Corruption in Moscow are**
> **As Great As In Any Other Region of Russia**

Because defendants have now put in issue the extent of corruption in the Moscow courts by stipulating to venue in Moscow, we again emphasize that corruption in the courts in Moscow is just as great as it is in other regions in Russia. Again, Judge Zaitsev, who sat on the Moscow Arbitrazh Court, confirms that judicial corruption is just as much a problem in Moscow. See First Zaitsev Dec. ¶¶ 86-96.

There is ample, uncontroverted evidence already in the record to support this conclusion. For example, in the case of Vanadium Plaintiff Foston LLC, its shares in GOK were stripped away by a Moscow court in a proceeding in which an imposter purportedly represented it, and where the court file subsequently "disappeared."[7] Joseph Traum, a beneficial owner of US plaintiffs Davis International LLC and Nexis Products LLC, was threatened by defendant Iskander Makmudov, who arranged for heroin to be planted in Traum's Moscow office in 2001 (only the intervention of the Israeli government prevented his false arrest). Similarly, key witness Jalal Khaidarov had drugs planted on him while dining in Moscow in 2000. Makmudov and Anton Malevsky, former partner of Vyacheslav Ivankov, also threatened the lives of both Traum and Khaidarov in Moscow on other occasions. And finally, key witness Mikhail Zhivilo, who survived an assassination attempt in Moscow in 1996, cannot return to Russia because of subsequent threats on his life.[8] Defendants have not submitted a single fact declaration to refute any of this evidence, and plaintiffs have had no discovery concerning these issues.

---

[7]    See Ashikmina Dec. of Sept. 12, 2002 ¶¶ 30-36.

[8]    See Traum Dec. of Sept. 14, 2002 ¶¶ 13-18, 27-31; Khaidarov Dec. of September 15, 2002 ¶¶ 8-15, 16-18; Zhivilo Dec. of Sept. 16, 2002 ¶ 19.

STROOCK & STROOCK & LAVAN LLP · NEW YORK · LOS ANGELES · MIAMI
180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212.806.5400 FAX 212.806.6006 www.STROOCK.COM

Honorable John G. Koeltl
February 25, 2003
Page 8

As if this is not enough, we again turn to Zankovsky's article, in which he describes the corrupt bankruptcy of Rospan in the Moscow Arbitrazh Court in 2001. In that case, according to Zankovsky, the majority shareholder "repaid the entire debt of the company by depositing the required amount to a notary's bank account, as prescribed by the Civil Code. . . . This development gave the Moscow City Aribtrazh Court the grounds for dismissal of the bankruptcy case since, obviously, the goal of protecting creditors' interests had been reached." Nonetheless, "the Court suspended the decision to end the bankruptcy proceedings" to permit the "creditors" controlling Rospan to continue to do so.[9] As Zankofsky himself questions, how can the decision to close the bankruptcy "be suspended if the patient is no longer ill?" See Bernard Dec. Ex. 14 at pp. 3-4. This is the reality of litigation in Moscow when powerful Russian interests are involved. See Second Zaitsev Dec. ¶¶ 53-59.

>    E.    **The Practical Reality of Russian Civil Practice**
>          **is that the Courts Do Not Compel Witness Testimony**
>          **or the Production of Documents in Economic Disputes**

It is not surprising that Stephan, who has not been to Russia since 1997, except to meet with his clients in this case for three days, and who has not observed Russian judicial proceedings since 1998, would focus on the theoretical possibilities of trial procedures in the Russian courts. See Stephan Strike Mem. at 3-5; supra note 6. Defendants' other expert, Zankovsky, candidly admitted the realities of practice in the Russian courts: "Indeed, Russian arbitrazh courts have no authority to summon witnesses, either on their own initiative, or at the request of the parties . . . . The cross-examination of witnesses, as a trial procedure aimed at determining whether evidence presented is truthful, simply does not exist in Russian law." Second Zankovsky Dec. ¶ 77. Judge Zaitsev, who served in various Russian courts for almost 20 years, explains the reality of that practice as well, and the absence of the use of oral testimony at trial and the inability to obtain documents. See First Zaitsev Dec. ¶¶ 74-85; Second Zaitsev Dec. ¶¶ 60-70.

Courts in this country have recognized the importance of these procedural devices in fraud cases such as this one, see, e.g., Cromer Finance Ltd. v. Berger, 158 F. Supp.2d 347, 359 (S.D.N.Y. 2001), and Judge Becker, in Lacey v. Cessna Aircraft Co., 932 F.2d 170 (3d Cir. 1991), held that deficiencies of this nature can warrant denial of a forum non motion. Simply put, this case could not be tried in Russia without the ability to compel the production of documents and without the oral testimony of witnesses at trial. And even if these devices were available, key witnesses cannot return to Russia because of defendants' threats of violence and harm, threats which are uncontradicted on this record. See Opp. Mem. at 95-100.

---

[9]    Plaintiffs can supplement the record on this issue, if it would be helpful to the Court, to show that the Tyumen Oil Company, which corrupted the proceedings concerning BP-Amoco, was the entity which corrupted this proceeding. See infra note 11.

STROOCK & STROOCK & LAVAN LLP · NEW YORK · LOS ANGELES · MIAMI
180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212.806.5400 FAX 212.806.6006 WWW.STROOCK.COM

Honorable John G. Koeltl
February 25, 2003
Page 9

IV.     **NKAZ's Letter Misconstrues Russian Law**

      A.     **NKAZ's US Counsel is Not Qualified to Address Russian Law**

We point out that defendants submitted a letter from a US attorney to argue certain points of Russian law with no record support from defendants' experts. In response to this letter, we submit the accompanying Second Golubev Declaration, summarized briefly below.

      B.     **The March 12, 2001 Order of the**
            **Constitutional Court Does Not Apply Retroactively**

The main point raised by NKAZ's letter is that the March 12, 2001 decision of Russia's Constitutional Court applies retroactively, and that after that decision plaintiffs could have appealed some of the decisions that Russian law previously prohibited them from appealing because they had not entered into legal force. See Feinberg Ltr. at 1-3. NKAZ's letter does not address specific orders, or address specifically which appeals were taken, and which were not, nor does it describe the applicable provisions of Russian law. Professor Golubev addresses all of these issues in his Second Declaration, and we summarize them briefly below.

At the time of the various bankruptcies, Russian law only permitted appeals in a very narrow class of decisions. The initial complaint in this action was filed in December 2000. After the complaint was filed, the Russian Constitutional Court issued a decision on March 12, 2001 lifting this particular limitation. That decision did not create a retroactive right to appeal decisions, and the orders at issue entered into legal force before final approval of the settlement. See Second Golubev Dec. ¶¶ 6-21. In any event, even if plaintiffs could retroactively appeal those decisions, and even if those appeals were accepted and the underlying orders vacated, plaintiffs would be no better off. Defendants, as a result of their illegal scheme, not only controlled the bankruptcies, but they now control NKAZ and GOK (the other parties to plaintiffs' contracts). And thus, even if the bankruptcy courts' refusals to honor plaintiffs' contracts could be undone, defendants would of course refuse to honor the contracts and plaintiffs would be in the same position they are in right now. See Second Zaitsev Dec. ¶¶ 44-48.

Professor Golubev also explains in specific detail the law and the facts concerning the appeals to which NKAZ's letter only generally refers. In brief, plaintiffs appealed the decisions they could have appealed (and filed applications to the Supreme Arbitrazh Court),[10] and those appeals and applications were denied. Plaintiffs did not retroactively seek to appeal decisions after the March 12, 2001 Decision, and after this lawsuit was filed, because the law did not permit plaintiffs to take such appeals. And last, after the March 12, 2001 Decision, plaintiffs appealed those decisions that could

---

[10]    To the extent records reflecting these appeals are not already in the record, see Feinberg Ltr. at 4 n.3, they are annexed as exhibits to the Golubev Dec.

SSL-DOCS2 70101464v1

STROOCK & STROOCK & LAVAN LLP · NEW YORK · LOS ANGELES · MIAMI
180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212.806.5400 FAX 212.806.6006 WWW.STROOCK.COM

A - 950

Honorable John G. Koeltl
February 25, 2003
Page 10

have been appealed, again in some instances filing applications to the Supreme Arbitrazh Court, and those appeals and applications were denied. See Second Golubev Dec. ¶¶ 22-54.

### C. Russian Is Not An Adequate Alternative Forum: Other Issues Raised by Defendant NKAZ

#### 1. This Court Can Consider All of Plaintiffs' Allegations of Corruption

NKAZ argues that some of plaintiffs' evidence of corruption should be disregarded. See Feinberg Ltr. at 1. Plaintiffs have generally alleged that the defendants corrupted Russian court proceedings and provided many specific details of this, including declarations identifying particular judges who were involved. In response to Your Honor's Order, the Aluminum Plaintiffs identified the orders which are believed to have been obtained through corruption. Plainly, litigation is an on-going process and the Aluminum Plaintiffs continue to obtain evidence of defendants' wrongdoing. We believe that it was entirely appropriate to provide the Court with all information in our possession relevant to Your Honor's Order.

#### 2. Plaintiffs Did Not Mislead the Court with Respect to Article 191

NKAZ makes much ado about Article 191 and whether plaintiffs may file applications to the Supreme Arbitrazh Court in regard to the decisions which were unappealable prior to the March 12, 2001. See Feinberg Ltr. at 3. As stated above, the March 12 Decision does not apply retroactively, as both Judge Zaitsev and Judge Anishina (cited by defendants) concluded. In any event, the ability to file such an application would not change the fact, as Professor Golubev and Judge Zaitsev concur, that the likelihood of the SAC granting such an application based on mixed questions of fact and law in bankruptcy proceedings that have been closed for almost two years is nil. Moreover, even if this occurred, the matters would merely be remanded to Kemerevo and Sverdlovsk, where defendants have already corrupted proceedings. See Second Zaitsev Dec. ¶¶ 42-48; Second Golubev Dec. ¶¶ 28, 35-36, 52-54.

#### 3. Plaintiffs Have Alleged Corruption in the Tyumen Courts

NKAZ erroneously argues that plaintiffs have not alleged corruption in the Tyumen courts. See Feinberg Ltr. at 4. We reference in the charts, for example, how defendants used the Tyumen cassation court to reverse the Kuzbass judgments against NKAZ after defendants and Kuzbass had a falling out. NKAZ Chart, p. 2; NKAZ Chart, p. 8 (May 23, 2000 Order). In addition, the Tyumen cassation court improperly affirmed the decision removing MIKOM as manager of NKAZ and denied the challenge to the sham settlement agreement. NKAZ Chart, pp. 18, 29.[11]

---

[11]   As stated at oral argument, there is no shortage of materials related to the corruption in the Tyumen courts,

SSL-DOCS2 70101464v1

STROOCK & STROOCK & LAVAN LLP · NEW YORK · LOS ANGELES · MIAMI
180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212.806.5400 FAX 212.806.6006 WWW.STROOCK.COM

Honorable John G. Koeltl
February 25, 2003
Page 11

### 4.    SAC Review is Not Available to Consider the Corruption in this Case

NKAZ also argues that plaintiffs admit that plaintiffs could, today, "bring before the Supreme Arbitrazh Court in Moscow all of the allegations of corruption allegedly affecting the NKAZ bankruptcy proceeding ." Feinberg Ltr. at 5. That is not correct. As we detailed herein, applications for protest to the SAC cannot be based on evidence outside the record. See supra Point II.D. The only way to bring these issues before the SAC is as follows: (1) hope that the criminal authorities will file charges against the four individual defendants (not the corporate defendants);[12] and (2) hope that these defendants will be convicted of their crimes; and (3) based on these criminal convictions, return to the corrupt courts that issued the underlying orders, and hope those courts vacate the orders; and (4) if the orders are not vacated, file an application for protest to the SAC, and hope that it becomes one of the 3% of such applications accepted each year for argument. Only if all of those conditions, over which plaintiffs have no control, are met, can plaintiffs "bring before the Supreme Arbitrazh Court in Moscow all of the allegations of corruption allegedly affecting the NKAZ bankruptcy proceeding."

### V.    Conclusion

We are not aware of a record establishing the inadequacy of a foreign forum in any other litigation like the record before this Court in this case, except in Eastman Kodak and Bridgeway. And here, unlike in Eastman Kodak and Bridgeway (where the motion was made on summary judgment), plaintiffs have amassed this record without the benefit of any discovery. Defendants invoke general references to the current political climate between Russia and the United States – without acknowledging the US governments' repeated statements supporting plaintiffs' view of the Russian judicial system – in an effort to divert this Court's attention from the specific facts contained in this record and their failure to refute any of them. But that should not deter this Court from making a finding supported by the record in this case, and denying defendants' forum non motion because Russia is not an adequate alternative forum for this litigation.

Respectfully submitted,

James L. Bernard

cc:    All Counsel

---

corruption which caused Secretary of State Albright, in 2000, to instruct the US Export-Import Bank to refrain from providing a loan guarantee to benefit the Tyumen Oil Company because it corrupted bankruptcies, including appeals, in these courts to the detriment of BP-Amoco. Plaintiffs are prepared to supplement the record on this matter if it would assist the Court.

[12]    Again, Russia's criminal laws do not apply to corporations. See supra note 2.

SSL-DOCS2 70101464v1

STROOCK & STROOCK & LAVAN LLP · NEW YORK · LOS ANGELES · MIAMI
180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212.806.5400 FAX 212.806.6006 WWW.STROOCK.COM

Exhibit A



International and US Contacts of Defendants' Conspiracy

**Footnotes / Citations in the Record listed by jurisdiction**

**Delaware**

1. Sibirsky Aluminum Bauxite Inc. merged with and into defendant Sibirsky Aluminum Products (USA) Corp. Both are incorporated in Delaware and both maintain offices at Suite 303, 550 Mamoraneck Avenue in Harrison, NY. See Second Amended Complaint ¶¶ 42; Bernard Dec. ¶¶ 24-25; Exs. 21-22.

2. Rual Trade USA Corp. is a defendant-affiliated entity of the same name as defendants Russian Aluminum ("Rusal") and Rual Trade Ltd. See Second Amended Complaint ¶ 71; Bernard Dec. ¶ 26, Ex. 23.

3. New Start Group Corp. and Venitom Corp. are defendants in this action and are located in Delaware. See Second Amended Complaint ¶¶ 89-90.

4. Around the Clock Corporation, MC Holdings Company LLC, CMC MIC Holding Company LLC, MIC Leasing Co L.P. and MIC Building Co. L.P. are defendant-related entities, which, upon information and belief, are managed by or affiliated with defendant Kislin, involved in the purchase and dealing with over $25,000,000 worth of real estate on 75 Ninth Avenue & 85 10ᵗʰ Avenue, New York, NY. See Bernard Dec. ¶ 22, Ex. 19, I-Brief pp. 889-934 (Reel pagination illegible).

**New York**

5. Defendants Russian Aluminum and Rual Trade Ltd. maintain places of business in two suites at this address. See Second Amended Complaint ¶¶ 71, Bernard Dec ¶ 28, Ex. 25.

6. Defendant Sibirsky Aluminum Products USA Corp. is licensed to conduct business in New York and maintains an office at this address, its turnover in 2000 amounted to $118,729,785. See Bernard Dec. ¶¶ 30-31, Exs. 27-28.

7. Defendant Chernoi listed this residential address on certain deeds for New York real estate. See Bernard Dec. ¶ 21, Exhibit 18, I-Brief p. 842, Reel 3518 pg. 0280.

8. Defendant Kislin is a New York citizen and resident. See Second Amended Complaint ¶ 59. With and on behalf of Chernoi, he manages defendant Blonde Management Inc, a New York Corporation, see id. ¶¶ 56-59, and was appointed as Chernoi's attorney in fact in relation to at least one New York real estate transaction worth $25,000,000. See Bernard Dec ¶ 21, Exhibit 18, I-Brief p. 842, Reel 3518 pg. 0280.

9. Defendant Pan-American is a US corporation. See Second Amended Complaint ¶¶ 9, 54-55, 175, 196.

10. Defendant MDM Bank maintains correspondent accounts with US Banks located in New York to facilitate the illegal scheme. See Second Amended Complaint, ¶¶ 55, 62-63, 68-69, 354, 361, 401-402, 463, 471-472, 474, 478, 483, 485, 492-493, 524.

11. American Citizen Felix Lvov was murdered by the Conspirators as part of their takeover of KRAZ. See Second Amended Complaint ¶¶ 138-9.

12. Defendant Chernoi engaged in transfers of these properties with a "David Chernoy," and an "Adella Chernoy" who appear to reside at this address and are believed to be related to defendant Chernoi. See Bernard Dec ¶ 21, Ex. 18, I-Brief p. 842, Reel 3518 pg. 0280-86, I-Brief pp. 882-887 (Reel pagination illegible).

13. Defendant Chernoi engaged in transfers of this property with a "Luobov Chernaya," who appears to reside at this address and is believed to be related to defendant Chernoi. See Bernard Dec ¶. 21, Ex. 18, I-Brief pp. 813-841, Reel 2920 pg. 0730 – Reel 3518 pg. 0279.

14. Defendant Chernoi and his proxies traded in real estate located here. See Bernard Dec ¶ 22, Ex. 19, I-Brief pp. 889-934 (Reel pagination illegible).

15. Ivankov is also known as "Yaponchik," he is an affiliate of defendants and a member of the Izmailovo Mafia who is currently incarcerated the US. See Second Amended Complaint ¶¶76, 168-169; United States v. Abelis, 146 F.3d. 73 (2d Cir. 1998).

**Texas, District of Columbia, Utah, West Virginia & other US Jurisdictions**

16. Investland LLC, Unidale, LLC, and Trans-Commodities are defendants in this action and are located in the US. See Second Amended Complaint ¶¶ 65, 91-92.

17. Plaintiffs Davis International LLC and Holdex LLC had their shares in GOK stolen by defendants and transferred to Defendant US companies. See Second Amended Complaint ¶¶ 32, 33, 397-403, 417-423.

18. Plaintiff Nexis Products LLC's claims against GOK were illegally rejected in the defendant-controlled bankruptcy of GOK. See Second Amended Complaint ¶¶ 37, 390, 426-427, 597.

19. Defendant Deripaska travelled to Chicago in 1995 to extort money from Yuri Zhivilo. See Second Amended Complaint ¶¶ 162-65.

20. Defendant Sibirsky and its affiliates, including Metcare Management and Unimetal, shipped NKAZ metal to these locations. See Second Amended Complaint ¶¶ 241-301.

**Panama, Cayman Islands, British Virgin Islands and Gibraltar**

21. Defendants Unimetal Limited, S.A., Metcare Management Ltd., Blonde Investments Corp., Rual Trade Ltd. and Bauxal Management Ltd are used by defendants as intermediaries for world-wide sales of Aluminum and other commodities, including sales and exports to US entities for US domestic manufacturing. See Second Amended Complaint ¶¶ 291-301, 321, 475, 479, 482-483, 487-488, 518, 524, 533; Bernard Dec. ¶ 29, Ex. 26.

**Europe: UK, Germany, Italy, Cyprus**

22. Defendant Russian Aluminum maintains offices in the United Kingdom and Germany. See Bernard Dec. ¶ 28, Ex. 25.

23. Millhouse Capital is the 50% owner of Defendant Russian Aluminum. See Bernard Dec. ¶ 27, Exhibit 24 p. 3 (I-Brief p. 966).

24. Aluminum of Siberia (UK) Ltd., Flamstead Investments Corp. and Fastact Development Ltd. are defendant-affiliated companies used to launder money, make false claims, and otherwise assist defendants in their illegal activities. See Second Amended Complaint ¶¶ 47, 51, 266, 481; Rekhovsky Dec. ¶¶ 150-155.

25. Plaintiffs Base Metal Trading Ltd. and Alucoal Holdings Ltd. were direct victim of defendants' scheme to takeover NKAZ. See Second Amended Complaint ¶¶ 25-28.

26. UCSA Cyprus Ltd. is the shareholder of Sibirsky Aluminum Products USA Corp. See Bernard Dec. ¶. 30, Exhibit 27.

27. Defendants' agent Gregory Louchansky, through whom defendants acquired their shares in NKAZ, was indicted in Italy by the Anti-Mafia District Division of the Public Procurators office for money laundering and related offences on August 29, 2001. See Bernard Dec. ¶ 33, Exhibit 31.

**Switzerland**

28. Alpro SA is a defendant-related entity that is managed by defendant Kislin and Joseph Karam. See Second Amended Complaint ¶ 49.

29. Joseph Karam is a Swiss national closely related to defendants and their illegal activities. See Second Amended Complaint ¶¶ 50, 61, 133, 517, 519, 524.

30. Plaintiff Base Metal Trading S.A. was a direct victim of defendants' scheme to takeover NKAZ. See Second Amended Complaint 23-24.

**Russian Federation**

31. Russian Aluminum, Sibirsky Aluminum, Oleg Deripaska, Iskander Makhmudov, MDM Bank and NKAZ are defendants in this action. <u>See</u> Second Amended Complaint ¶¶ 66, 67, 70, 79. In this instance, Sibirsky Aluminium includes the individuals used by the defendants to further their illegal schemes, such as Sayan Agro's Chernyshev and his Sibirsky "takeover team", the corrupt governors and their agents. <u>See</u> Second Amended Complaint ¶¶ 48, 231-290, 306-311, 323-340.

32. Defendants' takeover of GOK was an integral part of their fraudulent scheme. <u>See</u> Second Amended Complaint ¶¶ 86-88.

33. Plaintiffs MIKOM and Polyprom were direct victims of defendants' conspiracy to takeover NKAZ and GOK. <u>See</u> Second Amended Complaint ¶¶ 29-31, 38-39.

34. SAZ, BRAZ and KRAZ are aluminum plants that defendants illegally took over before NKAZ and are now constituent parts of Russian Aluminum. <u>See</u> Second Amended Complaint ¶¶ 125-47.

**Israel**

35. Mikhail Chernoi is a defendant in this action, he is a former-resident of Russia and various other European Countries who now lives in Israel. <u>See</u> Second Amended Complaint ¶ 53.

**China**

36. Defendant Russian Aluminum maintains offices in China. <u>See</u> Bernard Dec. ¶ 28, Ex. 25.

**Bar Chart**

37. International Exports and Source of Revenues of Defendants. <u>See</u> Bernard Dec. ¶ 27, Exs. 24, page 970.

**Exhibit B**

## JUDICIAL POWER CRUSHED BY THE POLICE BOOTS

The materials published in the press allow us to conclude with deepest regret that the independence of our judicial power is being violated blatantly and with impunity, and that the idea of a lawful state in Russia ("the state of judges") is becoming more and more illusive.

The offensive against the judicial power has started long ago. On November 18, 1993, the Izvestia newspaper published an article called "A Scandal is Brewing: Minister of Internal Affairs of Russia is Making a List of Unreliable Judges". The article stated that 111 "liberal" judges, who find too many defendants innocent, had been noted. There have also been other publications on this subject.

This is how our law enforcement agencies welcomed the famous May 23, 1992 law which allowed for unlawful arrests to be appealed in court (the Russian version of the widely respected English Habeas Corpus Act of 1679). Using the media, the law enforcement agencies flooded it with absurd allegations of the courts freeing dangerous criminals, who are able to make the bail and then immediately flee from justice. Some examples were publicized in this attack at the new law to threaten the judges applying it. Whether insinuating or openly alleging, without proof, the judicial corruption, the media showed complete disregard for the judges' right to the presumption of innocence. A great number of articles by prosecutors and investigators appeared in the press. They demanded the right for the prosecutor to appeal the decision to release the accused in the court of the second instance and that the defendants stay in custody pending such an appeal. As evidenced by many publications, the law enforcement is agitated by the judicial qualification committees (see, for instance, Igor Korolkov. Who Will Wash the Stains off the Judge's Robe. Izvestia, 6 August 1997). Without the commission's approval no criminal investigation can be initiated and no strategic measures or investigative actions taken. Thus the propositions to liquidate such committees or include. . .prosecutors and others as members even though these committees fire about 100 corrupted judges annually (Sergey Zhdakaev. Unjust Trial. Segodnia, 28 September 1999). Apparently, that is not enough. As we can see, there is a massive, well planned attack at the judges' independence. There are attempts to depreciate the value of the judicial power and humiliate the judges. This is the context in which these publications must be viewed. Although they contain many just emotions, let's review the described situation based strictly on the legal analysis.

Let's ask ourselves this question: why does the law require an immediate release from custody, right there in the courtroom, of an acquitted person (Art. 319 CPC RSFSR) or any other defendant whose motion to suspend the arrest was granted by the judge (Art. 220(2) CPC)? The goal of this requirement is to demonstrate the authority and superiority of the judicial power, its independence from the investigative and prosecuting bodies. In pre-revolutionary Russia, a verdict of "not guilty" by the jury was often greeted with applause. The acquitted was showered with flowers, kissed and hugged by everyone. This was not prohibited by the authorities. And how about now? Armed men wearing masks storm into the courtroom and in front of the judges put the handcuffs on the acquitted and take him to an unknown destination. The intimidated judges render fewer and fewer acquittals. Even during the somber Stalin years, 10% of all verdicts by the district courts were acquittals; it is now 0.3%.

The prosecutor may declare that if an acquittal is rendered, the verdict will be appealed. However, it doesn't reverse the rule requiring immediate release of the defendant. Why? Simply because all of the allegations present at that moment had been denied. The prosecutor has no right to "tuck away" additional allegations "just in case" the accused is acquitted. If in the course of the preliminary investigation there appears a basis for modifying or amending the charges, the prosecutor must submit the new charges (Art. 154 CPC). This means that collecting "reserve" charges without submitting them to the court is prohibited by law.

It is also unacceptable to conduct an investigation and search efforts regarding the accused after the matter has been submitted to the court. In this case, the criminal case is no longer in the prosecutor's possession and, therefore, no investigating activities may be conducted. Similarly, no search operations that qualify as secret investigations may be conducted in respect to the accused. The prosecutor in the action against A.V. Litvinenko and A.I. Gusak had to know about the "reserve" charges, of which the accused was not informed. Even then he should have asked the court to return the case for further investigation, and not demand the guilty verdict.

Arresting the person found not guilty is illegal. An arrest is possible when the person has been caught in the process of conducting a crime, or there are witnesses who can testify that the person conducted a crime, or when traces of crime were found in the person's home, or there are other reasons, but only if the person has attempted to flee justice or has no permanent residence, or his identity is not established (Art. 122 CPC). There was none of the above conditions in this matter and, therefore, the arrest was unwarranted.

If an arrest for up to 10 days has taken place without any charges filed, it must be considered unlawful since an arrest qualifies as a procedural act. However, procedural acts (except for the crime scene examination) may not be conducted without initiating a criminal case.

However as long as the case in under consideration of the court, a prosecutor or an investigator have no right to initiate a criminal case against an accused person based on new charges, because after initiation of the case the investigation shall be commenced. It is in our case because the person against whom the new case is initiated is subject to another judicial proceedings. The accused person, who does not know that a new criminal case was initiated against him/her is deprived of possibility "to use all means not prohibited by law for his/her defense" (Resolution of the Constitutional Court of the Russian Federation dated April 29, 1998 # 13-P.) In this situation a prosecutor who participates in the judicial case should make a statement that there are new facts in the case indicating the necessity to "aggravate the charges, or to replace them by those significantly different from the filed ones because of change of factual circumstances" (Articles 232, 258 of the Criminal Procedural Code), and request the court to remit the case for supplementary investigation. Otherwise a prosecutor or an investigator have a right to initiate a criminal case based on new charges only after the verdict issued by the court became effective.

A FSB[1] officer and a military prosecutor should have foreseen that the defense will contest illegal arrest with the court and that the judge will invalidate or change this preventive measure. If ,despite of the above, they imposed such a measure, the most likely they did it in order to demonstrate their invincibility and disrespect to the court.

---

[1] Federal Security Service

The representative of FSB had no right to state: "keep quiet" and to announce arrest of the accused persons before the end of the judicial hearing. Pursuant to Article 263(2) of the Criminal Procedural Code, the judge presiding over the hearing had a right to remove him from the court room without warning and to impose a monetary fine on him. It was a shame he did not do it.

Actions of the FSB representative and the colonel of justice who were directing the arrest of acquitted persons, or of their leaders who issued unlawful order, fall under indications of article 301 of the Criminal Code – unlawful detention and arrest, article 315 of the Criminal Code - failure to execute a verdict (release from custody is a beginning of the execution of the "not guilty" verdict), Article 127(3) – unlawful imprisonment, Article 285 of the Criminal Code - abuse of authority (use by an official of his/her authority contrary to interests of the service, if it resulted in significant violation of rights and lawful interests of citizens.)

Arrest of a person who just was released by the judge from custody in Sankt-Peterburg is an evidence of obvious disrespect with regard to court, act of violence significantly violating Russian laws. The organizers and executors of this action shall be liable under Article 285 of the Criminal Code - abuse of authority, Article 116 of the Criminal Code - beating (several people had to apply for medical help) and Article 213 of the Criminal Code – hooliganism (significant violation of public order expressed in obvious disrespect with regard to society, accompanied by violence toward citizens or threat of violence, as well as by destruction or damage of other person's property).

In order to protect judicial branch of power from arbitrariness and prevent incidents similar to the ones that had place in the Moscow garrison military court and Kaliningrad District court of Sankt-Peterburg, I believe it is necessary to: seek after the conviction of the guilty persons (not only prosecutor's inspection); introduce control excluding bringing of weapons and explosives into the court buildings; increase protection of courts; transfer the Court Marshals Service to the Judicial Department at the Supreme Court of the Russian Federation; include a new part into article 297 of the Criminal Code: "Disrespect with regard to court from the side of law enforcement bodies"; to introduce in the Criminal Code liability of Media for spreading of false information discrediting the judicial branch of power; organize broad discussion of the problem "Independence of the Judicial Branch of Power."

Doctor of legal sciences, professor I. Petrukhin

January 24, 2000



 *Уголовное право*          *Статьи*          

<<< предыдущее                                          следующее >>>

## "СУДЕБНАЯ ВЛАСТЬ, РАЗДАВЛЕННАЯ ПОЛИЦЕЙСКИМ САПОГОМ"

Публикуемые материалы дают основание с глубоким прискорбием констатировать, что независимость нашей судебной власти беспардонно, безнаказанно попирается и что идея правового государства в России ("государства судей") становится все более иллюзорной.

Наступление на судебную власть ведется уже давно. В газете "Известия" от 18 ноября 1993 г. была опубликована статья под названием "Зреет скандал: Министр внутренних дел России составляет списки неблагонадежных судей", где сообщалось, что взяты на заметку 111 "либеральных" судей, которые слишком часто освобождают обвиняемых из-под стражи. Появились и другие публикации на эту тему.

Так встретили наши правоохранительные органы знаменитый Закон РФ от 23 мая 1992 г., допустивший обжалования в суд незаконных арестов (российский вариант почитаемого во всем мире Habeas Corpus Act 1679 г., Англия). Используя СМИ, правоохранительные органы обрушили на суды лавину вздорных обвинений в освобождении от ареста опасных преступников. имеющих деньги, чтобы внести залог и тут же скрыться от правосудия. Выхватывались отдельные примеры с целью охаять новый закон и запугать применяющих его судей. Намекали или прямым текстом, без приведения доказательств, судей обвиняли в коррупции. хотя и на судей распространяется презумпция невиновности. Появилась масса статей прокурорско - следственных авторов, требовавших, чтобы постановления судей об освобождении от ареста прокуроры могли опротестовывать в суд второй инстанции и чтобы до рассмотрения таких протестов обвиняемые содержались под стражей.
Правоохранительным органам, как видно из многих публикаций (см., например, Игорь Корольков. Кто выведет пятна на судейской мантии. Известия, 6 августа 1997 г.), очень мешают квалификационные коллегии судей. Без их согласия, как известно, недопустимо возбудить против судьи уголовное дело, проводить в отношении него оперативные мероприятия и следственные действия. Поэтому вносятся предложения ликвидировать эти коллегии или ввести в их состав... прокуроров и других лиц (Сергей Ждакаев. Шемякин суд. Сегодня. 28 сентября 1999 г.), хотя ежегодно коллегии увольняют около сотни скомпрометировавших себя судей. Этого, оказывается, мало. Как видим, ведется массированная, хорошо спланированная атака на независимость судей. Пытаются вновь принизить значение судебной власти и унизить судей. В этом контексте и следовало бы рассматривать публикуемые материалы. В них много справедливых эмоций. Но давайте рассмотрим описанную ситуацию на основе строго правового анализа.

Зададимся вопросом, почему закон требует немедленного освобождения из-под

A - 962

стражи прямо в зале суда всякого оправданного (ст. 319 УПК РСФСР) и всякого обвиняемого, чье ходатайство об отмене ареста удовлетворено судьей (ст. 220(2) УПК)? Это правило имеет целью продемонстрировать верховенство и авторитет судебной власти, ее независимость от следственных и прокурорских органов. В дореволюционной России оправдательный вердикт суда присяжных нередко встречали аплодисментами. Оправданного осыпали цветами, целовали и обнимали. И власти этому не препятствовали. А что теперь? В зал заседания суда врываются люди в масках, с оружием, в присутствии судей силой надевают на оправданного наручники и увозят в неизвестном направлении. Запуганные судьи выносят все меньше и меньше оправдательных приговоров. В мрачные сталинские времена районные суды выносили 10% оправдательных приговоров, а теперь - 0,3%.

Прокурор может заявить, что если будет вынесен оправдательный приговор, то он его опротестует. Но это никак не отменяет действие правила о немедленном освобождении оправданного от ареста. Почему? Да потому, что все имеющиеся на данный момент обвинения опровергнуты. Прокурор не вправе приберегать "на всякий случай" дополнительные обвинения в предвидении возможного оправдания подсудимого. Если при производстве предварительного расследования возникнут основания для изменения или дополнения обвинения, следователь обязан предъявить новое обвинение (ст. 154 УПК). Значит, накапливать "резервные" обвинения, не предъявляя их до передачи дела в суд, Закон не разрешает.

Недопустимо также проводить расследование и оперативно - розыскные мероприятия в отношении подсудимого, когда уголовное дело уже передано в суд. В этом случае уголовное дело не находится в производстве следователя и, значит, никакие следственные действия производиться не могут. В отношении подсудимого не могут производиться и оперативно - розыскные мероприятия, имеющие характер негласного расследования. Прокурор, выступая по делу А.В. Литвиненко и А.И. Гусака, не мог не знать о "резервных" обвинениях, не предъявленных подсудимым. Но тогда он должен был просить суд о возвращении дела для доследования, а не требовать вынесения обвинительного приговора.

Если оправданные были подвергнуты задержанию, то оно незаконно. Задержание возможно, когда лицо застигнуто при совершении преступления, или очевидцы укажут на лицо как на совершившее преступление, или на подозреваемом в его жилище будут обнаружены следы преступления, или имеются иные основания, но при условии, что лицо покушалось на побег, или не имеет постоянного места жительства, или не установлена его личность (ст. 122 УПК). Ни одного из этих оснований не было, и, значит, задержание не могло быть произведено.

Если же был предпринят арест без предъявления обвинения на срок до 10 суток (ст. 90 УПК), то и его следует считать незаконным, так как арест - это процессуальное действие. Но, как известно, процессуальные действия (кроме осмотра места происшествия) не могут производиться без возбуждения уголовного дела.

Но пока дело находится на рассмотрении суда, прокурор и следователь не вправе возбудить уголовное дело в отношении подсудимого по новому обвинению. Ведь после возбуждения дела надо производить расследование, а это невозможно, так как лицо, в отношении которого оно возбуждено, занято в судебном процессе. Подсудимый, не знающий, что против него возбуждено новое уголовное дело, лишается возможности "использовать для своей защиты все способы, не запрещенные законом" (постановление

A - 963

Конституционного Суда РФ от 29 апреля 1998 г. No. 13-П). В данной ситуации прокурор, выступающий в суде, должен заявить, что имеются новые факты, указывающие на необходимость "изменения обвинения на более тяжкое или существенно отличающееся по фактическим обстоятельствам от обвинения, содержащегося в обвинительном заключении" (ст. ст. 232, 258 УПК), и просить суд о возвращении дела для доследования. Если это не сделано, то прокурор или следователь могут возбудить новое уголовное дело по новому обвинению лишь после вынесения приговора и вступления его в законную силу.

Сотрудник ФСБ и военный прокурор, конечно, не могли не предвидеть, что защита обратится в суд с жалобой на незаконный арест и что судья отменит или изменит эту меру пресечения. Если, несмотря на это, они прибегли к грубой силе, то, вероятно, потому, что хотели продемонстрировать свою неуязвимость и неуважение к суду.

До закрытия судебного заседания представитель ФСБ не имел права заявлять "соблюдайте спокойствие" и объявлять о задержании подсудимых. В соответствии с ч. 4 ст. 263 УПК председательствующий имел право без предупреждения удалить его из зала суда и наложить на него денежный штраф. Жаль, что он этого не сделал.

Действия представителя ФСБ и полковника юстиции, под руководством которых проводилась операция по задержанию оправданных, либо их руководства, отдавшего незаконный приказ, подпадают под признаки ст. 301 УК - незаконные задержание и арест, ст. 315 УК - неисполнение приговора (освобождение из-под стражи - начало исполнения оправдательного приговора), ч. 3 ст. 127 УК - незаконное лишение свободы, ст. 285 УК - злоупотребление должностными полномочиями (использование должностным лицом своих служебных полномочий вопреки интересам службы, если это повлекло существенное нарушение прав и законных интересов граждан).

Арест только что освобожденного судьей из-под стражи обвиняемого в г. Санкт-Петербурге - свидетельство явного неуважения к суду, акт насилия, грубо нарушающий российские законы. Организаторы и исполнители этого мероприятия должны отвечать по ст. 285 УК - злоупотребление должностными полномочиями, ст. 116 УК - побои (несколько человек обратились за врачебной помощью) и ст. 213 УК - хулиганство (грубое нарушение общественного порядка, выражающее явное неуважение к обществу, сопровождающееся применением насилия к гражданам либо угрозой его применения, а равно уничтожением или повреждением чужого имущества).

Для защиты судебной власти от произвола и недопущения инцидентов, подобных тем, которые произошли в Московском гарнизонном военном суде и Калининском районном суде г. Санкт-Петербурга, полагаю необходимым: добиться осуждения виновных (а не только прокурорской проверки); ввести контроль, исключающий пронос в помещения судов оружия и взрывчатых веществ; усилить охрану судов; передать судебных приставов в ведение Судебного департамента при Верховном Суде РФ; в ст. 297 УК ввести квалифицирующий состав: "Неуважение к суду со стороны правоохранительных органов"; ввести в УК ответственность СМИ за распространение ложных сведений, порочащих судебную власть; организовать широкое обсуждение проблемы: "Независимость судебной власти".

*Доктор юридических наук, профессор И.ПЕТРУХИН*

*24.01.2000*

A - 964

Судебная власть, раздавленная полицейским сапогом                                    Page 4 of 4

<<< предыдущее                                                              следующее >>>



A - 965

**Exhibit C**

## REFORM OF THE CRIMINAL PROCEEDINGS: THE PROBLEMS AND THE OUTLOOK

1.    **Outdated Procedural Forms.** The provisions of the substantive law come alive through procedural forms. However, the Russian judicial reform was defective in that although the new Civil, Criminal, and Criminal Execution Proceedings Codes had been adopted, the old Codes of Civil Procedure, Criminal Procedure, and Code RSFSR of Administrative Violations are still in force. The development of the court procedures is obviously lagging behind and thus preventing the application of the substantive law provisions. This underestimation of the magnitude of these procedures leads to the infringement of the civil rights.

2.    **The Goals of the Court Reform.** There is a widespread opinion that the judicial reform is being implemented to fight crime. But this would be a one-sided interpretation of its goals. Courts do not solve crimes. They simply record, based on the evidence examined, whether the crime has been solved or not. The most important mission of the courts is to protect the rights and lawful interests of the citizens (first of all, those of the accused and the victim) from potential unlawful actions, errors or biases of the law enforcement agencies. Although these guarantees by the court make investigations more difficult they also prevent wrongful convictions. At the same time, by passing lawful and valid sentences, they promote the deterrence of crime. Whether the judicial reform takes a punitive or remedial character, depends on the clear understanding of and desire to solve these problems.

3.    **Realization of the Concept of the Judicial Reform.** In compliance with the Concept of the judicial reform (of 1991), the Criminal Procedural Code of the RSFSR provides for the following: contesting arrests in court (1992); regulation of the jury trial proceedings (1993); procedures for review of criminal cases by the "Mirovoi Sudiya"[1], and a consequent appeal of the verdict (2000). Other innovations concerned more particular issues. It is important to keep in mind that, as the result of the strongest pressure from the law enforcement agencies, the number of granted petitions contesting arrests was slowly decreasing (in 1994, 20% of the petitions were granted; in 2000, only 15%); jury trials are implemented in only 9 subjects of the Federation and have lately been suffering from persecution (in more detail this will be discussed later); and the "Mirovoi Sud"[2] procedures are still in the formation stage.

In relation to the basic provisions of the Concept of the judicial reform, the situation was also developing in the opposite direction. In essence, the "transfer to the court" stage with its scheduling conferences was eliminated in many categories of cases (1992); Judges have been given the right to make critical decisions independently and outside of the official hearing in a case (for example, of its dismissal). This has created favorable conditions for corruption and abuse and allowed for the transfer of poorly investigated cases to the courts for review. The number of judges on the panel of the courts of the first instance has been sharply reduced (1992). The maximum length of an arrest during the preliminary investigation has been increased from 18 months to two years (1996), and so on.                    .

The CPC[3] of the RSFSR, the main source of the criminal procedural law, was adopted forty years ago and is largely outdated. Over 400 amendments and modifications of it, mostly of a specific nature, have been introduced. The first reading of the draft CPC RF was approved by the State Duma of the RF on June 6, 1997 but its revision may drag on forever.

The development of the criminal procedural law in the democratic direction went through two channels:

a)    through the direct influence of the Constitution of the RF, adopted in 1993 (appeal in court of a number of decisions by the investigator or public prosecutor; necessity of the court's approval to sanction certain investigational activities, etc.)

b)    through the decisions of the Constitutional Court of the RF, due to which the outdated criminal procedural law was being brought to compliance with the Constitution of the RF (the

---

[1] Translator's note: "Mirovoi Sudiya" - to a certain extent, similar to a small claims court judge.
[2] Translator's note: "Mirovoi Sud" - to a certain extent, similar to a small claims court.
[3] Criminal Procedural Code of the Russian Federation.

Constitutional Court rendered 18 such decisions, however its powers are limited in that it has no right to overstep the limitations of the demands contained in the filed petitions and claims).

    **4.**      The situation in the field of administration of justice may be characterized as critical.

Due to the inadequate financing of the judicial system, the courts don't have sufficient funds to pay for business trips, subpoenas of witnesses and victims, expert opinions, rental properties, renovations to the properties, delivery and use of the utilities, and postage expenses. As the result, contrary to Art. 124 of the Constitution of Russia, financing of courts is openly or secretly conducted not only by the federal budget but also budgets of the subjects of the Federation, which places courts in a position of dependence on the local powers.

Absence or shortage of office equipment complicates the creation and duplication of verdicts, court transcripts and other documents, which, in its turn, creates red tape and massive violations of procedural deadlines, which, further, leads to the violation of the rights and interests of the parties to the proceedings.

In 1999, 275851 criminal cases (21.7% of the total) contained violations of the procedural deadlines required by law, including 150122 cases that were in court proceedings for up to 3 months, 93382 cases that were in court proceedings from 3 to 6 months, and 74926 criminal cases that took over 6 months to decide.

The legal red tape limits citizens' access to the justice and rouses resentment by the public. People wait for months for appointments with judges. The idea of the "people's judge" who is easily accessible in the time of need, just like a doctor or a lawyer, is being compromised. The citizens form a perception of the courts as an institution of a punitive-bureaucratic nature.

Inadequate financing of the courts prevents them from hiring necessary personnel and lowering the exorbitant workload of the judges, which affects negatively the quality of their work. The crime is intensively rising around the country, consequently so is the number of criminal cases. If at the beginning of Perestroika (1988), 1220361 crimes were registered and 427039 people convicted, in 1998 the numbers were 2581940 and 1070336 respectively; in 1999 – 3001748 and 1276000 respectively. Thus, during the period of 11 years, crime and convictions rose by almost 300%. Add to that the 5 million civil cases, 1824775 records of administrative violations, 80271 petitions contesting unlawful and unjustified arrests, as well as their postponements, all registered in 1999 alone. The dynamics of the rising crime and convictions were obviously ahead of the rate of increase in the number of judges. The Decree of the President of the RF dated December 30, 1999 increased the judicial staff by 1000 judges, which, as of the beginning of 2000, reached 16742.

According to V.M. Lebedev, the Chairman of the Supreme Court, to normalize the situation, the number of judges must be increased to 53.7 thousand, i.e. by 2.4 times; the number of other judicial personnel – to at least 4 to 5 times. These numbers must be increased to accommodate the creation of administrative justice. In Russia, there is one judge per 9.5 thousand people, whereas in France it's one per 6, in Germany – one per 4, and in England – one per 3 thousand. Thus an extremely heavy average workload per each district judge: 9.3 criminal, 36.2 civil cases and 15.2 records of administrative violations (as of the first half of 2000). This heavy workload and inadequate pay make this position unattractive. This is why in the beginning of 2000 there were 2130 vacant judges' chairs. Ad to this number another 5 to 6 thousand vacancies among "Mirovykh Sudey".

At the same time, most of the judges were not the brightest law school graduates. This position may be occupied by an individual with a law degree who is at least 25 years of age. The age of graduation from the school – approximately 22. The best of them obtain well paid positions and will never join the court system. Less gifted float from job to job and at the age of 25 some of them become judges. To change the situation, it is necessary to make the job of a judge more prestigious and their salaries – sufficiently high (for instance, in pre-revolutionary Russia, the posts of a district judge and court investigator corresponded to the IV Class and were equal to the rank of an army general). It is also

desirable to lower the minimum age requirement for the applicants for the positions of "mirovoi" and district judges, as well as to introduce a position of a candidate for a court position.

Such obvious shortage of the court personnel prevent the judges from rendering quality decisions in all criminal cases. In 1999, 2.2% of all verdicts by the district (municipal) courts were reversed in cassation (second appeal) or in the course of supervision proceedings; 1.7% of the verdicts by these courts were changed. Thus, 3.9% of the verdicts were erroneous. In 1999, the number of reversed and changed verdicts of the supreme courts of the subjects of the Federation reached 11.7%. In reality, the number of judicial errors is much higher since not all unlawful or unjustified verdicts are discovered and reversed (changed). No research on the number of undiscovered (latent) judicial mistakes has been done.

   5.     **Competitiveness of court proceedings.**  This principle, which was for the first time introduced by the Constitution of the Russian Federation of 1993 (Article 123(3) still did not became a fundamental principle of the Russian criminal proceedings, which because of this reason preserves some features of inquisition.

Competitiveness is a form of organization of criminal court proceedings characterized by strict division of functions of prosecution, defense and resolution of the case between the prosecutor, (private accuser), accused person and the court, equality of the prosecution and defense; examination of the case through the mean of polemics in front of independent and impartial court.

The assertion of the opponents of competitiveness that the parties and the court have the same goal - truth seems incorrect. An accused person and a defense council will be happy in situation when the crime is not solved and truth is not established. Because, if the guilt is not proved the accused person is considered to be not guilty. The prosecutor is the one who should prove to the court that he established guilt of the accused person. If the prosecutor is not able to prove the truth, the court should not help him. It should be appropriate for judges to refrain from questions of accusatory as well as justificatory nature, so that nobody could suspect that they sympathize to an accused person to a prosecutor. The inactivity of a court is an attribution of competitive proceedings.  However such passivity should be with regard to examination of evidence and not with regard to guidance of judicial hearing. Active role of a court with regard to examination of evidence is an attribute of inquisitional proceedings.

One of the tasks of the judicial reform is to essentially restrict principle of publicity in activities of the court causing the situation when the court accepts the function of prosecution. The rule that judges and assigned to them people's deputies can question accused persons, victims, witnesses at any stage of judicial examination, including prior to their questioning by the parties (Articles 280, 283, 287 of the Civil Procedural Code of the RSFSR), should be excluded from our criminal procedure (whole and not jury trial). This is inconsistent with competitiveness of judicial proceedings because a judge and people's deputies ask questions proving that the accused person committed a crime, i.e. perform the function of prosecution. This is basically inevitable in situations when the prosecutor does not support public prosecution in court. And there are a lot of such cases: if in 70-80-s prosecutors supported prosecution in 80-85% of criminal cases, than now they participate only in 40% of criminal cases referring to overload of work.  In the absence of a prosecutor the judge becomes a accuser and judicial proceeding cease to be competitive. In is necessary to obligate the prosecutors to support prosecution in courts in all criminal cases of public prosecution and to release it from function of general supervision (this is a competence of administrative justice). But in that case arises the problem of significant increase of barristers, because in case when the prosecutor supports prosecution, the law provides for obligatory participation of defense council (Article 48 of the Civil Procedural Code of the RSFSR).

The court should not determine the order of examination of evidence (Article 279 of the Criminal Procedural Code of RSFSR) at his own discretion, alternating evidence of prosecution and defense and evidence characterizing personality of an accused person. First the evidence of prosecution shall be examined, than evidence of defense. The examination of personality of the accused person should be performed after he was proclaimed guilty as it is done in the jury trial.

The parties should be put in equal position, namely: to repudiate provision of Article 245 of the Criminal Procedural Code of RSFSR, which talks about their equality only with regard to provision of evidence, participation in its examination and filing of motions; to abolish provisions of Articles 248 and 249 the Criminal Procedural Code of RSFSR, according to which a prosecutor provides with regard to issues arising in the course of judicial hearing, when the defense council can only express his opinion; to abolish Article 25 of the Criminal Procedural Code of RSFSR in the part establishing that the prosecutor is obligated to timely take provided by the law measures aimed at elimination of any violation of law in spite of the source of violation, which could by the court, defense council or any other participant of the court proceedings. Prosecutor, as well as a defense council should file complaints in higher courts and not protests. Tasks of a prosecutor should be restricted to support of state prosecution in court, direction of investigation and filing of complaint in protection of citizens upon their request in court.  This is how procedural functions of prosecutor were described in a project of Constitution of the Russian Federation approved by the constitutional conference in summer of 1993. However, later on the President of the Russian Federation B.N. Yeltsin changed the text of Article 129 of the project of Constitution of the Russian Federation upon the demand of a former Prosecutor General of the Russian Federation A. I. Kazannik and removed from it any mentioning about functions of the prosecutor's office, and the Main Law was adopted in such version.  In order to phrase the suggested functions of the prosecutor's office it is enough to amend the Federal Law "On prosecutor's office in the Russian Federation" (in version of 1999).

The cassation and supervision proceedings should be built on the basis of the principle of competitiveness. The prosecutor who entered a cassation protest (usually it is an assistant prosecutor of a district, city), should support such protest himself and not hope that employees of the regional (territorial) prosecutor's office will do it. In the order of supervision should be filed not protests but complaints, and both parties should receive the right to file such complaints. The conclusion with regard to possibility to consider the complaint should be made by a panel of three judges of supervision level.

It is necessary to change the procedural order of consideration of cases by cassation and supervision instances and to transform it into competitive. Such order could be as follows:

First, should speak a party which filed a complaint with provision of new evidence and materials, then – the opposite party (I believe that the preliminary report of a judge is not necessary);

The examination of evidence is possible, and then the court of cassation (supervision) instance shall announce that it heard the case in appellate order;

Then should follow pleadings and the last word of the accused person;

The procedure shall be ended by the issue of the order of cassation (supervision) court; and by the court verdict if the case was herd in appellate order.

At present there is no strict division of functions in the stage of supervision proceedings.  Chairmen of the higher courts "compete" with prosecutors in entering of protests to "not guilty" verdicts, mildness of the punishment and application of less severe than necessary criminal law (Article 371 of the Criminal Procedural Code of RSFSR). The law that allows such practice should be reversed because a representative of the judicial power should not perform functions of prosecution – to enter protests not in favor of the convicted (acquitted) person, to examine his own protest within a panel of judges and to grant them.

Introduction of a principle of competitiveness in the Russian judicial proceedings was happened due to the Constitutional Court of the Russian Federation, which in order to pursue this goal made a number of important decisions.(on right of a victim to participate in pleadings, on lack of a right of the court to initiate criminal cases, on inadmissibility  of return of criminal cases for additional investigation upon the initiative of the court, on inadmissibility of continuation of judicial examination and rendering of a "guilty" verdict when the prosecutor withdrew criminal charges, on participation of convicted and acquitted

person during hearings of higher courts and others.) the legislator should immediately take into account these decisions of the Constitutional court.

6.       The jury was introduced in out country by the Law of July 16, 1993 *(5), then its status was confirmed by the Constitution of the Russian Federation (Articles 20, 47(2), 123(4), therefore, the opinion about temporary, experimental character of a jury is groundless. We talk about step-by-step introduction of a jury in all regions of Russia. So far it exists only in nine subjects of the Federation, therefore the principle of equality of citizens to law and court (Article 19(1) of the Constitution of the Russian Federation) is violated.

Advantages of jury and undoubted and essential: lesser probability of judicial mistake , especially with regard to not guilty person, independence and non corrupt nature of the members of a jury (it is practically not possible to exert criminal influence upon each of the 12 members); relatively wide participation of the people in administration of justice; lack of bureaucratic spirit; freedom of jury from stereotypes and standards resulting from directive with regard to cooperation with prosecution; truly open and competitive proceedings; increase of social activity of citizens, their responsibility for fate of other people end society as a whole; contribution to development of humanitarian legal ground of the Russian legislation.

Taking into account the above, more and more citizens prefer the jury trial to other forms of judicial proceedings. The number of motions for jury trial increases: in 1994 in was 20,4%; in 1995  - 30,9%; in 1996 - 37,3%; in 1997 - 36,8%; in 1998 - 43,2%; in 1999 - 44,0% from all cases that fall under jurisdiction of a jury. The amount of cases examined by a jury increases also: in 1994 it was  241, in 1995 - 544, in 1996 - 618, in 1997 - 825, in 1998 - 800, and in 1999 - 867.

There are opponents of a jury trial. In their opinion, such court is excessively liberal, is inconsistent with Russian legal traditions, is not able to actively fight crime.

Indeed, jury makes approximately 20% of "non guilty" verdicts, while other courts render only 0,4%, of such verdicts and this annoys heads of law-enforcement bodies. Because each "not guilty" verdict is an evidence of non-objectivity and incompleteness of investigation, lack of sufficient grounds for arrests, searches and other constraining measures restricting constitutional rights of citizens. Jury does not examine evidence acquired in the course of preliminary investigation in violation of law, and the remaining evidence is in many cases not sufficient for the "guilty" verdict. The jury trial creates the most favorable conditions for revelation of mistakes and abuses of investigators. However the Cassation Panel of the Supreme Arbitrazh Court of the Russian Federation restricts these liberal tendencies by reversing much more "not guilty" jury verdicts that "guilty" verdicts. Thus, in 1996 it reversed 30,7% of "not guilty" jury verdicts and 20,6% of "guilty" verdicts, and in 1997-2000 it reversed about 50% of "not guilty" and only 15-16% of "guilty" verdicts. Therefore, the Supreme Court of the Russian Federation together with law-enforcement bodies tries to reduce the amount "not guilty" verdicts however it does not help because the quality of preliminary investigation apparently did not improve.

The opponents of a jury trial use a peculiar tactics: many of them do not openly oppose the jury trial any more but try to actually eliminate it by the mean of sharp reduction of its jurisdiction. At present, cases heard by regional (territorial) courts, which constitute about 47 types of crimes fall under jurisdiction of jury (Article 36 of the Criminal Procedural Code of RSFSR). However, in accordance with the project of the Criminal Procedural Code of the Russian Federation adopted in a first reading of the State Duma, only five types of crimes with possible punishment of death penalty or life imprisonment will be left within their jurisdiction (qualified types of murder and genocide). This is the "quiet" way to eliminate this democratic institution.

It seems that there is a necessity to take the following measures:

a) to preserve the jury trial and to initiate it in all the subjects of the Russian Federation (article 6 of final and transitional provisions of the Constitution of the Russian Federation, which should be finally implemented now 7 years after enactment of the Constitution, talks about it);

b) to preserve the present rules with regard to jurisdiction of jury courts;

c) to preserve traditional Russian model of jury court ( 1 judge and 12 members of  jury), introduced y the Regulations on criminal proceedings of 1864.;

d) to introduce strict material and other liability of jurors who do not appear in court upon the receipt of a jury subpoena, as well as of persons preventing their appearance in court (at the present time only 15-20% of persons who received a jury subpoena appear in court, which prevents administration of justice);

d) to vest control over composition of list of jurors in officials of regional (territorial) administrations, which will be especially created for performance of this obligation (at present many persons which according to the law cannot perform jury duty are included in such lists);

e) to hear in the jury court only those criminal cases where the accused persons do not plead guilty, and with regard to remaining cases to provide a right to a judge of a regional (territorial) court) to impose punishment without holding of the hearing or with an expedited hearing (such order exists in Anglo-American legal system and it justifies itself by relieving courts from consideration of undisputed cases);

f) to increase the amount of "reserve" jurors up to 3-4, taking into account that certain judicial proceedings continue for a long period of time;

g) to change the current law and to strengthen competitive principle in activity of jury trial.

The current law set forth that in the course of jury trial, after the accused person testified he is first questioned by a public prosecutor, then – by a victim, and in the end by a defense council. (Article 446(2) of the Criminal Procedural Code of the RSFSR). This rule is inconsistent with principle of competitiveness. The accused person, who agreed to testify, is a defense witness and the defense council should depose him first.  The law of July 16, 1993 does not determine the order of judicial hearing.  The prosecutor deposes first all accused persons, witnesses, victims and experts, while in accordance with the principle of competitiveness a defense council should depose accused persons and defense witnesses. The judicial examination is not divided into stages of provision of evidence of prosecution and defense; there is no division of evidence into evidence of prosecution and evidence of defense.

Apparently, we need a new law in jury trial or a new section in Criminal Procedural Code), main idea of which will be competitiveness. Statements from both sides should open judicial examination.  Judicial examination should be clear divided into two stages:: provision of evidence by the prosecution and provision of evidence by the defense.  It is advisable to conduct questioning according to principle "question-answer".  It is necessary to introduce terms "questioning", "cross-examination", "additional questioning" and allow conduct of a "parallel" (independent) expert examination.

Common spirit should penetrate forms of judicial proceedings. Therefore, all of them should be built in such a way when competitiveness becomes fundamental principle of the Russian justice.

7.      **Expedited judicial examination and plea bargaining.** In accordance with Article 446 of the Criminal Procedural Code of RSFSR, which determines the order of examination of cases  by jury, voluntary entry of a guilty plea allows to restrict the judicial examination only by questioning of accused persons when the following conditions exist: the plea entered is not contested by either party, the judge does not have doubts with regard to it; all participants of the proceedings agree with termination of judicial examination. When the same conditions exist the restriction of judicial examination to only questioning of an accused person and a victim is allowed in *mirovoi* court too.

It is desirable to spread this rules to proceedings in all other courts, which will expedite the examination of criminal cases and allow the courts to concentrate on cases where accused persons deny their guilt. It should be recognized that normal capable person free in his opinions and actions has no

inclinations to lies and self-slander (presumption of good faith). The court has enough possibilities to reject false guilty plea and to conduct the complete judicial examination if it has doubts.

As it concerns plea bargains, this specific American institution hardly acceptable for contemporary Russia, even though it its resolution of April 3, 1998 the Council of judges of the Russian federation supported such type of "bargains". The same decision was med by the V Convention of judges of the Russian Federation on November 29, 2000.

In the USA plea bargains consist of the agreement between the prosecutor and defense council about the accused person pleading guilty to some of the charges for mitigation of the sentence. At that, the judge also participates in such plea bargain. In Russian conditions it could lead to refusal from resolving of many crimes, first of all heinous crimes and extremely heinous crimes, increase of criminality of and second offences, distortion of criminal statistics, and, which is the most important, to encouragement of corruption in law-enforcement bodies, courts and legal offices. Plea bargains will humiliate investigator, prosecutor and a judge because they'll have to bargain with a criminal who admits his guilt only partially. The judge cannot promise to mitigate the punishment because people's deputies might not agree with him. The lawful interests of the victims not participating in the bargain will be violated. Sawing resources on "bargains" the state will loose much more for necessity to fight crime, which will multiply significantly due to application of such manner of resolution of criminal cases. By the way in the USA federal judges are prohibited to participate in plea bargains, and without their participation execution of the agreement between the prosecution and the defense is not guaranteed.

In new conditions in connection with initiation of jury trial, where members of a jury are not obligated to reason their verdict , reduction of judicial examination and intend to introduce plea bargains, developers of the Criminal Procedural Code do not consider achievement of truth as a goal of judicial proceedings. In their opinion such approach characterizes inquisitional procedure. For example, judge S.A. Pashin asserts: ",As a judge I do not search for truth ...". However, the truth is compatible with competitive order of judicial proceedings ("truth is a product of adversarial process") and the creators of new Criminal Procedural Code should not cease the attempts to find it.

**8.    Judicial control over preliminary investigation.** Pursuant to the Constitution of the Russian Federation, the court controls preliminary investigation by sanctioning investigatory actions connected with limiting constitutional rights and freedoms of citizens (Art. 22, 23, 25), and reviewing complaints against illegal actions and decisions of officials who conduct and oversee the investigation (Art. 46).

However, these provisions of the Basic Law are not yet realized. According to Art. 22 of the Constitution of RF and Art. 5 of the Convention for the Protection of Human Rights and Fundamental Freedoms *(9) ("Convention") which Russia ratified in 1998, it is necessary to note that incarceration and extension of detention for over 48 hours is allowed only under a court decision.

Therefore, the State Duma should retract the reservation it made during the ratification that, in Russia, arrests will remain to be sanctioned by procurators (district attorneys). It is also necessary to remove another reservation according to which the rule of Art. 5 of the Convention will not yet be applied in Russia, which requires that the arrested be immediately brought to court to verify the legality and probable cause for detention (arrest).

The judicial procedure for the issuance of an order (warrant) for arrest and the rule regarding the immediate bringing of the detained (arrested) to a judge exists in all civilized nations. The advantage of such approach is that the decision of the detective and the district attorney to conduct an arrest and the actions of the police are checked by an authority independent from the investigation or procurator's supervision. The Judge is not responsible for the ratio of solved crimes and the quality of investigation, he is not tied by accusatory predisposition and narrow bureau interests and, therefore, can protect the interests of the citizens in the best way.

Art. 174 of the Criminal Procedure Code of RSFSR must be repealed. According to this Article, the warrant for arrest, search and seizure of postal and telegraph correspondence is issued by the procurator, whereas, pursuant to Art. 23 of the Constitution of the Russian Federation this procedural action may be undertaken only by a decision of a court of law. The same must be said about tapping of the telephone and other conversations with the use of technical means because there exists a draft of a bill as to the inclusion of such investigatory action into the acting Criminal Procedure Code.

Also contradicts the Constitution of the RF and must be repealed Art. 168 of the Criminal Procedure Code of RSFSR, which envisages a procurator's sanction for conducting a search. The procurators do not agree with this position, and continue to issue search warrants, on the basis that the norm of Art. 25 of the Constitution is formulated in the alternative: entry into a dwelling against the will of the tenants may be done either as allowed by law, or on the basis of a court decision. Such definition is not logically flawless, because a court decision allowing to conduct a search must also be based on the law. Neither the Constitution, nor the Criminal Procedure Code indicates when an entry into a dwelling is done on the basis of law (in this case, Art. 168 of the Criminal Procedure Code of RSFSR) and when on the basis of a court decision. But search is the most serious and harsh intrusion into the private life of citizens. And if a court decision is not necessary for such action, then the question arises, when would a court decision be necessary? The foregoing does not exclude the possibility of conducting a search without a court decision in emergency circumstances which are enumerated in the law.

The law project's aim was to make CPC of the RSFSR consistent with the Constitution of the Russian Federation and rulings of the Constitutional Court of the Russian Federation. In particular, it provided for a court (rather than a prosecutor) to issue arrest warrants, to place the accused to psychiatric facilities for expertise, to issue search warrants, confiscation papers and search of houses of the citizens, to fire an accused from a job position held, to issue warrants for arrest, search and confiscation of the mail and telephone communication correspondence, as well as to deliver each arrested individual to a judge within 48 hours of his arrest in order to check lawfulness and probable cause for arrest and make a decision on applicable measures preventing an arrestee from conducting further criminal activities. The project also provided for appeal of the actions and decisions of the investigative bodies, of an investigator and prosecutor, who could violate constitutional rights and freedoms of the parties to the investigation or to impede citizens' access to the justice system.

President of the RF, V. V. Putin presented the above draft for review to the State Duma on January 5, 2001. However, on January 19, 2001, the President recalled his draft, stating that such a project will require the 9900 persons increase in courts support staff and judges as well as additional 1.55 billion rubles federal budget spending annually. President's decision of January 19, 2001 was based on the document issued by the Courts Department of the Supreme Court of RF, which detailed all additional amounts that would have to paid for judges' and support staff's salaries, maintenance of the administrative buildings an even ... for combustive-lubricating material and cleaning etc. in the event the project gets approved.

It would seem, however, that prevention of the approval of the project in reality was caused not so much by the financial, but rather political and pragmatical considerations.

The economical problem, presented by the presidential project was not that difficult. At present time, a certain amount of work that was planned to be done by the courts (sanctioning of the arrests, searches and other investigative actions) is actually done by the prosecutor's office. These functions should be performed by the courts, thus decreasing the number of prosecutor's office staff. The number of staff employed by the prosecutor's office in Russia is approximate 50 thousand; the number of judges – around 18 thousand. The problem would be solved without any extra expenses if a few thousand staff members are moved from one office to the other.

Either we solve the problem or we will have to admit that our Constitution is a fiction and our Constitutional Court is completely unnecessary.