**9.     The Appeal.** In accordance with the Convention (Art. 6), every convicted person has the right to have his or her case reviewed by the court of the second instance. This means an appeal which is characterized by the review of evidence, including that which was analyzed by the court of the first instance. To speed up judicial proceedings and reinforce the fight against crime, Russia at some point abolished appeal (CPC RSFSR of 1922) and replaced it by cassation, i.e. review of the lawfulness and validity of the verdict based only on the materials of the case without the direct review of the evidence or rendering a new decision. However, it is impossible to verify the compliance of the court's conclusions with the evidence collected in the case and evaluate their reliability without the new criminal investigation. Thus, the institution of cassation, as it was established in RSFSR, came to contradict Art. 6 of the Convention and must be replaced by the appeal whenever a correction of a purely legal error is at issue. Some jurists have been proposing the return of the mentioned appeal and the idea has been reflected in the Draft CPC RSFSR, which is currently under the review by the State Duma. In this connection, it is necessary to note that a brief review of the evidence by the appellate instance should not be allowed without the agreement of the defense.

Depending on whether the complaint (appeal) is against the issues of the fact (validity of the verdict) or the right (lawfulness of the verdict), the same higher court instance could review the matter according to the rules of either appeal or cassation.

The Federal Law of the RF No. 119-F3, of August 7, 2000, introduced an appeal of a sentence issued by a "mirovoi sudiya", at the district court's level where the complaint (appeal) is reviewed by a single judge. The "mirovoi" and district judges share the same status, the requirements to the candidates to both are the same (age – 25, higher degree in jurisprudence), thus it is hardly appropriate to assign the review of a complaint (appeal) to one single district judge. Such complaints (appeals) must be reviewed by at least two district judges. The final instance to review the verdicts of the "mirovykh sudey" is the court of the subject of the Federation. The removal of this limitation would be desirable. In pre-revolutionary Russia, the verdicts of "mirovykh sudey" could have gone up to the highest court instance – the Senate.

**10.** Rehabilitating justice instead of punitive is a relatively new concept which was initiated in the West. It is quite compatible with the conditions in Russia. Presently, over 1 million convicted persons are in the correctional system; about 300-400 thousand are in detention pending investigation. They are starving; many are seriously ill, they get involved in the criminal environment and, after the sentence, are unable to overcome crime. The idea of a rehabilitating justice is as follows: the victim and the accused, in presence of a psychologist, pedagogue, or other qualified professional, and upon an approval by the investigator, public prosecutor, or court, are engaged in a reconciliatory discussion, explaining to each other what had happened, what motivated the criminal, and whether he understands the extent of the harm inflicted upon the victim; and whether he is ready to voluntarily compensate the victim for the harm. On the other hand, the victim, having listened to the accused, softens and is ready to forgive him a lot. The reached reconciliation is recorded in an agreement, which is then approved by the investigator, public prosecutor, or judge; the criminal case is closed, and the accused does not get sentenced. This method of social conflicts resolution had been tested and has shown very positive results.

I.L. Petrukhin
Doctor of Jurisprudence, Professor,
Member of the Commission for the Judicial
Reform under the President of the RF and
State Duma of the RF

"Zakonodatelstvo", No. 3, March 2001.

## Реформа уголовного судопроизводства: проблемы и перспективы

**1. Отставание процессуальных форм.** Нормы материального права обретают жизнь в процессуальных формах. Но в ходе судебной реформы в России наметился перекос: приняты новые <u>Гражданский</u>, <u>Уголовный</u> и <u>Уголовно-исполнительный кодексы</u>, однако действуют прежние <u>Гражданский процессуальный</u>, <u>Уголовно-процессуальный кодексы</u> и <u>Кодекс РСФСР об административных правонарушениях</u>. Таким образом, налицо отставание в разработке судебных процедур, препятствующее применению норм материального права. Недооценка значимости процедур влечет ущемление прав человека.

**2. О задачах судебной реформы.** Распространено мнение, согласно которому судебная реформа проводится в целях борьбы с преступностью. Но это односторонняя трактовка ее целей. Суд не раскрывает преступлений. На основе исследования доказательств он лишь фиксирует, раскрыто преступление или нет. Важнейшая задача суда - защита прав и законных интересов граждан (прежде всего обвиняемого и потерпевшего) от возможных противозаконных действий, ошибок и заблуждений правоохранительных органов. Судебные гарантии затрудняют работу следствия, но предупреждают осуждение невиновных. В то же время, вынося законные и обоснованные обвинительные приговоры, суд способствует сдерживанию преступности. От понимания и решения этих проблем зависит карательный или правозащитный характер судебной реформы.

**3. О реализации Концепции судебной реформы.** В соответствии с Концепцией судебной реформы (1991 г.) в <u>УПК</u> РСФСР предусмотрены: обжалование в суд арестов (1992 г.); регламентация производства в суде присяжных (1993 г.); определение порядка рассмотрения уголовных дел мировыми судьями, апелляционного обжалования их приговоров (2000 г.). Остальные новации носили преимущественно частный характер. При этом надо иметь в виду, что число удовлетворенных судами жалоб с просьбами об отмене арестов в результате сильнейшего давления правоохранительных органов постепенно снижалось (в 1994 г. было удовлетворено 20% жалоб, в 2000 г. - лишь 15%); суды присяжных учреждены только в 9 субъектах федерации и в последнее время подвергаются гонениям (подробнее об этом будет сказано далее); производство в мировых судах находится лишь в стадии становления.

По отношению к основным положениям Концепции судебной реформы ситуация развивалась и в противоположном направлении. В сущности, ликвидирована стадия предания суду (1992 г.) с ее распорядительными заседаниями по многим категориям дел. Судья получил право принимать ответственные решения по делу (например, о его прекращении) единолично и вне официального заседания, что создает благоприятные условия для злоупотреблений и коррупции и позволяет передавать на стадию судебного разбирательства некачественно расследованные дела. Резко сужена коллегиальность при рассмотрении дел в судах первой инстанции (1992 г.). Увеличена предельная продолжительность арестов на предварительном следствии с полутора до двух лет (1996 г.) и т.д.

Основной источник уголовно-процессуального права - <u>УПК</u> РСФСР - был принят 40 лет назад и существенно устарел. В него было внесено более 400 дополнений и изменений, в основном частного характера. Проект УПК РФ был принят Государственной Думой РФ в первом чтении 6июня 1997 г., но его доработка может тянуться сколь угодно долго.

Развитие уголовно-процессуального права в демократическом направлении шло по двум каналам:

а) посредством прямого действия Конституции РФ, принятой в 1993 г. (обжалование в суд ряда постановлений следователя и прокурора, судебный порядок санкционирования некоторых следственных действий и др.);

б) через постановления Конституционного Суда РФ, благодаря которым устаревшее уголовно-процессуальное право приводилось в соответствие с <u>Конституцией</u> РФ (Конституционный Суд принял 18 таких постановлений, однако его возможности ограничены

тем, что он не вправе выходить за пределы требований, содержащихся в поданных жалобах и запросах).

4. Ситуация в сфере отправления правосудия по уголовным делам может быть охарактеризована как кризисная.

Из-за недостаточного финансирования судебной системы в судах нет достаточных средств для оплаты командировок, вызова свидетелей и потерпевших, проведения экспертиз, аренды помещений, ремонта зданий, доставки топлива, почтовых расходов, оплаты коммунальных услуг. В связи с этим вопреки ст.124 Конституции РФ финансирование судов явно или скрыто производится не только из федерального бюджета, но и из средств субъектов федерации, что ставит суды в зависимость от местной власти.

Отсутствие или недостаток в судах оргтехники затрудняет составление и копирование приговоров, протоколов судебных заседаний, других документов, что в свою очередь порождает волокиту и массовые нарушения процессуальных сроков, влекущие ущемление прав и интересов участников судопроизводства.

С нарушением установленных законом процессуальных сроков в 1999 г. было рассмотрено 275851 уголовное дело (21,7% от всех дел), в том числе со сроком рассмотрения в суде до 3 месяцев - 150122, от 3 до 6 месяцев - 93382, свыше 6 месяцев - 74926 уголовных дел.

Судебная волокита ограничивает доступ граждан к правосудию и вызывает возмущение общественности. Люди месяцами стоят в очередях, чтобы попасть на прием к судье. Компрометируется идея "своего судьи", к которому можно было бы беспрепятственно обратиться - так же, как к своему врачу или своему адвокату. У граждан формируется представление о суде как об учреждении карательно-бюрократического типа.

Неудовлетворительное финансирование судов не позволяет решить проблему судейских кадров и снизить до нормы непомерную нагрузку судей, отрицательно влияющую на качество их работы. В стране отмечается интенсивный рост преступности, соответственно увеличивается число уголовных дел. Если в начале перестройки (1988 г.) было зарегистрировано 1220361 преступление и осуждено 427039 лиц, то в 1998 г. эти показатели составили соответственно 2581940 и 1070336, а в 1999 г.- 3001748 и 1276000. Таким образом, за рассматриваемый период преступность и судимость выросли почти в три раза. К тому же в 1999 г. судами было рассмотрено около 5 млн гражданских дел, 1824775 материалов об административных правонарушениях, 80271 жалоба на незаконность и необоснованность арестов, а также их продление. Динамика роста преступности и судимости явно не соответствовала увеличению численного состава судей. Указом Президента РФ от 30 декабря 1999 г. штатная численность судей увеличена на 1000 единиц и на начало 2000 г. составила 16742 судьи*(1).

По мнению Председателя Верховного Суда РФ В.М.Лебедева, для нормальной работы необходимо увеличить штатную численность судей до 53,7 тыс., т.е. в 2,4 раза, а штат работников аппарата судов - в 4-5 раз*(2). Эти цифры надо скорректировать в большую сторону с учетом создания административной юстиции. В России один судья приходится на 9,5 тыс. населения, тогда как во Франции - на 6, в ФРГ - на 4 и в Англии - на 3 тыс. Отсюда более чем высокая нагрузка, приходящаяся в среднем на одного районного судью: 9,3 уголовных, 36,2 гражданских дел и 15,2 материалов об административных правонарушениях (приведены данные за первую половину 2000 г.). Высокая нагрузка и недостаточная зарплата делают работу судьи малопривлекательной. Поэтому на начало 2000 г. оставались вакантными 2130 судейских должностей. К ним надо прибавить 5-6 тыс. вакантных должностей мировых судей.

При этом судьями работают не самые способные выпускники юридических вузов. Указанную должность может занять лицо с высшим юридическим образованием, которому исполнилось 25 лет. Возраст выпускников вузов - примерно 22 года. Лучшие из них устраиваются на хорошо оплачиваемую работу и в дальнейшем в суды не идут. Менее способные меняют места работы и по достижении 25-летнего возраста некоторые из них становятся судьями. Чтобы ситуация изменилась, надо сделать судебную работу более

престижной, а зарплату судей достаточно высокой (например, в дореволюционной России должности окружного судьи и судебного следователя соответствовали IV классу и приравнивались к званию армейского полковника)*(3). Желательно также снизить возрастной ценз для лиц, претендующих на должность мирового и районного судей, а также ввести должность кандидата на судебную должность.

Явно недостаточные штаты судов не позволяют судьям обеспечить качественное разрешение всех уголовных дел. В 1999 г. было отменено в кассационном и надзорном порядке 2,2% от общего количества приговоров районных (городских) судов и изменено 1,7% приговоров этих судов. Таким образом, 3,9% приговоров были ошибочными. Число отмененных и измененных в 1999 г. приговоров высших судов субъектов федерации составило 11,7%. На самом деле число судебных ошибок гораздо больше, так как не все незаконные и необоснованные приговоры выявляются и отменяются (изменяются). Исследования, имеющие цель определить долю невыявленных (латентных) судебных ошибок, не проводятся*(4).

5. **Состязательность судопроизводства.** Этот принцип, впервые введенный Конституцией РФ 1993 г. (ч.3 ст.123), до сих пор не стал основополагающим в российском уголовном процессе, который вследствие этого сохраняет некоторые черты инквизиционного.

Состязательность - форма организации уголовного судопроизводства, для которой характерны: строгое расчленение функций обвинения, защиты и разрешения дела между прокурором (частным обвинителем), обвиняемым (защитником) и судом; равноправие сторон обвинения и защиты; разбирательство дела путем полемики сторон перед независимым и беспристрастным судом.

Неверным представляется утверждение противников состязательности о том, что стороны и суд объединены стремлением к одной цели - истине. Подсудимого и защитника вполне устраивает ситуация, когда преступление не раскрыто, истина не установлена. Ведь при недоказанной виновности обвиняемый считается невиновным. А вот прокурор должен доказать суду, что им установлена виновность подсудимого. При неумении прокурора доказать истину суд не должен приходить ему на помощь. Судьям уместно воздерживаться от постановки вопросов как обвинительного, так и оправдательного характера, чтобы никто не мог заподозрить их в симпатиях к обвинителю или обвиняемому. Отсюда - пассивность суда как атрибут состязательного процесса. Но пассивность лишь в исследовании доказательств, а не в руководстве судебным разбирательством. Активная роль суда в исследовании доказательств - достояние инквизиционного процесса.

Одна из задач судебной реформы - резко ограничить начало публичности в деятельности суда, приводящее к тому, что суд принимает на себя функцию обвинения. Из нашего уголовного процесса (всего, а не суда присяжных) должно быть изгнано правило, согласно которому судья и народные заседатели могут допрашивать подсудимых, потерпевших, свидетелей в любой момент судебного следствия, в том числе и до того, как они будут допрошены сторонами (ст.280, 283, 287 УПК РСФСР). Это никак не согласуется с состязательностью судебного процесса, поскольку судья и заседатели волей-неволей задают вопросы, изобличающие подсудимого в совершении преступления, т.е. выполняют функцию обвинения. Это почти неизбежно в ситуациях, когда прокурор не поддерживает публичное обвинение в суде. И таких случаев много: если в 70-80-х годах прокуроры поддерживали обвинение в 80-85% уголовных дел, то теперь, ссылаясь на перегруженность работой, они участвуют лишь в 40% уголовных дел. В отсутствие прокурора судья становится обвинителем, и судебный процесс перестает быть состязательным. Необходимо возложить на прокуратуру обязанность поддержания обвинения в судах по всем уголовным делам публичного обвинения, освободив ее от общенадзорных функций (это компетенция административной юстиции). Но тогда возникает проблема значительного расширения адвокатуры, так как в случае, если обвинение поддерживает прокурор, закон предусматривает непременное участие в суде защитника (ст.48 УПК РСФСР).

Суд не должен по своему усмотрению устанавливать порядок исследования доказательств (ст.279 УПК РСФСР), перемежая доказательства обвинения и защиты, а также доказательства, характеризующие личность подсудимого. Сначала должны быть исследованы доказательства обвинения, потом - защиты. Изучением же личности подсудимого следовало бы заниматься после установления его виновности, как это делается в суде присяжных.

Необходимо уравнять стороны, а именно: отказаться от положения ст.245 УПК РСФСР, где говорится об их равенстве лишь в представлении доказательств, участии в их исследовании и заявлении ходатайств; отменить положения ст.248 и 249 УПК РСФСР, согласно которым прокурор дает заключения по возникающим во время судебного разбирательства вопросам, тогда как защитник высказывает только мнения; отменить ст.25 УПК РФ в той части, где установлено, что прокурор обязан своевременно принимать предусмотренные законом меры к устранению всяких нарушений закона, от кого бы они ни исходили, будь то суд, защитник или другой участник процесса. Прокурор, как и защитник, должен подавать в вышестоящий суд жалобы, а не протесты. Задачи прокурора надо ограничить поддержанием в суде государственного обвинения, руководством следствия и предъявлением в суд исков в защиту граждан по их просьбам. Именно так были обрисованы процессуальные функции прокурора в проекте Конституции РФ, одобренном Конституционным совещанием летом 1993 г. Но в дальнейшем Президент РФ Б.Н.Ельцин по требованию бывшего Генерального прокурора РФ А.И.Казанника изменил текст ст.129 проекта Конституции РФ, изъяв из него всякое упоминание о функциях прокуратуры, и в таком виде Основной Закон был принят. Для формулирования предлагаемых функций прокуратуры достаточно внести коррективы в Федеральный закон "О прокуратуре Российской Федерации" (в редакции 1995 г.).

На основе принципа состязательности должны строиться кассационное и надзорное производства. Прокурор, принесший кассационный протест (чаще всего это помощник прокурора района, города), должен сам его и поддерживать, а не надеяться на то, что этим будут заниматься работники областной (краевой) прокуратуры. В порядке надзора следовало бы приносить не протесты, а подавать жалобы, причем такое право должно быть предоставлено обеим сторонам. Заключение о возможности рассмотрения дела по жалобе давала бы коллегия из трех судей надзорной инстанции.

Нужно изменить процессуальный порядок рассмотрения дел кассационными и надзорными инстанциями, сделав его состоятельным. Указанный порядок мог бы быть следующим:

сначала выступает, представляя доказательства и новые материалы, сторона, обратившаяся с жалобой, затем - противоположная сторона (предварительный доклад судьи, полагаю, не нужен);

возможно исследование доказательств, и тогда суд кассационной (надзорной) инстанции объявляет, что он рассматривает дело в апелляционном порядке;

далее следуют судебные прения и последнее слово подсудимого;

процедура завершается вынесением судом кассационного (надзорного) определения, а если дело слушалось в апелляционном порядке - приговором суда.

В настоящее время нет четкого размежевания функций в стадии надзорного производства. Председатели вышестоящих судов "состязаются" с прокурорами в принесении протестов на оправдательные приговоры, мягкость наказания и применение менее сурового, чем нужно, уголовного закона (ст.371 УПК РСФСР). Закон, допускающий такую практику, следует отменить, поскольку представитель судебной власти не должен выполнять обвинительные функции - приносить протесты не в пользу осужденного (оправданного), рассматривать в составе суда свои собственные протесты и принимать решения об их удовлетворении.

Внедрение принципа состязательности в российское судопроизводство происходило благодаря Конституционному Суду РФ, который принял с этой целью ряд важных постановлений (о праве потерпевшего выступать в прениях сторон, об отсутствии у суда

права на возбуждение уголовных дел, о недопустимости возвращения уголовных дел для доследования по инициативе суда, о недопустимости продолжения судебного разбирательства и вынесения обвинительного приговора при отказе прокурора от обвинения, об участии осужденного и оправданного в заседаниях вышестоящих судов и др.). Эти постановления Конституционного Суда РФ должны быть без промедления учтены законодателем.

6. Суд присяжных введен в нашей стране законом от 16 июля 1993 г.*(5), затем его статус был закреплен Конституцией РФ (ст.20, ч.2 ст.47, ч.4 ст.123), поэтому мнение о временном, экспериментальном характере суда присяжных несостоятельно. Речь идет о поэтапном учреждении суда присяжных во всех регионах России. Пока он существует лишь в девяти субъектах федерации, чем нарушается принцип равенства граждан перед законом и судом (ч.1 ст.19 Конституции РФ).

Преимущества суда присяжных несомненны и очень существенны: меньшая вероятность судебной ошибки, особенно в отношении невиновного; независимость и некоррумпированность присяжных (на каждого из 12 заседателей оказать преступное воздействие практически невозможно); сравнительно широкое участие народа в отправлении правосудия; отсутствие бюрократического, чиновничьего духа; свобода присяжных от стереотипов и стандартов, сложившихся под влиянием установки на сотрудничество с обвинительной властью; подлинно гласное и состязательное производство; рост социальной активности граждан, их ответственности за судьбы других людей и общества в целом; вклад в развитие гуманистических правовых начал российского законодательства.

Учитывая изложенное, все большее число граждан предпочитает суд присяжных другим формам судопроизводства. Растет количество ходатайств о рассмотрении дел судом присяжных: 1994 г. - 20,4%; 1995 г. - 30,9%; 1996 г. - 37,3%; 1997 г. - 36,8%; 1998 г. - 43,2%; 1999 г. - 44,0% от всех дел, подсудных суду присяжных. Увеличивается также количество дел, рассмотренных судом присяжных: 1994 г. - 241, 1995 г. - 544, 1996 г. - 618, 1997 г. - 825, 1998 г. - 800, 1999 г. - 867.

Существуют и противники суда присяжных. По их мнению, этот суд излишне либерален, не соответствует российской правовой традиции, не способен решительно бороться с преступностью.

Действительно, суды присяжных выносят примерно 20% оправдательных приговоров, тогда как прочие суды - только 0,4%, и это раздражает руководителей правоохранительных органов. Ведь почти каждый оправдательный приговор - это свидетельство необъективности и неполноты расследования, отсутствия достаточных оснований для арестов, обысков и других принудительных мер, ограничивающих конституционные права граждан. Присяжные не рассматривают доказательства, добытые на предварительном следствии с нарушением закона, а оставшихся доказательств во многих случаях недостаточно для вынесения обвинительного приговора. В суде присяжных существуют наиболее благоприятные условия для выявления ошибок и злоупотреблений со стороны следствия. Но эти либеральные тенденции сдерживает Кассационная Палата Верховного Суда РФ, отменяя гораздо большее число оправдательных, чем обвинительных приговоров судов присяжных. Так, в 1996 г. она отменила 30,7% оправдательных приговоров судов присяжных и 20,6% - обвинительных, а в 1997-2000 гг. отменено около 50% оправдательных и лишь 15-16% обвинительных приговоров. Таким образом, Верховный Суд РФ в унисон с правоохранительными органами стремится уменьшить число оправдательных приговоров, но оно остается стабильным, поскольку качество предварительного следствия, очевидно, не улучшается.

Противники суда присяжных прибегли к своеобразной тактике: многие из них уже не выступают против суда присяжных открыто, но пытаются фактически избавиться от этого суда, резко сократив его подсудность. В настоящее время к подсудности суда присяжных относятся дела, рассматриваемые областным (краевым) судом - это 47 уголовно-правовых составов (ст.36 УПК РСФСР). Однако в соответствии с проектом УПК РФ, принятом в первом

чтении Государственной Думой, в их подсудности остается только пять составов с наказаниями в виде смертной казни или пожизненного лишения свободы (квалифицированные виды убийства и геноцид). Так, "втихую", пытаются расправиться с этим демократическим институтом.

Представляется, что необходимо предпринять следующее:

а) сохранить суд присяжных, учредив его во всех субъектах федерации (об этом говорится в п.6 Заключительных и переходных положений Конституции РФ, которые спустя 7 лет после ее принятия должны быть, наконец, реализованы)*(6);

б) сохранить ныне существующую подсудность дел суду присяжных;

в) сохранить традиционно российскую модель суда присяжных (1 судья и 12 присяжных), введенную еще Уставом уголовного судопроизводства 1864 г.;

г) ввести строгую материальную и иную ответственность присяжных заседателей, не являющихся по вызовам суда, а также лиц, препятствующих их явке (в настоящее время в суд являются лишь 15-20% лиц, вызванных в качестве присяжных заседателей, что препятствует отправлению правосудия);

д) возложить контроль за составлением списков присяжных заседателей на должностных лиц областной (краевой) администрации, специально учреждаемых для выполнения этой обязанности (в настоящее время в списки присяжных заседателей включаются многие лица, которые, согласно закону, не могут выполнять эти обязанности);

е) в суде присяжных рассматривать только те уголовные дела, по которым подсудимые не признают себя виновными, а по остальным делам предоставить право судье областного (краевого) суда назначать наказание без проведения или с ограниченным проведением судебного следствия (такой порядок существует в англо-американской системе права, и он вполне себя оправдывает, избавляя суды от рассмотрения бесспорных дел);

ж) увеличить число "запасных" заседателей до 3-4, имея в виду, что некоторые судебные процессы очень длительные;

з) изменить действующий закон, усилив состязательное начало в деятельности суда присяжных.

Действующий закон установил, что в суде присяжных после дачи показаний подсудимым первым его допрашивает государственный обвинитель, потом - потерпевший и лишь в конце - защитник (ч.2 ст.446 УПК РСФСР). Это правило не согласуется с принципом состязательности. Подсудимый, согласившийся давать показания, - это свидетель защиты, и первым его должен допрашивать защитник. В законе от 16 июля 1993 г. не говорится о том, в каком порядке вести судебное следствие. Всех подсудимых, свидетелей, потерпевших, экспертов первым допрашивает прокурор, тогда как в соответствии с принципом состязательности подсудимых и свидетелей защиты первым должен допрашивать защитник. Судебное следствие не расчленено на этапы представления доказательств обвинения и защиты, нет деления доказательств на доказательства обвинения и доказательства защиты.

Очевидно, нужен новый закон о суде присяжных (или новый раздел УПК), основной идеей которого должна стать состязательность. Открывать судебное следствие должны вступительные выступления обеих сторон. Судебное следствие надо четко разделить на два этапа: представление доказательств стороной обвинения и представление доказательств стороной защиты. Допросы желательно вести по принципу: "вопрос - ответ". Необходимо ввести понятия "допрос", "перекрестный допрос", "передопрос" и допустить проведение "параллельной" (состязательной) экспертизы.

Единый дух должен пронизывать все формы судопроизводства. Поэтому все они должны быть построены таким образом, чтобы состязательность была основополагающим принципом российского правосудия.

7. Сокращение судебного следствия и "сделки" о признании вины. В соответствии со ст.446 УПК РСФСР, определяющей порядок рассмотрения дел в суде присяжных, добровольное признание подсудимым вины позволяет ограничить судебное следствие лишь допросами подсудимых при наличии следующих условий: сделанные признания не оспариваются ни одной из сторон; признания не вызывают сомнений у судьи; все участники

процесса согласны с отказом от дальнейшего проведения судебного следствия. При наличии этих же условий допускается ограничение судебного следствия лишь допросами подсудимого и потерпевшего в мировом суде.

Эти правила желательно распространить на производство во всех остальных судах, что ускорит рассмотрение уголовных дел и позволит судам сосредоточиться на тех делах, в которых подсудимый отрицают свою вину. Необходимо признать, что нормальный дееспособный человек свободен в своих суждениях и поступках, не склонен ко лжи и самооговору (презумпция добропорядочности). Суд имеет достаточно возможностей при наличии сомнений не принять ложное признание вины и провести судебное следствие в полном объеме.

Что касается "сделок" о признании вины, то этот специфически американский институт вряд ли приемлем для современной России, хотя Совет судей РФ в постановлении от 3 апреля 1998 г. высказался за введение такого рода "сделок"*(7). Аналогичное решение принял V Съезд судей РФ 29 ноября 2000 г.

В США "сделки" о признании вины состоят в том, что прокурор договаривается с адвокатом о признании подсудимым части обвинений в обмен на смягчение наказания, причем в заключении такого соглашения участвует и судья. В условиях России это могло бы привести к отказу от раскрытия многих преступлений, прежде всего тяжких и особо тяжких, росту преступности и рецидива, искажению криминальной статистики, но самое главное - к поощрению коррупции в правоохранительных органах, судах и адвокатуре. "Сделки" унизят следователя, прокурора и судью, поскольку им придется вести торг с преступником, лишь отчасти признающим свою вину. Судья не может обещать, что наказание будет смягчено, так как с ним могут не согласиться заседатели. Будет причинен вред законным интересам потерпевших, не участвующих в "сделках". Экономя на "сделках", государство потеряет гораздо больше от необходимости вести борьбу с преступностью, которая многократно возрастет благодаря применению такого метода разрешения уголовных дел. Кстати, и в США судьям федеральных судов запрещено участвовать в "сделках" о признании вины, а без их участия выполнение договоренности между сторонами обвинения и защиты ничем не гарантировано.

В новых условиях - в связи с учреждением суда присяжных, не обязанных мотивировать свой вердикт, сокращением судебного следствия и намерением ввести "сделки" о признании вины - разработчики УПК не рассматривают достижение истины как задачу уголовного судопроизводства. По их мнению, такой подход характерен лишь для инквизиционного процесса. Например, судья С.А.Пашин заявляет: "Я, как судья, занимаюсь не поисками истины..."*(8). Однако истина вполне совместима с состязательным порядком судопроизводства ("истина рождается в споре") и отказываться от попыток найти ее создателям нового УПК не следует.

8. **Контроль суда за предварительным расследованием.** В соответствии с Конституцией РФ суд контролирует предварительное расследование, санкционируя проведение следственных действий, связанных с ограничением конституционных прав и свобод граждан (ст.22, 23, 25), и рассматривая жалобы на незаконные действия и решения должностных лиц, ведущих расследование и надзирающих за ним (ст.46).

Однако эти положения Основного Закона до сих пор не реализованы. В соответствии со ст.22 Конституции РФ и ст.5 Конвенции о защите прав человека и основных свобод*(9) (далее - Конвенция), ратифицированной Россией в 1998 г., необходимо установить, что заключение под стражу и продление задержания на срок более 48 часов допускаются только по судебному решению.

В связи с этим Государственная Дума должна снять выдвинутую ею при ратификации Конвенции оговорку о том, что в России аресты будут по-прежнему санкционироваться прокурорами. Необходимо снять и другую оговорку, согласно которой в России пока не будет применяться правило ст.5 Конвенции, в соответствии с которым каждый задержанный или арестованный должен быть без промедления доставлен в суд для проверки законности и обоснованности задержания (ареста).

Судебный порядок выдачи ордера (приказа) об аресте и правило о немедленном доставлении задержанного (арестованного) к судье существуют во всех цивилизованных странах. Преимущество такого подхода в том, что решение следователя и прокурора об аресте и действия полиции при задержании проверяются органом, не зависящим от следствия и прокурорского надзора. Судья не отвечает за раскрываемость преступлений и качество следствия, он не связан обвинительной установкой и узковедомственными интересами и поэтому способен наилучшим образом защитить права граждан.

Подлежит отмене ст.174 УПК РСФСР, согласно которой санкцию на арест, осмотр и изъятие почтово-телеграфной корреспонденции дает прокурор, тогда как согласно ст.23 Конституции РФ это процессуальное действие может быть проведено только по судебному решению. То же следует сказать и о прослушивании телефонных и иных переговоров с применением технических средств, поскольку имеется законопроект о включении такого следственного действия в действующий УПК.

Противоречит Конституции РФ и подлежит отмене ст.168 УПК РСФСР, предусматривающая получение прокурорской санкции на обыск. Прокуратура с такой позицией не согласна и продолжает практику санкционирования обысков, ссылаясь на то, что норма ст.25 Конституции сформулирована в виде альтернативы: вхождение в жилище вопреки воле проживающих в нем лиц допускается либо на основании закона, либо на основании судебного решения. Такая формулировка логически небезупречна, так как судебное разрешение провести обыск тоже должно быть основано на законе. Ни Конституция, ни УПК не указывают, когда вхождение в жилище производится на основании закона (в данном случае - ст.168 УПК РСФСР) и когда - на основании судебного решения. Но обыск - самое серьезное и грубое вторжение в частную жизнь граждан. И если для проведения указанного действия не требуется судебного решения, то возникает вопрос: когда же такое решение может понадобиться? Изложенное не исключает возможности проведения обыска без судебного решения в неотложных случаях, прямо указанных в законе.

Удивляет пассивность законодателя, который до сих пор не привел УПК РСФСР в соответствие с Конституцией РФ и многими постановлениями Конституционного Суда РФ (например, о признании неконституционными ряда положений ст.248, 255, 335, 371 УПК РСФСР и др.). В связи с этим желательно принятие закона, который устанавливал бы срок, в течение которого Государственная Дума РФ должна отменять или изменять законы, признанные противоречащими Конституции РФ.

К судебной юрисдикции следовало бы также отнести принятие решений, разрешающих:

1) помещение обвиняемого на экспертизу в психиатрическое учреждение;
2) производство выемки предметов и документов в жилище;
3) домашний арест (если он будет предусмотрен УПК РФ);
4) отстранение обвиняемого от должности (или работы);
5) наложение ареста на имущество обвиняемого.

Судебный контроль за расследованием в виде разрешения судьей жалоб обвиняемого, защитника, других участников процесса на незаконные действия и решения следователя и прокурора (ст.46 Конституции РФ) должен охватывать не некоторые (как предусмотрено проектом УПК), а все действия и решения. В этом случае предварительное расследование будет построено по состязательному типу. Понадобится ввести должность следственного судьи, который будет рассматривать такие жалобы и выдавать решения о производстве названных ранее следственных действий. В этом случае штаты судов следовало бы расширить при одновременном сокращении прокурорских кадров, занимающихся этой работой в настоящее время.

Процесс демократизации российского уголовного судопроизводства идет с большим трудом, наталкиваясь на сопротивление силовых ведомств, отчасти судов. Яркий пример - судьба законопроекта "О внесении изменений и дополнений в Уголовно-процессуальный кодекс РСФСР".

Законопроект преследовал цель привести УПК РСФСР в соответствие с Конституцией РФ и постановлениями Конституционного Суда РФ. В частности, предусматривался судебный (вместо прокурорского) порядок выдачи санкций на аресты, на помещение обвиняемых в психиатрические учреждения для проведения экспертизы, на обыски, выемки и осмотры в жилищах граждан, на отстранение обвиняемого от должности, на арест, осмотр и изъятие почтово-телеграфной корреспонденции, а также доставление в течение 48 часов каждого задержанного к судье для проверки законности и обоснованности задержания и решения вопроса о мере пресечения. Предусматривалось также обжалование в суд действий и решений органа дознания, следователя и прокурора, способных причинить ущерб конституционным правам и свободам участников процесса либо затруднить доступ граждан к правосудию.

Президент РФ В.В.Путин внес названный проект на рассмотрение в Государственную Думу РФ 5 января 2001 г. Однако 19 января 2001 г. Президент РФ отозвал свой законопроект, в качестве причины указав, что для его реализации потребуется увеличение штатной численности судей и аппарата судов на 9900 человек и выделение из федерального бюджета 1,55 млрд руб. ежегодно. Решение от 19 января 2001 г. было основано на справке Судебного департамента при Верховном Суде РФ, который скрупулезно подсчитал, какие дополнительные суммы понадобится выделить на зарплату судьям и сотрудникам аппарата судов, на ремонт зданий и даже... на горюче-смазочные материалы и коммунальные услуги (и т.п.), если президентский законопроект будет принят.

Представляется, однако, что воспрепятствование принятию законопроекта в действительности вызвано не столько финансовыми, сколько политическими и прагматическими соображениями.

Экономическая проблема, поставленная президентсюм законопроектом, не так уж сложна. В настоящее время определенный объем работы, которую планировалось возложить на суды (санкционирование арестов, обысков, других следственных действий), выполняет прокуратура. Необходимо передать эти функции судам, сократив соответственно штаты прокуратуры. Численность работников прокуратуры в России - около 50 тыс., численность судей - примерно 18 тыс. Если из одного органа в другой передать несколько тысяч штатных единиц, то проблема будет решена без дополнительных расходов.

Или мы решим эту проблему, или будем вынуждены признать, что наша Конституция-фикция, а наш Конституционный Суд - никому не нужное заведение.

9. **Апелляция.** В соответствии с Конвенцией (ст.6) каждый осужденный имеет право на пересмотр его дела судом второй инстанции. Речь идет об апелляции, для которой характерно исследование доказательств, в том числе и тех, которые анализировались в суде первой инстанции. Для ускорения судопроизводства и усиления борьбы с преступностью Россия в свое время отказалась от апелляции (УПК РСФСР 1922 г.) и заменила ее кассацией, т.е. проверкой законности и обоснованности приговора лишь по письменным материалам дела без непосредственного исследования доказательств и вынесения нового приговора. Но проверить соответствие выводов суда собранным по делу доказательствам, оценить их достоверность невозможно только по письменным материалам дела без проведения нового судебного следствия. Таким образом, институт кассации в том виде, в каком он был учрежден в РСФСР, пришел в противоречие со ст.6 Конвенции и должен быть заменен апелляцией, если речь не идет об исправлении чисто правовой ошибки. Некоторые юристы предлагают ввести урезанную апелляцию, и эта идея нашла воплощение в проекте УПК РФ, находящемся на рассмотрении в Государственной Думе РФ. В связи с этим необходимо подчеркнуть, что без согласия защиты сокращенное исследование доказательств в апелляционной инстанции не должно допускаться.

В зависимости от того, касается ли жалоба (протест) вопросов факта (обоснованности приговора) или права (законности приговора), одна и та же вышестоящая судебная инстанция могла бы рассматривать дело по правилам апелляции или кассации.

Федеральным законом РФ от 7 августа 2000 г. N 119-ФЗ введено апелляционное обжалование приговоров, вынесенных мировыми судьями, в районный суд, где

*(10) См.: Зер. Х. Восстановительное правосудие: новый взгляд на преступление. М., 1998.

# HERRICK, FEINSTEIN LLP

A NEW YORK LIMITED LIABILITY PARTNERSHIP INCLUDING NEW YORK PROFESSIONAL CORPORATIONS

104 CARNEGIE CENTER
PRINCETON, N.J. 08540-6232

2 PENN PLAZA
NEWARK, N.J. 07105-2245

III WASHINGTON AVENUE
ALBANY, N.Y. 12210-2210

2 PARK AVENUE

NEW YORK, N.Y. 10016-9301

TELEPHONE: (212) 592-1400
FACSIMILE: (212) 592-1500
WEB: www.herrick.com

RAYMOND N. HANNIGAN
PARTNER
(212) 592-1462
EMAIL: rhann@herrick.com

February 25, 2003

BY HAND

Honorable John G. Koeltl
United States District Judge
United States District Court - S.D.N.Y.
500 Pearl Street - Room 1030
New York, New York 10007

      Re:   *Base Metal Trading, S.A. et al. v. Russian Aluminum et al.*
                Docket No. 00 Civ. 9627 (JGK)

Dear Judge Koeltl:

      This firm represents the Vanadium Plaintiffs in the above-referenced matter. We write in response to the letter dated February 20, 2003 of Mr. Peter Venaglia, counsel to defendants (and United States entities) New Start Group Corp., Venitom Corp., Unidale, LLC and Investland, LLC (the "GOK Defendants' Letter"). In that letter, Mr. Venaglia raises objections to the charts that were submitted by the Vanadium Plaintiffs in connection with the February 10, 2003 oral argument. None of these objections has merit.

      First, Mr. Venaglia claims that the charts "inexplicably fail to address most of the decisions already issued by the Russian courts which have considered and decided many of the matters raised by Plaintiffs' Second Amended Complaint," such as decisions relating to the January 28, 2000 GOK board of directors' meeting, and the March 4, 2000 meeting by which Defendants' agent, Andrei Kozitsin, was elected as the general director of GOK. GOK Defendants' Letter at 1-2. What Mr. Venaglia neglects to mention, however, is that the Vanadium Plaintiffs were <u>not</u> parties to nearly all of the GOK-related decisions referenced in his letter, and thus, those decisions could have no preclusive effect on them. In addition, due to their illegal conduct, the Defendants prevailed in all but one of the cases in which the Vanadium Plaintiffs were parties.

      Moreover, the real purpose of Mr. Venaglia's objection is to mislead the Court into believing that proof of the Vanadium Plaintiffs' case requires an exhaustive review of Russian court decisions and 142 Russian laws, which simply isn't true. At the end of the day, and contrary to Mr. Venaglia's suggestion, the Vanadium Plaintiffs need not prove that Mr. Kozitsin was illegally elected or address complicated legal issues; rather, the Vanadium Plaintiffs can show that immediately after Mr. Kozitsin was elected, he created undeniably sham debts which were

accepted in bankruptcy by the corrupted external manager, Oleg Kozyrev, who concealed his relationship with Defendants, in order to permit Defendants to control GOK.

Further, the charts do not identify *every* decision concerning the GOK plant because this is not what the Court requested. They do, however, address those decisions "affecting the parties," which in the case of the Vanadium Plaintiffs' claims, concern the sham GOK bankruptcy and the theft of the Vanadium Plaintiffs' shares.[1] As for Mr. Venaglia's claim that the Vanadium Plaintiffs prevailed in "many of the decisions not addressed by the Plaintiffs' charts," this is simply untrue: were this the case, the sham settlement agreement providing for payment in rubles without interest from 2006 through 2014 would not have been approved in the corrupted bankruptcy. Similarly, the Vanadium Plaintiffs' GOK shares, which were transferred by court orders in proceedings in which they were not served or named as parties, would have been returned – something which has not occurred.

Mr. Venaglia's assertions concerning the Vanadium Plaintiffs' appellate rights and other alleged available remedies in Russia are equally meritless, and are addressed in: (a) the letter from Mr. Bernard, counsel to the Aluminum Plaintiffs, dated February 20, 2003, (b) the Declaration of the Honorable Sergey Borisovich Zaitsev, which accompanied that letter ("First Zaitsev Decl."), (c) the letter from Mr. Bernard dated February 25, 2003, (d) the Second Declaration of Victor Golubev, dated February 25, 2003 ("Second Golubev Decl."), and (e) the Second Declaration of the Honorable Sergey Borisovich Zaitsev ("Second Zaitsev Decl.").

As described in greater detail in the Golubev and Zaitsev Declarations, the Vanadium Plaintiffs do not have any meaningful appellate rights because any application to review corruption of a prior proceeding must be brought in the same arbitrazh court in which the corruption occurred and can only be commenced after the person who corrupted the proceedings has been convicted. And litigants are precluded from introducing evidence of corruption on the appeal if such evidence had not previously been introduced to the very court that litigant claims has been corrupted. See First Zaitsev Decl. ¶¶ 20-34; Second Zaitsev Decl. ¶¶ 5-21.

The Vanadium Plaintiffs face equally insurmountable hurdles in connection with appeals of bankruptcy rulings. See Second Golubev Decl. ¶¶ 47, 52-54. As for the availability of a RICO or analogous fraud claim, or a tortious interference claim, Judge Zaitsev demonstrates that no such remedies are available in Russia. See First Zaitsev Decl. ¶¶ 55-73. Finally, as set forth in the First Declaration of Joseph Traum and the Second Declaration of Jalal Khaidarov, the Vanadium Plaintiffs' key witnesses, who are cooperating with the US authorities, cannot travel to Russia because of threats made to their lives by Defendants.

---

[1]   On the subject of charts, it bears noting that item no. 1 on Defendants' Chart of the GOK Contracts -- contract no. SWER/07-99 -- incorrectly states that the parties chose the Arbitrazh Court of the City of Moscow as their forum. That agreement was amended on November 25, 1999, and provides for New York as the forum state. See Second Traum Dec. Ex. 4; Letter dated February 20, 2003, from James L. Bernard, Ex. B.

HERRICK, FEINSTEIN LLP

In short, no amount of maneuvering by Defendants can alter the fact that Russia is not an adequate alternative forum and that the Vanadium Plaintiffs, including three Americans, should be allowed to pursue their claims in this Court against Defendants, including eight Americans.

Respectfully submitted,

Raymond Hannigan

cc:     All Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
BASE METAL TRADING, SA, et al.,                              :

                Plaintiffs,                              :            Docket No. 00 CIV. 9627 (JGK)

        -against-                                             :

RUSSIAN ALUMINUM, et al.,                                    :

               Defendants.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

## Second Declaration and Exhibits of Victor Vasilyevich Golubev

A - 989

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BASE METAL TRADING S.A., et al.,                    Docket No. 00 Civ. 9627

Plaintiffs,

v.

RUSSIAN ALUMINUM, et al.,

Defendants.

---

## SECOND EXPERT REPORT OF VICTOR VASILYEVICH GOLUBEV

I, Victor Vasilyevich Golubev, pursuant to the provisions of 28 U.S.C. § 1746, hereby declare as follows:

### QUESTIONS PRESENTED

1.  I have been asked by counsel for plaintiffs to review rulings entered in the bankruptcies of NKAZ and GOK to determine:

a.      whether the March 12, 2001 decision of the Constitutional Court of the Russian Federation which held that the prohibition on appeals of certain rulings rendered in bankruptcy proceedings violated the Constitution permitted the retroactive appeal of rulings which entered into legal force and were enforced more than 30 days before the above decision was adopted; and

b.      whether an application for protest related to rulings or decisions rendered in the NKAZ and GOK closed bankruptcy cases would likely be granted by the Supreme Arbitrazh Court.

### CONCLUSIONS

2.  Based on my review, I conclude as follows:

a.    Rulings made in bankruptcies which entered into legal effect and were enforced more than 30 days before the above decision of the Constitutional Court invalidating the prohibition placed on appeals in bankruptcy proceedings did not become "retroactively" appealable;

b.    Given that there is no judicial practice where the Supreme Arbitrazh Court revised decisions and rulings rendered in closed bankruptcy cases, I believe that the likelihood of the Supreme Arbitrazh Court granting an application to bring a protest related to judicial acts rendered in the closed NKAZ and GOK bankruptcies determined on disputed issues of fact is practically nil.

## MATERIALS REVIEWED

3.  I have reviewed the materials which I reviewed in preparing my first declaration regarding the NKAZ Bankruptcy and related proceedings, and the various judicial acts related to the "GOK Bankruptcy" listed in the Declaration of Marina Telyukina, dated September 16, 2002.

4.  I have also reviewed an article by Defendants' expert Professor S. Zankovsky "Theory and Practice of Bankruptcy," *Izvestia*, Apr. 27, 2002 (Exhibit "1") and an article by Judge V. Anishina "Application of Decisions of the Constitutional Court of the Russian Federation by Courts of General Jurisdiction," *Rossiiskaya Yustitsya*, Oct. 26, 1999 (Exhibit "2").

5.  I will use the following terminology:  Arbitrazh Procedural Code of the Russian Federation enacted on July 1, 1995 (the "1995 APC"); Arbitrazh Procedural Code of the Russian Federation enacted on September 1, 2002 (the "2002 APC"); and the Federal

2

Law "On Insolvency (Bankruptcy) #6-FZ dated January 8, 1998" (the "1998 Bankruptcy Law").[1]

## DISCUSSION

6.   Prior to the Constitutional Court decision dated March 12, 2001 (the "March 12, 2001 Decision"), only a limited class of rulings by an arbitrazh court rendered in bankruptcy proceedings was subject to appeal.

7.   Pursuant to Art. 55 (3) of the 1998 Bankruptcy Law, "rulings by arbitrazh courts [for which appeal] is not provided for by the Arbitrazh Procedural Code of the Russian Federation may [only] be appealed in cases provided for by [the 1998 Bankruptcy] Law." (Exhibit "5").

8.   In other words, rulings of arbitrazh courts rendered in bankruptcy proceedings could only be appealed, and therefore, reversed, if directly provided by the 1995 APC or the 1998 Bankruptcy Law.[2]

9.   In its March 12, 2001 Decision, the Constitutional Court held that this prohibition on certain appeals violated the Constitution.[3] (Exhibit "7"). Retroactive effect is subject to express indication.

10. My review of judicial practice of cassation courts shows that revision of judicial acts based on the decision dated March 12, 2001 in appellate and cassation appeal courts was not permitted if the time period for filing an appeal to a judicial act had expired before March 12, 2001. Thus, I am unaware of any decisions which have applied the March 2001 Decision retroactively to permit appeals of judicial acts which were in legal effect and enforced that were not previously subject to appeal.

3

11. In addition, the 1995 APC, which was in effect at the time of the March 12, 2001 Decision, did not provide a mechanism through which an arbitrazh court could revise a judicial act which had come into legal force based on a change in the law, such as the change created by the March 12, 2001 decision. However, in accordance with decisions of the Constitutional Court dated February 2, 1996 (Exhibit "8") and February 3, 1998 (Exhibit "9"), respectively, courts were permitted to revise a judicial act which had come into legal force based on a decision that the law on which the act was based violated the Constitution.

12. Based on these decisions, Judge V. Anishina noted in her article that "the list of grounds [provided by the 1995 APC] [for reversal of judicial acts] shall be supplemented by the Legislature by indicating [a basis] when a normative act is recognized as not corresponding to the Constitution of Russia."

13. Indeed, when the Legislature adopted the new APC in 2002, it did precisely this. Article 311(6) of the newly adopted 2002 APC specifically provides that a "judicial act in legal force" may be revised if the act was "recognized by the Constitutional Court of the Russian Federation as not corresponding to the Constitution as applied by the arbitrazh court in the instant case based on a decision of the Constitutional Court of the Russian Federation in response to an application by the applicant." In other words, Article 311(6) of the 2002 APC expressly limited the retroactive effect of Constitutional Court decisions for reversal of judicial acts which entered into legal force to those cases in which the persons participating in a case contested themselves the relevant provisions of the law in the Constitutional Court on which the decision was rendered.

4

14. Judge V. Anishina also states that "many legislative acts, which were subsequently declared as inconsistent with the Constitution of the Russian Federation had been applied by various bodies (including courts) for many years. Decisions on such cases have long entered into legal force and have been enforced. Are such decisions subject to revision if a citizen did not apply to the Constitutional Court and after disqualification of a law seeks for review of a case? No, I don't think so. <u>Such a decision cannot be reviewed because decisions of the Constitutional Court have no retroactive force.</u>"

15. I completely agree with this statement. If this were not the case, there would be no legal finality under Russian law.

16. Finally, Judge V. Anishina states: "[D]ecisions that have not entered into force and decisions that have entered into force but have not been enforced are to be reviewed upon application of interested persons pursuant to Art. 79 of the Law on Constitutional Court."

17. Art. 79 (3) of the Federal Constitutional Law -- "On Constitutional Court of the Russian Federation" dated July 21, 1994 (Exhibit "10") -- provides that "[d]ecisions of the courts and other bodies based on acts recognized as not corresponding to the Constitution, shall not be enforced and must be revised in cases provided by the federal law."

18. But the judicial acts at issue here had already entered into force and been enforced at the time of the March 12, 2001 Decision. I would agree that if a judicial act has not entered into force (for example, if an appeal is pending in the first level appellate court)

5

or if the judicial act has not been enforced, then the case may be reconsidered. But again, this was not the case here.

19. Pursuant to Article 135 of the 1995 APC, a decision of an arbitrazh court enters into legal force 30 days after it is issued if no appeal has been taken. Therefore, as described in greater detail below, the rulings in question entered into legal force 30 days after they were issued.

20. In addition, under 1998 Bankruptcy Law, a number of rulings in question were subject to immediate execution. For example, "an arbitrazh court' ruling to impose external management shall be subject for immediate execution" (Art. 68 (2) of the 1998 Bankruptcy Law) or "a ruling appointing an external manager shall be subject to immediate execution" (Art. 72 (2) of the 1998 Bankruptcy Law).

21. As explained below, the rulings in question rendered from January through August 2000 in the NKAZ and GOK bankruptcies entered into legal force and had been enforced at the time of the March 12, 2001 Decision. Therefore, they would not have been subject to appeal in the appellate court or cassation appeal court after the March 12, 2001 Decision.

## THE NKAZ BANKRUPTCY

### Rulings Prior to the March 12, 2001 Constitutional Court Decision

22. By the time of the March 12, 2001 Decision, numerous rulings had been entered into legal force and enforced in the NKAZ bankruptcy.

23. These rulings included:

- Acceptance of the bankruptcy petition on January 19, 2000 (Rekhovsky Dec. Ex. 24);

6

- Imposition of a conservatory arrest on all of NKAZ's assets on January 19, 2000 (Rekhovsky Dec. Ex. 37);

- Removal of MIKOM as manager of NKAZ on February 17, 2000 (Rekhovsky Dec. Ex. 58);

- Refusal to include BMT Ltd.'s claims into the creditors register on March 17, 2000 (Golubev Dec. Exs. 71,72, 91);

- Imposition of external management and appointment of S. Chernyshev as external manager on March 20, 2000 (Golubev Dec. Ex. 77);

- Set-off of Alucoal's claims on June 9, 2000 (Chernyshev Dec. Ex. 92);

- Inclusion of the Flamstead claim into the register of NKAZ creditors on August 17, 2000 (Chernyshev Dec. Ex. 107); and

- Refusal to remove Chernyshev as external manager on August 17, 2000 (Chernyshev Dec. Ex. 97).

24. Of these rulings, only (a) the imposition of the conservatory arrest on January 19, 2000; (b) removal of MIKOM on February 17, 2000; and (c) imposition of external management and appointment of Chernyshev as external manager on March 20, 2000 were subject to appeal.[4]

25. In regard to the conservatory arrest on January 19, 2000, after Chernyshev was appointed as External Manager of NKAZ, he withdrew the appeal filed by NKAZ (Rekhovsky Dec. Ex. 44). The Plaintiffs lacked standing to prosecute this ruling because the property belonged to NKAZ.

26. In regard to the removal of MIKOM on February 17, 2000, the appeal by Base Metal Trading S.A. directly to the Cassation Court was denied by order dated May 31,

7

A - 996

2000 (Rekhovsky Dec. Ex. 60), as was the application for protest to the Supreme

Arbitrazh court. as evidenced by the letter dated June 14. 2000 (Exhibit "11").

27. In regard to imposition of external management and appointment of Chernyshev

as external manager on March 20, 2000, the appeal by Base Metal Trading S.A. directly

to the Cassation Court was denied by order dated July 3, 2000. (Rekhovsky Dec. Ex. 36).

28. Although no application for protest was filed, based on my experience of over 10

years in handling bankruptcy matters, the likelihood of the Supreme Arbitrazh Court

revising a ruling by supervisory review based on disputed issues of fact concerning the

appointment of external management was practically nil.

29. I would note that Base Metal Trading Ltd. and Alucoal lacked standing to file

appeals or an application for protest concerning the relevant judicial acts because they

were not participants in the bankruptcy case due to the fact that their claims had been

rejected by Chernyshev.

30. All of the remaining rulings were not subject to appeal and were rendered on or

before August 17, 2000, i.e., long before the March 12, 2001 Decision.

31. These rulings could not be appealed as a result of the March 12, 2001 Decision

because the time period for appealing to the first level appeal court would have expired in

2000 pursuant to Article 147 of the 1995 APC, which provided that "an appeal complaint

shall be filed within one month upon rendering a decision," and the time period for

appealing to the cassation court would have also expired in 2000, pursuant to Art. 164 of

the 1995 APC which provided that "a cassation appeal [second level appeal complaint]

can be filed within one month upon entering into legal force of a decision or ruling of an

arbitrazh court." *See* Exhibit "3".

8

## Rulings Appealable After the March 12, 2001 Decision

32. In regard to the March 12, 2001 Constitutional Court decision, two decisions occurred in the NKAZ bankruptcy which were appealable:

- Inclusion of the furnace claim of Sibirsky Aluminum into creditors' register of NKAZ on February 28, 2001[5] (Golubev Dec. Ex. 99); and

- Approval of the settlement agreement on April 3, 2001 (Rekhovsky Dec. Ex. 70).

33. In regard to the approval of the settlement agreement, the appeal by Base Metal Trading S.A. and two other creditors directly to the Cassation Court was denied by order dated September 6, 2001. (Rekhovsky Dec. Ex. 71).

34. An application for protest with respect to the ruling on approval of settlement agreement and the decision of September 6, 2001, may be filed to the Supreme Arbitrazh Court.

35. However, based on my experience of over 10 years in handling bankruptcy matters, the likelihood of the Supreme Arbitrazh Court granting a protest regarding approval of a settlement agreement is practically nil because there is no similar precedents in Russian judicial practice.

36. I am not aware of any decision of the Supreme Arbitrazh Court granting an application to reverse a bankruptcy case which has already been closed.

37. I should also note that Base Metal Trading Ltd. and Alucoal lacked standing to file appeals or an application for protest concerning these judicial acts after their claims had been denied by Chernyshev and the court because they were not considered to be participants in the bankruptcy case.

9

A - 998

38. Assuming the protest was granted and the ruling approving the settlement agreement was set aside, the Supreme Arbitrazh Court would merely reinstate proceedings on the bankruptcy case of NKAZ and remand the case to the Arbitrazh Court of the Kemerevo Region.

### Other Relevant Judicial Acts

39. In addition to the decisions in the bankruptcy court, judgment in favor of the "Prosecutor's Energy Claim" was entered against NKAZ on October 21, 1999 (Golubev Dec. Ex. 14), vacated on May 23, 2000 (Golubev Dec. Ex. 20), and reinstated on September 28, 2000 (Chernyshev Dec. Ex. 125); the transfer of NKAZ's officially registered location to Dmitrov, Moscow region was invalidated on February 28, 2000 (Rekhovsky Dec. Ex. 28); and judgment in favor of Kuzbass in the "First Kuzbass Action" was entered against NKAZ on October 17, 2000 (Chernyshev Dec. Ex. 123).

40. The Plaintiffs lacked standing to challenge any of these judicial acts because they were not parties to the disputes.

### THE GOK BANKRUPTCY

### Rulings Prior to the March 12, 2001 Decision

41. By the time of the March 12, 2001 Decision, numerous rulings had entered legal force and were enforced in the GOK bankruptcy.

42. These rulings included:

- Acceptance of bankruptcy petition, introduction of provisional management and appointment of O. Kozyrev as Provisional Manager of GOK on March 30, 2000 (Telyukina Dec. Ex. 62);

10

- The change of date of the hearing regarding appointment of an external manager and introduction of external management at GOK on August 15,2000 (Telyukina Dec. Ex. 105);

- Imposition of external management and appointment of Kozyrev as external manager on August 22, 2000 (Telyukina Dec. Ex. 47);

- Denial of the challenge to the sham Lebaut claim on August 22, 2000[6] (Telyukina Dec. ¶ 42, Ex. 47);

- Refusal to permit the shareholders to pay GOK's debts on August 22, 2000 (Telyukina Dec. ¶ 65, Ex. 47).[7]

43. Of these rulings, only the introduction of external management at GOK and appointment of Kozyrev as GOK's External Manager on August 22, 2000 were appealable.[8]

44. The appeal to that ruling was dismissed by order dated January 15, 2001 on the ground that the claimants lacked standing because their claims had not been approved into creditors' register. The subsequent appeal to the cassation court was denied by order dated June 7, 2001.

45. Polyprom and Nexis Products LLC lacked standing to appeal this order because their claims had not been included by Kozyrev in the register of creditors and they were not considered to be parties to the proceedings at this time.

46. I would note that this abusive tactic, i.e., not recognizing the claims of creditors adverse to persons controlling a bankruptcy, did not escape the eye of defendants' expert, Professor Zankovsky, who wrote in an article concerning GOK[9] that "the [a] manager's goal is to create such composition of creditors that would only make decisions necessary

A - 1000

for the retention of control over the company. One of the manager's functions, i.e., determining the pool of debtors' creditors and the total amount of their claims, serves in achieving that goal. In violation of the law, the manager can use this function to refuse to include the claims filed by the "inconvenient" creditors in the register of creditors' claims."

47. As stated above, in regard to the rulings which entered into legal force and which were enforced prior to the March 12, 2001 Decision, these rulings could not be appealed as a result of the March 12, 2001 Decision because the time period for appealing to the first level appeal court would have expired in 2000 pursuant to Article 147 of the 1995 APC, which provided that "an appeal complaint shall be filed within one month upon rendering a decision. " and the time period for appealing to the second level appeal court would have also expired in 2000, pursuant to Art. 164 of the 1995 APC which provided that "a cassation appeal [second level appeal complaint] can be filed within one month upon entering into legal force of a decision or determination of an arbitrazh court."

### Judicial Acts Appealable After the March 12, 2001 Decision

48. In regard to March 12, 2001 Decision, three rulings which occurred in the GOK bankruptcy were appealable:

- Denial of the challenge by Nexis Products LLC and three other claimants of the inclusion of Lebaut claim[10] on February 19, 2001 (Telyukina Dec. Ex.51)[11]

- Refusal to include Polyprom's claim into GOK's creditors register on March 23, 2001 (Telyukina Dec. Ex. 120);

- Approval of the settlement agreement on April 19, 2001 (Telyukina Dec. Ex. 92)

12

A - 1001

49. Nexis Products' appeal of the denial of its challenge to the inclusion of the claim filed by Lebaut was denied by order dated April 19, 2001 (Telyukina Dec. Ex. 55). The appeal to the cassation court was denied by order dated July 12, 2001 (Telyukina Dec. Ex. 58).

50. Nexis Products' appeal of the approval of the settlement agreement was denied by order dated June 27, 2001 (Telyukina Dec. Ex. 123). The appeal to the cassation court was returned by order dated August 21, 2001 (Telyukina Dec. Ex.124). Another cassation appeal of Nexis Products was returned by order dated October 29, 2001 (Telyukina Dec. Ex.125).

51. Polyprom lacked standing to file an appeal because its claims had not been accepted by Kozyrev and therefore it was not considered to be a party to the proceeding.

52. An application for protest may be filed with respect to these decisions.

53. However, in my view, the chances of a successful protest to the Supreme Arbitrazh Court of decisions in a closed bankruptcy are practically nil.

54. Assuming the protest were granted and the ruling approving the settlement agreement of GOK set aside, the Supreme Arbitrazh Court would reinstate bankruptcy proceedings of GOK and merely remand the case to the arbitrazh court in the Sverdlovsk Region.

A - 1002

I have executed this affidavit outside of the United States of America and declare under the penalty of perjury pursuant to the laws of the United States that the foregoing is true to the best of my knowledge and belief.

_____

14

---

[1]    I have attached the relevant provisions of the 1995 APC as exhibit "3"; the 2002 APC as exhibit "4"; and the 1998 Bankruptcy Law as exhibit "5".

[2]    Specifically, the following rulings rendered in bankruptcy proceedings were not subject to appeal: (1) rulings concerning establishing of creditors claims (Art. 46, 63, 75, 114, 160 of the 1998 Bankruptcy Law); (2) rulings rendered in regard to applications of arbitrazh managers; rulings rendered in regard to complaints of creditors concerning breach of their rights and interests; rulings concerning differences between an arbitrazh manager and representative of a debtor's employees (Art. 55 of the 1998 Bankruptcy Law); (3) a ruling concerning shortening of the time period of external management (Art. 68 (5) of the 1998 Bankruptcy Law); (4) ruling concerning prolongation of bankruptcy liquidation (Art. 97 (2) of the 1998 Bankruptcy Law); (5) a ruling in regard to closing bankruptcy liquidation (Art. 119 (2) of the 1998 Bankruptcy Law).

Rulings on accepting bankruptcy petitions for consideration, introduction of supervision and appointment of a provisional manager which contain indications concerning imposition of conservatory measures to secure creditors claims can be appealed [only] to the extent and in part concerning imposition of conservatory measures to secure claims of creditors (Art. 41 (3), Art. 44 of the Bankruptcy Law, Art. 75 of the [1995] APC." See Information Letter of the Presidium of the Supreme Arbitrazh Court of the Russian Federation # 43 "Issues on the Application of the Federal Law on Insolvency (Bankruptcy) in Judicial Practice", dated Aug. 6, 1999, ¶ 22. (Exhibit "6").

[3]    Specifically, it held that rulings rendered under Art. 46 (4) (validity of debtor's objections), Art. 55 (1) (creditor's disputes with an arbitrazh manager), Art. 63 (4) and Art. 75 (5) (disputes concerning establishment of the amount of creditors' claims), and Art. 56 (instituting observation proceedings) of the 1998 Bankruptcy Law were subject to appeal.

[4]    See Art. 75 (4) of the 1995 APC. 44 (3) of the 1998 Bankruptcy Law ("In the course of observation proceedings [a petition to remove can be filed by] a person participating in the bankruptcy case or ... the interim manager ... [based on which] the Arbitrazh Court shall have the right to remove the debtor's executive and assign his duties to the interim manager. To remove the debtor's executive from his post the Arbitration Court shall render a ruling, which may be appealed, including by the debtor's executive."); Art. 68 (3) of the 1998 Bankruptcy Law ("The Arbitrazh Court's ruling to institute external management may be appealed"); and Art. 72 (4) of the 1998 Bankruptcy Law ("A ruling appointing an external manager may be appealed.").

[5]    Although this decision was not subject to appeal when made, it became subject to appeal because the March 2001 Decision was rendered within the 30 day appeal period provided by Article 147 of the 1995 APC.

[6]    I have been instructed by counsel for plaintiffs to assume that at August 22, 2000 hearing the court refused to accept creditor's challenge to the sham Lebaut claim. In

15

regard to the court's refusal. I was asked to determine whether it would be appealable had the court issued a separate documented ruling on August 22, 2000.

[7]    I have been instructed by counsel for plaintiffs to assume that at August 22, 2000 hearing the court refused to permit the shareholders to pay GOK's debts. In regard to the court's refusal. I was asked to determine whether it would be appealable had the court issued a separate documented ruling on August 22, 2000.

[8]    *See* Art. 68 (3) and Art. 72 (4) of the 1998 Bankruptcy Law.

[9]    I have been instructed to assume that the GOK in the article is Kachkanarsky Gok.

[10]    Subsequently, Lebaut assigned its claim to Sirius.

[11]    Although this decision was not subject to appeal when made, it became subject to appeal because the March 2001 Decision was rendered within the 30 day appeal period.

16

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

**BASE METAL TRADING SA et al**                    **Docket No. 00 Civ. 9627**

**Plaintiffs**

**v.**

**RUSSIAN ALUMINUM et al.**

**Defendants**

## ВТОРОЕ ЭКСПЕРТНОЕ ЗАКЛЮЧЕНИЕ ВИКТОРА ВАСИЛЬЕВИЧА ГОЛУБЕВА

Я, Виктор Васильевич Голубев, в соответствии с положениями 28 U.S.C. § 1746, настоящим заявляю следующее:

### ПОСТАВЛЕННЫЕ ВОПРОСЫ

1.        По просьбе адвокатов Истцов я рассмотрел судебные акты, вынесенные в ходе процедур банкротства НКАЗа и ГОКа, с целью вынесения заключения о том:

(a)        позволяет ли Постановление Конституционного Суда РФ от 12 марта 2001 года, признающее не соответствующими Конституции ограничения на обжалование ряда определений, выносимых в деле о банкротстве, обжаловать такие определения, если они вступили в законную силу и были исполнены более чем за 30 дней до принятия вышеуказанного постановления Конституционного суда; и

(б)        существует ли вероятность того, что заявление о принесении протеста в отношении любого из определений или решений, вынесенных в рамках

дел о банкротстве НКАЗа и ГОКа, производство по которым прекращено, будет

удовлетворено Высшим Арбитражным Судом.

## ВЫВОДЫ

2.    Основываясь на проведенном мною анализе я делаю следующие

выводы:

a.   Я полагаю, что Постановление Конституционного суда от 12 марта

2001 г., признающее не соответствующими Конституции

ограничения на обжалование ряда определений, выносимых в деле о

банкротстве, не позволяет обжаловать такие определения, если они

вступили в законную силу и были исполнены более чем за 30 дней до

принятия вышеуказанного постановления Конституционного суда.

b.   С учетом отсутствия практики пересмотра Высшим Арбитражным

Судом решений и определений, вынесенных в прекращенных делах о

банкротстве, вероятность удовлетворения Высшим Арбитражным

Судом РФ заявления о принесении протеста в отношении судебных

актов в прекращенных делах о банкротстве НКАЗа и ГОКа ничтожно

мала.


## ИЗУЧЕННЫЕ ДОКУМЕНТЫ

3.    При подготовке данного заключения, мною были изучены различные

материалы, включая материалы по делу о банкротстве НКАЗа и связанных с ним

судебных разбирательств, которые я использовал при написании своего первого

A - 1008

заключения, а также различные судебные акты, относящиеся к делу о банкротстве

ГОКа, перечисленные в Заявлении Марины Телюкиной от 16 сентября 2002 г.

4.    Мною также были изучены статья эксперта ответчиков профессора

С. Занковского «Теория и практика банкротства», опубликованная в газете

«Известия» от 27 апреля 2002 г. (Приложение 1), и статья судьи В. Анишиной

«Применение постановлений Конституционного суда РФ судами общей

юрисдикции» опубликованная в журнале «Российская Юстиция» 26 октября 1999 г.

(Приложение 2).

5.    В данном Заключении я буду использовать следующие термины:

Арбитражный процессуальный кодекс введенный в действие 1 июля 1995 г. («АПК

1995»); Арбитражный процессуальный кодекс введенный в действие 1 сентября

2002 («АПК 2002»); и Федеральный Закон «О Несостоятельности (Банкротстве) №

6-ФЗ от 8 января 1998 г. («Закон о Банкротстве 1998»).[1]

### ОБОСНОВАНИЕ

6.    До принятия Постановления Конституционного Суда Российской

Федерации от 12 марта 2001 года («Постановление от 12 марта 2001 года»), только

узкая категория определений, вынесенных арбитражным судом в ходе процедур

банкротства, могли быть обжалованы в апелляционном порядке.

7.    Согласно п.3 ст. 55 Закона о Банкротстве 1998, «определения

арбитражного суда, не предусмотренные Арбитражным процессуальным кодексом

Российской Федерации, могут быть обжалованы [только] в случаях,

предусмотренных настоящим Федеральным законом» [о Банкротстве 1998].

(Приложение 5).

3

8.    Другими словами, определения арбитражного суда, выносимые  в процедуре банкротства, могли быть обжалованы и, соответственно, пересмотрены только в случаях, прямо предусмотренных АПК 1995 или Законом о Банкротстве 1998[2].

9.    В своем Постановлении от 12 марта 2001 Конституционный суд указал, что ограничение обжалования определенных судебных актов противоречит Конституции[3] (Приложение 7).  Если нормативно-правовой акт обладает обратной силой, это напрямую должно быть в нем указано.

10.    Изученная мной судебная практика судов кассационной инстанции, показывает, что пересмотр судебных актов на основании Постановления от 12 марта 2001 года в апелляционной и кассационной инстанциях, при условии истечения до 12 марта 2001 года срока на обжалование судебного акта в указанных инстанциях, не допускался. Таким образом, мне не известно ни одно судебное решение, в котором применялась бы обратная сила Постановления от 12 марта 2001 года и разрешалось обжалование вступивших в законную силу и исполненный судебных актов, которые не подлежали обжалованию ранее.

11.    К тому же, АПК 1995, действовавший на момент вынесения Постановления от 12 марта 2001 г., не предоставлял арбитражному суду права отменять вступившие в законную силу судебные акты на основании изменения в праве подобного тому, которое являлось результатом вынесения Постановления от 12 марта 2001 г.  Однако постановления Конституционного Суда от 2 февраля 1996 г. (Приложение 8) и 3 февраля 1998 г (Приложение 9) соответственно, разрешили судам отменять вступившие в законную силу судебные акты на основании решения

A - 1010

о том, что закон на котором судебные акты были основаны, противоречит Конституции.

12.     Основываясь на указанных решениях, судья В. Анишина отметила в своей статье что: «перечень оснований [к отмене судебных актов предусмотренных АПК 1995] должен быть законодателем дополнен указанием на случаи признания нормативных актов неконституционными.»

13.     Действительно, когда законодатель изменил АПК в 2002 г., он так и сделал.  П.6 ст. 311 недавно принятого АПК 2002 конкретно предусматривает, что «вступивший в законную силу судебный акт» может быть пересмотрен в случае «признания Конституционным Судом Российской Федерации не соответствующим Конституции Российской Федерации закона, примененного арбитражным судом в конкретном деле, в связи с принятием решения по которому заявитель обращался в Конституционный Суд Российской Федерации».  Другими словами, п.6 ст. 311 АПК 2002 чрезвычайно ограничил возможность применения обратной силы постановлений Конституционного Суда для отмены судебных актов, вступивших в законную силу, сузив его до тех случаев, когда лица, участвующие в деле, сами обращались в Конституционный Суд для признания неконституционной нормы закона, положенной в основание конкретного решения.

14.     Судья В. Анишина, также, утверждает, что: «Многие нормативные акты, признанные впоследствии неконституционными, применялись различными органами (в том числе судами) в течение многих лет. Решения по таким делам давно вступили в законную силу и исполнены. Подлежат ли они пересмотру, если гражданин не обращался в Конституционный Суд, а после отмены закона просит

5

пересмотреть его дело? Думается, что нет. <u>Такое решение не может быть</u> <u>пересмотрено, поскольку постановления Конституционного Суда не имеют</u> <u>обратной силы.</u>»

15.    Я полностью согласен с указанным утверждением.  В противном случае это означало бы, что правовой определенности в соответствии с российским правом не существует.

16.    В заключение, судья В. Анишина утверждает: «решения же, не вступившие в силу, а также вступившие, но не исполненные, согласно ст. 79 Закона о Конституционном Суде подлежат пересмотру по заявлению заинтересованных лиц.»

17.    В соответствии с п. 3 ст. 79 Федерального Конституционного Закона «О Конституционном Суде Российской Федерации» от 21 июля 1994 г. (Приложение 10), «решения судов и иных органов, основанные на актах, признанных неконституционными, не подлежат исполнению и должны быть пересмотрены в установленных федеральным законом случаях».

18.    Однако судебные акты, вынесенные в рассматриваемых делах, уже либо вступили в законную силу, либо были исполнены ко времени вынесения Постановления от 12 марта 2001 г.  Я согласен с тем, что если судебный акт не вступил в законную силу (к примеру, если апелляционная жалоба находится на рассмотрении в суде апелляционной инстанции) или если судебный акт не был исполнен, тогда дело может быть пересмотрено.  Хотя, опять же, эти случаи не относятся к рассматриваемым делам.

A - 1012

19.    В соответствии со ст. 135 АПК 1995, решение арбитражного суда вступает в законную силу по истечении тридцати дней после его вынесения в том случае если оно не было обжаловано в апелляционном порядке. Таким образом, как подробно описывается далее, судебные акты являющиеся предметом настоящего заключения вступили в законную силу по истечении 30 дней с даты их вынесения.

20.    Более того, в соответствии с Законом о Банкротстве 1998, определенные судебные акты являющиеся предметом настоящего заключения подлежали немедленному исполнению. К примеру, «определение арбитражного суда о введении внешнего управления подлежит немедленному исполнению» (п. 2 ст. 68 Закона о Банкротстве 1998) или «определение о назначении внешнего управляющего подлежит немедленному исполнению» (п.2 ст. 72 Закона о банкротстве 1998).

21.    Как более подробно будет описано ниже, являющиеся предметом настоящего заключения судебные акты, вынесенные в период между январем и августом 2000 г. в делах о банкротствах НКАЗа и ГОКа, вступили в законную силу и были исполнены ко времени вынесения Постановления от 12 марта 2001 г. Таким образом, они не могли быть обжалованы в апелляционной и кассационной инстанциях после Постановления от 12 марта 2001 г.

## БАНКРОТСТВО НКАЗА

### Судебные Акты, Вынесенные до Постановления Конституционного Суда от 12 Марта 2001 Года

7

A - 1013

22.    До вынесения Постановления от 12 марта 2001 года, в ходе процедур банкротства НКАЗа было вынесено большое количество различных определений, вступивших в законную силу и исполненных.

23.    Среди них были следующие определения:

- О принятии заявления о признании должника банкротом от 19 января 2000 г. (Приложение 24 к Декларации Реховского);

- О наложении обеспечительных мер в виде наложения ареста на все имущество НКАЗа от 19 января 2000 г. (Приложение 37 к Декларации Реховского);

- Об отстранении МИКОМа от управления НКАЗом от 17 февраля 2000 г. (Приложение 58 к Декларации Реховского);

- Об отказе во включении в реестр требований кредиторов НКАЗ требований кредитора БМТ, Лтд. от 17 марта 2000 г. (Приложения 71, 72, 91 к Декларации Голубева);

- О введении внешнего управления и назначении С. Чернышева внешним управляющим от 20 марта 2000 г. (Приложения 77 к Декларации Голубева);

- О зачете требований кредитора Алюкоал от 9 июня 2000 года; (Приложение 92 к Декларации Чернышева)

- О включении в реестр требований кредиторов НКАЗ требований кредитора Фламстед от 17 августа 2000 года (Приложение 107 к Декларации Чернышева); и

8

- Об отказе в отстранении Чернышева от исполнения обязанностей внешнего управляющего от 17 августа 2000 года (Приложение 97 к Декларации Чернышева ).

24.    Из всех вышеперечисленных определений, только определения (а) о наложении обеспечительных мер на все имущество НКАЗа от 19 января 2000 г.; (б) об отстранении МИКОМа от управления НКАЗом от 17 февраля 2000 г.; и (с) о введении внешнего управления и назначении Чернышева внешним управляющим от 20 марта 2000 года, могли быть обжалованы.[4]

25.    В отношении наложения обеспечительных мер на имущество НКАЗа 19-го января 2000 г., после своего назначения Чернышев отозвал апелляционную жалобу, заявленную НКАЗом (Приложение 44 к Декларации Реховского).  Сами Истцы не могли обжаловать это определение, так как имущество принадлежало НКАЗу.

26.    В отношении отстранения МИКОМа от управления НКАЗом 17 февраля 2000 г., в удовлетворении кассационной жалобы Бэйс Метал Трейдинг СА, направленной напрямую в кассационную инстанцию, было отказано постановлением от 31 мая 2000 г. (Приложение 60 к Декларации Реховского).  Также было отказано и в пересмотре указанного определения Высшим Арбитражным Судом в порядке надзора, что следует из письма от 14 июня 2000 г. (Приложение 11).

27.    В отношении введения внешнего управления и назначения Чернышева внешним управляющим 20 марта 2000 года, в удовлетворении кассационной жалобы Бэйс Метал Трейдинг СА, направленной в кассационную

9

A - 1015

инстанцию, было отказано постановлением от 3 июля 2000 г. (Приложение 36 к Декларации Реховского).

28.    Хотя никакого заявления о пересмотре судебного акта в порядке надзора не было подано, основываясь на своем более чем десятилетнем опыте работы с делами о банкротстве, я могу сказать, что вероятность того, что Высший Арбитражный Суд пересмотрел бы в порядке надзора определение о назначении внешнего управляющего с пересмотром фактических обстоятельств его назначения была ничтожно мала.

29.    Хотелось бы отметить, что Бэйс Метал Трейдинг Лтд. и Алюкоал не могли подавать апелляционные жалобы или заявления о принесении протеста, так как их требования были отклонены и они, в силу отклонения их требований, не являлись участниками дела о банкротстве.

30.    Все остальные определения не подлежали обжалованию и были вынесены до 17 августа 2000 г., т.е. задолго до Постановления от 12 марта 2001 г.

31.    Указанные определения не могли быть обжалованы в соответствии с Постановлением от 12 марта 2001 г., так как срок их обжалования в апелляционную инстанцию истек в 2000 г. в соответствии со ст. 147 АПК 1995, на основании которой «апелляционная жалоба подается в течении месяца после принятия арбитражным судом решения». Срок для обжалования судебных актов в кассационной инстанции также истек бы в 2000 г. в соответствии со ст. 164 АПК 1995 г., согласно которой «кассационная жалоба [жалоба второго уровня обжалования] может быть подана в течении одного месяца после вступления в

A - 1016

законную силу решения или постановления апелляционного суда.» См.

Приложение 3.

### Определения, Подлежавшие Обжалованию После Постановления Конституционного Суда от 12 Марта 2001 Года

32.    Касательно Постановления от 12 марта 2001 года, в рамках процедуры банкротства НКАЗа были вынесены два определения:

- О включении в реестр требований кредиторов НКАЗ требований кредитора Сибирский Алюминий, от 28 февраля 2001 года[5]; (Приложение 99 к Декларации Голубева) и

- Об утверждении судом мирового соглашения, от 3 апреля 2001 года (приложение 70 к Декларации Реховского).

33.    В отношении утверждения судом мирового соглашения, постановлением от 6 сентября 2001 г. кассационный суд оставил кассационную жалобу Бэйс Метал Трэйдинг СА и двух других кредиторов без удовлетворения. (Приложение 71 к Декларации Реховского.)

34.    Заявление о пересмотре определения об утверждении мирового соглашения и постановления от 6 сентября 2001 в порядке надзора может быть подано в Высший Арбитражный Суд.

35.    Однако, основываясь на своем более чем десятилетнем опыте работы с делами о банкротстве, я могу сказать, что вероятность того, что Высший Арбитражный Суд удовлетворит заявление о принесении протеста на определение, утверждающее мировое соглашение, ничтожно мала, поскольку подобные прецеденты в российской правоприменительной практике отсутствуют.

A - 1017

36.    Мне не известно ни одного решения Высшего Арбитражного Суда удовлетворяющего заявление об отмене судебного акта в деле о банкротстве, которое уже было прекращено.

37.    Необходимо отметить, что Бэйс Метал Трэйдинг Лтд. и Алюкоал не могли направлять апелляционные жалобы или заявление о принесении протеста в отношении этих судебных актов, так как после отклонения их требований Чернышевым и судом они не являлись лицами, участвующими в деле о банкротстве.

38.    Даже если предположить, что заявление будет удовлетворено, и определение об утверждении мирового соглашения будет отменено, то все, что Высший Арбитражный Суд может сделать, это возобновить производство по делу о банкротстве НКАЗа и направить это дело обратно на рассмотрение в Арбитражный суд Кемеровской области.

### Другие Судебные Акты, Касающиеся Настоящего Дела

39.    В дополнение к определениям, вынесенным арбитражным судом по делу о банкротстве, 21 октября 1999 года было вынесено решение против НКАЗа в пользу «Требований Прокурора по Энергии» (Приложение 14 к Декларации Голубева), указанное решение было отменено 23 мая 2000 (Приложение 20 в Декларации Голубева) и восстановлено 28 сентября 2000 года (Приложение 125 к декларации Чернышева); перенос места нахождения НКАЗа в город Дмитров, Московской области был признан недействительным 28 февраля 2000 года (Приложение 28 к Декларации Реховского); и решение в пользу Кузбасса в

A - 1018

«Первый Иск Кузбасса» было вынесено против НКАЗа 17 октября 2000 года

(Приложение 123 к Декларации Чернышева).

40.    Истцы не могли обжаловать эти решения, поскольку, они не являлись

сторонами указанных споров.

## БАНКРОТСТВО ГОКА

### Судебные Решения, Вынесенные до Постановления Конституционного Суда от 12 Марта 2001 Года

41.    До вынесения Постановления от 12 марта 2001 года, в ходе процедур

банкротства ГОКа было вынесено значительное количество определений,

вступивших в законную силу и исполненных до 12 марта 2001 года.

42.    Среди них были следующие определения:

- О принятии заявления о признании должника банкротом, введении

  процедуры наблюдения и назначении Козырева временным

  управляющим от 30 марта 2000 года (Приложение 62 к Декларации

  Телюкиной);

- О переносе даты судебного заседания от 15 августа 2000 года

  (Приложение 105 к Декларации Телюкиной);

- О введении внешнего управления и назначении Козырева внешним

  управляющим от 22 августа 2000 г. (Приложение 47 к Декларации

  Телюкиной).

- Об отказе в удовлетворении заявления об отклонении требований

  Лебаута 22 августа 2000[6] (¶ 42, Приложение 47 к Заявлению

  Телюкиной)

13

A - 1019

- Об отказе в удовлетворении заявления акционеров ГОКа о погашении долгов ГОКа 22 августа 2000 г.[7] (¶ 65, Приложение 47 к Декларации Телюкиной)

43.     Из всех вышеперечисленных судебных актов, только определение о введении внешнего управления на ГОКе и назначении Козырева внешним управляющим от 22 августа 2000 года, могло бы быть обжаловано[8].

44.     Апелляционная жалоба в отношении этого определения была оставлена без удовлетворения определением от 15 января 2001 г. на том основании, что лица подавшие жалобу не имели права ее подавать, так как их требования не были внесены в реестр требований кредиторов ГОКа.  Поданная в последующем кассационная жалоба была оставлена без удовлетворения постановлением от 7 июня 2001 г.

45.     Полипром и Нексиз Продактс ЛЛСи не могли обжаловать указанное определение, так как их требования не были в то время внесены внешним управляющим Козыревым в реестр требований кредиторов ГОКа и они не являлись лицами, участвующими в деле, в тот момент.

46.     Следует заметить, что такая тактика  злоупотреблений, т.е. непризнание требований кредиторов, противостоящих ответчикам, не прошло незамеченным для  эксперта ответчиков, профессора Занковского, который в своей статье пишет в отношении ГОКа[9] что, « ангажированный управляющий ставит задачу сформировать такой их состав, который примет необходимые для установления контроля над предприятием решения. Инструментом для достижения этой цели служит одна из функций управляющего, связанная с установлением

A - 1020

круга кредиторов должника и определением размера их требований. Используя эту функцию, управляющий может вопреки закону отказать во включении в реестр кредиторов требований, заявленных "неподходящими" лицами».

47.     Как было указанно выше, Постановление от 12 марта 2001 года не имело силы в отношении судебных актов, вступивших в законную силу и исполненных до 12 марта 2001 года, соответственно, иные определения, указанные в пункте 42 настоящего Заявления, не могли быть обжалованы, так как срок для апелляционного обжалования истек в 2000 г. в соответствии со ст. 147 АПК 1995, на основании которой «апелляционная жалоба подается в течении месяца после принятия арбитражным судом решения».  Срок для обжалования судебных актов в кассационном порядке также истек в 2000 г. в соответствии со ст. 164 АПК 1995 г., согласно которой «кассационная жалоба [жалоба второго уровня обжалования] может быть подана в течении одного месяца после вступления в законную силу решения или постановления апелляционного суда.»

### Судебные Акты, Вынесенные После Постановления Конституционного Суда от 12 Марта 2001 года

48.     После вынесения Постановления от 12 марта 2001 года, в рамках процедуры банкротства ГОКа были вынесены три определения:

- Об отклонении жалобы Полипрома на решение внешнего управляющего об отказе во включении требований Полипрома в реестр требований кредиторов ГОКа, от 23 марта 2001 года (Декларация Телюкиной, Приложение 120);

- Об отказе в удовлетворении возражений Нэксиз Продактс ЛЛСи и трех других заявителей по результатам рассмотрения внешним

15

A - 1021

управляющим требований Лебаута[10] и включению требований

Лебаута в реестр требований кредиторов ГОКа. от 19 февраля 2001 г.

(Декларация Телюкиной. Приложения 51)[11]; и

- Об утверждении судом мирового соглашения от 19 апреля 2001 года

    (Декларация Телюкиной, Приложение 92).

49.    Апелляционная жалоба Нэксиз Продактс на определение об отказе в

удовлетворении возражений Нэксиз Продактс ЛЛСи и трех других заявителей по

результатам рассмотрения внешним управляющим требований Лебаута и

включению требований Лебаута в реестр требований кредиторов ГОКа, была

оставлена без удовлетворения постановлением от 19 апреля 2001 г. (Декларация

Телюкиной, Приложение 55.)  Кассационная жалоба была оставлена без

рассмотрения определением от 12 июля 2001 г. (Декларация Телюкиной,

Приложение 58.)

50.    Апелляционная жалоба Нэксиз Продактс  на определение об

утверждении мирового соглашения была оставлена без рассмотрения

определением от 27 июня 2001 г. (Декларация Телюкиной, Приложение 123.)

Кассационная жалоба была возвращена заявителю определением от 21 августа 2001

г. (Декларация Телюкиной, Приложение 124.)  Другая кассационная жалоба Нэксиз

Продактс была возвращена заявителю по процессуальным основаниям

определением от 29 октября 2001 г. (Декларация Телюкиной, Приложение 125.)

51.    Полипром не мог обжаловать указанное определение, так как его

требования не были в то время внесены внешним управляющим Козыревым в

16

A - 1022

реестр требований кредиторов и, следовательно, он не являлся лицом, участвующим в деле.

52.    В отношении указанных определений и постановления может быть направлено заявление о принесении протеста в порядке надзора.

53.    Однако, по моему мнению, шансы на удовлетворение протеста Высшим Арбитражным судом в отношении уже прекращенного дела о банкротстве, ничтожно малы.

54.    Даже если предположить, что протест будет вынесен и определение, утверждающее мировое соглашение, будет отменено, то Высший Арбитражный Суд сможет лишь возобновить производство по делу о банкротстве ГОКа и вернуть дело на рассмотрение в арбитражный суд Свердловской области.

A - 1023

Я составил настоящее Заявление за пределами Соединенных Штатов Америки и заявляю под угрозой ответственности за дачу ложных показаний, в соответствии с законами Соединенных Штатов, что вышеизложенное является верным, насколько я знаю и верю.

Дата: *25. 02. 2003,-*

18

A - 1024

¹      Соответствующие положения АПК 1995 приведены в качестве Приложения 3 к настоящему заявлению; АПК 2002 - Приложения 4; Закон о Банкротстве 1998 - Приложения 5.

²      В частности следующие определения, вынесенные в рамках процедуры банкротства не подлежали обжалованию: (1) определение в отношении установления требований кредиторов (Статьи 46, 63, 75, 114, 160 Закона о Банкротстве 1998); (2) определения, вынесенные по заявлениям арбитражных управляющих; определения, вынесенные по жалобам кредиторов в отношении нарушения их прав и интересов; определения, касающиеся разногласий между арбитражным управляющим и представителем работников должника (Ст. 55 Закона о Банкротстве 1998); (3) определение, касающееся сокращения срока внешнего управления (Ст. 68 Закона о Банкротстве 1998); (4) определение, касающееся продления конкурсного производства (П. 2 ст. 97 Закона о Банкротстве 1998); (5) определение, касающееся завершения конкурсного производства (П. 2 ст. 119 Закона о Банкротстве 1998).

    Определения о принятии к производству заявления о признании должника банкротом, введении наблюдения и назначении временного управляющего содержащих указания на наложение мер по обеспечению требований кредиторов могли быть обжалованы [только] в отношении и в части касающейся наложения мер обеспечения требований кредиторов (П. 3 ст. 41, ст. 44 Закона о Банкротстве, Ст. 75 АПК [1995]. *См.* информационное Письмо Президиума Высшего Арбитражного Суда Российской Федерации № 43 «Вопросы применения Федерального Закона о Несостоятельности (Банкротстве)» в судебной практике» от 6 августа 1999 г.¶22 (Приложение 6).

³      В частности, суд указал, что определения, выносимые в соответствии с п. 4 ст. 46 (обоснованность возражений должника), п. 1 ст. 55 (разногласия кредиторов с арбитражным управляющим), п.4 ст. 63 и п.5 ст. 75 (споры в отношении определения размера требований кредиторов), и ст. 56 (введение процедуры наблюдения) Закона о Банкротстве 1998, должны подлежать обжалованию.

⁴      *См.* п. 4 ст. 75 АПК 1995 п.3 ст. 44 Закона о Банкротстве 1998 («При проведении наблюдения лицом участвующем в деле о банкротстве или ... временным управляющим [может быть подано ходатайство об отстранении руководителя должника от должности на основании которого] арбитражный суд вправе отстранить руководителя должника от должности и возложить выполнение его обязанностей на временного управляющего. Об отстранении руководителя должника от должности арбитражный суд выносит определение, которое может быть обжаловано, в том числе руководителем должника.»); п. 3 ст. 68 Закона о Банкротстве 1998 («Определение арбитражного суда о введении внешнего управления может быть обжаловано»); и п.4 ст. 72 Закона о Банкротстве 1998 («Определение о назначении внешнего управляющего может быть обжаловано.»)

A - 1025