68. Copy of invoice No. 1141 of December 29, 1997;
69. Copy of invoice No. 69 of January 30, 1998;
70. Copy of invoice No. 163 of February 27, 1998;
71. Copy of invoice No. 273 of March 31, 1998;
72. Copy of invoice No. 378 of April 27, 1998;
73. Copy of invoice No. 459 of May 29, 1998;
74. Copy of invoice No. 578 of June 30, 1998;
75. Copy of invoice No. 742 of July 31, 1998;
76. Copy of invoice No. 857 of August 31, 1998;
77. Copy of invoice No. 972 of September 30, 1998;
78. Copy of invoice No. 1109 of October 30, 1998;
79. Copy of invoice No. 1276 of November 30, 1998;
80. Copy of invoice No. 1354 of December 25, 1998;
81. Copy of invoice No. 1371 of January 30, 1998;
82. Copy of request for payment No. 15 of February 17, 1997;
83. Copy of request for payment No. 23 of April 8, 1997;
84. Copy of request for payment No. 47 of May 29, 1997;
85. Copy of request for payment No. 60 of June 26, 1997;
86. Copy of request for payment No. 64 of July 14, 1997;
87. Copy of request for payment No. 73 of August 13, 1997;
88. Copy of request for payment No. 88 of September 8, 1997;
89. Copy of request for payment No. 95 of October 13, 1997;
90. Copy of request for payment No. 56 of November 11, 1997;
91. Copy of request for payment No. 81 of January 9, 1998;
92. Copy of request for payment No. 72 of February 9, 1998;
93. Copy of request for payment No. 84 of February 3, 1998;
94. Copy of request for payment No. 105 of March 11, 1998;
95. Copy of request for payment No. 115 of April 28, 1998;
96. Copy of request for payment No. 128 of May 14, 1998;
97. Copy of request for payment No. 142 of June 8, 1998;
98. Copy of request for payment No. 154 of July 8, 1998;
99. Copy of request for payment No. 165 of August 3, 1998;
100. Copy of request for payment No. 174 of September 15, 1998;
101. Copy of request for payment No. 193 of October 19, 1998;
102. Copy of request for payment No. 202 of November 16, 1998;
103. Copy of request for payment No. 212 of December 3, 1998;
104. Copy of request for payment No. 216 December 25, 1998;
105. Copy of request for payment No. 301 of January 18, 1998;
106. Copy of reconciliation of February 15, 2000;
107. Copy of letter from Uraltransbank Branch re acceptance of requests for payment;
108. Copy of claim incoming No. 370 of February 7, 2000;
109. Copy of response to claim outgoing No. 4050-110A of February 8, 2000;
110. Copy of claim incoming No. 493A of February 16, 2000;
111. Copy of response to claim outgoing No. 4050-149A of February 21, 2000;

112. Copy of invoice No. 1668 of March 31, 1998
113. Copy of invoice No. 6788 of 12/17/1997
114. Copy of invoice No. 6838 of 12/18/1997
115. Copy of invoice No. 014293 of 12/23/1997
116. Copy of invoice No. 6424 of 12/1/1997
117. Copy of invoice No. 014193 of 1/14/1997
118. Copy of invoice No. 480 of 1/30/1998
119. Power-of-attorney of 3-20-2000 authorizing E.A. Stepanova to certify copies of the documentation submitted to the Arbitration Court;
120. Power-of-attorney of 3/20/2000 authorizing T.N. Stepchenko to certify copies of the documentation submitted to the Arbitration Court;
121. ~~Application to take measures to honor creditors' claims with 23 addenda.~~ Not included. [signature]

[round seal]
[signature]: V.G. Shishkin
General Director
OAO Krasnouralskmezhrairaz

**Арбитражный суд**
**Свердловской области**
г. Екатеринбург
пр. Ленина 34

**Кредитор:**
**Открытое акционерное общество**
**«Красноуральскмежрайгаз»**

624330, Свердловская обл.
г. Красноуральск, ул. Устинова, д. 34

**Должник: ОАО «Качканарский горно-обогатительный**
**комбинат «Ванадий»**
624356 г. Качканар Свердловской области,
ул. Свердлова, д.2

**Территориальный орган Федеральной службы России**
**по делам о несостоятельности и финансовому оздоровлению**
**в Свердловской области**
620014, г. Екатеринбург, Октябрьская пл., д.3

**Орган местного самоуправления: Администрация г. Качканара**
624356, Свердловская обл., г. Качканар,
ул. Свердлова, д.8

## ЗАЯВЛЕНИЕ
о признании Должника несостоятельным
(банкротом)

**I**

Между Открытым акционерным обществом «Красноуральскмежрайгаз» (далее Поставщик, Кредитор) и Открытым акционерным обществом «Качканарский горно-обогатительный комбинат «Ванадий» (далее Потребитель, Должник) 24 января 1997 года был заключен Договор № 4/п на снабжение природным газом (копия договора прилагается). Срок действия данного договора в соответствии с п. 8.1. договора был установлен с 1.01.1997 года по 31.12.1997 года.

В соответствии с Письмом № 80 от 21 января 1998 года и письмом № 72-58/1 ДПР от 10 февраля 1998 года срок действия договора № 4/п от 24 января 1997 года продлен до 31 января 1998 года (копии Писем прилагаются).

Таким образом, между Кредитором и Должником с 1.01.1997 года по 31.12.1998 года существовали отношения по поставке газа.

В соответствии с п. 1.1. вышеуказанного договора на снабжение природным газом Поставщик (Кредитор): *«...обязуется поставлять, а потребитель принимать и оплачивать природный газ...»*

Согласно п. 5.1. вышеуказанного договора *«...цена на природный газ определяется в соответствии с Постановлением Правительства РФ № 678 от 13.07.1993 года «О государственном регулировании цен на природный газ и другие виды энергоресурсов» и индексируются ежемесячно...».*

АРБИТРАЖНЫЙ
СУД СВ. ОБЛ.
ПОСТУПИЛО 24.03.00
СОСТАВ

Согласно п. 5. 3. вышеуказанного договора «...*расчеты за газ, поставляемый по настоящему договору, производятся выставлением Поставщиком платежных требований в безакцептном порядке в срок до 20 числа месяца, следующего за расчетным*».

В соответствии с п.3.5. вышеуказанного договора: «...*подтверждение количества поданного (принятого) газа за месяц производится обменом телефонограмм первого числа каждого месяца не позднее 15 часов московского времени с последующим оформлением двухстороннего акта...*».

## II

В соответствии с вышеуказанным договором Кредитор исполнил обязательства по поставке природного газа надлежащим образом. Руководствуясь п.3.5. договора № 4/п от 24.01.1997 года стороны подтвердили поставку (получение) природного газа оформлением и подписанием двухсторонних актов, а именно (копии Актов прилагаются):

| № п/п | Дата составления акта | Период поставки газа | Количество поставленного газа (в тыс. норм. м3) |
|---|---|---|---|
| 1 | 31 января 1997 года | Январь 1997 года | 12 000 |
| 2 | 28 февраля 1997 года | Февраль 1997 года | 9 900 |
| 3 | 30 марта 1997 года | Март 1997 года | 11 100 |
| 4 | 30 апреля 1997 года | Апрель 1997 года | 9 700 |
| 5 | 02 июня 1997 года | Май 1997 года | 10 000 |
| 6 | 01 июля 1997 года | Июнь 1997 года | 10 400 |
| 7 | 01 августа 1997 года | Июль 1997 года | 13 711 |
| 8 | 01 сентября 1997 года | Август 1997 года | 10 720 |
| 9 | 01 октября 1997 года | Сентябрь 1997 года | 10560 |
| 10 | 01 ноября 1997 года | Октябрь 1997 года | 9 070 |
| 11 | 02 декабря 1997 года | Ноябрь 1997 года | 8 560 |
| 12 | 26 декабря 1997 года | Декабрь 1997 года | 9 100 |
| 13 | 30 января 1998 года | Январь 1998 года | 12 760 |
| 14 | 26 февраля 1998 года | Февраль 1998 года | 10 190 |
| 15 | 31 марта 1998 года | Март 1998 года | 9 900 |
| 16 | 24 апреля 1998 года | Апрель 1998 года | 8 040 |
| 17 | 31 мая 1998 года | Май 1998 года | 13 600 |
| 18 | 01 июля 1998 года | Июнь 1998 года | 12 480 |
| 19 | 30 июля 1998 года | Июль 1998 года | 10 303 |
| 20 | 31 августа 1998 года | Август 1998 года | 11 900 |
| 21 | 01 октября 1998 года | Сентябрь 1998 года | 12 370 |
| 22 | 31 октября 1998 года и Приложение к акту от 31 октября 1998 года | Октябрь 1998 года | 13 490 |
| 23 | 01 декабря 1998 года и Приложение к акту от 01 декабря 1998 года | Ноябрь 1998 года | 10 018 |
| 24 | 28 декабря 1998 года | Декабрь 1998 года | 6 407 |

A - 1123

На основании подписанных Должником и Кредитором Актов поставки-(получения) природного газа Кредитор выставил Должнику счета-фактуры на оплату, а именно (копии счетов-фактур прилагаются):

| № п/п | Дата Акта поставки (получения) природного газа | Номер и дата счета-фактуры на оплату | Сумма по счету-фактуре/счету (с учетом деноминации), в руб. |
|---|---|---|---|
| 1 | 31 января 1997 года | № 138 от 14 февраля1997 года | 4 164 148=80 |
| 2 | 28 февраля 1997 года | № 240 от 07 марта 1997 года | 3 375 108=00 |
| 3 | 30 марта 1997 года | № 396 от 03 апреля 1997 года | 3 784 212=00 |
| 4 | 30 апреля 1997 года | № 514 от 30 апреля 1997 года | 3 306 924=00 |
| 5 | 02 июня 1997 года | № 561 от 30 мая 1997 года | 3 409 200=00 |
| 6 | 01 июля 1997 года | № 669 от 30 июня 1997 года | 3 545 568=00 |
| 7 | 01 августа 1997 года | № 739 от 31 июля 1997 года | 4 674 354=12 |
| 8 | 01 сентября 1997 года | № 824 от 29 августа 1997 года | 3 654 662=40 |
| 9 | 01 октября 1997 года | № 899 от 30 сентября 1997 года | 3 600 115=20 |
| 10 | 01 ноября 1997 года | № 1006 от 31 октября 1997 года | 3 092 144=40 |
| 11 | 02 декабря 1997 года | № 1074 от 28 ноября 1997 года | 2 918 275=20 |
| 12 | 26 декабря 1997 года | № 1141 от 29 декабря 1997 года | 3 205 020=00 |
| 13 | 30 января 1998 года | № 69 от 30 января 1998 года | 4 494 072=00 |
| 14 | 26 февраля 1998 года | № 163 от 27 февраля 1998 года | 3 588 918=00 |
| 15 | 31 марта 1998 года | № 273 от 31 марта 1998 года | 3 486 780=00 |
| 16 | 24 апреля 1998 года | № 378 от 27 апреля 1998 года | 2 831 688=00 |
| 17 | 31 мая 1998 года | № 459 от 29 мая 1998 года | 4 789 920=00 |
| 18 | 01 июля 1998 года | № 578 от 30 июня 1998 года | 4 395 456=00 |
| 19 | 30 июля 1998 года | № 742 от 31 июля 1998 года | 3 628 716=60 |
| 20 | 31 августа 1998 года | № 857 от 31 августа 1998 года | 4 191 180=00 |
| 21 | 01 октября 1998 года | № 972 от 30 сентября 1998 года | 4 356 714=00 |
| 22 | 31 октября 1998 года | № 1109 от 30 октября 1998 года | 4 751 178=00 |
| 23 | 01 декабря 1998 года | № 1276 от 30 ноября 1998 года | 3 528 339=60 |
| | | № 1354 от 25 декабря 1998 года | 1 695 843=00 |
| 24 | 28 декабря 1998 года | № 1371 от 29 декабря 1998 года | 2 256 545=40 |
| | | **ИТОГО** | **90 725 082=72** |

Таким образом, согласно счетам-фактурам, стоимость поставленного по договору № 4/п от 24.01.1997 года природного газа составила 90 725 082=72 рубля.

Согласно п. 5.3. Договора №. 4/п от 24 января 1997 года Кредитор выставил Должнику платежные требования, а именно (копии платежных требований прилагаются):

| № п/п | Номер и дата платежного требования | Сумма по платежному требованию (с учетом деноминации), в руб. |
|---|---|---|
| 1 | № 15 от 17 февраля 1997 года | 4 164 148=80 |
| 2 | № 23 от 8 апреля 1997 года | 7 159 320=00 |
| 4 | № 47 от 29 мая 1997 года | 3 306 924=00 |
| 5 | № 60 от 26 июня 1997 года | 3 409 200=00 |
| 6 | № 64 от 14 июля 1997 года | 3 545 568=00 |
| 7 | № 73 от 13 августа 1997 года | 4 674 354=12 |

A - 1124

| 11 | Акт № 42 – 01/859 на проведение взаиморасчетов между П «Тюментрансгаз», Красноуральскмежрайгаз, Качканарский ГОК, ЗАО ТД «Урал» | 01 апреля 1999 года | 3 000 000=00 |
|---|---|---|---|
| 12 | Акт зачета взаимных требований между АО «Ванадий» г.Качканар,ООО«Промтехснаб» г.Екатеринбург, АО«Красноуральскмежрайгаз» г.Красноуральск | 14 мая 1999 года | 216 012=00 |
| 13 | Акт зачета взаимных требований № 42-01/368 | 24 февраля 1997 года | 5 000 000=00 |
| 14 | Акт зачета взаимных требований № 16816 между АО «Ванадий» г.Качканар, ООО «Промтехснаб» г.Екатеринбург,АО«Красноуральск межрайгаз» г. Красноуральск | 10 июня 1998 года | 345 446=42 |
| 15 | Акт зачета взаимных требований между ОАО КГОК «Ванадий», ОАО «Красноуральскмежрайгаз», ЗАО УМСК «Каменный пояс» | 02 июня 1999 года | 900 000=00 |
| 16 | Акт № 42 – 01/505 на проведение взаимозачета пл. требований между предприятиями Качканарский ГОК, Красноуральскмежрайгаз, ДП Тюментрансгаз | 25 июня 1997 года | 7 000 000=00 |
| 17 | Соглашение № 6-ВР/109 о зачете взаимной задолженности Акт № 6-ВР/109 зачета взаимных требований | 17 марта 1997 года<br><br>17 марта 1997 года | 3 000 000=00 |
| 18 | Акт зачета взаимных требований между ОАО «КГОК «Ванадий» и ОАО «Красноуральскмежрайгаз» по договору на снабжение природным газом № 4/п от 24.01.1997 года | 05 июня 1999 года | 2 908 973=90 |
|  |  | ИТОГО: | 68006049=32 |

В результате данного погашения задолженность Должника перед Кредитором по договору № 4/п от 24.01.1997 года составила 22 719 033=40 рубля. Указанная сумма получилась в результате вычитания из общего размера задолженности Должника перед Кредитором по договору № 4/п от 24.01.1997 года (90 725 082=72 рубля) суммы погашенной задолженности (68 006 049=32 рублей).

В подтверждении этого Должник и Кредитор подписали Акт сверки взаимных расчетов между Должником и Кредитором по состоянию на 15.12.1999 года (копия Акта прилагается).

Приводя указанные выше сведения и прилагая указанные выше документы. Кредитор исполняет требования, закрепленные в абз. 6, 8 п. 2 ст. 35 и п. 1 ст. 37 Федерального закона «О несостоятельности (банкротстве)» (в заявлении Кредитора

должны быть указаны обязательство Должника перед Кредитором, из которого возникло требование, срок его исполнения, а также доказательства, подтверждающие основания заявления кредитора, что должно быть подтверждено соответствующими документами).

### III

4 февраля 2000 года Кредитор направил в адрес Должника претензию (вх. 370 от 7 февраля 2000 года; копия прилагается), в которой требовал погасить задолженность, образовавшуюся у Должника перед Кредитором по договору № 4/п от 24.01.1997 года на снабжение природным газом в размере 22 719 033=40 рубля.

В ответ на указанную претензию Должник направил Кредитору письмо (исх. № 4050- 110А от 8 февраля 2000 года; копия прилагается), в соответствии с которым Должник признал задолженность Должника перед Кредитором по договору № 4/п от 24.01.1997 года на снабжение природным газом в размере 22 719 033=40 рубля, но отказался ее погасить.

15 февраля 2000 года Кредитор направил в адрес Должника претензию (вх. 493А от 16 февраля 2000 года; копия прилагается), в которой повторно требовал погасить задолженность, образовавшуюся у Должника перед Кредитором по договору № 4/п от 24.01.1997 года на снабжение природным газом в размере 22 719 033=40 рубля, и предупредил о своём намерении в случае отказа в погашении задолженности обратиться за защитой своих прав в судебном порядке.

В ответ на указанную претензию Должник направил Кредитору письмо (исх. № 4050-149А от 21 февраля 2000 года; копия прилагается), в соответствии с которым Должник повторно признал задолженность Должника перед Кредитором договору № 4/п от 24.01.1997 года на снабжение природным газом в размере 22 719 033=40 рубля и повторно отказался ее погасить.

Указанные выше претензия и письма Кредитор представляет Арбитражному суду и ссылается на них, руководствуясь абз. 7 п. 2 ст. 35 и абз. 3 п. 3 ст. 37 Федерального закона «О несостоятельности (банкротстве)» (в заявлении Кредитора должны быть указаны и к заявлению должны быть приложены доказательства обоснованности требований Кредитора, в том числе доказательства, подтверждающие признание требований Должником).

### IV

Принимая во внимание, что в течение более одного года Должник не погасил задолженность перед Кредитором в сумме 22 719 033=40 рубля, Кредитор, руководствуясь п.1 ст. 6, п.1 ст. 32, ст.ст. 35, 37 ФЗ «О несостоятельности (банкротстве)», решил удовлетворить свои требования в рамках процесса о банкротстве Должника.

Руководствуясь абз. 5 п. 2 ст. 35 Федерального закона «О несостоятельности (банкротстве)», Кредитор указывает на то, что размер требований Кредитора к Должнику составляет 22 719 033=40 рубля; при этом данная сумма представляет собой размер основного долга, в нее не входит размер процентов и неустоек (штрафов, пени), которые Должник не требует, а Кредитор не признает.

Таким образом, исходя из того, что на момент подачи настоящего заявления задолженность Должника перед Кредитором в размере 22 719 033=40 рубля не погашена в течение более чем 3-х месяцев с момента ее возникновения, а сумма задолженности превышает установленный п.2 статьи 5 Федерального закона «О несостоятельности (банкротстве)» предел 500 минимальных размеров оплаты труда,

Кредитор, руководствуясь статьей 143 АПК и статьей 48 ФЗ «О несостоятельности (банкротстве)».

**ПРОСИТ:**

Арбитражный суд Свердловской области признать ОАО «Качканарский горно-обогатительный комбинат «Ванадий» банкротом и открыть конкурсное производство.

**Приложения:**
1. Доказательство уплаты государственной пошлины;
2. Квитанция об отправке копии заявления Должнику;
3. Квитанция об отправке копии заявления Территориальному органу ФСДН;
4. Квитанция об отправке копии заявления Органу местного самоуправления;
5. Ходатайство Кредитора о назначении временного управляющего с 13 приложениями;
6. Копия Устава;
7. Копия Протокола о назначении Генерального директора общества;
8. Копия Договора № 4/п от 24 января 1997 года;
9. Копия письма № 80 от 21 января 1998 года;
10. Копия письма 72 58/1ДПР от 10 февраля 1998 года;
11. Копия акта на поставку газа от 31 января 1997 года;
12. Копия акта на поставку газа от 28 февраля 1997 года;
13. Копия акта на поставку газа от 30 марта 1997 года;
14. Копия акта на поставку газа от 30 апреля 1997 года;
15. Копия акта на поставку газа от 02 июня 1997 года;
16. Копия акта на поставку газа от 01 июля 1997 года;
17. Копия акта на поставку газа01 августа 1997 года;
18. Копия акта на поставку газа от 01 сентября 1997 года;
19. Копия акта на поставку газа от 01 октября 1997 года;
20. Копия акта на поставку газа от 01 ноября 1997 года;
21. Копия акта на поставку газа от 02 декабря 1997 года;
22. Копия акта на поставку газа от 26 декабря 1997 года;
23. Копия акта на поставку газа от 30 января 1998 года;
24. Копия акта на поставку газа от 26 февраля 1998 года;
25. Копия акта на поставку газа от 24 апреля 1998 года;
26. Копия акта на поставку газа от 31 мая 1998 года;
27. Копия акта на поставку газа от 01 июля 1998 года;
28. Копия акта на поставку газа от 30 июля 1998 года;
29. Копия акта на поставку газа от 31 августа 1998 года;
30. Копия акта на поставку газа от 01 октября 1998 года;
31. Копия акта на поставку газа от 31 октября 1998 года;
32. Копия приложения к акту от 31 октября 1998 года;
33. Копия акта на поставку газа от 01 декабря 1998 года;
34. Копия приложения к акту от 01 декабря 1998 года;
35. Копия акта на поставку газа от 28 декабря 1998 года;
36. Копия акта передачи простых векселей ОАО «НТМК» от 16 декабря 1997г.
37. Копия акта приема-передачи простого векселя от 22 февраля 1999г.
38. Копия акта передачи простых векселей ОАО «НТМК» от 03 декабря 1997г.
39. Копия акта приема-передачи простого векселя от 08 апреля 1999г.
40. Копия акта передачи простых векселей ОАО «Качканарский горно-обогатительный комбинат Ванадий от 30 марта 1997г.
41. Копия акта приема-передачи простых векселей от 14 апреля 1998г.
42. Копия акта приема-передачи простых векселей АООТ «Западно-сибирский металлургический комбинат» от 29 января 1997г.

A - 1127

43. Копия акта приема-передачи простых векселей к договору № 4/п от 24.01.97г. от 25 августа 1998г.

44. Копия доверенности ОАО «Красноуральскмежрайгаз» на Васильева В.В. №1060 от 29.06.98г.

45. Копия акта передачи простых векселей ОАО «ММК» от 16 декабря 1997г.

46. Копия акта зачета взаимных требований от 19 июля 1999г.

47. Копия акта № 42 – 01/859 на проведение взаиморасчетов между П «Тюментрансгаз», Красноуральскмежрайгаз, Качканарский ГОК, ЗАО ТД «Урал» от 01 апреля 1999г.

48. Копия акта зачета взаимных требований между АО «Ванадий» г. Качканар, ООО «Промтехснаб» г.Екатеринбург, АО «Красноуральскмежрайгаз» г. Красноуральск от 14 мая 1999г.

49. Копия Акта зачета взаимных требований № 42 –01/368 от 24 февраля 1997 года;

50. Копия акта зачета взаимных требований № 16816 от 10 июня 1998 года;

51. Копия акта зачета взаимных требований от 02 июня 1999 года;

52. Копия акта № 42 – 01/505 от 25 июня 1997 года на проведение взаимозачета;

53. Копия акта № 6-ВР/109 о зачете взаимных требований от 17 марта 1997 года;

54. Копия соглашения № 6-ВР/109 о зачете взаимной задолженности 17 марта 1997 года;

55. Копия акта зачета взаимных требований от 05 июня 1999 года;

56. ~~Копия акта зачета взаимных требований от 24 января 1997 года;~~

57. Копия счета-фактуры № 138 от 14 февраля 1997 года;

58. Копия счета-фактуры № 240 от 07 марта 1997 года;

59. Копия счета-фактуры № 396 от 03 апреля 1997 года;

60. Копия счета-фактуры № 514 от 30 апреля 1997 года;

61. Копия счета-фактуры № 561 от 30 мая 1997 года;

62. Копия счета-фактуры № 669 от 30 июня 1997 года;

63. Копия счета-фактуры № 739 от 31 июля 1997 года;

64. Копия счета-фактуры № 824 от 29 августа 1997 года;

65. Копия счета-фактуры № 899 от 30 сентября 1997 года;

66. Копия счета-фактуры № 1006 от 31 октября 1997 года;

67. Копия счета-фактуры № 1074 от 28 ноября 1997 года;

68. Копия счета-фактуры № 1141 от 29 декабря 1997 года;

69. Копия счета-фактуры № 69 от 30 января 1998 года;

70. Копия счета-фактуры № 163 от 27 февраля 1998 года;

71. Копия счета-фактуры № 273 от 31 марта 1998 года;

72. Копия счета-фактуры № 378 от 27 апреля 1998 года;

73. Копия счета-фактуры № 459 от 29 мая 1998 года;

74. Копия счета-фактуры № 578 от 30 июня 1998 года;

75. Копия счета-фактуры № 742 от 31 июля 1998 года;

76. Копия счета-фактуры № 857 от 31 августа 1998 года;

77. Копия счета-фактуры № 972 от 30 сентября 1998 года;

78. Копия счета-фактуры № 1109 от 30 октября 1998 года;

79. Копия счета-фактуры № 1276 от 30 ноября 1998 года;

80. Копия счета-фактуры № 1354 от 25 декабря 1998 года;

81. Копия счета-фактуры № 1371 от 30 января 1998 года;

82. Копия платежного требования № 15 от 17 февраля 1997 года;

83. Копия платежного требования № 23 от 08 апреля 1997 года;

84. Копия платежного требования № 47 от 29 мая 1997 года;

85. Копия платежного требования № 60 от 26 июня 1997 года;

86. Копия платежного требования № 64 от 14 июля 1997 года;

87. Копия платежного требования № 73 от 13 августа 1997 года;

88. Копия платежного требования № 88 от 08 сентября 1997 года;

89. Копия платежного требования № 95 от 13 октября 1997 года;

90. Копия платежного требования № 56 от 11 ноября 1997 года;

A - 1128

91. Копия платежного требования № 81 от 09 января 1998 года;
92. Копия платежного требования № 72 от 09 февраля 1998 года;
93. Копия платежного требования № 84 от 03 февраля 1998 года;
94. Копия платежного требования № 105 от 11 марта 1998 года;
95. Копия платежного требования № 115 от 28 апреля 1998 года;
96. Копия платежного требования № 128 от 14 мая 1998 года;
97. Копия платежного требования № 142 от 08 июня 1998 года;
98. Копия платежного требования № 154 от 08 июля 1998 года;
99. Копия платежного требования № 165 от 03 августа 1998 года;
100. Копия платежного требования № 174 от 15 сентября 1998 года;
101. Копия платежного требования № 193 от 19 октября 1998 года;
102. Копия платежного требования № 202 от 16 ноября 1998 года;
103. Копия платежного требования № 212 от 03 декабря 1998 года;
104. Копия платежного требования № 216 от 25 декабря 1998 года;
105. Копия платежного требования № 301 от 18 января 1998 года;
106. Копия акта сверки от 15 февраля 2000 года;
107. Копия письма Филиала Уралтрансбанка о принятии платежных требований;
108. Копия претензии вх. 370 от 07 февраля 2000 года;
109. Копия ответа на претензию исх. № 4050-110А от 08 февраля 2000 года;
110. Копия претензии вх. 493А от 16 февраля 2000 года;
111. Копия ответа на претензию исх. № 4050-149А от 21 февраля 2000 года;
112. Копия счета-фактуры № 1668 от 31 марта 1998г.
113. Копия счета-фактуры № 6788 от 17.12.97г.
114. Копия счета-фактуры № 6838 от 18.12.97г.
115. Копия счета-фактуры № 014293 от 23.12.97г.
116. Копия счета-фактуры № 6424 от 01.12.97г.
117. Копия счета-фактуры № 014193 от 14.01.97г.
118. Копия счета-фактуры № 480 от 30.01.1998г.
119. Доверенность на Степанову Е.А. от 20.03. 2000 года, предоставляющая право на удостоверение копий письменных доказательств, представляемых в Арбитражный суд;
120. Доверенность на Степченко Т.Н. от 20.03. 2000 года, предоставляющая право на удостоверение копий письменных доказательств, представляемых в Арбитражный суд;
121. ~~Заявление о принятии мер по обеспечению требований кредиторов с 23 приложениями.~~ *нет. Ш. Ши...*

Генеральный директор
ОАО «Красноуральскмежрайгаз»              В.Г. Шишкин

**NATURAL GAS DELIVERY**
## CONTRACT No. 4/P

January 24, 1997

Krasnoural'sk

The Public Joint Stock Company Kranoural'skmezhraygaz, represented by its General Director
V. G. Shishkin acting on the basis of the Company's Bylaws, hereinafter referred to as "GRO",
on the one hand, and AO Kachkanarskiy GOK Vanadiy [the Joint Stock Company Vanadium
Processing Works of Kachkanar], represented by V. B. Molchanov, acting on the basis of
_____, hereinafter referred to as the "User," on the other hand, have
entered into this contract as follows:

### 1.    Subject Matter

1. 1    GRO shall deliver and the User shall accept and pay for natural gas in the amount of
140 million cubic meters broken down by quarters as follows:

Quarter I:        40 million cubic meters
Quarter II:       20 million cubic meters
Quarter III:      40 million cubic meters
Quarter IV:       40 million cubic meters

1. 2    The volumes specified above in Item 1.1 hereof shall be distributed evenly by each
quarter's months. The User shall take into account, to the maximum extent possible, the
uneven nature of gas consumption by month, both for utility requirements and
population, provided that GRO is notified of such uneven requirements at least 30 days
prior to a scheduled quarter.

### 2.    Delivery Method

2. 1    The gas volumes specified above in Item 1.1 hereof shall be delivered and accepted
evenly within each month with maximum allowable deviations of daily volumes from the
average daily gas delivery rates not exceeding 5%. Within each 24 hours, allowable
deviations of gas delivery from average hourly rates shall not exceed 5%.

2. 2    The User shall be entitled to uneven gas deliveries on a contractual basis provided GRO
is reimbursed for any additional costs.

2. 3    Any operational instructions by RAO Gazprom's TsPDU [Operations Control Center] for
gas deliveries and/or consumption shall be mandatory for execution by both parties
provided such instructions are within the scope of authority of said Center.

2. 4   Any gas consumption by the User in excess of contracted daily volumes, unless previously agreed to by GRO, shall result in an increase in payments for such excessive gas volumes using the following step-up factors:

from April 15 to September 15:      1.1
from September 16 to April 14:     4.0

2. 5   In order to provide uninterrupted and safe gas deliveries, the User shall draft and obtain GRO's agreement to schedules for User conversion to backup fuels. These schedules (Schedule 1: User Conversion to Backup Fuels and Schedule 2: Emergency Gas Supplies) are attached hereto and shall constitute an integral part of this contract. Procedures for applying such schedules and the sequence of user disconnection from the gas supply system shall be as determined by RAO Gazprom's Operations Control Center.

2. 6   Should the User's consumption exceed the average daily rates of gas consumption, GRO shall have the right to enforce constraints on gas supplies down to the established average daily rates upon expiration of 24 hours from the time the User was notified thereof.

2. 7   Should any malfunction in main gas pipeline operations occur as a result of an accident, RAO Gazprom's Operations Control Center will instruct GRO, and GRO will instruct the User, to apply Schedule 2 and adjust the average daily gas consumption rates accordingly. If this requirement is not complied with, GRO shall have the right to enforce constraints on gas supplies to the User down to the established average daily rates without any additional notification.

2. 8   The User shall apply said schedules at GRO's request for gas lift within the established daily volumes.

2. 9   Both GRO and the User shall monitor reasonable gas use within the assigned volumes and provide such accounting of gas consumption as may be necessary.

2. 10  GRO shall have the right to partially reduce or completely stop any gas deliveries if any of the following occurs:
- an event of force majeure;
- accrual of outstanding sums due and payable for any gas delivered;
- any interruption in operating control communications with the User in order to provide safety.

2

### 3. Gas Delivery Accounting Procedures

3. 1    In accordance with GOST 2939–63, Gases: Conventions Used for Volume Determination, one cubic meter of gas shall be used as a conventional accounting unit under the following conditions:
- Temperature: 20 degrees Celsius (293.15 K)
- Pressure: 760 mm of mercury (101325 H/m$^2$)
- Humidity: 0

3. 2    The quantity of any delivered or accepted gas shall be determined based on readings of the User's control and measurement instruments that meet the requirements of the Rules for Measuring Gas and Liquid Flow Rates Using Standard Contracting Devices (RD–50–213–80), existing GOSTs, and other standards and codes. In the event of failure or absence of such User's control and measurement instruments or seal tampering, the quantity of any delivered or accepted gas shall be determined based on design capacity of gas units and the number of hours of operation of the User's plant during the time such gas flow metering devices remain faulty or absent. Any dispute between GRO and the User related to the quantity of any delivered or accepted gas shall be resolved as provided by the Russian Federation Rules for Gas Deliveries to Users, No. 1445, dated December 30, 1994.

3. 3    The gas system custody boundary between GRO and the User shall be the incoming valve at the User's facility.

3. 5    [sic] Every day before 10 AM Moscow time, the User shall provide to GRO information on the quantity of gas delivered or accepted during the preceding 24 hours. Mutual claims with respect to payments shall be made within 10 days of receipt of such information on gas quantities. Confirmation of the quantity of gas delivered or accepted during a month shall be made by telephone on the first day of each month no later than 3 PM Moscow time to be followed by execution of a bilateral written statement.

3. 6    Adjustments to estimates of daily gas quantities shall be made in such manner as may be provided by the RD–50–213–80 Rules. Flow meters must be inspected by local Gosstandart [Russian State Standards Committee] offices in addition to regular operability checks to be performed in accordance with existing procedures.

3. 7    GRO shall be entitled to have its representatives witness any change of charts, scheduled audits, and checks of gas flow metering and accounting devices. The User and GRO shall approve a schedule for mutual periodical checks of gas flow metering devices.

3

3.8    Should any error be discovered during chart processing or calculation of daily gas quantities, an adjustment shall be made in the quantity of gas delivered during the next 24 hours with allowance made for the error discovered during the preceding 24 hours.

3.9    Only personnel with proper Gosstandart Ids shall be allowed to conduct checks of gas flow metering and accounting devices.

### 4.    Gas Quality Determination

4.1    The delivered natural gas shall meet the quality specifications provided by Items 1 through 7 of the Table in GOST 5542–87.

4.2    The gas quality specifications shall be as determined by Tumentransgaz LPU MG [Main Gas Pipeline Operating Department].

4.3    GRO shall provide results of the analysis of any gas supplied on a monthly basis no later than on the 30th day of each month.

### 5.    Price and Payment Procedures

5.1    The natural gas price shall be determined in accordance with Government Decree No. 678 dated July 13, 1993 "On State Regulation of Prices for Natural Gas and Other Energy Resources" and shall be escalated on a monthly basis. The escalation index shall be provided by GRO to the User within 6 days of receipt of Tumentransgaz notice of price index adjustment.

5.2    In the event of any deviation of the actual gas combustion heat value from the nominal value (7900 kcal/m$^3$ ± 100 kcal/m$^3$), the gas price shall be adjusted based on recalculation for the actual gas combustion heat value using the following formula:

$$P_n = \frac{Q_a}{7900} \times P_c$$

where  $Q_a$ is the actual average monthly natural gas calorific capacity (kcal/m$^3$);
   $P_n$ is the new price of 1000 m$^3$ of natural gas;
   $P_c$ is the price of 1000 m$^3$ of natural gas under the existing contract.

Price recalculation based on the actual caloric value shall be made by GRO once a month using the average monthly calorific capacity value as agreed to by the User.

4

A - 1133

5. 3    The User agrees to pay off any outstanding amounts owed by the User for the used gas under the 1996 Contract by June 31, 1997 and make timely payments for the gas supplied in 1997. Should partial payment be made for the gas received in 1997, gas delivery volumes will be reduced in proportion to the percentage of the amount paid beginning on July 1, 1997. Payments for the gas delivered hereunder shall be made by submitting payment orders to GRO, on a nonacceptance basis, by the 20th day of the month following the month of payment. By the 5th day of the month following the month of payment, the User agrees to provide to GRO adjustment statements executed in a mutually agreed-to format, including any outstanding amounts due for previous years and months of 1996 (see Exhibit 1).

5. 4    As of July 1, 1997, payments for any gas supplied shall be made by the User by cash transfers, and any outstanding amounts due may be settled by mutual setoff only subject to an additional agreement with GRO.

5. 5    Any services provided by GRO for delivery of natural gas to the User through GRO gas pipelines shall be deemed completed upon payment by the User for the gas received or upon setoff of mutual claims.

5. 6    GRO may assign to a third party any of its claims for any amounts due for the natural gas used by the User.

### 6.    Relations between the Parties

6. 1    *Payment Period and its Starting Point:*
A  payment period shall be one calendar month beginning at 10 AM Moscow time on the first day of the month and ending at 10 AM Moscow time on the first day of the following month.

6. 2    Any proposals by the User for redistribution of gas volumes under contract shall be accepted by GRO by the 20th day of the current month or by agreement of the parties thereafter.

6. 3    The parties agree to notify each other immediately of any accidents or failures at their facilities which may result in reduction or complete interruption of gas deliveries or acceptance as well as an estimated time such gas deliveries or acceptance will be resumed. The relations between the parties shall be governed by the terms and conditions of this Contract, the Rules for Gas Deliveries to Users in the Russian Federation, and existing regulations in the Russian Federation.

6. 4    The User shall, at GRO's request, provide operating information with respect to gas consumption rates and status of payments for the delivered natural gas.

5

6. 5    The parties agree to notify each other of any stoppage by telephone within the following
periods:
  - for scheduled stops, 30 days in advance;
  - for unscheduled stops, 3 days prior to the stop.

6. 6    The parties shall notify each other in writing, within a 3-day period, of their new legal
addresses and bank information, should this information be changed.

## 7.    Liabilities

7. 1    Failure to make payment for gas, in whole or in part, within such periods as may be
provided for by this Contract, shall provide basis for reducing gas deliveries or complete
termination thereof.

7. 2    The parties liabilities shall apply in accordance with the Rules for Gas Deliveries to
Users in the Russian Federation, including the following:
  - For short supply of gas, the party at fault shall pay to the other party a penalty in the
    amount of 8% of the cost of delivery of gas that was not supplied during the relevant
    month. The penalty shall be collected on a claim basis within 6 months of the date
    such claim may accrue;
  - For unsubstantiated nonacceptance write-off of cash funds from the account, the
    party at fault, in addition to return of the amount so written off, shall pay to the other
    party a penalty for each day of the use of such cash funds, with the amount of such
    penalty to be determined based on the bank interest rate existing at the GRO
    location;
  - For late payment for the delivered gas, the User shall pay to GRO a default fee in the
    amount of 0.5% of the amount due for each day of the delay;
  - For incomplete use by the User of the monthly gas volume under contract without a
    prior mutual agreement with GRO, the User shall return to GRO 10% of the cost of
    unused gas.

7. 3    The parties shall be relieved of their liabilities if they are able to prove that
nonperformance or improper performance hereunder has been caused by an event
beyond their reasonable control.

7. 4    Any dispute arising from execution, performance, or termination of this Contract shall be
referred to Sverdlovsk Oblast Arbitration Tribunal.

6

### *8.    Effect of the Contract*

8. 1    This Contract is executed for a period of one year, from January 1, 1997 to December 31, 1997 and, with respect to payments hereunder, until full completion of such payments.

8. 2    For any matter that is not regulated by this Contract, the parties shall be governed by existing laws of the Russian Federation.

8. 3    This Contract is executed in two counterparts, one for each party. Both counterparts shall have equal legal force.

### *10.    [sic] Legal Addresses of the Parties*

10. 1  *GRO:*        OAO Krasnoural'skmezhraygaz
624330 Sverdlovsk Oblast, Krasnoural'sk, ul. Ustinova, d. 34
Tel. 2–10–25, fax 2–14–23, teletype 0284306 Metan
Taxpayer ID: 6618001551
Settlement account # 000467827 at UTB Branch, Krasnoural'sk
Correspondent account # 800161122 RKTs, N. Tura
Banking code: 046552822
OKPO [All-Russia Classification of Enterprises and Organizations]:
03302747
OKONKh [All-Russia Classification of Branches of National Economy]:
90214

10. 2  *The User:*    Public Joint Stock Company Kachkanarskiy GOK Vanadiy
[Vanadium Processing Works of Kachkanar]
Tel. 3–34–55, fax 34341–21650, teletype 721255
Taxpayer ID: 6615001962
Settlement account # 000467070 at Kachkanar Commercial Bank
Correspondent account # 700161210
Banking code: 046513710
OKPO [All-Russia Classification of Enterprises and Organizations]:
00186938
OKONKh [All-Russia Classification of Branches of National Economy]:
12112; 12130

7

**A - 1136**

*11.*    ***Signatures of the Parties:***
*Including the List of Exceptions*

For GRO:                          For the User:
[signature]                       [signature]
[seal]                            [seal]

                                            [signatures]

8

A - 1137

2541-1-1 72.657/2п

5279

# ДОГОВОР 4/п
## на снабжение природным газом

"24" 01 1997г. г. Красноуральск

Открытое акционерное общество "Красноуральскмежрайгаз" в лице генерального директора В.Г.Шишкина, действующего на основании Устава предприятия, именуемое в дальнейшем "ГРО", с одной стороны, и АО Качканарский ГОК "Ванадий" в лице Мелихова В.Б. действующего на основании : именуемое в дальнейшем "Потребитель", с другой стороны, заключили настоящий договор о нижеследующем:

### 1. Предмет договора.

1.1. ГРО обязуется поставлять, а Потребитель принимать и оплачивать природный газ в объеме 140 млн метров куб. со следующей разбивкой по кварталам:

I квартал 40 млн м. куб. ;
II квартал 20 " м. куб. ;
III квартал 40 " м. куб. ;
IV квартал 40 " м. куб. .

1.2. Распределение объемов, указанных в п. 1.1. настоящего договора, по месяцам квартала производится равномерно.
Потребитель максимально учитывает неравномерность потребления газа по месяцам на коммунально-бытовые нужды и для населения при условии доведения до ГРО требуемой неравномерности не позднее 30 дней до начала планируемого квартала.

### 2. Режим снабжения.

2.1. Поставка-прием объемов газа, указанных в п. 1.1., производится равномерно в течение месяца с допустимыми отклонениями суточных объемов от среднесуточной нормы поставки газа не более 5%. Отклонение подачи газа в течение суток допускается не более 5% от среднечасового.
2.2. Потребителю предоставляется право неравномерного газопотребления на договорной основе с возмещением ГРО дополнительных расходов.
2.3. Оперативные распоряжения ЦПДУ РАО "Газпром" в пределах его компетенции по подаче (потреблению) газа являются обязательными к выполнению обеими сторонами.
2.4. Расход газа Потребителем сверх договорных суточных объемов без предварительного согласования с ГРО влечет повышенную оплату объема перерасходованного газа с повышающим коэффициентом:

- 2 -

с 15 апреля по 15 сентября - 1.7 ;
с 16 сентября по 14 апреля - 4,0 .

2.5. Для обеспечения бесперебойной и безопасной подачи газа Потребитель составляет и согласовывает с ГРО. графики перевода Потребителя на резервные виды топлива. Данные графики (перевода Потребителя на резервные виды топлива - график 1 и график аварийного газоснабжения - график 2) прилагаются к договору и являются его неотъемлемой частью. Применение графиков и очередность отключения Потребителей от газовых сетей определяется ЦПДУ РАО "Газпром".

2.6. При перерасходе Потребителем среднесуточной нормы потребления газа, ГРО предоставляется право проводить принудительное ограничение подачи газа до установленной среднесуточной нормы по истечении 24 часов с момента предупреждения Потребителя.

2.7. При нарушении технологических режимов работы магистральных газопроводов в результате аварии ЦПДУ РАО "Газпром" дает указание ГРО, а ГРО Потребителю о введении в действие Графика и соответствующем изменении среднесуточной нормы потребления газа. При невыполнении данного требования ГРО вправе принудительно ограничить подачу газа Потребителю до установленной среднесуточной нормы подачи газа без дополнительного предупреждения.

2.8. Введение указанных графиков Потребитель производит по требованию ГРО об отборе газа в пределах установленного суточного объема.

2.9. ГРО и Потребитель осуществляют контроль за рациональным использованием газа в пределах выделяемых объемов и за обеспечением необходимого учета его потребления.

2.10. ГРО имеет право уменьшить частично или прекратить полностью подачу газа в случаях:
- наличия форс-мажорных обстоятельств;
- наличия задолженности по оплате за поставленный газ;
- отсутствия диспетчерской связи с Потребителем в целях обеспечения безопасности.

**3. Порядок учета отпускаемого газа.**

3.1. За расчетную единицу в соответствии с ГОСТом 2939-63 "Газы. Условия для определения объема" принимается один кубический метр газа при следующих условиях:
- температура 20 град. С ( 293,15 град. К);
- давление 760 мм рт. ст. ( 101325 Н/м. кв. );
- влажность равна 0.

3.2. Количество поданного (принятого) газа определяется по показаниям контрольно-измерительных приборов Потребителя, отвечающих требованиям Правил измерения расхода газов и жидкостей стандартными сужающими устройствами: РД-50-213-80,

- 3 -

действующих ГОСТов и другой НТД.

При неисправности или отсутствии контрольно-измерительных приборов у Потребителя, срыве пломб, количество поданного (принятого) газа определяется по проектной мощности газовых установок и количеству часов работы предприятия Потребителя за время неисправности (отсутствия) приборов учета расхода газа. Разногласия по количеству поданного (принятого) газа между ГРО и Потребителем разрешаются в соответствии с Правилами поставки газа потребителям РФ от 30.12.94 г. № 1445.

3.3. Границей балансовой принадлежности газовых сетей между ГРО и Потребителем является задвижка на вводе в объект Потребителя. Потребитель обязан ежедневно до 10-ти час. московского времени сообщать ГРО сведения о количестве поданного (принятого) газа за прошедшие сутки. Обоюдные претензии по расчетам предъявляются в течение 10-ти дней с момента получения сведений о количестве газа. Подтверждение количества поданного (принятого) газа за месяц производится обменом телефонограмм 1-го числа каждого месяца не позднее 15-ти час. московского времени с последующим оформлением двухстороннего акта.

В расчеты суточных количеств газа вносятся поправки в порядке, предусмотренном Правилами РД-50-213-80. Расходомеры должны проходить проверку в местных органах Росстандарта, а также периодическую проверку работоспособности в установленном порядке.

ГРО предоставляется право иметь своих представителей при снятии диаграмм, при плановых ревизиях и проверках средств измерения расхода и учета количества газа. Потребитель и ГРО согласовывают график взаимной периодической проверки средств измерения расхода газа.

3.3. В случае выявления ошибок при обработке диаграмм и расчетах суточных количеств газа, необходимо вводить коррекцию на количество поданного газа в следующие сутки с учетом выявленной ошибки предыдущих суток.

К работам по проверкам средств измерений расхода и учета количества газа допускаются только лица, имеющие соответствующие полномочия Росстандарта.

### 4. Определение качества газа.

4.1. Подаваемый природный газ должен удовлетворять показателям качества, предусмотренным пунктами 1-7 таблицы ГОСТ 5542-87. Показатели качества газа определяются линейным производственным управлением магистральных газопроводов ЛПУ МГ предприятия "Тюментрансгаз".

4.2. ГРО обязана ежемесячно, не позднее 30 числа каждого месяца, сообщать результаты анализа отпущенного газа.

### 5. Цена и порядок расчетов.

A - 1141

- 4 -

цена на природный газ определяется в соответствии с поста-
новлением Правительства N 678 от 13.07.93 г. "О госу-
дарственном регулировании цен на природный газ и другие виды
энергоресурсов" и индексируется ежемесячно. Данный индекс
ГРО доводит до Потребителя в течение 6 дней после получения
им сообщения от предприятия "Тюментрансгаз" об изменении ин-
декса цен.

5.2. Изменение цены газа при отклонении фактической теплоты сго-
рания газа от расчетной (7900 ккал/куб. м. +- 100 ккал/куб. м. )
производится в перерасчете на фактическую теплоту сгорания
газа по следующей формуле:

$$Цн = \frac{Qф}{7900} * ЦД$$

где: Qф - фактическая среднемесячная теплотворная способ-
ность природного газа ( ккал/куб. м. );
Цн - новая цена за 1000 куб. м. природного газа;
ЦД - цена природного газа за 1000 куб. м. по действующе-
му договору.

Пересчет цены на фактическую калорийность производится ГРО
один раз в месяц по среднемесячной теплотворной способности
по согласованию с Потребителем.

5.3. Потребитель обязуется погасить всю имеющуюся задолженность
за израсходованный газ по договору 1996 года в срок до
01.06.97 г., а также своевременно оплачивать за газ, полученный в
1997 году. В случае частичной оплаты за газ, полученный в
1997 году, с 01.07.97 года объемы поставки газа будут сниже-
ны пропорционально проценту оплаты. Расчеты за газ, подавае-
мый по настоящему договору, производятся выставлением ГРО
платежных требований в безакцептном порядке в срок до 20-го
числа месяца следующего за расчетным. В срок до 5-го числа
месяца, следующего за расчетным, Потребитель обязуется
представлять ГРО акты сверки по взаимосогласованной форме с
учетом долга прошлых лет и месяцев 1996 года (приложение 1).

5.4. С 01.07.97 года оплата за поставленный газ производится Потре-
бителем перечислением денежных средств, погашение долга
путем взаимозачетов возможно только по дополнительному сог-
ласованию с ГРО.

5.5. Услуги ГРО по подаче природного газа Потребителю по газопро-
водам ГРО считаются оказанными после оплаты Потребителем
отпущенного газа или с момента зачета взаимных требований.

5.6. ГРО вправе уступить право требования на взыскание задолжен-
ности за потребленный Потребителем природный газ третьим ли-
цам.

## 6. Взаимоотношения сторон.

За расчетный период и время его отсчета:

- 5 -

За расчетный период принимается один календарный месяц, с 10-ти час. московского времени 1-го числа до 10-ти час. московского времени 1-го числа следующего месяца.

6.2. Предложения Потребителя по перераспределению договорных объемов газа принимаются ГРО до 20-го числа текущего месяца. Позднее указанного срока - по согласованию сторон.

6.3. Стороны обязуются немедленно сообщать друг другу об авариях и неисправностях на объектах, вызывающих сокращение или полное прекращение подачи (приема) газа и ориентировочный срок возобновления подачи (приема) газа.

Взаимоотношения сторон определяются условиями настоящего договора, Правилами поставки газа Потребителям РФ и действующими нормативными актами РФ.

Потребитель, обязан по запросу ГРО предоставлять оперативную информацию о режиме газопотребления и состоянии платежей за поставленный природный газ.

6.5. Стороны обязуются уведомлять друг друга об остановках путем обмена телефонограммами в следующие сроки:
- о плановой остановке - за 30 дней;
- при неплановых остановках - за 2-ое суток до остановки.

6.6. Стороны обязуются в 3-х дневный срок письменно сообщать друг другу новые юридический адрес и банковские реквизиты, в случае их изменения.

## 7. Имущественная ответственность.

7.1. Отсутствие полной или частичной оплаты за газ в сроки, оговоренные настоящим договором, является основанием для сокращения подачи газа, вплоть до полного отключения.

7.2. Имущественная ответственность сторон применяется в соответствие с Правилами поставки газа потребителям РФ, в том числе:
- за недопоставку газа виновная сторона уплачивает другой стороне штраф в размере 8% стоимости подачи газа, который не был поставлен в течение месяца. Штраф взыскивается в претензионном порядке в течение 6-ти месяцев со дня возникновения права требования;
- за необоснованное безакцептное списание денежных средств с счета виновная сторона, кроме возврата списанной суммы, уплачивает другой стороне штраф за каждый день использования денежных средств, размер которого определяется исходя из существующей в месте нахождения ГРО учетной ставки банковского процента;
- за несвоевременную оплату поставленного газа Потребитель уплачивает ГРО пени в размере 0.5% от просроченной суммы за каждый день просрочки;
- при неполном использовании Потребителем договорного объема газа за месяц без предварительного взаимного согласования

A - 1143