[handwritten: 3648-1-1
72-[illegible]]

## CONTRACT No. 01-99/P

**City of Kachkanar**                                                                 **July 9, 1999**

Vanadiy Mining Enrichment Plant of Kachkanar Open Joint Stock Company, hereinafter referred to as the Supplier, represented by its General Director D.A. Khaydarov, acting on the basis of the Charter, and

Poliprom Limited Liability Company, hereinafter referred to as the Purchaser, represented by its General Director G.M. Bukharin, acting on the basis of the Charter,

hereinafter together referred to as the Parties, have entered into this contract (hereinafter the Contract) as follows:

### Article 1.
### SUBJECT OF THE CONTRACT

1.1. The subject of the contract is the delivery of raw iron ore sluice in 1999 (technical specification 14-00186933-003-95) and agglomerate (technical specification 14-00186933-005-95), hereinafter referred to as the Products, in the quantity, assortment, quality and at the price determined by the terms of the Contract and supplemental agreements.

1.2. The Supplier agrees to transfer title to the Products to the Purchaser (delivery at the addresses indicated by the Purchaser), and the Purchaser agrees to accept title to the Products and pay for them the price as established by this Contract.

1.3. The Supplier shall have the right to deliver Products under this contract up to 5% more or less than the total quantity of the monthly order. The obligations of the Supplier shall be considered performed and payment shall be made according to the actual delivered quantity of Products.

### Article 2.
### PRICE AND VOLUME OF DELIVERY

2.1. The price for raw iron ore shall be set by the Supplier independently, based on the economically justifiable costs of production, not counting VAT and the railroad fare.

2.2. Depending on the cost of production of the Products and on market conditions, the price of the Products may be changed during the period of delivery, about which the Supplier shall notify the Purchaser by telegram or letter no later than 10 (ten) days prior to the introduction of a new price. Within ten days after receipt of the notice the Purchaser shall negotiate with the Supplier on the change in price, which shall be set in supplemental agreements.

2.3. If partial payment has been made for a portion of the Products, the price for that portion of the Products shall remain unchanged.

2.4. The price of the Products shall be set in Russian rubles per ton, including VAT.

2.5. The volume of monthly delivery of Products and the price for them shall be stipulated by the Parties in supplemental agreements pursuant to the Purchaser's monthly orders.

### Article 3.
### MANNER, TERMS AND TIMES OF DELIVERY

3.1. The specific monthly volume of delivery shall be determined by the Parties in supplemental agreements at the end of the month preceding the month of delivery.

3.2. The total quantity of the Products according to the Purchaser's monthly order shall be delivered by the 31st day of each month.

3.3. Products shall be delivered to the Purchaser on terms *FCA, Kachkanar Station, Sverdlovsk Railroad*, in accordance with INCOTERMS-1990.

3.4. The Supplier shall deliver the Products by railroad transport in hopper cars and sluice transport cars of the Ministry of Railroads.

3.5. The date of delivery of the Products from the Supplier to the Purchaser shall be the date of the stamp of the railroad station of origin on the railroad receipt for acceptance of cargo (the Products).

3.6. The Supplier shall load the Products itself at its own expense.

3.7. Title to the Products shall transfer from the Supplier to the Purchaser as of the date of delivery according to section 3.5 of the Contract.

3.8. The railroad fare and all expenses related to the shipment of the Products shall be paid by the Purchaser.

*Supply Contract No. 01-99/P, dated July 9, 1998.*

*Article 4.*
### QUANTITY AND QUALITY OF DELIVERED PRODUCTS

4.1. The weight of delivered Products shall be considered the weight indicated in the railroad waybill.

4.2. The quantity of the Products by weight shall be determined by taking into account weighing error of 1% of the net weight in the train pursuant to State Standard 12409-66, the rate of natural loss, and the weight of the container. The rate of natural loss shall be determined in accordance with Decree No. 130 of Gossnab [the State Supply Committee] of the USSR, dated October 26, 1987, and shall be set in the following amount for shipment in open cars up to 500 km: sluice – 0.3%, agglomerate – 0.2%.

4.3. With the joint participation of the Parties, a commissioned test of the working order of the railroad scale may be made in accordance with Recommendation Mi 1953 88, "Weight of Economic Cargoes in Bulk Shipments. Methodology of Measurement."

4.4. For each delivered shipment of Products the Supplier shall provide a certificate in accordance with technical specifications. Test samples may be taken from the shipment of no more than 2500 tons.

4.5. Products shall be accepted in accordance with Instructions P-6, dated May 15, 1965, and P-7, dated April 25, 1966, as subsequently amended and supplemented. If new instructions on the acceptance of products are adopted by authorized agencies, they shall take effect automatically without amendment of the Contract.

4.6. If the results of a control test of the quality of the products differ from the data indicated in the certificate but do not exceed the rate of error acceptable under the standard, then the data of the supplier of the goods shall be used. In the absence of a standard determining the rate of error, the Parties shall use an agreed upon methodology.

*Article 5.*
### TERMS AND MANNER OF PAYMENT

5.1. Payments between the Parties according to the monthly volume of delivery shall be made no later than the 31st day of the month following the month of delivery.

5.2. By agreement of the Parties, payment under section 5.1 may be made by transfer of funds into a current account, by transfer of a promissory note and preparation of a statement of acceptance and transfer, by offset of mutual claims, or by other financial instruments.

*Article 6.*
### RIGHTS AND DUTIES OF THE PARTIES

6.1. The Supplier shall be obligated:

6.1.1. To deliver Products during the term of the Contract in the quantity according to monthly orders and supplemental agreements, and the proportion of components of the Products shall be approximately 70% sluice and 30% agglomerate.

6.1.2. The proportion indicated in section 6.1.1 may be changed by agreement of the Parties.

6.2. The Purchaser shall be obligated:

6.2.1. To make payments for the Products in the manner and on the terms indicated in article 5 of the Contract.

*Article 7.*
### LIABILITY OF THE PARTIES AND RESOLUTION OF DISPUTES

7.1. Each of the parties shall be liable for non-performance or improper performance of their obligations hereunder in accordance with current law of the Russian Federation and this Contract.

7.2. If the Supplier has made actual deliveries of Products and there is a delay by the Purchaser in the performance of its obligation to pay, the Purchaser shall pay to the Supplier a fine in the amount of 0.5% of the price of the Products for which payment was not made.

7.3. If the total quantity of the Products is not delivered by the deadlines set in section 3.5 of this Contract, the Supplier shall pay to the Purchaser a fine in the amount of 0.5% of the price of Products not delivered.

7.4. The Purchaser shall reimburse the Supplier for fines the Supplier pays to the railroad for non-performance of the railroad shipping plan for deliveries to the Purchaser, for unplanned orders for cars, and for changes in the approved cargo shipment plan, in the event that the Purchaser refuses to accept volumes of deliveries that were planned pursuant to the Contract. In the event of arrears the Supplier shall have the right to terminate shipment of products until normal relations are restored.

*Supply Contract No. 01-99/P, dated June 28, 1998.*

7.5.  In the event of a prohibition on shipment of products by the Ministry of Railroads of the Russian Federation or the imposition of restrictions on the use of electrical energy by Sverdlovenergia, as a consequence of which the Supplier's pattern of work is disrupted, the latter shall not be liable for failure to make full delivery of products, and the Parties shall use their joint efforts to eliminate such obstacles.

7.6.  Disputes that may arise during the implementation of this Contract about which the Parties cannot reach agreement shall be resolved by the interested party bringing a case to the Arbitration Court I accordance with the laws of the Russian Federation.

### Article 8.
### TERM OF CONTRACT

8.1.  The Contract shall take effect upon its signing by both Parties.

8.2.  The term of the Contract shall be until December 31, 1999, and with respect to payments, until full performance of their obligations by the Parties, but no later than January 31, 2000.

8.3.  The Contract may be terminated by agreement of the Parties expressed in a separate protocol (by exchange of letters, telegrams, faxes, etc.), or by the exercise by one of the Parties of the right to terminate it in the event of improper performance or non-performance of obligations by the other Party, or by impossibility of performance, or by liquidation of the legal entity.

8.4.  The Contract may be extended by a specified term by agreement of the Parties.

### Article 9.
### OTHER TERMS

9.1.  The Contract may be amended supplemented by agreement between the Parties, made in the form of attachments or supplementary agreements, to which all requirements of the Contract apply.

9.2.  All attachments and supplementary agreements to the Contract shall be considered integral parts thereof and by agreement of the Parties the content of the amendments and supplementary agreements are declared to be commercial secrets.

9.3.  In all cases, circumstances, and situations related to the fulfillment of this Contract but not directly provided for by it, the Parties shall be governed by current law.

### Article 10.
### REQUISITES OF THE PARTIES

| 10.1. Supplier | 10.2. Purchaser |
|---|---|
| Vanadiy Mining Enrichment Plant of Kachkanar OJSC, taxpayer ID No. 6615001962, 2 Sverdlov St., Kachkanar, Sverdlovsk Oblast, Russia 624356, current account 40702810900000000085 at Kachkanarbank Commercial Bank, correspondent account No. 30101810200000000710, BIK 046513710 | Poliprom LLC, taxpayer ID No. 0814113973, 249 Lenin St., room 505, Elista, Republic of Kalmykia, Russian Federation 358000, current account 40702810800090000040 in the Elista branch of the Moskovskiy Delovoy Mir Joint Stock Commercial Bank, BIK 044525466, correspondent account No. 30101810900000000466, correspondent account 30301810600011680006 at Moskovskiy Delovoy Mir Joint Stock Commercial Bank |
| [signature]<br>D.A. Khaydarov<br>[round stamp: Vanadiy Mining Enrichment Plant of Kachkanar Open Joint Stock Company, city of Kachkanar] | [signature]<br>G.M. Bukharin<br>[round stamp: Poliprom Limited Liability Company, city of Elista, Republic of Kalmykia, Russian Federation] |

*Supply Contract No. 01-99/P, dated June 28, 1998.*

### SUPPLEMENTAL AGREEMENT No. 3
### to Supply Contract No. 01-99/P, dated July 9, 1999

City of Kachkanar                                                                         August 30, 1999

Vanadiy Mining Enrichment Plant of Kachkanar Open Joint Stock Company, hereinafter referred to as the Supplier, represented by its General Director D.A. Khaydarov, acting on the basis of the Charter, and

Poliprom Limited Liability Company, hereinafter referred to as the Purchaser, represented by its General Director G.M. Bukharin, acting on the basis of the Charter,

together referred to as the Parties, have entered into this Supplemental Agreement No. 3 (hereinafter Supplemental Agreement No. 3) to Supply Contract No. 01-99/P, dated July 9, 1999, (hereinafter the Contract) as follows:

1. The Parties have set the following terms for deliveries of raw iron ore in the form of slurry (TU 14-00186938-003-95) and agglomerate (TU 14-00186938-005-95) (hereinafter in the text as Product) in September, 1999:

| No. | Delivery Address | Agglomerate, in tons | Sluice, in tons |
|-----|------------------|----------------------|-----------------|
| 1. | Nizhniy Tagil Metallurgical Plant OJSC (NTMP OJSC) | 124,000 | 264,000 |
| 2. | Serov Metallurgical Factory OJSC | 5,500 | 5,500 |
| 3. | Western Siberian Metallurgical Plant OJSC (WSMP OJSC) | -- | 32,000 |
| 4. | Chusovskoy Metallurgical Factory OJSC (CMF OJSC) | 32,500 | 76,000 |
| 5. | Chelyabinsk Metallurgical Plant OJSC (Mechel OJSC) | -- | 29,000 |
| 6. | Severstal OJSC | -- | 23,000 |
| | TOTAL: | 162,000 | 429,500 |

2. The size of the delivery in August 1999 shall be:
 – 162,000 (one hundred sixty-two thousand) (+/-5%) tons of agglomerate,
 – 429,500 (four hundred twenty-nine thousand five hundred) (+/-5%) of sluice.
3. The price of Products delivered in July 1999 shall be:
 – agglomerate: 228 rubles per ton, including 20% VAT = 38 rubles
 – sluice: 228 rubles per ton, including 20% VAT = 38 rubles
4. The total cost of Products delivered in September 1999 shall be 134,862,000 (one hundred thirty-four million eight hundred sixty-two thousand) (+/-5%) rubles, including 20% VAT = 22,477,000 (twenty-two million four hundred seventy-seven thousand) rubles.
5. This Supplemental Agreement No. 3 shall be an integral part of the Contract.

Supplier:                                                 Purchaser:

D.A. Khaydarov                                            G.M. Bukharin
[signature]                                               [signature]

[round stamp: Vanadiy Mining Enrichment                   [round stamp: Poliprom Limited Liability Company
Plant of Kachkanar OJSC]                                   EM-V No. 198 Russian Federation, Republic of
                                                          Kalmykia, City of Elista]

Supplemental Agreement No. 3 to Supply Contract No. 01-99/P, dated July 9, 1999

### SUPPLEMENTAL AGREEMENT No. 1
### to Supply Contract No. 01-99/P, dated July 9, 1999

City of Kachkanar                                                October 28, 1999

     Vanadiy Mining Enrichment Plant of Kachkanar Open Joint Stock Company, hereinafter referred to as the Supplier, represented by its General Director D.A. Khaydarov, acting on the basis of the Charter, and

     Poliprom Limited Liability Company, hereinafter referred to as the Purchaser, represented by its General Director G.M. Bukharin, acting on the basis of the Charter,

     together referred to as the Parties, have entered into this Supplemental Agreement No. 5 (hereinafter Supplemental Agreement No. 5) to Supply Contract No. 01-99/P, dated July 9, 1999, (hereinafter the Contract) as follows:

     1. The Parties have set the following terms for deliveries of raw iron ore in the form of sluice (technical specification 14-00186938-003-95) and agglomerate (technical specification 14-00186938-005-95) (hereinafter the Products) in November 1999:

| No. | Delivery Address | Agglomerate, in tons | Sluice, in tons |
|-----|------------------|----------------------|-----------------|
| 1. | Nizhniy Tagil Metallurgical Plant OJSC (NTMP OJSC) | 160,000 | 125,000 |
| 2. | Chusovskoy Metallurgical Plant OJSC (CMF OJSC) | 36,500 | 59,500 |
| 3. | AK LMZ OJSC, City of Lysva | -- | 22 |
| | TOTAL: | 196,500 | 184,522 |

     2. The volume of delivery in November 1999 shall be:

     -- 196,500 (one hundred ninety-six thousand five hundred) (+/-5%) tons of agglomerate,

     -- 184,500 (one hundred eighty-four thousand five hundred) (+/-5%) tons of sluice.

     3. The price of Products delivered in November 1999 shall be:

     -- agglomerate: 312 rubles per ton, including 20% VAT = 52 rubles

     -- sluice: 300 rubles per ton, including 20% VAT = 50 rubles

     4. The total cost of Products delivered in November 1999 shall be 116,664,600 (one hundred sixteen million six hundred sixty-four thousand six hundred) (+/-5%) rubles, including 20% VAT = 19,444,100 (nineteen million four hundred forty-four thousand one hundred) rubles.

     5. This Supplemental Agreement No. 5 shall be an integral part of the Contract.

Supplier:                              Purchaser:

D.A. Khaydarov                         G.M. Bukharin
[signature]                            [signature]

[round stamp: Vanadiy Mining Enrichment    [round stamp: Poliprom Limited Liability Company
Plant of Kachkanar OJSC]                   Russian Federation, Republic of Kalmykia, City of Elista]


Supplemental Agreement No. 5 to Supply Contract No. 01-99/P, dated July 9, 1999

**SUPPLEMENTAL AGREEMENT No. 1**
**to Supply Contract No. 01-99/P, dated June 28, 1999**

City of Kachkanar                                                                July 9, 1999

     Vanadiy Mining Enrichment Plant of Kachkanar Open Joint Stock Company, hereinafter referred to as the Supplier, represented by its General Director D.A. Khaydarov, acting on the basis of the Charter, and

     Poliprom Limited Liability Company, hereinafter referred to as the Purchaser, represented by its General Director G.M. Bukharin, acting on the basis of the Charter,

     together referred to as the Parties, have entered into this Supplemental Agreement No. 1 (hereinafter Supplemental Agreement No. 1) to Supply Contract No. 01-99/P, dated June 28, 1999, (hereinafter the Contract) as follows:

     1. The Parties have set the following terms for delivery of raw iron ore sluice (technical specification 14-00186933-003-95) and agglomerate (technical specification 14-00186933-005-95) (hereinafter the Product) in July 1999:

| No. | Delivery Address | Agglomerate, in tons | Sluice, in tons |
|---|---|---|---|
| 1. | Nizhniy Tagil Metallurgical Plant OJSC (NTMP OJSC) | 131,000 | 249,000 |
| 2. | Serov Metallurgical Factory OJSC | 9,500 | 9,500 |
| 3. | Western Siberian Metallurgical Plant OJSC (WSMP OJSC) | – | 41,000 |
| 4. | Chusovskoy Metallurgical Factory OJSC (CMF OJSC) | 33,000 | 76,000 |
| 5. | Chelyabinsk Metallurgical Plant OJSC (Mechel OJSC) | – | 50,000 |
| 6. | Novolipetsk Metallurgical Plant OJSC (NLMP OJSC) | – | 70,000 |
| | TOTAL: | 173,500 | 495,500 |

     2. The volume of the delivery in July 1999 shall be:
     – 173,500 (one hundred seventy-three thousand five hundred) (+/-5%) tons of agglomerate,
     – 495,500 (four hundred ninety-five thousand five hundred) (+/-5%) tons of sluice.
     3. The price of the Products delivered in July 1999, shall be:
     – agglomerate: 240 rubles per ton, including 20% VAT = 40 rubles
     – sluice: 228 rubles per ton, including 20% VAT = 38 rubles
     4. The total cost of Products delivered in July 1999 shall be 154,614,000 (one hundred fifty-four million six hundred fourteen thousand) (+/-5%) rubles, including 20% VAT = 25,769,000 (twenty-five million seven hundred sixty-nine thousand) rubles.
     5. This *Supplemental Agreement No. 1* shall be an integral part of the Contract.

Supplier:                                                        Purchaser:

D.A. Khaydarov                                               G.M. Bukharin
[signature]                                                     [signature]

[round stamp: Vanadiy Mining Enrichment                [round stamp: Poliprom Limited Liability Company
Plant of Kachkanar OJSC]                                  Russian Federation, Republic of Kalmykia, City of
                                                                Elista]

Supplemental Agreement No. 1 to Supply Contract No. 01-99/P dated June 28, 1999

**SUPPLEMENTAL AGREEMENT No. 6**
**to Supply Contract No. 01-99/P, dated July 9, 1999**

City of Kachkanar                                                    November 29, 1999

      Vanadiy Mining Enrichment Plant of Kachkanar Open Joint Stock Company, hereinafter referred to as the Supplier, represented by its General Director D.A. Khaydarov, acting on the basis of the Charter, and

      Poliprom Limited Liability Company, hereinafter referred to as the Purchaser, represented by its General Director G.M. Bukharin, acting on the basis of the Charter,

      together referred to as the Parties, have entered into this Supplemental Agreement No. 6 (hereinafter Supplemental Agreement No. 6) to Supply Contract No. 01-99/P, dated July 9, 1999 (hereinafter the Contract) as follows:

      1. The Parties have set the following terms for deliveries of raw iron ore in the form of sluice (technical specification 14-00186938-003-95) and agglomerate (technical specification 14-00186938-005-95) (hereinafter the Products) in December 1999:

| No. | Delivery Address | Agglomerate, in tons | Sluice, in tons |
|-----|------------------|----------------------|-----------------|
| 1. | Nizhniy Tagil Metallurgical Plant OJSC (NTMP OJSC) | 166,400 | 250,500 |
| 2. | Chusovskoy Metallurgical Factory OJSC (CMF OJSC) | 38,000 | 63,000 |
| 3. | Serov Metallurgical Factory OJSC | 2,200 | 3,100 |
| 4. | AK LMZ OJSC, City of Lysva | -- | 160 |
| | TOTAL: | 206,600 | 316,760 |

      2. The volume of the delivery in December 1999 shall be:
      -- 206,600 (two hundred six thousand, six hundred) (+/-5%) tons of agglomerate,
      -- 316,760 (three hundred sixteen thousand, seven hundred sixty) (+/-5%) of sluice.
      3. The price of the Products delivered in December 1999 shall be:
      -- agglomerate: 312 rubles per ton, including 20% VAT = 52 rubles
      -- sluice: 306 rubles per ton, including 20% VAT = 51 rubles
      4. The total cost of Products delivered in December 1999 shall be 161,387,760 (one hundred sixty-one million, three hundred eighty-seven thousand, seven hundred sixty) (+/-5%) rubles, including 20% VAT = 26,897,960 (twenty-six million, eight hundred ninety-seven thousand, nine hundred sixty) rubles.

      5. This Supplemental Agreement No. 6 shall be an integral part of the Contract.

Supplier:                                              Purchaser:

D.A. Khaydarov                                         G.M. Bukharin
[signature]                                            [signature]

[round stamp: Vanadiy Mining Enrichment
Plant of Kachkanar OJSC]

Supplemental Agreement No. 6 to Supply Contract No. 01-99/P, dated July 9, 1999

**SUPPLEMENTAL AGREEMENT No. 9**
**to Supply Contract No. 01-99/P, dated July 9, 1999**

City of Kachkanar                                                    January 12, 2000

    Vanadiy Mining Enrichment Plant of Kachkanar Open Joint Stock Company, hereinafter referred to as the Supplier, represented by its General Director D.A. Khaydarov, acting on the basis of the Charter, and

    Poliprom Limited Liability Company, hereinafter referred to as the Purchaser, represented by its General Director G.M. Bukharin, acting on the basis of the Charter,

    together referred to as the Parties, have entered into this Supplemental Agreement No. 9 (hereinafter Supplemental Agreement No. 9) to Supply Contract No. 01-99/P, dated July 9, 1999, (hereinafter the Contract) as follows:

    1. The Parties have set the following terms for deliveries of raw iron ore in the form of sluice (technical specification 14-00186938-003-95) and agglomerate (technical specification 14-00186938-005-95) (hereinafter ) in February 2000:

| No. | Delivery Address | Agglomerate, in tons | Slurry, in tons |
|-----|------------------|----------------------|-----------------|
| 1. | Nizhniy Tagil Metallurgical Plant OJSC (NTMP OJSC) | 114,000 | 266,000 |
| 2. | Chusovskoy Metallurgical Factory OJSC (CMF OJSC) | 32,600 | 76,100 |
| 3. | Serov Metallurgical Factory OJSC | 28,000 | 12,000 |
| | TOTAL: | 174,600 | 354,100 |

    2. The approximate volume of the delivery of Products in February 2000 shall be:
-- 174,600 (one hundred seventy-four thousand, six hundred) tons of agglomerate,
-- 354,100 (three hundred fifty-four thousand, one hundred) tons of sluice.
    3. The preliminary price for Products delivered in February 2000 shall be:
-- agglomerate: 324 rubles per ton, including 20% VAT = 54 rubles
-- sluice: 324 rubles per ton, including 20% VAT = 54 rubles
    4. The approximate total cost of Products delivered in February 2000 shall be 171,298,800 rubles, including 20% VAT = 28,549,800 (twenty-eight million, five hundred forty-nine thousand, eight hundred) rubles.
    5. The volume of the Product delivery and its price in February 2000 may be changed.
    6. In the absence of additional agreements regarding payments between the Parties, the price for Products shall be as indicated in section 3 of this Supplemental Agreement No. 9.
    7. This Supplemental Agreement No. 9 shall be an integral part of the Contract.

Supplier:                                              Purchaser:

D.A. Khaydarov                                         G.M. Bukharin
[signature]                                            [signature]

[round stamp: Vanadiy Mining Enrichment                [round stamp: Poliprom Limited Liability Company
Plant of Kachkanar OJSC]                                EM-V No. 198 Russian Federation, Republic of
                                                       Kalmykia, City of Elista]

Supplemental Agreement No. 9 to Supply Contract No. 01-99/P, dated July 9, 1999

[handwritten: 72-109/(illegible)]

**Contract for the**
**Supply of Products No. 02-99**

City of Kachkanar                                                                    July 9, 1999

Poliprom Limited Liability Company, hereinafter referred to as the "Company", represented by its General Director G.M. Bukharin, acting on the basis of the Charter, and Vanadiy Mining Enrichment Plant of Kachkanar Open Joint Stock Company, hereinafter referred to as the "Plant", represented by its General Director D.A. Khaydarov, acting on the basis of the Charter, have entered into this Contract as follows:

### *1. SUBJECT OF THE CONTRACT.*

1.1.  The Company agrees to deliver during 1999, and the Plant agrees to accept and pay for the following products manufactured by Nizhniy Tagil Metallurgical Plant [NTMP] OJSC:
  - balls D=60 (technical specification 14-2-139-40)
  - rods (state standard 2590-71, technical specification 144-586-76)
  - oxygen (technical specification 14-2-139-40)
  - coke fines (technical specification 14-7-115-89)
  - rails 12.5 (technical specification 14-2-797-88)
  - rails 25 (technical specification 14-2-797-88)
  - other products manufactured by NTMP OJSC.
1.2.  The prices for products delivered shall be set monthly in Supplemental Agreements to this Contract.
1.3.  The volume of products indicated in section 1.1 shall be determined pursuant to the Plant's order for delivery of products.
1.4.  The Parties agree that all Supplements, Specifications, Exhibits and changes in the terms of this Contract that are expressed in the proper manner are integral parts of the Contract.

### *2. QUALITY OF PRODUCTS. PACKAGING*

2.1.  The quality of products delivered shall be consistent with current state standards, sector standards, and technical specifications.
  For each shipment of products delivered a certificate or equivalent document attesting to the quality of the products shall be issued.
2.2.  If the quality of delivered products is found to deviate from technical specifications, state standards, or sector standards, it shall be mandatory to call the representative of the delivering party, and the cargo of the receiving side shall be placed in secure storage.
2.3.  In the event of transfer of products that do not meet quality requirements, the Plant shall have the right to demand that the Company eliminate the deficiencies within deadlines agreed upon additionally by the parties.
2.4.  The packaging of the products shall ensure the safekeeping of the products during shipment and storage.

### *3. OBLIGATIONS OF THE PARTIES AND MANNER OF PAYMENT*

3.1.  The total amount of this Contract as of the time it is signed is approximately 100,000,000 (one hundred million) rubles, not counting VAT and transportation expenses.

**A - 1527**

3.2.  Payment shall be made by offset of mutual claims for deliveries made by the Plant to the Company.

3.3.  For delivered products the Company agrees to provide to the Plant the following documents: invoice, cargo waybill, certificates of the quality of the products (or equivalent documents), and other necessary documents.

3.4.  The Company agrees to notify the Plant within three days of the actual shipment of products, indicating the number of the railroad car, the number of the railroad waybill, and the exact quantity of products.

3.5.  Products shall be transferred by the Company to the Plant on terms FCA, city of Nizhniy Tagil.  Delivery of the products to the destination shall be carried out at the Plant's expense.  Transportation expenses for delivery of the products to the destination shall be paid by the Company and reimbursed by the Plant in excess of the prices established by the Parties in Supplemental Agreements to this Contract.

## 4. DELIVERY TERMS, ACCEPTANCE OF PRODUCTS.

4.1.  The Company's products shall be delivered by railroad transport in cars of the Ministry of Railroads at the times provided by section 1.1 of this Contract.

4.2.  If it is necessary to deliver additional volumes of products in excess of those provided by this Contract, the parties shall decide this issue by entering into a Supplemental Agreement or by exchanging letters or telegrams that shall be an integral part of this Contract.

4.3.  The day of performance of obligations to deliver products shall be considered the day of release of the products to the transportation agency, determined as the date of the railroad waybill, and if portions are selected to be picked up directly, the day the products are received from the warehouse.

4.4.  Products shall be accepted in accordance with Instructions P-6, dated May 15, 1965, and P-7, dated April 25, 1966, as subsequently amended and supplemented.  If new instructions on the acceptance of products are adopted by authorized agencies, they shall take effect automatically without amendment of the Contract.

## 5. DISPUTES AMONG THE PARTIES.  LIABILITY.

5.1.  On all issues not addressed by this Contract, the parties shall be governed by the Civil Code of the Russian Federation and other normative acts in force in Russia.

5.2.  The parties shall be liable for non-performance or improper performance of the terms of this Contract in accordance with the laws of the Russian Federation.

5.3.  This contract is entered into voluntarily, therefore pre-contractual disputes shall not be permitted.  If the parties do not agree on the terms of the Contract, it shall not be considered formed.

5.4.  All disputed issues on the performance of this Contract that are not resolved by the good-faith agreement of the parties shall be referred for consideration to the arbitration court in the location of the defendant.

Before filing a lawsuit, the interested party shall be obligated to present a claim to the other party.  The party shall have 30 days from receipt of the claim to respond to it.  If the claim is fully or partially rejected, or if no answer is received in the allotted time (taking into account the time in postal transit), the interested party shall have the right to file with the arbitration court.

5.5.  If the performance of obligations is prevented by circumstances beyond the party's control that temporarily prevent or entirely preclude the performance of the contractual obligations (natural disaster, accident, fire, military actions of any type, the adoption of [line of text missing]

of authority and economic management, prohibition by the Ministry of Railroads of the Russian Federation on shipments in certain directions), the time of delivery shall be postponed for the entire time necessary to eliminate these circumstances, and they shall be taken into consideration when the issue of liability is decided. The parties shall notify each other of the emergence of such circumstances in writing within three days.

In the deadline provided by this section is not observed, the parties shall not have the right to refer to such circumstances in the event of liability.

## 6. TERM OF THE CONTRACT

6.1.   The term of this Contract shall be from the time of its signing until December 31, 1999, and with respect to payments, until such payments are made in full by the parties. The term of this Contract may be extended by mutual agreement of the parties. Terms of the extension shall be stipulated additionally by the parties.

## 7. LEGAL ADDRESSES AND REQUISITES OF THE PARTIES:

**Company:** Taxpayer ID number 0814113973, 249 Lenin St., room 505, Elista, Republic of Kalmykia, Russian Federation 358000, current account 40702810800090000040 in the Elista branch of the Moskovskiy Delovoy Mir Joint Stock Commercial Bank, BIK 044525466, correspondent account No. 30101810900000000466, correspondent account 30301810600011680006 at Moskovskiy Delovoy Mir Joint Stock Commercial Bank.

**Plant:** 2 Sverdlov St., Kachkanar, Sverdlovsk Oblast, Russia 624356, taxpayer ID No. 6615001962, current account 40702810531201000090 at the branch of Uralpromstroybank OJSC in the city of Nizhnyaya Tura, correspondent account No. 30101810600000000762, BIK 046552762, Sverdlovsk Railroad code for Kachkanar Station: 773008, company code: 5752037, teletype 721255 RUDA, telephone/fax: 21650.

**Company**

[signature]

[round stamp: Poliprom Limited Liability Company, city of Elista, Republic of Kalmykia, Russian Federation]

**Plant**

[signature]

[round stamp: Vanadiy Mining Enrichment Plant of Kachkanar Open Joint Stock Company, city of Kachkanar]

A - 1529



## ДОГОВОР ПОСТАВКИ № S-02/M-99.

г. Элиста                                              *"18" октября 1999 г.*

ООО «Полипром», именуемое в дальнейшем Поставщик, в лице Генерального директора Бухарина Г.М., действующего на основании Устава, с одной стороны, и ОАО «Качканарский ГОК «Ванадий», именуемое в дальнейшем Покупатель, в лице Генерального директора Хайдарова Д.А., действующего на основании Устава, с другой стороны, (вместе по тексту именуются Стороны), заключили настоящий договор (далее Договор) о следующем:

## 1.  Предмет Договора

1.1. Поставщик обязуется поставить Покупателю на условиях настоящего Договора металлопродукцию (далее по тексту – «Товар») согласно дополнительным соглашениям к настоящему Договору, а Покупатель обязуется принять и оплатить поставленный Товар.

## 2. Стоимость Товара и порядок расчетов

2.1. Цена Товара принимается на условиях "FCA, станция Серов-заводской Свердловской железной дороги", и устанавливается в российских рублях (в дальнейшем рубли) за одну тонну.

2.2. Цена и количество Товара определяется в дополнительных соглашениях к настоящему Договору.

2.3. Общая стоимость Товара составляет 8.514.375 (Восемь миллионов пятьсот четырнадцать тысяч триста семьдесят пять) (+/- 5%) рублей, в том числе НДС 20% - 1.419.062,50 рублей.

2.4. Цена Товара включает стоимость упаковки и прочих расходов Продавца, связанных с доставкой Товара на условиях, указанных в п.2.1.

2.5. Общая стоимость Договора может быть изменена, путем подписания Сторонами дополнительных соглашений.

2.6. Расчеты между Сторонами производятся путем перечисления денежных средств на расчетный счет Поставщика, ценными бумагами, в том числе по согласованию Сторон путем передачи векселя и составления приемопередаточного акта, зачетом взаимных требований, другими финансовыми инструментами в соответствии с действующим законодательством РФ.

2.7. Оплата производится Покупателем частями за каждую партию товара в соответствии с дополнительными соглашениями к настоящему Договору не позднее 60 (Шестидесяти) банковских дней с даты поставки последнего вагона партии Товара по п.3.3 Договора.

## 3. Условия и сроки поставки

3.1. Поставка Товара осуществляется партиями с АОР НП «Серовский металлургический завод» (здесь и далее – Завод-изготовитель) железнодорожным

A - 1531

транспортом на условиях "FCA, станция Серов-заводской Свердловской железной дороги" согласно "ИНКОТЕРМС 1990".

3.1.1. Под партией подразумевается количество товара, определяемое в дополнительных соглашениях к настоящему Договору.

3.2. Поставка Товара по настоящему Договору должна быть произведена в сроки, указанные в дополнительных соглашениях.

3.3. Датой поставки Товара считается дата штемпеля ж.д. станции отправления на ж.д. накладной и/или дата выписки ж.д. квитанции о приеме груза последнего вагона партии товара.

3.4 Право собственности на Товар переходит от Поставщика к Покупателю с даты поставки Товара по п.3.3 Договора.

## 4. Качество и количество Товара

4.1. Товар считается переданным Поставщиком Покупателю по количеству согласно количеству, указанному в ж.д. накладной.

4.2. Товар считается переданным Поставщиком Покупателю по качеству согласно качеству, указанному в сертификате завода-изготовителя.

4.3. При приемке Товара Покупателем в случае расхождения данных по количеству и качеству Товара, полученного Покупателем, с данными, содержащимися в отгрузочных документах, приемка Товара по количеству и качеству производится согласно "Инструкции о порядке приемки продукции производственно-технического назначения и Товаров народного потребления по количеству" (№ П-6) и "Инструкции о порядке приемки продукции производственно-технического назначения и Товаров народного потребления по качеству" (№ П-7) с обязательным извещением Поставщика, взятием Товара на ответхранение в случаях недостачи или получения некачественных показателей и составлением в присутствии Поставщика соответствующего акта.

## 5. Права и обязанности Сторон

5.1. Стороны обязуются указывать в документах, сопровождающих Товар, помимо данных, необходимых для отгрузочных документов, также и результаты анализов качества Товара либо ссылки на документы, удостоверяющие надлежащее его качество.

5.2. *Покупатель вправе:*
- требовать передачи ему поставляемых Товаров;
- требовать уменьшения цены Товаров либо расторжения договора, если Товары не свободны от прав третьих лиц;
- требовать при недопоставке передачи недостающих Товаров.

5.3. *Покупатель обязан:*
- совершить все необходимые действия, обеспечивающие принятие Товара;
- проверить количество и качество принятых Товаров и о выявленных недостатках Товаров незамедлительно письменно уведомить Поставщика;
- при отказе от принятия поставленных Товаров обеспечить их сохранность. Если в разумный срок Поставщик не распорядиться Товаром, Покупатель вправе

Договор поставки № S-02/M-99 от 18.10.99 с ОАО «Качканарский ГОК «Ванадий».



2

реализовать Товар или возвратить его Поставщику с возмещением необходимых расходов;

- оплатить Товар по цене, предусмотренной дополнительными соглашениями к Договору.

**5.4. Поставщик обязан:**

- передать Товар свободным от любых прав третьих лиц, если только Покупатель не согласился принять Товар, обремененный такими правами;

- передать Товар в количестве и качестве, соответствующий условиям Договора.

## 6. Ответственность сторон

6.1. Сторона, не исполнившая или ненадлежащим образом исполнившая обязательства по Договору, обязана возместить другой стороне причиненные таким неисполнением убытки.

6.2. С Поставщика за недопоставку или просрочку поставки Товара до фактического исполнения обязательства взыскивается неустойка в размере 0,1 % в день от суммы не поставленного в срок Товара.

6.3. С Покупателя за неоплату или несвоевременную оплату Товара до фактической оплаты взыскивается неустойка в размере 0,1 % в день от неоплаченной или несвоевременно оплаченной суммы Товара.

## 7. Разрешение споров

7.1. Все споры и разногласия разрешаются путем переговоров на основе действующего законодательства РФ и обычаев делового оборота.

7.2. При не урегулировании в процессе переговоров спорных вопросов, споры разрешаются в суде в порядке, установленном действующим законодательством РФ.

## 8. Основания освобождения от ответственности

8.1. Стороны освобождаются от ответственности за частичное или полное неисполнение обязательств по Договору, если это неисполнение явилось следствием обстоятельств непреодолимой силы, возникших после заключения Договора в результате обстоятельств чрезвычайного характера, которые стороны не могли предвидеть или предотвратить.

## 9. Заключительные положения

9.1. Односторонний отказ от исполнения Договора или одностороннее его изменение не допускаются.

9.2. Любые изменения и дополнения к Договору действительны при условии, если они совершены в письменной форме и подписаны сторонами.

9.3. Договор вступает в силу с момента его подписания и действует до 15 января 2000 года, а в части расчетов – до полного исполнения обязательств.

Договор поставки № S-02/M-99 от 18.10.99 с ОАО «Качканарский ГОК «Ванадий».                  3

A - 1533

9.4. Договор составлен в двух экземплярах, один из которых находится у Покупателя, второй - у Поставщика.

9.5. Стороны обязаны информировать друг друга об изменении адресов и реквизитов, в том числе отгрузочных. Сообщение Покупателя об изменении реквизитов Получателя принимается к исполнению Поставщиком для отгрузки Товара в установленный Договором срок, если такое сообщение поступит к Поставщику не позднее 10 (десяти) дней до начала поставки.

### 10. Юридические адреса и банковские реквизиты сторон:

*Покупатель:*
**ОАО «Качканарский ГОК «Ванадий»**
ИНН 6615001962
624356, г. Качканар, Свердловской области, ул. Свердлова, 2.
Банковские реквизиты:
расчетный счет № 40702810000000003170 в КБ «Уральский банк реконструкции и развития», г. Екатеринбург,
корр. счет № 30101810900000000795,
БИК 046577795

*Поставщик:*
**ООО «Полипром»,**
ИНН 0814113973
358000, РФ, Республика Калмыкия, г. Элиста, ул. Ленина д. 249, ком. 505.
Банковские реквизиты:
расчетный счет 40702810800090000040 в филиале АКБ «Московский Деловой Мир» г. Элиста, БИК 044525466, к/с №30101810900000000466, к/с №30301810600011680006 в АКБ «Московский деловой мир»,
БИК 044525466

### Подписи сторон:



Покупатель:                    Поставщик:

Д.А. Хайдаров                  Г.М. Бухаров

A - 1534



ОТ:Х

НОМЕР ТЕЛЕФОНА:

ДЕК. 21 2001 19:00  СТР5

### ДОПОЛНИТЕЛЬНОЕ СОГЛАШЕНИЕ № 1  к
*Договору поставки № S-02/М-99. от 18.10.99 г.*

г. Элиста                                                    «15» ноября 1999 г.

ООО «Полипром», именуемое в дальнейшем «Поставщиком», с одной стороны, и ОАО «Качканарский ГОК «Ванадий», именуемое в дальнейшем «Покупатель», с другой стороны (вместе по тексту именуются – Стороны), заключили настоящее Дополнительное соглашение № 1 (далее - «Дополнительное соглашение № 1») к Договору поставки № S-02/М-99 от «18» октября 1999 г. (далее – «Договор») о нижеследующем:

Поставщик обязуется поставить Покупателю на условиях Договора, а Покупатель обязуется принять и оплатить Товар согласно следующей спецификации:

#### Спецификация Товара:

1. **Наименование продукции:** обточенный и необточенный круг
S45C и SCM440 (по ASTM)
диаметр - от 13,00 мм до 75,00 мм и 140,00 мм до 270,00 мм,
длина - от 3000 мм до 6000 мм.

2. Химический состав:

| Марка | C | Mn | S | P | Si | Cr | Mo | Ni | Cu | Al |
|---|---|---|---|---|---|---|---|---|---|---|
| S45C | 0,44-0,51 | 0,50-0,80 | Max 0,035 | Max 0,035 | 0,15-0,35 | Max 0,40 | — | Max 0,30 | Max 0,30 | Max 0,06 |
| SCM440 | 0,38-0,45 | 0,60-0,90 | Max 0,035 | Max 0,040 | Max 0,40 | 0,90-1,10 | 0,15-0,30 | Max 0,30 | Max 0,30 | Max 0,06 |

3. Допускаемые отклонения по содержанию элементов в прокате, масс. %:

| Марка Grade | C | Mn | S | P | Si | Cr | Mo | Ni | Cu | Al |
|---|---|---|---|---|---|---|---|---|---|---|
| S45C | +/-0,02 | +/-0,03 | +0,005 | +0,005 | +0,02 | +/-0,03 | | +0,03 | +0,03 | +0,005 |
| SCM440 | +/-0,02 | +/-0,04 | +0,005 | +0,005 | +0,03 | +/-0,05 | +/-0,03 | +0,03 | +0,03 | +0,005 |

4. Количество: 1250 тонн (+/-10%), в том числе:
S45C        – 496 тонн,
SCM440   – 754 тонн.

5. Поставка осуществляется в соответствии с условиями Договора.

6. Цена металлопродукции: 6 811,50 (Шесть тысяч восемьсот одиннадцать целых пятьдесят сотых) рублей за 1 тонну, в том числе НДС 20% - 1135,25 руб.

7. Общая стоимость по Дополнительному соглашению № 1 составляет 8.514.375 (Восемь миллионов пятьсот четырнадцать тысяч триста семьдесят пять) (+/- 5%) рублей, в том числе НДС 20% - 1.419.062,50 рублей.

8. Указанные цены действительны только на данную партию Товара.

7. Срок поставки – ноябрь - декабрь 1999 года.

9. Настоящее Дополнительное соглашение № 1 являются неотъемлемой частью Договора.

#### Подписи сторон:

Покупатель:                                          Поставщик:

Д.А. Хайдаров                                      Г.М. Бугарин

A - 1535

**КОПИЯ**

г.Качканар

**Акт сверки взаиморасчетов между ОАО Качканарский ГОК "Ванадий" и ООО "Полимрон"**
**по Договору № S-02/М-99 от 30.09.1999 г.**
**за период с 01.01.2000 г. по 21.01.2000 г.**

21 января 2000 г.

| Наименование | ООО "Полимрон" | | | ОАО Качканарский ГОК "Ванадий" | | |
|---|---|---|---|---|---|---|
| | Документ | Номер документа | Дата | Сумма руб. | Документ | Номер документа | Дата | Сумма руб. |
| 1. Поставка металлопродукции в адрес ОАО КГОК "Ванадий" | счет | 28 | 21.01.00 | 8 288 505,66 | | | | |
| Итого: | | | | 8 288 505,66 | | | | |

Итого по состоянию на 22.01.2000 г. сальдо расчетов в пользу ООО "Полимрон" составляет 8 288 505,66 рублей, в том числе НДС 1 381 417,61 рублей.

ОАО КГОК "Ванадий"    ООО "Полимрон"

Генеральный директор    Генеральный директор

Хайдаров Д.А.    Бухарин Г.М.

Начальник ФО    Главный бухгалтер

Гришкина И.С.    Толкачева Т.Н.

A - 1536

ОТ:Х 

НОМЕР ТЕЛЕФОНА:                    ДЕК. 21 2001 19:03  СТР12



## ДОГОВОР № KGOK 18/10-99
### купли-продажи акций

| | |
|---|---|
| г. Москва | «18» октября 1999 г. |

Общество с ограниченной ответственностью «Полипром», именуемое в дальнейшем «Продавец», в лице Генерального директора Бухарина Г.М., действующего на основании Устава, с одной стороны, и Открытое акционерное общество «Качканарский ГОК «Ванадий», именуемое в дальнейшем «Покупатель», в лице Генерального директора Хайдарова Д.А., действующего на основании Устава, с другой стороны, именуемые совместно «Стороны», заключили настоящий договор о нижеследующем:

### 1. Предмет Договора

1.1. Продавец обязуется передать ценные бумаги, указанные в п.1.2 настоящего Договора, а Покупатель обязуется принять в собственность и оплатить Продавцу стоимость ценных бумаг согласно п.1.3. настоящего договора.

1.2. Сведения о ценных бумагах, являющихся предметом купли-продажи по настоящему договору:

| | |
|---|---|
| Вид акций | Именные обыкновенные акции бездокументарной формы |
| Государственный регистрационный номер | 43-1-453 от 06.05.96 |
| Эмитент акций | Открытое акционерное общество «Бентонит» |
| Регистр. № Эмитента | Постановление о регистрации Администрации Юргамышского района № 142 от 24 мая 1995 г. |
| Место нахождения эмитента | Россия, Курганская обл., г. Курган, ул. Ленина, д.5 |
| Держатель реестра акционеров эмитента | Открытое акционерное общество «Бентонит» |
| Номинальная стоимость одной акции | 10 (Десять) рублей |
| Количество акций | 34 075 (Тридцать четыре тысячи семьдесят пять) штук |
| Валюта сделки: | Рубли РФ |
| Валюта платежа: | Рубли РФ |

1.3. Сумма Сделки по настоящему договору составляет 20 445 000 (Двадцать миллионов четыреста сорок пять тысяч) рублей.

### 2. Порядок оплаты акций

2.1. Покупатель обязуется произвести полную оплату ценных бумаг, указанных в п. 1.2. настоящего Договора, путем перечисления денежных средств на банковский счет Продавца, либо ценными бумагами или другими финансовыми инструментами с составлением соответствующего акта приема-передачи.

2.2. Оплата ценных бумаг, указанных в п. 1.2 настоящего Договора, осуществляется Покупателем в течение 30 (Тридцати) дней с даты заключения настоящего договора.

### 3. Переход прав собственности на акции

3.1. Продавец обязуется при подписании настоящего Договора выдать Покупателю и/или Регистратору передаточное распоряжение на ценные бумаги, указанные в п. 1.2 настоящего Договора, для внесения изменений в реестр владельцев именных ценных бумаг Эмитента акций и перерегистрации права собственности с Продавца на Покупателя.

3.2. Продавец обязуется при подписании настоящего Договора выдать Покупателю доверенность на внесение изменений в реестр владельцев именных ценных бумаг Эмитента акций в отношении ценных бумаг, указанных в п. 1.2 настоящего Договора.

3.3. Продавец обязуется не отзывать выданное им в порядке, установленном в п. 3.1 настоящего Договора, передаточное распоряжение, а также не выдавать

A - 1538

OT:X                           НОМЕР ТЕЛЕФОНА:                    ДЕК. 21 2001 19:03  СТР13

передаточное распоряжение в отношении всех (части) ценных бумаг, указанных в п. 1.2 настоящего Договора, какому-нибудь третьему лицу.

3.4. Покупатель осуществляет перерегистрацию права собственности на ценные бумаги, указанные в п. 1.2 настоящего Договора, в реестре владельцев именных ценных бумаг Эмитента в любой момент по своему усмотрению.

3.5. Расходы по перерегистрации прав собственности на ценные бумаги в реестре владельцев именных ценных бумаг Эмитента акций несет Продавец.

## 4. Ответственность Сторон

4.1. В случае нарушения Покупателем сроков, указанных в п. 2.2 настоящего договора, Покупатель обязан уплатить Продавцу пеню в размере 0,2 (ноль целых две десятых) процента от суммы настоящего Договора за каждый день просрочки.

4.2. В случае нарушения Покупателем сроков, указанных в п. 2.2 настоящего Договора, более чем на 10 (Десять) банковских дней, Продавец вправе в одностороннем порядке расторгнуть настоящий Договор. При этом Покупатель уплачивает Продавцу штраф за отказ от исполнения Договора в размере 10 (Десять) процентов от суммы настоящего Договора.

4.3. В случае нарушения Продавцом обязанностей, возложенных на него п.п. 3.1, 3.2, 3.3. настоящего Договора, Продавец уплачивает Покупателю штраф в размере 10 (Десять) процентов от суммы настоящего Договора.

## 5. Срок действия договора.

5.1. Стороны прилагают все усилия, чтобы решить в рамках реализации настоящего Договора споры и разногласия путем переговоров и достижения двусторонних соглашений. Если соглашения не будут достигнуты, споры подлежат рассмотрению в арбитражном суде г. Москвы.

5.2. Договор вступает в силу с момента его подписания и должен быть прекращен полным исполнением Сторонами принятых на себя по Договору обязательств, либо вступивших в силу норм настоящего договора о его расторжении.

5.3. Все изменения, дополнения, соглашения к настоящему договору действительны лишь в том случае, если они составлены в письменной форме и подписаны уполномоченными представителями обеих Сторон, а также заверены печатями.

5.4. Договор может быть изменен, расторгнут, признан недействительным только по основаниям и в порядке, предусмотренным действующим законодательством и настоящим договором.

5.5. Во всех обстоятельствах, связанных с реализацией настоящего договора, которые прямо не урегулированы настоящим договором. Стороны руководствуются требованиями действующего законодательства.

## 6. Юридические и банковские адреса Сторон

ПОКУПАТЕЛЬ:

ОАО «Качканарский горно-обогатительный комбинат «Ванадий»»
624356, Свердловская область, г. Качканар, ул. Свердлова, 2, ИНН 6615001962, ОКПО 00186938,
расч./счет 40702810000000003170 в КБ «Уральский банк реконструкции и развития»
к/с 30101810900000000795, БИК 046577795

ПРОДАВЕЦ:

ООО «Полипром»,
358000, Республика Калмыкия, г Элиста, ул. Ленина, д.249, ком 505, ИНН 0814113973,
расч./счет № 40702810800090000040 в ФАКБ «Московский Деловой Мир», г. Элиста, корр./счет № 30301810600011680006 в АКБ «МДМ», БИК 044525466

Генеральный директор
ОАО «Качканарский ГОК «Ванадий»


_____ /дзров Д.А./

Генеральный директор
ООО «Полипром»


_____ / Бухарин Г.М. /



ОТ:Х

НОМЕР ТЕЛЕФОНА:                          ДЕК. 21 2001 19:03  СТР14

## ВЫПИСКА

из реестра владельцев именных ценных бумаг
( не является ценной бумагой )
по состоянию на 20 октября 1999 г.

Полное наименование Эмитента : Открытое Акционерное Общество
" Бентонит".
Постановление о регистрации № 143 от 24 мая 1993 года.
Наименование органа осуществившего регистрацию: Администрация Юргамышского
района.
Номер лицевого счета зарегистрированного лица: 41
Фамилия Имя Отчество зарегистрированного лица ( полное наименование)
Открытое акционерное общество " Качканарский Горно-Обогатительный комбинат
" ВАНАДИЙ"
Адрес: 634356, Свердловская область, город Качканар- ул. Свердлова, 2
Вид зарегистрированного лица- владелец

Ценные бумаги , учитываемые на лицевом счете зарегистрированного лица:

| Вид ЦБ | Категория ЦБ | Номиналь ная стоимость ( руб) | Количество ценных бумаг ( шт) | Гос. регистр. номер выпуска ( ЦБ) | Орган осуществивши й регистра- цию выпуска |
|---|---|---|---|---|---|
| Акции именные ( первый выпуск) | Обыкновен- ные | 10 | 34075 | 43-1-453 от 6 мая 1996 г. | Финан- совое управление Курган- ской об- ласти |

Количество, вид, категория ЦБ, обремененных обязательствами или в отношении
которых осуществлено блокирование:

34075 ( Тридцать четыре тысячи семьдесят пять ) штук именных обыкновенных
акций обязательствами не обременены, в отношении их не осуществлено
блокирование.

Регистратор несет ответственность за полноту и достоверность сведений,
содержащихся в данной выписке из реестра.

Держатель реестра: ОАО "Бентонит"
640000,  г. Курган, ул. Ленина, 5 - 509 телефон 22670, факс 23118

Генеральный директор                            И. В. Эрет

Регистратор                                     М. Г. Черникова

Копия верна

A - 1540

Акт сверки взаиморасчетов между ОАО Качканарский ГОК "Ванадий" и ООО "Полипром"
по Договору № КГОК-18/10-99 от 18.10.1999 г.
за период с 01.10.1999 г. по 31.12.1999 г.

г.Качканар                                                                                                                                     03 января 2000г

| Наименование | Документ | Сумма руб. |
|---|---|---|
| 1.Переданы акции ОАО "Бентонит;" | выписка из реестра акционеров | 20 445 000,00 |

Задолженность ОАО КГОК "Ванадий" перед ООО "Полипром" по состоянию на 31.12.1999 г. составляет 20445000,00 рублей.

ООО "Полипром"                                                        ОАО "Качканарский ГОК "Ванадий"

Генеральный директор                      Бухарин Г.М.         Генеральный директор               Хайдаров Д.А.

Главный бухгалтер                           Тюкачева Т.Н.        Начальник                                  Гришкина И.С.

A - 1541

*10*

## ДОГОВОР ПОСТАВКИ № S-01-99/М.

*г. Элиста*                                                    *"30" сентября 1999 г.*

ООО «Полипром», именуемое в дальнейшем Поставщик, в лице Генерального директора Бухарина Г.М., действующего на основании Устава, с одной стороны, и ОАО «Качканарский ГОК «Ванадий», именуемое в дальнейшем Покупатель, в лице Генерального директора Хайдарова Д.А., действующего на основании Устава, с другой стороны, (вместе по тексту именуются Стороны), заключили настоящий договор (далее Договор) о следующем:

### 1. Предмет Договора

1.1. Поставщик обязуется поставить Покупателю на условиях настоящего Договора металлопродукцию (далее по тексту – «Товар») согласно дополнительным соглашениям к настоящему Договору, а Покупатель обязуется принять и оплатить поставленный Товар.

### 2. Стоимость Товара и порядок расчетов

2.1. Цена Товара принимается на условиях "FCA, станция Чусовская Свердловской железной дороги", и устанавливается в российских рублях (в дальнейшем рубли) за одну тонну.

2.2. Цена и количество Товара определяется в дополнительных соглашениях к настоящему Договору.

2.3. Общая стоимость Товара составляет 72.000.000 (Семьдесят два миллиона) (+/- 5%) рублей, в том числе НДС 20% - 12.000.000 рублей.

2.4. Цена Товара включает стоимость упаковки и прочих расходов Продавца, связанных с доставкой Товара на условиях, указанных в п.2.1.

2.5. Общая стоимость Контракта может быть изменена, путем подписания Сторонами дополнительных соглашений.

2.6. Расчеты между Сторонами производятся путем перечисления денежных средств на расчетный счет Поставщика, ценными бумагами, в том числе по согласованию Сторон путем передачи векселя и составления приемопередаточного акта, зачетом взаимных требований, другими финансовыми инструментами.

2.7. Оплата производится Покупателем частями за каждую партию товара в соответствии с дополнительными соглашениями к настоящему Договору не позднее 30 (Тридцати) банковских дней с даты поставки последнего вагона партии Товара по п.3.3 Договора.

### 3. Условия и сроки поставки

3.1. Поставка Товара осуществляется партиями с Чусовского металлургического завода (здесь и далее – Завод-изготовитель) железнодорожным транспортом на условиях "FCA, станция Чусовская Свердловской железной дороги" согласно "ИНКОТЕРМС 1990".

A - 1543

3.1.1. Под партией подразумевается количество товара, определяемое в дополнительных соглашениях к настоящему Договору.

3.2. Поставка Товара по настоящему Договору должна быть произведена в сроки, указанные в дополнительных соглашениях.

3.3. Датой поставки Товара считается дата штемпеля ж.д. станции отправления на ж.д. накладной и/или дата выписки ж.д. квитанции о приеме груза последнего вагона партии товара.

3.4 Право собственности на Товар переходит от Поставщика к Покупателю с даты поставки Товара по п.3.3 Договора

## 4. Качество и количество Товара

4.1. Товар считается переданным Поставщиком Покупателю по количеству согласно количеству, указанному в ж.д. накладной.

4.2. Товар считается переданным Поставщиком Покупателю по качеству согласно качеству, указанному в сертификате завода-изготовителя.

4.3. При приемке Товара Покупателем в случае расхождения данных по количеству и качеству Товара, полученных Покупателем, с данными, содержащимися в отгрузочных документах, приемка Товара по количеству и качеству производится согласно "Инструкции о порядке приемки продукции производственно-технического назначения и Товаров народного потребления по количеству" (№ П-6) и "Инструкции о порядке приемки продукции производственно-технического назначения и Товаров народного потребления по качеству" (№ П-7) с обязательным извещением Поставщика, взятием Товара на ответхранение в случаях недостачи или получения некачественных показателей и составлением в присутствии Поставщика соответствующего акта.

## 5. Права и обязанности Сторон

5.1. Стороны обязуются указывать в документах, сопровождающих Товар, помимо данных, необходимых для отгрузочных документов, также и результаты анализов качества Товара либо ссылки на документы, удостоверяющие надлежащее его качество.

5.2. *Покупатель вправе:*
- требовать передачи ему поставляемых Товаров;
- требовать уменьшения цены Товаров либо расторжения договора, если Товары не свободны от прав третьих лиц;
- требовать при недопоставке передачи недостающих Товаров.

5.3. *Покупатель обязан:*
- совершить все необходимые действия, обеспечивающие принятие Товара;
- проверить количество и качество принятых Товаров и о выявленных недостатках Товаров незамедлительно письменно уведомить Поставщика;
- при отказе от принятия поставленных Товаров обеспечить их сохранность. Если в разумный срок Поставщик не распорядиться Товаром, Покупатель вправе реализовать Товар или возвратить его Поставщику с возмещением необходимых расходов;

A - 1544

- оплатить Товар по цене, предусмотренной дополнительными соглашениями к Договору.

*5.4. Поставщик обязан:*

- передать Товар свободным от любых прав третьих лиц, если только Покупатель не согласился принять Товар, обремененный такими правами;

- передать Товар в количестве и качестве, соответствующий условиям Договора.

## 6. Ответственность сторон

6.1. Сторона, не исполнившая или ненадлежащим образом исполнившая обязательства по Договору, обязана возместить другой стороне причиненные таким неисполнением убытки.

6.2. С Поставщика за недопоставку или просрочку поставки Товара до фактического исполнения обязательства взыскивается неустойка в размере 0,1 % в день от суммы не поставленного в срок Товара.

6.3. С Покупателя за неоплату или несвоевременную оплату Товара до фактической оплаты взыскивается неустойка в размере 0,1 % в день от неоплаченной или несвоевременно оплаченной суммы Товара.

## 7. Разрешение споров

7.1. Все споры и разногласия разрешаются путем переговоров на основе действующего законодательства РФ и обычаев делового оборота.

7.2. При не урегулировании в процессе переговоров спорных вопросов, споры разрешаются в суде в порядке, установленном действующим законодательством РФ.

## 8. Основания освобождения от ответственности

8.1. Стороны освобождаются от ответственности за частичное или полное неисполнение обязательств по Договору, если это неисполнение явилось следствием обстоятельств непреодолимой силы, возникших после заключения Договора в результате обстоятельств чрезвычайного характера, которые стороны не могли предвидеть или предотвратить.

## 9. Заключительные положения

9.1. Односторонний отказ от исполнения Договора или одностороннее его изменение не допускаются.

9.2. Любые изменения и дополнения к Договору действительны при условии, если они совершены в письменной форме и подписаны сторонами.

9.3. Договор вступает в силу с момента его подписания и действует до 15 января 2000 года, а в части расчетов – до полного исполнения обязательств.

9.4. Договор составлен в двух экземплярах, один из которых находится у Покупателя, второй - у Поставщика.

A - 1545

9.5. Стороны обязаны информировать друг друга об изменении адресов и реквизитов, в том числе отгрузочных. Сообщение Покупателя об изменении реквизитов Получателя принимается к исполнению Поставщиком для отгрузки Товара в установленный Договором срок, если такое сообщение поступит к Поставщику не позднее 10 (десяти) дней до начала поставки.

### 10. Юридические адреса и банковские реквизиты сторон:

*Покупатель:*
**ОАО «Качканарский ГОК «Ванадий»**
**ИНН 6615001962**
624356, г. Качканар, Свердловской области, ул. Свердлова, 2.
Банковские реквизиты:
расчетный счет № 40702810000000003170 в КБ «Уральский банк реконструкции и развития», г. Екатеринбург,
корр. счет № 30101810900000000795, БИК 046577795

*Поставщик:*
**ООО «Полипром»,**
**ИНН 0814113973**
358000, РФ, Республика Калмыкия, г. Элиста, ул. Ленина д. 249, ком. 505.
Банковские реквизиты:
расчетный счет 40702810800090000040 в филиале АКБ «Московский Деловой Мир» г. Элиста, БИК 044525466, к/с №30101810900000000466, к/с №30301810600011680006 в АКБ «Московский деловой мир», БИК 044525466

### Подписи сторон:

Покупатель:

Поставщик:





A - 1546

Дополнительное соглашение № 1
к Договору поставки № S-01/M-99 от «30» сентября 1999 г.

г. Москва

«30» сентября 1999 г.

ООО «Полипром», именуемое в дальнейшем «Поставщик», с одной стороны, и ОАО «Качканарский ГОК «Ванадий», именуемое в дальнейшем «Покупатель», с другой стороны (вместе по тексту именуются – Стороны), заключили настоящее Дополнительное соглашение № 1 (далее - «Дополнительное соглашение № 1») к Договору поставки № S-01/M-99 от «30» сентября 1999 г. (далее – «Договор») о нижеследующем:

Поставщик обязуется поставить Покупателю на условиях Договора, а Покупатель обязуется принять и оплатить Товар согласно следующей спецификации:

### СПЕЦИФИКАЦИЯ ТОВАРА.

1. Стальная заготовка, ГОСТ 380-94, ТУ-14-1-5237-93.
Качество поверхности – 1 категория, ТУ-14-1-4492-88.
Упаковка – связки по 6 тонн.
Минимальная загрузка вагонов – 60 тонн.

| № п/п | Размер, мм | Длина мерная, мм | Сталь | Количество, т. |
|---|---|---|---|---|
| 1 | 125х125 | 4000(+/-100) | 3 СП/ПС | 9 000 |

Цена за 1 тонну- 3 246 (Три тысячи двести сорок шесть) рублей за тонну, в том числе НДС 20%=541 рубль.

Общее количество по Дополнительному соглашению:
- стальная заготовка – 9 500 (+5%/-0%) тонн.

2. Срок поставки: октябрь - ноябрь 1999 г.
3. Общая стоимость по Дополнительному соглашению № 1 составляет 29 214 000 (Двадцать девять миллионов двести четырнадцать тысяч) рублей, в том числе НДС 20%=4 869 000 руб.
4. Указанные цены действительны только на данную партию Товара.
5. Дополнительное соглашение № 1 является неотъемлемой частью Договора поставки № S-01/M-99 от «30» сентября 1999 г.

Подписи сторон:

| Покупатель: | Поставщик: |
|---|---|
|  |  |

Дополнительное соглашение № 1 к Договору поставки № S-01/M-99 от «30» сентября 1999 г.

**Дополнительное соглашение № 2**
**к Договору поставки № S-01/M-99 от «30» сентября 1999 г.**

г. Москва                                          «29» ноября 1999 г.

ООО «Полипром», именуемое в дальнейшем «Поставщик», с одной стороны, и ОАО «Качканарский ГОК «Ванадий», именуемое в дальнейшем «Покупатель», с другой стороны (вместе по тексту именуются – Стороны), заключили настоящее Дополнительное соглашение № 2 (далее - «Дополнительное соглашение № 2») к Договору поставки № S-01/M-99 от «30» сентября 1999 г. (далее – «Договор») о нижеследующем:

Поставщик обязуется поставить Покупателю на условиях Договора, а Покупатель обязуется принять и оплатить Товар согласно следующей спецификации:

**СПЕЦИФИКАЦИЯ ТОВАРА.**

1. Арматура горячекатаная, ГОСТ 5781-82, класс А3.
Марка стали – 35ГС
Длина – 11700 (+/-100) мм

| № п/п | Диаметр, мм | Количество, т. |
|---|---|---|
| 3 | 16 | 325 |
| 4 | 18 | 325 |
| 5 | 20 | 325 |
| 6 | 25 | 325 |
| 7 | 28 | 325 |
| 8 | 32 | 390 |
| **Всего:** | | **2 015** |

Цена за 1 тонну- 4 080 (Четыре тысячи восемьдесят) рублей за тонну, в том числе НДС 20%=680 рублей.

Общее количество по Дополнительному соглашению:
- Арматура горячекатаная – 2 015 (+5%/-0%) тонн.

2. Срок поставки: октябрь - декабрь 1999 г.
3. Общая стоимость по Дополнительному соглашению № 1 составляет 8 221 200 (Восемь миллионов двести двадцать одна тысяча двести) рублей, в том числе НДС 20%=1 370 200 руб.
4. Указанные цены действительны только на данную партию Товара.
5. Дополнительное соглашение № 2 является неотъемлемой частью Договора поставки № S-01/M-99 от «30» сентября 1999 г.

Подписи сторон:

Покупатель:                                          Поставщик:

Р.М. Хайдаров                                       Г.М. Бухарин

Дополнительное соглашение № 2 к Договору поставки № S-01/M-99— 29.09.99

A - 1548

КОПИЯ

ДОГОВОР № 15-99/ПК

г. Качканар                                                    "27" октября 1999 г.

Общество с ограниченной «Полипром», именуемое дальнейшем «Продавец», в лице Генерального директора Бухарина Г. М., действующего на основании Устава, с одной стороны, и Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий», именуемое дальнейшем «Покупатель», в лице Генерального директора Хайдарова Д. А., действующего на основании Устава, с другой стороны, заключили настоящий Договор о нижеследующем:

## 1. ПРЕДМЕТ ДОГОВОРА

1.1. В соответствии с настоящим Договором Продавец обязуется продать Покупателю товар, именуемый в дальнейшем «Товар» согласно Приложениям к настоящему Договору, а Покупатель обязуется принять и оплатить этот Товар в порядке и в сроки, предусмотренные настоящим Договором.

## 2. ЦЕНА ТОВАРА

2.1. Цена и наименование Товара указываются в Приложениях к настоящему Договору.

## 3. ПОСТАВКА И ПРИЕМКА ТОВАРА

3.1. Поставка Товара осуществляется до 31 декабря 2000 г. в количестве и ассортименте в соответствии с Приложениями к настоящему Договору.

3.2. Местом нахождения Товара является ж.д. ст. Нижний Тагил Свердловской области. Доставка Товара до ст. Качканар Свердловской ж/д осуществляется за счет Покупателя. Транспортные расходы Продавца по доставке Товара не включаются в цену Товара и в полном объеме возмещаются Покупателем в течение трех дней с даты приемки Товара Покупателем.

3.3. Приемка товара по ассортименту и количеству проводится при передаче товара Покупателю вместе с сертификатами качества.

3.4. Обязательства Продавца по доставке Товара, считаются выполненными с момента подписания акта приема-передачи Товара уполномоченными лицами Продавца и Покупателя.

## 4. ПОРЯДОК РАСЧЕТОВ

4.1. Деньги за проданный Товар перечисляются на расчетный счет Продавца не позднее трех банковских дней с даты подписания акта приема-передачи Товара.

4.2 В случае задержки оплаты Товара против сроков, указанных в п. 4.1 по причинам, зависящим от Покупателя, последний выплачивает Продавцу штраф в размере 0.2% за каждый день просрочки, но не более 5% стоимости Товара.

## 5. ОТВЕТСТВЕННОСТЬ СТОРОН

5.1. Продавец отвечает за недостатки Товара, если не докажет, что недостатки Товара возникли после его передачи Покупателю вследствие нарушения Покупателем правил пользования Товаром, его хранения либо в результате действий третьих лиц, либо в следствии непреодолимой силы.

5.2. За нарушение условий настоящего Договора стороны несут ответственность в установленном порядке. Возмещению подлежат убытки в виде прямого ущерба и неполученной прибыли. Бремя обоснования убытков лежит на потерпевшей стороне.

5.3. При необоснованном отказе от приемки Товара Покупатель возмещает Продавцу убытки полученные Продавцом в виде прямого ущерба и неполученной прибыли.

A - 1550

ОТ:X

НОМЕР ТЕЛЕФОНА:

ДЕК. 21 2001 19:01  СТР8

## 6. ФОРС-МАЖОР (ДЕЙСТВИЕ НЕПРЕОДОЛИМОЙ СИЛЫ)

.1. Ни одна из сторон не несет ответственности перед другой стороной за невыполнение обязательств, обусловленных обстоятельствами, возникшими помимо воли и желания сторон и которые нельзя предвидеть и избежать.

.2. Сторона, не исполнившая своих обязательств перед другой стороной вследствие действия преодолимой силы, должна немедленно известить другую сторону о препятствии и влиянии действия преодолимой силы на исполнение обязательств по настоящему Договору.

## 7. РАЗРЕШЕНИЕ СПОРОВ

7.1. Все споры по настоящему Договору решаются путем переговоров.
7.2. При недостижении согласия споры решаются арбитражном суде в соответствии с правилами о подсудности на основании законодательства РФ.

## 8. СРОК ДЕЙСТВИЯ ДОГОВОРА

8.1. Срок действия Договора с 27 октября 1999 года по 31 декабря 2000 года.
8.2. Настоящий договор может быть пролонгирован Дополнительными соглашениями сторон.
8.3. Договор может быть расторгнут:
8.3.1. По соглашению сторон.
8.3.2. По другим основаниям, предусмотренным настоящим Договором и действующим законодательством.

## 9. ЗАКЛЮЧИТЕЛЬНЫЕ ПОЛОЖЕНИЯ

9.1. Настоящий Договор составлен в двух экземплярах, имеющих одинаковую юридическую силу, по одному экземпляру для каждой из сторон.
9.2. Все Приложения и Дополнения к настоящему Договору являются его неотъемлемой частью.

## 10. ЮРИДИЧЕСКИЕ АДРЕСА И ПЛАТЕЖНЫЕ РЕКВИЗИТЫ СТОРОН

10.1. Покупатель

ОАО «Качканарский ГОК «Ванадий»,624356, г. Качканар, Свердловской области, Ул. Свердлова, 2, ИНН 6615001962, р/с №40702810800020421865 в АКБ «Московский Деловой Мир», 117049, г. Москва, ул. Житная, д. 30101810900000000466, БИК

/Хайдаров Д. А./

10.2.Продавец

ООО «Полипром» 358000 г. Элиста, ул. Ленина д.249,к.505, ИНН 0814113973, р/с № 40702810800090000040 в филиале АКБ «Московский Деловой Мир», к/с № 30301810600011680006, БИК 044525466



/Бухарин Г.М. /

ОТ:Х

НОМЕР ТЕЛЕФОНА:
ПРИЛО...(ОНА):
ДОГОВОРУ № 15-99/ПК от "27" октяб...
между ООО «Полипром» и ОАО «Качканарский ГОК «Ванадий»

ДЕК. 21 2001 19:02 СТР9

"27" октября 1999 г

| Наименование товара | Количество | Цена единицы товара (руб.) | Сумма (руб.) | Сумма НДС (руб.) | Всего с НДС (руб.) |
|---|---|---|---|---|---|
| Комплект узких клиновых ...ений 0-30-034, 8-SPS x 3000-28 (прорезиненные) | 1 комплект | 220 000-00 | 220 000-00 | 44 000-00 | 264 000-00 |
| Адаптер реле (штыковой разъем) | 40 штук | 2 800-00 | 112 000-00 | 22 400-00 | 134 400-00 |
| Контакты (медные) | 1 430 штук | 1 540-00 | 2 202 200-00 | 440 440-00 | 2 642 640-00 |
| Шайба специальная (электороизолятор из пропитанной бумаги) | 30 штук | 80-00 | 2 400-00 | 480-00 | 2 880-00 |
| Электромагнитный вентиль 10-45-002, EV 80  110 V | 40 штук | 24 900-00 | 996 000-00 | 199 200-00 | 1 195 200-00 |
| Реле давления KPS 37 R1/4 6-18 bar (клапан) | 29 штук | 10 600-00 | 307 400-00 | 61 480-00 | 368 880-00 |
| Проволочное сопротивление | 10 штук | 17 200-00 | 172 000-00 | 34 400-00 | 206 400-00 |
| Направляющее сопло (пластмасса) | 1 штука | 34 000-00 | 34 000-00 | 6 800-00 | 40 800-00 |
| Плавкий предохранитель 20-58-006 006L 110а. 500в. | 1 500 штук | 180-00 | 270 000-00 | 54 000-00 | 324 000-00 |
| Выключатель автоматический, пакетный | 166 штук | 4 300-00 | 713 800-00 | 142 760-00 | 856 560-00 |
| Электродвигатель переменного тока, однофазный 20-50-460  K10R  112 M2 7,5 кВт | 40 штук | 46 200-00 | 1 848 000-00 | 369 600-00 | 2 217 600-00 |
| Амперметр 20-53-053.M15  0-1000А  п2  45 | 20 штук | 11 400-00 | 228 000-00 | 45 600-00 | 273 600-00 |
| Промежуточное реле 10-57-014 2RH  01. 24в GS | 40 штук | 8 200-00 | 328 000-00 | 65 600-00 | 393 600-00 |
| Промежуточное реле 10-60-001. 2RH01 110v GS | 40 штук | 8 200-00 | 328 000-00 | 65 600-00 | 393 600-00 |
| Реле Бухгольца 10-56-003. TypBF  50/80 | 10 штук | 8 200-00 | 82 000-00 | 16 400-00 | 98 400-00 |
| ИТОГО | | | 7 843 800-00 | 1 568 760-00 | 9 412 560-00 |

Продавец
Генеральный директор ООО «Полипром»

Покупатель
Генеральный директор
ОАО «Качканарский ГОК «Ванадий»

Бухарин Г.М.

Хайдаров Д.А.

4041  5.09.2000.    л. Маек

A - 1552

ОТ:Х

НОМЕР ТЕЛЕФОНА:    ДЕК. 21 2001 19:02 СТР10

**АКТ**
**приема-передачи товара**

г.Качканар                                                           29 декабря 1999г.

Общество с ограниченной «Полипром», именуемое дальнейшем «Продавец», в лице Генерального директора Бухарина Г. М., действующего на основании Устава, с одной стороны, и Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий», именуемое дальнейшем «Покупатель», в лице Генерального директора Хайдарова Д. А., действующего на основании Устава, с другой стороны, составили и подписали настоящий Акт приема-передачи товара о нижеследующем:

В ноябре-декабре 1999 года Продавец передал, а Покупатель принял товар в соответствии с Приложением №1 от 27.10.1999г. к Договору №15-99ПК от 27.10.1999г., отгруженный со станции Нижний Тагил Свердловской области на станцию Качканар Свердловской области согласно ж/д квитанциям. Покупатель не имеет к Продавцу претензий по качеству и количеству товара.

**Продавец**                                    **Покупатель**
**Генеральный директор**            **Генеральный директор**
**ООО «Полипром»**                      **ОАО «Качканарский ГОК «Ванадий»**

Бухарин Г.М.                                                         Хайдаров Д.А.

ОТ:Х    НОМЕР ТЕЛЕФОНА:    ДЕК. 21 2001 19:02 СТР11

**[КОПИЯ]**

Акт сверки взаиморасчетов между ОАО Качканарский ГОК "Ванадия" и ООО "Полипром"
по Договору № 15-99/ЛК от 27.10.1999 г.
за период с 01.11.1999 г. по 31.12.1999 г.

г.Качканар    05 января 2000г.

| Наименование | Документ | Номер документа | Дата | Сумма руб. |
|---|---|---|---|---|
| 1.Отгружено запчастей в адрес ОАО КГОК "Ванадий" | счет-фактура | 126 | 15.12.99 | 9.412.000,00 |
| | счет-фактура | 127 | 27.12.99 | 936.000,00 |
| Итого: | | | | 10.348.000,00 |

Задолженность ОАО КГОК "Ванадий" перед ООО "Полипром" по состоянию на 31.12.1999 г. составляет 10348000,00 рублей, в том числе НДС 1724666,67 рублей.

ООО "Полипром"    ОАО "Качканарский ГОК "Ванадий"

Генеральный директор    Бухарин Г.М.    Генеральный директор    Хандаров Д.А.

Главный бухгалтер    Тюкачева Т.Н.    Начальник    Трошкина Н.С.

р. Шин

## ДОГОВОР № 16-99/Пк

**г.Качканар**                                                    **"10" ноября 1999г.**

ООО "Полипром", именуемое в дальнейшем "Продавец", в лице Генерального директора г-на Бухарина Г.М, действующего на основании Устава, с одной стороны, ОАО «Качканарский ГОК «Ванадий»", именуемое в дальнейшем "Покупатель", в лице Генерального директора г-на Хайдарова Д.А., действующего на основании Устава, с другой стороны, совместно именуемые Стороны, заключили настоящий Договор о нижеследующем:

### 1. ПРЕДМЕТ ДОГОВОРА

1.1. Продавец продает, а Покупатель покупает ванадиевую продукцию производства ОАО «Ванадий Тулачермет», именуемую в дальнейшем Продукция, со спецификацией согласно Приложению №1 к настоящему Договору.

### 2. КОЛИЧЕСТВО ПРОДУКЦИИ

2.1. Количество ежемесячно отгружаемой продукции согласовывается Сторонами дополнительно в Приложениях.

### 3. УСЛОВИЯ И СРОКИ ПОСТАВКИ

Базис поставки - FCA Тула (в редакции Инкотермс 1990 г). В обязанности Продавца входит за счет Продавца осуществить погрузку продукции в транспортное средство, предоставленное Покупателем.

Покупатель обязан письменно сообщить Продав... ... ...нее чем за 3 рабочих дня до прибытия транспортного средства за товаром на склад Продавца название фирмы-транспортного агента, планируемую дату прибытия, номера автомашины и прицепа. Прибытие автомашины в выходные (суббота и воскресенье) и праздничные для России дни исключено. При прибытии автомашины на склад Продавца не позднее 8 ч 00 мин московского времени Продавец обязан в течение дня прибытия автомашины на его склад отправить продукцию Покупателю при условии соблюдения им срока оповещения о прибытии автомашины. При прибытии автомашины на склад Продавца позднее 8.ч 00 мин московского времени Продавец обязано в течение рабочего дня, следующего за днем прибытия автомашины на его склад, отправить продукцию Покупателю при условии соблюдения им срока оповещения о прибытии автомашины.

Продукция отгружается партиями по 18,5 мт нетто ± 10% автотранспортом, либо по 50 мт нетто ± 10% в крытых ж/д вагонах.

Дата и, соответственно, месяц отгрузки каждой партии продукции определяется по дате автонакладной, оформленной на эту партию, либо по дате железнодорожной накладной.

На каждую отгруженную партию Продавец предоставляет Покупателю следующие документы:
- счет-фактуру;
- сертификат качества и количества, выданный ОАО «Ванадий Тулачермет»;
- сертификат происхождения, выданный ОАО «Ванадий Тулачермет» и заверенный его печатью.

### 4. ЦЕНА ПРОДУКЦИИ

4.1. Цена продукции понимается на базисе FCA Тула (с учетом затрат по погрузке), устанавливается на каждый месяц и согласовывается приложениями.

A - 1556

4.2. В случае, если Продавец по просьбе Покупателя выполняет дополнительные обязанности по отправке продукции (за исключением погрузки в транспортное средство на складе Продавца), как, например, таможенное оформление и, соответственно, несет дополнительные затраты (уплата таможенных платежей за Покупателя и т.п.), Продавец предъявляет эти затраты Покупателю дополнительно.

## 5. УСЛОВИЯ ПЛАТЕЖА

5.1. Покупатель производит оплату за поставляемую Продукцию в течение месяца следующего за месяцем отгрузки Продукции.

5.2. По согласованию Сторон оплата производится перечислением денежных средств на расчетный счет Покупателя, зачетом взаимных требований или ценными бумагами.

5.3. Дополнительные расходы по таможенному оформлению и таможенной очистке могут быть оплачены векселями, эмитенты которых согласуются Сторонами дополнительно.

## 6. ПРОВЕРКА КАЧЕСТВА И КОЛИЧЕСТВА

Покупатель имеет право за свой счет проверить вес и качество поставляемой продукции. Если вес, определенный в результате взвешивания, будет отличаться от веса, указанного в сертификате качества и количества, на величину не более 0,5% в большую либо меньшую сторону, то вес, указанный в сертификате качества и количества, будет считаться окончательным. Проверка содержания основного вещества (пентоксида ванадия) проводится по каждой плавке отдельно, и её результаты распространяются только на проверяемую плавку. В случае, если отклонение по содержанию основного вещества в плавке не превышает ± 0,5% от данных по этой плавке, приведённых в сертификате, анализ считается соответствующим данным сертификата. В случае расхождения данных взвешивания или контрольных анализов с данными сертификата более чем на указанные выше величины, Покупатель не позднее 30 календарных дней с даты CMR подает Продавцу официальную претензию, к которой должен быть приложен акт контрольной проверки с полным описанием отбора проб, методик проведённых анализов и их результатов. Срок рассмотрения Продавцом претензии - 10 календарных дней с даты ее получения.

В случае несогласия Продавца с результатами проверки, дополнительную проверку этих параметров будет проводить независимая компания, выбранная по согласованию между Продавцом и Покупателем, чьи результаты будут окончательными как для Продавца, так и для Покупателя. При этом методики отбора проб и определения химического состава материала уточняются Сторонами дополнительно. Все расходы, связанные с проверкой независимой компанией качества и количества поставленного по настоящему контракту товара, на который заявлена претензия, будут отнесены за счёт проигравшей Стороны.

До урегулирования Сторонами претензии Покупатель не имеет права использовать товар, на который заявлена претензия.

## 7. ОБСТОЯТЕЛЬСТВА НЕПРЕОДОЛИМОЙ СИЛЫ

7.1. Ни одна из Сторон не несет ответственности за полное или частичное неисполнение любых обязательств по настоящему Договору, если такое неисполнение возникает вследствие форс-мажорных обстоятельств, таких как наводнение, пожар, землетрясение и другие стихийные бедствия, а также вследствие войны или военных действий, актов правительства и других обстоятельств, которые находятся вне контроля Сторон, возникших после заключения настоящего Договора и непосредственно влияющих на исполнение Договора.

7.2. В случае наличия любого из указанных обстоятельств сроки, обусловленные в настоящем Договоре и дополнениях к нему, продляются соответственно на время действия указанных обстоятельств.

7.3. Сторона, которая оказалась не в состоянии выполнить свои обязательства, должна уведомить другую Сторону в письменном виде о начале, ожидаемой продолжительности и времени прекращения действия перечисленных обстоятельств немедленно, но не позднее, чем через 10 (Десять) дней со времени начала и прекращения их действия. Надлежащим доказательством наличия указанных выше обстоятельств и их продолжительности будут служить свидетельства Торговой палаты Российской Федерации.

7.4. В течение одного месяца с даты отправки извещения о наступлении форс-мажорных обстоятельств, указанных в настоящей статье, представители Сторон должны встретиться для того, чтобы провести консультацию и договориться о принятии мер для дальнейшего выполнения или расторжения настоящего Договора.

## 8. РАЗРЕШЕНИЕ СПОРОВ

8.1.Покупатель и Продавец примут все меры к разрешению всех споров и разногласий, которые могут возникнуть из настоящего Договора или в связи с ним, путем переговоров.

8.2. В случае, если Стороны не могут прийти к соглашению, все споры и разногласия, за исключением подсудности общим судам, подлежат передаче для разрешения в арбитраж г.Москвы.

## 9. ОТВЕТСТВЕННОСТЬ СТОРОН

9.1. За неисполнение или ненадлежащее исполнение своих обязательств по настоящему Договору Стороны несут ответственность в соответствии с действующим законодательством.

9.2. Продавец несет ответственность за качество и количество поставляемой продукции, которые оговорены в настоящем Договоре и Приложениях к нему.

9.3. За просрочку Продавцом поставки продукции по настоящему Договору или за просрочку Покупателем оплаты продукции, противоположной Стороне по настоящему Договору уплачивается штраф, размер которого рассчитывается согласно правилам, установленным ст. 395 ГК РФ.

## 10. СРОК ДЕЙСТВИЯ НАСТОЯЩЕГО ДОГОВОРА

10.1. Настоящий Договор вступает в силу с даты его подписания обеими Сторонами и действует по 31.12.2000 г.

10.2. По взаимному согласию Сторон, оформленному в письменном виде, Договор может быть пролонгирован на последующий срок.

## 11. ПРОЧИЕ УСЛОВИЯ

11.1. После подписания Сторонами настоящего Договора все предыдущие устные и письменные договорённости относительно предмета настоящего Договора считаются аннулированными и теряют силу.

11.2. Если из-за сокращения разницы между ценами на шлак и пентоксид ванадия и/или из-за понижения мировой цены на пентоксид ванадия и/или увеличения затрат на производство пентоксида ванадия реализация настоящего контракта станет экономически невыгодной для Продавца или Покупателя, Стороны будут согласовывать изменение условий Договора. Если изменения будут неприемлемы для одной из Сторон, действие настоящего Договора будет приостановлено.

11.2. Все изменения и дополнения к настоящему Договору будут считаться действительными, если они совершены в письменном виде. Все Приложения, упомянутые в настоящем контракте, являются его неотъемлемой частью.

A - 1558

ОТ:Х                    НОМЕР ТЕЛЕФОНА:                    ДЕК. 21 2001 19:47  СТР4

11.3. Ни одна из Сторон не вправе передать свои обязанности и права по настоящему Договору третьей организации без письменного согласия другой Стороны.

11.4. Взаимоотношения Сторон, не урегулированные настоящим Договором, регламентируются действующим законодательством.

11.5. Настоящий Договор содержит 4 страниц текста, составлен в двух экземплярах, имеющих одинаковую юридическую силу, по одному экземпляру для каждой из Сторон.

## 12. ЮРИДИЧЕСКИЕ АДРЕСА И РЕКВИЗИТЫ СТОРОН.

**Продавец:**   ООО "Полипром"
Адрес: 358000, г. Элиста, ул. Ленина, д.249, к.505, ИНН 0814113973
р/с 40702810800090000040 в филиале АКБ "МДМ", г. Элиста
к/с 30301810600011680006
БИК 044525466

**Покупатель:** ОАО «Качканарский ГОК «Ванадий»,
Адрес: 624356, г. Качканар, Свердловской области, Ул. Свердлова, 2, ИНН 6615001962,
ОКПО 00186938,
Банковские реквизиты: расчетный счет № 40702810800020821865 в АКБ «Московский Деловой Мир», 117049, г. Москва, ул. Житная, д. 14, корр. счет № 30101810900000000466, БИК 044525466

### ПОДПИСИ СТОРОН

от Продавца:                              от Покупателя:

Генеральный директор                      Генеральный директор
ООО "Полипром"                            ОАО «Качканарский ГОК «Ванадий»

_____ Бухарин Г.М.                    _____ Хайдаров Д.А.

ОТ:X                    НОМЕР ТЕЛЕФОНА:                ДЕК. 21 2001 19:47  СТР5

## Дополнение №1
### к договору № 16-99/Пк от "10" ноября 1999 г.

г. Москва                                           от 18 ноября 1999г.

Стороны договорились о нижеследующем :

1. Стоимость упаковки по контракту (стальные барабаны), входит в стоимость товара и является невозвратной тарой.
2. Дополнить раздел 1 «Предмет», п.1.1 после слов пентоксид ванадия, словами « и феррованадий».
3. Остальные условия - в соответствии с вышеназванным контрактом.

Продавец                                            Покупатель

ОТ:Х                    НОМЕР ТЕЛЕФОНА:                    ДЕК. 21 2001 19:48  СТР6

Приложение № 1
к договору № 16–99/Пк
от "10" ноября 1999 г.

**Спецификация на $V_2O_5$**

| | | |
|---|---|---|
| $V_2O_5$ | не менее | 90 % |
| $SiO_2$ | не более | 0,85 % |
| P | не более | 0,055 % |
| Mn | не более | 2,5 % |
| $TiO_2$ | не более | 0,65 % |
| S | не более | 0,1 % |
| CaO | не более | 5,0 % |
| Fe | не более | 5,0% |
| | | (факультативно) |

Размер до 77 мм.
Средняя толщина 2 - 3 мм.
Максимальная толщина 5 мм.

Упаковка: в стальных барабанах с максимальным весом нетто 180 кг.

По согласованию Сторон спецификация может уточняться.

**ПОДПИСИ СТОРОН**

от Продавца:                          от Покупателя:

Генеральный директор                  Генеральный директор
ООО "Полипром"                        ОАО «Качканарский ГОК «Ванадий»

_____ Бухарин Г.М.          _____ Хайдаров Д.А.

ОТ:Х

НОМЕР ТЕЛЕФОНА:

ДЕК. 21 2001 19:48 СТР7

Приложение № 2
к Договору № 16-99/Пк
от 10 ноября 1999 г.

г. Качканар

20 ноября 1999 г.

| Наименование товара | Количество в пересчете на содержание чистого V2O5 в пентоксиде ванадия (V в феррованадии), т | Цена за 1 кг V2O5 в пентоксиде ванадия (V в феррованадии), руб/ кг | Стоимость товара без НДС |
|---|---|---|---|
| Пентоксид ванадия | 172,023 +/- 10% | 80.10 руб/ кг | 13 779 042,30 р. |
| Феррованадий-80 | 45,58 +/- 10% | 211 руб/ кг | 9 617 380,00 р. |
| Феррованадий- 50 | 18,6+/- 10% | 211 руб/ кг | 3 924 600,00 р. |

Итого

27 321 022,30 р.

Общая стоимость товара составляет 32785226,76 руб. (тридцать два миллиона семьсот восемьдесят пять тысяч двести двадцать шесть рублей, семьдесят шесть копеек )., в том числе стоимость товара - 27321022,30 руб., НДС 20%- 5464204,46 руб.

Срок поставки: ноябрь- декабрь 1999 года.

от Продавца:

Генеральный директор
ООО "Полипром"

_____ Бухарин Г.М.

от Покупателя:

Генеральный директор
ОАО «Качканарский ГОК «Ванадий»

_____ Хайдаров Д.А.

A - 1562

ОТ:Х

НОМЕР ТЕЛЕФОНА:

ДЕК. 21 2001 19:48  СТР8

Приложение № 3
к договору № 16-99/Пк
от "10" ноября 1999 г.

## Спецификация на FeV-80

| | | |
|---|---|---|
| V | не менее | 78% |
| Si | не более | 2,0% |
| P | не более | 0,06% |
| Mn | не более | 2,0% |
| Cu | не более | 0,1% |
| S | не более | 0,05% |
| Al | не более | 2,0% |
| C | не более | 0,4% |
| As | не более | 0,02% |
| Fe | | остальное |

Размер кусков: 5÷50 мм
Упаковка: в маркированных стальных барабанах с максимальным весом нетто
400 кг.

По согласованию Сторон спецификация может уточняться.

Продавец                                          Покупатель

A - 1563

Приложение № 4
к договору № 16-99/Пк
от "10" ноября 1999 г.

### Спецификация на FeV-50

| | | |
|---|---|---|
| V | не менее | 48% |
| Si | не более | 2,0% |
| P | не более | 0,1% |
| Mn | не более | 4,0% |
| Cu | не более | 0,2% |
| S | не более | 0,02% |
| Al | не более | 0,1% |
| C | не более | 0,5% |
| As | не более | 0,01% |

Размер кусков: 5-50 мм.
Упаковка: в маркированных стальных барабанах с максимальным весом нетто 400 кг.

По согласованию Сторон спецификация может уточняться.

Продавец                              Покупатель

ОТ:X                    НОМЕР ТЕЛЕФОНА:                    ДЕК. 21 2001 19:48 СТР10

Приложение № 5
к Договору № 16-99/Пк
от 10 ноября 1999 г.

г. Качканар                                                09 декабря 1999 г.

| Наименование товара | Количество в пересчете на содержание чистого V2O5 в пентоксиде ванадия (V в феррованадии), т | Цена за 1 кг V2O5 в пентоксиде ванадия (V в феррованадии), руб/кг | Стоимость товара без НДС |
|---|---|---|---|
| Пентоксид ванадия | 263,596 +/- 10% | 72,50 руб./ кг | 19 110 710,00 р. |
| Феррованадий-80 | 76,00 +/- 10% | 190,00 руб./ кг | 14 440 000,00 р. |
| Феррованадий- 50 | 29,1+/- 10% | 190,00 руб./ кг | 5 529 000,00 р. |

Итого                                                         39 079 710,00 р.

Общая стоимость товара составляет 46895652,00 руб. (сорок шесть миллионов восемьсот девяносто пять тысяч шестьсот пятьдесят два рубля )., в том числе стоимость товара -39079710,00 руб., НДС 20%- 7 815 942,00  руб.

Срок поставки:  декабрь 1999 года- январь 2000 года.

от Продавца:                              от Покупателя:

Генеральный директор                      Генеральный  директор
ООО "Полипром"                            ОАО «Качканарский ГОК «Ванадий»

_____ Бухарин Г.М.            _____ Хайдаров Д.А.

3648-1-1
72-0.1

## ДОГОВОР № 01-99/П

г. Качканар                                                                                              «09» июля 1999 г.

Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий», именуемое в дальнейшем Поставщик, в лице Генерального директора Хайдарова Д.А., действующего на основании Устава и

Общество с ограниченной ответственностью «Полипром», именуемое в дальнейшем Покупатель, в лице Генерального Директора Бухарина Г.М., действующего на основании Устава,

вместе именуемые как Стороны, заключили настоящий договор (далее по тексту Договор) о нижеследующем:

### Статья 1.
### ПРЕДМЕТ ДОГОВОРА

1.1. Предметом договора является поставка в 1999 году железорудного сырья - окатышей (ТУ 14-00186933-003-95) и агломерата (ТУ 14-00186933-005-95), далее по тексту – Продукция, в количестве, ассортименте, качества и по цене, определяемым условиями Договора и дополнительных соглашений.

1.2. Поставщик обязуется передать Продукцию в собственность Покупателю (поставить по адресам, указанным Покупателем), а Покупатель обязуется принять Продукцию в собственность и уплатить за него цену как установлено настоящим Договором.

1.3. Поставщик имеет право поставить Продукцию по настоящему договору до 5% более или менее от общего количества ежемесячной заявки. При этом обязательства Поставщика считаются выполненными, а оплата производится по фактически отгруженному количеству Продукции.

### Статья 2.
### ЦЕНА И ОБЪЕМЫ ПОСТАВКИ.

2.1. Цена на железорудное сырье устанавливается Поставщиком самостоятельно, исходя из экономически обоснованных затрат на производство, без учета НДС и железнодорожного тарифа.

2.2. В зависимости от себестоимости Продукции и конъюнктуры рынка, стоимость Продукции в период поставки может быть изменена, о чем Поставщик не позднее 10 (Десяти) дней до даты введения новой цены уведомляет Покупателя телеграммой или письмом. Покупатель в десятидневный срок с момента получения извещения согласует изменение цены с Поставщиком, которое фиксируется в дополнительных соглашениях.

2.3. Если за часть Продукции была произведена предоплата, то цена на эту часть Продукции остается неизменной.

2.4. Стоимость Продукции устанавливается в российских рублях за одну тонну, включая НДС.

2.5. Объем месячной поставки Продукции и цена за нее оговариваются Сторонами в дополнительных соглашениях согласно месячным заявкам Покупателя.

### Статья 3.
### ПОРЯДОК, УСЛОВИЯ И СРОКИ ПОСТАВКИ

3.1. Конкретный месячный объем поставки определяется Сторонами в дополнительных соглашениях в конце месяца, предыдущего месяцу поставки.

3.2. Поставка общего количества Продукции по ежемесячной заявке Покупателя осуществляется до 31 числа каждого месяца.

3.3. Продукция поставляется Покупателю на условиях "FCA, станция Качканар, Свердловской железной дороги", в соответствии с «ИНКОТЕРМС-1990».

3.4. Поставка Продукции Поставщиком производится железнодорожным транспортом в хопперах и окатышевозах МПС.

3.5. Датой поставки Продукции от Поставщика Покупателю является дата штемпеля ж.д. станции отправления на железнодорожной квитанции о приемке груза (Продукции).

3.6. Погрузку Продукции Поставщик осуществляет своими силами и за свой счет.

3.7. Право собственности на Продукцию переходит от Поставщика к Покупателю с даты поставки по п.3.5. Договора.

3.8. Железнодорожный тариф и все расходы, связанные с перевозкой Продукции оплачиваются за счет Покупателя.

*Договор поставки № 01-99/П от 09 июля 1998г.*

*Статья 4.*
### КОЛИЧЕСТВО И КАЧЕСТВО ПОСТАВЛЯЕМОЙ ПРОДУКЦИИ

4.1. Весом отгружаемой Продукции считается вес, указанный в железнодорожной накладной.

4.2. Весовое количество Продукции определяется с учетом погрешности при взвешивании, равной 1 % от массы (нетто) в железнодорожном составе согласно ГОСТ 12409-66, нормы естественной убыли и веса тары. Нормы естественной убыли определяются в соответствии с Постановлением Госснаба СССР от 26.10.1987 г. № 130 и установлены в следующем размере для перевозки в хопперах-полувагонах до 500 км: окатышей - 0,3%, агломерата - 0,2%.

4.3. При совместном участии Сторон допускается производить взаимную комиссионную проверку работоспособности железнодорожных весов в соответствии с Рекомендацией Ми 1953 88 "Масса народнохозяйственных грузов при бестарных перевозках. Методика выполнения измерений».

4.4. На каждую отгруженную партию Продукции Поставщик предоставляет сертификат в соответствии с ТУ. Проба отбирается от партии не более 2500 тонн.

4.5. Приемка продукции осуществляется в соответствии с Инструкциями П-6 от 15.05.1965 г. и П-7 от 25.04.1966 г. с последующими изменениями и дополнениями. При принятии компетентными органами новых инструкций о приемке продукции они автоматически вступают в действие без внесения изменений в Договор.

4.6. При контрольной проверке качества продукции результаты проверки, отличающиеся от данных, указанных в сертификате, но не выходящие за пределы принятой по стандарту погрешности, принимаются по данным поставщика продукции. При отсутствии стандарта, определяющего величину погрешности, Стороны применяют согласованную методику.

*Статья 5.*
### УСЛОВИЯ ПЛАТЕЖА И ПОРЯДОК РАСЧЕТОВ

5.1. Расчеты между Сторонами по месячному объему поставки осуществляются не позднее 31 числа месяца, следующего за месяцем поставки.

5.2. Оплата по п.5.1. по согласованию Сторон может быть произведена путем перечисления денежных средств на расчетный счет, путем передачи векселя и составления приемопередаточного акта, зачетом взаимных требований, другими финансовыми инструментами.

*Статья 6.*
### ПРАВА И ОБЯЗАННОСТИ СТОРОН

6.1. Поставщик обязуется:

6.1.1. поставлять Продукцию в период действия Договора в количестве согласно месячным заявкам и дополнительным соглашениям, при этом соотношение составляющих в Продукции ориентировочно должно составлять 70 % окатышей и 30 % агломерата.

6.1.2. Пропорция, указанная в п. 6.1.1. может быть изменена по согласованию Сторон.

6.2. Покупатель обязуется:

6.2.1. Производить оплату Продукции в порядке и на условиях, определенных ст.5 Договора.

*Статья 7.*
### ОТВЕТСТВЕННОСТЬ СТОРОН И ПОРЯДОК РАЗРЕШЕНИЯ СПОРОВ

7.1. Ответственность каждой из сторон за неисполнение или ненадлежащее исполнение принятых на себя обязательств обуславливается действующим законодательством РФ и настоящим Договором.

7.2. При наличии фактических поставок Продукции со стороны Поставщика в случае задержки Покупателем исполнения обязательств по оплате, Покупатель уплачивает Поставщику штраф в размере 0,5 % стоимости неоплаченной Продукции.

7.3. При недопоставке общего количества Продукции в сроки, установленные п.3.5. настоящего Договора, Поставщик уплачивает Покупателю штраф в размере 0,5 % стоимости недопоставленной продукции.

7.4. Покупатель возмещает Поставщику штрафы, выплаченные им железной дороге за невыполнение плана ж/д перевозок по поставкам в адрес Покупателя, внеплановые заказы вагонов, изменение утвержденного плана перевозок грузов, при отказе Покупателя принимать запланированные согласно Договору объемы поставок. При возникновении задолженности Поставщик имеет право прекратить отгрузку продукции до урегулирования взаимоотношений.

*Договор поставки № 01-99/П от 28 июня 1998г.*