**Attachment 1**

to Sale and Purchase Agreement No. 25/K, dated 06 October 2000, between the parties named below.

**Приложение 1**

Настоящий документ является Приложением 1 к Договору купли-продажи No. 25/K от 06 октября 2000 г., заключенному между ниже указанными сторонами.

**SELLER:**  **Davis International L.L.C.**
**Notice Address:**  **Davis International L.L.C.**
**1205, Wilkie Drive, Charleston,**
**WV 25314-1726, West Verginia,**
**USA**
**Attention:  Legal Counsel**

**ПРОДАВЕЦ:**
**Адрес для уведомлений:**

**Seller Bank Account:**

**Account name:**  **Davis International L.L.C.**
**Account number:**  **40807840000020022528**
**Bank Beneficiary's: Moscow Business World Bank**
**Beneficiary's Bank Account: 574074527841**
**Intermediary Bank: ABN AMRO BANK N.V.**
**NEW YORK, USA**
**SWIFT code:**  **ABNAUS33**

**Банковский счет Продавца:**

**Account name:**
**Счет номер:**
**Информация о денежном переводе с использованием**

**PURCHASER:**  **Newstart Group Corp.**
**Notice Address:**  **Newstart Group Corp.**
**Suite 606, 1220 N.Market St.,**
**Wilmington, DE 19801,**
**Delaware,**
**USA**
**Attention:  Legal Counsel**

**ПОКУПАТЕЛЬ:**
**Адрес для уведомлений**

**ISSUER:  OAO Kachkanar Ore-Mining Integrated Works "Vanadiy"**
TITLE OF SECURITY: Ordinary voting shares

**ISSUE 1:**
STATE REGISTRATION NUMBER: 62-1n-290
NUMBER OF SECURITIES: 78 282
**ISSUE 2:**
STATE REGISTRATION NUMBER: 62-1-1396
NUMBER OF SECURITIES: 35 027 740

**TOTAL NUMBER OF SECURITIES: 35 106 022**
(Thirty five millions hundred six thousand twenty two)
**PURCHASE PRICE:  USD 2 011 086,12**
(Two million eleven thousand eighty six and 12/100 USD)

НАИМЕНОВАНИЕ ЭМИТЕНТА:

НАИМЕНОВАНИЕ ЦЕННОЙ БУМАГИ:

**ВЫПУСК 1:**
НОМЕР ГОСУДАРСТВЕННОЙ РЕГИСТРАЦИИ:
КОЛИЧЕСТВО ЦЕННЫХ БУМАГ:
**ВЫПУСК 2:**
НОМЕР ГОСУДАРСТВЕННОЙ РЕГИСТРАЦИИ:
КОЛИЧЕСТВО ЦЕННЫХ БУМАГ:

ОБЩЕЕ КОЛИЧЕСТВО ЦЕННЫХ БУМАГ:

СУММА СОВОКУПНОГО ПЛАТЕЖА:

**A - 2001**



# PEARSON LOWE
### SOLICITORS

\ КОПИЯ

48 Queen Anne Street
London W1M 0JJ

Telephone: 020 7224 0888

Fax: 020 7486 4220
DX 9008 West End - 1
email: pearson.lowe@virgin.net

Our ref.
Your ref.

To whom it may concern

3 February 2000

Dear Sirs,

Davis International L.L.C.
1205 Wilkie Drive, Charleston, WV 25314-1726, USA.

I hereby certify that the attached document is an original General Power of Attorney dated 3rd December 1999.

**IN FAITH AND TESTIMONY** whereof I have set my hand and affixed my Stamp

JAMES PEARSON, LL.M.
Solicitor of The Supreme Court of England and Wales

JAMES PEARSON L.L.M.
SOLICITOR

48 QUEEN ANNE STREET
LONDON W1M 0JJ
TEL: 0171 224 0888

James Pearson LL.M   Gill Dempsey LL.B  (Hons)   N  St  J  W  R  Lane   Peter  T  Hamlyn   Simon Marks LL.B  (Hons)

This firm is regulated by The Law Society in the conduct of Investment Business



# GENERAL POWER OF ATTORNEY

THIS POWER OF ATTORNEY is made this Third day of December 1999.

KNOW ALL MEN PRESENT that we:

## DAVIS INTERNATIONAL L.L.C.

### 1205 Wilkie Drive, Charleston, WV 25314-1726 USA

ACTING by Resolution of the Members this Third day of December 1999 and in accordance with our Certificate of Formation and Limited Liability Company Operating Agreement (hereinafter called "the Company") we hereby appoint:

### EUGEN ASCHENBRENNER
### Holder of passport Nr. L 6739680

The true and lawful Attorney in fact of the Company (hereinafter called "the Attorney") for and in the name of and on behalf of the Company to do or to execute all or any of the facts and things hereinafter mentioned that is to say:

1. To transact manage carry on and do all and every business matter and things requisite and necessary or in any manner connected with or having reference to the business and affairs of the Company and for such purposes to conduct all correspondence appertaining to such business and affairs.

2. To open and operate one or more banking accounts in any jurisdiction in the name of the Company and to draw, sign, endorse and negotiate cheques, bills of exchange and negotiable instruments and documents of whatsoever nature in relation thereto for the purpose of the business of the Company and otherwise as the Attorney may deem necessary or proper in relation to the Company's affairs.

3. To adjust settle compromise or submit to arbitration any account or debt owing to the Company or claimed by the Company or any disputes concerning any such accounts debts claim or demands which may hereafter arise between the Company and any person or persons.

4. To commence prosecute enforce defend answer or oppose all sanctions and other legal proceedings and demands touching any of the matters aforesaid or any other matters in which the Company is or may hereafter be interested or concerned and also if thought fit to compromise refer to arbitration abandon submit to judgement or be non suited in any such action or proceedings as aforesaid.

Authorised signatures
of the Members

SATURN INVESTMENT GROUP, S.A.

STAR GROUP FINANCE & HOLDINGS, INC.

continued on page 2

James Pearson LL. M.  Gill Dempsey LL. B. (Hons)  N. St. J. W. R. Lane  Peter T. Hamlyn  Sangita Manek LL. B. (Hons)

This firm is regulated by The Law Society in the conduct of investment business

5.  To concur in doing any of the acts and things hereinbefore mentioned in conjunction with any other person or persons interested in the premises.

6.  For the better and more effectually executing the powers or authorities aforesaid or any of them to retain and employ such advocates attorneys or lawyers as our Attorney shall think fit to act or represent the Company wherever it may be necessary in the view of our Attorney so to do.

7.  To acknowledge this Power of Attorney as the act and deed of the Company and generally to do all such acts matters and things the Attorney considers may be necessary or desirable for furthering the corporate purposes of the Company or properly to represent the Company in it's interests and further those interests and generally act as the Company might-though it's Board of Directors or through a meeting of it's members act either by resolution or personal presence or by proxy or otherwise as the case might be and in all respects as if the Attorney were the Company.

8.  The Attorney is at liberty to appoint an agent or agents by Power of Attorney as necessary, to do all acts on behalf of the Attorney which the Attorney is authorised to perform on behalf of the Company under this Power of Attorney.

AND IT IS HEREBY AGREED THAT :

(1) This Power of Attorney shall remain in force within 3rd day of December 2000 or until notice of the Company having revoked the same shall have been received by the said Attorney or by the Company Secretary to whom all enquiries regarding its validity should be addressed whichever is the earliest.

We hereby authenticate the signature of our Attorney as hereinbelow

IN WITNESS whereof the seal of the Company has been hereunto affixed this Third day of December 1999.

In the name and
on behalf of
SATURN INVESTMENT GROUP, S.A.

In the name and
on behalf of
STAR GROUP FINANCE & HOLDINGS, INC.

Pedro Alvarez Garcia

Sydney Tavarez

James Pearson LL.M.   Gill Dempsey LL.B. (Hons)   N. St. J. W. R. Lane
This firm is regulated by The Law Society in the conduct of investment business

**A - 2004**

**Пирсон-Лоу**
**стряпчие**

48 Квин Анн Стрит
Лондон W1M 0JJ

Тел. 020 7224 0888
Факс: 020-7486 4220
DX 9008 Вест Энд – 1
эл. почта: pearsonlowe@virgin.net

Всем заинтересованным лицам                    03 февраля 2000 года

Уважаемые господа,

Дэвис Интернешнл Эл. Эл. Си.
1205 Уилки Драйв, Чарльзтон, WV 25314-1726, США.

Настоящим свидетельствую, что прилагаемый документ является подлинной Генеральной доверенностью, выданной 03 декабря 1999 года.

В свидетельство вышесказанного ставлю свою подпись и прилагаю печать
/подпись/
Джеймс Пирсон
стряпчий Верховного суда Англии и Уэльса

Джеймс Пирсон
стряпчий

48 Квин Анн Стрит
Лондон W1M 0JJ
Тел. 0171 224 0888

Джейме Пирсон Л.Л.М., Дэид Демпси Л.Л.Б., Н Ст. Дж. В.Р. Лэйн Питер Т. Хэлэн Сэнгита Манск Л.Л.Б.
Деятельность фирмы в плане инвестиционного бизнеса регулируется Юридическим обществом

**А П О С Т И Л Ь**

(Гаагская конвенция 05 октября 1961г.)

1. Страна: Соединенное Королевство Великобритании и Северной Ирландии

**Настоящий официальный документ**

2. подписан: Дж. Пирсон

3. действующим в качестве:         стряпчего

4. и имеет на себе печать/штамп

**заверен**

5. в Лондоне                                                    6. 07 февраля 2000г.

7. Ее Величества Первый Государственный Секретарь по иностранным делам и делам Содружества

8. за № G 714000

9. Печать: гербовая печать Министерства иностранных дел и дел Содружества

10. Подпись: (А. Бэквит, от имени Госсекретаря)

A - 2007

# ГЕНЕРАЛЬНАЯ ДОВЕРЕННОСТЬ

НАСТОЯЩАЯ ДОВЕРЕННОСТЬ выдана третьего декабря 1999 года
СООБЩАЕМ ВСЕМ ЗАИНТЕРЕСОВАННЫМ ЛИЦАМ, что мы

## ДЭВИС ИНТЕРНЕШНЛ ЭЛ.ЭЛ.СИ.

### 1205 Уилки Драйв, Чарльзтон, WV 25314-1726 США

действуя на основании решения участников от третьего декабря 1999 года и в
соответствии с нашим Меморандумом и Учредительным Договором Компании с
ограниченной ответственностью (именуемые далее – Компания), настоящим назначаем:

Ойгена Ашенбреннера
владельца паспорта № L 6739680

законным и полномочным Поверенным Компании (именуемый далее – Поверенный) и
уполномочиваем его от имени компании совершать любые действия из перечисленных
ниже, а именно:

1. Совершать все сделки, выполнять все и любые действия, необходимые или каким-либо
образом связанные или имеющие отношение к деятельности и делам Компании и в этих
целях вести всю деловую переписку, связанную с такой деятельностью и делами.

2. Открывать и распоряжаться одним или несколькими банковскими счетами в любой
стране мира на имя Компании и выписывать, подписывать, индоссировать и проводить
чеки, переводные векселя и переводные документы и документы любого характера в
интересах деятельности компании и в иных целях, которые Поверенный сочтет
необходимыми и нужными в связи с деятельностью Компании.

3. Урегулировать, разрешать, согласовывать или передавать в арбитраж любой счет или
долговое обязательство, составляющее долг перед Компанией или взыскиваемые
Компанией, а также любые спорные вопросы, касающиеся любого из этих счетов,
задолженностей, исков или требований, которые могут возникнуть в дальнейшем между
Компанией и любым лицом или лицами.

4. Возбуждать судебные дела, обращаться в суд за исполнением решений, выступать в
качестве ответчика по делам и искам любого рода, затрагивающим любые из
вышеперечисленных вопросов и любые другие, в которых Компания заинтересована в
настоящее время или будет заинтересована в будущем, или к которым она имеет
отношение, и если возможно – улаживать дела, подлежащие передаче в арбитражный суд,
или избегать судебного рассмотрения всех вышеперечисленных дел.

Подписи полномочных участников:
Подпись                                                                    Подпись



5. Совершать любые перечисленные выше действия в сотрудничестве с другим лицом или лицами, заинтересованными в вышесказанном.

6. Для наилучшего и более эффективного осуществления вышеуказанных прав и полномочий или любых из них нанимать адвокатов и юрисконсультов, по выбору поверенного, в целях представления интересов Компании в случае необходимости.

7. Признавать настоящую доверенность в качестве документа, выданного от лица компании, и в общем и целом выполнять все дела, которые Поверенный сочтет необходимыми или желательными для достижения задач Компании и надлежащим образом представлять Компанию во всех интересующих ее делах в настоящее время и в будущем и в целом и общем действовать таким же образом, что и Совет директоров или собрание участников, действующее лично или через представителей, как если бы Поверенный выступал в качестве Компании.

8. Поверенный вправе назначать в случае необходимости своего представителя или представителей для выполнения от имени поверенного всех действий, на которые он уполномочен от имени Компании настоящей доверенностью.

НАСТОЯЩИМ СОГЛАШАЕМСЯ, что
(1) Данная доверенность остается в силе до 03 декабря 2000 года включительно или до тех пор, пока указанный Поверенный или Секретарь Компании, к которому необходимо обращаться по всем вопросам относительно действия настоящей доверенности, не получит от Компании уведомления о прекращении действия данной доверенности.
Настоящим заверяем подлинность подписи Поверенного

/ПОДПИСЬ/
В свидетельство вышесказанного настоящий документ был скреплен печатью компании третьего декабря 1999 года

От имени                                              От имени
Сатурн Инвестмент Груп, С.А.          Стар Груп Файненс энд Холдингс. Инк.
/подпись/                                             /подпись/
Педро Алварез Гарсиа                         Сидней Таварез
Печать компании                                 Печать компании

## LOAN AGREEMENT No. SWER/07-99

Moscow                                                                July 13, 1999

Nexis Products LLC, hereinafter referred to as "Company," represented by Director Mr. Sidney Tavarez, acting on the basis of the Statutes, party of the first part, and

Joint Stock Company Kachkanar Iron Ore Mining & Dressing Concern "Vanadiy," hereinafter referred to as "Concern," represented by General Director D.A. Khaidarov, acting on the basis of the Statutes, party of the second party,

hereinafter jointly referred to as the "Parties," have executed this Loan Agreement, hereinafter referred to as "Agreement," regarding the following:

### I. SUBJECT OF THE AGREEMENT.

1.1. Company shall provide to Concern as an interest-free loan (hereinafter "Loan") funds in the amount of 7,000,000 (seven million) US dollars, and Concern shall repay the Loan as stipulated herein.

1.2. The Loan is being extended to Concern to replenish its current assets.

### II. LENDING PROCEDURE.

2.1. The Loan shall be extended in a lump sum by the transfer of funds to Concern's account in an amount not to exceed that stated in paragraph 1.1 hereof.

2.2. The Loan extended hereunder shall be repaid within 180 (one hundred and eighty) days from its effective date, i.e. by January 8, 2000.

2.3. Company shall make the funds available within 5 (five) banking days from the Agreement's date of execution.

2.4. The effective date of the Loan shall be the date the funds are deposited in Concern's hard currency current account specified in section VI hereof.

### III. LOAN SECURITY AND REPAYMENT PROCEDURE.

3.1. Concern guarantees repayment of the Loan.

3.2. Concern shall be liable hereunder to the full extent of its fixed and current assets.

3.3. The Parties shall execute a security contract, which will be an integral part hereof.

3.4. Concern shall repay the Loan in either a lump sum or installments in US dollars by transferring funds from its current hard currency account to Company's hard currency account at SCB Moscow Business World, Moscow.

### IV. RIGHTS AND RESPONSIBILITIES OF THE PARTIES.

4.1. Company shall:

- extend the Loan within 5 (five) banking days from the Agreement's execution date.

4.2. Company has the right to:

- monitor the intended use of the funds made available to Concern hereunder;
- demand that Concern provide the documents necessary to monitor the intended use of the funds,
- call the loan if Concern breaches any provision hereof.

4.3. Concern shall

- use the funds as intended, i.e., exclusively for the purposes stipulated in paragraph 1.2. hereof;
- provide, at Company's request, the documents necessary to monitor the intended use of the Loan, as well as estimates of receipt of funds to repay the loan;
- immediately notify Company of all circumstances which could affect Concern's proper execution of its obligations hereunder, including the loss or deterioration of the Loan security conditions.

4.4. Concern has the right:

- to demand that the funds be made available within 5 (five) banking days from the Agreement's date of execution;
- repay the Loan early with Company's written approval.

## V. ADDITIONAL PROVISIONS

5.1. This Contract is effective upon signing and until the full performance by the Parties of all obligations undertaken by them.

5.2. The Parties agree to maintain confidentiality with regard to the terms of this Contract, and with regard to any commercial, financial and other information that becomes known to them in connection with the execution and performance of this Contract.

5.3. The Parties shall guarantee under liability that this Contract is executed (signed) by authorized persons and, if necessary, will be confirmed (approved) by the management bodies of the Parties that have the authority to make such confirmation (approval) in accordance with the foundation documents of the Parties.

5.4. All disputes and disagreements under this Contract shall be resolved by the Parties through negotiation. If agreement is not reached, disputes shall be considered by the Arbitration Court of the City of Moscow.

5.5. In all other matters that are not regulated by this Contract, the Parties shall be guided by current law of the Russian Federation.

5.6. Neither Party shall bear liability for partial or total nonperformance of its obligations if such nonperformance was caused by circumstances beyond their control (natural disaster, conduct of military activities, change in law, etc.) that such Party could neither foresee nor prevent by reasonable measures.

5.7. All changes and supplements to this Contract shall be valid only if they are made in written form, signed by the authorized representatives of the parties and sealed with the appropriate seals, after which they shall become integral parts of this Contract.

5.8. This Contract is made in two originals having identical legal effect, one retained by each of the parties.

## VI. REQUISITES AND SIGNATURES OF THE PARTIES

*The Company:*
Nexis Products L.L.C.
47 West 200 South, Suite 104
Salt Lake City, Utah 84101 USA
Bank requisites:
Hard-currency account No. 40807840200020021808, Moskovskiy Delovoy Mir Joint Stock Commercial Bank, 14 Zhitnaya St., Moscow 117049

*The Joint Stock Company:*
Vanadiy Mining Enrichment Plant of Kachkanar OJSC
2 Sverdlov St., Kachkanar, Sverdlovsk Oblast 624356 Russia
Taxpayer ID No. 6615001962, OPKO 00186938
Current account No. 40702840400020121865, Moskovskiy Delovoy Mir Joint Stock Commercial Bank, 14 Zhitnaya St., Moscow
Correspondent account 30101810900000000466, BIK 044525466

| The Company: | The Joint Stock Company: |
|---|---|
| [signature] | [signature] |
| Sydney Tavarez | D.A. Khaydarov |
| | [round stamp: Vanadiy Mining Enrichment Plant of Kachkanar Open Joint Stock Company; city of Kachkanar] |

SCB MOSCOW BUSINESS WORLD

Statement for Account 40702810200020021865
Vanadiy Kachkanar Mining-Dress. for January 20, 1999
  Date of Previous Transaction: 1/10/1999
  Starting Balance                    0.00 P

| OP | No. | Doc. | Corr. Account | Bank Code | Debit | Credit |
|----|-----|------|---------------|-----------|-------|--------|
| [see source for figures] | | | | | | |

Ending Balance

Statement for Personal Account 40702810200020021865 Vanadiy Kachkanar Iron Ore Mining & Dressing Concern JSC
[illegible] January 20, 1999
Currency [illegible]
Starting Balance    0.00 P    Date of Previous Account Transaction

| Date | [illegible] | Corr. Account | Bank Code | Debit | Credit | [illegible] Date | Purpose of Payment | [illegible] |
|------|-------------|---------------|-----------|-------|--------|------------------|--------------------|-------------|
| [illegible] | [illegible] | [see source for figures] | [illegible] | | | | COMMISSION FOR OPENING THE ACCOUNT ACCORDING TO ITS FEES | |
| | | | | | | | Payment pursuant to Supply Contract No. 58/12-98 of 12/3/1998 for metals. Including VAT 78926706-74. | |
| | | | | | | | Payment pursuant to Supply Contract No. 7 of 11/23/1998 for corrosion-resistant steel. Including VAT 100555560.- | |
| | | | | | | | Payment pursuant to Supply Contract No. 43-17 of 11/27/1998 for corrosion-resistant steel. Including VAT 151501680.- | |
| | | | | | | | DEPOSITED PER FOREIGN CURRENCY DEPARTMENT INSTRUCTIONS 7 of 1/20/99 settlement account 40702810200020021865 JSC KACHKANAR GOK "VANADIY." | *Loan from Nexis P.U-* *Loan from Northwest* |
| | | | | | | | Payment under contract RU/001869881/1-90 of 11/30/1998 for supplying metal products, without VAT. | [illegible] |
| | | | | | | | Payment under contract [illegible] of 11/30/1998 for supplying metal products, without VAT. | |

Closing Balance
[illegible] SCB MOSCOW BUSINESS WORLD

A - 2014

## ДОГОВОР ЗАЙМА № SWER/07-99

г. Москва                                                                 «13» июля 1999 г.

Компания «Нэксиз Продактс Эл.Эл.Си.», именуемая в дальнейшем «Компания», в лице Директора г-на Сиднея Тавареза, действующего на основании Устава с одной стороны и

Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий»», именуемое в дальнейшем «Общество», в лице Генерального директора Хайдарова Д. А., действующего на основании Устава, с другой стороны,

в дальнейшем совместно именуемые «Стороны», заключили настоящий Договор займа, именуемый в дальнейшем «Договор», о нижеследующем:

### I. ПРЕДМЕТ ДОГОВОРА.

1.1. Компания предоставляет обществу в качестве беспроцентного займа (далее «Заем») денежные средства на сумму 7000000,00 (Семь миллионов) долларов США, а Общество обязуется возвратить предоставленный Заем в порядке, предусмотренном настоящим Договором.

1.2. Заем предоставляется Обществу на пополнение оборотных средств.

### II. ПОРЯДОК ПРЕДОСТАВЛЕНИЯ ЗАЙМА.

2.1. Заем предоставляется единовременно, путем перечисления средств на счет Общества, в размере, не превышающем суммы, указанной в пункте 1.1. настоящего Договора.

2.2. Заем, предоставляемый по настоящему Договору, должен быть возвращен не позднее 180 (Сто восемьдесят) дней с даты его оформления, т.е. не позднее «08» января 2000 года.

2.3. Компания предоставляет денежные средства в течение 5 (Пяти) банковских дней с даты заключения Договора.

2.4. Датой предоставления Займа считается дата зачисления денежных средств на текущий валютный счет Общества, указанный в разделе VI настоящего Договора.

### III. ОБЕСПЕЧЕНИЕ И ПОРЯДОК ВОЗВРАТА ЗАЙМА.

3.1. Общество гарантирует возврат предоставленного Займа.

3.2. Общество несет ответственность по настоящему Договору всем принадлежащим ему имуществом и оборотными средствами.

3.3. Стороны обязуются заключить договор залога, который будет являться неотъемлемой частью настоящего договора займа.

3.4. Возврат Займа осуществляется Обществом единовременно, либо по частям в долларах США путем перечисления денежных средств с текущего валютного счета Общества на валютный счет Компании в АКБ «Московский Деловой Мир», г. Москва.

### IV. ПРАВА И ОБЯЗАННОСТИ СТОРОН.

4.1. Компания обязуется:
* предоставить Заем в течение 5 (Пяти) банковских дней с даты заключения Договора.

4.2. Компания имеет право:
* контролировать целевое использование средств, предоставленных Обществу по настоящему Договору;
* требовать от Общества предоставления документов, необходимых для контроля за целевым использованием денежных средств;
* требовать от Общества досрочного возврата Займа при нарушении им любого из положений настоящего Договора.

4.3. Общество обязуется:
* соблюдать целевой характер использования предоставленных средств, т.е. направлять предоставленные средства исключительно на цели, предусмотренные пунктом 1.2. настоящего Договора;
* предоставлять по требованию Компании документы, необходимые для осуществления контроля за целевым использованием Займа, а также расчеты поступления средств, направляемых в его погашение;
* незамедлительно извещать Компанию обо всех обстоятельствах, способных повлиять на надлежащее исполнение Обществом обязательств по настоящему Договору, в том числе об обстоятельствах утраты или ухудшения условий обеспечения Займа.

4.4. Общество имеет право:
* требовать предоставления средств в течение 5 (Пяти) банковских дней с даты заключения Договора;
* досрочно по письменному согласованию с Компанией, возвратить предоставленный Заем.

## V. ДОПОЛНИТЕЛЬНЫЕ УСЛОВИЯ.

5.1. Настоящий Договор действует с момента подписания и до полного исполнения Сторонами всех взятых на себя обязательств.

5.2. Стороны обязуются соблюдать конфиденциальность в отношении условий настоящего Договора, а равно в отношении любой коммерческой, финансовой и прочей информации, ставшей им известной в связи с заключением и исполнением настоящего Договора.

5.3. Стороны гарантируют и несут ответственность в том, что настоящий Договор заключен (подписан) уполномоченными лицами и при необходимости будет утвержден (одобрен) органами управления Сторон, имеющими на это утверждение (одобрение) соответствующие полномочия согласно учредительных документов Сторон.

5.4. Все споры и разногласия по настоящему Договору разрешаются сторонами путем переговоров, а при не достижении согласия, спор подлежит передаче на рассмотрение в Арбитражный суд г. Москвы.

5.5. Во всем остальном, что не урегулировано настоящим Договором, Стороны руководствуются действующим законодательством Российской Федерации.

5.6. Ни одна из Сторон не будет нести ответственность за полное или частичное неисполнение принятых на себя обязательств, если оно будет вызвано действием обстоятельств непреодолимой силы (стихийные бедствия, проведение боевых действий, изменения в законодательстве и т.п.), которые данная сторона не могла ни предвидеть, ни предотвратить разумными мерами.

5.7. Все изменения и дополнения к настоящему Договору действительны лишь в том случае, если они совершены в письменной форме, подписаны уполномоченными представителями сторон и скреплены соответствующими печатями, после чего становятся неотъемлемой частью настоящего Договора.

5.8. Настоящий Договор составлен в двух экземплярах, имеющих равную юридическую силу, по одному для каждой из сторон.

## VI. РЕКВИЗИТЫ И ПОДПИСИ СТОРОН.

*Компания:*
«Нэксиз Продактс Эл.Эл.Си.»
47 Вест 200 Сауз, Сьют 104, Солт Лейк Сити, Юта 84101, США.
Банковские реквизиты:
Валютный счет № 40807840200020021808 в АКБ «Московский Деловой Мир»,
117049, г. Москва, ул. Житная, д. 14.

*Общество:*
ОАО «Качканарский горно-обогатительный комбинат «Ванадий»»
624356, Россия, Свердловская область, г. Качканар, ул. Свердлова, 2.
ИНН 6615001962, ОКПО 00186938,
р/с № _40702840400020121865_ в АКБ «Московский Деловой Мир»
г. Москва, ул. Житная, д.14,
к/с 30101810900000000466, БИК 044525466

**Компания:**                                    **Общество:**

/Сидней Таварез/                                  /Хайдаров Д.А./

АКБ "МОСКОВСКИЙ ДЕЛОВОЙ МИР"

Выписка по счету 40702810200020021865
Заведени? Канцелярский горно-обо за жату 20 января 1999
Дата предыдущей операции: 10/01/1999
Входящее сальдо 0.00 п

| Оп | N док. | Счет корр. | Код банки | Дебет | Кредит |
|----|--------|-----------|-----------|-------|--------|
| 06 | 1 | 40804810900020022020 | | | 400 331 113.00 |
| 06 | 2 | 40804810900020022020 | | | |
| 06 | 1 | 47408102000100751599 | | 473 560 240.44 | 1 266 243 009.00 |
| 06 | 1 | 47702810000010021032 | | 909 010 080.00 | 319 328 921.00 |
| 06 | 2 | 47702810800000021115 | | 603 333 360.00 | |
| 06 | 3 | 47702810900010021821 | | | |
| 06 | 1 | 70702810900017720305 | | | |

Исходящее сальдо 1 063.56 п 1 985 903 980.44 1 985 905 044.00

Выписка по лицевому счету   40702810200002100021865   Валадай Качканарский горно-обогатительный комбинат ОАО

20 января 1999 г.

0.00 п   Входящий остаток

| Дата пров. | Дата предыдущей операции по счету | Счет корр. | Код опер. | Дебет | Кредит | Назначение платежа |
|---|---|---|---|---|---|---|

01/99 06 1   10197810500011720505   КОМИССИЯ ЗА ОТКРЫТИЕ СЧЕТА   300.00   СОГЛАСНО ТАРИФОВ ЗА РКО

01/99 06 1   40702810000010021032   473 560 240.44   ОПЛАТА ПО ДОГОВОРУ ПОСТАВКИ №59/12-98 от 03.12.1998г. за металлопродукцию. В том числе НДС

01/99 06 2   40702810500010021321   603 333 360.00   ОПЛАТА ПО ДОГОВОРУ ПОСТАВКИ № 7 от 23.11.1998г. за коррозионностойкой стали. В том числе НДС 100535560.-

01/99 06 2   40702810600010022115   969 010 080.00   ОПЛАТА ПО ДОГОВОРУ ПОСТАВКИ № 63-12 от 27.11.1998г. коррозионностойкой стали. В том числе НДС 151501680.-

01/99 06 1   47408810100010075199   319 328 931.00   ЗАЧИСЛЕНО СОГЛАСНО РАСПОРЯЖЕНИЯ КРЕДИТНОГО ОТДЕЛА 1 от 20/01/99 Р/С 40702810200002100021865 ОАО КАНКАНАРСКИЙ ГОК "ВАНАДИЙ"

01/99 06 1   40804810900020022020   400 331 113.00   ОПЛАТА ПО КОНТРАКТУ 30/11/98 РУ/0010698/3498 от 20/11/98 за поставку металлопродукции, без НДС.

01/99 06 2   40804810900020022020   1 266 245 000.00   ОПЛАТА ПО КОНТРАКТУ 30/11/98 РУ/0010698/3498 от 20/11/98 за поставку металлопродукции, без НДС.

1 663.56 п

1 985 903 980.44   1 985 905 044.00

*SVERDLOVSK REGION*
**ARBITRATION COURT**
**RULING**

*Ekaterinburg*
*3-23-2001*                                    Case No. A60-4517/00-S1

Sverdlovsk Region Arbitration Court comprised of:
Presiding Judge N.V. Kazantseva, and
Judges I.V. Lipina and E.A. Platonova,

reviewed in open court Polyprom LLC's complaint against the decision of Kachkanar
Iron Ore Mining & Dressing Concern "Vanady" bankruptcy trustee O.S. Kozyrev to
exclude its claims from the creditor registry

with:
O.S. Kozyrev, bankruptcy trustee
and debtor's representatives - E.A. Starshinova and T.N. Stepchenko
in attendance.

On 8-22-2000, the arbitration court placed Kachkanar GOK "Vanady" in
bankruptcy trusteeship and appointed O.S. Kozyrev to serve as the trustee.

A creditor of Kachkanar GOK "Vanady" – Polyprom LLC – filed a complaint
against the trustee's refusal to recognize its claims and include them in the creditor
registry.

On 10-31-2000, the arbitration court stayed the proceedings re Polyprom LLC's
complaint against the Kachkanar Iron Ore Mining & Dressing Concern "Vanady"
trustee's refusal to include Polyprom's claims in the registry of creditors pending
enactment of the Kachkanar City Court's ruling on B.N. Biryukov's suit to invalidate a
number of contracts.

On 3-5-2001, the arbitration court reopened the proceedings to review Polyprom's
complaint against the refusal to include its demands in the creditor registry.

The petitioner, who had been duly notified of the time and place of the
proceedings, failed to appear in court.

In the course of the proceedings, the arbitration court established that the creditor
Polyprom premises its claims on Kachkanar GOK "Vanady's" obligations arising out of
supply agreements No. 02-99 of 7-9-99, No. S-1-99/M of 9-30-99, No. S-02/M-99 of
10-18-99, No. 16-99/PK of 11-10-99, No. 15-99/PK of 10-27-99, No. 01-99/P of 7-9-99,
stock buy-sell agreement No. KGOK-18/10-99 of 10-18-99, Assignment Agreement
No. 18-99/UP of 12-9-99 in which Lenax LLC assigned its rights under loan agreement

No. 08-93/3 of 6-3-99, which it had entered into with Kachkanar GOK "Vanady," to Polyprom LLC. The creditor claims a total of 459,846,589.79 rubles.

The grounds for the trustee's refusal to include Polyprom's claims in the creditor registry is the fact that the parties did not enter into disputed agreement No. 15-99/PK of 10-27-99, and the reconciliation instrument was signed by an unauthorized person because the plant employee had been fired at the time of the signing. The creditor did not provide any supplies under the agreement. A Moscow district attorney has brought criminal case No. 184186 in connection with the signing of the documents and use of a forged seal.

On these same grounds the trustee does not recognize the demands arising out of agreements No. 16-99/PK of 11-10-99, No. 01-99/P of 7-9-99, No. 02-99 of 7-9-99, 8-01-99/M of 9-30-99, and No. KGOK 18/10-99 of 10-18-99. The trustee contends that the shares under the above agreements were not transferred to the plant, the goods were not received, and the reconciliation instruments were signed by an unauthorized person, and cites the same criminal case.

Since the proceedings require that the petitioner substantiate his property claims, on 3-5-2001 the arbitration court directed Polyprom to present the original contracts that are the basis of his claims against the debtor with all attachments. The petitioner has failed to present the documents to the court.

Insolvency (bankruptcy) cases, as well as [illegible] within the framework of this category of cases, are heard under the rules of the RF Arbitration Code and Rules (APK RF) taking into consideration the Federal Law "On Insolvency (Bankruptcy)" (Article 143 of the APK RF), in accordance with Article 53 of the APK RF (sic), each person who is a party to a case must prove the circumstances which he cites as the basis for his claims and objections.

The arbitration court also directed the petitioner – Polyprom LLC – to submit an estimate of the debt amount, referencing specific original shipping documents, all original payment documents for the products, and the original reconciliation instruments. These documents were not presented to the court either.

The arbitration court therefore adjudges the creditor's objections to the Kachkanar GOK "Vanady" bankruptcy trustee's refusal to include Polyprom's claims in the creditor registry to be baseless since the petitioner has not documented the circumstances on which the petition is based.

Based on the foregoing and Articles 140 of the APK RF and Articles 55 and 75 of the Federal Law "On Insolvency (Bankruptcy)," the arbitration court

R U L E D:

Adjudge Polyprom LLC's complaint against the decision of the Kachkanar Iron Ore Mining & Dressing Concern "Vanady" bankruptcy trustee to exclude Polyprom's claims from the registry of Kachkanar GOK "Vanady" creditors to be baseless.

[illegible handwritten text]

Presiding Judge                                N.V. Kazantseva


Judges                                              I.V. Lipina

                                                       E.A. Platonova

[round seal]

[stamp] "True copy [illegible]"

**A - 2022**

ОТ : X

FROM : PRIVAT LAW

НОМЕР ТЕЛЕФОНА:                          ЯНВ. 24 2002 14:50  СТР1

PHONE NO. : 3432_562769                  JAN. 24 2002 02:13PM P1



# АРБИТРАЖНЫЙ СУД
## *СВЕРДЛОВСКОЙ ОБЛАСТИ*
## Определение

*г. Екатеринбург*
*«23» 03. 2001г.*                         Дело № А60-4517/00-С1

Арбитражный суд Свердловской области в составе:

председательствующего судьи Казанцевой Н.В.

судей Липиной И.В., Платоновой Е.А.,

рассмотрел в судебном заседании жалобу ООО «Полипром» на решение внешнего управляющего ОАО «Качканарский горно-обогатительный комбинат «Ванадий» Козырева О.С. об отказе включения требований в реестр кредиторов

при участии в заседании:
внешнего управляющего Козырева О.С.
представителей должника - Старшиновой Е.А., Степченко Т.Н.

22.08.2000г. арбитражным судом вынесено определение о введении на ОАО «Качканарский ГОК «Ванадий» внешнего управления и назначении на должность внешнего управляющего Козырева О.С.

В адрес суда поступили жалоба от кредитора ОАО «Качканарский ГОК «Ванадий» - ООО «Полипром» на отказ внешнего управляющего в признании его требований и включении требований в реестр кредиторов.

31.10.2000г. определением арбитражного суда было приостановлено производство по рассмотрению жалобы ООО «Полипром» на отказ внешнего управляющего ОАО «Качканарский горно-обогатительный комбинат «Ванадий» от включении требований ООО «Полипром» в реестр кредиторов до вступления в законную силу решения Качканарского городского суда по иску Бирюкова Б.Н. о признании недействительными ряда договоров.

A - 2024

ОТ:Х

НОМЕР ТЕЛЕФОНА:                    ЯНВ. 24 2002 14:50 СТР2
                    PHONE NO. : 3432 562769    JAN. 24 2002 02:16PM P1

FROM : PRIVAT LAW

5.03.2001г. определением арбитражного суда возобновлено производство по рассмотрению жалобы ООО «Полипром» на отказе от включения требований в реестр кредиторов.

Заявитель, надлежаще извещенный о времени и месте судебного разбирательства, в судебное заседание не явился.

В ходе судебного разбирательства арбитражный суд установил, что свои требования кредитор - ООО «Полипром» основывает на обязательствах ОАО «Качканарский ГОК «Ванадий», вытекающих из договоров поставки продукции № 02-99 от 9.07.99г., № S-01-99/М от 30.09.99г., № S-02/М-99 от 18.10.99г., № 16-99/ПК от 10.11.99г., № 15-99/ПК от 27.10.99г., № 01-99/П от 9.07.99г., договора купли-продажи акций № KGOK-18/10-99 от 18.10.99г., договора уступки права требования № 18-99/УП от 9.12.99г., по которому ООО «Ленэкс» передал права по договору займа № 08-93/3 от 3.06.99г., заключенному с ОАО «Качканарский ГОК «Ванадий», ООО «Полипром». Всего требований кредитором заявлено на сумму 459 846 589-79 руб.

Основанием отказа внешнего управляющего включения требований ООО «Полипром» в реестр кредиторов послужило то, что спорный договор № 15-99 ПК от 27.10.99г. сторонами не заключался, а акт сверки подписан неуполномоченным лицом, поскольку на момент подписания акта работник комбината был уволен. Поставка по данному договору кредитором не производилась. По факту подписания документов и использования поддельной печати прокурором г.Москвы возбуждено уголовное дело № 184186.

По тем же основаниям внешний управляющий не признает требования, возникшие из договоров № 16-99/ПК от 10.11.99г., № 01-99/П от 09.07.99г., № 02-99 от 9.07.99г., S-01-99/М от 30.09.99г., № KGOK 18/10-99 от 18.10.99г. Внешний управляющий утверждает, что акции по перечисленным договорам комбинату не передавались, товар не поступал, а акты сверки подписаны неуполномоченным лицом, ссылаясь на то же уголовное дело.

Поскольку для рассмотрения дела необходимо установить обоснованность имущественных требований заявителя, арбитражный суд определением от 5.03.2001г. обязал ООО «Полипром» представить подлинные договоры, на которых основаны его требования к должнику со всеми приложениями. Указанные документы заявителем в судебное заседание представлены не были.

Дела о признании несостоятельным (банкротом), а также иные вопросы, возникшие в рамках дел данной категории, рассматриваются по правилам, установленным АПК РФ с учетом особенностей, установленных ФЗ «О несостоятельности (банкротстве)» (ст. 143 АПК РФ), то в соответствии со ст.

ОТ:Х
FROM : PRIVAT LAW    НОМЕР ТЕЛЕФОНА:    ЯНВ. 24 2002 14:51 СТР3
PHONE NO. : 3432 562769    JAN. 24 2002 02:18PM P1

53 АПК РФ каждое лицо, участвующее в деле должно доказать т обстоятельства, на которые оно ссылается как на основание своих требований и возражений.

Определением арбитражный суд также обязал заявителя - ООО «Полипром» представить расчет суммы кредиторской задолженности со ссылкой на конкретные подлинные отгрузочные документы, все подлинники платежных документов на оплату продукции, подлинные акты сверок. Данные доказательства суду также представлены не были.

Таким образом, арбитражный суд не может признать обоснованными возражения кредитора на отказ внешнего управляющего ОАО «Качканарский ГОК «Ванадий» во включении в реестр кредиторов, требований ООО «Полипром», поскольку заявителем документально не подтверждены обстоятельства, положенные в основу заявления.

На основании изложенного и руководствуясь ст. ст. 140 АПК РФ, ст.ст. 55, 75 ФЗ «О несостоятельности (банкротстве)», арбитражный суд

ОПРЕДЕЛИЛ:

Признать жалобу ООО «Полипром» на решение внешнего управляющего ОАО «Качканарский горно-обогатительный комбинат «Ванадий» об отказ во включении требований ООО «Полипром» в реестр кредиторов ОАО «Качканарский ГОК «Ванадий» необоснованной.

Председательствующий судья    Казанцева Н.В.

Судьи    Платонова Е.А.

A - 2026

*Copy 1*

### RULING
### in the name of the Russian Federation

July 13, 2000
Meshansk Inter-Municipal District People's Court, Moscow Central Administrative District,
comprised of Presiding Judge E.M. Naumova,
with court clerk A.A. Samarkhanova,
heard in open court civil lawsuit No.
filed by Uralelektromash against Amber Star, LLC, Nexis Products, LLC, and V.V. Volnov to invalidate stock buy-sell agreements and reclaim property from adverse possession, and

### D E T E R M I N E D :

Uralelektromash (UEM) filed a lawsuit to invalidate the February 4, 2000 buy-sell agreement for 37,804,555 ordinary nominal book entry shares of Kachkanar GOK "Vanady" between Amber Star, LLC and Nexis Products, LLC, and the buy-sell agreement for 4,555 ordinary nominal book entry shares of Kachkanar GOK "Vanady" between Nexis Products, LLC, and V.V. Volnov.

The representative of Nexis Products, LLC was present in court and did not acknowledge the suit.

Defendant V.V. Volnov was present in court and did not acknowledge the suit.

The representative of Amber Star, LLC did not appear in court, had been duly notified of the hearing date, and submitted written objections to the suit.

Having verified the case material and heard the parties, the court finds that the claim should be denied for the following reasons.

As is evident from the case materials and was established in court on October 9, 1997, UEM and Ural Start Ltd entered into a buy-sell agreement for Kachkanar GOK "Vanady" shares.

Pursuant to the conditions of this buy-sell agreement the plaintiff should have signed over the above shares in Kachkanar GOK "Vanady" to the buyer upon receipt of full payment for them, which was due within 10 days from the execution of the agreement. The buyer paid for the shares after the deadline and only partially on November 6, 199[text cut-off], and the seller therefore terminated the agreement unilaterally, notifying the buyer on November 3, 1997. Prior to the shares being signed over to the buyer, namely on November 4, 199[text cut-off], the plaintiff entered into an assignment contract with Green Investment Company to transfer Kachkanar GOK "Vanady" shares to the latter's nominal possession. The plaintiff believes that these circumstances are grounds for claiming that Ural Star Ltd. did not own the securities nor have the right to dispose of them, and all further transactions are invalid.

On 6-16-1998, the Ekaterinburg Arbitration Court recognized Ural Start Ltd.'s ownership of 37,804,555 shares of Kachkanar GOK "Vanady" and validated the

assignment contract of 11-4-1997 between Green Investment Company and Uralelektromash to dispose of them. On 7-29-1998, the Appellate Instance of the Sverdlovsk Region Arbitration Court upheld the ruling.

Having evaluated the evidence in its entirety and having regard to the specific circumstances of the case, the court concludes that the plaintiff's grounds for invalidating the transactions may not be taken into consideration because Ural Start Ltd.'s ownership of the shares had been recognized at the time of the disputed transactions, and at the time of the disputed transactions there were no conditions to preclude their conclusion. The plaintiff failed to present proof that the defendants were aware that the shares were in dispute and that he had claims to them.

Plaintiff's demand to reclaim the shares from the defendants cannot be satisfied because, pursuant to Article 302 of the RF Civil Code, property may be reclaimed from a good faith purchaser who purchased the item for value only if the owner or assignee has lost the property or had it stolen, or if they lost possession of it by other means against their will. These facts have not been established in court or the case materials.

Under the circumstances, the plaintiff's demands shall not be satisfied.

Based on the foregoing and Articles 191-197 of the RF Civil Code and Rules, the court

## R U L E D:

Deny Uralelektromash's claim against Amber Star, LLC, Nexis Products, LLC, and V.V. Volnov to invalidate the buy-sell agreements and reclaim property from adverse possession.

The ruling may be appealed in the Moscow City Court within ten days.

Judge:          [signature]          E.M. Naumova

*Ruling entered into force on 7-24-2000.*
*Judge* [round seal] [signature]
*Secretary* [signature]
[illegible]
*Judge* [round seal] [signature]
*Secretary* [signature]

*том 1*

РЕШЕНИЕ

именем Российской Федерации

13 июля 2000 г.

Мещанский Межмуниципальный районный народный суд ЦАО г. Москвы

в составе председательствующего судьи Наумовой Е.М.

при секретаре Самархановой АА

рассмотрев в открытом судебном заседании гражданское дело N

по иску ЗАО "Уралэлектромаш" к компании "Амбер Стар эл.Эл.Си",
компании "Нэксиз Продактс Эл.Эл.Си", Вольнову ВВ о признании недейс-
твительным договоров купли-продажи акций, истребовании имущества из
незаконного владения,

У С Т А Н О В И Л :

ЗАО "Уралэлектромаш" обратился в суд с иском о признании недейс-
твительным договора купли-продажи 37804 555 обыкновенных именных без-
документарных акций ОАО "Качканарский ГОК "Ваннадий" от 4 февраля 2000
г. между компаниями "Амбер Стар Эл Эл Си" и "Нэксиз Продактс Эл Эл Си"
и договора купли-продажи 4555 обыкновенных именных бездокументарных
акций ОАО "Качканарский ГОК Ваннадий" между компанией "Нэксиз продактс
Эл Эл Си" и Вольновым ВВ.

Представитель "Нэксиз Продактс Эл Эл Си" в судебное заседание
явился, иск не признал.

Ответчик Вольнов ВВ в судебное заседание явился, иск не признал.

Представитель "Амбер Стар Эл Эл Си" в судебное заседание не явил-
ся, о дне слушания дела извещен надлежащим образом, представил пись-
менные возражения на иск.

Суд, проверив материалы дела, выслушав стороны, находит исковые
требования удовлетворению не подлежащими по следующим основаниям.

Как усматривается из материалов дела и установлено в судебном за-
седании 9 октября 1997 г. между ЗАО "УЗМ" и ООО "Урал Старт ЛТД" был
заключен договор купли-продажи акций ОАО "Качканарский ГОК Ваннадий".

покупателя передаточное распоряжение на указанное количество акций О/

"Качканарский ГОК "Ваннадий" по факту их полной оплаты, которая долж

была произойти в течение 10 дней с момента заключения договора. Поку

патель оплатил акции с нарушением срока и не полностью 6 ноября 199

г., в связи с чем продавец произвел расторжение договора в односторо

нем порядке, о чем направил уведомление покупателю 3 ноября 1997 г. ;

выдачи покупателю передаточного распоряжения, а именно 4 ноября 199

г., истец заключил договор-поручение с АОЗТ "Инвестиционная компани

"Грин", в соответсвии с которым акции ОАО "Качканарский ГОК "Ваннадий

были переданы последнему в номинальное держание. Указанные обстоятель

ства, по мнению истца дают основания утверждать, что у ООО "Урал-ста

ЛТД" не возникло право собственности на указанные ценные бумаги и он

не имело права отчуждать их, все дальнейшие сделки недействительны.

Решением Арбитражного суда г. Екатеринбурга от 16.06.1998 г.

ООО "Урал_Старт ЛТД" признано право собственности на 37804555 акци

ОАО "Качканарский ГОК "Ванадий" и признан недействительным договор п

ручения от 4.11.1997 г. заключенный между АОЗТ "Инвестиционная компа

ния "Грин" и ЗАО "Уралэлктромаш" в части отчуждения вышеуказанного к

личества акций. 29.07.1998 г. Апелляционной инстанцией Арбитражно

суда Свердловской области решение оставлено без изменения.

Оценивая собранные по делу доказательства в их совокупности, учи

тывая конкретные обстоятельства дела, суд приходит к выводу о том, ч

основания, изложенные истцом для признания сделок недействительным

не могут быть приняты во внимание, поскольку на момент совершения о

париваемых сделок за ООО "Урал-Старт ЛТД" было признано право соб

твенности на вышеуказанное число акций, на момент совершения сдело

отсутствовали условия, препятствовавшие их совершению. Истцом

представлено доказательств того, что ответчикам было известно о то

что акции находятся в споре и имеются притязания на них со сторо

тца.

Требование истца об истребовании указанных акций от ответчиков

может быть удовлетворено, поскольку в соответствии со ст. 302 ГК

мущество может быть истребовано от добросовестного приобретате

побретшего вещь возмездно, только в том случае, если имущество у

но собственником или лицом, которому имущества было передано соб

венником во владение, либо похищено у того или другого, либо выбы

A - 2031

из их владения иным путём помимо их воли. Таких фактов в ходе судебно-
го заседания и в материалах дела не установлено.

При таких обстоятельствах исковые требования удовлетворению не
подлежат.

На основании изложенного, руководствуясь ст.ст. 191-197 ГПК РФ,
суд

Р Е Ш И Л :

В иске ЗАО "Уралэктромаш" к компании "Амбер Стар Эл Эл Си", ком-
пании "Нэксиз Продактс Эл Эл Си", Вольнову ВВ о признании недействи-
тельным договоров купли-продажи акций, истребовании имущества из неза-
конного владения отказать.

Решение может быть обжаловано в Мосгорсуд в течение 10 дней.

Судья:                                    Е.М. Наумова.

А - 2032

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 90-2913-CIV-UNGARO-BENAGES

REPUBLIC OF PANAMA,

     Plaintiff,

vs.

BCCI HOLDINGS (LUXEMBOURG) S.A.;
BANK OF CREDIT AND COMMERCE
INTERNATIONAL, S.A.; BANK OF CREDIT
AND COMMERCE INTERNATIONAL (OVERSEAS)
LIMITED; AMJAD AWAN,

     Defendants.



_____/

## ORDER GRANTING BCCI'S MOTION TO DISMISS

THIS CAUSE is before the Court upon Defendant BCCI's Motion to Dismiss Panama's

Fourth Amended Complaint [hereinafter BCCI's Motion to Dismiss] filed on June 2, 1994. Plaintiff

filed a Memorandum in Opposition to BCCI Defendants' Motion to Dismiss Panama's Fourth

Amended Complaint [hereinafter Response to Motion to Dismiss] on August 17, 1994 and the BCCI

Defendants' filed a Reply Memorandum in Support of Their Motion to Dismiss the Fourth Amended

Complaint [hereinafter Reply to Motion to Dismiss] on August 26, 1994. This matter is ripe for

disposition.

241

## I. BACKGROUND

*A. Procedural History*

The procedural history of this matter is important to an overall understanding of the

present Motion. The BCCI Defendants [1] initially filed a Motion to Dismiss the Second Amended

Complaint on Jurisdictional Grounds and to Quash Service of Process [hereinafter BCCI's

Original Motion to Dismiss] on September 30, 1991. (D.E. #73). The Court denied the BCCI's

Original Motion to Dismiss as it related to subject-matter and personal jurisdiction and deferred

ruling on the issue of forum non conveniens. (D.E. #121). Then the BCCI Defendants filed a

Supplemental Memorandum on Motion to Dismiss on February 19, 1993 [hereinafter BCCI's

Supplemental Motion to Dismiss], which focused solely on the issue of forum non conveniens.

BCCI's Supplemental Motion to Dismiss was denied without prejudice on July 13, 1993. (D.E. #

200). On September 30, 1993 the First American Defendants [2] filed a Motion to Dismiss the

Fourth Amended Complaint. (D.E. # 210). The First American Defendants Motion to Dismiss

was granted on May 6, 1994. (D.E. # 226). Then the BCCI Defendants' filed the present Motion

to Dismiss on June 2, 1994, requesting dismissal in accordance with the doctrines of international

comity and forum non conveniens. [3]

---

[1] The BCCI Defendants consist of BCCI Holdings (Luxembourg) S.A., BCCI S.A.,
BCCI (Overseas) Limited.

[2] The First American Defendants included First American Bank, N.A. and First American
Bank of New York.

[3] The BCCI Defendants incorporated by reference their Original and Supplemental
Motions to Dismiss into the present Motion. The Original Motion addressed the traditional
factors of forum non conveniens - the location of witnesses and documents, the application of
foreign law, and public interest considerations - and the Supplemental Motion addressed the

2

A - 2034

## B. Facts

BCCI was a worldwide banking organization with operations in approximately 69 countries. Plea Agreement at 2-3, Exhibit A-3, BCCI's Supplemental Motion to Dismiss [hereinafter Plea Agreement]. On July 5, 1991, BCCI was closed by banking regulatory authorities in the United Kingdom, the United States, the Cayman Islands, Luxembourg and elsewhere. Id. In the Cayman Islands and Luxembourg where the BCCI Defendants are incorporated and in England where BCCI had its major base of operations, courts of local jurisdiction appointed provisional liquidators to assume control over the operations of BCCI. *See* Court of Appeals Judgment, Exhibit A, Plaintiff's Response to BCCI's Supplemental Memorandum on Motion to Dismiss Due to Forum Non Conveniens, filed on March 12, 1993 [hereinafter Response to Supplemental Motion to Dismiss]. In January 1992, after it became apparent that BCCI could not be rescued from insolvency, the courts in Luxembourg, England and the Cayman Islands ordered the formal liquidation of BCCI. Liquidators in each country were charged with the responsibility for supervising the collection of remaining assets and the orderly distribution of those assets to BCCI's legitimate depositors and creditors. Affidavit of Ian A.N. Wight at para. 5, Exhibit A, BCCI's Supplemental Motion to Dismiss [hereinafter Wight Aff.]. In accordance with the law of the jurisdictions, the liquidators implemented a "pooling agreement" as the means of collecting and distributing assets.[4] Court of Appeals Judgment, Exhibit A, Response to Supplemental Motion to Dismiss [hereinafter Court of Appeals

---

threshold issue of the availability of an alternative forum.

A "pooling agreement" essentially combines all the assets of a debtor or group of debtors and then equally distributes them to all unsecured creditors. *See* Court of Appeals Judgment.



Judgment]. The "pooling agreement" received Final Court approval in England and the Cayman

Islands and District Court approval in Luxembourg, where an appeal is pending. Affidavit of

Stephen J. Akers at 2, Exhibit C, BCCI's Supplemental Motion to Dismiss [hereinafter Akers

Aff.].

 In addition to establishing a "pooling agreement," each jurisdiction has established an

essentially identical procedure for filing a claim. *See* Akers Aff at 4-7; Wight Aff. at 6-12;

Declaration of Georges Baden, Exhibit B, BCCI's Supplemental Motion to Dismiss [hereinafter

Baden Decl.]. First, a creditor or a depositor of BCCI must submit a proof of debt form or other

acceptable evidence of debt for all present and future claims, including claims for damages, to the

Official Liquidators. Id. Proof of debt forms are currently available and have been sent to the

creditors and depositors along with an explanatory letter, a summary of proposed agreements, and

if applicable, the latest available bank statement. Proof of debt forms were also published in

approximately 136 newspapers worldwide. Id. Claims may be submitted to the Official

Liquidator in the Cayman Islands in the liquidation of BCCI Overseas at any time up to the

deadline which has not yet been established by the Court. Wight Aff. para. 20. In the liquidation

of BCCI S.A., depositors and creditors may submit their claims to either the English liquidators or

the liquidators appointed in Luxembourg. Akers Aff. para. 8. The claims will then be considered

by the Official Liquidators who may accept or reject any claim in whole or in part, in accordance

with the law of the jurisdiction. Akers Aff. para. 13. If a claim is rejected, the creditor may appeal

to a court of appropriate jurisdiction. Akers Aff. para. 14.

 In addition to the above described proceedings, a liquidation proceeding against BCCI

Overseas currently exists in Panama. The assets of some branches of the BCCI banking

4

corporation in certain countries have not been made available to the worldwide liquidation and are instead being handled by local liquidators. The assets that existed in Panama as of the date BCCI was seized will not be "pooled" but will instead be distributed with a preference to local Panamanian creditors. It is believed that the local creditors have a good chance of receiving full reimbursement on their claims. *See* Wight Affidavit para. 9-12. This method of liquidation is known as "ring-fencing" and is the same as that employed in the United States.

On December 19, 1991 the BCCI Defendants entered into a Plea Agreement to criminal RICO charges brought by the United States in the District of Columbia. *See* BCCI's Supplemental Motion to Dismiss at 9. Pursuant to the Plea Agreement, all of BCCI's assets in the United States were forfeited to the United States Government and placed in a Custodial Account. Plea Agreement at 11. The first $100 million deposited in the Custodial Account shall be disbursed to a United States Disgorgement, Compensation, and Penalty Fund, maintained by the Treasury Department (the "U.S. Fund") to be used for certain specified purposes including the support for certain banks insured by the Federal Deposit Insurance Corporation. Id. The next $100 million shall be disbursed to a Worldwide Victims and Creditors Compensation Fund maintained by Court Appointed Fiduciaries (the "Worldwide Victims Fund") which shall be distributed by the liquidators to innocent BCCI creditors and depositors. Id.; Baden Decl. para. 6. The Court Appointed Fiduciaries have also agreed to cooperate fully with the Department of Justice and the District Attorney of New York. Plea Agreement at para. 17.

The Fourth Amended Complaint in this action, filed on August 19, 1993, alleges that between 1982 and 1991 Defendants "formulated and implemented a corporate strategy for increasing the BCCI Group's profits by appearing to provide legitimate international banking

5

services while covertly soliciting and accepting deposits of funds from illegal sources, in conscious

disregard of the currency regulations, tax laws, and other laws of the United States and of other

Nations." Fourth Amended Complaint at 5. Plaintiff specifies that a major "illegal source" of

funds was Manuel Antonio Noriega ("Noriega"), "a former Panamanian military officer, [who]

abused his official position in a conspiracy with the BCCI Group to divert millions of dollars of

government funds into secret BCCI Group accounts," which the BCCI Group then 'laundered' and

redistributed to various component entities. Id. at 6. Plaintiff alleges that Defendants actions

constituted a RICO enterprise in violation of 18 U.S.C. § 1961 and that as a result of said Plaintiff

is entitled to damages, including statutorily authorized treble damages. Id. at 21-24. Plaintiff

further alleges common law causes of action for breach of fiduciary duty, fraud, and conversion.

Id. at 24-25.

The BCCI Defendants allege that this matter should be dismissed in accordance with the

doctrines of international comity and forum non conveniens. The Court will consider each

doctrine and evaluate whether or not it mandates a dismissal of this matter.

## II. FORUM NON CONVENIENS

The doctrine of forum non conveniens derives from the court's inherent power, under

Article III of the Constitution, to control the parties and cases before it and to prevent its process

from becoming an instrument of abuse or injustice." In re Air Crash Disaster Near New Orleans

La., 821 F.2d 1147, 1153-54 (5th Cir. 1987), vacated on other grounds, 490 U.S. 1032 (1989).

Forum non conveniens allows a court to decline to exercise its jurisdiction, even though the court

6

has jurisdiction and venue, where it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum. Id. at 1154; Koster v. American Lumbermens Mutual Casualty Co., 330 U.S. 518, 526 (1947); Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947).

District courts have broad discretion to retain or refuse to retain jurisdiction under the forum non conveniens doctrine and may be reversed only where there is a clear abuse of discretion. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255-56 (1981); Canada Malting Co. v. Paterson Steamships, 285 U.S. 413, 418 (1932). However, the court's decision must be founded on a procedural framework which guides the decision making process. In re Air Disaster, 821 F.2d at 1165 (citing Friends For All Children in Lockheed Aircraft Corp., 717 F.2d 602, 607 (D.C. Cir. 1983)).

In determining whether or not to grant Defendants' Motion to Dismiss the Court must evaluate whether an adequate alternative forum exists and then conduct a balancing process considering the private and public interest surrounding the matter. Gilbert, 330 U.S. at 508. This analytical process has been summarized as follows:

> As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case. Next, the trial judge must consider all relevant factors of *private* interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice. If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors or *public* interest tip the balance in favor of a trial in a foreign forum. If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

La Seguridad v. Transytur Line, 707 F.2d 1304, 1307 (11th Cir. 1983) (*quoting* Pain v. United Technologies Corp., 637 F.2d 775, 784-85 (D.C. Cir. 1980) (*emphasis in original*), *cert. denied*, 454 U.S. 1128 (1981)).

7

## A. Adequate Alternative Forum

The BCCI Defendants argue that the world wide liquidation proceedings presently existing in the Cayman Islands, England, and Luxembourg provide an "available" and "adequate" alternative forum for this matter. *See* BCCI's Supplemental Motion to Dismiss at 5. Plaintiff contends that since the law utilized by the world wide proceedings differs from that in the United States, no adequate alternative forum exists. *See* Response to Supplemental Motion to Dismiss. This Court had considered each parties' arguments and finds that the world wide liquidation proceedings, located in the Cayman Islands, England, and Luxembourg, do provide an adequate alternative forum for Plaintiff's claim because the standard is "adequate" and not "equal."

An adequate alternative forum is said to exist if there is an alternate forum that is "available" and "adequate." In re Air Crash Disaster, 821 F.2d at 1165. A forum is considered "available" if the "defendant is 'amenable' to process in the other jurisdiction." Reyno, 454 U.S. at 254-55, n.22 (*quoting* Gilbert, 330 U.S. at 506-07). It is undisputed that the BCCI Defendants are amenable to process in each of the three world wide liquidation proceedings [5] because the BCCI Defendants are incorporated in the Cayman Islands and Luxembourg with their principal place of business located in England. Accordingly, this Court concludes that an alternative forum is "available."

An alternative forum is considered "adequate" if "the parties will not be deprived of all remedies or treated unfairly," in that forum. In re Air Crash Disaster, 821 F.2d at 1165 (*citing*

---

[5]Plaintiff did not dispute that the BCCI Defendants were amenable to process in the forums at issue. See Plaintiff's Response to BCCI's Supplemental Memorandum on Motion to Dismiss Due to Forum Non Conveniens (D.E. # 188) at 9.

8

Reyno, 454 U.S. at 255). Each of the three locations of the world wide proceedings - the Cayman Islands, England, and Luxembourg - have been recognized by United States courts as providing an "adequate" alternate forum. *See e.g.* In re Gee, as Official Liquidator of Universal Casualty & Surety Co., 53 B.R. 891, 902 (Bankr. S.D.N.Y. 1985) (United States bankruptcy court recognized the bankruptcy laws of the Cayman Islands); Syndicate 420 at Lloyd's London v. Early American Insurance Co., 796 F.2d 821, 829 (5th Cir. 1986) (England provides adequate alternative forum justifying dismissal on forum non conveniens grounds); Overseas National Airways, Inc. v. Cargolux Airlines International S.A., 712 F.2d 11, 14 (2d Cir. 1983) (affirming dismissal on forum non conveniens grounds to Luxembourg).

Plaintiff contends, however, that under the facts of this case, the forums are inadequate because the bankruptcy rules and procedures of the forums are not the same as the procedures afforded in the United States and because there is no cause of action in the forums that is comparable to Plaintiff's RICO count. *See* Response to Supplemental Motion to Dismiss at 1-2, 10. Plaintiff's first argument appears to contain two components: first, that the liquidation procedures in the world wide proceedings differ from those that would be utilized in the United States and second, that the courts in the three jurisdictions utilize pretrial and trial procedures that differ from those used in the United States. *See* Id. at 1-2, 7-8. As to both arguments Plaintiff is correct. The world wide liquidation proceedings have implemented a "pooling agreement," whereby all of the BCCI Defendants' assets and liabilities will be pooled together and then distributed to all creditors worldwide "pari passu," or equally. *See* High Court Judgment; English Court of Appeals Decision, Exhibit A, Response to Supplemental Motion to Dismiss [hereinafter English Court of Appeals Decision]. Whereas, if the liquidation proceedings were in the United

9

States, a "ring-fencing" approach would be employed, whereby the assets of defendant located in that branch would be collected and then distributed to the creditors of that branch on a preferential basis.[6] Id. Additionally, it is undisputed that the pretrial discovery and similar procedures vary from jurisdiction to jurisdiction.[7]

However, an alternative forum is not considered inadequate merely because the parties may not enjoy the same benefits as they might receive in an American court. Reyno, 454 U.S. at 251 (possibility of an unfavorable change in law does not deprive the plaintiffs of an adequate forum because such an interpretation would ineffectuate the doctrine of forum non conveniens). Courts have consistently held that differences in rules and procedures, even those that are less favorable to Plaintiff are insufficient to make the alternate forum "so clearly inadequate or unsatisfactory that it is no remedy at all" as to require denial of a motion to dismiss. Id. at 254; see e.g. Mercier v. Sheraton International, Inc., 981 F.2d 1345, 1352-3 (1st Cir. 1992), cert. denied 113 S Ct. 2346 (1993) (Turkish forum adequate although Turkish procedures and laws different than those in the United States); Lockman Foundation v. Evangelical Alliance Mission, 930 F.2d 764, 768-69 (9th Cir. 1991) (Japanese forum held adequate although discovery procedures were "not identical to those in the United States"); In re Union Carbide Corp. Gas Plant Disaster, 809 F.2d 195, 206 (2d Cir.), cert denied sub nom, Executive Committee Members

---

[6]The Court thinks that it is important to note at this point that while the bankruptcy rules and procedures on the world proceedings are different than that in the United States, the liquidation proceedings currently progressing in Panama are not. Therefore, Plaintiff does have an alternative forum available in which a "ring-fence" liquidation approach is being utilized.

[7] Specifically, Plaintiff argues, the Luxembourg court does not recognize the United States equivalent of pre-trial discovery or the work product doctrine. Response to Supplemental Motion to Dismiss.

10

v. Union of India, 484 U.S. 871 (1987) (Indian forum adequate although Indian discovery rules were less extensive than United States rules); Zipfel v. Halliburton Co., 832 F.2d 1477, 1484 (9th Cir. 1987), *cert denied*, 486 U.S. 1054 (1988) (Singapore and Indonesia forums held adequate and available even though pretrial procedures and available recovery differed from U.S.); Doe v. Hyland Therapeutics Div., 807 F. Supp. 1117, 1123-24 (S.D.N.Y. 1992) (Irish forum adequate although scope of discovery more limited than in the United States).

Plaintiff further claims that "[t]his court cannot force Panama to join a liquidation proceeding which the majority of BCCI S.A. creditors apparently did not believe was in their best interests," as evidenced by the fact that the creditors' committee objected to a significant aspect of the Liquidator's plan - the pooling agreement. Response to Supplemental Motion to Dismiss at 3-4. While the Court takes note of the creditors' committee objections it fails to see how these objections demonstrate that Plaintiff will somehow be deprived of all remedies or treated unfairly in a foreign forum, especially in light of the fact that subsequently the Liquidation Plan was adopted by the supervising courts in England, Luxembourg, and the Cayman Islands, and 93% of all identified depositors and creditors of BCCI S.A. voted to support said Plan. Akers Aff. para. 6; Ballot of Creditors, Exhibit 1, Defendant's Reply to Supplemental Motion to Dismiss.

Lastly, Plaintiff argues that the world wide proceedings are not "adequate" because none of the alternative forums recognize a cause of action that is equivalent to Plaintiff's RICO claim. Response to Supplemental Motion to Dismiss at 10. Once again, Plaintiff is correct. Plaintiff will not be able to claim RICO violations nor recover treble damages in the world wide proceedings because the forums do not recognize a cause of action equivalent to RICO. However, Plaintiff will be able to recover for money laundering and theft, the causes of action which underlie RICO,

11

A - 2043

in England or Panama because both forums recognize said causes of action. United States courts have consistently held that the absence of a cause of action equal to RICO in a foreign jurisdiction does not render that jurisdiction inadequate for purposes of the doctrine of forum non conveniens. *See e.g.* Transunion Corporation v. Pepsico, Inc., 811 F.2d 127, 129 (2nd Cir. 1987) (Philippine corporation claim against a United States corporation for breach of contract, fraud, and RICO was dismissed on grounds of forum non conveniens; the fact that plaintiff could not assert RICO claim and treble damages in the Philippines was not dispositive as plaintiff could still maintain fraud actions underlying the RICO counts); Kempe v. Ocean Drilling & Exploration Co., 876 F.2d 1138, 1145 (5th Cir.), *cert. denied*, 493 U.S. 918 (1989) (absence of equivalent of RICO in Bermuda does not bar dismissal on grounds of forum non conveniens where foreign law permits recover for fraud, negligence, breach of fiduciary duty and the like); Alcoa Steamship Company, Inc. v. M/V Nordic Regent, 654 F.2d 147, 159 (2nd Cir.), *cert. denied* 449 U.S. 890 (1980) (maximum recovery of $570,000 in foreign forum versus $8,000,000 in United States does not render foreign forum inadequate).

The Court also notes that the special venue provision of the RICO statute, 18 U.S.C. §1965(a) (1982), which provides that any civil RICO action "may be instituted" in the district court in any district with which the defendant has certain specified connections, does not prevent dismissal of a RICO claim on forum non conveniens grounds. *See* Transunion, 811 F.2d at 129-30. Dismissal has been upheld in other instances involving statutes with special venue provisions. *See* In re Air Crash Disaster, 821 F.2d at 1163-64 (forum non conveniens available under Jones Act notwithstanding special venue provision); Howe v. Goldcorp Investments, Ltd., 946 F.2d 944 (1st Cir. 1991) (forum non conveniens applicable to private securities case notwithstanding

12



special venue provision); Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 431 (9th Cir. 1977) (forum non conveniens applicable to Lanham Act notwithstanding special venue provision).

### B. Weighing of the Private and Public Interest Factors

Once a court determines that an adequate alternative forum exists, it must consider relevant factors of private and public interest to determine whether or not dismissal on grounds of forum non conveniens is appropriate. The starting point in the private interest analysis is a well-recognized presumption that favors Plaintiff's choice of forum. See Gilbert, 330 U.S. at 508. However, the presumption is weakened in this case because plaintiff is a foreign entity. See Reyno, 454 U.S. at 266. Other private interest factors that the court may consider are "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . all other practical problems that make trial of a case easy, expeditious and inexpensive . . . [and] questions [relating] to the enforceability of a judgment if one is obtained." Gilbert, 330 U.S. at 508.

It is undisputed that the documents and the witnesses pertinent to this matter are scattered throughout the world, making no one forum significantly more convenient than another.[*] It is also undisputed that Plaintiff may join the worldwide liquidation, while the other BCCI creditors are not eligible to join this action. Lastly, it is undisputed that the BCCI defendants forfeited all their United States assets when they plead guilty to criminal RICO charges. Therefore, any

---

[*]While the parties seem unable to agree as to the percentage of documents and witnesses located in the United States or elsewhere for that matter, they do seem to agree that the proof is located everywhere, without any significant concentration.

13

12/21/2001  14:04    4047637059                    NARA SE REGION                    PAGE  02

potential judgment attained by Plaintiff in this matter would be unenforceable in the United

States.[9]  Accordingly, the Court finds that the factors of private interest, including Plaintiff's

weakened presumption of choice of forum, simply do *not* weigh in favor of the continuance of this

action in the United States.

"If the trial judge finds [the] balance of private interests to be in equipoise or near

equipoise, he must then determine whether or not factors or *public* interest tip the balance in

favor of a trial in a foreign forum." La Seguridad, 707 F.2d at 1307 (*quoting* Pain v. United

Technologies Corp., 637 F.2d at 784–85 (*emphasis in original*).  Public interest factors which

may be considered by the court are the administrative difficulties of congestion of the court

system; the burden imposed on jurors, especially in cases unrelated to the surrounding community;

the interest in having localized controversies decided at home; and the appropriateness of having a

diversity matter tried in a home jurisdiction, thereby avoiding problems in conflict of laws.

Gilbert, 330 U.S. at 508.

This Court finds that the public interest factors weigh overwhelmingly in favor of

dismissing this action.  The worldwide liquidation proceedings have been in place since 1992 and

have implemented a comprehensive plan designed to equally distribute assets to all known BCCI

creditors.  The Cayman Islands, England, and Luxembourg have a significant interest in resolving

this matter because the matter arose in their jurisdiction and because they are international

banking centers with a "strong interest in regulating its industry so as to retain credibility abroad."

Kempe, 876 F.2d at 1146 (claim dismissed on forum non conveniens grounds as Bermuda, an

---

[9]  Plaintiff argues that a judgment would be enforceable against the First American
Defendants because an appeal is pending as to this Court's Order dismissing said Defendants from
this action.  This Court hardly finds Plaintiff's argument tenable.

14

international insurance center, had a greater interest in regulating insurance industry than the

defendant's residence of Louisiana). Whereas, the United States simply does not have a

substantial interest in this litigation as it involves foreign parties and foreign matters. Further, the

administrative difficulties that will be presented if this case is allowed to remain on the Court's

docket are enormous, especially in light of the fact that this case concerns Panamanian law and

would require the Court to do an extensive conflict of law analysis as well as interpret and apply

foreign law. Gilbert, 330 U.S. at 509 (one of the purposes of a forum non conveniens dismissal is

"the avoidance of unnecessary problems of conflict of laws or the application of foreign law.");

Syndicate 420, 796 F.2d at 832 ("[t]he necessity of applying this foreign law, in turn, is simply

another factor that militates in favor of the dismissal"). Accordingly, America's interest in this

case "is simply not sufficient to justify the enormous commitment of judicial time and resources

that would inevitably be required if the case were to be tried here." Reyno. 454 U.S. at 260-61.

*C. Conclusion*

Originally Plaintiff claimed the United States was the only adequate forum available

because "[a] judgment without money to pay it is worthless. Noriega, with the aid of BCCI, spent

years looting the nation's treasury of government assets. The funds that rightfully are the

Republic of Panama's have now made their way into the United States. It would have been

foolish to bring this action in Panama... [or[ the United Kingdom...because the money is no longer

there." Response to BCCI's Original Motion to Dismiss at 29-30. However the money is no

longer here. All of BCCI's assets in the United States have been forfeited and placed into a

Custodial Account, and a worldwide proceeding has been instituted to deal with debtor and

A - 2047



creditor's potential claims. Plea Agreement at para. 11

The Court has weighed all the factors in the forum non conveniens analysis and finds that the coordinated worldwide liquidation is both available and adequate and a balancing of the private and public interest factors favors dismissal based on forum non conveniens.  The fact that the laws and procedures in the foreign forum are different from those in the United States, or that Plaintiff will be unable to assert its RICO claim, or that certain documents or witnesses are in this country does not override the fundamental unfairness of allowing Plaintiff to adjudicate its claim outside the official liquidation proceedings.  Plaintiff has failed to demonstrate why it should be treated differently than the other innocent creditors who have been forced to seek relief in the pending worldwide proceedings.  Plaintiff has the opportunity to file its claim in the liquidation proceeding and should not be able to interfere with the orderly liquidation proceedings of England, Luxembourg, and the Cayman Islands.  For these reasons, the BCCI Defendants' Motion to Dismiss is granted based on the doctrine of forum non conveniens.[10]

## II. COMITY

In the alternative, the Court also finds that the BCCI Defendants' Motion to Dismiss should be granted in accordance with the doctrine of international comity because the world wide proceedings are courts of competent jurisdiction which abide by "fundamental standards of procedural fairness" and because said decision furthers the laws and public policies of the United

---

[10]The Court notes that a similar decision was reached in BCCI Holdings (Luxembourg) v. Mahfouz, 828 F. Supp. 92, 100 (D. D.C. 1993).

16

States.

Comity is "the recognition which one nation allows within its territory to the legislative,

executive or judicial acts of another nation, having due regard both to international duty and

convenience, and to the rights of its own citizens or of other persons who are under the protection

of its law." Hilton v. Guyot, 159 U.S. 113, 164 (1895). United States courts have traditionally

recognized the need to extend comity to foreign bankruptcy proceedings. *See* Victrix Steamship

Co. S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713-15 (2d Cir. 1987) ("American courts have

long recognized the particular need to extend comity to foreign bankruptcy proceedings.");

Cunard Steamship Co., Ltd. v. Salen Reefer Services A.B., 773 F.2d 452, 458 (2d Cir. 1985);

Canada Southern Railroad Company v. Gebhard, 109 U.S. 527, 537-39 (1883). The Bankruptcy

Court in the Southern District of New York explained the justification behind this policy:

> Lurking in all transnational bankruptcies is the potential for chaos if the courts
> involved ignore the importance of comity. As anyone who has made even a brief
> excursion into this area of insolvency practice will report, there is little to guide
> practitioners or the judiciary in dealing with the unique problems posed by such
> bankruptcies. Yet it is critical to harmonize the proceedings in the different courts
> lest decrees at war with one another result.

*In re* Petition of Brierley, 145 B.R. 151, 164 (Bankr. S.D.N.Y. 1992); *see also* Canada Southern,

109 U.S. at 539 ("[u]nless all parties in interest, wherever they reside, can be bound by the

arrangement which it is sought to have legalized, the scheme may fail.")

Generally, comity may be granted where "it is shown that the foreign court is a court of

competent jurisdiction, and that the laws and public policy of the forum state and the rights of its

residents will not be violated." Cunard, 773 F.2d at 457. This is especially true in sister common

law countries such as the Cayman Islands and England as well as civil law countries such as

Luxembourg and Panama. *See* Lindner Fund, Inc. v. Polly Peck International, 143 B.R. 807, 810

17

(Bankr. S.D.N.Y. 1992) (England); Corfeld v. Investors Overseas Servs. Ltd., 471 F. Supp. 1255,

1259 (S.D.N.Y. 1979) (Canada); IIT v. Cornfeld, 462 F.Supp. 209, 216-17 (S.D.N.Y. 1978),

*aff'd in relevant part*, 619 F.2d 909 (2d Cir. 1980) (Luxembourg).

 In assessing whether a foreign jurisdiction is a "court of competent jurisdiction" courts are

most concerned with whether the foreign court abides by "fundamental standards of procedural

fairness." Id.  In Allstate Life Insurance Co. v. Linter Group Ltd., the court delineated the

following factors as those to be considered when assessing procedural fairness:

> 1) whether creditors of the same class are treated equally in the distribution; 2)
> whether the liquidators are considered fiduciaries and are held accountable to the
> court; 3) whether creditors have the right to submit claims which, if denied, can be
> submitted to a bankruptcy court for adjudication; 4) whether the liquidators are
> required to give notice to the debtor's potential claimants; 5) whether there are
> provisions for creditors' meetings; 6) whether a foreign country's insolvency laws
> favor its own citizens; 7) whether all assets are marshalled before one body foe
> centralized distribution; and 8) whether there are provisions for an automatic stay
> and for the lifting of such stays to facilitate the centralization of claims

Allstate Life Insurance Co. v. Linter Group Ltd., 994 F.2d 996, 999 (2d Cir.), *cert. denied* 114 S.

Ct. 386 (1993) (*citing* Cunard, 773 F.2d at 459-60).

 The worldwide liquidation proceedings have implemented a comprehensive plan to

liquidate the BCCI defendants.  The Official Liquidators in the Cayman Islands, England, and

Luxembourg published notice to potential creditors directly and indirectly, via mail and by

publishing information in over 136 newspapers worldwide.  Once identified, the creditor can

document their claim by filing a proof of debt form with the liquidator, which includes all past,

present, and future claims against the BCCI defendants.  The Official liquidators then consider

said claim and accept or reject it.  If a claim is disallowed, in whole or in part, the creditor may

appeal to the appropriate court within the jurisdiction.  Meanwhile, the liquidators are directing

the pooling of the BCCI defendants' assets, which will then be distributed to all creditors equally,



regardless of their country of origin. *See* Wight Aff.; Baden Aff.; Akers Aff. These proceedings clearly comport with a "fundamental standard of procedural fairness," especially in light of the factors enunciated in <u>Allstate</u>.

The next factor that the Court must consider is whether affording comity to the worldwide liquidation proceedings would be "contrary or prejudicial to the interests of the nation called upon to give effect." <u>Philadelphia Gear Corp. v. Gear De Mexico, S.A.</u>, 44 F.3d 187, 191 (3d Cir. 1994); <u>Somportex Ltd. v. Philadelphia Chewing Gum Corp.</u>, 453 F.2d 435, 440 (3d Cir. 1971), *cert. denied*, 405 U.S. 1017 (1972). This Court finds that affording comity in this case furthers the laws and public policies of the United States because "[our] courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities." <u>Allstate</u>, 994 F.2d at 1000 (*quoting* <u>Cunard</u>, 773 F.2d at 458); <u>ITT v. Cornfeld</u>, 462 F.Supp. at 209. Further, where as here, "the granting of comity to a Foreign bankruptcy proceedings enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion," comity has long been recognized as appropriate. <u>Id.</u>

Plaintiff argues that denying them the opportunity to pursue their RICO action is in contravention of United States laws and policies because implicit in RICO is a deterrence factor, which will not be served. *See* Plaintiff's Response to Motion to Dismiss at 9. The Court disagrees because it believes that the important public policy of deterrence implicit in RICO was fulfilled when the United States brought criminal charges against BCCI and the BCCI defendants plead guilty and forfeited significant assets.

Plaintiff further argues that comity should not be granted in this matter because to do so

19



would deny Plaintiff a fair opportunity to present its RICO damage claim. *See Id.* at 8. As

previously discussed in the forum non conveniens section, Plaintiff's argument fails because courts

have consistently held that the law of the foreign forum need not be identical to ours. *See Allstate,*

994 F.2d at 999 (when considering whether dismissal based on comity was proper court stated

that "there is no requirement that Australian liquidation proceedings be identical to United States

bankruptcy proceedings.").

Based on the foregoing discussion, it is hereby

### III. ORDER

ORDERED and ADJUDGED that the BCCI Defendants' Motion to Dismiss is

GRANTED.

DONE AND ORDERED in Chambers at Miami, Florida, this _17_ day of July, 1995.

URSULA UNGARO-BENAGES
UNITED STATES DISTRICT JUDGE

copies provided:

Counsel of Record

20

A - 2052