IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
```
DAVIS INTERNATIONAL, LLC, HOLDEX,      :
LLC, FOSTON MANAGEMENT, LTD, and       :
OMNI TRUSTHOUSE, LTD,                   :
                                       :
            Plaintiffs,                :
                                       :
     v.                                :    Case No. 04-1482-GMS
                                       :
NEW START GROUP CORP., VENITOM         :
CORP., PAN-AMERICAN CORP., MDM         :
BANK, URAL-GORNO METALURAGICAL         :
COMPANY, EVRAZ HOLDING, MIKHAIL        :
CHERNOI, OLEG DERIPASKA, ARNOLD        :
KISLIN, MIKHAIL NEKRICH, and           :
ISKANDER MAKMUDOV,                     :
                                       :
            Defendants.                :
```
------------------------------------------------------------x
```

# APPENDIX TO DEFENDANTS'
# OPENING BRIEFS IN SUPPORT OF
# DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

## Volume 12 of 13

Attorneys for Defendant Arnold Kislin:

Charles M. Oberly, III (DSBA No. 743)       Lisa C. Cohen
Karen V. Sullivan (DSBA No. 3872)           Schindler Cohen & Hochman LLP
Oberly, Jennings & Rhodunda, P.A.           100 Wall Street
800 Delaware Avenue, Suite 901              15th Floor
PO Box 2054                                 New York, NY 10005
Wilmington, DE 19899                        (212) 277-6300
(302) 576-2000

                                            Lawrence S. Goldman
                                            Elizabeth Johnson
                                            The Law Offices of Lawrence S. Goldman
                                            500 Fifth Ave., 29th Floor
                                            New York NY 10110-2900
                                            (212) 997-7499

Attorneys for Defendants New Start Group
Corp. and Venitom Group:

Charles M. Oberly, III (DSBA No. 743)
Karen V. Sullivan (DSBA No. 3872)
Oberly, Jennings & Rhodunda, P.A.
800 Delaware Avenue, Suite 901
PO Box 2054
Wilmington, DE 19899
(302) 576-2000

Richard J. Schaeffer
Peter J. Venaglia
Laura B. Sullivan
Dornbush, Schaeffer, Strongin &
Weinstein, LLP
747 Third Avenue, 11th Floor
New York, NY 10017
(212) 759-3300

Attorneys for Defendant Oleg Deripaska:

Collins J. Seitz, Jr.(DSBA No. 2237)
Kevin F. Brady (DSBA No. 2248)
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141

Rodney F. Page
Michael G. Biggers
Bryan Cave LLP
700 13th Street, N.W.
Washington, D.C. 20005-3960
(202) 508-6002

Attorneys for Defendant Evraz Holding:

William M. Lafferty (DSBA No. 2755)
Morris, Nichols, Arsht & Tunnell
Chase Manhattan Centre, 18th Floor
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 575-7341

David H. Herrington
Vitali Rosenfeld
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York New York 10006
(212) 225-2266

Attorneys for Defendant MDM Bank:

Stephen E. Jenkins (DSBA No. 2152)
Richard I.G. Jones, Jr. (DSBA No. 3301)
Ashby & Geddes
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

Joel B. Kleinman
Steven J. Roman
David H. Greenberg
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street NW
Washington, DC 20037-1526
(202) 785-9700

Attorneys for Defendant Ural-Gorno
Metallurgical Company:

Charles M. Oberly, III (DSBA No. 743)    William H. Devaney
Karen V. Sullivan (DSBA No. 3872)        Heard & O'Toole LLP
Oberly, Jennings & Rhodunda, P.A.        405 Lexington Ave, Floor 62
800 Delaware Avenue, Suite 901           New York, NY 10174
PO Box 2054                              (212) 307-5500
Wilmington, DE 19899
(302) 576-2000

Attorneys for Defendant Iskander
Makmudov:

Charles M. Oberly, III (DSBA No. 743)    William H. Devaney
Karen V. Sullivan (DSBA No. 3872)        Heard & O'Toole LLP
Oberly, Jennings & Rhodunda, P.A.        405 Lexington Ave, Floor 62
800 Delaware Avenue, Suite 901           New York, NY 10174
PO Box 2054                              (212) 307-5500
Wilmington, DE 19899
(302) 576-2000

Attorneys for Defendant Mikhail Chernoi:

Charles M. Oberly, III (DSBA No. 743)    Brian Maas
Karen V. Sullivan (DSBA No. 3872)        Cameron Myler
Oberly, Jennings & Rhodunda, P.A.        Frankfurt Kurnit Klein & Selz PC
800 Delaware Avenue, Suite 901           488 Madison Avenue, 9th Floor
PO Box 2054                              New York, NY 10022
Wilmington, DE 19899                     (212) 980-0120
(302) 576-2000

Attorneys for Defendant Mikhail Nekrich:

Charles M. Oberly, III (DSBA No. 743)    Paul R. Grand
Karen V. Sullivan (DSBA No. 3872)        Edward M. Spiro
Oberly, Jennings & Rhodunda, P.A.        Morvillo, Abramowitz, Grand, Iason &
800 Delaware Avenue, Suite 901           Silberberg, P.C.
PO Box 2054                              565 Fifth Avenue
Wilmington, DE 19899                     New York, NY 10017
(302) 576-2000                           (212) 880-9510

# Table of Contents

| **DOCUMENT** | **PAGE** |
|---|---|
| **VOLUME 1 OF 13:** | |
| Complaint | A-1 |
| *Base Metal Trading v. Russian Alum.*, 253 F. Supp. 2d 681 (S.D.N.Y. 2003) ("*Base Metal Trading*") | A-31 |
| Transcript of Oral Argument before Hon. John G. Koeltl, dated February 10, 2003, in *Base Metal Trading* | A-64 |
| **VOLUME 2 OF 13:** | |
| First Amended Complaint, dated August 3, 2001, filed in *Base Metal Trading* | A-176 |
| **VOLUME 3 OF 13:** | |
| Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss the Amended Complaint, dated September 15, 2002, filed in *Base Metal Trading* | A-295 |
| **VOLUME 4 OF 13:** | |
| Resume of Paul B. Stephan | A-465 |
| List of Paul B. Stephan's "Participation in U.S. Lawsuits" | A-476 |
| Declaration of Paul B. Stephan, dated January 28, 2002, filed in *Base Metal Trading* | A-479 |
| Reply Declaration of Paul B. Stephan, dated October 17, 2002, filed in *Base Metal Trading* | A-514 |
| Complaint filed in *Norex Petroleum Ltd. v. Access Indus.* (LTS) (S.D.N.Y.) | A-535 |
| *Norex Petroleum Ltd. v. Access Indus.*, 304 F. Supp. 2d 570 (S.D.N.Y. 2004) | A-607 |
| Judge Koeltl's written request for submissions prior to oral argument, dated January 29, 2003 | A-622 |
| Defendants' response to Judge Koeltl's Jan. 29th request ("Defendants' Oral Argument Submissions") | A-624 |
| Chronology of GOK-related Russian court decisions | A-625 |
| Map – location of courts | A-651 |
| Chart of Russian Court Decisions | A-652 |

| VOLUME 5 OF 13: | |
|---|---|
| Plaintiffs' response to Judge Koeltl's Jan. 29th request ("Plaintiffs' Oral Argument Submissions") | A-653 |
| GOK Bankruptcy Litigation Chart | A-654 |
| Shareholder Litigation Chart | A-660 |
| Chart – Kozitsin and Kozyrev "Wrongful Conduct" | A-668 |
| Chart – "Direct Evidence of Corruption" | A-677 |
| Sergei Zankovsky: Theory and Practice of Bankruptcy | A-684 |
| Defendants' post-oral argument submissions in *Base Metal Trading*, dated February 20, 2003 | A-687 |
| Letter from Winston & Strawn, dated February 20, 2003 | A-688 |
| Letter from Hogan & Hartson, dated February 20, 2003 | A-690 |
| Letter from Dornbush Mensch Mandelstam & Schaeffer, dated February 20, 2003 | A-695 |
| Defendants' Summary of Contracts | A-698 |
| Supplemental Declaration of Paul B. Stephan, dated Feb. 19, 2003 | A-705 |
| Third Declaration of Igor Petrukhin, dated Feb. 20, 2003 | A-713 |
| Plaintiffs' post-oral argument submissions in *Base Metal Trading*, dated February 20, 2003 | A-744 |
| Letter from Strook Stroock & Lavan, dated February 20, 2003 (with exhibits) | A-745 |
| Second Declaration and Exhibits of Joseph Traum, dated February 19, 2003 | A-782 |
| Expert Report of Sergei B. Zaitsev, dated February 19, 2003 (without exhibits) | A-828 |
| VOLUME 6 OF 13: | |
| Defendants' post-oral argument submissions in *Base Metal Trading*, dated February 25, 2003 | A-885 |
| Letter from Winston & Strawn, dated February 25, 2003 (with exhibits) | A-886 |
| Supplemental Declaration of Paul B. Stephan, dated February 25, 2003 | A-933 |
| Plaintiffs' post-oral argument submissions in *Base Metal Trading*, dated February 25, 2003 | A-941 |

| | |
|---|---|
| Letter from Strook Stroock & Lavan, dated February 25, 2003 (with exhibits) | A-942 |
| Letter from Herrick Feinstein, dated February 25, 2003 | A-986 |
| Second Declaration of Victor Golubev, dated February 25, 2003 (without exhibits) | A-989 |
| Second Declaration of Sergei B. Zaitsev, dated February 25, 2003 (without exhibits) | A-1027 |
| **VOLUME 7 OF 13:** | |
| March 30, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1075 |
| August 22, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1080 |
| April 19, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1092 |
| Application to the Arbitrazh Court for the Sverdlovsk Oblast dated March 24, 2000 filed by Krasnouralskmezhraygaz ("Kras Gas") | A-1112 |
| January 24, 1997 contract between GOK and Kras Gas | A-1130 |
| Letter dated February 4, 2000 from Kras Gas to GOK | A-1146 |
| Letter dated February 15, 2000 from Kras Gas to GOK | A-1157 |
| Letter dated February 8, 2000 from GOK to Kras Gas | A-1170 |
| Letter dated February 21, 2000 from GOK to Kras Gas | A-1175 |
| Federal Service's recommendation to appoint Kozyrev as Interim Trustee | A-1180 |
| Instruction of the Government of the Russian Federation from July 10, 1999 (No. 1100-R) | A-1187 |
| Audit Report and list of GOK's creditors as of March 24, 2000 | A-1191 |
| Minutes of the first GOK creditors' meeting held on August 11, 2000 | A-1245 |
| August 2, 2000 decision of the Izmailovo Inter-Municipal Court of Moscow | A-1266 |
| November 30, 2000 decision of the Moscow City Court | A-1269 |
| **VOLUME 8 OF 13:** | |
| Nexis' appellate complaint | A-1276 |
| January 15, 2001 determination of the Appellate Instance of the Arbitrazh Court for the Sverdlovsk Oblast | A-1306 |
| Nexis' cassation complaint | A-1311 |
| June 7, 2001 decision of the Federal Arbitrazh Court for the Urals Circuit | A-1318 |

| | |
|---|---|
| Minutes of the March 11, 2001 creditors' meeting | A-1323 |
| June 27, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1357 |
| August 21, 2001 decision of the Federal Arbitrazh Court for the Urals Circuit | A-1365 |
| August 18, 2000 opinion of the Federal Service | A-1367 |
| August 29, 2000 Nexis petition regarding loan agreement | A-1382 |
| July 26, 1999 supply contract between Nexis and GOK | A-1392 |
| August 29, 2000 Application filed by Nexis regarding supply contract | A-1424 |
| October 4, 2000 letter to Nexis from Trustee Kozyrev | A-1442 |
| March 23, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1445 |
| August 29, 2000 Statement of Claim submitted by Polyprom | A-1452 |
| **VOLUME 9 OF 13:** | |
| Supply agreements between GOK and Polyprom | A-1479 |
| October 4, 2000 letter to Polyprom from Trustee Kozyrev | A-1579 |
| October 31, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1583 |
| February 16, 2001 letter from Trustee Kozyrev to the Arbitrazh Court for the Sverdlovsk Oblast | A-1588 |
| February 19, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1591 |
| April 19, 2001 Resolution of the Appellate Instance of the Arbitrazh Court for the Sverdlovsk Oblast | A-1598 |
| July 12, 2001 determination of the Federal Arbitrazh Court of the Urals District | A-1607 |
| April 18, 2001 decision of the Arbitrazh Court for Sverdlovsk Oblast | A-1613 |
| January 22, 2000 letter from several members of GOK Board of Directors requesting meeting of GOK Board | A-1620 |
| January 24, 2000 letter from several members of GOK Board of Directors requesting meeting of GOK Board | A-1623 |
| February 2, 2000 "Decision Not To Institute Legal Proceedings" of the Senior Assistant Prosecutor for the City of Kachkanar | A-1628 |
| February 1, 2000 ruling of the Kachkanar City Court for the Sverdlovsk Oblast | A-1635 |
| February 15, 2000 decision of the Arbitrazh Court for the Sverdlovsk | A-1649 |

| Oblast | |
|---|---|
| March 8, 2001 decision by the Moscow City Court | A-1657 |
| September 19, 2000 decision of the Meshchansky Inter-Municipal Regional Court of Moscow | A-1667 |
| **VOLUME 10 OF 13:** | |
| March 26, 2001 decision of the Moscow City Court | A-1676 |
| November 21, 2000 decision of the Tverskoy Inter-Municipal Regional Court of Moscow | A-1683 |
| February 22, 2001 decision of the Appellate Instance of the Federal Arbitrazh Court of Moscow | A-1691 |
| November 16, 2000 decision of the Arbitrazh Court of Moscow | A-1698 |
| April 26, 2001 decision of the Federal Arbitrazh Court of the Moscow Circuit | A-1706 |
| December 13, 2000 decision of the Perovsky Inter-Municipal Regional Court of Moscow | A-1712 |
| Davis Complaint filed in Moscow before the Gagarinsky Inter-Municipal Court of Moscow | A-1728 |
| April 10, 2000 decision of the Perovsky Inter-Municipal Regional Court of Moscow | A-1737 |
| September 25, 2000 decision of the Perovsky Inter-Municipal Regional Court of Moscow | A-1747 |
| October 26, 2000 decision of the Moscow City Court | A-1752 |
| September 17, 2001 decision of the Gagarinsky Inter-Municipal Court of Moscow | A-1758 |
| May 30, 2000 decision of the Tverskoy Inter-Municipal Regional Court | A-1761 |
| February 7, 2000 decision of the Tverskoy Inter-Municipal Court of Moscow | A-1765 |
| December 22, 2000 decision of the Gagarinsky Inter-Municipal Court of Moscow | A-1768 |
| February 14, 2000 decsion of the Cheryomoushkinsky Inter-Municipal Court of Moscow | A-1774 |
| March 2, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1779 |
| September 4, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1784 |
| August 14, 2000, decision of the Kachkanar City Court of the Sverdlovsk Oblast | A-1790 |

| February 15, 2000 decision of the Kachkanar City Court | A-1797 |
|---|---|
| February 29, 2000 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-1801 |
| March 6, 2001 decision of the Moscow City Court | A-1806 |
| April 5, 2000 decision of the Meshchansky Inter-Municipal Regional Court of Moscow | A-1814 |
| June 22, 2001 decision of the Tverskoy Inter-Municipal Regional Court of Moscow | A-1827 |
| Two Notices of registrar change published in the *Oblastnaya gazeta* on, respectively, March 17, 2000 and October 21, 2000 | A-1832 |
| March 20, 2001 decision by the Arbitrazh Court of Moscow | A-1839 |
| June 26, 2001 decision of Appellate Instance of the Arbitrazh Court of Moscow | A-1846 |
| **VOLUME 11 OF 13:** | |
| September 5, 2001 decision of the Federal Arbitrazh court of the Moscow Circuit | A-1852 |
| December 20, 2000 decision of the Petrogradsky Regional Court of St. Petersburg | A-1859 |
| January 12, 2001 decision of the Petrogradsky Regional Court of St. Petersburg | A-1864 |
| March 13, 2001 decision of Izmailovsky Regional Court of Moscow | A-1871 |
| March 13, 2001 decision of Izmailovsky Regional Court of Moscow | A-1874 |
| August 27, 2001 decision of the Chertanovo Federal Court | A-1877 |
| Agreement between GOK and Polyprom dated January 18, 1999 | A-1880 |
| November 22, 2000 decision of the Arbitrazh Court of the Republic of Kalmykia | A-1884 |
| April 17, 2001 decision of the Arbitrazh Court for the North Caucasus Region | A-1895 |
| July 5, 2001 decision of the Arbitrazh Court for the Republic of Kalmykia | A-1904 |
| November 9, 2001 decision of the Appellate Instance of the Arbitrazh Court for the Republic of Kalmykia | A-1910 |
| September 10, 2001 decision of the Arbitrazh Court for the Republic of Kalmykia | A-1919 |
| August 1, 2000 decision of the Arbitrazh Court for the Chelyabinsk Region | A-1924 |

| | |
|---|---|
| October 16, 2000 decision of the Appellate Instance for the Arbitrazh Court for the Chelyabinsk Region | A-1942 |
| January 4, 2001 decision of the Arbitrazh Court for Urals Circuit | A-1952 |
| September 29, 2000 decision of the Solntsevsky Inter-Municipal Regional Court of Moscow | A-1960 |
| March 30, 2001 decision of the Moscow City Court | A-1970 |
| November 30, 2001 decision of the Solntsevsky Inter-Municipal Regional Court of Moscow | A-1980 |
| Agreement between New Start Group, Corp. and Davis dated October 6, 2000 | A-1995 |
| Eugene Aschenbrenner's Power of Attorney to act on behalf of Davis (valid December 3, 1999 through December 3, 2000) | A-2002 |
| Nexis Loan Agreement dated July 13, 1999 | A-2010 |
| March 23, 2001 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2020 |
| July 13, 2000 decision of the Meshchansky Inter-Municipal Regional Court of Moscow | A-2027 |
| Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 90-2913-CV-UUB, slip.op. (S.D. Fla. July 17, 1995) | A-2033 |
| **VOLUME 12 OF 13** | |
| October 29, 2001 decision of the Federal Arbitrazh Court for the Urals Circuit | A-2053 |
| November 24, 2001 Opinion of the Department of the Interior of the Sverdlovsk Region | A-2060 |
| January 21, 2002 decision of the Federal Arbitrazh Court for the North Caucasus Circuit | A-2084 |
| March 12, 2002 decision of the Arbitrazh Court for the Republic of Kalmykia | A-2094 |
| April 23, 2002 decision of the Federal Arbitrazh Court for the North Caucasus Circuit | A-2105 |
| April 30, 2002 decision of the Kachkanar Town Court for the Sverdlovsk Oblast | A-2108 |
| September 24, 2002 decision of the Kachkanar Town Court for the Sverdlovsk Oblast | A-2121 |
| November 19, 2002 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2126 |

| | |
|---|---|
| January 22, 2003 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2133 |
| February 4, 2003 decision of the Appellate Instance for the Arbitrazh Court for the Republic of Kalmykia | A-2143 |
| May 20, 2003 decision of the Federal Arbitrazh Court for the North Caucasus Region | A-2150 |
| May 27, 2003 decision of the Appellate Instance of the Arbitrazh Court for the Sverdlovsk Oblast | A-2159 |
| August 27, 2003 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2165 |
| October 30, 2003 decision of the Moscow Municipal Court | A-2170 |
| January 14, 2004 decision of the Federal Arbitrazh Court for the Urals Circuit | A-2176 |
| April 20, 2004 decision of the Arbitrazh Court for the Sverdlovsk Oblast | A-2187 |
| **VOLUME 13 OF 13** | |
| April 27, 2004 decision of the Arbitrazh Court for the Republic of Kalmykia | A-2197 |
| July 2, 2004 decision of the Moscow City Court | A-2205 |
| July 29, 2004 decision of the Federal Arbitrazh Court for the Urals Circuit | A-2212 |
| December 7, 2004 decision of the Moscow City Court | A-2221 |
| September 18, 2001 decision of the Sverdlovsk Arbitrazh Court | A-2224 |
| December 20, 2001 decision of the Urals Circuit | A-2238 |
| May 22, 2002 decision of the Moscow City Court | A-2246 |
| August 22, 2002 decision of the Moscow City Court | A-2256 |
| September 10, 2002 decision of the Kalmykia Court | A-2269 |
| May 22, 2003 decision of the Sverdlovsk Arbitrazh Court | A-2277 |
| August 13, 2003 decision of the Solntsevsky Court | A-2283 |
| March 3, 2004 decision of the Sverdlovsk Arbitrazh Court | A-2289 |
| March 31, 2004 report issued by Russian Ministry of Internal Affairs | A-2294 |
| Declaration of Tatiana Yastrebova, dated September 16, 2002, filed in *Base Metal Trading* (without exhibits) | A-2314 |
| July 2, 2002 decision of the North Caucasus Circuit | A-2344 |

- 8 -

## FEDERAL COURT OF ARBITRATION OF THE DISTRICT OF URALSK

### RULING

of the appellate level for the verification of the legality and validity of decisions
(resolutions) of courts of arbitration entering into force,
of the return of an appellate claim

City of Ekaterinburg                                         No. A60-4517/00-C1
October 29, 2001

    Judge Kondrateva L.I., having examined the material of the appellate claim of
company "Nexus Products LLC," of the ruling of 08.21.2001 of the Federal Court of
Arbitration of the District of Uralsk of the return of the appellate claim of case No. A60-
4517/001-C1 according to the declaration of OAO "Karsnouralskmezhraigaz" of the
recognition of the bankruptcy of OAO "Kachkanar GOK "Vanadii."

RULED:
    The appellate claim of company "Nexus Products LLC" was submitted on
10.09.2001, that is, after the end of the term established in art. 164 APK RF. Making a
motion for the restoration of the term of submission, the declarant cites that the disputed
decision of 08.21.2001 was received by the company on 09.09.2001, but the
representative of the company Ashikhmina M.M. could review the decision only by
10.04.2001.
    The motion for restoring the term of the submission of an appellate claim has
been examined and refused.
    According to art. 9 APK RF, the court of arbitration can restore the term of
submission of an appellate claim if it recognizes legitimate reasons for failure to submit.
    The court considers that the reasons cited by the declarant for the failure to submit
the appellate claim within the limit of the term are illegitimate, because the ruling of
08.21.2001 was received by the company on 09.09.2001, and the company had adequate
time for submitting the appellate claim within the established term. The circumstance
that the representative Ashikhmina M.M. could have reviewed the decision after the
expiration of the term of the claim is not grounds for the restoration of the term of
submission of the appellate claim.
    The appellate claim of the company "Nexus Products LLC," without date or
number, in violation of pt. 1 art. 165 APK RF, was signed by an individual not having the
right to sign it.
    In the name of the company "Nexus Products LLC," the appellate claim was
signed by representative Ashikhmina M.M., without a reference to the date and number
of the power of attorney for the right to appeal judicial acts in the name of the company.
Support for the authority of Ashmikhina M.M. for the right to appeal judicial acts to an
appellate claim was affixed on incomplete pages and on uncertified photocopies: in the
English language - apostille of 11.28.2000, affidavit of 09.28.2000 and general power of
attorney of 11.15.2000 on two pages; on incomplete pages in the Russian language and in
uncertified photocopies - apostille of 11.28.2000, declaration under oath of 09.28.2000,

first page of the general power of attorney of 11.15.2000, witness of notary Boitsova V.Iu. of the validity of the translation and the registration in the register No. 1K-3245, a page with a photocopies of a stamp and images of attachments and numbered 9 pages.

According to art. 165 APK RF, power of attorney signed by the representative supporting his authority for the appeal of judicial acts should be included with the claim, if it has not been earlier presented for the given case.

There is no power of attorney of Ashmikhmina M.M. in the materials of the case with the stamped apostille in the appropriate manner in support of her authority to appeal judicial acts on behalf of the company "Nexus Products LLC."

According to pt. 1 art. 49, art. 50 APK RF, the authority of a representative must be expressed in the form of power of attorney, and issued in the form required by law.

The operative law does not provide for copies of power of attorney to verify authority.

Art. 3 of the Hague Convention (1961) does not provide for photocopies of the apostille to certify the authenticity of a signature, the capacity in which a person appears, singing the document and the authenticity of the seal and stamp, with which the document is affixed.

In agreement with art. 11 of the Hague Convention (1961), changing requirement of the legalization of foreign official documents, the apostille is inscribed on official documents which were completed on the territory of one of the contracting state and must be presented on the territory of the other contracting state.

In this manner, only the power of attorney with the apostille, inscribed in correspondence with the requirements of the Hague Convention (1961), can serve as appropriate evidence of the authority of representative Ashikhmina M.M. to appeal judicial acts on behalf of the company "Nexus Products LLC."

Since the appellate claim was signed by Ashikhmina M.M. without the attachment of the appropriate power of attorney with the apostille, and such a power of attorney with apostille is not in the materials of the case, there is no evidence of the authority of Ashikhmina M.M of the signing of the appellate claim on behalf of the company "Nexus Products LLC."

In violation of pt. 2 art. 165, art. 166 APK RF, evidence of the sending of copies of the appellate claim to all of the parties participating in the case were not attached to the appellate claim.

Under art. 30 FZ "On Bankruptcy," a party participating in a case is an arbitration manager.

There is no evidence of the sending of copies of the appellate claim to the external manager Kozytev O.S., and in the register of the company of the dispatch of letters by certified mail of 10.08.2001 consisting of 173 points, is not equivalent to the dispatch of the correspondence to the external manager Kozyrev O.S.

Taking into account what has been set forth, the appellate claim is returned to the declarant.

Governed by p.1, 3, 5, pt. 1, art. 168 of the Arbitration Code of Procedure of the Russian Federation, the court

**DECIDED:**

1.  To deny the motion of the restoration of the term of submission of the appellate claim of the decision of 08.21.2001 of the Federal Court of Arbitration of the District of Uralsk of case No. A60-4517/00-C1.
2.  To return the appellate claim to the declarant.
3.  To return to the declarant the duties paid according to receipt of 10.09.2001 in the sum of 500 rubles from the Federal Budget.
4.  The decision can be appealed in the Federal Court of Arbitration of the District of Uralsk.

Judge                                                      Kondrateva L.I.


*signature*



# ФЕДЕРАЛЬНЫЙ АРБИТРАЖНЫЙ СУД УРАЛЬСКОГО ОКРУГА

## ОПРЕДЕЛЕНИЕ

кассационной инстанции по проверке законности и обоснованности решений (постановлений) арбитражных судов, вступивших в законную силу, о возвращении кассационной жалобы

**г. Екатеринбург**
**29 октября 2001 г.**                                         **№ А60-4517/00-С1**

Судья Кондратьева Л.И., рассмотрев материалы кассационной жалобы компании «Нэксиз Продактс Эл.Эл.Си.» на определение от 21.08.2001 Федерального арбитражного суда Уральского округа о возвращении кассационной жалобы по делу № А60-4517/001-С1 по заявлению ОАО «Красноуральскмежрайгаз» о признании несостоятельным (банкротом) ОАО «Качканарский ГОК «Ванадий»

**УСТАНОВИЛ:**

Кассационная жалоба компании «Нэксиз Продактс Эл.Эл.Си.» подана 09.10.2001, то есть по истечении срока, установленного ст.164 АПК РФ. Ходатайствуя о восстановлении срока ее подачи, заявитель ссылается на то, что обжалуемое определение от 21.08.2001 получено компанией 09.09.2001, а представитель компании Ашихмина М.М. смогла ознакомиться с определением лишь 04.10.2001.

Ходатайство о восстановлении срока подачи кассационной жалобы рассмотрено и отклоняется.

Согласно ст.99 АПК РФ арбитражный суд может восстановить срок подачи кассационной жалобы, если признает уважительными причины его пропуска.

Суд считает неуважительными причины пропуска срока подачи кассационной жалобы, на которые ссылается заявитель, поскольку определение от 21.08.2001 получено компанией 09.09.2001, у компании имелось достаточно времени для подачи кассационной жалобы в установленный срок. То обстоятельство, что представитель Ашихмина М.М. смогла ознакомиться с определением по истечении срока на обжалование не является основанием для восстановления срока подачи кассационной жалобы.

Кассационная жалоба компании «Нэксиз Продактс Эл.Эл.Си.» без даты и без номера, в нарушение ч.1 ст.165 АПК РФ, подписана лицом, не имеющим права ее подписывать.

От имени компании «Нэксиз Продактс Эл.Эл.Си.» кассационная жалоба подписана представителем Ашихминой М.М., без ссылки на дату и номер доверенности на право обжалования судебных актов от имени компании. В подтверждение полномочий Ашихминой М.М. на право обжалования судебных актов к кассационной жалобе приложены на разрозненных листах в ни кем не

**2**

заверенных ксерокопиях: на английском языке - апостиль от 28.11.2000, аффидавит от 28.09.2000 и генеральная доверенность 15.11.2000 на 2х листах; на разрозненных листах на русском языке в ником не заверенных ксерокопиях - апостиль от 28.11.2000, заявление под присягой от 28.09.2000, первая страница генеральной доверенности от 15.11.2000, свидетельство нотариуса Бойцовой В.Ю. верности перевода и регистрации в реестре за № 1К-3245, лист с ксерокопиями печати и отметкой о скреплении и нумерации 9 листов.

Согласно ст. 165 АПК РФ к жалобе, подписанной представителем, прилагается доверенность, подтверждающая его полномочия на обжалование судебных актов, если она ранее не была представлена по данному делу.

В материалах дела отсутствует доверенность на Ашихмину М.М. с проставленным апостилем в установленном порядке в подтверждение ее полномочий на обжалование судебных актов от имени компании «Нэксиз Продактс Эл.Эл.Си.».

Согласно ч.1 ст.49, ст.50 АПК РФ полномочия представителя должны быть выражены в доверенности, выданной и оформленной в соответствии с законом.

Действующим законодательством не предусмотрено, что копия доверенностей удостоверяют полномочие.

Ст. 3 Гаагской конвенции (1961) не предусмотрено, что ксерокопия апостиля удостоверяет подлинность подписи, качества, в котором выступает лицо, подписавшее документ и подлинность печати и штампа, которым скреплен документ.

В соответствии со ст.11 Гаагской конвенции (1961), отменяющей требование о легализации иностранных официальных документов, на официальных документах, которые были совершены на территории одного из договаривающихся государств и должны быть представлены на территории другого договаривающегося государства, проставляется апостиль.

Таким образом, только доверенность с апостилем, проставленным в соответствии с требованиями Гаагской конвенции (1961) может служить надлежащим доказательством наличия у представителя Ашихминой М.М. полномочий на обжалование судебных актов от имени компании «Нэксиз Продактс Эл.Эл.Си.».

Поскольку кассационная жалоба подписана Ашихминой М.М. без приложения надлежащей доверенности с апостилем и такой доверенности с апостилем в материалах дела не имеется, отсутствуют доказательства полномочий Ашихминой М.М. на подписание кассационной жалобы от имени компании «Нэксиз Продактс Эл.Эл.Си.».

В нарушение ч.2 ст. 165, ст.166 АПК РФ к кассационной жалобе не приложено доказательство направления копии кассационной жалобы всем лицам, участвующим в деле.

В силу ст.30 ФЗ «О несостоятельности (банкротстве)» лицом, участвующим в деле, является арбитражный управляющий.

Доказательства направления копии кассационной жалобы внешнему управляющему Козыреву О.С. отсутствуют, и в реестре компании об отправке

A - 2058

3

заказных писем 08.10.2001, состоящем из 173 пунктов, отправка корреспонденции внешнему управляющему Козыреву О.С. не значится.

Учитывая изложенное, кассационная жалоба подлежит возврату заявителю.

Руководствуясь п.п.1, 3, 5 ч.1 ст. 168 Арбитражного процессуального кодекса Российской Федерации, суд

**О П Р Е Д Е Л И Л :**

**1.** В удовлетворении ходатайства о восстановлении срока подачи кассационной жалобы на определение от 21.08.2001 Федерального арбитражного суда Уральского округа по делу № А60-4517/00-С1 отказать.

**2.** Кассационную жалобу возвратить заявителю.

**3.** Возвратить заявителю из федерального бюджета государственную пошлину в сумме 500 руб., уплаченную по квитанции от 09.10.2001.

**4.** Определение может быть обжаловано в Федеральный арбитражный суд Уральского округа.

Судья                                                                                    Кондратьева Л.И.

A - 2059

**O R D E R**

**To Close Criminal Case**

City of Ekaterinburg                                        November 24, 2001

V. V. Nikiforov, a Lieutenant of Justice, an Investigator of the Main Investigation

Unit ["GSU"] of GUVD [the Department of the Interior] for Sverdlovsk Region, has

reviewed the materials of the criminal case # 323909, and

DETERMINED:

On May 25, 2001, the Chief Assistant General Prosecutor of the Russian

Federation, a State Counsel of Justice 2nd class T. A. Parkhomenko issued an order to

open a criminal case on the theft of property and intentional bankruptcy of OAO

Kachkanarsky ore mining and processing plant Vanadii ("OAO KGOK"), the elements of

the crimes under sections 160(3) and 196 of the Criminal Code of the Russian Federation.

(Docket Volume 1, pp. 1-6).

This criminal case was sent for preliminary investigation to the GSU of the

Sverdlovsk Region GUVD, and I accepted it for investigation on July 3, 2001.

In the course of the investigation, the following was determined:

A. A. Kozitsyn was elected the General Director of OAO KGOK by the decision

of the Board of Directors of January 28, 2000. (V. 3, p. 13).

On February 1, 2000, he issued a power of attorney to act on behalf of OAO

KGOK to his first deputy A. G. Gruzdev (order # 206, dated August 9, 1999, v. 1, p. 107)

valid through January 1, 2001.  This power of attorney was issued in accordance with the

requirements of the civil legislation of the Russian Federation – it was signed by the

A - 2060

director, with the seal of the legal entity attached. By said power of attorney, A. G. Gruzdev was empowered, inter alia, to perform all types of actions allowed by the Civil Code of the Russian Federation on behalf of the issuer of the power of attorney, including signing contracts, issuing powers of attorney, issuing and signing, on behalf of the issuer of the power of attorney, promissory notes. (V. 1, p. 134).

The order to open criminal case refers to a notarized power of attorney dated March 21, 2000 issued by Kozitsin to Gruzdev (V. 3, p. 90). Proceeding from the testimony of Kozitsyn, that power of attorney was issued to allow the performance of transactions which required notarization, in addition to the one of February 1, 2000, which did not include such authorization. (V. 1, p. 111).

Therefore, A. G. Gruzdev is a person authorized to perform any transactions on behalf of OAO KGOK. (V. 10, p. 204).

On February 1, 2000, the General Director's first deputy A. G. Gruzdev signed a Simple Partnership Agreement # 19/34-1-00-N with OAO Svyatogor, whereby OAO KGOK was obligated to make a contribution in the amount of 10 million U.S. Dollars, for the financing of the purchasing and processing of vanadium-bearing raw materials, and subsequent sales.

On February 4, 2000, OAO KGOK, represented by A. G. Gruzdev, signed a Credit Line Agreement # 10.3311.05-KL/00 with the AKB [Joint Stock Bank] Moskovsky Delovoi Mir ("AKB MDM"), according to which the latter contracted to extend credit to the former in the amount of 15 million U.S. Dollars. Under paragraph 5.2 of the Special Terms of that Agreement, the credit was to be extended upon furnishing a security in the form of the Surety Agreement # 23.331.05-P/00, the second party to which was OAO Svyatogor, and the Agreement # 22.3311.05/1-3/00 with OAO

A - 2061

KGOK to pledge equipment, both of which were signed on the same day. In accordance with the terms of the above Credit Line Agreement, on February 4, 2000 AKB MDM and OAO KGOK signed Supplemental Agreements ## 1 and 2 thereto, pursuant to which the bank contracted to loan to the borrower 5 million 100 U.S. Dollars until February 8, 2000, and 10 million U.S. Dollars until February 10, 2000, respectively.

On the same day, OAO KGOK, represented by A. G. Gruzdev, signed the Surety Agreement with OAO Svyatogor, whereby OAO Svyatogor undertook to act as a surety for OAO KGOK in its repayment of the credit of 15 million 100 U.S. Dollars to the bank, and, should the obligations of OAO KGOK to the bank be satisfied by OAO Svyatogor, OAO KGOK contracted to reimburse OAO Sviatogor for the expended funds. To ensure the performance of that contract, on February 4, 2000, OAO KGOK and OAO Svyatogor signed a Security Agreement for pledging as a collateral 36 straight interest-free promissory notes of OAO KGOK with the total face value of 72,000,000 roubles which, according to the Agreement, were to be conveyed by the pledgor to the pledgee under a conveyance and acceptance act, which was done on February 8, 2000.

On February 10, 2000, OAO KGOK, in performance of its duties under the Simple Partnership Agreement, transferred to OAO Svyatogor 286,200,000 roubles (10 million U.S. Dollars) by the payment order # 38.

On February 11, 2000, OAO Svyatogor, acting pursuant to the Surety Agreement and on the basis of the letters from AKB MDM dated February 8, 2000 and February 10, 2000 notifying it about the duty to perform its obligations under the Credit Line Agreement due to the failure to perform by OAO KGOK, by payment orders ## 412 and 413 transferred to the bank 285,998,267 and 148,570,756.49 roubles, respectively, for the principal debt and interest.

Subsequently, on February 21, 2000, OAO KGOK and OAO Svyatogor signed a Release Agreement. According to paragraph 3 of that Agreement, OAO KGOK transferred to OAO Svatogor the pledged promissory notes in exchange for a monetary consideration, thereby terminating its obligations under the Security Agreement between these two companies.

Thereafter, OAO Svyatogor sold these promissory notes to OOO Predpriyatie Lebaut under Contract # 8 dated February 21, 2000. On February 22, 2000, OAO Svyatogor and OOO Predpriyatie Lebaut signed a Supplemental Agreement to the above Contract whereby they evaluated the above notes at 434,059,000 rubles and set forth the term of payment of 6 months following the execution of the Contract.

On February 22, 2000, a Kachkanar notary S. N. Gornitsina issued a statement protesting the above promissory notes for non-payment by the issuer, due to the OAO KGOK's rejection to honor the notes presented OOO Predpriyatie Lebaut for lack of monetary funds.

On March 20, 2000, OAO Krasnouralskmezhraigaz filed a petition with the Arbitrazh Court of the Sverdlovsk Region seeking to declare OAO KGOK insolvent (bankrupt) for OAO KGOK's outstanding debt to Krasnouralskmezhraygas in the amount of 22,719,033.4 roubles for the supplied gas. On March 30, 2000, the Sverdlovsk Region Arbitrazh Court issued an order introducing the supervision procedure at OAO KGOK and appointing a provisional manager.

An outside expert institution conducted a forensic economic analysis of the above contractual relations of OAO KGOK. According to the experts' conclusion, the analysis of the executed agreements indicated that they complied with the existing market conditions and norms and usages of trade. (V. 10, p. 205).

Additionally, as indicated in the Conclusion of the FSFO [Federal Service for Financial Rehabilitation and Bankruptcy] of Russia on the Existence (Absence) of Indications of an Intended Bankruptcy of OAO KGOK, based on the information provided by ZAO Informational Agency FINMARKET with regard to the price quotes on the promissory notes of OAO KGOK for the period between February 8, 2000 and February 23, 2000, the average selling price of these promissory notes constituted 40% of the face value. Accordingly, the sale price of the promissory notes, and the terms of release, complied with the market prices for such notes. KGOK used monetary funds in the amount of 429,495,000 rubles received pursuant to the Credit Line Agreement with AKB MDM to pay off the arrears of wages, make current payments to the budget and off-budget funds, and to pay off the debt for the supplied goods and electricity. In addition, funds in the amount of 286,200,000 rubles were transferred as a contribution under the agreement for the joint activity on the project of the "Production of Vanadium Quintoxide". (V. 10, p. 166).

During the investigation, it was determined that the amount of the contribution under the above joint activity agreement was justified, both technically and economically. It was used for the research conducted by the scientific industrial research center "Uralmekhanobr-Engineering", which is confirmed by the chief chemist of OAO Svyatogor A. I. Martynov. (V. 9, pp. 1-2, 13).

A theft consists of an unlawful taking and (or) conversion, without compensation, of the property of another for the benefit of the perpetrator or other persons, which caused damage to the owner of that property or another person in possession.

A taking is an alienation, a severance of a part of the property from the total of the property in the owner's possession. As a result of such taking, the property is actually

removed from the possession of the owner and isolated from other property, which deprives the owner of the actual possibility to posses, use and dispose of the property at his discretion.

With regard to the transfer of monetary funds as a contribution under a simple partnership (joint venture) agreement, it should be noted that such funds in fact are not taken from the owner's possession, and are not converted by anyone, because, according to Article 1043(1) of the Civil Code of the Russian Federation, the partners' contribution of their own property which they owned, as well as the output, products and revenues received as a result of such joint activity, are deemed as the jointly owned property of the partners. Pursuant to paragraph 3 of Article 1050 (2) of the Civil Code of the Russian Federation, a division of property jointly owned by the partners, and of their joint claims, is be performed in the order prescribed by Article 252 of the Civil Code of the Russian Federation. Moreover, this financial transaction was recorded in both partners' accounting books. Based on the above provisions, there is no basis to discuss the mandatory elements of a theft, the unlawfulness and the absence of compensation. (V. 1, pp. 129-133, v. 8, pp. 195-204, v. 10, pp. 200-201). Thus, this transfer cannot be considered to contain the elements of the crime defined by Article 160 (3) of the Criminal Code of Russian Federation.

Criminal law defines embezzlement as conversion of the property temporarily entrusted to the perpetrator, and the establishment by the perpetrator of an unlawful possession. Pursuant to this provision, it would be reasonable to state that a crime was committed only if it can be established that Kozitsin and Gruzdev illegally possessed promissory notes for the total face value amount of 720,000,000 roubles, which OAO KGOK transferred to OAO Svyatogor under the Release Agreement, which were

subsequently transferred to OOO Predpriyatie Lebaut. However it was established in the course of the investigation that neither Kozitsin, nor Gruzdev are the shareholders or the owners of the beneficiary companies, i.e. OAO Svyatogor and OAO Predpriyatie Lebaut. This assertion is confirmed by the seized register of shareholders pf OAO Svyatogor and by-laws of OOO Predpriyatie Lebaut, and the testimony of the Director of OOO Predpriyatie Lebaut A. A. Menshikov, who stated that he did not know Kozitsin or Gruzdev. (V. 8, pp. 65-67, 70-153, 154-178).

An intentional bankruptcy consists of an intentional creation or an aggravation of insolvency by the manager of the company, which entails criminal liability if these actions resulted in substantial harm to: persons to whom the debtor is indebted for the payments for personal injury; wages; to the state - in connection with debts on payments to the budget; or if these actions caused grave consequences which resulted in violations of labor and social rights of employees.

An aggravation of insolvency occurs by execution of deliberately unfavorable transactions the financial results of which are recorded as losses of the company.

A report prepared by OOO Dalex-M upon request of OOO Leneks, attached to the record of the case, indicated that Kozitsin deliberately failed to reflect the losses from the transactions with the promissory notes of OAO KGOK in the amount of 501,630,977 roubles in the accounting books in order to conceal his actions which were aimed at an intentional bankruptcy of NKAZ and stopping the activity of the company, without arising anybody's suspicion. (V. 6, pp. 7-16).

This assertion contradicts the conclusion of an expert EKU of the Federal Service on Insolvency of Companies of the Russian Federation performed according to the letter of the head of the Main Department for Documentary Inspections of the Federal Service

on Insolvency of Companies # 3/2619 of October 20, 2000, which examined the effect of the recording in the KGOK's Balance of the discount on promissory notes in the amount of 501,630,977 roubles, which was recorded in line 270, "Other Liquid Assets," instead of line 475, "Uncovered Losses for the Reported Year" in the first quarter of 2000, on the overall financial results.

It was established in the course of that audit that OAO Kachkanar GOK Vanadiy issued the following interest-free promissory notes to its contractors: to OAO Svyatogor - notes # 3029917 – 3029952 with the total face value of 720,000,000 roubles, conveyed for 434,569,0123 roubles, with the discount in the amount of 285,430,977 roubles, which was reflected in the Release Agreement dated February 21, 2000; to OOO Ural Brokerage Agency - notes # 2834483 – 2834485 for the total face value of 237,990,000 roubles, conveyed for 79,330,000 rubles, with the discount of 158,660,000 roubles; to OOO Financial and Investment company Teksi-Stock - note # 3159986 with the face value of 86,310,000 roubles, conveyed for 28,770,000 roubles, with the discount of 501,098,977 rubles. The writing off of the discount amounts to the financial result of the issuer of notes must be connected with a fact of its business activity, such as the issuance of the promissory note, the presentation of the note for payment, the payment upon the note. The first two facts regarding the notes in question have already taken place, in the first quarter of 2000, the third is still pending.

The letter from the Ministry of Finance of the Russian Federation No. 142, "The Order of Entry of Transactions with Promissory Notes Into Accounting Ledgers and Financial Statements", dated October 31, 1994, regulates in detail the order of the write-off of the interest on the promissory notes for the note issuer and of the discount for the note holder but contains nothing about the discount for the note issuer. There are no

direct answers to this question in any other acts regulating the maintenance of accounting records. Therefore, it is necessary to establish that the system of accounting regulations presently in effect in the RF does not directly regulate the moment of the write-off of the discount for the note issuer (V. 10, pp. 119-133).

Thus, the conclusions of this examination do not reveal the existence of any discrepancies between the accounting records and the acting legislation or the system of accounting regulations. This conclusion was reflected in the findings of the independent forensic accounting examination. (V. 10, pp. 188-205).

Article 196 of the Criminal Code of the RF, along with the large-scale damages, contains a provision for other grave consequences causing violations of the workers' labor and social rights.

In relation to the situation in question, it is necessary to note that no such consequences had occurred. This fact is confirmed in the Certificates issued by the Human Resources and Labor Management of OAO KGOK in reference to the average number of workers /9623 in 1999 and 9954 in 2000/ and the average monthly wages /1793,9 roubles in 1999 and 3844.7 roubles in 2000/ (V. 8, pp. 4-5), as well as by the testimony of Ms. A.C. Zharikova, the Head of the above-noted Management, who confirmed that the number of specialists in the area of efficiency maintenance has grown under the new management (V. 8, p. 6).

Furthermore, the situation at OAO KGOK was examined by the Center for Business Law of the State and Law Institute, as to the issues presented by the Central Administration of the Federal Tax Police Service. The main conclusion of the expert opinion was that, in signing and executing the Credit Line Agreement No. 10.3311.05-KL/00, dated February 4, 2000 and any other agreements related thereto, certain

objective indications of an intentional bankruptcy may have been present. The same expert opinion also states that, if the objective of the Credit Line Agreement and any additional agreements related to it, as well as the Surety Agreement and the Release Agreement, was the creation or an increase of insolvency, then, according to Article 169 of the Civil Code of the RF, said transactions could qualify as effected in deliberate violation of the fundamentals of law and order (V. 10, pp. 134-141).

Thus, from the above-stated, it follows that the main criteria to qualify these transactions as unlawful actions is the purpose with which they were concluded.

The commission of a crime necessarily results in harm to the object protected by civil and criminal law. But it is not that each action, provided by the criminal law, is considered unlawful and subject to punishment/punishable/criminally liable. Under certain circumstances (conditions), the actions which objectively contain the elements of a crime, are not considered a crime and do not result in criminal liability. Although the actions performed do look, on their face, like criminally punishable liable actions, the fact is that they do not pose a security threat to the society and, moreover, in a number of cases, are useful in terms of the protection of the interests of an individual, the state, and the society. Specific conditions that eliminate the criminality of actions include such specific conditions that the harm caused by an individual, does not involve harm to an object protected by civil and criminal law, and the actions are not considered as crimes.

Pursuant to section 41(1) of the Criminal Code, causing damage to the interests protected by criminal law is not a criminal offence where it was caused because of taking a reasonable risk in seeking to achieve a socially useful purpose. The reasonableness of the risk, i.e. the legitimacy of the actions of an individual which caused the harm, is determined by a number of factors. First, under the law, these aspects are related to the

purpose of the actions of individual taking the risks – he must be acting with the purpose of achieving a socially useful purpose, i.e. must be acting for the benefit of many people or defending the interests of the of the society and the state.  Second, these aspects are related to the compelling nature of these actions, i.e., that the purpose of providing for the public well-being could not be achieved by means of actions unconnected with risks. Third, these aspects are concerned with the fact that the individual, who took the risk, also took sufficient measures to prevent the damage to the interests protected by criminal law. (See Article 41(2) of the Criminal Code).  In addition, the individual's taking of sufficient measures implies doing so under the subjective assessment of the circumstances of the risky actions, i.e., to avoid causing damage to other individuals, society and state, thatindividual must undertake the very measures which depended on him and, according to him, could help to achieve a socially useful purpose, and avoid possible damage.  At the same time, the individual is not required to undertake all measures that would be objectively sufficient in that situation to prevent harmful consequences of the risky actions, - if this were the case, the notion of "risk" would be deprived of any meaning.  Article 41(3) of the Criminal Code defines risk as unreasonable if it was known to entail a threat to the lives of many individuals, a threat of ecocatastrophe or social disaster, and if these damaging consequences ensued. Therefore, the purpose of preventing such consequences is socially useful in itself.

According to the decree of the Government of RF, OAO "KGOK" is considered to be socially and economically important. The declaration of D. A. Khaidarov indicates that this enterprise a "city-forming" enterprise and its bankruptcy may involve mass layoffs of the workers of the plant and an increase of social tensions. (V. 2, pp. 130-133).

According to the testimony of Kozitsin, as soon as he became of the General Director of OAO "KGOK," he found a difficult financial situation at the enterprise, caused by the non-receipt of monetary funds from the buyer for the products sold, such accounts receivable amounting to about 10-12 million U.S. Dollars. In order to prevent the shutdown of the enterprise, the management made a decision to finance. The bank set up a mandatory requirement of either a collateral or a guarantee. Upon a search for the guarantor, OAO "Svyatogor" agreed to act as a surety on the following conditions: the pledge of the promissory notes of OAO KGOK and expediting the implementation of the program for the manufacturing of vanadium quintoxide. Considering the existing situation, which could possibly lead to the total shutdown of the enterprise and, as a result, to a possibility of ecologically and socially dangerous consequences, the management of OAO KGOK accepted these conditions. In order to prevent the possibility of damage and to pay off the loan to the bank, the management undertook measures to restore payment schemes with the enterprises that were the buyers of the products of OAO KGOK as soon as possible. Thus, the management of KGOK and the General Director of the major buyer, OAO "NTMK," S. K. Nosov agreed on the prepayment for the products to be delivered to that company. He also believes that the taking of a loan from AKB MDM did not cause any harm to the employees, the social sphere of the enterprise and the municipal system of the town of Kachkanar. The current liabilities to OAO "Krasnouralskmezhraigaz" were paid in time, and its filing a complaint in the Sverdlovsk Region Arbitrazh Court was unexpected. (V. 1, pp. 111-113).

The above stated testimony is corroborated by similar testimonies of the following persons: A. G. Gruzdev A.G., the General Director of OAO "KGOK" (V. 1, p. 81-83); S. K. Nosov, the General Director of OAO NTMK (V. 8, p. 1); I. G.

Kudryashkin, the economic advisor (V. 1, pp. 114-116); V. G. Shishkin, General Director of OAO Krasnouralskmezhraigaz (V. 9, pp. 99-100).

Furthermore, according to the report of an independent forensic accounting expertise dated November 22, 2001, the following was concluded:

- there was no substantial decrease in the ratio of collateral/equity to debt during the examined period (from January 1, 1998 to July 1, 2001);
- the contracts examined corresponded to the existing market conditions and usages of trade.

Proceeding from the above, it follows that the indicators of an intentional bankruptcy are not present. (v. 10, pp. 188-205).

The circumstances of the case determined in the course of preliminary investigation present grounds for the conclusion that the actions of the executives of OAO KGOK A. A. Kozitsyn and A. G. Gruzdev should not be classified as a large scale embezzlement, nor as an intentional creation and increase of the insolvency of the plant, the elements of which crimes are defined sections 160(3) and 196 of the Criminal Code of the Russian Federation.

Proceeding from the above, and according to sections 5(1)(2) and 209 of the Criminal Procedure Code of the Russian Federation,

**ORDERED:**

1. The criminal case # 323909 against the General Director of OAO Kachkanarsky ore mining and processing plant Vanadii, A. A. Kozitsin and his first deputy, A. G. Gruzdev on the charges of large scale embezzlement and intentional

bankruptcy of OAO Kachkanarsky ore mining and processing plant Vanadii, the elements

of which crimes are defined sections 160(3) and 196 of the Criminal Code of the Russian

Federation, is hereby closed for lack of corpus delicti.

    2.        Inform all interested parties hereof, and explain to them their right to

appeal this Order.

    3.        Copy to the Procurator of Sverdlovsk Region.

Investigator of GSU at GUVD
Sverdlovsk Region
Lieutenant of Justice          /signature/          V. V. Nikiforov

**A - 2073**

ПОСТАНОВЛЕНИЕ
о прекращении уголовного дела

г.Екатеринбург                                    24 ноября 2001 года.

Следователь Главного следственного управления при ГУВД Свердловской области лейтенант юстиции Никифоров В.В., рассмотрев материалы уголовного дела № 323909,

УСТАНОВИЛ:

25 мая 2001 года Старшим помощником Генерального прокурора Российской Федерации государственным советником юстиции 2 класса Пахоменко Т.А. вынесено постановление о возбуждении уголовного дела о хищении чужого имущества и преднамеренном банкротстве ОАО «Качканарский горно-обогатительный комбинат «Ванадий» ( далее ОАО «КГОК» ) по признакам преступлений, предусмотренных ч.3 ст.160 и ст.196 УК РФ ( т.1 л.д. 1-6).

Настоящее уголовное дело направлено для организации предварительного следствия в ГСУ при ГУВД Свердловской области и 3 июля 2001 года принято мной к своему производству.

В ходе расследования установлено следующее:

Решением Совета директоров ОАО «КГОК» от 28.01.2000 года генеральным директором общества избран Козицын А.А ( т.3 л.д. 13 ).

1 февраля 2000 года им была выдана доверенность ОАО «КГОК» своему первому заместителю Груздеву А.Г. ( приказ № 206 от 9.08.99 г.; т.1 л.д. 107 ) сроком действия до 01 января 2001 года. Данная доверенность оформлена в соответствии с требованиями гражданского законодательства Российской Федерации — подписана руководителем и скреплена печатью юридического лица. Указанной доверенностью Груздев А.Г. помимо прочего уполномочен совершать от имени доверителя сделки всех видов, предусмотренные ГК РФ, в том числе подписывать договоры, доверенности, выдавать и подписывать от имени доверителя векселя ( т.1 л.д. 134 ).

В постановлении о возбуждении уголовного дела имеется ссылка на нотариально удостоверенную доверенность от 21 марта 2000 года, выданную Козицыным на имя Груздева ( т.3 л.д.90 ). Как следует из показаний Козицына, данная доверенность была выдана для совершения действий, требующих нотариального заверения в дополнение к имеющейся от 1 февраля 2000 года в момент выдачи которой не предполагалось совершения таковых действий ( т.1 л.д. 111 ).

Таким образом, Груздев А.Г. является уполномоченным на совершение любых сделок от имени ОАО «КГОК» лицом ( т. 10 л.д. 204 ).

A - 2075

1.02.2000 года Первый заместитель генерального директора Груздев А.Г. заключил с ОАО «Святогор» договор Простого Товарищества № 19/34-1-00-Н, согласно которого ОАО «КГОК» обязался в 1 квартале 2000 года внести вклад в размере 10 млн. долларов США для финансирования деятельности по закупу и переработке ванадийсодержащего сырья и последующей его реализации.

4.02.2000 года ОАО «КГОК», в лице Груздева А.Г. заключил договор о кредитной линии № 10.3311.05-КЛ/00 с АКБ «Московский Деловой Мир» (далее АКБ «МДМ»), согласно которому последний обязался предоставить первому кредит в размере 15 млн. 100 долларов США. В соответствии с п.5.2 особых условий договора кредит выдается при обеспечении в виде, заключенных в этот же день с АКБ «МДМ», договора поручительства № 23.3311.05-П/00, второй стороной по которому является ОАО «Святогор», и договора о залоге оборудования № 22.3311.05/1-3/00 ОАО «КГОК». В соответствии с условиями указанного договора о кредитной линии, 4.02.2000 года между АКБ «МДМ» и ОАО «КГОК», были подписаны дополнительные соглашения к нему за №1 и №2, на основании которых банк предоставил заемщику соответственно 5 млн.100 долларов США – на срок до 8.02.2000 года, и 10 млн. долларов США – на срок до 10.02.2000 года.

В этот же день ОАО «КГОК», в лице Груздева А.Г. заключил с ОАО «Святогор» договор о предоставлении поручительства, по условиям которого ОАО «Святогор» поручается перед банком за ОАО «КГОК» в обеспечение кредита на сумму 15 млн.100 долларов США, а ОАО «КГОК» в случае исполнения его обязательств перед банком за счет ОАО «Святогор», обязан возместить последнему все выплаченные средства. В обеспечение исполнения указанного договора между ОАО «КГОК» и ОАО «Святогор», 4.02.2000 года был заключен договор о залоге, предметом залога по которому являлись 36 простых беспроцентных векселей ОАО «КГОК» общей номинальной стоимостью 720000000 рублей, которые согласно условий договора должны быть переданы залогодателем залогодержателю по акту приема-передачи, что и было сделано 8.02.2000 года.

10.02.2000 года ОАО «КГОК» платежным поручением № 38 перечислил ОАО «Святогор» 286200000 рублей (10 млн. долларов США) во исполнение договора простого товарищества.

11.02.2000 года ОАО «Святогор», действуя на основании договора поручительства и писем АКБ «МДМ» от 8.02.2000 года и 10.02.2000 года, содержащих уведомление о необходимости исполнения обязательств по кредиту за неисполнившее их ОАО «КГОК», платежными поручениями №№ 412 и 413 перечислил банку соответственно 285 998 267 и 148 570 756,49 рублей основного долга и процентов за пользование кредитом.

Затем 21 февраля 2000 года между ОАО «КГОК» и ОАО «Святогор» было заключено соглашение об отступном, п.3 которого предусмотрено, что ОАО «КГОК» взамен возмещения денежными средствами, передает ОАО «Святогор» заложенные векселя, тем самым прекращая обязательства по

договору между указанными предприятиями о предоставлении поручительства.

Впоследствии ОАО «Святогор» по договору № 8 от 21.02.2000 года продал указанные векселя ООО «Предприятие «Лебаут», с заключением 22.02.2000 года дополнительного соглашения к указанному договору, которым векселя оценены в 434 059 000 рублей и установлен срок оплаты в течение 6 месяцев после заключения договора.

22.02.2000 года нотариусом г.Качканара Горницыной С.Н. составлен акт, согласно которому в связи с отказом ОАО «КГОК» от оплаты векселей, в виду отсутствия денежных средств, предъявленных ему ООО «Предприятие «Лебаут», нотариус протестует указанные векселя и неплатеж против векселедателя.

В марте 2000 года ОАО «Красноуральскмежрайгаз» предъявил в Арбитражный суд Свердловской области иск о признании несостоятельным (банкротом) ОАО «КГОК» в связи с задолженностью последнего за услуги по транспортировке газа на сумму 22 719 033,4 рубля. 30.03.2000 года Арбитражный суд Свердловской области вынес определение, которым на ОАО «КГОК» введено наблюдение и назначен временный управляющий.

Указанные договорные отношения ОАО «КГОК» были подвергнуты исследованию в рамках проведенной судебно-экономической экспертизы вне экспертного учреждения. Согласно заключению экспертов, анализ заключенных договоров выявил их соответствие сложившимся рыночным условиям, нормам и обычаям делового оборота ( т.10 л.д. 205 ).

Кроме того, как указано в Заключении ФСФО России о наличии (отсутствии) признаков преднамеренного банкротства ОАО «КГОК», в соответствии с информацией ЗАО «Информационное агентство ФИНМАРКЕТ» по котировке векселей ОАО «КГОК» в период с 8.02.2000 г. по 23.02.2000 г. средняя цена продажи векселей составила 40% от стоимости номинала. Таким образом, продажная цена векселей и условия об отступном соответствуют рыночной котировке векселей. Полученные по договору о кредитной линии с АКБ «МДМ» денежные средства в объеме 429495000 рублей использовались ОАО «КГОК» для погашения задолженности по заработной плате, текущих платежей в бюджет и во внебюджетные фонды, на погашение кредиторской задолженности по поставленным товарам и электроэнергии, а также сумма 286200000 рублей передана в качестве вклада по договору о совместной деятельности по проекту « Производство пятиокиси ванадия». ( т.10 л.д. 166 )

В ходе следствия установлено, что сумма вклада по вышеуказанному договору о совместной деятельности является технико-экономически обоснованной, нашла отражение в исследованиях научно-проектного производственного центра «Уралмеханобр-инжениринг», а также подтверждается показаниями главного химика ОАО «Святогор» Мартынова А.И. ( т.9 л.д.1-2, 13 )

Объективная сторона хищения выражается в противоправных безвозмездном изъятии и (или) обращении чужого имущества в пользу виновного или других лиц, причинившее ущерб собственнику или иному владельцу этого имущества.

Изъятие означает отторжение, обособление части имущества от общей имущественной массы, находящейся в обладании собственника. В результате изъятия имущество фактически выводится из владения собственника, обособляется от другого имущества, что лишает собственника фактической возможности владеть, пользоваться и распоряжаться имуществом по своему усмотрению.

Применительно к факту передачи денежных средств в качестве вклада по договору простого товарищества (о совместной деятельности) необходимо отметить то, что они фактически не выводятся из владения собственника и не обращаются в чью либо пользу, так как в соответствии с п. 1 ст. 1043 ГК РФ внесенное товарищами имущество, которым они обладали, на праве собственности, а также произведенная в результате совместной деятельности продукция и полученные от такой деятельности плоды и доходы признаются их общей долевой собственностью. В соответствии с абзацем 3 п. 2 ст. 1050 ГК РФ раздел имущества, находившегося в общей собственности товарищей, и возникших у них общих прав требования осуществляется в порядке, установленном статьей 252 ГК РФ. Кроме того, данная финансовая операция нашла отражение в бухгалтерском учете обоих товарищей. Исходя из указанных положений также нет оснований говорить и об обязательных признаках хищения — незаконности и безвозмездности ( т.1 л.д. 129-133, т.8 л.д. 195-204, т.10 л.д. 200-201 ). Таким образом, данный факт нельзя рассматривать как содержащий признаки состава преступления, предусмотренного ч.3 ст.160 УК РФ.

Уголовным законом установлено, что присвоение выражается в обособлении вверенного виновному имущества и установлении над ним его незаконного владения. Согласно данного положения, утверждение о совершении преступления обосновано лишь в случае установления факта незаконного владения Козицыным и Груздевым, переданными ОАО «КГОК» по соглашению об отступном ОАО «Святогор», а в дальнейшем и реализованными ООО «Предприятие Лебаут» векселями, на общую номинальную сумму 720000000 рублей. Однако, в ходе следствия установлено, что ни Козицын ни Груздев не являются акционерами и собственниками предприятий выгодоприобретателей, то есть ОАО «Святогор» и ООО «Предприятие Лебаут». Данное утверждение подтверждается, изъятыми в ходе выемок, реестром акционеров ОАО «Святогор» и учредительными документами ООО «Предприятие Лебаут», а также показаниями директора ООО «Предприятие Лебаут» Меньшикова А.А. о том, что он не знаком с Козицыным и Груздевым ( т. 8 л.д. 65-67, 70-153, 154-178)

Объективная сторона преднамеренного банкротства состоит в умышленном создании или увеличении неплатежеспособности, руководителем организации, которое влечет уголовную ответственность при условии причинения этими действиями крупного ущерба, который может быть причинен: гражданам, перед которыми должник несет ответственность по выплате за нанесенный вред здоровью, з/платы; государству — в связи с задолженностью по выплатам в бюджет; либо иных тяжких последствий, повлекших нарушение трудовых и социальных прав работников.

Увеличение неплатежеспособности происходит путем совершения заведомо невыгодных сделок с отнесением финансовых результатов на убытки предприятия.

В имеющемся в материалах дела, подготовленном ООО «Далекс-М» по заказу ООО «Ленекс», заключении указано, что Козицын при составлении бухгалтерской отчетности, чтобы скрыть свои действия по преднамеренному банкротству и намерения по приостановке деятельности предприятия, не вызывая при этом оснований для беспокойства у третьих лиц, намеренно не отразил убыток от операций с векселями ОАО «КГОК» в размере 501630977 рублей ( т.6 л.д. 7-16 ).

Данное утверждение противоречит заключению специалиста ЭКУ ФСНП РФ, выполненное по письму Начальника Главного управления документальных проверок ФСНП РФ № 3/2619 от 20.10.2000 г., в котором исследовано влияние на финансовый результат отнесение в бухгалтерском балансе ОАО «КГОК» дисконта по собственным векселям на сумму 501.098.977 рублей включенную в строку 270 «Прочие оборотные активы» вместо строки 475 «Непокрытый убыток отчетного года», за период первого квартала 2000 г.

В ходе исследования установлено, что ОАО «Качканарский ГОК «Ванадий» выдал своим контрагентам собственные беспроцентные векселя: в адрес ОАО «Святогор» №№ 3029917 –3029952 на общую номинальную сумму 720.000.000 рублей за 434.569.023 рублей, дисконт по которым составил 285.430.977 рублей, о чем оформлено Соглашение об отступном от 21.02.2000 г.; в адрес ООО «Уральское брокерское агентство» №№ 2834483 – 2834485 на общую номинальную сумму 237.990.000 рублей за 79.330.000 рублей, дисконт по которым составил 158.660.000 рублей; в адрес ООО «Финансовая инвестиционная компания «Тэкси-Сток» № 3159986 номинальной стоимостью 86.310.000 рублей за 28.770.000 рублей, дисконт по которому составил 57.008.000 рублей. Таким образом суммарный дисконт по указанным векселям составил 501.098.977 рублей. Списание сумм дисконта на финансовый результат у векселедателя должно быть увязано с каким-либо фактом его хозяйственной деятельности, которыми могут быть: выдача векселя, предъявление векселя к оплате, оплата векселя. Первые два факта в отношении исследуемых векселей на период первого квартала 2000 г. уже имели место, третий — еще не свершился.

Письмо Министерства финансов РФ № 142 от 31.10.1994 г. «О порядке отражения в бухгалтерском учете и отчетности операций с векселями»

подробно регламентируется порядок списания процентов по векселям у векселедателя и дисконта у векселеполучателя, но ничего не говорит относительно сумм дисконта у векселедателя. Нет прямого ответа на данный вопрос и в других нормативных актах по бухгалтерскому учету. Таким образом, необходимо констатировать, что действующая в РФ система нормативного регулирования бухгалтерского учета прямо не регламентирует момент списания сумм дисконта у векселедателя ( т.10 л.д. 119-133 ).

Таким образом, выводы данного исследования не содержат фактов несоответствия бухгалтерского учета действующему законодательству и системе нормативного регулирования бухгалтерского учета. Настоящее утверждение нашло отражение в заключении судебно-экономической экспертизы вне экспертного учреждения ( т.10 л.д. 188-205 ).

Диспозицией ст.196 УК РФ наряду с причинением крупного ущерба предусмотрено наступление иных тяжких последствий, повлекших нарушение трудовых и социальных прав работников.

Применительно к рассматриваемой ситуации, необходимо отметить, что таковых последствий не наступило. Данный факт подтверждается справками управления труда и кадров ОАО «КГОК» о среднесписочной численности работников / 9623 чел. в 1999 г. и 9954 чел. в 2000 г. / и осреднемесячной заработной плате 1793,9 руб. в 1999 г. и 3844,7 руб. в 2000 г. / ( т.8 л.д. 4-5 ), а также показаниями начальника указанного управления Жариковой А.А., пояснявшей, что с приходом нового руководства была увеличена численность специалистов в области поддержания работоспособности предприятия ( т.8 л.д. 6 ).

Кроме того, ситуация возникшая в ОАО «КГОК» была исследована, по поставленным Главным управлением ФСНП РФ вопросам, Центром предпринимательского права Института государства и права. Общий вывод заключения сводится к тому, что в действиях по заключению и исполнению договора о кредитной линии № 10-33 11.05 КЛ00 от 1.02.2000 г. и связанным с ним соглашений могут присутствовать объективные признаки преднамеренного банкротства. В данном заключении также указано, что если исходить из предпосылки о том, что целью договора о кредитной линии, дополнительных соглашений к нему, договоров о предоставлении поручительства, залога и соглашения об отступном являлось создание или увеличение неплатежеспособности, то названные сделки могли бы быть согласно ст. 169 ГК РФ квалифицированы как совершенные с целью заведомо противной основам правопорядка ( т.10 л.д. 134-141 ).

Таким образом, из вышесказанного следует, что основным критерием, оказывающим влияние на отнесение или не отнесение данных сделок к преступному деянию, является цель их совершения.

При совершении преступлений непременно причиняется вред объекту уголовно-правовой охраны. Однако на всякое совершение деяния, предусмотренного уголовным законом, рассматривается в качестве преступного и наказуемого. При наличии определенных обстоятельств

(условий) действия, объективно содержащие признаки состава преступления, не признаются преступлением и не влекут уголовной ответственности. Несмотря на то, что совершенные действия внешне выглядят как уголовно наказуемое деяние, фактически они не представляют общественной опасности и, более того, в ряде случаев являются полезными с позиции охраны интересов личности, общества и государства. Обстоятельствами, исключающими преступность деяния, признаются такие специфические условия, которые указывают на то, что причинение лицом вреда не образует посягательства на объекты уголовно-правовой охраны и содеянное не рассматривается в качестве преступления.

Согласно ч.1 ст.41 УК, не является преступлением причинение вреда охраняемым уголовным законом интересам при обоснованном риске для достижения общественно полезной цели. Обоснованность риска, то есть правомерность действий лица, причиняющего вред, определяется рядом условий. Которые закон прежде всего связывает, во-первых, с целью действий рискующего лица — оно должно стремиться к достижению общественно полезной цели, то есть должно стремиться обеспечить благо многих людей либо отстаивать интересы общества и государства. Во-вторых, с вынужденностью действий, означающей, что цель обеспечения общественного блага не могла быть достигнута не связанными с риском действиями. В-третьих с тем, что лицо допустившее риск, предприняло достаточные меры для предотвращения вреда, охраняемым уголовным законом интересам ( ч.2 ст. 41 УК). Причем, принятие лицом достаточных мер означает, главным образом, внутреннюю (субъективную) оценку обстоятельств рискованных действий, то есть лицо должно предпринять именно те меры для предотвращения вреда интересам третьих лиц, общества и государства, которые в данной ситуации от него зависели и, по его мнению, были способны привести к социально полезной цели, при этом исключив возможный вред. Вместе с тем отнюдь не требуется, чтобы лицо предприняло все объективно достаточные в сложившейся ситуации меры для недопущения вредных последствий рискованных действий: если бы это было так, то всякое понятие риска утратило бы свой смысл. Ч.3 ст. 41 УК устанавливает, что риск не признается обоснованным, если он заведомо был сопряжен с угрозой для жизни многих людей, с угрозой экологической катастрофы или общественного бедствия и данные вредные последствия наступили. Следовательно, сама по себе цель предотвращения таких последствий является общественно полезной.

ОАО «КГОК» постановлением Правительства РФ отнесено к имеющим большое социально-экономическое значение. В заявлении Хайдарова Д.А. указано, что данное предприятие является градообразующим и его банкротство может повлечь за собой массовые увольнения среди рабочих комбината и обострение социальной напряженности ( т.2 л.д. 130-133 ).

Как следует из показаний Козицына, приступив к исполнению обязанностей генерального директора ОАО «КГОК» он обнаружил, что на предприятии сложилась сложная финансовая ситуация, связанная с