UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

BASE METAL TRADING SA et al

           **Plaintiffs**

      v.

RUSSIAN ALUMINUM et al.

           **Defendants**

Docket No. 00 Civ. 9627

---

### DECLARATION OF TATIANA YASTREBOVA

I, Tatiana D. Yastrebova, pursuant to the provisions of 28 U.S.C. §1746, herby declare as follows:

1.     I am a citizen and resident of the Russian Federation.

2.     I submit this Declaration to explain the true financial situation of the Open Joint Stock Company Kachkanarsky Metallurgical Ore Combine "Vanadium" ("GOK") prior to the initiation of bankruptcy proceedings, and at the time of the claim-related correspondence between Krasnouralskmezhraygaz (Krasgaz) and GOK.

**MY BACKGROUND**

3.     I have a degree in metallurgical engineering from Ural Polytechnic Institute as well as qualification certificates, which allow me to perform company audits and audits of stock exchanges, investment funds, non-budgetary funds and investment institutions. I have been working as an economist on ferrous metallurgy enterprises for more than twenty years. I have also been performing the duties of an accountant and auditor for over nine years.

1

4.    The following identifies my employment as an economist (accountant and auditor):

| | |
|---|---|
| 1999-present | Director General<br>Auditing firm OOO Dalex-M |
| 1995-1999 | Auditor, Director on Audit<br>Auditing firm OOO Metro EK. |
| 1994-1995 | Auditor of 1st category.<br>Auditing firm AOZT Yunikon/ms Consulting Group |
| 1993-1994 | Chief Specialist-Accountant of Economical Department<br>Russian Federation Committee on Precious Metals and Precious Stones,<br>Department Roszoloto. |
| 1991-1993 | Deputy Head of Economical Department<br>RSFSR Ministry of Industry, Concern Tyazhtsvetmet. |
| 1988-1991 | Deputy Head of Advance Planning Department.<br>USSR Ministry of Metallurgy, Concern Tyazhtsvetmet. |

5.    I have had personal experience with audits of GOK. During the period of March 25, 2000 through June 30, 2000, I was the supervisor of an audit[1] of GOK's accounts payable and investments for the period of the first quarter of 2000. In the course of this audit,[2] I became familiar with the accounting books and original documents of GOK.

6.    I have been asked to provide the present declaration to describe the financial condition of GOK in the period prior to the dismissal of Director General Khaidarov and to discuss GOK's ability to pay during the time period in which Krasgaz and the new Director General of GOK Kozitsin exchanged correspondence.

---

[1]    An "audit" is defined herein as an independent examination performed by an auditor to determine the degree of reliability of the accounting of an economic entity.

[2]    This audit of submitted accounts and original documents was performed in accordance with the applicable rules and principles governing auditing activity, which in conformity with the Rule (Standard) of audit activity "Objectives and main principles connected with audit of financial accounts" approved by Commission on auditing with the President of the RF August 20, 1999, include independence, honesty, objectivity, good faith, professional competence, and confidentiality.

2

A - 2315

7.    I also was asked to examine the distortion of accounts on GOK's balance sheet for the first quarter of 2000 and to evaluate the inaccuracy of the data in the Report of GOK's financial condition, which was prepared by the Sverdlovsk regional branch of TA FSDN, as well as in the Conclusion reached by the experts at the Department of Support of Judicial Proceedings of FSFO concerning the presence (absence) of signs of intentional bankruptcy.

**EVALUATION OF GOK'S FINANCIAL CONDITION IN 1995-1999**

8.    From 1995 to 1998, GOK operated at a total loss in the amount of 642.9 million rubles (about 23 million dollars)[3] including 183 million rubles (more than 6,5 million dollars) in the year 1998. In 1997 and 1998, GOK was on the verge of bankruptcy, which is confirmed by other data of the balance sheet of the enterprise as of January 1, 1999. [Exhibit 1].

9.    There was a significant amount of indebtedness, which equaled approximately 4 billion rubles (about 143 million dollars), including:

> (i) indebtedness to budgets of all levels and non-budgetary funds in the amount of 845 million rubles (more than 30 million dollars), and fines and penalties in the amount of 500 million rubles (about 18 million dollars) for non-payment over the last 4 years;
>
> (ii) unpaid salary in the amount of 63 million rubles (about 3 million dollars) covering a 5 month period;
>
> (iii) indebtedness to suppliers and contractors in excess of 3 billion rubles (more than 107 million dollars); and
>
> (iv) borrowed funds in the amount of 81 million rubles (about 3 million dollars).

---

[3] Conversion of monetary sums specified in the Russian rubles into US dollars was carried out at the rate 28 rubles = 1 US dollar (the average rate of ruble with respect to US dollar for year 2000).

A - 2316

10.    According to the balance sheet for 1999 [Exhibit 2], total losses of the company as of December 31, 1999 amounted to 670 million rubles (about 24 million dollars). Only 27.1 million (less than 1 million dollars) of this amount reflects the losses incurred by GOK in 1999, which relates to damages sustained as a result of an accident caused by the shut-down of electricity at GOK in October 1999.

11.    The fact that the company's losses in 1999 were 8 times less than its losses in 1998 (183 million rubles) is evidence that GOK's financial situation in 1999 improved significantly.

12.    GOK's balance sheet dated December 31, 1999 shows that

(i)   overall production and sales increased by 150% over 1998, and there was a 112% increase on rolled briquettes;

(ii)  there was profit in the amount of 154 million rubles;

(iii) there was a 2.4-fold reduction in the total amount of accounts payable, a 3.6-fold reduction of indebtedness to budgets, and a 4.4-fold reduction of indebtedness on salary;

(iv)  value of net assets increased 2.5 times (358 million rubles or 12,8 million dollars).

13.    Thus, in 1999 GOK achieved the best results basically in all parameters for the last five years.

## SOLVENCY OF GOK AS OF THE MOMENT OF EXCHANGE OF CLAIM-RELATED CORRESPONDENCE WITH KRASGAZ

14.    According to the balance sheet, as of the end of 1998, GOK had indebtedness to Krasgaz in the amount of **67.7** million rubles [Exhibit 1]

4

A - 2317

15.    The indebtedness of GOK to Krasgaz was in the process of being eliminated. In 1999, GOK paid **45** million rubles (1,6 million dollars) to Krasgaz for gas supplied under the agreement of January 24, 1997. As a result, indebtedness was reduced to **22.7** million rubles (810,000 dollars).

16.    Payments for gas supplied in 1999 were made in full.

17.    In the end of 1999, GOK and Krasgaz entered into an oral agreement according to which the already substantially reduced debt was to be repaid. Notwithstanding this, on February 4, 2000, shortly after the replacement of GOK's management, Krasgaz sent a claim to Kozitsin, the Director General of GOK, demanding that GOK pay off the above debt. [Exhibit 3]

18.    On the date the claim was submitted to GOK, GOK had funds sufficient to pay off the debt and could have avoided bankruptcy by paying off the debt to Krasgaz. According to the attached extracts from GOK's bank account # 40702810200000005075/RUR in the Ural Bank of Reconstruction and Development, the remainder of funds as of February 4, 2000 equaled **28 million rubles** (1 million dollars) [Exhibit 4]. In addition, on February 4, 2000, GOK received a first installment on its credit line in the amount of **143.8 million rubles** (more than 5 million dollars) [Exhibit 5] pursuant to GOK's credit line agreement with AKB MDM [Exhibit 6], and on February 7, 2000, GOK received a second installment in the amount of **287.7 million rubles** (more than 10 million dollars) [Exhibit 7].

19.    In spite of the fact that GOK had in its bank account funds nineteen times greater than the amount the of indebtedness to Krasgaz, on February 8, 2000, Mr. Kozitsin acknowledged the existence of indebtedness in full, but refused to pay off the debt "because of lack of monetary funds at GOK" [Exhibit 8].

5

20.    On February 15, 2000, Krasgaz sent the claim for the second time, requesting

GOK to pay off the debt [Exhibit 9]. However, despite the availability of the funds exceeding

107 million rubles (more than 3,8 million dollars) in GOK's accounts funds as of February 15,

2000 [Exhibit 11] and funds exceeding 60.5 million rubles (more than 2 million dollars) as of

February 21, 2000 [Exhibit 12]  February 21, 2000  Kozitsin rejected the claim [Exhibit 10].

21.    Moreover, in spite of the existence of sufficient funds in GOK's accounts,

Kozitsin did not pay off the debt, and instead, on February 10, 2000, sent available monetary

funds in the amount of 286 million rubles (more than 10 million dollars) to OAO Svyatogor for

unclear purposes.  This is reflected as investments in other companies on line 143 of the balance

sheet for the 1st quarter of 2000 [Exhibit 13].

**22.**    From the facts,stated above, it follows that at the moment of presentation of

Krasgaz' claims for payment of debts, GOK had available funds to pay off the debts and to avoid

the bankruptcy proceedings.


## DISTORTION OF ACCOUNTS IN GOK'S BALANCE SHEET FOR THE FIRST QUARTER OF 2000


23.    On January 28, 2000 GOK and OAO Svyatogor entered into a joint venture

agreement pursuant to which GOK paid Svyatogor US $10 million [Exhibit 14].

24.    The next week, February 4, 2000 GOK received from AKB MDM an

economically irrational loan in the amount of US$ 15 million (432 million rubles) for a term of

10 days in accordance with credit line agreement # 10.3311.05-ÊL/00 and two additional

agreements thereto [Exhibit 6].  ÎÀÎ Svyatogor acted as a guarantor for GOK [Exhibit 15],

6

which in turn, provided a pledge to Svyatogor in the form of promissory notes with a total face

value of 720 million rubles (25 million dollars)  [Exhibit 16].

25.    On February 10, 2000 GOK transferred 286.2 million rubles [Exhibit 17] (more

than 10 million dollars) of the loaned funds to OAO Svyatogor under the contract of joint

venture [Exhibit 14].  After GOK refused to repay the funds to AKB MDM, which had

demanded their return, Svyatogor paid off GOK's debt to AKB MDM in the amount of 435

million rubles (15 million dollars) as provided by the guarantee agreement.  The same day, GOK

transferred the pledged promissory notes with face value of 720 million rubles (25 million

dollars), i.e. at discount of 285 million rubles (more than 10 million dollars) [Exhibit 18].

26.    Shortly after, ÎÀÎ Svyatogor transferred the GOK promissory notes to the

company ÎÎÎ Predpriyatie Lebaut, which after purchases of GOK promissory notes from other

companies, had become GOK's major creditor. Lebaut then submitted  the notes for payment at

face value, which exceeded 1,096 million rubles (or 39 million dollars)[4] [Exhibit 19].

27.    As a result of the above transactions involving the promissory notes, GOK

**incurred losses** in the amount of 501 million rubles. These losses **were not reflected in GOK's**

**report on profits and losses** for the reported period.  This omission resulted in distortion of the

financial report for the 1st quarter of 2000, as well as distortion of indexes of the net assets and

financial solvency of GOK.

28.    Pursuant to the current legislation, the issuer of promissory notes is required to

write off the amount of the discount  -- when the notes are issued at a discount -- and to reflect it

---

[4] As of January 28, 2000 the major creditors of GOK owning in total 54 per cent of GOK's accounts
payable were OOO "Polyprom", OOO "Lenex", OOO "Metaltorg", OOO "Nexis", Northwest
Systems Ltd, Nexis Products LLC. As a result of the credit received and operations with promissory
notes OOO "Predpriyatie Lebaut" became the major creditor of GOK (37 per cent of GOK's accounts
payable according to GOK's balance sheet for the 1st quarter of year 2000).

A - 2320

on the "account for profits and losses" at the moment the promissory notes are issued.[5]  Failure

to do so constitutes a violation of the legislation on bookkeeping currently in force.

29.    Here, the regulations were not followed.  The documents confirm that the notes

were issued and submitted for payment in the same accounting period.  Further, the amount of

the expense and the amount by which profit was reduced also are known figures.  This means

that the expenses/losses[6], which resulted from the notes being issued at a discount in the amount

of 501 million rubles, date back to the 1st quarter of 2000.  Despite this, the financial results for

the first quarter of 2000 did not reflect the promissory note transaction described above.

30.    Indeed, had GOK properly shown a 501 million ruble loss relating to the notes,

the balance sheet would have reflected losses in the amount of 200,000,000 rubles, rather than

showing a profit.  The 501 million ruble loss was, instead, intentionally reflected not as losses,

but as other working assets of the company.

31.    In my opinion, GOK's accounting data were deliberately distorted with one

purpose -- to conceal the signs of the intentional bankruptcy.

## INACCURACY OF CONCLUSIONS IN THE FINANCIAL ANALYSIS PERFORMED BY TA FSDN RF ON SVERDLOVSK REGION

---

[5]    Instruction on application of the "Plan of accounts for accounting of financial and economical activity of companies" (approved by the order of the USSR Finance Ministry of November 1, 1991 # 56) (with changes of December 28, 1994, July 28, 1995, March 27, 1996, February 17, 1997.) [Exhibit 20]

[6]    Pursuant to §§ 16-18 of Regulations on accounting «Expenditures of the company», approved by the order of the Russian Federation Finance Ministry dated May 6, 1999 # 33n, expenditures shall be recognized in the accounting if the following conditions are present: an expenditure shall be made in accordance with particular agreements or legislation; the amount of the expenditure is capable of being determined; there is confidence that a particular transaction will result in reduction of economic benefits to the organization. Expenditures shall be acknowledged in accounting irrespective of the intent to receive proceeds, operational or other profit, and irrespective of the form of expenditure (monetary, payment in kind).  Expenditures shall be recognized in the same reported period in which they took place, irrespective of the time of actual payment of funds or other form of implementation.

8

32.    TA FSDN RF for the Sverdlovsk Region conducted an analysis of GOK's

financial condition at the request of GOK's provisional manager, O.S. Kozyrev (the "Analysis").

The Analysis was performed on the basis of the distorted accounting information described

above, and served as the grounds for confirming the unsatisfactory financial situation at GOK

and for justifying the introduction of external management.

33.    The fact that the analysis was performed using inaccurate accounting information

of GOK, and various mistakes made by ÒÀ FSDN RF, resulted in the distortion of major

financial indexes within the Analysis, namely:

(i)    information on indebtedness to budget and non-budgetary funds (amount of lines
(625+626+628)in the balance sheet) was understated in the amount of
135,624,000 rubles;

(ii)    information on indebtedness upon promissory notes due (balance sheet, line 622)
was understated in the amount of 1,713,430,000 rubles;

(iii)    information on indebtedness upon salary (balance sheet, line 624) was overstated
in the amount of 1,690,985,000 rubles;

(iv)    information with regard to net capital of GOK was overstated in the amount of
514,326,000 rubles;

(v)    final figures of assets and liabilities are not equal and do not comport with actual
currency on the balance sheet -- the difference between assets and liabilities
constitutes 488,124,000 rubles.

34.    The use of distorted accounting records of GOK in the Analysis resulted in a false

conclusion on the increase in GOK's solvency, which in fact had already been significantly

reduced in the first quarter of 2000[7].  It also resulted in distortion of the financial security

---

[7]       According to data on the balance sheet for 1999, outfit for the amount of 2,689,072,000
rubles was shipped to suppliers and monetary funds for the shipped output in the amount of
2,861,468,000 rubles were received -- i.e., all shipped output was paid for in full.  Thus,
according to results in 1999, GOK was solvent.  However in the first quarter of 2000, output in
the amount of 890,264,000 rubles was shipped to suppliers, and funds in the amount of
282,318,000 rubles were received, i.e. only 30% of output was paid for.

9

indexes, and, as a result, in an artificial increase in the net assets index, which is one of the major indicators for determining the financial condition of the company.

35.    Thus, the incompatibility of the data in the Analysis with the data in GOK's accounting documentation, coupled with the partial falsification of the information, caused erroneous calculations in the Analysis.  Accordingly, this interfered with the ability to establish a clear picture of GOK's true financial situation and to detect signs of intentional bankruptcy.

### INACCURACY OF CONCLUSIONS REACHED BY THE DEPARTMENT OF SUPPORT OF JUDICIAL PROCEEDINGS OF FSFO OF RUSSIA IN ITS REPORT ON PRESENCE (ABSENCE) OF SIGNS OF INTENTIONAL BANKRUPTCY

36.    Like the Analysis, the Report on presence (absence) of signs of intentional bankruptcy at GOK (hereinafter referred to as "the Report") prepared by the experts at the Department of Support of Judicial Proceedings of FSFO also was based on distorted accounting records and therefore the conclusions contained in the Report  are doubtful, viz.:

(i)    The statement in the report that cash was excluded from liquid assets is erroneous;

(ii)    examination of the credit transaction in the amount of 15 million dollars received by GOK was not performed in full since the financial effect of the transaction (the loss in the amount of 501,000 rubles) was not disclosed, which resulted in fictitious creation of the profit in 1 quarter 2000;

---

In addition, there was a sudden increase of accounts payable in the first quarter of 2000 -- nearly two times the total amount of accounts payable for the first quarter 1999.  There also was a widespread increase in short-term obligations, excluding debt to budget:
Indebtedness on account «Promissory notes due» increased in the amount of 1,098,199, 000 rubles, i.e. 2.8 times the amount the previous year;
Indebtedness of suppliers and contractors increased in the amount of 265,867,000 rubles, i.e. 1.35 times the previous year;
Indebtedness to the state non-budgetary funds increased in the amount of 17,662,000 rubles, i.e. 2.11 times the prior year;
Indebtedness to territorial non-budgetary funds increased in the amount of 18,959,000 rubles, i.e. 1.16 times the previous year;
Indebtedness on salary increased 1.58 times the previous year.

A - 2323

(iii)   final conclusions of the Report on increase of accounts payable, deterioration of GOK's solvency, absence of signs of intentional bankruptcy at GOK are doubtful, groundless and of tendentious nature.

37.   Pursuant to Article 10 of the Federal Law "On insolvency (bankruptcy)" and §11 of Methodical recommendations approved by the decision of FSDN of Russia # 33-r of October 8, 1999 [Exhibit 21], actions by the debtor's management that result in an inability to satisfy Creditor's claims are deemed indications of intentional bankruptcy. In other words, a sudden deterioration in a company's performance (a negative change in the financial security index -- if it falls below 1 -- and sudden reduction in the net assets index), which occurs within a short period of time, is considered evidence of an intentional bankruptcy.

38.   Recalculating the index in a manner that takes into account the losses which resulted from the transactions involving the promissory notes, the financial security index would be 0.995 -- the declared index was 1.13 -- and net assets would become negative, amounting to - 10,700,000 rubles. (The distorted balance sheet showed net assets of + 535,171,000 rubles).

39.   In the first quarter of year 2000 there was a sharp decrease both in the financial security index (below 1) and in the net assets (negative values). It is noteworthy that the financial security index of GOK for year 1999 was above 1 – 1.115, while the net assets of the enterprise were equal to 358,411,000 rubles (about 12.8 million dollars).

40.   Thus, in fact in the first quarter 2000 there were evident signs of intentional bankruptcy at GOK, and the above-stated distortions in GOK's accounting data as well as inaccuracy of conclusions of the Analysis and the Report, in my view, have as their only object the concealment of signs of intentional bankruptcy.

A - 2324

**CONCLUSIONS**

41.    GOK's financial situation in 1995-1998 was unsatisfactory, which is evidenced by losses in the amount of 642.9 million rubles (23 million dollars).

42.    1999 was a turning point in GOK's performance. That year, GOK achieved its best financial results in the last five years, and all the building blocks for further economic growth were in place.

43.    As of the date when the exchange of claim-related correspondence between GOK and Krasgaz took place, which subsequently served as a basis for initiating the bankruptcy proceedings, GOK was solvent. There were sufficient funds in GOK's accounts to cover the debt. However, GOK's management did not use the funds for these purposes, which further illustrates the intentional nature of the bankruptcy.

44.    In the first quarter of year 2000, the management of GOK carried out a number of economically unfounded transactions, which resulted in a sharp increase of accounts payable, a decrease of the financial security index, as well as a decrease of the net assets of the enterprise. This shows the "ordered" character of GOK's bankruptcy.

45.    In order to conceal the obvious indications of the intentional bankruptcy, GOK's accounting documentation was significantly distorted. The documentation did not reflect the losses, which resulted from the transactions involving GOK's promissory notes, and the net assets and financial solvency indexes were therefore inflated.

46.    An analysis of GOK's results for the 1st quarter of 2000, if based upon accounting data that reflected losses in the amount of 501 million rubles (18 million dollars), would have revealed a drastic deterioration in the security of financial obligation indexes in the 1st quarter of

12

2000. The index value fell below 1 and the net assets value became negative, evidencing the existence of intentional bankruptcy.

47.    Conclusions made in the Analysis by TA FSDN, as well as conclusions reached by the Department of Support of Judicial Proceedings of FSFO of Russia, were based on GOK's distorted accounting data and information, which had been partially falsified. Therefore, the conclusions were inaccurate.

13

I am informed that the contents of the Affidavit in English corresponds to that in Russian.

I have executed this affidavit outside the of the United States of America and declare under the penalty of perjury pursuant to the laws of the United States that the foregoing is true to the best of my knowledge and belief.

_____

Date: _____

14

A - 2327

**ОКРУЖНОЙ СУД США**
**ЮЖНЫЙ ОКРУГ НЬЮ-ЙОРКА**

---

**BASE METAL TRADING SA и прочие**          **Дело No. 00 Civ. 9627**

Истцы

против

**RUSSIAN ALUMINUM и прочие**

Ответчики

---

### ЗАЯВЛЕНИЕ ТАТЬЯНЫ ДЕКАБРЕВНЫ ЯСТРЕБОВОЙ

Я, Ястребова Татьяна Декабревна, согласно положениям 28 U.S.C. §1746, заявляю следующее:

### СВЕДЕНИЯ О ЗАЯВИТЕЛЕ

1. Я являюсь гражданкой Российской Федерации и постоянно проживаю в России.

2. Я делаю настоящее заявление с целью разъяснить реальное финансовое положение, в котором находилось ОАО "Качканарский Горно-Обогатительный Комбинат «Ванадий» («ГОК») в период предшествующий процедуре банкротства и на момент начала претензионной переписки между «Красноуральскмежрайгазом» («Красгаз») и ГОКом.

### ОБСТОЯТЕЛЬСТВА ДЕЛА

3. Я окончила Уральский политехнический институт по специальности инженер-металлург, а также обладаю квалификационными аттестатами,

l

предоставляющими право на осуществление профессиональной деятельности в области общего аудита и аудита бирж, инвестиционных фондов, внебюджетных фондов и инвестиционных институтов. Общий стаж работы по специальности бухгалтерский учет и аудит – более девяти лет, а также более двадцати лет в качестве экономиста предприятий цветной металлургии.

4. Места работы по специальности экономист (бухгалтерский учет и аудит):

1999-н.в.    Аудиторская фирма ООО «Далэкс-М». Генеральный директор фирмы.

1995-1999г.  Аудиторская фирма ООО «МетроЭК». Аудитор, Директор по аудиту.

1994-1995г.  Аудиторская фирма АОЗТ «Юникон/мс консультационная группа. Аудитор 1 категории.

1993-1994г.  Комитет РФ по драгоценным металлам и драгоценным камням, Управление «Росзолото». Главный специалист-бухгалтер экономического отдела.

1991-1993г.  Министерство промышленности РСФСР, Концерн «Тяжцветмет». Заместитель начальника экономического отдела.

1988-1991г.  Министерство металлургии СССР, Концерн «Тяжцветмет». Заместитель начальника сектора перспективного планирования.

5. Мною лично проводились аудиторские проверки на ГОКе. С 25 марта по 30 июня 2000 года под моим непосредственным руководством как аудитора была проведена аудиторская проверка[1] кредиторской задолженности и инвестиционных вложений ГОКа за 1 квартал 2000 года. В результате такой

---

[1] Под аудитом бухгалтерской отчетности понимается независимая проверка, осуществляемая аудиторской организацией (аудитора) и имеющая своим результатом выражение мнения аудиторской организации (аудитора) о степени достоверности бухгалтерской отчетности экономического субъекта.

2

A - 2330

аудиторской проверки[2] мне стали известны бухгалтерская отчетность и первичные документы ГОКа.

6. Мне было предложено сделать настоящее заявление для того, чтобы я описала финансовое состояние ГОКа в период, предшествующий смещению генерального директора Хайдарова, платежеспособность ГОКа в период претензионной переписки между Красноуральскмежрайгазом («Красгазом») и новым генеральным директором ГОКа Козициным.

7. Меня также попросили рассмотреть искажения финансовой отчетности в бухгалтерском балансе ГОКа в первом квартале 2000 года и дать оценку недостоверности данных Анализа финансового состояния ГОКа, выполненного ТА ФСДН России по Свердловской области и выводов Заключения о наличии (отсутствии) признаков преднамеренного банкротства ГОКа, подготовленного экспертами управления сопровождения судебных процедур ФСФО России.

### ОЦЕНКА ФИНАНСОВОГО СОСТОЯНИЯ ГОКа ЗА 1995-1999 гг.

8. Результатом финансово-хозяйственной деятельности ГОКа за период 1995-1998 гг. был убыток в размере 642.9 млн. рублей (около 23 миллионов долларов США)[3], в т.ч. 183 млн. рублей за 1998 г.(более 6,5 миллионов долларов США). В 1997 и 1998 гг. ОАО «Качканарский ГОК «Ванадий» находился на грани банкротства, об этом свидетельствуют также и другие показатели бухгалтерского баланса предприятия по состоянию на 01 января 1999 года [Приложение № 1].

---

[2] Аудиторская проверка представленной бухгалтерской отчетности и первичных документов проводилась согласно правилам (стандартов) аудиторской деятельности и основных ее принципов, которые, в соответствии с Правилом (стандартом) аудиторской деятельности «Цели и основные принципы, связанные с аудитом бухгалтерской отчетности», одобренным Комиссией по аудиторской деятельности при Президенте РФ 20 августа 1999 г., включают в себя независимость, честность, объективность, добросовестность, профессиональную компетентность, конфиденциальность.

[3] Перевод в доллары США денежных сумм, указанных в российских рублях, осуществлялся по курсу 1 доллар США – 28 рублей (средний курс рубля по отношению к доллару США за 2000 год ).

3

A - 2331

9. Имелась значительная кредиторская задолженность в размере около 4 млрд. рублей (около 143 млн. долларов США), в том числе:

    (i)   перед бюджетами всех уровней и внебюджетными фондами на 845 млн. рублей (более 30 миллионов долларов США), пеней и штрафов на 500 млн. рублей (около 18 миллионов долларов США) (неуплата за 4 предыдущих года);

    (ii)   по заработной плате 63 млн. рублей (более 2 миллионов долларов США) (невыплаты более чем за 5 месяцев);

    (iii)   перед поставщиками и подрядчиками более чем на 3 млрд. рублей (более 107 миллионов долларов США);

    (iv)   заемные средства 81 млн. рублей (около 3 миллионов долларов США).

10. По данным бухгалтерского баланса за 1999г. [Приложение № 2] общий убыток предприятия по состоянию на 31.12.99 г. составил 670 млн. рублей (около 24 миллионов долларов США), из которых только 27,1 млн. рублей (менее 1 миллиона долларов США) приходятся на убытки, понесенные ГОКом в 1999 году. Убытки 1999 года были вызваны исключительно затратами на ликвидацию последствий аварии, произошедшей из-за отключения на ГОКе электроэнергии в октябре 1999 года.

11. Сокращение убытков предприятия в 1999 году более чем в 8 раз по сравнению с убытками за 1998 г. (183 млн. рублей) свидетельствует о том, что финансовое состояние ГОКа в 1999 году существенно улучшилось.

12. .Показатели бухгалтерского баланса ГОКа по состоянию на 31 декабря 1999 года свидетельствуют о

    (i)   увеличении объема производства и продаж по сравнению с 1998 годом по агломерату на 150%, по окатышам на 112 %;

    (ii)   прибыли по основной деятельности в сумме 154 млн. рублей ( 5,5 миллионов долларов США);

4

A - 2332

(iii) максимальном снижении кредиторской задолженности (в 2,4 раза), в том числе задолженности перед бюджетом в 3,6 раза, задолженности по оплате труда в 4,4 раза.

(iv) увеличении стоимости чистых активов в 2,5 раза (358 млн. рублей или 12,8 миллионов долларов США).

13. Таким образом, в 1999 году ГОК достиг наилучших результатов практически по всем параметрам за последние пять лет.

## ПЛАТЕЖЕСПОСОБНОСТЬ ГОКа НА МОМЕНТ ПРЕТЕНЗИОННОЙ ПЕРЕПИСКИ С КРАСГАЗОМ

14. Согласно данным бухгалтерского баланса, на конец 1998 года ГОК имел кредиторскую задолженность перед Красгазом в размере 67.7 млн. рублей (2,4 млн. долларов США). [Приложение № 1]

15. Задолженность ГОКа перед Красгазом успешно ликвидировалась. В 1999 году ГОК оплатил Красгазу поставленный в 1997-1998 годах газ по контракту от 24.01.97 на сумму 45 млн. рублей (1,6 млн. долларов США), в результате чего задолженность прошлых лет снизилась до 22.7 млн. рублей (810 тыс. долларов США).

16. Текущие платежи за поставляемый газ в 1999 году осуществлялись в полном объеме.

17. В конце 1999 г. между ГОКом и Красгазом было достигнуто устное соглашение о погашении задолженности. Несмотря на это, 4 февраля 2000 г., т.е. вскоре после смены руководства ГОКа, Красгаз направил в адрес генерального директора ГОКа Козицына А.А. претензию с требованием погасить указанную задолженность [Приложение №3].

5

A - 2333

18. На день предъявления претензии **ГОК обладал свободными денежными средствами, необходимыми для погашения задолженности перед Красгазом.** В соответствии с приложенными выписками с банковского счета ГОКа № 40702810200000005075/RUR в Уральском Банке Реконструкции и Развития, остаток средств на начало дня 4 февраля 2000 г. (день направления претензии) был равен **28 млн. рублей** (1 млн. долларов США) [Приложение № 4]. Кроме того, 4 февраля 2000 года ГОК получил первый транш по кредитной линии на сумму **143.8 млн. рублей** (более 5 млн. долларов США) [Приложение № 5] по договору кредитной линии с АКБ «МДМ» [Приложение № 6], а 7 февраля 2000 г. был получен второй транш по данному договору на сумму **287.7 млн. рублей** (более 10 млн. долларов США) [Приложение № 7].

19. Несмотря на то, что **на счету ГОКа находились суммы более чем в 19 раз превышающие задолженность перед Красгазом,** 8 февраля 2000 г. А.Козицын признал существование задолженности в полном объеме однако отказался погасить долг «в связи с отсутствием у ГОКа денежных средств» [Приложение № 8 ].

20. 15 февраля 2000 г. Красгаз повторно направил претензию о погашении имеющейся задолженности [Приложение № 9]. Однако, несмотря на наличие на счете ГОКа денежных средств в размере **более 107 млн. рублей** (более 3,8 млн. доларов США) по состоянию на 15 февраля 2000 года [Приложение № 11] и **более 60,5 млн. рублей** (более 2 млн. долларов США) по состоянию на 21 февраля 2000 года [Приложение № 12], 21 февраля 2000 г. Козицын в удовлетворении претензии отказал [Приложение № 10].

21. Более того, Козицин А.А. не только не погасил долг, но и вместо этого 10 февраля 2000 г. направил ОАО «Святогор» на непонятные цели денежные средства в сумме 286 млн. рублей (более 10 млн. долларов США), отраженные в бухгалтерском балансе за 1-й квартал 2000 г. по стр. 143 как инвестиции в другие организации [Приложение № 13].

6

22. Из изложенного следует, что на момент предъявления Красгазом претензий о выплате задолженности у ГОКа **имелись свободные денежные средства**, чтобы удовлетворить предъявленные требования и избежать процедуры банкротства.

## ИСКАЖЕНИЕ ФИНАНСОВОЙ ОТЧЕТНОСТИ В БУХГАЛТЕРСКОМ БАЛАНСЕ ГОКа ЗА ПЕРВЫЙ КВАРТАЛ 2000 ГОДА

23. 28 января 2000 г. между ГОКом и ОАО «Святогор» был заключен договор о совместной деятельности на сумму 10 млн. долларов США [Приложение № 14]

24. На следующей неделе, 04 февраля 2000 г., ГОК получил у АКБ «МДМ» экономически необоснованный кредит в размере 15 млн. долларов (432 млн. рублей) по договору кредитной линии № 10.3311.05-КЛ/00 и двум дополнительным соглашениям к нему **сроком на 10 дней** [Приложение № 6]. ОАО «Святогор» выступило поручителем за ГОК [Приложение № 15], который, в свою очередь, предоставил поручителю в залог свои векселя общей номинальной стоимостью 720 млн. рублей (25 млн. долларов) [Приложение № 16].

25. 10 февраля 2000 года ГОК перевел 286,2 млн. рублей [Приложение № 17] (более 10 млн. долларов США) из взятого кредита ОАО «Святогор» по договору простого товарищества [Приложение № 14]. После того, как ГОК ответил на требование АКБ «МДМ» о выплате полученного кредита отказом, 11 февраля 2000 г. ОАО «Святогор» во исполнение договора поручения погасил задолженность ГОКа перед АКБ «МДМ» в размере 435 млн. рублей (15 млн. долларов). В тот же день ГОК передал ОАО «Святогор» свои заложенные векселя общей номинальной стоимостью 720 млн. рублей (25 млн. долларов), т.е. с дисконтом равным 285 млн. рублей (более 10 миллионов долларов США) [Приложение № 18]

7

A - 2335

26. Вскоре ОАО «Святогор» продало векселя ГОКа фирме ООО «Предприятие Лебаут», которое после скупки векселей ГОКа у других организаций стало основным кредитором ГОКа, предъявившим к оплате по номиналу векселя на сумму более 1 096 млн. рублей или 39 млн. долларов США.[4] [Приложение № 19]

27. От вышеуказанных операций с векселями ГОК **понес убытки** в сумме 501 млн. рублей (около 18 млн. долларов США), **которые не были отражены в отчете о прибылях и убытках ГОКа**, что привело к искажению финансового результата по итогам 1 квартала 2000 г., искажению показателей чистых активов и обеспеченности (платежеспособности).

28. Согласно действующему законодательству, в случае выдачи векселей с дисконтом векселедатель обязан списать сумму дисконта по векселям на счет прибылей и убытков в момент выдачи векселей.[5] Несписание сумм дисконта по векселям на счет прибылей и убытков является нарушением действующего законодательства о бухгалтерском учете.

29. В данном случае требования нормативных актов соблюдены не были. Документы подтверждают то, что векселя были выданы и предъявлены к оплате в одном отчетном периоде. Кроме того была известна сумма расходов и уменьшение экономических выгод, а следовательно, расходы[6] в виде дисконта по векселям в сумме 501 млн. рублей имели место в 1 квартале 2000 года.

---

[4] По состоянию на 28 января 2000 года основными кредиторами ГОКа являлись ООО «Полипром», ООО «Ленекс», ООО «Металторг», ООО «Нексиз», «Нортвест Системз Лтд», «Нексиз Продактс ЭлЭлСи», которым в совокупности принадлежало 54% всей кредиторской задолженности ГОКа. Вследствие полученного кредита и операций с векселями основным кредитором ГОКа (37% от всей кредиторской задолженности по данным бухгалтерского баланса за 1 квартал 2000 года) стало ООО «Предприятие Лебаут».

[5] Инструкция по применению Плана счетов бухгалтерского учета финансово-хозяйственной деятельности предприятий (утв. приказом Минфина СССР от 1 ноября 1991 г. N 56) (с изменениями от 28 декабря 1994 г., 28 июля 1995 г., 27 марта 1996 г., 17 февраля 1997 г.) [Приложение № 20]

[6] На основании п. 16-18 Положения по бухгалтерскому учету «Расходы организации», утвержденного Приказом Минфина РФ от 6 мая 1999 года № 33н, расходы признаются в бухгалтерском учете при наличии следующих условий: расход производится в соответствии с конкретным договором, требованием законодательных и нормативных актов; сумма расхода может

8

30. В действительности, если бы ГОК надлежащим образом отразил в бухгалтерской отчетности убытки от операций с векселями, бухгалтерский баланс ГОКа показывал бы убыток в размере 200 млн. рублей (более 7 млн. долларов США), а не прибыль. Вместо этого, убытки в сумме более 501 млн. рублей были преднамеренно отражены не как убытки, а как прочие оборотные активы предприятия.

31. По моему мнению, бухгалтерская отчетность ГОКа была преднамеренно искажена с целью сокрытия признаков преднамеренного банкротства.

## НЕДОСТОВЕРНОСТЬ ВЫВОДОВ АНАЛИЗА ФИНАНСОВОГО СОСТОЯНИЯ ГОКа, ВЫПОЛНЕННОГО ТА ФСДН РФ ПО СВЕРДЛОВСКОЙ ОБЛАСТИ

32. По поручению временного управляющего ГОКа Козырева О.С. ТА ФСДН России по Свердловской области выполнило Анализ финансового состояния ГОКа (далее по тексту – «Анализ»). Анализ основывался на вышеописанной искаженной бухгалтерской отчетности ГОКа и послужил основанием для подтверждения неудовлетворительного финансового состояния ГОКа и правомерности введения внешнего управления.

33. В результате анализа недостоверной бухгалтерской отчетности ГОКа и различных ошибок, допущенных ТА ФСДН России по Свердловской области основные финансовые показатели Анализа были существенно искажены, а именно:

(i)    по задолженности в бюджет и внебюджетные фонды (сумма строк по балансу (625+626+628)) данные занижены на 135 624 тыс. рублей;

---

быть определена; имеется уверенность в том, что в результате конкретной операции произойдет уменьшение экономических выгод организации. Расходы подлежат признанию в бухгалтерском учете независимо от намерения получить выручку, операционные или иные доходы и от формы осуществления расхода (денежной, натуральной). Расходы признаются в том отчетном периоде, в котором они имели место, независимо от времени фактической выплаты денежных средств и иной формы осуществления (допущение временной определенности фактов хозяйственной деятельности).

9

A - 2337

(ii)  по задолженности по векселям к уплате (строка по балансу 622) данные занижены на 1 713 430 тыс. рублей;

(iii)  по задолженности по оплате труда (строка по балансу 624) данные завышены на 1 690 985 тыс. рублей;

(iv)  по собственному капиталу ГОКа данные завышены на 514 326 тыс. рублей;

(v)  итоговые суммы актива и пассива не равны между собой и не совпадают с фактической валютой бухгалтерского баланса: разница между активом и пассивом составляет 488 124 тыс. рублей.

34. Использование в Анализе искаженных данных бухгалтерской отчетности ГОКа привело к ложному выводу об увеличении платежеспособности ГОКа, которая в действительности существенно снизилась в 1 квартале 2000 года[7] в результате сделки по получению кредита и операций с векселями, к искажению показателей обеспеченности, и как следствие, к искусственному увеличению чистых активов, которые являются одним из основных показателей при определении финансового положения предприятия.

35. Таким образом, нетождественность сведений Анализа данным бухгалтерской отчетности ГОКа в совокупности с частичной фальсификацией информации обуславливает ошибочные расчеты и не позволяет строить на них реальное представление о финансовом состоянии ГОКа.

---

[7] По данным бухгалтерского баланса за 1999 г. было отгружено поставщикам продукции на 2,689,072,000 рублей, а получено денежных средств в расчет за отгруженную продукцию – 2,861,468,000 рублей. То есть вся отгруженная продукция была полностью оплачена. Таким образом, ГОК по итогам 1999 года был полностью платежеспособен. В 1же квартале 2000 г. в адрес поставщиков было отгружено продукции на 890,264,000 рублей, а получено денежных средств 282,318,000 рублей, то есть оплачено только 30% поставленной продукции.

Кроме того, в 1 квартале 2000 г. наблюдался резкий рост кредиторской задолженности. За 1 квартал 2000 г. по сравнению с 1999г. общая сумма кредиторской задолженности возросла на 1,367,223 тыс. руб. или в 1,84 раза. При этом рост краткосрочных обязательств отмечается по всем позициям, за исключением задолженности перед бюджетом:
- задолженность по статье «Векселя к уплате» на сумму 1,098,199 тыс. руб. или в 2,8 раза;
- задолженность поставщиков и подрядчиков увеличена на сумму 265,867 тыс. руб. или в 1,35 раз;
- Задолженность перед государственными внебюджетными фондами увеличилась на сумму 17 662 тыс. рублей или в 2,11 раза;
- Задолженность перед территориальным внебюджетным фондом увеличилась на сумму 18 959 тыс. рублей или в 1,16 раза;
- Задолженность по оплате труда увеличилась в 1,58 раза.

10

A - 2338

## НЕДОСТОВЕРНОСТЬ ВЫВОДОВ ЗАКЛЮЧЕНИЯ ФСФО РОССИИ «О НАЛИЧИИ(ОТСУТСТВИИ) ПРИЗНАКОВ ПРЕДНАМЕРЕННОГО БАНКРОТСТВА» ГОКа.

36. На искаженных данных бухгалтерской отчетности было основано и Заключение о наличии (отсутствии) признаков преднамеренного банкротства ГОКа (далее по тексту – «Заключение»), подготовленное экспертами управления сопровождения судебных процедур ФСФО России, и, следовательно, содержащиеся в нем выводы недостоверны, а именно:

    (i)    утверждение об исключении из хозяйственного оборота предприятия наиболее ликвидной части оборотных активов – денежных средств является ошибочным;

    (ii)    экспертиза сделки на получение ГОКом кредита в объеме 15 млн. долларов США была выполнена не в полном объеме, т.к. не был выявлен финансовый результат проведенных хозяйственных операций (убыток в размере 501 тыс. рублей), что привело к фиктивному созданию балансовой прибыли 1 квартале 2000 г.;

    (iii)    завершающие выводы Заключения о росте кредиторской задолженности, ухудшении платежеспособности ГОКа, отсутствии признаков преднамеренного банкротства ГОКа недостоверны, не обоснованы и имеют тенденциозный характер.

37. В соответствии со ст.10 ФЗ «О несостоятельности (банкротстве)» и п. 11 Методических рекомендаций, утвержденных Распоряжением ФСНД России № 33-р от 08.10.1999 г. [Приложение № 21], признаками преднамеренного банкротства являются действия руководящего органа должника, вызвавшие неспособность удовлетворить требования Кредиторов, то есть возбуждению дела о признании должника банкротом должно предшествовать резкое, в течение короткого периода времени, ухудшение показателей работы предприятия: изменение показателя

11

A - 2339

обеспеченности в сторону ухудшения (менее 1) и резкое снижение величины чистых активов.

38. Если произвести перерасчет показателей Заключения с учетом неотраженного в бухгалтерской отчетности ГОКа убытка от операций с векселями, то показатель обеспеченности на самом деле будет составлять 0,995 (против заявленного 1,13), а чистые активы станут отрицательными и составят – 10,700,000 рублей (- 382 тыс. долларов США) против заявленных + 535,171,000 рублей (+ 19 млн. долларов США).

39. В первом квартале 2000 года произошло резкое снижение как показателя обеспеченности до величины менее 1, так и величины чистых активов до отрицательных значений. Следует отметить, что показатель обеспеченноти ГОКа за 1999 год был более 1 и составлял 1,115, в то время как чистые активы предприятия равнялись 358,411,000 рублей (около 12,8 млн. долларов США).

40. Таким образом, в действительности признаки преднамеренного банкротства явно наблюдалось на ГОКе в первом квартале 2000 года, а вышеуказанные искажения в бухгалтерской отчетности ГОКа а также выводы Анализа и Заключения, с моей точки зрения, имеют под собой единственную цель - сокрытие признаков преднамеренного банкротства.

12

A - 2340

**ВЫВОДЫ:**

41. Финансовое состояние ГОКа в 1995-1998 годах являлось неудовлетворительным, что подтверждается убытком, понесенным в результате финансово-хозяйственной деятельности, в размере 642.9 млн. рублей (23 млн. долларов США).

42. 1999 год стал переломным в экономическом положении ГОКа. По результатам за 1999 г. ГОК достиг наилучших финансовых показателей за последние 5 лет, и имелись все предпосылки для дальнейшего экономического роста.

43. На момент претензионной переписки с Красгазом, послужившей основанием для инициации процедуры банкротства, ГОК был платежеспособен, на его счетах находились свободные денежные средства, достаточные для погашения задолженности, но не использованные руководством ГОКа для данных целей, что свидетельствует о преднамеренном характере банкротства.

44. В первом квартале 2000 года руководством ГОКа был осуществлен ряд экономически необоснованных сделок, результатом которых стало резкое увеличение кредиторской задолженности, снижение показателя обеспеченности и величины чистых активов предприятия, что свидетельствует о «заказном» характере банкротства.

45. С целью скрыть очевидные признаки преднамеренного банкротства была значительно искажена бухгалтерская отчетность ГОКа, в которой не был отражен убыток от операций с векселями ГОКа, завышены показатели чистых активов, обеспеченности и платежеспособности.

46. При проведении объективного анализа результатов хозяйственной деятельности ГОКа за 1 квартал 2000 г. по данным бухгалтерского баланса, с

13

учетом отражения в нем финансового результата (убытка в сумме 501 млн. рублей или 18 мил. долларов США), выявляется резкое ухудшение обеспеченности финансовых обязательств ГОКа в 1 квартале 2000 г. до значения менее единицы; снижение величины чистых активов до отрицательных значений, что определенно указывает на наличие признаков преднамеренного банкротства.

47. Выводы Анализа финансового состояния ГОКа, выполненного ТА ФСНД России по Свердловской области, и Заключения о наличии (отсутствии) признаков преднамеренного банкротства ГОКа, подготовленного экспертами управления сопровождения судебных процедур ФСФО России, основаны на искаженных данных финансовой отчетности ГОКа и частичной фальсификации информации и, таким образом, являются недостоверными.

14

A - 2342

Я проинформирована, что содержание Заявления на английском языке соответствует Заявлению на русском.

Я составила настоящее Заявление за пределами Соединенных Штатов Америки и заявляю под угрозой ответственности за дачу ложных показаний, в соответствии с законами Соединенных Штатов, что вышеизложенное является верным, насколько я знаю и верю.

Дата: *16 сентября 2002 г.*

[handwritten:]
Grishina
For filing.
Send a copy of the determination by fax to M. N. Kolesnikov.
[signature] (Belov)
July 16, 2002

[shield]
FEDERAL COURT OF ARBITRATION OF THE NORTH CAUCASUS CIRCUIT

**DETERMINATION**
Of the Court of Cassation regarding the Verification of the Legality and Propriety of
Decisions (Determinations) of the Courts of Arbitration that Have Become Legally
Effective

City of Krasnodar      Entry No. F08 – 2260/2002     July 2, 2002
Case No. A22-1222/2000-6/109Ar46

The Federal Court of Arbitration of the North Caucasus Circuit, comprised of the
presiding judge I. P. Nazarenko, and the judges S. V. Rogalskii and Iu. V. Shirvis, in the
presence of representatives of OOO Poliprom, V. V. Volynov (pursuant to power of
attorney of March 11, 2002), in the absence of representative of OAO Kachkanarskii
GOK Vanadii, OAO Torgovyi dom OAO Vanadii [Vanadii Open Joint Stock Company,
Trading Company LLC], AOZT Vedenie reestrov kompanii [Company Register
Management, Closed Joint Stock Company],and Holdex LLC, duly notified of the time
and place of the court hearing, upon reviewing the cassation appeal of OOO Poliprom
against the decision of March 12, 2002 of the Court of Arbitration of the Republic of
Kalmykia in the matter of Case No. A22-1222/2000-6/109Ar46 (Judge V. E. Bembeev),
found the following:

Open Joint Stock Company Kachkanarskii gorno-obogatitelnyi kombinat Vanadii
[hereinafter to be referred to as "OAO Kachkanarskii GOK Vanadii") filed with the court
of arbitration a claim against the Limited Liability Company Torgovyi dom OAO
Vanadii (hereinafter to be referred to as "OOO Torgovyi dom OAO Vanadii"), and the
Limited Liability Company Poliprom (hereinafter to be referred to as "OOO Poliprom")
for nullification of agreement No. 3 for the purchase and sale of securities dated January
18, 1999, for nullification of the transfer orders pursuant to which, in implementation of
the disputed agreement, [illegible] of OAO Kachkanarskii GOK Vanadii have been
transferred from the personal account of the seller, as well as for restoration in the
register of holders of nominal common stock of OAO Kachkanarskii GOK Vanadii of the
entry regarding the existence on the personal account of OOO Torgovyi dom OAO
Vanadii of the nominal common stock transferred pursuant to the purchase and sale
agreement subject to the dispute.

[square stamp:]
OAO Kachkanarskii GOK Vanadii

A - 2344

In the capacity of a third party not making any independent claims regarding the matter of the dispute, the court has summoned AOZT Vedenie reestrov kompanii.

The court's decision of November 22, 2000, sustained the plaintiff's claim in its entirety.

The ruling of the Court of Cassation dated April 17, 2001, remanded the decision of November 22, 2000.

At the remand hearing, Holdex LLC was summoned by the court as a third party without independent claims regarding the subject of the dispute.

The decision of July 5, 2001, sustained by the ruling of the appellate court of November 9, 2001, sustained the claim of OAO Kachkanarskii GOK Vanadii.

The ruling of the cassation court of January 21, 2002, revoked the court decisions and the case was remanded. At the remand hearing, the court had to determine which of the stock purchase and sale agreements produced by the parties was the authentic agreement, as well as to determine the actual owner of the stock subject to the dispute and the actual owner's good faith, and, depending on the court's findings, to propose that the plaintiff specify its claim. The courts had not studied or assessed the debt securities acceptance certificate of January 19, 2000, which is part of the materials of the case and contains a reference to the agreement for the purchase and sale of the disputed stock dated January 18, 2000.

With the court's decision of March 12, 2002, the plaintiff's claim was sustained.

The legality and grounds for the decision were not examined by the appellate court.

Disagreeing with the court's decision, OOO Poliprom filed a cassation appeal with the Federal Court of Arbitration of the North Caucasus Circuit against the court decision of March 12, 2002, in which OOO Poliprom states that the court had violated the provisions of Article 178 of the Code of Arbitration Procedure of the Russian Federation and had not followed the instructions of the cassation court.

Statement of defense in response to the cassation appeal was not presented to the court.

Upon hearing the representatives of the parties and upon examination of the materials of the case, the Federal Court of Arbitration of the North Caucasus Circuit believes that the decision of the court should be revoked on the following grounds.

It follows from the materials of the case that the plaintiff and the defendant had presented at the court hearing two different in content and dates of execution agreements for the purchase and sale of stock of OAO Kachkanarskii GOK Vanadii in the total

amount of RUR 5,558,847, i.e., Agreement No. 3 of January 18, 1999 and Agreement No. 3 of January 18, 2000, entered into between OOO Torgovyi dom OAO Vanadii (seller) and OOO Poliprom (buyer).

In substantiation of the decision in the case, the court referred to the nullity of the stock purchase and sale agreement of January 18, 1999. When clarifying the issue of which of the agreement is authentic, the appellate court referred to the excerpt from the register of ZAO Kompaniia-registrator Panorama [Panorama Company-Registrar, Closed Joint Stock Company], according to which an entry for the removal of the disputed stock from the personal account of OOO Torgovyi dom Vanadii was carried out pursuant to the purchase and sale agreement of January 18, 1999, and on these grounds, the court arrived at the conclusion about the authenticity of the agreement dated January 18, 1999.

At the same time, while recognizing the agreement of January 18, 1999, as authentic, the court did not take into consideration that in the notification of January 21, 2000 regarding the transaction conducted with the stock on the account, the register keeper, when referring to the purchase and sale agreement of January 18, 1999, points out at the same time that the new holder of the stock, OOO Poliprom, was registered with the State Registration Chambers of the Republic of Kalmykia on June 22, 1999. This circumstance is also supported by the certificate of state registration of OOO Poliprom dated June 22, 1999 and by the certificate of registration with the tax authority dated August 25, 2000.

Since OOO Poliprom did not exist in January 1999, it could not have been able to enter into an agreement dated January 18, 1999.

In addition, the agreement of January 18, 2000 provides that payment for the stock is to be made by the buyer of debt securities of Sberegatelnyi bank Rossiiskoi Federatsii [Savings Bank of the Russian Federation] with singing of an acceptance certificate (Section 2.1). The possibility for payment with debt securities is provided for also in the agreement of January 18, 1999. Based on the debt securities acceptance certification of January 19, 2000, it can be concluded that OOO Torgovyi dom OAO Vanadii transfers debt securities of Sberegatelnyi bank Rossiiskoi Federatsii to OOO Poliprom in implementation of the agreement for the purchase and sale of the disputed stock dated January 18, 2000. The transaction for the removal of the disputed stock from the personal account of Torgovyi dom OAO Vanadii and for its registration on the personal account of OOO Poliprom was carried out by the register keeper on January 21, 2000 pursuant to the transfer orders of January 21, 2000.

Therefore, the conclusion of the court that the authentic agreement is the agreement dated January 18, 1999, is not supported by the materials of the case. Under these circumstances, the agreement of January 18, 1999, should be declared null and void pursuant to Article 168 of the Civil Code of the Russian Federation.

Pursuant to Article 46 of the Federal Act of the Russian Federation On Limited Liability Companies, the decision to perform a major transaction associated with the sale

of assets that constitute more than twenty-five percent of the value of the company's assets determined on the basis of the balance sheet for the most recent accounting period, is to be passed by the general stockholders meeting. A major transaction performed in violation of the provisions of this article can be declared null and void at the request of the company of a stockholder thereof.

It follows from the materials of the case that the above procedure for signing the agreement of January 18, 2000 was not complied with by OOO Torgovyi dom OAO Vanadii. The value of the stock sold pursuant to the agreement of January 18, 2000, constitutes more than twenty-five percent of the value of the assets of OOO Torgovyi dom OAO Vanadii determined on the basis of the balance sheet as of the end of 1999.

Pursuant to the Articles of Incorporation of OOO Torgovyi dom OAO Vanadii, the sole founder of the company is OAO Kachkanarskii GOK Vanadii. Therefore, pursuant to Article 46, Section 5 of the Federal Act of the Russian Federation On Limited Liability Companies, OAO Kachkanarskii GOK Vanadii has the right to file a claim for nullification of the major transaction performed by OOO Torgovyi dom OAO Vanadii in violation of the provisions of the above article.

In light of the fact that the stock purchase and sale agreement of January 18, 2000 is entered into in violation of the provisions of Article 46 of the Federal Act of the Russian Federation On Limited Liability Companies, said agreement should be declared null and void.

The transfer orders of January 20, 2000, pursuant to which nominal common stock of OAO Kachkanarskii gorno-obogatitelnyi Vanadii issue No. 62-111-290 of July 12, 1993 in the amount of 9,759 shares and No. 62-1-1396 of June 12, 1996, in the amount of 2,298,225 shares, were transferred to the personal account of OOO Poliprom, are null and void pursuant to Article 168 of the Civil Code of the Russian Federation as based on a null and void agreement.

The case file contains a copy of the securities purchase and sale agreement No. KGOK-001/A, pursuant to which OOO Poliprom sold the disputed stock to Holdex LLC. When assessing said agreement, in violation of Article 178 of the Code of Arbitration Procedure of the Russian Federation, the court had not followed the instructions of the cassation court and had not summoned Holdex as a defendant in the case.

Pursuant to Article 29 of the Federation Securities Market Act, an entry in the stockholders register records the right of an individual or entity to the appropriate number of shares. Therefore, the plaintiff's claim to reinstatement of the entry regarding the existence of the disputed stock on the personal account of OOO Torgovyi dom OAO Vanadii in the event that said assets are in the possession of third parties, which have acquired it pursuant to an agreement with OOO Poliprom, of which the appropriate entry has been made in the register, in essence means a demand for restitution of said asset (Article 302 of the Civil Code of the Russian Federation), which cannot be heard without summoning the actual holder of the stock as a second defendant in the case.

Under these circumstances, the decision is subject to revocation in the portion where it sustains the plaintiff's claim for restoration in the register of holders of nominal securities of OAO Kachkanarskii GOK Vanadii of the entry regarding the existence of nominal common stock on the personal account of OOO Torgovyi dom OAO Vanadii, and the case is subject to remand.

Considering the above and pursuant to Article 174, 175, 176 and 177 of the Code of Arbitration Procedure of the Russian Federation, the Federal Court of Arbitration of the North Caucasus Circuit

## DETERMINED:

The decision of the Court of Arbitration of the Republic of Kalmykia of March 12, 2002 in the matter of case No. A22-1222/2000/6-109Ar46 is hereby amended in the section of nullification of the agreement of January 18, 2000 and of the transfer orders of January 20, 2000 as follows: agreement No. 3 of January 18, 1999 and agreement No. 3 of January 18, 2000 entered into between TD Vanadii [Vanadii Trading Company] and OOO Poliprom, as well the transfer orders of January 20, 2000, pursuant to which nominal common stock of OAO Kachkanarskii gorno-obogatitelnyi kombinat Vanadii issue No. 62-111-290 of July 12, 1993 in the amount of 9,759 shares and No. 62-1-1396 of June 12, 1996, in the amount of 2,298,225 shares, were transferred to the personal account of OOO Poliprom, are hereby nullified.

The remainder of the decision is hereby revoked and the case is hereby remanded to the lower court.

This Determination shall become legally effective as of the moment of rendition thereof and shall not be subject to appeal.

Presiding judge:                    I. P. Nazarenko

Judges:                             S. V. Rogalskii
                                    Iu. V. Shirvis

[square stamp:]
COPY AUTHENTICATED

[handwritten:]
Specialist: [illegible] N. Iu. Kuznetsova



ФЕДЕРАЛЬНЫЙ АРБИТРАЖНЫЙ СУД СЕВЕРО-КАВКАЗСКОГО ОКРУГА

# ПОСТАНОВЛЕНИЕ

кассационной инстанции по проверке законности

и обоснованности решений (постановлений)

арбитражных судов, вступивших в законную силу

г. Краснодар                    Вх. Ф08-2260/2002                    2 июля 2002 г.

Дело №А22-1222/2000/6-109Ар46

Федеральный арбитражный суд Северо-Кавказского округа в составе председательствующего Назаренко И.П., судей Рогальского С.В. и Ширвиса Ю.В., при участии в судебном заседании представителя ООО «Полипром»  Вольнова В.В. (доверенность от 11.03.02), в отсутствие представителей ОАО «Качканарский горно-обогатительный комбинат «Ванадий»), ООО «Торговый дом ОАО «Ванадий» , АОЗТ «Ведение реестров компаний», компании «Холд Экс Эл. Эл. Си», надлежащим образом извещенных о времени и месте судебного разбирательства, рассмотрев кассационную жалобу ООО «Полипром» на решение от 12.03.02 Арбитражного суда Республики Калмыкия по делу №А22-1222/2000/6-109Ар46 (судья Бембеев В.Э.), установил следующее

Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий» (далее – ОАО «Качканарский горно-обогатительный комбинат «Ванадий») обратилось в арбитражный суд с иском к обществу с ограниченной ответственностью «Торговый дом ОАО «Ванадий» (далее - ООО "Торговый дом ОАО «Ванадий») и обществу с ограниченной ответственностью «Полипром» (ООО – «Полипром») о признании недействительными договора купли-продажи акций № 3 от 18.01.99 и передаточных распоряжений, на основании которых с лицевого счета продавца были списаны именные обыкновенные акции ОАО «Качканарский ГОК «Ванадий», а также о восстановлении в реестре владельцев именных ценных бумаг ОАО «Качканарский ГОК «Ванадий» записи о наличии на лицевом счете ООО «Торговый дом ОАО «Ванадий» именных обыкновенных акций, переданных по оспариваемому договору купли-продажи.

ОАО "Качканарский ГОК
"ВАНАДИЙ"

в качестве третьего лица, не заявляющего самостоятельных требований на предмет спора, привлечено АОЗТ «Ведение реестров компаний».

Решением суда от 22.11.00 исковые требования удовлетворены в полном объеме.

Постановлением кассационной инстанции от 17.04.01 решение от 22.11.00 отменено с направлением дела на новое рассмотрение.

При новом рассмотрении дела в качестве третьего лица, не заявляющего самостоятельных требований на предмет спора, к участию в деле привлечена компания «Холд Экс Эл. Эл. Си».

Решением от 05.07.01, оставленным без изменения постановлением апелляционной инстанции от 09.11.01, исковые требования ОАО «Качканарский ГОК «Ванадий» удовлетворены.

Постановлением кассационной инстанции от 21.01.02 судебные акты отменены, дело направлено на новое рассмотрение. При новом рассмотрении суду предлагалось установить, какой из предъявленных сторонами договоров купли-продажи акций является подлинным, фактического владельца спорных акций и его добросовестность и в зависимости от установленных обстоятельств предложить истцу уточнить заявленные исковые требования. Судами не исследовался и не оценивался имеющийся в материалах дела акт приемки-передачи векселей от 19.01.00, содержащий ссылку на договор купли-продажи спорных акций от 18.01.00.

Решением суда от 12.03.02 исковые требования удовлетворены.

В апелляционной инстанции законность и обоснованность решения не проверялись.

Не согласившись с судебным актом, ООО «Полипром» подало кассационную жалобу в Федеральный арбитражный суд Северо-Кавказского округа на решение суда от 12.03.02, в которой указывает, что суд нарушил требования статьи 178 Арбитражного процессуального кодекса Российской Федерации и не выполнил указания кассационной инстанции.

Отзыв на кассационную жалобу в суд не представлен.

Федеральный арбитражный суд Северо-Кавказского округа, выслушав представителей сторон, изучив материалы дела, считает, что решение суда следует отменить по следующим основаниям.

Из материалов дела следует, что истец и ответчик представили в судебное заседание два различных по содержанию и датам заключения договора купли-продажи акций ОАО «Качканарский ГОК «Ванадий» на общую сумму – 5558847 рублей: № 3 от

18.01.99 и № 3 от 18.01.00, заключенных между ООО «Торговый дом ОАО «Ванадий» (продавец) и ООО «Полипром» (покупатель).

В обоснование решения по делу суд сослался на недействительность договора купли-продажи акций от 18.01.99. Выясняя вопрос о том, какой из договоров является подлинным, суд апелляционной инстанции сослался на выписки из реестра ЗАО «Компания-регистратор «Панорама», в соответствии с которыми запись о списании с лицевого счета ООО «Торговый дом «Ванадий» спорных акций произведена на основании договора купли-продажи от 18.01.99, и на этом основании пришел к выводу о подлинности договора от 18.01.99.

Вместе с тем, признавая подлинным договор от 18.01.99, суд не учел то, что в уведомлении от 21.01.00 об операции, проведенной по счету с акциями, держатель реестра, ссылаясь на договор купли-продажи от 18.01.99, одновременно указывает, что новый владелец акций – ООО «Полипром» – зарегистрирован в Государственной регистрационной палате Республики Калмыкия 22.06.99. Данное обстоятельство подтверждается также свидетельством о государственной регистрации ООО «Полипром» от 22.06.99 и свидетельством о постановке на учет в налоговом органе от 25.08.00.

Поскольку ООО «Полипром» не существовало в январе 1999 года, оно не могло заключить договор от 18.01.99.

Кроме того, договор от 18.01.00 предусматривает, что оплата акций осуществляется покупателем векселями Сберегательного банка Российской Федерации с подписанием акта приема-передачи (п. 2.1). Возможность расчета векселями предусмотрена и договором от 18.01.99. Из акта приема-передачи векселей от 19.01.00 следует, что ООО «Торговый дом ОАО «Ванадий» передает векселя Сберегательного банка Российской Федерации ООО «Полипром» во исполнение договора купли-продажи спорных акций от 18.01.00. Операция по списанию с лицевого ООО «Торговый дом ОАО «Ванадий» и зачислению на лицевой счет ООО «Полипром» спорных акций проведена реестродержателем 21.01.00 на основании передаточных распоряжений от 21.01.00.

Таким образом, вывод суда о том, что подлинным является договор от 18.01.99 не соответствует материалам дела. При таких обстоятельствах договор от 18.01.99 следует признать ничтожным на основании статьи 168 Гражданского кодекса Российской Федерации.

Согласно статье 46 Федерального закона Российской Федерации «Об обществах с ограниченной ответственностью» решение о совершении крупной сделки, связанной с

отчуждением обществом имущества, стоимость которого составляет более двадцати пяти процентов стоимости имущества общества, определенной на основании данных бухгалтерской отчетности за последний отчетный период, принимается общим собранием участников общества. Крупная сделка, совершенная с нарушением требований, предусмотренных настоящей статьей, может быть признана недействительной по иску общества или его участника.

Из материалов дела следует, что указанный порядок заключения договора от 18.01.00 ООО «Торговый дом ОАО «Ванадий» соблюден не был. Стоимость акций, проданных по договору от 18.01.00, составляет более двадцати пяти процентов стоимости имущества ООО «Торговый дом ОАО «Ванадий», определенного по данным бухгалтерского баланса на конец 1999 года.

Согласно уставу ООО «Торговый дом ОАО «Ванадий» единственным учредителем общества является ОАО «Качканарский ГОК «Ванадий». Следовательно, в силу пункта 5 статьи 46 Федерального закона Российской Федерации «Об обществах с ограниченной ответственностью» ОАО «Качканарский ГОК «Ванадий» вправе обратиться с иском о признании недействительной крупной сделки, совершенной ООО «Торговый дом ОАО «Ванадий» с нарушением требований указанной статьи.

Поскольку договор купли-продажи акций от 18.01.00 заключен с нарушением требований статьи 46 Федерального закона Российской Федерации «Об обществах с ограниченной ответственностью», его следует признать недействительным.

Передаточные распоряжения от 20.01.00, на основании которых на лицевой счет ООО «Полипром» были зачислены именные обыкновенные акции ОАО «Качканарский горно-обогатительный комбинат «Ванадий» выпуска № 62-1П-290 от 12.07.93 в количестве 9759 шт. и № 62-1-1396 от 12.06.96 в количестве 2298225 шт., являются недействительными в силу статьи 168 Гражданского кодекса Российской Федерации, поскольку основаны на недействительном договоре.

В деле имеется ксерокопия договора купли-продажи ценных бумаг № KGOK-001/А, согласно которому ООО «Полипром» продал спорные акции компании «Холд Экс Эл. Эл.Си» Оценивая этот договор, суд в нарушение статьи 178 Арбитражного процессуального кодекса Российской Федерации не исполнил указаний кассационной инстанции и не привлек компанию «Холд Экс Эл. Эл.Си» к участию в деле в качестве ответчика.

Согласно статье 29 Федерального закона «О рынке ценных бумаг» запись в реестре акционеров фиксирует право лица на соответствующее количество акций. Поэтому требование истца о восстановлении записи о наличии на лицевом счете ООО

«Торговый дом ОАО «Ванадий» спорных акций, в случае, если это имущество находится у третьих лиц, которые приобрели его по договору с ООО «Полипром», о чем в реестр внесена соответствующая запись, по существу означает требование о возврате имущества (статья 302 Гражданского кодекса Российской Федерации), которое не может быть рассмотрено без привлечения фактического владельца акций к участию в деле в качестве второго ответчика.

При таких обстоятельствах решение подлежит отмене в части удовлетворения исковых требований о восстановлении в реестре владельцев именных ценных бумаг ОАО «Качканарский ГОК «Ванадий» записи о наличии на лицевом счете ООО «Торговый дом ОАО «Ванадий» именных обыкновенных акций с передачей дела на новое рассмотрение.

Учитывая изложенное и руководствуясь статьями 174, 175, 176, 177 Арбитражного процессуального кодекса Российской Федерации, Федеральный арбитражный суд Северо-Кавказского округа

П О С Т А Н О В И Л :

решение от 12.03.02 Арбитражного суда Республики Калмыкия по делу №А22-1222/2000/6-109Ар46 изменить в части признания недействительным договора от 18.01.00 и передаточных распоряжений от 20.01.00, изложить решение в этой части в следующей редакции: признать недействительными заключенные ТД «Ванадий» и ООО «Полипром» договор № 3 от 18.01.99 и договор № 3 от 18.01.00, а также передаточные распоряжения от 20.01.00, на основании которых на лицевой счет ООО «Полипром» были зачислены именные обыкновенные акции ОАО «Качканарский горно-обогатительный комбинат «Ванадий» выпуска № 62-1П-290 от 12.07.93 в количестве 9759 шт., № 62-1-1396 от 12.06.96 в количестве 2298225 шт.

В остальной части решение отменить, дело передать на новое рассмотрение в суд первой инстанции.

Постановление вступает в законную силу с момента его принятия и обжалованию не подлежит.

Председательствующий                    И.П. Назаренко

Судьи:                                          С.В. Рогальский

                                                   Ю.В. Ширвис

## CERTIFICATE OF SERVICE

I, Karen V. Sullivan, Esquire, hereby certify that on this 31st day of March, 2005 two

copies of the foregoing Appendix to Defendants' Opening Brief in Support of Defendants'

Motion to Dismiss the Complaint Volumes 1 through 13 were served on the following in the

manner indicated:

VIA E-FILING & HAND DELIVERY
Kurt M. Heyman, Esquire
Patricia L. Enerio, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P. O. Box 25130
Wilmington, DE 19899

VIA U.S. MAIL
Bruce S. Marks, Esquire
Gene M. Burd, Esquire
Marks & Sokolov LLC
1835 Market Street – 28th Floor
Philadelphia, PA 19103

KAREN V. SULLIVAN (No. 3872)