# EXHIBIT A

# TO NOTICE OF FILING OF AMENDED COMPLAINT

IN THE UNITED STATES DISTRICT COURT OF CHANCERY OF
FOR THE STATEDISTRICT OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

DAVIS INTERNATIONAL, LLC, HOLDEX, LLC,:
FOSTON MANAGEMENT, LTD, and     :
OMNI TRUSTHOUSE, LTD,       :
       :
       Plaintiffs,     :
       :
       v.     :    C.A. No. ——————04-1482-
GMS
       :
NEW START GROUP CORP., VENITOM CORP.,   :
PAN AMERICANPANAMERICAN TRADE CORP., MDM BANK,  :
URAL-GORNO METALURAGICALMETALURGICAL COMPANY,  :
EVRAZ HOLDING,      :MIKHAIL CHERNOI, _:
OLEG DERIPASKA,÷ ARNOLD KISLIN, _:
MIKHAIL NEKRICH, and     :
ISKANDER MAKMUDOV,     :
       :
      Defendants.   :

## FIRST AMENDED COMPLAINT

Plaintiffs Davis International, LLC, ("Davis"), Holdex, LLC ("Holdex"), Foston

Management, LTD ("Foston"), and Omni Trusthouse, LTD ("Omni," and collectively,

"Plaintiffs"), by and through their undersigned counsel, as and for their First Amended

Complaint against Defendants, hereby allege as follows:

### Nature of the Action

1.    The instant case concerns a racketeering scheme beginning in the 1990s among

members of an international organized crime group, headed by Mikhail Chernoi, Oleg Deripaska,

Iskander Makmudov, and American Mikhail Nekrich, utilizing Delaware entities as their alter

egos, managed by American Arnold Kislin (the "Illegal Scheme").

2.    Defendants Chernoi, Deripaska, Makmudov, Nekrich and Kislin (the "Conspirators"), as a unified criminal group, committed numerous criminal acts, including bribery, extortion, and mail and wire fraud, as part of the Illegal Scheme.

3.    In the early 1990's, the Conspirators effected a scheme by which they took advantage of weaknesses in the Russian central banking system. By providing forged authorizations from regional banks to the central banking system, they were able to wire funds to shell companies in other regions, convert the funds to cash, and then ultimately wire the funds to the U.S. in order to launder and legalize them.

4.    From 1993 onward, these funds were laundered through Delaware entities and used to purchase tens of millions of dollars of real estate in the U.S.; the real estate was then sold and the laundered and "legalized" funds further reinvested in other businesses.  These funds, "legalized" in the U.S. in the above manner, served as seed money for their illegal ventures.

5.    In mid 1999, the Conspirators threatened physical harm to Plaintiffs' representatives unless they ceded control over Kachkanarsky GOK ("GOK"), Russia's largest vanadium ore mining concern, of which Plaintiffs were the majority shareholders.

6.    In early 2000, the Conspirators took over GOK through physical force, bribery, and extortion.

7.    Once in physical control of GOK, the Conspirators replaced the plant's general director with their own designee, who had the plant enter into sham contracts with their affiliates, which contracts were then deliberately defaulted, creating massive sham debts.

8.    The plant was then placed in a bankruptcy by which they could assert control, because the debts they were "owed" allowed them to elect their agent as the bankruptcy manager.

9.    In late 2000, the Conspirators arranged for Plaintiffs' shares in GOK to be transferred to the Delaware corporate defendants, utilizing, *inter alia,* fraud or corrupted court proceedings in which Plaintiffs were not even named as parties; the Delaware companies ultimately transferred these shares to UGMC and then to EVRAZ, which is controlled by the Chernoi, Deripaska, Makmudov, and Nekrich.

10.    Delaware was the forum of choice for Defendants for effecting this and other illegal schemes; over the course of time, Defendants used over 100 Delaware entities to effect their schemes of fraud, bribery, and money laundering; seventeen of these entities are named herein.

11.    Also, in 2000, in order to sustain the seizure of GOK, false criminal charges were brought against Jalol Khaidarov, who had served as the general director of GOK, including an incident widely-reported in the electronic and print media of the police planting narcotics on him at the Starlight Diner in Moscow, which forced him to flee to Israel.

12.    In 2001, at Makmudov's direction, Russian police purported to find narcotics in the Moscow headquarters office of Israeli citizen Joseph Traum, a principal and managing director of Plaintiff Davis; when freed, he fled home. The "discovery" of "narcotics" at Traum's office and his "deportation" from Russia was covered on TV and radio.

13.    In 2003, the Conspirators arranged for GOK to issue new shares to companies which they control so that even if Plaintiffs recovered their shares in GOK they would be in the minority, unless the new shares are either transferred to Plaintiffs or set aside.

14.    As a result of the Illegal Scheme, Plaintiffs have suffered in excess of $500 million in damages through the loss of their shares and control over GOK.

15.    In August 2001, Plaintiffs joined a suit in the Southern District of New York brought by other plaintiffs involving additional defendants and additional claims, which was dismissed for *forum non conveniens* in March 2003 and affirmed in a non-published opinion in ~~March~~April 2004.

### Parties and Related Non-Parties

### Plaintiffs

16.    **Plaintiff Davis International, LLC** ("Davis") is a company organized under the laws of the State of West Virginia.

17.    **Plaintiff Holdex, LLC** ("Holdex") is a company organized under the laws of the State of Texas.

18.    **Plaintiff Foston Management, LTD** ("Foston") is a company organized under the laws of Cyprus.

19.    **Plaintiff Omni Trusthouse, LTD** ("Omni") is a company organized under the laws of England.

20.    Davis, Holdex, Foston, and Omni collectively owned more than 72% of the shares of GOK prior to the fraudulent transfer of their shares described herein.

### Kachkanarsky GOK

21.    Non-party **Kachkanarsky GOK** ("GOK") is a company organized under the laws of the Russian Federation that maintains Russia's largest vanadium ore plant in Kachkanarsky GOK, which is located in the town of Kachkanar in the Sverdlovsk Oblast in the Ural Mountains.

22.    Vanadium ore produced by GOK is used to manufacture various metal products as well as pure vanadium, which are sold to customers in the United States.

**Defendants**

23.    **Defendant New Start Group Corp.** ("New Start") is a company organized under the laws of the State of Delaware.

24.    **Defendant Venitom Corp.** ("Venitom") is a company organized under the laws of the State of Delaware.

25.    **Defendant** ~~Pan-American~~**Panamerican Trade Corp.** ("Pan-American") is a company organized under the laws of the State of Delaware, which was dissolved in 1998.

26.    **Defendant Mikhail Chernoi** ("Chernoi") is a Russian and/or Israeli citizen who resides in Israel.  He is the head of the Conspirators' criminal group.

27.    **Defendant Oleg Deripaska** ("Deripaska") is a Russian citizen who resides in Moscow.

28.    **Defendant Arnold Kislin** ("Kislin") is an American citizen and resident of the State of New York.

29.    **Defendant Iskander Makmudov** ("Makmudov") is a Russian citizen who resides in Moscow.

30.    **Defendant Mikhail Nekrich ("Nekrich")** is a United States citizen who resides in Switzerland or Russia and joined the conspiracy in 1997.

31.    **Defendant Moscovsky Delovoy Mir Bank ("MDM Bank")** is organized under the laws of the Russian Federation; its name means Moscow Business Bank.    MDM Bank was owned, directly or indirectly, by Chernoi, Deripaska, Makmudov, and Nekrich and operated and managed by them.

32.    **Defendant Ural-Gorno Metallurgical Company ("UGMC")** is organized under the laws of the Russian Federation; during the relevant time, Makmudov operated and managed

UGMC. At present, Makhmudov is the Chairman of the Board of Directors of UGMC. The beneficial owners of UGMC are Chernoi, Deripaska, Makmudov, and Nekrich.

33. **Defendant Evraz Holdings ("EVRAZ")** is organized under the laws of the Russian Federation. Evraz was owned, directly or indirectly, by Chernoi, Deripaska, Makmudov, and Nekrich and operated and managed by them, or under their direction and control.

34. Defendants New Start, Venitom, and Pan-American are owned and controlled, directly or indirectly, and the corporate alter egos of by Chernoi, Deripaska, Makmudov, and Nekrich, and managed and operated by Kislin.

35. These Delaware Defendants and other Delaware entities were created by the Conspirators and used for the purpose of furthering criminal conduct.

36. The Conspirators regularly utilized Delaware entities in their various illegal schemes involving fraud, bribery, and money laundering. The Conspirators organized or bought over 100 Delaware entities for these purposes, including **(1) MIC Building Co. L.P.; (2) MC MIC Building Corp.; (3) MIC Leasing Co., L.P.; (4) MC MIC Leasing Corp.; (5) Around the Clock Corp.; (6) CMC MIC Holding Company, LLC; (7) MC Holdings Company, LLC; (8) CMC Factory Holding Company, LLC; (9) CMC Center Holding Company, LLC; (10) CMC Falchi Holding Company, LLC; (11) Falchi Building Co., L.P.; (12) 33-00 Center Building LLC; (13) The Factory, L.P.; and (14) MC Factory Corp.** (collectively the "Delaware Real Estate Entities").

37. The Delaware Real Estate Entities were used by Chernoi, Deripaska, Kislin, Makmudov, and Nekrich in part, to own real estate in the United States as a means of laundering their illegally obtained funds.

6

### The Russian-American "Izmailovo Mafia"

38.    Non-party **Anton Malevsky** ("Malevsky"), now deceased, was a Russian citizen who was a member of and controlled the Russian-American Izmailovo Mafia during the relevant time period and acted on behalf of Defendants.

39.    The Izmailovo Mafia is one of the most powerful Russian-American organized crime groups and is named for the Izmailovo region of Moscow.

40.    As set forth in numerous media articles and government reports, the Izmailovo Mafia has infiltrated the United States; its American leader, Vyacheslav Ivankov, was recently released from federal prison where he served seven years for extortion; he was immediately extradited to Russia to be tried for murder charges.

41.    Chernoi, Deripaska, Makmudov, and Nekrich operate an organized crime group which is part of the Izmailevo Mafia.

42.    Chernoi has been indicted in Israel for the equivalent of money laundering; on information and belief, he is currently the subject of criminal proceedings in Switzerland.

43.    Deripaska has been barred from entering Switzerland and, on information and belief, he is currently the subject of criminal proceedings in Switzerland.

44.    According to numerous media articles, the Ismailovo Mafia, through Nekrich, has financed Chechen terrorists , including those with ties to the international terrorist network of al-Qaeda.

### The Central Bank Fraud

45.    In the early 1990's, a number of Russian organized crime groups, including the Chernoi, Deripaska, and Makmudov association, engaged in a simple, but effective, check kiting-like fraud, on the Russian central bank.

46.    In order to effect the fraud, they set up dummy companies and opened accounts in their names with a local branch of the Russian central bank, usually in Chechnya.  Then, they would issue a payment advice to the order of another dummy company controlled by them and arrange for it to be accepted by the branch.  The branch would transfer the advice to the payee company's account in another branch which would be credited with immediate availability of funds upon receipt of the advice.  Because the Conspirators used Chechen branches to effect the fraud, the advices were known as "Chechen Advices."

47.    The payee would then cash the funds, which would ultimately be wired through bank accounts in the United States.  The funds were used to purchase tens of millions of dollars of real estate in the U.S. in the name of entities registered in the state of Delaware.

48.    Fourteen of these Delaware entities are named above as the Delaware Real Estate Entities; ultimately, this real estate was sold and the proceeds were used as "seed money" for the Conspirators other criminal ventures, including the takeover of GOK.

### The Initial Extortion

49.    Prior to December 1998, Jalol Khaidarov ("Khaidarov") had worked for Chernoi, Deripaska, and Makmudov as a financial advisor.  In December 1998, Khaidarov established an independent career and began to serve as the general director of GOK in April 1999.

50.    In April 1999, Khaidarov met with Chernoi and Makmudov in Chernoi's apartment in the center of Paris regarding GOK.  Chernoi told Khaidarov that "there were a lot of clever people like Felix Lvov, Oleg Kantor, Vadim Yafasov, but sometimes they die.  Don't be too clever.  You have a chance to continue working with us.  To that end, you should persuade the shareholders of GOK to transfer their shares to us.  Some people refuse my offers.  But for the rest of their lives, they wear bulletproof jackets.  So what's the sense?  Think it over."  This

was a direct threat on the life of Khaidarov if he did not cooperate with Chernoi because all of the above persons had been murdered in Russia.

51.     By May or June 1999, the controlling shareholders of GOK agreed preliminarily to sell 20% of their shares to a company controlled by the Conspirators in response to the extortion. The GOK controlling shareholders hoped that this would satisfy the Conspirators. The Conspirators made a down payment of $5 million for these shares, which was wired through a bank in the United States to an account held on behalf of the GOK shareholders.

52.     Several months later, Makmudov told Khaidarov that the Conspirators needed a controlling share of GOK, and Chernoi demanded that Khaidarov arrange for 51% of the shares of GOK to be transferred to the Conspirators.

53.     In response, the GOK controlling shareholders decided that it was impossible to cooperate or satisfy Chernoi and Makmudov, short of simply giving up their interests for far less than their worth. As a result, the GOK shareholders returned the $5 million through a bank in the U.S. and the purported transfer of shares did not take place.

### The Malevsky Extortion

54.     Immediately thereafter, in November 1999, Makmudov asked Khaidarov to meet with him at the Luxor Restaurant at the Metropole Hotel in Moscow. Shortly after the meeting began, Makmudov called Malevsky, who then joined the meeting, accompanied by five armed thugs; Deripaska, Kislin, and Nekrich were also present. Malevsky is well known as a leader in the Russian mafia and his mere presence was a direct threat by Deripaska, Kislin, and Nekrich.

55.     Makmudov demanded that Khaidarov arrange for the GOK controlling shareholders to transfer 51% of Gok's shares to Chernoi without payment.

56.    Khaidarov said he thought Makmudov was crazy, but that he would transmit the message.

57.    Malevsky then told Khaidarov, "What do you think you're saying?    This is the last time that you will leave here alive."

### The Bribery of Governor Roussel

58.    As of 1999, Eduard Roussel ("Roussel") was the Governor of the Sverdlovsk Oblast, where GOK was located.

59.    In that year, meetings were arranged between representatives of the Conspirators, including Makmudov, to pay Roussel for his "protection" and "help."

60.    Payments were then wired by Pan-American through banks in the United States to MDM Bank for conversion into cash for payment at the direction of Roussel.

61.    These payments included the illegal payment of $850,000 in cash for Roussel's election campaign -- a payment that was widely reported in the Russian press.

62.    In return for these payments, Roussel agreed to support the Conspirators' efforts to do "business" in Sverdlovsk Oblast.

### The Physical Takeover of GOK

63.    On or about January 28, 2000, the Conspirators took over GOK by sending armed persons to take physical control of the plant.    The takeover of GOK was widely covered by leading Russian TV and media.

64.    By threat of physical harm, the Conspirators caused four of the seven member board of directors of GOK in the absence of a quorum, which according to the bylaws was five to vote to remove Khaidarov as general director and to replace him with Andrey Kozitsin ("Kozitsin"), an agent of the Conspirators.

65.    Although the lower court order approving this resolution of the board of directors was invalidated by a directive from a member of the Supreme Court of Russia, which remanded the case for reconsideration, the lower court failed to conduct a hearing to reconsider its order for over two years and, as of the filing of this Complaint, has yet to decide the matter.

66.    The three remaining board members initially refused to succumb to the threats and filed criminal complaints with the Prosecutors of the Kachkanar and Sverdlovsk areas, requesting initiation of the criminal proceedings in connection with the illegal takeover.

67.    Malevsky's people threatened the three resisting directors that their families would be killed.  Two of the remaining directors then agreed to support the Conspirators and, in return, received bribes in the form of expensive automobiles and apartments in Moscow.

68.    On information and belief, these apartments and automobiles were purchased with cash from MDM Bank which had been wired through banks in the United States from Pan-American or another company associated with the Conspirators.

### Makmudov's Next Threat

69.    After the physical takeover of GOK, one of Makmudov's men met with Khaidarov.

70.    The man said that the Conspirators knew that Khaidarov and the GOK shareholders could fight them with complaints to the authorities and lawsuits in Russia.  The man also said that the Conspirators also knew that Khaidarov had relatives in Tashkent and that his wife and son were then in England, and threatened harm to them if Khaidarov resisted the takeover.

### The Initial Efforts to Fight the Illegal Takeover

71.    On or about March 4, 2000, shareholders of GOK conducted a meeting to invalidate the decision of the board which removed Khaidarov as the general director.

72.    The meeting of shareholders took place on a side of the road near Kachkanar.

73.    The shareholders adopted a resolution invalidating the decision of the board meeting, elected a new board of directors, and expressed confidence in Khaidarov as general director of GOK.

### Malevsky's Final Threat

74.    After the shareholders' meeting, Malevsky met with Khaidarov at the Balchug-Kempinsky Hotel in Moscow in late February or early March 2000.  There, he said to Khaidarov: "What are you doing?  It's going to end badly for you.  Nobody will help.  Not the FSB [Federal Security Service].  Not the MVD [Ministry of Interior Affairs]."  Malevsky was sending the message that the Conspirators controlled government agencies and that Khaidarov and the GOK shareholders had a "last chance" to give up.

### The Creation of the False Debt of GOK

75.    Recognizing that the shareholders of GOK had an opportunity to reacquire control, the Conspirators arranged for GOK to incur massive false debts prior to placing it in a sham bankruptcy.

76.    The Conspirators and MDM Bank arranged for Andrey Kozitsin, who was acting as general manager of GOK, to enter into a number of sham transactions.  The end result of the sham transactions was that a shell company, Lebaut, during the period of several days in the middle of February, became a holder of demand promissory notes issued by GOK with the face value of about $39 million through the following scheme:

12

(a)     On or about January 28, 2000 -- the very day of the physical takeover of GOK -- Kozitsin had GOK enter into a sham Joint Venture Agreement (the "JV Agreement") with a Russian company named Svyatogor, which was controlled by the Conspirators and which is currently a subsidiary of UGMK.

(b)     Subsequently, on or about February 4, 2000, the Conspirators arranged for MDM Bank to enter into a sham Credit Agreement with GOK for $15 million to be loaned to GOK and repaid within several days.

(c)     On February 4, 2000, MDM Bank loaned the $15 million to GOK, which Svyatogor guaranteed under a guaranty agreement (the "Guarantee Agreement").

(d)     Under the terms of Guarantee Agreement, GOK was to pledge its promissory notes for approximately $25 million as "security" for Svyatogor's issuance of Guarantee.

(e)     Subsequent to GOK's delivery of its promissory notes to Svyatogor, on February 10, 2000, GOK wired the $15 million it had obtained from MDM Bank to Svyatogor, through an American Bank, as GOK's contribution to the "Joint Venture."

(f)     On February 10, 2001, GOK "defaulted" on its obligation to repay the $15 million "loan" from MDM Bank.

(g)     The following day, Svyatogor, as guarantor under the Guarantee Assessment, wired $15 million to MDM Bank, through an American Bank.

(h)     Pursuant to the terms of the Guarantee Agreement, after the "default," Svyatogor became the holder of the GOK promissory notes for $25 million -- using the same monies lent by MDM Bank to GOK to repay MDM Bank!

(i)     Just 10 days later, on or about February 21, Svyatogor transferred the promissory notes to Lebaut.

77.     Thus, as a result of this "transaction," the Conspirators arranged for $15 million to circulate through GOK's and Svyatogor's accounts, and, in return, obtained $25 million of GOK notes for literally nothing.

13

78.     Through the use of this and various other sham transactions during the period of five days from February 18 to February 23, Lebaut accumulated a total of 53 GOK promissory notes with a face value of approximately $39 million.

### GOK's Sham Bankruptcy

79.     Following the "last chance" meeting with Malevsky, the Conspirators arranged for a false bankruptcy to take place in order to cement their control over GOK, causing a local natural gas company to file an involuntary bankruptcy petition against GOK on March 24, 2000.

80.     Prior   to   initiation   of   bankruptcy   proceedings,   GOK's   debt   to "Krasnouralskmezhraygaz" ("Krazgaz"), its gas supplier, amounted to $810,000 caused by the Conspirators' deliberate nonpayment of natural gas bills for January, February, and March 2000, -- the time period after they took over GOK.  At the instigation of the Conspirators, on February 4, 2000, Krazgaz demanded that GOK pay the debt even though an agreement had been reached to pay the debt over time.

81.     Despite the fact that GOK had on its bank account funds nineteen times greater than the amount of its debt to Krasgaz, on February 8, 2000, Kozytsin refused to pay off the debt due to "lack of monetary funds at GOK."

82.     On February 21, 2000, Kozitsin again rejected a collusive demand to pay the debt despite the availability of the funds exceeding $2 million; thereafter, in collusion with Kozitsin, Krasgaz filed a petition placing GOK in involuntary bankruptcy.

83.     On or about March 30, 2000, the Sverdlovsk Arbitrazh Court accepted the bankruptcy petition and appointed Oleg Kozyrev ("Kozyrev"), an agent of the Conspirators, as provisional manger of GOK.

84.    On or about August 11, 2000, Kozyrev held the first meeting of creditors where Lebaut's fraudulent claim amounted to 94% of creditor votes.  As a result of the first creditors meeting, Kozyrev was nominated as external manager of GOK.  Under Russian Law, an external manager has management authority over a company.  Thus, the appointment allowed the Conspirators to avoid the risk that a court could invalidate the decision to remove Khaidarov and return him to the position of the general director of GOK as well as give them time for the subsequent conversion of GOK shares from the Plaintiff companies.

85.    Shortly thereafter, on August 22, 2000, the court held a hearing to approve the decision of the first meeting of the creditors to appoint Kozyrev as external manager.

86.    The Sverdlovsk Oblast government, controlled by Roussel, filed a petition in support of the approval of the appointment of Kozyrev in order to send a signal to the court, which approved the appointment of Kozyrev.

87.    As shareholders, Plaintiffs had no standing under the Russian bankruptcy law to challenge these actions.

### The Fraudulent Transfers of Plaintiffs' Shares in GOK

88.    After Kozyrev was appointed as external manager in August 2000, the Conspirators arranged for Plaintiffs to be removed from the registry of GOK shareholders and for their shares to be transferred secretly to Delaware shell companies New Start and Venitom and other companies controlled by the Conspirators.  This tactic is a relatively common method in Russia by which organized crime groups seize control of economic enterprises.

**The Davis Shares**

89.     On or about September 30, 2000, the Conspirators had Kozyrev change the registrar of shares of GOK to VRK Company, a  registration company controlled by the Conspirators through UGMC, which was a shareholder of VRK.

90.     On or about October 18, 2000, the VRK Company registered a transfer of 35,106,022 shares of GOK from Davis to New Start, which constituted 18.39% of issued and outstanding GOK shares and all of the shares owned by Davis.

91.     In order to cloak the transfer with the appearance of legitimacy, the Conspirators arranged for Mr. Ashenbrenner, a prior agent of Davis, to submit to VRK an invalid, not notarized and unauthorized power of attorney which purportedly authorized him to transfer shares from Davis to New Start.   The only power of attorney that has ever been issued to Ashenbrenner had been revoked on or about September 28, 2000 -- three weeks before the fraudulent transfer.   VRK, according to its own Charter, improperly accepted the transfer order signed by Ashenbrenner even though the order was not executed with Davis' corporate seal and the power of attorney issued from the name of the company and submitted by Ahsenbrenner was not an original document.

92.     Furthermore, in order to give the transfer of the Davis shares appearance of legality, the Conspirators, on or about October 20, 2000, arranged for New Start to make a wire transfer in the amount of $2 million to the order of Davis' account with MDM Bank through an American bank.   The same day, the Conspirators arranged for MDM Bank to wire the above $2 million from Davis' MDM Bank account.   This transfer was based on a forged payment order executed by Ashenbrener.   The order was not executed with Davis' corporate seal.   At no time did Davis authorize Ashenbrener to execute any payment orders on its behalf.

16

93.     Moreover, Davis would never agree to sell its 35 million shares constituting 18.39% of all issued and outstanding GOK shares for $2 million.

94.     The Davis shares, in whole or in part, were registered in the names of New Start and Venitom. There has never been litigation related to the Davis Shares.

### Omni's Shares

95.     Prior to 2000, Omni purchased its shares in GOK from various entities that had acquired the shares as a result of a judicial sale that occurred in September 1998. As the result, Omni accumulated 34,031,114 shares, which constituted 17.83 % of issued and outstanding GOK shares.

96.     In the spring of 2000, unbeknownst to Omni, NPRO Urals, a company controlled by the Conspirators, filed a lawsuit in the obscure Chelyabinsk Arbitrazh Court to set aside the judicial sale. On August 1, 2000, the ~~court~~Court ruled in favor of NPRO Urals and ordered that the shares be re-registered in the name of NPRO Urals. By decision dated October 16, 2000, the appellate division of the court likewise ordered that the shares be re-registered in the name of NPRO Urals, which occurred on or about November 15, 2000. This order was affirmed by the Federal Court for the Ural District on January 4, 2001.

97.     As a result, Omni was divested of 10,583,063 shares, which constituted 5.54 % of the issued and outstanding GOK shares.

98.     Contrary to Russian law, Omni, the owner of shares, was never notified of or participated in these proceedings and did not learn of the transfer of its shares until two months after it took place. Court ordered transfer of property of persons who are not named as parties and not provided notice or an opportunity to be heard in violation of Russian law is emblematic of corruption in Russia.

99.    After Omni had learned of the transfer of its shares, its representative appeared at the January 4, 2001 hearing and petitioned to make Omni a party to the proceedings. This request was denied; thus, Omni has never been party to the proceedings even though its shares were transferred.

100.    Several defendants in the NPRO Urals lawsuit, who had sold the shares to Omni, filed applications for protest at the Supreme Arbitrazh Court of the Russian Federation, seeking to reverse these decisions. Two of the applications were denied on February 12, 2001, and May 21, 2001, by Judge Arifulin, and another application was denied on July 4, 2001, by Judge Yukov.

101.    In *Films By Jove v. Berov*, 2003 U.S. Dist. LEXIS 6233 (E.D.N.Y. Apr. 16, 2003), Judge Trager of the Eastern District of New York found that a decision in which Judge Arifulin was involved was obtained through corruption.

102.    Omni's shares were registered in whole or in part in the name of Venitom and other companies controlled by the Conspirators, even though it was not named and did not participate in the proceeding.

103.    On information and belief, Venitom "paid" for these shares with monies wired through an American bank.

### Foston's Shares

104.    As of September 2000, Foston owned 37,799,600 shares, which constituted 19.8% of issued and outstanding GOK shares.

105.    In 2000, three companies owned and controlled by the Conspirators sued Foston in Moscow, seeking to invalidate the sale of shares to Foston. Foston was never notified of the

proceedings and, instead, a forged power of attorney was submitted to the court purportedly on behalf of Foston; presumably, an impostor appeared on behalf of Foston.

106.    On September 29, 2000, absent any opposition, the court ordered the transfer of 37,715,081 of the Foston's GOK shares which consisted of 19.75% of the Gok shares to the Conspirators' companies.  Subsequently, on October 18, 2000 the transfer has been registered on the books of the registrar company VRK controlled by UGMC.

107.    Only in October 2000, Foston accidentally learned of the transfer of its shares. When Foston attempted to investigate what had occurred, the court files were stolen.

108.    Although a final decision of the Russian court compelling the return of these shares was entered in October 30, 2003, the Conspirators in the person of new owners of the stolen shares did not honor the decision.  The shares had been transferred by the Russian companies controlled by the Conspirators to other companies, including Venitom.  On information and belief, Venitom "paid" for these shares with monies wired through an American bank.

### Holdex's Shares

109.    As of September 25, 2000, Holdex owned 30,947,386 shares, which constituted 16.21% of issued and outstanding GOK shares.

110.    In late 2000, GOK filed a suit in the Kalmykia Arbitrazh Court against Polyprom, the company that sold its GOK shares to Holdex, to declare that the sale of shares to Polyprom, which it later sold to Holdex, was invalid.  By order dated November 22, 2000, the Court ruled in favor of GOK which the Conspirators then controlled and ordered that the shares be re-registered to another Russian company, which occurred on or about December 22, 2000.  As the result,

Holdex was divested of 2,307,984 shares, which constitutes 1.2 % of the issued and outstanding shares.

111. Contrary to Russian law, neither Polyprom nor Holdex were notified of, and did not participate in, the proceedings; in fact, Holdex was not even originally named as a defendant in the suit, but was only added as a defendant later upon the demand of Holdex itself after the fact of transfer of its shares. Again, court ordered transfers of property belonging to persons who were not named as parties and not provided notice or an opportunity to be heard, in violation of Russian law, which is emblematic of corruption in Russia.

112. Polyprom and Holdex did not learn about the decision until about two months after it was rendered.

113. Subsequently, hearings have taken place in the Russian courts for which Holdex never received notice; thus Holdex never participated in these proceedings.

114. Ultimately, the shares purchased by Holdex were transferred in whole or in part to Venitom and other companies controlled by Conspirators. On information and belief, Venitom "paid" for these shares with monies wired through an American bank

### The Bankruptcy "Settlement Agreement"

115. After the fraudulent transfer of shares was completed and the Conspirators no longer needed the bankruptcy proceedings, they decided to terminate the bankruptcy by having GOK enter into a settlement agreement with creditors.

116. To that end, on or about March 3, 2001, Kozyrev held a Second Meeting of Creditors. At the meeting, based on Lebaut's huge claim, the creditors approved a sham settlement agreement that, provided that the payments to creditors would be effected without

interest pursuant to the following schedule: 5% in 2006, 7% in 2007, 9% in 2008, 9% in 2009, 10% in 2010, and 15% each year thereafter until paid.

117.    The GOK sham settlement agreement was intended to make the debt owed to legitimate creditors worthless while transferring control of GOK to the "new" shareholders. Shareholders had no standing to challenge this agreement under Russian bankruptcy law.

### The False Criminal Charges Against Khaidarov

118.    In retaliation for the filing of the Russian litigation to set aside the fraudulent transfer of the shares, the Conspirators arranged for false criminal charges to be brought against Khaidarov.

119.    In July 2000, false criminal charges were filed as a result of a well-publicized incident in which the police planted drugs on Khaidarov while he was at the Starlight Diner in Moscow.    The police asked Khaidarov for his passport and then "found" a packet of heroin inside.  False charges of rape were also brought against Khaidarov.

120.    As a result of these false charges and threats on his life, Khaidarov was forced to flee Russia in November 2000,2000 and now lives in Israel under police protection, where he is cooperating with the Israeli, as well as American, authorities in their investigation of Chernoi and his associates.

### The Illegal Detention of Traum

121.    Joseph Traum ("Traum") was a managing director of Davis and was also authorized to represent the interests of several other GOK shareholders, including Holdex and Omni.

122.    Subsequent to the illegal takeover of GOK in January 2000, Traum had numerous conversations with Makmudov and Chernoi, during which Makmudov demanded that Traum sell them all of Davis' Gok shares or he would lose his "freedom."

123.    In March 2001, after Makmudov and Aschenbrenner had arranged the theft of all of the ~~GOK~~Gok shares from Davis, Makmudov threatened Traum with huge problems if he continued to challenge the theft of the shares.

124.    One month later, in April 2001, Traum was in his office in Moscow when Russian police (i.e. special forces) came to his office and directed people to lay on the floor. The police announced that they had information that Traum was a drug dealer, and that there were drugs hidden in the office. The police then put a big package on Traum's desk which they said contained a kilo of heroin. Within a few minutes, Makmudov called Traum and said, "Are you convinced? Now you can face 18 years in jail, or you can go to the airport and leave Russia."

125.    A secretary from the office called Khaidarov in Israel to inform him what was occurring. Khaidarov then called the Israeli police to request immediate assistance. Shortly thereafter, the Russian police received a telephone call while in Traum's office and then said he would be free to go. Apparently, Israeli officials interceded on behalf of Traum.

126.    Later, Makmudov called Traum and said that Traum had left him no choice and now he would have to eliminate him. Traum reported this to the Israeli police, who recommended that Traum immediately leave Russia, which he did. He is also cooperating with the authorities in their investigation of Chernoi and his associates.

**The Final Step to Consolidate
the Conspirators' Control Over GOK**

127.   In 2003, the Conspirators arranged for GOK to issue new shares in an amount equal to all previously issued shares to companies which they controlled.

128.   As of May 31, 2001, Holdex owned 14.99% , Omni owned 12.28%, and Foston owned 0.044% totaling to about 27% of all of then issued and outstanding GOK shares.

129.   The purpose of this was to dilute the Plaintiffs' remaining shares, since at the relevant time Plaintiffs still owned a blocking amount of GOK shares because under Russian law certain corporate decisions require the approval of 75% plus 1 of the voting shares.

130.   Upon information and belief, the Conspirators used profits obtained from their control of GOK to purchase the newly issued shares.  Upon information and belief, payment was made through fraudulently obtained funds which were wired to GOK or MDM Bank, directly or indirectly, in dollar denominated amounts through banks in the United States.

131.   Ultimately, the ~~GOK~~Gok shares illegally taken from Plaintiffs were "sold" to UGMC which then "sold" the shares to EVRAZ in 2004.

132.   Specifically, according to media reports in 2004, the Conspirators via UGMC, which they control, "sold" their controlling interest in GOK, which was illegally taken from Plaintiffs for $500 million, to EVRAZ.

133.   In an attempt to further consolidate their control of GOK, the Conspirators, through intermediaries, approached Holdex and Omni with an offer to purchase their GOK shares.  Ultimately, a block of about 52 million shares constituting about 13.64 % of issued and outstanding GOK shares was sold for about $27.7 million.

134.   After conclusion of the transaction, Holdex and Omni learned that the shares ultimately end up in the hands of the Conspirators.   Apparently, the Conspirators are seeking

access to Western financing or equity investment and, thus, are seeking to eliminate minority shareholders through legal means.

### The Predicate Acts of Racketeering

135.    Defendants committed numerous predicate acts forming a pattern of racketeering, including extortion, bribery, money laundering, illegal transactions in monetary instruments, violations of the Travel Act, and mail and wire fraud, described above.

136.    The pattern of racketeering began no later than the early 1990's and continues through the current date.

### The Enterprises

137.    New Start, Venitom, Pan-American, GOK, MDM, UGMC, and EVRAZ, as well as the Delaware Real Estate Entities, each constitute an enterprise pursuant to 18 U.S.C. §-1961(4), which engaged in and effected interstate and foreign commerce in the United States.

### COUNT I
Conversion
(Against New Start, Venitom, UGMC, EVRAZ,

Chernoi,Deripaska, Kislin, Makmudov and Nekrich)

138.    The allegations in the above paragraphs are incorporated herein as if set out in full.

139.    Pursuant to the Illegal Scheme, New Start, Venitom, UGMC, EVRAZ, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich exercised undue dominion and control over the property of the Plaintiffs by misappropriating Plaintiffs' shares and control of GOK, which were ultimately transferred to UGMC and EVRAZ.

140.    As a direct and proximate result of the unlawful acts of these Defendants, the Plaintiffs have suffered damages in an amount in excess of $500 million, including loss of the

value of their controlling interest in GOK and loss of dividends which would have been paid to them.

### COUNT II
### Equitable Relief
### (Against New Start, Venitom, UGMC, EVRAZ, Chernoi,Deripaska, Kislin, Makmudov, and Nekrich)

141.    The allegations of the above paragraphs are incorporated herein as if set out in full.

142.    The Conspirators used New Start and Venitom, two Delaware shell companies, in order to carry out their conversion of Plaintiffs' GOK shares. The Conspirators formed these and other Delaware corporations for fraudulent and illegal purposes, including money laundering and schemes like, and including, the conversion of Plaintiffs' GOK shares, which were ultimately transferred to UGMC and then to EVRAZ.

143.    On information and belief, New Start and Venitom do not conduct any real or legitimate business activities, but exist solely as the Conspirators' *alter egos* to serve their unlawful purposes. The Conspirators even attempt to hide their relationship with New Start and Venitom, as though they are clandestine "off shore" corporations in which anonymity is the norm, by failing to identify any officers or directors of those companies in their annual franchise tax reports filed with the Delaware Secretary of State.

144.    Accordingly, it is probable that New Start and Venitom are not capitalized and that any judgment rendered against them — particularly a judgment for millions or hundreds of millions of dollars—would be uncollectible.

145.    Delaware has a significant state interest in preventing the use of corporations formed under its aegis for perpetrating illegal international schemes. To the extent that New

Start and Venitom are unable to satisfy any judgment rendered against them in this action, Plaintiffs may be left without an adequate remedy at law, and this Court should exercise its equitable powers to pierce those companies' corporate veils and hold the Conspirators personally liable for any judgment against those companies.

146.    To the extent that it is still possible, the Court should also exercise its equitable power of injunction to require Defendants to disgorge and return Plaintiffs' GOK shares to them.

**COUNT III**
**Violation of RICO 18 U.S.C. § 1962(a)**
**(Against New Start, Venitom, Pan-American, Chernoi,**
**Deripaska, Makmudov, and Nekrich)**

138.    147.  The allegations of the above paragraphs are incorporated herein as if set out in full.

139.    148. Defendants received income from a pattern of racketeering, as described above.

140.    149. The pattern included predicate acts of bribery, extortion, money laundering, illegal transactions in monetary instruments, violations of the Travel Act, and mail and wire fraud.

141.    150. A part of such income or its proceeds were used, directly or indirectly, to acquire an interest in GOK and to operate GOK through the Illegal Takeover and conversion of Plaintiffs' shares, in violation of 18 U.S.C. § 1962(a).

142.    151. As a direct and proximate result of Defendants' use and investment of racketeering income in the Illegal Takeover of GOK and loss of their shares, Plaintiffs have suffered damages in an amount in excess of $500 million.

**COUNT IV II**
**Violation of RICO 18 U.S.C. § 1962(b)**
**(Against MDM Bank, New Start, Venitom,**

**Pan-American, UGMC, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich)**

143. ~~152.~~ The allegations of the above paragraphs are incorporated herein as if alleged in full.

144. ~~153.~~ Pursuant to the Illegal Scheme, MDM Bank, New Start, Venitom, Pan-American, UGMC, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich engaged in a pattern of racketeering activity specifically directed at acquiring and maintaining control of GOK, in violation of 18 U.S.C. § 1962(b).

145. ~~154.~~ This pattern of racketeering activity resulted in their gaining control of GOK.

146. ~~155.~~ The pattern included predicate acts of bribery, extortion, money laundering, illegal transactions in monetary instruments, violations of the Travel Act, and mail and wire fraud.

147. ~~156.~~ As a direct and proximate result of the takeover of GOK, Plaintiffs have suffered damages in an amount in excess of $500 million.

**COUNT ~~V~~ III**
**Violation of RICO 18 U.S.C. § 1962(c)**
**(Against New Start, Venitom, Pan-American, UGMC, EVRAZ**
**Chernoi, Deripaska, Kislin, Makmudov, and Nekrich)**

148. ~~157.~~ The allegations of the above paragraphs are incorporated herein as if set out in full.

149. ~~158.~~ Pursuant to the Illegal Scheme, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich operated and managed the New Start, Venitom, Pan-American, and, with the exception of Nekrich, the Delaware Real Estate Entities enterprises through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

150. 159. Pursuant to the Illegal Scheme, New Start, Venitom, UGMC, EVRAZ, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich operated and managed the GOK enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

151. 160. Pursuant to the Illegal Scheme, Chernoi, Deripaska, Makmudov, and Nekrich operated and managed the MDM Bank, UGMC, and EVRAZ enterprises through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

152. 161. The pattern included predicate acts of bribery, extortion, money laundering, illegal transactions in monetary instruments, violations of the Travel Act, and mail and wire fraud.

153. 162. The pattern of racketeering activity included the commission of two or more predicate acts of racketeering from 1993 through the current date, in violation of 18 U.S.C. § 1962(c).

154. 163. As a direct and proximate result of Defendants' misconduct, Plaintiffs have suffered damages in an amount in excess of $500 million.

## COUNT VIIV
### Violation of 18 U.S.C. § 1962(d)
### (Against New Start, Venitom, Pan-American, MDM Bank, UGMC, EVRAZ, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich)

155. 164. The allegations of the above paragraphs are incorporated herein as if set out in full.

### Conspiracy to Violate § 1962(a)

156. ~~165.~~ Pursuant to the Illegal Scheme, MDM Bank, New Start, Venitom, Pan-American, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich conspired among themselves, and with others, including Malevsky, to use the monies received from a pattern of racketeering, as detailed above, to directly or indirectly, to acquire an interest in GOK and to operate GOK through the Illegal Takeover and conversion of Plaintiffs' shares in GOK, in violation of 18 U.S.C. § 1962(a).

### Conspiracy to Violate § 1962(b)

157. ~~166.~~ Pursuant to the Illegal Scheme, MDM Bank, New Start, Venitom, Pan-American, Chernoi, UGMC, Deripaska, Kislin, Makmudov, and Nekrich conspired among themselves, and with others, including Malevsky, who acted as Defendants' agent, to violate 18 U.S.C. § 1962(b) by taking over GOK through a pattern of racketeering activity.

### Conspiracy to Violate § 1962(c)

158. ~~167.~~ Pursuant to the Illegal Scheme, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich conspired among themselves, and with others, to violate 18 U.S.C. § 1962(c) by operating and managing New Start, Venitom, Pan-American, and, with the exception of Nekrich, the Delaware Real Estate Entities through a pattern of racketeering activity.

159. ~~168.~~ Pursuant to the Illegal Scheme, MDM Bank, New Start, Venitom, Pan-American, UGMC, EVRAZ, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich conspired among themselves, and with others, including Malevsky, who acted as Defendants' agent, to violate 18 U.S.C. § 1962(c) by operating and managing GOK through a pattern of racketeering activity.

160. ~~169.~~ Pursuant to the Illegal Scheme, Chernoi, Deripaska, Makmudov, and Nekrich among themselves, and with others, to violate 18 U.S.C. § 1962(c) by operating and managing MDM Bank, UGMC, and EVRAZ through a pattern of racketeering activity.

161. ~~170.~~ Defendants knowingly agreed among themselves to commit and did commit at least two Predicate Acts in furtherance thereof of each of the conspiracies within a ten year period.

162. ~~171.~~ As a direct and proximate result of the above conspiracies, Plaintiffs have suffered damages in an amount in excess of $500 million.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

a.     Awarding compensatory damages in excess of $500 million;

b.     Awarding treble damages under RICO in excess of $1.5 billion;

c.     ~~Holding the Conspirators personally liable for any judgment against New Start and Venitom, by piercing those companies' corporate veils;~~

~~d.~~     ~~Awarding appropriate injunctive relief requiring the return of Plaintiffs' GOK shares and Defendants to transfer any subsequently issued Gok shares to Plaintiffs;~~c. Awarding costs and attorney fees under RICO; and

~~f~~d.     Granting such other relief as is just and proper.

OF COUNSEL:                                      THE BAYARD FIRM

MARKS & SOKOLOV, LLC
Bruce S. Marks
1835 Market Street - ~~28~~6th Floor

~~Philadelphia, PA 19103~~Suite 625                      Kurt M. Heyman (# 3054)
~~(215) 569-8901~~Philadelphia, PA 19103            Patricia L. Enerio (# 3728)
(215) 569-8901                                   222 Delaware Avenue, Suite 900

P.O. Box 25130
Wilmington, Delaware 19899
(302) 655-5000
Email: Kheyman@bayardfirm.com
Email: Penerio@bayardfirm.com

Attorneys for Plaintiffs

Dated: November 4, 2004  April 26, 2005