**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

DAVIS INTERNATIONAL, LLC, HOLDEX, LLC,:
FOSTON MANAGEMENT, LTD, and                    :
OMNI TRUSTHOUSE, LTD,                               :
                                                                          :
                          Plaintiffs,                          :
                                                                          :
            v.                                                       :            No. 04-1482-GMS
                                                                          :
NEW START GROUP CORP., VENITOM CORP.,:
PAN-AMERICAN CORP., MDM BANK,            :
URAL-GORNO METALURAGICAL COMPANY,:
EVRAZ HOLDING, MIKHAIL CHERNOI,          :
OLEG DERIPASKA, ARNOLD KISLIN,              :
MIKHAIL NEKRICH, and ISKANDER               :
MAKMUDOV,                                                     :
                                                                          :
                          Defendants.                       :

**PLAINTIFFS' BRIEF IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**
**PURSUANT TO THE DOCTRINE OF DIRECT ESTOPPEL AND TO**
**ENJOIN PLAINTIFFS FROM RE-FILING THIS ACTION**

Bruce S. Marks                                         David L. Finger (DE Bar ID #2556)
MARKS & SOKOLOV, LLC                         FINGER & SLANINA, LLC
1835 Market Street, 6th Floor                 One Commerce Center
Philadelphia, Pennsylvania 19103          1201 Orange Street, Suite 725
215-569-8901                                            Wilmington, DE 19801-1155
                                                                302 - 884-6766


*Of counsel*:
            George C. Pratt
            FARRELL FRITZ, P.C.
            EAB Plaza
            Uniondale, New York 11556
            516-227-0700

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iv

PRELIMINARY STATEMENT ..................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ..................................... 3

SUMMARY OF THE ARGUMENT ................................................. 3

STATEMENT OF FACTS ......................................................... 4

    A.    The Instant Claims ................................................. 4

        1.  The Central Bank Fraud ........................................ 5
        2.  The Conspirators Illegally Seize GOK Through
            Physical Force And Corrupted Bankruptcy Proceedings ..... 5
        3.  The Conspirators Steal Plaintiffs' Shares In GOK
            Through Fraud And Corrupted Litigation ........................... 7
        4.  The Conspirators Terminate The Bankruptcy By A
            Sham Settlement Agreement.................................................. 8
        5.  Defendants' Original Threats On The Lives Of
            Witnesses And Procurement Of False Arrests..................... 8

    B.    The Murder of Khaidarov's Mother and New Threats by
        Ivankov................................................................. 9

    C.    The Yukos Case ...................................................... 9

    D.    The Evraz Group, S.A. Year 2005 Admission......................... 11

ARGUMENT............................................................... 11

    I.    Defendants Should Be Precluded From Seeking Dismissal
        for *Forum Non* From the Forum They Selected ...................... 11

        A.    Defendants Should Be Precluded From Asserting
            *Forum Non* Under the Doctrine of Unclean Hands....... 13

i

B.    Defendants Have Waived *Forum Non* By Choosing
This Forum and Seeking Affirmative Relief In This
Court ............................................................................. 14

C.    Defendants Should Be Estopped From Seeking
*Forum Non* Dismissal .................................................... 15

II.    Estoppel Does Not Apply Because the Parties and Complaint
In This Case Are Substantially Different Than *Base Metal*
and Plaintiffs' Proffer Different Objective Criteria and
Material Facts ........................................................................ 16

A.    The Complaint in This Matter Is Substantially
Different Than *Base Metal* ........................................... 17

    1.  The Omitted NKAZ Claims ..................................... 18
    2.  The Omitted Gok Creditor Claims ........................... 19
    3.  The Much Narrower Instant Claims ......................... 20

B.    There Are Different Objective Criteria and Material
Facts Between *Base Metal* and This Case With
Respect to (1) Deference Due to Plaintiffs' Choice
of Forum, (2) the Private Interest Factors, (3) the
Public Interest Factors, (4) the Need For a Fresh
Balancing of the Factors, and (5) the Adequacy of
the Russian Court ............................................................ 21

    1.  Plaintiffs Proffer Different Objective Criteria and
New Material Facts Regarding the Deference Due
to Their Choice of Forum ......................................... 21
    2.  Plaintiffs Proffer Different Objective Criteria and
New Material Facts Regarding the Private Interest
Factors ...................................................................... 24
    3.  Plaintiffs Proffer Different Objective Criteria and
New Material Facts Regarding the Public Interest
Factors ...................................................................... 26
    4.  The Need for a New Balancing Test Based on the
Different Public and Private Interest Factors ........... 28
    5.  The New Material Facts As to the Adequacy of
the Moscow Arbitrazh Court ..................................... 28

III.   Plaintiffs Were Not Required to File a Fed.R.Civ.P. 60(b)
       Motion In Regard to the Different Objective Criteria and
       New Material Facts .................................................................. 30

IV.    This Court Should Not Enjoin Plaintiffs From Prosecuting
       The Chancery Court Action Or Any Other Action .................. 31

       A.    This Court Should Not Grant Affirmative Relief Until
             It Determines Its Own Jurisdiction ................................. 32

       B.    The Chancery Court Action Should Not Be Enjoined  . 32

             1.  The Anti-Act Injunction Act Protects The
                 Chancery Court Action ............................................. 32
             2.  No Statutory Exception Applies Under the Anti-
                 Injunction Act .......................................................... 34
             3.  The "Necessary In Aid of Its Jurisdiction
                 Exception" Does Not Apply Under the Anti-
                 Injunction Act or All Writs Act ............................... 36
             4.  The "Re-litigation" Exception Does Not Apply
                 Under the Anti-Injunction Act or All Writs Act ...... 37
             5.  Defendants Cannot Meet the Standards For An
                 Injunction  ............................................................... 39

CONCLUSION ........................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*American Cyanamid Co. v. Picaso-Anstalt*, 741 F. Supp. 1150 (D.N.J. 1990) ........... 26-27

*Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers*,
398 U.S. 281 (1970) .................................................................................... 32-33, 35, 37

*Ayers v. Watson*, 113 U.S. 594 (1884) ............................................................................12

*Bankers Life & Casualty Co. v. Holland*, 346 U.S. 379 (1953).......................................31

*Barancik v. Investors Funding Corp. of N.Y.*, 489 F.2d 933 (7th Cir. 1973)..............33, 34

*Baris v. Sulpico Lines, Inc.*, 74 F.3d 567 (5th Cir. 1996) ........................................... 38-39

*Base Metal Trading S.A. v. Russian Aluminum*, 253 F. Supp. 2d 681
(S.D.N.Y. 2003) ..................................................................................................... *passim*

*Boys Market, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970) ....................15

*Cabiri v. Assasie-Gyimah*, 921 F.Supp. 1189 (S.D.N.Y. 1996) .......................................23

*Candlewood Timber Group, LLC v. Forestal Santa Barbara SRL*, 859 A.2d 989
(Del. 2004) .......................................................................................................................1, 27

*Carlough v. Amchem Products, Inc.*, 10 F.3d 189 (3d Cir. 1993) ....................................34

*China Tire Holdings Limited v. Goodyear Tire and Rubber Co.*, 91 F.Supp.2d 1106
(N.D. Ohio 2000) ..............................................................................................................31

*Constructors Ass'n of Western Penna. v. Kreps*, 573 F.2d 811 (3d Cir. 1978) ........... 39-30

*Cowley v. Northern Pac. Railroad Co.*, 159 U.S. 569 (1895) .........................................12

*DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21 (2d Cir. 2002) ................................ 25-26, 28

*Edwards v. Connecticut Mut. L. Ins. Co.*, 20 F. 452 (Cir. N.D. New York 1884) ...........12

*Exxon Corp. v. Chick Kam Choo*, 486 U.S. 140 (1988) ................................3, 4, 30, 38, 39

*Fid. & Cas. Co. v. Tex. E. Transmission Corp.* 15 F.3d 1230 (3d Cir. 1994) ............. 14-15

*Fisher v. Shropshire*, 147 U.S. 133 (1892) ......................................................................12

*Frith v. Blazon-Flexible Flyer, Inc.*, 512 F.2d 899 (5th Cir. 1975) ............................ 35-36

*Grupke v. Linda Lori Sportswear, Inc.*, 174 F.R.D. 15 (E.D.N.Y. 1997)........................ 14

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)...................................................... 2, 24, 28

*Gwynedd Properties, Inc. v. Lower Gwynedd Township*, 970 F.2d 1195
    (3d Cir. 1992)........................................................................................................ 35

*In re Diet Drugs Phentermine/Fenfluramine/ Dexfenfluramine) Prods. Liab. Litig.*,
    369 F.3d 293 (3d Cir. 2004)................................................................................. 34

*Iragorri v. United Technologies Corp.*, 274 F.3d 65 (2d Cir. 2001)(*en banc*)................ 23

*Kansas Public Employees Retirement System v. Reimer & Koger Assoc., Inc.*, 77 F.3d
    1063 (8th Cir. 1996)............................................................................................. 36

*Kennecott Corp. v. Smith*, 637 F.2d 181 (3d Cir. 1980) ...................................... 34

*Kline v. Burke Construction Co.*, 260 U.S. 226 (1922) ...................................... 37

*Leon v. Miller*, 251 F.3d 1305 (11th Cir. 2001)................................................. 29

*Lony v. E. I. Du Pont de Nemours & Co.*, 886 F.2d 628 (3d Cir. 1989) .............. 21, 24, 26

*Lou v. Belzberg*, 834 F.2d 730 (9th Cir. 1987) ................................................. 33, 36, 37

*Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994)................................................... 35

*Mar-Land Indus. Contrs., Inc. v. Caribbean Petroleum Ref., L.P.*, 777 A.2d 774
    (Del. 2001) ........................................................................................................... 30

*McCoy v. Siler*, 205 F.2d 498 (3d Cir. 1953).................................................... 15

*Mizokami Bros. of Ariz. v. Mobay Chem. Corp.*, 660 F.2d 712
    (8th Cir. 1981)......................................................................................... 16-17, 28, 31, 39

*Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488
    (2d Cir. 2002)....................................................................................................... 32

*NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.)*, 203 B.R. 905 (D. Del 1996)............ 15

*Northeast Women's Center, Inc. v. McMonagle*, 868 F.2d 1342 (3d Cir. 1989).............. 13

*Ortho Pharmaceutical Corp. v. Amgen, Inc.*, 882 F.2d 806 (3d Cir. 1989) .................... 32

*Parsons v. Chesapeake & Ohio Railway Co.*, 375 U.S. 71 (1963)...................................31

*Pastewka v. Texaco, Inc.*, 420 F. Supp. 641, (D. Del 1976), *aff'd* 565 F.2d 851
  (3d Cir. 1977).................................................................1, 2, 4, 17, 21, 30, 31

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).......................................2, 13, 25, 26, 27

*Precision Inst. Man. Co. v. Aut. Maintenance Mach Co.*, 324 U.S. 806 (1945) ..............13

*Roth v. Bank of the Commonwealth*, 583 F.2d 527 (6th Cir. 1978), *cert. dismissed*,
  442 U.S. 925 (1979)..............................................................................33, 34

*Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999) ......................................32

*Scarano v. Central R. Co. of New Jersey,* 203 F.2d 510 (3d Cir. 1953)..........................15

*Standard Microsystems Corp. v. Texas Instruments Inc.*, 916 F.2d 58 (2d Cir. 1990) .....33

*Tafflin v. Levitt*, 493 U.S. 455 (1990) ...........................................................16

*Trainor v. Hernandez*, 431 U.S. 434 (1977)....................................................13

*U.S. v. Abelis*, 146 F.3d 73 (2d Cir. 1998) .......................................................5

*United States Steel Corporation Plan for Employee Benefits v. Musisko*, 885 F.2d 1170
  (3d Cir. 1989).................................................................................32

*Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665 (5th Cir. 2003) .................34, 38, 39

*Villar v. Crowley Maritime Corp.*, 990 F.2d 1489 (5th Cir. 1993)..................................39

*Woodcock v. Baltimore & O. R. Co.*, 107 F. 767 (Cir. N.D. Ohio, 1901) ........................12

## STATUTES

The Anti-Injunction Act, 28 U.S.C. §2283 ....................................................... *passim*

The All Writs Act, 28 U.S.C. §1651 ................................................................. *passim*

12 U.S.C. §1441 .....................................................................................36

28 U.S.C. §1331 .....................................................................................36

28 U.S.C. §1441 ...............................................................................14, 16

28 U.S.C. §1446(d) .............................................................................................35, 36

28 U.S.C. §1961 *et seq.* ...............................................................................................1

## RULES

Fed.R.Civ.P. 60 ..........................................................................................4, 30, 31

## OTHER AUTHORITY

16-107 MOORE'S FEDERAL PRACTICE – Civil §107.03 (2005) .........................................12

5C WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1397 (3d ed. 2004).......14

18 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 4477 (1981).....15

Bob Dole "Russia Has Put Itself in the Dock," *The Financial Times,* June 16, 2004 .......10

Execution of Letters Rogatory, Nov. 22, 1935, U.S.-U.S.S.R., 11 Bevans 1262 (1935) ..25

Hague Convention of the Taking of Evidence Abroad in Civil and Commercial
  Matters,  23 U.S.T. 2555 (1970) ....................................................................25

H. Rept. No. 1078, 49th Cong., 1st Sess..........................................................16

Peter G. McAllen, *Deference to the Plaintiff in Forum Non Conveniens*,
  13 S. ILL.U. L.J. 191, 270-271 (1989) ................................................... 13-14

Richard Boucher, Spokesman, *Daily Press Briefing*, Washington, DC, May 16, 2005....10

Secretary of State Condoleezza Rice, *Interview With Jill Dougherty*, *CNN*,
  April 20, 2005 ......................................................................................10

U.S. Senate Resolution 258, Nov. 4, 2003, 108th Cong., 1st Sess. ....................................10

## PRELIMINARY STATEMENT

Plaintiffs filed claims against Defendants, including two Delaware companies, their American manager, and their beneficial owners, who have chosen Delaware as their state of convenience for criminal activities, under the Racketeer Influenced Corrupt Organizations Act, 28 U.S.C. §1961 et seq. ("RICO") and state law.   These claims were filed in Delaware Chancery court, which has concurrent jurisdiction over civil RICO claims and applies a narrower *forum non conveniens* standard than federal courts.[1]

Defendants removed this action based on the RICO federal question, for the transparent, if not sole, purpose of avoiding Delaware's narrower *forum non* standard. Defendants then moved to dismiss, arguing that the decision in *Base Metal Trading S.A. v. Russian Aluminum* serves as estoppel.  Plaintiffs amended their complaint to eliminate their non-RICO claims and filed a new state law action in Chancery Court. One defendant improperly removed the new state action, but it has been remanded. Defendants continue to move to dismiss on estoppel grounds and also to enjoin Plaintiffs from prosecuting the new Chancery Court action and future actions based on the underlying facts.   Defendants' motion should be denied.

As a threshold matter, basic principles of unclean hands, waiver, and estoppel preclude Defendants from complaining that the very forum which they chose by removing this action is inconvenient.  On the merits, under *Pastewka v. Texaco, Inc.*, 420 F. Supp. 641, (D. Del 1976), *aff'd* 565 F.2d 851 (3d Cir. 1977), a second district court is permitted, if not required, to make its own *forum non* decision after a matter is dismissed

---

[1] *See Candlewood Timber Group, LLC v. Forestal Santa Barbara SRL,* 859 A.2d 989, 994 (Del. 2004) ("Under Delaware law the moving party must demonstrate, with particularity, that being required to litigate in Delaware would subject it to overwhelming hardship").

by a different federal court "where the parties, complaints, and legal theories are … [not] identical … [and if] the second court were proffered different objective criteria or different facts underlying the application of those criteria." *Id*. at 646.   Litigating this matter in Delaware, as opposed to New York, involves different objective criteria and new material facts regarding the deference due to Plaintiffs' choice of forum, the court's balancing of the private and public interest factors under *Gulf Oil* and *Piper Aircraft*, and the adequacy of the Moscow court to which *Base Metal* relegated Plaintiffs.

This case is far narrower than *Base Metal*.   It involves 10 fewer plaintiffs, omits 15 of the *Base Metal* defendants, and asserts much narrower claims which require far fewer Russian witnesses and documents.   Delaware is a natural forum because the two defendant Delaware corporations received the shares that were stolen from Plaintiffs.   In addition, Defendants used 15 known Delaware corporations in furtherance of their criminal activity and undoubtedly scores of others.   Unlike claims filed in New York, the relief sought does not require setting aside Russian court rulings in matters in which Plaintiffs were named as parties, served, and participated on the merits.

Further, new, highly material developments have occurred since the *Base Metal* decision.   Defendants' partner in crime, Vyacheslav Ivankov, better known as "Yaponchik", a leader in the Russian-American mafia, who had been convicted of extortion in the United States, returned to Russia in 2004, where he can make good his recent threat to kill Plaintiffs' key witnesses, Joseph Traum and Jalal Khaidarov, if they return.   The day after the original Chancery court complaint was filed, Khaidarov's mother was murdered in his hometown of Tashkent, Uzbekistan, in retaliation for the filing, which follows Defendants' pattern of threatening the lives of Plaintiffs' witnesses

and their families, making Russia an inadequate forum.   In addition, after *Base Metal* was decided, the Yukos Oil Company was dismantled in proceedings which the world has denounced as influenced in the Moscow court where Plaintiffs have been directed to file their claims, underscoring the inadequacy of Russian courts.   Tellingly, the successor to Defendant Evraz Holding, SA acknowledged the "lack of judicial independence [in Russia] from political, social and commercial forces" in its Year 2005 offering statement.

Finally, Defendants' request to enjoin the Chancery court and future state court proceedings is barred by the Anti-Injunction Act and bedrock principles of federalism which preclude federal courts from interfering with state court proceedings absent extraordinary circumstances.   In *Exxon Corp. v. Chick Kam Choo,* 486 U.S. 140 (1988), on all fours with this matter, the Supreme Court held an injunction which precluded re-filing in state court an action dismissed for *forum non* in federal court violated the Act because of differences between the state and federal *forum non* standards.

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs adopt the statement of Defendants.

## SUMMARY OF THE ARGUMENT

I.      Defendants should be precluded from complaining that the very forum which they chose is inconvenient based on basic principles of unclean hands, waiver, and estoppel.

II.     Under *Pastewka*, this Court should conduct its own *forum non* analysis because of the vastly different nature of this case from *Base Metal* and Plaintiffs' proffer of different objective criteria and material facts.

**III.**     Fed.R.Civ.P. 60 does not apply because Plaintiffs had the right to file this action

in state court under *Chick Kam Choo* or in a different federal court under *Pastewka.*

**IV.**     Defendants' request to enjoin Plaintiffs from prosecuting the new Chancery court

action or filing a new action is barred by the Anti-Injunction Act and bedrock

principles of federalism.

## STATEMENT OF FACTS

### A.     The Instant Claims

American plaintiffs Davis International, LLC, and Holdex, LLC, along with

Cyprus plaintiff Foston Management, Ltd., and English plaintiff Omni Trusthouse, Ltd.

owned a controlling interest of shares in Kachkanarsky GOK ("Gok"), a vanadium ore

plant, which were illegally transferred to Delaware defendants New Start Group Corp.

and Venitom Corp., which are owned and controlled by defendants Mikhail Chernoi,

Oleg Deripaska, Mikhail Nekrich, and Iskander Makmudov and managed by American

Arnold Kislin (collectively, the "Conspirators"). Am. Compl. ¶¶ 1-5, 16-35.  MDM Bank

wired funds through banks in the United States in furtherance of the scheme.  The

Conspirators ultimately transferred Plaintiffs' shares to Defendants Ural-Gorno

Metallurgical Company ("UGMC") and then to defendant Evraz Holdings, SA,[2] both of

which the Conspirators control. Am. Compl. ¶ 1-9.

The Conspirators regularly utilized Delaware entities in their various illegal

schemes involving fraud, bribery, and money laundering, including 14 companies named

in the Complaint (collectively the "Delaware Real Estate Entities") as well as Pan-

American Corp., which has been dissolved.  The Delaware Real Estate Entities were used

---

[2]    Plaintiffs recently learned that Defendant Evraz Holding, S.A. was succeeded by Evraz Group, S.A., which was formed in Luxembourg on December 31, 2004.

by the Conspirators to own real estate in the United States as a means of laundering their illegally obtained funds. Am. Compl. ¶¶ 36-37.

### 1. The Central Bank Fraud

In the early 1990's, Russian organized crime groups, including the Chernoi, Deripaska, and Makmudov association, engaged in a check kiting-like fraud, on the Russian central bank. The funds were used to purchase tens of millions of dollars of U.S. real estate by entities registered in Delaware, including the Delaware Real Estate Entities; ultimately, this real estate was sold and the proceeds were used as "seed money" for the Conspirators' other criminal ventures, including the takeover of GOK.  Am. Compl. ¶¶ 45-48. *These allegations can be proved solely through financial records from Western institutions and documents and witnesses under Defendants' control.*

### 2. The Conspirators Illegally Seize GOK Through Physical Force And Corrupted Bankruptcy Proceedings

In 1998, Jalol Khaidarov ("Khaidarov") became the general director of GOK, after working for companies controlled by Chernoi and Makhmudov.  In 1999, Chernoi, Deripaska, Makmudov, and Nekrich conspired to take over GOK.   They, along with Anton Malevsky, a leader in the feared Russian-American mafia,[3] repeatedly threatened Khaidarov's life unless shares in GOK were transferred to them.   Plaintiffs refused.   In response, the Conspirators arranged for Pan-American Corporation and Blonde Management, Inc., managed by Kislin in New York, to pay bribes to the governor of the region where GOK was located.   The bribes were wired through American banks to Defendant MDM Bank to gain the governor's assistance in taking over GOK. Am.

---

[3]   The Russian-American mafia maintained operations in Russia, headed by Malevsky, and in New York, headed by Vyacheslav  Ivankov, a/k/a "Yaponchik."  Ivankov was convicted of extortion in New York. *See U.S. v. Abelis*, 146 F.3d 73 (2d Cir. 1998).

Compl. ¶¶ 49-62.  *These allegations can be proved solely through willing witnesses and records and witnesses under Defendants' control, i.e. Kislin and MDM Bank personnel.*

Defendants used bribes and threats of physical force to convince four (of seven) members of the GOK Board of Directors to remove Khaidarov and replace him with Andrey Kozitsin ("Kozitsin").   To thwart efforts by the Plaintiffs to reacquire control over GOK, Kozitsin arranged for GOK to incur false debts through sham transactions. Am. Compl. ¶¶ 63-64, 75-78. *These allegations can be proved solely through willing witnesses and witnesses under Defendants' control, i.e. Kozitsin.*

Just days after assuming control over the plant, Kozitsin arranged for a sham loan. GOK "borrowed" $15 million from MDM Bank, of which $10 million was "contributed" to a joint venture with Svyatogor, a shell company controlled by Defendants.   Svyatogor "guaranteed" the "loan" from MDM Bank.  When GOK "defaulted" just a few days later, Svyatogor "repaid" the loan with the same funds received from MDM Bank and, in turn, received $25 million in GOK notes.   Svyatogor then "sold" the notes on credit to another related shell company, Lebaut, controlled by the Conspirators.   Ultimately, through sham transactions, Lebaut accumulated $39 million in GOK "debt", making it, by far, GOK's largest purported creditor for literally no consideration. Am. Compl. ¶¶ 75-78. *These allegations can be proved solely through documents and witnesses under Defendants' control, i.e. MDM Bank, Svyatogor, and Lebaut personnel.*

The Conspirators arranged for the local electric company, "Krasgaz," to file an involuntary bankruptcy petition against GOK, alleging that GOK had not paid its bills.   In reality, Kozitsin collusively chose not to pay these bills.   The Conspirators had Oleg Kozyrev ("Kozyrev") appointed as GOK's provisional manager.  Kozyrev then corruptly

recognized Lebaut's sham $39 million claim. With Lebaut's false votes (voting is proportional to the amount of the creditor's recognized claim), Kozyrev was elected as the external manager of GOK at a creditors' meeting. With their agent installed as external manager, the Conspirators controlled GOK. Am. Compl. ¶¶ 79-86. *These allegations can be proved solely through willing witnesses, one witness from Krasgaz, and documents and witnesses under Defendants' control, i.e. Kozitsin and Kozyrev.*

### 3. The Conspirators Steal Plaintiffs' Shares In GOK Through Fraud And Corrupted Litigation

Contemporaneously with the physical takeover and corrupted bankruptcy, the Conspirators arranged for the GOK shares owned by Plaintiffs to be stolen, transferred to shell companies, and then to Defendants New Start Group and Venitom Corporation. Am. Compl. ¶ 88.

Davis' shares were fraudulently transferred by an unauthorized power of attorney. There have never been proceedings against Davis in Russia. Omni's shares were fraudulently reregistered in a proceeding in the obscure Chelyabinsk region in August 2000. Omni was not a party. Foston's shares were fraudulently transferred in a proceeding in Moscow in September 2000, in which Conspirators had a forged power of attorney and had an imposter attend the hearing on behalf of Foston. Holdex's shares were fraudulently transferred in November 2000 in a proceeding in the obscure Kalmykia region. Holdex was not a party. The subsequent efforts of Omni, Foston, and Holdex to obtain the return of their shares has resulted in years of fruitless litigation. Am. Compl. ¶¶ 89-114. *The above allegations can be proven solely through willing witnesses.*

Meanwhile, the Conspirators arranged for GOK to issue new shares to themselves in April 2003. The challenge to this issuance was denied in August 2003. Thus, even if

their shares were returned, Plaintiffs would no longer have a controlling interest. The

Conspirators then transferred the shares to Defendant UMGC and then to Defendant

Evraz.   Am. Compl. ¶¶ 127-132.  *These allegations can be proven solely through willing*

*witnesses and documents and witnesses under Defendants' control.*

### 4.   The Conspirators Terminate The Bankruptcy By A Sham Settlement Agreement

Once the Conspirators controlled GOK through their fraudulently obtained

shareholdings, they had no use for the bankruptcy.   Thus, GOK entered into a sham

settlement agreement approved by its creditors.  The settlement agreement was structured

for payment in rubles without interest (or indexation), with the first payment due in 2006

and final payment not due until 2014.  No legitimate creditors would agree to this; it was

only approved because of Lebaut's sham claims.  The trial court rejected the challenge to

the settlement agreement; the appeals courts dismissed appeals for flawed procedural

reasons.  Am. Compl. ¶¶ 115-117. *These allegations can be proved solely through willing*

*witnesses and documents and witnesses under Defendants' control, i.e. Kozyrev.*

### 5.   Defendants' Original Threats On The Lives Of Witnesses And Procurement Of False Arrests

Chernoi, Deripaska, Makmudov, and Nekrich, as well as their mafia partner,

Malevsky, repeatedly threatened the lives of Plaintiffs' key witnesses, Traum and

Khaidarov, in Moscow, as well as Khaidarov's family.   In 2000, Khaidarov was

subjected to a false arrest when drugs were planted on him in Moscow; when freed, he

fled to Israel where he lives under government protection.   Traum was arrested when

drugs were planted in his office in Moscow in 2001.  Makmudov called during the raid

and claimed credit for the action.  Traum was freed through the intervention of the Israeli

government and returned home. Am. Compl. ¶¶ 118-126.    *These allegations can be proved solely through willing witnesses.*

### B.    The Murder of Khaidarov's Mother and New Threats by Ivankov

As set forth in the Declaration of Jalol Khaidarov (Exhibit A), Makmudov had threatened the lives of Khaidarov and his family.  K. Dec. ¶¶ 14-23, 32.   This threat has been carried out.   At the time of the filing of the original Chancery court action, Khaidarov received a message from Makmudov that he should check on his mother. Khaidarov then learned that his mother was killed in a purported hit and run accident in Tashkent, Uzbekistan that day.   The use of hit and run accidents for contract murders is common in the former Soviet Union and the message is obvious: Khaidarov's mother was killed in retaliation for the filing.  K. Dec. ¶¶ 33-38.

After *Base Metal* was decided, Khaidarov received a message from Ivankov, who has now returned to Russia, that Traum and he would be killed if they returned to Russia. K. Dec. ¶¶ 27-31. As set forth in the Declaration of former FBI case agent Robert Levinson (Exhibit B), Ivankov's threats have true meaning.  Ivankov is one of Russia's most dangerous criminals, heading a major division of the Russian mafia, and has the resources to arrange for the murder of Khaidarov and Traum, whether in or out of prison. L. Dec. ¶¶ 39-43. Given the murder of Khaidarov's mother and new threats, Kahidarov, Traum, and Plaintiffs' other key witnesses  will not go back to Russia.

### C.    The Yukos Case

In October, 2003, Mikhail Khodorkovsky, former CEO of one of the largest Russian companies, the Yukos Oil Company, was arrested on charges of fraud, tax evasion and embezzlement filed in a Moscow criminal court.   The Russian government

brought claims against Yukos for allegedly unpaid taxes in the Moscow Arbitrazh court, the same court to which *Base Metal* relegated Plaintiffs.[4]   Ultimately, the Moscow Arbitrazh court ruled in favor of the Russian government on almost every issue and ordered the sham auction of Yukos' main subsidiary, Yuganskneftegaz, effectively dismantling the company.   The "Yukos affair" has received worldwide attention and condemnation by governmental organizations, private individuals, and the media.  *See* Richard Boucher, Spokesman, *Daily Press Briefing*, Washington, DC, May 16, 2005 (Exhibit C); Secretary of State Condoleezza Rice, *Interview With Jill Dougherty*, *CNN*, April 20, 2005 (Exhibit D); U.S. Senate Resolution 258, Nov. 4, 2003, 108th Cong., 1st Sess., (Exhibit E); Bob Dole "Russia Has Put Itself in the Dock," *The Financial Times,* June 16, 2004 (Exhibit F).

In March 2005, the London Magistrates Court refused to extradite two former Yukos employees against whom the Russian Federation brought charges within its case against Yukos.  In denying the extradition, Senior Magistrate Judge Tim Workman, concluded:

> Professor Bowring gave clear and unequivocal evidence, stating that it was his view that the defendants "would most certainly not" receive a fair trial in Russia. I found support for his view in the two reports to the Council of Europe whose rapporteurs had been monitoring Russia's obligations…
>
> I have heard a substantial amount of evidence about the concerns of the independence of the Judiciary … I have also noted the concerns about the Judicial President of the Moscow City Court and the very strong influence that she brings to bear, which suggests that judicial independence has been substantially eroded … in respect of this particular case, *I am satisfied that it is so politically motivated that there is a substantial risk that the Judges of the Moscow City court would succumb to political interference in a way which would call into question their independence.*

---

[4] The Arbitrazh courts are the state courts which have original jurisdiction over commercial claims; the term is historical and does not mean arbitration.

London Magistrates Court Decision, March 18, 2005 (emphasis added) (Exhibit G).

A legal expert report detailing the influenced nature of the tax proceedings in the Moscow Arbitrazh court prepared by Russian Attorney Sergey Gladyshev was filed in the above English court proceeding.   As set forth in the Declaration of Bruce S. Marks (Exhibit H), Mr. Marks spoke with Attorney Gladyshev, who confirmed that it set forth in detail how the proceedings were influenced; Plaintiffs have tried, but not yet been able, to obtain a copy of the report.  Plaintiffs submit that if they can obtain this report through discovery or otherwise, it would establish how the court decisions could only be explained by influence.

### D.    The Evraz Group, S.A. Year 2005 Admission

On December 31, 2004, Evraz Group, S.A. was organized in Luxembourg and, according to its undated 2005 offering prospectus, acquired the Gok shares.  *See* Evraz prospectus, at 42 (excerpts attached as Exhibit O).   The prospectus concedes the "lack of judicial independence from political, social and commercial forces," stating:

> The independence of the judicial system and the prosecutor general's office  and their immunity from economic, political, and nationalistic influences in Russia is also less than complete … Enforcement of court judgments can in practice be very difficult in Russia.    All of these factors make judicial decisions in Russia difficult to predict and effective redress uncertain.   Additionally, court claims are often used in furtherance of political aims, and law enforcement agencies do not always enforce or follow court judgments.

Exhibit O at 28.

## ARGUMENT

### I.    Defendants Should Be Precluded From Seeking Dismissal for *Forum Non* From the Forum They Selected

"The removal statutes are designed to provide defendants with a federal forum to litigate federal claims … The original purpose of removal jurisdiction in federal question cases was to ensure the tribunal better informed on questions of federal law would adjudicate the matter."  16-107 MOORE'S FEDERAL PRACTICE – Civil §107.03 (2005).

Defendants have done nothing to hide their motivation for removal is not to have the instant federal claims adjudicated by a federal court, but to seek dismissal for *forum non* based on *Base Metal* to Russia, a forum that certainly is not "better informed on issues of federal law."  By removal, Defendants have invoked this court's jurisdiction to address federal claims and should not be heard to object to its exercise of that jurisdiction.   This proposition was broadly stated in *Cowley v. Northern Pac. Railroad Co.*, 159 U.S. 569 (1895):

> The case having been removed to the Circuit Court upon the petition of defendant, it does not lie in its mouth to claim that such court had no jurisdiction of the case unless the court from which it was removed had no jurisdiction.

*Id.* at  583.  *See also*, *Fisher v. Shropshire*, 147 U.S. 133, 145 (1892) ("[W]e are not prepared to hold the Circuit Court should be deprived of jurisdiction at the suggestion of the party who voluntarily invoked it."); *Ayers v. Watson*, 113 U.S. 594, 599 (1884) ("[S]ince the removal was effected at the instance of the party who now makes the objection, we think that he is estopped.").[5]  In accord with the above cases, courts can apply unclean hands, waiver, and estoppel to preclude parties from taking contradictory positions.[6]

---

[5] *See also Woodcock v. Baltimore & O. R. Co.*, 107 F. 767, 768 (Cir. N.D. Ohio, 1901) ("A defendant may not obtain removal …, and, after it has procured removal, object to the jurisdiction"); *Edwards v. Connecticut Mut. L. Ins. Co.*, 20 F. 452, 454 (Cir. N.D. New York 1884) ("The jurisdiction of this court was invoked by the defendant and it should abide the result in a forum of its own seeking").

[6] Plaintiffs are aware that courts implicitly permit removed cases to be dismissed for *forum non*.

A.    **Defendants Should Be Precluded From Asserting *Forum Non* Under the Doctrine of Unclean Hands**

As the Supreme Court explained in the seminal *Piper Aircraft* case, *forum non* is an "equitable doctrine" designed to achieve the "interests of justice."  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249, 254 (1981).  It is black-letter law that a party "'who comes into equity must come with clean hands.' This maxim is far more than a mere banality.  It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith." *Precision Inst. Man. Co. v. Aut. Maintenance Mach Co.*, 324 U.S. 806, 814 (1945).  In applying the doctrine "'courts are concerned primarily with their own integrity' and with avoiding becoming 'the abettor of iniquity'" *Northeast Women's Center, Inc. v. McMonagle*, 868 F.2d 1342, 1354 (3d Cir. 1989).

Defendants have unclean hands because they did not invoke the jurisdiction of this Court to have the RICO claims heard in a federal forum, the purpose of the removal statute.  To the contrary, Defendants seek to have no American court, federal or state, examine the RICO claims.  If removal and then dismissal for *forum non* is permitted, it puts the federal courts in the position of denying sovereign state courts the opportunity to adjudicate federal issues while the federal court itself declines to adjudicate them.  In *Trainor v. Hernandez*, 431 U.S. 434 (1977) the Supreme Court stated that "in a Union where both the States and Federal Government are sovereign entities, there are basic concerns of federalism which counsel against interference by federal courts, through injunctions or otherwise, with legitimate state functions, particularly with the operation of state courts." *Id.* at 441.

As one commentator trenchantly observed:

a defendant who files a forum non conveniens motion in a removed case …

13

indeed is asking the court to throw out the defendant's own choice of forum. No system of procedure could survive very much of that kind of folly … [A]federal court that grants forum non conveniens dismissals in removed cases where the state court would have retained jurisdiction creates an incentive for defendants to use the removal jurisdiction not for its apparent purpose of providing a federal forum for certain claims, but for the purpose of depriving plaintiffs of any American forum for their claims. There is unlikely to be any significant substantive federal policy served by such a use of the federal courts … *Thus, even where forum non conveniens might appropriately be applied in a diversity or federal question case originally filed in the federal court, it should not be available if that same case has been removed from state court. In sum, forum non conveniens should never be available in removed cases.*

*See* Peter G. McAllen, *Deference to the Plaintiff in Forum Non Conveniens*, 13 S. ILL.U. L.J. 191, 270-271 (1989) (emphasis added).

As Defendants have not invoked the jurisdiction of this court for legitimate purposes of adjudicating federal issues, their hands are unclean, and they should not be permitted to pervert the purpose of 28 U.S.C. §1441 and seek *forum non* dismissal.

**B.    Defendants Have Waived *Forum Non* By Choosing this Forum and Seeking Affirmative Relief In This Court**

Defendants, including non-parties to *Base Metal*, request this Court to exercise "its jurisdiction" under the All Writs Act to bar "plaintiffs from re-filing anywhere in the United States another case based on the underlying facts asserted in the complaint." Defendants' choice of this forum and request for injunctive relief waives *forum non*.

"A party who invoked the power of the court for his own purposes should not be allowed the inconsistent objection that the forum was personally inconvenient to him", 5C WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1397, at 563 (3d ed. 2004), and "appearing and seeking affirmative relief from the court is the paradigm of a waiver" of the court's jurisdiction. *Grupke v. Linda Lori Sportswear, Inc.*, 174 F.R.D. 15, 18 (E.D.N.Y. 1997) (internal quotation and citation omitted.) *See Fid. & Cas. Co. v.*

*Tex. E. Transmission Corp.* 15 F.3d 1230, 1236 (3d Cir. 1994) ("[A] party is deemed to have consented to personal jurisdiction if the party actually litigates the underlying merits or demonstrates a willingness to engage in extensive litigation in the forum."); *NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.)*, 203 B.R. 905, 910 at n. 4 (D. Del 1996) ("Thus, by interposing a claim for relief defendant has waived the right to object to the venue of the action or to the court's jurisdiction over him.")[7]

Defendants' invocation of this court's jurisdiction is plainly inconsistent with a request for this court to decline jurisdiction based upon *forum non*, and is thus waived.

### C. Defendants Should Be Estopped From Seeking *Forum Non* Dismissal

Judicial estoppel, sometimes called the "doctrine against the assertion of inconsistent positions", "is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding." *Scarano v. Central R. Co. of New Jersey,* 203 F.2d 510, 513 (3d Cir. 1953) (citation omitted). "The basic principle . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigating on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4477, at 782 (1981). "[T]here has never been a serious contention that Congress intended that the removal mechanism be utilized to foreclose completely remedies otherwise available in the state courts."  *Boys Market, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 246 (1970) (footnote omitted).

---

[7]  "A waiver need not be asserted directly or expressly. *See McCoy v. Siler*, 205 F.2d 498, 499 (3d Cir. 1953) ("Waiver, it is well established, can be by conduct as well as by expressed consent").

The legislative history of §1441 states: "In the opinion of the committee it is believed to be just and proper to require the plaintiff to abide by his selection of a forum." *See* H. Rept. No. 1078, 49th Cong., 1st Sess., p.1. This principle should apply equally to defendants who chose this court; they should not be permitted to use it as a stepping stone to a foreign forum which would deny Plaintiffs the remedies under RICO available in Delaware state court.

In *Tafflin v. Levitt*, 493 U.S. 455 (1990), the Supreme Court held that state courts have concurrent jurisdiction to hear RICO claims, stating, "under our federal system … we have consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." *Id.* at 458. "[W]e have full faith in the ability of state courts to handle the complexities of civil RICO actions … Thus, to the extent that Congress intended RICO to serve broad remedial purposes … concurrent state court jurisdiction over civil RICO claims will advance rather than jeopardize federal policies underlying the statute." *Id*. at 467.

Having chosen this forum, Defendants should be estopped from denying its convenience. To allow Defendants to manipulate this litigation through the removal statute would defeat the significant remedial purposes for which RICO was enacted.

## II.    Estoppel Does Not Apply Because the Parties and Complaint in This Case Are Substantially Different Than *Base Metal* And Plaintiffs' Proffer Different Objective Criteria and Material Facts

There can be no dispute that federal courts permit re-litigation of *forum non* in a different federal forum when the plaintiffs demonstrate different objective criteria or material facts between the new forum and the underlying dispute. *Mizokami Bros. of*

*Ariz. v. Mobay Chem. Corp.*, 660 F.2d 712 (8th Cir. 1981).   *Mizokami* held that an

Arizona district court's dismissal did not preclude considering the merits of a *forum non*

motion in Missouri because "the contacts of the parties with Missouri, the availability of

witnesses in Missouri and other relevant factors make the inquiry [in Missouri] distinct".

*Id.* at 716-717.

     *Pastewka,* the key case cited by Defendants, holds that re-litigation is precluded

only "where the parties, complaints, and legal theories are, for all practical purposes,

identical." *Pastewka v. Texaco, Inc.*, 420 F. Supp. 641, 646 (D. Del. 1976), *aff'd* 565 F.2d

581 (3d Cir. 1977). To avoid the preclusive effect of a prior *forum non* determination,

plaintiffs need only to show that there is a "difference between the districts as to the

objective criteria or material facts underlying application of these criteria for forum non

conveniens purposes." *Pastewka,* 420 F.Supp. at 646.   In a passage which Defendants

chose not to quote, the *Pastewka* district court stated:

> It is emphasized that not every discretionary determination of *forum non conveniens* will necessarily preclude a second court from reconsidering the issue.  If a second court were proffered different objective criteria or different facts underlying the application of those criteria, the necessity for taking a 'second look' would be evaluated in that context.

*Id.* at 646.

     The parties and complaint in the instant case are not identical to *Base Metal* and,

in fact, substantially are different.   *Pastewka* does not bind this Court to the result

reached in *Base Metal* simply because *some* of the parties and *some* of the claims are the

same.  To the contrary, given the far narrower claims and the different objective criteria

and new material facts, it is this Court's obligation to make its own determination.

     **A.**    **The Complaint in This Matter Is Substantially Different Than *Base Metal***

The present case represents only a small subset of the claims in *Base Metal* and is far from being identical "in all material respects" to *Base Metal* as Defendants argue. *Base Metal* involved very different and complex claims not included herein.

### 1.    The Omitted NKAZ Claims

The scheme of the takeover of the Novokuznetsk Aluminum Zavod ("NKAZ") through corrupted bankruptcy proceedings brought by four foreign claimants - Base Metal Trading, SA, Base Metal Trading, Ltd., Alucoal Holdings, Ltd. and MIKOM (collectively the "BMT Plaintiffs") - dominates the *Base Metal* complaint (First Amended Complaint, dated August 3, 2001 ("BMT Comp."*)*, ¶¶ 123-340, attached to Defendants' Appendix at A-176). The *Base Metal* case begins in the 1990's with the corrupt takeover of three other aluminum plants, as well as the Pavlodarsky Aluminum Zavod, a major supplier of raw material for NKAZ.  (BMT Comp*.*, ¶¶ 123-150).

Through 1996 to 1999, Deripaska, Chernoi, and Malevsky extorted payments of $24 million through threats to Mikhail Zhivilo ("Zhivilo), the president of MIKOM, which managed NKAZ.  (BMT Comp., ¶¶ 2, 12, 30, 148, 160-174).  In 1997, they attempted to murder a local deputy governor who investigated their efforts to control NKAZ through the local energy provider, Kuzbass, (BMT Comp., ¶¶ 177-184), and in 1998 to 1999, paid $1.5 millions in bribes to the governor of the Kemerovo region. (BMT Comp., ¶¶ 187-188).

In 2000, the Kemerovo court improperly granted Kuzbass' *ex parte* involuntary bankruptcy petition against NKAZ based on the Kuzbass' false claims for unpaid electricity.  (BMT Comp., ¶¶ 208-223).  The court also appointed a provisional manager connected with defendants to oversee the management of NKAZ.  (BMT Comp., ¶¶ 222-

18

230, 325-328).  Based on false allegations against MIKOM, the local court appointed the provisional manager as the acting manager of NKAZ allowing defendants to control NKAZ.  (BMT Comp., ¶¶ 231-260).

Subsequently, the acting manager failed to pursue the dispute with Kuzbass, recognized over $70 million dollars worth of false creditors' claims, and executed sham contracts with companies controlled by defendants.  (BMT Comp., ¶¶ 262-289, 311).  At the same time he refused to recognize about $60 million dollars worth of proper claims and canceled contracts with the Base Metal Plaintiffs, thus ascertaining control over the creditors' votes, as well as suppliers and customers.  (BMT Comp., ¶¶ 269-276).  As a result, the shareholders of NKAZ were forced to sell their shares to companies controlled by defendants at distress prices, thus allowing defendants to take control of NKAZ by ending the bankruptcy through a sham settlement with creditors confirmed by the local court.  (BMT Comp., ¶ 312-317).   This complex and involved fact pattern resulted in nine of the fifteen counts in *Base Metal* including eight RICO counts. These claims are not included in the present complaint.

### 2.    The Omitted Gok Creditor Claims

*Base Metal* also included the claims of Nexis Products, LLC ("Nexis") and Polyprom, Ltd ("Polyprom") (collectively the "GOK Creditors") relating to the takeover of GOK through physical force and corrupted bankruptcy proceedings resulting in cancellation of their trading contracts and credit agreements.

Nexis, a Utah company, was owed $15 million pursuant to various loan agreements with GOK.  (BMT Comp., ¶ 37).  During the bankruptcy of GOK, it had a $7 million bankruptcy claim against GOK which was improperly denied which permitted the

defendants to gain 94% creditors' votes in order to gain control over GOK bankruptcy proceedings. (BMT Comp., ¶ 390-394.) Subsequently, its claim was again recognized in order to extinguish it by including in the sham settlement agreement. (BMT Comp., ¶¶ 427-429). Polyprom, a Russian company, had $100 million worth of contracts illegally terminated by the defendants. (BMT Comp., ¶¶ 38, 597).

In order to uphold the claims of the GOK Creditors, the *Base Metal* court would have been required to find that GOK bankruptcy proceedings were invalid. (Sec. Am. Comp. ¶ 387-396.) The court would also have been required to invalidate the approval of the creditors' settlement agreement and subsequent court decisions. (BMT Comp., ¶¶ 425-428). These issues, too, are omitted from the present complaint.

### 3.    The Much Narrower Instant Claims

Instantly, there are no claims related to NKAZ. Unlike the claims of the GOK Creditors, allegations regarding the GOK bankruptcy are background and not critical to proof of the instant Plaintiffs' claims. *Base Metal* referred to 120 Russian legal decisions which had to be considered if the case proceed to trial. *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 708 (S.D.N.Y. 2003) (cited hereinafter as "Opinion at *"). Here, the Court would not need to reverse a single Russian court decision in which Plaintiffs were named, served, and participated on the merits. In fact, the *Base Metal* opinion *did not even discuss* one expert and four fact declarations which were submitted in regard to the instant Plaintiffs' claims regarding the theft of their shares, which appear to have been "lost in the mix" of the more complicated allegations of the BMT Plaintiffs and Gok Creditors.[8] Thus, while the claims of the present Plaintiffs were included as a

---

[8]  In *Base Metal*, the instant Plaintiffs submitted (a) two factual declarations of Dov Rieger relevant to the illegal transfer of Omni and Holdex shares in GOK (Exhibits I, J); (b) the fact declaration of Nikita

small part of the *Base Metal* complaint, they do not appear to have played a significant

role in its *forum non* dismissal.

> **B.    There Are Different Objective Criteria and Material Facts Between *Base Metal* and This Case With Respect to (1) Deference Due to Plaintiffs' Choice of Forum, (2) the Private Interest Factors, (3) the Public Interest Factors, (4) the Need For a Fresh Balancing of the Factors, and (5) the Adequacy of the Russian Court**

As recognized in *Pastewka,* the presence of different objective criteria and new

material facts should prompt the second court to take a "second look" at the *forum non*

picture. *Pastewka,* at 646. Here, there are at least five groups of different criteria and

material facts, which when taken alone, and certainly when considered together, should

require the court to examine for itself whether the requirements for the *forum non*

doctrine are present for these claims under the present circumstances.

> **1.    Plaintiffs Proffer Different Objective Criteria and New Material Facts Regarding the Deference Due to Their Choice of Forum**

The choice of forum of a plaintiff, including a foreign plaintiff, is due substantial

deference. *Lony v. E. I. Du Pont de Nemours & Co.*, 886 F.2d 628, 634 (3d Cir. 1989)

("The district court must assess whether the considerable evidence of convenience has in

this case overcome any reason to refrain from extending full deference to the foreign

plaintiff's choice.").

*Base Metal* found "little deference should be given to the plaintiffs' choice of

forum," referring to a declaration of Joseph Traum that allegedly "provides no bona fide

reasons for the plaintiffs to have sued in this Court … because Davis, Holdex, and Nexis

---

Chervinsky relevant to the forgery of his signature on a document submitted by the defendants to the Russian court in connection with illegal transfer of Holdex's shares. (Exhibit K); (c) the fact declaration of Marina Ashikhmina relevant to the illegal transfer of Foston's shares (Exhibit L); and (d) the expert opinion of Anatoly Kleymenov, an experienced attorney, opining on the illegality of the transfer of the shares of Holdex, Omni, and Foston. (Exhibit M).

are nothing more than shell companies ...."  Opinion at 695.[9]  Putting aside that the briefs in *Base Metal*, as opposed to the Traum declaration, set forth the reasons that the case was filed in New York, different objective criteria and new material facts exist as to litigation in Delaware.

First, Plaintiffs chose Delaware because the two defendant Delaware corporations received the GOK shares which were stolen from Plaintiffs.  Delaware is where Defendants organize their criminal activity, creating no less than 17 Delaware corporations named in the Complaint which were used in their criminal schemes.   In contrast, New York lacked this strong connection to the litigation based on these objective criteria.   By Plaintiffs suing in Delaware, this forum court will be able to compel the defendant Delaware corporations, as well as the Delaware Real Estate Entities, to produce documents and witnesses for deposition, wherever located.

Second, Plaintiffs chose Delaware because their principals and key witnesses, such as Traum and Khaidarov, are unwilling to go to Russia because of threats on their lives.   Putting aside that *Base Metal* did not address this highly relevant factor when analyzing the motive for the plaintiffs' choice of forum, two significant events have occurred since *Base Metal*.   Ivankov has returned from U.S. prison to Russia, where he has threatened to kill Khaidarov and Traum.   K. Dec., ¶¶ 14-23, 27-32. (Exhibit A).  Levinson, the former F.B.I. case agent responsible for the prosecution of Ivankov, states that Ivankov is capable of arranging for the murder of Plaintiffs' witnesses if they return

---

[9] *Base Metal* also observed that "having pursued various remedies in the Russian court system with unsatisfactory results, the plaintiffs now seek to take their case to the United States.  Such a tactical maneuver is not protected by the deference generally owed to plaintiffs' choice of forum."  *Id.* at 698.  This, of course, does not apply to the instant Plaintiffs, who did not initiate any litigation in Russia in regard to the ownership of their shares.  Davis was party to no litigation; Foston was represented by an imposter; and Holdex and Omni lost their shares in GOK where they were not named as parties.

to Russia, regardless of whether Ivankov is in or out of jail.   L. Dec., ¶¶ 39-43. (Exhibit

B).  This is not an idle threat; Khaidarov's mother was murdered in Tashkent in

retaliation for filing the original complaint.   K. Dec., ¶¶ 33-37.  These new, material

facts dispel any suggestion that Plaintiffs' motivation for filing in Delaware was for less

than *bona fide* reasons and should be granted substantial, if not dispositive, deference.[10]

Finally, Defendants' suggestion that Plaintiffs' counsel "readily boasts of his

forum shopping on behalf of his clients" and that re-filing the claims is a "ploy" is *ad*

*hominem* argument hardly due response.    Counsel filed this action in a jurisdiction in

which Defendants reside and do business and where his clients will not be killed.    As

*Iragorri v. United Technologies Corp*., 274 F.3d 65, 72 (2d Cir. 2001)(*en banc*),

admonishes:

> Courts should be mindful that, just as plaintiffs sometimes choose a forum
> for forum-shopping reasons, defendants also may move for dismissal
> under the doctrine of *forum non conveniens* not because of genuine
> concern with convenience but because of similar forum-shopping reasons.
> District courts should therefore arm themselves with an appropriate degree
> of skepticism in assessing whether the defendant has demonstrated
> genuine inconvenience and a clear preferability of the foreign forum.

274  F.3d at 75.

One can only be skeptical as to the motivations of two Delaware defendants, as

well as American defendant Kislin, to litigate in Russia, rather than at home, particularly

on a record where Defendants stripped Plaintiffs Holdex and Omni of their shares in

corrupted proceedings in courts in the obscure Chelyabinsk and Kalmyka courts.  When

plaintiffs "sue the defendant where the defendant has established itself and is thus

---

[10] *See Iragorri v. United Technologies Corp*., 274 F.3d 65, 75 (2d Cir. 2001) (*en banc*) ("plaintiffs . . . fear
for their safety in Cali and . . . witnesses['] unwilling[ness] to travel to Cali . . . appear highly relevant to
the balancing inquiry that the District Court must conduct"); *Cabiri v. Assasie-Gyimah*, 921 F.Supp. 1189,
1199 (S.D.N.Y. 1996) (denying *forum-non* motion in part because plaintiff "would be putting himself in
grave danger were he to return to Ghana").

amenable to suit, this would not ordinarily indicate a choice motivated by desire to

impose tactical disadvantage." *Iragorri*, 274 F.3d at 73.

> **2. Plaintiffs Proffer Different Objective Criteria and New Material Facts Regarding the Private Interest Factors**

Plaintiffs proffer different objective criteria and new material facts relevant to the

private interest factors, which include:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Lony v. E.I. Du Pont De Nemours & Co.*, 935 F.2d 604, 609 (3d Cir. 1991) (*quoting Gulf*

*Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

First, *Base Metal* concluded the convenience of party and non-party witnesses

favored Russia because "the list of potential non-party witnesses who appear in the

Amended Complaint alone demonstrates why this litigation should proceed in Russia."

Opinion at 710.  *Base Metal* referenced the allegations concerning the illegal takeover

and bankruptcies of NKAZ and GOK, which formed the basis for claims of the BMT

Plaintiffs and GOK Creditors.  Opinion at 710.

In contrast, the instant claims are far narrower than the claims in *Base Metal.*

Witnesses to the illegal takeover of NKAZ are completely irrelevant.  While the takeover

and corrupted bankruptcy of GOK serve as background to Plaintiffs' claims, these facts

require almost no witnesses outside of the parties' control.  Further, Plaintiffs need not

prove such illegality in order to prevail.   Rather, their core claims concern the narrow

issues of proving (a) Davis did not authorize the "contract" by which its shares were

"sold"; (b) Foston was represented by an imposter in the Moscow litigation by which its

shares were transferred; and (c) Omni and Holdex were not named or served in litigation

by which their shares were transferred.  The number of foreign witnesses related to these

factual disputes are limited and almost all are under the control of the parties, as set forth

in Plaintiffs' Rule 26 Disclosures (Exhibit N).

Second, *Base Metal* discounted the unwillingness of Traum and other witnesses to

return to Russia based on threats to their lives and fear of false prosecution, concluding

that Traum was not a witness to the main allegations of that case. Opinion at 711.  In

contrast, Traum and Khaidarov are the *main* witnesses to the narrower allegations of this

case.   Further, to the extent that the fear of Traum, Khaidarov, and Plaintiffs' other

witnesses did not "rise to the level of gravity" sufficient for *Base Metal*, the subsequent

return of Ivankov to Russia, his threat to kill Plaintiffs' witnesses, and the murder of

Khaidarov's mother cannot but elevate gravity sufficient to make this an important, if not

determinative, factor.

Finally, in light of the much narrower claims in the instant Complaint, the Court

should reconsider whether Defendants have established "*trial in the chosen forum would*

*'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to*

*plaintiff's convenience*" as required under *Piper*, 454 U.S. at 241, taking into account

Defendants can preserve the testimony of any allegedly unwilling witnesses under the

Hague Convention or letters rogatory.[11]  *See DiRienzo v. Philip Servs. Corp.*, 294 F.3d

21, 30 (2d Cir. 2002) (reversing a *forum-non* dismissal because "any difficulties . . .

regarding witnesses whose attendance the Court is unable to compel can most likely be

---

[11] The U.S. and Russia, as successor to the Soviet Union, are parties to a bilateral letters-rogatory
agreement for the production of documents and preservation of testimony.  Execution of Letters Rogatory,
Nov. 22, 1935, U.S.-U.S.S.R., 11 Bevans 1262 (1935).  Russia is also a party to the Hague Convention of
the Taking of Evidence Abroad in Civil and Commercial Matters.  23 U.S.T. 2555 (1970).

resolved by the use of deposition testimony or letters rogatory[, and] videotaped

depositions, obtained through letters rogatory, could afford the jury an opportunity to

assess the credibility of[] witnesses" who do not testify live) (citations omitted).

### 3. Plaintiffs Proffer Different Objective Criteria and New Material Facts Regarding the Public Interest Factors

Plaintiffs proffer different objective criteria and new material facts relevant to the

public interest factors, which include

> the administrative difficulties flowing from court congestion; the 'local interest in
> having localized controversies decided at home'; the interest in having the trial of
> a diversity case in a forum that is at home with the law that must govern the
> action; the avoidance of unnecessary problems in conflict of laws, or in the
> application of foreign law; and the unfairness of burdening citizens in an
> unrelated forum with jury duty.

*Lony*, 935 F.2d at 612 (*quoting Piper,* 454 U.S. at 241, n.6).

First, unlike *Base Metal*, where only two defendants were residents in New York

(excluding Pan American Corp., which had been dissolved), Delaware is the location of

two Defendant corporations as well as 15 named Delaware entities which were involved

in Defendants' criminal schemes.   It is these two Delaware corporations that received the

shares stolen from Plaintiffs and it is Delaware where the Conspirators center their

activities.    It is a matter of common sense that Delaware has a strong interest in

preventing Russian criminal elements from infiltrating Delaware to use it as the corporate

base for their schemes.

Second, unlike *Base* Metal, which sought relief under RICO and non-U.S. law,

this case only sets forth RICO claims; when claims are to be decided under American

law, the public interest factors almost always favor the American forum.  *See, e.g.,*

*American Cyanamid Co. v. Picaso-Anstalt*, 741 F. Supp. 1150, 1158 (D.N.J. 1990) ("the

26

Court must attempt to ensure that the resolution of the case takes place in a forum that is at home with the law that must govern the case … Dismissal of the case in favor of the [foreign] action would require a court unschooled in our laws to apply statutory law and common law precepts in what would clearly be a cumbersome process.") (internal quotations omitted).

Third, unlike *Base Metal,* where the court concluded that it "would be forced to consider approximately 120 Russian legal decisions related to the NKAZ and GOK bankruptcies and the GOK change of control," Opinion at 708, presumably implicating difficult issues of foreign law, the instant Complaint does not require this Court to undo a *single* Russian court decision in a case where plaintiffs were named, served, and participated on the merits.

Fourth, while *Base Metal* determined it would be "unfair to require a New York jury to sit on this case", Opinion at 713, Delaware policy, which this Court should not ignore under principles of federalism, imposes a very narrow *forum non* standard, recognizing that Delaware citizens should serve on juries to resolve disputes over which Delaware courts have jurisdiction unless defendants can establish "overwhelming hardship." *Candlewood Timber Group v. Forestal, supra.* If Delaware, which knows best, believes its citizens should so sit, this Court should not second guess Delaware's determination.

Given the different objective factors and new material facts related to the public interest factors, this Court should determine whether trial in plaintiff's chosen forum is "inappropriate because of considerations affecting the court's own administrative and legal problems" under *Piper.*

### 4. The Need for a New Balancing Test Based on the Different Public and Private Interest Factors

As courts have uniformly recognized, the *forum non* balancing test is fact specific. *DiRienzo v. Philip Services Corp.*, 294 F.3d 21, 27 (2d Cir. 2002) ("[b]ecause the *Gilbert* test is so fact-specific, a district court's erroneous understanding of facts central to a case can preclude a reasonable balancing of the *Gilbert* factors and form the basis for reversal on appeal"). Given the *different objective criteria* and *new material facts* relevant to the deference granted to Plaintiffs' choice of forum, the private interest factors, and the public interest factors, it is incumbent on this Court to conduct its own balancing test to determine whether Defendants have met their heavy burden of proving that dismissal for *forum non* is warranted. *See, e.g., Mizokami*, 660 F.2d at 716 (Arizona district court's dismissal did not preclude Missouri district court from conducting its own *forum non* analysis).

### 5. The New Material Facts As to the Adequacy of the Moscow Arbitrazh Court

A prerequisite for *forum non* dismissal is the existence of an adequate forum. *Base Metal* rejected Plaintiffs' so called "alternate forum is too corrupt to be adequate argument," Opinion at 706, concluding the record was insufficient "to condemn the entire Russian judiciary as an inadequate alternative forum in which to try this case." Opinion at 708. Nonetheless, given the record, including expert reports, that defendants had corrupted Russian court proceedings and no rebuttal to the Kleymonov expert report that defendants had corrupted the litigation concerning the GOK shares, *Base Metal* required defendants to consent to venue in Moscow, where, presumably, the Moscow

Arbitrazh court would be less subject to improper influence than regional courts.
Opinion at 703.

Should one be tempted to believe that the arbitrazh court in Moscow is free from the corruption and influence that plague the Russian court system, any such belief should be dispelled by the recent dismantling of Yukos, which has received world-wide condemnation as being orchestrated by powerful Russian interests.   While Plaintiffs have not amassed a complete record, as an initial proffer, they submit statements of U.S. government officials, a U.S. Senate resolution, an English court decision, and numerous media articles.   With discovery, Plaintiffs anticipate that they can obtain the Gladyshev expert report, or prepare their own, detailing that these proceedings can only be explained by influence.

Plaintiffs do not ask this Court to find that every court in Russia is corrupted. Plaintiffs simply suggest that given these new material facts regarding the very court to which *Base Metal* relegated them, this Court should conduct its own determination in this case whether Defendants have met *their* burden of proving that Russia offers an adequate forum in the Moscow Arbitrazh court.  *See Leon v. Miller,* 251 F.3d 1305, 1312-13 (11th Cir. 2001) ("where the plaintiff produces significant evidence documenting the partiality . . . and these conditions are so severe as to call the adequacy of the forum into doubt, then the defendant has the burden to persuade the district court that the facts are otherwise").   Yukos provides *new* and persuasive evidence that Russian courts can be influenced, particularly when taking into account Evraz's admission of the "lack of judicial independence from political, social and commercial forces" in its Year 2005 offering statement.

III.    **Plaintiffs Were Not Required to File a Fed.R.Civ.P. 60(b) Motion In Regard to the Different Objective Criteria and New Material Facts**

Defendants assert that Plaintiffs have improperly circumvented Fed.R.Civ.P. 60(b) by failing to file such a motion before the *Base Metal* court.  Nonsense.

First, Plaintiffs filed this case in Delaware *state* court, which applies a very *different* and *narrower forum non* test than federal court. *Mar-Land Indus. Contrs., Inc. v. Caribbean Petroleum Ref., L.P.*, 777 A.2d 774, 779 (Del. 2001) ("Our jurisprudence makes clear that … for *forum non conveniens,* whether an alternative forum would be more convenient for the litigation, or perhaps a better location, is irrelevant.") Defendants, not Plaintiffs, brought this action to this Court.  When Plaintiffs filed, Rule 60(b) simply had no application.   And Plaintiffs had every right to re-file in a state court which applied a different *forum non* standard under *Chick Kam Choo.*

Second, even if Plaintiffs had re-filed in federal court, Rule 60(b) would not apply because Plaintiffs are not relying on "newly discovered evidence."    Plaintiffs seek this Court to determine the *forum non* issue based on (a) the objective differences between the allegations of *Base Metal* and this case and (b) the objective differences and new material facts regarding (i) the deference due to Plaintiffs' choice of forum, (ii) the private interest factors, (iii) the public interest factors, (iv) the balancing thereof, and (v) the adequacy of the Moscow Arbitrazh court.

The duty of a second district court to revisit the *forum non* issue after a determination by a different district is reflected by the very caselaw cited by Defendants, *Pastewka,* which permits such new consideration when the objective criteria and material facts differ.  Defendants' citation to the Third Circuit's opinion in *Pastewka* for the proposition that Plaintiffs should have filed a Rule 60(b) motion is disingenuous, at best.

30

The Third Circuit's citation to Rule 60(b) was based on plaintiffs' concession that there

were no different objective criteria or different material facts.   The Third Circuit

contrasted this with *Parsons v. Chesapeake & Ohio Railway Co.*, 375 U.S. 71 (1963),

where the Supreme Court reversed a district court's decision refusing a motion to transfer

based on a state court's *forum non* decision.   *Pastewka* quoted *Parsons* as follows:

> The discretionary determinations of both the state and federal courts in this case
> required, to be sure, evaluations of similar, but by no means identical, objective
> criteria.  However, since the material facts underlying the application of these
> criteria in each forum were different in several respects, principles of *res judicata*
> are not applicable to the situation here presented.

*Pastewka*, 565 F.2d at 854 (*quoting Parsons*, 375 U.S. at 72-73).[12]

As *Pastewka*, *Mizokami,* and *Parsons* establish, plaintiffs may file a second action

in a different district without filing a Rule 60(b) motion and receive consideration of the

*forum non* (or similar) issue on the merits if they can establish different objective criteria

and/or material facts relevant to the decision.  Plaintiffs proffer exactly that.

**IV.    This Court Should Not Enjoin Plaintiffs From Prosecuting The Chancery
Court Action Or Any Other Action**

Defendants moved pursuant to the All Writs Act, 28 U.S.C. §1651,[13] to enjoin

Plaintiffs from bringing future actions based on the underlying facts asserted in the

Complaint. Further, in their May 5, 2005 letter brief Defendants argue such an injunction

should apply to the Chancery court action.   Such an injunction should not be granted.

---

[12] Defendants' citation to *China Tire Holdings Limited v. Goodyear Tire and Rubber Co.*, 91 F.Supp.2d
1106 (N.D. Ohio 2000) is equally disingenuous because the reference to Rule 60(b) had nothing to do with
*forum non*.  Plaintiffs pled newly discovered evidence to sustain RICO claims which had been dismissed.

[13] The All Writs Act provides "The Supreme Court and all courts established by Act of Congress may issue
all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and
principles of law." 28 U.S.C. 1651(a).   Relief is permitted only in "the exceptional case."  *Bankers Life &
Casualty Co. v. Holland*, 346 U.S. 379, 383 (1953).

### A.    This Court Should Not Grant Affirmative Relief Until It Determines Its Own Jurisdiction

It is a fundamental principle that a federal court may not grant relief until it has determined that it has subject matter jurisdiction. *See Ortho Pharmaceutical Corp. v. Amgen, Inc.*, 882 F.2d 806, 811 (3d Cir. 1989) ("we must decide whether the district court has subject matter jurisdiction [before] entertain[ing] a motion for preliminary injunctive relief"). Defendants challenge subject matter jurisdiction in their pending motions to dismiss. It would be improper for this Court to grant affirmative relief until this issue is decided.[14]

### B.  The Chancery Court Action Should Not Be Enjoined

### 1.  The Anti-Act Injunction Act Protects The Chancery Court Action

The Anti-Injunction Act, 28 U.S.C. §2283, provides:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

"On its face the present Act is an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of the three specifically defined exceptions." *Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281 (1970).[15] "A federal court does not have inherent power to ignore the limitations of §2283 and to enjoin state court proceedings merely because those

---

[14] Although courts consider personal jurisdiction or *forum non* in dismissing a case when questions of subject matter jurisdiction are complex, no court has been permitted to grant injunctive relief before deciding its jurisdiction. S*ee Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 588 (1999) (permitting dismissal for lack of personal jurisdiction); *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 497- 498 (2d Cir. 2002) (permitting dismissal for *forum non*).

[15] The history of the Act is set forth in *Atlantic Coast, supra.*, and *United States Steel Corporation Plan for Employee Benefits v. Musisko*, 885 F.2d 1170 (3d Cir. 1989) (vacating injunction issued in violation of Anti-Injunction Act).

proceedings interfere with a protected federal right or invade an area preempted by federal law, even when the interference is unmistakably clear … This conclusion is required because Congress itself set forth the only exceptions to the statute." *Id*. at 294. "[T]he exceptions to the Anti-Injunction Act must be construed narrowly and doubts as to the propriety of a federal injunction against a state court proceeding should be resolved in favor of permitting the state court to proceed." *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987) (internal citations omitted). "It is settled that the prohibitions of §2283 cannot be evaded by addressing the order to the parties or prohibiting utilization of the results of a completed state court proceeding." *Atlantic Coast,* 398 U.S. at 288 (citations omitted).

The Chancery Court action is pending, and, thus, falls within the plain language of the statute.   While Defendants may argue that the Act should only apply to litigation pending at the time of the request for injunctive relief, *see Barancik v. Investors Funding Corp. of N.Y.*, 489 F.2d 933 (7th Cir. 1973), such an "interpretation runs afoul of the language of the Act and of the clear authority which insists the language be read literally … The Supreme Court has repeatedly ruled that the ban is absolute and the language is to be taken literally." *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 533 (6th Cir. 1978), *cert. dismissed,* 442 U.S. 925 (1979) (rejecting *Barancik* and vacating injunction); *see also Standard Microsystems Corp. v. Texas Instruments Inc.*, 916 F.2d 58, 62 (2d Cir. 1990) ("In passing the Anti-Injunction Act, Congress meant to avoid friction in the relationship between federal courts and state courts.  The *Barancik* rule places the power in the hands of the [movant] unilaterally to nullify the effectiveness of an Act of Congress and to create exactly the kind of federal-state conflict that Congress sought to prevent").

33

No court in this Circuit has ignored the plain language of the Act and adopted the *Barancik* view.   Rather,  in *Kennecott Corp. v. Smith*, 637 F.2d 181 (3d Cir. 1980), the Third Circuit carefully distinguished *Roth v. Bank of the Commonwealth*, focusing on whether the state court proceedings were pending when the district court *acted*, not when the motion was filed, indicating agreement with *Roth*.  In holding that the district court incorrectly denied the injunction motion, the Third Circuit stated that the "anti-injunction act is not designed to deprive a federal plaintiff of the right to an appeal … Since there were no state proceedings to be enjoined *at the time the district court acted*, the anti-injunction statute does not foreclose relief [on appeal]."  *Id.* at 187 (emphasis added).

Alternatively, even if this Court should adopt the *Barancik* rule, the language of the "necessary in aid of jurisdiction" and "re-litigation" provisions of the Anti-Injunction Act and All Writs Act are identical and construed similarly.[16]  Thus, to the extent an injunction is prohibited under the Anti-Injunction Act, it does not fall within the powers provided by the All Writs Act.  *In re Diet Drugs Phentermine/Fenfluramine/ Dexfenfluramine) Prods. Liab. Litig.*, 369 F.3d 293, 305 (3d Cir. 2004) ("The two statutes act in concert…The authority the All Writs Act imparts to district courts is limited, however, by the Anti-Injunction Act, which prohibits injunctions "to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.").

### 2.   No Statutory Exception Applies Under the Anti-Injunction Act

---

[16] *See Carlough v. Amchem Products, Inc.*, 10 F.3d 189, 201 (3d Cir. 1993) ("The parallel 'necessary in aid of jurisdiction' language is construed similarly in both the All Writs Act and Anti-Injunction Act"); *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 675 (5th Cir. 2003) ("All Writs Act … authorizes federal courts 'to issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.' This power dovetails with the relitigation exception to the Anti-Injunction Act.") (internal citations omitted).

Defendants argue that 28 U.S.C. §1446(d), which provides that after a removal notice has been filed, "the State court shall proceed no further unless and until the case is remanded", somehow applies to the Chancery Court case.   It does not because the current Chancery Court matter was remanded after it was improperly removed; the Chancery Court is not proceeding in the case currently on removal.

The law could not be clearer that plaintiffs are permitted to proceed simultaneously with their non-federal claims in state court and federal claims in federal court.  *See, e.g., Marks v. Stinson*, 19 F.3d 873, 885 (3d Cir. 1994); ("A federal plaintiff may pursue parallel actions in the state and federal courts"); *Gwynedd Properties, Inc. v. Lower Gwynedd Township,* 970 F.2d 1195, 1203 (3d Cir. 1992) ("[T]he rule is well recognized that the pendency of an action in the state court is no bar to proceedings concerning the same subject matter in the Federal court having jurisdiction").

Plaintiffs had every right to delete the non-federal claims by amending their Complaint and filing them in state court; in fact, dual filings is exactly what occurred in *Atlantic Coast*, where the plaintiff filed federal claims in federal court and then filed state claims in state court.  As the Supreme Court observed there, "In short, [when] the state and federal courts [have] concurrent jurisdiction … neither court [is] free to prevent either party from simultaneously pursuing claims in both courts … Therefore the state court's assumption of jurisdiction over the state law claims … did not hinder the federal court's jurisdiction so as to make an injunction *necessary* to that jurisdiction."  *Atlantic Coast*, 398 U.S. at 296.

In *Frith v. Blazon-Flexible Flyer, Inc.*, 512 F.2d 899 (5th Cir. 1975), cited by Defendants, the Fifth Circuit *reversed* an injunction that would have precluded the

prosecution of a second filed state case.  There, the defendant removed the first-filed suit based on diversity.   The plaintiff filed a second state suit, adding a non-diverse defendant.   Defendants then removed, alleging fraudulent joinder of the new defendant. Judge Russell granted plaintiff's remand petition on the second suit, finding no fraudulent joinder.  Judge Cox, to whom the first suit had been assigned, then enjoined prosecution of the second suit in state court, but the Fifth Circuit *reversed*, stating "where no fraud is found, the second action brought in state court should not be enjoined."[17]  *Id*. at 901.

Defendants do not allege fraud here, nor could they; all that Plaintiffs have effected is what they were entitled to from the beginning - litigating their non-federal claims in state court.   In similar circumstances, in *Lou v. Beltzberg*, 834 F.2d 730 (9th Cir. 1987), the plaintiffs filed claims under RICO and state law which were removed. The district court enjoined plaintiffs from prosecuting in state court  a second suit which asserted only state law claims, purportedly under 28 U.S.C. §1446.  While the Ninth Circuit opined that "where a second state court suit [which] is fraudulently filed in an attempt to subvert the removal of a prior case, a federal court may issue an injunction," *id*. at 741, it found nothing fraudulent or subversive about filing a second suit based solely on state claims and vacated the injunction.  Such is the instant case.

### 3.  The "Necessary In Aid of Its Jurisdiction Exception" Does Not Apply Under the Anti-Injunction Act or All Writs Act

---

[17] Defendants also cite *Kansas Public Employees Retirement System v. Reimer & Koger Assoc., Inc.,* 77 F.3d 1063 (8th Cir. 1996), where the court affirmed an order enjoining the second filed case because of the unique nature of 12 U.S.C. §1441(a)(1), which provides exclusive federal jurisdiction over "the entirety of any case to which the R[esolution T[rust] C[orporation] is a party and not just to those claims in such a case brought by or against the RTC." *Id.* at 1070.  In other words, any suit filed by the *Kansas Public* plaintiffs to which the RTC was party was subject to federal jurisdiction, regardless of the nature of the claims.   In contrast, in this case, Defendants' right to removal under 28 U.S.C. §1331 is based on the existence of a federal question; Plaintiffs' deletion of their non-federal claims in this Court and re-filing in state court has no impact on this Court's jurisdiction over the federal claims.

The Anti-Injunction Act and All Writs Act contain identical language permitting a federal court to enjoin state court proceedings when "necessary in aid of its jurisdiction." Under this language, "it is not enough that the requested injunction is related to that jurisdiction, but it must be 'necessarily in aid of' that jurisdiction … we conclude that it implies something similar to the concept of injunctions to 'protect' or 'effectuate' judgments." *Atlantic Coast*, 398 U.S. at 295.   Injunctive relief is not permitted unless it is "necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Id.*   "The mere existence of a parallel action in state court does not rise to the level of interference with the federal jurisdiction necessary to permit injunctive relief under the 'necessary in aid of' exception." *Lou v. Beltzberg*, 834 F.2d 730, 740 (9th Cir. 1987).   It is a doctrine of long standing that "[w]here the action first brought is in personam and seeks only a personal judgment, another action for the same cause of action in another jurisdiction is not precluded." *Kline v. Burke Construction Co.*, 260 U.S. 226, 230 (1922) (numerous cases cited therein).

 In the instant case, the Chancery and federal court cases state different claims which require different proofs.  The RICO action is in personam; Plaintiffs do not ask this Court to assert jurisdiction over a rem.   There is no conceivable manner in which the Chancery Court action falls within the "necessary in aid" exception.

### 4. The "Re-litigation" Exception Does Not Apply Under the Anti-Injunction Act or All Writs Act

The Anti-Injunction Act and All Writs Act contain an identical  "re-litigation" exception permitting a federal court to enjoin state court proceedings in order to effectuate its prior judgment.   Defendants argue that this language applies because this

Court should "protect" the judgment of dismissal in *Base Metal*.  This argument is frivolous.

In *Exxon Corp. v. Chick Kam Choo,* 486 U.S. 140 (1988), the Supreme Court reversed an injunction that precluded the plaintiff from re-filing in state court an action that the federal court dismissed for *forum non*.  As the Court held, "an essential pre-requisite for applying the re-litigation exception is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court … this prerequisite is strict and narrow."  *Id.* at 148.  In language which applies word for word to the instant case, *Chick Kam Choo* held

> the only issue decided by the District Court was that petitioner's claims should be dismissed under the  federal *forum non conveniens* doctrine.  Federal *forum non conveniens* principles simply cannot determine whether Texas [Delaware] courts, which operate under a broad 'open-courts' mandate, would consider themselves an appropriate forum for petitioners' lawsuit … Thus, whether the Texas [Delaware] *state* courts are an appropriate forum for petitioners' … claims has not yet been litigated, and an injunction to foreclose consideration of that issue is not within the relitigation exception."

*Id.* at 148-149.

Following *Chick Kam Choo,* courts uniformly hold that a federal dismissal for *forum non* cannot serve as the basis for enjoining the filing of claims in state court.  *E.g., Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 679 (5th Cir. 2003) (vacating injunction, holding that while a *forum non* dismissal by a federal court "may bar reconsideration of the claims in another Texas federal court, it cannot forever bar the controversy from all American courts.  To conclude otherwise would prevent states from deciding the openness of their courts") (footnote omitted); *Baris v. Sulpico Lines, Inc.*, 74 F.3d 567, 573 (5th Cir. 1996) (affirming district court's refusal to issue an injunction, holding: "Under *Chick Kam Choo*, it is Louisiana's prerogative to chose not to recognize

the doctrine of f.n.c. in its own courts.  It would be improper for this court to preclude plaintiffs from pursuing their claims in Louisiana state court solely based upon a prior federal court dismissal on f.n.c. grounds").[18]

As in *Chick Kam Choo,* the *forum non* doctrine of Delaware, the state at issue, is far narrower than that applied in federal court.   All *Base Metal* decided was that the federal doctrine of *forum non* justified dismissal of *that* case from *that* federal court. *Base Metal* did not decide, not could it, whether Delaware's *completely different* and *far narrower* doctrine justified dismissal of a suit filed in Delaware state court.[19]   Thus, the re-litigation exception cannot apply.

### 5.   Defendants Cannot Meet the Standards for An Injunction

Even assuming that the Anti-Injunction Act does not apply (it does) and the All Writs Act permits the requested relief (it doesn't), Defendants must still satisfy the normal standards for obtaining an injunction, which require the moving party to show "(1) a reasonable probability of eventual success in the litigation, and (2) that irreparable injury will ensue if relief is not granted. In addition, the court may consider (3) the possibility of harm to other interested persons from the grant or denial of relief, and (4)

---

[18] Defendants trumpet *Villar v. Crowley Maritime Corp.*, 990 F.2d 1489 (5th Cir. 1993) for the proposition that this Court may enjoin the filing of a new action in state court after a federal court has dismissed an action for *forum non*, but do not disclose that the appeals court held that the Anti-Injunction Act did not apply because a new state court action had not been filed when the injunction was issued.  In the instant case, the Chancery Court action has already been filed.   In any case, *Villar* is not of precedent in this circuit and, with all due respect, it was wrongly decided under *Chick Kam Choo*, which may explain why it was not cited or followed in *Vasquez v. Bridgestone/Firestone* and *Baris v. Sulpico.*

[19] While some district courts, including *Base Metal*, loosely include language comparing the entire United States to the alternative foreign forum, such dicta does not preclude a state court, or even another federal district court, from deciding the issue.  *Chick Kam Choo*, 486 U.S. at 148 ("Federal forum non conveniens principles simply cannot determine whether Texas courts, which operate under a broad "open-courts" mandate, would consider themselves an appropriate forum for petitioner's lawsuit."); *Mizokami,* 660 F.2d at 716-717 (8th Cir. 1981) (Arizona district court's determination could not preclude Missouri court from analyzing the issue).

the public interest." *Constructors Ass'n of Western Penna. v. Kreps,* 573 F.2d 811, 815

(3d Cir. 1978).  Defendants cannot meet this standard for the reasons set forth above.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss on estoppel grounds and

for injunctive relief should be denied.


|  | /s/ David L. Finger |
|---|---|
| Bruce S. Marks | David L. Finger (DE Bar ID #2556) |
| MARKS & SOKOLOV, LLC | FINGER & SLANINA, LLC |
| 1835 Market Street, 6th Floor | One Commerce Center |
| Philadelphia, Pennsylvania  19103 | 1201 Orange Street, Suite 725 |
| 215-569-8901 | Wilmington, DE 19801-1155 |
|  | 302 - 884-6766 |

*Of counsel*:
    George C. Pratt
    FARRELL FRITZ, P.C.
    EAB Plaza
    Uniondale, New York  11556
    516-227-0700

Attorneys for Plaintiffs