UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
BASE METAL TRADING, SA, <u>et al</u>.,                    :

                    Plaintiffs,          :     Docket No. 00 CIV. 9627 (JGK)

          -against-                       :

RUSSIAN ALUMINUM, <u>et al</u>.,                         :

                 Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X


## <u>Declaration and Exhibits of Nikita Chervinskiy</u>

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

**BASE METAL TRADING SA et al**                    **Docket No. 00 Civ. 9627**

                    **Plaintiffs**

          **v.**

**RUSSIAN ALUMINUM et al.**

                    **Defendants.**
_____


### DECLARATION OF NIKITA ILLYICH CHERVINSKY

          I, Nikita Illyich Chervinsky, pursuant to the provisions of 28 U.S.C. §1746, herby

declare as follows:

### BACKGROUND

          1.          I am a citizen of the Russian Federation.  From December 1, 1998 until

January 29, 2000, I was an Assistant General Director of Open Joint Stock Company

Kachkanarskii GOK "Vanadii" ("GOK").  Additionally, from February 11, 1999 until

January 29, 2000, I was the General Director of the Limited Liability Company Trading

House OJSC "Vanadii" ("GOK Trading House"), all shares of which were owned by

GOK.

### THE SALE OF SHARES TO HOLDEX

          2.          On January 18, 2000, Limited Liability Company Polyprom ("Polyprom")

and GOK Trading House signed Contract # 3 for the sale of 2,307,984 shares of GOK to

Polyprom.  The purchase price for these shares was 5,558,847 rubles.  (See Exhibit 1).  I

signed the contract for GOK Trading House, and G. M. Bukharin signed the contract on behalf of Polyprom.

3.    Contrary to assertions made by Samir Kapoura, both Bukharin and I had the power to sign that agreement based on the by-laws of our respective companies -- Bukharin as the General Director of Polyprom, and I as the General Director of GOK Trading House.

4.    Polyprom paid for the shares by transferring twelve promissory notes of the Savings Bank of the Russian Federation ("Sberbank"), ## 1054314, 1054323, 1054333, 1054334, 1077333, 1077321, 1054565, 0458145, 0458192, 1936588, 1936535, 1936536, in the amount of 5,558,847 rubles -- $194,569.37 according to the official rate of the Central Bank of the Russian Federation on January 18, 2000 -- to GOK Trading House.  Sberbank is the largest bank in Russia.

5.    On January 20, 2000, GOK Trading House and GOK signed a loan agreement.  (See Exhibit 2).  According to that loan agreement, GOK Trading House loaned to GOK 5,558,847 rubles in the form of the 12 Sberbank promissory notes identified above, which had been received by GOK Trading House from Polyprom as payment for the GOK shares sold to Polyprom by GOK Trading House.

6.    It is my understanding that these promissory notes were never recorded in the accounting books of GOK, and were subsequently stolen.  It is also my understanding that, on January 20, 2000, Polyprom sold the 2,307,984 shares it had bought from GOK Trading House to Holdex, LLC.  (See Exhibit 3).

## THE RUSSIAN LITIGATION

7.      After the Illegal Takeover of GOK, GOK filed a suit in the Kalmykia Arbitrazh Court (KaAC) against Polyprom and GOK Trading House to invalidate the sale of shares from GOK to Polyprom, as well as the subsequent sale to Holdex, LLC. GOK's apparent purpose in filing this suit was to receive double profits by (a) obtaining the return of the shares, and (b) retaining the benefit of the promissory notes.  GOK also sought the return of the shares to permit certain persons, such as Chernoi, Makhmudov, and others, to take over control of GOK.

8.      To procure a favorable ruling from the Court, GOK presented a document dated January 18, 1999, which was identified as "Contract # 3."  (See Exhibit 4).  This document bore a signature which purported to be my signature.  However, I never signed the Contract #3 that was presented to KaAC by GOK; the signature contained on the document is a forgery.

9.       As of January 1999, I was not an officer or employee of GOK Trading House and thus could not have signed the contract on its behalf.  Further, as an Assistant General Director of GOK in January 1999, I have personal knowledge that there was no such contract between GOK Trading House or GOK, on the one hand, and Polyprom on the other hand.  Further, according to its organizational documents, Polyprom did not even exist as of the purported date of the falsified contract.  (See Exhibit 5).

10.      Based on this falsified contract, by order dated November 22, 2000, KaAC ruled in favor of GOK.  Specifically, the Court found that the fraudulent January 18, 1999 Agreement was invalid and reversed the share transfer, even though the shares sold by GOK Trading House were actually sold pursuant to an agreement dated January 18, 2000. (See Exhibit 6).

11.     Polyprom filed a cassation appeal on January 22, 2001, and by Order dated April 17, 2001, the Federal Arbitrazh Court for the North Caucasus Circuit reversed the November 22, 2000 decision and remanded the case to KaAC. (See Exhibit 7). The April 17, 2001 order was based, among other things, on the fact that there was a dispute concerning the date when the sale of shares took place, and that GOK had failed to present the KaAC with an authenticated copy of the purported agreement.

12.     Thereafter, Polyprom filed a petition with the KaAC on June 18, 2001, and the KaAC ordered me to present a witness statement on the authenticity of the contract presented by GOK.  In compliance with that Order, I submitted in writing my witness statement that the contract submitted by GOK was a forgery.  (See Exhibit 8).

13.     Inexplicably, at a hearing that took place on July 5, 2001, the KaAC refused to consider my witness statement.  Further, GOK presented to the KaAC a purportedly notarized copy of the false Contract # 3 dated January 18, 1999.  The contract was purportedly notarized by Elena Aleksandrovna Kostikova, who dated the notarized copy January 22, 1999.  (See Exhibit 4).  But I never appeared before Ms. Kostikova and never signed any agreement in her presence.  She simply produced a notarized copy of a fake document.  The notarization was yet another fraud, aimed at giving the appearance of legitimacy to a forged document.  Notwithstanding this fact, the KaAC ordered the reversal of the sale of stock to Polyprom by order dated July 5, 2001. (See Exhibit 9).

14.     Subsequently, Polyprom filed an appeal with the appellate instance of KaAC.  This appeal was accompanied by a motion to join Holdex, LLC, the good faith purchaser of the shares.  By order dated September 10, 2001, the appellate instance of

KaAC granted Polyprom's motion to join Holdex, LLC, and postponed the hearing of the appeal.  (See Exhibit 10).

15.     On November 9, 2001, Holdex, LLC appeared as a third party at the hearing at the appellate instance of KaAC.  By order of the same date, the appellate instance upheld the lower court's decision dated July 5, 2001.  It found that the January 18, 1999 contract presented by GOK was the true one, and that the signatories to the contract did not have the authority to sign it. (See Exhibit 11).

16.     On January 21, 2002, the Federal Arbitrazh Court for the Northern District of Caucasus reversed and remanded the November 9, 2001 decision because KaAC failed to follow the instructions of the Federal Arbitrazh Court contained in its decision dated April 17, 2001, ordering KaAC to properly review the circumstances of the case, and because KaAC failed to provide any reasoning why it preferred one contract over the other or to give any consideration to Holdex's right of ownership of the shares in question.  The Federal Arbitrazh Court remanded the case for a de novo review of all circumstances of the case at the court of the first instance. (See Exhibit 12).

17.     On March 12, 2002, in the absence of Polyprom and Holdex, KaAC issued another decision in favor of GOK, invalidating the sale and ordering to return the shares to GOK. (See Exhibit 13).  Polyprom and Holdex did not attend because the conspirators had submitted forged telegrams to the Court, which falsely indicated that Polyprom and Holdex had consented to a  March 12, 2002 court date and to have a hearing conducted in their absence.

18.     Polyprom filed a cassation appeal with the Federal Arbitrazh Court for the North Caucasus Circuit.  On April 23, 2002 the cassation appeal was dismissed for procedural reasons. (See Exhibit 14).

**The text of the affidavit in Russian and English**

I am informed that the contents of the Affidavit in English corresponds to that in Russian.

I have executed this affidavit outside the of the United States of America and declare under the penalty of perjury pursuant to the laws of the United States that the foregoing is true to the best of my knowledge and belief.

_____

N.I. Chervinsky

Dated:  _____

**ОКРУЖНОЙ СУД США**
**ЮЖНЫЙ ОКРУГ НЬЮ-ЙОРКА**

---

**BASE METAL TRADING SA и прочие**        **Дело No. 00 Civ. 9627**

**Истцы**

**против**

**RUSSIAN ALUMINUM и прочие**

**Ответчики**

---

## ЗАЯВЛЕНИЕ НИКИТЫ ИЛЬИЧА ЧЕРВИНСКОГО

Я, Никита Ильич Червинский, согласно положениям 28 Кодекса США §1746,

настоящим заявляю о нижеследующем:

## СВЕДЕНИЯ О ЗАЯВИТЕЛЕ

1.    Я являюсь гражданином Российской Федерации. С 1 декабря 1998 года до

29 января 2000 года я был заместителем Генерального директора Открытого

акционерного общества Качканарский ГОК «Ванадий» ("ГОК"). Кроме того, с 11

февраля 1999 года до 29 января 2000 года я являлся Генеральным директором компании

с ограниченной ответственностью Торговый дом ОАО «Ванадий» ("Торговый дом

ГОКа"), все акции которого принадлежали ГОКу.

## ПРОДАЖА АКЦИЙ ХОЛДЕКСУ

2.    18 января 2000 года компания с ограниченной ответственностью

Полипром («Полипром») и Торговый дом ГОКа подписали Договор № 3 о продаже

2,307,984 акций ГОКа Полипрому. Цена приобретения этих акций составляла5,558,847

рублей. (См. Приложение 1). Я подписал Договор за Торговый дом ГОКа, а

Г.М.Бухарин подписал Договор от имени Полипром.

1

3.      Вопреки утверждениям Самира Капуры, как Бухарин, так и я имели полномочия подписывать этот договор на основании положений уставов наших компаний – Бухарин как Генеральный директор Полипрома,и я как Генеральный директор Торгового дома ГОКа.

4.      Полипром оплатил акции переводом 12 векселей Сберегательного банка Российской Федерации («Сбербанк») №№ 1054314, 1054323, 1054333, 1054334, 1077333, 1077321, 1054565, 0458145, 0458192, 1936588, 1936535, 1936536, на сумму 5,558,847 рублей -- $194,569.37 по официальному курсу Центрального банка Российской Федерации на 18 января 2000 года – Торговому дому ГОКа. Сбербанк является крупнейшим банком в России.

5.      20 января 2000 года Торговый дом ГОКа и ГОК подписали договор займа. (См. Приложение 2). Согласно договору займа, Торговый дом ГОКапредоставил кредит ГОКу в размере 5,558,847 рублей в форме вышеуказанных 12 векселей Сбербанка, полученых Торговым домом ГОКа от Полипрома в качестве платежа за акции ГОКа, которые были проданы Полипрому Торговым домом ГОКа.

6.      Насколько мне известно, эти векселя никогда не учитывались в бухгалтерской отчетности ГОКа и впоследствии былипохищены. Я также знаю, что 20 января 2000 года Полипром продал 2,307,984 акций, которые он купил у Торгового дома ГОКа, Холдекс ЛЛС. (См. Приложение 3).

## СУДЕБНОЕ РАЗБИРАТЕЛЬСТВО В РОССИИ

7.      После незаконного захвата ГОКа, ГОК возбудил иск в Арбитражном суде Калмыкии (АСК) против Полипрома и Торгового дома ГОКа с целью признать недействительной продажу акций ГОКом Полипрому, а также последующую продажу Холдексу. Явной целью ГОКа в возбуждении данного иска состояла в получении двойной выгоды посредством (а) возврата акций и (b) получения прибыли по векселям.

2

ГОК также пытался вернуть акции для того, чтобы позволить некоторым лицам, таким как Черной, Махмудов и другим, захватить контроль над ГОКом.

8.     Чтобы добиться выгодного определения суда, ГОК представил документ от 18 января 1999 года, который был назван как «Договор № 3». (См. Приложение 4). Этот документ содержал подпись, которая была представлена в качестве моей подписи. Однако я никогда не подписывал тот Договор №3, который был представлен в АСК ГОКом; подпись, имеющаяся на этом документе является подделкой.

9.     На январь 1999 года я не был работником или сотрудником Торгового дома ГОКа и, таким образом, не мог подписать договор от его имени. Далее, будучи заместителем Генерального директора ГОКа в январе 1999 года, я лично знаю, что такого контракта между Торговым домом ГОКа или ГОКом, с одной стороны, и Полипромом, с другой, не существовало.  Далее, согласно учредительным документам, Полипром даже не существовал на предполагаемую дату сфальсифицированного договора. (См. Приложение 5).

10.     Основываясь на этом сфальсифицированном договоре, АСК 22 ноября 2000 года вынес решение в пользу ГОКа.  В частности, суд определил, что сфабрикованный договор от 18 января 1999 года является недействительным и отменил перевод акций,  несмотря на то, что акции, проданные Торговым домом ГОКа, были в действительности проданы согласно договору от 18 января 2000 года. (См Приложение 6).

11.     Полипром 22 января 2001 года подал кассационную жалобу и постановлением от 17 апреля 2001 года Федеральный арбитражный суд по Северо-Кавказскому округу отменил решение от 22 ноября 2000 года и вернул дело в АСК. (См Приложение 7). Постановление от 17 апреля 2001 года было основано, среди прочего, на том факте, что существовал спор относительно даты, когда имела место продажа акций,

при этом ГОК не смог представить в АСК подлинную копию предполагаемого договора.

12.    Впоследствии, Полипром 18 июня 2001 года подал в АСК ходатайство,и АСК постановил, чтобы я представил свидетельские показания относительно подлинности договора, представленного ГОКом.  В соответствии с этим постановлением я представил в письменном виде свои свидетельские показания относительно того, что договор, представленный ГОКом, является подделкой. (См. Приложение 8).

13.    Необъяснимым образом, на заседании, которое состоялось 5 июля 2001 года, АСК отказался принять во внимание мои свидетельские показания. Более того, ГОК представил в АСК документ, обозначенный как нотариально заверенная копия фальшивого договора №3 от 18 января 1999 года.  Договор, якобы, был нотариально удостоверен Еленой Александровной Костиковой, которая заверила копию 22 января 1999 года. (См. Приложение 4). Однако, я никогда не встречался с г-жой Костиковой и никогда не подписывал договор в ее присутствии, все что она сделала– произвела нотариально заверенную копию фальшивого документа.  Нотариальное заверение было еще одной фальсификацией, с целью придать фальшивому документу вдимость законности.  Несмотря на этот факт, АСК постановил отменить продажу акций Полипрому своим постановлением от 5 июля 2001 года.  (См. Приложение 9).

14.    Впоследствии Полипром подал апелляцию в апелляционную инстанцию АСК. Эта апелляция сопровождалась просьбой привлечь Холдекс ЛЛС как добросовестного покупателя акций. Постановлением от 10 сентября 2001 года апелляционная инстанция АСК удовлетворила просьбу Полипрома о привлечении Холдекс ЛЛС и отложила рассмотрение апелляции.  (См. Приложение 10).

15.    9 ноября 2001 года компания Холдекс ЛЛС присутствовала на заседании апелляционной инстанции АСК в качестве третьей стороны. Постановлением от того же

4

числа апелляционная инстанция поддержала решение суда нижестоящей инстанции от 5 июля 2001 года. Она определила, что подлинным договором являлся договор от 18 января 1999 года, представленный ГОКом, и что лица, подписавшие его, не имели полномочий подписывать этот договор. (См. Приложение 11).

16.    21 января 2002 г. Федеральный Арбитражный Суд Северо-Кавказского Округа отменил решение КАС от 9 ноября 2001 г., поскольку КАС не выполнил предписания Федерального Арбитражного Суда от 17 апреля 2001 г. рассмотреть должным образом все обстоятельства дела, и не представил объяснения, почему признан подлинным один договор а не другой, а также не рассмотрел права собственности Холдекса на акции, являющиеся предметом спора.  Федеральный Арбитражный Суд вернул дело в суд первой инстанци на новое рассмотрение всех обстоятельств дела. (См. Приложение 12).

17.    12 марта 2002 г., в отстутствие Полипрома и Холдекса, АСК вынес еще одно решение в пользу ГОКа, отменяющее продажу акций и обязующее вернуть акции ГОКу. (См. Приложение 13)  Полипром и Холдекс не принимали участия в заседании, поскольку сообщники представили в суд фальшивые телеграммы, согласно которым Полипром и Холдекс якобы согласились на проведение заседания суда 12 марта 2002 года в их отсутствие.

18.    Полипром подал кассационную жалобу в Федеральный арбитражный суд Северо-Кавказского округа. 23 апреля 2002 года кассационная жалоба была отклонена по формальным основаниям. (См. Приложение 14).

**Текст Заявления на английском и русском языке**

Я проинформирован, что содержание Заявления на английском языке

соответствует Заявлению на русском.

Я составил настоящее Заявление за пределами Соединенных Штатов Америки и

заявляю под угрозой ответственности за дачу ложных показаний, в соответствии с

законами Соединенных Штатов, что вышеизложенное является верным, насколько я

знаю и верю.

Н.И. Червинский

Дата: _12 июля 2002 г._

6

## EXHIBITS TO DECLARATION OF N. I. CHERVINSKIY

| # | Exhibits |
|---|---|
| 1. | Agreement # 3 for the sale of shares between Trading house Vanadiy and OOO Poliprom, dated January 18, 2000 |
| 2. | Loan Agreement between OOO Trading House OJSC Vanadiy and OJSC KGOK Vanadiy of January 20, 2000 |
| 3. | Agreement # KGOK-00/A for the sale of shares, dated January 20, 2000 |
| 4. | Notarized copy of the fake Agreement # 3 for the sale of shares between Trading House Vanadiy and OOO Poliprom dated January 18, 1999 |
| 5. | Certificate of state registration of Poliprom |
| 6. | Decision of the Arbitrazh Court of the Republic of Kalmykia dated November 22, 2000, case # A22-1222/2000/6-109 |
| 7. | Decision of the Cassation Instance of the Federal Arbitrazh Court of North Caucasus District dated April 17, 2001, case # A22-1222/2000/6-109 |
| 8. | Witness statement of N. I. Chervinskiy dated July 19, 2001 |
| 9. | Decision of the Arbitrazh Court of the Republic of Kalmykia dated July 5, 2001, case # A22-1222/2000/6-109 |
| 10. | Order of the Arbitrazh Court of the Republic of Kalmykia, dated September 10, 2001, case # A22-1222/2000/6-109/Ar-46 |
| 11. | Decision of the Appellate Instance of the Arbitrazh Court of the Republic of Kalmykia, dated November 9, 2001, case # A22-1222/2000/6-109 |
| 12. | Decision of Federal Arbitrazh Court of North Caucasus District, dated January 21, 2002, case # A22-1222/2000/6-109/Ar-46 |
| 13. | Decision of the Arbitrazh Court of the Republic of Kalmykia, dated March 12, 2002, case # A22-1222/2000/6-109/Ar-46 |
| 14. | Order of the Federal Arbitrazh Court of the North-Caucasus District, dated April 23, 2002, case # A22-1222/2000/6-109/Ar-46 |

# EXHIBIT "1"

# AGREEMENT No.3
## ON PURCHASE AND SALE OF SECURITIES

Moscow
January 18, 2000

"TRADING HOUSE "Vanadium", a limited liability company, hereinafter referred to as "the Seller", represented by N.I. Chervinsky, Acting General Director, acting on the basis of Minutes of the Board of Directors' Meeting of "Kachkanar GOK "Vanadium" open joint-stock company, dated February 11, 1999 and the Charter, on the one side,
AND
"Polyprom", a limited liability company, hereinafter referred to as "the Buyer", represented by G.M. Bukharin, General Director, acting on the basis of the Charter, on the other side,
commonly named "the Parties", have entered into this agreement (hereinafter referred to as "the Agreement") as follows.

## 1. SUBJECT OF AGREEMENT

1.1.   In accordance with this Agreement the Seller shall assign securities to the Buyer's ownership, and the Buyer shall accept and pay for securities, meeting the following characteristics (hereinafter referred to as "the Securities" or "Stocks"):

| | |
|---|---|
| Type of Securities: | Common registered stocks |
| Issuer: | "Kachkanar GOK "Vanadium" open joint-stock company (hereinafter referred to as "the Issuer"): |
| Number of state registration: | 62-1P-290 (First issue) |
| Number of Stocks of the first issue: | 9,759 (Nine Thousand Seven Hundred and Fifty Nine) |
| Number of state registration: | 62-1-1396 (Second issue) |
| Number of Stocks of the second issue: | 2,298,225 (Two Million Two Hundred Ninety Eight Thousand and Two Hundred Twenty Five) |
| Total number of Stocks transferred under this Agreement: | 2,307,984 (Two Million Three Hundred Seven Thousand and Nine Hundred Eighty Four) |

1.2.   The value of Stocks transferred under this Agreement is 5,558,847 (Five Million Five Hundred Fifty Eight Thousand and Eight Hundred Forty Seven) Roubles.

1.3.   The Seller shall be considered fulfilled its obligation on transfer of Securities to the Buyer in duly manner from the moment of handover of notification of making transaction in the stockholders' register of the Issuer to the Buyer;

1.4.   In accordance with the Agreement the Seller shall be responsible for execution of all works (carrying out all actions), as well as covering all expenses related to registration of transfer of the right of ownership to Securities.

## 2.  PROCEDURE OF PAYMENT FOR SECURITIES

2.1.    The Buyer shall pay for Stocks acquired under this Agreement within 15 days from the moment of signing of this Agreement, by promissory notes of the Savings Bank of the Russian Federation. The Parties shall make and sign Act of Acceptance on transfer of promissory notes.

## 3.  REGISTRATION OF THE TRANSFER OF OWNERSHIP RIGHT FOR SECURITIES

3.1.    The Seller shall within 5 (Five) working days following the date of signing of this Agreement make all actions that are necessary for registration of the transfer of the ownership right for Securities in the Stockholders' register of the Issuer from the Seller to the Buyer and present to the Buyer the original copy of the document indicated in Par.1.3 of this Agreement.
In case the Buyer fails to fulfill terms of Par.3.2 of the Agreement, the term given to the Seller for registration of the ownership right of the Buyer for Securities shall be extended for the term of delay.

3.2.    The Buyer shall within 1 (One) working day following the date of signing of the Agreement present to the Seller all documents indicated by the latter and that are necessary for execution of registration of the transfer of the ownership right for Securities.

3.3.    The moment when the ownership right for Securities of the Buyer arises shall be the moment of registration of transfer of the ownership right from the Seller to the Buyer in the Stockholders' register of the Issuer.

## 4.  GUARANTIES OF THE SELLER

4.1.    The Seller guaranties that the Securities transferred under this Agreement are not pledged, arrested or encumbered by other obligations and are free from claims of the third parties.

4.2.    Except case of cancellation of this Agreement all dividends, interest, profit or other distribution (hereinafter, the Income) on Securities accrued to the Seller following the registration of transaction made on the basis of this Agreement, the Seller shall transfer to the Buyer within 2 (Two) banking days following the date of receiving such Income.

## 5.  RESPONSIBILITIES OF THE PARTIES

5.1.    In case of violation of terms indicated in Par.2.1 of this Agreement by the Buyer, the Buyer shall pay penalty in the amount of 0.5 (five tenth interest) of the amount indicated in Par.1.2 of this Agreement for each calendar day of delay.

5.2.    In case of violation of terms indicated in Par.3.1 of this Agreement by the Seller, the Seller shall pay penalty in the amount of 0,5 (five tenth interest) of the amount indicated in Par.1.3 of this Agreement for each calendar day of delay.

5.3.    The payment of penalty or fine under this Agreement shall not release the Party infringing its obligation from fulfillment of obligations under this Agreement, unless the other Party agrees to.

## 6.  MISCALLENEOUS

6.1.    All changes, amendments and annexes to this Agreement shall be made in writing and signed by authorized representatives of the Parties.

6.2.    The Agreement comes into force from the moment of its signing and be valid till the Parties fulfill all obligations undertaken under this Agreement.

6.3.    The Agreement is made in two copies, having equal legal force, one copy for the Buyer and one copy for the Seller.

## 7.  ADDRESSES AND REQUISITES OF THE PARTIES

The Seller:    "TRADING HOUSE OPEN JOINT-STOCK COMPANY "VANADIUM" limited liability company

Legal address: 358000, Elista, 249, Lenin Street, Suite 505

INN:                    0814072702

Banking requisites    Settlements account 40702810416340100075
                      At Saving Bank Branch of the RF No. 8057, Kachkanar
                      Corresponding account 30101810900000000609
                      BIC 046513609

The Buyer:    "POLYPROM" limited liability company

Legal address: 358000, Elista, 249, Lenin Street, Suite 505

INN:                    0814113973

Banking requisites    Settlements account 40702810800090000040
                      At AKB "MDM" Branch, Elista
                      Corresponding account 30301810600011680006
                      BIC 044525466

ACT
OF ACCEPTANCE OF PROMISSORY NOTES

Moscow
January 19, 2000

"Trading House of the open joint-stock company "Vanadium", a limited liability company, hereinafter referred to as "the Seller", represented by N.I. Chervinsky, Acting General Director, acting on the basis of Minutes of the Board of Directors' Meeting of "Kachkanar GOK "Vanadium" open joint-stock company, dated February 11, 1999, on the one side,
AND
"Polyprom", a limited liability company, hereinafter referred to as "the Buyer", represented by G.M. Bukharin, General Director, acting on the basis of the Charter, on the other side,
commonly named "the Parties", have made this Act on the following.·

1.  In pursuance of Par.2.1 of the Agreement No.3 on purchase and sale of securities dated January 18, 2000, the Seller has transferred and the Buyer has accepted the following promissory notes issued by the Savings bank of the Russian Federation (Petrov branch No. 5287, Moscow):

| Ref.No. | Notes value, Rbls. | Series | Number | Maturity |
|---------|--------------------|--------|--------|----------|
| 1 | 30000=00 | BC | 1054314 | on demand |
| 2 | 10000=00 | BC | 1054323 | on demand |
| 3 | 20000=00 | BC | 1054333 | on demand |
| 4 | 20000=00 | BC | 1054334 | on demand |
| 5 | 50000=00 | VP | 1077333 | on demand |
| 6 | 1300000=00 | VP | 1077321 | on demand |
| 7 | 650000=00 | BC | 1054565 | on demand |
| 8 | 828500=00 | VP | 0458145 | on demand |
| 9 | 650347=00 | VP | 0458192 | on demand |
| 10 | 1000000=00 | VP | 1936588 | February 1, 2000 |
| 11 | 500000=00 | VP | 1936535 | February 1, 2000 |
| 12 | 500000=00 | VP | 1936536 | February 1, 2000 |

In total twelve promissory notes of the total value of 5.558.847 (Five Million Five and Fifty Eight Thousand Eight Hundred and Forty Seven) Roubles have been transferred under this Act.
2.  The signing of this Act by the authorized representatives of both Parties means that the Buyer has transferred and the Seller has accepted promissory notes indicated in Par. 1 of this Act and that the Parties have no claims related to transfer of promissory notes to each other.

3. Because of transfer of promissory notes indicated in Par.1 of this Act by the Buyer to the Seller the obligation of the Buyer on payment for Securities acquired under the Agreement No.3 on purchase and sale of securities dated January 18, 2000 shall be considered fulfilled in full amount.

4. This Act is made in two copies, one for each Party.

Buyer                                                                          Seller

# ДОГОВОР № 3
## купли-продажи ценных бумаг

**г. Москва**

**«18» января 2000 г.**

**ООО «Торговый дом ОАО «Ванадий»**, именуемая в дальнейшем «Продавец», в лице Исполняющего обязанности Генерального директора Червинского Н. И., действующей на основании Протокола заседания совета директоров ОАО «Качканарский ГОК «Ванадий» от 11 февраля 1999 г. и Устава, с одной стороны, и

**ООО «Полипром»**, именуемое в дальнейшем «Покупатель», в лице Генерального директора Бухарина Г. М., действующего на основании Устава, с другой стороны,

вместе именуемые в дальнейшем «Стороны», заключили настоящий Договор (далее по тексту «Договор») о нижеследующем:

## 1. ПРЕДМЕТ ДОГОВОРА

1.1 По настоящему Договору Продавец обязуется передать в собственность Покупателю, а Покупатель обязуется принять и оплатить ценные бумаги, отвечающие следующим характеристикам (далее – «ЦБ» или «Акции»):

| Вид ЦБ: | Акции обыкновенные именные; |
|---|---|
| Эмитент: | Открытое акционерное общество «Качканарский ГОК «Ванадий» (далее – «Эмитент»); |
| Номер государственной регистрации: | 62-1П-290 (Первый выпуск) |
| Количество Акций первого выпуска: | 9.759 (Девять тысяч семьсот пятьдесят девять) штук |
| Номер государственной регистрации: | 62-1-1396 (Второй выпуск) |
| Количество Акций второго выпуска: | 2.298.225 (Два миллиона двести девяносто восемь тысяч двести двадцать пять) штук |
| Общее количество Акций, передаваемых по настоящему Договору: | 2.307.984 (Два миллиона триста семь тысяч девятьсот восемьдесят четыре) штуки. |

1.2 Цена Акций, передаваемых по настоящему Договору, составляет: 5.558.847 (Пять миллионов пятьсот пятьдесят восемь тысяч восемьсот сорок семь) рублей.

1.3 Продавец считается выполнившим свое обязательство по передаче ЦБ Покупателю должным образом с момента передачи Покупателю уведомления о проведении операции в реестре акционеров Эмитента;

1.4 Проведение всех работ (осуществление всех действий), а также расходы по регистрации перехода права собственности на ЦБ, в соответствии с Договором, возлагается на Продавца.

## 2. ПОРЯДОК ОПЛАТЫ ЦБ

2.1 Оплата Акций, приобретаемых по настоящему Договору, осуществляется Покупателем в течение 15 дней с момента подписания настоящего Договора, векселями Сберегательного банка Российской Федерации. При передаче векселей Стороны составляют и подписывают Акт приема-передачи векселей.

2

## 3. РЕГИСТРАЦИЯ ПЕРЕХОДА ПРАВА СОБСТВЕННОСТИ НА ЦБ

3.1  Продавец обязан в течение 5 (Пяти) рабочих дней, следующих за днем подписания настоящего Договора, совершить все действия, необходимые для регистрации перехода права собственности на ЦБ в реестре акционеров Эмитента от Продавца к Покупателю и предоставить Покупателю оригинал документа, указанного в п. 1.3. настоящего Договора.

В случае, если Покупатель не выполняет условий пункта 3.2. Договора, то срок предоставленный Продавцу для регистрации права собственности Покупателя на ЦБ продлевается на время задержки.

3.2  Покупатель обязан в течение 1 (Одного) рабочего дня, следующего за днем подписания Договора, предоставить Продавцу все указанные последним документы, необходимые для осуществления регистрации перехода права собственности на ЦБ.

3.3  Моментом возникновения права собственности Покупателя на ЦБ является момент регистрации перехода права собственности от Продавца к Покупателю в реестре акционеров Эмитента.

## 4. ГАРАНТИИ ПРОДАВЦА

4.1  Продавец гарантирует, что ЦБ, передаваемые по настоящему Договору, не заложены, под арестом не состоят, не обременены иными обязательствами и свободны от притязаний третьих лиц.

4.2  Кроме случая аннулирования Договора любые дивиденды, проценты, доход или иное распределение (в дальнейшем Доход) на ЦБ, начисленные Продавцу после регистрации сделки, совершаемой на основании Договора, Продавец обязуется передать Покупателю в течение 2 (Двух) банковских дней, следующих за днем получения им такого Дохода.

## 5. ОТВЕТСТВЕННОСТЬ СТОРОН

5.1  В случае нарушения Покупателем сроков, установленных п. 2.1. Договора, Покупатель обязан заплатить Продавцу пеню в размере 0,5 (пять десятых процента) от суммы, указанной в п. 1.2. настоящего Договора, за каждый календарный день просрочки.

5.2  В случае нарушения Продавцом сроков, установленных п. 3.1. Договора, Продавец обязан заплатить Покупателю пеню в размере 0,5 (пять десятых процента) от суммы, указанной в п. 1.3. настоящего Договора, за каждый календарный день просрочки.

5.3  Уплата пени или штрафа по Договору не освобождает нарушившую свое обязательство Сторону от выполнения обязательств по Договору, если другая Сторона не согласится на иное.

## 6. ПРОЧИЕ ПОЛОЖЕНИЯ

6.1  Все изменения, дополнения и приложения к Договору осуществляются в письменной форме и подписываются уполномоченными представителями Сторон.

6.2  Договор вступает в силу с момента его подписания и действует до исполнения Сторонами всех принятых на себя обязательств по настоящему Договору.

6.3  Договор составлен в 2-х экземплярах, имеющих одинаковую юридическую силу, один из которых находится у Покупателя, другой - у Продавца.

## 7 АДРЕСА И РЕКВИЗИТЫ СТОРОН

| Продавец: | ООО «Торговый дом ОАО «Ванадий» |
|---|---|
| Юридический адрес: | 358000, г. Элиста, ул. Ленина, д. 249, к. 505 |
| ИНН: | 0814072702 |
| Банковские реквизиты: | Р/с 40702810416340100075 |
| | В отд. СБ РФ № 8057 в г. Качканаре |
| | К/с 30101810900000000609 |
| | БИК 046513609 |

| Покупатель: | ООО «Полипром» |
|---|---|
| Юридический адрес: | 358000, г. Элиста, ул. Ленина, д.249, к. 505 |
| ИНН: | 0814113973 |
| Банковские реквизиты: | Р/с 40702810800090000040 |
| | В филиале АКБ «МДМ» г. Элиста |
| | К/с 30301810600011680006 |
| | БИК 044525466 |

| Покупатель | Продавец |
|---|---|

М.П.

21/03 2002 15:34 FAX 9334614          MARKS&SOKOLOV                    NO. 501    P. 4

## АКТ
приема-передачи векселей

г. Москва

«19» января 2000 г.

ООО «Торговый дом ОАО «Ванадий», именуемая в дальнейшем «Продавец», в лице Исполняющего обязанности Генерального директора Червинского Н. И., действующей на основании Протокола заседания совета директоров ОАО «Качканарский ГОК «Ванадий» от 11 февраля 1999 г., с одной стороны, и

ОАО «Полипром», именуемое в дальнейшем «Покупатель», в лице Генерального директора Бухарина Г. М., действующего на основании Устава, с другой стороны,

вместе именуемые в дальнейшем «Стороны», составили настоящий Акт о нижеследующем:

1. Во исполнение п. 2.1. Договора № 3 купли-продажи ценных бумаг от 18.01.2000 г. Покупатель передал, а Продавец принял следующие простые векселя, выданные Сберегательным банком Российской Федерации (Петровское отделение №5287 г. Москвы):

| № п/п | Вексельная сумма, руб | Серия | Номер | Срок платежа |
|---|---|---|---|---|
| 1 | 30000=00 | ВС | 1054314 | по предъявлении |
| 2 | 10000=00 | ВС | 1054323 | по предъявлении |
| 3 | 20000=00 | ВС | 1054333 | по предъявлении |
| 4 | 20000=00 | ВС | 1054334 | по предъявлении |
| 5 | 50000=00 | ВП | 1077333 | по предъявлении |
| 6 | 1300000=00 | ВП | 1077321 | по предъявлении |
| 7 | 650000=00 | ВС | 1054565 | по предъявлении |
| 8 | 828500=00 | ВП | 0458145 | по предъявлении |
| 9 | 650347=00 | ВП | 0458192 | по предъявлении |
| 10 | 1000000=00 | ВП | 1936588 | 1 февраля 2000 г. |
| 11 | 500000=00 | ВП | 1936535 | 1 февраля 2000 г. |
| 12 | 500000=00 | ВП | 1936536 | 1 февраля 2000 г. |

Всего по настоящему Акту передано двенадцать векселей общей вексельной суммой 5.558.847 (Пять миллионов пятьсот пятьдесят восемь тысяч восемьсот сорок семь) рублей.

2. Подписание настоящего Акта уполномоченными представителями обеих Сторон означает, что Покупатель передал, а Продавец принял векселя, указанные в п. 1 настоящего Акта, и что Стороны не имеют друг к другу претензий, связанных с передачей векселей.

3. В связи с передачей векселей, указанных в п. 1 настоящего Акта, Покупателем Продавцу обязанность Покупателя по оплате ценных бумаг, приобретенных по договору № 3 купли-продажи ценных бумаг от 18.01.2000 г., считается выполненной в полном объеме.

4. Настоящий Акт составлен в двух экземплярах по одному для каждой из Сторон.

Покупатель                                  Продавец

М.П.                                        М.П.

# EXHIBIT "2"

COPY

Loan Agreement

Kachkanar

January 20, 2000

**The limited liability company Trading House OJSC Vanadiy**, hereinafter, Lender, in the person of Acting Director General Chervinskiy N.I. acting on the basis of the Minutes of the meeting of the Board of Directors of OJSC Kachkanar ore mining and processing plant Vanadiy of February 11, 1999 on one side, and

**The Open Joint Stock Company Kachkanar ore mining and processing plant Vanadiy**, hereinafter, Borrower, in the person of Director General Khaidarov D.A. acting on the basis of the Charter, on the other side, concluded the following Loan agreement ("Agreement"):

## 1. Subject of the Agreement

1.1 Pursuant to the present Agreement the Lender provides to the Borrower an interest free loan for the amount of 5,558,847 (five million five hundred fifty eight thousand eight hundred forty seven) rubles, and the Borrower is obligated to repay the received amount of loan within the term provided by this Agreement.

## 2. Conditions for provision and the repayment of a loan, liability of the Parties

2.1 The Lender is obligated to provide a loan to the Borrower by the means of transfer of ordinary promissory notes of the Savings Bank of the Russian Federation with value corresponding the face value of the notes within three days from the day of execution of the Agreement.

2.2 The Borrower should repay the amount of a loan received pursuant to the present Agreement prior to December 3[1], 2000. Besides, upon the desire of the Borrower the repayment can be made in parts (by installments) but not later then the date indicated in this section. The repayment can be made at a time or in parts by the means of transfer of ordinary promissory note on the basis of conveyance-acceptance report, or in a different form on the basis of an additional agreement or statement.

The amount of money received by the Borrower can be repaid prior to the prescribed term.

2.3 If case of failure to return the amount of loan received within the term indicated in section 2.2 of the Agreement, the Borrower shall pay a fine in the amount of 0,05 % from the amount of the loan for each day of delay of repayment until the day of the repayment.

---

[1] The text is partially illegible, therefore the date can be December 3, as well as December 30 or December 31, - translator's note.

2.4 If one of the parties failed to perform or improperly performed its obligations pursuant to the present agreement, it is obligated to compensate losses of the other party caused by such failure.

2.5 Failure of one of the parties to fulfill condition of the Agreement, which caused financial losses of the other party, shall cause imposition against the guilty party of a penalty in the amount of loss and can be a reason for the pre-term termination of the Agreement.

## 3. Force Majeur

3.1 The parties shall be exempted from responsibility for failure to fulfill or incomplete fulfillment of obligations upon the Agreement if such failure resulted from force majeure circumstances, which occur after the conclusion of the Agreement as a result of circumstance of insurmountable nature the Parties could not envisage or overcome.

3.2 When the circumstances indicated in section 3.1 occur, each party shall without delay send a written notification with regard to the circumstance to the other party. The notification shall contain information with regard to the nature of circumstances and the official documents confirming the existence of such circumstances and, if possible, evaluating the influence of such circumstances upon the ability of parties to perform their obligations upon the Agreement.

3.3 If a party will not send a notification indicated in section 3.2 or send it untimely, it shall compensate all losses of the other party.

3.4 If circumstances indicated in section 3.1 occur, the term for performance of the party's obligations upon the agreement shall be postponed in proportion to the time of duration of such circumstances and their consequences.

3.5 If the occurred circumstances, indicated in section 3.1 and their consequences continue for more than two months, the parties shall hold additional negotiations in order to discover acceptable alternative ways of execution of the Agreement.

## 4. Confidentiality

4.1 The conditions of the Agreement and additional agreement (protocols, and so on) hereto are confidential and shall not be disclosed.

4.2 The parties take all the necessary measures to prevent their employees, agents and successors from informing of third persons with regard to details of the agreement and attachments hereto without preliminary permission of the other party.

## 5. Resolution of disputes

5.1 All disputes and disagreements between the parties regarding issues that were not settled in the text of the Agreement shall be resolved by the means of negotiations.

5.2 If the parties failed to settle the disputable issues within the course of negotiations, the disputes shall be resolved in the order prescribed by the current legislation.

## 6. Termination of the Agreement

6.1 The Agreement can be terminated:
- Upon the agreement between parties
- On other basis, as provided by the current legislation.

## 7. Closing provisions

7.1 Any changes and additions to the agreement are valid only if they are made in a written form and signed by representatives of the parties, who were properly authorized to sign such changes or additions.

7.2 All the notifications and announcements shall be send in a written form.

7.3 The Agreement becomes effective from the moment of transfer by the Lender of the amount of the loan indicated in section 1.1 of the Agreement to the Borrower, or from the moment of transfer of the respective amount of money on its [Borrower's] account.

7.4 The agreement will be considered executed after the parties fulfill mutual obligations.

7.5 The Agreement is made in two copies, one cope for each party, which have equal legal force.

## 8. Addresses and Banking information of the Parties

**The Lender**

LLC Trading House OJSC Vanadiy
358000 Elista, 249 Lenina St., office 505
EIN 0814072702
Account # 40702810416340100075 in the
Joint Stock Commercial Bank
Moscow Business World, Moscow
Account # 30101810900000000466
BIK 044525466

On behalf of the Lender Chervinskiy N.I.

[signed]
[seal]

**The Borrower**
OJSC Kachkanar GOK Vanadiy
624356 Kachkanar, Sverdlovsk region
2 Sverdlova St.
EIN 6615001962
Account # 40702810000000003170 in the
Commercial Bank Ural Bank of
Reconstruction and Development,
Ekhaterinburg
Account # 30101810900000000795,
BIK 046577795

**On behalf of the Borrower Khaidarov D.A.**
[signed]
[seal]

[notary seal]

Loan agreement of 01/20/2000

> On April 13, 2001 I, Nikityuk N.Yu., acting as notary of the city of Moscow [illegible] acting on the basis of a license # [illegible] of 01/10/2000 verified the authenticity of this copy with the original document. I did not find any erasures, additions, crossed words and other not mentioned corrections or other peculiarities in the original documents.
> Registered in the register under # GK-652
> Recovered 20 rubles
> Acting Notary: signed

COPY

REPORT

On conveyance-acceptance of promissory notes

To the agreement of January 20, 2000

Kachkanar                                          January 20, 2000

**The limited liability company Trading House OJSC Vanadiy**, hereinafter, Lender, in the person of Acting Director General Chervinskyi N.I. acting on the basis of the Minutes of the meeting of the Board of Directors of OJSC Kachkanar ore mining and processing plant Vanadiy of February 11, 1999 on one side, and

**The Open Joint Stock Company Kachkanar ore mining and processing plant Vanadiy**, hereinafter, Borrower, in the person of Director General Khaidarov D.A. acting on the basis of the Charter, on the other side,

Named jointly "the Parties" executed the present report:

1. In order to execute the Loan agreement of January 20, 2000 the Lender transferred, and the Borrower accepted the following ordinary promissory notes issued by the Savings Bank of the Russian Federation (Petrovskoe branch # 5287, Moscow):

| # | Face value in rubles | series | number | Date of payment |
|---|---|---|---|---|
| 1. | 30,000.00 | VS | 1054314 | Upon demand |
| 2. | 10,000.00 | VS | 1054323 | Upon demand |
| 3. | 20,000.00 | VS | 1054333 | Upon demand |
| 4. | 20,000.00 | VS | 1054334 | Upon demand |
| 5. | 50,000.00 | VP | 1077333 | Upon demand |
| 6. | 1,300,000.00 | VP | 1077321 | Upon demand |
| 7. | 650,000.00 | VS | 1054565 | Upon demand |
| 8. | 828,500.00 | VP | 0458145 | Upon demand |
| 9. | 650,347.00 | VP | 0458192 | Upon demand |
| 10. | 1,000,000.00 | VP | 1936588 | February 1, 2000 |
| 11. | 500,000.00 | VP | 1936535 | February 1, 2000 |
| 12. | 500,000.00 | VP | 1936536 | February 1,2000 |

Altogether pursuant to the present report were transferred twelve promissory notes for the total amount of 5,558,847 (five million five hundred fifty eight thousand eight hundred forty seven) rubles.

2. The present report is made in two copies, one for each party.

The Lender                                    The Borrower
[signed]                                      [signed]
[seal]                                        [seal]
Loan agreement of 01/20/2000

| On April 13, 2001 I, Nikityuk N.Yu., acting as notary of the city of Moscow Malkova G.V. acting on the basis of a license 77 # 000018 of |
|---|

01/10/2000 verified the authenticity of this copy
with the original document.  I did not find any
erasures, additions, crossed words and other not
mentioned corrections or other peculiarities in
the original documents.
Registered in the register under # 1K-6514
Recovered 10 rubles
Acting Notary: signed

[notary seal]

К О П И Я

**Договор займа**

г. Качканар                                                      20 января 2000г.

Общество  с ограниченной ответственностью «Торговый дом ОАО «Ванадий», именуемо
дальнейшем Займодавец, в лице Исполняющего обязанности Генерального директора Червинского Н. 
действующей на основании Протокола заседания совета директоров ОАО «Качканарский ГОК «Ванади
от 11 февраля 1999 г, с одной стороны, и
Открытое акционерное общество «Качканарский ГОК «Ванадий», именуемое в дальнейш
Заемщик, в лице Генерального директора Хайдарова Д.А., действующего на основании Устава, с друг
стороны, заключили настоящий Договор займа (далее Договор) о следующем:

### 1. Предмет Договора

1.1. По настоящему договору Займодавец передает Заемщику беспроцентный заем на сумм
5.558.847 (Пять миллионов пятьсот пятьдесят восемь тысяч восемьсот сорок семь) рублей,
Заемщик обязуется вернуть полученную сумму займа в обусловленный Договором срок.

### 2. Условия предоставления и возврата займа, ответственность Сторон

2.1. Займодавец обязан предоставить Заемщику  займ в течение трех дней с даты подписани
Договора путем передачи по акту приема-передачи простых векселей Сберегательного банка РФ в оценк
по номинальной сумме.
2.2. Возврат полученной по настоящему договору суммы займа осуществляется Заемщиком до 3
декабря 2000 года, при этом по желанию Заемщика возврат может происходить по частям (в рассрочку
но не позднее указанного в настоящем пункте срока. Возврат займа возможен полностью или частичн
путем передачи простого векселя с оформлением акта приема-передачи, а также в ином виде, о че
стороны заключают дополнительное соглашение или акт.
Полученная Заемщиком сумма займа может быть возвращена досрочно.
2.3. В случае невозвращения полученной суммы займа в определенный согласно п. 2.2 Договор
срок, Заемщик уплачивает штраф в размере 0,05 % от суммы займа за каждый день просрочки до дня е
возврата Займодавцу.
2.4. В случае неисполнения или ненадлежащего исполнения одной из сторон обязательств п
Договору, она обязана возместить другой стороне причиненные таким неисполнением убытки.
2.5. Неисполнение одной из сторон условий Договора, приведшее к материальным потеря
второй стороны, влечет за собой применение к виновной стороне штрафных санкций в размер
нанесенного ущерба и может служить основанием досрочного прекращения Договора.

### 3. Форс-мажор

3.1. Стороны освобождаются от ответственности за частичное или полное неисполнени
обязательств по Договору, если это неисполнение явилось следствием обстоятельств непреодолимо
силы, возникших после заключения Договора в результате обстоятельств чрезвычайного характера
которые стороны не могли предвидеть или предотвратить.
3.2. При наступлении обстоятельств, указанных в п. 3.1, каждая сторона должна без промедлени
известить о них в письменном виде другую сторону. Извещение должно содержать данные о характер
обстоятельств, а также официальные документы, удостоверяющие наличие этих обстоятельств и, п
возможности, дающие оценку их влияния на возможность исполнения стороной своих обязательств п
данному договору.
3.3. Если сторона не направит или несвоевременно направит извещение, предусмотренное в п. 3.2
то она обязана возместить второй стороне понесенные ею убытки.
3.4. В случаях наступления обстоятельств, предусмотренных в п. 3.1, срок выполнения стороно
обязательств по Договору отодвигается соразмерно времени, в течении которого действуют эт
обстоятельства и их последствия.

3.5. Если наступившие обстоятельства, перечисленные в п. 3.1 и их последствия продолжа[ют] действовать более двух месяцев, стороны проводят дополнительные переговоры для выявлен[ия] приемлемых альтернативных способов исполнения Договора.

### 4. Конфиденциальность

4.1. Условия Договора и соглашений ( протоколов и т.п.) к нему конфиденциальны и не подлеж[ат] разглашению.

4.2. Стороны принимают все необходимые меры для того, чтобы их сотрудники, агент[ы] правопреемники без предварительного согласия другой стороны не информировали третьих лиц [о] деталях Договора и приложений к нему.

### 5. Разрешение споров

5.1. Все споры и разногласия, которые могут возникнуть между сторонами по вопросам, н[е] нашедшим своего разрешения в тексте Договора, будут разрешаться путем переговоров.

5.2. При неурегулировании в процессе переговоров спорных вопросов, споры разрешаются [в] порядке, установленном действующим законодательством.

### 6. Прекращение Договора

6.1. Договор прекращается:
- по соглашению сторон;
- по иным основаниям, предусмотренным действующим законодательством.

### 7. Заключительные положения

7.1. Любые изменения и дополнения к Договору действительны при условии их совершения в письменной форме и подписания надлежащими уполномоченными на то представителями сторон.

7.2. Все уведомления и сообщения должны направляться в письменной форме.

7.3. Договор вступает в силу с момента передачи Займодавцем суммы займа, указанной в п. 1.1 Договора, Заемщику или перечисления соответствующих денежных средств на его банковский счет.

7.4. Договор будет считаться исполненным при выполнении Сторонами взаимных обязательств.

7.5. Договор составлен в двух экземплярах, имеющих одинаковую юридическую силу, по одному экземпляру для каждой из сторон.

### 8. Адреса и банковские реквизиты Сторон

| **Займодавец** | **Заемщик** |
|---|---|
| ООО "Торговый дом ОАО «Ванадий», | ОАО «Качканарский ГОК «Ванадий» |
| 358000, г.Элиста, ул.Ленина, д.249, к.505 | 624356, г.Качканар Свердловской области |
| ИНН 0814072702 | ул.Свердлова, 2. ИНН 6615001962 |
| Р/с №40702810416340100075 в АКБ | Р/с №40702810000000003170 в «Уральском |
| "Московский Деловой Мир", г.Москва | банке реконструкции и развития» |
| К/с №30101810900000000466, БИК 044525466 | г.Екатеринбург |
|  | К/с №30101810900000000795, БИК |
|  | 046577795 |

**За Займодавца Червинский Н.И.**                **За Заемщика Хайдаров Д.А.**

Договор займа  от 20.01.2000г.

К О П И Я

## АКТ
приема-передачи векселей
к Договору займа от 20.01.2000г.

г. Качканар                                                    «20» января 2000г.

ООО «Торговый дом ОАО «Ванадий», именуемая в дальнейшем «Займодавец», в лице Исполняющего обязанности Генерального директора Червинского Н. И., действующей на основании Протокола заседания совета директоров ОАО «Качканарский ГОК «Ванадий» от 11 февраля 1999 г., с одной стороны, и

ОАО «Качканарский ГОК «Ванадий», именуемое в дальнейшем «Заемщик», в лице Генерального директора Хайларова Д.А., действующего на основании Устава, с другой стороны,

вместе именуемые в дальнейшем «Стороны», составили настоящий Акт о нижеследующем:

1. Во исполнение Договора займа от 20.01.2000 г. Займодавец передал, а Заемщик принял следующие простые векселя, выданные Сберегательным банком Российской Федерации (Петровское отделение №5287 г. Москвы):

| № п/п | Вексельная сумма, руб | Серия | Номер | Срок платежа |
|-------|------------------------|-------|---------|--------------|
| 1 | 30000=00 | ВС | 1054314 | по предъявлении |
| 2 | 10000=00 | ВС | 1054323 | по предъявлении |
| 3 | 20000=00 | ВС | 1054333 | по предъявлении |
| 4 | 20000=00 | ВС | 1054334 | по предъявлении |
| 5 | 50000=00 | ВП | 1077333 | по предъявлении |
| 6 | 1300000=00 | ВП | 1077321 | по предъявлении |
| 7 | 650000=00 | ВС | 1054565 | по предъявлении |
| 8 | 828500=00 | ВП | 0458145 | по предъявлении |
| 9 | 650347=00 | ВП | 0458192 | по предъявлении |
| 10 | 1000000=00 | ВП | 1936588 | 1 февраля 2000 г. |
| 11 | 500000=00 | ВП | 1936535 | 1 февраля 2000 г. |
| 12 | 500000=00 | ВП | 1936536 | 1 февраля 2000 г. |

Всего по настоящему Акту передано двенадцать векселей общей вексельной суммой 5.558.847 (Пять миллионов пятьсот пятьдесят восемь тысяч восемьсот сорок семь) рублей.

2. Настоящий Акт составлен в двух экземплярах по одному для каждой из Сторон.



# EXHIBIT "3"

AGREEMENT # KGOK-001/a
for purchase and sale of securities

Moscow
January 20, 2000

     Limited Liability Company Poliprom, hereinafter "Seller", in the person of the Director General Bukharin G.M. acting on the basis of the Charter, on one side, and
     Company Holdex L.L.C., hereinafter "Purchaser", in the person of representative Ievleva I.V., acting on the basis of the power of attorney of October 11, 1999, on the other side,
     hereinafter jointly "Parties", separately "Party", concluded the following agreement ("Agreement"):

## 1. Subject of the Agreement

1.1 The Seller transfers securities indicated in section 1.2 of the Present agreement, and the Purchaser is obligated to pay for the mentioned securities to the Seller and to accept the securities in ownership.

1.2 The information about securities, which are a subject of sale and purchase pursuant to section 1.1 of the present agreement:

| | |
|---|---|
| Issuer of securities | Open Joint Stock Company Kachkanar Ore Mining and Processing Plant Vanadiy |
| Registration # of the issuer | 0422 series III-IK, registered by the order of the Head of Kachkanar City Administration # 348 of April 15, 1993 |
| Location of the issuer | Russia, Sverdlovsk region, Kachkanar, 2 Sverdlova St. |
| Category (type) of securities | Ordinary nominal non-documentary shares |
| Form of issue of securities | Non-documentary: in a form of a record on accounts |
| State registration number of securities | First issue – 62-1p-290 of July 12, 1993<br>Second issue – 62-1-1396 of June 13, 1996 |
| Holder of shareholders register of issuer | CJSC Company-registrar Panorama   101000 Moscow, Bolshov Kharitonievskiy Pereulok 13A, office 8A |
| Securities face value | 1 (one) ruble |
| Amount of securities of the first issue: | 9,759 (nine thousand seven hundred fifty eight) |
| Amount of securities of the second issue: | 2,298,225 (two million two hundred ninety eight thousand two hundred twenty five) |
| Total amount of securities: | 2,307,984 (two million three hundred seven thousand nine hundred eighty four) |
| Total amount of transaction pursuant to agreement: | 5,580,000 (Five million five hundred eighty thousand) |

## 2. Order of payments

2.1 The Purchaser is obligated to pay for the securities indicated in section 1.2 of the present agreement by the means of transfer of monetary funds from the type "I" account to the account of the "Seller".

2.2 The Purchaser shall pay for the securities indicated in section 1.2 of the present agreement within 30 (thirty) days from the moment of the conclusion of the present agreement.

### 3. Order of registration of transition of the securities ownership rights

3.1 Within 5 days after execution of the agreement the Seller is obligated to reregister shares on the name of the Purchaser in the register of the issuer's shareholders and to provide notification with regard to transition of the securities ownership rights from the Seller to the Purchaser.

3.2 The Parties share the expenditures connected with reregistration of securities ownership rights in the register of owners of the issuer's nominal securities upon agreement.

### 4. Liability of the parties

4.1 If the Purchaser violates the terms indicated in section 2.2 of the present Agreement, it should pay to the Seller fine in the amount of 0.2 (two tenths) percent from the amount of the present Agreement for each day of the delay.

4.2 If the Purchaser violates the terms indicated in section 2.2 of the present Agreement for more than 10 (ten) banking days, the Seller shall have a right to unilaterally terminate the present Agreement. In this case, the Purchaser is obligated to reregister the received shares to the name of the Seller in the shareholders register and to pay to the Seller a fine for the refusal to execute the Agreement in the amount of 10 (ten) percent from the amount of the present Agreement within three days from the moment of termination of the Agreement.

4.3 If the Seller violates the terms for reregistartion of shares indicated in section 2.2 of the present Agreement, it should pay to the Purchaser a fine in the amount of 0.2 (two tenths) percent from the amount of the present agreement for each day of the delay.

### 5. Term of the Agreement. Order of change and termination of the Agreement

5.1 The parties shall make all efforts to resolve disputes and disagreements in a framework of the present Agreement and to reach bilateral agreements. If the parties failed to reach agreements, the disputes shall be subject to consideration of the Moscow Arbitrazh Court.

5.2 The Agreement becomes effective from the moment of its execution and shall be terminated after the parties completely perform their obligations under the present Agreement, or after the provisions of the present Agreement regarding its termination became effective.

5.3 All the changes, additions, and agreements to the present Agreement will be valid only if they are executed in a written form, signed by the authorized representatives of both parties and attested by seals.

5.4 The Agreement can be changed, terminated or invalidated only on the grounds and in the order as provided by the current legislation and the present Agreement.

5.5 In regard to all circumstances connected with execution of the present agreement, which are not directly regulated by the present agreement, the parties shall be guided by the requirements of the present legislation.

## 6. Registered addresses and Banking information of the parties

**The Seller**
LLC Poliprom
358000 Republic of Kalmykia, Elista
249 Lenina St., off. 505
EIN 0814113973
Account # 40702810800090000040 in
the Elista Branch of Joint Stock
Commercial Bank Moscow Business
World,
Account # 30301810600011680006
BIK 044525466

**The Purchaser**
The Company Holdex LLC
707 W. 7th Street, Austin, Texas 78701,
USA
Account type "I"
408058104000000000028
In the of Joint Stock Commercial Bank
Tsentrokredit, Moscow
Account # 30101810700000000514
BIK 044583514

Signatures of the parties:

The Seller:

The Purchaser:

[signed] /Bukharin G.M./
[seal]

[signed] /Ievleva I.V./

PAYMENT ORDER # 1  February 17, 2000          via mail          0401060

Five million five hundred eighty thousand rubles 00 kopeks

| EIN 0000000000 Kompany Holdex LLC<br><br>Payer | The amount | 5580000.00 | | |
|---|---|---|---|---|
| | Account # | 408058104000000000028 | | |
| Joint Stock Commercial Bank Tsentrokredit, Moscow, 32 Pyatnitskaya St.<br><br>Bank of the Payer | BIK | 044583514 | | |
| | Account # | 30101810700000000514 | | |
| Joint Stock Commercial Bank Tsentrokredit, Moscow, 32 Pyatnitskaya St.<br><br>Bank of the recipient | BIK | 044583514 | | |
| | Account # | 30101810700000000514 | | |
| LLC Poliprom EIN 0814113973 | Account # | 40702810100000001077 | | |
| | Form of payment | 01 | Payment term | 02/17/00 |
| | Purpose of the payment | | Payment priority | 5 |
| Recipient | Code | | Reserve field | |

Purpose of payment, denomination of goods, works carried out, services performed, ## and dates of commercial documents, agreements, VAT

Payment for 2307984 ordinary nominal shares of Open Joint Stock Company Kachkanar Ore Mining and Processing Plant Vanadiy with face value of 1 ruble pursuant to Sale and Purchase agreement # KGOK-001\A of January 20, 2000. Without VAT.

| Signatures<br>[signed]<br>_____ | Bank notes |
|---|---|
| | AKB Tsentrocredit BIK 044583514<br>Account # 30101810700000000514<br>February 17, 2000<br>Paid<br>Mikishola M.B.<br>Accepted _____[signed] |

# ДОГОВОР № KGOK-001/А
## купли-продажи ценных бумаг

*г. Москва*                                                                          *«20» января 2000г.*

Общество с ограниченной ответственностью «Политром», именуемое в дальнейшем «Продавец», в лице Генерального директора Бухарина Г.М., действующего на основании Устава, с одной стороны, и

Компания «Холдэкс Эл.Эл.Си.», именуемая в дальнейшем «Покупатель», в лице Поверенного Иевлевой И.В., действующей на основании Доверенности от 11.10.1999 г., с другой стороны,

именуемые совместно «Стороны» и каждый по отдельности «Сторона», заключили настоящий договор (далее по тексту - «Договор») о нижеследующем:

### 1. Предмет Договора

1.1. Продавец передает ценные бумаги, указанные в п.1.2 настоящего Договора, а Покупатель обязуется оплатить Продавцу стоимость указанных ценных бумаг и принять их в собственность.

1.2. Сведения о ценных бумагах (далее - ЦБ), являющихся предметом купли-продажи в соответствии с п.1.1 настоящего договора:

| | |
|---|---|
| Эмитент ЦБ: | Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий» |
| Регистр. № Эмитента: | 0422 серия III-ИК, зарегистрировано постановлением Главы Администрации г. Качканар № 348 от 15.04.1993г. |
| Место нахождения Эмитента: | Россия, Свердловская обл., г. Качканар, ул. Свердлова, д.2 |
| Категория (тип) ЦБ: | Обыкновенные именные акции бездокументарной формы |
| Форма выпуска ЦБ: | Бездокументарная – в виде записи на лицевых счетах |
| Государственный регистрационный номер выпуска ЦБ: | Первый выпуск - 62-1п-290 от 12 июля 1993 г. Второй выпуск - 62-1-1396 от 13 июня 1996 г. |
| Держатель реестра акционеров Эмитента: | ЗАО «Компания – регистратор «Панорама» 101000 г. Москва. Б. Харитоньевский пер., д. 13А, офис 8А |
| Номинальная стоимость ЦБ | 1 (один) рубль |
| Количество ЦБ 1-го выпуска: | 9 759 (Девять тысяч семьсот пятьдесят девять) штук. |
| Количество ЦБ 2-го выпуска: | 2 298 225 (Два миллиона двести девяносто восемь тысяч двести двадцать пять) штук. |
| Общее количество ЦБ: | 2 307 984 (Два миллиона триста семь тысяч девятьсот восемьдесят четыре) штуки. |
| Общая сумма сделки по Договору: | 5 580 000 (Пять миллионов пятьсот восемьдесят тысяч) рублей. |

### 2. Порядок расчетов

2.1. Покупатель обязуется произвести полную оплату ценных бумаг, указанных в п. 1.2. настоящего Договора, путем перечисления денежных средств со счета типа «И» на расчетный счет Продавца.

2.2. Оплата ценных бумаг, указанных в п. 1.2 настоящего Договора, осуществляется Покупателем в течение 30 (Тридцати) дней с даты заключения настоящего Договора.

### 3. Порядок регистрации перехода прав собственности на ценные бумаги

3.1. Продавец обязуется в течении 5-ти дней после подписания договора перерегистрировать пакет ЦБ на имя Покупателя в реестре акционеров Эмитента и предоставить последнему уведомление о проведении операции по переходу прав собственности на ценные бумаги от Продавца к Покупателю.

3.2. Расходы по перерегистрации прав собственности на ценные бумаги в реестре владельцев именных ценных бумаг Эмитента акций Стороны несут по соглашению.

### 4. Ответственность Сторон

4.1. В случае нарушения Покупателем сроков, указанных в п. 2.2 настоящего договора, Покупатель обязан уплатить Продавцу пеню в размере 0,2 (ноль целых две десятых) процента от суммы настоящего Договора за каждый день просрочки.

4.2. В случае нарушения Покупателем сроков, указанных в п. 2.2 настоящего Договора, более чем на 10 (Десять) банковских дней, Продавец вправе в одностороннем порядке расторгнуть настоящий Договор. При этом Покупатель обязан в трехдневный срок с даты расторжения договора перерегистрировать полученные акции на имя Продавца в реестре акционеров и заплатить Продавцу штраф за отказ от исполнения Договора в размере 10 (Десять) процентов от суммы настоящего Договора.

4.3. В случае нарушения Продавцом сроков перерегистрации акций, указанных в п. 3.1 настоящего договора, Продавец обязан уплатить Покупателю пеню в размере 0,2 (ноль целых две десятых) процента от суммы настоящего Договора за каждый день просрочки.

## 5. Срок действия договора. Порядок его изменения и расторжения

5.1. Стороны прилагают все усилия, чтобы решить в рамках реализации настоящего Договора споры и разногласия путем переговоров и достижения двусторонних соглашений. Если соглашения не будут достигнуты, споры подлежат рассмотрению в Арбитражном суде г. Москвы.

5.2. Договор вступает в силу с момента его подписания и должен быть прекращен полным исполнением Сторонами принятых на себя по Договору обязательств, либо вступившими в силу норм настоящего договора о его расторжении.

5.3. Все изменения, дополнения, соглашения к настоящему договору действительны лишь в том случае, если они составлены в письменной форме и подписаны уполномоченными представителями обеих Сторон, а также заверены печатями.

5.4. Договор может быть изменен, расторгнут, признан недействительным только по основаниям и в порядке, предусмотренным действующим законодательством и настоящим договором.

5.5. Во всех обстоятельствах, связанных с реализацией настоящего договора, которые прямо не урегулированы настоящим договором, Стороны руководствуются требованиями действующего законодательства.

## 6. Юридические и банковские адреса Сторон

**Продавец:**
ООО «Полипром»
358000, Республика Калмыкия, г. Элиста,
ул. Ленина, д.249, к.505, ИНН 0814113973,
расч./счет № 40702810800090000040
в Филиале АКБ «Московский Деловой Мир»,
г. Элиста, кор./счет № 30301810600011680006,
БИК 044525466.

**Покупатель:**
Компания «Холдэкс Эл.Эл.Си.»
707 W. 7th Street, Austin, Texas 78701, USA
расчетный счет типа «И» 40805810500000000628
в АКБ «Центрокредит», г. Москва,
корр. счет № 30101810700000000514
БИК 044583514

### Подписи сторон:

**Продавец:**

/Бухарин Г.М./

**Покупатель:**

/Иевлева И.В./

ПЛАТЕЖНОЕ ПОРУЧЕНИЕ № 1      **17.02.2000**      почтой      0401060

                                  Дата            Вид платежа

Сумма прописью    Пять миллионов пятьсот восемьдесят тысяч рублей 00 копеек

| | | |
|---|---|---|
| ИНН 0000000000 Компания "Холдэкс Эл.Эл.Си" | Сумма | 5580000-00 |
| | Сч. № | 40805810400000000028 |

| Плательщик | БИК | 044583514 |
|---|---|---|
| АКБ "Центрокредит" г.Москва, ул.Пятницкая, д.32 | Сч. № | 30101810700000000514 |

| Банк плательщика | БИК | 044583514 |
|---|---|---|
| АКБ "Центрокредит" г. Москва, ул.Пятницкая, д.32 | Сч. № | 30101810700000000514 |

| Банк получателя | Сч. № | 40702810100000001077 |
|---|---|---|
| ООО "Полипром" ИНН 0814113973 | | |

| Вид.оп. | 01 | Срок плат. | 17.02.2000 |
|---|---|---|---|
| Наз.пл. | | Очер плат. | 5 |
| | Код | Рез. поле | |

Получатель

Назначение платежа, наименование товара, выполненных работ, оказанных услуг, №№ и даты товарных документов, договоров, НДС.

Опла...та за обыкновенные именные акции "Качканарский ГОК "Ванадий" номинальной стоимостью один рубль в к...личестве 2307984 штуки по Договору купли-продажи № KGOK-001\A от 20.01.2000 г. Без НДС.

Подписи                       Отметки банка

М.П.                                      АКБ Центрокредит БИК 044583514 г.
                                      к/с 30101810780000000514

                                      1 7 ФЕВ 2000

                                      Миккилова М.Б
                       ПРИНЯТО

# EXHIBIT "4"

[p. 48]

AGREEMENT No. 3
For the Purchase and Sale of Securities

City of Ekaterinburg                                              January 18, 1999

OOO Torgovyi dom OAO Vanadii, represented by N. I. Chervinskii, hereinafter to be referred to as "the Seller", on one hand, and OOO POLIPROM, represented by the General Director, G. M. Bukharin, hereinafter to be referred to as "the Buyer", on the other hand, have entered into this agreement regarding the following:

## 1. SUBJECT OF THE AGREEMENT

1.1. The Seller shall sell securities and the Buyer shall be obligated to pay to the Seller the value of said securities and assume ownership thereof.

1.2. Information regarding the securities subject to purchase and sale in accordance with Section 1.1. of this Agreement:

> Class (type) of securities:     Common nominal shares
> State registration No.:          No. 62-111-290 of July [*illegible*], 1993
>                                          No. 62-1-1396 of June 12, 1996
> Issuer: OAO Vanadii Mining and Milling Complex of Kachkanara
> Number of shares: 2,307,984 (two million three hundred and seven thousand, nine hundred eighty-four) shares;
> Amount of the Agreement: 5,558,847 (five million, five hundred fifty-eight thousand, eight hundred forty-seven) rubles

## 2. OBLIGATIONS OF THE PARTIES

2.1. The Buyer shall be obligated to pay the value of the above securities within 35 (thirty-five) banking days as of the moment of signing of this Agreement by the parties.

2.2. The Seller shall be obligated to deliver the securities indicated in Section 1.2 of this Agreement to the ownership of the buyer by means of signing an order of deliver regarding the above securities.

2.3. Payment by the Buyer pursuant to this Agreement may be done either in cash or in securities, including in promissory notes.

2.4. Transfer of the ownership right to the above securities shall be conducted by means of re-registration of the securities to the name of the Buyer in the issuer's register of shareholders.

2.5. Signing of the certificate of delivery and receipt shall be considered as factual implementation of the parties' obligations under this Agreement.

2.6. The Seller shall guarantee to the Buyer that the former is the owner of the above securities and that the above securities are not subject to a pledge or subject to the rights of third parties.

2.7. Pursuant to this Agreement, the ownership rights to those securities, to which the Seller has a right on the basis of an increase in the registered stock of the issuer of the above securities passed by the Board of Directors (Supervisory Board) or by the General Shareholders Meeting of the issuer shall also be transferred to the Buyer. Additional order of delivery for the delivery of securities to which the owner shall be entitled on the basis of an increase in the registered stock of the securities' issuer, or on the basis of a split, etc., shall not be necessary.

## 3. TERM OF THE AGREEMENT AND ORDER OF ITS AMENDMENT AND TERMINATION

3.1. This Agreement shall become effective as of the moment of its signing by both parties and shall be effective until its factual implementation.

3.2. Amendments shall be made upon coordination between the parties.

3.3. Disputes related to this Agreement on which the parties shall not be able to reach an understanding shall be resolved in accordance with the procedure set forth by the current laws of the Russian Federation.

## 4. LEGAL AND BANKING INFORMATION OF THE PARTIES

OOO Torgovyi dom OAO Vanadii
Republic of Kalmykia, Town of Elista, 249
Lenin Street, Suite 505
Taxpayer's ID: 0814072702

OOO Poliprom
Republic of Kalmykia, Town of Elista, 249
Lenin Street, Suite 505
Taxpayer's ID: 0814113973

## 5. SIGNATURES OF THE PARTIES

SELLER
[signature]
[seal:]
Russian Federation, Republic of Kalmykia
Limited Liability Company,
Torgovyi Dom OAO VANADII

BUYER
[signature]
G. M. Bukharin
[seal:]
Russian Federation, Republic of Kalmykia
Limited Liability Company, [illegible]
Poliprom

On January 22, 1999 I, Kostikova
[illegible]. A., a notary of the city of
Moscow verified the authenticity of this
copy with the original document. I did not
find any erasures, additions, crossed words
and other not mentioned corrections or other
peculiarities in the original documents.
Registered in the register under # 1K-379
Recovered 10.00
Notary: signed

[seal]

correct judge Dzhambalova[1] [initials are illegible]

Arbitrazh Court
Republic of Kalmykia
COPY IS CORRECT

[seal]

---

[1] In handwriting, - translators note



## ДОГОВОР № 3
### купли-продажи ценных бумаг

г. Екатеринбург                                                                18 января 1999 г.

ООО «Торговый дом ОАО «Ванадий» в лице Червинского Н.И., именуемое в дальнейшем "Продавец", с одной стороны, и ООО «ПОЛИПРОМ» в лице Генерального директора Бухарина Г.М., именуемое в дальнейшем "Покупатель", с другой стороны, заключили настоящий договор о нижеследующем:

### 1. ПРЕДМЕТ ДОГОВОРА
1.1. Продавец продает ценные бумаги, а Покупатель обязуется оплатить Продавцу стоимость указанных ценных бумаг и принять их в собственность.
1.2. Сведения о ценных бумагах (далее ЦБ), являющихся предметом купли-продажи в соответствии с п. 1.1 настоящего договора:

Категория (тип) ценных бумаг - обыкновенные именные акции;
Номер государственной регистрации:     № 62-1П-290 от 12.07.93 г. и
                                         № 62-1-1396 от 12.06.96 г.

Эмитент: ОАО «Качканарский горно-обогатительный комбинат «Ванадий»;
Количество: 2.307.984 (два миллиона триста семь тысяч девятьсот восемьдесят четыре) штук;
Сумма договора: 5 558 847 (Пять миллионов пятьсот пятьдесят восемь тысяч восемьсот сорок семь) руб.

### 2. ОБЯЗАННОСТИ СТОРОН
2.1. Покупатель обязуется оплатить стоимость вышеуказанных ценных бумаг, в течение 35 (Тридцати пяти) банковских дней с момента подписания сторонами настоящего договора.
2.2. Продавец обязуется передать в собственность покупателю ценные бумаги, указанные в п. 1.2 настоящего договора путем подписания передаточного распоряжения на вышеуказанные ценные бумаги 2.3. Оплата Покупателем по настоящему договору может осуществляться как денежными средствами, так и ценными бумагами, в т.ч. простыми векселями.
2.4. Переход права собственности на вышеуказанные ценные бумаги осуществляется путем перерегистрации ценных бумаг на имя Покупателя в реестре акционеров эмитента.
2.5. Фактом исполнения сторонами обязательств по данному договору является подписание акта приема-передачи ценных бумаг.
2.6. Продавец гарантирует Покупателю, что он является собственником вышеуказанных ценных бумаг, и что вышеуказанные ценные бумаги не являются предметом залога и предметом прав третьих лиц.
2.7. По настоящему договору к Покупателю переходят права собственности и на те ценные бумаги, на которые Продавец имеет право за счет увеличения уставного капитала эмитента вышеуказанных ценных бумаг, принятого Советом директоров (наблюдательным советом) или общим собранием акционеров эмитента. Дополнительного передаточного распоряжения на передачу ценных бумаг на которые имеет право собственности за счет увеличения Уставного капитала эмитента ЦБ, дробления п.т. п. не требуется.

### 3. СРОК ДЕЙСТВИЯ ДОГОВОРА ПОРЯДОК ЕГО ИЗМЕНЕНИЯ И РАСТОРЖЕНИЯ
3.1. Настоящий договор вступает в силу с момента подписания обеими сторонами и действует до фактического исполнения.
3.2. Изменения и дополнения вносятся по согласованию сторон.
3.3. Разрешение споров по настоящему договору, по которым стороны не смогли достигнуть взаимного соглашения осуществляется в порядке, предусмотренном действующим законодательством Российской Федерации.

### 4. ЮРИДИЧЕСКИЕ И БАНКОВСКИЕ РЕКВИЗИТЫ СТОРОН
ООО «Торговый дом ОАО «Ванадий»                        ООО «Полипром»
Республика Калмыкия, г.Элиста, ул.Ленина, д.249,   Республика Калмыкия, г.Элиста, ул.Ленина, д.249,
ком.505                                            ком.505
ИНН 0814072702                                     ИНН 0814113973

### 5.ПОДПИСИ СТОРОН

ПРОДАВЕЦ                                                    ПОКУПАТЕЛЬ





верно

Арбитражный суд
Республики Калмыкия

**КОПИЯ ВЕРНА**