UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
BASE METAL TRADING, SA, et al.,                                 :

                        Plaintiffs,                   :    Docket No. 00 CIV. 9627 (JGK)

          -against-                                          :

RUSSIAN ALUMINUM, et al.,                                       :

                       Defendants.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

.

## <u>Declaration and Exhibits of Anatoly Kleymenov</u>

### Volume I of I

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

BASE METAL TRADING SA et al                    Docket No. 00 Civ. 9627

                          Plaintiffs

          v.

RUSSIAN ALUMINUM et al.

                          Defendants
_____

## <u>LEGAL OPINION OF ANATOLY KLEYMENOV</u>

I, Anatoly Kleymenov, pursuant to the provisions of 28 U.S.C. §1746, hereby

declare as follows:

1.        I am a citizen of the Russian Federation and an attorney admitted to

practice law in Russia in accordance with the legislation of the Russian Federation.

2.        I was asked by Marks & Sokolov, LLC, counsel for Plaintiffs in the above

captioned matter, to give my expert opinion on issues of Russian law as set forth below.

## I.        QUALIFICATIONS AS EXPERT

3.        In 1993 I received a degree in law from the Moscow Law Institute

(currently Moscow State Law Academy) and have been practicing law in Russia since

that time.

4.        I serve as an attorney -at-law with the law office # 35 affiliated with the

Moscow City Bar.

1

5.      I have been member of  Moscow City Bar since 1994.

6.      I specialize in commercial law, including securities transactions, arbitrazh procedures and criminal law, concentrating on economic crime and tax fraud. I also have in depth knowledge in the field of administrative liability and customs regulations.

7.      I have represented numerous clients on both trial and appellate levels in courts of general jurisdiction and arbitrazh courts. I have handled litigation involving various shareholders' disputes, including lawsuits brought to invalidate various resolutions of state and private entities, and resolutions passed by corporate bodies.

8.      I have represented an American company-claimant in a case before the Constitutional Court of the Russian Federation in which the constitutionality of Article 380 of the Russian Customs Code was challenged.[1]  I also represented the Federation Council (the upper chamber of the Russian Parliament) in the Constitutional Court when a review of the constitutionality of Article 46 and Article 51 of the Criminal Procedure Code of the RSFSR was performed.[2]

9.      I have experience both in litigation and as a legal counsel.

10.     I have authored a publication on Russian law entitled "Who is a proper defendant in tax evasion cases."[3]

11.     I am fluent in English.

## II.    QUESTIONS PRESENTED

12.     I have been asked to render my opinion on the following question:

Were the transfers of the shares in GOK owned by Holdex LLC, Omni Trusthouse Ltd. and Foston Management Limited made in accordance with Russian law?

---

[1] See Constitutional Court Resolution of May 14, 1999 No. 8-P
[2] See the Decision of the Constitutional Court of the Ruffian Federation of June 27, 2000
[3] See Russian Justitsia, No. 8/2001, p. 52

2

### III.    SUMMARY OF CONCLUSIONS

13.    For the reasons set forth in detail below, I have concluded that:

- The deprivation of the three shareholders (Holdex, Omni and Foston) of their shares in GOK was the result of gross violations of substantive and procedural norms of Russian law, and the court decisions that ordered the alienation of those shares were tainted with fraud.

### IV.    DOCUMENTS REVIEWED

14.    In preparing my expert opinion, I have reviewed the fact witness statements of Dov Reiger concerning Omni and Holdex, the witness statement of Nikita Illyich Chervinsky in regard to Holdex, Marina Ashikhmina's witness statement concerning Foston, and the declaration of Alexei Zanadovorov. For the purposes of rendering my opinion, I have assumed the facts contained in those declarations to be true. I have also reviewed the declaration of Samir Kapura and the declaration of Paul B. Stephan III.

15.    My expert opinion is based upon my knowledge both as a practicing attorney and a legal scholar of the Constitution of the Russian Federation, the Arbitrazh Procedure Code of the Russian Federation, the Civil Code of the Russian Federation, the Federal Law "On Joint Stock Companies" (the "Corporations Act"), as well as other norms of Russian laws and regulations and of Russian judicial practice.

16.    I have reviewed and analyzed the court decisions and certain pleadings in each of the three court proceedings whereby the GOK shares owned by Holdex, LLC, Omni Trusthouse Ltd, and Foston Management Limited were alienated.

## V.     DISCUSSION

## TRANSFER OF SHARES

## A. HOLDEX

### 1. Facts

17.     Based on my analysis of the witness statements of Dov Rieger, Nikita Illyich Chervinsky, pertinent contracts for the sale of shares, financial documents indicating the payment for the shares in question, certain pleadings and court decisions, I have determined the following facts which serve as the basis for my conclusions.

18.     Holdex, LLC ("Holdex") purchased 2,307,984 shares in GOK from Polyprom according to Contract # KGOK-001/A dated January 20, 2000. [Exhibit 1] As indicated by the bank Payment Order dated February 17, 2000, Holdex paid Polyprom the full purchase price under the contract for the GOK shares in question. [Exhibit 2]

19.     Polyprom, in turn, had purchased those shares from GOK Trading House, a subsidiary of GOK, under Contract # 3, dated January 18, 2000. [Exhibit 3] As indicated by the Acceptance Act signed by GOK Trading House and Polyprom on January 19, 2000, attached as an exhibit to the Declaration of Dov Rieger, Polyprom fully paid for the GOK shares in question, and the title to the shares was transferred from GOK to Polyprom. [Exhibit 4]

20.     Subsequently, GOK filed a complaint against GOK Trading House and Polyprom in the Kalmykia Arbitrazh Court ("KaAC") seeking to take back the shares. GOK claimed that the shares were sold by GOK Trading House to Polyprom under a different contract --  dated January 18, 1999 [Exhibit 5], and not January 18, 2000 -- and that at that time, the parties who signed the contract were not authorized to do so.  Based

on the contract presented by GOK, on November 22, 2000, KaAC invalidated the sale of GOK shares from GOK Trading House to Polyprom, as well as the subsequent sale to Holdex. [Exhibit 6]

21.    According to the sworn statement of Dov Rieger, and the text of the November 22, 2000 KaAC decision itself, Holdex was not served, joined, or notified of the proceedings seeking to alienate its shares.

22.    By Order dated April 17, 2001, the Federal Arbitrazh Court for the North Caucasus Circuit reversed the November 22, 2000 decision and remanded the case to KaAC, ordering the lower court to properly investigate the circumstances of the case with regard to the existence of two different contracts for the same transaction, and to join the current registered owner of the shares. [Exhibit 7]

23.    Upon remand, the KaAC held a new hearing on July 5, 2001. By order of the same date, ignoring the instructions of the Federal Arbitrazh Court, the KaAC again directed the reversal of the sale of GOK shares to Polyprom and, accordingly, the subsequent sale to Holdex, without serving, joining or notifying Holdex. [Exhibit 8]

24.    As described in the declaration of Chervinsky, Polyprom subsequently filed an appeal with the appellate instance of KaAC. This appeal was accompanied by a motion to join Holdex as the registered purchaser of the shares.

25.    By order dated September 10, 2001, the appellate instance of KaAC granted Polyprom's motion to join Holdex, LLC, and postponed the hearing of the appeal. [Exhibit 9] On November 9, 2001, Holdex appeared as a third party at the hearing at the appellate instance of KaAC. By order of November 9, 2001, the appellate instance of KaAC upheld the lower court's decision dated July 5, 2001. [Exhibit 10]

26.     On January 21, 2002, the Federal Arbitrazh Court for the Northern District of Caucasus reversed and remanded the November 9, 2001 decision and the July 5, 2001 decision because both instances of KaAC failed to follow the explicit instructions of the Federal Arbitrazh Court contained in its decision dated April 17, 2001. [Exhibit 11] The Federal Arbitrazh Court had ordered KaAC to properly review the circumstances of the case, which it failed to do, and it also failed to provide any reasoning why it preferred one contract over the other, or give any consideration to Holdex's right of ownership of the shares in question.  The Federal Arbitrazh Court remanded the case for a de novo review of all circumstances of the case to the court of the first instance.

27.     On March 12, 2002, KaAC issued another decision in favor of GOK, invalidating the sale and ordering the return of shares to GOK. [Exhibit 12] Polyprom and Holdex were not present at the March 12, 2002 hearing and the court record indicates that they allegedly had sent telegrams consenting to the conduct of the hearing in their absence. According to the declaration of Chervinsky, neither Polyprom nor Holdex ever sent such telegrams or consented to conducting the hearing in their absence.  Once again, the owners of the property sought to be alienated were not notified of the proceedings. Once Polyprom in fact learned of the March 12, 2002 hearing and an adverse decision, it filed a cassation appeal with the Federal Arbitrazh Court for the North Caucasus Circuit. However, on April 23, 2002 the cassation appeal was dismissed for procedural reasons. [Exhibit 13]

## 2. Issue

28.     The issue is whether the absence of notice of the court proceedings that disposed of the ownership interests of Holdex in the shares of GOK constituted a violation of Holdex's rights.

## 3. Applicable Law

29.     The Russian legal system provides for two branches in the court system: courts of general jurisdiction and arbitrazh courts.

30.     The subject matter jurisdiction over cases arising out of commercial disputes between legal entities is vested in the Arbitrazh Court, pursuant to Article 22 (1) of the Russian Arbitrazh Procedure Code[4] ("APC RF") . [Exhibit 14]

31.     The principle of the "rule of law" is one of the overarching principles of the Arbitrazh courts' practice in the Russian Federation. Pursuant to Article 6 of the Federal Constitutional Law "On Arbitrazh Courts", entitled "The main principles of the functioning of the Arbitrazh Courts in the Russian Federation,"[5]

> *The functioning of the arbitrazh courts in the Russian Federation is based on the principles of the rule of law, independence of the judges, equality of the organizations and the individuals before the law, adversary nature of the proceedings, public nature of the court hearings.*

32.     The principle of the rule of law requires that the arbitrazh courts properly apply the substantive law and strictly comply with the procedural rules governing the operation of the arbitrazh courts.  Specifically, pursuant to Article 11(1) of the APC RF "The Laws Applied in the Adjudication of Disputes"[6]:

> *The arbitrazh courts, in resolving disputes, must follow the Constitution of the Russian Federation, federal laws, the Edicts of the*

---

[4] All Arbitrazh Procedure Code articles referred to in this declarations are to April 5, 1995 version.
[5] Exhibit 15
[6] Exhibit 16

7

> *President of the Russian Federation and the Resolutions of the Russian*
> *government, normative legal acts of the federal government bodies,*
> *normative legal acts of the subjects of the Russian Federation and*
> *international treaties of the Russian Federation.*

33.     There are a number of important provisions of substantive law that are

applicable to the present case.  First and foremost is Article 35(3) of the Constitution,

which states:  "Nobody could be deprived of his property otherwise than on the basis of

a decision of a court of law." [Exhibit 17]

34.     The exclusive list of the circumstances under which an owner of property

can be deprived of the rights of ownership or possession of property is set forth in

Article 235 (2) of the Russian Civil Code ("CC RF") [Exhibit 18].  It provides that:

> *a compulsory deprivation of a person of his property shall not be*
> *permitted  except in the following instances allowed by  law:*
> *(1)   levying execution on property for obligation (Article 237)* [Exhibit
> 18]*;*
> *(2)   compulsory alienation of property which by virtue of a law can not*
> *belong to the particular person (Article 238)* [Exhibit 19]*;*
> *(3)   alienation of immovable property in connection with the*
> *withdrawal of a plot (Article 239)* [Exhibit 20]*;*
> *(4)   purchase of improvidently maintained cultural valuables and*
> *domestic livestock (Article 240  and 241)* [Exhibit 21]*;*
> *(5)   requisition (Article 242)* [Exhibit 21]*;*
> *(6)   confiscation (Article 243)* [Exhibit 21]*;*
> *(7)   alienation of property in the instances provided for by the Article*
> *252(4), Article 272(2), and Articles 282, 285, and 293 of the present*
> *Code* [Exhibit 22]*.*

35.     Russian law also contemplates legal proceedings that are akin to replevin

suits, which are actions brought by an alleged owner of property to recover that

property from someone who allegedly gained possession unlawfully.  Thus, Article 301

of the CC RF states that "The owner has the right to claim his property from an other's

illegal possession." [Exhibit 23]. In such a case, the proper defendant is the party whose

possession or ownership is being challenged by the plaintiff.  [See Exhibit 24, M.I.

Braginsky, Senior Legal Analyst of the Institute of Legislation and Comparative Jurisprudence at the Russian Government, PhD in jurisprudence, Professor, V.V. Vitrainsky, Commentary to Part I of the Civil Code of the Russian Federation for Enterpreneurs at p.269.][7]

36.    Where a party's property rights are at stake, it is critical that the Arbitrazh courts strictly follow all procedural requirements.  The observance of the adversary nature of the proceedings is the cornerstone principle of the administration of justice in the Russian Federation, which is guaranteed by Article 123 (3) of the Constitution of the Russian Federation. [Exhibit 25]  It states:

> *3. The adjudication of cases in the courts must be conducted with the observance of the adversary nature of the proceedings and equality of the parties.*

37.    Consistent with this, the Arbitrazh  Procedure Code ("APC") of the Russian Federation provides that "the legal proceedings in the arbitration court shall be conducted on the basis of the competitiveness and equality of the parties."  Article 7 of APC. [Exhibit 26]

38.    To ensure the adversary nature of the proceedings, all parties whose interests are affected must have an opportunity to appear before the Court.  Thus, Article 112 (2) of the APC requires that when preparing the case for hearing, the Court must notify all the interested parties about the proceedings. [Exhibit 27] As explained in the commentary to the APC, edited by the Chairman of the Supreme Arbitrazh Court, Professor Yakovlev and First deputy Chairman of the Supreme Arbitrazh Court

---

[7] Commentary to the Part I of the Civil Code of the Russian Federation for Enterpreneurs,  Head of the authors team - M.I. Braginsky, Moscow 1995.

of the Russian Federation, Professor M.K Yukov, at 278[8], the interested persons are all

the persons "who have a legal interest in the (substantive or procedural) outcome of the

litigation and can occupy a procedural position provided for in the law." [Exhibit 28]

39.     Further, Article 36 of the APC [Exhibit 29] requires courts to attest that

the action has been brought by and against proper parties:

> *1. In the instances when the arbitrazh court has determined in*
> *the course of the proceedings that the claim is brought by a party*
> *which lacks the right to bring the claim or not against the party*
> *which has to be a respondent in the case, the court can, provided*
> *the plaintiff's consent is in place, substitute the initial plaintiff or*
> *a respondent by a proper plaintiff or defendant.*
> *[...]*
> *3. In a case where the plaintiff does not consent to the*
> *substitution of the defendant, the court has the right, with the*
> *plaintiff's consent, to join the proper person as a second*
> *defendant.*
> *4. After the improper party is substituted, the proceedings begin from the*
> *initial stage.*

40.     Although the law requires the consent of the plaintiff in order to dismiss

the improper defendant, in the absence of this consent, the court has the right to join the

proper defendant as a second defendant pursuant to Article 36(3) [Exhibit 29].

41.     The APC mandates the reversal of a decision rendered in violation of a

party's right to participate in a proceeding concerning that party's property interest.

Article 158 of the APC [Exhibit 30] provides, in subsection 3, that:

> *A violation of procedural rules is a ground for modification or*
> *reversal of a decision of the Arbitrazh court of the first instance:*
> *[...]*
> *4) where the court issued a ruling regarding the rights and obligations*
> *of the parties which were not included in the proceedings...*

---

[8] Commentary to Arbitrazh Procedure Code of the Russian Federation, Editorial Board: Chairman of the Supreme Arbitrazh Court of the Russian Federation , PhD in jurisprudence, Professor V.F.Yakovlev, first deputy Chairman of the Supreme Arbitrazh Court of the Russian Federation, PhD in jurisprudence, Professor  M.K Yukov, Moscow, 2000.

42.     It follows from the discussion above that, under Russian law, a violation of the aforementioned principles affects the legitimacy of court decisions and constitutes an error that mandates a reversal.

### 4. Application.

43.     In the instant case, GOK filed a complaint that asserted its claim over the shares in question, in Kalmykia Arbitrazh Court, which, according to Art 22 of APC had subject matter jurisdiction over the controversy.

44.     However, the proceedings that took place in that case were obtained as a result of procedural and substantive violations of basic, well-established legal norms - violations that are so severe that I believe these decisions were procured through fraudulent conduct.

45.     Though GOK sought to invalidate the transactions which resulted in the transfer of shares from GOK's account, GOK essentially sought to replevin the shares allegedly as a legal owner. In doing this, GOK failed to comply with the requirements of Article 301 CC RF, as explained by Decree of the Plenum of the Supreme Arbitrazh court dated February 25, 1998 # 8 "On certain issues of the dispute resolution practice, dealing with the protection of the ownership right and other property rights", section 22 [Exhibit 31].

46.     Specifically, the Plaintiffs did not name Holdex as a Respondent in their action, even though Holdex was the registered owner of the shares in question.

47.     Moreover, the KaAC failed to comply with Article 36 of the APC, which required the court to join the current owner of shares as a co-defendant.  To the contrary, Holdex, as an interested person within the meaning of Article 112 (2) of the

11

APC, was not even notified of the proceedings, much less joined as a party to them, until much later.  Further, neither the Plaintiffs nor the KaAC took the required steps to ascertain the owner of the shares in question.

48.     The failure to notify Holdex of the proceedings and to join Holdex as a party is a clear basis under Article 158 of the APC for reversal of the lower court's decision.  As noted above, subsection 3 of Article 158 mandates reversal where the court "issued a ruling regarding the rights and obligations of the parties which were not included in the proceedings." That Article 158 required such a result in this case is not surprising, given that Holdex's rights as an owner of the property in question were guaranteed by Article 35 of the Constitution, which conferred upon Holdex the right to take part in proceedings seeking to alienate its property and to defend its right of ownership.

49.     The deprivation of Holdex's right to participate also violated Holdex's rights to the equality of the parties in the adversary system under Article 123 of the Constitution of the Russian Federation and Article 7 of the Arbitrazh Procedure Code.

50.     The only plausible explanation for this violation of basic procedural rules, a violation that is unequivocally proscribed by the Arbitrazh Procedure Code, and for the subsequent  failure to correct the error, is the court's improper bias.

## B. OMNI

### 1. Facts

51.     Based on my analysis of the witness statement of Dov Rieger and exhibits attached to his witness statement, which include pertinent pleadings, court decisions and documents reflecting the movements of shares, namely, excerpts from the register

12

of shares of GOK, I have determined the following facts which serve as the basis for my conclusions.

52.     As of September 2000, Omni owned 34,031,114 shares of GOK, which amounted to 17.8 % of the company's authorized stock.  [Exhibit 32]. Omni had acquired approximately 10.6 million of these shares from a closed joint stock company called Profit House ("Profit House"). Profit House, in turn, had acquired those shares as a result of the September 1998 judicial sale of GOK shares that had belonged to NPRO Urals. In Spring 2000, nearly two years after the judicial sale of its shares, NPRO Urals filed a lawsuit in the Chelyabinsk Arbitrazh Court ("ChAC") to set aside the judicial sale of GOK and to re-register the GOK shares in the name of NPRO Urals.  On August 1, 2000, the ChAC ruled in favor of NPRO Urals and ordered that the shares be re-registered in the name of NPRO Urals.  [Exhibit 34].

53.     Omni was never made a party to this proceeding, and was never notified of the proceeding, even though Omni was the record owner of the shares at the time the lawsuit was brought.

54.     Profit House appealed this decision.  On October 16, 2000, the appellate division of ChAC ordered that the shares be re-registered.  [Exhibit 35].  In its October 16, 2000 Order, the court rejected Profit House's argument that the current owners of GOK shares had not been parties to the proceeding.  The bizzare reason given by the ChAC was that ChAC had taken measures to ascertain and join the true owners.  The October 16, 2000 order was affirmed by the Federal Arbitrazh Court for the Ural District on or about December 4, 2000. [Exhibit 36].

55.     The re-registration apparently occurred on or about November 15, 2000. [Exhibit 37]  Omni did not learn of the transfer, and did not learn of any of the above-mentioned litigation, until two months after the transfer took place.

56.     On June 4, 2001, Profit House filed a petition with the Supreme Arbitrazh Court of the Russian Federation, seeking to bring a protest of the ChAC decision of August 1, 2000, the ChAC Order of October 16, 2000 and the decision of Federal Arbitrazh Court for the Ural District of December 4, 2001  [Exhibit 38]. The petition is still pending.

## 2. Issue

57.     The issue is whether the absence of notice of the court proceedings that disposed of the ownership interests of Omni in the shares of GOK constituted a violation of Omni's rights.

## 3. Applicable Law

58.     *The applicable law is discussed above.*

## 4. Application

59.     In the instant case, NPRO Urals filed a complaint asserting its claim over the shares in question in Chelyabinsk Arbitrazh Court ("ChAC"), which, according to Article 22 of the APC had subject matter jurisdiction over the controversy.

60.     However, the decisions that were obtained in that case, like the decisions rendered in the Holdex case discussed above, were obtained as a result of procedural and substantive violations of basic, well-established legal norms - violations that are so

severe that I believe these decisions, like the decisions in the Holdex case, must have

been procured through fraudulent conduct.

61.    As in the Holdex case, the NPRO Urals lawsuit involved an attempt to

replevin the shares.  However, NPRO Urals failed to comply with the proper defendant

requirements of Article 301 CC RF, as explained by Decree of the Plenum of the

Supreme Arbitrazh court dated February 25, 1998 # 8 "On certain issues of the dispute

resolution practice, dealing with the protection of the ownership right and other

property rights."

62.    Specifically, NPRO Urals, like GOK in the Holdex case, did not name

Omni as a Respondent in its action, even though Omni was the registered owner of the

shares in question.

63.    Moreover, the ChAC, like the KaAC in the Holdex action, failed to

comply with Article 36 of the APC, which required the court to join the current owner

of shares as a co-defendant.  Like Holdex, Omni was not notified of the proceedings as

an interested person within the meaning of Article 112 (2) of the APC, much less joined

as a party to them.  Further, neither the Plaintiffs nor the KaAC took the required steps

to ascertain the owner of the shares in question.

64.    The failure to notify Omni of the proceedings and to join Omni as a party

is a clear basis under Article 158 of the APC for reversal of the lower court's decision.

As noted above, subsection 3 of Article 158 mandates reversal where the court "issued

a ruling regarding the rights and obligations of the parties which were not included in

the proceedings." Here, as in the case of Holdex, Omni's rights as the owner of the

property in question were guaranteed by Article 35 of the Constitution, which conferred

upon Omni the right to take part in proceedings seeking to alienate its property and to defend its right of ownership. The deprivation of Omni's right to participate also violated Omni's rights to the equality of the parties in the adversary system under Article 123 of the Constitution of the Russian Federation and Article 7 of the Arbitrazh Procedure Code.

65.    As with Holdex, the only plausible explanation of this violation of the basic Arbitrazh procedure rules and subsequent failure to correct the error is that the Court was biased in favor of NPRO Urals.

## C. FOSTON.

### 1. Facts

66.    As of September 25, 2000, Foston owned 37,779,600 of GOK shares, or 19.7% of the total outstanding shares. [Exhibit 32].

67.    Pursuant to a court execution sheet dated October 10, 2000 [Exhibit 39], virtually all of Foston's shares – 37,715,167 of them -- were removed from Foston's account pursuant to the decision dated September 29, 2000 of the Solntsevo Intermunicipal Court of the city of Moscow ("Solntsevo Court") [Exhibit 40].

68.    Having obtained a copy of the decision, Foston applied to the Solntsevo Court to obtain information on the case and was informed that the case materials were lost from the court files under strange circumstances.

69.    On February 20, 2001, pursuant to Foston's application to the Solntsevo Court, the case was reactivated and the term for cassation appeal reinstated.   [See Exhibit 33, Exhibit 41].

70.     Thereafter, on  January 26, 2001, Foston filed a cassation appeal of the Solntsevo Court's September 29, 2000 decision with the Moscow City Court, which sits as an appellate court to the Solntsevo Court.  [Exhibit 42].

71.     At the March 30, 2001 hearing of the cassation appeal, the Moscow City Court reversed the September 29, 2000 decision based upon the absence of any evidence that Foston had been notified of the proceeding.  [Exhibit 43]  It did not, however, order the transfer of shares back to Foston.

72.     On November 30, 2001, the Solntsevo Court heard the case on remand from the Moscow City Court. [Exhibit 44]

73.     The Solntsevo Court held that it had no jurisdiction over the case, choosing instead to defer to the Sverdlosk Arbitrazh court.  The Court also refused to order the return of shares to Foston (see Decision of the Solntsevo Court of November 30, 2001, Exhibit 44).  Thus, the very Court which had ordered the divestiture of Foston's shares had inexplicably determined that it had no jurisdiction, yet had left its prior improper decision intact.

74.     Foston appealed the Novmeber 30, 2001 decision to the extent it refused to reverse the execution of the dismissed case. [Exhibit 45]

75.     The Moscow City court heard the case on appeal on May 22, 2002 and according to the declaration of M. Ashikhmina, it refused to grant Foston's appeal.

76.     On July 17, 2002, the Office of the Prosecutor for the City of Moscow brought a protest to the Presidium of the Moscow City Court in regard to the decisions of the Solntsevo Court of November 30, 2001 and the Moscow City Court of May 22, 2002.  [Exhibit  46]

77.     According to the declaration of M. Ashikhmina, the Presidium of the Moscow City Court granted the protest and remanded the case to the Solntsevo Court -- the very court which had disregarded Foston's rights in all its prior rulings -- for the purpose of reversing the two decisions, which had, in part, refused to reinstate Foston's shareholding in GOK. The date for the hearing in the Solntsevo court has not yet been set.

## 2. Issue

78.     The issue is whether the absence of notice of the court proceedings that disposed of the ownership interests of Foston in the shares of GOK constituted a violation of Foston's rights.

## 3. Applicable law

79.     As discussed above, the Russian legal system provides for two branches in the court system: courts of general jurisdiction and arbitrazh courts. The general rule of subject matter jurisdiction is that arbitrazh courts generally hear  "economic disputes between the legal entities and the individuals engaged in the entrepreneurial activities."

80.     If at least one party to the dispute is an individual who does not have the status of an entrepreneur, the case is within the subject matter jurisdiction of a court of general jurisdiction and should be resolved according to the procedural rules of the Civil Procedure Code (CPC).

81.     Article 10 of the CPC[9] provides that:

> *The court shall decide the civil cases on the basis of the Constitution of the Russian Federation, federal constitutional laws, federal laws, normative legal acts of the President of the Russian Federation, Russian Governments, other federal bodies, constitutions (charters) of the subjects of the Russian federation, laws of the subjects of the Russian Federation,*

---

[9] <mark>Exhibit 47</mark>

*local authorities, international treaties of the Russian Federation. The court applies the customary business practice, in cases provided for in the normative legal acts.*

82.     As noted in my discussion relating to the Arbitrazh courts, the observance of the adversary nature of proceedings is the cornerstone principle of the administration of justice in the Russian Federation, which is guaranteed by Article 123(3) of the Constitution.  It states*: "The adjudication of cases in the courts must be conducted with the observance of the adversary nature of the proceedings and equality of the parties."*

83.     Consistent with this Constitutional provision, the Civil Procedure Code provides:  "The civil legal proceedings shall be conducted on the basis of the competitiveness and equality of the parties."  Article 14 of the CPC. [Exhibit 48].  An analogous provision, which is discussed in connection with the Holdex Action, is found in the Arbitrazh Procedure Code.  See Article 7 of APC.

84.     Like the procedure in the Arbitrazh Courts, the Civil Procedure Code, which applies to courts of general jurisdiction, requires all parties whose interests may be affected to have an opportunity to appear before the Court, thereby ensuring the adversary nature of the system.  Pursuant to Article 106 of the CPC [Exhibit 49], the Court is required to notify the parties of the time and place for the hearing.  It provides:

> *Court Notifications.*
>      *Parties and their representatives shall be notified by court notifications about the time and place of the hearing and about any procedural action taken by the court.*
> *...*
>      *The parties to the proceedings and their representatives shall be notified having taken into account that they shall be allowed sufficient time for appearing in court and preparation for the hearing...*

85.    Where a court renders a decision in violation of procedural or substantive law, the CPC mandates the reversal of such decision.  See Article 306 of the CPC [Exhibit 50].  Further, Article 308 of the CPC [Exhibit 51] requires reversal of any decision rendered in violation of the party's right to be notified and to participate in the proceedings.  It provides that:

> *A decision shall be reversed, if*
> *1)*
> *2) the court heard the case in the absence of the person who is a participant to the proceedings, who was not notified about the time and place of the hearing.*
> *…*

86.    If, prior to the reversal of the improper decision, the party has already executed the judgment, the CPC mandates reversal of the execution.  Thus, Article 430 of the CPC states that "If the decision is executed and subsequently reversed and when heard on remand the suit is dismissed in full or in part or the decision is made to terminate the proceedings or leave the suit without consideration, the defendant is entitled to receive back everything which the plaintiff recovered from him pursuant to the reversed decision (reversal of the execution of a decision)." [Exhibit 52]  In addition, pursuant to Article 431 of the CPC [Exhibit 53], the Judge or the Court hearing the case on remand, at their own initiative, shall consider the issue of the reversal of the execution and rule in this regard in the new decision.

87.    In short, the CPC ensures that a party that was wrongfully deprived of a legal or property interest shall have that interest returned to him in the event a lower court decision is reversed.

20

#### 4. Application

88.     In the instant case, three Plaintiffs, OAO "Nizhnitagilsky Metallurgical Combine", OOO Inrossmet and ZAO "Standart Trust", filed a complaint in Solntsevo Intermunicipal court, asserting ownership of shares in GOK.  Plaintiffs sued several companies, including Foston, and also sued an individual.  Because an individual was sued, the Solntsevo Court had jurisdiction.

89.     The proceedings that took place in the Solntsevo Court were so permeated by procedural and substantive violations of basic, well-established legal norms that it is my opinion that the decisions rendered by the Court were procured through fraudulent conduct.

90.     Specifically, Foston was not notified of the proceedings as provided in Article 106 of the CPC.  This is a clear basis under Article 308 of the CPC for reversal of the lower court's decision, which as noted above, requires reversal where the court "heard the case in the absence of person participating in the case who was not notified of the time and place of the court hearing."

91.     In addition, the deprivation of Foston's right to participate violated Foston's rights to the equality of the parties in the adversary system under Article 123 of the Constitution of the Russian Federation and Article 14 of the CPC.

92.     The Moscow City Court, which sits as an appellate court to the Solntsevo Court, reversed and remanded the September 29, 2000 decision of the Solntsevo Court on March 30, 2001 on the ground that there was no evidence that Foston had been notified of the proceeding.

21

93.    On November 30, 2001, the trial court hearing the case on remand failed to order the reversal of the execution in violation of Article 431 (part 1) of the CPC, which requires the court to do so on its own initiative. This represents a clear violation of Article 430 of the CPC, which requires the reversal of the execution of a previously rendered decision when that decision itself has been reversed.  Further, the trial court refused to grant Foston's request -- a request that Foston was required to make because the court would not do so on its own initiative -- to reverse the execution pursuant to Article 431 (part 2) of the CPC. This decision was affirmed on appeal.

94.    For the reasons discussed above, the failure to order the return of Foston's shares in GOK was clearly contrary to Russian law and was a gross violation of Foston's legal and property interest in the GOK shares.  The failure to restore Foston's ownership, despite the fact that the Court had reversed the decision, which stripped Foston of that ownership, cannot be reconciled and illustrates that the Court held an improper bias against Foston.

<u>CONCLUSION</u>

For the reasons stated above, I conclude as follows:

- Foston, Omni and Holdex were denied fundamental rights of notice and opportunity to be heard in connection with the lawsuits that resulted in the divestiture of their shares.

- The violations were particularly egregious, given that Foston, Omni and Holdex were the record owners of the shares.

- The courts' decisions were so clearly erroneous and contrary to fundamental Russian legal principles that the courts necessarily were biased against Foston, Omni and Holdex.

SSL-DOCS2 70079574v1
09/24/02 09:47am

I have executed this affidavit outside the of the United States of America and declare under the penalty of perjury pursuant to the laws of the United States that the foregoing is true to the best of my knowledge and belief.

Anatoly Kleymenov

Date: _16 September 2002_

## EXHIBITS TO LEGAL OPINION OF ANATOLY KLEYMENOV

| # | Exhibit |
|---|---------|
| 1. | Contract # KGOK-001/A dated January 20, 2000 for sale and purchase of shares between Polyprom and Holdex, LLC |
| 2. | Payment Order dated February 17, 2000, evidencing that Holdex paid Polyprom the full purchase price under the contract # KGOK-001/A dated January 20, 2000 |
| 3. | Contract # 3, dated January 18, 2000 for sale and purchase of shares between GOK Trading House and Polyprom |
| 4. | Act of Acceptance of Promissory notes dated January 19, 2000 |
| 5. | Forged contract dated January 18, for sale and purchase of shares allegedly concluded between GOK Trading House to Polyprom |
| 6. | Decision of the Arbitrazh Court of the Kalmykia Republic of November 22, 2000 invalidating the sale of GOK shares from GOK Trading House to Polyprom, as well as the subsequent sale to Holdex |
| 7. | Order of the Federal Arbitrazh Court for the North Caucasus Circuit dated April 17, 2001, reversing the November 22, 2000 decision and remanding the case to the Arbitrazh Court of the Kalmykia Republic |
| 8. | July 5, 2001 order the Arbitrazh Court of the Kalmykia Republic reversing the sale of GOK shares to Polyprom and, accordingly, the subsequent sale to Holdex |
| 9. | Order dated September 10, 2001 of the appellate instance of the Arbitrazh Court of the Kalmykia Republic granting Polyprom's motion to join Holdex, LLC, and postponing the hearing of the appeal. |
| 10. | Order of November 9, 2001, of the appellate instance of the Arbitrazh Court of the Kalmykia Republic upholding the decision of Arbitrazh Court of the Kalmykia Republic dated July 5, 2001 |
| 11. | January 21, 2002 decision of the Federal Arbitrazh Court for the Northern District of Caucasus reversing and remanding the November 9, 2001 decision and the July 5, 2001 decision of the Arbitrazh Court of the Kalmykia Republic |
| 12. | March 12, 2002 decision of the Arbitrazh Court of the Kalmykia Republic invalidating the sale and ordering to return the shares to GOK |
| 13. | April 23, 2002 order of the federal Arbitrazh Court for the Northern Caucasus Circuit dismissing Poliprom's cassation appeal on the decision of March 12, 2000 for procedural reasons. |
| 14. | Article 22 of the Arbitrazh Procedural Code of the Russian Federation |
| 15. | Article 6 of the Federal Constitutional Law "On Arbitrazh Courts" |
| 16. | Article 11 of the Arbitrazh Procedural Code of the Russian Federation |
| 17. | Article 35 of the Constitution of the Russian Federation |
| 18. | Articles 235, 237 of the Civil Code of the Russian Federation |
| 19. | Article 238 of the Civil Code of the Russian Federation |
| 20. | Article 239 of the Civil Code of the Russian Federation |
| 21. | Article 240 - 243 of the Civil Code of the Russian Federation |
| 22. | Articles 252, 272, 282, 285, and 293 of the Civil Code of the Russian Federation |
| 23. | Article 301 of the Civil Code of the Russian Federation |

| 24. | Professor, V.V. Vitrainsky, Commentary to the Part I of the Civil Code of the Russian Federation for Entrepreneurs, p.269 |
|---|---|
| 25. | Article 123 of the Constitution of the Russian Federation. |
| 26. | Article 7 of the Arbitrazh Procedural Code of the Russian Federation |
| 27. | Article 112 (2) of the Arbitrazh Procedural Code of the Russian Federation |
| 28. | Commentary to APC, edited by the Chairman of the Supreme Arbitrazh Court, Professor Yakovlev and First deputy Chairman of the Supreme Arbitrazh Court of the Russian Federation, Professor M.K Yukov, p. 278 |
| 29. | Article 36 of the Arbitrazh Procedural Code of the Russian Federation |
| 30. | Article 158 of the Arbitrazh Procedural Code of the Russian Federation |
| 31. | Decree of the Plenum of the Supreme Arbitrazh court dated February 25, 1998 # 8 "On certain issues of the dispute resolution practice, dealing with the protection of the ownership right and other property rights", section 22 |
| 32. | List of shareholders of OAO Kachkanar GOK Vanadiy, as of September 25, 2000 |
| 33. | Decision of the Solntsevo Intermunicipal Court of the Western District of Mosocw dated February 19, 2001 |
| 34. | August 1, 2000 decision of the Arbitrazh Court of the Chelyabinsk Region ordering to re-register shares in the name of NPRO Urals |
| 35. | October 16, 2000 decision of the appellate division of Arbitrazh Court of the Chelyabinsk Region ordering to re-register shares |
| 36. | December 4, 2000 decision of the Federal Arbitrazh Court for the Ural District affirmed order of October 16, 2000 |
| 37. | Notifications of November 17, 2000 on transactions performed on OMNI's account |
| 38. | June 4, 2001 petition to bring a protest to the ChAC decision of August 1, 2000, the Arbitrazh Court of the Chelyabinsk Region Order of October 16, 2000 and the decision of Federal Arbitrazh Court for the Ural District of December 4, 2001 filed by Profit House with the Supreme Arbitrazh Court of the Russian Federation |
| 39. | Court execution sheet dated October 10, 2000 |
| 40. | September 29, 2000 Decision of the Solntsevo Intermunicipal Court of the city of Moscow ordering to transfer shares from Foston's account |
| 41. | February 20, 2001 order of the Solntsevo Court reactivating the case and reinstating the term for cassation appeal |
| 42. | January 26, 2001, Foston's cassation appeal of the Solntsevo Court's September 29, 2000 decision filed with the Moscow City Court |
| 43. | March 30, 2001 decision of the Moscow City Court reversing the September 29, 2000 |
| 44. | November 30, 2001 decision of the Solntsevo Court dismissing the complaint of ZAO Sandart Trust, OOO Inrosmet and OOO Nizhnetagilsky metallurgical plant to recover shares due to lack of jurisdiction, denying Foston's motion to reverse the execution of the decision |
| 45. | Foston's appeal of the November 30, 2001 decision to the extent it refused to reverse the execution of the dismissed case |
| 46. | On July 17, 2002 protest of the Office of the Prosecutor for the City of Moscow to the Presidium of the Moscow City Court with regard to the decisions of the Solntsevo Court of November 30, 2001 and the Moscow City Court of May 22, 2002 |
| 47. | Article 10 of the Civil Procedural Code of the Russian Federation |

| 48. | Article 14 of the Civil Procedural Code of the Russian Federation |
| 49. | Article 106 of the Civil Procedural Code of the Russian Federation |
| 50. | Article 306 of the Civil Procedural Code of the Russian Federation |
| 51. | Article 308 of the Civil Procedural Code of the Russian Federation |
| 52. | Article 430 of the Civil Procedural Code of the Russian Federation |
| 53. | Article 431 of the Civil Procedural Code of the Russian Federation |

AGREEMENT # KGOK-001/a
for purchase and sale of securities

Moscow                                                         January 20, 2000

     Limited Liability Company Poliprom, hereinafter "Seller", in the person of the Director General Bukharin G.M. acting on the basis of the Charter, on one side, and

     Company Holdex L.L.C., hereinafter "Purchaser", in the person of representative Ievleva I.V., acting on the basis of the power of attorney of October 11, 1999, on the other side,

     hereinafter jointly "Parties", separately "Party", concluded the following agreement ("Agreement"):

## 1. Subject of the Agreement

1.1 The Seller transfers securities indicated in section 1.2 of the Present agreement, and the Purchaser is obligated to pay for the mentioned securities to the Seller and to accept the securities in ownership.

1.2 The information about securities, which are a subject of sale and purchase pursuant to section 1.1 of the present agreement:

| | |
|---|---|
| Issuer of securities | Open Joint Stock Company Kachkanar Ore Mining and Processing Plant Vanadiy |
| Registration # of the issuer | 0422 series III-IK, registered by the order of the Head of Kachkanar City Administration # 348 of April 15, 1993 |
| Location of the issuer | Russia, Sverdlovsk region, Kachkanar, 2 Sverdlova St. |
| Category (type) of securities | Ordinary nominal non-documentary shares |
| Form of issue of securities | Non-documentary: in a form of a record on accounts |
| State registration number of issue of securities | First issue – 62-1p-290 of July 12, 1993 Second issue – 62-1-1396 of June 13, 1996 |
| Holder of shareholders register of issuer | CJSC Company-registrar Panorama   101000 Moscow, Bolshov Kharitonievskiy Pereulok 13A, office 8A |
| Securities face value | 1 (one) ruble |
| Amount of securities of the first issue: | 9,759 (nine thousand seven hundred fifty eight) |
| Amount of securities of the second issue: | 2,298,225 (two million two hundred ninety eight thousand two hundred twenty five) |
| Total amount of securities: | 2,307,984 (two million three hundred seven thousand nine hundred eighty four) |
| Total amount of transaction pursuant to agreement: | 5,580,000 (Five million five hundred eighty thousand) |

## 2. Order of payments

2.1 The Purchaser is obligated to pay for the securities indicated in section 1.2 of the present agreement by the means of transfer of monetary funds from the type "I" account to the account of the "Seller".

2.2 The Purchaser shall pay for the securities indicated in section 1.2 of the present agreement within 30 (thirty) days from the moment of the conclusion of the present agreement.

### 3. Order of registration of transition of the securities ownership rights

3.1 Within 5 days after execution of the agreement the Seller is obligated to reregister shares on the name of the Purchaser in the register of the issuer's shareholders and to provide notification with regard to transition of the securities ownership rights from the Seller to the Purchaser.

3.2 The Parties share the expenditures connected with reregistration of securities ownership rights in the register of owners of the issuer's nominal securities upon agreement.

### 4. Liability of the parties

4.1 If the Purchaser violates the terms indicated in section 2.2 of the present Agreement, it should pay to the Seller fine in the amount of 0.2 (two tenths) percent from the amount of the present Agreement for each day of the delay.

4.2 If the Purchaser violates the terms indicated in section 2.2 of the present Agreement for more than 10 (ten) banking days, the Seller shall have a right to unilaterally terminate the present Agreement. In this case, the Purchaser is obligated to reregister the received shares to the name of the Seller in the shareholders register and to pay to the Seller a fine for the refusal to execute the Agreement in the amount of 10 (ten) percent from the amount of the present Agreement within three days from the moment of termination of the Agreement.

4.3 If the Seller violates the terms for reregistartion of shares indicated in section 2.2 of the present Agreement, it should pay to the Purchaser a fine in the amount of 0.2 (two tenths) percent from the amount of the present agreement for each day of the delay.

### 5. Term of the Agreement. Order of change and termination of the Agreement

5.1 The parties shall make all efforts to resolve disputes and disagreements in a framework of the present Agreement and to reach bilateral agreements. If the parties failed to reach agreements, the disputes shall be subject to consideration of the Moscow Arbitrazh Court.

5.2 The Agreement becomes effective from the moment of its execution and shall be terminated after the parties completely perform their obligations under the present Agreement, or after the provisions of the present Agreement regarding its termination became effective.

5.3 All the changes, additions, and agreements to the present Agreement will be valid only if they are executed in a written form, signed by the authorized representatives of both parties and attested by seals.

5.4 The Agreement can be changed, terminated or invalidated only on the grounds and in the order as provided by the current legislation and the present Agreement.

5.5 In regard to all circumstances connected with execution of the present agreement, which are not directly regulated by the present agreement, the parties shall be guided by the requirements of the present legislation.

### 6.  Registered addresses and Banking information of the parties

**The Seller**
LLC Poliprom
358000 Republic of Kalmykia, Elista
249 Lenina St., off. 505
EIN 0814113973
Account # 40702810800090000040 in the Elista Branch of Joint Stock Commercial Bank Moscow Business World,
Account # 30301810600011680006
BIK 044525466

**The Purchaser**
The Company Holdex LLC
707 W. 7th Street, Austin, Texas 78701, USA
Account type "I"
408058104000000000028
In the of Joint Stock Commercial Bank Tsentrokredit, Moscow
Account # 30101810700000000514
BIK 044583514

Signatures of the parties:

The Seller:

[signed] /Bukharin G.M./
[seal]

The Purchaser:

[signed] /Ievleva I.V./

## ДОГОВОР № KGOK-001/A
### купли-продажи ценных бумаг

*г. Москва*                                                          *«20» января 2000г.*

Общество с ограниченной ответственностью «Полипром», именуемое в дальнейшем «Продавец», в лице Генерального директора Бухарина Г.М., действующего на основании Устава, с одной стороны, и

Компания «Холдэкс Эл.Эл.Си.», именуемая в дальнейшем «Покупатель», в лице Поверенного Иевлевой И.В., действующей на основании Доверенности от 11.10.1999г., с другой стороны,

именуемые совместно «Стороны» и каждый по отдельности «Сторона», заключили настоящий договор (далее по тексту - «Договор») о нижеследующем:

### 1. Предмет Договора

1.1. Продавец передает ценные бумаги, указанные в п.1.2 настоящего Договора, а Покупатель обязуется оплатить Продавцу стоимость указанных ценных бумаг и принять их в собственность.

1.2. Сведения о ценных бумагах (далее - ЦБ), являющихся предметом купли-продажи в соответствии с п.1.1 настоящего договора:

| | |
|---|---|
| Эмитент ЦБ: | *Открытое акционерное общество «Качканарский горно-обогатительный комбинат «Ванадий»* |
| Регистр. № Эмитента: | *0422 серия III-ИК, зарегистрировано постановлением Главы Администрации г. Качканар № 348 от 15.04.1993г.* |
| Место нахождения Эмитента: | *Россия, Свердловская обл., г. Качканар, ул. Свердлова, д. 2* |
| Категория (тип) ЦБ: | *Обыкновенные именные акции бездокументарной формы* |
| Форма выпуска ЦБ: | *Бездокументарная – в виде записи на лицевых счетах* |
| Государственный регистрационный номер выпуска ЦБ: | *Первый выпуск - 62-1п-290 от 12 июля 1993 г.*<br>*Второй выпуск - 62-1-1396 от 13 июня 1996 г.* |
| Держатель реестра акционеров Эмитента: | *ЗАО «Компания – регистратор «Панорама»*<br>*101000 г. Москва, Б. Харитоньевский пер., д. 13Л, офис 8Л* |
| Номинальная стоимость ЦБ | *1 (один) рубль* |
| Количество ЦБ 1-го выпуска: | *9 759 (Девять тысяч семьсот пятьдесят девять) штук.* |
| Количество ЦБ 2-го выпуска: | *2 298 225 (Два миллиона двести девяносто восемь тысяч двести двадцать пять) штук.* |
| Общее количество ЦБ: | *2 307 984 (Два миллиона триста семь тысяч девятьсот восемьдесят четыре) штуки.* |
| Общая сумма сделки по Договору: | *5 580 000 (Пять миллионов пятьсот восемьдесят тысяч) рублей.* |

### 2. Порядок расчетов

2.1. Покупатель обязуется произвести полную оплату ценных бумаг, указанных в п. 1.2. настоящего Договора, путем перечисления денежных средств со счета типа «И» на расчетный счет Продавца.

2.2. Оплата ценных бумаг, указанных в п. 1.2 настоящего Договора, осуществляется Покупателем в течение 30 (Тридцати) дней с даты заключения настоящего Договора.

### 3. Порядок регистрации перехода прав собственности на ценные бумаги

3.1. Продавец обязуется в течении 5-ти дней после подписания договора перерегистрировать пакет ЦБ на имя Покупателя в реестре акционеров Эмитента и предоставить последнему уведомление о проведении операции по переходу прав собственности на ценные бумаги от Продавца к Покупателю.

3.2. Расходы по перерегистрации прав собственности на ценные бумаги в реестре владельцев именных ценных бумаг Эмитента акций Стороны несут по соглашению.

### 4. Ответственность Сторон

4.1. В случае нарушении Покупателем сроков, указанных в п. 2.2 настоящего договора, Покупатель обязан уплатить Продавцу пеню в размере 0,2 (ноль целых две десятых) процента от суммы настоящего Договора за каждый день просрочки.

4.2. В случае нарушения Покупателем сроков, указанных в п. 2.2 настоящего Договора, более чем на 10 (Десять) банковских дней, Продавец вправе в одностороннем порядке расторгнуть настоящий Договор. При этом Покупатель обязан в трехдневный срок с даты расторжения договора перерегистрировать полученные акции на имя Продавца в реестре акционеров и заплатить Продавцу штраф за отказ от исполнения Договора в размере 10 (Десять) процентов от суммы настоящего Договора.

4.3. В случае нарушения Продавцом сроков перерегистрации акций, указанных в п. 3.1 настоящего договора, Продавец обязан уплатить Покупателю пеню в размере 0,2 (ноль целых две десятых) процента от суммы настоящего Договора за каждый день просрочки.

## 5. Срок действия договора. Порядок его изменения и расторжения

5.1. Стороны прилагают все усилия, чтобы решить в рамках реализации настоящего Договора споры и разногласия путем переговоров и достижения двусторонних соглашений. Если соглашения не будут достигнуты, споры подлежат рассмотрению в Арбитражном Суде г. Москвы.

5.2. Договор вступает в силу с момента его подписания и должен быть прекращен полным исполнением Сторонами принятых на себя по Договору обязательств, либо вступивших в силу норм настоящего договора о его расторжении.

5.3. Все изменения, дополнения, соглашения к настоящему договору действительны лишь в том случае, если они составлены в письменной форме и подписаны уполномоченными представителями обеих Сторон, а также заверены печатями.

5.4. Договор может быть изменен, расторгнут, признан недействительным только по основаниям и в порядке, предусмотренным действующим законодательством и настоящим договором.

5.5. Во всех обстоятельствах, связанных с реализацией настоящего договора, которые прямо не урегулированы настоящим договором. Стороны руководствуются требованиями действующего законодательства.

## 6. Юридические и банковские адреса Сторон

**Продавец:**
ООО «Полипром»
358000, Республика Калмыкия, г. Элиста,
ул. Ленина, д.249, к.505, ИНН 0814113973,
расч./счет № 40702810800090000040
в Филиале АКБ «Московский Деловой Мир»,
г. Элиста, кор./счет № 30301810600011680006,
БИК 044525466.

**Покупатель:**
Компания «Холдэкс Эл.Эл.Си.»
707 W. 7th Street, Austin, Texas 78701, USA
расчетный счет типа «И» 40805810400000000028
в АКБ «Центрокредит», г. Москва,
корр. счет № 30101810700000000514
БИК 044583514

Подписи сторон:

Продавец:                                       Покупатель:

_____ /Бурхин Г.М./      _____ /Иевлева И.В./

PAYMENT ORDER # 1  February 17, 2000        via mail        0401060

Five million five hundred eighty thousand rubles 00 kopeks

| EIN 0000000000 Kompany Holdex LLC | The amount | 5580000.00 |
|---|---|---|
| | Account # | 408058104000000000028 |
| Payer | | |
| Joint Stock Commercial Bank Tsentrokredit, Moscow, 32 Pyatnitskaya St. | BIK | 044583514 |
| | Account # | 30101810700000000514 |
| Bank of the Payer | | |
| Joint Stock Commercial Bank Tsentrokredit, Moscow, 32 Pyatnitskaya St. | BIK | 044583514 |
| | Account # | 30101810700000000514 |
| Bank of the recipient | | |

| LLC Poliprom EIN 0814113973 | Account # | 40702810100000001077 | | |
|---|---|---|---|---|
| | Form of payment | 01 | Payment term | 02/17/00 |
| | Purpose of the payment | | Payment priority | 5 |
| Recipient | Code | | Reserve field | |

Purpose of payment, denomination of goods, works carried out, services performed, ## and dates of commercial documents, agreements, VAT

Payment for 2307984 ordinary nominal shares of Open Joint Stock Company Kachkanar Ore Mining and Processing Plant Vanadiy with face value of 1 ruble pursuant to Sale and Purchase agreement # KGOK-001\A of January 20, 2000. Without VAT.

Signatures
[signed]

Bank notes

AKB Tsentrocredit BIK 044583514
Account # 30101810700000000514
February 17, 2000
Paid
Mikishola M.B.
Accepted _____[signed]

ПЛАТЕЖНОЕ ПОРУЧЕНИЕ № 1 _____ **17.02.2000** _____ почтой _____ 0401060

| | Дата | | Вид платежа | |

Пять миллионов пятьсот восемьдесят тысяч рублей 00 копеек

| ИНН 0000000000 Компания "Холдэкс Эл.Эл.Си" | Сумма | 5580000-00 |
|---|---|---|
| | Сч. № | 40805810400000000028 |

Плательщик

| АКБ "Центрокредит" г.Москва, ул.Пятницкая, д.32 | БИК | 044583514 |
|---|---|---|
| | Сч. № | 30101810700000000514 |

Банк плательщика

| АКБ "Центрокредит" г. Москва, ул.Пятницкая, д.32 | БИК | 044583514 |
|---|---|---|
| | Сч. № | 30101810700000000514 |

Банк получателя

| ООО "Полипром" ИНН 0814113973 | Сч. № | 40702810100000001077 |
|---|---|---|

| | Вид.оп. | 01 | Срок плат. | 17.02.2000 |
|---|---|---|---|---|
| | Наз.пл. | | Очер плат. | 5 |
| | Код | | Рез. поле | |

Получатель

Назначение платежа, наименование товара, выполненных работ, оказанных услуг, №№ и даты товарных документов, договоров, НДС

Оплата за обыкновенные именные акции "Качканарский ГОК "Ванадий" номинальной стоимостью один рубль в количестве 2307984 штуки по Договору купли-продажи № KGOK-001\А от 20.01.2000 г. Без НДС.

Подписи                              Отметки банка

М.П.

АКБ Центрокредит БИК 044583514
к/с 30101810780000000514

1 7 ФЕВ 2000

ПРИНЯТО
Микиноль М.Б

# AGREEMENT No.3
## ON PURCHASE AND SALE OF SECURITIES

Moscow
January 18, 2000

"TRADING HOUSE "Vanadium", a limited liability company, hereinafter referred to as "the Seller", represented by N.I. Chervinsky, Acting General Director, acting on the basis of Minutes of the Board of Directors' Meeting of "Kachkanar GOK "Vanadium" open joint-stock company, dated February 11, 1999 and the Charter, on the one side,
AND
"Polyprom", a limited liability company, hereinafter referred to as "the Buyer", represented by G.M. Bukharin, General Director, acting on the basis of the Charter, on the other side,

commonly named "the Parties", have entered into this agreement (hereinafter referred to as "the Agreement") as follows.

## 1. SUBJECT OF AGREEMENT

1.1.    In accordance with this Agreement the Seller shall assign securities to the Buyer's ownership, and the Buyer shall accept and pay for securities, meeting the following characteristics (hereinafter referred to as "the Securities" or "Stocks"):

| Type of Securities: | Common registered stocks |
|---|---|
| Issuer: | "Kachkanar GOK "Vanadium" open joint-stock company (hereinafter referred to as "the Issuer"); |
| Number of state registration: | 62-1P-290 (First issue) |
| Number of Stocks of the first issue: | 9,759 (Nine Thousand Seven Hundred and Fifty Nine) |
| Number of state registration: | 62-1-1396 (Second issue) |
| Number of Stocks of the second issue: | 2,298,225 (Two Million Two Hundred Ninety Eight Thousand and Two Hundred Twenty Five) |
| Total number of Stocks transferred under this Agreement: | 2,307,984 (Two Million Three Hundred Seven Thousand and Nine Hundred Eighty Four) |

1.2.    The value of Stocks transferred under this Agreement is 5,558,847 (Five Million Five Hundred Fifty Eight Thousand and Eight Hundred Forty Seven) Roubles.

1.3.    The Seller shall be considered fulfilled its obligation on transfer of Securities to the Buyer in duly manner from the moment of handover of notification of making transaction in the stockholders' register of the Issuer to the Buyer;

1.4.    In accordance with the Agreement the Seller shall be responsible for execution of all works (carrying out all actions), as well as covering all expenses related to registration of transfer of the right of ownership to Securities.

## 2. PROCEDURE OF PAYMENT FOR SECURITIES

2.1.　The Buyer shall pay for Stocks acquired under this Agreement within 15 days from the moment of signing of this Agreement, by promissory notes of the Savings Bank of the Russian Federation. The Parties shall make and sign Act of Acceptance on transfer of promissory notes.

## 3. REGISTRATION OF THE TRANSFER OF OWNERSHIP RIGHT FOR SECURITIES

3.1.　The Seller shall within 5 (Five) working days following the date of signing of this Agreement make all actions that are necessary for registration of the transfer of the ownership right for Securities in the Stockholders' register of the Issuer from the Seller to the Buyer and present to the Buyer the original copy of the document indicated in Par.1.3 of this Agreement.

In case the Buyer fails to fulfill terms of Par.3.2 of the Agreement, the term given to the Seller for registration of the ownership right of the Buyer for Securities shall be extended for the term of delay.

3.2.　The Buyer shall within 1 (One) working day following the date of signing of the Agreement present to the Seller all documents indicated by the latter and that are necessary for execution of registration of the transfer of the ownership right for Securities.

3.3.　The moment when the ownership right for Securities of the Buyer arises shall be the moment of registration of transfer of the ownership right from the Seller to the Buyer in the Stockholders' register of the Issuer.

## 4. GUARANTIES OF THE SELLER

4.1.　The Seller guaranties that the Securities transferred under this Agreement are not pledged, arrested or encumbered by other obligations and are free from claims of the third parties.

4.2.　Except case of cancellation of this Agreement all dividends, interest, profit or other distribution (hereinafter, the Income) on Securities accrued to the Seller following the registration of transaction made on the basis of this Agreement, the Seller shall transfer to the Buyer within 2 (Two) banking days following the date of receiving such Income.

## 5. RESPONSIBILITIES OF THE PARTIES

5.1.　In case of violation of terms indicated in Par.2.1 of this Agreement by the Buyer, the Buyer shall pay penalty in the amount of 0,5 (five tenth interest) of the amount indicated in Par.1.2 of this Agreement for each calendar day of delay.

5.2.　In case of violation of terms indicated in Par.3.1 of this Agreement by the Seller, the Seller shall pay penalty in the amount of 0,5 (five tenth interest) of the amount indicated in Par.1.3 of this Agreement for each calendar day of delay.

5.3.　The payment of penalty or fine under this Agreement shall not release the Party infringing its obligation from fulfillment of obligations under this Agreement, unless the other Party agrees to.

## 6.  MISCALLENEOUS

6.1.    All changes, amendments and annexes to this Agreement shall be made in writing and signed by authorized representatives of the Parties.

6.2.    The Agreement comes into force from the moment of its signing and be valid till the Parties fulfill all obligations undertaken under this Agreement.

6.3.    The Agreement is made in two copies, having equal legal force, one copy for the Buyer and one copy for the Seller.

## 7.  ADDRESSES AND REQUISITES OF THE PARTIES

The Seller:    "TRADING HOUSE OPEN JOINT-STOCK COMPANY "VANADIUM" limited liability company

Legal address: 358000, Elista, 249, Lenin Street, Suite 505

INN:              0814072702

Banking requisites    Settlements account 40702810416340100075
At Saving Bank Branch of the RF No. 8057, Kachkanar
Corresponding account 30101810900000000609
BIC 046513609

The Buyer:    "POLYPROM" limited liability company

Legal address: 358000, Elista, 249, Lenin Street, Suite 505

INN:              0814113973

Banking requisites    Settlements account 40702810800090000040
At AKB "MDM" Branch, Elista
Corresponding account 30301810600011680006
BIC 044525466

# ДОГОВОР № 3
## купли-продажи ценных бумаг

г. Москва                                                          «18» января 2000 г.

ООО «Торговый дом ОАО «Ванадий», именуемая в дальнейшем «Продавец», в лице Исполняющего обязанности Генерального директора Червинского Н. И., действующей на основании Протокола заседания совета директоров ОАО «Качканарский ГОК «Ванадий» от 11 февраля 1999 г. и Устава, с одной стороны, и

ООО «Полипром», именуемое в дальнейшем «Покупатель», в лице Генерального директора Бухарина Г. М., действующего на основании Устава, с другой стороны,

вместе именуемые в дальнейшем «Стороны», заключили настоящий Договор (далее по тексту «Договор») о нижеследующем:

## 1. ПРЕДМЕТ ДОГОВОРА

1.1  По настоящему Договору Продавец обязуется передать в собственность Покупателю, а Покупатель обязуется принять и оплатить ценные бумаги, отвечающие следующим характеристикам (далее – «ЦБ» или «Акции»):

| Вид ЦБ: | Акции обыкновенные именные; |
|---|---|
| Эмитент: | Открытое акционерное общество «Качканарский ГОК «Ванадий» (далее – «Эмитент»); |
| Номер государственной регистрации: | 62-1П-290 (Первый выпуск) |
| Количество Акций первого выпуска: | 9.759 (Девять тысяч семьсот пятьдесят девять) штук |
| Номер государственной регистрации: | 62-1-1396 (Второй выпуск) |
| Количество Акций второго выпуска: | 2.298.225 (Два миллиона двести девяносто восемь тысяч двести двадцать пять) штук |
| Общее количество Акций, передаваемых по настоящему Договору: | 2.307.984 (Два миллиона триста семь тысяч девятьсот восемьдесят четыре) штуки. |

1.2  Цена Акций, передаваемых по настоящему Договору, составляет: 5.558.847 (Пять миллионов пятьсот пятьдесят восемь тысяч восемьсот сорок семь) рублей.

1.3  Продавец считается выполнившим свое обязательство по передаче ЦБ Покупателю должным образом с момента передачи Покупателю уведомления о проведении операции в реестре акционеров Эмитента;

1.4  Проведение всех работ (осуществление всех действий), а также расходы по регистрации перехода права собственности на ЦБ, в соответствии с Договором, возлагается на Продавца.

## 2. ПОРЯДОК ОПЛАТЫ ЦБ

2.1  Оплата Акций, приобретаемых по настоящему Договору, осуществляется Покупателем в течение 15 дней с момента подписания настоящего Договора, векселями Сберегательного банка Российской Федерации. При передаче векселей Стороны составляют и подписывают Акт приема-передачи векселей.

## 3. РЕГИСТРАЦИЯ ПЕРЕХОДА ПРАВА СОБСТВЕННОСТИ НА ЦБ

3.1 Продавец обязан в течение 5 (Пяти) рабочих дней, следующих за днем подписания настоящего Договора, совершить все действия, необходимые для регистрации перехода права собственности на ЦБ в реестре акционеров Эмитента от Продавца к Покупателю и предоставить Покупателю оригинал документа, указанного в п. 1.3. настоящего Договора.

В случае, если Покупатель не выполняет условий пункта 3.2. Договора, то срок предоставленный Продавцу для регистрации права собственности Покупателя на ЦБ продлевается на время задержки.

3.2 Покупатель обязан в течение 1 (Одного) рабочего дня, следующего за днем подписания Договора, предоставить Продавцу все указанные последним документы, необходимые для осуществления регистрации перехода права собственности на ЦБ.

3.3 Моментом возникновения права собственности Покупателя на ЦБ является момент регистрации перехода права собственности от Продавца к Покупателю в реестре акционеров Эмитента.

## 4. ГАРАНТИИ ПРОДАВЦА

4.1 Продавец гарантирует, что ЦБ, передаваемые по настоящему Договору, не заложены, под арестом не состоят, не обременены иными обязательствами и свободны от притязаний третьих лиц.

4.2 Кроме случая аннулирования Договора любые дивиденды, проценты, доход или иное распределение (в дальнейшем Доход) на ЦБ, начисленные Продавцу после регистрации сделки, совершаемой на основании Договора, Продавец обязуется передать Покупателю в течение 2 (Двух) банковских дней, следующих за днем получения им такого Дохода.

## 5. ОТВЕТСТВЕННОСТЬ СТОРОН

5.1 В случае нарушения Покупателем сроков, установленных п. 2.1. Договора, Покупатель обязан заплатить Продавцу пеню в размере 0,5 (пять десятых процента) от суммы, указанной в п. 1.2. настоящего Договора, за каждый календарный день просрочки.

5.2 В случае нарушения Продавцом сроков, установленных п. 3.1. Договора, Продавец обязан заплатить Покупателю пеню в размере 0,5 (пять десятых процента) от суммы, указанной в п. 1.3. настоящего Договора, за каждый календарный день просрочки.

5.3 Уплата пени или штрафа по Договору не освобождает нарушившую свое обязательство Сторону от выполнения обязательств по Договору, если другая Сторона не согласится на иное.

## 6. ПРОЧИЕ ПОЛОЖЕНИЯ

6.1 Все изменения, дополнения и приложения к Договору осуществляются в письменной форме и подписываются уполномоченными представителями Сторон.

6.2 Договор вступает в силу с момента его подписания и действует до исполнения Сторонами всех принятых на себя обязательств по настоящему Договору.

6.3 Договор составлен в 2-х экземплярах, имеющих одинаковую юридическую силу, один из которых находится у Покупателя, другой - у Продавца.

## 7 АДРЕСА И РЕКВИЗИТЫ СТОРОН

| Продавец | ООО «Торговый дом ОАО «Ванадий» |
|---|---|
| Юридический адрес: | 358000, г. Элиста, ул. Ленина, д. 249, к. 505 |
| ИНН: | 0814072702 |
| Банковские реквизиты: | Р/с 40702810416340100075 |
| | В отд. СБ РФ № 8057 в г. Качканаре |
| | К/с 30101810900000000609 |
| | БИК 046513609 |

| Покупатель | ООО «Полипром» |
|---|---|
| Юридический адрес: | 358000, г. Элиста, ул. Ленина, д.249, к. 505 |
| ИНН: | 0814113973 |
| Банковские реквизиты: | Р/с 40702810800090000040 |
| | В филиале АКБ «МДМ» г. Элиста |
| | К/с 30301810600011680006 |
| | БИК 044525466 |

| Покупатель | Продавец |
|---|---|

М.П.

ACT
OF ACCEPTANCE OF PROMISSORY NOTES

Moscow
January 19, 2000

"Trading House of the open joint-stock company "Vanadium", a limited liability company, hereinafter referred to as "the Seller", represented by N.I. Chervinsky, Acting General Director, acting on the basis of Minutes of the Board of Directors' Meeting of "Kachkanar GOK "Vanadium" open joint-stock company, dated February 11, 1999, on the one side,
AND
"Polyprom", a limited liability company, hereinafter referred to as "the Buyer", represented by G.M. Bukharin, General Director, acting on the basis of the Charter, on the other side,
commonly named "the Parties", have made this Act on the following.·

1. In pursuance of Par.2.1 of the Agreement No.3 on purchase and sale of securities dated January 18, 2000, the Seller has transferred and the Buyer has accepted the following promissory notes issued by the Savings bank of the Russian Federation (Petrov branch No. 5287, Moscow):

| Ref.No. | Notes value, Rbls. | Series | Number | Maturity |
|---------|---------|--------|--------|----------|
| 1 | 30000=00 | BC | 1054314 | on demand |
| 2 | 10000=00 | BC | 1054323 | on demand |
| 3 | 20000=00 | BC | 1054333 | on demand |
| 4 | 20000=00 | BC | 1054334 | on demand |
| 5 | 50000=00 | VP | 1077333 | on demand |
| 6 | 1300000=00 | VP | 1077321 | on demand |
| 7 | 650000=00 | BC | 1054565 | on demand |
| 8 | 828500=00 | VP | 0458145 | on demand |
| 9 | 650347=00 | VP | 0458192 | on demand |
| 10 | 1000000=00 | VP | 1936588 | February 1, 2000 |
| 11 | 500000=00 | VP | 1936535 | February 1, 2000 |
| 12 | 500000=00 | VP | 1936536 | February 1, 2000 |

In total twelve promissory notes of the total value of 5.558.847 (Five Million Five and Fifty Eight Thousand Eight Hundred and Forty Seven) Roubles have been transferred under this Act.

2. The signing of this Act by the authorized representatives of both Parties means that the Buyer has transferred and the Seller has accepted promissory notes indicated in Par. 1 of this Act and that the Parties have no claims related to transfer of promissory notes to each other.

3.  Because of transfer of promissory notes indicated in Par.1 of this Act by the Buyer to the Seller the obligation of the Buyer on payment for Securities acquired under the Agreement No.3 on purchase and sale of securities dated January 18, 2000 shall be considered fulfilled in full amount.

4.  This Act is made in two copies, one for each Party.


Buyer                                                                                    Seller

## АКТ
### приема-передачи векселей

г. Москва                                         «19» января 2000 г.

ООО «Торговый дом ОАО «Ванадий», именуемая в дальнейшем «Продавец», в лице Исполняющего обязанности Генерального директора Червинского Н. И., действующей на основании Протокола заседания совета директоров ОАО «Качканарский ГОК «Ванадий» от 11 февраля 1999 г., с одной стороны, и

ОАО «Полипром», именуемое в дальнейшем «Покупатель», в лице Генерального директора Бухарина Г. М., действующего на основании Устава, с другой стороны,

вместе именуемые в дальнейшем «Стороны», составили настоящий Акт о нижеследующем:

1. Во исполнение п. 2.1. Договора № 3 купли-продажи ценных бумаг от 18.01.2000 г. Покупатель передал, а Продавец принял следующие простые векселя, выданные Сберегательным банком Российской Федерации (Петровское отделение №5287 г. Москвы):

| № п/п | Вексельная сумма, руб | Серия | Номер | Срок платежа |
|-------|----------------------|-------|-------|--------------|
| 1 | 30000=00 | ВС | 1054314 | по предъявлении |
| 2 | 10000=00 | ВС | 1054323 | по предъявлении |
| 3 | 20000=00 | ВС | 1054333 | по предъявлении |
| 4 | 20000=00 | ВС | 1054334 | по предъявлении |
| 5 | 50000=00 | ВП | 1077333 | по предъявлении |
| 6 | 1300000=00 | ВП | 1077321 | по предъявлении |
| 7 | 650000=00 | ВС | 1054565 | по предъявлении |
| 8 | 828500=00 | ВП | 0458145 | по предъявлении |
| 9 | 650347=00 | ВП | 0458192 | по предъявлении |
| 10 | 1000000=00 | ВП | 1936588 | 1 февраля 2000 г. |
| 11 | 500000=00 | ВП | 1936535 | 1 февраля 2000 г. |
| 12 | 500000=00 | ВП | 1936536 | 1 февраля 2000 г. |

Всего по настоящему Акту передано двенадцать векселей общей вексельной суммой 5.558.847 (Пять миллионов пятьсот пятьдесят восемь тысяч восемьсот сорок семь) рублей.

2. Подписание настоящего Акта уполномоченными представителями обеих Сторон означает, что Покупатель передал, а Продавец принял векселя, указанные в п. 1 настоящего Акта, и что Стороны не имеют друг к другу претензий, связанных с передачей векселей.

3. В связи с передачей векселей, указанных в п. 1 настоящего Акта, Покупателем Продавцу обязанность Покупателя по оплате ценных бумаг, приобретенных по договору № 3 купли-продажи ценных бумаг от 18.01.2000 г., считается выполненной в полном объеме.

4. Настоящий Акт составлен в двух экземплярах по одному для каждой из Сторон.

Покупатель                                         Продавец

[p. 48]

AGREEMENT No. 3
For the Purchase and Sale of Securities

City of Ekaterinburg

January 18, 1999

OOO Torgovyi dom OAO Vanadii, represented by N. I. Chervinskii, hereinafter to be referred to as "the Seller", on one hand, and OOO POLIPROM, represented by the General Director, G. M. Bukharin, hereinafter to be referred to as "the Buyer", on the other hand, have entered into this agreement regarding the following:

## 1. SUBJECT OF THE AGREEMENT

1.1. The Seller shall sell securities and the Buyer shall be obligated to pay to the Seller the value of said securities and assume ownership thereof.

1.2. Information regarding the securities subject to purchase and sale in accordance with Section 1.1. of this Agreement:

Class (type) of securities:    Common nominal shares
State registration No.:         No. 62-111-290 of July [illegible], 1993
                                No. 62-1-1396 of June 12, 1996
Issuer: OAO Vanadii Mining and Milling Complex of Kachkanara
Number of shares: 2,307,984 (two million three hundred and seven thousand, nine hundred eighty-four) shares;
Amount of the Agreement: 5,558,847 (five million, five hundred fifty-eight thousand, eight hundred forty-seven) rubles

## 2. OBLIGATIONS OF THE PARTIES

2.1. The Buyer shall be obligated to pay the value of the above securities within 35 (thirty-five) banking days as of the moment of signing of this Agreement by the parties.

2.2. The Seller shall be obligated to deliver the securities indicated in Section 1.2 of this Agreement to the ownership of the buyer by means of signing an order of deliver regarding the above securities.

2.3. Payment by the Buyer pursuant to this Agreement may be done either in cash or in securities, including in promissory notes.

2.4. Transfer of the ownership right to the above securities shall be conducted by means of re-registration of the securities to the name of the Buyer in the issuer's register of shareholders.

2.5. Signing of the certificate of delivery and receipt shall be considered as factual implementation of the parties' obligations under this Agreement.

2.6. The Seller shall guarantee to the Buyer that the former is the owner of the above securities and that the above securities are not subject to a pledge or subject to the rights of third parties.

2.7. Pursuant to this Agreement, the ownership rights to those securities, to which the Seller has a right on the basis of an increase in the registered stock of the issuer of the above securities passed by the Board of Directors (Supervisory Board) or by the General Shareholders Meeting of the issuer shall also be transferred to the Buyer. Additional order of delivery for the delivery of securities to which the owner shall be entitled on the basis of an increase in the registered stock of the securities' issuer, or on the basis of a split, etc., shall not be necessary.

## 3. TERM OF THE AGREEMENT AND ORDER OF ITS AMENDMENT AND TERMINATION

3.1. This Agreement shall become effective as of the moment of its signing by both parties and shall be effective until its factual implementation.

3.2. Amendments shall be made upon coordination between the parties.

3.3. Disputes related to this Agreement on which the parties shall not be able to reach an understanding shall be resolved in accordance with the procedure set forth by the current laws of the Russian Federation.

## 4. LEGAL AND BANKING INFORMATION OF THE PARTIES

| | |
|---|---|
| OOO Torgovyi dom OAO Vanadii | OOO Poliprom |
| Republic of Kalmykia, Town of Elista, 249 Lenin Street, Suite 505 | Republic of Kalmykia, Town of Elista, 249 Lenin Street, Suite 505 |
| Taxpayer's ID: 0814072702 | Taxpayer's ID: 0814113973 |

## 5. SIGNATURES OF THE PARTIES

| | |
|---|---|
| SELLER | BUYER |
| [signature] | [signature] |
| [seal:] | G. M. Bukharin |
| Russian Federation, Republic of Kalmykia | [seal:] |
| Limited Liability Company, | Russian Federation, Republic of Kalmykia |
| Torgovyi Dom OAO VANADII | Limited Liability Company, [illegible] Poliprom |



# ДОГОВОР №3
купли-продажи ценных бумаг

г. Екатеринбург                                                                18 января 1999г.

ООО «Торговый дом ОАО «Ванадий» в лице Червинского Н.И., именуемое в дальнейшем "Продавец", с одной стороны, и ООО «ПОЛИПРОМ» в лице Генерального директора Бущрина Г.М., именуемое в дальнейшем "Покупатель", с другой стороны, заключили настоящий договор о нижеследующем:

## 1. ПРЕДМЕТ ДОГОВОРА.

1.1. Продавец продает ценные бумаги, а Покупатель обязуется оплатить Продавцу стоимость указанных ценных бумаг и принять их в собственность.

1.2. Сведения о ценных бумагах (далее ЦБ), являющихся предметом купли-продажи в соответствии с п. 1.1. настоящего договора:

Категория (тип) ценных бумаг - обыкновенные именные акции;
Номер государственной регистрации:    № 62-1П-290 от 12.07.93г. и
№ 62-1-1396 от 12.06.96г.
Эмитент: ОАО «Качканарский горно-обогатительный комбинат «Ванадий»;
Количество: 2.307.984 (два миллиона триста семь тысяч девятьсот восемьдесят четыре) штук;
Сумма договора: 5 558 847 (Пять миллионов пятьсот пятьдесят восемь тысяч восемьсот сорок семь) руб.

## 2. ОБЯЗАННОСТИ СТОРОН.

2.1. Покупатель обязуется оплатить стоимость вышеуказанных ценных бумаг, в течение 35 (Тридцати пяти) банковских дней с момента подписания сторонами настоящего договора.

2.2. Продавец обязуется передать в собственность покупателю ценные бумаги, указанные в п. 1.2. настоящего договора путем подписания передаточного распоряжения на вышеуказанные ценные бумаги 2.3. Оплата Покупателем по настоящему договору может осуществляться как денежными средствами, так и ценными бумагами, в т.ч. простыми векселями.

2.4. Переход права собственности на вышеуказанные ценные бумаги осуществляется путем перерегистрации ценных бумаг на имя Покупателя в реестре акционеров эмитента.

2.5. Фактом исполнения сторонами обязательств по данному договору является подписание акта приема-передачи ценных бумаг.

2.6. Продавец гарантирует Покупателю, что он является собственником вышеуказанных ценных бумаг, и что вышеуказанные ценные бумаги не являются предметом залога и предметом прав третьих лиц.

2.7. По настоящему договору к Покупателю переходят права собственности и на те ценные бумаги, на которые Продавец имеет право за счет увеличения уставного капитала эмитента вышеуказанных ценных бумаг, принятого Советом директоров (наблюдательным советом) или общим собранием акционеров эмитента. Дополнительного передаточного распоряжения на передачу ценных бумаг на которые имеет право собственник за счет увеличения Уставного капитала эмитента ЦБ, проблемия п.п. п. не требуется.

## 3. СРОК ДЕЙСТВИЯ ДОГОВОРА ПОРЯДОК ЕГО ИЗМЕНЕНИЯ И РАСТОРЖЕНИЯ.

3.1. Настоящий договор вступает в силу с момента подписания обеими сторонами и действует до фактического исполнения.

3.2. Изменения и дополнения вносятся по согласованию сторон.

3.3. Разрешение споров по настоящему договору, по которым стороны не смогли достигнуть взаимного соглашения осуществляется в порядке, предусмотренном действующим законодательством Российской Федерации.

## 4. ЮРИДИЧЕСКИЕ И БАНКОВСКИЕ РЕКВИЗИТЫ СТОРОН

ООО «Торговый дом ОАО «Ванадий»                ООО «Полипром»
Республика Калмыкия, г.Элиста, ул.Ленина, д.249,    Республика Калмыкия, г.Элиста, ул.Ленина, д.249,
ком.505                                                                ком.505
ИНН 0814072702                                                    ИНН 0814113973

## 5. ПОДПИСИ СТОРОН

ПРОДАВЕЦ                                                                ПОКУПАТЕЛЬ

КОПИЯ ВЕРНА

In the name of the Russian Federal

# DETERMINATION

The city of Elista

Case No. A22-1222/2000/6-109

22 November 2000

The Arbitrazh Court of the Republic of Kalmykia, in the composition of:

Presiding Judge Loginov S.N.

Judges:

Considered in a court session the suit of OAO "Kachkanar Mineral Processing Combine "Vanadium" (hereinafter, the Combine) against OOO "Trading House OAO "Vanadium" (hereinafter, the Trading House) and OOO "Polyprom" (hereinafter, the OOO) concerning the recognition as void the agreement of purchase and sale of securities of 18 January 1999 and the conveyance instructions of re-registration of the Combine's stock in the amount of 2 307 984 items for 5 558 847 rubles from the Trading House to the OOO and reinstatement of the entry of ownership of the disputed stock in the bankbook of the Trading House with the participation in the session of:

From the Plaintiff: Shumakov R.A. by Power of Attorney No.72-360/10p of 30 October 2000

From the Respondent: Plotnikov V.A. by Power of Attorney No.28 of 08 November 2000,

From OOO "Polyprom": not attended the session;

From the third party: Kapura S.M., AOZT "Maintenance of Company Registers"

Has established:

Due to violations of the legislation in force at the disposal of shares, the Combine resorted to the Arbitrazh Court with a suit of recognition as void of the agreement of purchase and sale of securities of 18 January 1999 and the conveyance instructions of 20 January 2000 to write-off from the bankbook of the Trading House to the OOO's account the Combine's stock, issuance No. 62-III-290 of 12 July 1993 in the amount of 2 307 984 items for 5 558 847 rubles and the reinstatement in the bankbook of the Combine's shareholders register of the registration entry of the Trade House's ownership of the said stock.

In the court session, the Combine's representative supported the claim and explained that the agreement of purchase and sale of the Combine's stock and the conveyance instructions by the

Trading House were signed by Chervinsky N.I. who at the performance of such actions was not the general director of the Trading House and was not properly authorized. Herewith, proceeding from the value of the disposed stock, the said transaction was large for the Trading House and, under the current legislation the approval of the general meeting of the company's founders is required to conclude such transaction. However, it was not done despite the fact that the Combine's Board member Zanodvornov A.V. who concurrently was an authorized representative of one of the OOO's founders (KEMPL Company) was authentically aware of that. In virtue of that, the concluded transaction does not lead to legal consequences for the parties and the OOO thereby took possession of the disputed shares illegally.

The representative of the Trading House acknowledged the claim and stated that at the conclusion of the agreement, Mashkovtzev E.A. was the general director of the Trading House, and at the forwarding of the conveyance instructions the general director was Khalmirzaev S.A. Thereby, as Chervinsky did not have proper authorities he was not entitled to sign the above-said instruments. Furthermore, the transaction of stock disposal was large for the Trading House, thus it required the approval of the Combine, which was not obtained. Thereby, the shares are to be returned to the Trading House.

The representative of the OOO failed to attend the court session, despite proper notification of the time and location of the dispute consideration. In connection with it and taking in consideration the fact that the case papers have information sufficient to demonstrate the positions of the parties, the arbitrazh court thinks it virtual to consider the case in absentia of the OOO's representative.

The representative of the third party AOZT "Maintenance of Company Registers" acknowledged the claim and explained that it was unaware of violations that took place at registration of the shares under the agreement of purchase and sale of 18 January 1999. Thereby, appropriate measures shall be taken subject to the court decision.

Having heard the opinions of the parties and having studied the case papers, the Arbitrazh Court found that on 18 January 1999 the Trading House and the OOO entered into Agreement No. 3, according to which the Trading House undertook the obligation to convey to the OOO the Combine's registered common shares of issuance No. 62-III-290 of 12 July 1993 in the amount of 9759 items for 23 504.80 rubles and of issuance No. 62-I-1396 of 12 June 1996 in the amount of 2 298 225 items for 5 535 342.20 rubles with the total number of 2 307 984 items for 5 558 847 rubles and the OOO undertook the obligation to pay up the stock value within 35 banking days following the signing of the agreement by the parties both in monetary means and in securities, including in promissory notes.

On 20 January 2000, : Trading House sent to ZAO Registr Company "Panorama", the holder of the Combine's shareholders register, the conveyance instructions of re-registration of the stock under Agreement No. 3 of 18 January 1999 to the OOO.

On 21 January 2000, ZAO "Registrar Company "Panorama" made appropriate changes in the shareholders register.

Under Article 53 of the Civil Code of the Russian Federation, a judicial person obtains legal rights and undertakes civil duties through its bodies acting pursuant to the law, other legal acts and constituent documents.

Under Paragraph 4.6 of the Trading House's charter, the general director is entitled to enter into agreements.

The case papers demonstrate that Chervinsky signed the agreement and the conveyance instructions on behalf of the Trading House.

Meanwhile, as was found in the court session, at the conclusion of the agreement (18 January 1999) and at the forwarding of the conveyance instructions (20 January 2000) Mashkovtzev E.A. and Khalmirzaev S.A., accordingly, were the general directors of the Trading House.

As the representatives of the Combine and the Trading House explained it, prior to the dismissal of Mashkovtzev, other persons of the Combine and the Trading House were signed by an unauthorized person.

Under Article 183 of the Civil Code of the Russian Federation if a person is not authorized to act on behalf of another person or if a person exceeds such authorities, the transaction is considered as concluded on behalf and for the person that concluded such transaction, unless the other person (the represented person) expressly approves of that transaction afterwards.

Under the circumstances, the Arbitrazh Court finds that as the agreement was entered into by an unauthorized person and it was approved neither by the Combine, nor the Trading House, the agreement may not lead to legal consequences for the parties.

Pursuant to Article 46 of the Federal Law No. 14-FZ "On Limited Liability Companies" of 08 February 1998, the large transaction is a transaction or a number of interrelated transactions associated with purchase, disposal and possible disposal by the company of property, both directly and indirectly, having the value of more than 25% of the company's property value calculated on the basis of the reports for the last reporting period that preceded the date of the decision to negotiate such transactions.

The case papers demonstrate that the value of the disposed figures amounted to 5 558 847 rubles and the property value of the Trading House was 122 285 903 rubles.

Herewith, the transaction of the Combine's stock disposal does not constitute the transaction concluded in the course of regular business activity of the company as the Trading House is not a professional stock market actor and its charter does not stipulate operations with securities as the main type of activity.

Under the circumstances, the Arbitrazh Court finds that the Trading House and the OOO concluded a large transaction of the Combine's stock disposal.

Under Article 168 of the Civil Code of the Russian Federation, a transaction that is incompliant with the provisions of the law and other legal acts is void, unless the law stipulates that such transaction is traversable.

Under Paragraphs 3 and 5 Article 46 of the Federal Law "On Limited Liability Companies", the general meeting of the company's participants makes the decision to conclude a large transaction. Herewith, a large transaction concluded with violations of the provisions of this article may be recognized as void under the claim of the company or its participant.

The case papers demonstrate that the OOO is the sole participant.

However, the management of the Combine neither made the decision of the stock sale by the Trading House to the OOO, nor approved of the concluded transaction afterwards, pursuant to Article 39 of the Federal Law "On Limited Liability Companies".

Furthermore, by the decision of the Combine's Board of Directors of 18 January 1998, the sale of the Combine's stock to alien organizations was prohibited.

In the court session it was found that the founders of the OOO are Bukharin G.M. and Company "KEMPL" with Zanodvornov A.V. being its authorized representative who signed the constituent agreement on its behalf. Herewith, Zanodvornov A.V. was the Combine's Board member at the signing of the agreement of purchase and sale of 18 January 1999.

In virtue of that, when entering into the agreement of stock sale, the OOO must have known that an unauthorized person signed the agreement and the transaction was concluded without an appropriate approval of its founder.

Under the circumstances and taking into consideration that the stock book-value amounts to 45% of the property value of the Trading House, and the transaction of stock disposal was concluded by an unauthorized person and without consent and an appropriate approval of the

founder, the arbitrazh    urt finds that the purchase and sale trai    ction of the Combine's stock is void.

The voidance of the purchase and sale transaction leads to recognition as void of all subsequent transactions with the stock, including the stock's re-registration from the Trading House to the OOO.

Based on the set forth and being guided by Articles 124-127 of the Arbitrazh Procedure Code of the Russian Federation, the Arbitrazh Court has determined:

- To satisfy the claim of OAO "Kachkanar Mineral Processing Combine "Vanadium";

1. To recognize as void Agreement of Purchase and Sale No. 3 of 18 January 1999 entered into by OOO "Trading House OAO "Vanadium" and OOO "Polyprom".

2. To recognize as void the conveyance instructions of 20 January 2000 of the write-off from the bankbook of OOO "Trading House OAO "Vanadium" of the registered common shares of OAO Kachkanar Mineral Processing Combine "Vanadium" of issuance No. 62-III-290 of 12 July 1993 in the amount of 9759 items and of issuance No. 62-I-1396 of 12 June 1996 in the amount of 2 298 225 items.

3. The holder of the shareholders register of OAO "Kachkanar Mineral Processing Combine "Vanadium" AOZT "Maintenance of Company Registers" is to reinstate in the register of owners of registered common securities of OAO "Kachkanar Mineral Processing Combine "Vanadium" the record in the bankbook of OOO "Trading House OAO "Vanadium" that it owns registered common shares of OAO "Kachkanar Mineral Processing Combine "Vanadium" of issuance No. 62-III-290 of 12 July 1993 in the amount of 9759 items and of issuance No. 62-I-1396 of 12 June 1996 in the amount of 2 298 225 items

4. To exact the expenses on the state duty in favor of OAO "Kachkanar Mineral Processing Combine "Vanadium" from OOO "Trading House OAO "Vanadium" in the amount of 834.90 rubles and from OOO "Polyprom" in the amount of 834.90 rubles.

To issue execution orders upon the determination comes into legal force.

This determination may be appealed by the parties within one month after the date hereof to the appeal authority of the Arbitrazh Court of the Republic of Kalmykia.


Judge: Loginov S.N.