84. On or about August 11, 2000, Kozyrev held the first meeting of creditors where Lebaut's fraudulent claim amounted to 94% of creditor votes. As a result of the first creditors meeting, Kozyrev was nominated as external manager of GOK. Under Russian Law, an external manager has management authority over a company. Thus, the appointment allowed the Conspirators to avoid the risk that a court could invalidate the decision to remove Khaidarov and return him to the position of the general director of GOK as well as give them time for the subsequent conversion of GOK shares from the Plaintiff companies.

85. Shortly thereafter, on August 22, 2000, the court held a hearing to approve the decision of the first meeting of the creditors to appoint Kozyrev as external manager.

86. The Sverdlovsk Oblast government, controlled by Roussel, filed a petition in support of the approval of the appointment of Kozyrev in order to send a signal to the court, which approved the appointment of Kozyrev.

87. As shareholders, Plaintiffs had no standing under the Russian bankruptcy law to challenge these actions.

### The Fraudulent Transfers of Plaintiffs' Shares in GOK

88. After Kozyrev was appointed as external manager in August 2000, the Conspirators arranged for Plaintiffs to be removed from the registry of GOK shareholders and for their shares to be transferred secretly to Delaware shell companies New Start and Venitom and other companies controlled by the Conspirators. This tactic is a relatively common method in Russia by which organized crime groups seize control of economic enterprises.

## The Davis Shares

89. On or about September 30, 2000, the Conspirators had Kozyrev change the registrar of shares of GOK to VRK Company, a registration company controlled by the Conspirators through UGMC, which was a shareholder of VRK.

90. On or about October 18, 2000, the VRK Company registered a transfer of 35,106,022 shares of GOK from Davis to New Start, which constituted 18.39% of issued and outstanding GOK shares and all of the shares owned by Davis.

91. In order to cloak the transfer with the appearance of legitimacy, the Conspirators arranged for Mr. Ashenbrenner, a prior agent of Davis, to submit to VRK an invalid, not notarized and unauthorized power of attorney which purportedly authorized him to transfer shares from Davis to New Start. The only power of attorney that has ever been issued to Ashenbrenner had been revoked on or about September 28, 2000 -- three weeks before the fraudulent transfer. VRK, according to its own Charter, improperly accepted the transfer order signed by Ashenbrenner even though the order was not executed with Davis' corporate seal and the power of attorney issued from the name of the company and submitted by Ahsenbrenner was not an original document.

92. Furthermore, in order to give the transfer of the Davis shares appearance of legality, the Conspirators, on or about October 20, 2000, arranged for New Start to make a wire transfer in the amount of $2 million to the order of Davis' account with MDM Bank through an American bank. The same day, the Conspirators arranged for MDM Bank to wire the above $2 million from Davis' MDM Bank account. This transfer was based on a forged payment order executed by Ashenbrener. The order was not executed with Davis' corporate seal. At no time did Davis authorize Ashenbrener to execute any payment orders on its behalf.

93. Moreover, Davis would never agree to sell its 35 million shares constituting 18.39% of all issued and outstanding GOK shares for $2 million.

94. The Davis shares, in whole or in part, were registered in the names of New Start and Venitom. There has never been litigation related to the Davis Shares.

### Omni's Shares

95. Prior to 2000, Omni purchased its shares in GOK from various entities that had acquired the shares as a result of a judicial sale that occurred in September 1998. As the result, Omni accumulated 34,031,114 shares, which constituted 17.83 % of issued and outstanding GOK shares.

96. In the spring of 2000, unbeknownst to Omni, NPRO Urals, a company controlled by the Conspirators, filed a lawsuit in the obscure Chelyabinsk Arbitrazh Court to set aside the judicial sale. On August 1, 2000, the Court ruled in favor of NPRO Urals and ordered that the shares be re-registered in the name of NPRO Urals. By decision dated October 16, 2000, the appellate division of the court likewise ordered that the shares be re-registered in the name of NPRO Urals, which occurred on or about November 15, 2000. This order was affirmed by the Federal Court for the Ural District on January 4, 2001.

97. As a result, Omni was divested of 10,583,063 shares, which constituted 5.54 % of the issued and outstanding GOK shares.

98. Contrary to Russian law, Omni, the owner of shares, was never notified of or participated in these proceedings and did not learn of the transfer of its shares until two months after it took place. Court ordered transfer of property of persons who are not named as parties and not provided notice or an opportunity to be heard in violation of Russian law is emblematic of corruption in Russia.

99. After Omni had learned of the transfer of its shares, its representative appeared at the January 4, 2001 hearing and petitioned to make Omni a party to the proceedings. This request was denied; thus, Omni has never been party to the proceedings even though its shares were transferred.

100. Several defendants in the NPRO Urals lawsuit, who had sold the shares to Omni, filed applications for protest at the Supreme Arbitrazh Court of the Russian Federation, seeking to reverse these decisions. Two of the applications were denied on February 12, 2001, and May 21, 2001, by Judge Arifulin, and another application was denied on July 4, 2001, by Judge Yukov.

101. In *Films By Jove v. Berov*, 2003 U.S. Dist. LEXIS 6233 (E.D.N.Y. Apr. 16, 2003), Judge Trager of the Eastern District of New York found that a decision in which Judge Arifulin was involved was obtained through corruption.

102. Omni's shares were registered in whole or in part in the name of Venitom and other companies controlled by Conspirators, even though it was not named and did not participate in the proceeding.

103. On information and belief, Venitom "paid" for these shares with monies wired through an American bank.

### Foston's Shares

104. As of September 2000, Foston owned 37,799,600 shares, which constituted 19.8% of issued and outstanding GOK shares.

105. In 2000, three companies owned and controlled by the Conspirators sued Foston in Moscow, seeking to invalidate the sale of shares to Foston. Foston was never notified of the

proceedings and, instead, a forged power of attorney was submitted to the court purportedly on behalf of Foston; presumably, an impostor appeared on behalf of Foston.

106. On September 29, 2000, absent any opposition, the court ordered the transfer of 37,715,081 of the Foston's GOK shares which consisted of 19.75% of the Gok shares to the Conspirators' companies. Subsequently, on October 18, 2000 the transfer has been registered on the books of the registrar company VRK controlled by UGMC.

107. Only in October 2000, Foston accidentally learned of the transfer of its shares. When Foston attempted to investigate what had occurred, the court files were stolen.

108. Although a final decision of the Russian court compelling the return of these shares was entered in October 30, 2003, the Conspirators in the person of new owners of the stolen shares did not honor the decision. The shares had been transferred by the Russian companies controlled by the Conspirators to other companies, including Venitom. On information and belief, Venitom "paid" for these shares with monies wired through an American bank.

### Holdex's Shares

109. As of September 25, 2000, Holdex owned 30,947,386 shares, which constituted 16.21% of issued and outstanding GOK shares.

110. In late 2000, GOK filed a suit in the Kalmykia Arbitrazh Court against Polyprom, the company that sold its GOK shares to Holdex, to declare that the sale of shares to Polyprom, which it later sold to Holdex, was invalid. By order dated November 22, 2000, the Court ruled in favor of GOK which the Conspirators then controlled and ordered that the shares be re-registered to another Russian company, which occurred on or about December 22, 2000. As the result,

Holdex was divested of 2,307,984 shares, which constitutes 1.2 % of the issued and outstanding shares.

111. Contrary to Russian law, neither Polyprom nor Holdex were notified of, and did not participate in, the proceedings; in fact, Holdex was not even originally named as a defendant in the suit, but was only added as a defendant later upon the demand of Holdex itself after the fact of transfer of its shares. Again, court ordered transfers of property belonging to persons who were not named as parties and not provided notice or an opportunity to be heard, in violation of Russian law, which is emblematic of corruption in Russia.

112. Polyprom and Holdex did not learn about the decision until about two months after it was rendered.

113. Subsequently, hearings have taken place in the Russian courts for which Holdex never received notice; thus Holdex never participated in these proceedings.

114. Ultimately, the shares purchased by Holdex were transferred in whole or in part to Venitom and other companies controlled by Conspirators. On information and belief, Venitom "paid" for these shares with monies wired through an American bank

### The Bankruptcy "Settlement Agreement"

115. After the fraudulent transfer of shares was completed and the Conspirators no longer needed the bankruptcy proceedings, they decided to terminate the bankruptcy by having GOK enter into a settlement agreement with creditors.

116. To that end, on or about March 3, 2001, Kozyrev held a Second Meeting of Creditors. At the meeting, based on Lebaut's huge claim, the creditors approved a sham settlement agreement that, provided that the payments to creditors would be effected without

interest pursuant to the following schedule: 5% in 2006, 7% in 2007, 9% in 2008, 9% in 2009, 10% in 2010, and 15% each year thereafter until paid.

117. The GOK sham settlement agreement was intended to make the debt owed to legitimate creditors worthless while transferring control of GOK to the "new" shareholders. Shareholders had no standing to challenge this agreement under Russian bankruptcy law.

### The False Criminal Charges Against Khaidarov

118. In retaliation for the filing of the Russian litigation to set aside the fraudulent transfer of the shares, the Conspirators arranged for false criminal charges to be brought against Khaidarov.

119. In July 2000, false criminal charges were filed as a result of a well-publicized incident in which the police planted drugs on Khaidarov while he was at the Starlight Diner in Moscow. The police asked Khaidarov for his passport and then "found" a packet of heroin inside. False charges of rape were also brought against Khaidarov.

120. As a result of these false charges and threats on his life, Khaidarov was forced to flee Russia in November 2000 and now lives in Israel under police protection, where he is cooperating with the Israeli, as well as American, authorities in their investigation of Chernoi and his associates.

### The Illegal Detention of Traum

121. Joseph Traum ("Traum") was a managing director of Davis and was also authorized to represent the interests of several other GOK shareholders, including Holdex and Omni.

122. Subsequent to the illegal takeover of GOK in January 2000, Traum had numerous conversations with Makmudov and Chernoi, during which Makmudov demanded that Traum sell them all of Davis' Gok shares or he would lose his "freedom."

123. In March 2001, after Makmudov and Aschenbrenner had arranged the theft of all of the Gok shares from Davis, Makmudov threatened Traum with huge problems if he continued to challenge the theft of the shares.

124. One month later, in April 2001, Traum was in his office in Moscow when Russian police (i.e. special forces) came to his office and directed people to lay on the floor. The police announced that they had information that Traum was a drug dealer, and that there were drugs hidden in the office. The police then put a big package on Traum's desk which they said contained a kilo of heroin. Within a few minutes, Makmudov called Traum and said, "Are you convinced? Now you can face 18 years in jail, or you can go to the airport and leave Russia."

125. A secretary from the office called Khaidarov in Israel to inform him what was occurring. Khaidarov then called the Israeli police to request immediate assistance. Shortly thereafter, the Russian police received a telephone call while in Traum's office and then said he would be free to go. Apparently, Israeli officials interceded on behalf of Traum.

126. Later, Makmudov called Traum and said that Traum had left him no choice and now he would have to eliminate him. Traum reported this to the Israeli police, who recommended that Traum immediately leave Russia, which he did. He is also cooperating with the authorities in their investigation of Chernoi and his associates.

### The Final Step to Consolidate the Conspirators' Control Over GOK

127. In 2003, the Conspirators arranged for GOK to issue new shares in an amount equal to all previously issued shares to companies which they controlled.

128. As of May 31, 2001, Holdex owned 14.99%, Omni owned 12.28%, and Foston owned 0.044% totaling to about 27% of all of then issued and outstanding GOK shares.

129. The purpose of this was to dilute the Plaintiffs' remaining shares, since at the relevant time Plaintiffs still owned a blocking amount of GOK shares because under Russian law certain corporate decisions require the approval of 75% plus 1 of the voting shares.

130. Upon information and belief, the Conspirators used profits obtained from their control of GOK to purchase the newly issued shares. Upon information and belief, payment was made through fraudulently obtained funds which were wired to GOK or MDM Bank, directly or indirectly, in dollar denominated amounts through banks in the United States.

131. Ultimately, the Gok shares illegally taken from Plaintiffs were "sold" to UGMC which then "sold" the shares to EVRAZ in 2004.

132. Specifically, according to media reports in 2004, the Conspirators via UGMC, which they control, "sold" their controlling interest in GOK, which was illegally taken from Plaintiffs for $500 million, to EVRAZ.

133. In an attempt to further consolidate their control of GOK, the Conspirators, through intermediaries, approached Holdex and Omni with an offer to purchase their GOK shares. Ultimately, a block of about 52 million shares constituting about 13.64 % of issued and outstanding GOK shares was sold for about $27.7 million.

134. After conclusion of the transaction, Holdex and Omni learned that the shares ultimately end up in the hands of the Conspirators. Apparently, the Conspirators are seeking access to Western financing or equity investment and, thus, are seeking to eliminate minority shareholders through legal means.

### The Predicate Acts of Racketeering

135. Defendants committed numerous predicate acts forming a pattern of racketeering, including extortion, bribery, money laundering, illegal transactions in monetary instruments, violations of the Travel Act, and mail and wire fraud, described above.

136. The pattern of racketeering began no later than the early 1990's and continues through the current date.

### The Enterprises

137. New Start, Venitom, Pan-American, GOK, MDM, UGMC, and EVRAZ, as well as the Delaware Real Estate Entities, each constitute an enterprise pursuant to 18 U.S.C. 1961(4), which engaged in and effected interstate and foreign commerce in the United States.

### COUNT I
### Violation of RICO 18 U.S.C. § 1962(a)
### (Against New Start, Venitom, Pan-American, Chernoi, Deripaska, Makmudov and Nekrich)

138. The allegations of the above paragraphs are incorporated herein as if set out in full.

139. Defendants received income from a pattern of racketeering, as described above.

140. The pattern included predicate acts of bribery, extortion, money laundering, illegal transactions in monetary instruments, violations of the Travel Act, and mail and wire fraud.

141. A part of such income or its proceeds were used, directly or indirectly, to acquire an interest in GOK and to operate GOK through the Illegal Takeover and conversion of Plaintiffs' shares, in violation of 18 U.S.C. §1962(a).

142. As a direct and proximate result of Defendants' use and investment of racketeering income in the Illegal Takeover of GOK and loss of their shares, Plaintiffs have suffered damages in an amount in excess of $500 million.

### COUNT II
### Violation of RICO 18 U.S.C. § 1962(b)
### (Against MDM Bank, New Start, Venitom, Pan-American, UGMC, Chernoi, Deripaska, Kislin, Makmudov and Nekrich)

143. The allegations of the above paragraphs are incorporated herein as if alleged in full.

144. Pursuant to the Illegal Scheme, MDM Bank, New Start, Venitom, Pan-American, UGMC, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich engaged in a pattern of racketeering activity specifically directed at acquiring and maintaining control of GOK, in violation of 18 U.S.C. § 1962(b).

145. This pattern of racketeering activity resulted in their gaining control of GOK.

146. The pattern included predicate acts of bribery, extortion, money laundering, illegal transactions in monetary instruments, violations of the Travel Act, and mail and wire fraud.

147. As a direct and proximate result of the takeover of GOK, Plaintiffs have suffered damages in an amount in excess of $500 million.

### COUNT III
### Violation of RICO 18 U.S.C. § 1962(c)
### (Against New Start, Venitom, Pan-American, UGMC, EVRAZ Chernoi, Deripaska, Kislin, Makmudov and Nekrich)

148. The allegations of the above paragraphs are incorporated herein as if set out in full.

149. Pursuant to the Illegal Scheme, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich operated and managed the New Start, Venitom, Pan-American, and, with the exception of Nekrich, the Delaware Real Estate Entities enterprises through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

150. Pursuant to the Illegal Scheme, New Start, Venitom, UGMC, EVRAZ, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich operated and managed the GOK enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

151. Pursuant to the Illegal Scheme, Chernoi, Deripaska, Makmudov, and Nekrich operated and managed the MDM Bank, UGMC, and EVRAZ enterprises through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

152. The pattern included predicate acts of bribery, extortion, money laundering, illegal transactions in monetary instruments, violations of the Travel Act, and mail and wire fraud.

153. The pattern of racketeering activity included the commission of two or more predicate acts of racketeering from 1993 through the current date, in violation of 18 U.S.C. §1962(c).

154. As a direct and proximate result of Defendants' misconduct, Plaintiffs have suffered damages in an amount in excess of $500 million.

**COUNT IV**
**Violation of 18 U.S.C. § 1962(d)**
**(Against New Start, Venitom, Pan-American, MDM Bank, UGMC, EVRAZ,**
<u>**Chernoi, Deripaska, Kislin, Makmudov and Nekrich)**</u>

155. The allegations of the above paragraphs are incorporated herein as if set out in full.

### Conspiracy to Violate § 1962(a)

156. Pursuant to the Illegal Scheme, MDM Bank, New Start, Venitom, Pan-American, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich conspired among themselves, and with others, including Malevsky, to use the monies received from a pattern of racketeering, as detailed above, to directly or indirectly, to acquire an interest in GOK and to operate GOK through the Illegal Takeover and conversion of Plaintiffs' shares in GOK, in violation of 18 U.S.C. § 1962(a).

### Conspiracy to Violate §1962(b)

157. Pursuant to the Illegal Scheme, MDM Bank, New Start, Venitom, Pan-American, Chernoi, UGMC, Deripaska, Kislin, Makmudov, and Nekrich conspired among themselves, and with others, including Malevsky, who acted as Defendants' agent, to violate 18 U.S.C. § 1962(b) by taking over GOK through a pattern of racketeering activity.

### Conspiracy to Violate § 1962(c)

158. Pursuant to the Illegal Scheme, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich conspired among themselves, and with others, to violate 18 U.S.C. § 1962(c) by operating and managing New Start, Venitom, Pan-American, and, with the exception of Nekrich, the Delaware Real Estate Entities through a pattern of racketeering activity.

159. Pursuant to the Illegal Scheme, MDM Bank, New Start, Venitom, Pan-American, UGMC, EVRAZ, Chernoi, Deripaska, Kislin, Makmudov, and Nekrich conspired among themselves, and with others, including Malevsky, who acted as Defendants' agent, to violate 18 U.S.C. § 1962(c) by operating and managing GOK through a pattern of racketeering activity.

160. Pursuant to the Illegal Scheme, Chernoi, Deripaska, Makmudov, and Nekrich among themselves, and with others, to violate 18 U.S.C. § 1962(c) by operating and managing MDM Bank, UGMC, and EVRAZ through a pattern of racketeering activity.

161. Defendants knowingly agreed among themselves to commit and did commit at least two Predicate Acts in furtherance thereof of each of the conspiracies within a ten year period.

162. As a direct and proximate result of the above conspiracies, Plaintiffs have suffered damages in an amount in excess of $500 million.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

a. Awarding compensatory damages in excess of $500 million;

b. Awarding treble damages under RICO in excess of $1.5 billion;

c. Awarding costs and attorney fees under RICO; and

d. Granting such other relief as is just and proper.

OF COUNSEL:

MARKS & SOKOLOV, LLC
Bruce S. Marks
1835 Market Street - 6th Floor
Suite 625
Philadelphia, PA 19103
(215) 569-8901

THE BAYARD FIRM

_/s/ Kurt M. Heyman_

Kurt M. Heyman (# 3054)
Patricia L. Enerio (# 3728)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, Delaware 19899
(302) 655-5000
Email: Kheyman@bayardfirm.com
Email: Penerio@bayardfirm.com

Attorneys for Plaintiffs

Dated: April 26, 2005

## CERTIFICATE OF SERVICE

Kurt M. Heyman, Esquire hereby certifies that on April 26, 2005, copies of the foregoing First Amended Complaint were served electronically and via hand delivery on counsel listed below:

Richard I.G. Jones, Jr., Esquire
Ashby & Geddes
222 Delaware Avenue, 17th Floor
Wilmington, DE 19899

Charles M. Oberly, III, Esquire
Karen V. Sullivan, Esquire
Oberly, Jennings & Rhodunda, P.A.
800 Delaware Avenue, Suite 901
Wilmington DE 19899

Collins J. Seitz, Jr., Esquire
Kevin F. Brady, Esquire
Connolly Bove Lodge & Hutz, LLP
1007 North Orange Street
Wilmington, DE 19899

William M. Lafferty, Esquire
Morris, Nichols, Arsht & Tunnell
Chase Manhattan Centre, 18th Floor
1201 North Market Street
Wilmington, DE 19899-1347

_____
Kurt M. Heyman

585317v1