# RISK FACTORS

*An investment in the GDRs involves a high degree of risk. Prospective investors in the GDRs should carefully consider the risks described below and the other information contained in this Offering Circular before making a decision to invest in the GDRs. Any of the following risks could adversely affect Evraz's business, financial condition and results of operations, in which case the trading price of the GDRs could decline, resulting in the loss of all or part of an investment in the GDRs.*

## RISKS RELATING TO EVRAZ

**The steel and mining industries are cyclical, and any local or global downturn in the steel or mining industries may have an adverse effect on Evraz's results of operations and financial condition.**

The steel industry is cyclical because the industries in which steel customers operate are themselves cyclical and sensitive to changes in general economic conditions. The demand for steel products is thus generally correlated with macroeconomic fluctuations in the economies in which steel producers sell products which are in turn affected by global economic conditions. The prices of steel products are influenced by many factors, including demand, worldwide production capacity, capacity-utilization rates, raw material costs, exchange rates, trade barriers and improvements in steel-making processes. For example, steel prices have recently been driven to a significant extent by demand in China for imported steel and reached their highest levels in nearly 20 years during 2004. Simultaneously, global steel production volumes have reached their highest levels in the past fifty years. A decline in Chinese demand for imported steel could have a significant adverse effect on steel prices. Steel prices have experienced, and in the future may experience, significant fluctuations as a result of these and other factors, many of which are beyond Evraz's control. A decline in steel prices could have a material adverse effect on Evraz's results of operations.

Evraz's mining business also sells iron ore, and, as a result of the acquisition of Mine 12 and development of Neryungri Ugol, coking coal, to third parties. Cyclical and other changes in world market prices of these commodities could affect the results of Evraz's mining activities. Changes in these prices result from factors that are beyond Evraz's control, such as fluctuations in global supply and demand and transportation costs. Prices of these commodities have varied significantly in the past and could vary significantly in the future, and are also positively correlated to demand from steel producers. For example, prices of both iron ore and coking coal have increased significantly in recent years to reach their highest levels since the late 1990s, largely as a result of increasing global demand by steel producers. A decline in the prices of the commodities Evraz sells to third parties could have an adverse effect on its results of operations. A decline in steel prices could also adversely affect Evraz's customers for these commodities, in turn resulting in reduced demand for Evraz's products.

Evraz derived approximately 55% of its total consolidated revenue from sales to customers in Russia in 2004. The Russian economy has experienced significantly fluctuating growth rates over the past ten years. From 1994 to 1998, the Russian economy contracted in real terms at an average rate of 3.7% per year; after the Russian financial crisis in 1998, the economy recovered and grew in real terms at an average rate of approximately 6.9% annually from 2000 to 2004, and grew by 7.1% in real terms in 2004. Production of steel in Russia also suffered a substantial decline from over 77 million tonnes in 1991 to 44 million tonnes in 1998, but then recovered to 64 million tonnes in 2004. Similarly, production of iron ore in Russia decreased from 82 million tonnes in 1992 to 71 million tonnes in 1997 before recovering to 93 million tonnes in 2004, and production of coal in Russia decreased from 92 million tonnes in 1990 to 52 million tonnes in 1998, before recovering to 75 million tonnes in 2004. Further, Evraz's steel products in Russia are mainly used in the rail and construction industries, which are particularly vulnerable to general economic downturns. The majority of Evraz's exports are to Asia and the Middle East and the economies of these areas, like Russia's, are relatively volatile. Accordingly, any significant decrease in demand for steel products or decline in the price of these products in Russia or in Evraz's principal export markets could result in significantly reduced revenues, thereby materially adversely affecting Evraz's business, financial condition and results of operations.

**The steel industry is highly competitive, and Evraz may not be able to compete successfully.**

Evraz faces competition from Russian and foreign steel manufacturers. A number of its Russian competitors are undertaking modernisation and expansion plans, which may make them more efficient or allow them to develop new products. Evraz also faces price-based competition from steel producers in

emerging market countries, including Ukraine in particular. Recent consolidation in the steel sector globally has also led to the creation of several large global steel producers, including Arcelor and Mittal Steel. These and many other large international steel companies have greater financial resources and more extensive global operations than Evraz. Moreover, the steel industry has historically suffered from production overcapacity. Increased competition from Russian or international steel producers could result in more competitive pricing, adversely affecting Evraz's results of operations and prospects.

**Evraz has grown rapidly in a relatively short period and its strategy foresees continued integration of its steel making and mining operations as well as further acquisitions, but it is not certain that Evraz will be successful in its integration efforts or in identifying suitable acquisition targets.**

Evraz has grown rapidly in a short period of time primarily through acquisitions of additional assets, and its strategy is based on its ability successfully to integrate these acquisitions in order to enhance its position as a vertically integrated steel and mining group.

The integration of newly acquired businesses may be difficult for a variety of reasons, including differing culture or management styles, poor records or internal controls and difficulty in establishing immediate control over cash flows. As a result, the need to integrate recently acquired assets, such as KGOK and Evraz Ruda, and potential future acquisitions of additional assets, poses significant risks to Evraz's existing operations, including:

- additional demands placed on Evraz's senior management, who are also responsible for managing Evraz's existing operations;
- increased overall operating complexity of Evraz's business, requiring greater personnel and other resources;
- significant cash expenditures to integrate recent acquisitions;
- incurrence of additional debt to finance acquisitions and higher debt service costs related thereto; and
- the ability to attract and retain sufficient numbers of qualified management and other personnel.

Moreover, Evraz may not be able to identify suitable acquisition targets, and future acquisitions may not be available to Evraz on terms as favourable as in the past. Evraz faces significant competition for potential acquisitions, particularly for mining assets. When making acquisitions it may not be possible for Evraz to conduct a detailed investigation of the nature of the assets being acquired, for example due to time constraints in making the decision and other factors. Evraz may also become responsible for additional liabilities or obligations not foreseen at the time of an acquisition.

Any failure to conclude acquisitions in the future or successfully to integrate past or future acquisitions could adversely affect Evraz's business, financial condition and results of operations. Moreover, even if Evraz is successful in integrating newly acquired assets and acquiring additional assets, expected synergies and cost savings may not materialise, resulting in lower than expected profit margins.

**Evraz faces protective trade restrictions in the export of its steel products.**

Evraz faces numerous protective tariffs, duties and quotas that reduce its competitiveness in, and limit its access to, particular markets. Several key steel importing countries currently have import restrictions on steel products or intend to introduce them in the future. For example, the EU has a quota system in place with respect to Russian steel imports, South Korea currently imposes tariffs on imports of H-beams from Russia, and South Korea and Brazil have announced that they are also considering restrictions on steel imports in order to protect domestic producers. In 1999 China imposed anti-dumping measures on imports of cold-rolled steel from Russia, but allowed them to expire in December 2004.

The United States had a quota system in effect with respect to imports from Russia of pig iron, cold-rolled steel, slabs, zinc-plated sheets and some other products that expired on 12 July 2004. From March 2002 until December 2003, the United States had implemented safeguard measures in the form of tariffs on most steel imported into the United States and has retained a licensing and monitoring regime. Depending on market conditions, the United States may in the future impose other trade restrictions.

Most of Evraz's exports of steel products are of semi-finished products, primarily billets and slabs, which generally are not subject to protective measures (including tariffs and quotas) in Evraz's principal

export markets. However, there can be no assurance that these products will not be subject to such protective measures in the future. The introduction of additional protective measures could have an adverse effect on Evraz's business, results of operations and prospects.

**Evraz benefits from tariffs and duties imposed on steel that is imported into Russia and which may be eliminated in the future.**

Russia has in place import tariffs with respect to certain steel products imported from outside of Russia, excluding certain other CIS countries. These tariffs generally amount to 5% of the value of the products, but also increase to up to 20% of the value for certain higher value-added products. In addition, Russia has in place a 21% countervailing duty on imports of rebars from Ukraine, which is currently scheduled to expire in August 2005 and the Russian government is currently considering further protectionist measures against channels imported from Ukraine. Evraz believes that it benefits from these tariffs and duties because they prevent subsidised Ukrainian imports from reducing the prices that Evraz can obtain for these products in Russian markets. Evraz's sales in Russia of steel products that are protected by these tariffs and duties accounted for approximately 27% of its sales volume of construction products and approximately 13% of its total sales volume of steel products in 2004. These tariffs and duties may be reduced or eliminated in the future, which could materially adversely affect Evraz's results of operations and prospects.

In May 2004, Russia and the EU agreed on trade policy measures to be adopted in preparation for Russia's entry into the World Trade Organisation ("WTO") and, according to press reports, Russia may complete its negotiations with other countries to be able to join the WTO by 2007. Russia's future accession to the WTO could negatively affect Evraz's business and prospects, in particular by requiring that Russia lower or remove tariffs and duties on steel products, resulting in increased competition in the Russian steel market from foreign producers. See also "—Increasing tariffs and restructuring in the Russian energy sector could materially adversely affect Evraz's business".

**Estimates of Evraz's mining reserves are subject to uncertainties.**

The estimates concerning Evraz's iron ore and coal reserves contained in this Offering Circular are subject to considerable uncertainties. These estimates are based on interpretations of geological data obtained from sampling techniques and projected rates of production in the future. Actual production results may differ significantly from reserves estimates. In addition, it may take many years from the initial phase of drilling and exploration before production is possible. During that time, the economic feasibility of exploiting a discovery may change as a result of changes in the market price of iron ore or coal.

In addition, some of Evraz's ore deposits have not yet been evaluated in accordance with international methodologies. Information relating to Evraz's iron ore and coal in these deposits has been prepared on the basis of Russian reserves methodologies, which differ significantly from international methodologies and the standards applied by the United States Securities and Exchange Commission, among others. See "Description of Business—Mining Business—Ore Reserves".

**Evraz's mining operations are subject to mining risks, and Evraz may not maintain sufficient insurance in respect of these mining and other operational risks.**

Evraz's mining operations are subject to hazards and risks normally associated with the exploration, development and production of natural resources, any of which could result in production shortfalls or damage to persons or property. In particular, hazards associated with Evraz's open-pit mining operations include:

- flooding of the open pit;
- collapses of the open-pit wall;
- accidents associated with the operation of large open-pit mining and rock transportation equipment;
- accidents associated with the preparation and ignition of large-scale open-pit blasting operations;
- production disruptions due to weather; and

13

- hazards associated with the disposal of mineralised waste water, such as groundwater and waterway contamination.

Hazards associated with Evraz's underground mining operations include:

- underground fires and explosions, including those caused by flammable gas;
- cave-ins or ground falls;
- discharges of gases and toxic chemicals;
- flooding;
- sinkhole formation and ground subsidence; and
- other accidents and conditions resulting from drilling, blasting and removing and processing material from an underground mine.

Evraz is at risk of experiencing any or all of these hazards. For example, on 18 May 2005, a methane gas explosion occurred at Mine 12, as a result of which one miner was killed and ten were injured. The occurrence of any of these hazards could delay production, increase production costs and result in injury to persons and damage to property, as well as liability for Evraz. The liabilities resulting from any of these risks may not be adequately covered by insurance, and no assurance can be given that Evraz will be able to obtain additional insurance coverage at rates it considers to be reasonable. Evraz may therefore incur significant costs that could have a material adverse effect upon its business, results of operations and financial condition.

**Evraz's business could be adversely affected if it fails to obtain or renew necessary licenses or fails to comply with the terms of its licenses.**

Evraz's business depends on the continuing validity of its licenses, the issuance to it of new licenses and its compliance with the terms of its licences, including subsoil licenses for Evraz's mining operations in Russia. Evraz's subsoil licences currently expire in the period from 2013 to 2017. Regulatory authorities exercise considerable discretion in the timing of licence issuance and renewal and in monitoring of licensees' compliance with licence terms. Requirements imposed by these authorities may be costly and time-consuming and may result in delays in the commencement or continuation of exploration or production operations. Moreover, legislation on subsoil rights remains internally inconsistent and vague, and the acts and instructions of licencing authorities and procedures by which licences are issued are often arguably inconsistent with legislation.

In certain circumstances, state authorities in Russia may seek to interfere with the issuance of licences, for example by initiating legal proceedings where the issuance of a licence may allegedly violate the civil rights or legal interests of a person or legal entity. The licencing process may also be influenced by outside commentary, political pressure and other extra-legal factors. In the case of subsoil licenses, unsuccessful applicants may bring direct claims against the issuing authorities that the licence was issued in violation of applicable law or regulation. If successful, such proceedings and claims may result in the revocation or invalidation of the licence. Accordingly, licenses that Evraz requires may be invalidated or may not be issued or renewed. Licenses that are issued or renewed may not be issued or renewed in a timely fashion or may involve conditions that restrict Evraz's ability to conduct its operations or to do so profitably.

As part of their obligations under licensing regulations and the terms of their licenses, the Company's Russian subsidiaries (and Russian affiliates such as Raspadskaya) are also required to comply with numerous industrial standards, maintain production levels, recruit qualified personnel, maintain necessary equipment and a system of quality control, monitor Evraz's operations, maintain appropriate filings and, upon request, submit appropriate information to licencing authorities, which are entitled to control and inspect their activities. In most cases, a licence may be suspended or terminated if the licensee does not comply with the "significant" or "material" terms of the licence. However, the Ministry of Natural Resources of the Russian Federation has not issued any interpretive guidance on the meaning of "significant" or "material" terms of licences. Court decisions on the meaning of these terms have been inconsistent and, under Russia's civil law system, do not have significant value as precedents for future judicial proceedings. These deficiencies result in the regulatory authorities, prosecutors and courts having significant discretion over enforcement and interpretation of the law, which may be used arbitrarily to challenge the rights of subsoil licencees. As a result, while Evraz seeks to comply with the terms of its subsoil licences and believes that it is currently in material compliance with the terms of such licences,

there can be no assurance that its licences may not be suspended or terminated. In the event that the licencing authorities in Russia discover a material violation by a subsidiary of the Company, such company may be required to suspend its operations or to incur substantial costs in eliminating or remedying the violation, which could have an adverse effect on Evraz's business or results of operations.

Any or all of these factors may affect Evraz's ability to obtain, maintain or renew necessary licenses. If Evraz is unable to obtain, maintain or renew necessary licenses or is only able to obtain or renew them with newly-introduced material restrictions, it may be unable to benefit fully from its reserves and its results of operations and prospects could be materially adversely affected.

**Evraz will require significant amounts of cash to fund its capital investment programme, and Evraz's ability to generate cash or obtain financing depends on many factors beyond Evraz's control.**

Evraz plans to make significant capital investments in its production facilities in the next five years. In particular, certain of the production facilities at NTMK and ZapSib were commissioned in the 1940s, 1950s or 1960s, and some of the production facilities at NKMK were commissioned in the 1930s. As a result of their age, parts of these facilities require significant investment in upgrades, maintenance or replacement. See "Description of Business—Steel Business—Production Facilities" and "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Capital Requirements". Total capital expenditures over the next five years are expected to be approximately U.S.$1,422 million and are expected to be funded both from cash flow from operating activities and external sources, including long-term unsecured bank facilities insured by relevant export credit agencies and long-term syndicated facilities, in addition to the proceeds of the Offering. It is possible that these sources of financing may not be available in the future in the amounts Evraz requires or at an acceptable cost, for reasons including, without limitation, the unavailability of external financing sources; changes in the terms of existing financing arrangements; pursuit of new business opportunities or significant additional investment in existing businesses; fluctuations in the Russian or global steel markets; and regulatory developments. If these sources of financing are not available in the future in the amounts Evraz requires or at an acceptable cost, Evraz may not be able to make some or all of its planned capital expenditures in the amounts Evraz requires or at an acceptable cost. The unavailability or high cost of financing could have a material adverse effect on Evraz's ability to make its anticipated capital expenditures, and on its business and prospects.

**Some transactions between the Company's Russian subsidiaries and their interested parties, affiliates and other members of the Evraz group require the approval of disinterested directors or disinterested shareholders.**

The Company owns less than 100% of the shares in most of its subsidiaries, including NTMK, ZapSib and KGOK. These subsidiaries have in the past carried out, and continue to carry out, numerous transactions with other companies in Evraz's consolidated group and affiliates of Evraz that may be considered "interested party transactions" under Russian law, requiring approval by a majority vote of the "independent disinterested directors" or of the "disinterested shareholders", in advance of a particular transaction. In particular, NTMK, ZapSib and NKMK rely to a large extent on the supply of raw materials from related parties, including Raspadskaya, Evraz Ruda, KGOK and VGOK, and sales to Ferrotrade Limited.

Russian law requires a joint stock company that enters into transactions with certain related persons that are sometimes referred to as "interested party transactions" to comply with special approval procedures. Under Russian law, an "interested party" means: (i) any member of the board of directors or the collegiate executive body of the company, (ii) the chief executive officer of the company (including a managing organisation or hired manager), (iii) any person who, together with its affiliates, owns at least 20% of the company's voting shares or (iv) a person who on legal grounds has the right to give mandatory instructions to the company. A transaction with the company is an "interested party transaction" if any of the above listed persons, or a close relative or affiliate of such person, is, in each case:

- a party to a transaction with the company, whether directly or as a representative or intermediary, or a beneficiary of the transaction;

- the owner of at least 20% of the shares in a company that is a party to a transaction with the company, whether directly or as a representative or intermediary, or a beneficiary of the transaction;

15

- a member of a governing body of a company that is a party to a transaction with the company, whether directly or as a representative or intermediary, or a beneficiary of the transaction or an officer of the managing organisation of such company; or

- in other cases stipulated by law or the company's charter.

Due to the way in which the Russian law on interested party transactions is drafted, the special approval procedures that apply to interested party transactions also apply to transactions between entities within a consolidated group such as Evraz. The failure to obtain necessary approvals for transactions between the Company's Russian subsidiaries could result in the invalidation of such transactions and adversely affect Evraz's business.

In addition, the concept of "interested parties" is defined with reference to the concepts of "affiliated persons" and "group of persons", which are subject to many different interpretations under Russian law. Moreover, the provisions of Russian law defining which transactions must be approved as "interested party" transactions are subject to different interpretations. Evraz cannot be certain that its compliance with these concepts will not be subject to challenge. Any such challenge could result in the invalidation of transactions that are important to Evraz's business. Though Evraz generally seeks to obtain the required approvals for interested party transactions, in some cases, as a practical matter, it may not be able to obtain them. Failure to obtain the necessary approvals for transactions between the Company's Russian subsidiaries or any successful challenge to such transactions could result in the invalidation of such transactions and could have a material adverse effect on the business, financial condition, results of operations or prospects of Evraz.

**Evraz has been and will continue to be controlled by two beneficial owners whose interests could conflict with those of the holders of the GDRs.**

Following the Offering, assuming that the underwriters exercise the Over-allotment Option in full, 59.11% of the outstanding shares of the Company will be beneficially owned by Mr. Alexander Abramov, the Company's Chief Executive Officer and Chairman of its Board of Directors, and 28.18% by Mr. Alexander Frolov, Evraz's Senior Executive Vice President and a member of the Company's Board of Directors. As a result of their interests in Evraz, Mr. Abramov and, to a lesser extent, Mr. Frolov, have the ability to exert significant influence over certain actions requiring shareholder approval, including, but not limited to, increasing or decreasing the authorised share capital of the Company (and disapplying pre-emptive rights), the election of directors, declaration of dividends, the appointment of management and other policy decisions. The interests of the controlling beneficial owners could also at times conflict with the interests of holders of the GDRs. For example, the Company's subsidiaries have engaged in and continue to engage in transactions with related parties, including parties that are under common control with Evraz, such as supplies of raw materials such as coking coal and acquisitions of assets such as Evraz Ruda. Although Evraz has in the past sought and continues to seek to conclude all related party transactions on an arm's-length basis, and the Company has adopted procedures for entering into transactions with related parties, conflicts of interest may arise between Evraz, its affiliates and the Company's principal shareholders or their affiliates, resulting in the conclusion of transactions on terms not determined by market forces. See "Directors and Management—Corporate Governance" and "Related Party Transactions". Any such conflict of interest could adversely affect Evraz's business, financial condition and results of operations, and therefore the value of an investment in the GDRs could be adversely affected.

**Evraz's competitive position and future prospects are heavily dependent on its controlling beneficial owners' and senior management's experience and expertise.**

The involvement in Evraz's management of Evraz's controlling beneficial owners, who serve as its Chairman and Chief Executive Officer and Senior Executive Vice President, respectively, has been, and Evraz believes will continue to be, important in the pursuit and implementation of Evraz's strategy. However, there can be no assurance that they will remain controlling shareholders or continue to make their services available to Evraz in the future. Evraz's business could suffer if either or both of these shareholders ceased to participate actively in its management.

In addition to the significant role in Evraz's management played by its controlling beneficial owners, Evraz's ability to maintain its competitive position and to implement its business strategy is dependent to a significant extent on the services of its senior management team, and in particular on its Chief Operating Officer, Chief Financial Officer and Commercial Director. Evraz depends on its current senior

16

management for the implementation of its strategy and the operation of its day-to-day activities, and personal connections and relationships of members of senior management are important to the conduct of its business. However, there can be no assurance that these individuals will continue to make their services available to Evraz in the future. Evraz also does not maintain key personnel life insurance covering any of its senior managers.

The loss or diminution in the services of members of Evraz's senior management team or an inability to attract and retain additional senior management personnel could have a material adverse effect on Evraz's business, financial condition, results of operations or prospects. Moreover, competition in Russia for personnel with relevant expertise is intense due to the small number of qualified individuals, and this situation could seriously affect Evraz's ability to retain its existing senior management and attract additional suitably qualified senior management personnel. As a result, the departure of key members of management could have a material adverse effect on the business, results of operations or prospects of Evraz.

**If the Russian Federal Antimonopoly Service were to conclude that Evraz acquired or created a new company in contravention of antimonopoly legislation or were to increase the level of control it exerts over certain of Evraz's operations, Evraz could face administrative sanctions, be required to divest certain assets or be subject to limitations in its operating flexibility.**

Evraz's business has grown substantially through the acquisition and founding of companies incorporated and operating in the Russian Federation, many of which required the prior approval or subsequent notification of the Russian Federal Antimonopoly Service (the "FAS") or its predecessor agencies. In part, relevant legislation restricts the acquisition or founding of companies by groups of companies or individuals acting in concert without this approval or notification. Some of the Company's Russian subsidiaries are included in the register of entities holding market shares in excess of 35% that is maintained by the FAS. An entity included in the register that holds a market share in excess of 65% in a particular product market is presumed to hold a dominant position in such market and is prohibited from abuse of such position. Several of the Company's Russian subsidiaries have market shares in excess of 65% in certain product markets, including, among other products, ZapSib in respect of certain types of reinforced steel, NTMK in respect of H-beams, channels, tyres and wheels, NKMK in respect of rails and KGOK in respect of high-vanadium iron ore. See "Regulatory matters—Antimonopoly Regulation". While Evraz believes that it has complied with applicable regulations of the FAS (and its predecessor agencies), the legislation and regulations with respect to such matters are vague in certain parts and subject to varying interpretations, and there can be no assurance that the FAS will not conclude that an acquisition or the creation of a new company was done in contravention of applicable legislation and competition has been reduced as a result. Any such finding could result in the imposition of administrative sanctions or require the divestiture of such newly acquired or created company or other assets, adversely affecting Evraz's business, results of operations and prospects.

Evraz's acquisitions of certain assets have also been subject to various conditions imposed by the FAS. For example, the FAS has ordered Evraz not to reduce the production volumes of rails at NTMK and NKMK, of H-beams and channels at NTMK and ZapSib and high-vanadium iron ore, sinter and pellets at KGOK. The FAS has also ordered Evraz not to discriminate against purchasers of these products as well as customers of Nakhodka Commercial Sea Port as compared to its internal customers. Evraz must also provide certain information to the FAS about its production volumes and increases in the prices of these products on a regular basis. While Evraz believes that it is currently in compliance with the requirements established by the FAS with respect to its operations, there can be no assurance that it will be able to remain in compliance in the future or that its past conduct will not be challenged. Moreover, these requirements or any changes to these requirements, such as limitations on further acquisitions or specific pricing requirements, or on the ability of Evraz to adjust its production and pricing to respond to changed market conditions, could have an adverse effect on the results of operations and prospects of Evraz.

**In the event that the title to any company acquired by Evraz through privatisation, bankruptcy sale or otherwise is successfully challenged, Evraz may lose its ownership interest in that company or its assets.**

Almost all of Evraz's steel making and mining assets consist of companies that have been privatised or that Evraz acquired through bankruptcy proceedings or directly or indirectly from others who acquired them through privatisation or bankruptcy proceedings, and Evraz may seek to acquire additional companies that have been privatised or that have undergone bankruptcy proceedings.

Most of the Company's Russian subsidiaries are companies that have been privatised. Privatisation legislation in Russia is vague, internally inconsistent and in conflict with other elements of Russian legislation. As the statute of limitations for challenging transactions entered into in the course of privatisations is currently ten years, many privatisations are still vulnerable to challenge, including through selective action by governmental authorities motivated by political or other extra-legal considerations. In March 2005, President Putin announced that he had instructed Prime Minister Mikhail Fradkov to draft legislation that would reduce the statute of limitations on privatisation transactions from ten years to three years, and the draft bill received preliminary approval from the Government in mid-May 2005. This bill must still be approved by both houses of the Russian legislature, the State Duma and the Federation Council, and approved by the president, before becoming law.

In addition, Evraz acquired assets of Kuznetsk Iron and Steel Plant ("KMK") through a bankruptcy auction process, and other operations, including NTMK, ZapSib, and KGOK, were subject to bankruptcy proceedings prior to their acquisition by Evraz. The regulations relating to Russian insolvency proceedings are cumbersome and it may be difficult to be in full compliance with such regulations.

Evraz has also been named in litigation filed in the United States District Court for the District of Delaware and the Delaware Chancery Court that challenges certain aspects of events relating to KGOK's insolvency proceedings and Evraz's subsequent acquisition of KGOK. In these proceedings, the plaintiffs have alleged that they lost control of KGOK as a result of fraud, extortion, bribery and false bankruptcy proceedings that purportedly occurred between 1999 and 2003 (prior to Evraz's acquisition of control over KGOK), and that Evraz was owned or controlled by one or more of the other defendants in the matter (which is incorrect). Evraz and the other defendants are currently seeking dismissal of these claims on various grounds. Evraz acquired its shares in KGOK through transactions mediated by an experienced market intermediary, and received from the sellers the limited representations and warranties that are customary in the Russian market in respect of the shares it acquired. Evraz's management believes that the plaintiffs' claims against Evraz are without merit. See "Description of Business—Legal Proceedings".

While Evraz believes that it has complied with applicable legislation and regulations with respect to the acquisitions of its assets, if any of such acquisitions are challenged as having been improperly conducted and Evraz is unable successfully to defend itself, Evraz may lose its ownership interests, which could materially adversely affect its business and results of operations.

**Vaguely drafted Russian transfer pricing rules and lack of reliable pricing information may affect Evraz's results of operations.**

Russian transfer pricing rules entered into force in 1999, giving Russian tax authorities the right to make transfer pricing adjustments and impose additional tax liabilities in respect of all controlled transactions, provided that the transaction price differs from the market price by more than 20%. Controlled transactions include domestic and international transactions between related entities and certain other types of transactions between independent parties, such as foreign trade transactions or transactions with significant (greater than 20%) price fluctuations. The Russian transfer pricing rules are vaguely drafted, leaving wide scope for interpretation by Russian tax authorities and courts. Moreover, in the event that a transfer pricing adjustment is assessed by Russian tax authorities, the Russian transfer pricing rules do not provide for an offsetting adjustment to the related counterparty in the transaction that is subject to adjustment. While members of the consolidated Evraz group engage in numerous transactions between related parties, Evraz seeks to conduct such transactions based on prices at which Evraz believes similar sales could be made to unrelated parties, which Evraz believes is the market price. However, it is not always possible to determine a relevant market price, and the Russian tax authorities may take a view as to what constitutes an appropriate market price that differs from that adopted by Evraz. As a result, Russian tax authorities may challenge Evraz's prices in such transactions and propose adjustments. If any such price adjustments are upheld by the Russian courts and implemented, Evraz could face significant losses associated with the assessed amount of prior tax underpaid and related interest and penalties, which could have an adverse effect on Evraz's financial condition and results of operations. See also "—Risks Relating to the Russian Federation—Legislative and Legal Risks—Weaknesses and changes in the Russian tax system could materially adversely affect Evraz's business and the value of the GDRs".

**Evraz depends on the Russian railroad network for the transportation of mining and steel products, and the Russian railroad network is also a near monopoly purchaser of Evraz's railway products.**

Railway transportation is Evraz's principal means of transporting raw materials and steel products to its facilities and to customers, as well as to ports for onward transportation overseas. Moreover, Evraz's production facilities are located at a greater distance from their primary markets and seaports than are many of Evraz's competitors. As a result, Evraz's transportation costs are generally higher than those of its competitors. For example, while two of Evraz's major Russian competitors, Severstal and Novolipetsk Iron and Steel Works (''NLMK''), ship their products to export markets via Baltic sea ports that are located relatively close to their major production facilities, Evraz ships most of its products for export via sea ports in Russia's Far East (primarily Nakhodka Commercial Sea Port and Vladivostok) that are comparatively more distant from its production facilities. As a result, increases in transportation costs may adversely affect Evraz's ability to compete successfully both on the Russian and export markets. Currently, the Russian government sets rail tariffs and may further increase these tariffs, as it has done in the past. Moreover, in 2003, legislation was enacted which sets out the framework for privatisation of certain state-owned railway enterprises, and in 2004 their assets were contributed into the share capital of a state-owned company, Russian Railways. If the privatisation of Russian Railways or other factors were to result in increased railway transport costs, Evraz's results of operations could be materially adversely affected. While Evraz believes that its position as the leading supplier of railway products to Russian Railways has in the past enabled it to increase the prices of its finished railway products to offset increases in transportation costs associated with these products, there can be no assurance that Evraz will be able to engage in such price increases in the future or that any such increases will be sufficient to offset increases in transportation tariffs.

In addition, Russian rolling stock is generally in a poor state of repair. While Evraz owns and leases railcars, and rents additional railcars, in order to reduce its dependence on rolling stock owned by Russian Railways, such assets are sufficient for only a portion of Evraz's total transportation requirements. The failure of Russian Railways to upgrade its rolling stock within the next few years could result in a shortage of available working rolling stock, a disruption in transportation of Evraz's raw materials and products and cause rail tariffs to increase. Any such occurrences could adversely affect Evraz's results of operations and prospects.

Evraz also sells most of its railway products to Russian Railways. Sales to Russian Railways accounted for approximately 17% of Evraz's total sales volume of steel products in Russia and the CIS in 2004, and approximately 7% of Evraz's total consolidated revenues in 2004. While demand from Russian Railways for railway products has generally been consistent over the last five years, any reduction in Russian Railways' investment budget, the introduction of requirements to decrease the purchase prices of railway products or the potential entry of new producers into the market for railway products could have an adverse effect on Evraz's results of operations and prospects.

**More stringent environmental laws and regulations or more stringent enforcement of existing environmental laws and regulations may have a significant negative effect on Evraz's operating results.**

Evraz's operations and properties are subject to environmental, health and safety and other laws and regulations in the jurisdictions in which it operates, principally in Russia. For instance, Evraz's operations generate large amounts of pollutants and waste, some of which are hazardous, such as benzapiren, sulphur oxide, sulphuric acid, sulphates, phenicols and sludges (including sludges containing chrome, copper, nickel and zinc). The discharge, storage and disposal of such hazardous waste is subject to environmental regulations, including some requiring the clean-up of contamination and reclamation. Pollution risks and related clean-up costs are often impossible to assess unless environmental audits have been performed and the extent of liability under environmental laws is clearly determinable.

Under current Russian environmental legislation, Evraz must make payments for air and water discharges as well as waste which are within specified limits as well as make increased payments for discharges and waste in excess of these limits. Evraz's total payments associated with such pollution were approximately U.S.$4.5 million in 2004, U.S.$3.3 million in 2003 and U.S.$2.8 million in 2002.

Through it has been enhanced since the Soviet era, environmental legislation in Russia is generally weaker and less stringently enforced than in the EU or the United States. More stringent standards may be introduced or enforcement increased in Russia in the future. In addition, based on the existing regulatory environment, as of 31 December 2004 Evraz had made provisions of U.S.$16.7 million for site restoration activities to be conducted at its mining facilities and U.S.$481,000 associated with the reclamation of land

at its steel mills. Any change in the current regulatory environment could result in actual costs and liabilities for which Evraz has not provided or planned. Moreover, in the course of, or as a result of, an environmental investigation, regulatory authorities in Russia can issue an order reducing or halting production at a facility that has violated environmental standards. In the event that production at one of Evraz's facilities was partially or wholly prevented due to this type of sanction, its business could suffer significantly and its operating results would be negatively affected.

Furthermore, the implementation of the Kyoto Protocol to the United Nations Framework Convention on Climate Change from February 2005 may impose new and/or additional rules or more stringent environmental norms. Complying with any such requirements may entail additional capital expenditures or modifications in operating practices. The impact on Evraz will depend on, among other factors, the base level against which permissible levels of emissions are to be measured and the allocation of quotas for such emissions, which is currently uncertain.

In addition, Evraz has generally not been indemnified against environmental liabilities or any required land reclamation expenses of Evraz's acquired businesses that arise from activities that occurred prior to the acquisition of such businesses.

**Fluctuations in the value of the rouble against the U.S. dollar may materially adversely affect Evraz's results of operations.**

Evraz's presentation currency is the U.S. dollar. Evraz's products are typically priced in rubles for Russian and CIS sales and in U.S. dollars for international sales, and Evraz's direct costs, including raw materials, labour and transportation costs, are largely incurred in rubles, while other costs, such as interest expense, are incurred in rubles, U.S. dollars and euro. The mix of Evraz's revenues and costs is such that appreciation in real terms of the rouble against the U.S. dollar tends to result in an increase in Evraz's costs relative to its revenues, while depreciation of the rouble against the U.S. dollar in real terms tends to result in a decrease in Evraz's costs relative to its revenues. The rouble appreciated in real terms against the U.S. dollar by 13.6% in 2004, 15.0% in 2003 and 6.0% in 2002, according to the CBR. However, in recent years the effect of the real appreciation of the rouble against the U.S. dollar has been more than offset by increased prices for Evraz's steel products, both in Russia and internationally. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations for the Periods ended 31 December 2004, 2003 and 2002" and "Management's Discussion and Analysis of Financial Condition and Results of Operations—Inflation". Further real appreciation of the rouble against the U.S. dollar may materially adversely affect Evraz's financial condition and results of operations.

In addition, nominal depreciation of the rouble against the U.S. dollar results in a decrease in the reported U.S. dollar value of Evraz's rouble-denominated assets (and liabilities) and nominal appreciation of the rouble against the U.S. dollar results in an increase in the reported U.S. dollar value of Evraz's rouble-denominated assets (and liabilities). Moreover, nominal appreciation and depreciation of the rouble against the U.S. dollar has a similar effect when the income statements of Evraz's Russian subsidiaries are translated into U.S. dollars in connection with the preparation of Evraz's consolidated financial statements. The average exchange rate of the rouble against the U.S. dollar depreciated by 7.0% in nominal terms during 2002, but appreciated by 2.2% and 6.5% in nominal terms in 2003 and 2004, respectively, according to the CBR.

**Sustained periods of high inflation could adversely affect Evraz's business.**

Evraz's production activities are located in Russia, and the majority of Evraz's direct costs are incurred in Russia. Russia has experienced high levels of inflation since the early 1990s. Inflation increased dramatically after the 1998 financial crisis, reaching a rate of 84.4% in that year. Notwithstanding recent reductions in the inflation rate, which in 2003 was 12.0% and in 2004 was 11.7%, Evraz tends to experience inflation-driven increases in certain of its costs, such as salaries, that are linked to the general price level in Russia. However, Evraz may not be able to increase the prices that it receives for its products sufficiently in order to preserve operating margins, particularly in the case of Evraz's export sales, when such inflation is accompanied by real appreciation of the rouble against the U.S. dollar. Accordingly, high rates of inflation in Russia could increase Evraz's costs and decrease Evraz's operating margins.

**Increasing tariffs and restructuring in the Russian energy sector could adversely affect Evraz's business.**

In 2004, Evraz's Russian operations purchased approximately 7,903 million kWh of electricity, representing approximately 92% of their requirements, from local subsidiaries of RAO UES ("UES"), the government-controlled national holding company for the Russian power sector. Domestic electricity prices are regulated by the Russian government. The government is currently in the early stages of implementing a restructuring plan for the power sector aimed at introducing competition, liberalising the wholesale electricity market and moving from regulated pricing to a market-based system by 2008. Moreover, according to the Russian Energy Strategy approved by the Russian government in 2003, electricity tariffs for industrial users are to reach 3.2-3.6 U.S. cents per kWh by 2006. In 2004, Evraz's average cost of electricity was 2.7 U.S. cents per kWh. Assuming a price of 3.6 U.S. cents per kWh in 2004, Evraz's Russian operations would have incurred approximately U.S.$103 million in additional costs. Further price increases for electricity may also occur in the future as the industry is restructured and controlled to a greater extent by the private sector. Evraz has instituted a programme to increase the proportion of its electricity requirements that it generates from internal sources and to seek more favourable pricing on the electricity that it purchases from outside suppliers. See "Description of Business—Steel Business—Raw Materials". As part of this strategy, Evraz may seek to acquire generating assets in the restructuringof the Russian power sector referred to above. However, if Evraz is required to pay higher prices for electricity in the future, its costs will rise and its business and prospects could be materially adversely affected.

Evraz's Russian operations also purchase significant amounts of natural gas, primarily for the production of electricity and heat energy at Evraz's facilities, from subsidiaries of OAO Gazprom ("Gazprom"). Gazprom is a government-controlled company and the dominant producer and monopoly transporter of natural gas within Russia. Domestic natural gas prices are regulated by the government, and have been rising over the last few years. The average price for industrial consumers in Russia was approximately RUR873 (approximately U.S. $31.46) per thousand cubic metres in 2004, an increase of approximately 65% from 1 February 2002. Despite these recent price increases, natural gas prices in Russia remain significantly below western European levels, helping to provide Evraz with a cost advantage over its competitors. In May 2004, in connection with an agreement on Russia's potential accession to the WTO, Russia and the EU agreed that Russia would raise domestic gas prices to U.S.$37-42 per thousand cubic metres for natural gas by 2006 and to U.S.$49-57 per thousand cubic metres by 2010. Assuming a price of U.S.$42 per thousand cubic metres in 2004, Evraz's Russian operations would have incurred approximately U.S.$19 million in additional costs. If Evraz is required to pay a higher price for natural gas, its costs will rise and its results of operations and prospects could be adversely affected.

**Evraz's accounting systems and internal controls may be inadequate to ensure timely and accurate financial reporting, and any such shortcomings in these systems could have a material adverse affect on Evraz's business, financial condition and results of operations and thus the value of the GDRs.**

Evraz's system of internal control over financial reporting is not designed for the preparation of consolidated IFRS financial statements. For example, Evraz does not have integrated information systems; each subsidiary has its own accounting platform and chart of accounts. Evraz's Russian subsidiaries prepare separate financial statements under Russian accounting standards for statutory purposes. The preparation of IFRS consolidated financial statements is a manual process that involves, first, the transformation of the statutory financial statements of Evraz's subsidiaries into IFRS financial statements through accounting adjustments and, second, a consolidation of all subsidiaries financial statements. This process is complicated and time-consuming, and it requires significant attention from Evraz's senior accounting personnel at its corporate headquarters and subsidiaries.

Evraz has taken, and plans to take, steps to improve its accounting systems and internal controls, including the development and documentation of control procedures over the financial statements closing process and hiring additional qualified personnel in the area of financial reporting. Despite these steps, and in light of Evraz's past and planned growth through acquisitions, Evraz may not be able to detect or prevent a material misstatement of its annual or interim IFRS consolidated financial statements or to ensure that its IFRS consolidated financial statements are prepared in a timely manner in accordance with the requirements of the London Stock Exchange or otherwise.

**Evraz depends on key accounting staff for the preparation of IFRS financial information. These persons may leave the group, which could disrupt Evraz's ability to timely and accurately report IFRS financial information and have an adverse effect on Evraz's business and the value of the GDRs.**

The preparation of Evraz's IFRS financial information is a difficult task requiring IFRS-experienced accounting personnel at each of Evraz's principal subsidiaries and at its Moscow corporate offices. However, Russia has available only a small number of accounting personnel with IFRS expertise. Moreover, there is an increasing demand for such personnel as more Russian companies are beginning to prepare financial statements on the basis of IFRS or other international standards. Such competition, combined with the remote locations of the Company's Russian subsidiaries, which such personnel may not find suitable in comparison to other opportunities, makes it difficult for Evraz to hire and retain such personnel, and Evraz's key accounting staff may leave Evraz. Any inability to hire or to retain qualified accounting staff could adversely affect Evraz's business and the value of the GDRs.

**The Company's subsidiaries in Russia are in many cases the largest employers in their respective regions, and as a result Evraz may be limited in its ability to make rapid and significant reductions in numbers of employees.**

The Company's subsidiaries are in many regions the largest employers in the cities in which they operate, for example NTMK in Nizhny Tagil, ZapSib and NKMK in Novokuznetsk and KGOK in Kachkanar. While Evraz does not have any specific legal social obligations or responsibilities with respect to these regions, its ability to effect alterations in the numbers of its employees may nevertheless be subject to political and social considerations. Any inability to make planned reductions in numbers of employees or other changes to Evraz's operations in such regions could have an adverse effect on its results of operations and prospects.

**The Company or its non-Russian subsidiaries could be deemed to be tax residents of Russia, adversely affecting Evraz's business, financial condition and results of operations.**

The Company and its subsidiaries incorporated outside of Russia are generally considered to be non-residents of Russia for tax purposes. Though Evraz believes that it conducts its operations in accordance with applicable requirements, there can be no assurance that Russian tax authorities will not deem the Company or any such non-Russian subsidiaries to have a permanent establishment in Russia as a result of an exercise of management and control over a foreign entity from within Russia, for example by virtue of the location of Evraz's corporate headquarters activities in Russia. There are instances where foreign companies that perform holding or finance functions and are managed and controlled from Russia have been challenged by Russian tax authorities as having a permanent establishment in Russia. Such challenges with respect to Evraz could result in the Company or one or more of its non-Russian subsidiaries being subject to Russian profits tax computed under Russian tax principles and Russian income tax withholding on dividend, interest and other similar payments paid from such companies. Such occurrences could increase Evraz's tax liabilities and adversely affect Evraz's business and results of operations and the value of the GDRs.

**Changes in the application or interpretation of the Cypriot tax system could materially adversely affect Evraz's business and the value of the GDRs.**

Cyprus became a member of the European Union on 1 May 2004, as a result of which it has harmonised its legislation with European Union directives and guidelines and has reformed its tax system. Moreover, Cyprus will now adhere to European Court of Justice Decisions and any amendments to existing or newly introduced EU Directives with respect to taxation. Such judicial decisions and legislative changes may adversely affect the tax treatment of Evraz's Cypriot subsidiaries and of transactions with such Cypriot companies.

In addition, in accordance with Cyprus Income tax laws, a company is tax resident in Cyprus if its management and control is exercised in the Republic of Cyprus. There is no definition in the Cyprus Income tax laws as to what constitutes management and control. Evraz has received advice that the Cyprus tax authorities follow the definition of management and control as set forth in the OECD model convention with respect to taxes on income and capital, which defines a "place of effective management". That model convention states: "The place of effective management is the place where key management and commercial decisions that are necessary for the conduct of the entity's business are in substance made. The place of effective management will ordinarily be the place where the most senior person or group of

22

persons (for example a board of directors) makes its decisions, the place where the actions to be taken by the entity as a whole are determined; however, no definitive rule can be given and all relevant facts and circumstances must be examined to determine the place of effective management. An entity may have more than one place of management, but it can have only one place of effective management at any one time''. Based on this definition, management and control may be considered to be exercised where the board of directors of a company meets and take decisions. A company that is tax resident in Cyprus is subject to Cypriot taxation, qualifies for benefits available under the Cypriot tax treaty network, including the double-taxation treaty with Russia, and may enable an EU parent company to claim tax benefits under EU tax directives with respect to dividends paid from Cypriot resident companies or gains from the sale of shares in Cypriot resident companies.

In the event the tax residency of a company incorporated in Cyprus is challenged, such Cypriot company would be required to establish that it is managed and controlled from Cyprus. If the tax residency of any of the Company's Cypriot subsidiaries, including Mastercroft, were to be challenged and Evraz was unable to establish that such company qualified as a Cypriot tax resident, such company may be subject to tax in its place of tax residency, would be unable to make use of the Cypriot tax treaty network, including any Cypriot tax treaty based benefits, and may restrict or eliminate tax benefits under the EU parent-subsidiary directive applicable to dividends received by the Company from such Cypriot incorporated company and capital gains realized by the Company from the sale of shares in such Cypriot incorporated company if the place of tax residency is not an EU member state.

Adverse changes in the application or interpretation of Cypriot tax law, or a finding that a subsidiary of the Company that is incorporated in Cyprus does not qualify as a Cypriot tax resident or for tax treaty based benefits, may significantly increase Evraz's tax burden and adversely affect its financial condition and results of operations.

## RISKS RELATING TO THE GDRs AND THE TRADING MARKET

**Because there has been no prior active public trading market for the GDRs, the Offering may not result in an active or liquid trading market for the GDRs, and their price may be highly volatile.**

Before this offering, there has been no public trading market for the GDRs or for the Company's ordinary shares. Although the GDRs will be admitted to trading on the London Stock Exchange, an active, liquid trading market may not develop or be sustained after this offering. Active, liquid trading markets generally result in lower price volatility and more efficient execution of buy and sell orders for investors. If an actual liquid trading market for the GDRs does not develop, the price of the GDRs may be more volatile and it may be difficult to complete a buy or sell order for the GDRs.

The trading prices of the GDRs may be subject to wide fluctuations in response to many factors, including:

- variations in Evraz's operating results and those of other steel and mining companies;
- variations in national and industry growth rates;
- actual or anticipated announcements of technical innovations or new products or services by Evraz or its competitors;
- changes in governmental legislation or regulation;
- general economic conditions within Evraz's business sector or in Russia; or
- extreme price and volume fluctuations on the Russian or other emerging market stock exchanges.

In addition, the market price of the GDRs may decline below the offering price, which will be determined by the results of the book building exercise being conducted by the Managers.

**Future sales of shares or GDRs may affect the market price of the GDRs.**

Sales, or the possibility of sales, by the Company or its controlling shareholder of a substantial number of GDRs or of the Company's ordinary shares in the public markets following the Offering could have an adverse effect on the trading prices of the GDRs or could effect the Company's ability to obtain further capital through an offering of equity securities. Subsequent equity offerings by the Company may also

23

reduce the percentage ownership of shares by its existing shareholders. Moreover, the Company may issue new shares that have rights, preferences or privileges senior to those of the Shares.

**The Shares underlying the GDRs are not listed and may be illiquid.**

Unlike nearly all other GDRs traded on the London Stock Exchange, the Company's ordinary shares are neither listed nor traded on any stock exchange, and the Company does not intend to apply for the listing or admission to trading of its ordinary shares on any stock exchange. As a result, a withdrawal of Shares by a holder of GDRs, whether by election or due to certain events described under "Terms and Conditions of the Global Depositary Receipts—Termination of Deposit Agreement", will result in that holder obtaining securities that are significantly less liquid than the GDRs and the price of those Shares may be discounted as a result of such withdrawal.

**Holders of the GDRs may not be able to benefit from certain UK anti-takeover protections.**

As the Company is not resident in the United Kingdom, the City Code on Takeovers and Mergers does not apply to the Company. As a result, a bid for, or creeping acquisition of control over, the Company is presently unregulated. Additional EU rules are likely to come into effect with respect to Luxembourg. See "Description of Share Capital and Corporate Structure—Potential Mandatory Offer Rules".

## RISKS RELATING TO THE RUSSIAN FEDERATION

*Political and Social Risks*

**Political and governmental instability could adversely affect the value of the GDRs.**

Since 1991, Russia has moved from a one-party state with a centrally-planned economy to a federal republic with democratic institutions and a market-oriented economy, but the Russian political system remains vulnerable to popular dissatisfaction, including dissatisfaction with the results of privatisations in the 1990s, as well as to demands for autonomy from particular regional and ethnic groups. The course of political, economic and other reforms has in some respects been uneven, and the composition of the Russian government—the prime minister and the other heads of federal ministries—has at times been unstable. For example, six different prime ministers headed governments between March 1998 and May 2000. During his term as president, President Putin has generally maintained governmental stability. In addition, the elections to the lower house of the legislature, the State Duma, in December 2003 resulted in a substantial majority for parties supportive of President Putin.

In February 2004, just prior to his election to a second term as president, President Putin dismissed his entire cabinet, including the prime minister. He subsequently appointed Mikhail Fradkov as Prime Minister and issued a presidential decree that significantly reduced the number of federal ministries, redistributed certain functions amongst various agencies of the Government of the Russian Federation (the "Government") and announced plans for a major overhaul of the federal administrative system. Many of these changes have since been implemented. President Putin is implementing reforms by which executives of sub-federal political units are no longer elected by the population, but instead are nominated by the President of the Russian Federation and confirmed by the legislature of the sub-federal political unit. President Putin has also proposed to eliminate single-member-district elections for the State Duma, and that all votes would instead be cast on a party list basis.

Future changes in the government, major policy shifts or lack of consensus between President Putin, the Government, Russia's parliament and powerful economic groups could lead to political instability, which could have a material adverse effect on Evraz and thus the value of the GDRs.

**Evraz is heavily dependent on its operations in the Russian Federation, and the reversal of reform policies or government policies targeted at specific individuals or companies could harm Evraz's business as well as investments in Russia more generally.**

Since President Putin took office as prime minister and then president in 1999, the political and economic situation in Russia has generally become more stable and conducive to investment. However, signs of a breakdown in the consensus among key Governmental officials are beginning to appear, raising questions about the direction of future economic reforms. Any significant struggle over the direction of future reforms, or the reversal of the reform program, could lead to a deterioration in Russia's investment climate that might constrain Evraz's ability to obtain financing in the international capital markets, hinder its access to raw materials in and limit its sales in Russia, and otherwise harm its business and results of

24

operations. In May 2005, President Putin ordered Prime Minister Mikhail Fradkov to submit to the Russian parliament by 1 November 2005 draft laws limiting foreign ownership of sectors that "ensure government security", which may include defense, oil and metals. The nature and scope of any such limitations that may be proposed is currently uncertain.

In 2003, Russian authorities arrested Mikhail Khodorkovsky and Platon Lebedev, key shareholders and managers of OAO NK Yukos ("Yukos"), then Russia's largest oil company by production, on tax evasion and related charges. Significant back tax claims have since been brought against Yukos, resulting in the auction of its major production subsidiary, OAO Yuganskneftegaz ("Yuganskneftegaz"), and the effective destruction of Yukos. Yuganskneftegaz was acquired, indirectly, by OAO NK Rosneft, a state-owned oil company, resulting in the first effective renationalisation of a significant company privatised in the 1990s. Some analysts contend that the arrests, destruction of Yukos and renationalisation of Yuganskneftegaz portend a willingness on the part of the Putin administration to reverse key political and economic reforms of the 1990s, including certain privatisations. Other analysts, however, believe that these arrests were isolated events that relate to the specific individuals and companies involved and do not signal any deviation from broader political and economic reforms or a wider program of asset redistribution. In March 2005, President Putin announced that he had instructed Prime Minister Mikhail Fradkov to draft legislation that would reduce the statute of limitations on privatisation transactions from ten years to three years, and a draft bill was approved by the Government in mid-May 2005, though it still must be approved by both houses of the Russian Legislature, the State Duma and the Federation Council, and approved by the president before becoming effective. President Putin also announced in March that the Government was considering plans to reform the system of tax collection and administration, and in his Annual Address to the Federal Assembly on 25 April 2005, President Putin stated that tax authorities should not "terrorize" taxpayers by repeatedly considering the same problems. For further discussion of recent activities by Russian tax authorities, see "—Legislative and Legal Risks—Unlawful, selective or arbitrary government action may have an adverse effect on Evraz's business and the value of the GDRs".

**Political, social and other conflicts, and corruption, create an uncertain operating environment that hinders Evraz's long-term planning ability and could adversely affect the value of its investments in Russia.**

The Russian Federation is a federation of 89 sub-federal political units, consisting of republics, territories, regions, cities of federal importance and autonomous regions and districts. The delineation of authority and jurisdiction among the members of the Russian Federation and the federal government is, in many instances, unclear and remains contested. Lack of consensus between the federal government and local or regional authorities often results in the enactment of conflicting legislation at various levels and may lead to further political instability. In particular, conflicting laws have been enacted in the areas of privatisation, securities, corporate legislation and licensing. Some of these laws and governmental and administrative decisions implementing them, as well as certain transactions consummated pursuant to them, have in the past been challenged in the courts, and such challenges may occur in the future. This lack of consensus hinders Evraz's long-term planning efforts and creates uncertainties in Evraz's operating environment, both of which may prevent Evraz from effectively and efficiently carrying out its business strategy. See also "—Risks Relating to Evraz—In the event the title to any company acquired by Evraz through privatisation, bankruptcy, sale or otherwise is successfully challenged, Evraz may lose its ownership interest in that company or its assets" and "—Legislative and Legal Risks—Weaknesses relating to the Russian legal system and Russian legislation create an uncertain environment for investment and business activity in Russia and thus could have a material adverse effect on Evraz's business and the value of the GDRs".

In addition, ethnic, religious, historical and other divisions have, on occasion, given rise to tensions and, in certain cases, military conflict, such as the continuing conflict in Chechnya, which has brought normal economic activity within Chechnya to a halt and disrupted the economies of neighboring regions. Various armed groups in Chechnya have regularly engaged in guerrilla attacks in that area. Violence and attacks relating to this conflict have also spread to other parts of Russia, including terrorist attacks in Moscow. The further intensification of violence, including terrorist attacks and suicide bombings, or its continued spread to other parts of Russia, could have significant political consequences, including the imposition of a state of emergency in some or all of Russia. Moreover, any terrorist attacks and the resulting heightened security measures may cause disruptions to domestic commerce and exports from Russia, and could materially adversely affect Evraz's results of operations and prospects, and thus the value of the GDRs.

The implementation of Russia's economic reforms has also led from time to time to social protest. For example, in 1998, miners in several regions of Russia, demanding payment of overdue wages, resorted to strikes which included blocking major railroads, and, in early 2005, pensioners in cities across Russia protested the replacement of certain in-kind benefits with cash allowances. The escalation of social unrest could have an adverse effect on Evraz's ability to conduct its business in Russia.

Finally, the Russian and international media have reported high levels of corruption in Russia and elsewhere in the CIS. Press reports have also described instances in which Government officials have engaged in selective investigations and prosecutions to further the interests of the Government and individual officials or business groups. Moreover, certain members of the Russian media appear to have published biased articles in exchange for payment. In addition, persons who are hostile to Evraz and/or its management and/or its beneficial owners may allege, in the press or elsewhere, that Evraz and/or its beneficial owners have engaged in illegal activities. Demands of corrupt officials, claims that Evraz or its management or its beneficial owners have been involved in corruption or illegal activities or biased articles and negative publicity could adversely affect Evraz's ability to conduct its business in Russia and the value of the GDRs.

*Economic Risks*

**Emerging markets such as Russia are subject to greater risks than more developed markets, and financial turmoil in any emerging market could disrupt Evraz's business, as well as cause the price of the GDRs to suffer.**

Generally, investment in emerging markets is only suitable for sophisticated investors who fully appreciate the significance of the risks involved in, and are familiar with, investing in emerging markets. Investors should also note that emerging markets such as Russia are subject to rapid change and that the information set out in this Offering Circular may become outdated relatively quickly. Moreover, financial turmoil in any emerging market country tends to adversely affect prices in equity markets of all emerging market countries as investors move their money to more stable, developed markets. As has happened in the past, financial problems or an increase in the perceived risks associated with investing in emerging economies could dampen foreign investment in Russia and adversely affect the Russian economy. In addition, during such times, companies that operate in emerging markets can face severe liquidity constraints as foreign funding sources are withdrawn. Thus, even if the Russian economy remains relatively stable, financial turmoil in any emerging market country could seriously disrupt Evraz's business, as well as result in a decrease in the price of the GDRs.

**Economic instability in Russia could adversely affect Evraz's business.**

Since the dissolution of the Soviet Union, the Russian economy has experienced at various times:

- significant declines in gross domestic product;
- hyperinflation;
- an unstable currency;
- high government debt relative to gross domestic product;
- a weak banking system providing limited liquidity to Russian enterprises;
- a large number of loss-making enterprises that continued to operate due to the lack of effective bankruptcy proceedings;
- significant use of barter transactions and illiquid promissory notes to settle commercial transactions;
- widespread tax evasion;
- the growth of black and gray market economies;
- high levels of capital flight;
- high levels of corruption and the penetration of organized crime into the economy;
- significant increases in unemployment and underemployment; and
- the impoverishment of a large portion of the Russian population.

26

The Russian economy has been subject to abrupt downturns. In particular, on 17 August 1998, in the face of a rapidly deteriorating economic situation, the Russian government defaulted on its rouble-denominated securities, the CBR stopped its support of the rouble and a temporary moratorium was imposed on certain hard currency payments. These actions resulted in an immediate and severe devaluation of the rouble, a sharp increase in the rate of inflation, a dramatic decline in the prices of Russian debt and equity securities and the inability of Russian issuers to raise funds in the international capital markets. These problems were aggravated by the near collapse of the Russian banking sector after the events of 17 August 1998, which further impaired the ability of the banking sector to act as a reliable and consistent source of liquidity to Russian companies.

Recent favourable trends in the Russian economy—such as the increase in gross domestic product, a relatively stable rouble and a reduced rate of inflation—may not continue or may be abruptly reversed. For example, in the first quarter of 2005 the inflation rate in Russia increased and economic growth slowed. In addition, because Russia produces and exports large quantities of oil and natural gas, the Russian economy is particularly vulnerable to fluctuations in the price of oil and natural gas on the world market, and a decline in the price of oil or natural gas could significantly slow or disrupt the Russian economy. The occurrence of any of these events could adversely affect Russia's economy and Evraz's business in the future.

**The Russian banking system remains underdeveloped, and Evraz is only able to conduct banking transactions with a limited number of creditworthy Russian banks.**

Russia's banking and other financial systems are not well developed or regulated, and Russian legislation relating to banks and bank accounts is subject to varying interpretations and inconsistent application. The 1998 financial crisis resulted in the bankruptcy and liquidation of many Russian banks and almost entirely eliminated the developing market for commercial bank loans at that time. From April through July 2004, the Russian banking sector experienced its first serious turmoil since the financial crisis of August 1998. As a result of various market rumours and, in some cases, certain regulatory and liquidity problems, several privately-owned Russian banks experienced liquidity problems and were unable to attract funds on the interbank market or from their client base. Simultaneously, they faced large withdrawals of deposits by both retail and corporate customers. Several of these privately-owned Russian banks collapsed or ceased or severely limited their operations. Russian banks owned or controlled by the Government or the CBR and foreign-owned banks generally were not adversely affected by the turmoil. There are currently also only a limited number of creditworthy Russian banks, most of which are located in Moscow.

As a result of these weaknesses in the Russian banking system, Evraz seeks to reduce its risk by receiving and holding its funds in Russia, including its rouble-denominated funds, with subsidiaries of foreign banks, which it generally believes to be more stable and less risky than Russian banks. However, there are few, if any, safe rouble-denominated instruments in which Evraz may invest the excess rouble cash of its Russian subsidiaries. Another banking crisis or the bankruptcy or insolvency of the banks with which Evraz holds funds could result in the loss of Evraz's deposits or affect its ability to complete banking transactions in Russia, which could have a material adverse effect on Evraz's financial condition and results of operations.

**Russia's physical infrastructure is in poor condition, which could disrupt Evraz's normal business activities.**

Russia's physical infrastructure largely dates back to Soviet times, and has not been adequately funded and maintained since the dissolution of the Soviet Union. Particularly affected are the rail and road networks, power generation and transmission, communication systems and building stock. Road conditions throughout Russia are poor, with many roads not meeting minimum requirements for use and safety. Breakdowns and failures of any part of Russia's physical infrastructure may disrupt normal business activity.

In order to enhance the prospects of infrastructure improvement, the Government is actively considering plans to reorganise the nation's rail, electricity and telephone systems. Any such reorganisations may result in increased charges and tariffs and may not result in the anticipated capital investment that is needed to repair, maintain and improve these systems. Significant increases in charges and tariffs, or further deterioration of Russia's infrastructure may limit economic growth, disrupt the transportation of goods and supplies and interrupt business operations of Evraz, its customers and

suppliers, any or all of which could have a material adverse effect on Evraz's business and the value of the GDRs.

*Legislative and Legal Risks*

**Weaknesses relating to the Russian legal system and Russian legislation create an uncertain environment for investment and business activity in Russia and thus could have a material adverse effect on Evraz's business and the value of the GDRs.**

Russia is still developing the legal framework required to support a market economy. The following risks relating to the Russian legal system create uncertainties with respect to the legal and business decisions that Evraz makes, many of which do not exist in countries with more developed market economies:

- inconsistencies among (1) federal laws; (2) decrees, orders and regulations issued by the president, the government and federal ministries; and (3) regional and local laws, rules and regulations;
- a lack of judicial and administrative guidance on interpreting Russian legislation;
- substantial gaps in the regulatory structure due to delay or absence of implementing regulations;
- the relative inexperience of judges and courts in interpreting new principles of Russian legislation;
- a lack of judicial independence from political, social and commercial forces;
- a high degree of unchecked discretion on the part of governmental authorities; and
- bankruptcy procedures that are not well developed and are subject to abuse.

Additionally, several fundamental laws in Russia have only recently become effective. The enactment of new legislation in the context of a rapid evolution to a market economy and the lack of consensus about the scope, content and pace of economic and political reforms has resulted in ambiguities, inconsistencies and anomalies in the overall Russian legal system. The enforceability and underlying constitutionality of many recently enacted laws is in doubt, and many new laws remain untested. Moreover, courts have limited experience in interpreting and applying many aspects of business and corporate law. Russian legislation also often contemplates implementing regulations that have not yet been promulgated, leaving substantial gaps in the regulatory infrastructure. All of these weaknesses could affect Evraz's ability to enforce its legal rights in Russia, including rights under its contracts, or to defend against claims by others in Russia.

The independence of the judicial system and the prosecutor general's office and their immunity from economic, political and nationalistic influences in Russia is also less than complete. The court system is understaffed and underfunded; judicial precedents generally have no binding effect on subsequent decisions; and most court decisions are not readily available to the public. Enforcement of court judgments can in practice be very difficult in Russia. All of these factors make judicial decisions in Russia difficult to predict and effective redress uncertain. Additionally, court claims are often used in furtherance of political aims, and law enforcement agencies do not always enforce or follow court judgments. Evraz may be subject to such claims and may not be able to receive a fair trial.

These uncertainties also extend to property rights. While legislation has been enacted to protect private property against expropriation and nationalisation, due to the lack of experience in enforcing these provisions and political factors, these protections may not be enforced in the event of an attempted expropriation or nationalisation. Expropriation or nationalisation of any of Evraz's entities in Russia, their assets or portions thereof, potentially without adequate compensation, could have a material adverse effect on Evraz's business and prospects.

**Unlawful, selective or arbitrary Government action may have an adverse effect on Evraz's business and the value of the GDRs.**

Governmental authorities have a high degree of discretion in Russia and at times appear to act selectively or arbitrarily, without hearing or prior notice, and in a manner that is contrary to law or influenced by political or commercial considerations. Moreover, the Government also has the power in certain circumstances, by regulation or government act, to interfere with the performance of, nullify or

terminate contracts. Unlawful, selective or arbitrary governmental actions have reportedly included denial or withdrawal of licenses, sudden and unexpected tax audits, criminal prosecutions and civil actions. Federal and local government entities also appear to have also used common defects in matters surrounding share issuances and registration as pretexts for court claims and other demands to invalidate the issuances or registrations or to void transactions, seemingly for political purposes. Standard & Poor's has expressed concerns that "Russian companies and their investors can be subjected to government pressure through selective implementation of regulations and legislation that is either politically motivated or triggered by competing business groups". In this environment, Evraz's competitors may receive preferential treatment from the government, potentially giving them a competitive advantage. Unlawful, selective or arbitrary government action, if directed at Evraz's operations in Russia, could have a material adverse effect on its business, results of operations and prospects and on the value of the GDRs.

In addition, since 2003, the Ministry for Taxes and Levies (now succeeded by the Federal Tax Service) has begun to attack certain Russian companies' use of tax-optimisation schemes, and press reports have speculated that these enforcement actions have been selective. For example, the Russian Federal Tax Service determined that Yukos owes in excess of U.S.$28 billion in back taxes and related penalties, and, as noted above, in December 2004 Yukos' major production subsidiary, Yuganskneftegaz, was auctioned in partial settlement of these obligations. In addition, the press has reported significant claims for back taxes and related penalties against other oil companies, including TNK-BP; telecommunications companies, including OAO Vimpelcom; and other major companies. In March 2005, President Putin announced that the Government was considering plans to reform the system of tax collection and administration. However, in April 2005 the back tax claim against TNK-BP for 2001 was increased by RUR22 billion (approximately U.S.$792 million), bringing the total claim for 2001 against TNK-BP to RUR26 billion (approximately U.S.$936 million), and it has been reported that Sibneft, another oil company, may receive a back tax claim for RUR21 billion (approximately U.S.$756 million). In his Annual Address to the Federal Assembly on 25 April 2005, President Putin stated that tax authorities should not "terrorize" taxpayers by repeatedly considering the same problems. Although Evraz believes that it is currently in compliance with all of its tax obligations with respect to its operations in the Russian Federation, there can be no assurance that the Federal Tax Service will not become more aggressive in respect of future tax audits, which may have an adverse effect on Evraz's results of operations and prospects.

**Shareholder liability under Russian legislation could cause the Company to become liable for the obligations of its Russian subsidiaries.**

The Russian Civil Code, the Law on Joint Stock Companies and the Law on Limited Liability Companies generally provide that shareholders in a Russian joint stock company or limited liability company are not liable for the obligations of the company and bear only the risk of loss of their investment. This may not be the case, however, when one person (an "effective parent") is capable of determining decisions made by another (an "effective subsidiary"). The effective parent bears joint and several responsibility for transactions concluded by the effective subsidiary in carrying out these decisions if:

- this decision-making capability is provided for in the charter of the effective subsidiary or in a contract between the companies; and

- the effective parent gives obligatory directions to the effective subsidiary.

In addition, an effective parent is secondarily liable for an effective subsidiary's debts if an effective subsidiary becomes insolvent or bankrupt as a result of the action or inaction of an effective parent. This is the case no matter how the effective parent's capability to determine decisions of the effective subsidiary arises. For example, this liability could arise through ownership of voting securities or by contract. In these instances, other shareholders of the effective subsidiary may claim compensation for the effective subsidiary's losses from the effective parent that caused the effective subsidiary to act or fail to act, knowing that such action or inaction would result in losses. Accordingly, in the Company's position as an effective parent, it could be liable in some cases for the debts of its effective subsidiaries in Russia. The total liabilities of the Company's consolidated Russian subsidiaries as of 31 December 2004 were U.S.$1.2 billion, excluding intercompany indebtedness.

**Weaknesses and changes in the Russian tax system could materially adversely affect Evraz's business and the value of the GDRs.**

Generally, taxes payable by Russian companies are substantial and numerous. These taxes include, among others, income taxes, value-added tax (VAT), excise taxes, unified social tax and property tax.

29

The tax environment in Russia has historically been complicated by the fact that various authorities have often issued contradictory pieces of tax legislation. Because of the political changes which have occurred in Russia over the past several years, there have recently been significant changes to the Russian taxation system.

Tax reform commenced in 1999 with the introduction of Part One of the Russian Tax Code, which sets general taxation guidelines. Since then, Russia has been in the process of replacing legislation regulating the application of major taxes such as corporate income tax, VAT and property tax with new chapters of the Tax Code. For instance, new chapters of the Tax Code on VAT, unified social tax and personal income tax came into force on 1 January 2001; the profits tax and mineral extraction tax chapters came into force on 1 January 2002; and the corporate property tax chapter of the Tax Code came into force on 1 January 2004.

In practice, Russian tax authorities often have their own interpretation of the tax laws that rarely favours taxpayers, who often have to resort to court proceedings to defend their position against the tax authorities. Differing interpretations of tax regulations exist both among and within government ministries and organizations at the federal, regional and local levels, creating uncertainties and inconsistent enforcement. Tax declarations, together with related documentation such as customs declarations, are subject to review and investigation by a number of authorities, each of which may impose fines, penalties and interest charges. Generally, taxpayers are subject to inspection for a period of three calendar years of their activities which immediately preceded the year in which the audit is carried out. As previous audits do not exclude subsequent claims relating to the audited period, the statute of limitations is not entirely effective. In addition, in some instances, new tax regulations have been given retroactive effect. Recently, the Constitutional Court of the Russian Federation ruled that VAT paid on a commercial enterprise's purchases, or input VAT, cannot be offset against VAT collected from sales to the extent that the input VAT was incurred on items purchased with borrowed funds.

Moreover, financial statements of Russian companies are not consolidated for tax purposes. Therefore, each of the Company's Russian subsidiaries pays its own Russian taxes and may not offset its profit or loss against the loss or profit of another entity in the consolidated Evraz group. In addition, pursuant to amendments to tax legislation effective as of 1 January 2005, payments of intercompany dividends between two Russian entities are subject to a withholding tax of 9% at the time they are paid out of profits, though this tax does not apply to dividends once they have already been taxed.

The foregoing conditions create tax risks in Russia that are more significant than typically found in countries with more developed tax systems, imposing additional burdens and costs on Evraz's operations, including management resources. There can be no assurance that current taxes will not be increased or that additional sources of revenue or income, or other activities, will not be subject to new taxes, charges or similar fees in the future. For a further discussion of the risks and uncertainties associated with the enforcement and application of the tax regime in Russia, see "—Legislative and Legal Risks—Unlawful, selective or arbitrary government action may have an adverse effect on Evraz's business and the value of the GDRs". In addition to Evraz's substantial tax burden, these risks and uncertainties complicate its tax planning and related business decisions, potentially exposing Evraz to significant fines and penalties and enforcement measures despite its best efforts at compliance, and could adversely affect Evraz's business and results of operations and the value of the GDRs.