# EXHIBIT C

## COMPLAINT COMPARISON CHART

| Allegations Made by These Plaintiffs in the Complaint in This Action, Filed on November 4, 2004 | Allegations Made by These Plaintiffs in the Complaint Filed in Chancery Court on April 26, 2005 |
|---|---|
| **COMPLAINT** | **COMPLAINT** |
| Plaintiffs Davis International, LLC, ("Davis"), Holdex, LLC ("Holdex"), Foston Management, LTD ("Foston"), and Omni Trusthouse, LTD ("Omni," and collectively, "Plaintiffs"), by and through their undersigned counsel, as and for their Complaint against Defendants, hereby allege as follows: | Plaintiffs Davis International, LLC, ("Davis"), Holdex, LLC ("Holdex"), Foston Management, LTD ("Foston"), and Omni Trusthouse, LTD ("Omni," and collectively, "Plaintiffs"), by and through their undersigned counsel, as and for their Complaint against Defendants, hereby allege as follows: |
| **Nature of the Action** | **Nature of the Action** |
| 1. The instant case concerns a racketeering scheme beginning in the 1990s among members of an international organized crime group, headed by Mikhail Chernoi, Oleg Deripaska, Iskander Makmudov, and American Mikhail Nekrich, utilizing Delaware entities as their alter egos, managed by American Arnold Kislin (the "Illegal Scheme"). | 1. The instant case concerns a racketeering scheme beginning in the 1990s among members of an international organized crime group, headed by Mikhail Chernoi, Oleg Deripaska, Iskander Makmudov, and American Mikhail Nekrich, utilizing Delaware entities as their alter egos, managed by American Arnold Kislin (the "Illegal Scheme"). |
| 2-3. Defendants Chernoi, Deripaska, Makmudov, Nekrich and Kislin (the "Conspirators), . . . committed numerous criminal acts . . . . In the early 1990's, the Conspirators effected a scheme by which they took advantage of weaknesses in the Russian central banking system. By providing forged authorizations from regional banks to the central banking system, they were able to wire funds to shell companies in other regions, convert the funds to cash, and then ultimately wire the funds to the U.S. in order to launder and legalize them. | 2. In the early 1990's, Defendants Chernoi, Deripaska, Makmudov, Nekrich and Kislin (the "Conspirators"), effected a scheme by which they took advantage of weaknesses in the Russian central banking system. By providing forged authorizations from regional banks to the central banking system, they were able to wire funds to shell companies in other regions, convert the funds to cash, and then ultimately wire the funds to the U.S. in order to launder and legalize them. |
| 4. From 1993 onward, these funds were | 3. From 1993 onward, these funds were |

| | |
|---|---|
| laundered through Delaware entities and used to purchase tens of millions of dollars of real estate in the U.S.; the real estate was then sold and the laundered and "legalized" funds further reinvested in other businesses. These funds, "legalized" in the U.S. in the above manner, served as seed money for their illegal ventures. | laundered through Delaware entities and used to purchase tens of millions of dollars of real estate in the U.S.; the real estate was then sold and the laundered and "legalized" funds further reinvested in other businesses. These funds, "legalized" in the U.S. in the above manner, served as seed money for their illegal ventures. |
| 5. In mid 1999, the conspirators threatened physical harm to Plaintiffs' representatives unless they ceded control over Kachkanarsky GOK ("GOK"), Russia's largest vanadium ore mining concern, of which Plaintiffs were the majority shareholders. | 4. In mid 1999, the conspirators threatened physical harm to Plaintiffs' representatives unless they ceded control over Kachkanarsky GOK ("GOK"), Russia's largest vanadium ore mining concern, of which Plaintiffs were the majority shareholders. |
| 6. In early 2000, the Conspirators took over GOK through physical force, bribery, and extortion. | 5. In early 2000, the Conspirators took over GOK through physical force, bribery, and extortion. |
| 7. Once in physical control of GOK, the Conspirators replaced the plant's general director with their own designee, who had the plant enter into sham contracts with their affiliates, which contracts were then deliberately defaulted, creating massive sham debts. | 6. Once in physical control of GOK, the Conspirators replaced the plant's general director with their own designee, who had the plant enter into sham contracts with their affiliates, which contracts were then deliberately defaulted, creating massive sham debts. |
| 8. The plant was then placed in a bankruptcy by which they could assert control, because the debts they were "owed" allowed them to elect their agent as the bankruptcy manager. | 7. The plant was then placed in a bankruptcy by which they could assert control, because the debts they were "owed" allowed them to elect their agent as the bankruptcy manager. |
| 9. In late 2000, the Conspirators arranged for Plaintiffs' shares in GOK to be transferred to the Delaware corporate defendants, utilizing, *inter alia,* fraud or corrupted court proceedings in which Plaintiffs were not even named as parties; the Delaware companies ultimately transferred these shares to UGMC and then to EVRAZ, which is controlled by Chernoi, Deripaska, Makmudov, and Nekrich. | 8. In late 2000, the Conspirators arranged for Plaintiffs' shares in GOK to be transferred to the Delaware corporate defendants, utilizing, *inter alia,* fraud or corrupted court proceedings in which Plaintiffs were not even named as parties; the Delaware companies ultimately transferred these shares to UGMC and then to EVRAZ, which is controlled by the [sic] Chernoi, Deripaska, Makmudov, and Nekrich. |

{00019856}

| | |
|---|---|
| 10. Delaware was the forum of choice for Defendants for effecting this and other illegal schemes; over the course of time, Defendants used over 100 Delaware entities to effect their schemes of fraud, bribery, and money laundering; seventeen of these entities are named herein. | 9. Delaware was the forum of choice for Defendants for effecting this and other illegal schemes; over the course of time, Defendants used over 100 Delaware entities to effect their schemes of fraud, bribery, and money laundering; seventeen of these entities are named herein. |
| 11. Also, in 2000, in order to sustain the seizure of GOK, false criminal charges were brought against Jalol Khaidarov, who had served as the general director of GOK, including an incident widely-reported in the electronic and print media of the police planting narcotics on him at the Starlight Diner in Moscow, which forced him to flee to Israel. | 10. Also, in 2000, in order to sustain the seizure of GOK, false criminal charges were brought against Jalol Khaidarov, who had served as the general director of GOK, including an incident widely-reported in the electronic and print media of the police planting narcotics on him at the Starlight Diner in Moscow, which forced him to flee to Israel. |
| 12. In 2001, at Makmudov's direction, Russian police purported to find narcotics in the Moscow headquarters office of Israeli citizen Joseph Traum, a principal and managing director of Plaintiff Davis; when freed, he fled home. The "discovery" of "narcotics" at Traum's office and his "deportation" from Russia was covered on TV and radio. | 11. In 2001, at Makmudov's direction, Russian police purported to find narcotics in the Moscow headquarters office of Israeli citizen Joseph Traum, a principal and managing director of Plaintiff Davis; when freed, he fled home. The "discovery" of "narcotics" at Traum's office and his "deportation" from Russia was covered on TV and radio. |
| 13. In 2003, the Conspirators arranged for GOK to issue new shares to companies which they control so that even if Plaintiffs recovered their shares in GOK they would be in the minority, unless the new shares are either transferred to Plaintiffs or set aside. | 12. In 2003, the Conspirators arranged for GOK to issue new shares to companies which they control so that even if Plaintiffs recovered their shares in GOK they would be in the minority, unless the new shares are either transferred to Plaintiffs or set aside. |
| 14. As a result of the Illegal Scheme, Plaintiffs have suffered in excess of $500 million in damages through the loss of their shares and control over GOK. | 13. As a result of the Illegal Scheme, Plaintiffs have suffered in excess of $500 million in damages through the loss of their shares and control over GOK. |
| 15. In August 2001, Plaintiffs joined a suit in the Southern District of New York brought by other plaintiffs involving additional defendants and additional claims, which was dismissed for *forum non conveniens* in March 2003 and affirmed in a | 14. In August 2001, Plaintiffs joined a suit in the Southern District of New York brought by other plaintiffs involving additional defendants and additional claims, which was dismissed for *forum non conveniens* in March 2003 and affirmed in a |

| | |
|---|---|
| non-published opinion in March 2004. | non-published opinion in April 2004. |
| **Parties and Related Non-Parties** | **Parties and Related Non-Parties** |
| **Plaintiffs** | **Plaintiffs** |
| 16. **Plaintiff Davis International, LLC** ("Davis") is a company organized under the laws of the State of West Virginia. | 15. **Plaintiff Davis International, LLC** ("Davis") is a company organized under the laws of the State of West Virginia. |
| 17. **Plaintiff Holdex, LLC** ("Holdex") is a company organized under the laws of the State of Texas. | 16. **Plaintiff Holdex, LLC** ("Holdex") is a company organized under the laws of the State of Texas. |
| 18. **Plaintiff Foston Management, LTD** ("Foston") is a company organized under the laws of Cyprus. | 17. **Plaintiff Foston Management, LTD** ("Foston") is a company organized under the laws of Cyprus. |
| 19. **Plaintiff Omni Trusthouse, LTD** ("Omni") is a company organized under the laws of England. | 18. **Plaintiff Omni Trusthouse, LTD** ("Omni") is a company organized under the laws of England. |
| 20. Davis, Holdex, Foston and Omni collectively owned more than 72% of the shares of GOK prior to the fraudulent transfer of their shares described herein. | 19. Davis, Holdex, Foston and Omni collectively owned more than 72% of the shares of GOK prior to the fraudulent transfer of their shares described herein. |
| **Kachkanarsky GOK** | **Kachkanarsky GOK** |
| 21. Non-party **Kachkanarsky GOK** ("GOK") is a company organized under the laws of the Russian Federation that maintains Russia's largest vanadium ore plant in Kachkanarsky GOK, wich is located in the town of Kachkanar in the Sverdlovsk Oblast in the Ural Mountains. | 20. Non-party **Kachkanarsky GOK** ("GOK") is a company organized under the laws of the Russian Federation that maintains Russia's largest vanadium ore plant in Kachkanarsky GOK, wich is located in the town of Kachkanar in the Sverdlovsk Oblast in the Ural Mountains. |
| 22. Vanadium ore produced by GOK is used to manufacture various metal products as well as pure vanadium, which are sold to customers in the United States. | 21. Vanadium ore produced by GOK is used to manufacture various metal products as well as pure vanadium, which are sold to customers in the United States. |
| **Defendants** | **Defendants** |

| | |
|---|---|
| 23. **Defendant New Start Group Corp.** ("New Start") is a company organized under the laws of the State of Delaware. | 22. **Defendant New Start Group Corp.** ("New Start") is a company organized under the laws of the State of Delaware. |
| 24. **Defendant Venitom Corp.** ("Venitom") is a company organized under the laws of the State of Delaware. | 23. **Defendant Venitom Corp.** ("Venitom") is a company organized under the laws of the State of Delaware. |
| 25. **Defendant Pan-American Corp.** ("Pan-American") is a company organized under the laws of the State of Delaware, which was dissolved in 1998. | 24. Non-Party **Pan-American Trade Corp.** ("Pan-American") is a company organized under the laws of the State of Delaware, which was dissolved in 1998. |
| 26. **Defendant Mikhail Chernoi** ("Chernoi") is a Russian and/or Israeli citizen who resides in Israel. He is the head of the Conspirators' criminal group. | 25. **Defendant Mikhail Chernoi** ("Chernoi") is a Russian and/or Israeli citizen who resides in Israel. He is the head of the Conspirators' criminal group. |
| 27. **Defendant Oleg Deripaska** ("Deripaska") is a Russian citizen who resides in Moscow. | 26. **Defendant Oleg Deripaska** ("Deripaska") is a Russian citizen who resides in Moscow. |
| 28. **Defendant Arnold Kislin** ("Kislin") is an American citizen and resident of the State of New York. | 27. **Defendant Arnold Kislin** ("Kislin") is an American citizen and resident of the State of New York. |
| 29. **Defendant Iskander Makmudov** ("Makmudov") is a Russian citizen who resides in Moscow. | 28. **Defendant Iskander Makmudov** ("Makmudov") is a Russian citizen who resides in Moscow. |
| 30. **Defendant Mikhail Nekrich** ("Nekrich") is a United States citizen who resides in Switzerland or Russia and joined the conspiracy in 1997. | 29. **Defendant Mikhail Nekrich** ("Nekrich") is a United States citizen who resides in Switzerland or Russia and joined the conspiracy in 1997. |
| 31. **Defendant Moscovsky Delovoy Mir Bank ("MDM Bank")** is organized under the laws of the Russian Federation; its name means Moscow Business Bank. MDM Bank was owned, directly or indirectly, by Chernoi, Deripaska, Makmudov, and Nekrich and operated and managed by them. | 30. **Defendant Moscovsky Delovoy Mir Bank ("MDM Bank")** is organized under the laws of the Russian Federation; its name means Moscow Business Bank. MDM Bank was owned, directly or indirectly, by Chernoi, Deripaska, Makmudov, and Nekrich and operated and managed by them. |
| 32. **Defendant Ural-Gorno Metallurgical Company ("UGMC")** is organized under | 31. **Defendant Ural-Gorno Metallurgical Company ("UGMC")** is organized under |

{00019856}

| | |
|---|---|
| the laws of the Russian Federation; during the relevant time, Makmudov operated and managed UGMC. At present, Makmudov is the Chairman of the Board of Directors of UGMC. The beneficial owners of UGMC ar eChernoi, Deripaska, Makmudov and Nekrich. | the laws of the Russian Federation; during the relevant time, Makmudov operated and managed UGMC. At present, Makmudov is the Chairman of the Board of Directors of UGMC. The beneficial owners of UGMC are Chernoi, Deripaska, Makmudov and Nekrich. |
| 33. **Defendant Evraz Holdings ("EVRAZ")** is organized under the laws of the Russian Federation. Evraz was owned, directly or indirectly by Chernoi, Deripaska, Makmudov and Nekrich and operated and managed by them, or under their direction and control. | 32. **Defendant Evraz Holdings ("EVRAZ")** is organized under the laws of the Russian Federation. Evraz was owned, directly or indirectly by Chernoi, Deripaska, Makmudov and Nekrich and operated and managed by them, or under their direction and control. |
| 34. Defendants New Start, Venitom, and Pan-American are owned, directly or indirectly, and the corporate alter egos of Chernoi, Deripaska, Makmudov and Nekrich and operated and managed and operated by Kislin. | 33. Defendants New Start, Venitom, and Pan-American [sic] are owned, directly or indirectly, and the corporate alter egos of Chernoi, Deripaska, Makmudov and Nekrich and operated and managed and operated by Kislin. |
| 35. These Delaware Defendants and other Delaware entities were created by the Conspirators and used for the purpose of furthering criminal conduct. | 34. These Delaware Defendants and other Delaware entities were created by the Conspirators and used for the purpose of furthering criminal conduct. |
| 36. The Conspirators regularly utilized Delaware entities in their various illegal schemes involving fraud, bribery, and money laundering. The Conspirators organized or bought over 100 Delaware entities for these purposes, including (1) MIC Building Co., L.P.; (2) MC MIC Building Corp.; (3) MIC Leasing Co., L.P.; (4) MC MIC Leasing Corp.; (5) Around the Clock Corp.; (6) CMC MIC Holding "Company, LLC; (7) MC Holdings Company, LLC; (8) CMC Factory Holding Company, LLC; (9) CMC Center Holding Company, LLC; (10) CMC Falchi Holding Company, LLC; (11) Falchi Building Co., L.P.; (12) 33-00 Center Building LLC; (13) The Factory, L.P.; and (14) MC Factory Corp. (collectively the "Delaware Real | 35. The Conspirators regularly utilized Delaware entities in their various illegal schemes involving fraud, bribery, and money laundering. The Conspirators organized or bought over 100 Delaware entities for these purposes, including (1) MIC Building Co., L.P.; (2) MC MIC Building Corp.; (3) MIC Leasing Co., L.P.; (4) MC MIC Leasing Corp.; (5) Around the Clock Corp.; (6) CMC MIC Holding "Company, LLC; (7) MC Holdings Company, LLC; (8) CMC Factory Holding Company, LLC; (9) CMC Center Holding Company, LLC; (10) CMC Falchi Holding Company, LLC; (11) Falchi Building Co., L.P.; (12) 33-00 Center Building LLC; (13) The Factory, L.P.; and (14) MC Factory Corp. (collectively the "Delaware Real |

{00019856}

| | |
|---|---|
| Estate Entities"). | Estate Entities"). |
| 37. The Delware Rreal Estate Entities were used by Chernoi, Deripaska, Kislin, Makmudov, and Nekrich in part, to own real estate in the United States as a means of laundering their illegally obtained funds. | 36. The Delware Rreal Estate Entities were used by Chernoi, Deripaska, Kislin, Makmudov, and Nekrich in part, to own real estate in the United States as a means of laundering their illegally obtained funds. |
| **The Russian-American "Izmailovo Mafia"** | **The Russian-American "Izmailovo Mafia"** |
| 38. Non-party **Anton Malevsky** ("Malevsky"), now deceased, was a Russian citizen who was a member of and controlled the Russian-American Izmailovo Mafia during the relevant time period and acted on behalf of Defendants. | 37. Non-party **Anton Malevsky** ("Malevsky"), now deceased, was a Russian citizen who was a member of and controlled the Russian-American Izmailovo Mafia during the relevant time period and acted on behalf of Defendants. |
| 39. The Izmailovo Mafia is one of the most powerful Russian-American organized crime groups and is named for the Izmailovo region of Moscow. | 38. The Izmailovo Mafia is one of the most powerful Russian-American organized crime groups and is named for the Izmailovo region of Moscow. |
| 40. As set forth in numerous media articles and government reports, the Izmailovo Mafia has infiltrated the United States; its American leader, Vyacheslav Ivankov, was recently released from federal prison where he served seven years for extortion; he was immediately extradited to Russia to be tried for murder charges. | 39. As set forth in numerous media articles and government reports, the Izmailovo Mafia has infiltrated the United States; its American leader, Vyacheslav Ivankov, was recently released from federal prison where he served seven years for extortion; he was immediately extradited to Russia to be tried for murder charges. |
| 41. Chernoi, Deripaska, Makmudov, and Nekrich operate an organized crime group which is part of the Izmailevo [sic.] Mafia. | 40. Chernoi, Deripaska, Makmudov, and Nekrich operate an organized crime group which is part of the Izmailovo Mafia. |
| 42. Chernoi has been indicted in Israel for the equivalent of money laundering; on information and belief, he is currently the subject of criminal proceedings in Switzerland. | 41. Chernoi has been indicted in Israel for the equivalent of money laundering; on information and belief, he is currently the subject of criminal proceedings in Switzerland. |
| 43. Deripaska has been barred from entering Switzerland and, on information and belief, he is currently the subject of | 42. Deripaska has been barred from entering Switzerland and, on information and belief, he is currently the subject of |

{00019856}

| | |
|---|---|
| criminal proceedings in Switzerland. | criminal proceedings in Switzerland. |
| 44. According to numerous media articles, the Ismailovo Mafia, through Nekrich, has financed Chechen terrorists, including those with ties to the international terrorist network of al-Qaeda. | 43. According to numerous media articles, the Ismailovo Mafia, through Nekrich, has financed Chechen terrorists, including those with ties to the international terrorist network of al-Qaeda. |
| **The Central Bank Fraud** | **The Central Bank Fraud** |
| 45. In the early 1990's, a number of Russian organized crime groups, including the Chernoi, Deripaska, and Makmudov association, engaged in a simple, but effective, check kiting-like fraud, on the Russian central bank. | 44. In the early 1990's, a number of Russian organized crime groups, including the Chernoi, Deripaska, and Makmudov association, engaged in a simple, but effective, check kiting-like fraud, on the Russian central bank. |
| 46. In order to effect the fraud, they set up dummy companies and opened accounts in their names with a local branch of the Russian central bank, usually in Chechnya. Then, they would issue a payment advice to the order of another dummy company controlled by them and arrange for it to be accepted by the branch. The branch would transfer the advice to the payee company's account in another branch which would be credited with immediate availability of funds upon receipt of the advice. Because the Conspirators used Chechen branches to effect the fraud, the advices were known as "Chechen Advices." | 45. In order to effect the fraud, they set up dummy companies and opened accounts in their names with a local branch of the Russian central bank, usually in Chechnya. Then, they would issue a payment advice to the order of another dummy company controlled by them and arrange for it to be accepted by the branch. The branch would transfer the advice to the payee company's account in another branch which would be credited with immediate availability of funds upon receipt of the advice. Because the Conspirators used Chechen branches to effect the fraud, the advices were known as "Chechen Advices." |
| 47. The payee would then cash the funds, which would ultimately be wired through bank accounts in the United States. The funds were used to purchase tens of millions of dollars of real estate in the U.S. in the name of entities registered in the state of Delaware. | 46. The payee would then cash the funds, which would ultimately be wired through bank accounts in the United States. The funds were used to purchase tens of millions of dollars of real estate in the U.S. in the name of entities registered in the state of Delaware. |
| 48. Fourteen of these Delaware entities are named above as the Delaware Real Estate Entities; ultimately, this real estate was sold and the proceeds were used as "seed | 47. Fourteen of these Delaware entities are named above as the Delaware Real Estate Entities; ultimately, this real estate was sold and the proceeds were used as "seed |

{00019856}

| | |
|---|---|
| money" for the Conspirators other criminal ventures, including the takeover of GOK. | money" for the Conspirators other criminal ventures, including the takeover of GOK. |
| **The Initial Extortion** | **The Initial Extortion** |
| 49. Prior to December 1998, Jalol Khaidarov had worked for Chernoi, Deripaska, and Makmudov as a financial advisor. In December 1998, Khaidarov established an independent career and began to serve as the general director of GOK in April 1999. | 48. Prior to December 1998, Jalol Khaidarov had worked for Chernoi Deripaska, and Makhmudov as a financial advisor. In December 1998, Khaidarov established an independent career and began to serve as the general director of GOK in April 1999. |
| 50. In April 1999, Khaidarov met with Chernoi and Makmudov in Chernoi's apartment in the center of Paris regarding GOK. Chernoi told Khaidarov that "there were a lot of clever people like Felix Lvov, Oleg Kantor, Vadim Yafasov, but sometimes they die. Don't be too clever. You have a chance to continue working with us. To that end, you should persuade the shareholders of GOK to transfer their shares to us. Some people refuse my offers. But for the rest of their lives, they wear bulletproof jackets. So what's the sense? Think it over." This was a direct threat on the life of Khaidarov if he did not cooperate with Chernoi because all of the above persons had been murdered in Russia. | 49. In April 1999, Khaidarov met with Chernoi and Makmudov in Chernoi's apartment in the center of Paris regarding GOK. Chernoi told Khaidarov that "there were a lot of clever people like Felix Lvov, Boris Kantor, Yafiasov, but sometimes they die. Don't be too clever. You have a chance to continue working with us. To that end, you should persuade the shareholders of GOK to transfer their shares to us. Some people refuse my offers. But for the rest of their lives, they wear bullet proof jackets. So what's the sense? Think it over." This was a direct threat on the life of Khaidarov if he did not cooperate with Chernoi because all of the above persons had been murdered in Russia. |
| 51. By May or June 1999, the controlling shareholders of GOK agreed preliminarily to sell 20% of their shares to a company controlled by the Conspirators in response to the extortion. The GOK controlling shareholders hoped that this would satisfy the Conspirators. The Conspirators made a down payment of $5 million for these shares, which was wired through a bank in the United States to an account held on behalf of the GOK shareholders. | 50. By May or June 1999, the controlling shareholders of GOK agreed preliminarily to sell 20% of their shares to a company controlled by the Conspirators in response to the extortion. The GOK controlling shareholders hoped that this would satisfy the Conspirators. The Conspirators made a down payment of $5 million for these shares, which was wired through a bank in the United States to an account held on behalf of the GOK shareholders. |
| 52. Several months later, Makmudov told Khaidarov that the Conspirators needed a | 51. Several months later, Makmudov told Khaidarov that the Conspirators needed a |

{00019856}

| | |
|---|---|
| controlling share of GOK, and Chernoi demanded that Khaidarov arrange for 51 % of the shares of GOK to be transferred to the Conspirators. | controlling share of GOK, and Chernoi demanded that Khaidarov arrange for 51% of the shares of GOK to be transferred to the Conspirators. |
| 53. In response, the GOK controlling shareholders decided that it was impossible to cooperate or satisfy Chernoi and Makmudov, short of simply giving up their interests for far less than their worth. As a result, the GOK shareholders returned the $5 million … and the purported transfer of shares did not take place. | 52. In response, the GOK controlling shareholders decided that it was impossible to cooperate or satisfy Chernoi and Makmudov, short of simply giving up their interests for far less than their worth. As a result, the GOK shareholders returned the $5 million and the purported transfer of shares did not take place. |
| **The Malevsky Extortion** | **The Malevsky Extortion** |
| 54-55. Immediately thereafter, in November 1999, Makmudov asked Khaidarov to meet with him at the Luxor Restaurant at the Metropole Hotel in Moscow. Shortly after the meeting began, Makmudov called Malevsky, who then joined the meeting, accompanied by five armed thugs; . . . Makmudov demanded that Khaidarov arrange for the GOK controlling shareholders to transfer 51% of GOK's shares to Chernoi without payment. | 53-54. Immediately thereafter, in November 1999, Makmudov asked Khaidarov to meet with him at the Luxor Restaurant at the Metropole Hotel in Moscow. Shortly after the meeting began, Makmudov called Malevsky, who then joined the meeting, accompanied by five armed thugs. . . . Makmudov demanded that Khaidarov arrange for the GOK controlling shareholders transfer 51% of GOK's shares to Chernoi without payment. |
| 56-57. Khaidarov said he thought Makmudov was crazy, but that he would transmit the message. Malevsky then told Khaidarov, "What do you think you're saying? This is the last time that you will leave here alive." | 55-56. Khaidarov said he thought Makmudov was crazy, but that he would transmit the message. Malevsky then told Khaidarov, "What do you think you re saying? This is the last time that you will leave here alive." |
| **The Bribery of Governor Roussel** | **The Bribery of Governor Roussel** |
| 58. As of 1999, Eduard Roussel ("Roussel") was the Governor of the Sverdlovsk Oblast, where GOK was located. | 57. As of 1999, Eduard Roussel ("Roussel") was the Governor of the Sverdlovsk Oblast, where GOK was located. |
| 59. In that year, meetings were arranged between representatives of the Conspirators | 58. In that year, meetings were arranged between representatives of the Conspirators |

{00019856}

| | |
|---|---|
| including Makmudov, to pay Roussel for his "protection" and "help." | including Makmudov, to pay Roussel for his "protection" and "help." |
| 60-61. Payments were then wired by Pan-American through banks in the United States to MDM Bank for conversion into cash for payment at the direction of Roussel. These payments included the illegal payment of $850,000 in cash for Roussel's election campaign -- a payment that was widely reported in the Russian press. | 59-60. Payments were wired by Pan-American through banks in the United States to MDM Bank for conversion into cash for payment at the direction of Roussel. These payments included the illegal payment of $850,000 in cash for Roussel's election campaign -- a payment that was widely reported in the Russian press. |
| 62. In return for these payments, Roussel agreed to support the Conspirators' efforts to do "business" in Sverdlovsk Oblast. | 61. In return for these payments, Roussel agreed to support the Conspirators' efforts to do "business" in Sverdlovsk Oblast. |
| **The Physical Takeover of GOK** | **The Physical Takeover of GOK** |
| 63. On or about January 28, 2000, the Conspirators took over GOK by sending armed persons to take physical control of the plant. The takeover of GOK was widely covered by leading Russian TV and media. | 62. On or about January 28, 2000, the Conspirators took over GOK by sending armed persons to take physical control of the plant. The takeover of GOK was widely covered by leading Russian TV and media. |
| 64. By threat of physical harm, the Conspirators caused four of the seven member board of directors of GOK in the absence of a quorum, which according to the bylaws was five to vote to remove Khaidarov as general director and to replace him with Andrey Kozitsin ("Kozitsin"), an agent of the Conspirators. | 63. By threat of physical harm, the Conspirators caused four of the seven member board of directors of GOK in the absence of a quorum, which according to the bylaws was five to vote to remove Khaidarov as general director and to replace him with Andrey Kozitsin ("Kozitsin"), an agent of the Conspirators. |
| 65. Although the lower court order approving this resolution of the board of directors was invalidated by a directive from a member of the Supreme Court of Russia, which remanded the case for reconsideration, the lower court failed to conduct a hearing to reconsider its order for over two years and, as of the filing of this Complaint, has yet to decide the matter. | 64. Although the lower court order approving this resolution of the board of directors was invalidated by a directive from a member of the Supreme Court of Russia, which remanded the case for reconsideration, the lower court failed to conduct a hearing to reconsider its order for over two years and, as of the filing of this Complaint, has yet to decide the matter. |

| | |
|---|---|
| 66. The three remaining board members initially refused to succumb to the threats and filed criminal complaints with the Prosecutors of the Kachkanar and Sverdlovsk areas, requesting initiation of the criminal proceedings in connection with the illegal takeover. | 65. The three remaining board members initially refused to succumb to the threats and filed criminal complaints with the Prosecutors of the Kachkanar and Sverdlovsk areas, requesting initiation of the criminal proceedings in connection with the illegal takeover. |
| 67. Malevsky's people threatened the three resisting directors that their families would be killed. Two of the remaining directors then agreed to support the Conspirators and, in return, received bribes in the form of expensive automobiles and apartments in Moscow. | 66. Malevsky's people threatened the three resisting directors that their families would be killed. Two of the remaining directors then agreed to support the Conspirators and, in return, received bribes in the form of expensive automobiles and apartments in Moscow. |
| 68. On information and belief, these apartments and automobiles were purchased with cash from MDM Bank which had been wired through banks in the United States from Pan-American or another company associated with the Conspirators. | 67. Upon information and belief, these apartments and automobiles were purchased with cash from MDM Bank which had been wired though banks in the United States from Pan-American or another company associated with the Conspirators. |
| **Makmudov's Next Threat** | **Makhmudov's Next Threat** |
| 69. After the physical takeover of GOK, one of Makmudov's men met with Khaidarov. | 68. After the physical takeover of GOK, one of Makhmudov's men met with Khaidarov. |
| 70. The man said that the Conspirators knew that Khaidarov and the GOK shareholders could fight them with complaints to the authorities and lawsuits in Russia. The man also said that the Conspirators also knew that Khaidarov had relatives in Tashkent and that his wife and son were then in England, and threatened harm to them if Khaidarov resisted the takeover. | 69. The man said that the Conspirators knew that Khaidarov and the GOK shareholders could fight them with complaints to the authorities and lawsuits in Russia. The man said that the Conspirators also knew that Khaidarov had relatives in Tashkent and that his wife and son were then in England, and threatened harm to them if Khaidarov resisted the takeover. |