LEXSEE

**ROBERT CONLON, Plaintiff, -against- SEA-LAND SERVICE, INC., in personam, and M.V. SEA-LAND SPIRIT, its engines, boilers, tackle, etc., in rem, Defendants. SEA-LAND SERVICE, INC., Third-Party Plaintiff, -against- UNITOR SHIPS SERVICE, INC., UNITOR SHIPS SERVICE, A.S. and ANSUL FIRE PROTECTION, Third-Party Defendants.**

**94 Civ. 0609 (KMW)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1995 U.S. Dist. LEXIS 433**

**January 18, 1995, Decided
January 19, 1995, FILED**

**COUNSEL:** [*1] For ROGER CONLON, plaintiff: Stephen H. Fields, Fields & Rosen, New York, NY.

For SEA-LAND SERVICE, INC., in personam, M.V. SEA-LAND SPIRIT, its engines, boilers, tackle, etc., in rem., defendant: William J. Manning, Jr., Kenny & Sterne, New York, NY.

For UNITOR SHIPS SERVICE, INC., third-party defendant: Steven M. Zweig, Damon & Morey, Buffalo, NY. Marylou K. Roshia, Damon & Morey, Buffalo, NY.

For ANSUL FIRE PROTECTION, third-party defendant: Saul Wilensky, Lester Schwab Katz & Dwyer, New York, NY.

For UNITOR SHIPS SERVICE, INC., cross-claimant, cross-defendant: Steven M. Zweig, Damon & Morey, Buffalo, NY.

For ANSUL FIRE PROTECTION, cross-defendant, cross-claimant: Saul Wilensky, Lester Schwab Katz & Dwyer, New York, NY.

For M.V. SEA-LAND SPIRIT, counter-defendant: William J. Manning, Jr., Kenny & Sterne, New York, NY.

**JUDGES:** MICHAEL H. DOLINGER, UNITED STATES MAGISTRATE JUDGE

**OPINION BY:** MICHAEL H. DOLINGER

**OPINION**

*MEMORANDUM & ORDER*

MICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE:

Plaintiff Roger Conlon has sued his former employer, Sea-Land Services, Inc., and its vessel *in rem* to recover damages for injuries suffered while Conlon was a seaman on the vessel. The accident involved the unplanned release of a large quantity of carbon dioxide into an enclosed area below deck on the M.V. Sea-Land Spirit on September 13, 1992, while the vessel was en route from Japan to California. As a consequence, four crewmen, including plaintiff, lost consciousness. Of the four, three were revived and one died.

Plaintiff, who lives in Florida, filed suit in this district against Sea-Land on February 1, 1994. On June 27, 1994, Sea-Land impleaded three entities that were said to have been responsible for any defects in the marine carbon dioxide fire protection system that was the source of the injurious carbon dioxide. Those entities -- known as Unitor Ships Service, Inc., Unitor Ships Service, A.S. and Ansul Fire Protection -- filed answers and cross-claims on July 28, 1994 and August 25, 1994, respectively.

On September 23, [*2] 1994, third-party defendant Ansul filed a motion to transfer this case, for the convenience of the parties and witnesses, to the Northern District of California. Ansul also seeks an order consolidating this case with a lawsuit now pending in that district, entitled *Ahmed v. Sea-Land Service, Inc.,* C94 0716. Alternatively, Ansul asks that this court transfer to California so much of this case as concerns liability issues, as

distinguished from damages. Defendants and third-party defendant Unitor have belatedly supported Ansul's motion. Plaintiff opposes it.

### A. *Background*

This lawsuit and the related *Ahmed* litigation stem from a fatal accident on board the defendant M.V. Sea-Land Spirit in September 1992. The ship was based in Long Beach, California, and was, at the time, in the northern Pacific Ocean, en route from Yakamota, Japan to Long Beach, California. *(See* unsworn Affidavit of Richard Adam Senzer, Esq., dated Sept. 22, 1994, Exh. F).

According to the findings of a Coast Guard investigation, an officer of the ship instructed Second Engineer Robert Mahler to perform a test of the vessel's fire warning system. For reasons unknown, Mr. Mahler rigged an apparatus [*3] to the ship's fire protection system that resulted in the discharge of a large quantity of carbon dioxide into the engine room, in which Conlon, Ahmed, Mahler and one other crewmen were located. The four crew members lost consciousness, although ultimately three were revived. The one man who died as a result of the accident was Mr. Ahmed. *(Id.,* Exh. G at 4-5).

We are advised that Conlon received brief emergency medical care in San Francisco, but has since been treated for his assertedly continuing injuries near his home in Florida. (Affidavit of John P. James, Esq., sworn to Sept. 30, 1994, at P 13). He ultimately filed suit in February 1994 solely against the vessel *in rem* and its owner, Sea-Land Service, Inc. He seeks recovery for negligence under the Jones Act, 46 U.S.C. § 688, and also asks for an award of maintenance and cure.

In choosing this forum, plaintiff apparently relied on the fact that Sea-Land had its principal place of business in Port Elizabeth, New Jersey and conducts business in the Southern District of New York. *(See* Complaint at P 1; Answer at P 1). Sea-Land has neither contested venue nor asserted any jurisdictional [*4] defenses.

In its original scheduling order, dated June 6, 1994, the District Court directed that additional parties, if any, be joined by June 30, 1994, with discovery to be completed by August 3, 1994 and a joint pre-trial order submitted by August 24, 1994. In August 1994, in the wake of defendants' impleading of Ansul and the Unitor entities, the Court prepared an amended scheduling order, which required the parties to complete discovery by October 3, 1994, and submit a pre-trial order by October 24, 1994.

Limited discovery has taken place, including document production, responses to interrogatories, designation of medical experts and physical examinations of plaintiff in New York. (James Aff. at PP 6-10). The parties have apparently not commenced depositions, but have agreed that depositions taken in the California action may be used in this litigation. *(See* Senzer Aff., Exh. I at 7-8).

### B. *Analysis*

Ansul presses its motion for a transfer and consolidation on two grounds. First, it notes the pendency of the *Ahmed* case in the Northern District of California, and suggests that since both lawsuits arose from the same incident, consolidation would be desirable to minimize [*5] expenses and avoid the danger of inconsistent results. Second, Ansul argues that most of the evidence and pertinent witnesses are located in or near the Northern District of California, and hence the litigation of this matter in California would be more convenient and efficient. For the reasons that follow, I conclude that Ansul has failed to justify the relief that it seeks.

The governing statute, 28 U.S.C. § 1404(a), authorizes transfer "for the convenience of parties and witnesses, in the interest of justice." Determination of such a motion requires "an 'individualized, case-by-case consideration of convenience and fairness.'" *Jones v. Weibrecht,* 901 F.2d 17, 19 (2d Cir. 1990) (quoting *Stewart Org. v. Ricoh Corp.,* 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988); *Van Dusen v. Barrack,* 376 U.S. 612, 622, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964)). Among the considerations that the court must look to are the choice of forum made by the plaintiff, although this is of course not dispositive, [*6] *see, e.g., Norwood v. Kirkpatrick,* 349 U.S. 29, 32, 99 L. Ed. 789, 75 S. Ct. 544 (1955); the location of witnesses and other evidence; and any relevant public policy concerns. *See, e.g., Red Bull Assocs. v. Best W. Int'l, Inc.,* 862 F.2d 963, 967 (2d Cir. 1988); *Cento Group, S.P.A. v. Oroamerica,* 822 F. Supp. 1058, 1060 (S.D.N.Y. 1993); *Don King Prods., Inc. v. Douglas,* 735 F. Supp. 522, 533-34 (S.D.N.Y. 1990).

The burden is on the moving party to justify the transfer, and he must make a "clear-cut" showing to overcome the weight normally given to the plaintiff's initial choice of forum. *See, e.g., Eastern Refractories Co. v. Forty Eight Insulations, Inc.,* 668 F. Supp. 183, 187 (S.D.N.Y. 1987) (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 91 L. Ed. 1055, 67 S. Ct. 839 (1947)); *United States Barite Corp. v. M.V. Haris,* 534 F. Supp. 328, 330-31 (S.D.N.Y. 1982). *See also A. Olinick & Sons v. Dempster Bros., Inc.,* 365 F.2d 439, 444-45 (2d Cir. 1966). [*7] Moreover, if the movant relies on a claim of witness convenience -- as is the case here -- "he must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover." *Factors Etc., Inc. v. ProArts, Inc.,* 579 F.2d 215, 218 (2d Cir. 1978), *cert. denied,* 440 U.S. 908, 59 L. Ed.

2d 455, 99 S. Ct. 1215 (1979). *But cf. Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 258, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981).

Ansul seeks the transfer of the entire case, including plaintiff's claims against Sea-Land as well as Sea-Land's third-party claims and the resultant cross-claims of Ansul and the Unitor entities. As noted, the motion is premised on the pendency of the *Ahmed* case and the asserted location of witnesses and other evidence.

We start with the fact of plaintiff's choice of forum, which is entitled to some presumptive weight. In attacking that choice, Ansul argues that it is not entitled to any deference because this district has no link to the events at issue. According to the movant, [*8] the absence of any such ties demonstrates that plaintiff is engaged in forum-shopping, which is said to be inconsistent with public policy and otherwise frowned upon.

There is no dispute that plaintiff does not reside in this district and that none of the pre-suit events pertinent to this action took place here. That fact does not, however, demonstrate that plaintiff's filing of this suit in this district should be deemed unworthy of any weight in our analysis.

Plaintiff resides on the East Coast, in Florida, and Sea-Land is doing business in this district. These two facts suggest that plaintiff sensibly chose to serve his own convenience by filing suit here rather than in California. Forum-shopping in this sense is of course a common occurrence and entirely permissible, particularly in Jones Act cases. *See, e.g., Babbidge v. Apex Oil Co.,* 676 F. Supp. 517, 519 (S.D.N.Y. 1987) (citing, *inter alia Lykes Bros. Steamship Co. v. Sugarman,* 272 F.2d 679, 681 (2d Cir. 1959)). The fact that Sea-Land itself waived any venue objections and thus chose in effect to consent to litigate here until Ansul, as a third-party defendant, objected [*9] to this forum underscores the fact that there is nothing unfair in plaintiff's decision to proceed here with his claims.

Indeed, even if plaintiff had made some calculation that the courts in this district might be more receptive to his claims than would a court in the home state of the Unitor third-party defendants -- an unlikely surmise since plaintiff did not sue the third-party defendants -- this too would not raise the spectre of impermissible forum-shopping. There is nothing *per se* improper in an attorney's choosing between available venues based on his calculation that the selection of one may benefit his client because the courts in that district may be more favorably disposed to his legal theory. As former Judge Sofaer has noted:

Forum shopping is no more an evil than any other tactical determination a party makes in its behalf. Any competent lawyer chooses a forum with his or her client's interest in mind. This is undoubtedly why Justice Jackson [in *Gulf Oil v. Gilbert*] made clear that a party had to do more than forum shop to justify invoking *forum non conveniens;* the choice of forum must have been made "with some harassment" in mind to have justified dismissal [*10] of the action.

*Cheeseman v. Carey,* 485 F. Supp. 203, 215 (S.D.N.Y.) (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. at 507), *remanded on other grounds,* 623 F.2d 1387 (2d Cir. 1980).

Ansul makes no showing that plaintiff chose this district for an improper purpose. As noted in *Cheeseman,*

Had plaintiff[] selected this forum to avoid specific precedents in the Northern District, the case for a transfer would have been far stronger. Just as this district's local rules are designed to prevent shopping for individual judges -- and thereby for the application of some anticipated view of the law -- efforts to select one district to avoid or to obtain specific rulings of another district court should be disfavored and discouraged.

*Id.* at 215. As in *Cheeseman,* however, "no such argument can be made here." *Id.* There simply has been no suggestion that this court interprets the governing law differently from the Northern District of California, much less that any such difference would be beneficial to plaintiff. *Compare, e.g., Schmid Lab., Inc. v. Hartford Accident & Indemnity Co.,* 654 F. Supp. 734, 736-37 (D.D.C. 1986), [*11] *with Cheeseman v. Carey,* 485 F. Supp. at 215.

Thus, Ansul's case for transfer must depend on a clear showing of convenience or public policy. Its showing in this regard, however, is rather weak.

First, the most potent argument for transfer on public policy grounds -- the desirability of litigating the *Ahmed* and *Conlon* claims together to avoid duplication of effort and inconsistent results -- has been overtaken by events. We are advised that in late December 1994 the parties in the *Ahmed* case agreed to settle the plaintiff's claims and left open for trial only the apportionment of responsibility among the defending parties. *(E.g.,* Jan. 10, 1995 letter to the Court from Marylou K. Roshia, Esq.). Moreover, it appears that the remaining litigants have informally agreed that the result of that apportion-

ment -- which is scheduled for trial in July 1995 -- should govern as well the various third-party claims in this case. In the wake of these developments, a transfer of plaintiff's claims to California is unnecessary to ensure consistency of results. [1]

> [1]   Under these circumstances, we need not assess plaintiff's counter-argument that since this case was filed approximately one month before *Ahmed,* any transfer should involve sending the California case here.

[*12]   In addition, defendants and third-party defendants in this case tell us that they have agreed that the discovery obtained in the California action will be admissible here, a position with which plaintiff apparently agrees. Hence the danger of duplicative discovery also proves to be chimerical.

The remaining ground for the proposed transfer is the asserted predominance of witnesses and evidence in and around the Northern District of California. There is less to this argument, however, than meets the eye.

Ansul's showing as to the location of witnesses and evidence is fairly threadbare, amounting to little more than a listing of various individuals and physical evidence located in or near the Northern District, but without any real indication of either the need for the testimony and other evidence, or the likelihood of their being more readily available in the Northern District than here. The most glaring example is Ansul's citation of the fact that Mr. Ahmed, now deceased, lived in the Northern District. (Ansul's Memorandum of Law at fifth unnumbered page). Similarly unpersuasive is the fact that medical records of Conlon's initial treatment in San Francisco are located in California. [*13]   *(Id.* at fourth unnumbered page). Ansul does not identify any medical providers located in that district whom it wishes to call, much less indicate what they are expected to testify to. If defendants' intention is simply to offer those records into evidence by stipulation or certification of authenticity, that can be accomplished here as well as in California.

The other items in Ansul's list are also unpersuasive. It cites the fact that the Coast Guard conducted a hearing and issued a report concerning the incident at the home port of the Sea-Land Spirit, in Long Beach, California, which is in the Central District of California. *(Id.; see* Senzer Aff., Exh. G). That report, which may be admissible under Fed. R. Evid. 803(8)(C), *see, e.g., Henry v. Daytop Village, Inc.,*   F.3d   , 1994 WL 677963, at * 6 (2d Cir. Dec. 1, 1994) (citing *Chandler v. Roudebush,* 425 U.S. 840, 863 n. 39, 48 L. Ed. 2d 416, 96 S. Ct. 1949 (1976)), may be highly significant with respect to liability, but it is of course as available and admissible in this district as in California. Moreover, if the parties require

the testimony [*14] of the Coast Guard officer who conducted the investigation that led to the hearing and report, the current venue is preferable. He is no longer in California, but rather is stationed in this district. (James Aff. at P 14).

The remaining documentary evidence mentioned by Ansul consists of vessel and maintenance records. (Ansul's Memorandum of Law at seventh unnumbered page). Again, these documents can obviously be made available here without difficulty.

Ansul also refers to the fact that most of the crew members of the vessel were identified in the ship's papers as residing closer to the Northern District of California than to this district. *(See* Senzer Aff., Exh. H). The problem is that Ansul does not indicate whether all of these crew members will be needed as witnesses at trial and if so, why. We may assume that likely witnesses will include Ronald Sparkawich, the Chief Engineer, who directed Mr. Mahler to run the test *(id.,* Exh. G at 4); Mahler, who set up the apparatus that apparently initiated the release of carbon dioxide; Cadet Nathan Hodges, who participated in the rescue of the stricken shipmates (James Aff. at P 11); Mr. Conlon and possibly the fourth injured crewman, [*15] Mr. Mohammed. Ansul also mentions the ship's master, Jerome Sawyer. (Ansul's Memorandum of Law at fifth unnumbered page)

Of these potential witnesses, Mr. Mohammed apparently resides in the Northern District of California, but it is open to question whether he has anything significant to say. Moreover, since he is in the merchant marine, it is quite possible in any event that his testimony would have to be taken by way of deposition since he presumably spends much of his time overseas. *See, e.g., Babbidge v. Apex Oil Co.,* 676 F. Supp. at 519-20. As for the others, the Chief Engineer resides in the State of Washington (Affidavit of William J. Manning, Jr., Esq., sworn to Oct. 6, 1994, P 4 & Exh. A at 112), well beyond trial subpoena range in California, but since he is employed by Sea-Land he will presumably be made available wherever the trial is conducted unless he is at sea. *(See Id.* at P 4). Mr. Mahler lives in New Hampshire *(see* Senzer Aff., Exh. H), which is closer to this district than to California, although it is unlikely in any event that he will agree to appear voluntarily at trial. As for Cadet Hodges, he is now studying at the Merchant [*16] Marine Academy, within subpoena range of this district. (James Aff. at P 11). Plaintiff, as noted, resides far closer to this district than to California, although he presumably would be prepared to travel to whatever district hosted the trial. Finally, the ship's master resides in Long Beach, in the Central District of California, and presumably can be made available by Sea-Land wherever a trial is held, if he has pertinent testimony.

1995 U.S. Dist. LEXIS 433, *

The only other witnesses to whom Ansul refers are Rodney Bradley, of Houston, Texas, who has been designated as an expert by Sea-Land; Jack Goudreau, of Wisconsin, who is employed by Ansul; and Brent Allen, of California, who is employed by Unitor. (Ansul Memorandum of Law at sixth unnumbered page). Since Goudreau and Allen are employed by the third-party defendants, they will presumably be made available, if deemed helpful to their employers' case, and Sea-Land will obviously arrange transportation for its expert. Moreover, both Bradley and Goudreau are somewhat closer to this district than to the Northern District of California. Finally, these three witnesses have apparently been deposed in the *Ahmed* case, and the transcripts are available for [*17] use in this case. [2]

> 2   Counsel for Sea-Land refers to another potential witness, identified as Philip Cippolini, who resides in Long Beach, California. *(See* Manning Aff. at P 6). He does not specify what testimony Mr. Cippolini would offer, although he mentions that Cippolini trained Mr. Allen.

This marginal showing by Ansul does not justify ordering plaintiff to try his case three thousand miles from his chosen forum and three thousand miles from his home. As noted, a few potentially key witnesses are located in this district or within subpoena range, others will presumably be brought here by the defendants and third-party defendants if they believe it to be in their interest to do so, and the others have been or will be deposed. Moreover, most of those identified by Ansul are not subject to subpoena in the Northern District of California or are otherwise likely to be unavailable at the time of trial.

Apart from these problems with the rationale for a transfer, it bears noting that plaintiff will be otherwise [*18] disadvantaged by a transfer. First, as noted, plaintiff lives much closer to this district. Second, he has retained two medical experts in this district who have already examined him. *(See* James Aff. at P 12). It is hardly reasonable to demand that a seaman plaintiff either transport a medical expert three thousand miles for a trial or hire an additional expert in California. [3] Third, Sea-Land has designated a medical expert in this district, and plaintiff has undergone examination by him. (James Aff. at P 9). If the case is transferred to California, Sea-Land would presumably retain different experts, with the likelihood that plaintiff would be directed to undergo still another examination.

> 3   In this circumstance the location of an expert witness, particularly one retained on behalf of an individual litigant who is unlikely to have substantial funds, may be relevant to the transfer decision. *Cf. Babbidge v. Apex Oil Co.,* 676 F. Supp. at 520 (citing cases).

In sum, Ansul has failed [*19] to justify its application for a transfer to the Northern District of California.

**CONCLUSION**

For the reasons stated, the motion of third-party defendant Ansul Fire protection is denied.

**DATED: New York, New York**

**January 18, 1995**

**SO ORDERED.**

MICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE

LEXSEE

**RICHARD A. CHAVEZ, Plaintiff, vs. BRIAN SUZUKI, individually and doing business as FAMILY DENTISTRY; and DOES 1 THROUGH 10, Inclusive, Defendants.**

**CASE NO. 05cv1569 BTM(BLM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

**2005 U.S. Dist. LEXIS 40092**

**November 29, 2005, Decided**
**November 30, 2005, Filed**

**COUNSEL:** [*1] For RICHARD A CHAVEZ, plaintiff: Duane H Sceper, Paluso and Sceper, San Diego, CA.

For BRIAN SUZUKI, individually dba Family Dentistry, defendant: William A Adams, Norton Adams and Downey, San Diego, CA.

**JUDGES:** HONORABLE BARRY TED MOSKOWITZ, United States District Judge.

**OPINION BY:** BARRY TED MOSKOWITZ

**OPINION**

**ORDER DENYING MOTION TO DISMISS**

Defendant Brian Suzuki dba Family Dentistry ("Suzuki" or "Defendant") has filed a motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1), (3), (6) and 12(h)(3). For the reasons discussed below, Defendant's motion is **DENIED.**

**BACKGROUND**

Plaintiff Richard A. Chavez commenced this action on August 9, 2005. Plaintiff alleges that on or about April 22, 2005 and June 21, 2005, he was denied full and equal access to the facilities owned and/or operated by Defendant. (Complaint, P 11.) The alleged barriers to entry include, but are not limited to, lack of disabled parking spaces or an insufficient number and dimensions of disabled parking spaces and lack of or improper signage for such spaces and an unmarked or inaccessible path of travel. (*Id.* [*2] ) Plaintiff claims that he intends to visit the Defendant's facility again in the immediate future and believes that the architectural barriers precluding him from full and equal access of the public accommodation will continue to exist at his future visits. (Complaint, P 21.)

The Complaint asserts the following causes of action: (1) violation of the American With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*; (2) violation of California Civil Code §§ 51, 52, 54; (3) violation of California Health & Safety Code § 19955, *et seq.*; (4) negligence per se; (5) negligence; (6) declaratory relief; and (7) injunctive relief. Plaintiff seeks an injunction, declaratory relief, monetary damages under the California Civil Code §§ 52(a) and 54.3, and attorney's fees and costs.

**DISCUSSION**

*A. Standing*

Defendant argues that Plaintiff has failed to state a claim and lacks standing to bring this action because the Complaint (1) fails to establish that Plaintiff ever intended or desired to use Defendant's services; (2) fails to make any allegation of ever personally [*3] experiencing any barrier or discrimination at Defendant's business; and (3) fails to make any allegation of personal knowledge of access barriers at Defendant's business. The Court does not find this argument persuasive.

An ADA plaintiff need only state that he is currently deterred from attempting to gain access to a public accommodation to satisfy the standing requirement of a "concrete and particularized" injury. *Pickern v. Holiday Quality Foods, Inc.,* 293 F.3d 1133, 1138 (9th Cir. 2002). In addition, "a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered actual injury.'" *Id.*

Although the Complaint is not detailed, it sufficiently alleges that Plaintiff has been and continues to be deterred from visiting or patronizing Defendant's business because of barriers to full and equal access. (Complaint, PP 11, 21.) In support of its motion to dismiss,

Defendant introduces evidence that Suzuki's dental practice is by appointment only and that Plaintiff has never been a patient of Suzuki. (Suzuki Decl., P 3.) However, Plaintiff explains that he "personally visited Dr. [*4] Suzuki's office for the purpose of inquiring about his services, prices and availability as a possible new patient." (Chavez Decl., P 3; *see also* Complaint, P 8.) When Plaintiff arrived at the premises, he did not observe any disabled parking spaces, any accessible entrance to the facility, or a designated or safe path of travel. (*Id.*) Because of these barriers, Plaintiff was deterred from entering the business. (*Id.*) If there were no accessibility barriers, Plaintiff would want to return to inquire about services, prices and availability as a new patient. (*Id.*)

Plaintiff has sufficiently established standing to maintain this action. Accordingly, Defendant's motion to dismiss for lack of standing is denied. If Defendant discovers facts showing that Plaintiff did not suffer an "actual injury" -- e.g., facts establishing that Defendant did not and does not have any real intention of seeking dental services -- Defendant may seek summary judgment based on lack of standing.

B. *Supplemental Jurisdiction*

Defendant requests that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims. The Court denies Defendant's request.

Relying [*5] on several unpublished district court decisions, Defendant argues that this Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c). Defendant contends that (1) the Unruh Act and California Disabled Persons Act ("DPA") claims raise novel or complex issues of state law (§ 1367(c)(1)); (2) the Unruh Act and DPA claims substantially predominate over the ADA claim (§ 1367(c)(2)); and (3) compelling reasons exist for declining jurisdiction (§ 1367(c)(4)).

Although the Unruh Act and DPA claims may implicate issues that remain to be resolved under state law -- most notably, how to determine "each offense" for purposes of damages -- the Court does not find that these issues are of such complexity or centrality that the Court must surrender jurisdiction. Furthermore, the mere fact that the state claims allow for the recovery of monetary damages, whereas the ADA provides for injunctive relief only, does not compel the conclusion that the state claims "substantially predominate" over the federal claim. Other than the availability of statutory damages under state law, the state and federal claims are [*6] identical. The burdens of proof and standards of liability are the same. Indeed, the Unruh Act and DPA specifically provide that a violation under the ADA also constitutes a violation of the Unruh Act and DPA. Cal. Civ. Code §§ 51(f), 54.1(d).

Even assuming that the state claims raise a novel or complex issue of state law and/or substantially predominate over the ADA claim, the Court must determine whether the exercise of its discretion to decline supplemental jurisdiction would comport with the underlying objective of "most sensibly accommodat [ing]" the values of "economy, convenience, fairness, and comity." *Executive Software North America, Inc. v. United States District Court for the Central District of California*, 24 F.3d 1545, 1557 (9th Cir. 1994) (citations omitted). Here, the Court's exercise of supplemental jurisdiction would best advance economy, convenience, fairness, and comity. The state and federal claims are so intertwined that it makes little sense to decline supplemental jurisdiction. To do so would create the danger of multiple suits, courts rushing to judgment, increased litigation costs, and wasted judicial resources.

Defendant [*7] advances as a separate compelling reason for declining supplemental jurisdiction the policy of discouraging forum-shopping. However, if it is otherwise proper for the Court to exercise supplemental jurisdiction, there is nothing wrong with Plaintiff choosing to file suit in federal court because he believes it is more favorable to him. This sort of forum-shopping is commonplace among plaintiffs and removing defendants alike and is not an "exceptional" circumstance giving rise to compelling reasons for declining jurisdiction, as required by section 1367(c)(4).

The Court does not find any compelling reasons to exercise its discretion to decline supplemental jurisdiction over the state claims. Therefore, Defendant's motion to dismiss these claims is denied. If, at a future date, the ADA claim is resolved, Defendant may make another motion to dismiss the state law claims. *See Schneider v. TRW. Inc.*, 938 F.2d 986,993 (9th Cir. 1991) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)) ("[I] n the usual case in which federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise [*8] jurisdiction over the remaining state law claims.")

**CONCLUSION**

For the reasons discussed above, Defendant's motion to dismiss is **DENIED.**

**IT IS SO ORDERED.**

Dated: November 29, 2005

**HONORABLE BARRY TED MOSKOWITZ**

2005 U.S. Dist. LEXIS 40092, *

United States District Judge

LEXSEE

**Davis International, LLC, et al. v. New Start Group Corp., et al.**

**C.A. No. 1297-N**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

**2005 Del. Ch. LEXIS 169**

**October 19, 2005, Submitted**
**October 27, 2005, Decided**

**NOTICE:**

[*1]    THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** Motion denied by Davis Int'l, LLC v. New Start Group Corp., 2006 Del. Ch. LEXIS 150 (Del. Ch., Aug. 22, 2006)

**COUNSEL:** David L. Finger, Esquire, Finger & Slanina, LLC, Wilmington, DE.

William M. Lafferty, Esquire, Natalie J. Haskins, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

Charles M. Oberly, III, Esquire, Karen V. Sullivan, Esquire, Oberly, Jennings & Rhodunda, P.A., Wilmington, DE.

Collins J. Seitz, Jr., Esquire, Kevin F. Brady, Esquire, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

Richard I. G. Jones, Esquire, Ashby & Geddes, Wilmington, DE.

**JUDGES:** STEPHEN P. LAMB, VICE CHANCELLOR.

**OPINION BY:** STEPHEN P. LAMB

**OPINION**

Before the court is the defendants' motion to stay these proceedings pending the resolution of a prior filed case in the U.S. District Court for the District of Delaware. For the reasons set forth herein, the defendants' motion to stay is granted pending the development of the litigation between the parties in the District Court.

**I.**

In December 2000, the plaintiffs brought an action in the U.S. District Court for the Southern District of New York against some of the defendants in this case alleging violations of the Racketeer Influenced and [*2] Corrupt Organizations Act (RICO), 18 U.S.C.S. § 1961, intentional interference with contract, and conversion arising from allegedly illegal takeovers of aluminum and vanadium production facilities located in Western Siberia and the Northern Ural Mountains. [1] On March 27, 2003, Judge John G. Koeltl dismissed the case on *forum non conveniens* grounds, holding that "Russia is clearly the more convenient forum." [2] This judgment was affirmed on appeal. [3]

1

*Base Metal Trading v. Russian Aluminum*, 253 F. Supp. 2d 681, 683 (S.D.N.Y. 2003). Two of the defendants in this action were initially named as defendants in the prior New York action.

2   *Id.* at 713.

3   *Base Metal Trading Ltd. v. Russian Aluminum*, 98 Fed. Appx. 47 (2d Cir. 2004).

On November 4, 2004, the plaintiffs filed a new action in this court to take advantage of what they perceived to be a more lenient *forum non conveniens* standard applied by Delaware [*3] state courts. The plaintiffs brought federal RICO and common law claims of conversion and added defendants Evraz Holdings, Ural-Gorno Metallurgical Company, and Mikhail Nekrich, alleging that the defendants stole their controlling interest in the vanadium ore plant through a criminal scheme. On November 30, 2004, the defendants removed the case to the federal court, pursuant to 28 U.S.C. 1441(b), based on federal question jurisdiction resulting from the plaintiffs' RICO claims. The defendants moved in the District Court to dismiss the complaint on grounds, *inter alia, of forum non conveniens* and direct estoppel based on Judge

Koeltl's decision and its affirmance. The defendants also moved for an injunction barring the plaintiffs from further litigating this matter in any court in the United States. These motions are currently pending before the Honorable Gregory M. Sleet.

The plaintiffs responded to these developments by amending their federal court complaint to exclude the non-federal law claims and by refiling the state law claims in this court on April 26, 2005, adding new claims for aiding and abetting, conversion, and civil conspiracy. [4] On July 5, 2005, the [*4] defendants moved to stay this action pending the outcome of their motions in the District Court. After briefing, this court heard oral arguments on October 19, 2005.

> 4   In June 2005, the plaintiffs also brought suit on similar allegations in Luxembourg against Evraz Group, a corporation related to Evraz Holdings.

## II.

In addressing a motion to stay a later-filed action pending the outcome of a first-filed foreign action, *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.* and its progeny provide the appropriate analysis. [5] The plaintiffs, nevertheless, cite to *Marks v. Stinson* [6] and *Gwynedd Properties, Inc. v. Lower Gwynedd Township* [7] in their briefs and at oral argument as controlling precedent on this matter. Those cases are concerned with whether a federal court, pursuant to the *Younger* abstention doctrine, should abstain from litigating the case because of an ongoing state court proceeding and, thus, not relevant to the motion at hand. [8]

> 5   263 A.2d 281 (Del. 1970); Donald J. Wolfe, Jr. and Michael A. Pittenger, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, § 5-1 at 5-2 (2005) (explaining that where a prior-filed action is pending in another jurisdiction, *McWane* and its progeny mandate the liberal exercise of discretion in favor of a stay).

[*5]

> 6   19 F.3d 873 (3d. Cir. 1994).

> 7   970 F.2d 1195 (3d. Cir. 1992).

> 8
>
>    The *Younger* abstention doctrine reflects a strong federal policy against federal court interference with pending state judicial proceedings. A federal court should abstain under *Younger* when (1) there are ongoing state proceedings that are judicial in nature; (2) the state proceedings

implicate important state interests; and (3) the state proceedings afford an adequate opportunity to raise the federal claims. *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971). In *Gwynedd Properties*, the plaintiff landowner brought suit against the defendant township under 42 U.S.C.S. § 1983 alleging that the defendants, acting under color of state law, conspired to deprive it of its constitutional property rights. The district court dismissed the suit, relying on the *Younger* abstention doctrine, due to the existence of an ongoing state proceeding. The Court of Appeals for the Third Circuit reversed on grounds that the *Younger* abstention doctrine did not bar the appellant from litigating its claims in both state and federal courts because the claims advanced in the federal court were different than those advanced in the state court and the federal action would not interfere with the ongoing state proceeding. In *Marks v. Stinson*, the plaintiffs, election officials and candidates, brought suit under the Voting Rights Act and the Civil Rights Act challenging an election on the theory that the defendants conspired to cause illegally obtained absentee ballots to be cast. The Third Circuit affirmed the lower court's decision to refuse to abstain from proceeding due to ongoing state court litigation on grounds that the plaintiff did not seek relief in the federal court that would interfere with the state judicial process.

[*6] *McWane* sets forth the following guidelines:

> A stay may be warranted . . . by facts and circumstances sufficient to move the discretion of the Court; that such discretion should be exercised freely in favor of the stay when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues; that, as a general rule, litigation should be confined to the forum in which it was first commenced. [9]

In effect, where a party alleges that there is a pending foreign action, the discretion to grant a stay should be freely exercised when (1) there is a first-filed prior pending action, (2) that involves similar parties and issues, and (3) the other court is capable of doing prompt and complete justice. [10] "These concepts are impelled by considerations of comity and the necessities of an orderly and efficient administration of justice." [11] Moreover, if a foreign action is pending, principles of fairness, judicial

economy, and the possibility of inconsistent results favor the granting of a stay. [12]

9

263 A.2d at 283.

[*7]

10  *Id.; See generally Kurtin v. KRE*, LLC, 2005 Del. Ch. LEXIS 70 at *15-17 (Del. Ch. May 16, 2005) for a recent and thorough discussion of the *McWane* analysis.

11  *Supra* note 9; *Issen & Settler v. GCS Enterprises, Inc.*, 1981 Del. Ch. LEXIS 615 at *5 (Del. Ch. Dec. 7, 1981) (holding that, in exercising its discretion to stay an action, the court is guided by policy considerations which promote the efficient administration of justice).

12  *Harbor Finance Partners v. Sunshine Mining & Refining Co.*, 1996 Del. Ch. LEXIS 10 at *5 (Del. Ch. Feb. 16, 1996) (granting the defendants' motion to stay the Court of Chancery action pending resolution of the claims in the District Court, and holding that Delaware courts should avoid duplicative efforts to conserve limited judicial resources).

First, there is no doubt that the action pending in the District Court is the first-filed action. The plaintiffs initially filed that action in this court; however, by choosing to include federal claims in their complaint, they voluntarily subjected [*8] themselves to the possibility of removal under 28 U.S.C. § 1441(b). [13] Instead of moving in the District Court to remand the state claims back to this court, the plaintiffs unilaterally determined to split their claims through the device of amending their federal court complaint to eliminate their state law claims, and refiling those non-removable claims in this court. The plaintiffs' procedural maneuvers, premised on their desire to obtain a different *forum non conveniens* standard, do not change the fact that the litigation pending in the District Court is the first-filed action.

13  *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (U.S. 1987) (explaining that the plaintiff is the master of the claim and may choose to avoid federal jurisdiction by exclusive reliance on state law).

Second, it is obvious that the two complaints involve the "same parties and the same issues." [14] "Consistent with the *McWane* doctrine generally, the same parties, same issues' [*9] analysis focuses on substance over form. The parties and issues need not be identical." [15] Instead, there must be a showing of "substantial or functional identity" between the parties in the cases and the

issues must arise out of a "common nucleus of operative fact." [16] Here, the parties and issues involved in the first-filed complaint are substantially similar to those involved in this action. [17] Furthermore, it is apparent that the common law claims arising under state law and the RICO violation claims under federal law arise from the same disputed transaction and thus derive from a common nucleus of operative fact. [18] In both cases, the plaintiffs allege that they were wrongfully deprived of their controlling interest in Kachkanarsky GOK, a vanadium plant, through a complex criminal scheme orchestrated by the defendants.

14  *McWane*, 263 A.2d at 283.

15  *Kurtin*, 2005 Del. Ch. LEXIS 70 at *15.

16  *Id.*; Donald J. Wolfe, Jr. and Michael A. Pittenger, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, § 5-1 at 5-17 (2005) ("Although the complete identity of parties and issues can greatly simplify the analysis, complete identity is rare, and an absolute identity of parties and issues is not a necessary prerequisite to a stay of a later-filed action in favor of a prior pending action. Delaware courts have often granted stays even though the parties and issues involved in the various pending actions were not identical."); *Cornerstone Tech., LLC v. Conrad*, 2003 Del. Ch. LEXIS 34, at *46-49 (Mar. 31, 2003); *In re Westell Techs., Inc. Deriv. Litig.*, 2001 Del. Ch. LEXIS 161, at *5-6 (June 29, 2001) ("Our cases have consistently held that in determining whether parties, issues, or claims are similar for the purpose of the *McWane* analysis, substantial or functional identity is sufficient."); *USX Corp. v. U.S. Denro Steels, Inc.*, 2001 Del. Ch. LEXIS 122, at *5-6 (June 29, 2001) (staying the Delaware action in favor of a Texas action involving the same, but not all, identical issues); *Harbor Finance Partners*, 1996 Del. Ch. LEXIS 10, at *6 ("Delaware law does not require both actions to have identical parties and issues in order to grant a stay."); *Zimmerman v. Home Shopping Network*, 1989 Del. Ch. LEXIS 101 (Sept. 11, 1989) (according deference to the first-filed Florida action, notwithstanding the lack of complete identity among the parties and issues in the two cases).

[*10]

17  The only difference between the parties to this action and the parties to the action pending in the District Court is that Pan-American is not a defendant in this action.

18    *In re Westell Technologies*, 2001 Del. Ch. LEXIS 161 at *7 (rejecting the plaintiffs' argument that the issues are not the same because the Delaware plaintiffs are asserting common law breach of fiduciary duty claims, while the federal plaintiffs are asserting claims under the federal securities laws, since they arise out of the same transactional facts); *Visual Edge Sys., Inc. v. Takefman*, 2000 Del. Ch. LEXIS 24 at *5-6 (Jan. 31, 2000) (noting that the *McWane* analysis "applies equally to actions involving issues, which, while similar, are not identical to the pending action, provided that the actions arise out of the same set of operative fact."); *Jeffreys v. Exten*, 1988 Del. Ch. LEXIS 96, at *8 (July 15, 1988) (staying the present action in the Court of Chancery until resolution of the RICO claims brought in the first-filed suit in the District Court).

[*11]    Third, the District Court is able to render "prompt and complete justice" of the dispute between the parties. [19] Accordingly, based on the foregoing *McWane* analysis, this litigation will be stayed pending resolution by the District Court.

19    *Johnston v. Caremark Rx, Inc.*, 2000 Del. Ch. LEXIS 46 at *12 (Mar. 28, 2000) (granting a motion to stay the Delaware action and holding that other courts are capable of applying Delaware law).

Finally, the court notes that the plaintiffs are engaging in piecemeal litigation and are trying to subvert the removal statute by improperly splitting their claims. [20] It would be a wasteful duplication of time, effort, and expense if the court, at this time, allowed parallel adjudications to proceed simultaneously. [21] Indeed, if the District Court grants the defendants' pending motion to enjoin the plaintiffs from further litigating this matter, this court could not proceed. In addition, if the federal court denies the defendants' motion to dismiss and [*12] reaches the merits of the plaintiffs' claims, *res judicata* may apply to bar this action. [22]

20    *Maldonado v. Flynn*, 417 A.2d 378 (Del. Ch. 1980) (finding that the plaintiff impermissibly split his claim and dismissing the subsequently filed state law claims because the plaintiff failed to show that he could not have presented the entire controversy to the district court for its determination).

21    *McWane*, 263 A.2d at 283.

22    *Maldonado*, 417 A.2d at 383 ("It is clear that if a plaintiff can present his state claims in a prior federal action by use of pendent jurisdiction and he chooses not to present them in the federal court, the doctrine of *res judicata* will bar his later assertion of the same claims in a state forum."); *Issen & Settler*, 1981 Del. Ch. LEXIS 615 at *7 ("Plaintiffs are compelled to assert their state claims in the U.S. District Court or risk the possibility of having them barred by the doctrine of *res judicata*.").

[*13] **III.**

For the reasons set forth above, the defendants' motion to stay is GRANTED. IT IS SO ORDERED.

Stephen P. Lamb

Vice Chancellor

LEXSEE

**NATALIE M. GRIDER, M.D.; KUTZTOWN FAMILY MEDICINE, P.C. v. KEYSTONE HEALTH PLAN CENTRAL, INC.; THOMAS F. BICKMAN; HIGHMARK, INC.; JOHN S. BROUSE; CAPITAL BLUECROSS; JAMES M. MEAD; JOSEPH PFISTER, Keystone Health Plan Central, Inc.; Capital BlueCross; James M. Mead; Joseph Pfister, Appellants, No. 07-1231, Highmark, Inc.; John S. Brouse, Appellants, No. 07-1232, ˙ CROWELL MORING LLP; KATHLEEN TAYLOR SOOY; MICHAEL L. MARTINEZ, Appellants, No. 07-1270**

* Pursuant to F.R.A.P. 12(a)

**Nos. 07-1231, 07-1232 and 07-1270**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

**2007 U.S. App. LEXIS 20633**

**June 19, 2007, Argued**
**August 28, 2007, Filed**

**PRIOR HISTORY:** [*1]
    On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. No. 01-cv-05641). District Judge: Honorable James Knoll Gardner. Grider v. Keystone Health Plan Cent., Inc., 2006 U.S. Dist. LEXIS 93085 (E.D. Pa., Dec. 21, 2006)
    Shane v. Humana, Inc., 2007 U.S. App. LEXIS 13813 (11th Cir. Fla., June 13, 2007)

**COUNSEL:** Malcolm J. Gross, Gross, McGinley, La-Barre & Eaton, Allentown, PA; Kathleen T. Sooy (Argued), Clifton S. Elgarten, Tracy A. Roman, Crowell & Moring, Washington, DC, Attorneys for Appellants (No. 07-1231), Keystone Health Plan Cent., Inc., and Capital BlueCross, James M. Mead and Joseph Pfister.

Daniel I. Booker, Donna M. Doblick, James C. Martin (Argued), Reed Smith, Pittsburgh, PA; Sandra A. Girifalco, Stradley, Ronon, Stevens & Young, Philadelphia, PA, Attorneys for Appellants (No. 07-1232), Highmark, Inc. and John S. Brouse.

Clifton S. Elgarten, Tracy A. Roman, Crowell & Moring, Washington, DC, Attorneys for Appellants (No. 07-1270), Crowell Moring LLP, Kathleen Taylor Sooy and Michael L. Martinez.

Louis C. Bechtle, Conrad, O'Brien, Gellman & Rohn, Philadelphia, PA; Joseph A. O'Keefe, O'Keefe & Sher, Kutztown, PA; Francis J. Farina, Devon, PA; Kenneth A. Jacobsen (Argued), Wallingford, PA, Attorneys for Ap-

pellees, Natalie M. Grider, M.D., and Kutztown Family Medicine, P.C.

**JUDGES:** Before: McKEE, FISHER and CHAGARES, Circuit Judges.

**OPINION BY:** FISHER

**OPINION**

    OPINION [*2] OF THE COURT

    FISHER, *Circuit Judge.*

    This appeal requires us to explore the limits of the All Writs Act, 28 U.S.C. § 1651(a), as it relates to actions by one federal court that may affect those in a different federal court. Specifically, in this case, Dr. Natalie Grider and Kutztown Family Medicine P.C., representing a class of approximately 6,000 doctors in Central Pennsylvania, filed a suit against Keystone Health Plan Central, Inc. ("Keystone"); Keystone's two former fifty-percent owners, Highmark, Inc. ("Highmark") and Capital Blue Cross ("Capital"); and each company's chief executive officer, Joseph Pfister, John Brouse, and James Mead. The suit alleges that Keystone's claims handling practices violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 - 1968, and Pennsylvania's "prompt pay" statute, 40 Pa. Stat. §§ 991.2101 - 991.2193. Around that time, similar nationwide claims were consolidated by a Multidistrict Litigation ("MDL") panel in the United States District Court for the Southern District of Florida ("Florida MDL"), which declined to add the *Grider* case as an tag-along

2007 U.S. App. LEXIS 20633, *

action because it was at a more advanced stage in its proceedings. [*3] Recently, however, as the parties in the Florida MDL moved towards a comprehensive settlement agreement, the United States District Court for the Eastern District of Pennsylvania issued an injunction under the All Writs Act prohibiting the *Grider* Defendants from settling or attempting to settle claims in the Florida MDL that would have the effect of also settling the claims in *Grider*. The question presented to us is whether this is a permissible exercise of power under the All Writs Act. For the reasons that follow, we conclude that it is not, and we will therefore vacate the injunction issued by the District Court.

I.

A. The *Grider* Case

This case involves a certified class of approximately 6,000 doctors in Central Pennsylvania who were providers with the Keystone health maintenance organization ("HMO"), which operates exclusively in Central Pennsylvania. These doctors had signed contracts with Keystone to provide medical services to patients who subscribed to the Keystone HMO. To receive reimbursement for services they provided to subscribers, the doctors submitted claims on forms provided by Keystone, using a standardized set of numerical codes provided by the American Medical Association, [*4] which are referred to as "CPT codes." These codes are provided for virtually every medical procedure in order to avoid variations in descriptions given by doctors. Because each code only represents a single procedure, one visit to a doctor may result in a reimbursement claim containing multiple CPT codes. A typical claim form, for instance, may have one code for the office visit itself, and another for the administration of a particular test.

During the class period certified by the District Court, when a doctor within Keystone's network submitted one of these claim forms, it was processed through a company named Synertech, Inc. ("Synertech"). Synertech is located in Central Pennsylvania, and used a proprietary software system owned by Tingley, Inc. to process these claims.

In addition to being reimbursed on a fee-for-service basis, many doctors in Keystone's network also received reimbursements for certain pools of patients - usually employees of a large employer - under contractual "capitation" arrangements with Keystone. Approximately 28% of the certified class members in this case are family practice providers, most of whom were under contractual capitation arrangements with Keystone. [*5] Under these capitation agreements, doctors are paid a set monthly fee in exchange for providing basic medical services - such as examinations and treatment for minor

illnesses - to a pool of patients. More complicated medical procedures not on the list of capitation services are supposed to be billed to Keystone and paid on a fee-for-service basis.

On October 5, 2001, the Plaintiffs in this case filed an action in Pennsylvania state court, which the Defendants promptly removed to the United States District Court for the Eastern District of Pennsylvania. The suit alleges that Keystone violated RICO by not processing and paying claims as it had promised to do in its contracts and other communications with the doctors in its network. According to the Plaintiffs, Keystone used automated systems and software built into Synertech's computerized claims processing operations to systematically "bundle" two or more CPT codes. By doing so, it would pay for only one procedure, thereby reducing payments to doctors. The Plaintiffs also allege that Keystone used Synertech's software to systematically "down-code" the doctors' claims by automatically changing the CPT code on a claim form to a less costly [*6] procedure.

In terms of the capitation agreements, the Plaintiffs allege that Keystone secretly reduced monthly capitation payments to participating doctors. Specifically, they claim that Keystone "shaved" capitation payments by "secretly: 1) shifting patients off of a doctor's capitation roster to so-called 'dummy accounts' set up by Keystone, whereby doctors continued to treat the insured patient and Keystone continued to collect premiums for medical insurance paid by or on behalf of the member, but retained those premiums for itself instead of paying them to the doctor; and 2) delaying capitation payments to providers for newly enrolled members assigned to that doctor's capitation roster."

In addition to these claims, the complaint also alleges violations of Pennsylvania's "prompt pay" statute, which requires insurers to reimburse doctors within forty-five days after receiving a reimbursement claim.

On December 21, 2006, following three years of discovery, the District Court certified a class of providers in the Keystone network who were alleged to have been defrauded by the practices described in the complaint. The class includes:

> All medical service providers in connection with medical [*7] services rendered to patients insured by Keystone Health Plan Central Inc. who during the period January 1, 1996 through October 5, 2001:
>
> > (1) submitted claims for reimbursement on a fee-for-service basis for cov-

2007 U.S. App. LEXIS 20633, *

ered services which claims were denied or reduced through the application of automated edits in the claim processing software used by defendants to process those claims; and/or

(2) received less in capitation payments than the provider was entitled through the use and application of automated systems to "shave" capitation payments in the manner alleged in plaintiffs' Amended Complaint filed October 6, 2001.

*Grider v. Keystone Health Plan Cent., Inc.,* No. 2001-CV-05641, 2007 WL 201011, *2 (E.D. Pa. Jan. 19, 2007). Now that the class is certified, the case appears to be headed towards trial.

B. The *Love* and *Solomon* Cases in Florida

The *Grider* case was just one of many similar cases that were being filed around the country at the time. On May 22, 2003, three doctors from Alabama, one doctor from Puerto Rico, and the medical societies of South Carolina, Louisiana, Northern Virginia, and Puerto Rico, filed a complaint in the United States District Court for the Southern District of Florida  [*8] against sixty-nine separate Blue Cross and Blue Shield companies throughout the United States ("Blues defendants"), and their national trade association, the Blue Cross and Blue Shield Association ("the Association"). Capital and Highmark are among the specifically named defendants, but Keystone is not. [1] The case, which is now known as the *Love* case (formerly, it was known as *Thomas*), No. 03-21296 (S.D. Fla.), was eventually assigned to District Judge Federico Moreno. It alleges a national conspiracy among the Blues defendants, with the Association as the "hub," to bundle and downcode claims and to delay payments to providers under contract with the defendant HMOs.

1   Keystone Health Plan East, Inc., which is a wholly owned subsidiary of Independence Blue Cross operating out of the Philadelphia area, is named as a defendant in *Love.* The complaint also purports to include the subsidiaries of all of the named defendants, which ostensibly would cover

Keystone Health Plan Central. However, while some of those subsidiaries are specifically listed, Keystone Health Plan Central is not a specifically named defendant.

On November 4, 2003, thirteen chiropractic physicians, podiatrists, physical  [*9] therapists, and psychologists from Florida, Texas, Oregon, and Arizona filed the action now known as *Solomon,* No. 03-22935 (S.D. Fla.). The *Solomon* case involves essentially the same claims as *Love.* As in *Love,* both Capital and Highmark are named defendants. Although the complaint purports to include the subsidiaries of all of the named defendants as defendants themselves, it does not specifically list Keystone as a defendant in the case.

The *Love* and *Solomon* cases are part of the consolidated multidistrict proceedings being conducted in the United States District Court for the Southern District of Florida (MDL No. 1334) pursuant to 28 U.S.C. § 1407. On March 27, 2004, Highmark and Capital filed notice with the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407(c)(ii) arguing that the *Grider* case would be appropriate for transfer to the Florida MDL proceedings as a tag-along action. Keystone did not join the motion to transfer. On August 10, 2004, the Chairman of the Judicial Panel on Multidistrict Litigation entered an order denying transfer of the *Grider* case to the Florida MDL. The order explained that

while *Grider* shares some questions of fact with actions in  [*10] this litigation previously centralized in the Southern District of Florida, inclusion of *Grider* in MDL-1334 proceedings in the Southern District of Florida will not necessarily serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. We point out that *Grider* is nearly three years old with a discovery cutoff date of less than five months away. Moreover, alternatives to Section 1407 transfer exist that can minimize whatever possibilities there might be of duplicate discovery, inconsistent pretrial rulings, or both.

*Grider,* 2007 WL 201011, *6 (quoting Judicial Panel on Multidistrict Litigation Order Denying Transfer (Aug. 10, 2004)) (internal quotation marks omitted). Accordingly, the *Grider* case continued to proceed independently of the Florida MDL.

C. *Grider* Injunction Decision

On November 29, 2006, Highmark's counsel announced that Highmark had joined a "substantial majority" of Blues defendants in *Love* who had decided to settle that litigation, and that the *Grider* claims would be released under a broad release negotiated as part of that settlement. However, because of the confidentiality of the pending settlement agreement, Highmark's [*11] counsel would not discuss any details at that time. Plaintiffs' counsel in *Love* subsequently confirmed that Highmark had agreed to settle the *Love* litigation, and that the release in *Love* would also release claims against all present and former subsidiaries of any defendant in *Love,* which would include Keystone.

After learning of this pending settlement agreement, the Plaintiffs in *Grider* filed a motion for a preliminary injunction against Highmark, Capital, and other co-defendants, to enjoin them from settling the *Grider* claims as part of the Florida *Love* and *Solomon* settlements. Subsequently, on January 19, 2007, the United States District Court for the Eastern District of Pennsylvania granted the injunction sought by the Plaintiffs. Its order provides that:

> IT IS ORDERED that plaintiffs' motion for an injunction is granted.
>
> IT IS FURTH[E]R ORDERED that pursuant to the All Writs Act, 28 U.S.C. § 1651(a), the court enjoins defendants Keystone Health Plan Central, Inc.; Highmark, Inc.; John S. Brouse; Capital Blue Cross; James M. Mead; Joseph Pfister; their attorneys, including, but not limited to, Michael L. Martinez, Kimberly J. Krupka, Kathleen Taylor Sooy, Sandra A. Girifalco, Mary [*12] J. Hackett, Steven E. Siff and their respective law firms; and anyone acting [o]n their behalf or in concert with them, from settling, or attempting to settle, the class and subclass claims in, or any part of, the within litigation, which claims the undersigned certified by Order and Opinion dated December 20, 2006, and filed December 21, 2006, and which are pending before this court, in any other forum without the express approval of this court.
>
> IT IS FURTHER ORDERED that the aforesaid persons and firms are specifically enjoined from settling, or attempting to settle, the certified class and subclass claims in, or in any part of, the within matter in the multidistrict litigation currently pending before United States District Judge Federico A. Moreno in case

number MDL No. 1334 in the United States District Court [for] the Southern District of Florida, Miami Division, in the cases known as *Love, et al. v. Blue Cross and Blue Shield Association, et al.,* case number 1:03-CV-21296; . . . *Solomon, et al. v. Blue Cross and Blue Shield Association, et al.,* case number 1:03-CV-22935; and any other related case or cases.

*Grider,* 2007 WL 201011, *1.

In granting this injunction, the District Court [*13] explained that "[i]n doing so, I am not enjoining Judge Moreno from taking any action in his MDL cases in Florida. Nor am I enjoining any of the parties in the Florida litigation, including Highmark, Inc. and Capital Blue Cross, from settling any of the Florida plaintiffs' claims in the Florida litigation, which in my view are different than the class claims which I certified in this Pennsylvania litigation." *Id.* at *2. The Court emphasized that the Defendants "will still be able to settle the *Love* and *Solomon* claims in Florida." *Id.* at *25.

Indeed, the District Court arrived at this view, in part, based on statements from the Defendants themselves, who had argued at various times earlier in the proceedings that the *Grider* case was distinct from the Florida MDL. In response to discovery requests regarding the Florida MDL, for example, Capital stated that the MDL "concerns unrelated defendants with different payment policies, different payment practices, and different payment software," and explained that *Love* and *Solomon* "do not involve defendant [Keystone Health Plan] Central's HMO."

D. Proposed Settlement Agreement Reached in *Love*

On April 27, 2007, after engaging in court-ordered mediation, [*14] the plaintiffs in the *Love* case announced that they had reached a settlement with a majority of the named defendants. The settlement provides that the settling defendants will pay $ 128.3 million to members of the settlement class and will adopt a range of new policies and procedures concerning their business practices. In exchange, the settling defendants will be released from all causes of action, judgments, and claims of every kind "that were or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to" the transactions and conduct giving rise to the settlement agreement. *Love v. Blue Cross & Blue Shield Association et al.* Settlement Agreement, at 88-89 (Apr. 27, 2007). The settlement class is defined in the agreement as:

[A]ny and all Physicians, Physician Groups and Physician Organizations who provided Covered Services to any Plan Member or any individual enrolled in or covered by a Plan offered or administered by any Person named as a defendant in the Complaint or by any other primary licensee of the [Blue Cross and Blue Shield Association] or by any of their respective current or former subsidiaries or Affiliates, in each [*15] case from May 22, 1999 through the Preliminary Approval Date. The Class shall exclude: (I) all Persons who, in accordance with the terms of this Agreement, execute a timely request for exclusion (Opt-Out) from the Class; and (ii) the Blue Parties, their Affiliates and any of their officers, directors and employees.

*Id.* at 6. Under this definition, the *Love* settlement class would include Dr. Grider and nearly all of the Pennsylvania physicians she represents in the *Grider* litigation.

In light of the progressing settlement activity in the Florida MDL and the likelihood that it will impact the claims in *Grider,* the affected parties have filed the appeals currently before this Court. Specifically, currently before us are the consolidated appeals of: (1) Capital, James Mead, Keystone, and Joseph Pfister (No. 07-1231); (2) Highmark and John Brouse (No. 07-1232); and (3) Crowell & Moring and its attorneys (No. 07-1270).

II.

We exercise jurisdiction over this case pursuant to 28 U.S.C. § 1292(a)(1). When determining whether or not a district court has the authority to issue an injunction under the All Writs Act, we exercise plenary review. *See, e.g., In re Diet Drugs Prods. Liab. Litig. II,* 369 F.3d 293, 304 (3d Cir. 2004). [*16] Once that authority has been established, a district court's decision to issue such an injunction is reviewed for abuse of discretion. *Id.* In addition, "[w]e review the terms of an injunction for an abuse of discretion, underlying questions of law receive de novo review, and factual determinations are reviewed for clear error." *Id.* (quoting *In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 261 F.3d 355, 363 (3d Cir. 2001)) (internal quotation marks omitted).

III.

The All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "The All Writs Act confers on courts 'extraordinary powers' that are 'firmly circumscribed.'" *Alabama v. U.S. Army Corps of Eng'rs,* 424 F.3d 1117, 1132 (11th Cir. 2005) (quoting *ITT Cmty. Dev. Corp. v. Barton,* 569 F.2d 1351, 1358 (5th Cir. 1978)).

Typically, the All Writs Act has been used by federal courts to enjoin action by state courts that threatens the federal court's jurisdiction. In this context, the Anti-Injunction Act restricts injunctions under the All Writs [*17] Act that have the effect of staying a state court proceeding to those "expressly authorized by Act of Congress, or where necessary in aid of [a federal court's] jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. [2]

> 2   We have repeatedly noted that the two statutes' "parallel 'necessary in aid of jurisdiction' language is construed similarly." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 134 F.3d 133, 143 (3d Cir. 1998) (citing *Carlough v. Amchem Prods., Inc.,* 10 F.3d 189, 201 n.9 (3d Cir. 1993)). Nonetheless, these *similar* standards are not *identical.* The Anti-Injunction Act authorizes writs that are "necessary in aid of . . . jurisdiction." 28 U.S.C. § 2283. The All Writs Act, on the other hand, authorizes all writs "necessary *or appropriate* in aid of . . . jurisdiction[]." 28 U.S.C. § 1651(a) (emphasis added). The use of the disjunctive "or" followed by the more expansive "appropriate" connotes a larger quantum of injunctive authority than that provided by the Anti-Injunction Act. *See Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate [*18] meanings, unless the context dictates otherwise . . . ."). Thus, this Court has recognized that "[i]nsofar as [the All Writs Act] also permits writs 'appropriate in aid' of jurisdiction, the court's authority to issue writs is, if anything, broader than the exception contained in the Anti-Injunction Act." *In re Diet Drugs,* 282 F.3d at 239.

In *In re Diet Drugs Products Liability Litigation I,* 282 F.3d 220 (3d Cir. 2002) ("*In re Diet Drugs*"), for example, we upheld an injunction that had been issued under the All Writs Act to stop the parties from litigating in state court. There, patients had brought various class action cases against diet drug manufacturers after a link had been discovered between the drugs and valvular heart disease, and the cases were consolidated in the United States District Court for the Eastern District of

2007 U.S. App. LEXIS 20633, *

Pennsylvania. *Id.* at 225. After the consolidation, the court issued an order conditionally certifying a class containing six million members and approving a settlement agreement that had been reached. As this was happening, however, one of the plaintiffs whose case had been transferred to the MDL filed an action in Texas state court, seeking to certify an independent [*19] class. In so doing, that plaintiff sought an order from the Texas court opting-out all of the members of this new class from the Pennsylvania MDL settlement class, which was granted. *Id.* at 226. In response, the United States District Court for the Eastern District of Pennsylvania issued an order enjoining class-wide opt-outs and declaring the Texas court's opt-out order null and void. *Id.* at 228.

In upholding the injunction, we were careful to explain the narrow circumstances under which such an order would be appropriate: "Without more, it may not be sufficient that prior resolution of a state court action will deprive a federal court of the opportunity to resolve the merits of a parallel action in federal court." *Id.* at 234. Rather, "[t]he traditional notion is that *in personam* actions in federal and state court may proceed concurrently, without interference from either court, and there is no evidence that the exception to § 2283 was intended to alter this balance." *Id.* (quoting *Vendo Co. v. Lektro-Vend Corp.,* 433 U.S. 623, 642, 97 S. Ct. 2881, 53 L. Ed. 2d 1009 (1977) (plurality opinion)) (internal quotation marks omitted). As we explained,

> [i]n ordinary actions *in personam,* "[e]ach court is free to proceed in its [*20] own way and in its own time, without reference to the proceedings in the other court. Whenever a judgment is rendered in one of the courts and pleaded in the other, the effect of that judgment is to be determined by the application of the principle of res adjudicata by the court in which the action is still pending . . . ."

*Id.* (quoting *Kline v. Burke Constr. Co.,* 260 U.S. 226, 230, 43 S. Ct. 79, 67 L. Ed. 226 (1922)).

Thus, we concluded in *In re Diet Drugs* that "it may not be sufficient that state actions risk some measure of inconvenience or duplicative litigation." *Id.* (citing *In re Baldwin-United Corp.,* 770 F.2d 328, 337 (2d Cir. 1985)). Rather, an injunction under the All Writs Act is appropriate only when "the state court action threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation." *Id.* (quoting *Winkler v. Eli Lilly & Co.,* 101 F.3d 1196, 1202 (7th Cir. 1996)). That is, "the state action must not simply threaten to reach judg-

ment first, it must interfere with the federal court's own path to judgment." [3] *Id.*

> 3   As the Appellees point out, we did recognize in *In re Diet Drugs* that complex class action cases are one "category of federal cases for which state court actions [*21] present a special threat to the jurisdiction of the federal court." 282 F.3d at 235. As we explained, "[u]nder an appropriate set of facts, a federal court entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts, may appropriately enjoin state court proceedings in order to protect its jurisdiction." *Id.* This is so because "maintaining 'the federal court's flexibility and authority to decide' such complex nationwide cases makes special demands on the court that may justify an injunction otherwise prohibited by the Anti-Injunction Act." *Id.* (quoting *Carlough,* 10 F.3d at 202). However, we were careful to emphasize that "[t]his is not to say that class actions are, by virtue of that categorization alone, exempt from the general rule that *in personam* cases must be permitted to proceed in parallel." *Id.* at 236. Rather, "[w]hat is ultimately important, in any event, is that in both [*in rem* and *in personam*] cases state actions over the same subject matter have the potential to 'so interfer[e] with a federal court's consideration or disposition of a case as to seriously impair [*22] the federal court's flexibility and authority to decide the case.'" *Id.* (quoting *Atlantic C. L. R. Co. v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 295, 90 S. Ct. 1739, 26 L. Ed. 2d 234 (1970)).

Of course, to the extent that this framework is useful in the current context, it is important to note that we are dealing with the use of the All Writs Act to enjoin another federal court, not a state court. Although the Appellants repeatedly resort to the rule explained above that parallel proceedings do not disturb the jurisdiction of either court, we made it clear long ago that this rule generally applies only when one court is a state court and the other is a federal court. As we explained, the "parallel proceedings" rule "clearly ha[s] no application to a situation in which two actions are pending in courts of equal dignity within the judicial system of a single sovereignty." *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir. 1941). In any event, this is not important here because *Grider* and the Florida MDL cases are not actually "parallel" proceedings, as we have traditionally used that term. To be considered parallel proceedings, "[t]he one must be materially on all fours with the other . . . . [T]he issues [*23] 'must have such an identity that a

determination in one action leaves little or nothing to be determined in the other.'" *Smith v. S.E.C.,* 129 F.3d 356, 361 (6th Cir. 1997) (quoting *Congress Credit Corp. v. AJC Int'l, Inc.,* 42 F.3d 686, 689 (1st Cir. 1994)). Although there is overlap between *Grider* and the Florida MDL cases, none of the parties contend that they are identical in this regard.

Although *In re Diet Drugs* concerned an injunction against action in a state court -- and thus involved the terms of the Anti-Injunction Act -- it is still instructive in the instant case. Indeed, the lack of cases in which the All Writs Act has been used to enjoin settlement efforts in another federal court is telling. It is clear that the Act is generally used to prohibit activities in another court that threaten to undermine a pending settlement in the enjoining court. *See, e.g., Carlough v. Amchem Prods., Inc.,* 10 F.3d 189, 202-04 (3d Cir. 1993) (upholding an All Writs Act injunction directed at a state court action that threatened to derail a pending settlement in a complex multidistrict class action case). When the Act has been used to *block* settlement efforts in another court, it is typically [*24] because a party was deliberately using that forum to circumvent a pending settlement agreement in the enjoining court. This was the case in both *In re Lease Oil Antitrust Litigation,* 48 F. Supp. 2d 699 (S.D. Tex. 1998), and *In re Managed Care Litigation,* 236 F. Supp. 2d 1336 (S.D. Fla. 2002).

In *In re Lease Oil Antitrust Litigation,* an MDL Panel had consolidated a series of cases asserting violations of federal antitrust laws in the United States District Court for the Southern District of Texas. After this consolidation, other plaintiffs filed an antitrust suit in Alabama state court, which did not include the federal claims. In the state forum, a settlement was proposed that would have released the federal claims pending in the Texas MDL. 48 F. Supp. 2d at 701. Facing this situation, the Texas MDL court explained that an injunction was necessary "to protect its jurisdiction over the exclusively federal antitrust claims: the Court needs to act in order to prevent the parties before it from possibly pursuing an inadequate or collusive settlement in state courts which would release the apparently stronger claims in the instant case." *Id.* at 704. Thus, the court enjoined the parties before it [*25] from entering into settlements in any other forum without its approval.

The clearest example of a court applying the All Writs Act to enjoin settlement efforts in another federal court actually came in the context of the Florida MDL in this very case. In *In re Managed Care Litigation,* the United States District Court for the Southern District of Florida found that one of the defendants had attempted to circumvent its authority by filing and immediately attempting to settle a suit in the United States District Court for the Southern District of Illinois. 236 F. Supp. 2d at 1338-39. The court explained that

> [a]dmittedly, in most instances, the issuance of an injunction would be in order to *protect* a settlement. Here, instead this Court seeks to *prevent* a settlement. This Court is well aware of the strong public interest favoring settlements. However, it cannot turn a blind eye to the under-handed maneuvers CIGNA took to obtain this settlement agreement. CIGNA snookered both this Court and Judge Murphy in Illinois in an obvious attempt to avoid this Court's jurisdiction.

*Id.* at 1342 (emphasis in original). Accordingly, the Florida court, emphasizing its role as an MDL court, enjoined CIGNA [*26] from participating in the Illinois settlement.

Based on the limited precedent in this area, there does not appear to be any basis for the injunction in this case. Although significant resources have been invested in the *Grider* litigation to this point, there is simply no support for the proposition that a court may enjoin parties from participating in or reaching a bona fide settlement in another federal court that may dispose of claims before it -- particularly when there is no pending settlement in the enjoining court and the other federal court is an MDL court charged with attempting to reach a global settlement. [4]

> 4   The Appellees argue that the injunction does not in any way interfere with the Florida MDL because the claims in *Grider* involve only Keystone, which is not a defendant in *Love* and *Solomon.* As explained above, the complaints in the Florida cases purport to include the subsidiaries of all of the named defendants, which include Capital and Highmark. However, while some of those subsidiaries are specifically listed, Keystone Health Plan Central, Inc. is not a specifically named defendant. Regardless of whether or not Keystone could be called into court as a defendant on this [*27] basis, it is clear that the settlement agreement could still settle claims with those subsidiaries in an attempt to reach a global settlement. Indeed, the settlement agreement as it is currently written releases the settling defendants themselves as well as their "present and former parents, divisions and Affiliates and each of their respective current or former officers, directors, employees, agents, insurers and attorneys." *Love v. Blue Cross & Blue Shield Associa-*

*tion, et al.* Settlement Agreement, at 88 (Apr. 27, 2007). Thus, it is clear that, although the claims against Keystone may not be as squarely presented in the Florida MDL as they are in *Grider,* they are tied up with the MDL court's settlement efforts.

First, unlike in *In re Lease Oil Antitrust Litigation* and *In re Managed Care Litigation,* there is no evidence of any collusion or wrongdoing by the *Grider* Defendants. Rather, there is a consolidated MDL in Florida that appears to have reached a settlement on claims similar to the ones in *Grider* after court-ordered mediation. Indeed, because of the injunction issued by the District Court, attorneys from Capital and Highmark were not even at the table when the existing settlement [*28] agreement was formed, subduing any suggestion that they were trying to manipulate the settlement to deliberately affect the *Grider* claims.

Second, "[a]n injunction under the All Writs Act invokes the equitable power of the court; thus, as is similarly the case for traditional injunctions, a court may not issue an injunction under the All Writs Act if adequate remedies at law are available." *U.S. Army Corps of Eng'rs,* 424 F.3d at 1132 (citing *Rosen v. Cascade Int'l, Inc.,* 21 F.3d 1520, 1526 n.13 (11th Cir. 1994); *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1100-01 (11th Cir. 2004)). Under this standard, the general rule is that "if a party will have opportunity to raise its claims in the concurrent federal proceeding sought to be enjoined, that concurrent proceeding is deemed to provide an adequate remedy at law." *Id.; see also Porto Rico Tel. Co. v. Puerto Rico Commc'n Auth.,* 189 F.2d 39, 41 (1st Cir. 1951).

Here, that adequate remedy at law is Federal Rule of Civil Procedure 23(e), which provides that "[a]ny class member may object to a proposed settlement, voluntary dismissal, or compromise that requires court approval under Rule 23(e)(1)(A)," and that "[a]n objection made under [*29] Rule 23(e)(4)(A) may be withdrawn only with the court's approval." Fed. R. Civ. P. 23(e)(4)(A) & (B). To the extent that the actual proposed settlement in *Love* affects the *Grider* class members unfairly, those class members may object, and Judge Moreno can deal with the objections. Indeed, in *In re Managed Care Litigation,* Judge Moreno explained that courts "must operate on the basis of the assumption that all federal judges follow the law and protect the rights of the class members in accordance with Rule 23 of the Federal Rules of Civil Procedure." 236 F. Supp. 2d at 1342-43.

The Appellees have not explained why Rule 23(e) is not an adequate remedy at law that would militate against injunctive relief under the All Writs Act. They have argued instead that they cannot avail themselves of the protections of Rule 23(e) because they are not members of the *Love* class. But if it is true that the *Grider* class members are not members of the *Love* settlement class, any settlement reached in *Love* would not affect the *Grider* case at all because the *Grider* class members would not have to sign a release of claims. Under these circumstances, there would be no need for an injunction.

This is not to [*30] say that there are not valid concerns with allowing the *Grider* Defendants to proceed with the Florida settlement discussions, even though there is no evidence of collusion to this point. Although everyone involved in this case admits there is overlap between the claims in *Grider* and the claims in *Love,* there are aspects of the *Grider* claims that are not at issue in *Love.* Primarily, the *Love* claims do not cover the Defendants' behavior with respect to capitation payments that is at issue in *Grider.* Rather, *Love* is limited to the Defendants' procedures for paying fee-for-service reimbursements. In addition, the relevant dates of the class periods differ. In *Grider,* the class includes anyone who rendered services from January 1, 1996 through October 5, 2001, whereas the *Love* settlement class period is from May 22, 1999 through the date when the settlement is preliminarily approved. [5] But any fear that the Defendants may use future settlement discussions in Florida to release themselves from liability without ever having to answer for certain claims that are unique to the *Grider* litigation is assuaged by the protections contained in Rule 23(e).

> 5  In addition to these two distinctions, the [*31] Appellees repeatedly argue that there is a major difference between the cases because the reimbursement systems used by Keystone are not used by the defendants in *Love.* That is, the *Love* defendants do not use software from Synertech to process claims, whereas Keystone does. However, this is a spurious distinction. Synertech is not a party in this case. Instead, the claims asserted by the *Grider* plaintiffs target the behavior of Keystone (i.e., downcoding and claim bundling) that happened to be implemented by the software of Synertech. There is no argument that Synertech's involvement affected the downcoding and claim bundling in a way that made it materially different than the downcoding and claim bundling that was averred in *Love.*

Finally, our conclusion that the injunction issued by the District Court was an abuse of discretion is buttressed by the fact that the court it sought to enjoin is the site of a multidistrict consolidation on the matters at issue in *Grider.* The very purpose of such a consolidation is to conserve judicial resources by resolving as many claims as possible. *See In re Managed Care Litig.,* 236 F. Supp.

2d at 1342-43. Thus, although the *Grider* case itself is not [*32] part of the MDL, to the extent that the MDL court can achieve a global settlement that appropriately and fairly deals with a range of claims, other federal courts should be willing to let it do so absent some indication of collusion.

Given the facts of this case, we are compelled to conclude that the District Court abused its discretion by resorting to the All Writs Act. [6] We have no doubt that the injunction issued in this case was a good faith attempt by the District Court to keep the *Grider* claims before it after presiding over many years of discovery and pre-trial disputes. But we do not believe that this is an appropriate instance in which to use the power conferred by the All Writs Act. This is essentially a case where another court has "threaten[ed] to reach judgment first," not where action in another court has "interfere[d] with the [enjoining] federal court's own path to judgment." *In re Diet Drugs,* 282 F.3d at 234. That is, there is no evidence that the Appellants were trying to swindle the system to avoid the District Court's jurisdiction by "settling on the cheap" in another forum. In addition, the injunction has had the effect of limiting the ability of an MDL court to [*33] comprehensively manage the matter before it, undermining the very purpose of such a consolidation. Accordingly, we conclude that the District Court abused its discretion by using the All Writs Act to enjoin the parties in this case. [7]

6    The District Court also supported its decision to issue the injunction in this case by citing the so-called "first filed" rule, as discussed in *Crosley Corp.,* 122 F.2d 925. However, this rule has no application in the circumstances of this case. Rather, the later-filed case must be "truly duplicative of the suit before [the court]." *Smith,* 129 F.3d at 361. That is, "[t]he one must be materially on all fours with the other . . . . [T]he issues 'must have such an identity that a determination in one action leaves little or nothing to be determined in the other.'" *Id.* (quoting *Congress Credit Corp.,* 42 F.3d at 689). In *Crosley,* for example, the two suits at issue were filed by the same parties involving the same declaratory judgment in a patent case. Those simply are not the facts of the instant case. Here, the *Love* and *Solomon* cases were filed by plaintiffs who have no involvement whatsoever with the *Grider* case. And the claims in *Love* and *Solomon* are neither [*34] identical claims, nor compulsory counter-claims in *Grider.* As such, the District Court's injunction order cannot be supported by citing the first filed rule.

7    Because we conclude that the District Court abused its discretion by issuing the injunction in this case, we do not address the remainder of the Appellants' arguments.

IV.

For the forgoing reasons, we will vacate the injunction issued by the District Court.

LEXSEE

**CLARA J. THOMAS, Plaintiff, v. CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Defendant.**

**C.A. No. 02-MC-136**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2003 U.S. Dist. LEXIS 22436**

**December 12, 2003, Decided**

**PRIOR HISTORY:** Thomas v. Conn. Gen. Life Ins. Co., 2003 U.S. Dist. LEXIS 19876 (D. Del., Nov. 4, 2003)

**DISPOSITION:** [*1] Court issued injunction to limit plaintiff's future access to federal courts.

**COUNSEL:** Clara A Thomas, PLAINTIFF, Pro se, Hudson, FL USA.

For Connecticut General Life Insurance Company, DEFENDANT: Linda Richenderfer, Saul Ewing LLP, Wilmington, DE USA.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Kent A. Jordan

**OPINION**

Judgment from the Southern District of Florida

**MEMORANDUM ORDER**

**I. INTRODUCTION**

One of the greatest aspects of our judicial system is that it provides all citizens broad access to the courts. Yet when a litigant uses the limited resources of the judicial system as a conduit for a campaign of harassment, she must be stopped. As set forth in more detail below, "the time has come where this court can no longer tolerate [Clara Thomas's] abuse of the judicial [*2] system," and an injunction will be entered to limit her future access to the federal courts. *See Armstrong v. School District of Philadelphia, et al.,* 1999 U.S. Dist. LEXIS 14918 at *7 (E.D. Pa. Sept. 29, 1999).

**II. BACKGROUND**

Ms. Thomas's saga begins in Florida. On July 2, 1991, after a bench trial, the United States District Court for the Southern District of Florida entered final judgment in Ms. Thomas' favor, and against defendant, Connecticut General Life Insurance Company ("CGLIC"), regarding her claim for benefits pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* (D.I. 1.) CGLIC was ordered to pay all past-due benefits [1] to Ms. Thomas, and to act "in accordance with the terms of the [CGLIC] policy" in the future. (*Id.*) In 1995, CGLIC twice requested medical evidence of Ms. Thomas's ongoing medical disability, which she failed to provide. (D.I. 17, Exh. 1 PP 43-45.) This prompted CGLIC to terminate Ms. Thomas' benefit payments on August 30, 1995, and she again sued CGLIC, this time in the United States District Court for the Middle District of Florida. (D.I. 17 at 4.) On April 7, 1997, after [*3] another bench trial, the Middle District of Florida entered judgment in CGLIC's favor, finding that Ms. Thomas' claim that her benefits were improperly terminated in August 1995 was "without merit as plaintiff failed to comply with repeated requests to furnish proof of continued disability." (*Id.,* Exh. 1 at 18.) Ms. Thomas appealed this judgment to the United States Court of Appeals for the Eleventh Circuit, and it was affirmed on May 28, 1998. (*Id.,* Exh. 5.)

1 A notice of satisfaction of this judgment was entered in the Southern District of Florida on July 9, 1993. (D.I. 17, Exh. 11.)

However, Ms. Thomas refuses to accept that her claims against CGLIC have been fully adjudicated. In 1998, she filed a "Motion [To Relieve] Plaintiff from Judgment" in the Middle District of Florida, which was denied on August 4, 1998. (*Id.,* Exh. 6.) She appealed that decision, but her appeal was dismissed by the Eleventh Circuit on November 18, 1999 for want of prosecu-

tion. (*Id.,* Exh. 7.) While that appeal was [*4] pending, Ms. Thomas filed a "Motion to Set Aside Judgment for Fraud Upon the Court" in the Middle District of Florida, which was denied on October 19, 1999. (*Id.,* Exh. 8.) On July 19, 1999, Ms. Thomas moved the Southern District of Florida for an order holding CGLIC in contempt, which was denied on July 24, 1999, as was her motion for reconsideration on August 18, 1999. (*Id.,* Exh. 9, 10, 11.)

Apparently undeterred by these adverse decisions, Ms. Thomas filed another complaint against CGLIC in the Middle District of Florida on November 19, 2001, which the court dismissed *sua sponte* on November 21, 2001. (*Id.,* Exh. 12, 13.) On September 20, 2002, Ms. Thomas filed a Motion for Relief of Judgment in the Middle District of Florida. (*Id.,* Exh. 14.) The court denied the Motion, and required Ms. Thomas to show cause why it should not impose sanctions upon her, pursuant to Federal Rule of Civil Procedure 11. (*Id.,* Exh. 15.) On February 4, 2003, the court sanctioned Ms. Thomas $ 250.00, to be paid to CGLIC within sixty days. (*Id.,* Exh. 16.) Ms. Thomas has not paid any portion of that amount to CGLIC. (1999 U.S. Dist. LEXIS 14918, [WL] at 7.)

Meanwhile, [*5] Ms. Thomas filed a "Motion for Writ of Execution" in the Southern District of Florida on September 20, 2002. (*Id.,* Exh. 17.) Even though that motion was denied on September 30, 2002, (*id.,* Exh. 18), Ms. Thomas filed yet another Motion for Writ of Execution in the Southern District of Florida on October 7, 2002 (*id.,* Exh. 19), which was also denied (*id.,* Exh. 20.)

On February 13, 2003, Ms. Thomas filed a Notice of her intention to appeal the Middle District of Florida's February 4 Order imposing sanctions, and simultaneously requested leave to proceed *in forma pauperis* on appeal. (*Id.,* Exh. 21.) Her request was denied on March 13, 2003, together with the observation that "the appeal ... reflects the Plaintiff's growing history of bringing unmeritorious litigation against [CGLIC]." (*Id.,* Exh. 22.) The Eleventh Circuit also noted that Ms. Thomas' "appeal [was] frivolous" and denied her motion for leave to proceed *in forma pauperis* on May 29, 2003. (D.I. 21.)

Ms. Thomas came to this court in December 2002, and, without providing any information about her past proceedings in Florida, registered the 1991 judgment here and instituted garnishment proceedings [*6] against Deutsche Bankers Trust Co. Delaware ("Deutsche Bank"), which she apparently believed had custody of funds belonging to CGLIC. (*See* D.I. 1, 4.) She then sought default judgment against Deutsche Bank. (D.I. 14.)

Once CGLIC became aware of the proceedings against Deutsche Bank, it filed a Motion to Vacate Judgment, to Quash Writ of Execution, Deny Motion for Default Judgment and to Show Cause Why Plaintiff Should Not be Sanctioned. (D.I. 16.) On November 4, 2003, I granted CGLIC's Motion in all respects and found that Ms. Thomas is abusing the judicial system by continuing to file frivolous motions. (D.I. 24 at 3.) I also ordered Ms. Thomas and CGLIC to appear at a hearing on December 8, 2003 regarding CGLIC's Motion to Show Cause Why Plaintiff Should Not be Sanctioned. (*Id.*) During a December 3, 2003 teleconference with the court, plaintiff stated that she would not appear at the December 8th hearing, despite warnings that her failure to appear could result in the imposition of sanctions. Based on Plaintiff's representations, CGLIC stated that it would forego a hearing and was content to rest on its Memorandum of Law in Anticipation of Hearing on Sanctions (D.I. 29.) [*7] For the reasons that follow, I will enter an Injunction to prevent Ms. Thomas from burdening the judicial system and CGLIC with frivolous filings in the future, and impose sanctions upon Ms. Thomas for her vexatious conduct.

## III. DISCUSSION

Federal courts are invested with the equitable power to issue an injunction when such is necessary to effectuate orders of the court and to avoid relitigation of identical or similar issues. *In re Packer Ave. Assoc,* 884 F.2d 745, 747 (3d Cir. 1989). The All Writs Act, which codifies this equitable power, provides, in pertinent part, that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of the law." 28 U.S.C. § 1651(a) (2003). Section 1651(a) therefore authorizes district courts to issue an injunction restricting the access to the federal courts of parties who repeatedly file frivolous litigation. *Abdul-Akbar v. Watson,* 901 F.2d 329, 332 (3d Cir. 1990). Moreover, "federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction [*8] from conduct which impairs their ability to carry out Article III functions." *In re Martin-Trigona,* 737 F.2d 1254, 1261 (2d Cir. 1984). *Pro se* litigants do not have license to abuse the judicial process. *Armstrong,* 1999 U.S. Dist. LEXIS 14918 at *6 (citations omitted). The court therefore has broad discretion to protect its jurisdiction. *Lysiak v. Comm. of Internal Revenue,* 816 F.2d 311, 313 (7th Cir. 1987). Enjoining a plaintiff from filing additional papers is an appropriate sanction to curb frivolous litigation. *Id.*

CGLIC argues that a nationwide injunction should issue against plaintiff to restrict her future access to the courts. (D.I. 29 at 3.) On the basis of Ms. Thomas' past conduct, it seems she is "likely to continue to abuse the judicial process," and I agree that an injunction is appro-

priate. *See Safir v. U.S. Lines, Inc.,* 792 F.2d 19, 24 (2d Cir. 1986). I will enjoin plaintiff from filing any action in federal court against CGLIC without prior leave of court.

There is no question that Ms. Thomas has harassed CGLIC with her frivolous filings and needlessly increased the costs of this litigation, [*9] which was adjudicated over twelve years ago. *See* Fed. R. Civ. P. 11(b)(1), (b)(2), (b)(3). She has also vexatiously and unreasonably multiplied the proceedings associated with her dispute with CGLIC. *See* 28 U.S.C. § 1927 (2003). Therefore, I find that Ms. Thomas has violated Federal Rule of Civil Procedure 11(b) and 28 U.S.C. § 1927. "Both [Rule 11(c) and 28 U.S.C. § 1927] provide courts with the power to sanction abusive *pro se* litigants." *Ketchum v. Cruz,* 775 F. Supp. 1399, 1403 (D. Colo. 1991), *aff'd,* 961 F.2d 916 (10th Cir. 1992). Imposing sanctions upon Ms. Thomas is not only proper in this case, but also necessary to deter her from engaging in the same conduct in the future.

CGLIC has provided a detailed accounting of the attorney's fees, costs, and expenses associated with its counsel's work on this matter. (D.I. 29 at 9, Exhs. B and C.) Through October 2003, CGLIC has paid the law firm of Saul Ewing LLP $ 6,533.00 in fees and $ 618.83 in costs and expenses associated with responding [*10] to Ms. Thomas' filings in this court. [2] Ms. Thomas will be sanctioned in the amount of $ 7151.83, to be paid to CGLIC.

> 2    CGLIC estimates that its attorney's fees through November 2003 will be approximately $ 1,104.00. (D.I. 29 at 9.) This estimate is unsubstantiated and I decline to add this amount to the sanctions I now impose.

Accordingly, it is hereby ORDERED that, to protect the integrity of the courts, and to protect defendant CGLIC and others from the harassment of further frivolous litigation initiated by Ms. Thomas:

1. The court ENJOINS Ms. Thomas, or any entity acting on her behalf, from filing any action or proceeding in any federal court, including any action or proceeding against the defendant named in the instant action, without first obtaining leave of the court in which she intends to file the action or proceeding. The court ORDERS Ms. Thomas to attach a copy of this Memorandum Order and Injunction to any such petition for leave of court.

2. The court ENJOINS Ms. Thomas from filing [*11] any further papers in any case, either pending or terminated, in the District of Delaware, without first obtaining leave of this court. Leave of court shall be forthcoming upon Ms. Thomas' demonstrating through a properly filed petition, that the proposed filing: (1) can survive a challenge under Federal Rule of Civil Procedure 12; (2) is not barred by principles of *res judicata* or collateral estoppel; (3) is not repetitive or violative of a court order; and (4) is in compliance with Federal Rule of Civil Procedure 11.

The court further ORDERS the clerk of court of the District of Delaware to refuse to accept any submissions for filing from Ms. Thomas except petitions for leave of court, unless such submissions for filing are accompanied by an order of this court granting leave. In the event that Ms. Thomas succeeds in filing papers in the District of Delaware without first obtaining leave of this court, the clerk of court shall, under authority of this court's Order, immediately and summarily strike the pleadings or filings.

The court ORDERS the clerk of court for the District of Delaware to provide [*12] a copy of this Memorandum Order to the clerks of court for the Southern District of Florida and the Middle District of Florida.

The court ORDERS Ms. Thomas to pay sanctions in the amount of $ 7,151.83 to Connecticut General Life Insurance Company within ninety (90) days of the date of this Order.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

December 12, 2003

Wilmington, Delaware

LEXSEE

**ISAAC BOWEN, Plaintiff, vs. STATE OF TENNESSEE, Defendant.**

**No. 06-2587-JDB/dkv**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE, WESTERN DIVISION**

**2007 U.S. Dist. LEXIS 42990**

**June 13, 2007, Decided**
**June 13, 2007, Filed**

**COUNSEL:** [*1] Isaac Bowen, Plaintiff, Pro se, Memphis, TN.

For John Zelinka, Larry Scroggs, Carlin Stuart, Defendants: Thomas E. Williams, LEAD ATTORNEY, SHELBY COUNTY ATTORNEYS OFFICE, Memphis, TN.

**JUDGES:** J. DANIEL BREEN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** J. DANIEL BREEN

**OPINION:**

ORDER GRANTING MOTION TO PROCEED IN FORMA PAUPERIS ORDER GRANTING MOTION TO DISMISS ORDER OF DISMISSAL ORDER DENYING MOTIONS FOR INJUNCTIVE RELIEF AS MOOT ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH NOTICE OF APPELLATE FILING FEE AND ORDER ENJOINING PLAINTIFF FROM FILING FURTHER DOCUMENTS

On September 12, 2006, Plaintiff Isaac Bowen filed a pro se complaint, along with a motion to proceed in forma pauperis. The motion to proceed in forma pauperis is GRANTED. Bowen sues the State of Tennessee, former Department of Human Services Commissioner Natasha Metcalf, City of Memphis Delinquent Tax Attorney Gwen Hewitt, former City of Memphis Delinquent Tax Attorney Larry Scroggs, current Legal Manager for the Shelby County Trustee Carlin Stewart, and former Legal Manager John Zelinka. Bowen alleges that Defendant Metcalf denied his disability benefits for almost three years causing an undue financial hardship [*2] for him and his family. He further alleges that Defendants Hewitt, Scroggs, Steward, and Zelinka continue to sue him in attempts to collect unpaid, delinquent property taxes despite his contention that he is exempt from property taxes.

On February 12, 2007, Defendants Stuart, Zelinka, and Scroggs filed a motion to dismiss, alleging, in part, that Plaintiff's complaint should be dismissed for insufficiency of service of process. On February 16, 2007, Plaintiff responded to the motion to dismiss. The United States Court of Appeals for the Sixth Circuit has issued an administrative order which states:

> Even if a non-prisoner pays the filing fee and/or is represented by counsel, the complaint must be screened under § 1915(e)(2). The language of § 1915(e)(2) does not differentiate between cases filed by prisoners and cases filed by non-prisoners. The screening must occur even before process is served or the individual has had an opportunity to amend the complaint. The moment the complaint is filed, it is subject to review under § 1915(e)(2). If the complaint falls within the requirements of § 1915(e)(2) when filed, it must be dismissed.

In Re Prison Litigation Reform Act, 105 F.3d 1131, 1134 (6th Cir. 1997) [*3] (articulating how district courts should apply the PLRA). This District Court has issued an administrative order establishing a policy for the Clerk to follow in implementing § 1915(e)(2). That policy provides, in part, that it is:

> ORDERED that service not be issued upon the filing of a non-prisoner *pro se* complaint, pending review of the complaint's merit under 28 U.S.C. § 1915(e)(2). Section 1915(e)(2) provides that whether or not a filing fee is paid, the

court shall dismiss a case at any time upon the court's determination that any of the § 1915(e)(2) provisions are met.

Administrative Order No. 98-10. Therefore, screening of pro se complaints must occur before process issues. The delay in issuing process and effecting service in a case subject to screening is not attributable to the Plaintiff. Before the entry of a screening order, the Clerk of this Court was not authorized to issue any process. Accordingly, insufficiency of process is not a defense upon which the Defendants may rely.

Bowen has a lengthy history of filing cases in this district court. In Bowen v. State of Tennessee, et al., 03-2883-D/P, 2004 U.S. Dist. LEXIS 30509 (W.D. Tenn. Feb. 18, 2004), [*4] Bowen sued the State of Tennessee, Department of Human Services, Disability Determination Services Section ("DDS"), City of Memphis Tax Assessor and Shelby County Tax Assessor alleging that the denial of disability benefits for three years caused undue hardship for him and his family and that DDS did not follow the "proper laws" and violated his "civil rights." He also alleged that City of Memphis and Shelby County Tax assessors were depriving him of his rights by filing "lawsuite [sic] after lawsuite [sic]" despite his informing them of the undue hardship caused by the denial of his disability claim. Bowen was advised that this Court lacked jurisdiction of such a suit. He did not appeal the dismissal of that lawsuit.

In Bowen v. Metcalf, 04-2206-B/V, 2004 U.S. Dist. LEXIS 30517 (W.D. Tenn. Sept. 30, 2004), Bowen sued Defendant Metcalf and was advised that even if the state agency erred in its handling of Plaintiff's claim for disability benefits, Metcalf was not liable to the Plaintiff and this Court lacked jurisdiction over his lawsuit. In Bowen v. Shelby County, 06-2203-D/V, 2006 U.S. Dist. LEXIS 96431 (W.D. Tenn. May 31, 2006), Plaintiff sued Shelby County seeking a stay of state court proceedings for the sale of his property [*5] due to delinquent taxes. The order of dismissal, entered on May 22, 2006, stated, in part:

The Anti-Injunction Act specifically prohibits this Court from issuing an injunction. "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.

Here, the Shelby County Trustee is invoking state court judicial remedies for the recovery of overdue property taxes.

In procedural due process claims, the deprivation by state action of a constitutionally protected interest in "life, liberty, or property" is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law. Parratt [v. Taylor, 451 U.S. 527,] 537, 101 S. Ct. 1908, 68 L. Ed. 2d 420 [(1981)]; Carey v. Piphus, 435 U.S. 247, 259, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978)("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property"). The constitutional violation actionable under [*6] § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.

Zinermon v. Burch, 494 U.S. 113, 125-26, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990)(footnote and some citations omitted).

Generally, claims for deprivation of property without due process are not actionable under § 1983 if adequate state remedies are available to redress the deprivation. Id. at 132. See also Hudson v. Palmer, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984); Parratt v. Taylor, 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981); Smith v. Rose, 760 F.2d 102, 106 (6th Cir. 1985); Brooks v. Dutton, 751 F.2d 197 (6th Cir. 1985). Plaintiff has the right to contest and seek judi-

cial review of that proceeding in the state forum. State law remedies clearly satisfy plaintiff's due process rights.

Furthermore, plaintiff may not attack any pending state court proceedings filed by the Shelby County Trustee in a collateral proceeding in federal court. This would amount to obtaining review in this Court of the decision of a Tennessee court. Any claim or defense arising from the manner in which those proceedings are being litigated [*7] should be presented in that forum.

> United States district courts . . . do not have jurisdiction[]over challenges to state-court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional. Review of those decisions may be had only in this [the United States Supreme] Court. 28 U.S.C. § 1257.

District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482-83, 486, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983). See also Rooker v. Fidelity Trust Co., 263 U.S. 413, 416, 44 S. Ct. 149, 68 L. Ed. 362 (1923)(federal district courts lack jurisdiction to review or modify a judgment of a state's highest court). In short, "[l]ower federal courts possess no power whatever to sit in direct review of state court decisions." Cleveland Surgi-Center v. Jones, 2 F.3d 686, 691 (6th Cir. 1993). Similarly,

> federal courts have no authority to issue writs of mandamus to direct state courts or their judicial officers in the performance of their duties. Clark v. Washington, 366 F.2d 678 (9th Cir. 1966); Campbell

> v. Washington State Bar Ass'n, 263 F. Supp. 991 (W.D. Wash. 1967). [*8]

Haggard v. State of Tennessee, 421 F.2d 1384, 1386 (6th Cir. 1970).

Plaintiff's conclusory allegations of constitutional violations are insubstantial and fail to vest this Court with jurisdiction. Clearly, plaintiff is merely seeking to file an action here regarding matters pending in a Tennessee state court and is seeking a more favorable forum for his cause. This Court is not that forum. Thus, this Court either lacks jurisdiction or must abstain from exercising any jurisdiction over plaintiff's claim for relief from the state court proceedings or judgments.

Furthermore, this case is duplicative of plaintiff's previous case, Bowen v. State of Tennessee, et al., 03-2883-D/P, 2004 U.S. Dist. LEXIS 30509 (W.D. Tenn. Feb. 18, 2004), wherein plaintiff sued both the city and county tax assessors and was advised that [this court lacked jurisdiction of such a suit. Bowen did not appeal the dismissal of his lawsuit. A completely duplicative complaint lacks an arguable basis either in law or in fact and is, therefore, frivolous. See Denton v. Hernandez, 504 U. S. 25, 31, 112 S. Ct. 1728, 118 L. Ed. 2d 340 (1992); Neitzke v. Williams, 490 U.S. 319, 325, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989).

Accordingly, this complaint [*9] presents claims that are devoid of jurisdiction and which fail to state a claim upon which relief may be granted. As the complaint is frivolous, devoid of jurisdiction, and fails to state a claim upon which relief may be granted, it is dismissed pursuant to Fed. R. Civ. P. 12(h)(3) and 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

The remaining basis for Defendants' motion to dismiss is that this Court lacks jurisdiction of Plaintiff's claims and that his complaint fails to state a claim upon which relief may be granted. Bowen's claims for hardship from the denial of disability benefits and his attempts to stop the state courts from collecting his delinquent property taxes have been heard and finally concluded in multiple previous state and federal court adju-

2007 U.S. Dist. LEXIS 42990, *

dications. "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Federated Dept. Stores, Inc. v. Moitie, 452 U.S. 394, 398, 101 S. Ct. 2424, 69 L. Ed. 2d 103 (1981). To apply the doctrine of res judicata, three elements must be present: (1) judgment [*10] on the merits in an earlier action; (2) identity of the parties or their privies in the two suits; and (3) identity of the cause of action or claims between both suits. Blonder-Tongue Laboratories v. Univ. of Ill. Foundation, 402 U.S. 313, 323-24, 91 S. Ct. 1434, 28 L. Ed. 2d 788 (1971); Brzostowski v. Laidlaw Waste Sys., Inc., 49 F.3d 337, 338 (7th Cir. 1995); Wade v. Hopper, 993 F.2d 1246, 1252 (7th Cir. 1993). Because of Plaintiff's prior litigation in federal court, federal rules of res judicata determine whether the present suit is barred. Barnett v. Stern, 909 F.2d 973, 977 (7th Cir. 1990); In re Energy Cooperative, Inc., 814 F.2d 1226, 1230 (7th Cir. 1987). Bowen's claims are clearly barred by res judicata, or claim preclusion.

As plaintiff's complaint fails to state a claim and is clearly barred by res judicata, Defendants' motion to dismiss is well-taken and is GRANTED. The entire complaint lacks an arguable basis either in law or in fact and is, therefore, frivolous. See Denton v. Hernandez, 504 U.S. 25, 31, 112 S. Ct. 1728, 118 L. Ed. 2d 340 (1992); Neitzke v. Williams, 490 U.S. 319, 325, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989). Accordingly, the complaint [*11] is DISMISSED pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(i) and (ii) and Fed. R. Civ. P. 12(h)(3). Plaintiff's motions for injunctive relief are DENIED as moot due to the dismissal of his complaint.

The next issue to be addressed is whether Plaintiff should be allowed to appeal this decision in forma pauperis. Twenty-eight U.S.C. § 1915(a)(3) provides that an appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith.

The good faith standard is an objective one. Coppedge v. United States, 369 U.S. 438, 445, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962). An appeal is not taken in good faith if the issue presented is frivolous. Id. Accordingly, it would be inconsistent for a district court to determine that a complaint is too frivolous to be served, yet has sufficient merit to support an appeal in forma pauperis. See Williams v. Kullman, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983). The same considerations that lead the Court to grant Defendants' motion to dismiss and to dismiss this case as frivolous and devoid of jurisdiction also compel the conclusion that an appeal [*12] would be frivolous.

It is therefore CERTIFIED, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal in this matter is not taken in good faith, and Plaintiff may not proceed on appeal in forma pauperis.

The Sixth Circuit Court of Appeals decisions in McGore v. Wrigglesworth, 114 F.3d 601, 612-13 (6th Cir. 1997), and Callihan v. Schneider, 178 F.3d 800 (6th Cir. 1999), apply to any appeal filed in this case. If Plaintiff files a notice of appeal, he must pay the entire $ 455 filing fee required by 28 U.S.C. §§ 1913 and 1917, n1 or file a request for leave to appeal in forma pauperis by filing "within thirty days after service of the district court's decision as prescribed by Fed. R. App. P. 24(a)(4), a motion with [the Sixth Circuit] for leave to proceed as a pauper on appeal." Callihan, 178 F.3d at 803. Under Callihan, if the appellant does not within this thirty-day period either file the required motion or pay the filing fee, the appeal will be dismissed for want of prosecution. If the appeal is dismissed, it [*13] will not be reinstated once the fee is paid. Id. at 804.

> n1 The fee for docketing an appeal is $ 450. See Judicial Conference Schedule of Fees, P 1, Note following 28 U.S.C. § 1913. Under 28 U.S.C. § 1917, a district court also charges a $ 5 fee:
>
> > Upon the filing of any separate or joint notice of appeal or application for appeal or upon the receipt of any order allowing, or notice of the allowance of, an appeal or of a writ of certiorari $ 5 shall be paid to the Clerk of the district court, by the appellant or petitioner.

Finally, it is apparent from Plaintiff's continuing pattern of filing repetitive complaints that he will continue to abuse the federal court's jurisdiction in an attempt to harass the Defendants and the Court. See Filipas v. Lemons, 835 F.2d 1145 (6th Cir. 1987). This Court has the obligation and authority to prevent this type of abuse.

> Federal courts have both the inherent power and the [*14] constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions. If such power did not exist, or if its exercise were somehow dependent upon the actions of another branch of government or upon the entitlement of a private party to injunctive relief, the independence and constitutional

role of Article III courts would be endangered.

In re Martin-Trigona, 737 F.2d 1254, 1261 (2d Cir. 1984). See also Winslow v. Romer, 759 F. Supp. 670, 677-78 (D. Colo. 1991); Kersh v. Borden Chemical, Div. of Borden, Inc., 689 F. Supp. 1442, 1452-53 (E.D. Mich. 1988). The Sixth Circuit and other appellate courts have endorsed the enjoining of prolific frivolous filers. See Filipas, 835 F.2d at 1146. See also Day v. Allstate Ins. Co., 788 F.2d 1110 (5th Cir. 1986); Cotner v. Hopkins, 795 F.2d 900 (10th Cir. 1986); Procup v. Strickland, 792 F.2d 1069 (11th Cir. 1986); Franklin v. Murphy, 745 F.2d 1221, 1232 (9th Cir. 1984); In re Martin-Trigona; In re Green, 215 U.S. App. D.C. 393, 669 F.2d 779 (D.C. Cir. 1981) [*15]  (per curiam); Green v. Warden, 699 F.2d 364 (7th Cir. 1980); Green v. White, 616 F.2d 1054, 1056 (8th Cir. 1980) (per curiam); Gordon v. Department of Justice, 558 F.2d 618 (1st Cir. 1977); Gambocz v. Yelencsics, 468 F.2d 837 (3d Cir. 1972). The Court must take care not to impose restrictions that would preclude the party from all access to the courts. Safir v. United States Lines, Inc., 792 F.2d 19, 24 (2d Cir. 1986); Sires v. Gabriel, 748 F.2d 49, 51 (1st Cir. 1984).

The Court has considered how to prevent Bowen from continuing to abuse the judicial system by continuously attempting to litigate the same or similar frivolous claims, without also completely precluding his access to the courts. See, e.g., Sickle v. Holloway, 791 F.2d 1431, 1437 (10th Cir. 1986)(limited filing restrictions prevent relitigation of frivolous allegations but do not totally preclude access). See also Lyons v. Randall, 834 F.2d 493, 496 (5th Cir. 1987)(sanctions imposed for third filing of frivolous lawsuit and for suing federal judge protected by absolute judicial immunity).  [*16]

Accordingly, this Court ORDERS that Plaintiff shall file no further documents in this case except a notice of appeal. Bowen shall not file any other case in which he seeks to relitigate matters which in any way arise from this closed or his previous closed cases. The Clerk is ORDERED not to file or otherwise accept any document other than a notice of appeal for filing in this action or accept any other documents and filings which attempt to relitigate matters arising from this action or from the hardship caused to Bowen by the denial of disability benefits or from actions to collect his delinquent property taxes. Any further documents attempting to relitigate matters arising from this case or that prosecution and confinement shall be returned to Bowen.

Furthermore, should Bowen violate this order, the Court will then impose further sanctions against him, including a monetary fine. Any case submitted by this plaintiff to another court that is thereafter transferred or removed to this district court will result in the same sanctions.

IT IS SO ORDERED this 13th day of June, 2007.

s/ J. DANIEL BREEN

UNITED STATES DISTRICT JUDGE