

Neutral Citation Number: [2008] EWHC 1530 (Comm)

Case No: 2006 FOLIO 1218

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 03/07/2008

**Before**:

**MR JUSTICE CHRISTOPHER CLARKE**
- - - - - - - - - - - - - - - - - - - - -
**Between:**

| | |
|---|---|
| **MICHAEL CHERNEY** | **Claimant** |
| **- and -** | |
| **OLEG VLADIMIROVICH DERIPASKA** | **Defendant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Geoffrey Vos QC & David Lord** (instructed by **Dechert LLP**) for the **Claimant**
**Roger Stewart QC, Nick Cherryman & Graham Chapman**
(instructed by **Bryan Cave**) for the **Defendant**

Hearing dates: 30th April & 1st May 2008
- - - - - - - - - - - - - - - - - - - - -

# Judgment Approved by the court
# for handing down
# (subject to editorial corrections)

**MR JUSTICE CHRISTOPHER CLARKE :**

1.    This is an application for permission to serve the claim form on Mr Oleg Deripaska, the defendant, out of the jurisdiction. The original claim form was issued on 24th November 2006. It was purportedly served on Mr Deripaska by service on a security guard at his house in Belgrave Square on 26th November 2006. In a judgment of 3rd May 2007 Langley, J decided that Mr Deripaska  had not been properly served and that the Court had no jurisdiction to try the claim under Article 2 of Council Regulation (EC) 44/201 (the "Jurisdiction Regulation") because Mr Deripaska was not domiciled in England & Wales.  He also refused (a) to dispense with service of the claim form; (b) to extend time for its service and (c) to grant permission to appeal.

*The history of the application*

2.    On 9th February 2007 Tomlinson, J, had fixed a second hearing for 21st- 22nd June 2007 (with evidence to be exchanged on 11th May, and evidence in reply by 5th June) at which the Court would determine, if relevant, any question of stay on the grounds of forum non conveniens, and, if the claimant was not successful at the first hearing, an application which, in that event, was anticipated, for permission to serve the defendant out of the jurisdiction. In the event no such application was made and the June hearing was vacated. The claimant's reasons for not making it, as put before Langley, J, were that, if he succeeded in establishing, on appeal, that Mr Deripaska was domiciled in England, no question of forum conveniens would arise, and that he would be trying to serve him within the jurisdiction.

3.    On 29th June 2007 Longmore, LJ, refused permission to appeal Langley J's orders. He ordered that no application for renewal of the application for permission to appeal should be made until the claimant had finally decided whether to seek permission to serve the defendant out of the jurisdiction; and that, if any such application was made, any renewal was to await a judge's decision on the matter.

4.    On 5th July 2007 the claimant gave notice of a change of solicitor and Dechert LLP, his new solicitors, wrote to the Listing Office to confirm that it was Mr Cherney's intention to seek permission to serve the defendant out of the jurisdiction. On 8th August 2007 Tomlinson, J retrospectively extended the time for service of the claim form for 4 months. On 3rd December 2007 Mr Cherney applied for permission to serve the amended claim form on Mr Deripaska out of the jurisdiction.  On 4th December Gloster, J ordered, inter alia, that the time for service of the amended claim form should be extended until 14 days after the determination of the claimant's proposed application for permission to serve the amended claim form and amended Particulars of Claim out of the jurisdiction. The orders of 8th August and 4th December were made without notice.

*The claimant's case*

5.    The claimant is Mr Michael Cherney. He claims that he was a partner of Mr Deripaska, in a business whose principal asset was a large interest in an aluminium company – OJSC United Company Siberian Aluminium ("Sibal"). He and Mr Deripaska each had, he says, a 40% ultimate beneficial interest in Sibal.  In about late 2000 or 2001 a merger took place between Sibal and an aluminium business called Sibneft, owned by Mr Roman Abramovich, Mr Boris Berezovsky and Mr Badri

Patarkatsishvili. Sibal and Sibneft transferred their assets to a company called Russian Aluminium ("Rusal"), in which Sibal and Sibneft took a 50% interest. As a result he became entitled to a 20% (40% of 50%) share in Rusal, the world's largest aluminium producer.

6.      In March 2001 he and Mr Deripaska met at an hotel in London. They then entered into an agreement, principally contained in two written documents. Under the first document Mr Deripaska agreed to pay Mr Cherney $ 250 million up front for his shareholding in Sibal. Under the second Mr Deripaska undertook (a) to hold 20% of the shares in Rusal on trust for Mr Cherney, (b) to sell them between 10th March 2005 and 10th March 2007; and (c) to account to Mr Cherney for the proceeds of these sales, minus the $ 250,000,000. It was also orally agreed that the agreement would be governed by English law and be subject to English jurisdiction.  It is not suggested that, in the absence of that agreement the agreement is governed by English law.

7.      Subsequently there was a merger of Rusal and two companies named Sual and Glencore to form United Company Rusal ("UCR"). The former shareholders of Rusal hold 66% of UCR.  The effect of that, according to Mr Cherney, is that Mr Deripaska holds 20% of 66% i.e.13.2% of UCR on trust for him. He claims declarations to give effect to his trust claims, an order that Mr Deripaska sell or procure the sale of 20% of Rusal and 13.2% of UCR and account to him for the proceeds, and damages.

8.      It is common ground that the $ 250,000,000 has been paid, that Mr Deripaska does not accept that he has any obligation towards Mr Cherney in respect of 40% of the shares in Sibal, 20% of the shares in Rusal, or 13.2% of the shares in UCR, and that he has not accounted to Mr Cherney for any proceeds of any sale of shares in Rusal.

*Mr Deripaska's position*

9.      Mr Deripaska denies that he was ever a partner, in any normally accepted commercial meaning of the word, with Mr Cherney in the aluminium, or any other, business. He agrees that at a meeting at the Lanesborough Hotel on 10th March 2001 he signed the first of the two documents relied on by Mr Cherney, which provided for the payment of  $ 250,000,000. That payment was made, he claims, because Mr Cherney, together with Mr Anton Malevsky ("Mr Malevsky"), was engaged in a "protection" racket in relation to what was Mr Deripaska's business. The $ 250,000,000 was paid in order to buy Mr Cherney off. The second document, which deals with the shares in Rusal, was not produced at the meeting, nor was it intended to be part of any agreement with Mr Cherney. It was a proposal to be put forward to Mr Malevsky.

10.     This is not a run of the mill claim. 66% of UCR Rusal is said to be worth of the order of $ 23 billion. If so 13.2% is worth $ 4.6 billion, making the claim, after deduction of the $ 250 million, worth about $ 4.35 billion.  The payment of such a claim, if valid, would be beyond the reach of most individuals. But Mr Deripaska was, on his account, the beneficial owner of the majority of the shares of Rusal, together with many other commercial interests. The Rusal group employs some 100,000 people. Mr Deripaska's other companies employ over 250,000. He is said to be the richest man in Russia and ninth on the list of world billionaires.

*The grounds on which Mr Cherney seeks permission to serve out.*

11.     Mr Cherney claims that the agreement under which he seeks to sue was (a) made in England; (b) governed by English law and (c) that the agreed forum for resolving any disputes should be the English courts. The latter two terms are said to have been agreed orally.

*The relevant principles governing permission to serve out.*

*The first test*

12.     In order to obtain permission to serve a claim form outside the jurisdiction pursuant to CPR 6.20 and 6.21 the claimant must first establish that each cause of action in respect of which he claims stands a reasonable prospect of success. CPR 6.21 (1) (b) requires the claimant to state his belief that his claim has such a prospect. This is a relatively low threshold. In substance it is the same test as that of asking whether, on the written evidence, there is a serious issue to be tried: *Seaconsar Ltd v Bank Markasi* (1994) 1 A.C. 438,452D; *Bas Capital Funding Corp & Ors v Mediaco Ltd* [2004] 1 Lloyd's LR 253 at paragraphs 152-3; or of determining whether the claimant has a realistic prospect of succeeding on the claim: see CPR 24..2. (a) (i) and *De Molestina v Ponton* [2002] 1 Lloyd's Rep 271 at paragraph 3.8.

*The second test*

13.     The claimant must also show that, in respect of each of his claims, he has a good arguable case that the claim falls within one or more of the types of claim specified in CPR 6.20. The parties are in disagreement as to the approach that the court should take in circumstances where there are two conflicting accounts as to what occurred at a meeting, which the court cannot resolve on written evidence alone.  In particular, what approach should the court take if, on the material available to it, *both* sides may be said to have a good arguable case? What if a disputed agreement as to English law or jurisdiction is said to have been reached orally at a meeting between two solicitors of unimpeachable probity, or the event which is said to constitute the making of the contract occurred, according to one solicitor, at a meeting in England, and, by the other at a meeting in New York; and, in either case, the remainder of the evidence on the question is inconclusive*?*

*Authorities*

14.     The adjective "*good*" adds something to the expression "*arguable case*":  see Mance, LJ in *ABCI v Banque Franco-Tunisienne* [2003] 2 Lloyd's Rep 146, 167.  That unsurprising proposition does not, however, take the matter much further. "*Arguable*" is the lowest threshold. The fact that a case is arguable does not necessarily mean that it enjoys a realistic prospect of success.

15.     In *Seaconsar Far East Ltd v Bank Markazi Jomhouri Islami Iran* [1994] 1 AC 438 the House of Lords made plain that the test of "*good arguable case*" is not to be equated with the civil burden of proof - "*a standard of proof which in effect amounted to a trial of the action or a premature expression of opinion on the merits*": see Lord Simonds, at p 879 of *Vitkovice Horni a Hutni Tezirstvo v Korner* [1951] A.C. 669. Lord Goff indicated that he saw no reason to suppose that there was *any material*

*difference between "good arguable case" and "a* strong argument" or "*a strong case for argument*", expressions that had been used by other members of the House in that case.

16. One solution to the problem would be to order the trial of an issue as to whether or not the claim falls with CPR 6.20. The court is extremely reluctant to do so on an application for permission to serve out because such a trial can be extremely expensive and time consuming. In some cases it would involve determining the major, or even the sole, disputed issue in the claim, e.g. whether an agreement had ever been made, as a condition of allowing the claimant to start the action containing the claim.

17. If the Court were, when considering jurisdiction, to make an interlocutory decision that such a contract had been made on the written material alone, its status would be no more than that of a preliminary opinion. This would have two undesirable consequences. Firstly it might mean that the same issue had to be litigated twice. Secondly, the expression of such an opinion, which on fuller material might turn out to be wrong, could well be, or appear to be, unfair to the party denying the existence of such a contract.

18. The "*good arguable case*" test is the means by which the Court has sought to avoid what amounts to requiring some form of trial as a condition for starting the action at all, and the unfairness that might arise from the expression of a preliminary opinion.

19. In *Canada Trust v Stolzenberg (No 2)* [1998] 1 WLR 547, 555, Waller, LJ undertook a general analysis of the jurisdiction hurdle and affirmed what had been decided in *Seaconsar* (a domicile case) and in *Agrafax Public Relations Ltd v UCR Scottish Society Inc* [1995] CLC 862 namely that the standard of proof was the same both in cases where the issues going to jurisdiction went to the very matter to be argued at the trial, e.g. the existence of an agreement and in cases where they did not, e.g. domicile; and held that the "*good arguable case*" test reflected the fact that one side had a "*much better argument on the material available*". This has become known as the "*Canada Trust* gloss".

20. In *Canada Trust* the jurisdictional question was whether for the purposes of Article 6 (1) of the Lugano Convention and RSC Order 11 Rule 1 (1) (c) the first defendant was domiciled in the UK at the material time. Waller LJ said:

> "*It is I believe important to recognise, as the language of their Lordships in Korner's case [1951] A.C. 869 demonstrated, that what the court is endeavouring to do is to find a concept not capable of very precise definition which reflects that the plaintiff must properly satisfy the court that it is right for the court to take jurisdiction*".

21. He went on to observe that the concept of "*good arguable case*";

> "*…also reflects that the question before the court is one which should be decided on affidavits from both sides and without full discovery and/or cross examination, and in relation to which therefore to apply the language of the civil standard of proof applicable to issues after full trial, is inapposite*".

22.     The passage in which he expressed the gloss is as follows:

> "It is also right to remember that the "good arguable case"
> test, although obviously applicable at the ex parte stage,
> becomes of most significance at the inter partes stage where
> two arguments are being weighed in the interlocutory context
> which, as I have stressed, must not become a "trial". **"Good
> arguable case" reflects in that context that one side has a
> much better argument on the material available**. It is the
> concept which the phrase reflects on which it is important to
> concentrate i.e. of the court being **satisfied or as satisfied as it
> can be having regard to the limitations which an interlocutory
> process imposes that factors exist which allow the court to
> take jurisdiction**.

> The civil standard of proof has itself a flexibility depending on the issue being
> considered and the concept "good arguable case" has a similar flexibility. It
> is natural, for example, in a case concerned with a contract where the
> jurisdiction depends on whether the breach took place within the jurisdiction,
> but where the issue to be tried will be whether there was a contract at all, not
> to wish to give even the appearance of pre-trying the central issue, even
> though the concept of being satisfied must apply both to the existence of the
> contract and the place of the breach. It is equally natural for the court in the
> process of being satisfied to scrutinise most jealously that factor which
> actually provides jurisdiction. It is equally natural that where the foundation
> of jurisdiction is domicile, i.e. an issue that will not arise at the trial, that
> particular scrutiny of the material available takes place in the context of the
> limitations applied to an interlocutory process."

(Emphasis added).

23.     The use of the "*good arguable case*" test in the context of Article 6 of the Lugano
Convention was expressly approved by Lord Steyn when *Canada Trust* reached the
House of Lords [2002] 1 AC 1 at para 13: in the following terms:

> "The adoption of such a test [i.e. the balance of probabilities]
> would sometimes require the trial of an issue or at least cross-
> examination of deponents to affidavits. It would involve great
> expense and delay. While it is true that the jurisdictional issues
> under the Conventions are very important, they ought generally
> to be decided with due despatch without hearing oral evidence.
> In my view Waller LJ's judgment [1998] 1 WLR 502, 553-559
> correctly explained on sound principles and pragmatic grounds
> why the defendants' argument is misconceived".

24.     In *Konkola Copper Mines v Coromin* [2006] 1 Lloyd's Rep 410 the issue was whether
or not an exclusive Zambian jurisdiction clause applied so that proceedings against
the London, European and Swiss reinsurers should be stayed (as the reinsurers
claimed).  Whether that clause or an English jurisdiction clause applied depended on
which of two rival wordings applied to the reinsurance.

25.     In the course of his judgment Rix, LJ said:

> *"The problem in such a situation* [where the jurisdictional issue is also an issue on the merits] *is to find a test which answers the jurisdictional issue without trespassing further than is necessary on the merits. It was for this purpose that a test which was intended to be less onerous than the ordinary civil standard of proof on the balance of probabilities was adopted. Waller LJ spoke of this problem in his judgment in Canada Trust……*
>
> *………in such a case* [i.e., where the jurisdictional issue is part and parcel of the trial] *it seems to me that Waller LJ's warnings about avoiding even the appearance of pre-trying the central issue move to centre stage.*
>
> *81.     What is to be done in such a case? One possibility is that the* <u>Canada Trust</u> *gloss ("a much better argument") of the "good arguable case" test is not really appropriate in such circumstances.  It is quite possible, especially at the opening, jurisdictional stages of such a dispute for both sides to have a good arguable case as to the central merits of a dispute … I fear that, however much the judge couched his reasoning in terms of the provisional nature of his decision on the material available, he would inevitably be drawn into a trial of the merits. This is plainly undesirable.  Is it necessary? I am doubtful that it is, especially in circumstances where, as was generally the case under the old RSC Order 11 or is now the position under CPR 6.20, the power to give leave to serve out of the jurisdiction is at the end of the day a discretionary one. However important the proper disposition of a jurisdictional challenge is, it is not something which should be allowed to subvert the merits of a potential trial".*

26.     *Konkola Copper Mines* was a case in which reinsurers sought to derogate from an established English jurisdiction by way of a stay in favour of Zambia. Colman J had refused such a stay on the grounds that, applying  *Canada Trust[1]*,  the reinsurers had not shown a strong enough case that the reinsurance was subject to Zambian law  to engage the court's jurisdiction to stay the Part 20 proceedings between the insurers and the reinsurers. He also decided that, if reinsurers had shown such a case he would have refused a stay on discretionary grounds. The Court of Appeal would have upheld the judge's decision even on the basis that the reinsurers had much the better of the argument as to the applicable wording, so that Rix, LJ's observations were not necessary to the decision on the appeal.

---

[1] The reinsurers contended that the judge had *misapplied* the *Canada Trust* gloss, because (a) the onus of proof was on the insurers to show that the exclusive jurisdiction clause did not apply; and (b) he had not decided that they had shown that they had "<u>*much* the better *argument*</u>".

27.     Rix, LJ indicated that he regarded the issue of the right test to apply as a difficult one because of the tension between a wish to avoid a test which set up a trial on the merits and the fact that the defendants were invoking an allegedly agreed Zambian jurisdiction clause in order to derogate from the established English jurisdiction. He went on to say (paragraph 86) that, given the flexibility of the "*good arguable case*" test, the answer could simply be that the applicant should make out a case which was sufficient in the circumstances to render it just to derogate from the established jurisdiction but which still remained short of proof on the balance of probabilities. He said that in the instant case he would:

> "*96 …prefer to say, on the documents, evidence and arguments that have been shown to the court, that both parties had made out a good arguable case, without saying which was much the better of the two. Or to put it another way, that the reinsurers had not shown that their case in favour of the KCM wording was sufficiently good either to be preferred to Coromin's case in favour of the CCIP wording or to displace the otherwise established jurisdiction in England*".

28.     In *Bols Distilleries BV v Superior Yacht Services Ltd* [2007] 1 WLR 12 the House of Lords again endorsed Lord Justice Waller's *Canada Trust* approach in a case governed by the Judgments Regulation[2]. The issue was whether there was an agreement in writing or evidenced in writing conferring jurisdiction on the Gibraltar Courts so that they had jurisdiction under Article 23 (1) of the Judgments Regulation. The Privy Council, allowing the appeal, held that the court must be "*satisfied, or as satisfied as it could be having regard to the limitations which an interlocutory process imposes, that factors exist which allow the court to take jurisdiction*" (phraseology which was derived from *Canada Trust). What amounted to a "good arguable case*" depends on what was required to be shown in any particular situation to establish jurisdiction. What the claimants had to do in that case was, as the case law of the Court of Justice emphasised, to demonstrate "*clearly and precisely*" that the clause conferring jurisdiction on the court was in fact the subject of consensus between the parties. Accordingly, applying the "*good arguable case*" standard they had, but had failed, to show that they had a much better argument than the defendants that, on the material then available, the requirements of form in Article 23 (a) were met and that it could be established "clearly and precisely" (as European jurisprudence required) that the clause conferring jurisdiction on the court was the subject of consensus between the parties.

29.     In *WPP Holdings Italy Srl v Benatti* [2007] 1 WLR 2316 the defendant, an Italian businessman, entered into an agreement with the first claimant, an Italian company. The agreement was subject to English law and had an English exclusive jurisdiction clause. The agreement was terminated by the Italian company, which issued a claim form in England against the defendant for breach of contractual and fiduciary duty. The defendant issued a writ against the Italian company in Italy claiming that he had been working under a contract of employment which had been wrongfully terminated.

---

[2] The argument took place on June 21st-22nd 2006, the day before the judgment of Cooke J in the Bear Sterns case, on which Mr Vos relies, and to which I refer in paragraph 35 below. The judgment of the House was not, therefore, available to him.

He challenged the jurisdiction of the English court on the ground that the Italian court was first seized under Article 30(2) of the Judgements Regulation and that under Article 20(1) as an employee he was entitled to be sued in the courts of his domicile. (Article 21 provides that the Article 20 requirement can be departed from by an agreement as to jurisdiction but only in limited circumstances which were not applicable).

30.    Toulson, LJ, cited the *Bols* case as establishing that the "*good arguable case*" requirement was intended to encapsulate the critical rule that the Court must be as satisfied as it can be, having regard to the limitations which the interlocutory process imposes that factors exist which allow the court to take jurisdiction. He observed that the way in which the test of "*good arguable case*" came to be applied varied from case to case, both in order to take account of any relevant policy underlying the Regulations and of the particular limitations imposed by the interlocutory process. He rejected the submission that the *Bols* case meant that the WPP companies had to show that they had a much better argument than the defendant that he was a consultant rather than an employee in order to establish that Article 23 gave jurisdiction. The need for the claimants to satisfy such a test in the *Bols* case was, he said, the practical effect of the policy of the legislation that required it to be clearly established that the parties actually agreed on the clause alleged to confer jurisdiction. Here there was no doubt that they had agreed on such a clause. The question was whether there was a good arguable case that Article 23 applied and not section 5 and Article 20.

31.    Toulson, LJ, observed that there might be a case in which, because of the limitations of the interlocutory process, the court found it impossible to form a positive view which side had the better argument. He did not however consider it necessary to reach a final conclusion on what the court should do in such a case. But he did not exclude the possibility that application of the principle in the *Bols* case might lead a court to conclude that, if the case for jurisdiction was as good as the case against jurisdiction, but it was not possible to reach any firm conclusion without conducting a mini trial, in those circumstances factors would exist which would allow the court to take jurisdiction. However, the point would be much better considered on actual and not hypothetical facts.

32.    The Court of Appeal held that the judge had been entitled to hold that the agreement was not a contract of employment but a consultancy agreement and that the exclusive jurisdiction clause therefore gave the English court jurisdiction under Article 23.

33.    As is apparent *WPP Holdings* adverts to, but does not resolve, the question of the Court's approach if it is unable to reach a view as to who has the better side of the argument. The rejection by Toulson LJ of the submission that the WPP companies had to show that they had a much better argument than Mr Benetti that he was a consultant might appear to suggest that the *Canada Trust* gloss was inapplicable, at any rate in a case where the existence of an Article 23-compliant jurisdiction agreement was not in issue. But the judge, whose judgment was upheld, had applied the *Canada Trust* gloss and Toulson, LJ left open the question of its applicability where the court could not decide who had the better side of the argument. Further it is not wholly clear to me which principle in the *Bols* case would lead a court, in such a case, to find that factors exist which would allow the court to take jurisdiction. It may be that the reference is to the need to have regard to the limitations of the interlocutory process; but that leaves for consideration how the court can be "*as*

*satisfied as it can be that jurisdictional factors exist*" if it is unable to determine who has the better side of the argument.

34.    Mr Geoffrey Vos, QC, for Mr Cherney submitted that, where a claimant puts forward credible evidence of an agreement that is both at the heart of his claim and the foundation of his claim to English jurisdiction, but there is a conflict of evidence as to whether the agreement relied on was made, the Court should not attempt to resolve that conflict, and, if the claimant has presented a good arguable case, should not apply the *Canada Trust* gloss i.e. determine which side has much the better of the argument. If both parties have an arguable case on the point, to require the claimant to show that his case is markedly better than that of his opponent is, in effect, to require him to establish it on the balance of probabilities, when the authorities show that that is not necessary: *Seaconsar* 453 C-F; *Canada Trust* 555 D.

35.    Mr Vos drew attention to what he submitted was the correct approach, namely that of Cooke, J in *Bear Sterns PLC v Forum Global Equity Ltd* [2006] EWHC 1666 (Comm). Cooke, J had before him an application to set aside an order giving Bear Stearns permission to serve the defendant ("FGE") in the Virgin Islands. One of the questions was whether there was any oral contract between Bear and FGE made on the telephone for the sale of distressed debt, there being a direct conflict of evidence between those involved in the conversation. Cooke J held that, with such a conflict, there was no possibility of coming to any definitive conclusion but, given the very clear evidence of the claimants' witness, he was "*entirely  satisfied that the appropriate test had been met as to the existence of a contract for the purpose of CPR 6.20*". There was also an issue as to whether or not the putative contract included a choice of law clause. On this he said that it was again clear to him that there was a good arguable case made out for Bear Sterns backed up by documentation which passed between the solicitors thereafter. He again expressed himself "*entirely satisfied*" that Bear Sterns had met the burden on them to establish that the contract had an express choice of law clause.

36.    Mr Vos submitted that Cooke J did not proceed on the basis that he needed to be satisfied that the clamant had much the better of the argument; but only that it had, on the basis of its account, a strong case. I am not convinced that this is so. The judge referred at the beginning of his judgment to what he described as "*the usual run of authorities in these respects*" including *Canada Trust*. He did not suggest that the gloss was inapplicable; nor is there any indication that that was submitted to him[3]. In that context his reference to being "*entirely satisfied*" that the appropriate test had been met appears to me an acceptance, probably expressed in that way to avoid any possible unfairness, that Bear Sterns had much the better of the argument at that stage.

*My conclusion on the test*

37.    As will be apparent hereafter I do not find myself unable to form a view as to who has the better side of the argument in respect of the three grounds for jurisdiction asserted. But, in case my view on the facts is erroneous, I set out my conclusion as to the relevant approach.

---

[3] I have been told that there is no hint of that in the claimants' skeleton argument.

38.    The essential test, laid down by the rules, is that the claimant must *satisfy the court that England is the proper place in which to bring the claim.* If he satisfies the court of this, the court has a discretion to permit service out. As Rix, LJ pointed out in *Konkola*, the discretionary nature of the exercise enables the Court to couch its decision in terms that do not prejudice the final trial wherever it may be, e.g. by deciding that the material before it is not sufficiently good to displace an established jurisdiction, or, presumably, to establish jurisdiction here.

39.    An understandable wish not to prejudice future proceedings may influence the basis on which the court proceeds (i.e. on the basis of discretion) and the way in which it expresses itself (i.e. non prejudicially). But it cannot avoid the need to determine whether or not permission is to be granted in a case where the issue as to whether there was a ground for jurisdiction is no more than evenly balanced, or where the case in favour of an agreement is somewhat less convincing than the claim that there was not but is still plausible.

40.    Indeed it appears to me that Rix, LJ ended up propounding, even if *sub silentio* and *obiter*[4], the *Canada Trust* gloss or something very like it. If the reinsurers' case was not sufficiently good to be preferred to that of the reinsured they would, by definition, have failed to show that they had the better of the argument, or much the better of the argument. *Konkola* was a case where the question was whether reinsurers had established that they could derogate from an established jurisdiction. But I see no reason why similar considerations should not apply when the claimant has to establish jurisdiction in the first place.

41.    That being so, I have come to the conclusion that, even in a case where there is a dispute between two apparently credible witnesses the Court should usually, before giving permission, be satisfied that the claimant's contentions about the alleged agreement provide a much better, or at any rate a better, argument in favour of there being the ground for jurisdiction alleged than of there not being one. In granting permission to serve out of the jurisdiction the court is exercising an exorbitant jurisdiction over those who are not within its ordinary reach. In those circumstances the court is, as it seems to me, justified in  applying the good arguable test in that manner in order to avoid the risk of compelling individuals or companies to submit to a jurisdiction to which they ought not in truth to be made subject. Further if, as *Canada Trust* indicates, the concept which the phrase reflects is "*of the court being satisfied or as satisfied as it can be having regard to the limitations which an interlocutory process imposes that factors exist which allow the court to take jurisdiction",* it ought ordinarily to require that, when the Court looks at the material, it finds the points in favour of the ground for jurisdiction alleged to be more than just evenly balanced by those which point the other way.

42.    If it were otherwise it would appear to follow that a defendant who had at least as good a chance of showing that he did not agree to litigate in England as the claimant

---

[4] In the event the case was decided by reference to discretionary considerations and the court found it unnecessary to decide whether the reinsurers' case in favour of a Zambian clause or Coromin's case in favour of an English clause had much the better of the argument.

had of showing that he did, would be likely to find himself compelled to litigate in England, on the footing that, once a good arguable case was made out in favour of an English exclusive jurisdiction clause, discretionary considerations would be unlikely to call for the case to be decided elsewhere: see *Bas Capital Funding Corp v Medfinco* [2004] 1 Lloyd's Rep at paragraphs 192-3.

43.    I am not persuaded that the fact that both *Canada Trust* and *Bols Distilleries* were Convention or Jurisdiction Regulation cases makes a critical difference. In such cases allowing a claimant to bring proceedings in England may have the result that the English Court asserts a jurisdiction which, had the Court's trial findings been available when jurisdiction was determined, it would not have regarded itself as having, (e.g. because the relevant agreement was never made) - with the result that the rules of the Convention/Regulation turn out to have been sidestepped. But I can see little justification for adopting a less rigorous test to cases where what is in issue is whether the English domestic conditions for jurisdiction are in play.  In *Canada Trust* Waller, LJ indicated that the test was the same in Convention and (what was then) Order 11 cases: page 558G.

44.    I do not regard this as introducing by the back door a requirement that a claimant seeking permission should prove his case on the balance of probabilities.  The Court is concerned, at this stage, with the *arguments* in favour of the respective parties in the light of the material then tendered. Whilst the Court is entitled to reject the wholly implausible, what it will be concerned with is the relative plausibility of the contentions. Proof on the balance of probabilities would require a finding of fact, not a decision about the strength of arguments, and would probably require the availability of oral evidence and discovery.

*The factual dispute*

45.    The factual background of this case is lengthy[5], complex and in large measure in dispute. In the paragraphs that follow I set out so much of the account of events given by or on behalf of the claimant together with the response of the defendant as is necessary to determine the matters in issue on this application.

46.    Michael Cherney was borne in the Ukraine and grew up in Uzbekistan. He has a brother – Lev Cherney. He claims to have had significant influence and vast contacts in government circles which were completely transformed when Mr Putin came to power in Russia. He had lost such influence by 2001[6]. He left the former territory of the USSR with his family in 1991 to live in the West. He stopped visiting the territory of the former USSR in 1994 as a result of fears for his safety, save for the Ukraine which he started to revisit in 2003.  In 1994 allegations started to be made in the Russian press that he had links to organised crime. Following the election of Mr Yel'tsin as President in the middle of 1996 for a second term (Mr Cherney being

---

[5] The evidence extends to sixteen lever arch files, which the parties estimated would require 2 – 2.5 days to read.

[6] This claim may be contrasted with an interview he gave to *Vedemost,* a leading Russian business paper, *on 2nd* November 2000 in which, when asked "*Did you really not play politics, not use ties for the development of your business?*", he replied that he only knew one politician –former vice-premier Oleg Soskovetz – who promised a copper export licence and then never provided it.

connected with the opposition) there was an organised press campaign stating that he was connected with the mafia. At the end of 1993 and in 1994 and 1995 (and subsequently) he was warned by people with connections to the Russian security service, including retired personnel, that there were threats to his safety. He emigrated to Israel in 1994 and claimed Israeli citizenship.

47.    In 1995 an attempt was made to assassinate him in Israel. It appeared from the trial of two of his would-be assassins and from what the Israeli police told him that a Russian business crime group, possibly connected to the Russian secret services, contacted an Israeli private investigation firm to kill him. That firm hired a would-be assassin who was in fact a police informant.  Two former military intelligence officers were sentenced to prison. A third man, who was the go-between, fled to Russia.

48.    In a statement to the Swiss authorities made in 1997 Mr Cherney said that the "*contract*" [to kill him] referred to in a press article related both to him and Mr Malevsky and was in relation to business negotiated in Russia. In 2007 the Russian media in Israel published an article reporting that a private investigation firm had staged an attempt to assassinate him and had discovered that it was very easy to do. Two private investigators have recently been arrested in Israel on suspicion of illegally phone tapping calls to gather information about him.

49.    According to Mr Cherney's evidence he is an unconventional businessman, who delegated day to day management to his trusted partners, as was, in any event necessary after he had left for the West in 1991. He did not retain or receive much in the way of routine documentation. Further the conclusion of deals for enormous sums on a handshake or primitive agreement was a common feature of business life in the former Soviet Union in the 1990s.

50.    Oleg Deripaska is said by Mr Cherney to have been his protégé, and the recipient of his trust. He is now, on any view, one of the modern Russian business elite. According to Mr Cherney he is part of former President Putin's close circle and one of his unofficial confidants and advisers, having been close to the family of Boris Yel'tsin. He is married to the stepdaughter of the daughter of former President Yel'tsin, whom he married in 2001 after Mr Yel'tsin left office and before her father, who was Mr Yelt'tsin's chief of staff, married President Yelt'tsin's daughter.  Mr Cherney claims that Mr Deripaska is one of the most influential people in Russia having vast contacts and people he can trust in various positions of power which he successfully uses to promote his interests. Mr Deripaska accepts that he is a prominent businessman but not that he occupies some special unofficial position within the Russian government.

51.    In 1989 Mr Cherney started to trade in metals and raw materials in partnership with a company called Trans Commodities Ltd. That partnership ended in 1992 at which point he entered into partnership with a Mr Iskander Makhmoudov, his manager. Originally the partnership was 70/30 in Mr Cherney's favour but later became 50/50, with some of Mr Makhmoudov's half being shared with two junior partners. I call this "*the Makhmudov/Cherney joint venture*". The partnership owned companies and assets in the business of the processing and sale of copper, the sale and purchase of commodities and raw material in ferrous and non ferrous metallurgy, and later energy resources, engineering, ports etc.

52.    Mr Cherney also started to create corporate structures in Liechtenstein, Switzerland, Cyprus and other countries. For this purpose he made use of the services of a Liechtenstein professional fiduciary called Prasidial Anstalt and, later its subsidiary, Syndikus Treuhandanstalt ("Syndikus"), where the relevant individuals were Messrs Staeger, Domenjoz, and Wyss; and of one Joseph Karam, a former banker, of Switzerland. .

53.    In 1992 Mr Cherney and his brother began to work in the aluminium business on a 50/50 basis with a company called Trans World Group, which was controlled by two brothers, David and Simon Reuben.  TWG was involved in the supply of alumina ore from two refineries in the CIS to four smelters in Russia, of which the joint venture obtained control.

54.    Mr Cherney first met Mr Deripaska at the end of 1993 or the beginning of 1994 at an event at the Dorchester Hotel. He was impressed by him. He thought that he might be suitable as his manager and, later, as one of the partners in his future business. They became partners in a project to buy a share in the Sayansky Aluminium Plant ("Saaz") in Hakassia.  I call this "*the Cherney/Deripaska joint venture*".  The venture began to invest, with finance provided or procured by Mr Cherney, in various projects. But its core business was its interest in Saaz. Mr Deripaska was not then in a position to acquire any substantial interest in Saaz on his own.  Subsequently the venture acquired interests in aviation, car manufacture, and hydro-energy.

55.    The agreement was that all the companies involved in the project, of both parties, would eventually be merged into one structure and that, so long as the joint venture continued, Mr Deripaska could not participate in any other business, although Mr Cherney could[7].

56.    A large stake in Saaz was acquired by TWG and the Cherney/Deripaska joint venture, acting together, and the beneficial interest in the shares was held, as to 50% for TWG, as to 25% for Mr Cherney and 25% for Mr Deripaska. I refer to the beneficial interest in this and other corporations because the ownership structure of the businesses in both the Makhmoudov/Cherney joint venture and the Cherney/Deripaska joint venture involved a chain of different companies and other entities.

57.    At the end of 1994 Mr Deripaska became General Manager of the Sayansky plant, partly as a result of Mr Cherney persuading the Ministry of Metallurgy, who at that stage had an approximate 20% interest in Saaz, to vote for his appointment.

---

[7] But in proceedings before a Swiss Investigating Magistrate in June 2004 Mr Cherney is recorded as saying that he "*...never had significant business interests with [Mr Deripaska], apart from the shares which we had bought together for these aluminium plants*". Mr Cherney's explanation is that that was true because the aluminium business was by far the largest of their joint interests and the non aluminium interests were, as he understood, owned by and part of the aluminium business or at least were acquired and developed with profits derived from the aluminium business.

Michael Cherney v Oleg Deripaska

*Mr Deripaska's account of his investment in Saaz*

58.     According to Mr Deripaska Mr Cherney never provided him with any funds to purchase shares in Saaz or any other entity[8]. He began to purchase shares in Saaz in 1993 and was by 1994 its largest private shareholder. He continued to purchase shares thereafter together with TWG but the shares that they each purchased were financed by them separately and accounted for separately.

59.     He was elected General Manager of Saaz in November 1994. At that time the aluminium business in Russia was the subject of often violent struggles for control by factions that were sometimes connected to organised crime groups ("OCG"), which in turn had contacts with corrupt members of the security services and government ministries[9]. These struggles became known as the "Aluminium Wars", in which the gangs killed off their competitors or rivals in large numbers in lawless areas of Russia where the aluminium plants were located.

60.     Immediately after his election he received the first of a number of death threats, initially from the head of the local OCG. An unsuccessful attempt was made to assassinate his deputy. One such OCG was the Ismailovo organisation headed by Mr Malevsky.  Ismailovo is an area in the north of Moscow with at least five hotels and huge outdoor markets.  According to Mr Deripaska, Mr Cherney was closely involved with Mr Malevsky (a veteran of the Soviet invasion of Afghanistan) and was part of the Ismailovo group, of which, according to Professor Shelley, he was one of the leaders.  This group was engaged in providing "*protection*" to businesses in return for a share in their profits. Legitimate businesses had little option but to accept such "*protection*". In turn, according to Professor Shelley, Mr Cherney and Mr Malevsky enjoyed the protection of Oleg Soskovets, who was first Minister of Metallurgy and then First Deputy Russian Prime Minister and other important officials.

*Developments in the mid 1990s*

61.     In about 1995-1996 Mr Cherney, so he says, entrusted Mr Deripaska with the management of all his business interests in the Cherney/Deripaska joint venture. Mr Deripaska was introduced to Syndikus and Mr Karam and was authorised to give instructions to Syndikus in relation to the management of the business of the joint venture and their mutual assets.  This was in part necessary because at this time Mr Cherney was unable to enter Liechtenstein save for limited purposes.  Mr Deripaska was granted the widest authority by Mr Cherney, particularly in the appointment of representatives, lawyers, and directors of relevant companies. Ms Skir, Mr Cherney's

---

[8] In evidence given in an Irish action in April 2000 Lev Cherney asserted that TWG provided the necessary funds for the purchase of shares for Mr Deripaska in Saaz, which Mr Deripaska describes as equally false. In the same statement Lev Cherney states that Michael Cherney had told him (apparently in early 1995) that he owned or was entitled to 1/3rd of Mr Deripaska' shareholding in Saaz. Mr Cherney says that the proper percentage is 50%.

[9] A witness statement from Professor Louise Shelley, a distinguished expert on organised crime in the former Soviet  Union  sets out in considerable detail the development of OCGs from the time of the 1917 revolution and the provision by them of "*krysha*" = literally "*roof*", actually protection, initially to illicit private enterprise which used state owned materials and facilities (with the assistance of a  network of corrupt government and party officials) and then to newly privatised  businesses. The process became more sophisticated. Instead of cash the OCG took a financial interest in the business "protected" under a "*silovoe partnerstvo*" or "enforcement partnership".

personal assistant, confirms that between 1994 and 1997 Mr Deripaska came to visit Mr Cherney in Israel about every two or three months and they spoke frequently on the telephone and communicated by fax. Mr Deripaska was treated as a member of the family when he came to Israel, appeared originally to be an employee, and was very respectful to Mr Cherney; and later appeared to be a partner.

62.    In 1997 there was a serious conflict between TWG and Mr Deripaska in relation to his powers as CEO of Saaz. Mr Cherney supported Mr Deripaska. As a result Mr Cherney sold his 25% share in TWG for $ 410 million[10]. Mr Deripaska claims that the conflict had nothing to do with Mr Cherney supporting him. It arose because TWG regarded its connection with Mr Cherney as seriously damaging because of the constant allegations in the press of Mr Cherney's link to organised crime.

*The first merger: The Makhmudov/Cherney joint venture and the Cherney/Deripaska joint venture.*

63.    In 1997 Messrs Cherney, Deripaska and Makhmoudov agreed to merge all the businesses that Mr Cherney jointly owned with either Mr Deripaska or Mr Makhmudov into one structure. The interests of the trio were to be held through Liechtenstein Foundations: the *Galenit* Foundation for Mr Cherney; the *Cole* Foundation for Mr Deripaska; and the *Witestone* Foundation for Mr Makhmoudov. Those foundations were jointly to own (in differing proportions): (a) the *Meganetti* Foundation, which would primarily hold the former Cherney/Makhmoudov interests; and (b) the *Radom* Foundation ("Radom"), which would hold the former Cherney/Deripaska interests.

64.    According to Mr Cherney the original owners of Radom were himself, Mr Deripaska and Mr Makhmoudov. But Mr Makhmoudov had no beneficial interest in Radom and always held his legal interest on Mr Cherney's behalf. He had a nominee interest because Mr Cherney had hoped that he and Mr Deripaska would work together, in which case he would have had a beneficial interest. This plan did not work out and Mr Makhmoudov left Radom. A document dated 31st October 1997, signed by Mr Cherney, Mr Makhmoudov, and Mr Deripaska shows the ownership of the Radom Line as shared 50/50 between the Cole and Galenit Foundations (i.e. Mr Deripaska and Mr Cherney) and the ownership of the Meganetty (sic) Line shared 50/50 between Galenit and Witestone (i.e. Mr Cherney and Mr Makhmoudov). By a document dated 9th April 1998 Mr Makhmoudov confirmed that he had no interest in Radom from that date.

65.    Nevertheless, by a document dated 18th May 1998 Mr Deripaska confirmed to Syndikus that the ownership of Radom was as follows: Deripaska 40%; Cherney 30%; Makhmudov 10%; Andrei Malevsky (Mr Malevsky's brother) 10%; and Popov 10%. On a fax from Syndikus dated 20th May Mr Cherney confirmed these shareholdings. This position was reflected in Syndikus' records thereafter[11].

---

[10] Mr Cherney has produced what purports to be an agreement between the Cherney and Reuben brothers in which he sells 25% of Trans-World Metals S.A. for $ 300 million. He says he received $ 410 million.

[11] There are also two earlier documents signed by Mr Cherney in which the interests in Radom are said to be (a) Deripaska 45%; Cherney 45%; Makhmoudov 10%; Malevsky 10% and (b) Deripaska 45%, Cherney 45% and Malevsky 10%.

66.     According to Mr Cherney it was Mr Deripaska who recommended Mr Andrei Malevsky (as requested by Mr Anton Malevsky, his brother) and Mr Popov as minority partners and "*as they were influential people*", as Mr Deripaska stated them to be, he had little choice but to agree.

67.     Mr Deripaska claims that Mr Cherney knew both Mr Malevsky, by which he means Anton Malevsky, the gang leader, and Mr Popov, and introduced Mr Malevsky to him (i.e. Mr Deripaska) in Israel in 1995. Mr Malevsky had moved to Israel that year, where he brought a house close to Mr Cherney[12]. The evidence of Professor Shelley is that Mr Popov was one of the leaders of the Podolsk crime group, a ruthless criminal gang in central Moscow. Information to the same effect appears in a Swiss Federal police report of 10th August 2000[13].

68.     Mr Cherney stated in an interview with Konstatin Borovoy that he had met Mr Malevsky in 1993 and he said much the same in a declaration to the Swiss police in November 1996. In the same statement he described his friendly relationship with Mr Popov, who was staying at the hotel in Geneva where Mr Cherney was arrested.

69.     Mr Cherney accepts that he knew both Mr Malevsky and Mr Popov before Mr Deripaska did. What happened was that after Mr Deripaska met Mr Malevsky they became friends and met regularly in Moscow and elsewhere. The same happened with Mr Popov, who is the godfather of Mr Deripaska's daughter. It was in that context that Mr Deripaska recommended Malevsky and Popov as partners. He, himself did not see Mr Malevsky after about 1997, although he spoke to him occasionally by telephone; whereas, when Mr Malevsky was required to leave Israel in 1997 he spent a considerable amount of time at Mr Deripaska's invitation at a house owned by Mr Deripaska in Russia on Mr Deripaska's estate. Mrs Malevsky confirms this to be so. For six months her husband and Mr Deripaska spent a lot of time together; and the two of them, herself and Mr Deripaska's then girlfriend socialised.

70.     Mr Deripaska appears to have sought to hide any connection with Mr Malevsky from a Swiss Investigating Magistrate. On 17th February 2005 he told him:

        "*I know this person [Mr Malevsky] only by name. I have seen his name in the press*".

71.     Mrs Malevsky says that this statement is completely untrue and, in the light of her evidence, that seems likely to be so. She also states that the accusation that her husband was involved in organised crime is completely false.

72.     According to Mr Cherney at the time of the agreement reached in March 2001 Radom was beneficially owned in the following proportions:

---

[12] In 1997 or 1998 Mr Malevsky was deprived of his Israeli citizenship and deported on the grounds that he had not reported on his citizenship application that he had been on a criminal wanted list and on the basis of confidential information obtained by the police.

[13] This report was later held by the Swiss Federal Supreme Court to be one of several documents that did not provide "*any tangible element of proof to support the allegations made therein*".

| | |
|---|---|
| Mr Cherney | 40% |
| Mr Deripaska | 40% |
| Mr Malevsky | 10% |
| Mr Popov | 10% |

I call these "the group of four".

*TWG and Lev Cherney sell out to Sibneft*

73.    In 1999 TWG (i.e. David and Simon Reuben) and Lev Cherney agreed to sell all their assets in Russia and the CIS to Sibneft. Sibneft was a group controlled by Roman Abramovich, Boris Berezovsky and Badri Patarkatsishvili.

*Reorganisation of the Cherney/Deripaska joint venture*

74.    A meeting took place in Paris on 23rd April 1999. Mr Cherney and Mr Deripaska were there, as was Mr Todor Batkov, Mr Cherney's Bulgarian lawyer since 1996, together with representatives of Syndikus and others. Confirmation was given that the shareholding in Radom remained unchanged from what Syndikus had previously been told. (The note does not state what that shareholding was, but, according to Mr Domenjoz, the position as reflected in Syndikus' records was as in the fax of 20th May 1998).

75.    A decision was made to structure the business into four lines under one parent, namely (a) offshore tolling companies; (b) onshore trading companies; (c) Rostar Holding S.A., a Luxembourg company, which would primarily be engaged in the production of cans; (d) ownership of, or 75% or more participation in, about 10 Russian plants. The intention was that the plants should all be merged within a year into a new group to be called Sibal. All companies created as the result of the restructuring were ultimately to be owned by the owners of Radom.

76.    On 26th April 1999, pursuant to the Paris meeting, Mr Deripaska sent a letter to Syndikus setting out the proposed new structure. There was to be a Luxembourg parent company called Alincor S.A., which was to have 4 Luxembourg subsidiaries as follows:

   a)  Rostar Holding S.A. , holding Rostar, a Russian company;

   b)  Altechnology Invest Holdings S.A.: holding  Benet Invest & Trade and the tolling companies;

   c)  Almetaltrade Holding S.A.: holding the trading companies in the UK, Germany, USA, China and Cyprus;

   d)  Intermetal Investment Holding S.A.: holding participations in Russian enterprises of the Siberian Aluminium Group and enterprises in other countries.

77.     The structure was set out in an attached diagram in English. The minutes of the 23rd April meeting had recorded that Mr Deripaska was to deliver to Syndikus an English version of the "*Holding Structure in the Russian Federation*" in addition to the Russian version already provided.

78.     A note from Mr Stalbek Mishakov, Mr Deripaska's legal adviser, made it clear that the shares in Alincor were in due course to be transferred to the shareholders of Radom i.e. for the benefit of the group of four.

79.     Between 1998 and 2000 the joint businesses continued to develop in several fields. Mr Deripaska created new companies in Russia, the CIS and other countries. A decision was made to have the main managing company in Cyprus and Mr Deripaska chose NFM Holding Limited, which in 2002 was renamed Bazovy Element Ltd. He then started to move companies into place under that company. Upon completion of the process these companies were to form part of the Radom Group.

80.     At the end of July 1999 United Company Siberian Aluminium – "Sibal" – was formed by the merger of six entities controlled or owned by the group of four. Its core asset was Saaz.  According to Mr Cherney, Sibal was effectively owned and controlled by Radom, although he is unaware as to the precise route by which that is so. The researches of Mr Batkov into records of the shareholding in Sibal at various times are said by him to support his understanding that Sibal was controlled by Mr Cherney and Mr Deripaska through the Radom Group[14].

        *The second merger:   Sibal and Sibneft*

81.     In 2000 negotiations began for the merger of Sibal and Sibneft. The idea was that Sibal and Sibneft would contribute all of their aluminium assets to a company called Russian Aluminium (Russky Aluminy) – "Rusal". Because Sibal was smaller it was to pay Sibneft about $ 575 million.

82.     In March 2000, according to the evidence of Mr Berezovsky, a meeting took place at the Dorchester Hotel in London attended by Mr Berezovsky, Mr Abramovich and Mr Patarkatsishvili, and Mr Deripaska. It was acknowledged that Mr Abramovich would hold a 25% share of Rusal beneficially and 25% as trustee for Mr Berezovsky and Mr Patarkatsishvili. According to Mr Berezovsky, Mr Deripaska did not (at the meeting or thereafter) hide the fact that Mr Cherney was his partner. Mr Abramovich expressed the view that, given Mr Berezovsky's political activism, his name should not appear on any of the formal documents in relation to Rusal, and Mr Berezovsky agreed that Mr Abramovich's name would appear representing his own interests and those of the two others. He assumed that Mr Cherney's name did not appear there for political reasons also.

83.     Mr Deripaska's evidence is that he said nothing at the Dorchester meeting to the effect that Mr Cherney was his partner, because he was not. The names appearing on the legal documents were primarily those of the companies involved with some mutual guarantees from himself and Mr Abramovich. There was no discussion with

---

[14] The labyrinthine company structure makes it somewhat difficult to follow the route by which that is so.

Mr Deripaska's lawyers about the appearance of Mr Berezovsky's or Mr Cherney's name in the documents.

84.    Mr Deripaska also draws attention to the fact that the original pleading in Mr Berezovsky's Particulars of Claim in his action against Mr Abramovich, in respect of which the statement of truth is dated 6th September 2007, stated that at the Dorchester meeting it was agreed that Mr Deripaska should own 50% of the shares in Rusal; and that it was not until 8th January 2008 that the particulars were amended to assert that 50% of the new company would be owned by Mr Deripaska and his partners, Mr Cherney being one of them.

85.    According to Mr Cherney, in the second half of 2000 Mr Deripaska showed him a draft of the proposed merger between Sibal and Sibneft, which was governed by English law and subject to LCIA arbitration. Mr Cherney and Mr Deripaska agreed that Mr Deripaska would sign it on behalf of the group of four, and Mr Deripaska later said that he had signed it. But when Mr Cherney asked for a copy of the signed agreement Mr Deripaska told him that a copy could not be produced until the competition authorities approved it. At a meeting in Israel in 2001 Mr Deripaska said that the agreement was confidential and that the parties had decided that their respective lawyers would keep it in their safes.

86.    Rusal was registered on 25th December 2000. By March 2001 the necessary State approval for the merger had been obtained and formal approval from the competition authorities was awaited. According to Mr Cherney, Mr Deripaska told him that the new partners and some important officials in Russia did not want Mr Cherney's name to be in the Rusal foundation documents or those of the companies affiliated with it because of the political risk, Mr Cherney being a controversial figure and associated with the wrong political faction. He also told him that the names of Mr Berezovsky and Mr Patarkatsishvili were similarly to be omitted. Mr Cherney reluctantly agreed to this, Mr Deripaska assured him that, after the creation of Rusal and the receipt of all necessary licences and permits, their group would receive 50% of Rusal, which would give Mr Cherney 20% of it.

*The meeting at the Lanesborough hotel*

*Mr Cherney's account*

87.    Mr Cherney and Mr Deripaska met at the Lanesborough hotel on 10th March 2001. This was one of their regular meetings to discuss business. Mr Deripaska reported on the course of the Sibal/Sibneft merger. Mr Deripaska said that he and Mr Abramovich would jointly manage the company and that he, on behalf of both groups, would be in charge of Rusal's day to day management and strategy. They went through various documents which Mr Deripaska had brought relating to the merger.

88.    When Mr Cherney asked whether it would be possible to pay out a dividend from the joint business Mr Deripaska said that if he, Mr Cherney, wanted money, why was he offering to sell his business interests to third parties and not to him. Mr Deripaska then offered to make an advance payment of $ 250 million and promised that he would hold 20% of the shares in Rusal (to which Mr Cherney would shortly be entitled by reason of his 40% ownership of Radom) in trust for Mr Cherney, and would continue to manage the companies and assets of the aluminium business of the

Radom group. He would sell Mr Cherney's 20% of the shares in Rusal between 10th March 2005 and 10th March 2007 and account to Mr Cherney for the proceeds of these sales less the $ 250,000,000.  Mr Cherney agreed to this.

89.    Mr Cherney asked Mr Deripaska where any disputes would be dealt with and Mr Deripaska replied that they would be dealt with in England according to English law, as had been agreed with Mr Abramovich.

90.    Mr Deripaska then started to type up an agreement in Russian on his lap top. He produced a document which included the following in translation[15]:

> "                         *AGREEMENT NO 1          10th March 2001*
>
> *This agreement has been concluded between M Cherney, hereinafter the First Party, on the one hand, and O. Deripaska, hereinafter the Second Party, on the other hand.*
>
> ### *I. Object of the Agreement*
>
> *This agreement shall regulate:*
>
> *1.     Questions of the management of shares in [Sibal] belonging to the  First Party;*
>
> *2.     the repayment of the debt of [Sibal] to the First Party.*
>
> ### *II. Implementation of the Agreement*
>
> *For the purposes of implementing this agreement, the Parties shall undertake the following:*
>
> *1.     The First Party shall sell 17.5% of the shares in [Sibal] to the Second Party at a preliminary price of $ 100,000,000;*
>
> *2.     Payment for the shares shall take place within one year from the signing of this Agreement;*
>
> *3.     The Second Party shall ensure that the debt of [Sibal] to the company Bluzwed is repaid to a total sum of $ 150,000,000, including interest, which is for the benefit of the First Party [16];*
>
> *4.     The repayment of the debt shall take place within one year from the moment of signing of this Agreement;*

---

[15] Neither this translation nor that in paragraph 92 are agreed.

[16] There is a dispute as to whether Bluzwed was Mr Cherney's or Mr Deripaska's company. The agreement plainly contemplated that the repayment to Bluzwed would be for Mr Cherney's benefit.

> *In the event of the fulfilment of the payment conditions listed in points 1 -4, the First Party shall assign to the Second Party the right to settle of all obligations which [Sibal] has to third parties".*

91.   Why Mr Deripaska chose to refer to 17.5% or provide for payment of $ 250,000,000 is unclear. Mr Cherney's case is that he had no idea and was interested only in the ultimate result i.e. what was to happen about the 20% in Rusal. Mr Cherney asked where was the reference to his 20% interest in Rusal and the other agreed terms such as the future payment for that 20%. Mr Deripaska expressed reluctance to give a more detailed description of the agreement, repeated that Mr Cherney's name should not be linked to the Rusal transaction, and said that he had given his word to the new partners that he would ensure that that was so. However, when Mr Cherney insisted, Mr Deripaska agreed to put in writing the missing terms.

92.   At this stage Mr Cherney left the hotel to meet his wife, agreeing to meet for lunch later. When he and Mr Deripaska met for lunch Mr Deripaska brought with him a document in Russian which reads, in translation:

> "                    *Supplement No 1*
>
> *In fulfilment of Agreement No 1 dated 10th March 2001, the Parties have agreed on the following. The Second party must begin to sell shares in the company [Rusal] to third parties within three years from the moment of the beginning of the fulfilment, but not later than five years after the complete fulfilment of the Agreement[17] ; the Second party shall pay the First Party a sum equal to (Z\*$20-$250,000), where Z is the cost of one per cent of the shares of the company [Rusal]. If in the course of three years, several deals are concluded for the sale of shares to third parties, Z shall be calculated as the average for all the sale deals up to the sale of 20% of the shares.*
>
> *The Second Party shall pay the First Party the sum due to him within six months of the moment the shares are sold".*

93.   Mr Cherney noticed the omission of any reference to disputes being dealt with in England under English law but, being eager to get the document finalised, and trusting Mr Deripaska, did not press for inclusion of these terms in the documents.

94.   After lunch they returned to the hotel. Mr Deripaska had already printed out and placed on a table a number of sets of both of the documents which he had already signed. Mr Cherney signed two sets of such documents. He gave one of the sets back to Mr Deripaska and took the other set that he had signed along with the other remaining sets on the table. Mr Deripaska assured Mr Cherney that he would perform everything as had been agreed. They shook hands and parted.

*Mr Deripaska's account*

95.   According to Mr Deripaska the meeting at the Lanesborough hotel was not one of a number of regular meetings. It followed an earlier unpleasant meeting in Moscow in March 2001 between himself and Mr Malevsky when he told Mr Malevsky that he

---

[17] i.e. between 10th March 2005 and 10th March 2007. The first agreement was not due to be fulfilled until 10th March 2002.

wanted to end Mr Malevsky and Mr Cherney's "*protection*" of his business. They agreed a final global payment which included payments to Mr Malevsky and his Russian associates and a payment of $ 250,000,000 to Mr Cherney and his associates. On 10th March Mr Deripaska flew to London in a chartered plane with Agreement No 1 which had been was drafted by him in Moscow and, so far as he recalls, was not corrected at the hotel. He flew back the same afternoon and had no recollection of lunching with Mr Cherney.

96.    The charter invoice and hotel documentation reveal that Mr Deripaska did, indeed, fly from Moscow and back; and that he arrived at the hotel at 0910 and his room was checked as cleared at 1529.

97.    Supplement No 1 was not discussed at the meeting on 10th March 2001 nor was it shown to Mr Cherney. Supplement No 1 was a document which Mr Deripaska drafted in Moscow as an outline proposal to Mr Malevsky following the meeting with him in Moscow. It formed the basis of discussions with Mr Malevsky there a few days after that meeting. Mr Deripaska had no idea how Mr Cherney got hold of it. Mr Malevsky died in a parachuting accident in South Africa in late 2001.

98.    Nor did Mr Deripaska discuss, much less agree, anything to do with English law or English jurisdiction on 10th March 2001 or at any other time. The suggestion that Mr Cherney would ever concern himself with such matters is ridiculous. (Mr Cherney asserts that, whereas someone might be indifferent to questions of law and jurisdiction if no question of safety was involved, he was not prepared, as Mr Deripaska, knew, to have to go to a country where he would not be safe).

99.    Mr Deripaska draws attention to the fact that, in his examination before the Swiss Magistrate on 21st February 2004 Mr Cherney is recorded as saying (in translation):

> *"Maitre Hunziker asks me if I still maintain any interest, direct or indirect, in the company [Rusal]. I reply in the negative. All I have done was to sell my shares in the Russian plants that I used to own, I do not know through which intermediary this was done".*

100.    However, in a later interview with the Magistrate on 21st June 2004, Mr Cherney stated that he sold "some shares to [Mr Deripaska], but that took longer, up to 2001. For the second instalment I have never received the full payment and the contract is still in force."

*Events after the alleged agreement*

101.    There seems no doubt that $ 250,000,000 was paid to or for the benefit of Mr Cherney. On 8th October 2001 Siberian Investment Company ("SIC"), a share holder in Sibal, sold a 17.5% shareholding therein (10,482,965,692 10 kopek shares) to Hillgate Financial Corp ("Hillgate"), a company in the Radom Group for 1,747,176,180 roubles. On 14th November 2001 Hillgate sold that shareholding to G.S.A. Cyprus Ltd ("GSA") for $ 150,335,560. SIC, Hillgate, and GSA were all controlled by Mr Deripaska. The result of these transactions was that Hillgate made about $ 91,000,000. On 21st January 2002 Mr Batkov, Mr Cherney's Bulgarian

lawyer, was appointed Hillgate's sole director as a result of which Mr Cherney was able to receive the $ 91,000,000.

102.    The second half of the payments was not effected by way of loan repayment to Bluzwed as envisaged in Agreement No 1. On 8th April 2002 Radom loaned Hillgate $ 129,043,495.28. That was loaned back by Hillgate to NFM Holding Ltd, the holding company established by Mr Deripaska.  (This is odd if, as Mr Deripaska claims, he was buying Mr Cherney off). In the course of 2002 the loan was repaid to Hillgate, of which Mr Cherney now had effective control. On 18th February 2004 Radom waived its right to enforce the loan against Hillgate. The balance was paid by various payments at Mr Cherney's request by way of offset.

103.    In around July 2002 Mr Mishakov, Mr Deripaska's legal advisor provided Mr Cherney's Cypriot accountant, Mr George Philipides, with two draft documents. The first was a Call Option Agreement, expressed to be dated 20th September 1999 in which Mr Cherney granted Mr Deripaska a call option to purchase 10,482,965,692 shares in Sibal for $ 150,335,560. The second was dated 2nd February 2000 and purported to record the sale of those shares pursuant to the option. The documents were supposed to be necessary for the purpose of the audit of Rusal. When Mr Philipides pointed out that these documents[18] did not reflect the agreement to pay 20% of the value of Rusal less $ 250,000,000, Mr Mishakov, in an e-mail of July 11th 2002, noted his comments and said that he would revert.  So far as the evidence reveals he never did so. If, as Mr Deripaska claims, there was never any agreement about the 20%, I find this a most surprising omission.

104.    Mr Cherney's evidence was that when he telephoned Mr Deripaska about the two draft documents he said that his lawyer had made a mistake and "*we should forget about it*".  Mr Deripaska's evidence is that these documents said nothing about Mr Cherney's 20% interest in Rusal because he did not have one.

*Changes in Sibneft*

105.    According to Mr Berezovsky in June 2001 he and Mr Patarkatsishvili agreed to sell their interests in Sibneft to Mr Abramovich and his nominees at a substantial undervalue[19].

*Alleged recognition by Mr Deripaska of Mr Cherney's 20% interest in Rusal.*

106.    According to Mr Cherney he was approached in the second half of 2002 by Mr Gregory Loutchansky in relation to a substantial business proposition. He told Mr Loutchansky to ask Mr Deripaska if he could lend him money on account of his 20% interest in Rusal. Mr Deripaska later telephoned Mr Cherney and expressed anger that Mr Cherney had mentioned their agreement to a third party.

---

[18] Mr Philipides referred to an agreement date 1 March 2001 and a subsequent amendment of 10 March 2001. Why he wrote "1 March" is unclear. Since it is agreed that the first agreement was made on 10th March 2001, it seems likely to be a typographical error.

[19] If that is so, and the agreement was carried out, it is not clear to me how the two of them continued to have interests in Rusal thereafter.

107.    Mr Cherney also asked Mr Makhmoudov to liaise with Mr Deripaska with a view to obtaining a more comprehensive agreement with Mr Deripaska. Mr Makhmoudov told Mr Cherney that he had instructed lawyers to draft a more conventional agreement and that a draft had been sent to Mr Deripaska. Mr Deripaska telephoned Mr Cherney and reminded him that their agreement was confidential and should not be disclosed to third parties, and that he should rely on him to perform his obligations. Mr Deripaska's evidence is that he was unaware of any such draft agreement.

*2003      Sual offers $ 3 billion for 50% of Rusal*

108.    In 2003 a company named Sual offered, through intermediaries, to pay $ 3 billion for Mr Cherney and Mr Deripaska's 50% interest in Rusal. (It seems that by now Mr Deripaska had bought out the interests of the two minority partners). Mr Cherney telephoned Mr Deripaska and asked him to consider the offer. Mr Deripaska refused to sell. He said that he would comply with Supplement No 1 in due course.  Mr Deripaska was planning to buy the Abramovich group's 50% of shares in Rusal.

109.    Mr Cherney later sent to Mr Deripaska a document headed "*Supplement*" with a view to accelerating Mr Deripaska's obligation to buy out Mr Cherney's share in Rusal. It read (in translation):

    "                          *SUPPLEMENT*

        1.      *Party 2, before 31 March 2003, should perform assessment of [Rusal] including all the company assets. Starting from 1 April 2003, Party 2 should perform all necessary steps in order to realise the 20% stake of shares owned by Party 1 at the price at the time of sale, or in order to achieve a better result, all 50% joint stake of shares owned by Sibal.*

        2.      *Each party has a right to acquire the partner's shares at a price calculated on the basis of the offer price established with a third party in relation to the whole joint 50% stake"*

    Mr Deripaska called Mr Cherney and assured him that, although he refused to accept the Supplement, he would perform his obligations, for which there was still time.

*Mr Abramovich sells 25% of Rusal to Mr Deripaska*

110.    In September 2003 Mr Abramovich sold his 25% of Rusal to Mr Deripaska or companies controlled by him. As a result Mr Berezovsky and Mr Patarkatsishvili became minority shareholders.

*Mr Berezovsky and Mr Patarkatsishvili sell 25% of Rusal to Mr Deripaska*

111.    In October 2004 Mr Berezovsky and Mr Patarkazishvilli sold their 25% shareholding in Rusal to Mr Deripaska in an agreement with an English choice of law and jurisdiction clause. Mr Deripaska says that there was no agreement which contained such a clause. He says that Mr Patarkatsishvili confirmed that he was the sole ultimate beneficial owner of the 25% then acquired. Mr Berezovsky claims that Mr Patarkatsishvili told him that Mr Deripaska insisted as a condition of the sale that the transaction should be in Mr Patarkazishvilli's name alone and that, in the interests of

completing the sale he agreed to that. But Mr Deripaska knew perfectly well that he, Mr Berezovsky, held a 12.5% beneficial interest in Rusal.

*Further communications between Mr Cherney and Mr Deripaska*

112.    According to Mr Cherney Mr Deripaska would tell Mr Popov, Mr Makhmoudov and Mr Loutchansky that Mr Cherney had nothing to worry about. He met Mr Deripaska at the Ana Grand Hotel in Vienna at the end of 2003 or the beginning of 2004. He showed him Supplement No 1 and said that, if possible, he would like to receive the value of 20% of Rusal. Mr Deripaska replied that there was nothing to worry about and "*we still have time*". In January 2005 Mr Cherney met Mr Deripaska in Kiev. Mr Deripaska told him that he hoped to reach a settlement shortly of the litigation in which he was engaged with TWG and would then address his obligations to Mr Cherney. He asked how much Mr Cherney wanted for his share in Rusal. Mr Cherney said he wanted to know the value of 100% of Rusal and would then make him an offer. Mr Deripaska exploded and asked why he should pay such a potentially huge sum calculated by reference to the total value of the business when he had only paid Mr Berezovsky and Mr Patarkatsishvili about $ 450,000,000 for their 25% share of Rusal. Mr Cherney reminded him that he, Mr Deripaska, had paid $ 1.7 billion for Mr Abramovich's 25% share and referred to Sual's offer. Mr Deripaska said he would discuss the issue again after he had reached agreement with TWG.

113.    Mr Deripaska's evidence is that whenever he met Mr Cherney after March 2001 he made it clear that he did not regard himself as having any obligations towards him and that there was nothing to discuss. Statements to that effect have regularly been made by him or on his behalf. In January 2005 a spokesman for his management company was quoted in *Vedomosti,* a Russian business daily, as saying that Mr Cherney had never been among the shareholders of Sibal. In April 2006 a representative of that company was quoted as saying that Rusal had no unsettled financial obligations towards anyone. In July 2006 Mr Deripaska was reported as saying that he owed Mr Cherney nothing, In July 2007 he told the Financial Times that he had never worked in partnership with Mr Cherney.

*Mr Cherney's claims*

114.    On 14th May 2006 Mr Cherney's Israeli lawyers, Dr J Weinroth & Co, wrote to Mr Deripaska. The letter referred to Agreement No I and Annex No 1 of March 2001 which "*you drafted and thereafter signed*" and attached a copy of each of the two documents. The copy of Agreement No 1 bore the signatures of both parties. The copy of Annex No 1 (i.e. Supplement No 1) bore only Mr Deripaska's signature. The letter of 14th May referred to meetings between Mr Deripaska and Mr Cherney to discuss the performance of the agreement in Israel in 2002, Vienna during 2003 and 2004, and Kiev in 2005 as well as telephone calls and "*a number of meetings between you and persons on behalf of Mr Chernoy in Moscow*", during which meetings Mr Deripaska promised that it was only a matter of time before he would begin to fulfil his obligations and that he was examining the best ways to do so. The letter requested commencement of the repayment of the $ 3 billion in respect of Mr Cherney's 20% interest in Rusal. No reply was ever sent.

*The merger of Rusal, Sual and Glencore*

115.    In March 2007 a merger took place between Rusal, Sual and Glencore to form UCR. As a result of the merger Rusal's shareholders became the ultimate beneficial owners of 66% of UCR.

*Reasonable prospect of success*

116.    I am satisfied that Mr Cherney has a reasonable prospect of success in respect of his claim.  I consider the nature of the claim in more detail in paragraphs 136-8 below.

*Good arguable case*

117.    The next question is whether Mr Cherney has established a "*good arguable case*" that his claim falls within one or more of the types of claim specified in CPR 6.20. That involves determining whether or not he has a good arguable case (a) that the agreement for the breach of which he sues was made; and (b) that it was made in England; or (c) it is governed by English law; or (d) that it was a term of the agreement that disputes should be determined in England.  It is common ground that, if an agreement was made as alleged it was made in London. Otherwise (a), (c) and (d) are in dispute.

*The type of "agreement" made*

118.    As to (a) the dispute is as to whether an agreement was made as described by Mr Cherney, including both Agreement No 1 and Supplement No 1, by which Mr Deripaska was to sell a 20% interest in Rusal and account to Mr Cherney for the price (less $ 250 million); or whether, as Mr Deripaska says, Supplement No 1 was never agreed at all, and Agreement No 1 was in reality a vehicle for the payment of protection money, Mr Cherney having no interest, legal or equitable, direct or indirect, in Saaz, Sibal, or Rusal.

119.    I cannot and do not purport to determine who is right on this. One side or other is plainly telling lies on a grand scale. But I am satisfied that, on the material presently before me, Mr Cherney has a good arguable case on this point, in the sense that he has a strong argument and that, insofar as any judgment can be made on present material, he has much the better side of the argument. I say that for a number of reasons.

120.    *Firstly*, the account which Mr Cherney gives, both as to the background to and the making of the agreement, and what happened thereafter is detailed and plausible and consistent with contemporaneous documentary material.

121.    *Secondly*, if Mr Deripaska was never a partner with Mr Cherney in any shape or form and never agreed to do anything with any interest of Mr Cherney in Sibal, or Rusal, because Mr Cherney had none, it is somewhat curious that Mr Deripaska should have chosen to cloak the parties' true agreement in the form of a sale by Mr Cherney of shares in Sibal.  It is equally, if not more, curious that he should have used as a proposed means of buying off Mr Malevsky a document which (a) says nothing about Mr Malevsky and (b) is expressed to be a supplement to and in fulfilment of Agreement No 1, to which Mr Malevsky was not a party, and of which it is not apparent that he ever received a copy, in which Mr Deripaska agrees to sell shares in

Rusal and account for the proceeds to Mr Cherney.  It is also curious that Supplement No 1 should bear the same date as Agreement No 1.

122.   *Thirdly*, Mr Deripaska's evidence in relation to Supplement No 1 is scant. Nor is there any explanation as to how Mr Cherney might have got hold of Supplement No 1, if it was not at the meeting on 10th January 2001, or signed it when it was on top of Agreement no 1.

123.   *Fourthly*, there are documents which, or the failure to reply to which, provide support to Mr Cherney's claims including:

(a)   the document of 18th May 1998 (see paragraph 65);

(b)   Syndikus' note of the meeting of 23rd April 1999 (see paragraph 74);

(c)   the diagram of the proposed corporate structure (page 15 of MC1: see paragraph 77);

(d)   Mr Deripaska's letter of 26th April 1999 (see paragraph 76) ;

(e)   Mr Philipides' e-mail of 11th July 2002 and Mr Mishakov's reply, and the absence of any written denial of the applicability of Supplement No 1 thereafter (see paragraph 104);

(f)   the further "*Supplement*" (see paragraph 110);

(g)   Dr Weinroth's letter (see paragraph 115).  Mr Deripaska's evidence is that he saw no reason to dignify Mr Cherney's unfounded claims with a reply. Since, however, this was a claim worth several billion dollars, some reply might be expected, at any rate if it was bad. Mr Deripaska certainly asked his English solicitors for advice about it: see paragraph 92 of Mr Hauser's witness statement.

124.   In addition to the above:

a)   On 9th February 2002 Mr Harari, Mr Deripaska's Swiss attorney, wrote to the Swiss Investigating Judge a letter in which he said:

*"In 2001 Mr Deripaska purchased the economic rights which Mr Michael Cherney owned in the Sayansk factory"*

b)   On 17th February 2005 Mr Deripaska said in an interview with the Magistrate:

*"….the repurchase which I made in 2001 was….for the economic rights on the Sayansk plant. When I say economic rights, I mean the shares of the company which owns this plant"*

c)   It is noticeable that, in the same interview, Mr Deripaska was asked to be more precise about extortion attempts made against him. He referred to threats made to him a man called Tatarenkov when he was the general manager of the Sayansk plant. He did not suggest that Mr Cherney was an extortioner.

d) A report by the United Overseas Bank of their visit to the Sayansk plant on 22nd November 1995 records that they met Messrs Bulygin, Deripaska and Karam and learnt that the shareholdings in the plant were, as to 60%, TWM and the "*Michael Cherney*" group and that all management was concentrated in the hands of the "*Cherney*" group via Mr Deripaska. The report contains no reference to Mr Deripaska being a shareholder;

e) A report of a visit of the directors of Syndikus in November 1997 to various Russian businesses, which was to be copied to the Cole, Witestone and Galenit Foundations, states:

"*Our clients M.C., O.D., and I.M. jointly own approximately 51% of the plant. 34% of the plant belongs to the brother of M.C. (L.C. with his partners), and the rest is owned by majority shareholders and partially by employees*".

The report also reveals that "*our clients*" were entitled to about 35% in a power plant supplied with waste heat from the factory, a significant interest in an aluminium foil factory, 100% of a copper refining plant at Yekaterinburg; and 100% of the Rostar canning factory. It also reveals that at a lunch in Moscow I.M. claimed that he and his two partners controlled over 15 of the 200 largest Russian firms.

f) A memorandum of a meeting of 14th December 1998 shows Mr Deripaska introducing Mr Mishakov as the new lawyer for the group. A Syndikus memorandum of 5th July 1999 records Mr Mishakov discussing with Syndikus the holdings of various companies including Alnicor and that

"*In the long term the company intends to be listed on the stock exchange. As not all the beneficiaries of Radom Foundation wish to be mentioned, Iskander Makhmoudov and Pavel Esoubov will hold in trust 50% each of the shares of Alincor for the others when it comes to making the beneficiaries publicly known*"

125. *Fifthly*, there is the evidence of various professionals. Mr Jean-Pierre Domenjoz of Syndikus states that Mr Cherney and Mr Deripaska were partners in the Russian aluminium business held as part of the Radom Group in which they were both interested. He attests to the restructuring of Mr Cherney's interests in 1996 arising from the introduction of new partners. He produces a number of documents signed by Mr Deripaska in which Mr Cherney or his foundation (Galenit) is expressed to have between a 30% and a 50% interest in Radom, which, as Mr Deripaska's letter of 26th April 1999 shows, was to be the parent of the group including Sibal. Syndikus plainly treated Mr Cherney as one of the joint owners of Radom. Mr Domenjoz understood Mr Cherney to be the senior partner in the businesses under both the Meganetti and the Radom lines, and Mr Deripaska to be the day to day manager of the business under the Radom line. On August 10th 2001 Syndikus sent a fax to Mr Mishakov pointing out that:

> "As you know Radom Foundation is hold [sic] by five different
> parties and we need a letter from each party giving us the order
> and authorisation to liquidate Radom Foundation".

In a fax of 18th February 2003 Mr Deripaska referred to himself as "*one of the
beneficiaries of Radom Foundation*".

126.    Mr Batkov's evidence is that he met Deripaska more than 10 times between 1996 and
2001, one of which was at the meeting in Paris of 23rd April 1999. On the first
occasion he understood Mr Deripaska to be managing Mr Cherney's aluminium
business. Later Mr Cherney said that they were equal partners and Mr Deripaska
treated Mr Cherney as if he was in practice the senior partner.

127.    In October 2001 Mr Cherney commissioned Mr Philipides to research his financial
history with a view to providing independent confirmation of the legitimate source of
his wealth. Mr Cherney then explained to him that he effectively owned 50% of Sibal
through a structure operated by Mr Deripaska and that earlier in the year he had come
to an agreement with the latter to sell his interest for approximately $ 450 million (his
then assessment of its value), that he was to be paid partly up front within a year and
partly from the future proceeds of a 20% sale in Rusal. He says that his subsequent
investigations e.g. with Mr Domenjoz of Syndikus and Mr Joseph Karam repeatedly
confirmed that Mr Cherney had been in partnership with Mr Deripaska for the
aluminium side of the business and with Mr Makhmoudov for the copper side. In
addition Mr Cherney put him in touch with Mr Pavel Ezoubov, Mr Deripaska's
cousin, and Mr Mishakov, his legal advisor. On 21st November 2001 Mr Ezoubov sent
Mr Domenjoz a fax on Radom paper stating that he has been told that "*MC and OD
agreed to make an audit of Radom Foundation and I was supplied with the letter from
MC ... with request to inform you that he wants that it will be audited by "Horworth
Philipides & Partners" and he asks from you all possible help in that thing*".

128.    On 22nd January 2002 Mr Mishakov met Mr Philipides at Rusal's office in Moscow.
On 15th November 2001 Mr Philipides had sent Mr Mishakov an e-mail setting up the
meeting in which he had asked for a list of all investments held by Mr Cherney in
"*aluminium and other joint businesses*". At the meeting, according to Mr Philipides,
Mr Mishakov confirmed that Mr Cherney was until about a year before Mr
Deripaska's partner in owning Sibal; that Mr Deripaska started out as Mr Cherney's
assistant and eventually took over; that the operations of Sibal were delegated to Mr
Deripaska; and that Mr Cherney advised on strategy but otherwise was really only a
financier. He, Mr Mishakov, was aware that a buyout had been agreed and that Mr
Cherney had effectively divested himself of any interest in the group. He said that Mr
Cherney was an honourable business man who made one mistake which was to leave
Russia and leave himself exposed to the mercy of anybody who wanted to gain
control of his business.

129.    *Sixthly,* there is evidence which tends to support the claim that both Agreement No 1
and Supplement No 1 were executed by the parties in March 2001. In 2008 Mr
Robert Radley, an experienced forensic expert, examined the originals of Agreement
No 1 and Supplement No 1, which were in the possession of Mr Cherney's solicitors.
His report of 2nd April 2008 reveals that the dates and signatures on both Agreement
and Supplement were completed with the same blue ballpoint ink,  with similar ink
flow onto the paper, and with similar defects in the lay down of the ink, save that Mr

Cherney's signature on the Supplement was completed with a different blue ballpoint ink. In other words Mr Deripaska signed Agreement No 1 and Supplement No 1 with the same pen.  Further, ESDA examination revealed that the original Supplement was signed by Mr Cherney when it was resting on Agreement No 1. This is consistent with both documents having been signed on the same occasion. Why Mr Cherney should have signed the Supplement with a different pen is unknown but I do not regard that as a circumstance that justifies a conclusion that the Supplement did not come into existence in the circumstances described by him.

130.   The report also reveals, in agreement with the opinion of Dr Giles, instructed for Mr Deripaska, that the copy of the supplement signed only by Mr Deripaska attached to Dr Weinroth's letter of May 2006, has Mr Deripaska's signature in the same position as that in which it appears in (a)  the original Supplement No 1, as inspected by Bryan Cave LLP, Mr Deripaska's solicitors, at the offices of Stephenson Harwood, Mr Cherney's then solicitors; (b) the copies of Supplement No 1 with two signatures ("the copies") exhibited to the statements of Mr Cherney and Mr Batkov; and (c) the copy signed only by Mr Deripaska attached to Dr Weinroth's letter.  Mr Radley confirms that the original Supplement No 1 was the master document that has given rise to the copies. Accordingly Mr Cherney must have signed the original of the Supplement after it had been signed by Mr Deripaska. This, however, establishes no more than that someone took a copy of the original supplement bearing Mr Deripaska's signature alone before Mr Cherney signed it.

131.   Ms Skir states that, when Mr Cherney returned to Israel from England in March 2001, he gave her a package of documents which she placed in the office safe. Mr Cherney later asked her to copy the package. This was on some date before 26th March 2001 when the Israeli police conducted a search of the office. Whilst copying the documents she became aware that the package contained (a) an agreement and a supplement in Russian, each signed by both Mr Cherney and Mr Deripaska, and (b) an additional copy of Supplement No 1 signed only by Mr Deripaska. She gave the documents in the package to Mr Cherney and put the copies in the safe. The Israeli police took the copies in the safe on 26th March, eventually returning them about six months later.

132.   Mr Cherney's evidence is that, so far as Supplement No 1 is concerned, he signed two sets of originals. He brought back to Israel one of the original sets signed by both parties along with various other documents which included the copy of Supplement No 1 signed only by Mr Deripaska, which he later passed to Dr Weinroth. At the end of March 2001 he gave the two signed originals to Mr Batkov. Mr Batkov confirms that he received the two signed originals towards the end of March 2001 and retained them until they were provided to Stephenson Harwood (and thence to Dechert LLP). On Mr Deripaska's case no version of Supplement No 1 containing Mr Cherney's signature was, so far as he is aware, in existence in March 2001.

133.   *Seventhly*, I note that on 9th February 2007 Tomlinson, J was told by Mr Roger Stewart QC, for Mr Deripaska, that it was common ground that the first agreement was signed in London but that the status of the second one was still being investigated. I find the vagueness of Mr Deripaska's lawyers' then understanding of his position difficult to square with the robust assertion now made that Supplement No 1 was a proposal for buying off Mr Malevsky – a position which, if true, must have been apparent since 2001.

Michael Cherney v Oleg Deripaska

134.    *Eighthly,* I do not regard it as suspicious that there were two documents rather than a single one, in the first of which Mr Deripaska was content for Mr Cherney's name to appear. The first agreement could be represented as terminating Mr Cherney's involvement with Sibal. It is the second which may be regarded as confirming the link between Mr Cherney and Rusal, a link which Mr Deripaska, on one view of the evidence, was reluctant to have patent.

135.    I have been constrained to deal with these matters in some detail because of the contention of the defendant that it is necessary for Mr Cherney to satisfy the *Canada Trust* gloss. I repeat, however, that these are not findings of fact against Mr Deripaska. Any such findings are the province of the trial judge who will make them in the light of the totality of the evidence before him or her. Had I been unable to reach a conclusion as to which side had the better of the argument in relation to the making of the agreement relied on I would have held that Mr Cherney had not established a sufficiently good arguable case to justify granting him permission to serve the claim form out of the jurisdiction.

*The nature of the claimant's legal case*

136.    It is convenient at this juncture to consider Mr Cherney's pleaded case. I do so on the basis of English law[20]. The claim is that the express or implied effect of Supplement No 1 was that Mr Deripaska was to hold 20% of Rusal on trust for Mr Cherney, subject only to Mr Deripaska's entitlement to deduct $ 250 million from the proceeds of the realisation of the shares representing 20% in Rusal before accounting to Mr Cherney.  The relief sought is (a) a declaration that Mr Deripaska holds 20% of the shares in Rusal, and 20% of the 66% shareholding (i.e. 13.2%) in UCR, on trust for Mr Cherney; (b) an order that Mr Deripaska should sell or procure the sale of those interests at their market price and account to Mr Cherney for the proceeds; (c) an inquiry into, or an account of,  what has happened to the dividends or other monies or benefits taken from Rusal or UCR by Mr Deripaska, directly or indirectly, referable to Mr Cherney's interest in those companies; (d) an order for payment of whatever may be found due thereupon, or a declaration that any assets acquired by Mr Deripaska, directly or indirectly, from such dividends, monies or benefits, are held on trust for Mr Cherney; and (e) damages.

137.    The trust relied on is one that is said to arise from the intention of the parties to be inferred from the agreement they made.  Mr Vos drew my attention to the exposition in *Lewin on Trusts*, 18th Edition, paragraph 9-66*,* of the general principle of trusts founded on a common intention, which points out that the requisite intention may be shown by virtue of an express agreement or may, in certain circumstances be imputed to the parties. He also draws attention to the  dicta of Lord Walker in *Stack v Dowden* [2007] UKHL 17, with which I respectfully agree, to the effect that whether the trust be regarded as express, constructive or resulting is distinctly academic (although of some importance in that case in relation to indirect contributions to the acquisition of a property). The point, Mr Vos submitted, is that in this case the trust arises from the contract and a claim to enforce it (there is, of course, also a claim for damages) is,

---

[20] It may well turn out at trial that the agreement is not governed by English law (whether by express agreement or implication or by renvoi from Russian law). It was not submitted that, if Russian law, or some other law, applied there was no serious issue to be tried.

thus a claim "*in respect of the contract*" within the meaning of CPR 6.20 (5). I agree. I do not accept that the agreement sued on can only be regarded as involving no more than an agreement to sell shares in Sibal at a price to be determined by reference to future sales of shares in Rusal. There is a serious question as to whether the agreement between the parties was that Mr Cherney was to be beneficially entitled to 20% of Rusal (or was to be recognised as being already prospectively so entitled), which Mr Deripaska was to hold for him (since Mr Cherney's name was not to be on the books) and for the proceeds of which, less the $ 250,000,000, Mr Deripaska was to account to Mr Cherney as trustee.

138.    I have referred, as does the pleading, to Mr Deripaska allegedly holding 20% of Rusal on trust. Mr Deripaska's interest in Rusal was, however, held through a thicket of intermediary companies, foundations or other entities. I do not regard this as invalidating the claim, which refers to Mr Deripaska holding the 20% "*directly or indirectly*" and in which Mr Cherney seeks an order that Mr Deripaska sell or procure the sale of that holding and the resultant holding in UCR. It seems to me well arguable that equity's watchful eye is able to pierce through the thicket, and that the Court may treat an individual's power of control of a company as held on trust. Nor am I persuaded that the acceptance by the claimant of the alleged repudiation necessarily puts an end to any trust claim.

*English law and jurisdiction*

139.    I turn to consider whether Mr Cherney has a good arguable case that the agreement that he made was orally agreed to be subject to English law and jurisdiction. Mr Stewart submits that both of those suggestions are implausible. Since Mr Cherney is not a man concerned with details but only "*crucial issues*" it is unlikely that he would have concerned himself with questions of forum and law. If any such agreement had been made it would have been recorded. If the agreement was that disputes would be dealt with in England "*as had been agreed with Mr Abramovich*" the agreement would be for LCIA arbitration as that is what had been agreed with him. It is also to be noted that in the original Particulars of Claim filed in November 2006 the pleading was that it was expressly agreed that "*English law would govern the relations between the parties in respect of the agreement*". No reference was made to an agreement on English jurisdiction (curial or arbitral).

140.    Mr Vos submits that it is entirely understandable that Mr Cherney should seek to agree English law and jurisdiction given his obvious unwillingness to return to Russia. He further points out that Mr Deripaska has often agreed English law and either English jurisdiction or arbitration. Thus the draft merger agreement between Sibal and Sibneft provided for English law and LCIA arbitration. The Loan Agreement between Radom Foundation and Hillgate of 8th April 2002 and between NFM Holding and Hillgate of 9th April 2002 were also subject to English Law and LCIA Arbitration. The draft Call Option Agreement and Share Purchase and Sale Agreement (see paragraph 103 above) were subject to English law and arbitration in the former and English law and UNCITRAL arbitration in London in the latter.

141.    On this issue (which, again, I cannot and do not purport to determine) it seems to me that Mr Deripaska has the better side of the argument and, on the question of English jurisdiction, much the better side. Mr Cherney is avowedly not a man for detail. Choice of forum and law would seem to me a detail with which he would not

normally concern himself. (According to Mr Hauser it is not a matter with which Mr Deripaska would normally concern himself either). If, as is suggested, this was something of particular significance because of his reluctance or refusal to go back to Russia, one would expect it to have been recorded. Mr Cherney, on his account, asked for the documents to record the agreement about his 20% interest in Rusal and could have asked that it record their agreement on English law and jurisdiction. The alleged agreement could have been quite briefly recorded and even added in manuscript.  It is, also, noticeable that no mention was made of the alleged oral agreement on English law in the letter before action from Dr Weinroth.

142.    Mr Cherney's evidence is that he spotted the omission but did not raise it because he was eager to get the document finalised and had Mr Deripaska's verbal assurance. That may be so; but it is not particularly convincing. Further, the failure to plead an agreement as to English jurisdiction until December 2007 casts considerable doubt on whether that was ever agreed. I accept that witnesses often leave something out when recounting what has happened, and that language difficulties may contribute to that. Even so I find it highly surprising that Mr Cherney's experienced former solicitors do not seem to have understood from him that English jurisdiction had been agreed. No such suggestion was ever made to Tomlinson, J, Langley, J or Longmore, LJ and, if there was an agreement on English jurisdiction, an entirely unnecessary case was run on the question of Mr Cherney's domicile. No explanation has been given in any statements as to how the jurisdiction issue only came to be remembered or put forward later.

143.    The fact that Mr Deripaska, or, more accurately, his lawyers have included English law and arbitration clauses in agreements does not go much further than to show that he is not averse to having some disputes determined in this manner. It does not, however, sit well with the averment that what Mr Deripaska agreed was English jurisdiction. If the question of where any dispute would be determined was addressed, it would seem more likely that the parties, or at any rate Mr Deripaska, would choose arbitration, which was the form of dispute resolution usually adopted by him.

144.    In short, I am not satisfied, on the material before me, that Mr Cherney has a good arguable case that there was an oral agreement as to English law and jurisdiction in that I am not satisfied that on either of those issues he has either much the better or even the better side of the argument; and on the jurisdiction issue I am satisfied that Mr Deripaska has much the better side of the argument.

*Forum conveniens - preliminaries*

145.    Before I address the question of forum conveniens it is necessary to consider the evidence of (a) Mr Cherney's alleged criminality (and that of Mr Deripaska); (b) his links with Russia; (c) the Russian legal system and (d) the prospects of a fair trial for Mr Cherney there.

*Mr Cherney's alleged criminality.*

146.    A considerable body of evidence has been put in relating to Mr Cherney's alleged criminality. Professor Louise Shelley, a Professor at the School of Public Policy at George Mason University in Virginia and an internationally recognised expert in the development of organised crime in the former Soviet Union republics, describes him

as a close friend of a well known Uzbek man – Alimzhan Tokhtakhounov, generally known as "Taiwanchick" ("Little Taiwanese") -  believed to be a member of the Izmailovo Group and of another Uzbek, who was a Kremlin insider during the Yel'tsin years and protector of many organised criminals. Mr Malevsky and Mr Popov are said by Mr Deripaska and Professor Shelley to be leaders of criminal gangs.

147.    There is a Russian practice used by businessmen and even the government known as "*Kompromat*", meaning the release of damaging false information in order to compromise the reputation of a business rival or political opponent. Professor Shelley says that the numerous law enforcement officials, to whom she has spoken in and outside Russia, express the view that Mr Cherney is not the victim of Kompromat, that his reputation is well deserved, and that he has escaped conviction through bribery, intimidation, manipulation of the system and the purchase of influence in the police and the courts. She also asserts that it is the firm belief of numerous investigators that a large proportion of the funds used by him and his brother to invest in the post Soviet aluminium industry were obtained illegally by siphoning off 7 billion roubles by the use of false instructions ("*avisos*"), using stolen ciphers and codes, from the Central Bank to transfer monies to accounts run by their associates.

148.    In February 1997 the then Deputy Prime Minister and head of the Ministry of Internal Affairs, General Anatoly Kulikov, told the State Duma of the Russian Federation that criminal organisations had infiltrated the aluminium industry to a significant degree. He referred to "*large-scale embezzlement of government funds by means of false bank advice notices*" i.e. avisos; and to the fact that the Investigation Committee of the Russian Ministry of the Interior had established direct contacts with the law enforcement bodies of the USA, Canada and the UK that were now investigating "*the illegal activities of the Cherney brothers related to the laundering of funds obtained by illegal means*". He also referred to the Ismailovo criminal network and its leader Anton Malevsky.

149.    However in 2002 Mr Kulikov was interviewed by a film producer, Mr Alexander Gentelev, in the course of which he said:

> "*I don't think a single former or present law enforcement official would accuse the Cherney brothers or Michael Cherney of being mafia leaders, because their business was based upon the same loopholes in the Russian legislation. It's hard to make claims or charges against these people...*"

150.    In December 1996 Interpol communications referred to Mr Cherney as connected with the Russian mafia and with Malevsky the leader of "*Ismailova*". An internal Swiss police report of 21st November 1996 said the same thing whilst recording Mr Cherney's statement that all information in support of this theory came from people who wanted to do him harm commercially.  Mr Cherney's criminal association with Mr Malevsky "*according to certain sources*" was referred to in a Swiss police report

of 18th July 2001[21].  It was also referred to in an application for a wiretapping permit made by the Israeli police in December 1997.

*Allegations against and by Mr Deripaska*

151.    Mr Deripaska, himself, is the subject of serious allegations. Dr Rachel Ehrenfeld, a distinguished academic, published an article on 17th December 2007 entitled "*Russia's New State Oligarchy*" in which she described Mr Deripaska as President Putin's "*favorite oligarch*" and alleged that "*Deripaska's Rusal is suspected of resorting to bribery in 2004 to obtain a Nigerian Smelter company for the lowest bid and bribery in Guinea to obtain concessions for an aluminium refinery and bauxite mine*".  She records that the Stuttgart Prosecutor's office accuses him of involvement with the Ismailovo mob in laundering € 8 million and contracting the murder of several competitors; and that the Israeli police claim that he instigated illegal telephone-tapping of the Deputy Prime Minister and Minister of Strategic Affairs soon after the Prime Minister returned from Moscow, and that the tapes were apparently sent to Moscow.

152.    In July 2006 the US authorities revoked Mr Deripaska's entry visa. According to the Wall Street Journal, the entry ban related to concerns by US law enforcement officials that Mr Deripaska had ties with organised crime in Russia.

153.    Mr Cherney claims that Mr Deripaska has been behind an adverse public relations campaign against him in Israel and issued libel proceedings in Israel against him and others on 14th February 2008.

*Proceedings against Mr Cherney in Switzerland*

154.    On 21st May 1994 Mr Cherney flew from Geneva to Heathrow with his future wife. They were both detained by immigration officers who discovered that they had attempted entry on false Polish passports. They were refused entry and deported back to Switzerland. The following day they were arrested and imprisoned by the Swiss police, inter alia on the grounds that they had made use of false identities. Both were searched and found to be in possession of two allegedly false Polish driving licences. Mr Cherney gave a statement to the police in which he admitted using a Polish passport in an attempt to enter the UK (and that he had used the same passport on one previous occasion for that purpose). He explained that he had met a man called "*Dimitri*" in a bar in Florida who told him that it was possible to obtain a different nationality from the former Republics of the Soviet Union and offered and then provided him with a Polish passport[22].

155.    Mr Cherney was detained for further questioning. By now the police had learnt of the arrest of two Belarusians who had entered Switzerland via Basle illegally from

---

[21] This report was later held by the Swiss Federal Supreme Court to be one of several documents that  did not provide "*any tangible element of proof to support the allegations made therein*".

[22] In a subsequent interview his future wife admitted that he had bought false Polish passports for US  $ 1,000 in order to travel to Great Britain.  And in a later interview he said that, when he told Dimitri that his grandfather was Polish, Dimitri told him that there was a new law in Poland whereby those who still felt Polish could resume Polish nationality; and later on the beach gave  him various forms to complete.

Germany in a rented Mercedes which contained (i) six Polish passports, one in the name of "*Mikhail Czernyi*", bearing Mr Cherney's date of birth; (ii) 7 Polish driving licences; (iii) a loaded firearm; and (iv) two silencers. Mr Cherney claimed to have no idea how these individuals happened to have passports and driving licences in his name. Eventually Mr Cherney was released from police custody.

156.    On 9th June 1994 Mr Cherney was prohibited by the Swiss Foreigners Federal Office from returning to Switzerland (or Liechtenstein) for 2 years because of his use of a false passport. The impression that he gives in his witness statement that the restrictions on his movement (and thus his need to rely on Mr Deripaska) arose from criminal procedures instigated against him in Switzerland and elsewhere as a result of false allegations of crime seems to me misleading.

157.    At the time he was detained in Switzerland two passports were found in his possession (the UK authorities had seized the Polish passports) one of which appeared to be Russian and one of which clearly was Russian with a UK visa.

158.    On 25th October 1994 the Swiss authorities confirmed that they would not be pressing any charges against him. On 20th November 1996 the Swiss Federal Aliens Office confirmed that he was no longer subject to a prohibition order and that there was nothing to prevent his coming into Switzerland.

159.    On 22nd November 1996 Mr Cherney was accused ("*inculpé*") in Switzerland of being a member of an organisation with a secret structure and membership whose object was the commission of criminal offences or procuring income by criminal means. He was suspected of drug trafficking, money laundering, fraud and sponsoring murder, working for an organisation run by a Russian godfather, Mr V Ivankov (whose nickname is "Yaponchick") and of being a member of the Ismailovo group run by Mr Malevsky. On 26th November 1996 he was accused of being a member of a criminal organisation in Switzerland. On 6th December 1996 the Federal Foreigners Office prohibited Mr Cherney indefinitely from entering Switzerland. Mr Cherney's appeal against that decision was rejected.

160.    On 10th June 1999 a criminal complaint was filed by Trans-World Metals against Mr Deripaska and others for actions constituting fraud, mismanagement and breach of trust. In June 2003 the Examining Magistrate joined the investigation of the criminal complaint to the indictment of 22nd November 1996. In 2005 Trans-World Metals withdrew its complaint against Mr Deripaska after a settlement. In March 2006 the Swiss Public Prosecutor informed Mr Cherney that the proceedings against him had been placed on the file for no further action to be taken. Mr Cherney asked for the indictment to be quashed.

161.    The matter proceeded through the Swiss appellate system. On 9th January 2008 the Swiss Federal Supreme Court directed the Cantonal Appeal Court to dismiss the prosecution against him because the documents which formed the sole basis of their decision provided "*no tangible element of proof*" to support the allegations made; and because in concluding that there were "*substantial signs of [Mr Cherney's] membership of a criminal organisation*" the Cantonal Appeal Court had clearly misinterpreted "*the true scope of those documents and inferred untenable conclusions from them, both as regards the indication factor and probability. This being the case it succumbed to arbitrariness*". On 13th February 2008 the Cantonal Appeal Court

complied with the direction of the Federal Appeal Court and entered a non suit whose effect is that Mr Cherney cannot be "*brought to justice for the same facts*".

162.    Mr Cherney has produced a substantial body of evidence in support of his innocence consisting of:

    a)    An affidavit from Dr Vladimir Ovchnisky, who was assistant to the First Deputy of the Minister of the Interior between 1992 and 1995; assistant to the Minister of the Interior of Russia from 1995 to October 1997; and from October 1997 to July 1999 Chief of the National Central Bureau of Interpol of the Russian Federation, and an author of books on organised crime, two of which are used as textbooks for schools of enforcement agencies.  In it he states "*with absolute certainty*" that Mr Cherney has no criminal record, has never been declared as wanted in or out of Russia, and that law enforcement agencies "*do not have any legally valid information proving his implication in organized crime*".

    b)    An affidavit from Colonel Glushenkov, who was from 1992 to 2000 the Senior Investigator for Cases of Extraordinary Importance for the Office of Investigating Organised Criminal Activities. In the course of an investigation into alleged fraud he examined Mr Cherney's business activities and confirmed the legitimacy of Mr Cherney's business with aluminium companies and found no indication of the commission of any crime.

    c)    An affidavit of Mr Yuri Skuratov, who was between October 1995 and April 1999 the Attorney General of the Russian Federation. He states that throughout that period he did not receive any information to the effect that Mr Cherney had been convicted for crimes committed in the USSR or the Russian Federation nor were there any criminal proceedings instituted against him by law enforcement agencies in Russia.

    d)    Several letters between 2000 and 2004 from relevant authorities attesting to the absence of any criminal cases against him.

*Mr Cherney's position in Israel*

163.    Mr Cherney emigrated to Israel in 1994. In December 1997 the Israeli police sought authority to tap his telephones for 3 months on the grounds that a valid arrest warrant had been issued against him in Russia for economic offences in the aluminium business and that he was allegedly linked to drug dealing, money laundering and drugs and weapon smuggling, and plotting to murder.

164.    It appears that in 1994 Mr Cherney was granted Israeli citizenship and issued with an ordinary Israeli passport pursuant to the Law of Return (which requires at least one Jewish grandparent); but that in 1999 that passport was revoked and replaced by a "laissez passer" whilst the authorities investigated his entitlement to Israeli citizenship. The latter is a travel document and not a certificate of citizenship.

165.    Mr Cherney has made considerable efforts in the Israel courts to clear his name of a number of allegations that the authorities appear to have raised against him and to secure unqualified Israeli nationality

*Discussion on Mr Cherney's alleged criminality*

166.    I have set out the evidence given in relation to Mr Cherney's alleged criminality or the lack of it in some detail because of the reliance that has been sought to be placed on it. I cannot, for the purposes of this application, begin to determine where the truth lies. Mr Cherney may be a gangster or the victim of Kompromat. Mr Deripaska may be a spreader of calumnies about Mr Cherney, either true or false. The allegations against Mr Deripaska may be true. For present purposes it is material to note (a) that Mr Cherney has never been convicted of any crime anywhere; (b) that the highest Court in Switzerland has required the Cantonal Court to enter a non suit in relation to the charges against him; (c) that there is evidence in his favour of want of criminality on his part from individuals in  very senior positions;  but (d) that he is undoubtedly reputed to be a gangster in some of the public press in Russia and that there is hearsay evidence that this view is taken by some security personnel.

*Mr Cherney's links with Russia*

167.    In his first witness statement Mr Cherney said that he had not visited Russia since 1994, had never lived there, and had never held a Russian passport; and that he was not and never had been a Russian citizen and had nothing to do with Russia.

168.    In fact Mr Cherney has held at least three passports, all evidently well used, describing his birthplace as in the USSR (either *"Ukraine/USSR"* or *"City of Cherkssey/USSR"*) and his nationality as *"Russia"*. He told the Swiss authorities that he had 4 or 5 passports of this type. The first page of the passports refers to the USSR and bears its emblem. For a number of years after the dissolution of the USSR the Russian authorities continued to use up existing USSR forms. Two of the passports were issued by the Russian Foreign Affairs Ministry. The third was issued by the Regional Internal Affairs Directorate. When he sought to enter the UK on a Polish passport he was in possession of a valid Russian passport with a UK visa in it, which the authorities claimed to have reason to believe had been fraudulently obtained.

169.    When Mr Cherney was arrested in Switzerland he was described, as was his future wife, as domiciled (*"domicilié"*) at an address in Moscow. He told Mr Borovoy in his interview that he relocated from Uzbekistan to Moscow in 1987.

170.    Mr Cherney claims that he never understood the reference to "Russia" in his passports as suggesting that he was a Russian citizen, an explanation I find difficult to accept. He also says that, while he rented an apartment and office in Moscow in the early 1990s, his visits there were never particularly long and that he never lived in Russia on anything resembling a permanent basis.  That was why he said he had never lived in Russia.

171.    In 2003 he obtained a visa for Russia but, after Mr Makhmoudov told him that it was not safe to go, he did not go there. He does now go to the Ukraine where he was born.

*The Russian Legal system*

172.    The summary that follows is primarily derived from (a) the witness statement of Professor Alla Bolshova, who was from 1992 until 2005 the Chairman of the Moscow Arbitrazh court, and (b) Professor Paul Stephan.

173.    The Russian court system consists of the Constitutional Court of the Russian Federation and two judicial branches (a) courts of general jurisdiction and (b) state arbitrazh courts. The system of state arbitrazh (arbitration) arose in the Soviet Union as a means of resolving contractual disputes between state owned enterprises. By the Khrushchev period (1953-1964) the system had acquired the characteristics of a formal, law oriented court. In July 1991 the Russian Federation enacted a *Law on Arbitrazh Courts* which codified their role, which had become that of adjudicating on business disputes; and in March 1992 enacted an *Arbitrazh Procedural Code*. Substantial revisions were made to both Laws in 1995 and a new Procedural Code (the "APC") was adopted in July 2002. The *Constitutional Law on Arbitrazh Courts* in the Russian Federation enacted in 1995 established a 3-tier system of courts with jurisdiction over (essentially) commercial disputes, including bankruptcy. Amendments to that law in 2003 added a fourth tier.

174.    The jurisdiction of the general courts is very wide, the principal exception to its jurisdiction being economic and other cases falling within the arbitrazh courts. The present case, if tried in Russia, would be tried in the arbitrazh courts.

175.    The two judicial branches have different appeal structures. Appeals from arbitrazh courts of first instance of the relevant entity or region of the Russian Federation (of which there are 81 including the City of Moscow) go first to the arbitrazh appeal court, which consists of members of the relevant arbitrazh court of first instance who review the original decision on fact and law. The arbitrazh courts also have the authority to reopen closed cases in the light of newly discovered circumstances.

176.    The next level is the Federal Circuit (or District) Arbitrazh Courts, of which there are 10. These can only reverse a judgment where there was an incorrect application of material or procedural law or an incorrect legal conclusion from established facts. These courts were established in 2003.

177.    The final level of appeal is to the Supreme (or High) Arbitrazh Court ("HAC"), sitting in Moscow which began functioning in 1992. It can review the decisions of lower courts where an incorrect application of the law or other mistake has disrupted the uniform application of rules of law by the arbitrazh courts, or has violated the rights and freedoms of persons and citizens or the rights and legitimate interests of certain categories of persons, or otherwise in the interests of public policy[23]. This court also has the authority to reopen closed cases in the light of newly discovered circumstances.

178.    Appeals from the general jurisdiction courts have a similar, but not identical, appeal system, ultimately to the Supreme Court of the Russia Federation.

179.    Both sets of courts apply the *Civil Code* of the Russian Federation, other federal laws, decrees of the President and resolutions of the Government of the Russian Federation and regulatory documents of other federal executive bodies.

---

[23] The number of judges is very large by English standards. The arbtrazh system alone has about 100 courts and 4,000 judges. Most, as in the Continental pattern, have commenced a judicial career within a few years of graduating from law school.

180.   There is no system of judicial precedent as in common law countries nor are court decisions systematically published. But the Supreme Courts are empowered to give authoritative guidelines on the application of law in respect of a certain category of legal matters in order to achieve uniformity of interpretation and application of legislative provisions by lower courts. These guidelines are adopted by resolutions of plenary sessions (plenum) and are mandatory interpretations for the appropriate branch of the court system. Occasionally there are joint resolutions of the plenum of both Supreme Courts.

181.   Article 6 of the *Civil Procedure Code*, applicable to the general courts, and Articles 7 and 8 of the APC establish the principle of equality before the law and the courts of all individuals irrespective of, inter alia, their nationality, origin, or place of residence.

182.   Article 5 of the APC guarantees the independence of the judges, Article 9 guarantees the adversarial nature of proceedings; Article 11 requires open proceedings except in limited circumstances, Article 41 describes the procedural rights of participants; Article 56 gives the court power to summon witnesses and for the participants to ask the court to do so. Article 59 guarantees the right of participants to have legal representatives act on their behalf. The rules provide a mechanism for full discovery of evidence similar to that of several civil law countries such as Germany or France. Article 134 of the APC imposes a 60 day limit on the preparation of a case for a hearing by the trial court commencing with the filing of the claim and Article 152 gives the court 1 month from the commencement of the hearing to decide the case. Some exceptions to this strict time scale exist.

183.   The Russian courts will accept jurisdiction over the claim by Mr Cherney against Mr Deripaska because he lives there and has a significant part of his property there. Mr Cherney can participate through his representative and give explanations in writing.

184.   Mr Cherney claims that he will be unable to obtain a fair trial in Russia and that, if he visits Russia, he may well face arrest on trumped up charges (Mr Deripaska would categorise them as well merited charges).

*Mr Deripaska and the Russian Courts*

*Failure*

185.   Mr Hauser, Mr Deripaska's solicitor, has pointed out that Mr Deripaska is not a man who always wins in the Russian courts and gives the following examples. On 12th November 2007 the Moscow Aribtazh court enjoined the Russian insurance company, OSAO "Ingosstrakh", of which Mr Deripaska is the majority shareholder, from implementing an increase in its capitalisation. It did so at the suit of a Czech fund, PPF Investment, which claimed that the increase was not approved and would unfairly dilute its interest in the company. However, the case is continuing. On 29th December 2007 Mr Deripaska lodged a counter application at the Arbitrazh court seeking a ruling that PPF's purchase of a 38% minority holding violated Russian law.

186.   In 2005/6 LLC Rusal Rostar, an affiliate of Rusal, lost a claim for damages in respect of the package and carriage of goods from Russia to the United States in the St Petersburg Arbitrazh Courts. In 2007 Ingosstrakh was obliged to settle a claim brought against it in the Moscow Arbitrazh court arising out of the wreck of a ship.

*Success*

187.    Mr Deripaska's Russian management company was being pursued by the Russian tax authorities for an alleged underpayment of taxes in a dispute that had achieved wide publicity and which was being cited as an illustration of his inability to influence the Russian government.   However on 22nd March 2008 the newspaper "*Kommersant*" which is effectively government owned reported that all claims against Mr Deripaska's company had been rejected by the MAC. Such a victory, it pointed out, is very rare.

*Mr Cherney's previous attitude to the Russian Courts*

188.    In about 2000 a company called Base Metal Trading SA, together with other companies, including a group of companies called the Davis Group brought an action against numerous defendants, including Mr Deripaska and Mr Cherney under the RICO statute.  All of the defendants raised the defence of forum conveniens arguing that the claim against them should more appropriately be heard in Russia and not in a US Federal District Court. The existence of an alternative jurisdiction to which a defendant is amenable is a threshold requirement for a successful forum conveniens defence. In support of an application for dismissing the complaint all the defendants had to give formal consent to the jurisdiction of the Russian Courts in "*any action filed by the plaintiffs alleging the same or similar claims asserted in the Amended Complaint*" and undertake to produce any relevant documents or witnesses in the action.   Mr Cherney's lawyer, Mr Victor Rubin, signed such a consent on Mr Cherney's behalf, which he declared under penalty of perjury to be correct. At that time Mr Cherney and Mr Deripaska were separately represented.  The plaintiffs had asserted that the Russian judiciary was so corrupt that they could not obtain a fair decision anywhere in Russia. The judge allowed the forum conveniens motion and dismissed the suit.  The Court of Appeals dismissed an appeal.

189.    Thereafter the Base Metal plaintiffs settled their claims. The Davis Group plaintiffs did not. In 2004 Davis International LLC and various related companies, having lost on forum conveniens grounds in New York, brought a new action in Delaware, in which similar allegations were made. The plaintiffs asserted that the Moscow arbitrazh court was not free from corruption based on its handling of the Yukos case. In 2006 the Delaware court dismissed the case on the ground that the New York Court had already decided that the claims in issue should be determined by a Russian court and that the plaintiffs had not raised any new material facts regarding the adequacy of the Moscow arbitrazh courts. An appeal was dismissed. Mr Cherney's consent to the Delaware claims being heard in Russia, in similar terms to the consent in the *Base Metal* action, was confirmed, under penalty of perjury, by Mr Brian Mass of the New York firm of Frankfurt Kumit Klein & Selz, PC. Mr Deripaska was separately represented.

190.    In his first witness statement Mr Cherney refers to the New York proceedings and states that the application to dismiss was led by Mr Deripaska, that he played no active role in the litigation and had no substantive discussions with his lawyers and was "*not approached by anyone about these issues*". Mr Deripaska was responsible for dealing with claims by third parties and "*I would have followed any direction he made in this regard*". He says that he assumes that Mr Deripaska and others assumed that if the claim was dismissed on jurisdictional grounds there was little prospect that

the plaintiffs would pursue any claim in Russia, because they would have felt that they would not get a fair trial there with Mr Deripaska as a defendant; and that he never expected there to be any Russian proceedings.

191.  That neither of Mr Cherney's very experienced legal counsel communicated with him, either directly or indirectly, before giving, under penalty of perjury, consent to Russian jurisdiction on his behalf is not credible. In his second witness statement Mr Cherney accepts that his attorneys were authorised to give the consent that they did but that the instructions they received were "*provided by others on my behalf*". He does not identify who these others were. This later statement appears inconsistent with his earlier statement that he was not approached by anyone about these issues. I should be surprised if Mr Cherney's lawyers did not have either direct correspondence with Mr Cherney, or, at least, a document signed by him, authorising the giving of consent, although it is not impossible that they received instructions from recognised intermediaries. On either view Mr Cherney's first statement was misleading.

192.  I find it perfectly credible that both Mr Cherney and Mr Deripaska calculated that if the actions were stayed the claims would never go ahead in Russia.

193.  Mr Stewart submits that in circumstances where Mr Cherney has persuaded the US Courts to stay an action against him on the footing that he is amenable to Russian jurisdiction, he can scarcely be heard to say that Russia is not an appropriate forum for his dispute with Mr Deripaska. There is undoubted force in this submission. It is, however, material to note that, in the *Base Metal* proceedings, in which Rusal is the first defendant, Mr Cherney was on the same side as Mr Deripaska. They were alleged to have been parties, together with Mr Makhmoudov, to a massive racketeering scheme, involving criminal acts including fraud, bribery of the local governor to the tune of $ 850,000, violence, murder, attempted murder, and threats to murder, in order to take over and monopolise the Russian aluminium industry, although there were allegations against them that were not common. The first step in the scheme is said to have included the takeover of Saaz and other companies that came into Mr Cherney's stable.

194.  Under clause 4 of Agreement No 1 Mr Cherney was obliged, in the event of the fulfilment of the payment obligations (which happened), to assign to Mr Deripaska the right to settle all the obligations which Sibal had to third parties. He states that it was in accordance with the 2001 Agreement that Mr Deripaska was responsible for dealing with claims by thirds parties and that he followed his directions.

195.  The fact that Mr Cherney consented to Russian jurisdiction in those circumstances does not, in my view, compel the conclusion that he would, or should reasonably, be content with Russian jurisdiction in quite different circumstances. I have little doubt that he and Mr Deripaska reckoned (correctly) that the US plaintiffs would never go to trial in Russia. Mr Cherney's own evidence is that he assumed that that is what Mr Deripaska thought and that the claimants would not want a trial in Russia because they would have felt that they would not get a fair trial there.

196.  If he and Mr Deripaska obtained a forum conveniens dismissal, and resisted the contention that the Russian forum was unsuitable on the grounds, inter alia, of corruption, when they knew that the Plaintiffs would not get a fair trial, the forum conveniens motion was a cynical ploy and quite possibly an abuse of the process of

the District Court. I do not, however, regard that as disentitling Mr Cherney to complain that he will not obtain a fair trial in Russia in a case in which he and Mr Deripaska are on opposite sides or justifying me in not carrying out the *Spiliada* analysis.

*Discussion on forum conveniens*

197.    If there was no question of Mr Cherney not getting a fair trial in Russia and no doubt but that he would, if necessary, pursue his claim in the Russian Courts, or could reasonably be expected to do so, Mr Cherney would fail to establish that England was the proper forum for the trial of this dispute.  The alleged agreement, if made, was made in England. There may have been an agreement that it would be governed by English law but, on the present material Mr Deripaska has the better side of the argument on that.  The claim relates to a substantial stake in a major Russian aluminium business. Whether any agreement is found to have been made as alleged is in large measure dependant on whether or not the parties were partners in business or extortioner and victim. The answer to that depends, in part, on what happened in the relevant part of the aluminium business in Russia between 1993 and 2001. Any evidence on that topic is likely to come predominantly from Russians, who are likely to want to give evidence in Russian, or from Russian documents. Russia has an operating legal system of which Mr Cherney can avail himself.

198.    It is, however, apparent to me that, if this claim is not allowed to proceed in England, it will not proceed in Russia.  It is unrealistic to suppose that Mr Cherney's claim could be prosecuted with any hope of success without his giving oral evidence and he will not return there for three reasons.   *Firstly,* he fears for his life; *secondly,* he fears that he may be arrested on what he claims would be trumped up charges; *thirdly,* he does not believe that he will get a fair trial. I have, therefore, to consider what significance if any, should attach to the fact that a trial in Russia will, in all probability never take place.  That must depend on the extent to which any of Mr Cherney's fears are justified and whether, even if justified, they afford any reason for having a trial not in Russia but in England.

*Fear of assassination*

199.    As to the *first* of Mr Cherney's concerns, Mr Stewart submitted that Mr Cherney is no more likely to be the subject of an assassination attempt in Russia than he was in Israel or is anywhere else. I do not accept that. Whoever tried to have him killed in Israel was almost certainly Russian based. The risk of a successful assassination seems to me likely to be greater in the place where the person or persons who might wish to have him killed reside and where the requisite personnel and materiel are likely to be more readily available. This is particularly so if Mr Cherney is engaged in a public trial. I cannot tell whether any threat to Mr Cherney is likely to come from a figure from his supposed criminal past or a former business rival (or someone who falls into both categories) or neither. I do, however, consider that Mr Cherney has a well founded fear for his safety and that he will be more at risk in Russia than England.

*Fear of arrest*

200.   As to the *second*, Mr Deripaska denies that he has, as Mr Berezovsky suggests, such influence as would enable him to have Mr Cherney arrested on some pretext or other. He suggests that, if Mr Cherney fears arrest, a more realistic explanation of his fear is that the authorities may seek to prosecute him for the serious criminal offences which he has been accused of committing. Again, I cannot tell whether any criminal charge that might be brought would be well founded or trumped up. I bear in mind, however, that prior to 1991, when he left Russia, no criminal charges had been brought against Mr Cherney, nor has any attempt been made to prosecute Mr Cherney *in absentia*.

201.   It seems to me that there is a significant likelihood of Mr Cherney being prosecuted if he returns and a real possibility that Mr Deripaska might use his influence, or his ability to orchestrate feeling against Mr Cherney, to encourage the authorities to take that course.  I refer below to the evidence of Professor Bowring (see paragraphs 213-4 below) which appears to me to lend substantial support to that conclusion. There is reason to suppose that Mr Deripaska or his advisers have already conceived a plan to denigrate Mr Cherney in this country (see paragraph 249 below) and in Israel (see paragraph 153 above); and there appears to be far more scope for such a plan and for a prosecution  in Russia.    Further there is a distinct possibility that any charges would be trumped up.

*Fair trial?*

202.   As to the *third,* the parties have filed extensive evidence. Mr Cherney instructed Professor Bowring, the Professor of Law at Birkbeck College.  He is a fluent Russian speaker with a particular interest in the independence of the Russian judiciary. It is apparent from his *curriculum vitae* that he is well qualified to give such a report, having extensive experience of the workings of the Russian legal system, having advised UK Government departments and European and other bodies on the Russian legal system and on access to justice in Russia, and having carried out training for senior Russian judges and administrators and worked with senior figures in the system. He has given expert evidence in a number of extradition cases. I am satisfied that he has an open minded attitude to the system, of which, as it happens he appears to have been both the victim and the beneficiary[24].

*Professor William Bowring*

203.   The gravamen of Professor Bowring's report is that, if claims similar to those in the present action were pursued in Russia, Mr Cherney would be highly unlikely to get justice. I do not propose to précis what is an extensive and scholarly report. The gist of it is as follows.

---

[24] In November 2005 he was deported from Russia and his nullity-entry visa cancelled. On 23rd December 2005 Judge Workman concluded that it was more likely than not that the actions of the authorities were directly associated with the fact that Professor Bowring was giving evidence  in an extradition application by the Russian Federation. In 2006 he successfully applied to the Russian courts for a judicial review of the decision to exclude him and has since returned on several occasions.

204.    Mr Deripaska's Rusal group is one of the most important assets of the Russian economy and is of extraordinary importance to the Russian state and its project, under President Putin[25], of national revival involving, since 2004, increasing state control of key businesses ("national champions"), of which aluminium is one. State officials (e.g. Government ministers) are often chairmen of the boards of the state owned companies. The arbitrazh courts have in recent times been brought into much closer alignment with the economic structures of the state through a series of controversial appointments. It has been acknowledged at the highest level that there are problems of corruption in the judicial system and of political interference. Mr Deripaska is, by common account, a Kremlin friendly oligarch, who heeded President Putin's warning to the oligarchs to stay out of politics. Others have found themselves in exile (Gusinsky, Berezovsky) or in a Siberian labour camp (Khodorkovsky of Yukos). But Mr Deripaska emerged as the triumphant leader of the Kremlin friendly oligarchs whose ability to continue to do business is dependent on obedience to the Kremlin and who can count, in turn, on support from the government and the judicial system. He has funded President Putin's pet projects such as the construction of a new airport for the 2012 Winter Olympics. The available evidence indicates that Mr Cherney will not obtain a just and expeditious hearing in the Russian arbitrazh courts and that there is a strong likelihood that he will be arrested on false allegations.

*Alleged miscarriages of justice*

205.    Professor Bowring cites two instances in which justice appears to have miscarried namely:

>   a)    litigation in the Moscow arbitrazh court ("MAC") between "Gazprom Media" and "Media Most". The latter company, which owned NTV, belonged to Mr Gusinsky, who was forced to relinquish his holdings to Gazprom, which is state owned and the largest company in Russia. On 1st April 2001 NTV broadcast a programme which alleged that Judge Bolshova instructed her subordinate judges as to how to decide the case;

>   b)    On 6th March 2006, an application was made to the MAC to open insolvency proceeds with regard to Yukos. On 4th August 2006 the MAC declared Yukos bankrupt and appointed Mr Edward Rebgun as a receiver. Most of the claims accepted by the MAC in the bankruptcy arose from additional tax assessments imposed on Yukos in April 2004, without which the bankruptcy would not have been ordered. It was Judge Bolshova who appointed the judge to hear the tax cases against Yukos. Mr Rebgun appointed a Dutch lawyer to pursue Yukos assets held by a Dutch Yukos company. On 31st October 2007 the Civil Division of the Amsterdam District Court found that the way in which the amount of the additional tax assessments was made by the tax court, and on appeal, meant that Yukos was deprived of a fair hearing. This defect was not remedied by the MAC or on appeal by the HAC. As a result no substantive sufficiently safeguarded judicial test of the manner in which the tax assessments were carried out took place or could have taken place in the MAC or the HAC so that the bankruptcy order was not effected in accordance with the Dutch principles of due process.

---

[25] Now former President; but I shall refer to him as President Putin none the less.

206.    Judge Bolshova denies both the specific allegations against her "*in the strongest of terms*". She did not, she says, give any instructions to any judges with respect to the Media-Most case and was not responsible for the appointment of the arbitrazh court judge who heard the Yukos tax case and denies any suggestion of partiality or want of integrity.

*Appointment of Mr Ivanov*

207.    Professor Bowring also refers to the appointment in January 2005 of Anton Ivanov by President Putin as Chairman of the Higher Arbitrazh Court. He was then aged 39, with no judicial experience at all. Six months before he had been appointed Deputy General Director of "Gazprom-Media" (part of Gazprom), a member of its management board, and of the board of directors of the TV stations TNT and NDV. Mr Ivanov is an old friend of Dmitri Medvedev, the present President of the Russian Federation, who was a fellow student at the Leningrad State University (where President Putin also studied). In Professor Bowring's opinion, it is clear that Mr Medvedev ensured that he was appointed. Upon appointment a number of HAC judges were removed as well as the chairmen of the Moscow and 14 regional abritrazh courts and dozens of judges of first instance. Their places were filled by former colleagues of Putin and Ivanov at St Petersburg State University. He also cites a number of other appointments of Ivanov's students or former class mates to positions of responsibility in the arbitrazh system. These appointments signalled a deliberate re-alignment of these arbitrazh courts with the interests of the Russian state.

*Meetings with judges*

208.    Professor Bowring cites from the 2006 *Freedom House* Country Report for Russia which reports that President Putin holds frequent meetings with Russia's top judges, including Mr Ivanov, to discuss a wide range of issues. At the November 2005 meeting he is recorded as hoping that the meeting would "*contribute to the dialogue between different branches of power in Russia making the interaction between executive and judicial authorities more productive*". The Report, with which Professor Bowring agrees, observed:

> "*These meetings are problematic not because Putin is seeking to influence the judges, as any president presumably would, but because the judges see nothing wrong with it. Like other officials in Russia, the justices are susceptible to influence within a society that assumes policies are set at the top. Putin's suggestions undoubtedly trickle down through the judicial hierarchy. In lower and regional courts, chief judges have great influence over judicial salaries and which cases judges hear, thereby making it possible for them to determine the outcome of cases with a high degree of predictability.*
>
> *The Federation Council confirmed Putin's appointment of Anton Ivanov, the former first deputy general of Gazprom-Media, as chairman of the Supreme Arbitration Court on January 26. Many see the move as being connected to the fact that the courts are now considering a number of cases affecting Gazprom's interests*".

209.    Mr Ivanov is reported – in *Vedomosti*, 25th April 2007 – as making it very clear that he wished to strengthen the "*vertikal*" (top-down control) of the arbitrazh system so that the HAC can exercise a much closer and more detailed control over decisions of lower courts, so as to eliminate "*strange*" decisions taken by judges in those courts. Professor Bowring expresses the firm opinion that against that background any foreign individual seeking to challenge a state champion or Kremlin friendly oligarch will face the greatest difficulty in succeeding in the arbitrazh courts; and that any action against Mr Deripaska is highly unlikely to succeed particularly if the national interest is seen to be at stake.

*Corruption*

210.    Professor Bowring refers to a consensus of informed Western scholarly research and opinion, which he shares, to the effect that there is a serious and systemic problem of corruption in the arbitrazh system in the sense that some judges take bribes (either from the party who without bribery the judge has decided is in the right, or from the highest bidder, in whose favour he then decides) or issue a ruling based on the dictates of state officials or organised crime. In October 2004 the Chairman of the Constitutional Court referred to the courts as "*according to research … mired in corrupt relations with business*". The Supreme Court called upon him to submit to them the studies that he cited. It is not apparent whether he did so.

211.    Professor Bowring opines that the Russian Executive uses the courts to pursue its agenda just as it did in the Soviet era. The system is still deeply entrenched in the mindset of that era. A large number of judges were appointed before the collapse of the Soviet system and most of the remainder before the latest reforms. In cases which concern the interests of the State they very often defer to the wishes of the executive. This is partly illustrated by the extraordinarily low rate of acquittal – about 1% (formerly 0.5% before the new Code). Many courts are funded by their local authority and their independence in disputes with such authority is compromised. The chairman of a court (the "*tsar-bog*" – tsar and god) enjoys great influence over who hears which case, whether a new judge is given a permanent post after three years probation, and whether a judge is promoted or even kept in position. The Chairman of the Moscow City Court has become notorious for her control of her own and lower courts in Moscow and for the number of dismissals, of which Professor Bowring cites several examples. There are grounds to believe that she enjoys close relations with the Kremlin.

212.    One of the examples cited by Professor Bowring is the case of Judge Kudeshkina who, on the facts as described by him, was removed by Judge Yegorova from a criminal case because, after her two lay assessors refused the prosecutor's request to replace her on the ground that she was favouring the accused, and themselves resigned because of the pressure put on them and the judge, she refused to exclude the assessors' protests from the record. Of perhaps more significance is a commentary on the case[26] in the Moscow Times by Mr Afanasiev a partner in Egorov, Puginsky, Afanasiev, a firm which regularly advises Rusal and Basic Element, who said that the problems were attributable*:*

---

[26] The facts are disputed. Judge Kudeshkina was dismissed and lost her appeal against dismissal in circumstances which she claims were procedurally wholly unfair.

> "...to a loophole that exists in Russian legislation. In contrast
> to laws in the United States, there is no prohibition on lawyers
> from either side, representing the government or private
> individuals, meeting one-on-one with a judge before the case is
> heard. "Maybe one party is trying to bribe the judge. Maybe
> the government is trying to communicate to the court whatever
> it wants to say". "It's a mini-judicial process, before the
> judicial process" he said. "The name of the game is who gets
> access to the judge first, and who will be heard more. It's
> totally ridiculous, but that's the flaw". Reznik [the leader of
> the Moscow Bar] said in civil cases between two private
> individuals judges were mostly free from outside interference.
> In criminal cases, where the interests of power and money are
> clearly in play, the courts are less independent, he said".

*Misuse of criminal prosecutions*

213. The use of criminal prosecutions (or the threat of them) as tools in a power struggle
with rivals was a feature of Soviet Russia. The pattern has continued and has a new
name: "*zakaznye dela* " ("prosecutions to order"). In 2004 the ECHR in *Gusinsky v
Russia* found that the Russian authorities had, in violation of Article 18 and 5,
commenced a criminal investigation and deprived Mr Gusinsky of his liberty, not on
suspicion that he had committed a criminal offence, but in order to intimidate him as
part of a commercial bargaining strategy, namely to induce him to sell his media
business to Gazprom on unfavourable terms. The Central Magistrates Court in Madrid
refused the Russia Government's attempt to extradite Mr Gusinsky from Spain on a
similar basis.

214. There is force in Professor Bowring's opinion that a State capable of such conduct on
one occasion is perfectly capable of doing so again[27]. His view is that Mr Cherney is
an obvious candidate for false charges because Mr Cherney's action poses a real
threat to Rusal and to Mr Deripaska's most fundamental interests. The likelihood of
this is increased because of Mr Cherney's link with Mr Berezovsky, who has been
tried and sentenced in absentia, and is a well known enemy of Mr Putin, his former
protégé.

215. In March 2008 the Economist published a major briefing on Russia's economy in
which it noted that the destruction of Yukos negated any efforts to strengthen the rule
of law. It cited the President of the Moscow Institute for National Models of the
Economy as saying that:

> "The problem is not that the Russian legal system is weak. The
> problem is that it does not exist. The Russian justice system has
> as much to do with justice as the Soviet system of trade with
> trade"

---

[27] Many observers take the view that the prosecution of Mr Khordorkovsky was an example of such conduct.

The report went on to observe that whilst under Mr Yel'tsin the courts were corrupt but at least independent of the Kremlin, under President Putin they had "*turned into bureaucrats who rubber-stamp dubious administrative decisions*".

### Professor Paul Stephan

216. Professor Stephan is a Professor of Law at the University of Virginia whose research and teaching interests embrace Soviet and post Soviet law and who has worked closely with members of the Russian legal system, and in particular members of the Russian judiciary, for over 20 years. He has organised and directed a number of programmes to train Russian lawyers and judges, and after the dissolution of the Soviet Union he has been employed by a number of governmental and international bodies in connection with law reform processes in the former Republics of the Union, particularly the Russian Federation. Since 2000 he has increasingly been engaged in advising law firms and private individuals in connection with issues of Russian law. Professor Bowring acknowledges that Professor Stephan has unique experience of the workings of the arbitrazh courts at least until 2000, at which time the Russian authorities became less desirous of technical assistance from the US in relation to the legal system and Professor Stephan cut back on his activities in that sphere, whilst remaining actively involved in the Russian legal system and maintaining contact with officials and other persons involved in it.

### Adequacy of the arbitrazh courts

217. He expresses the view that the Russian arbitrazh courts are an adequate forum for disputes of the present kind and that in a commercial dispute between private persons those courts can be expected generally to perform their task fairly and impartially. The exception arises, he says, in cases where the government is itself a party and which concern a direct and material strategic interest of the Russian state (i.e. the matters at issue relate to foreign policy and the exercise of Russian power internationally). He does not regard the present as such a case. Professor Stephan draws attention to the fact that on three occasions judges of the Southern District of New York, which he describes as perhaps the foremost venue for international commercial litigation in the United States, have agreed specifically with his opinion and ordered the cases to be dismissed so that they could be brought in Russia instead. Appeals altered the result in some of those cases but the Court of Appeals did not challenge the lower court's rejection of the contention that general inadequacies in the Russian legal system rendered that forum inadequate. These cases include *Base Metal Trading S.A. v Russian Aluminium* in which Mr Cherney was one of the defendants. In that case and in *Norex Petroleum Ltd v Access Industries Inc* the plaintiffs' argument had been that the Russian courts were an inadequate alternative forum because, so it was said, the wealth and influence of the defendants would be used to corrupt the judicial process.

### Use of State influence

218. He does not believe that the prominence and character of Mr Deripaska provide grounds for concluding that the Russian courts would not do justice in a claim brought against him. He regards such evidence as there is of the involvement by the government of Russia in judicial proceedings as indicative of the fact that "*the exercise of this influence is husbanded carefully and limited to instances where the*

*Russian state has a direct and vital strategic interest in the subject of the proceedings*". There is effective separation between the HAC which supervises the arbitrazh court system and the Russian Supreme Court which supervises courts of general jurisdiction.

*The arbitrazh system*

219.    Professor Stephan observes that no one who has studied the operation of the arbitrazh court system could honestly claim that it operates perfectly all of the time or that all of the structures of the APC are always honoured. But he regards the country's leadership as having invested in strengthening and protecting, with the support of other countries such as the USA and the UK, the integrity of the judicial system, and the arbitrazh courts in particular, as Russia goes through the difficult process of transition from a state controlled economy to a law based system of commercial operations. He does not condemn the impartiality or the effectiveness of the system and believes that the leadership of the system is committed to making the legal guarantees contained in the Codes a reality.

*Mr Ivanov*

220.    Professor Stephan does not regard the appointment of Mr Ivanov as Chairman as indicating any significant change in the fairness and impartiality of the arbitrazh court system. The choice of someone who had worked outside the arbitrazh court system and who had been a colleague of senior members of the Russian Government was similar to the appointment of Chairman Yakovlev, his predecessor, who had had no judicial experience when appointed and worked with the political leadership of the Soviet Union.  Further as is apparent in the case of Velery Zor'kin, the first chair of the Constitutional Court, an appointee who enjoyed political support (in his case of President Yel'tsin) can take a position adverse to his supporter (as Mr Zor'kin did when he strongly opposed what he regarded as the President's unconstitutional attempt to encroach on the powers of the Legislature). There is no evidence that an arbitrazh court system under Ivanov's leadership will favour particular private persons simply because of their supposed ties to the Putin administration.

*Yukos*

221.    Professor Stephan does not dispute that in the Yukos case serious irregularities occurred. The principal criticisms concern the criminal proceedings brought in the courts of general jurisdiction against the leading figures. But the arbitrazh courts also failed to exercise a sufficiently stringent review of the tax assessments. There are also grounds for concern as to whether the arbitrazh court overseeing the Yukos bankruptcy was sufficiently proactive in limiting the discretion of the receiver. But the Yukos case, in which the principal target, Mr Khodorkovsky, was a prominent oligarch, involved the renationalisation of critical energy resources carried out by administrative agencies acting on behalf of the Russian State, that renationalisation being a central policy of the Putin administration.  The Russian state would regard the ownership and control of the aluminium industry as having an altogether different order of importance.

222.    Professor Stephan points out that the Russian Federation would not be a party to Mr Cherney's suit and that his claim would have no impact on any ownership interest of

the Federation. Russia's huge energy resources give Russia considerable influence in foreign affairs. By contrast its aluminium industry which processes bauxite located around the world does not have the same potential for the projection of State influence as the oil and gas industry does. Further 20% of Rusal would not even be a blocking interest.

223.    Professor Stephan also points out that a large portion of Professor Bowring's report deals with the problems of the Russian courts of general jurisdiction. But any criticism of those courts has little or no relevance to the arbitrazh courts. The legacy of the Soviet system is less significant in those courts than it is in the general courts. The collapse of the Soviet Union did not change significantly the membership or structure of the general courts, whereas the function and structure of the arbitrazh courts (in which in the Soviet era the government had little reason to interest itself – most disputes between state enterprises being dealt with by unofficial compromises outside the court system) was transformed in the transition from Soviet rule, as those courts became seized of private commercial disputes and non criminal matters involving the state and private citizens.  Further the transformation of the arbitrazh courts in the early 1990s included new layers of appellate supervision and profound changes in responsibilities, and brought in individuals, such as Chairman Yakovlev, with distinguished careers not involving the arbitrazh court system. It was this system whose independence the authorities made particular efforts to bolster, with a view to the encouragement of foreign investors. President Putin has denounced corruption in the judicial system.

*Professor Hendley*

224.    Professor Stephan cites with approval the systematic research of Professor Kathryn Hendley, Professor of Law at the University of Wisconsin which reached the general conclusion that Russian business managers are willing to use the arbitrazh courts in ever increasing numbers despite some rough spots in the system. Lastly he regards it as misleading to talk of well connected oligarchs in the post Yel'tsin era in which President Putin has  made plain that he will not tolerate competing centres of power. Those who acquired wealth and influence during the Yel'tsin years cannot assume that they will receive any favours. He is unaware of any evidence of improper influence by the Russian authorities in private commercial disputes on behalf of any oligarch temporarily allied with the Putin administration. Were it otherwise the decision of the MAC to enjoin Ingosstrakh from  implementing an increase in its shareholding and later declaring that decision invalid would have gone the other way. The new administration is likely to pursue the same line.

*Professor Bowring's reply*

225.    By way of riposte Professor Bowring, whilst confirming the increasing number of individuals and firms using the arbitrazh courts, draws attention to the fact that in a more recent article than the one cited by Professor Stephan, entitled "*Are Russian Judges Still Soviet?*", [28] Professor Hendley acknowledges that not everyone agrees with her interpretation of the data she has gathered since the 1990s with the full cooperation of the HAC. She states that the more commonly held view is that the

---

[28] (2007) v.23 n.3 *Post Soviet Affairs* pp 63-74, p 71.

arbitrazh courts are "*hopelessly corrupt and incompetent, and, if used, are functioning to prop up informal mechanisms of debt collection*". She adds that these interpretations tend to be grounded in anecdotal evidence from disgruntled litigants. In another recent article[29] she accepts that "*the paucity of evidence has done little to dampen Russian's belief in judicial corruption*" and, on the basis of various polls, she regards it as reasonable to assume that Russians approach the courts with trepidation: "*yet the caseload data – both for the courts of general jurisdiction and the arbitrazh courts do not support his hypothesis*". Later in her article she cites a reference by Dr Alena Ledeneva of the University of London (in a widely cited book that argues that in post-Soviet Russia law has become an instrument of a variety of powerful individuals and groups[30]) to the persistent rumours of "*telephone justice*" where the state or a senior judge gives the judge instructions to decide the case as was the norm in the Soviet era. In her final sentence Professor Hendley concludes that:

> "*Many cases are resolved by judges in accordance with the law and without any outside interference. But the political and economic elite can and do interfere when their core interests are in play*"

– a proposition with which Professor Bowring agrees.

226.    Professor Bowring observes that the initial phase of legal reform, which included the enactment of the new procedural codes, came to a definitive end in late 2003 with the arrest of Mr Khodorkovsky and the destruction of Yukos. He points out that Judge Zorkin, the first Chairman of the Constitutional Court, has stated that the move of the Constitutional Court from Moscow to St Petersburg, due to take place this month will mean a significant weakening of the Court and that Judge Zorkin in June 2007 sent to the State Duma a list of 15 Orders and 9 Determinations of the Court which had not been actioned by the Duma – contrary to law.

*Films by Jove, Inc v Berov*

227.    He also refers to the case of *Films by Jove, Inc v Berov* heard in 2003 [250 F Supp 2d 156] and 2004 [341 F Supp.2d 199] before the US District Court for the Eastern District of New York. In that case a US film company, Films by Jove Inc ("FBJ") brought an action against, amongst others, a Russian US resident with stores in Brooklyn and a publishing house for copyright violation. FBJ claimed to be the exclusive licensee of the foreign copyright to certain animated films created by what was originally a State owned entity named Soyuzmultfilm Studio. Soyuzmultfilm Studio had, according to the plaintiffs, metamorphosed from a Soviet state enterprise created in 1936 ("SMS 1") to a lease enterprise[31] in existence between 1939 and 1999 ("SMS 2") and a joint stock company which was joined as a plaintiff with FBJ ("SMS

---

[29] "*Assessing the Rule of Law in Russia*" (2006) v.14 *Cardozo Journal of International and Comparative Law* pp 347-391.

[30] This is the position for which Professor Peter Solomon cites the book in his article "*Assessing the Courts in Russia*" v 16 n.1. *Demokratizatsiya* pp 63-74, p 71.

[31] So called because such enterprises took on lease the buildings and equipment of the state enterprise, but kept the income for themselves.

3"). The films had been made between 1946 and 1991 i.e. in the Soviet era. The defendants challenged FBJ's licence of the copyright, asserting that the 1992 contract was invalid because SMS 2 did not have the power to deal with the rights. At some point in the action a Russian state owned enterprise ("Enterprise SMS") joined the US litigation in support of the defendant, claiming to be the lawful successor to SMS 1. Parallel proceedings took place in Russia in which SMS 3 was on one side and Enterprise SMS was on the other. Each side sought to nullify the other's corporate registration. The issue before the US courts – whether SMS 2 had the power to assign – was not in terms at issue before the Russian courts; but the issue as to who was the true successor in title to SMA 1 was potentially material to the US Court's decision. A decision of the HAC of 18th December 2001 had concluded, overruling the Federal District Court, that SMS 3 was not the successor to SMS 1 because the relevant provisions of the leasing statute did not provide for the conversion of a state enterprise into a leasing company and any succession of rights from a state enterprise to the lease entity would not survive the expiration of the lease term (of 10 years).

228.  There were three *Films by Jove* first instance decisions. In the first of them, in August 2001, the Court had awarded the plaintiffs summary judgement relying, inter alia, on some decisions of the arbitrazh courts. In the second of them, in 2003, the court was invited to reconsider its August 2001 ruling. Judge Trager had then to address the impact of the HAC decision of 18th December 2001. In that case Professor Stephan gave evidence for the plaintiff. Judge Trager, who was clearly sceptical of the validity of the decision of the HAC, had before him evidence that, whilst Russian law provided that in the consideration of economic disputes no priority should be given to the state, this practice was not widely adhered to; and that the current generation of judges, having been brought up in the spirit of Soviet law perpetuated a pro-state approach. This was particularly so because Court chairmen were interested in maintaining friendly relations with the authorities because judges receive substantial benefits other than salary from the hands of the officials of the Russian Federation President's Administration.

229.  Judge Trager described the alleged flaws in the Russian judicial system as "*troublesome*" but decided that the evidence did not support a sweeping condemnation of Russia's judiciary. He found no need to reach any broad conclusions as to the impartiality and fairness of the arbitrazh system as a whole because the plaintiffs had produced specific evidence in the form of documents obtained from the HAC's file of improprieties in the arbitrazh court proceedings leading up to the 18th December 2001 decision.

230.  The relevant documents had been discovered by a lawyer for the plaintiffs in the Russian case. The first document was a minute of a "*consultation meeting*" of the Deputy Chairman of the Russian Federation held on 30th March 2001. The agenda concerned the "*creation of necessary conditions for the activity of [Enterprise SMS]*". The meeting was attended by (i) a director of Enterprise SMS; (ii) an array of officials from seven Ministries or governmental bodies and (c) a representative of the HAC. The minutes recorded that "*as a result of the uncoordinated actions of the interested state organisations the measures necessary for the preservation of the state interests in the process of the settlement of the situation surrounding [SMS] have not been undertaken*". Various efforts were to be taken to remedy the situation. One of those -

Item 7 on the Agenda - expressed an intent to ask the HAC (V.A.Yakovlev[32]) to carry out, in procedural forms established by federal law, "*court supervision*" over the cases re the appeals of Enterprise SMS and SMS 3 which were being considered in the arbitrazh courts. A wish was expressed at the meeting for all state organs to provide the protection of "*the interests of the Russian Federation (Enterprise SMS)*", and in particular the reinforcement of control on behalf of the General Prosecutors' office and the HAC over the decisions of the arbitrazh courts.

231.    The second document was a memorandum produced by the HAC representative who attended the meeting to one of the judges of the HAC, under the reference number of the appeal that resulted in the judgment of 18th December 2001, relaying the substance of the meeting and conveying the request contained in item 7. The memorandum referred specifically to "*the reinforcement of control*" over the decisions of the courts presiding over the SMS3/ Enterprise SMS litigation.

232.    Professor Peter Maggs, a leading authority on Russian law, gave evidence to Judge Trager that the APC and the Law on Arbitrazh Courts, both of which he helped to draft, provided for ex parte contact between officials of the HAC  and litigants seeking HAC review of lower court decisions. This was because the review of a lower court ruling is possible only if the Chairman or Deputy Chairman of the court, or the Prosecutor or Deputy Prosecutor General, makes a formal "*protest*" of the lower court decision. The parties can only petition these officials for review. In practice parties make their petitions in writing and also request meetings to argue that the decision should be reviewed. Under the HAC procedure these meetings are held ex parte and the opposing party is only given notice and an opportunity to be heard if a formal protest is made and a hearing scheduled.  Since Enterprise SMS was a party to the proceedings it was proper for the various government agencies to meet with HAC officials for the purpose of asking the HAC Chairman to exercise his discretion to "*protest*" the lower court rulings.

*The judgment*

233.    Judge Trager concluded that, even if some form of ex parte hearing would have been an appropriate means to initiate a review of lower court decisions the stated objective of the 30th March meeting was not to seek such review but to coordinate the efforts of government officials to advance state interests by "*securing [the] necessary conditions for the activity of [Enterprise SMS]*". The memorandum to the HAC judge conveyed the views of the Russia government about "*the necessity by all the state organs to provide the protection of the interests of the Russian Federation*". Professor Maggs' evidence neither explained nor justified what was alleged to be improper ex parte collaboration between representatives of the executive and the judiciary.

234.    Judge Trager held that the legal analysis of the 18th December 2001 decision was faulty and held (in Professor Stephan's view wrongly) that in the light of the considerations referred to above, that decision "*is entitled to no deference and will not be followed*".

---

[32] The Chairman of the HAC.

235.  On the defendants moving in 2004 to vacate or modify the 2003 judgment, Judge Trager, denying the motion, referred to his 2003 judgment and to the fact that there had been:

> "*persuasive evidence that the [18th December 2001] decision was the coordinated result of efforts on the part of the Russian government to improperly use the courts to recapture property rights lost during privatisation in Russia, and thereby expropriate without compensation the Plaintiff's property right in the lease and concomitantly cause the loss of the plaintiff's multi-million dollar investment*".

236.  Films by Jove brought a claim before the ECHR against the Russian Government for violation of their property rights under Article 1 of Protocol 1, which was settled when their claim was paid in full on behalf of the Russian Government by a Russian billionaire.

*Discussion on the question of a fair trial in Russia*

237.  An English court will approach with considerable circumspection any contention that a potential claimant cannot obtain justice or a fair hearing in a foreign court and will require "*positive and cogent*" evidence to persuade it to the contrary: *The Abidin Daver* [1984] AC 398, 411C. Assertions to that effect are relatively easily made by generalised statements and may be difficult comprehensively to refute. I further accept that research on Russian law may suffer from what Professor Stephan describes as an "*echo chamber effect*" where one commentator states an impression which is swapped with the impression of another commentator, each citing the other as authority supporting their own thesis without any systematic study of data. It is, however, right to have some regard to any consensus of academic opinion, based on research and personal familiarity, particularly when backed by specific instances (such as the Yukos and Guzinsky affairs) or determinations of the ECHR or other courts.

238.  In the absence of cogent evidence to the contrary the Court will start with the working assumption, for which comity calls, that courts in other judicial systems will seek to do justice in accordance with applicable laws, and will be free from improper interference or restriction. As this case indicates, where there is evidence to the contrary it may be hotly in dispute and difficult to evaluate. Such evidence is likely, insofar as it derives from reports and articles, to consist of "*broad and conclusory allegations, founded on multiple levels of hearsay*" and, if so, to be unacceptable as an indictment of a legal system or part of it. Evidence relied on by Professor Burger, whom Professor Bowring cites, was so characterised by Judge Koeltl in the *Base Metal* case and regarded by him as "*insufficient to condemn the entire Russian judiciary as an inadequate alternative forum*". But the Court is not blind to the fact that unfairness or partiality may arise from that which occurs behind the scenes rather than centre stage.

239.  In the present case what is of concern is that it appears to be common ground between the experts that, in certain cases, the arbitrazh courts cannot necessarily be expected to perform their task fairly and impartially. Professor Stephan characterizes that as only

applicable in a case whose outcome will affect the direct and material strategic interest of the Russian state.

240.    The problem with that is fourfold. *Firstly*, respect for the rule of law and the separation of powers[33] requires that the freedom of the courts from interference by the executive (or anyone else) in their decision making should be without exception.

241.    *Secondly*, once it is apparent that such freedom is not without exception, it is difficult to describe what is the limit which the Russian State would in practice observe or to be satisfied that that limit will not change.

242.    *Thirdly*, the matter at issue in the *Films by Jove* case – copyright in films – suggests that the Russian State may be ready to intervene improperly in disputes which do not affect its vital interests. I guard myself against assuming that, simply because this happened in the *Fire by Jove* case, in which the Russian State was a party, it will happen in the case of Mr Cherney, where it is not. At the same time the facts of the *Fire by Jove* case provide an illustration by way of specific example of how the State can act in a much less significant cause.

243.    *Fourthly*, a 20% beneficial ownership in Rusal, and thus a 13.2% interest in UCR, is a mighty investment. Rusal is said to be the world's largest aluminium and alumina producer producing, according to its website, 12% of the global aluminium market and 15% of the global aluminium production, operating in 19 countries over 5 continents with about 100,000 employees. UCR is the world's second largest aluminium producer. Mr Deripaska's other companies employ another 250,000 people in Russia. Basic Element, Mr Deripaska's company, and its associated companies have huge interests in timber, mining, manufacturing, financial services, construction and aviation, together with automobile and aircraft manufacture. Aluminium is obviously an important material, not least because of its use for aircraft manufacture and weapons production. Mr Deripaska himself describes it as one of the most important sectors in the Russian economy. The affairs of Rusal and Mr Deripaska's group must be of considerable importance, including strategic importance, to the Russian State.

244.    Mr Deripaska has held himself out as having a link with the Russian State that borders on the umbilical. In an article in the Financial Times of 13th July 2007 he is reported as follows:

> "*Moreover, unlike at Yukos, he would be ready to transfer Rusal back to the state at any moment, he declares. "If the state says we need to give it up, we'll give it up" he says. "I don't separate myself from the State. I have no other interests*".

245.    This quotation confirms the observation cited by Professor Bowring (at paragraph 45 of his report) that Mr Deripaska is widely seem as a man "*who is working in lockstep*

---

[33] Article 10 of the Russian Constitution provides that "*State power in the Russian Federation shall be exercised on the basis of the separation of the legislative, executive and judiciary branches. The bodies of legislative, executive and judiciary powers shall be independent*".

*with the state's plans to build up a set of companies that act as much for Russia's
benefit as in their own commercial interest*".

246.    Given the closeness of the link between the Russian State and Mr Deripaska, the
alignment of his interests with those of the State, and the size and importance of
Rusal, it seems to me that the Russian State may well regard the question as to who
was beneficially entitled to 20% of Rusal and is beneficially entitled to a 13.2%
interest in UCR (even if the interest is held on trust for sale), as sufficiently important
to justify encouraging the courts to see their way to rejecting Mr Cherney's claims, if
he were to present them in a Russian Court.  The same applies to the question whether
any part of that interest has to be sold to honour obligations to Mr Cherney (no friend
of the Russian State). Sual and Glencore have a 33 1/3% interest in UCR. A sale of
Mr Cherney's alleged 13.2% beneficial interest would increase the minority interests
to just over 46%, which might be a matter of concern (even if Mr Cherney were to sell
to a loyal Russian). The apparent need to keep Mr Cherney's name off the face of the
documents suggests a considerable sensitivity on the part of Mr Deripaska or the
Russian State about Mr Cherney having any link with Rusal or UCR.   The prospect
of this is enhanced if, as also seems very possible, the State took, or was persuaded to
take, the view, whether by a public campaign or by private representation, that Mr
Cherney's interests had been obtained by the illicit acquisition of State property, as
has been alleged in various publicity campaigns in Russia and elsewhere. This was a
consideration that Judge Trager thought may well have influenced state officials in the
*Films by Jove* case: see page 53 (RHC) of his 2003 decision. The fact that Mr
Deripaska is reported to have owed his expansion to strong support from the Russian
authorities[34] also provides ground for believing that he may benefit from such support
in the future.

247.    I should make it clear what I am *not* deciding. I am not deciding that a fair trial can
never be obtained in the Russian arbitrazh system. On the contrary I do not doubt that
there many honest and good judges in the system at every level, who conscientiously
seek to do justice according to the relevant legal principles and procedures, who are
developing the arbitrazh system to relate to the commerce of the new Russia, and who
do so without improper interference.  Nor is it the case that in the arbitrazh courts the
State is practically bound to succeed, as appears from the two examples cited by Mr
Dmitry Dyakin of the Magisters Law firm in his witness statement.

248.    I do however regard there as being a significant risk of improper government
interference if Mr Cherney were to bring the present claims in Russia, where they
would be very high profile proceedings indeed, such that substantial justice may not
be done to him if he is required to proceed there. I am not satisfied that, if he is so
required, justice will be done.  I find support for this conclusion from the observations
of  Professor Hendley, upon whom Professor Stephan relies, in a chapter headed
"*Putin and the Law*" in her book "*Putin's Russia*"  where she concluded:

>    "*But the continued willingness of those with political power to
>    use law in an instrumental fashion to achieve their short term
>    goals means justice can sometimes be out of reach. It also
>    means that the commitment to the basic principle of the rule of*

---

[34] See a comment from the Polish Centre for Eastern Studies cited by Professor Bowring at paragraph 93.

> *law, namely that law applies equally to all, irrespective of their power or connections, is not yet complete. A gap between the law on the books and the law in practice exists in Russia, as in all countries. Surely it has receded from the chasm it was during the Soviet era. But whether it will increase or decrease as time goes by remains to be seen".*

*Mr Deripaska's appreciation of Mr Cherney's decision*

249.    It appears that Mr Deripaska realises that Mr Cherney will never go to trial in Russia. Mr Cherney has exhibited copies of what purports to be correspondence between an English public relations firm, Mirepco Limited, and Mr S. Berkovitz, who acted for Basic Element, Mr Deripaska's company. Mirepco's letter of 24th May 2007 sets out proposals "*with regard to creating and maintaining a public relations campaign aimed at engendering within the UK an awareness of the undesirability of granting MC either residential status in the UK or, indeed, the right to enter the country*". The proposal involved raising the suggestion that Mr Cherney was interested in acquiring Leeds United football club, then in administration. The letter records that Mirepco had mentioned to various parties that a Russian party might be interested in acquiring Leeds United. This would lead to public discussion about Mr Cherney's suitability for such an acquisition and "*enable negative comments to be placed in the public domain*". Once the issue had been raised Mirepco would arrange for UK experts and commentators *"to denigrate MC as being unsuitable for controlling an English league club"*; and for the national tabloid press to publish "*less than flattering information*". A Project Status Report of 14th September  2007 states, inter alia, that the "*desired end result is to ensure that the litigation being undertaken in the UK has no detrimental effect on the impending Initial Public Offering of Rusal in London. Preventing Cherney from obtaining entry to the UK would obviously assist the case but may not be fatal to his pursuit of it*".

250.    One of the strategies for dealing with the litigation outlined in  the report was this:

> *"5.    Russian (or other jurisdiction) judgement offset. A case can be opened against Cherney in Russia, or any other jurisdiction with which the UK has reciprocal enforcement arrangements (under the Hague Convention). Cherney will probably not defend it, as he will not return to Russia to answer any questions. Thus a default judgement can be obtained against him. If the case in the UK is settled or won by Cherney, and an amount paid, the outstanding judgement debt from the Russian case can be used to offset any such liability by using it to impound any money due to Cherney either under a settlement or a judgement".*

251.    Mr Stewart told me on instructions that Mr Deripaska never commissioned this report, and knew nothing about it at all. But no evidence has been filed that offers any explanation about it or about Mirepco's activities. It is also unclear how exactly Mr Cherney obtained these documents, which are said to have been "*located on the internet*".  They bear, however, no overt sign of forgery or falsity. On the contrary they seem to me likely to be genuine and a reflection of the assessment of Mr Deripaska and his advisers as to the unlikelihood of Mr Cherney ever litigating in Russia.

*The central question*

252.    In the light of those considerations I return to the central question: whether Mr Cherney has shown that *England is the proper place in which to bring the claim*. In *The Spiliada* [1987] AC 460 Lord Goff approved and applied Lord Kinnear's famous dictum in *Sim v Robinow* [1892] 19 R 665, that the task of the court, both in an application for permission to serve out and in a stay application, is to identify the forum in which the case can suitably be tried for the interests of all the parties and the ends of justice.  In a service out case the first stage is for the claimant to show that England is clearly the more appropriate forum for the trial than any other available foreign forum and, hence, the *"natural"* forum. Even if England is not the natural forum, the claimant may establish – the second stage - that substantial justice will or may[35] not be done in the natural forum so that justice requires that the case be tried in England. If he does so then the case cannot be tried there more suitably in the interests of the parties and for the ends of justice, and England will be the proper place. Despite an earlier Court of Appeal decision to the contrary[36] it appears that the question whether a foreign court is one where justice may not be done arises when the court considers the second stage: *Connelly v RTZ Corp* [1998] AC 854 where the House of Lords accepted that the defendants had discharged the burden of establishing that Namibia was the jurisdiction with which the action had its closest connection and that prima facie a stay should be granted. It was not material to the first stage question that the claimant would be unable to fund his action. The House concluded that, in view of the complexity of the claim, substantial injustice could not be done in Namibia without the benefit of financial assistance, which would not be available there.

253.    Mr Vos submitted that as the parties had made their agreement in England and had agreed English law and jurisdiction, the case for England as the natural forum was very strong. Even if they had only agreed on English law that would, in this case, be a powerful factor in favour of England, not least because, although the parties appear to have been familiar with the trust concept, Russian law does not appear to recognise it. Mr Deripaska had substantial links with England, had previously litigated here, had chosen English law and jurisdiction on occasion, and at one stage was going to float Rusal on the English market. The main witnesses would be the parties themselves. Both could come to England without difficulty. The same would apply to those who set up the various companies and to Mr Mishakov, Mr Deripaska's lawyer and Mr Ezoubov, his cousin.

*Natural forum*

254.    In my opinion the natural forum for this litigation is Russia. The case concerns the ownership (or the lack of it) of interests in a major part of the post Soviet Russian aluminium industry. The allegations of banditry and extortion, which are likely to give rise to pleas of illegality, relate to what did or did not occur in Russia.  An important issue is: who produced the money for the Russian plant. Mr Deripaska is

---

[35] *The Abidin Daver* [1984] AC at 411 B-D.

[36] *Mohammed v Bank of Kuwait and the Middle East KSC* [1966] 1 WLR 1483. The decision had been subject to academic criticism for confusing the two stages; and the criticism was thought by the Court of Appeal in *Askin v Absa Bank Ltd* to have substance.

Russian. Mr Cherney originally operated from Russia. If, as alleged, he was being paid "protection" money the protection was being afforded in Russia and at least some of the payment too. I have not been persuaded that Mr Cherney has a sufficiently good case that the contract was governed by English law to make that a basis for asserting jurisdiction, so that the contention that the agreement was governed by English law and, *on that account*, is the appropriate jurisdiction fails. It follows that, so far as the first stage question is concerned I am not satisfied that England is the natural forum for this claim.

*The second stage*

255.    I turn then to the second stage. If the claim is not permitted to continue in England, it will almost certainly not be pursued in Russia or elsewhere. It has not been suggested that, if the case is not heard in either Russia or England, there is some other jurisdiction to which Mr Deripaska is subject where the case can appropriately be tried.

256.    The fact that the claimant may face difficulties or obstacles in proceeding in what is, prima facie, the natural forum does not necessarily entitle him to trial in England. Nor can the English courts, whatever their merits, be the default home for every claimant who asserts that he will not venture abroad for his litigation or receive a fair trial there, provided only that he can bring himself within the letter of CPR 6.3. But the fact that the effective choice is between trial in England and no trial at all[37] is a material factor in any determination of the appropriate forum. The extent to which it is material will depend on the reasons for that being the effective choice.

257.    In the present case I am satisfied that two of the reasons are that Mr Cherney has a well founded fear that, if he proceeds in Russia, he will (a) be at greater risk of assassination, and (b) face criminal prosecution for what, on his evidence, and the reported remarks of Mr Deripaska's lawyer, would be a trumped up charge. Those fears cannot be discounted or disregarded on the footing that he runs no greater risk of assassination in Russia than in Israel or that there is no real possibility of any trumped up charge being brought.

258.    I note that in *Purcell v Khayat,* The Times November 23rd 1987, where the defendant failed to obtain a stay of an English action in favour of the courts of the Lebanon, the Court of Appeal accepted that it was, on the facts of that case, a legitimate personal or juridical advantage for the plaintiff not to have to bring his action in a jurisdiction where he had been convicted in absentia (the prosecution being brought by the other party) of the wrongful removal from the offices in London of goods belonging to a Lebanese company and sentenced to 3 years' imprisonment. The Court recognised that in some cases the court might conclude that the advantage sought to be retained would not be legitimate or would be one to which very little weight could be attached. Such was the case in *Askin v Absa Bank Ltd* [1999] EWCA Civ 680 where the fact that the claimant faced criminal charges in South Africa (in respect of which an unsuccessful attempt had been made to extradite him from Italy) based on his own allegedly criminal conduct in respect of the very transactions which gave rise to the

---

[37] I ignore for these purposes the possibility of a trial in which any evidence from Mr Cherney is on paper. The case cannot fairly be tried that way.

proceedings that he sought to bring in England was no bar to the court refusing him permission to serve the defendant bank out of the jurisdiction. Each case must depend on its own facts.

259.    The concept of legitimate personal or juridical advantage is now defunct. But if, as *Purcell v Khayat* illustrates, avoidance of the need to challenge an extant conviction can be a legitimate advantage, the fact that the claimant may be exposed to criminal proceedings in a foreign forum may, in some circumstances, be a relevant factor in determining which is the appropriate forum. I am satisfied that it is a relevant factor in this case where Mr Cherney has not been convicted of any crime, and has been acquitted by Switzerland's highest court of the charges against him, and where there is ground for believing that he may be the subject of trumped up charges on or after his return.

260.    In addition, whatever the position in other cases may be, I am, as I have said, satisfied that, in this particular case, there is a significant risk that Mr Cherney will not obtain in Russia a trial unaffected by improper interference by State actors and that substantial justice may not be done.

261.    So far as general discretionary considerations are concerned, the parties are not strangers to England. Mr Deripaska has a house in London and another in the country. His group has substantial assets within the jurisdiction. The parties met and made whatever agreement they did make in London. The rules contemplate that there may be circumstances in which the only basis for jurisdiction lies in the fact that the agreement was made in this country. The fact that that is the only ground for jurisdiction may militate against exercising discretion in the claimant's favour. But in this case London was not a fortuitous meeting place. It was somewhere readily accessible to both parties and may properly be regarded as neutral ground. Both parties have confidence in English law and the English courts.

262.    It does not seem to me that any need to call Russian or other non-English witnesses would give rise to unacceptable difficulties. The two most important witnesses are the parties themselves. A substantial proportion of the relevant material (e.g. as to company structures, instructions to lawyers and accountants and movement of funds) must be in writing. Several witnesses, such as the representatives of Syndikus and Mr Philipides, Mr Mishakov and others are likely to be seasoned travellers. Neither party has suggested that they will suffer significant prejudice if the trial takes place here.

263.    Lastly, I take into account the fact that Mr Cherney delayed until December 2007 making the application that Tomlinson, J had contemplated would be heard (after it had been made) in June. There appears to me no satisfactory justification for this delay. I do not, however, regard that delay as a sufficient reason to deny Mr Cherney the order that I would otherwise make.

*Conclusion*

264.    Taking all those considerations into account, I am persuaded that the risks inherent in a trial in Russia (assassination, arrest on trumped up charges and lack of a fair trial) are sufficient to make England the forum in which the case can most suitably be tried in the interests of both parties and the ends of justice and, accordingly, the proper place for the determination of this claim.

265.    I shall, therefore, give permission for the claim form to be served outside the jurisdiction.