

# Norex Petroleum Limited v. Chubb Insurance Company of Canada, 2008 ABQB 442 (CanLII)

Print:     PDF Format
Date:     2008-07-18
Docket:     0201 11097
URL:     http://www.canlii.org/en/ab/abqb/doc/2008/2008abqb442/2008abqb442.html
Noteup:     Search for decisions citing this decision

Reflex Record (related decisions, legislation cited and decisions cited)

---

## Court of Queen's Bench of Alberta

**Citation: Norex Petroleum Limited v. Chubb Insurance Company of Canada, 2008 ABQB 442**

**Date:** 20080718
**Docket:** 0201 11097
**Registry:** Calgary

Between:

**Norex Petroleum Limited and Zao Yugraneft Corporation**

Plaintiffs

- and -

**Chubb Insurance Company of Canada and Ingosstrakh Insurance Company Ltd.**

Defendants

---

> **Corrected judgment:** A corrigendum was issued on July 21, 2008; the corrections
> have been made to the text and the corrigendum is appended to this judgment.

---

**Reasons for Judgment**
**of the**
**Honourable Mr. Justice C.S. Brooker**

---

## I.    Introduction

[1]    This is an application by Ingosstrakh Insurance Company Ltd. ("Ingosstrakh") for an Order pursuant to Rule 129 of the *Alberta Rules of Court* to strike the Statement of Claim in this matter.

## II.     Facts

### A.     The Parties

[2]      ZAO Yugraneft Corporation ("Yugraneft") is a joint venture incorporated under the laws of the Russian Federation. It carries on the oil and gas business in the Nizhnevartovsk region of Russia.

[3]      Norex Petroleum Limited ("Norex") is a corporation incorporated pursuant to the laws of Cyprus. It was incorporated for the purpose of conducting the oil and gas business in the Russian Federation and it maintains an office in Calgary.

[4]      Ingosstrakh is a corporation incorporated in 1947 by the government of the U.S.S.R., as it then was. It was privatized and re-registered as a corporation pursuant to the laws of the Russian Federation in 1991. It has carried on the insurance business in the Russian Federation since 1994.

[5]      Chubb Insurance Company of Canada ("Chubb") is a corporation and carries on in the insurance business in the Province of Alberta and elsewhere in Canada.

### B.     The Yugraneft Shareholdings

[6]      In 1991, Nowsco Well Services Ltd. ("Nowsco") owned 60% of the share of Yugraneft. The other 40% were owned by JSC Chernogorneft ("Chernogorneft"), a Russian corporation that was Nowsco's joint venture partner. Following a corporate restructuring, Norex acquired Nowsco's shares of Yugraneft.

[7]      At two shareholder meetings in 1999, Norex voted unilaterally to reduce Chernogorneft's shareholdings in Yugraneft from 40% to 2.36%. Subsequently, Chernogorneft's assets, including its shares of Yugraneft, were acquired by OJSC TNK-Nizhnevartovsk ("TNK-NV").

[8]      The matter of the Yugraneft shareholdings came before the Russian commercial courts (known as the Arbitrazh courts) in the Khanty-Mansiysk Autonomous District, with Norex claiming to have had a right of first refusal over Chernogorneft's shares. Ultimately, this claim was dismissed by the Supreme Arbitrazh Court on July 13, 2001. That Court ruled that TNK-NV legally had acquired Chernogorneft's shares of Yugraneft.

### C.     The Subsequent Events

[9]      The subsequent events are the focus of this lawsuit dispute. In its brief, Ingosstrakh describes the events as "a management takeover of Yugraneft by TNK-NV". Ingosstrakh states that TNK-NV initiated proceedings in the Khanty-Mansiysk Arbitrazh Court to invalidate Norex's alleged contribution to the Yugraneft joint venture. The result of that proceeding, if successful, would be to alter the proportionate shareholdings of Yugraneft from 50% Norex /  40% TNK-NV to 80% TNK-NV / 20% Norex. In the course of that proceeding, TNK-NV obtained an interim injunction restraining Norex from voting certain disputed shares.

[10]      On June 28, 2001, at TNK-NV's request, a shareholders' meeting of Yugraneft was held to consider changing the General Director of Yugraneft. Norex voted to renew the appointment of Ludmilla Kondrashina while TNK-NV voted to replace her with Mr. V.A. Berman. Not surprisingly, given the dispute over the relative shareholdings, the vote is a matter of some controversy. However, Norex acknowledged at the meeting that, in light of the interim injunction, it could not vote the disputed shares. The end result was that the TNK-NV's resolution passed and Ms. Kondrashina was replaced by Mr. Berman.

[11]      Ingosstrakh asserts in its brief that, as a result of the meeting, TNK-NV "lawfully assumed management control of the Yugraneft facilities in Moscow and Nizhnervatovsk, including the installation of security personnel". It states that "Utilization of security personnel at industrial and corporate facilities is consistent with the practices of most Russian companies."

[12]      On January 24, 2002, the Khanty-Mansiysk Arbitrazh Court ruled that Norex had not made a valuable contribution to the Yugraneft joint venture. Consequently, as described above, Norex's shareholding in Yugraneft

was reduced from 40% to 20%.

[13]     For its part, Norex paints a very different picture of these events. It asserts first, that in or about October 2001, Ingosstrakh was "taken over" by Oleg Deripaska, whom Norex describes as "one of the most powerful oligarchs in Russia". Norex further asserts that it and Yugraneft were "the victims of a fraudulent and illegal scheme of corruption and conspiracy designed to enable TNK-NV and its subsidiaries and affiliates to acquire control of Yugraneft and take over Yugraneft's property and assets, including the Oilfield Equipment."

[14]     Norex argues that TNK-NV implemented this fraudulent and illegal scheme by claiming to rely on the Yugraneft shareholders' meeting of June 28, 2001, which meeting Norex states never took place.

[15]     Norex goes on to state that "On or about June 29, 2001, Mr. Berman, accompanied by at least 16 thugs wearing military style fatigues and armed with machine guns, invaded Yugraneft's office in Nizhnevartovsk. On or about July 6, 2001, TNK-NV security guards armed with pistols and machine guns took over Yugraneft's oilfields and field offices and cut off Yugraneft's telephone and internet services."

[16]     Norex goes on to assert that TNK-NV stripped Yugraneft of its assets and denied Norex access to Yugraneft's assets and records.

### D.      The Insurance

[17]     Certain oilfield equipment owned by Yugraneft and located at its facility in the Russian Federation was covered by policies of insurance. Ingosstrakh claims that it issued a property insurance policy (the "Ingosstrakh Policy") with Policy No. 41-000903/01 in the amount of U.S. $11,764,900. Norex, however, disputes the authenticity of the Ingosstrakh Policy.

[18]     Insurance coverage for Yugraneft's oilfield equipment was also provided by Chubb. However, both Chubb and Ingosstrakh allege that the Chubb policy was limited to "Differences in Conditions / Differences in Limits" coverage. They argue that this coverage was meant to be only a supplement, intended to fill any gaps between the Ingosstrakh Policy and a standard "all risks" policy in Canada.

[19]     Norex asserts that it was advised by its insurance broker that Chubb required the first loss property coverage to be placed with a Russian insurance company, specifically Ingosstrakh. Norex states that it had concerns about this, but that Chubb did not give it any choice. On the other hand, both Ingosstrakh and Chubb say that, where the property to be insured is located within the Russian Federation, Russian law requires that insurance be obtained from a "local admitted insurer" and that this was the reason that the first coverage was required to be provided via the Ingosstrakh Polciy.

[20]     In addition, Ingosstrakh states that the wording and conditions of Russian insurance policies are standardized, must be approved by the Russian Minister of Finance and cannot be unilaterally materially changed by the insurer. Ingosstrakh refers to these standard provisions as the "Licensed Conditions". One of the Licensed Conditions requires any disputes between the insurer and the insured to be governed by the laws of the Russian Federation. Norex asserts that it never received a copy of the Licensed Conditions or, indeed, of the Ingosstrakh Policy. Ingosstrakh argues that its normal business practice was to issue property policies only in the name of the registered property owner - in this case, Yugraneft. Ingosstrakh states that it sent the entire Ingosstrakh Policy to Yugraneft and also sent a copy of the licensed Russian conditions to Marsh Canada.

### E.      The Procedural History

[21]     Norex filed its Statement of Claim on June 28, 2002. It was granted an Order for service *ex juris* on July 15, 2002 allowing it to serve the Statement of Claim on Ingosstrakh in Russia. The claim is for loss of oilfield equipment arising out of the alleged forcible takeover of Yugraneft by TNK-NV.

[22]     Ingosstrakh filed a Statement of Defence on August 12, 2002. Chubb filed a Statement of Defence on September 12, 2002 and an Amended Statement of Defence on November 4, 2002.

[23]     On June 28, 2004, Ingosstrakh filed this Notice of Motion.

### III.    Issues

[24]    In its initial brief, Ingosstrakh seeks the following Orders:

(a)    an order striking out or dismissing the claim being advanced against Ingosstrakh in this action on the grounds that there is no real and substantial connection between the claim and the Province of Alberta; or

(b)    an order staying the claim being advanced against Ingosstrakh in this action on the grounds that the Province of Alberta is *forum non conveniens* and the Russian Federation is *forum conveniens*, the more suitable forum.

[25]    The overall question then, is whether this Court should assert jurisdiction over this matter.

### IV.    Analysis

[26]    The parties are in agreement that the determination of whether this Court should assert jurisdiction requires a two-stage inquiry. In its brief, Norex put the matter thus:

(a)    The first inquiry is whether the court <u>can</u> exercise jurisdiction. This is typically referred to as jurisdiction *simpliciter*. In this regard, the Plaintiffs acknowledge that in order for jurisdiction *simpliciter* to be established, there must be a real and substantial connection between the Province of Alberta and the claim.

(b)    If jurisdiction *simpliciter* is established, the court must then go on to consider whether it <u>should</u> exercise jurisdiction. This requires the court to consider whether Alberta is the *forum conveniens* or whether there is a clearly more appropriate forum in which the action should proceed. [Emphases in original.]

### A.    Jurisdiction *Simpliciter*

### 1.    Real and Substantial Connection

[27]    The first line of inquiry is whether this Court has jurisdiction *simpliciter*. Ordinarily, this requires a real and substantial connection between this forum and the claim. In *Morguard v. De Savoye*, 1990 CanLII 29 (S.C.C.), [1990] 3 S.C.R. 1077, La Forest J. said at p. 1108:

It seems to me that the approach of permitting suit where there is a real and substantial connection with the action provides a reasonable balance between the rights of the parties. It affords some protection against being pursued in jurisdictions having little or no connection with the transaction or the parties.

### a.    Factors

[28]    *Morguard* was followed by *Muscutt v. Courcelles* 2002 CanLII 44957 (ON C.A.), (2002), 60 O.R. (3d) 20 (C.A.), in which the Ontario Court of Appeal put some flesh on the bones of the real and substantial connection test by setting out the following eight factors for consideration:

(1)    the connection between the forum and the plaintiff's claim;
(2)    the connection between the forum and the defendant;
(3)    unfairness to the defendant in assuming jurisdiction;
(4)    unfairness to the plaintiff in not assuming jurisdiction;
(5)    the involvement of other parties to the suit;
(6)    the court's willingness to recognize and enforce an extra-provincial judgment rendered on the same jurisdictional basis;

(7)    whether the case is interprovincial or international; and
(8)    comity and the standards or jurisdiction, recognition and enforcement prevailing elsewhere.

**(1)      The connection between the forum and the plaintiff's claim**

[29]      Ingosstrakh argues that there is little connection between this forum and this claim. It points out that the insured party, Yugraneft, is a Russian corporation. It asserts that the Ingosstrakh Policy was delivered, executed and paid for in Russia and contains a Russian law clause. It also says that the insured property in question was situated in Russia and that the events giving rise to the claim occurred in Russia.

[30]      Norex, by contrast, argues that the Ingosstrakh Policy "was issued within a framework of a joint program with Chubb and both the Ingosstrakh Coverage and the Chubb Policy were negotiated and placed as a result of dealings which occurred in Calgary".

[31]      Chubb's connection to this matter and the extent to which it should be part of this action are open questions. Nevertheless, whatever Chubb's status, it is clear that Ingosstrakh is a Russian corporation which provided insurance to Yugraneft, another Russian corporation, in respect of property situate in Russia. Therefore, this factor militates against a finding of a real and substantial connection with Alberta.

**(2)      The connection between the forum and the defendant**

[32]      As noted above, Ingosstrakh is a Russian corporation. Norex argues in its brief that Ingosstrakh is an international insurance company whose target underwriting market includes major North American companies and that it is "integrated into the world market through overseas entities such as Chubb". Be that as it may, the fact remains that Ingosstrakh contracted for the insurance in question in respect of Russian situate property and I am not satisfied that is connection with Chubb is enough under this factor to establish a real and substantial connection with Alberta.

**(3)      Unfairness to the defendant in assuming jurisdiction**

[33]      At first blush, it would seem that requiring Ingosstrakh to defend this action in this forum would work some unfairness on it. As noted above, this situation involves a Russian insurance company issuing a policy in Russia to a Russian corporation in respect of Russian-situate property. It is unlikely that doing battle in an Alberta court was within Ingosstrakh's contemplation at the time that the Ingosstrakh Policy was written.

[34]      Norex argues that "insurance companies who insure person in foreign jurisdictions must foresee the potential for litigation in those jurisdictions". However, the person insured in this case was Yugraneft, a Russian corporation, so this argument carries little weight in these circumstances.

[35]      Norex points out that the insurance policy which the Plaintiffs had obtained from Ingosstrakh for the previous policy year contained a clause requiring Ingosstrakh to submit to the jurisdiction of a court in the United Kingdom and /or in the Commonwealth of Independent States. That may be, but the Ingosstrakh Policy contains no such requirement and Ingosstrakh cannot be said, on that basis, to have consented to the jurisdiction of this Court.

**(4)      Unfairness to the plaintiff in not assuming jurisdiction**

[36]      Norex bases its argument under this factor on its assertion that the Russian courts are corrupt and that it cannot expect to obtain justice in those courts. I will deal with this assertion in more detail in respect of the forum *non conveniens* argument. This factor is of assistance to Norex.

**(5)      The involvement of other parties to the suit**

[37]      Norex argues that the "core" of this action involves Chubb, the Canadian entity. It states that the claims against Ingosstrakh and Chubb are not separate, but arise from a common set of facts and from a joint policy framework. Ingosstrakh, by contrast, argues that the Ingosstrakh Policy and the Chubb Policy are separate and distinct and that any claim against Ingosstrakh can proceed only after the claim against Chubb has been determined.

[38]    As I have already stated, the extent of Chubb's involvement in this action remains an open question. For purposes of this application, it is sufficient to say that this factor may give some ground for a finding of a real and substantial connection to Alberta if, indeed, the claims against Ingosstrakh and Chubb are inextricably linked.

**(6)     The court's willingness to recognize and enforce an extra-provincial judgment rendered on the same basis**

[39]    Norex argues that this factor is of limited relevance given that the other potential forum is another country rather than another province. It questions whether this Court would recognize a Russian judgment in light of the corruption allegations, but states that in the absence of that factor, the principle of comity would require this Court to recognize a Russian judgment.

[40]    Ingosstrakh presents the following picture of what it calls "the present situation in reverse:"

(a)    an Alberta company, which was jointly owned by a Cypriat company and an Alberta company;
(b)    insured property that was located in Alberta;
(c)    with an Alberta insurer;
(d)    whose policy was delivered, executed and paid for in Alberta and which provided that it was governed by the laws of Alberta;
(e)    commenced an action in Russia against the Alberta insurer and a multinational insurer;

(f)     with respect to events which took place solely in Alberta, including events that took place before the Alberta courts and required a review of whether the decisions made by the Alberta courts in relation to those events were in keeping with Alberta procedural and substantive law, or whether they were a product of a judicial corruption.

[41]    Ingosstrakh argues that it would be patently unreasonable for this Court to recognize a Russian judgment given on the basis of this reverse situation. While some of the points in Ingosstrakh's reverse description are controversial, I take its point and agree that this Court would be reluctant to enforce a judgment obtained in Russian in circumstances that were the reverse of those at bar. Therefore, this factor militates against a finding of real and substantial connection.

**(7)     Whether the case is interprovincial or international in nature**

[42]    Obviously, this is an international case, not interprovincial. Both parties point out that the Supreme Court of Canada has indicated that the assumption of jurisdiction is more easily justified in interprovincial cases than in international ones. While Norex argues that the converse is not necessarily true, that is, that an international case does not necessarily weigh against assuming jurisdiction, I am of the view that this Court should be slower to assume jurisdiction in international circumstances.

**(8)     Comity and standards of jurisdiction, recognition and enforcement prevailing elsewhere**

[43]    Ingosstrakh takes the position that if Norex obtains judgment in this Court, it will be unenforceable in the Russian Federation. On this basis, Ingosstrakh argues that there can be no justification for requiring it to litigate here. For its part, Norex takes issue with Ingosstrakh's assertion that an Alberta judgment will be unenforceable in Russia. Further, Norex argues that if that is the case, it underscores the importance of allowing it to have recourse to the Chubb Policy. In addition, Norex takes the position that whether the Russian court will enforce a judgment of this Court is not relevant to the question of whether this Court should take jurisdiction and that, in essence, the possibility that an Alberta judgment will be unenforceable in Russia is Norex's risk to run.

[44]    I disagree with Norex's position on this latter point. If the question of enforcement of judgments in foreign jurisdictions were irrelevant other than to the plaintiff, Canadian courts, including the court in *Muscutt*, would not have adopted the question as one of the factors to be considered.

[45]    Ingosstrakh has provided an expert opinion that a decision of this Court will not be enforceable in Russia. Though Norex takes issue with the expert's opinion, it has not provided a contrary opinion and, therefore, this factor would seem to weigh against a finding of a real and substantial connection to Alberta.

**b.        Conclusion**

[46]      Taking all of the above factors into consideration, I am of the view that there is not a real and substantial connection between this action and the Province of Alberta. Ordinarily, then, I would be required to decline jurisdiction. In this case, however, that is not the end of the matter.

**2.        Attornment**

[47]      As noted in the Procedural History above, Ingosstrakh has taken certain steps in this litigation. It brought this application and, most significantly, it filed a Statement of Defence. Norex argues that in taking these steps, Ingosstrakh has attorned to the jurisdiction of this Court.

[48]      In support of this proposition, Norex refers to J.-G. Castel & J. Walker, *Canadian Conflict of Laws*, 6th ed. Looseleaf (Markham, Ontario: Butterworths, 2005) (updated to May 2007 - Release 8) which includes the following passages at pp. 11-1 and 11-2:

> Subject to the kinds of factors that place a matter beyond the scope of the court's subject matter jurisdiction, parties may by their consent vest personal jurisdiction in the court to determine their rights and obligations as between them. Whether this consent is given expressly, or is demonstrated by the parties' conduct, it rests on the equitable principle of estoppel. The parties' consent is considered first in the review of basis of jurisdiction because it can render the other bases irrelevant. There are generally three ways in which parties may establish jurisdiction by consent.
>
> . . .
>
> Second, defendants who appear to defend the action on the merits implicitly consent to the jurisdiction of the court to determine the controversy. This is sometimes called "attornment". . .Once a party takes steps to contest the merits of the claim, even if those steps are taken in error, or with express notice of the intention to challenge jurisdiction, the party will be precluded from challenging the jurisdiction of the court. . ..

**a.        Statement of Defence**

[49]      Norex points to several cases in which it has been held that taking steps in an action, particularly filing a defence, constitutes attornment to the court's jurisdiction. The Ontario Court of Appeal held as follows in *Muscutt* at para. 19:

> Consent-based jurisdiction permits jurisdiction over an extra-provincial defendant who consents, whether by voluntary submission, *attornment by appearance and defence*, or prior agreement to submit disputes to the jurisdiction of the domestic court.[Emphasis added.]

[50]      In *Stoymenoff v. Airtours plc* (2001), 17 C.P.C. (5th) 387, the Ontario Superior Court of Justice dealt with this issue expressly, saying at para. 20 that "[b]y delivering a Statement of Defence the defendant attorns to the jurisdiction of the court in which the Statement of Claim is issued."

[51]      Ingosstrakh argues that the filing of the Statement of Defence was not intended to be a consent to the jurisdiction of this Court and that the Statement of Defence was filed as a result of a misapprehension on the part of Ingosstrakh's in-house counsel. Ingosstrakh insists that it was consistently clear in its intention to dispute this Court's jurisdiction.

[52]      Unfortunately for Ingosstrakh, neither error nor lack of intention is relevant to the question of attornment. Indeed, Castel states this expressly in the passage quoted above and that statement is borne out in the case law.

[53]      Norex points to *Imagis Technologies Inc. v. Red Herring Communications Inc.* 2003 BCSC 366 (CanLII), (2003), 15 C.C.L.T. (3d) 140, 2003 BCSC 366 in which the Court made the following comments at paras. 8 - 10:

> ...in the absence of duress, any conduct in an action for purposes other than challenging jurisdiction will be

regarded as voluntary acceptance of the court's jurisdiction.

In this case, the filing of an Appearance followed by the filing of an exhaustive Statement of Defence directed at jurisdiction and the merits, and the subsequent delivery of the defence and a demand for the discovery and production of documents to the plaintiff, resulted in acceptance of this court's jurisdiction in the action. Attornment has not been avoided because the defendants pleaded a challenge to the assumption of jurisdiction in the defence or because counsel for the defendants advised Imagis upon delivery of the defence and demand for production that it intended to bring the R. 14(6)(c) application. The defendants pleaded to the merits independently of the issue of jurisdiction and not as an alternative defence. . . .

In relation to attornment, conduct supersedes intention. By taking the steps they did, the defendants voluntarily accepted the jurisdiction of this Court.

[54]     The same approach was adopted by Veit J. of this Court in *T.G. v. J.B.*, 1999 ABQB 847, where she stated at para. 45 that "[t]he determination of whether Mr. J.G. attorned to this Court's jurisdiction through his conduct is a question of fact which does not depend on intent".

[55]     Ingosstrakh argues that Mr. Novikov was under duress when he caused the Statement of Defence to be filed and asserts that the court in Imagis left open the possibility that there is no attornment in such circumstances. Ingosstrakh argues that Mr. Novikov did not understand the implications of filing the Statement of Defence and should not be bound to this Court's jurisdiction by virtue of having done so. I do not accept this argument. Certainly, I would not expect Mr. Novikov to be familiar with Alberta law. However, as a legal professional himself, I would have expected him to take the prudent step of contacting Alberta counsel to deal with the matter. Ingosstrakh notes that the warning on the Statement of Claim indicates that a defendant has only 15 days in which to file a Statement of Defence. However, as I noted during oral argument, the Statement of Defence was filed outside the 15 day period in any event. In my view, there is no evidence of any duress that would be sufficient to vitiate the attornment.

[56]     It is significant that Ingosstrakh's Statement of Defence does not merely contest the jurisdiction of the Alberta Courts. It asserts that the Ingosstrakh Policy should be governed by Russian law, but this does not amount to a jurisdictional challenge. Further, the Statement of Defence goes on to address the merits of Norex's claim. The case law, including *Stoymenoff*, *T.G.* and *Imagis* is clear that engaging on the merits of a claim constitutes attornment.

[57]     Ingosstrakh argues that it is entitled to assert a lack of jurisdiction at any time and points to the judgment of the Court of Appeal in *Young Estate v. Transalta Utilities Corp.* (1997), 209 A.R. 89. In that case, the Court of Appeal made the following comments at para. 43:

The appellants raised the question of jurisdiction in their defence and on the initial application to preserve Young's evidence. The respondent was on notice that a challenge to the court's jurisdiction would be made. In any event, it is our opinion that the appellants could not assent to the jurisdiction of the court. There is ample authority for the proposition that a defendant is entitled to assert a lack of jurisdiction at any stage in the proceedings: see *Church of Scientology of California v. World Federation of Mental Health Inc.*, [1981] 5 W.W.R. 74 (B.C.C.A.), *Standal v. Mainland Industries Ltd.* (1980), 53 C.P.R. (2d) 40 (F.C.T.D.). Also relevant are the cases which hold that the consent or attornments of the parties cannot confer jurisdiction on a court that it does not have: *Hicks v. Kennedy* ((1957), 20 W.W.R. 517 (Alta. C.A.); *Church of Scientology of California v. World Federation of Mental Health Inc.*, supra, *McKittrick Properties Ltd., Re,* [1926] 4 D.L.R. 44 (Ont. C.A.), *Royal Insurance Co. of Canada v. Legge* 1996 CanLII 5516 (NS S.C.), (1996), 152 N.S.R. (2d) 283, 442 A.P.R. 283 (S.C.). Jurisdiction was recognized as a fundamental issue by the trial judge in *St. Anne Nackawic Pulp & Paper Co. v. Canadian Paperworkers Union, Local 219* (1982), 37 N.B.R. (2d) 601; 97 A.P.R. 602; 131 D.L.R. (3d) 616 (T.D.), who raised the issue at trial, even though neither of the parties had done so.

[58]     In my view, however, the Court of Appeal's comments in *Young Estate* are directed at a different aspect of jurisdiction. There is a distinction between subject matter jurisdiction and territorial jurisdiction. *Stroud's Judicial Dictionary of Words and Phrases*, 4th ed., *s.v.* "Jurisdiction" provides, in part, as follows:

> In its narrow and strict sense, the "jurisdiction" of a validly constituted court connotes the limits which are imposed upon its power to hear and determine issues between persons seeking to avail themselves of its process by reference (1) to the subject-matter of the issue or (2) to the person between whom the issue is joined or (3) to the kind of relief sought, or to any combination of these factors. ...But sometimes it means an area or district. . .

[59]    This discinction was address in *Atlantic Shrimp Co. A Division of Clearwater Seafoods Limited Partnership v. Newfoundland and Labrador (Labour Relations Board)* (2006), 253 Nfld. & P.E.I.R. 170, 206 NLTD 121, in which the court commented at para. 6:

> I will deal first with the issue of jurisdiction. In the circumstances of this application, what is in issue is not the jurisdiction of the Board to deal with the application from a labour relations point of view - what I will refer to as "subject matter" jurisdiction. Rather, the question is whether the statutory labour relations tribunal of this province could appropriately assume jurisdiction on the basis of the existence of a real and substantial connection between the application and this province. This issue engages the <u>territorial</u>, rather than the subject matter jurisdiction of the tribunal. [Emphasis in original.]

[60]    There is authority for the proposition that where a court does not have subject matter jurisdiction (as might be the case with a statutory court such as the Tax Court of Canada) or where jurisdiction over particular subject matter has been removed from the court by the legislature and placed with another body such as a labour relations board, the court cannot be clothed with jurisdiction over that subject matter by consent of the parties. J.G. McLeod, in his text *The Conflict of Laws* (Calgary: Carswell, 1983) makes this point at p. 107:

> Submission, sufficient to vest jurisdiction in the court, may be established in many ways. Originally, jurisdiction based on submission required the defendant to voluntarily appear. Today, a court has jurisdiction to entertain an action against any person who voluntarily submits to the jurisdiction of the court expressly or impliedly, and personally or through an attorney. This submission may be with respect to a particular action, or actions generally, and may take place before or after the commencement of proceedings. A defendant cannot, however, by his submission, vest jurisdiction in a court to *a type of action* it is not authorized to hear. [Emphasis added.]

[61]    The same cannot be said for territorial jurisdiction. Castel and the other authorities set out above make clear that territorial jurisdiction can be consent based.

[62]    The Court of Appeal in *Young Estate* was faced with the question of whether certain claims could be heard by the court or were required to be determined by arbitration. Thus, the court was concerned with subject matter jurisdiction, not territorial jurisdiction.

[63]    Both in its initial brief and in oral argument, Ingosstrakh relied on *Young Estate* as support for its assertion that its attornment cannot confer on this Court a jurisdiction the Court does not have. Given that what is at issue here is territorial jurisdiction rather than subject matter jurisdiction, *Young Estate* is not of assistance to Igosstrakh.

## B.    Rule 129 Application

[64]    Norex asserts that Ingosstrakh has also taken other steps sufficient to constitute attornment. It referred to *Campagna v. Wong* 2002 SKQB 97 (CanLII), (2002), 216 Sask. R. 142, 202 SKQB 97, in which the court stated at para. 24 that "[t]he defendant was served in Alberta, but has since caused a Statement of Defence to be filed and has participated fully in this action. As a result, he has submitted to the jurisdiction of this court in respect of the whole of the action and cannot now be heard to object to that jurisdiction." Ingosstrakh argues that this case is distinguishable because, unlike the defendant in *Campagna*, it has not "participated fully" in this action.

[65]    It is significant, however, that in addition to filing a Statement of Defence, Ingosstrakh filed this motion under Rule 129. Ingosstrakh takes the position that this motion is an appropriate way in which to challenge this Court's jurisdiction and refers to the judgment of Sulyma J. in *Duracool Ltd. v. Wright (c.o.b. South Central Wholesalers)* 2001 ABQB 262 (CanLII), (2001), 287 A.R. 23, 2001 ABQB 262.

[66]     More recently, however, our Court of Appeal took the opposite view in *Manson v. Canada (Justice)* 2006 ABCA 212 (CanLII), (2006), 401 A.R. 26, 2006 ABCA 212, holding at para. 5:

> A party to litigation attorns to the jurisdiction by bringing a motion, returnable before the Court, and by appearing and arguing the motion. In *Hansraj v. Ao et al*. (2004), 354 a.R. 91; 329 W.AC. 91; 2004 ABCA 223 (CanLII), 2004 ABCA 223, this Court held at para. 40 that:
>
>> "[i]f someone takes steps in an Alberta suit (other than objecting to Alberta's jurisdiction or its order for service *ex juris*), then he attorns to Alberta's jurisdiction. . . ."
>
> See also *D.A.L. v. T.H.D.*, [2003] Sask. R. Uned. 193, [2003] S.J. NO. 539 (Q.B. Fam. Div.); *D.E.S. v. S.L.S.* 🔁 reflex, (1989), 92 A.R. 101 (Q.B.); *D.P.C. v. T.N.C.*, [2005] A.R. Uned. 922; [2005] A.J. No. 1634 (Q.B.) at p. 26 [A.J.]. A motion to strike out pursuant to Rule 129 is such a step. It follows that the Respondent attorned to the jurisdiction.

[67]     In fact, Ingosstrakh has gone further than file its Statement of Defence and motion under Rule 129. It has sought this Court's assistance in other ways. For example, in a Notice of Motion filed July 11, 2006 Ingosstrakh sought the following relief from this Court:

> An Order directing Alex Rotzang to answer the question, at pages 798 and 800 of his transcript, whether Yugraneft was relying on Marsh Canada Limited ("Marsh") to review the Ingosstrakh Policy wording and confirm, before coverage was bound, whether it was adequate for Yugraneft's purposes...

[68]     And in that same Notice of Motion it seeks an Order of costs against Yugraneft for its costs of a Rule 209 application as well as an Order denying costs to Marsh Canada Limited for the Rule 209 application.

[69]     As well, in an affidavit sworn by Leanne Zazelenchuk March 3, 2005 and filed with this Court March 4, 2005, she states at para. 15: "I make this Supplemental Affidavit in support of an application by the Applicant, Ingosstrakh, for an Order affirming that the Respondents, Norex and Yugraneft, cannot cross-examine Ivan Novikov and Igor Petrukhin on their affidavits swron on June 25, 2004."

[70]     In my view, there can be no doubt that Ingosstrakh has attorned to the jurisdiction of this Court, however inadvertently, and that, as a result, I have jurisdiction *simpliciter*. There then remains the question of whether this Court is *forum conveniens*. However, even before addressing that, I must decide whether I should, or even can, consider that issue.

## B.     *Forum Conveniens*

[71]     I noted that the doctrine is sometimes referred to as *forum conveniens* and sometimes as *forum non conveniens*. I will refer to it using the former term, though it is often referred to as the latter in the cases cited herein.

## 1.     Effect of Attornment

[72]     As noted above, the assumption of jurisdiction by a court is considered to require a two-step analysis. First, the court must consider whether it has jurisdiction *simpliciter* - that is, whether it can assert jurisdiction. If the court has jurisdiction *simpliciter*, it ordinarily will go on to consider whether it is *forum conveniens* - that is, whether it should assert jurisdiction.

[73]     I say that the court ordinarily will consider *forum conveniens* because that is the step that follows a finding of real and substantial connection. In this case, however, Norex argues that the situation is different given Ingosstrakh's attornment.

[74]     In oral argument, Norex referred to the filing of the Statement of Defence as an "insurmountable hurdle". Further, Norex took the position that this Court has no discretion to decline to take jurisdiction in the face of an attornment. However, Norex did not provide the Court with any appellate authority expressly supporting that proposition.

[75]     In my view, the matter is not so black and white; rather, there seems to be considerable uncertainty on the point. In some cases, the courts have treated attornment as an absolute bar to further consideration of jurisdiction. In fact, there have been cases where the courts have gone so far as to express concern that ordering a party to take steps in litigation will render a pending jurisdictional challenge moot.

[76]     In *Imperial Oil v. Lloyd*, 1999 ABCA 235 (CanLII), 1999 ABCA 235, Hunt J.A. granted a stay of an order requiring a party to take steps in an action and expressed concern about potential attornment at paras. 8-9:

> ...to me, the central question is whether, by involuntarily taking further steps in the litigation (including the filing of the Statement of Defence, submitting to examinations for discovery, producing documents, and so on) pending the hearing of the appeal of the decision under the Rule 27 application, the applicant would be attorning to the jurisdiction of the Alberta courts. The applicant says that taking those steps, albeit involuntarily, could amount to an attornment and if so, much of the argument on appeal would be rendered moot.
>
> There does not appear to be any clear authority that answers this question. In other words, whether taking those steps under these circumstances would amount to attornment appears, under present jurisprudence, to be arguable. Although counsel have provided me with a number of authorities, I do not see any that are directly on point. I say this, in particular, bearing in mind that each jurisdiction has different Rules of Court. I'm simply not satisfied that there is, at the present time, a clear answer. It also seems that this very question may have to be decided on the appeal proper, since the respondents' counsel has said this morning that they intend to argue on appeal that this motion for a stay in the Court of Appeal, itself, amounts to attornment to the jurisdiction of the Alberta courts. Given this context, it seems to me that the risk involved to the applicant in carrying on with the litigation pending the determination of the appeal is sufficiently grave to satisfy the second branch of the test [for a stay of proceedings]. I say this notwithstanding the position taken this morning by the respondents' counsel that they do not plan to assert that any further steps taken in the litigation, except as regards this motion, would amount to attornment. I found persuasive the reply by the applicant's counsel that that concession alone might not answer the question of whether or not there has been an attornment. Accordingly, I am satisfied that the applicant has shown irreparable harm.

[77]     More recently, in *M.J. Jones v. Kingsway General Insurance co.* 2004 CanLII 6211 (ON C.A.), (2004), 72 O.R. (3d) 68, Lang J.A. made these comments at paras. 2, 19 and 29-31 on the application for a stay:

> The facts in this case pose the question: If the request for a stay is refused, and Emery is ordered to file a Statement of Defence, would compliance with that order amount to an attornment to Ontario's jurisdiction, thereby rendering the leave application to the Supreme Court of Canada moot?
>
> ...
>
> Even though Emery proceeded under s. 106, as a foreign defendant it may be taken to have attorned to Ontario's jurisdiction if it engages on the merits of the litigation. By engaging on the merits, such a defendant is seen to have consented to or submitted to Ontario's jurisdiction. In that case, such a defendant will be precluded from disputing jurisdiction *simpliciter*.
>
> . . .
>
> The chambers judge [in Imperial Oil] held that the risk was sufficiently serious even though the respondents' counsel had been prepared to undertake not to assert that any such steps taken would amount to attornment. This concession, it was found, might be insufficient to preclude a subsequent finding of attornment, which would render the appeal moot. Accordingly, the chambers judge granted the stay.
>
> The situation in *Imperial Oil* is similar to this case. On the authorities given to me, there is no clear answer as to whether court-ordered involuntary participation on the merits will be an attornment sufficient to render Emery's leave application moot. In this case too, the other parties are prepared to agree that any such involuntary participation would be without prejudice to Emery's pending leave application to the

Supreme Court of Canada.

I agree with the chambers judge in *Imperial Oil* that there is no clear answer. It may be telling that even if I had refused a stay, and even if I had ordered Emery to file a defence, Emery would still have been faced with the choice of whether to comply with that order. If it had complied, it risked a subsequent finding of voluntary attornment. It also would have the further choice of, at least for the time being, submitting to the granting of default judgment. If a default judgment were granted, it might then itself seek a stay of that judgment's execution. In other words, a refusal of the stay does not provide a clear resolution to the problem. Emery still would have choice, and could make a voluntary decision as to which option it chose.

[78]     In this case, unlike *Imperial Oil* and *M.J. Jones*, I have already found that Ingosstrakh attorned. Nevertheless, the comments above indicate what might be called a "bright line" approach to attornment.

[79]     In contrast, there have been other cases where the courts have not treated attornment as an absolute bar to consideration of *forum conveniens*. In *Cincurak v. Lamoureux* 2002 ABQB 777 (CanLII), (2002), 328 A.R. 1, 2002 ABQB 777, Rooke J. held as follows at paras. 22 and 26:

Attornment to the jurisdiction in which the action is brought is an important consideration because it *may* be sufficient to disentitle one to later challenge jurisdiction.

. . .

It appears from the decisions of Dea, J. and Haddad, J.A. to be the better view that such an application is not barred by the filing of a Statement of Defence, but such filing is another element relevant to a finding of attornment. Attornment, in turn, is very relevant to determining whether to entertain an application for a stay. In the end result, I have concluded that these considerations should all go into the "mix" to determine whether Alberta is a proper *forum conveniens* context. [Emphasis added.]

[80]     While I am of the view that the filing of a Statement of Defence is sufficient to constitute attornment, I find interesting Rooke J.'s conclusion that attornment may not be sufficient to justify a stay.

[81]     I note as well that the court in *Stoymenoff* found that there was an attornment, but still went to consider *forum non conveniens*.

[82]     The approach in *Cincurak* and in *Stoymenoff* seems to me to be more in keeping with the discretionary nature of *forum conveniens*. The distinction between the non-discretionary nature of jurisdiction *simpliciter* and the discretionary nature of *forum conveniens* was aptly summarized by the British Columbia Court of Appeal in *Jordan v. Schatz* 2000 BCCA 409 (CanLII), (2000), 77 B.C.L.R. (3d) 134, 2000 BCCA 409 at para. 27-8:

Jurisdiction *simpliciter* is not a matter of discretion. Either a court has it or it does not based on the existence of a real and substantial connection between the jurisdiction and the defendant or the cause of action. . . .

On the other hand, the *forum non conveniens* test does involve an exercise of discretion on the part of the court in deciding whether to assume or decline jurisdiction. Only after jurisdiction *simpliciter* is established should *forum non conveniens* be considered.

[83]     It seems to me that the relevant question is whether there is a principled distinction between a finding of real and substantial connection and a finding of attornment that would justify undertaking the *forum conveniens* analysis in the former case but not in the latter. The answer may lie in the effect of attornment. The cases are uniform in saying that a party who has attorned to the jurisdiction of a court is precluded from challenging that court's jurisdiction. Castel, too, makes this point when he says in —11.2 that "[o]nce a party takes steps to contest the merits of the claim, ...the party will be precluded from challenging the jurisdiction of the court".

[84]     On the other hand, if the determination of *forum conveniens* is within the discretion of the court, can the court not raise it of its own motion? Counsel did not provide me with any authorities on this point, but there are a number of cases from Ontario in which the courts have considered *forum conveniens* notwithstanding a finding of

attornment. However, it is important to note that those cases were decided in a statutory framework different from that in this province.

[85]     In *Frymer v. Brettschneider* 1994 CanLII 1685 (ON C.A.), (1994), 19 O.R. (3d) 60, Arbour J.A., as she then was, held that Ontario's Rule 17.06, the rough equivalent of our Rule 27, does not address all instances where a motion is brought for a stay of proceedings on the basis that Ontario is not the appropriate forum. She held that such an application can also be brought under s. 106 of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, which provides:

> 106.     A court, on its own initiative or on motion by any person, whether or not a party, may stay any proceeding in the court on such terms as are considered just.

[86]     Arbour J.A.'s analysis has been followed in a number of subsequent Ontario cases. In *ABB Power Generation Inc. v. CSX Transportation* (1996), 47 C.P.C. (3d) 381 (Ont. Gen. Div.), the Court referred to s. 106 in determining whether it could consider *forum conveniens* in spite of the defendant's attornment. The court stated at para. 28 that "[i]n acting under s. 106 the court, of course, can have recourse to the full body of law upon which the doctrine of *forum non conveniens* is founded."

[87]     Similarly, in *Occidental Chemical Corp. v. Sovereign General Insruance Co.* 1997 CanLII 12095 (ON S.C.), (1997), 32 O.R. (3d) 277 (Ont. Gen. Div.), Lederman J. held that a master had erred in finding that a party was precluded from seeking a stay under s. 106 by reason of its attornment. At p. 279 he stated that "I agree that by delivering their defence, the third parties have attorned to the jurisdiction but rule 17.06 is not an exhaustive code as to when a motion to stay on the basis of *forum non conveniens* may be brought." The courts in *Kinch v. Pyle* (2004), 8 C.P.C. (6th) 66 (Ont. Sup. Ct. Jus.) and in *Denis v. Mouvement Desjardins* (2006), 44 C.C.L.E. (4th) 253 (Ont. Sup. Ct. Jus.) arrived at similar conclusions.

[88]     There is no equivalent to s. 106 of the *Courts of Justice Act* in either the *Court of Queen's Bench Act*, R.S.A. 2000, c. C-31 or the *Judicature Act*, R.S.A. 2000, c. J-2. However, I note that the court in *ABB* referred to *Empire-Universal Films Ltd. v. Rank* [1947] O.R. 775 (H.C.J.) and held at para. 28 that s. 106 "merely confers a statutory right that was considered previously to be inherent to the jurisdiction of the court". This conclusion was cited with approval by the Court in *Denis*.

[89]     On that basis, I conclude that this Court has the authority to stay proceedings where it considers it appropriate to do so, notwithstanding the absence of any statutory expression of that power. That being the case, I conclude that, as the Court in *ABB* stated, I have access to the full body of the case law on *forum conveniens*, therefore I will consider its application to this case.

## 2.     Factors

[90]     Castel describes the appropriate question for determining *forum non conveniens* as follows at —13.1:

> The question is not just whether there is a sufficient connection between the subject matter of the action or the parties and the forum, or whether the plaintiff is abusing its process, or whether granting the relief sought by the defendant would deprive the plaintiff of a legitimate personal or juridical advantage available to him or her in the chosen forum. The question is whether the forum is an inconvenient, *i.e.*, inappropriate forum in the sense that there is clearly a more appropriate forum elsewhere for the pursuit of the action and for securing the ends of justice.

[91]     The factors for a court to consider in making this determination were set out by the court in *Muscutt* at pp. 34-5:

> (1)     the location of the majority of the parties;
> (2)     where each party carries on business;
> (3)     where the cause of action arose;
> (4)     where the loss or damage occurred;
> (5)     any juridical advantage for the plaintiff in this jurisdiction;
> (6)     any juridical disadvantage for the defendant in this jurisdiction;

(7)    convenience or inconvenience to potential witnesses;
(8)    the cost of conducting the litigation in this jurisdiction;
(9)    applicable substantive law; and
(10)   difficulty in proving foreign law, if necessary.

[92]     Castel notes at —13.5 that the list of actors in *Muscutt* is not intended to be exhaustive and that certain factors may be more important than others in individual cases, depending upon the circumstances.

[93]     A similar list of factors has been adopted by the courts in this province and was referred to by the parties; see *Camco International (Canada) Ltd. v. Porodo* (1997), 211 A.R. 71, *Shell Canada Ltd. v. CIBC Mellon Trust Co.* 2003 ABQB 1058 (CanLII), (2003), 349 A.R. 276, 2003 ABQB 1058 and *Royal and Sun Alliance Insurance Co. of Canada v. Wainoco Oil & Gas Co.* 2004 ABQB 643 (CanLII), (2004), 364 A.R. 151, 2004 ABQB 643, aff'd. 2005 ABCA 198 (CanLII), (2005), 367 A.R. 177, 2005 ABCA 198:

(1)    where each party resides;
(2)    where each party carries on business;
(3)    where the cause of action arose;
(4)    where the loss or damage occurred;
(5)    any juridical advantage for the plaintiff in this jurisdiction;
(6)    any juridical disadvantage for the defendant in this jurisdiction;
(7)    convenience or inconvenience to potential witnesses;
(8)    the cost of conducting the litigation in this jurisdiction;
(9)    applicable substantive law; and
(10)   difficulty in proving foreign law, if necessary.

**(1)    where each party resides**

[94]     Yugraneft and Ingosstrakh are both Russian corporations. Chubb is a Canadian corporation that carries on business in Alberta. Norex was incorporated in Cyprus, but asserts that this was for tax reasons only and that its management executives are resident in Calgary.

[95]     On a strictly counting basis, it might be said that there is a split between Russia and Alberta in respect of this factor. However, given that Yugraneft and Ingosstrakh are the principal players in the insurance contract and that Chubb's status in respect of this litigation remains unclear, I am of the view that this factor favours Russia as the appropriate forum.

**(2)    where each party carries on business**

[96]     Given that all of the parties in this action are corporations, this factor is similar to the first. Ingosstrakh carries on business both in Russia and in Europe, but asserts that the great majority of its business is in Russia. Yugraneft carries on the oil and gas business solely in Russia. Norex asserts that it does not carry on any business in Russia. Nevertheless, its interest in this matter is in respect of its shareholdings in Yugraneft. Consequently, this factor also favours Russia as the appropriate forum.

**(3)    where the cause of action arose**

[97]     Ingosstrakh argues that all of the events underlying this dispute occurred in Russia. It further asserts that the denial of insurance coverage, being the alleged breach of contract, occurred in Russia.

[98]     Norex argues that in an action on an insurance policy, the place where the underlying loss occurred is not relevant and that the relevant factor is the place where the insurance contract was made. Its position is that the Ingosstrakh Policy was "issued within the framework of a joint policy with Chubb" and that the coverage was placed in Calgary. Norex also states that the Chubb policy was issued in Calgary.

[99]      Norex relies on *Gerling General Insurance Co. and American Home Assurance Co. v. PCL Construction Ltd.* ❧ reflex, (1986), 75 A.R. 340 (Q.B.). The facts of that case, however, are distinguishable from those at bar. In *Gerling*, an Alberta contractor was sued in Minnesota for damages resulting from a fire on a job in that state. The contractor's Canadian insurers were named in that action. The insurers then brought an action in Alberta for a determination of the policy limits. Therefore, that case involved in interpretation of an insurance contract made in Alberta between a Canadian insurer and an Alberta contractor in circumstances where an action in respect of the underlying events was already pending in the foreign court. In my view, *Gerling* is not of assistance to Norex.

[100]    The Ingosstrakh Policy is a Russian contract and denial of coverage was made in Russia.  Therefore, this factor favours Russia.

**(4)      where the loss or damage occurred**

[101]    Norex's position on this factor is identical to that on the third factor. Ingosstrakh's position is that the events and losses alleged in Norex's Statement of Claim occurred in Russia. I agree and find that this factor favours Russia.

**(5)      any juridical advantage for the plaintiff in this jurisdiction**

[102]    This factor is the primary focus of Norex's argument. Norex argues at great length that it will be unable to obtain justice in Russia because the Russian courts are corrupt. Ingosstrakh, not surprisingly, says that Norex's position is untenable and avers that Norex can and will get a fair hearing in the Arbitrazh courts in Russia.

[103]    Both parties provided affidavit evidence in support of their views on the Russian courts. Norex provided an affidavit for Professor Bernard Black, a professor of law and business at the University of Texas at Austin, who it describes as "a learned and qualified expert with extensive experience in Russian legal reform". Professor Black makes a number of assertions in his affidavit, including the following:

> 13.      ...Ingosstrakh could procure [a favourable] decision, at any level of the Russian Arbitrazh courts, should it choose to do so.

> . . .

> 16.      In my opinion:

>> (a)      In Russia, judicial corruption is not a question of yes or no, but instead of more or less. The likelihood of corruption in a particular case will depend on the amount at stake, the identity and political influence of the plaintiff and the defendant, the nature of the case, and the willingness of one or both sides to use extralegal tactics.

>> (b)      Russia is a corrupt country. Multi-country surveys of corruption routinely list Russia as among the most corrupt countries in the world. ...As President Putin and the chairs of the Russian Supreme Court and Supreme Arbitrazh Court have acknowledged, corruption extends to the judiciary.

>> (c)      I have personal experience with the pervasive nature of Russian corruption, both during my legal reform work in Russia and through involvement as an expert advisor or expert witness in disputes involving major Russian companies. I know many people, including coauthors, professional colleagues, and friends, who have personal knowledge of Russian judicial corruption in general.

>> (d)      The Russian economy is dominated by a handful of powerful oligarchs who control large industrial empires. Oleg Deripaska is one of the most powerful oligarchs in Russia today. If both parties have roughly equal power and influence, there is a reasonable opportunity to obtain a fair decision from the Russian Arbitrazh courts. However, in a case between a major oligarch-controlled company such as Ingosstrakh and a smaller company, especially a

        foreign company such as Norex, the major company can if it chooses, ensure a favourable judicial decision irrespective of the merits. Based on Deripaska's conduct in other instances, there is a substantial risk that Ingosstrakh would so choose.

. . .

17.    If the question is "*Can* the Russian Arbitrazh courts reach a reasonable decision in this case?" I concur with Professor Solomon that they can. If the question is *Will* they?", there is a substantial risk that they will not.

[104]  Ingosstrakh critiques Professor Black's opinion as relying on "inferences" rather than direct knowledge or proof and upon a selective reading of materials. Ingosstrakh notes that upon cross-examination on his affidavit, Professor Black made a number of admissions, including the following:

(a)    he has only general knowledge of how the Russian legal system operates;

(b)    he is not a scholar of the Russian legal system;

(c)    he has never been qualified as an expert with respect to the Russian judicial system or Russian civil procedure;

(d)    the Russian legal system and institutional framework have undergone a period of change since the fall of the old Soviet Union and that the process of change is ongoing; and

(e)    that he has no direct knowledge that either Ingosstrakh or Oleg Deripaska has ever improperly influenced a Russian judicial proceeding.

[105]  For its part, Ingosstrakh filed affidavits from three persons whom it asserts have expertise in the Russian legal system. One was the affidavit of Professor Igor Petrukhin, the head of the Judicial System Department of the Institute of State and Law of the Russian Academy of Sciences and Professor of the Academic Law School in Moscow. I would not regard him as completely disinterested and unbiased on the issue and I therefore do not find his evidence very helpful.

[106]  Ingosstrakh also filed two affidavits from Professor Peter Solomon, a professor of political science and law at the University of Toronto and head of the Canada-Russia Judicial Partnership, a project funded by the Canadian International Development Agency and based at the Office of the Commissioner for Federal Judicial Affairs. The salient points from Professor Solomon's June 24, 2004 affidavit are as follows:

6.    . . .on all matters connect to this case, the Russian courts (especially the Arbitrazh courts) represent the most competent forum for reviewing the matters under dispute.

. . .

12.    In practice, courts in post-Soviet Russia, including the Arbitrazh courts, have not operated perfectly all of the time. Russia has been involved in a difficult transition process involving the privatization of state owned firms and the replacement of state control over the economy with a system of law-based commercial relations. From 1992, the country's leadership, with significant international support, has invested in strengthening and protecting the integrity of the judicial system, including the Arbitrazh courts. My work with judges, court administrators, and other actors in Russian courts and extensive study of their operations leads me to conclude that the leaders of the Russian judicial community are committed to making the legal guarantees contained in the procedural codes a reality for all participants. It is realistic for persons who litigate in these courts to expect a fair and disinterested resolution of business disputes based on the law and the evidence.

. . .

21.    In light of the above, I am confident that the plaintiffs, if they could prove that the defendants failed to act in good faith in pursuing their claims, could obtain a satisfactory and sufficient remedy from Russian courts. Moreover, only Russian courts are in a position to assess the nature of the change in ownership of the property in question.

[107]   Norex questions Professor Solomon's qualifications to give these opinions. However, I am satisfied that Professor Solomon is appropriately qualified. It is significant that Professor Black, on cross-examination, acknowledged that Professor Solomon is a leading scholar on the Russian courts, though he is admittedly not a legal scholar *per se*.

[108]   Norex also sets out in its brief the following alleged admissions made by Professor Solomon during cross-examination:

> (a)     bribery and corruption involving judges is far less of a problem in Canada that it is in Russia;
> (b)     some judges in the Russian judicial system, especially in Arbitrazh courts, are susceptible to bribes;
> (c)     corruption, bribery and intimidation of judges does exist in the Russian judicial system, although the experts diverge as to how prevalent this is;
> (d)     most judges in Russia are more independent than were their counterparts in Soviet times, especially from sources of external influence, but not as independent as is the norm for judges in mature democracies;
> (e)     approximately 50% of the judges on the Arbitrazh court are holdovers from Soviet times;
> (f)      Arbitrazh courts hear high profile commercial cases in which high stakes easily lead to outside pressures;
> (g)     pressure is brought to bear on judges in Russia from a number of different sources, including oligarchs, corporations and the state;
> (h)     most informed observers in Russia believe that there are more attempts to influence decisions in the Arbitrazh courts than the regular courts;
> (i)      in the big money cases which are handled by the Arbitrazh courts, judges are more likely to approach the potential winners in the case after a review of the merits and ask for money in order to ensure that the proper decision is made. Such money is routinely paid.

[109]   Ingosstrakh takes issue with these alleged admissions, saying that they are taken out of context. In particular, Professor Solomon indicated in his cross-examination that the prevalence of bribery, while negligible in Canada, is also exaggerated in Russia. In my view, the comments made by Professor Solomon in cross-examination are consistent with the view expressed in his affidavit that the Russian courts are evolving and that, while problems remain, progress has been made and continues to be made.

[110]   Ingosstrakh also provided an affidavit from former Chief Judge Ala Bolshova of the Moscow Arbitrazh court. Chief Judge Bolshova made the following comments in respect of Norex's corruption allegations:

> 26.    In my opinion, the Moscow Arbitrazh Court functions well and is an adequate forum to fairly and justly adjudicate the claims set out in the Statement of Claim, especially since Russian law is applicable to the case.
>
>         . . .
>
> 39.    I have reviewed and studied the court decisions that led to the management takeover of Yugraneft by TNK-NV. I see no evidence that the courts' decisions were corrupt or biased. In my opinion, the courts' decisions are in accordance with the appropriate legal principles applicable in the Russian Federation. Moreover, I have never been aware of any information which suggests any reason to have a lack of confidence in the integrity of the courts of the Khanty-Mansiysk Autonomous Region.
>
>         . . .
>
> 46.    Unfortunately, any such implied allegation [of corruption] against me by Mr. Bodnar is characteristic of the many attacks upon the Russian judicial system. They are very typically based upon rumour, innuendo, the barest of speculation and totally lacking in proof. I have consistently asserted that anyone with actual evidence of a judge being guilty of any form of corruption should come forward with that evidence in order that the judge in question can be prosecuted.
>
> 47.    Based on my personal experience of over 40 years as a Judge and later the Chairperson of the Court,

it is my considered view that judicial corruption is neither widespread nor prevalent in the Russian
Federation judiciary. While I acknowledge that instances of judicial corruption may have occurred
in the past, and may occur presently, I believe that the incidence thereof has been grossly overstated
by both Western scholars and the media, both Russian and Western, and that such reports have been
primarily based on anecdotal gossip rather than actual facts.

48.     For example, I was once presented with what was purported to be a "schedule of bribes" for judges
by a magazine which I believe was called "Mergers and Acquisitions". I understand this to be the
same document that was quoted and relied upon by Professor Black in his opinion. I arranged
through my press secretary to meet with the magazine's editor. When I met with the editor, I was
advised that he had no hard data implicating the courts. The editor acknowledged that the source of
this information was purely anecdotal and that he could offer literally no evidence to corroborate it
in whole, or in part.

. . .

50.     Professor Black also asserts that "such payments are widely understood to occur at all levels of the
Arbitrazh courts, including the Supreme Artibtazh Court, both in regional courts and in the Moscow
court. This assertion is based upon allegations and suppositions and not upon facts. I believe this is
pure fiction and totally contrary to my personal experience and knowledge of the Russian judiciary
from within. I am not aware of any judge on my Court, or any other, having taken a bribe.

. . .

54.     In my lengthy career, no one ever exerted improper pressure on me either in Soviet or post-Soviet
times.

. . .

62.     In my opinion, the Russian legal system in general, and the Arbitrazh court in particular, function
well and are an adequate forum to fairly and justly adjudicate the claims set out in the Statement of
Claim.

[111]   Norex takes issue with the manner in which Chief Judge Bolshova's affidavit was drafted and refers to it as
a "sham", essentially implying that it does not represent Chief Judge Bolshova's own opinion. However, Chief
Judge Bolshova in cross-examination was adamant that the contents of the affidavit encapsulate her own views.

[112]   Norex also notes that Chief Judge Bolshova did not refer to external sources in arriving at the opinions
expressed in her affidavit but instead relied solely on her own experience. On this basis, Norex asserts that Chief
Judge Bolshova's opinion that judicial corruption is not widespread in Russia is "either patently false or wilfully
blind". Norex goes onto argue as follows:

By her own admission, Ms. Bolshova has come to deeply love the Russian judicial system. It has been her
passion and her life's work. In the circumstances, she is simply an apologist for the Russian judicial
system. It is submitted that her evidence ought to be discounted on this basis as well.

[113]   I pause at this point to say that I am somewhat disturbed by the vehemence of Norex's reaction to Chief
Judge Bolshova's evidence. As the above excerpts from her affidavit indicate, she acknowledges the possibility of
problems with the Russian judicial system, both past and present. It is clear that she has been dedicated to its
reform and improvement. This, in my view, does not equate to her being an "apologist". Moreover, in respect of
the lack of reference to external sources, Chief Judge Bolshova's affidavit does not purport to be an external
report. It is clear that the affidavit is meant to set out the personal experiences of an insider. I do, however,
recognize that she is not a disinterested witness.

[114]   Norex has referred me to the recent case of *Cherney v. Deripaska* [2008] All. E.R. (D) 37 (Q.B.), a
decision of Mr. Justice Clarke issued July 3, 2008. The case is interesting both because some of the persons

referred to there are also referred to in the case at bar. Also, the court there decided to permit the case to proceed in England because there was a risk that substantial justice might not be done in the Russian court because of the risk of improper influences on that court. Of course, the findings of Mr. Justice Clarke were based on the evidence put before him.

[115]    Here, taking all of the evidence into account, I am satisfied that while corruption in the Russian judicial system is not as pervasive as Norex contends, it does exist. Having said that, I adopt the following comments made by Clarke J. at para. 247 of *Cherney*:

> I should make clear what I am not deciding. I am not deciding that a fair trial can never be obtained in the Russian Arbitrazh system. On the contrary I do not doubt that there are many honest and good judges in the system at every level, who conscientiously seek to do justice according to the relevant legal principles and procedures, who are developing the Arbitrazh system to relate to the commerce of the new Russia, and who do so without improper interference...

[116]    In the end, I find that there is a real risk that Norex could be unable to obtain justice in this case from the Russian courts. It is unreasonable to expect that Norex should be obliged to court that risk. That risk does not exist in the Alberta court, the court to which Ingosstrakh has already attorned. I therefore find that there is a definite juridical advantage to Norex which weighs in favour of this court asserting jurisdiction.

[117]    There is a further juridical advantage that favours Alberta. Alex Rotzang, Chairman of the Board of Norex, deposes that he is unable to enter Russia for fear of arrest and incarceration on what he says are "trumped up" outstanding criminal charges. He also swears that a number of Norex's potential trial witnesses refuse to travel to Russia because of personal security and safety concerns. Thus, if the matter is tried in Russia, Norex will be deprived of the personal attendance of these potential witnesses. That is not the case if the matter is tried in Alberta.

**(6)      any juridical disadvantage for the defendant in this jurisdiction**

[118]    Ingosstrakh notes that the Ingosstrakh Policy contains a choice of law clause that provides that the contract is to be interpreted in accordance with Russian law. It argues that it would be a "massive" juridical disadvantage if this Court were required to attempt to apply Russian law in interpreting the Ingosstrakh Policy.

[119]    In my view, this concern is overstated. As Norex points out, this Court is routinely called upon to apply foreign laws and does so with the aid of experts as needed. Therefore, I see no substantial disadvantage to Ingosstrakh in this respect.

**(7)      the convenience of inconvenience to potential witnesses**

[120]    Both Norex and Ingosstrakh assert that a large number of witnesses will be required in this matter. Norex says that most of its witnesses are in Alberta and Ingosstrakh says that most of its witnesses are in Russia. Both parties point out that the expert witnesses are in Texas, Ontario and Russia.

[121]    Clearly, travel between Alberta and Russia would present an inconvenience to any witness called upon to make the trip, regardless of the direction. Therefore, I consider this factor neutral.

**(8)      the cost of conducting litigation in this jurisdiction**

[122]    Ingosstrakh's position is that the cost and length of the trial would be significantly greater in Alberta than in Russia. It relies on its assertions that most of the witnesses and documentary evidence are in Russia and on its position that the governing law is Russian and that a Russian law expert would therefore be required. Norex argues that this position is not supported by the evidence.

[123]    Given that there is very little evidence on this point, I am not persuaded that there would be significant difference between trying this action in Alberta versus trying it in Russia. Therefore, this factor is neutral.

**(9)    applicable substantive law**

[124]   Ingosstrakh refers to the judgment of the Manitoba Court of Queen's Bench in *Whirlpool Canada Co. v. National Union Fire Insurance Co. of Pittsburgh, PA* 2005 MBQB 205 (CanLII), (2005), 198 Man. R. (2d) 18, 2005 MBQB 205 as authority for the proposition that this factor is determinative. I do not believe that is a correct statement of the law in Alberta. Having reviewed the cases of *Camco International, Shell Canada* and *Wainoco*, I am satisfied that the applicable law is only one factor to be taken into consideration along with the others.

[125]   Norex asserts that it is not a foregone conclusion that Russian law is applicable and states that Russian law certainly will not be applicable to the claim against Chubb. That notwithstanding, as noted above, the Ingosstrakh Policy provides for the application of Russian law. Further, Ingosstrakh takes the position that this provision of the Ingosstrakh Policy was in place because it was required by Russian law. Therefore, I am persuaded that Russian law will be at issue and this factor weighs in favour of Russia as the appropriate forum.

**(10)    difficulty in proving foreign law if necessary**

[126]   Despite this conclusion, I am satisfied that this Court could apply Russian law if it were to assert jurisdiction over this matter. As noted above, this Court often applies foreign law with the assistance of experts where necessary. Therefore, this factor does not weigh in favour of Russia as the appropriate forum.

**3.    Conclusion**

[127]   In reviewing my conclusions with respect to these ten factors, I note the following. Those factors favouring Russia are not, in my view, particularly significant factors. Four of the more significant factors are neutral. The factor which clearly favours Alberta is the plaintiffs' juridical advantage. In my view, it is of fundamental importance that litigants be assured that their dispute will be adjudicated in an honest, fair and unbiased tribunal. No litigant should have to run the risk that the court hearing the dispute might be corrupt. Consequently, taking all of the foregoing factors into account, I conclude that Alberta is *forum coveniens*. There is , however, one further matter to consider.

**C.    Integrated Approach**

[128]   As noted above, the parties were in agreement that this matter requires a two-step inquiry: a determination with respect to jurisdiction *simpliciter* followed by a consideration of *forum conveniens*. However, there is some suggestion in Castel that a more integrated approach may be appropriate. The following comments appear at ——— 10.1 and 11.1:

> Jurisdiction *simpliciter* and *forum non conveniens* have been understood as distinct issues that depend on the application of different criteria. It has been thought that a court should decide first whether it can hear the case based on the connections between the matter and the forum and then, if it can, whether it should exercise discretion to decline to do so. However, recent decisions suggest that these two determinations might be related - that questions of fairness might properly affect the determination of jurisdiction *simpliciter* and that a court should hear a case even if it lacks substantial connections to the forum where it would be unjust to decline to do so.

> . . .some Canadian courts have been prepared to exercise jurisdiction in situations in which the connections between the subject matter of the action and the forum are not substantial when fairness requires them to do so, particularly when the plaintiff is capable of seeking relief in another forum.

[129]   In support of these comments, Castel refers to the case of *Oakley v. Barry* 1998 CanLII 3409 (NS C.A.), (1998), 158 D.L.R. (4th) 679 (N.S.C.A.). In that case, the plaintiff claimed to have received negligent medical treatment while living in New Brunswick. She did not discover the alleged negligence until some years later after having moved to Nova Scotia. She brought suit in Nova Scotia and the defendants brought an application for dismissal on the grounds that Nova Scotia lacked jurisdiction. The application was dismissed and the dismissal was upheld on appeal. The Court of Appeal made the following comments at pp. 693-4 and 699:

I agree with Professor Blom, in his reference to the "open-endedness of the *Morguard* formula" (at p. 393) and his comment that in trying to determine the meaning of order and fairness, in a jurisdiction *simpliciter* case, it may be necessary to take into account factors normally considered in a *forum non conveniens* case "in order to avoid injustice" (p. 387). I repeat what Justice La Forest said about the relationship between these considerations in *Hunt, supra* at 326:

> ...the assumption of and the discretion not to exercise jurisdiction must ultimately be guided by the requirements of order and fairness, not a mechanical counting of contacts or connections.

. . .

> The concept of fairness in determining jurisdiction should be considered from the point of view of both the respondent, as well as the appellants. While this issue, as well as the issue of juridical advantage, are matters that are usually considered on a *forum non conveniens* issue, it is appropriate and relevant to consider them in this case involving jurisdiction *simpliciter*.

[130]   It is unclear to me why the court in *Oakley* refers to jurisdiction *simpliciter* given that it found in that case that there was a real and substantial connection. Nevertheless, I take these comments and those in Castel to mean that, even if I had found that Alberta is not *forum conveniens*, I should still exercise my discretion to hear this matter "if it would be unjust to decline to do so" on the basis that "the plaintiff is incapable of seeking relief" in the alternative forum.

[131]   Adopting this "integrated" approach also results in my finding that it is appropriate for me to exercise my discretion to have this Court hear this matter. The alleged injustice here is based on Norex's corruption allegations against the Russian court. It is on the basis of those allegations that Norex argues it cannot obtain relief in the Russian courts. While I am not prepared to find, positively, that Norex's assertions are fact, i.e. that Norex <u>cannot</u> obtain a fair trial in Russia, I do find that that is a real risk that it will not. Consequently, fairness requires that the Alberta court should not decline to assert jurisdiction over the case.

### D.    Conclusion

[132]   In the result, I find that this Court has jurisdiction *simpliciter* to hear this action. I also find that Alberta is *forum conveniens*. Consequently, this Court should assert its jurisdiction to hear this action. Accordingly, Ingosstrakh's application to strike or stay these claims is dismissed.

### V.    Costs

[133]   If the parties are unable to agree on costs, they may seek directions from me within thirty days of the filing of this judgment.

Heard on the 22nd and 23rd days of February, 2007.
**Dated** at the City of Calgary, Alberta this 18th day of July, 2008.

_____

**C.S. Brooker**
**J.C.Q.B.A.**

**Appearances:**

Eugene J. Bodnar and Alan S. Rudakoff
Macleod Dixon LLP
      for the Plaintiff, Norex Petroleum Limited

J. Robert Black, Q.C.
Brownlee LLP
      for the Defendant, Ingosstrakh Insurance Company Ltd.

Havelock B. Madill, Q.C.
Brownlee LLP
      for the Defendant, Chubb Insurance Company of Canada

Case 1:04-cv-01482-GMS    Document 125-2    Filed 07/30/2008    Page 23 of 23

————————————————————————————————————

**Corrigendum of the Reasons for Judgment**
**of**
**The Honourable Mr. Justice C.S. Brooker**

————————————————————————————————————

Alan S. Rudakoff with MacLeod Dixon LLP should have been included in the Appearances as counsel for the Plaintiffs.